# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMRAM GALMI, Individually and on behalf of all others similarly situated, Plaintiff, | No. 3:17-cv-558 (SRU) |
| v. | |
| TEVA PHARMACEUTICALS INDUSTRIES LTD., et al., Defendants. | |

## <u>RULING ON MOTIONS FOR APPOINTMENT AS LEAD PLAINTIFF</u>

Before me is a consolidated class action against Teva Pharmaceutical Industries Ltd. ("Teva") and three of its executives. The plaintiffs allege that the defendants made materially false and misleading statements that concealed the fact that Teva was engaged in violations of United States antitrust laws. When the falsity of such statements was revealed, Teva's stock price decreased and the plaintiffs suffered damages as a result. Currently pending are three motions for appointment as lead plaintiff, filed by (1) a group calling itself the "Teva Investor Group," which consists of (i) the Oregon Public Employees' Retirement System ("Oregon Fund"), (ii) the Public School Teachers' Pension and Retirement Fund of Chicago ("Chicago Fund"), and (iii) individual investor, Dan Kleinerman; (2) TIAA (f/k/a Teachers Insurance and Annuity Association—College Retirement Equities Fund), which consists of various retirement funds that are owned and managed by TIAA; and (3) Ontario Teachers' Pension Plan Board ("Ontario Fund"), which is a single entity. For the following reasons, I appoint the Ontario Fund as lead plaintiff and approve of its choice of counsel.

## I.    Background

Amram Galmi filed the instant suit in the Central District of California against Teva and two of its executives, Erez Vigodman, and Eyal Desheh, on November 6, 2016.[1]  The complaint alleged two counts of securities violations based on alleged false and/or misleading statements issued by Teva on February 9, 2015, and February 11, 2016.  The underlying misstatements were contained in Teva's 2014 20-F and 2015 20-F forms, which were filed with the Securities and Exchange Commission ("SEC").  Those forms allegedly concealed the fact that Teva was conspiring with other name-brand manufacturers to fix drug prices, in violation of United States antitrust law.  The complaint alleges that, on August 4, 2016, a portion of Teva's prior false statements were disclosed when Teva filed a Form 6-K with the SEC that disclosed the fact that Teva had received a subpoena from the Department of Justice ("DOJ").  The subpoena requested documents and information relating to the marketing and pricing, and communications with competitors concerning, certain generic drugs manufactured by Teva.  On that same day, Teva also announced that it had received an additional subpoena from the Connecticut Attorney General seeking documents and other information relating to potential antitrust law violations.  The complaint alleges that, as a result of those disclosures, the price of Teva's American Depositary Receipts ("ADRs")[2] fell from $55.45 to $54.21, per share, in the trading day following the disclosure.

---

[1] Anthony Leone filed a similar action against the same defendants and an additional defendant, Kobi Altman, on December 27, 2016.  That action was consolidated into the instant action by court order on April 3, 2017, which ordered the matters to be consolidated and transferred from the Central District of California to this district.  *See* Doc. # 19.  The matters arrived with separate case numbers, 3:17-cv-558 and 3:17-cv-559, respectively, and I ordered the cases to be re-consolidated.  Doc. # 120.  Accordingly, the matter will proceed as a consolidated action against Teva, Vigodman, Desheh, and Altman.

[2] An ADR is a stock that trades in the United States but represents a specified number of shares in a foreign corporation.

On November 3, 2016, Teva suffered another decrease in the price of its ADRs, allegedly as a result of an article by *Bloomberg News*, titled, "U.S. Charges in Generic-Drug Probe to be Filed by Year-End." The article indicated that Teva was a potential target of the DOJ's investigation and that it and its executives were at risk of being criminally charged. Immediately following release of the article, the price of Teva's ADRs dropped from $43.33 to $39.20, per share.

On November 6, 2016, Galmi filed the instant suit on behalf of himself and others similarly situated. All agree that the class period at issue is from February 10, 2015, the first trading day following Teva's filing of the initial allegedly misleading Form 20-F, to November 3, 2016, the date of the final corrective disclosure alleged in the complaint.

On January 5, 2017, five plaintiff groups filed competing motions for appointment as lead plaintiff. Since then, two plaintiff groups have withdrawn from consideration. Accordingly, the remaining plaintiffs seeking appointment as lead plaintiff are: (1) the Teva Investor Group, which claims an aggregated loss of $47,843,638; (2) TIAA, which claims an aggregated loss of $42,525,807; and (3) Ontario Teachers' Pension Plan Board ("Ontario Fund"), which claims a loss of $23,236,807.

On April 3, 2017, the instant action was transferred from the Central District of California to this court. The Central District of California did not address the pending motions, so they are ripe for consideration at this time.

## II.    Discussion

### A.    Legal Standard

This action is brought under the Private Securities Litigation Reform Act ("PSLRA"), a statute that was enacted to "prevent 'lawyer-driven' litigation, and to ensure that 'parties with

significant holdings in issuers, whose interests are more strongly aligned with the class of

shareholders, will participate in the litigation and exercise control over the selection and actions

of plaintiffs' counsel.'" *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 615

(S.D.N.Y. 2015) (internal citations omitted).  Under the PSLRA, the Court is required to

"appoint as lead plaintiff the member or members of the purported plaintiff class that the court

determines to be most capable of adequately representing the interests of class members . . . ."

15 U.S.C. § 78u-4(a)(3)(B)(i).  The PSLRA provides that the presumptively most adequate

plaintiff is the "person or group of persons" that: (1) "has either filed the complaint or made a

motion in response to a notice," (2) "in the determination of the court, has the largest financial

interest in the relief sought by the class," and (3) "otherwise satisfies the requirements of Rule 23

of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).  The presumption

of most adequate plaintiff is only rebutted upon a showing that "the presumptively most adequate

plaintiff . . . will not fairly and adequately protect the interests of the class; or . . . is subject to

unique defenses that render such plaintiff incapable of adequately representing the class."  15

U.S.C. § 78u–4(a)(3)(B)(iii)(II); *see also Topping*, 95 F. Supp. 3d at 615.

