# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION**<br><br>This Document Relates to:<br><br>Civil Action No. 18-296 (MJD/KMM) | **MDL No. 17-2795 (MJD/KMM)**<br><br><br>Oral Argument Requested |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ...................................................................... 1

PLAINTIFFS' ALLEGATIONS ..................................................................... 4

    A.    CenturyLink's Business .................................................... 4

    B.    Billing Issues and Compliance ....................................... 5

    C.    Former CenturyLink Employees ..................................... 7

    D.    CenturyLink's Financial Results .................................... 12

    E.    Other Allegations ........................................................... 13

ARGUMENT ............................................................................................... 14

I.     PLAINTIFFS DO NOT ADEQUATELY PLEAD FALSITY ............................ 15

    A.    Plaintiffs Do Not Allege Falsity With Particularity .................................. 15

    B.    Plaintiffs Do Not Allege that Statements Regarding CenturyLink's Strategies, Policies, and Business Conduct Were False When Made ....... 20

    C.    Statements Concerning CenturyLink's Strategies, Policies, and Business Conduct Are Not Actionable ........................................................ 22

II.    PLAINTIFFS DO NOT ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ............................................................... 24

    A.    The Former Employee Allegations Do Not Support A Strong Inference of Scienter ............................................................ 25

    B.    The Balance of Plaintiffs' Scienter Allegations Also Fail ........................ 29

III.   PLAINTIFFS DO NOT ADEQUATELY PLEAD LOSS CAUSATION ........... 32

IV.   PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED ............... 33

CONCLUSION ......................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
  579 F.3d 878 (8th Cir. 2009) ..................................................... 15

*In re Apple Computer, Inc., Sec. Litig.*,
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ............................................ 27, 30

*Bernstein v. Extendicare Health Servs., Inc.*,
  607 F. Supp. 2d 1027 (D. Minn. 2009) ....................................... 23

*In re Buca Inc. Sec. Litig.*,
  2007 WL 2509716 (D. Minn. Aug. 30, 2007) ..................................... 32, 33

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) .............................................. 24, 31

*In re Cerner Corp. Sec. Litig.*,
  425 F.3d 1079 (8th Cir. 2005) .............................................. 18, 20

*Dillard v. Platform Specialty Prod. Corp.*,
  2016 WL 10586301 (S.D. Fla. 2016) ........................................... 32

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ......................................... 28

*Espinoza v. Whiting*,
  8 F. Supp. 3d 1142 (E.D. Mo. 2014), *aff'd sub nom.*, *Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015) ........................................ 31

*In re Express Scripts, Inc.*,
  2010 WL 2671456 (E.D. Mo. June 30, 2010) ..................................... 32, 33

*Freedman v. Saint Jude Med., Inc.*,
  4 F. Supp. 3d 1101 (D. Minn. 2014) ........................................... 4

*Henningsen v. ADT Corp.*,
  161 F. Supp. 3d 1161 (S.D. Fl. 2015) ......................................... 30, 31

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) .............................................. 24, 26

## TABLE OF AUTHORITIES
### Continued

Page(s)

*In re Hutchinson Tech., Inc. Secs. Litig.*,
  536 F.3d 952 (8th Cir. 2008) ............................................................... 22, 29

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .................................................................................. 20

*Jensen v. Thompson*,
  2018 WL 1440329 (D.S.D. Mar. 22, 2018) .............................................. 33

*Julianello v. K-V Pharm. Co.*,
  791 F.3d 915 (8th Cir. 2015) .................................................................... 23

*In re K-tel Intern., Inc. Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002) ............................................................... 14, 25

*In re K-V Pharm. Co. Sec. Litig.*,
  2014 WL 1272452 (E.D. Mo. Mar. 27, 2014) ........................................... 26

*Kurtzman v. Compaq Computer Corp.*,
  2002 WL 32442832 (S.D. Tex. Mar. 30, 2002) ......................................... 31

*Kushner v. Beverly Enterprises, Inc.*,
  317 F.3d 820 (8th Cir. 2003) ............................................................... 15, 16

*Lasker v. New York State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) ...................................................................... 22, 23

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010) ....................................................... 26

*Lustgraaf v. Behrens*,
  619 F.3d 867 (8th Cir. 2010) ............................................................... 14, 33

*Magro v. Freeport-McMoran Inc.*,
  2018 WL 3725781 (D. Ariz. Aug. 3, 2018) .............................................. 32

*Markman v. Whole Foods Market, Inc.*,
  269 F. Supp. 3d 779 (W.D. Texas 2017) ................................................... 33

*In re Medtronic Inc., Sec. Litig.*,
  618 F. Supp. 2d 1016 (D. Minn. 2009) ......................................... 26, 27, 30

## TABLE OF AUTHORITIES
### Continued

Page(s)

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*,
  2010 WL 11469576 (D. Minn. Feb. 3, 2010) ............................................................. 24

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
  641 F.3d 1023 (8th Cir. 2011) .................................................................................. 33

*In re Navarre Corp. Sec. Litig.*,
  299 F.3d 735 (8th Cir. 2002) ............................................................................. *passim*

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ............................................................................................. 23

*Ong v. Chipotle*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018) ................................................................. 21, 22

*In re Patterson Companies, Inc. Sec., Derivative & ERISA Litig.*,
  479 F. Supp. 2d 1014 (D. Minn. 2007) ........................................................... 27, 28, 30

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009) .................................................................. 26, 31

*Pound v. Stereotaxis, Inc.*,
  8 F. Supp. 3d 1157 (E.D. Mo. 2014) .................................................................... 25, 26

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-
  Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ................................................................................. 23

*S.E.C. v. True N. Fin. Corp.*,
  909 F. Supp. 2d 1073 (D. Minn. 2012) ..................................................................... 20

*Shoemaker v. Cardiovascular Sys., Inc.*,
  2017 WL 1180444 (D. Minn. Mar. 29, 2017) ............................................................ 26

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) .................................................................. 28, 29

*In re Target Corp. Sec. Litig.*,
  275 F. Supp. 3d 1063 (D. Minn. 2017) ............................................................. *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................ 24, 29

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Zack v. Allied Waste Indus.*,
  2005 WL 3501414 (D. Ariz. Dec. 15, 2005) ............................................................ 26

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................................ 27, 31

**Statutes**

15 U.S.C. § 78u-4(b)(1)-(2) ........................................................................ 14, 15

15 U.S.C. § 78u-5(c)(1) ................................................................................ 23

Private Securities Litigation Reform Act ................................................ *passim*

Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. § 78j ................... 14

**Other Authorities**

47 CFR § 64.2401 (2018) ............................................................................... 6

Federal Rule of Civil Procedure 9(b) ............................................................ 14

Federal Rule of Civil Procedure 12(b)(6) ..................................................... 14

## PRELIMINARY STATEMENT

This is precisely the type of case that the Private Securities Litigation Reform Act ("PSLRA") was designed to weed out at the pleading stage.  Seeking to piggyback on a series of consumer class action complaints (which are themselves based on anecdotal accounts of billing, service, and various other complaints from a tiny percentage of CenturyLink customers), Plaintiffs here have imagined a wildly implausible scheme by CenturyLink's top executives to inflate the price of the company's stock.[1]  But the Complaint, which is based on a series of sweeping conclusions, devoid of any supporting facts, fails the stringent pleading test under the PSLRA.  The Complaint does not allege facts to support a plausible inference that CenturyLink made any false or misleading statements, nor does it allege facts sufficient to support the required "*strong* inference" that any Defendant acted with an intent to deceive (*i.e.*, scienter).  The Complaint should be dismissed for failure to state a claim.