It is undisputed that each of the proposed lead plaintiffs has satisfied the first prerequisite

of filing a motion in response to a class action notice.  Accordingly, I must next consider which

plaintiff has the "largest financial interest," and whether that plaintiff "otherwise satisfies the

requirements of Rule 23."  15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).  Once I determine that a plaintiff

satisfies those factors, I will appoint that plaintiff as lead plaintiff unless another movant can

rebut the presumption that it will fairly and adequately represent and protect the interests of the

class.  15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

B. Largest Financial Interest

1. *Aggregation of the Teva Investor Group*

The Teva Investor Group asserts that it has the largest financial interest in the litigation. Before determining which of the potential lead plaintiffs has the largest financial interest in the litigation, however, a court must decide whether it will permit a group of persons or entities to aggregate their financial interests. *Varghese*, 589 F. Supp. 2d at 393. The PSLRA expressly allows a "group of persons" to be appointed as lead plaintiff, 15 U.S.C. section 78u-4(a)(3)(b)(iii)(I), but it does not provide any guidance for what a group "can or should be, nor how its members must be related to one another." *Varghese*, 589 F. Supp. 2d at 392. Plaintiffs with a relationship that pre-dates the litigation may aggregate their financial interests and form a putative lead plaintiff group with minimal court scrutiny. *See Maliarov v. Eros Int'l PLC*, 2016 WL 1367246, at *5 (S.D.N.Y. Apr. 5, 2016). When group members have limited or no prior relationship, however, courts look skeptically at whether the grouping operates to circumvent the purposes of the PSLRA. *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 621 (S.D.N.Y. 2015); *Varghese*, 589 F. Supp. 2d at 392 (collecting cases). Some courts simply refuse to permit a group of unrelated investors to aggregate their financial interests to gain the status as lead plaintiff. *See id.* Others say that the PSLRA's failure to prohibit groups indicates Congress's unwillingness to police the manner in which such groups form. *See id.* Most courts strike a balance and only approve the grouping of unrelated investors "if such a grouping would best serve the class." *Id.*; *see also Int'l Union of Operating Engineers Local No. 478 Pension Fund v. FXCM Inc.*, 2015 WL 7018024, at *2 (S.D.N.Y. Nov. 12, 2015) ("The prevailing view in this District is that unrelated investors may join together to aggregate their financial losses only if such grouping would best serve the class." (internal quotation marks omitted)).

A necessary prerequisite to showing that a proposed group would best serve the class is whether it has the ability to "function cohesively and to effectively manage the litigation apart from lawyers[.]." *Varghese*, 589 F. Supp. 2d at 392. Factors indicating the group's ability to function cohesively and separately from its lawyers include evidence of: "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa." *Id.* Courts have also considered the size of the group and have recognized the SEC's position that an investor group should generally not exceed 3-5 members. *See In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1041 (N.D. Cal. 1999).

The Teva Investor Group consists of two institutional investors, the Oregon and Chicago Funds, and an individual investor, Kleinerman, none of whom has a preexisting relationship with the others. The institutional investors hail from different states and Kleinerman lives in a different country. Each entity admits that it formed the group in order to position itself as the presumptive lead plaintiff in this action. Doc. # 17-8 at ¶¶ 1–3. In an attempt to provide an additional reason for their formation, they attest that they joined forces in order to "ensure this action is led by sophisticated investors with experience overseeing counsel in complex litigation," and "to gain the advantages of joint decision-making," including the advantage of "combini[ing each group member's] knowledge, experience, sophistication[,] and resources." Doc. # 49 at 12 (quoting Joint Decl., ¶¶ 5–6). They point out that their diverse backgrounds will bring a wide variety of experience and resources to the table, which will hopefully produce better litigation strategies.

With regard to the plan for communication, the group states that it discussed each party's respective role during a single conference call that was held prior to the filing of the instant motion. Doc. # 48 at 11. The group discussed the potential that conflicts within the group would arise, but proposed no mechanism for resolving such disputes. The parties only agreed that, in the event of a dispute, the parties would work diligently to reach a "consensus," and that each party would work in the best interests of the class. Doc. # 16 at 19.

Although each member has established that it is a sophisticated investor, the members have not adequately explained how they came to meet each other. Without such an explanation, one must assume that the group was arranged—or at least introduced—at the direction of counsel.

Two elements of the Teva Investor Group's relationship stand out as troubling. First, the lack of a preexisting relationship and the lack of an explanation for how the members were introduced to each other indicates that the group has been arranged by counsel. Evidence that the proposed class counsel chose the entities comprising the proposed lead plaintiff group creates a likelihood that the attorneys, not the clients, will control the action. *See In re Petrobras*, 104 F. Supp. 3d at 622. Second, the group's plan for conflict resolution appears too general and not the product of sufficient pre-litigation planning. Although the lack of a specific voting plan is not fatal to the ability of parties to operate as a group, *see In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (approving decisionmaking by "consensus"), it does not provide much comfort to a court that is already skeptical of the parties' relationship. *See In re Tarragon Corp. Sec. Litig.*, 2007 WL 4302732, at *1 (S.D.N.Y. Dec. 6, 2007). Conclusory statements such as "each group member shares a common purpose or goal in obtaining a recovery in the lawsuit" are not evidence of a group's cohesiveness. *Id.* Moreover, the fact that

the group's plan for cooperation was devised at a single conference call does not give the court

confidence of its ability to manage conflicts that may arise in the litigation.  *See Khunt v. Alibaba*

*Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 533 (S.D.N.Y. 2015).  Finally, the group does not

submit any information regarding how the appointment of two law firms as co-lead counsel is

necessary, let alone preferred, nor has it identified the division of authority or the responsibility

between the two firms.  *See In re Petrobras*, 104 F. Supp. 3d at 623.

      Even if a group is able to show that it is able to function cohesively and effectively

manage the litigation, courts will not permit aggregation of their financial interests if it apparent

that the group "has been assembled as a makeshift by attorneys for the purpose of [obtaining lead

plaintiff status]."  *Varghese*, 589 F. Supp. 2d at 392–93 (citing *In re Tarragon*, 2007 WL

4302732, at *1).  That is because such aggregation is exactly the "type of lawyer-driven action

that the PSLRA eschews."  *Goldberger v. PXRE Group, Ltd.*, 2007 WL 980417, at *5 (S.D.N.Y.

Mar. 30, 2007).  The PSLRA was enacted to "transfer primary control of private securities

litigation from lawyers to investors."  *In re Petrobras*, 104 F. Supp. 3d at 621 (quoting S. REP.