Plaintiffs' theory is that CenturyLink materially inflated its revenues for four years by systematically billing consumers for unauthorized products, services, and fees.  According to Plaintiffs, CenturyLink managed to keep this massive fraud under wraps, even as millions of customers were overcharged (and those overcharges showed up on their monthly bills), and thousands of employees were complicit.  The "truth" only began to emerge, Plaintiffs claim, when a call center employee sued CenturyLink, claiming she

---

[1]  As Plaintiffs do in their Complaint (Dkt. No. 143) (the "Complaint"), we use the term "CenturyLink" to refer collectively to CenturyLink, Inc. and its operating subsidiaries. The distinctions between those entities, which have been briefed in the related consumer class actions, are irrelevant to this Motion.

was fired for asking why customers were charged for products they did not order—a practice known in the industry as "cramming." That former employee's allegations—which were admittedly inspired by published reports about Wells Fargo—triggered several consumer class actions that are now before this Court.

But those lawsuits—which CenturyLink is vigorously defending—did not reveal any undisclosed "truth" about CenturyLink's business. Neither CenturyLink nor anyone else has disclosed that CenturyLink engaged in any fraud, much less the systematic, company-wide fraud that Plaintiffs suggest here. There has been no finding or determination that such a fraud occurred, and CenturyLink has not restated or corrected any allegedly inflated financial results. Quite the contrary, CenturyLink's independent auditor continues to certify the very financial statements that Plaintiffs claim were materially false.

Lacking any admission or disclosure by CenturyLink that the alleged fraud occurred, Plaintiffs rely almost entirely on statements attributed to twenty former CenturyLink employees. But none of these former employees describes anything like the systematic "cramming" that Plaintiffs purport to allege, much less on a scale that could have materially inflated the financial results of a company whose quarterly revenues routinely exceeded $4 billion. ¶ 203.[2] Many of these former employees have nothing at all to say about "cramming." Those who do speak about billing issues describe routine customer complaints and other billing matters that are a fact of life in the

---

[2] References to "¶ _" are to paragraphs of the Complaint.

telecommunications industry, many of which involve simple errors. None of these former employees purports to have knowledge of billing issues affecting more than a tiny percentage of CenturyLink's millions of customers, and none of them purports to calculate any financial impact from any alleged "cramming." The allegations, in other words, do not support a plausible inference that CenturyLink's financial results were materially inflated by systematic or widespread "cramming."

Critically, none of the former employees describe any directive from senior management to engage in "cramming" to inflate revenues, nor do they claim that any of CenturyLink's senior management was aware of any such scheme. All but a few of them worked in entry-level positions, had no direct contact with any of CenturyLink's senior executives, and would not have been in a position to know what was going on outside of a single office, call center or region. Simply put, the Complaint does not come close to supporting a "strong inference" that CenturyLink's senior management directed (or was aware of) any scheme to inflate the company's revenues by intentionally overbilling its customers.

The PSLRA was designed to prevent plaintiffs from asserting securities fraud claims based on sweeping and conclusory allegations of fraud. It requires allegations of specific fact. Plaintiffs' Complaint here does not come close to meeting the standard set by the PSLRA and, as such, it should be dismissed for failure to state a claim.

## PLAINTIFFS' ALLEGATIONS

### A.    CenturyLink's Business

CenturyLink is the third-largest telecommunications company in the country.  Ex. 5, at 4.[3]  It employs about 50,000 people who are based in locations all around the country.  Ex. 5, at 19.  CenturyLink's enterprise segment provides business services such as broadband, telecommunications services and equipment.  Ex. 5, at 6-7.  Its consumer segment offers a variety of products and services to residential consumers, including broadband, voice, and video.  Ex. 5, at 7.

CenturyLink serves many millions of customers: in 2016, for example, CenturyLink had nearly 6 million broadband subscribers, 11 million access lines, and 300,000 TV subscribers.  Ex. 4, at 3.  To support its customers, CenturyLink maintained 18 call centers, ¶ 60, each of which was staffed by "hundreds of call center representatives."  ¶ 64.  CenturyLink also employed up to 450 customer "retention specialists," ¶ 84, and a National Order Help Desk unit to handle complaints and service issues.  ¶ 86.

From 2013 through 2017, CenturyLink reported quarterly revenues of more than $4 billion, Exs. 6-20, at 3, with annual revenues ranging from $17.5 billion to $18.1 billion, Exs. 1-5, at 4, 3, 3, 4, 5, and total operating revenues of nearly $80 billion.  Exs.

---

[3]  References to "Ex. _" are to exhibits to the supporting Declaration of Patrick E. Gibbs. Each is either incorporated into the Complaint by reference or subject to judicial notice. *See Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1110 (D. Minn. 2014).

6-20, at 3.  During this period, the consumer segment accounted for roughly a third of CenturyLink's annual revenues.  *See* Exs. 1-5, at 6, 5, 5, 6, 7.

The executive defendants (Glen F. Post, R. Stewart Ewing, David D. Cole, Karen Puckett, Dean J. Douglas, and G. Clay Bailey), each held very senior executive positions at CenturyLink.[4]

### B.    Billing Issues and Compliance

CenturyLink requires its employees to abide by a Code of Conduct, framed by a set of "Unifying Principles" including "Fairness," "Honesty and Integrity," "Positive Attitude," and "Respect."  Ex. 21; ¶ 53.  But like any other consumer-facing business (especially one of this size and scope), CenturyLink's sales and billing processes are not perfect, and some number of errors, customer complaints, and disputes are inevitable.  In an effort to avoid such issues and/or to address them when they arose, CenturyLink put in place: "retention specialists," ¶ 84; a "complaint escalation department," ¶ 83; a "Customer Experience" group, ¶ 99; a quality assurance team that monitored sales calls, ¶ 99; and a division "responsible for handling complaints from the FCC, state attorneys general, and the Better Business Bureau," along with "formal written complaints to Defendant Post and other 'C-level' executives."  ¶ 103.  CenturyLink also maintains a 24/7 "Integrity Line," which employees can call with concerns about ethics and

---

[4]  The Complaint alleges that Post was Chief Executive Officer; Ewing was Chief Financial Officer; Cole was Controller; Puckett was Executive Vice President and Chief Operating Officer; Douglas was President of Sales and Marketing; and Bailey was Senior Vice President and Treasurer.  ¶¶ 29-34.

compliance issues, Ex. 21, at 8, and an extensive customer service website (*see* https://www.centurylink.com/home/help/contact.html).

"Cramming" (which Plaintiffs define to include a wide range of activities, ¶ 4) is a known issue in the telecommunications industry, and is the subject of state and federal regulation. *See* FCC Truth-in-Billing Requirements, 47 CFR § 64.2401 (2018); ¶¶ 44-45; Ex. 25. Obviously, such activities are flatly prohibited by CenturyLink's Code of Conduct and other policies, ¶¶ 53, 15, 240, Ex. 21, and as Plaintiffs themselves allege, both before and during the Class Period, CenturyLink put in place several concrete measures to prevent cramming, including:

- Voluntarily removing certain third-party billing, ¶¶ 47-48;

- Entering into "numerous franchise agreements with local authorities in which [CenturyLink] agreed to abide by FCC standards or even stricter rules" designed to protect consumers from unfair business practices, ¶ 49;

- Documenting cramming violations, communicating them to representatives' supervisors, and "coaching" employees on ethical sales practices, ¶ 96; and

- Disciplining or "frequently terminat[ing]" employees for cramming, ¶ 102.