104–98, at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685) (internal quotation marks

omitted).  "Allowing unrelated plaintiffs to band together in order to manufacture a larger

financial interest does just the opposite [by ensuring] that the lawyers, who are invariably the

matchmakers behind such marriages of convenience, are the true drivers of the litigation."  *Id.* at

621–22.  Permitting unrelated investors to form a group of lead plaintiffs also "creates problems

of coordination, risks duplication of effort, and reduces the incentive of any individual group

member to carry out its lead plaintiff duties to the fullest extent."  *Id.* at 622.  Though the lack of

a pre-litigation relationship is not fatal to a group's attempt to be appointed lead plaintiff, it will

be looked upon unfavorably as evidence that the group was "cobbled together" by counsel for

the sole purpose of securing status as lead plaintiff/appointed class counsel. *See id.* at 623. Such a concern is particularly apparent when aggregating the financial interests of unrelated investors "would displace the institutional investor preferred by the PSLRA." *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005).

As stated above, the three members of the Teva Investor Group have submitted no evidence of how they came to be introduced to each other. Absent such evidence, one must assume that they were introduced by the two law firms, Pomerantz LLP and Cohen Milstein Sellers & Toll, PLLC, that currently seek to represent the class in this action. Interestingly enough, there is also some indication that the Teva Investor Group formed as a result of an agreement between Pomerantz and Cohen Milstein that spans multiple cases. *See* Doc. # 33 at 18 n.8. On January 5, 2017, the day the lead plaintiff motions in this case were due, Pomerantz (representing another investor group) and Cohen Milstein (representing Kleinerman) were adverse to one another in a separate class action in which they each were competing for appointment as lead counsel. *Id.* After the filing of the Teva Investor Group's motion for appointment as lead plaintiff in this action, in which they identified both firms as co-lead counsel, they advised the court in the other action that they had reached an agreement in which their clients would form a group and they would seek to serve as co-lead counsel. The result of which is that both firms are now potentially eligible to serve as co-lead counsel in both actions. At a minimum, those events provide circumstantial evidence that the grouping of investor plaintiffs in this action (and the other action) was the result of an agreement between Pomerantz

and Cohen Milstein.  Such an agreement is evidence of exactly the type of lawyer driven litigation that the PSLRA sought to avoid.[3]

The instant case is not similar to the cases cited by the Teva Investor Group, in which the court permitted a group of unrelated investors to serve as lead plaintiff.  Courts who have appointed a group of unrelated investors as lead plaintiff have done so when such appointment was unopposed, *Johnson v. Pozen Inc.*, 2008 WL 474334, at *1 (M.D.N.C. Feb. 15, 2008), when no individual entity was eligible for appointment as lead plaintiff, *In re Host Am. Corp. Sec. Litig.*, 236 F.R.D. 102, 106 (D. Conn. 2006), or in circumstances in which the group offered something that the other proposed lead plaintiffs did not.  *In re Flight Safety Techs., Inc. Sec. Litig.*, 231 F.R.D. 124, 131 (D. Conn. 2005).  Moreover, courts are more willing to permit a group of unrelated investors if the group contains an individual investor that would otherwise be entitled to the status as presumptive lead plaintiff.  *Robb v. Fitbit Inc.*, 2016 WL 2654351, at *5 (N.D. Cal. May 10, 2016); *Bruce v. Suntech Power Holdings Co.*, 2012 WL 5927985, at *2 (N.D. Cal. Nov. 13, 2012).  Although the Teva Investor Group argues that one of its members, Kleinerman, has the largest financial stake in the litigation, that relies on the assumption that the TIAA's claimed interest is overstated—something that will be discussed below.  Even if it turns out that Kleinerman does have the largest individual financial stake, it does not alleviate my concerns that the Teva Investor Group has many of the hallmarks of a group formed by an operating at the direction of its attorneys.

---

[3] Groups of investors are not prohibited from joining forces in order to claim the largest stake in the litigation and obtain the status as presumptive lead plaintiff.  One cannot fault an investor from seeking to maintain control of the litigation.  However, the lack of a pre-existing relationship and evidence that the arrangement was facilitated by counsel who seeks to be appointed as class counsel require close examination.  *See Varghese*, 589 F. Supp. 2d at 392–93; *Goldberger*, 2007 WL 980417, at *5.  Absent strong evidence that the group is a cohesive unit driven by the clients, not its lawyers, such a group may not aggregate its financial interests and receive the benefit of being the presumptive lead plaintiff.

In sum, the Teva Investor Group members cannot aggregate their financial stakes in the

litigation because they are "unrelated entities that (1) do not have a pre-existing relationship; (2)

do not have an adequate plan for cooperation; and (3) have not shown that their grouping was not

the product of lawyer-driven litigation." *See Int'l Union of Operating Engineers*, 2015 WL

7018024, at *3.[4]

2.  *Aggregation of the TIAA Funds*

TIAA seeks to establish itself as the presumptive lead plaintiff by aggregating the

financial interests of nine of its investment funds.  The Teva Investor Group challenges TIAA's

ability to form as group under the PSLRA but it does not provide any authority to suggest that

TIAA, an individual nonprofit organization that manages various investment funds, should be

considered as a group rather than an individual investor.  Even if considered a group, the

grouping of various investment funds that TIAA manages would not offend the purposes of the

PSLRA.  Unlike the Teva Investor Group, the nine funds operated by TIAA were formed and are

operated by the same entity.  In other words, the funds had a preexisting relationship with each

other prior to the initiation of this action.  Moreover, there is nothing to suggest that the funds are

unable to function as a cohesive unit.  TIAA is the entity acting on behalf of each of the funds,

which have interests that are closely aligned with each other.  To the extent that the PSLRA

would consider the nine funds as a group of investors, as opposed to viewing TIAA as the

---

[4] In holding that the Teva Investor Group is not entitled to aggregate its individual financial interests, I do not intend
to express a general unwillingness to appoint a group as lead plaintiff.  I join other courts in recognizing that groups
often serve an important purpose.  *See In re Flight Safety*, 231 F.R.D. at 131.  A small group that represents a
diverse array of interests can often reasonably be expected to represent the diverse array of plaintiffs that comprise
the class.  *Id.*  Nevertheless, I decline to permit the Teva Investor Group to aggregate its individual stakes and, in
effect, steal the presumption as lead plaintiff from either a single entity or one that was formed for reasons unrelated
to its desire to serve as lead plaintiff.  *See In re eSpeed*, 232 F.R.D. at 100.

individual investor who has multiple different types of holdings, such grouping would be consistent with the proposes of the PSLRA.