According to Plaintiffs, however, these anti-cramming policies and practices were an elaborate ruse designed to hide the fact that "fraudulent sales practices" were "at the very core" of CenturyLink's business model. ¶ 62. Plaintiffs claim that Defendants somehow managed to hide their scheme to cram "millions" of customers on their

monthly invoices for years, until Heidi Heiser's wrongful termination lawsuit became public in June 2017.  ¶¶ 152-53.[5]

### C.    Former CenturyLink Employees

Plaintiffs' claims are based largely on statements attributed to twenty alleged former employees ("FEs").  Twelve of these are described as having been sales or customer service representatives, or their direct supervisors, in local or regional offices or call centers;[6] three were in human resources, never interacting with customers at all;[7] three were in quality assurance or reviewed sales agent performance and/or customer complaints;[8] one was a financial analyst;[9] and one was a regional president.[10]  Five

---

[5] Heiser alleged in her complaint, which has since been dismissed, that she was fired for posting a question during an online employee town hall hosted by then-CEO Post, asking "why customers were being given multiple accounts and being billed for things they did not ask for." ¶14; Ex. 22.  Heiser's complaint compared what she had allegedly witnessed at CenturyLink to the Wells Fargo scandal, which had generated enormous publicity around the same time. ¶ 16; Exs. 22, 23.  The parallel is less than obvious.  Wells Fargo employees were accused (among other things) of forging signatures to open entirely fake credit card accounts, thus effectively committing identity theft and destroying customers' credit ratings.

[6] *See* ¶¶ 38, 71-73, 77, 80, 82, 84, 87, 90, 91 (FE-3, FE-4, FE-6, and FE-14 worked as an inbound call center sales representatives; FE-1, FE-5 and FE-7 worked as customer care or sales managers or supervisors; FE-9, FE-10, and FE-13 worked within the National Order Help Desk ("NOHD") group; FE-11 and FE-12 worked as Retention Specialists).

[7] *See* ¶¶ 74, 102 (FE-8, FE-17, and FE-20 all worked in HR as a Director or Business Partner).

[8] *See* ¶¶ 99, 103 (FE-16 was a Manager of Customer Experience; FE-18 was a manager in the Executive & Regulatory Services division; FE-19 was a Manager of Executive Complaints).

[9] ¶ 69 (FE-2 worked as a Financial Analyst II in Financial Planning and Analysis).

[10] ¶ 70 (FE-15 worked as a Regional President in the Southern United States).

worked at CenturyLink for less than a year of the Class Period.[11]  Just four allegedly held roles that might plausibly have provided visibility into company-wide operations.[12]

Given the massive scale of the "scheme" at the heart of Plaintiffs' theory, the FE allegations are most notable for what they do not say.  None of them comes close to describing a massive scheme to inflate CenturyLink's revenues by systematically inflating customer bills.  None claim that any Defendant directed or encouraged employees to add unauthorized fees or services to customer bills or to deliberately misrepresent pricing or service terms to customers.  None claim to have informed any Defendant of widespread, systematic "cramming."  And none claim that any Defendant ever considered or discussed the impact of "cramming" on CenturyLink's reported revenues, or that "cramming" had any impact on CenturyLink's revenues (much less a material impact).

Indeed, far from describing a massive and company-wide scheme, eight FEs describe the existence of customer billing complaints, and company policies and practices on how to handle them.[13]  Four describe changes in evaluation systems for sales agents during the Class Period, three of whom opined that those changes impacted sales

---

[11]  ¶¶ 72-73, 103 (FE-4 and FE-6 both worked at CenturyLink for less than a year; FE-15, FE-18, and FE-19 all left CenturyLink in 2014).

[12]  ¶¶ 69, 70, 103 (FE-2 worked in Financial Planning and analysis; FE-15 was a Regional President; FE-18 and FE-19 reviewed complaints and prepared reports for senior management).

[13]  ¶¶ 98, 96-97, 85-87, 89, 103, 108, 106 (FE-7, FE-9, FE-10, FE-11, FE-12, FE-13, FE-18, FE-19)

performance.[14]   Fifteen of the FEs complain that sales targets were difficult to hit and that

agents were routinely disciplined or terminated for not meeting targets.[15]   Though not a

single one of them admits to having crammed customers, nine (all in sales) claim that

other CenturyLink employees did so, but do not explain why they failed to report any

such conduct through the internal hotline that CenturyLink maintained for that purpose.

¶¶ 84-85.[16]   And none of them provides even a rough estimate of any financial impact

from the behavior they purport to describe.

Three FEs say that CenturyLink employees were trained to use deceptive sales

pitches.[17]   But these allegations are uniformly lacking in specifics, and they supply no

factual basis for the opinions attributed to the FEs.   For example, FE-5 allegedly knew

"from his/her experience" that the instructions delivered during a training class were "in

violation of Company policy and federal regulations," but the Complaint does not explain

what "experience" had equipped FE-5 (who is identified as a Consumer and Business

Sales Manager) to opine on compliance with "Company policy and federal regulations,"

nor does it identify the policies or regulations he believed were being violated.   ¶¶ 73, 82.

Similarly, FE-11 (a "Retention Specialist") characterized as "highly illegal" a sales

practice of "quoting one price but not disclosing that individual services included in the

---

[14]   ¶¶ 111-14 (FE-1, FE-8, FE-17, FE-20).

[15]   ¶¶ 69, 71, 72-76, 78-81, 84-85, 89-90, 102, 107, 147, 183 (FE-1, FE-2, FE-3, FE-4,
FE-5, FE-6, FE-7, FE-8, FE-9, FE-10, FE-11, FE-12, FE-13, FE-17, FE-20).

[16]   ¶¶ 64, 86, 89, 90, 92, 96-7, 109 (allegations of cramming described by FE-4, FE-5,
FE-7, FE-9, FE-10, FE-11, FE-13, FE-14, and FE-20).

[17]   ¶¶ 81-82 (FE-5, FE-9, and FE-11).

package were optional." ¶ 82.  But the Complaint alleges no facts suggesting that anyone in senior management directed or was even aware of any such practice, or that it was widespread or systemic.

Though some of the FE allegations reference "cramming," they offer no basis to infer how often any such "cramming" might have occurred or how widespread it was, nor do they clearly identify any deliberate sales misconduct, as opposed to inadvertent billing errors.  *See, e.g.*, ¶¶ 64, 89, 90, 96, 105, 109, discussed further *infra* at 17-18.  The handful of FE allegations that purport to quantify the scope of alleged "cramming" in some way do not support an inference that it was anything close to widespread at CenturyLink or affected CenturyLink's financial results.  The FEs who were involved in responding to customer complaints (including FE-18 and FE-19), collectively describe, at most, a number of substantiated complaints that is far less than 1% of the many millions of customers that CenturyLink served during the proposed Class Period, and—perhaps more importantly—they acknowledge that CenturyLink gave refunds to customers whose complaints were substantiated.  ¶¶ 85, 106; Ex. 5, at 4.  None of this supports a plausible inference that CenturyLink's revenues (which exceeded $4 billion each quarter) were materially inflated by fraud.

As a group, the FEs are not alleged to have any specific information suggesting that any individual Defendant was aware of any widespread or systematic "cramming."  Only three of the 20 FEs are alleged to have ever spoken to or directly interacted with

any of the Defendants whatsoever.[18]  Of those, only two (FE-5 and FE-19, both discussed *infra*) are alleged to have discussed "cramming," and neither of them suggested that any Defendant directed or knew of a company-wide "cramming" scheme.[19]  For example, Plaintiffs allege that the Idaho-based FE-5 spoke with Bailey on a single occasion at a Company convention in Florida, raising "complaints and issues with cramming s/he was experiencing," and Bailey allegedly responded, "We've got to do something about our call centers."  ¶¶ 73, 109.  Plaintiffs further allege that "FE-5 [later] sent Defendant Bailey an email reminding him of their conversation at the Breakers and asked to be part of the team that was going to be fixing the call center issues."  ¶ 110.  But that email (described extensively and thus incorporated by reference in the Complaint) does not mention "cramming" at all, nor does it suggest that FE-5 ever discussed cramming with Bailey.  *Compare* ¶ 109 ("Brian Stading … introduced FE-5 to Bailey specifically so that FE-5 could address the constant and rampant cramming and misquoting problems s/he encountered") *with* Ex. 26 ("Brian Stading . . . asked me to explain to you how we improved our sales results by changing how we do business in Boise Idaho.").