### 3. *TIAA's Financial Interest*

The PSLRA "offers no guidance" with respect to how to measure a proposed lead plaintiff's financial interest in the litigation. *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 394 (S.D.N.Y. 2008). Courts within the Second Circuit generally rely on the factors known as the *Lax/Olsten* factors. *Id.* at 395 (citing *Lax v. First Merch. Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997), and *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)). Those factors include:

> (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered.

*Varghese*, 589 F. Supp. 2d at 395. Courts agree that the last factor, "approximate losses suffered," is the most important factor and is often dispositive. *See id.* (collecting cases). Below is a chart representing the *Lax/Olsten* factors with respect to the proposed plaintiffs' own estimates (numbers are estimated to the nearest 100,000 shares and $1,000,000):

| Movant | Total ADRs | Net ADRs | Total Net Expenditure | Last-in-First-Out ("LIFO") Computed Losses |
|---|---|---|---|---|
| Teva Investor Group | 8.7 Million | 2.6 Million | $148 Million | $48 Million |
| TIAA | 6.3 Million | 1.8 Million | $109 Million | $43 Million |
| Ontario Fund | 1.4 Million | 1 Million | $58 Million | $23 Million |

12

Because I do not permit the Teva Investor Group to aggregate its individual financial interests at stake, TIAA appears to be the movant with the largest financial interest in the litigation. Taking TIAA's claimed losses as true, the *Lax/Olsten* factors weigh in favor of TIAA over the Ontario Fund in every respect. TIAA claims approximately $42.5 million in losses, 6.3 million total ADRs purchased, 1.8 million net ADRs purchased, and a total net expenditure of $109 million. The Ontario Fund claims approximately $23 million in losses, 1.4 million total ADRs purchased, 1 million net ADRs purchased, and a total net expenditure of $58 million.[5] The parties opposing TIAA's motion for appointment as lead plaintiff assert that TIAA's financial interest is overstated because it includes losses attributable to so-called "in-and-out" trading. In-an-out trading refers to stocks that were purchased after the alleged fraudulent conduct but sold before the subsequent disclosure of such conduct. The opposing movants argue that in-and-out trading losses cannot be directly tied to the misconduct alleged in the complaint, and therefore that TIAA should not be able to include them in its estimate of total losses caused by Teva's conduct.

Neither the Supreme Court nor the Second Circuit has offered guidance on the appropriate method of calculating financial losses for the purposes of a lead plaintiff motion. However, courts within this Circuit overwhelmingly agree that a movant may only include "losses that will actually be recoverable in the class action." *Topping*, 95 F. Supp. 3d at 617 (emphasis added); *see also In re VimpelCom, Ltd.*, 2016 WL 5390902, at *2 (S.D.N.Y. Sept. 26, 2016); *Maliarov*, 2016 WL 1367246, at *2; *Khunt*, 102 F. Supp. 3d at 531. To determine which types of losses are recoverable, courts have looked to *Dura Pharmaceuticals, Inc. v. Broudo*, 544

---

[5] The Ontario Fund includes estimates of its losses that range from $23,236,126 to $24,243,959. *Compare* Doc. # 25 at 7, *with* Doc. # 33 at 30. I do not need to decide which figure is accurate because the fund is in the same position under either estimate. In fairness to the other movants, I accept the smallest estimate of approximately $23 million.

U.S. 336 (2005), a seminal Supreme Court case concerning the plaintiff's ability to recover in a PSLRA action. *See Khunt*, 102 F. Supp. 3d at 531.

To state a claim for damages in a securities fraud action, a plaintiff must do more than assert that it purchased a security that was artificially inflated as a result of the defendant's false statement. *Dura*, 544 U.S. at 343. That is because a plaintiff suffers no harm when it buys and sells a stock during the period that the stock price is artificially inflated. *Id.* at 342. Any losses from so-called in-and-out trading are due to inherent market fluctuations and cannot be traced to the company's fraudulent statement. *See id.* at 342–43. To allege an actual injury, a plaintiff must show that it purchased a stock at an artificially inflated price and that "the company's stock price later declined (and thus caused plaintiff's shares to be worth less) immediately following a disclosure of the alleged misconduct to the public." *In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *4 (E.D.N.Y. Mar. 2, 2007), *adhered to on reconsideration*, 2008 WL 820015 (E.D.N.Y. Mar. 25, 2008) (citing *Dura*, 544 U.S. at 344–47).

Although *Dura* was a case that involved the pleading standards for alleging loss causation, its reasoning has been extended to the context of a motion for appointment as lead plaintiff. *See Maliarov*, 2016 WL 1367246, at *2; *Topping*, 95 F. Supp. 3d at 617; *Khunt*, 102 F. Supp. 3d at 531. Courts within the Second Circuit consistently hold that, when calculating a proposed lead plaintiff's estimated losses, the court "should not include losses resulting from in-and-out transactions, which took place during the class period, but before the misconduct identified in the complaint was ever revealed to the public." *Topping*, 95 F. Supp. 3d at 618 (internal quotation marks and alterations omitted); *Khunt*, 102 F. Supp. 3d at 531 ("If a lead plaintiff movant cannot recover a given loss in the action he seeks to lead, the loss cannot logically contribute to his financial stake in that action.").

14

In the instant case, TIAA claims total losses of $42.5 million during the class period. The Teva Investor Group and the Ontario Fund both put forward evidence that much of TIAA's purported losses are based on in-and-out trading—ADRs that were bought and sold during the class period and prior to the disclosure of Teva's alleged false statements. The Ontario Fund also puts forward evidence that some of TIAA's claimed losses were the result of ADRs purchased after the final corrective disclosure. In other words, the competing movants argue that much of TIAA's losses cannot be attributable to the materialization of the risk that Teva fraudulently concealed.

TIAA does not dispute the Ontario Fund's calculations with respect to TIAA's losses that occurred prior to the August 4, 2016 disclosure or that were the result of ADRs purchased after the extent of the fraud was fully disclosed on November 3, 2016. Rather, TIAA's main challenges to the Ontario Fund's loss calculation method are that it lacks basis in law and is the product of gamesmanship. Doc. # 47 at 11.