---

[18]  FE-5, FE-15, and FE-19, ¶¶ 70, 109, 106.  The Complaint alleges that FE-18's "*team* emailed monthly reports" on customer complaints to Post and Puckett, and that FE-16 "was involved in this monthly reporting," but nowhere reflects that FE-16 or FE-18 had any direct contact with Defendants.  ¶ 104 (emphasis added).

[19]  FE-15, the only other employee who allegedly had direct contact with any Defendant, said only that she discussed "marketing strategy" in meetings with Puckett and Bailey.  ¶ 70.

### D.    CenturyLink's Financial Results

The Complaint asserts that "[t]he financial impact of these cramming practices was highly material," ¶ 93, and Ex. 27[20] to the Complaint identifies 44 "misleading revenue metrics."  But the Complaint does not allege any *facts* in support of these conclusions.  The Complaint does not even attempt to quantify the financial impact of any alleged "cramming," nor does it suggest what the true "revenue metrics" would have been absent the alleged scheme.  The Complaint does not allege that CenturyLink's financial statements were amended or restated, or even that anyone has ever questioned the accuracy of the financial results that CenturyLink reported during the Class Period.

To the contrary, after mid-2017 (when Plaintiffs allege that the "truth" of the cramming scheme was revealed), CenturyLink's auditors continued to sign off on CenturyLink's financial statements.  In so doing, the auditors adhered to the Public Company Accounting Oversight Board's auditing standards, which requires auditors to conduct audits independently and to "plan and perform the audit to obtain personable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud."  Ex. 5, at 79.  Here, CenturyLink's auditor has "expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting."  *Id.*

---

[20] Ex. 27 to this brief is a Summary Exhibit that identifies all the statements in the Complaint alleged to be false and misleading and catalogues the source of the statement, the speaker, the date, and the allegedly liable Defendant(s).

### E.     Other Allegations

Apart from the above, Plaintiffs' account of an elaborate and masterfully-concealed cramming scheme is based on the following:

- An investigation by the Arizona Attorney General in 2016, which resulted in CenturyLink making a $150,000 payment "to cover the Attorney General's fees and costs." ¶ 133, 134.

- A civil investigation demand sent to CenturyLink in May 2016 by the Minnesota Attorney General's Office. ¶ 141.

- Allegations in a letter brief filed by the Minnesota Attorney General that CenturyLink: (1) "charged over 12,000 Minnesota consumers more than CenturyLink promised;" (2) "*potentially over-billed* 3.5 million customers in various states;" and (3) "*over-billed* 175,000 customers in [an unnamed] state." ¶ 178 (emphasis added). These unverified assertions from an advocacy piece in another litigation (which in turn provides no basis for the facts alleged) do not reflect that any of the actual or "potential[ ] over-billing" by CenturyLink was the result of anything other than human or system errors, and do not speak to the financial impact of any alleged "over-billing."

- Unspecified but "[n]umerous investigations by state attorneys general and other regulatory authorities," ¶ 178, which are still pending.[21]

- A 2015 request from the SEC's Division of Corporate Finance for CenturyLink to provide additional disclosure regarding its revenues and sales, which did not lead to any enforcement action by the SEC.  ¶ 124.

- Six examples of CenturyLink customers who were allegedly "overbilled" by roughly $1,300 in total, or $215 on average.  ¶ 93.

## ARGUMENT

A complaint asserting a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, must allege that the defendant (1) made a misrepresentation or omission of material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, and that (4) plaintiffs relied on the alleged misrepresentation, and (5) suffered economic loss (6) that was caused by the fraud.  *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1069-70 (D. Minn. 2017) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)). Such claims are governed by the PSLRA, 15 U.S.C. § 78u-4, which holds plaintiffs to a "more rigorous" pleading standard than is ordinarily applied under Rule 12(b)(6), or even under Rule 9(b).  *Target*, at 1069 (quoting *Lustgraaf v. Behrens*, 619 F.3d 867, 874 n.2 (8th Cir. 2010)); *see also In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir.

---

[21]  As CenturyLink regularly warned investors, CenturyLink operates in a highly-regulated, consumer service industry, where such investigations are not uncommon.  *See* Exs. 1-5, at 9-12, 8-11, 9-12, 10-13, 11-15; *see also* ¶ 134, discussed *supra* at 6.

2002); *Kushner v. Beverly Enterprises, Inc*., 317 F.3d 820, 824 (8th Cir. 2003).  In

particular, Plaintiffs must plead the first two elements of a Section 10(b) claim—falsity

and scienter—with particularity, *Target*, 275 F. Supp. 3d at 1070, by identifying "the

'who, what, when, where and how' of the misleading statements or omissions," *In re

2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009), and, "with respect

to each act or omissions, . . . stat[ing] with particularity facts giving rise to a strong

inference" of scienter.  15 U.S.C. § 78u-4(b)(1)-(2).  The Court "must disregard 'catch-

all' or 'blanket' assertions that do not live up to the particularity requirements of the

[Reform Act]."  *Kushner*, 317 F.3d at 824.

## I.    Plaintiffs Do Not Adequately Plead Falsity

### A.    Plaintiffs Do Not Allege Falsity With Particularity

The Complaint should be dismissed because Plaintiffs fail to plead falsity with the

particularity required by the PSLRA.

When alleging that a corporation's financial statements were false or misleading, a

plaintiff must explain with particularity *how* the alleged fraud affected the financial

statements and made them misleading.  *See In re Navarre Corp. Sec. Litig.*, 299 F.3d 735,

744-45 (8th Cir. 2002).  Vague and conclusory allegations that do not specify "how and

to what extent particular [fraudulent acts] directly affected financial results . . . fail to

meet the PSLRA's standards."  *Target*, 275 F. Supp. 3d at 1076–77.

Plaintiffs' theory of falsity here is that CenturyLink and its senior executives

knowingly and materially inflated CenturyLink's revenues through systematic

"cramming" (as Plaintiffs define it).  *See, e.g.*, ¶¶ 192, 203 (statements concerning

financial performance and strategies were false because "the Company's results depended upon and were materially impacted by the Company's undisclosed cramming"). Plaintiffs claim that this practice of intentionally overbilling customers was "the very core of the Company's business model." ¶ 62. Therefore, according to Plaintiffs, dozens of public statements concerning CenturyLink's revenues and financial results were false and misleading because they omitted that cramming was the primary driver of CenturyLink's revenues. *See, e.g.*, ¶¶ 10, 190, 201-04, 219-36, 262; Ex. 27.

But the Complaint does not allege, or even estimate, the financial impact of any alleged "cramming." Ex. 27 lists 63 financial reporting statements that were allegedly materially misleading because they did not disclose the impact of cramming—but the Complaint does not say *how* those financial reports were misleading, or the *amount* of revenue allegedly driven by "cramming." Related allegations in the Complaint itself, such as that CenturyLink's financial performance "was due, *at least in part*, to the undisclosed illegal cramming practices," ¶ 203 (emphasis added), are almost comically vague. *See also* ¶ 225 (alleging bare conclusion that "revenue gains were driven by the illegal cramming practices"). And surrounding circumstances lend no support to Plaintiffs' story: the Complaint does not allege that CenturyLink ever restated its financial statements, or that the SEC or CenturyLink's auditors have asked it to do so, despite the fact that a full year has elapsed since Plaintiffs claim that the "truth" was revealed. ¶ 152; *see Kushner*, 317 F.3d at 829 (describing absence of auditor or SEC inquiry to be "telling").