TIAA cites to authority indicating that the court must only consider the "losses" suffered by the competing movants. Doc. # 47 at 12. That authority is unhelpful to the court because those cases do not adequately consider which losses should be considered. I agree with the proposition set forth in those decisions that LIFO and FIFO are the "preferred" methods for calculating losses. *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2016 WL 5867497, at *2 n.2 (S.D.N.Y. Oct. 4, 2016) (expressing a preference for LIFO). However, those accounting methods should only be used to account for losses that can be tied to the alleged fraud. *See Khunt*, 102 F. Supp. 3d at 531 ("If a loss is not *Dura* eligible then it is not redressable through the putative class action[.]"). Surely the cases cited by TIAA would not permit a movant to include trading losses wholly unrelated to the defendant's conduct, such as losses incurred

15

outside the class period, even if the movant used the appropriate accounting method. *See, e.g., Bodri v. Gopro, Inc.*, 2016 WL 1718217, at \*3 (N.D. Cal. Apr. 28, 2016) (recognizing that losses must be confined to those suffered during the class period). The question of the appropriate accounting method is wholly unrelated to which types of losses the court may consider.

I am not persuaded by out-of-circuit cases cited by TIAA that have refused to consider the *Dura* loss calculation method at the lead plaintiff stage. *See, e.g., In re Watchguard Sec. Litig.*, 2005 U.S. Dist. LEXIS 40923, at \*14–15 (D. Wash. July 13, 2005). After all, one's financial interest in the litigation can only consist of what one can recover in that action. *See Khunt*, 102 F. Supp. 3d at 531. A plaintiff that fails to allege the existence of a partial disclosure causally related to its losses cannot recover damages for its in-and-out trading losses. *See In re Flag*, 574 F.3d at 40. Accordingly, I align myself with the significant weight of authority in concluding that *Dura*'s loss calculation method must be undertaken when considering a lead plaintiff motion. *See Khunt*, 102 F. Supp. 3d at 531–32 (characterizing analysis as "Dura Recoverable Losses Using LIFO Accounting"); *Topping*, 95 F. Supp. 3d at 618.

With respect to TIAA's allegations of gamesmanship, I recognize the need to be wary of eleventh-hour shifts in strategy, *see Maliarov*, 2016 WL 1367246, at \*4. TIAA argues that the Ontario Fund seeks to devise its own methodology in an opposition brief that takes into account the particular nuances of the competing movant's transactions. TIAA correctly notes that courts have refused to allow parties to change their position on the appropriate methodology for measuring total financial interest. *See Bodri*, 2016 WL 1718217, at \*3 (court refused to use the "retained shares" methodology when the moving parties had initially focused solely on "estimated losses"). In *Bodri*, the court adhered to an evaluation of estimated losses as the primary proxy for greatest financial interest, noting that "no party has presented the Court with

16

an alternative calculation for estimated losses during this time period." *Id.*, at *4. Such a scenario is not similar to the instant case. The Ontario Fund does not seek to utilize an alternate methodology of evaluating TIAA's financial interest. Rather, the Ontario Fund agrees that total losses are an appropriate measure of greatest financial interest. It only disputes the manner in which TIAA estimates such loses and seeks to impose a requirement that the estimate only include losses that are recoverable in this action.

Moreover, the Ontario Fund cannot be faulted for failing to raise the notion of *Dura* recoverable losses in its initial motion because its own purported losses are largely unaffected by an application of *Dura*. *See* Doc. # 33 at 30. The Ontario Fund had no reason to know that TIAA would seek to include significant losses incurred prior to the August 4, 2016 disclosure. Accordingly, it had no reason to raise the issue of *Dura* loss calculation before opposing TIAA's motion.

Finally, regardless of gamesmanship, I must adhere to the law. The Court in *Dura* made it clear that a plaintiff can only recover for losses that are attributable to the materialization of the risk concealed by the defendant's fraudulent statement. *See In re Flag*, 574 F.3d at 40 (citing *Dura*, 544 U.S. at 340). Accordingly, I will only consider such losses in determining which plaintiff has the greatest financial stake in the litigation. *Khunt*, 102 F. Supp. 3d at 531–32; *Topping*, 95 F. Supp. 3d at 618. The fact that each of the parties failed to calculate their estimated losses in light of what is recoverable under *Dura* does not prohibit the court from considering what it believes to be the proper standard for loss calculation.

I understand TIAA's frustration with the burden I have imposed on it to support its claim for recoverable losses. However, doing so is better than simply taking each plaintiff's estimation at face value without evaluating whether that estimate bears any relationship to the plausible

17

recoverable losses in the case. *See Comverse*, 2007 WL 680779, at \*6. That lack of inquiry
would not serve the purposes of the PSLRA, which seeks to hand the reigns of class action
litigation to the most adequate plaintiff—not the plaintiff who has posited itself as most
adequate.[6]

In its reply brief, TIAA attempts to take advantage of an exception to the general rule that
one cannot recover losses incurred prior to the alleged disclosure of the fraudulent statement. A
plaintiff who has sold its shares prior to the alleged disclosure date can only recover damages if
it can show that its losses were the result of some other "materialization of the concealed risk."
*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009). Proceeding under
what is known as a "leakage theory," a plaintiff may allege facts showing that evidence of the
existence of a false statement "began to leak" prior to the date the statement's falsity was fully
disclosed. *Id.* Such disclosures, often referred to as "partial corrective disclosures," enable a
plaintiff to prove that it was harmed notwithstanding the fact it sold its shares prior to the
complete disclosure of the alleged fraud. *See In re Gentiva Securities Litigation*, 281 F.R.D.
108, 120 (E.D.N.Y. 2012). Because TIAA is permitted to proceed under a "leakage theory," the
fact that most of its losses are attributed to shares sold prior to the August 4, 2016 disclosure
does not necessarily render it incapable of acting as lead plaintiff. *Gentiva*, 281 F.R.D. at 116
(citing *Juliar v. Sunopta Inc.*, 2009 WL 1955237, at \*2 (S.D.N.Y. Jan. 30, 2009)).