Lacking any real factual detail to suggest that CenturyLink's financial results were materially false, Plaintiffs fall back on a thesaurus' worth of adjectives.  These do not suffice under the PSLRA.  *Target*, 275 F. Supp. 3d at 1072 (finding the allegation that "most" stores suffered from a problem to be insufficiently particular) *with* ¶ 90 ("*many, many* instances"), and ¶ 105 (cramming was "*very common* and *widespread*") (emphasis added).

Nor do any of the allegations attributed to FEs amount to a particularized showing that "cramming" had any impact on CenturyLink's revenues at all, much less a material one.  Neither the sole FE alleged to have worked in a finance function at CenturyLink (FE-2) nor the FE who held the relatively senior position of regional president (FE-15) are alleged to have observed any "cramming" at all.  ¶¶ 69-70.  Two FEs who were allegedly tasked with handling customer complaints, FE-18 and FE-19, describe, at most, a few thousand complaints a month that never could have come close to materially impacting revenues, ¶¶ 103-08, not least because (according to FE-19) CenturyLink reimbursed customers whose complaints were substantiated.[22]

---

[22]  FE-18 recalled processing "hundreds" of complaints per month, with "the majority" being "customers who said they had been defrauded through cramming *or otherwise improperly billed*."  ¶ 103 (emphasis added).  FE-18 does not say how many of the "hundreds" complained of "cramming," but does say that only "about half" of the complaints "were substantiated."  *Id.*  FE-19, who, like FE-18, was employed only briefly at CenturyLink during the Class Period, ¶ 103, similarly reports that his team reviewed "4,000 complaints per month, half of which were related to *billing issues* and cramming."  ¶ 106 (emphasis added).  Like FE-18, FE-19 does not say how many complaints related to inadvertent "billing issues" and how many related to cramming.  *Id.* FE-19 further states that, at the instruction of Post, FE-19's team would resolve substantiated complaints by giving the customers compensation.  *Id.*

Plaintiffs also describe a letter brief filed by Minnesota Attorney General's office in ongoing litigation, ¶ 178, which purports to characterize an internal CenturyLink document, but that allegation does not come close to filling the particularity gap. Among other things, the Complaint does not say who wrote the internal document, what the document actually says, whether the author had reliable information about any "potential[] overbill[ing]," or whether the letter brief is a fair or accurate summary of what the document says. And while the letter allegedly asserts that 175,000 customers were "over-billed" (and 3.5 million customers were "*potentially* over-billed") (emphasis added), it does not say whether, when, or by how much some or all of those customers were reimbursed. Most importantly, it does not say whether any alleged "over-billing" or "potential over-billing" resulted from intentional "cramming" or, instead, inadvertent errors. ¶ 178.

Courts in this Circuit routinely dismiss securities complaints where, as here, a plaintiff fails to plead with particularity how an alleged accounting fraud actually impacted revenues. For example, the plaintiffs in *In re Cerner Corp. Securities Litigation* alleged that a company defrauded investors by pulling in revenue that was projected for future quarters. 425 F.3d 1079 (8th Cir. 2005). The Eighth Circuit held that this did not suffice under the PSLRA because it did not "allege the amount of any overstatements, the extent of any pulling in that took place, or the amount of any revenue that was pulled in from future quarters." *Id.* at 1083-84. Similarly, the plaintiffs in *In re Navarre* alleged defendants inflated revenues by employing a "ship and store" marketing scheme. 299 F.3d at 744. Noting that plaintiffs had not alleged, among other things, "the

dollar amounts of the overstatements of revenues," the court found that the allegations did not "come close to reaching [the] level of particularity" required by the PSLRA.  *Id.* at 744-45 (emphasis added); *see also Target*, 275 F. Supp. 3d at 1076-77 ("Without specific details as to how and to what extent particular supply chain issues directly affected financial results, Plaintiffs fail to meet the PSLRA's standards.").  Plaintiffs' Complaint here fails for the same reason: Plaintiffs claim that revenues were misleading because they resulted from "cramming," but fail to allege the amount of any revenue impact, and instead fall back on vague allegations that "cramming" was "widespread." *See, e.g.*, ¶¶ 5, 89, 102.

To be sure, Plaintiffs challenge statements on topics other than CenturyLink's reported financial results.  *See e.g.* ¶¶ 241, 246.  But Plaintiffs claim *all* of the challenged statements in the Complaint were false or misleading for the same reason: because CenturyLink's true strategy and "core" business plan was to inflate its revenues through widespread and systematic "cramming."  *See* ¶¶ 62, 203, 207, 211, 225, 236, 241, 246, 255, 258, 263.  Plaintiffs' failure to plead either the existence or scope of the alleged "cramming" scheme thus undermines Plaintiffs' theory of falsity across the board.

Because Plaintiffs have failed to plead with particularity how Defendants' alleged "cramming" scheme rendered CenturyLink's reported revenues false—or rendered *any* of the challenged statements identified in the Complaint false or misleading—the Complaint should be dismissed.[23]  *See Target*, 275 F. Supp. 3d at 1071 ("For almost every

---

[23]  While all of Plaintiffs' claims are insufficiently particularized, their Section 10(b) claims against Puckett and Douglas are especially skeletal.  While Plaintiffs allege that

challenged statement, Plaintiffs provide only the expansive, undefined explanation that the supply chain suffered from 'systemic problems' and that the existence of such problems rendered the statement false or misleading . . . Without more detailed allegations, Plaintiffs fail to necessarily show that Defendants' statements were false or misleading when made, as required by the PSLRA."); *In re Cerner Corp. Sec. Litig.*, 425 F.3d at 1083-84.[24]

### B. Plaintiffs Do Not Allege that Statements Regarding CenturyLink's Strategies, Policies, and Business Conduct Were False When Made

The Complaint challenges dozens of statements relating to CenturyLink's strategies and policies. *See, e.g.*, ¶¶ 193-99 (strategic focus on customer needs); ¶¶ 205, 209-10, 215-17, 222-23, 226-33, 235 (bundling, credit, and pricing strategies); ¶¶ 238-240, 242-45, 248-54 (business practices and policies). Plaintiffs claim these statements

---

Puckett made just one misstatement on an investor conference call, ¶ 209, they seek to hold her liable for all of the statements made by anyone during ten other conference calls. ¶ 285(e). Similarly, while Plaintiffs allege that Douglas made misstatements on two investor calls, ¶¶ 223, 224, 228, they seek to hold him liable for the entirety of four calls. ¶ 285(f). This defies the Supreme Court's mandate that a Section 10(b) defendant must have "ma[de]" or had "ultimate authority over [a misstatement's] content[s] and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *see also S.E.C. v. True N. Fin. Corp.*, 909 F. Supp. 2d 1073, 1118 (D. Minn. 2012). The Complaint alleges no facts suggesting that Puckett or Douglas exercised "ultimate authority" over the statements of, for example, their chief executive officer or chief financial officer. In any event, Plaintiffs fail to plead that any of the handful of statements attributed to those two defendants were false. *See infra* at 20-22.