---

[6] Given the early stage of the litigation, my calculation of financial losses attributable to Teva's conduct is only
meant to be an estimate and is not a binding decision on loss calculations or loss causations. *See Pio v. Gen. Motors
Co.*, 2014 WL 5421230, at \*6 (E.D. Mich. Oct. 24, 2014). The fact that it is an estimate based on limited
information does not make it an inappropriate inquiry, so long as the estimate is based on the best available
information. If it is apparent that a particular movant seeks to include losses that it lacks a plausible basis for
seeking recovery, those losses should not be included in the determination of that movant's financial interest in the
case. *See Topping*, 95 F. Supp. 3d at 618. I am mindful of the risk that undertaking such an inquiry could lead to
"satellite litigation between competing movants, requiring significant judicial resources[.]" *Pio*, 2014 WL 5421230,
at \*8. However, in the context of a fraud-on-the-market action with two corrective disclosures, I am not persuaded
that it is exceedingly difficult for a court to assess which of the movant's losses were realized prior to the first of
those disclosures.

In an attempt to show that its losses incurred prior to the August 4, 2016 disclosure are actually recoverable in this action, TIAA points to earlier partial disclosures of Teva's misconduct that have not been identified in the complaint. TIAA alleges six events, occurring prior to August 4, 2016, that revealed a portion of Teva's alleged misconduct and caused the price of Teva's ADRs to drop as a result: (1) On September 9, 2015, *BMI Research* reported the fact that the Israel antitrust authority was investigating allegations of price fixing at one of Teva's drug distribution subsidiaries; (2) on September 25, 2015, *FDA Week* reported that Secretary Clinton announced a drug-pricing plan that included a ban on pay-for-delay anticompetitive practices; (3) on November 4, 5, and 9, 2015, *US Official News* and *Boston Business Journal* reported various settlements between Cephalon, a company acquired by Teva, and various state enforcement agencies regarding anticompetitive drug overcharging; (4) on November 30, 2015, Teva filed a Form 6-K with the SEC that disclosed allegations of its practice of over-charging for a share of Medicaid drug reimbursement costs; (5) on February 11, 2016, *Business Wire* reported about Teva's unfavorable 2015 annual and fourth quarter financial results; and (6) on March 31, 2016, the *Susquehanna Financial Group* mentioned Teva's involvement in a report on the Federal Trade Commission's push to bar anticompetitive pay-for-delay practices. *See* Doc. # 47 at 16. If TIAA is permitted to rely on those partial disclosures, it may be able to show that its alleged losses are actually recoverable in this action.

Courts have grappled with whether or not to allow a proposed lead plaintiff to proceed under a "leakage theory" that has not been supported by allegations in the complaint. *See Maliarov*, 2016 WL 1367246, at *3; *Gentiva*, 281 F.R.D. at 115; *Comverse*, 2007 WL 680779, at *6. On the one hand, "plaintiffs should not be penalized at the pleading stage for failing to enumerate every corrective disclosure in their initial complaints[.]" *Comverse*, 2007 WL

680779, at *6. Given the frequency with which an amended complaint is filed following the appointment of lead plaintiff, it would be unfair to exclude an investor from consideration as lead plaintiff unless it is apparent that it has not suffered any recoverable loss based on a leakage theory. *See In re Star Gas Sec. Litig.*, 2005 WL 818617, at *7 (D. Conn. Apr. 8, 2005) (holding that it was premature to limit plaintiff class before appointing lead plaintiff and recognizing that appointed lead plaintiffs would have opportunity to amend complaint to include allegations not made by first-filing plaintiff). On the other hand, it would be "unfair to speculate that [the proposed lead plaintiff] will ultimately be able to demonstrate loss causation for its in-and-out transactions, despite its patent failure to allege facts in support thereof." *Comverse*, 2007 WL 680779, at *6. Permitting such speculation would encourage proposed lead plaintiffs to "overstate their losses at the outset of a lawsuit," in the hope that, by the time their true interest is revealed, it is "too late to appoint a more deserving lead plaintiff." *Id.*

Striking a balance between the identified concerns, courts have required proposed lead plaintiffs to rely only on theories of recovery that can be supported by facts alleged in the complaint and declarations of the moving parties. *See id.* (internal citations omitted); *see also Maliarov*, 2016 WL 1367246, at *3. In *Maliarov*, the Court refused to credit a plaintiff's purported financial interest because it was apparent that he sold all of its shares prior to the disclosure of the company's fraud. Although the plaintiff attempted to proceed under the "leakage theory," it did not "identify any particular communication partially disclosing allegations of fraud prior to [the corrective disclosure date], but instead relie[d] on unsupported allegations that those with 'early access to the [financial statement]' leaked such information in an unspecified manner." *Id.*, at *3. Because the plaintiff did not "allege facts in support of his

leakage theory," the Court held that he had "not adequately established that he [] suffered any recoverable losses for the purpose of the lead plaintiff analysis." *Id.*

In contrast, the Court in *Gentiva* permitted a plaintiff to serve as lead plaintiff even though it sold "most, if not all," of its shares before the full extent of the alleged fraud had been disclosed. *Gentiva*, 281 F.R.D. at 115, 117. The plaintiff in that case relied on a leakage theory, in which the truth of the alleged fraud "leaked out" in the form of partial disclosures, reducing the price of the company's stock before the plaintiff sold its holdings. *Id.* at 115. The Court was aware of the danger of appointing a plaintiff that has sold a majority of his stock prior to the corrective disclosure alleged in the complaint, but also recognized that "selling shares during the class period does not disqualify a class member from being appointed lead plaintiff." *Id.* at 116. The plaintiff's "several plausible and legitimate partial disclosures" supported the plaintiff's claimed losses, and the Court recognized that in-and-out traders were not *per se* barred from serving as lead plaintiff. *Id.* at 115. The Court distinguished other courts' refusals to appoint in-and-out traders as lead plaintiffs because such refusals were based on the "complete absence of partial corrective disclosures or in light of speculative or highly questionable partial disclosures." *Id.* (collecting cases). So long as a partial disclosure can be plausibly alleged, a proposed lead plaintiff should not be precluded from relying on that disclosure to establish recoverable losses. *Id.* at 115–16.