[24] Plaintiffs' citation to Item 303 (¶ 190) does not change this analysis. Even if a breach of Item 303's disclosure duty could form the basis of a Section 10(b) claim (an open question in the Eighth Circuit, *see Target*, 275 F. Supp. 3d at 1081, n.8), Plaintiffs still fail "to meet the PSLRA's requirement to allege with particularity a breach of that [Item 303] disclosure duty," for all the reasons discussed above. *Target*, at 1081.

were false or misleading for the same reasons described above, namely, "CenturyLink's strategy was . . . to inflate the Company's revenues by adding improper charges and services to customers' bills." ¶ 207; *see supra* at 15. But the Complaint's allegations of disparate billing issues and customer complaints suggest, at most, that CenturyLink did not always *succeed* in the execution of its strategies or commitments—not that Defendants' statements about those strategies or commitments were false when made.[25] This is insufficient to sustain a claim for securities fraud. *See In re Navarre*, 299 F.3d at 742 (Plaintiff must plead facts that "demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements *when they were made*.") (emphasis added).

*Ong v. Chipotle*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018), is instructive. In *Chipotle*, plaintiffs filed a securities fraud action after many Chipotle customers contracted food-borne illnesses. *Id.* at 207. Plaintiffs claimed that the customer illnesses revealed the falsity of Chipotle's prior statements that its "'quality assurance department establishes and monitors . . . food safety programs,'" and that its "'training and risk management departments develop and implement operating standards for food quality.'" *Id.* at 232. The court dismissed the complaint because the plaintiffs had not adequately alleged that

---

[25] For example, Plaintiffs cite to a December 2017 press release, which described a Special Committee's investigation into CenturyLink's sales and billing practices, as evidence that the statements "were materially false and misleading when made." ¶ 174. But those statements—that "bills sometimes failed to meet customer expectations," or that "limitations in the Company's ordering and billing software made it difficult to provide customers with estimates"—suggest only that CenturyLink did not always manage to fully execute on its strategies or achieve its goals. *Id.*

Chipotle's statements about its safety policies were false when made; rather, they alleged only that Chipotle did not manage to fully *execute* those policies.  *Id.*

Here, many of the allegedly false statements closely mirror those at issue in *Chipotle*.  *See*, *e.g.*, ¶¶ 194, 238, 239.  As in *Chipotle*, the Complaint alleges no particularized facts suggesting that these statements were false when made; there is nothing to show that, for example, CenturyLink did not in fact rely on its employees to meet customers' needs, or that CenturyLink did not in fact adopt a Code of Conduct.  At most, the Complaint alleges only that some CenturyLink employees did not fully comply with CenturyLink's programs and procedures.  ¶ 241.  This does not meet Plaintiffs' burden to plead falsity.  *See Chipotle*, 294 F. Supp. at 232.

### C.    Statements Concerning CenturyLink's Strategies, Policies, and Business Conduct Are Not Actionable

Even setting aside Plaintiffs' failure to allege particularized facts undermining CenturyLink's statements about business strategies, policies, and goals, many of those statements are not actionable as a matter of law.

*First*, many of the challenged statements amount to corporate optimism and "puffery."  *See* ¶¶ 193-97, 209-10, 223-24, 227, 230-31, 233, 238-40, 242-45; Ex. 27, at 1-9, 12; *compare, e.g.*, ¶ 193 ("We … [d]eliver a solution that gets to the customer when they need, what they need and where they need it."); ¶ 209 ("[W]e have a pretty good methodology") ¶ 245 ("We are committed to providing the best quality experience"), with *In re Hutchinson Tech., Inc. Secs. Litig.*, 536 F.3d 952, 960-61 (8th Cir. 2008) (similar statements were inactionable "puffing") and *Lasker v. New York State Elec. &*

*Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (same); *compare, e.g.* ¶ 239 ("[a]ll of our

directors, officers and employees are required to abide by our long-standing ethics and

compliance programs"), with *Bernstein v. Extendicare Health Servs., Inc.*, 607 F. Supp.

2d 1027, 1032 (D. Minn. 2009) ("Statements that a [company] will comply with or

exceed 'applicable laws,' or that it has established 'rigorous standards' . . . are puffery."),

and *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,

845 F.3d 1268, 1276 (9th Cir. 2017) (company's "code of conduct is 'inherently

aspirational'" and "expresses opinions as to what actions are preferable, as opposed to

implying that all staff, directors, and officers always adhere to its aspirations.") (citation

omitted).

   ***Second***, many challenged statements expressed Defendants' subjective beliefs and

opinions, and Plaintiffs have failed to meet the test for pleading "falsity" for such

statements.  *See* ¶¶ 199, 205, 209, 210, 216, 217, 223, 224, 227, 228, 229, 231, 234, 235,

256, 260; Ex. 27 at 3, 8-10, 12; *compare, e.g.*, ¶ 205, *with Omnicare, Inc. v. Laborers*

*Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327-32 (2015).

   ***Third***, many others fall within the PSLRA's "forward-looking statement" safe

harbor, which protects a statement if its "truth or falsity is discernable only after it is

made" and it is accompanied by meaningful cautionary language.  *See* 15 U.S.C. § 78u-

5(c)(1); *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920-21 (8th Cir. 2015); *see, e.g.*, ¶

228 ("[W]e're continuing to drive some of those price increases into the second half, and

we'll see those manifest themselves in the second half, as well"); ¶ 229 ("[W]e believe

the improved customer experience will improve customer retention and improve our

23

revenue over time."); Ex. 4, at 19 (cautioning "we cannot assure you that our new product or service offerings will be as successful as anticipated"); *see also* ¶¶ 196-97, 205, 215-17, 222-24, 226, 230-35, 238-40, 242-45, 248; Ex. 27, at 10, 12; Exs. 1-5, at 16-32, 15-33, 16-36, 17-42, 19-45.

## II.    Plaintiffs Do Not Allege Facts Supporting a Strong Inference of Scienter

Under the PSLRA, Plaintiffs must plead specific facts that give rise to a "strong inference" that Defendants acted with an intent to defraud (or a "severe recklessness" so extreme that it is tantamount to an intent to mislead).  *See In re Navarre*, 299 F.3d at 745; *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008).  Scienter can be established by "(1) facts demonstrating a conscious intent to deceive, manipulate, or defraud; (2) allegations of severe recklessness; or (3) allegations of opportunity or motive."  *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 2010 WL 11469576, at *7 (D. Minn. Feb. 3, 2010).  "Severe recklessness" requires Plaintiffs to identify "highly unreasonable omissions or misrepresentations" that "present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it."  *Ceridian*, 542 F.3d at 244 (citation omitted). In evaluating Plaintiffs' scienter allegations, the Court must weigh "'plausible nonculpable explanations for the defendant's conduct,' against inferences favoring the plaintiff's allegation of scienter."  *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007)).  After all competing inferences are weighed, the court can

sustain the complaint only if it alleges facts giving rise to a "strong inference" that the defendants acted with scienter. *Navarre.*, 299 F.3d at 741.

Plaintiffs here have not alleged that any Defendant had any particular motive to commit securities fraud. Absent such a motive, Plaintiffs' other allegations "have to be particularly strong in order to meet the Reform Act standard." *In re K-tel Int'l*, 300 F.3d at 894; *see also Navarre*, 299 F.3d at 746. Plaintiffs' allegations here do not come close.

Indeed, taking the Complaint in total, the far more plausible inference is that the Defendants—senior executives charged with managing up to 50,000 employees serving millions of customers in 37 states—did *not* engage in a systemic, multiyear effort to defraud regulators, customers, and investors. The allegations themselves show that Defendants put in place systems and codes of conduct designed to discourage "cramming," respond to customer complaints, and reprimand or terminate employees who engaged in "cramming," and that those did not always work perfectly. ¶¶ 102, 238, 240, 242, 244-45. The Complaint does not support any inference, much less a strong one, that Defendants designed a scheme to cram millions of customers in direct contravention of policies and safeguards Defendants themselves had put in place.