TIAA provides neither citations to publicly available documents nor a sworn affidavit in support of its alleged partial disclosures, so the court is not in an ideal position to determine whether they are plausible allegations of partial disclosures.[7] That alone may be sufficient to

---

[7] I also note that TIAA makes no mention of the additional partial disclosures in its initial motion papers. Instead, it referred to August 4, 2016, as the date of the first disclosure. Doc. # 22 at 3–4.

prevent TIAA from claiming losses that resulted from those alleged disclosures.  *See Comverse*, 2007 WL 680779, at *6 (claimed losses must be based on facts alleged in pleadings).

Even if I am permitted to take the allegations supplied in reply brief as true, disclosures # 2, 4, 5 and 6 cannot be considered partial disclosures because they are not related to the misconduct alleged in the complaint.  The underlying fraud in this case is that Teva was engaged in anticompetitive pricing practices with other generic drug makers.  There are no allegations in any of the complaints regarding false earning reports, Medicaid fraud, or pay-for-delay anticompetitive practices.  The PSLRA was not intended to operate as an "insurance policy" against market losses.  *See Dura*, 544 U.S. at 347–48.

The lack of additional information regarding the remaining alleged partial disclosures makes it difficult to determine whether such disclosures enable TIAA to plausibly alleged that pre-August 2016 trading losses were the result of Teva's fraudulent conduct.  The September 9, 2015 disclosure that Israeli antitrust authorities were investigating a Teva subsidiary for potential price fixing reveals nothing about whether Teva itself was engaged in such price fixing.  The complaint does not allege anything with respect to Teva's drug distribution subsidiaries and there is no allegation that Teva ever made false statements or omissions about their alleged anticompetitive practices.  The November 4, 5, and 9, 2015 disclosures bear a slightly closer relationship to the facts alleged in the complaint.  Those disclosures related to potential anticompetitive drug overcharging by Cephalon, a company that Teva has acquired.  Still, there is not sufficient information to conclude that such disclosures are plausibly related to the misconduct alleged in the complaint.  From the barebones statement in the reply brief, there is no indication of when Teva acquired Cephalon.  If Teva did not own Cephalon in November 2015, the fact that Cephalon was engaged in antitrust violations is irrelevant.  Even if Teva had

acquired Cephalon prior to November 2015, the mere fact that Cephalon might have been

engaged in antitrust violations does not reveal the existence of Teva's own misconduct.  In that

respect, even the November 2015 disclosures are a far cry from the "plausible and legitimate"

partial disclosures that are required to support an in-and-out trader's lead plaintiff motion.  *See*

*Gentiva*, 281 F.R.D. at 115–16.

In *Gentiva*, the complaint alleged that Gentiva had falsely concealed the fact that it was

engaged in Medicare fraud.  The alleged partial disclosures all related to the fact that Gentiva

was currently under investigation for such fraud.  *Id.*  Although not every statement contained

the words "Medicare," and "fraud," each statement could not be viewed in a vacuum and, when

viewed together, could reasonably lead to the conclusion that Gentiva had concealed the

existence of the prior Medicare fraud.  *Id.* at 116.  In contrast, the statements put forward by

TIAA at most indicate that some of Teva's affiliates were being investigated for potential

anticompetitive practices.  Although such investigations might have contributed to a decline in

Teva's stock price, the factual allegations are not sufficient for me to conclude that those

statements revealed any indication that Teva itself was engaged in a price fixing conspiracy with

other drug manufacturers that it fraudulently concealed.  Accordingly, I will not permit TIAA to

rely on the partial disclosures identified in its reply brief.  Without such additional partial

disclosure allegations, TIAA cannot establish recoverable trading losses of $42.5 million for the

purposes of their lead plaintiff motion.

Because I conclude that TIAA has not plausibly alleged any partial disclosures prior to

August 4, 2016, I do not consider any losses attributed to shares that were sold prior to that date.

Doing so requires me to disregard any trading losses suffered by the five TIAA funds that

retained no shares as of August 4, 2016.  That reduces TIAA's recoverable losses from

approximately $42.5 million to approximately $22.6 million.  Doc. # 33 at 25.  TIAA's

recoverable losses are further reduced to approximately $20.3 million, which represents an

elimination of $2.3 million in losses TIAA incurred as a result of ADR purchases *after* the full

extent of the fraud was disclosed.  *Id.* at 26.  TIAA cannot attribute such losses to Teva's

fraudulent statements because the falsity of those statements had been disclosed, and the market

had corrected for such disclosure, before TIAA made the additional purchases.[8]  *Id.* at 27.

Although TIAA points out the frequency with which subsequent disclosure dates are alleged,

which would permit recovery for ADRs purchased following the November 3, 2016 disclosure, I

cannot consider hypothetical subsequent disclosures that have not yet been alleged.  Finally,

TIAA's losses are further reduced to take into account losses allegedly incurred by the remaining

four eligible funds prior to August 4, 2016.  An evaluation of the trading losses suffered by the

four TIAA funds still holding shares on August 4, 2016, shows that the majority of those losses

were realized prior to that date.  *See* Doc. # 34-6.  In fact, only $7.6 million in losses incurred by

the remaining TIAA funds can be traced to the two disclosures alleged in the complaint.  *See id.*;

Doc. # 33 at 30.[9]  Accordingly, when considering TIAA's financial interest in the litigation, I

will only consider $7.6 million of its losses as recoverable.

I now consider the *Lax/Olsten* factors using the revised calculation of TIAA's

recoverable losses.  TIAA has the greatest number of total shares purchased, 6.3 million, net

shares purchased, 1.8 million, and net funds expended, $108.6 million.  Doc. # 35 at 9.  The

---

[8] The Ontario Fund points out that TIAA purchased Teva ADRs on November 3, 2016, the same day as the final disclosure alleged in the complaint.  Prior to that disclosure, in the form of a *Bloomberg* publication at 2:10 p.m., Teva's ADRs traded between $42 and $43 per share.  Immediately following the article, the price of Teva's ADR began to drop, ultimately closing at $39.17 per share.  The fact that TIAA paid a price of $39.20 per share establishes that the purchase was made following the disclosure of the *Bloomberg* article that was published earlier that day.  *See* Doc. # 33 at 27.