### A. The Former Employee Allegations Do Not Support A Strong Inference of Scienter

"The Eighth Circuit has made clear that confidential witness allegations will be disregarded as unreliable where a plaintiff . . . relies on witnesses whose information comes only from second or third-hand; or fails to establish that the witnesses 'would have a basis to know what [defendants] knew.'" *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d

1157, 1166 (E.D. Mo. 2014) (citing *Horizon Asset*, 580 F.3d at 763); *see also Shoemaker v. Cardiovascular Sys., Inc.*, 2017 WL 1180444, at *9 (D. Minn. Mar. 29, 2017); *In re K-V Pharm. Co. Sec. Litig.*, 2014 WL 1272452, at *12 (E.D. Mo. Mar. 27, 2014).

Under this standard, the allegations attributed to 17 of the FEs must be disregarded entirely. Those 17 FEs are claimed to have, at most, only second-hand information about what Defendants knew or did, and never interacted directly with any Defendant. *See supra* at 10-11; *see, e.g.*, ¶ 69; ¶¶ 71, 76. Nor does the Complaint allege facts suggesting that these 17 would have had any other reliable basis to speak to any Defendant's knowledge or state of mind. Most are described as having been low-level employees and/or remotely situated from Defendants' top executives in a physical and organizational sense; others managed a back-office division, or worked at CenturyLink for only a fraction of the Class Period. *See supra* at n. 6-11. Their allegations thus cannot be used to plead Defendants' scienter. *See Pound*, 8 F. Supp. 3d at 1168; *In re K-V Pharm.*, 2014 WL 1272452 at *12; *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460–61 (S.D.N.Y. 2010); *Zack v. Allied Waste Indus.*, 2005 WL 3501414, at *7 (D. Ariz. Dec. 15, 2005).[26]

---

[26] Even setting aside the lack of reliability for these 17 FEs, the statements attributed to them would not help Plaintiffs establish a strong inference of scienter. For example, FE-1 and FE-2's allegations that the Defendants signed off on revenue projections, ¶¶ 68–69, describe nothing more than ordinary activity undertaken by company executives. *See Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234–35 (S.D.N.Y. 2009). FE-8 and FE-16 allege that some Defendants had access to a "dashboard system" (a database tracking sales force issues), and call scores. ¶¶ 75, 99. But allegations that Defendants had access to data—without specific allegations that Defendants actually viewed or studied the data, or what the data showed and how it was inconsistent with Defendants' public statements—are insufficient to establish scienter. *See In re Medtronic*

Nor do the scant allegations attributed to the remaining FEs add up to a strong

inference of scienter.  While FE-5, FE-15, and FE-19 each claim *some* contact with one

of the Defendants, none asserts the Defendants knew or should have known of a

widespread "cramming" scheme, much less that they orchestrated and hid one.

**FE-15** allegedly told Plaintiffs that he or she attended meetings with Puckett and

Bailey in which CenturyLink's "marketing strategy" of "trying to compete with cable

companies and other providers on price" while "add[ing] fees" was discussed.  ¶ 70.

(The Complaint does not reflect that this "marketing strategy" entailed charging

unauthorized or undisclosed fees.)  According to Plaintiffs, FE-15 "voiced concerns"

about the strategy, "particularly to [ ] Puckett."  *Id*.  But an allegation that a former

employee disagreed with management about business strategy is not indicative of

scienter.  *See In re Patterson Companies, Inc. Sec., Derivative & ERISA Litig.*, 479 F.

Supp. 2d 1014, 1032-33 (D. Minn. 2007).

**FE-19**, who was allegedly on a "team" that was tasked by Post with reviewing and

resolving customer complaints, claims to have disagreed with Post and Puckett about

whether certain unspecified complaints were substantiated or refunds justified, and

whether to adopt unspecified "recommendations" on "what could be done to reduce

cramming."  ¶¶ 106-07.  Again, a disagreement with superiors does not support a strong

---

*Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1034 (D. Minn. 2009); *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002).  More importantly, even if Defendants were alleged to have studied this data, it would have alerted them to nothing more than sporadic instances of a well-known issue for which CenturyLink had already implemented prophylactic measures.

inference of scienter.[27]  *Patterson*, 479 F. Supp. 2d at 1032-33; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (disagreement between defendants and confidential witnesses about accounting processes did not establish scienter).

      *FE-5*'s allegations (described *supra* at 11) are that Bailey heard once, from one of CenturyLink's 50,000 employees, that he or she had encountered "cramming" at one call center.  ¶ 109.  (As described *supra*, FE-5's account is not borne out by the documentary record of his single conversation with Bailey, which is incorporated by reference in the Complaint.)  As a seasoned telecommunications industry executive, such a conversation would have told Bailey nothing that anyone in his shoes did not already know.  FE-5's story provides no support for a conclusion that Bailey actually understood cramming to be the "core" of CenturyLink's business.  ¶ 62; *see In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 292-93 (S.D.N.Y. 2006) (confidential witness insufficient for scienter where defendant told only that 6% of customer base was dissatisfied with product). Moreover, *Plaintiffs have not asserted a Section 10(b) claim against Bailey*, but only a claim for "control person liability" (which fails for the independent reasons described *infra* at 33).  Thus, even if Plaintiffs had adequately alleged Bailey's unique knowledge of a widespread cramming scheme (which they have not), that would not carry their pleading burden for any *other* Defendant.  *See In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 907 (D. Minn. 2011) (scienter must be pleaded for "'each individual

---

[27]  FE-19 does not claim that Post ever saw or reviewed individual customer complaints.

defendant in multiple defendant cases"') (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006)).[28]

### B.    The Balance of Plaintiffs' Scienter Allegations Also Fail

The Complaint's remaining scienter allegations likewise fail to plead a strong inference of fraudulent intent on the part of any Defendant.

*First*, Plaintiffs claim that Defendants were directly informed of sales misconduct on a "massive scale," ¶ 180, citing FE-5's alleged conversation with Bailey, an investigation by the Arizona Attorney General that concluded in 2016,[29] and the pending investigation by the Minnesota Attorney General.  Put simply, Plaintiffs allege nothing to suggest that any of this would have put any Defendant on immediate notice of a massive, company-wide fraud.  *See* ¶¶ 141-42, 163-71; *supra* at 9-10, 17-18.  In particular, as discussed *supra* at 18, the allegations that Plaintiffs have cut and pasted from the Minnesota Attorney General's briefing reference "over-billing," or even "potential[] over-bill[ing]"—*not cramming*—and do not specify any facts that would permit a

---

[28]  Although neither the Eighth Circuit nor the Supreme Court has ruled on whether the group-pleading doctrine survives after the PSLRA (*see Tellabs*, 551 U.S. at 326 n.6; *In re Hutchinson*, 536 F.3d at 961 n.6), several courts in this District have held that plaintiffs must demonstrate a strong inference of scienter for each individual defendant. *In re St. Jude Med.*, 836 F. Supp. 2d at 906 n.11; *In re Patterson*, 479 F. Supp. 2d at 1028.

[29]  Plaintiffs claim that "the significance of the Arizona Attorney General's investigative findings was obscured from investors," but the settlement has been publicly available since 2016.  Ex. 24.

conclusion that a cramming scheme was "materially impact[ing]" revenues.  ¶¶ 178, 203.[30]

*Second*, Plaintiffs allege that Defendants: received regular reports regarding customer complaints (¶ 182); "had access to 'real time' sales and revenue data," which purportedly alerted Defendants that sales targets were difficult for agents to meet (¶ 183); and "paid careful attention to the drivers of the Company's revenues" (¶ 184).  But none of these allegations supports a strong inference of scienter.  Sales agents missing targets does not indicate fraud.  Nor would reports on customer complaints have alerted Defendants to a massive fraud, given that CenturyLink had put systems and entire personnel departments in place for the precise purpose of monitoring and responding to such complaints.  *See supra* at 5-6.  Allegations that defendants were given internal reports, monitored the business, or had access to data tracking systems are insufficient to establish scienter.  *See In re Medtronic*, 618 F. Supp. 2d at 1033 (". . . there is no allegation in the Complaint that any individual defendant actually studied the sales and performance data of the [product at issue]") *Patterson*, 479 F. Supp. 2d at 1032-33; *Apple*, 243 F. Supp. 2d at 1026.