[9] Aside from general objections already discussed, TIAA does not dispute the accuracy of Ontario Fund's analysis of trading losses tied to the alleged disclosures.

remaining movant, Ontario Fund, only had 1.4 million total shares purchased, 1 million net

shares purchased, and $58 million net funds expended.[10]  *Id.*  From an analysis of the first three

factors, it appears that TIAA retains the largest financial interest in the litigation.  However, the

final, and consistently most important factor, weighs against TIAA.  TIAA's recoverable losses

total approximately $7.6 million.  That figure is dwarfed by the recoverable losses of the Ontario

Fund, which are approximately $23 million.  This case does not involve a situation in which the

recoverable losses are of the same magnitude, causing courts to instead rely on the first three

*Lax/Olsten* factors.  *See Juliar*, 2009 WL 1955237, at *2.  Rather, this is a case in which, by

establishing far greater recoverable losses, one investor has clearly demonstrated a greater

financial interest in the litigation.  *See Varghese*, 589 F. Supp. 2d at 395; *Topping*, 95 F. Supp.

3d at 617.  Accordingly, I conclude that the Ontario Fund has the largest financial interest in the

litigation.

C.  Otherwise Satisfy Requirements of Rule 23

The plaintiff with the greatest financial stake in the litigation will only be entitled to the

status as presumptive lead plaintiff if it can show that it "otherwise satisfies the requirements of

Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).  Rule 23

---

[10] I recognize that I have the discretion to consider Kleinerman, an individual investor with a claimed financial loss of approximately $30 million, as a potential lead plaintiff even though he did not individually move to be appointed. *See Varghese*, 589 F. Supp. 2d at 394; *but see In re Petrobras*, 104 F. Supp. 3d at 624 n.4 (declining to consider member of a group who did not move to be individually appointed).  Nevertheless, I do not consider him for appointment as lead plaintiff because of my concerns, already discussed, that he is controlled by counsel.  Also, given his status as a potential "day trader," he may be subject to unique defenses that make him an inappropriate lead plaintiff.  *See Stooler v. Direxion Shares ETF Trust*, 2010 WL 3199679, at *4 (S.D.N.Y. Aug. 12, 2010), *as corrected* (Aug. 16, 2010) (day traders potentially subject to unique defenses); *but see Prefontaine v. Research in Motion Ltd.*, 2012 WL 104770, at *4 (S.D.N.Y. Jan. 5, 2012) (day traders not subject to unique defenses).  The merits of whether the day trading defense is actually the prevailing law within the Circuit, however, is not necessarily relevant.  Rather, the question is whether the appointment of a particular lead plaintiff would lead to the defendant raising unique defenses against that lead plaintiff that would unnecessarily complicate and/or stall the litigation.  *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013).  Evidence that a particular plaintiff may be subject to the unique defense that it did not actually rely on the company's alleged misstatements is sufficient for a court to decline to appoint that plaintiff as lead counsel.  *See id.*, at *6.

requires a showing that the claims of the lead plaintiff are typical of the class and that the lead plaintiff will be able to adequately represent the class. At this early stage in the litigation, the proposed lead plaintiff must only meet its prima facie burden of establishing its adequacy and typicality. *Varghese*, 589 F. Supp. 2d at 397.

The typicality requirement is satisfied by showing that each class member's claim "arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Janbray v. Canadian Solar, Inc.*, 272 F.R.D. 112, 120 (S.D.N.Y. 2010). "[T]he typicality requirement may be satisfied even if there are factual dissimilarities or variations between the claims of the named plaintiffs and those of other class members, including distinctions in the qualifications of the class members." *Janbay*, 272 F.R.D. at 120. The fact that a lead plaintiff may not have standing to sue on every claim alleged in the complaint does not render its claims atypical. *In re Third Ave. Mgmt. LLC Sec. Litig.*, 2016 WL 2997119, at *1 (S.D.N.Y. May 19, 2016).

The adequacy requirement is satisfied by showing that: "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the plaintiff has sufficient interest in the outcome of the case to ensure vigorous advocacy." *Khunt*, 102 F. Supp. 3d at 536.

In the instant case, the Ontario Fund has made the required showing of typicality. It alleges that it relied on the integrity of the market price of Teva's ADRs, which was artificially inflated as a result of Teva's false statements, when it purchased Teva ADRs. The Ontario Fund further alleges that it was damaged on account of the fact that it held Teva ADRs when their prices fell as a result of the disclosures of such false statements.

The Ontario Fund has also made the required showing of adequacy. The Ontario Fund is an institutional investor with experience as lead plaintiff in a securities action. *See* Doc. # 26-3. The fund maintains an in-house legal department with attorneys dedicated to the oversight of this action. That counsel will supervise retained counsel and actively participate in the litigation with its client and the class's best interests in mind. *Id.* The Ontario Fund has identified its proposed class counsel as Bleichmar Fonti & Auld LLP ("BFA"). The proposed class counsel has significant experience in the area of securities litigation, *see* doc. # 26-5, and the movants identify no challenges to the qualifications and experience of the firm. Nor have the competing movants identified any other reason why the proposed class counsel would be unable to adequately serve in the best interests of the class. Finally, there is nothing to suggest that the Ontario Fund has interests that are antagonistic to other members in the class, and no movant has challenged the Ontario Fund's interest in pursuing the case with vigor.

D. Subject to Unique Defenses/Otherwise Inadequate

The Ontario Fund emerges from the litigation regarding putative lead plaintiff unscathed. None of the movants have challenged the Ontario Fund's interest in pursuing recovery on behalf of the class to the fullest extent. The Ontario Fund is an institutional investor with experience leading class litigation; I am unaware of any fact that is able to rebut the presumption that it is most adequate lead plaintiff. Accordingly, I appoint the Ontario Fund as lead plaintiff in this case.

## III.    Appointment of Class Counsel

The PSLRA provides that upon appointing a lead plaintiff, he or she "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v). "There is a strong presumption in favor of approving a properly-selected lead

plaintiff's decision as to counsel." *Topping*, 95 F. Supp. 3d at 623–24 (citing *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001))).

As already discussed, the Ontario Fund's choice of counsel, BFA, has extensive experience in the field of securities litigation.  There are no challenges to BFA's ability to effectively litigate this case.  I have no doubt that BFA will provide more than adequate representation for the plaintiff class.

## IV.    Conclusion

For the foregoing reasons, I appoint the Ontario Fund as lead plaintiff and approve of its choice of BFA as lead counsel.

So ordered.

Dated at Bridgeport, Connecticut, this 11th day of July 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