*Third*, Plaintiffs allege that cramming was "so widespread and material at the Company that Defendants had to have known about it."  ¶ 186.  As discussed above, the allegations in the Complaint do not come close to alleging with particularity that

---

[30]  Likewise, Plaintiffs' allegations about a question posed by Heiser during a town hall, ¶ 14, likewise do not show scienter.  *See Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1200 (S.D. Fl. 2015) (allegations that that a defendant was alerted to attrition problems at a town hall were insufficiently particularized to establish scienter).

cramming was "widespread" or "material." *See supra* Section I(A). Moreover, scienter cannot be based upon allegations that Defendants simply "must have known." *See SafeNet*, 645 F. Supp. 2d at 234-35; *Henningsen*, 161 F. Supp. 3d at 1203.

*Fourth*, Plaintiffs allege that Defendants denied any "sales misconduct." ¶ 185. This allegation makes no sense. Plaintiffs do not explain how denying sales misconduct demonstrates that the Defendants knew that sales misconduct was, in fact, pervasive.

*Fifth*, Plaintiffs allege that the SEC asked for more disclosures about CenturyLink's revenues, sales and marketing practices. ¶ 187. But the SEC was satisfied by CenturyLink's letter response. ¶¶ 121-24. CenturyLink's garden-variety exchange with the Division of Corporate Finance, from which no enforcement activity ensued, does not support any inference of scienter. *See Ceridian*, 542 F.3d at 248-49; *Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1151 (E.D. Mo. 2014), *aff'd sub nom. Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015).

*Finally*, the Complaint alleges that the departures of Puckett and Douglas, as well as another former director who stepped down from the Board, create a strong inference of scienter. ¶¶ 188-89. But "there are many reasons not related to fraud why people resign and more is needed before one *reasonably* could infer [scienter], no less before a *strong* inference arises." *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002); *see also Zucco Partners*, 552 F.3d at 1002, *as amended* (Feb. 10, 2009); *Henningsen*, 161 F. Supp. 3d at 1205. Plaintiffs' allegation that Puckett and Douglas "forfeited equity awards" and compensation by departing, ¶ 188—which typically occurs whenever an executive employee leaves a job—is not indicative of

scienter.  *Dillard v. Platform Specialty Prod. Corp.*, 2016 WL 10586301, at *8 n.2 (S.D.

Fla. 2016).

## III.    Plaintiffs Do Not Adequately Plead Loss Causation

To plead loss causation, the Complaint must allege "'a causal connection between

the material misrepresentation and the loss.'"  *In re Buca Inc. Sec. Litig.*, 2007 WL

2509716, at *3 (D. Minn. Aug. 30, 2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 342 (2005)).  Disclosures that do not "unveil[] the truth of the alleged

misrepresentations" do not suffice.  *Id.* at *4.  Moreover, "conclusory statements" made

in a contested lawsuit "do not sufficiently allege loss causation."  *In re Express Scripts,*

*Inc.*, 2010 WL 2671456, at *16 (E.D. Mo. June 30, 2010); *see also Magro v. Freeport-*

*McMoran Inc.*, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018) (". . . the announcement

of an investigation, without more, is insufficient to establish loss causation") (citation

omitted).

Here, the Complaint asserts that "the truth concerning CenturyLink's billing

practices and their impact on the Company's financial condition" was revealed by a

series of news articles describing lawsuits filed by Heidi Heiser, a class of consumers,

and the Minnesota Attorney General.  ¶¶ 266, 152.  But these purported corrective

disclosures involve contested allegations and speculation, not a statement or disclosure of

a massive fraud.  None of the "disclosures" actually state that the allegedly fraudulent

billing practices had an impact on CenturyLink's reported financial results; indeed

CenturyLink did not issue a restatement or otherwise admit to a prior inaccuracy in its

financial reports.  *Magro v. Freeport-McMoran Inc*., 2018 WL 3725781 at *9.  Nor do

any of the articles describe a management-led scheme that was deliberately hidden from investors. That is, "none of the purported disclosures alleged by Plaintiffs unveiled the truth of the alleged misrepresentations." *In re Buca Inc. Sec. Litig.*, 2007 WL 2509716 at *4. The Complaint should therefore be dismissed for failure to plead loss causation. *Id.*; *Markman v. Whole Foods Market, Inc.*, 269 F. Supp. 3d 779, 787 (W.D. Texas 2017); *In re Express Scripts*, 2010 WL 2671456, at *16-17.

## IV.    Plaintiffs' Section 20(a) Claim Should Be Dismissed

Plaintiffs' failure to allege a Section 10(b) claim requires that their Section 20(a) control person claims be dismissed as well. *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011).

Further, the Section 20(a) claim against Bailey (which is the sole claim against him) should be dismissed because the Complaint does not adequately allege that he was a "control person" who might be held liable for the actions of others. *Lustgraaf*, 619 F.3d at 878 (control person claim requires plaintiff to allege facts showing that the person "actually exercised control" over the general operations of the primary violators and possessed the power to determine the specific facts or omissions on which the underlying claim is based). Although Plaintiffs allege that Bailey oversaw CenturyLink's regional operations, ¶ 299, Plaintiffs do not allege that Bailey exercised any control over other Executive Defendants. To the contrary, Plaintiffs allege that Bailey "worked directly for Post." ¶ 299. *See Jensen v. Thompson*, 2018 WL 1440329, at *17 (D.S.D. Mar. 22, 2018).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Dated:  August 31, 2018                    Respectfully submitted,

                                           */s/ Patrick E. Gibbs*

                                           Patrick E. Gibbs
                                           (CA Bar No. 183174)
                                           COOLEY LLP
                                           3175 Hanover Street
                                           Palo Alto, California 94304
                                           Phone:  (650) 843-5000
                                           Fax:  (650) 849-7400
                                           pgibbs@cooley.com

                                           Douglas P. Lobel
                                           (VA Bar No. 42329)
                                           David A. Vogel
                                           (VA Bar No. 48971)
                                           COOLEY LLP
                                           11951 Freedom Drive
                                           Reston, Virginia 20190
                                           Phone:  (703) 456-8000
                                           Fax:  (703) 456-8100
                                           dlobel@cooley.com
                                           dvogel@cooley.com

                                           Sarah M. Lightdale
                                           (NY Bar No. 4395661)
                                           Lauren Gerber Lee
                                           (NY Bar No. 4883500)
                                           COOLEY LLP
                                           1114 Avenue of the Americas
                                           New York, New York 10036
                                           Phone:  (212) 479-6000
                                           Fax:  (212) 479-6275
                                           slightdale@cooley.com
                                           lglee@cooley.com

William A. McNab
(MN Bar No. 320924)
David M. Aafedt
(MN Bar No. 27561X)
WINTHROP & WEINSTINE, P.A.
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402
Phone: (612) 604-6400
Fax: (612) 604-6800
wmcnab@winthrop.com
daafedt@winthrop.com

*Attorneys for Defendants CenturyLink,*
*Inc., Glen F. Post, III, R. Stewart Ewing,*
*Jr., David D. Cole, Karen Puckett, Dean*
*J. Douglas, and G. Clay Bailey*