**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION** | **MDL No. 17-2795 (MJD/KMM)** |
| This Document Relates to: Civil Action No. 18-296 (MJD/KMM) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

TABLE OF ABBREVIATIONS .................................................................. xi

I.   PRELIMINARY STATEMENT .......................................................... 1

II.  PLAINTIFFS' COMPLAINT ............................................................ 5

    A.   CenturyLink's Institutionalized Cramming Represented A Material Undisclosed Driver of the Company's Reported Financial Results ............. 5

    B.   The Executive Defendants Oversaw and Enforced CenturyLink's Companywide Cramming Apparatus ............................................. 7

    C.   CenturyLink Secretly Attempted to Address Its Cramming Crisis, But Abandoned That Effort When It Led to an Abrupt Decline in Sales .......................................................................... 9

    D.   CenturyLink Sought to Distinguished Itself as Honest and Legitimate, Even as Rampant Cramming Began to Trigger Regulator Investigations ............................................................. 12

    E.   The Minnesota Attorney General Investigates the Company and a Whistleblower Urges Defendant Post to Address the Fraud ................ 13

    F.   The Whistleblower Reveals CenturyLink's Wells Fargo-Like Scheme .................................................................... 14

    G.   Post-Class Period Events Confirm Defendants' Fraud .................... 15

III. ARGUMENT ................................................................... 15

    A.   Defendants Made Materially False and Misleading Statements ............... 16

    B.   Defendants' Arguments Concerning Falsity Are Meritless ..................... 21

        1.   The Complaint's Allegations Are Sufficiently Particularized ......... 21

i

2.      Defendants' Misrepresentations About CenturyLink's
        Strategies, Policies, and Business Conduct Were False When
        Made ................................................................................ 25

3.      Defendants' Statements Were Not "Puffery," "Opinions," or
        Forward-Looking ............................................................... 27

        a.      Defendants' Statements Were Not "Puffery" ...................... 27

        b.      Defendants' Statements Are Not Protected "Opinions" ....... 30

        c.      Defendants' Statements Were Not Forward-Looking or
                Protected By the Safe Harbor ................................... 31

C.      The Complaint Adequately Alleges A Strong Inference of Scienter ......... 32

1.      The Pleading Standard Under the PSLRA ......................... 32

2.      The Complaint Adequately Alleges Scienter ................................. 33

D.      Defendants' Scienter Arguments Are Meritless ........................................... 41

1.      Former CenturyLink Employee Accounts Demonstrate
        Scienter ............................................................................ 42

2.      The Complaint's Other Allegations Also Establish Scienter .......... 46

E.      The Consolidated Complaint Adequately Pleads Loss Causation ............. 51

F.      The Complaint Adequately Pleads a Claim for Violation of
        Section 20(a) ..................................................................................... 54

IV.  CONCLUSION ................................................................................................ 55

ii

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

CASES

*In re Adaptive Broadband Sec. Litig.*,
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ................................................................ 41

*Akerman v. Arotech Corp.*,
    608 F. Supp. 2d 372 (E.D.N.Y. 2009) ........................................................................ 47

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72, 83 (1st Cir. 2002) .................................................................................. 25

*In re Am. Italian Pasta Co. Sec. Litig.*,
    2006 WL 1715168 (W.D. Mo. June 19, 2006) .......................................................... 22

*In re Apple Computer, Inc. Sec. Litig.*,
    243 F. Supp. 2d 1012 (N.D. Cal. 2002) ..................................................................... 36

*Bach v. Amedisys, Inc.*,
    2016 WL 4443177 (M.D. La. Aug. 19, 2016) .......................................................... 18

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................ 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................... 16

*Bernstein v. Extendicare Health Servs., Inc.*,
    607 F. Supp. 2d 1027 (D. Minn. 2009)...................................................................... 30

*In re Bofi Holding, Inc. Sec. Litig.*,
    2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)........................................................... 28

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) .................................................................................. 40, 42

*In re Ceridian*,
    542 F.3d 240 (8th Cir. 2008) ..................................................................................... 50

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*,
    2013 WL 1100819 (W.D. La. Mar. 15, 2013) .......................................................... 19

*Cornwell v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010)........................................................................ 35

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................ 34, 35, 44

*Dep't of Treasury of the State of N.J. and Div. of Invest. v. Cliffs Nat'l Res., Inc.*,
2015 WL 6870110 (D.N.J. Mar. 5, 2015) .................................................... 40

*Dillard v. Platform Spec. Prod. Corp.*,
2016 WL 10586301 (S.D. Fla. 2016) ......................................................... 50

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .................................................................................. 51, 52

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017) ....................................................... 19, 29

*Espinoza v. Whiting*,
8 F. Supp. 3d 1142 (E.D. Mo. 2014) ......................................................... 50

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ....................................................... 20

*In re Finisar Corp. Sec. Litig.*,
646 F. App'x 506 (9th Cir. 2016) .............................................................. 20

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
1998 WL 781118 (N.D. Ill. Nov. 4, 1998) .............................................. 16, 24, 30, 46

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F. 3d 645 (8th Cir. 2001) .................................................................... 33, 47

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ....................................................... 22, 47

*Friedman v. Rayovac Corp.*,
295 F. Supp. 2d 957 (W.D. Wis. 2003) .................................................... 21

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)....................................................................... 28

*Garden City Empls. Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. 2011) ....................................................... 49

*Gebhardt v. ConAgra Foods, Inc.*,
335 F.3d 824 (8th Cir. 2003) ...................................................................... 22

iv

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)........................................................ 38

*In re Gentiva Sec. Litig.*,
   932 F.Supp.2d 352 (E.D.N.Y. 2013) ........................................................ 22

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   2014 WL 2815571 (S.D.N.Y. June 23, 2014) .......................................... 19

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .....................................*passim*

*Henningsen v. ADT Corp.*,
   161 F. Supp. 3d 1161 (S.D. Fla. 2015) ............................................... 48, 50

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ..................................................... 43

*In re Hutchinson Tech., Inc. Sec. Litig.*,
   536 F.3d 952 (8th Cir. 2008) .................................................................... 30

*In re Infineon Tech. AG*,
   2006 WL 1329887 (N.D. Cal. May 22, 2016) .......................................... 21

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242, 264 (3d Cir. 2009).............................................................. 20

*Janus Capital Group, Inc. v. First Deriv. Traders*,
   564 U.S. 135 (2011) .................................................................................. 31

*In re K-V Pharm. Co. Sec. Litig.*,
   2014 WL 1272452 (E.D. Mo. Mar. 27, 2014) .......................................... 44

*Khoja v. Orexigen Therapeutics, Inc.*,
   2018 WL 3826298 (9th Cir. Aug. 13, 2018)............................................. 43

*Kurtzman v. Compaq Comp. Corp.*,
   2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)........................................ 50

*Lapin v. Goldman Sachs Grp.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................... 29

*Lasker v. New York State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996).......................................................................... 30

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ....................................................... 44

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ................................................................... 52

*Lustgraaf v. Behrens*,
    619 F.3d 867 (8th Cir. 2010) ............................................................... 54, 55

*Marcus v. JCPenney Co., Inc.*,
    2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ........................................... 30

*Markman v. Whole Foods Market, Inc.*,
    269 F. Supp. 3d 779 (W.D. Texas 2017), *aff'd at* 2018 WL 4770729
    (5th Cir. Oct. 3, 2018) ............................................................................. 53

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................... 16

*Mauss v. Nuvavsive, Inc.*,
    2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ..................................... 22, 23

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013) ....................................................... 22

*In re McLeodUSA Inc., Sec. Litig.*,
    2004 WL 1070570 (N.D. Iowa Mar. 31, 2004) ......................................... 39

*In re Medtronic, Inc. Sec. Litig.*,
    618 F. Supp. 2d 1016 (D. Minn. 2009) ......................................... 33, 35, 36

*Minneapolis Firefighters' Relief Ass'n v. Medtronic*,
    2010 WL 11469576 (D. Minn. Feb. 3, 2010) ..................................... *passim*

*Monroe Co. Empls. Ret. Sys. v. Southern Co.*,
    2018 WL 1558577 (N.D. Ga. Mar. 29, 2018) ............................................ 39

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ......................................... 19, 29, 47

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ............................................ 20

*N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*,
    709 F.3d 109 (2d Cir. 2013) ..................................................................... 44

*In re Nash Finch Co. Sec. Litig.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) ........................................................ 32, 41, 42, 44

*Neborsky v. Valley Force Composite Techs.*,
   2014 WL 3767011 (S.D. Cal. July 29, 2014) ............................................................. 39

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. America West
   Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................... 37, 48

*Novak v. Kosaks*,
   216 F. 3d 300 (2d Cir. 2000) ................................................................................. 19, 43

*In re Novo Nordisk Sec. Litig.*,
   2018 WL 3913912 (D.N.J. Aug. 16, 2018) ................................................................. 49

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ..................................................................................... 35

*Omnicare v. Laborer Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) .......................................................................................... 30, 31

*Ong v. Chipotle*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018) .................................................................... 25, 26

*In re Patterson Cos., Inc. Secs. Deriv. & ERISA Litig.*,
   479 F. Supp. 2d 1014 (D. Minn. 2007) ............................................................. 35, 36, 46

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ............................................................... 50

*Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 210 (S.D.N.Y. 2009) .............................................................................. 48

*Pound v. Stereotaxis, Inc.*,
   8 F. Supp. 3d 1157 (E.D. Mo. 2014) ........................................................................... 44

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...................................................................................... 40

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001) .......................................................................... 18

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v.
   Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ................................................................................. 52, 53

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ..................................................... 31

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ................................................. 38, 41

*Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015) ................................... 21, 33

*Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012) ......................................... 44

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-
  Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ..................................................... 30

*In re Retek Inc. Sec.*,
  2005 WL 3059566 (D. Minn. Oct. 21, 2005) ............................... 51

*In re Schering-Plough Corp./Enhance Sec. Litig.*,
  2009 WL 2855457 (D.N.J. Sept. 2, 2009) ................................... 25

*Securities and Exchange Comm'n v. Goldstone*,
  233 F. Supp. 3d 1169 (D. N.M. 2017) ......................................... 32

*Shaev v. Baker*,
  2017 WL 1735573 (N.D. Cal. May 4, 2017) ..................... 17, 27, 42, 48

*Shoemaker v. Cardiovascular Sys., Inc.*,
  2017 WL 1180444 (D. Minn. Mar. 29, 2017) ............................... 44

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ....................................................... 52

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ..................................................... 47

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) ............................... 16, 28, 42

*In re St. Paul Travelers Sec. Litig. II*,
  2006 WL 2735221 (D. Minn. Sept. 25, 2006) ................. 33, 34, 44, 52

*Steiner v. MedQuist Inc.*,
  2006 WL 2827740 (D.N.J. Sept. 29, 2006) ................................. 18

viii

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014)......................................................... 49

*In re Stratasys Ltd. S'holder Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) ..................................................................... 28

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) ........................................................ 49

*In re Syncor Intern. Corp. Sec. Litig.*,
    239 Fed. Appx. 318, 2007 WL 1729968 (9th Cir. 2007) ..................... 18, 27

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*,
    633 F. Supp. 2d 763 (D. Ariz. 2009) .......................................................... 50

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................ *passim*

*In re UnitedHealth Group PSLRA Litig.*,
    2007 WL 1621456 (D. Minn. Jan. 1, 2007)................................................ 15

*In re Unumprovident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005)...................................................... 18

*In re Valeant Pharms. Int't Sec. Litig.*,
    2017 WL 1658822 (D.N.J. Apr. 28, 2017) ................................................. 32

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)................................................... 18, 21

*Verdieck v. TD Ameritrade, Inc.*,
    2015 WL 13216410 (D. Neb. Aug. 17, 2015) ............................................ 22

*In re Volkswagen "Clean Diesel,"*
    2017 WL 66281, at *12 (N.D. Cal. Jan. 4, 2017) ...................................... 35

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 .................................................................................. 39, 44

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................... 34, 37

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .............................................................. 46, 50

**STATUTES**

15 U.S.C. § 78t(a) ............................................................................................. 54

**OTHER AUTHORITIES**

F.R.C.P. 8 .......................................................................................................... 16

# <u>TABLE OF ABBREVIATIONS</u>

**RELEVANT PERSONS AND ENTITIES**

| | |
|---|---|
| "Lead Plaintiff" or "Oregon" | The State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund (¶26) |
| "Plaintiffs" | Oregon and Named Plaintiff Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009 (¶27) |
| "CenturyLink" or the "Company" | Defendant CenturyLink, Inc. |
| "Post" | Defendant Glen F. Post, III, Former CEO (¶29) |
| "Ewing" | Defendant R. Stewart Ewing, Jr., Former CFO (¶30) |
| "Cole" | Defendant David D. Cole, Former Executive Vice President and Controller (¶31) |
| "Puckett" | Defendant Karen Puckett, Former Global Head of Sales (¶32) |
| "Douglas" | Defendant Dean J. Douglas, Former President, Sales and Marketing (¶33) |
| "Bailey" | Defendant G. Clay Bailey, Former Senior Vice President and Treasurer (¶34) |
| "Defendants" | CenturyLink, Bailey, Cole, Douglas, Ewing, Post, and Puckett |
| "Executive Defendants" | Bailey, Cole, Douglas, Ewing, Post, and Puckett |
| "Victory" | Kathy Victory, Senior Vice President, Consumer Sales & Care (¶100) |

| | |
|---|---|
| "Flynn" | Kathy Flynn, Vice President, Human Resources (¶102) |
| "Olsen" | Linda Olsen, Vice President, Consumer Contact Centers (¶60) |
| "Stading" | Brian Stading, Vice President, Northwest Region (¶109) |
| "FE-1" | Former Manager of Customer Care and Sales (¶38) |
| "FE-2" | Former Financial Analyst II (¶69) |
| "FE-3" | Former Inbound Call Center Sales Representative (¶71) |
| "FE-4" | Former Inbound Sales and Care Representative (¶72) |
| "FE-5" | Former Consumer and Business Sales Manager (¶73) |
| "FE-6" | Former Inbound Sales Representative (¶73) |
| "FE-7" | Former Customer Care & Sales Supervisor (¶74) |
| "FE-8" | Former HR Business Partner (¶74) |
| "FE-9" | Former Residential Customer Service Representative and NOHD Representative (¶77) |
| "FE-10" | Former NOHD Representative (¶80) |
| "FE-11" | Former Retention Specialist (¶82) |
| "FE-12" | Former Retention Specialist (¶84) |
| "FE-13" | Former NOHD Consultant (¶87) |
| "FE-14" | Former Sales Representative (¶91) |

| "FE-15" | Former Regional President (¶70) |
| "FE-16" | Former Manage of Customer Experience (¶99) |
| "FE-17" | Former Director of Human Resources (¶102) |
| "FE-18" | Former Manager of Executive & Regulatory Services (¶103) |
| "FE-19" | Former Manager of Executive Complaints (¶103) |
| "FE-20" | Former HR Business Partner (¶102) |

**OTHER ABBREVIATIONS**

| "¶__" | Paragraph(s) from Plaintiffs' Consolidated Securities Class Action Complaint, ECF No. 143, *Craig v. CenturyLink, Inc.*, No. 0:18-cv-00296-MJD-KMM (D. Minn.) |
| "App'x A" | Appendix A to Plaintiffs' Consolidated Securities Class Action Complaint, ECF No. 143, *Craig v. CenturyLink, Inc.*, No. 0:18-cv-00296-MJD-KMM (D. Minn.) |
| "ARPU" | Average Revenue Per User |
| "Class Period" | March 1, 2013 through July 12, 2017, inclusive |
| "DB" | Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Securities Class Action Complaint, *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-02795 (D. Minn.) (ECF No. 278); *Craig v. CenturyLink, Inc.*, No. 18-cv-00296 (D. Minn.) (ECF No. 156) |
| "Ex. __" | Exhibits to the Declaration of Michael D. Blatchley in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed herewith |
| "FCC" | The Federal Communications Commission |

| "FOIA" | The Freedom of Information Act, codified at 5 U.S.C. § 552 |
| "PSLRA" | The Private Securities Litigation Reform Act of 1995, codified at 15 U.S.C. §78u-4 |
| "SEC" | The United States Securities and Exchange Commission |

## I.    PRELIMINARY STATEMENT

This is a strong case of securities fraud.  For years, CenturyLink engaged in systemic "cramming" of customer accounts—a practice so endemic that, according to an internal audit, CenturyLink potentially <u>overbilled 3.5 million customers</u>, a number representing <u>over half</u> of its 5.9 million broadband subscribers and <u>one-third</u> of its 12 million wireline subscribers.  This practice was condoned and encouraged by the Company's senior leadership, which depended on these corrupt practices to meet the financial projections Defendants provided to Wall Street.  Defendants never told investors that CenturyLink's sales practices could be called into question, instead falsely representing that its sales strategies focused on "customer needs," its results were driven by its touted "bundling" strategy, and that CenturyLink would <u>never</u> "<u>place or record an order for our products and services for a customer without that customer's authorization</u>."[1]

These representations bore no resemblance to reality. In truth, CenturyLink routinely added services to customers' accounts without authorization, deceived customers about the prices they would be charged, and systematically misquoted prices by failing to disclose that "bundles" included fees for optional services that the customer did not need or authorize—a sales pitch CenturyLink management developed, taught to employees, and discussed at monthly sales meetings.  The Executive Defendants directly and purposefully encouraged this behavior by imposing unachievable quotas on sales employees, which

---

[1] Unless otherwise indicated, all citations and quotations in case law have been omitted, and all emphasis in quotation marks has been added.

1

former CenturyLink employees reported were "insane," so "ridiculously high you had to cheat to get your numbers" and "impossible to meet unless you were engaged in shady practices." CenturyLink senior management strictly enforced compliance with these quotas, and terminated sales employees who did not meet them—even when <u>over half</u> of all sales employees were disciplined for failing to meet CenturyLink's quotas.

In 2014, Defendants internally acknowledged that cramming had reached crisis levels, with Defendant Bailey admitting that "<u>[w]e've got to do something about our call centers</u>," and secretly attempted to address it. But when doing so led to an abrupt decline in sales, Defendants quickly reverted to the old sales model—and sales and cramming quickly returned to previous levels. Then, when increased cramming incidents prompted the news media and regulators to ask questions, CenturyLink "expressly denied" any wrongdoing, falsely stated that any complaints were isolated, and claimed the Company was quickly and fairly addressing them. After revelations of a strikingly similar scandal involving unauthorized accounts at Wells Fargo, a CenturyLink whistleblower brought concerns about the cramming she witnessed directly to CenturyLink's CEO, Defendant Post. CenturyLink retaliated, fired the whistleblower, and then sought to scuttle an investigation by the Minnesota Attorney General into these practices.

The truth began to be revealed in a series of disclosures after the whistleblower filed a complaint detailing CenturyLink's sales misconduct. The market reacted swiftly. Analysts downgraded the Company's stock, and the price of CenturyLink securities declined dramatically—causing substantial damages to the Class.

These allegations state a claim for securities fraud under Section 10(b) of the Securities Exchange Act. Indeed, in every material respect, the allegations here are indistinguishable from those sustained in the securities class action against Wells Fargo. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018).

Faced with this precedent, Defendants try to ignore and mischaracterize Plaintiffs' detailed allegations and instead offer implausible excuses for their misconduct. The PSLRA may impose heightened pleading requirements, but it does not permit Defendants to obtain dismissal by running from the facts.

For instance, Defendants argue that the Complaint's allegations concerning the Company's results are not sufficiently "particular" or "quantified" because the Company (like Wells Fargo) has not yet restated its financial results. Defendants are wrong. To start, courts have uniformly rejected Defendants' premise that a restatement or the precise quantification of Defendants' fraud is necessary at the pleading stage. That is particularly true in cases like this one, as courts recognize that investors are entitled to know whether a company's revenues are even "<u>partially</u> attributable to illegal activities." In any event, Plaintiffs have provided a litany of facts quantifying the fraud at CenturyLink, including (1) internal audits demonstrating that <u>one-third to one-half of all CenturyLink customers were overbilled</u>, (2) former employee accounts reporting that cramming occurred "all the time, all day, every day" and in "every state," (3) CenturyLink's own internal investigations substantiating that <u>half to over 80% of cramming complaints</u> "did, in fact, happen like the customer said it did," and (4) findings of the Minnesota Attorney General confirming that customers were overcharged hundreds of dollars each.

3

Next, Defendants contend the Complaint fails to allege a single actionable misstatement because, Defendants claim, the detailed accounts of 20 former CenturyLink employees and numerous other well-pled allegations only show Defendants innocently "fell short" of their public aspirations. But the Complaint establishes that Defendants' statements were false when made, including because Defendants knew, in real time, that CenturyLink's revenues declined due to their effort to address the Company's rampant cramming—and rebounded immediately after Defendants abandoned that effort. Further, Defendants expressly and falsely denied any misconduct—when it was in fact pervasive—and cannot now be heard to argue they were unaware of how far it "fell short."

Defendants also argue the Complaint fails to allege a strong inference of scienter, again primarily by attacking as "unreliable" the 20 former employees cited by Plaintiffs. But the Complaint details how seven of those witnesses reported the endemic cramming practices directly to Defendant Post and other senior executives, and the rest provide first-hand accounts of CenturyLink's sales practices, the Company's punitive enforcement of sales quotas, and the reasons why Defendants were unwilling to sacrifice profits in order to comply with the law. These employees—who worked in different positions across the country—tell a consistent story that is corroborated by CenturyLink's internal audits, whistleblower allegations, the findings of two state Attorneys General, and the Company's own internal investigation. These allegations easily satisfy the PSLRA.

The motion should be denied.

4

## II.    PLAINTIFFS' COMPLAINT

### A.    CenturyLink's Institutionalized Cramming Represented A Material Undisclosed Driver of the Company's Reported Financial Results

This case is about CenturyLink's secret institutionalized practice of illegal "cramming"—placing unauthorized, misleading or deceptive charges on customers' bills. ¶44. According to an internal CenturyLink audit, the Company potentially overbilled 3.5 million customers—a number representing over half of CenturyLink's 5.9 million broadband subscribers and one-third of its 12 million wireline subscribers. ¶¶65, 178. During the Class Period, CenturyLink never once hinted at this endemic practice, revealed that the Company was the subject of numerous regulatory investigations because of it, or otherwise suggested its results could be called into question.

To the contrary, during the Class Period, Defendants told investors that the Company's sales practices were beyond reproach and publicly committed that CenturyLink would never "place or record an order for our products and services for a customer without that customer's authorization." ¶151; *see also* ¶¶4, 64, 96, 132, 144, 153, 156. Instead, Defendants falsely attributed CenturyLink's revenue and subscriber growth in its consumer and small business segments—which comprised well over one-third of CenturyLink's revenues during the Class Period—to the Company's focus on "customer needs" and its "customer first" sales approach, its "bundling" (and other) strategies, and its strict adherence to the Company's "Unifying Principles," "fairness, honesty and integrity." ¶¶55-61. These were the supposedly key "differentiators" that drove the Company's success. ¶40.

5

These representations were critical to investors, who were intently focused on CenturyLink's ability to generate dependable cash flows in the face of customers "cutting the cord"—abandoning traditional wireline services that were historically the core of CenturyLink's business.  Immediately prior to the Class Period, this trend forced CenturyLink to slash its dividend and heightened concern among analysts and investors about its financial condition. ¶¶55-56. To reassure investors, CenturyLink repeatedly highlighted the marketing strategies purportedly used to combat this threat, grow subscribers, and increase sales—including initiatives to "bundle" packages, reduce customer "churn," generate better "ARPU" or "average revenue per user," "enhance customer loyalty," and secure a "longer lifetime revenue base for that customer."  ¶¶58-59.

These representations were false.  In truth, CenturyLink (1) routinely added services to customer accounts without authorization; (2) lied to customers about the prices they would be charged and other material contract terms; and (3) systematically misquoted the prices of contracts, including by failing to disclose that "bundled" packages included fees for optional services that the customer did not need or authorize. ¶¶63-64, 88-94.

The Complaint provides extensive detail quantifying these illegal practices and their impact on the Company's financial results.  First, CenturyLink's own internal audits confirmed <u>one-third to one-half of all CenturyLink customers</u> were overcharged (¶¶65, 178), and the accounts of former employees—who worked in every region of the country and reported this misconduct to Defendants—confirmed that cramming was "happening all the time, all day, every day" and "clearly occurring in every state."  ¶¶89, 96, 105, 107. Second, the Complaint details that complaints were common, and <u>CenturyLink itself</u>

6

substantiated between <u>one-half and over 80% of them</u>.  ¶¶103-108; *see also* ¶86.  Third, as confirmed by the Attorney General's investigation and Plaintiffs' FOIA requests, CenturyLink overcharged customers hundreds of dollars per month, sometimes for months on end.  ¶93.

The Complaint also details how these practices were carried out, including by adding services at promotional rates without disclosing that the promotion would end, signing up customers for services they had not authorized, and promising low rates while charging significantly more. ¶¶89-90, 92-93. As a former Vice President who reported directly to Defendant Puckett explained, CenturyLink's strategy was to "keep the price point low but add fees."  ¶70.  CenturyLink managers instructed sales employees to engage in these practices in monthly sales meetings and training sessions, specifically telling employees not to disclose that the price of a "bundle" included optional services. One former employee explained, "it's highly illegal, and we were instructed to do it." ¶¶81-82. And as Defendants themselves confirmed, these managers were following policies implemented at the Company's headquarters.  ¶¶66, 180.

## B.  The Executive Defendants Oversaw and Enforced CenturyLink's Companywide Cramming Apparatus

These practices were encouraged and monitored by the Executive Defendants, who implemented a boiler-room sales apparatus in which intense pressure was exerted on sales personnel in the form of impossibly high sales quotas that were strictly enforced under the threat of termination. ¶¶63, 77, 83-87. The Executive Defendants set these quotas in order to deliver on their promises to Wall Street—without regard to historical sales experience

or the ability of sales representatives to meet them. ¶68. Moreover, Defendants refused to adjust these quotas—even when their enforcement led to disciplinary action for 70 to 80% of all sales employees—because, at CenturyLink, the "number was the number." ¶¶68, 71-78, 83-87. The managers who were responsible for disciplining employees for improper sales practices had no incentive to do so, as their compensation was driven by sales—a problem compounded by the fact that a quality assurance metric was eliminated from monthly manager bonus compensation in 2014. ¶100. As explained by executive Linda Olsen, who oversaw all CenturyLink call centers, strict enforcement of quotas was CenturyLink's "culture. If you don't get to 90% [of your quota], we're going to churn to the next person." ¶79.

Further, CenturyLink's management designed the Company's "customer service" apparatus not to help customers, but to retain as much of the overcharges as possible. That department was staffed with "retention specialists" who were incentivized to minimize refunds, required to meet sales quotas, and strictly limited in how much they could reimburse customers—regardless of how much they had been overcharged. ¶¶85-86. CenturyLink also made it nearly impossible for customers to challenge overcharges by deleting call recordings (likely the only evidence that a customer was misquoted) before the customer received the first "real" bill, while requiring customers to prove misquotes. ¶87.

Defendants monitored CenturyLink's cramming practices through monthly reports detailing thousands of complaints by the FCC, state agencies, and others of "slamming/cramming," overbilling, and misrepresentation of prices. ¶¶96-99. Defendants

Post, Puckett and other senior executives expressly acknowledged that the number of complaints was extraordinarily high—even accusing the team who compiled the data of overstating the numbers. ¶105. But when the team verified the numbers, and provided recommendations on how to reduce cramming, they were ignored. *Id*. As reported by FE-19, this was because the Executive Defendants were not willing to sacrifice revenues in order to comply with the law. ¶108.

Similarly, when employees—including former salespeople cited in the Complaint—reported cramming violations through CenturyLink's "tips" hotline, their complaints were either ignored or invited retaliation. ¶¶98, 102-05. Even after substantiating 83% of cramming complaints identified by a state Attorney General, the Company refused to change its practices. As one former employee reported, senior management would rather "pay the fines" than "kowtow" to a state Attorney General. ¶¶106-08.

### C.     CenturyLink Secretly Attempted to Address Its Cramming Crisis, But Abandoned That Effort When It Led to an Abrupt Decline in Sales

Several developments at the beginning of the Class Period put the risks created by CenturyLink's improper sales practices into sharp focus for the Executive Defendants. First, following congressional scrutiny into "cramming," and after CenturyLink publicly committed to Senator Klobuchar that the Company would "step up to the plate" to address it, regulators began to initiate several enforcement actions targeting the practice. ¶47. In the fall of 2014, the FTC and attorneys general from all 50 states obtained a nine-figure settlement in an action against AT&T. In that case, the government alleged that crammed customers had requested refunds of more than 40% of the charges placed by some third

parties—which should have rung "alarms inside AT&T"—but AT&T refused to refund the amounts, capping any refunds at only two months' worth. ¶51.

Second, the Company's senior-most executives were directly informed and internally acknowledged that cramming was a widespread problem. At the Company's "Circle of Excellence" event at the Breakers Hotel in Palm Beach, Florida in April 2014, a former employee discussed the Company's rampant cramming problem with Defendant Bailey, who admitted that cramming was occurring on a widespread basis and that "[w]e've got to do something about our call centers." ¶109. Bailey, who worked "directly" for Defendant Post (¶34), was then put in charge of a team devoted to improving the Company's customer interactions. ¶110. At the same time, CenturyLink's termination of sales employees for cramming and missing quotas had reached crisis levels. For seven months in a row in 2014, over half of all employees were written up each month for failing to meet the monthly quota. ¶78. Indeed, FE-20 noted that terminations for failure to meet sales quotas and cramming were so severe that recruiting "couldn't even keep [up with] the turnover." ¶113.

In direct response to these developments—and specifically in order to address the cramming crisis at the Company—CenturyLink's senior management overhauled its sales model. Specifically, in 2014, the Company's human resources team developed a new "behavioral coaching" system that focused less on impossible-to-meet "metrics," and instead held supervisors—not sales employees—responsible for meeting quotas. ¶¶111, 114. Defendant Post publicly recognized CenturyLink's Vice President of Human Resources, Kathy Flynn, for her work on the project. ¶¶102, 111. The change was well

received by employees, and the number of complaints from customers declined significantly, as did terminations for unethical behavior. ¶111. But CenturyLink's sales also immediately fell "drastically." ¶114. And because Defendants could not tolerate any drop in revenues, CenturyLink reverted to the old quota system almost immediately. ¶¶112-14.

To disguise their attempt to address the cramming crisis, Defendants concocted a false narrative to explain the Company's fluctuating financial results. ¶115. The Company attributed the dip in revenues to an organizational realignment, credit tightening, and shift in strategy to focus on "higher value customers." ¶¶115, 213-18. By the third-quarter 2015, however, CenturyLink's return to its prior practices began to take hold, and Defendants attributed the rejuvenated results to CenturyLink's strategy of pursuing "higher value bundled sales and select pricing increases." ¶117. In response, CenturyLink's shares shot up, increasing over $4 per share, and began trading at their highest levels in over six months. ¶119.

At the same time, the Company was pointedly instructed by the SEC to disclose any known trends impacting its consumer segment results. ¶¶121, 123. Under Item 303, CenturyLink was required to disclose that the Company's illegal and deceptive sales practices were a material driver of CenturyLink's revenue in the consumer and small business segments—and that the Company's efforts to reduce cramming had caused sales to decline. ¶122. But instead of making that required disclosure, in September 2015, CenturyLink falsely attributed the changes to innocuous "price compression and customer disconnects caused by competition." ¶124.

Just two months later, longtime CenturyLink director Joseph Zimmel—who was on the audit committee and would have reviewed the Company's response to the SEC—was forced out by Defendant Post and other senior Board members. ¶126.  In connection with his ouster, Zimmel accused CenturyLink of conduct that raised "<u>serious governance, transparency and honesty issues</u>," stating that a press release CenturyLink prepared was "<u>incomplete and inaccurate</u>" and "<u>deliberately misleading in a material way</u>."  ¶125.

### D.    CenturyLink Sought to Distinguished Itself as Honest and Legitimate, Even as Rampant Cramming Began to Trigger Regulator Investigations

After CenturyLink returned to its quota-driven model, revenues—as well as cramming and resulting customer complaints—promptly returned to their prior levels. ¶131. The complaints caught the attention of regulators and, by March 2016, the Arizona Attorney General concluded that CenturyLink had engaged in numerous deceptive billing practices. ¶132. In the face of the Attorney General's findings, CenturyLink quietly agreed to a $150,000 settlement (to cover the Attorney General's fees and costs) in which it promised to take measures to prevent consumers from being improperly charged.  ¶135. At the same time, CenturyLink "expressly denie[d]" each of the Attorney General's allegations, instead claiming that all relevant terms and fees were "fully disclosed." ¶¶133-34.

Just weeks later, the Company again reported favorable results in its consumer segment, which had been buoyed by the improper sales practices identified by the Arizona Attorney General.  ¶139.  But instead of warning investors that CenturyLink's consumer segment results could be called into question, Defendant Douglas claimed the Company's

strategies were successful in signing up customers who were "less precluded to churn" and generated "higher ARPU." ¶140. Most significantly, Defendant Douglas affirmatively distinguished CenturyLink from competitors that Douglas claimed charged unwanted fees—something Douglas falsely told investors CenturyLink did not do. ¶¶140, 220-25. In other words, CenturyLink not only failed to inform investors of the Arizona Attorney General's action or its findings, but furthered the false impression that the Company was in fact less susceptible to government scrutiny than CenturyLink's competitors. ¶¶50, 52-53, 260.

### E.   The Minnesota Attorney General Investigates the Company and a Whistleblower Urges Defendant Post to Address the Fraud

In May 2016, the Minnesota Attorney General issued a civil investigative demand to CenturyLink following a wave of complaints. ¶141. Defendants recognized that this new investigation, following on the heels of the Arizona settlement, posed a significant threat, and did everything in their power to keep it at bay. ¶¶142, 168. For example, CenturyLink told the Attorney General that certain documents did not exist—but when the Attorney General subpoenaed CenturyLink's vendors, the vendors "promptly" produced them. ¶168.

Just months later, after repeatedly raising concerns about CenturyLink's fraudulent business practices to her supervisors with no success, a former CenturyLink employee, Heidi Heiser, brought them directly to Defendant Post, asking him "why customers were being given multiple accounts and being billed for things they did not ask for." ¶146. Just two days later, Heiser was suspended and then fired for blowing the whistle—a reaction

13

entirely consistent with the Company's treatment of other employees who questioned CenturyLink's practices. ¶147.

At the same time, CenturyLink was increasingly forced to publicly respond to media inquiries about its billing practices. In each case, CenturyLink flatly denied any wrongdoing, falsely claiming that it took the complaints "seriously and [worked] diligently" to resolve them—when, in truth, the Company enforced a policy specifically designed to limit the amounts CenturyLink would refund. ¶¶85-87, 103-10, 149-50.

### F.    The Whistleblower Reveals CenturyLink's Wells Fargo-Like Scheme

The truth concerning CenturyLink's sales practices were revealed in a series of disclosures. On June 16, 2017, *Bloomberg* published an article, "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme," which detailed Heiser's whistleblower complaint and revealed CenturyLink's practice of charging customers for services they neither authorized nor requested. ¶¶152-53. On June 19, 2017, *Bloomberg* reported that a consumer class action lawsuit arising out of CenturyLink's billing misconduct had been filed in California, impacting potentially millions of consumers. ¶158. Then, on July 12, 2017, the last day of the Class Period, the media reported that the Minnesota Attorney General filed a complaint against CenturyLink following a year-long investigation, which cited internal Company documents, emails, and call recordings detailing the Company's fraudulent practices. ¶¶167-68. In response to each of these disclosures, CenturyLink securities declined in a statistically significant manner, causing substantial damage to the class. ¶¶171, 266.

### G.    Post-Class Period Events Confirm Defendants' Fraud

Post-Class Period events further confirm that Defendants deliberately misled investors. In October 2017, CenturyLink entered into a consent order with the Minnesota Attorney General in which it agreed to dramatically reform its sales practice (even as the Attorney General continues to pursue monetary relief for the underlying misconduct alleged in this case).  ¶173.  In December 2017, the Company announced the results of an internal investigation, which found that CenturyLink's promotions misled customers who did not receive discounts they were offered.  ¶174.  Just weeks later, on March 6, 2018, Defendant Post—who had previously announced his intention to remain as CEO until January 1, 2019—unexpectedly announced he would retire nearly a year earlier.  ¶177. Even now, numerous investigations by state attorneys general into CenturyLink's billing misconduct remain pending, and the Company's consumer revenues have flat-lined with no return in sight.

## III.    ARGUMENT

At the motion to dismiss stage, courts assume that well-pleaded allegations are true and draw all reasonable inferences in plaintiffs' favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 322 (2007).  A securities complaint "should not be dismissed for failure to state a claim where there is a 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support plaintiffs' claims." *In re UnitedHealth Group PSLRA Litig.*, 2007 WL 1621456, at *1 (D. Minn. Jan. 1, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007)).

15

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) that the defendant made a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). While Plaintiffs are required to plead falsity and scienter with particularity in accordance with Rule 9(b) and the PSLRA, materiality and loss causation need only satisfy Rule 8's "notice" pleading standard. F.R.C.P. 8, 9(b); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 908 (D. Minn. 2011). Plaintiffs satisfy these standards.

### A.    Defendants Made Materially False and Misleading Statements

Throughout the Class Period, Defendants made a series of false and misleading statements about CenturyLink's business strategies and results.

<u>First</u>, Defendants misled investors concerning the drivers of the Company's revenues and the Company's business strategies, falsely touting CenturyLink's supposed focus on meeting "customer needs." Specifically, Defendants claimed that CenturyLink relied on its "call center personnel to promote sales of services that meet the <u>needs of [its] customers</u>," "emphasize[d] customer-oriented sales," and offered services tailored to the "<u>needs</u> of [its] customers." ¶¶194-96. In its Annual Reports, the Company claimed its strategy to manage access line losses—a persistent investor concern—was "based primarily on," among other things, "meeting customer care needs." ¶¶197-98. And on conference calls, Defendant Post explicitly attributed positive results to the Company's work to "<u>meet the needs of our customers</u>." ¶¶197, 199, 210. In truth, CenturyLink's

undisclosed practice of adding services that customers did not want, let alone need, was the direct opposite of these claims. ¶¶200, 207.

In addition, Defendants repeatedly attributed revenue growth to the Company's various business strategies, such as "bundling." Specifically, Defendants represented that bundling presented significant value to customers, helped "maintain…customer relationships" and "enhance customer loyalty," "attract and retain customers and increase usage of [CenturyLink's] services" and resulted in more dependable and growing revenues. ¶¶58-59, 140, 205, 210, App'x A. These statements concealed that the Company's revenues were driven by cramming, and that CenturyLink's "bundling" strategy relied on it. ¶¶200, 203-04, 207, 211-12.

These statements are actionable, and virtually indistinguishable from those upheld in the derivative and securities class actions involving Wells Fargo. *See Hefler*, 2018 WL 1070116, at *7 ("statements about… commitment to providing value for customers were both material and false or misleading" and sustaining statements that Wells Fargo provided customers with the financial products that they "need," "want," "utilize"); *see also, e.g.,* Ex. A at ¶¶13, 101, 104; *Shaev v. Baker*, 2017 WL 1735573, at *15 (N.D. Cal. May 4, 2017) (statements that "suggested that Wells Fargo's strong financial performance was attributable to a purportedly effective governance structure, while improperly omitting that such financial performance stemmed, in material part, from the illicit account-creation scheme," were misleading).[2]

---

[2] *See also In re Syncor Intern. Corp. Sec. Litig.*, 239 Fed. Appx. 318, 320, 2007 WL 1729968, at *1 (9th Cir. 2007) ("By attributing…success solely to legitimate practices,

17

Second, Defendants' statements concealing CenturyLink's secret, short-lived attempt to reduce cramming at the Company were false and misleading. Specifically, after the Company's effort to address cramming led to a sharp drop in revenues, Defendants reverted to the prior quota-driven system, and sales (and cramming incidents) returned to their prior levels. ¶¶112, 114, 116-17. Rather than reveal these facts—which would have exposed Defendants' practices—Defendants concocted a false narrative to explain the Company's fluctuating financial results.

For example, Defendants falsely attributed CenturyLink's "weaker" revenues to an organizational realignment (¶115), a supposed attempt to weed out "disloyal" customers by "tightening our credit policies" (¶215), changes in pricing strategies (¶216), and "price compression" and "competition." ¶¶124, 263. Along similar lines, after returning to prior sales practices, Defendants falsely attributed rejuvenated results to an "aggressive corrective action" to "realign" the sales force and shifts in strategy to attract "more high-value customers," reduce "churn," promote "bundling," implement "select price increases," and tighten CenturyLink's credit policy. ¶¶117-18, 220, 222-23, 226-35.

---

defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); *Bach v. Amedisys, Inc.*, 2016 WL 4443177, at *9 (M.D. La. Aug. 19, 2016) ("investors have the *right* to assume that their financial future does not hinge upon the continuation of a fraud") (emphasis in original); *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (attributing revenues to legitimate causes and failing to disclose scheme behind them is actionable); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 885–86 (E.D. Tenn. 2005) (same); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400–01 (S.D.N.Y. 2005) (same); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) (same).

These false explanations are actionable. *See Novak v. Kasaks*, 216 F. 3d 300, 311-12 (2d Cir. 2000) ("despite knowledge of the true reasons for rising inventory levels, the defendants made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth"); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *3 (W.D. La. Mar. 15, 2013) (finding actionable statements that revenues were driven by "'organic growth' and 'acquisitions'" when they partly resulted from Medicare abuse).

Third, Defendants falsely told investors that CenturyLink would never "misstate facts or mislead consumers through Company advertisements or promotions," "engage in unethical or deceptive sales practices" or, most significantly, "place or record an order for our products and services for a customer without that customer's authorization." ¶¶238-40. These statements were directly contradicted by CenturyLink's actual sales practices, and are actionable. *E.g.*, ¶¶64, 89-90, 92-93, 240; *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (statements about independence actionable when company "did not address or manage its conflicts of interest"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements about "strong ethical standards" that "stand in stark contrast with" reality are actionable); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statement concerning "procedures and controls that are designed to address conflicts of interest" actionable where there were "egregious conflicts").

Similarly, Defendants falsely denied allegations of wrongdoing when questioned about its practices by regulators and the media, instead representing the Company was a

"<u>customer-first business, we take any complaint seriously and work diligently to provide</u> <u>each customer with a fair and quick resolution</u>." ¶¶242-45.  In reality, the Company had established an entire "customer service" apparatus designed to retain as much of the Company's improper overcharges as possible. ¶¶83-87.  Further, when directly questioned about billing misconduct by regulators, CenturyLink "expressly denied" that the Company engaged in it, and instead represented that all contract terms were "fully disclosed."  ¶¶132-33, 242-45, 247-55.  These false denials are actionable.  *See In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (denial that customers were stockpiling inventory); *Institutional Inv'rs Grp. v. Avaya*, *Inc.,* 564 F.3d 242, 264 (3d Cir. 2009) (statements falsely denying pricing pressure); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 662-63 (S.D.N.Y. 2017) (denials of knowledge and participation in bribery scheme).

<u>Fourth</u>, CenturyLink issued false and misleading warnings about regulatory risks and failed to disclose "known trends and uncertainties" that CenturyLink knew had "a material…impact on" revenues.  These risk warnings were materially false and misleading because they represented as merely possible risks that had already materialized, and concealed the reality that CenturyLink's illegal practices were unsustainable.  ¶¶258-60; *see In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) ("to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible…when they have already occurred is deceit"); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013); *Van der Moolen*, 405 F. Supp. 2d at 400.

In addition, Item 303(a) of Regulation S-K required CenturyLink to disclose that the Company's illegal sales practices were a material driver of the Company's reported revenue, CenturyLink's attempt to curtail those practices led to a sharp decline in revenues, and the reversal of this effort caused revenues to rebound. ¶262, 109-14, 262. CenturyLink failed to disclose these facts even after the SEC specifically questioned the Company about them. ¶¶121-24, 263. These allegations state a claim. *See Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047-48 (D. Minn. 2015) (sustaining claims based on failure to disclose known trend under Item 303).

## B.    Defendants' Arguments Concerning Falsity Are Meritless

### 1.    The Complaint's Allegations Are Sufficiently Particularized

In response to the well-pleaded allegations in the Complaint, Defendants raise a host of arguments that can be readily rejected.

Defendants first argue that the Complaint should be dismissed because Plaintiffs have not alleged the specific amount by which CenturyLink's reported financial metrics were overstated. DB 16. This argument fails for several reasons.

To start, the law does not require Plaintiffs to specify, at the pleading stage, the specific amounts by which CenturyLink's revenues were inflated by the Company's sales misconduct. *See Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 987 (W.D. Wis. 2003) ("Plaintiffs do not have to plead the dates of transactions or the exact dollar amounts involved" in a channel stuffing scheme to sufficiently plead falsity); *In re Infineon Tech. AG*, 2006 WL 1329887, at *6 (N.D. Cal. May 22, 2016) (results were misleading although artificial inflation not quantified). In effect, Defendants demand that Plaintiffs plead

21

detailed evidence contained in Defendants' own internal books and records, which courts unanimously hold the PSLRA does <u>not</u> require. *See, e.g.*, *In re Am. Italian Pasta Co. Sec. Litig.*, 2006 WL 1715168, at *6 (W.D. Mo. June 19, 2006) (at the pleading stage, "the Court is not weighing evidence and again emphasizes this is not the time to put Plaintiffs to their proof"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 125 (S.D.N.Y. 2013) ("In the complaint, Plaintiffs are not required to 'prove' the falsity of the alleged misrepresentations").[3]

This is particularly true here because the Complaint pleads that CenturyLink's results were attributable to illegal conduct. *See, e.g., Mauss v. Nuvavsive, Inc.*, 2015 WL 10857519, at *9 (S.D. Cal. Aug. 28, 2015). This is a critical distinction. Unlike cases involving deviations from generally accepted accounting principles, where the quantification of accounting irregularities may be necessary to show materiality, the misstatements here are inherently material, as a reasonable investor is entitled to know if revenues are "partially attributable to illegal activities." *Id.*[4]

In any event, the Complaint pleads numerous facts quantifying the material impact on the Company's revenues, including (1) internal audits, ¶¶65, 178; (2) CenturyLink's own internal investigative findings, ¶¶103, 108; (3) the accounts of numerous employees,

---

[3] *Verdieck v. TD Ameritrade, Inc.*, 2015 WL 13216410, at *11 (D. Neb. Aug. 17, 2015) (at the pleading stage, "the plaintiff is not required to come forward with evidence to support the allegations"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) (on a motion to dismiss, "[a] plaintiff is not required to plead evidence").

[4] *See also Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003); *In re Gentiva Sec. Litig.*, 932 F.Supp.2d 352, 368 (E.D.N.Y. 2013).

*e.g.*, ¶¶81-82, 89, 96, 107; (4) Defendant Post's recognition that the number of complaints was too high, ¶105; (5) the amounts of overcharges detailed by the Minnesota Attorney General, ¶93; (6) CenturyLink's policy of limiting refunds to resolve billing disputes (¶¶85-86); and (7), the dramatic impact on revenues triggered by the Company's efforts to address its cramming crisis. ¶¶109-20. These allegations substantiate the impact of the Company's billing misconduct on CenturyLink's results, and are far more particular than those routinely upheld by courts in similar cases. *See, e.g.*, *Nuvavsive*, 2015 WL 10857519, at *9.[5]

Defendants ignore these facts, and resort to quibbling with Plaintiffs' witnesses. For example, Defendants note that a finance specialist (FE-2) and a senior executive (FE-15) were not alleged to have "observed" cramming. DB 17. But that is not surprising given that neither had roles in which they would have directly observed sales practices, while the other 17 witnesses who did reported cramming was commonplace. *E.g.*, ¶¶89, 96, 107. In any event, Defendants do not challenge their actual accounts about the Company's corporate strategy and quota-setting process. ¶¶69-70. Defendants also try to discount FE-18 and FE-19 as reporting only "few thousand complaints a month." DB 17. But these witnesses (who only reviewed a small subset of complaints) actually reported that between 50% to over 80% of investigated customer billing complaints "did, in fact, happen like the

---

[5] For example, in *Wells Fargo*, the court sustained similar financial performance misstatements where the underlying misconduct impacted approximately 2% of all accounts, and where only 5% of the 2% of affected accounts incurred improper charges—whereas, here, CenturyLink overbilled between one-third to one-half of its customers hundreds of dollars each.  ¶¶93, 178.

customer said it did," (¶¶103, 108), that cramming was "very common and widespread," (¶105), occurring in every state (¶107), carried out by the Company's top sales performers (¶103), and that Defendant Post could not believe how high the numbers were.  ¶105.[6]

Last, Defendants question the Complaint's allegations about CenturyLink's internal audits—which showed that one-third to one-half of all CenturyLink customers were overbilled—by speculating (without basis) that those customers might have been reimbursed, or that this colossal rate of overbilling might just be the result of "inadvertent errors."  DB 18.  This is nonsense.  To start, while Defendants could have pointed out these supposed shortcomings in the Minnesota Attorney General action, they chose not to. Instead, Defendants refused to produce the audits even after being ordered by the court to do so, and now face a motion for sanctions.  *See* Ex. B at 2.  Of course, this establishes that the audits are, without question, "particularly" within Defendants' control, and thus "need not be included" in Plaintiffs' Complaint.  *In re First Merchs. Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *11 n.5 (N.D. Ill. Nov. 4, 1998) ("The specifics of [an] audit are…precisely 'the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint.'").[7]

---

[6] Similarly, FE-16, who was also responsible for monthly complaint reporting to the Executive Defendants, recounted that the complaint that "always stood out was misrepresenting prices" because the Company "always had those issues." ¶104.

[7] *See also In re Schering-Plough Corp./Enhance Sec. Litig.*, 2009 WL 2855457, at *2 (D.N.J. Sept. 2, 2009) ("standard is relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control").

In any event, Defendants' request that the Court infer CenturyLink overbilled one-third to one-half of its customers by mistake—or that it paid them back—is entirely inappropriate on a motion to dismiss and incompatible with the allegations in the Complaint.  *See, e.g.,* ¶¶85-87, 152 (CenturyLink had policies to retain overcharges).[8]

### 2. Defendants' Misrepresentations About CenturyLink's Strategies, Policies, and Business Conduct Were False When Made

Defendants next argue that their statements were not false when made because the Complaint alleges only that CenturyLink "did not always *succeed* in the execution of its strategies or commitments."  DB 21. In doing so, Defendants cite only *Ong v. Chipotle*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018), where plaintiffs alleged that, in light of several E. coli outbreaks, Chipotle's statements concerning its food quality processes were false because they omitted that Chipotle "failed to live up to its own food safety standards."  *Id.* at 219.  Respectfully, *Chipotle* is entirely inapposite.

---

[8] Defendants' accounting cases do not help them. DB 18-20.  In *In re Navarre Corp. Securities Litigation*, the Eighth Circuit made clear that plaintiffs "need not plead the exact amounts of the overstatements," but upheld dismissal because the complaint there was devoid of "any details regarding time, persons, places, and subjects."  299 F.3d 735, 744 (8th Cir. 2002).  Similarly, in *In re Cerner Corp. Securities Litigation*, the court again held that investors are "not required to describe in detail" the allegedly improper "pulling in" of revenue, but found insufficient the bare description in the complaint, which lacked any indication of "the extent of any pulling in that took place." 425 F.3d 1079, 1084 (8th Cir. 2005).  And in *In re Target Corporation Securities Litigation*, the complaint did not "provide the barest clue" about the reasons for falsity and simply "compare[d] an earlier statement about sales to a later, inconsistent statement" as proof the earlier statement was false.  275 F. Supp. 3d 1063, 1080 (D. Minn. 2017).  In all events, courts uniformly reject the notion that a restatement or auditor finding is a prerequisite to alleging fraud, as such a requirement "would shift to accountants [a] responsibility that belongs to [] courts." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

Here, CenturyLink's statements directly contradicted the facts concerning the Company's sales misconduct, and several were in fact specifically designed to conceal those practices—such as Defendants' false explanations for CenturyLink's fluctuating results that, in reality, were driven by management's attempt to curb cramming. ¶¶215-17, 221-23, 226-35. Far from failing to disclose that CenturyLink merely failed to "live up" to its "standards," these representations were specifically designed to conceal the fraud, and were plainly materially false and misleading when made.

Further, CenturyLink's "policy" statements here are fundamentally different from the risk warnings about quality assurance in *Chipotle*. 294 F. Supp. 3d at 228- 32. For example, while CenturyLink represented that it would never "place or record an order for our products and services for a customer without that customer's authorization" (¶240), in reality the Company instructed sales representatives to do just that (¶¶81-82, 183) and CenturyLink did so with such frequency that "cramming" was included as an option in the drop-down menus in the Company's internal computer systems. ¶96. Similarly, when responding to media inquiries into billing misconduct, CenturyLink denied any problems and instead claimed the Company "work[ed] diligently to provide each customer with a fair and quick resolution"—when in reality billing misconduct was rampant and CenturyLink sought to retain as much of the overcharges as possible. ¶¶64, 83-93, 246; *cf. Chipotle*, 294 F. Supp. 3d at 232 (allegations did "not conflict with Defendants' statements").

Last, Defendants' statements concerning CenturyLink's bundling, credit and pricing strategies falsely conveyed that the Company's performance was the product of legitimate

practices—not overbilling—and are precisely the type of statements routinely upheld by courts. ¶¶201-02, 209-10, App'x A; *see, e.g., Shaev*, 2017 WL 1735573, at *15 (statements attributing performance to legitimate causes while it stemmed "in material part, from the illicit account-creation scheme" are actionable); *Syncor*, 239 Fed. Appx. at 320.[9]

### 3.    Defendants' Statements Were Not "Puffery," "Opinions," or Forward-Looking

The Court should also reject Defendants' argument that their statements are excusable as non-actionable "puffery," "opinions," or forward-looking statements.

### a.    Defendants' Statements Were Not "Puffery"

Defendants challenge several statements as "puffery," including statements that CenturyLink provided services based only on "customer needs," ¶¶193-97; described CenturyLink's results and business strategies as driven by legitimate factors, ¶¶209-10, 223-24, 227, 230-31, 233; touted CenturyLink's supposedly "honest" business practices and strict enforcement of a Code of Conduct, ¶¶238-40; and denied wrongdoing in response to media inquiries. ¶¶242-45. Defendants' arguments fail for several reasons.

First, these statements are not "puffery." As courts have recognized, a statement may be dismissed as "puffery" <u>only</u> if it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ" on its importance and it is "<u>extremely unlikely</u>" to induce reliance. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir.

---

[9] Defendants' "bundling" statements were also false because CenturyLink claimed this strategy offered significant value to customers, improved customer "loyalty," and helped the Company compete—when, in reality, it encouraged cramming, and jeopardized the Company's ability to attract and retain customers. *E.g.*, ¶¶205-07.

2000); *In re Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *8 (S.D. Cal. Sept. 27, 2016). Here, however, Defendants explicitly encouraged investors to rely on the Company's statements about its focus on "customer needs," with Defendant Post making clear he was not being ~~not being~~ "trite"—*i.e.,* "puffing"—when doing so:

> [W]e have talked about our focus on the customer today. <u>And I know maybe that sounds a little trite.</u> But…so many companies fail to really focus on the customer. And it is about creating value for that customer in a way and the customer experience being something they can walk away with really makes him want to do business with CenturyLink in this case, <u>very important</u>.

¶193. The surrounding context for these statements further demonstrates their materiality, as CenturyLink touted its "customer needs" approach in connection with marketing its "strategic services," the key business line for future success (¶¶57, 197, 201), to convince investors it would succeed where acquired companies had fallen short (¶¶41-42), and to differentiate CenturyLink from competitors targeted by regulators.  ¶¶44-48, 51.  Indeed, a nearly identical argument, concerning nearly identical statements, was rejected in *Wells Fargo* for precisely this reason.  *See Hefler*, 2018 WL 1070116, at *7.

Defendants' statements ascribing CenturyLink's results to legitimate factors (¶¶209-10, 223-24, 227, 230-31, 233), and its express denials (¶¶242-45, 248-54), also are not puffery.  CenturyLink's results statements are "description[s] of historical fact rather than unbridled corporate optimism," *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 883 (8th Cir. 2017), and several were made in response to analyst questions (¶¶210, 224), which further demonstrates their materiality. *St. Jude Med.*, 836 F. Supp. 2d at 888 (responses to analysts' questions are material). And, as noted, its express denials are actionable.

CenturyLink's Code of Conduct statements are also actionable. Courts find such statements actionable when (1) they are explicit concerning what the company purports to do, as opposed to merely endorsing abstract principles; (2) they purport to reflect the current state of affairs of the company, not its aspirations; *or* (3) the statement has been held out as important to the company's business. *See Moody's*, 599 F. Supp. 2d at 508-09 (conduct statements about independence actionable because they "listed verifiable actions [regarding] independence" and company "maintained independence as a cornerstone of the business"); *Eletrobras*, 245 F. Supp. 3d at 463 n.6 (statements in code "purported to reflect the Company's current state of affairs" that rules "are observed"); *Lapin v. Goldman Sachs Grp.*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) (statement about "dedication to complying with the letter and spirit of the laws" actionable where company's "success depended on such adherence").

Defendants' statements here are actionable for each of these three independent reasons.    ¶239. Defendants were highly specific about what CenturyLink presently "required" the Company's employees not to do, *e.g.*, never "place or record an order for our products and services for a customer without that customer's authorization."  ¶¶239-40.  Moreover, Defendant Post made clear in introducing the Code of Conduct that these requirements were not merely aspirational, but were the "standards by which we conduct our operations" and that any "violations of the Code will not be tolerated."  Ex. C at 3. Here, the most prolific violators were the Company's top sales performers, and thus violations were of course "tolerated" by CenturyLink.  ¶103.  And Defendants held out

CenturyLink's treatment of customers as critical to the business. *See, e.g.*, ¶¶41-42, 48.[10] These statements were material, not puffery.

Defendants' cases are inapposite. None involved statements held out as important to investors, *cf.* ¶193 ("customer needs" should not be viewed as "trite"); concerned reported results, *cf.* ¶209; denied fraud allegations, *cf.* ¶245; or held out as important specific and strictly enforced company "standards" that were rendered false by systemic conduct. *See* ¶¶88-94, 178, 239-40.[11]

### b.    Defendants' Statements Are Not Protected "Opinions"

Defendants' contention that many statements (¶¶199, 205, 209, 210, 216, 217, 223, 224, 227, 228, 229, 231, 234, 235, 256, 260) are non-actionable opinions also fails. First, the statements are not opinions. A statement is an opinion only when it is expressly stated as such, and here vast majority of statements contained no such qualifying language whatsoever. *See Omnicare v. Laborer Dist. Council Const. Indus. Pension Fund*, 135 S.

---

[10] Even if the Court were to find them to be "puffery," they would still be actionable because they omitted material contrary facts. *See, e.g.*, *Marcus v. JCPenney Co., Inc.*, 2015 WL 5766870, at *5 (E.D. Tex. Sept. 29, 2015) (puffery actionable when contrary facts omitted).

[11] *Cf. In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) ("best" statement was "[w]e believe we are well-positioned on a number of new disk drive programs"); *Bernstein v. Extendicare Health Servs., Inc.*, 607 F. Supp. 2d 1027, 1032 (D. Minn. 2009) (statements did not reference "any particular standard or make any specific promise"); *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (code was puffery in case where CEO had improper relationship with subordinate because it did not guarantee perfect compliance); *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (puffery that company would not "compromise its financial integrity").

Ct. 1318, 1327, 1333 (2015); *see, e.g.* ¶¶199, 205, 209, 210, 217, 227, 228, 234, 256, 260.[12]

<u>Second</u>, even if certain statements could be considered opinions, they are actionable because they omitted material facts—including the Company's cramming practices and aborted attempt to address them. *See Omnicare*, 135 S. Ct. at 1329 (opinion actionable if it "omits material facts [that] a reasonable investor would take from the statement itself").[13]

### c.  Defendants' Statements Were Not Forward-Looking or Protected By the Safe Harbor

Defendants also argue that several challenged statements are not actionable because they are forward-looking—but <u>all</u> are statements of present fact to which the safe harbor does not apply. *See* ¶¶196-97 (describing present marketing strategy); 205 (same), 215-17 (same); 222-24 (explaining results); 226 (same), 230-35 (explaining business strategy), 238-40 (describing past adoption of Code of Conduct and present commitment under it), 242-45 (present commitment), 248 (express denial); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).[14]  The argument should be rejected.[15]

---

[12] For some statements, Defendants appear to have seized on terms like "think" or "believe" in quotations that are not themselves challenged as false. *See, e.g.,* ¶¶216 (challenged portion of statement related to explanation of changes to credit policies, <u>not</u> "we are still somewhat discounted, <u>I believe</u>, to the cable companies"), 223, 224.

[13] Opinions are also not actionable if they are not sincerely believed, and they were not here. *Omnicare*, 135 S. Ct. at 1321; ¶¶200, 207, 236, 229, 231, 234-35.

[14] Even if certain of them contain forward-looking portions, the non-forward-looking portions are actionable and, in all events, none were accompanied by meaningful cautionary language. *See id.*; *see also, e.g.*, ¶¶225 (statement that CenturyLink did not "add[] a lot of fees" was false because CenturyLink did so); 236.

[15] Defendants are wrong that *Janus Capital Group, Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011) precludes liability for misstatements on conference calls in which Defendants Puckett and Douglas participated.  DB 19-20 n.23. *Janus* dealt with liability for third-party

C.      **The Complaint Adequately Alleges A Strong Inference of Scienter**

1.      **The Pleading Standard Under the PSLRA**

The Complaint pleads a strong inference of scienter.  The inference of scienter "need not be irrefutable" (*i.e.*, of the "'smoking-gun' genre"), nor "even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.  Rather, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 310.  The inquiry is whether all allegations, "<u>taken collectively</u>" give rise to a strong inference, not "whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322-23 (emphasis in original).

A "strong inference" of scienter arises: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud, (2) from conduct which rises to the level of severe recklessness, or (3) from allegations of motive and opportunity." *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 881 (D. Minn. 2007).  Courts in this Circuit have recognized "badges of fraud" to assist in evaluating scienter allegations, including

---

statements in a prospectus, and has "no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability." *Securities and Exchange Comm'n v. Goldstone*, 233 F. Supp. 3d 1169, 1225 (D. N.M. 2017) (finding liability based on other members' oral statements that were based on notes defendant prepared).   Here, Puckett "oversaw the entire sales apparatus…and was responsible for addressing this segment in the Company's investor presentations" (¶297), Douglas succeeded Puckett in that role (¶298), each were involved in preparing revenue projections and tracking results (¶¶67-70, 75, 104-08), and it would be implausible to suggest they did not draft, review, or approve the prepared remarks in the joint presentations addressing them here. *See, e.g., In re Valeant Pharms. Int'l Sec. Litig.*, 2017 WL 1658822, at *12 (D.N.J. Apr. 28, 2017).

whether defendants: (1) "engaged in deliberately illegal behavior," (2) "knew facts or had access to information suggesting that their public statements were not accurate," or (3) "failed to check information they had a duty to monitor."  *In re St. Paul Travelers Sec. Litig. II*, 2006 WL 2735221, at *3 (D. Minn. Sept. 25, 2006).  As here, "one 'classic' fact pattern giving rise to a strong inference of scienter" is where "defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate."  *Navarre*, 299 F.3d at 746 (citing *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F. 3d 645, 665 (8th Cir. 2001)).[16]

### 2.    The Complaint Adequately Alleges Scienter

Here, Plaintiffs allege with particularity facts that give rise to a strong inference that Defendants knew or were reckless in not knowing about CenturyLink's institutionalized fraudulent billing practices.  These include:

*Defendants Set Unobtainable Sales Quotas and Strictly Enforced Them.*   The Executive Defendants were responsible for setting sales quotas, ensured their enforcement, and refused to adjust them—even when 70 to 80% of all sales employees were disciplined for missing them.  ¶¶78-79. Defendants set quotas based on projections that did not "make

---

[16] At least three courts in this District have held that scienter of *either* a named individual *or* a non-defendant employee can be imputed to the corporate defendant.  *See In re Medtronic, Inc. Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009); *St. Paul*, 2006 WL 2735221, at *4 n.3; *Tile Shop Holdings*, 94 F. Supp. 3d at 1054.  Thus, in order to demonstrate CenturyLink's scienter, Plaintiffs need only allege that someone at CenturyLink possessed the requisite state of mind.

sense" and were "mind blowing" when considering past sales or what reasonably could be expected. ¶¶68-69.

Defendants strictly enforced these quotas, leading to sales misconduct that was reported to senior management, and CenturyLink routinely terminated employees for failing to meet quotas and for cramming. ¶¶75-76, 78, 101-02, 113. Defendants had access to "real time" employee-level sales data through the Company's "dashboard," and Olsen and other senior managers reviewed quotas, cramming incidents, and disciplinary actions monthly. ¶¶75, 103-05.

These same managers were informed of the fraudulent practices the quota enforcement system encouraged and, as reported by sales employees, they did not reflect what employees who were dealing honestly with customers could be expected to sell (¶71), "insane," (¶72), "so ridiculously high you had to cheat," (¶73), "impossible to hit unless you were engaged in shady practices," (*id.*), and led to cramming. Top sales performers were often those most frequently cited for cramming—a fact that was repeatedly investigated and confirmed to senior management. ¶103. Courts have held that these very kinds of allegations establish scienter. *See, e.g., In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1082, 1099-1100 (N.D. Cal. 2017) (imposition of strict sales quotas, close tracking by company established scienter); *St. Paul*, 2006 WL 2735221, at *4 (pervasiveness of misconduct); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008) (witness accounts tell "the same story…from markedly different angles").

***Defendants Acknowledged the Cramming Crisis and Attempted to Address It.*** As five former employees (FE-1, FE-8, FE-17, and FE-20) consistently recounted, Defendants acknowledged that cramming was a problem and attempted to address it, but abandoned those efforts when eliminating quotas caused sales to decline. ¶¶109-14; *see Countrywide*, 554 F. Supp. 2d at 1059. Defendant Post understood and approved the effort, praised Victory for her work on it, and obviously knew why the effort was initiated (and later abandoned) when he did so. *Id*. These allegations show direct knowledge that cramming was a serious problem that could not be fixed without compromising revenues, and is strong evidence of scienter.

***Contemporaneous Data and Reports.*** Defendants were directly informed about the extent of the Company's cramming in monthly email reports, and the former employees who compiled and reported these figures to Defendants Post, Ewing, Puckett, and others confirmed that "the complaint that always stood out was misrepresenting prices" and that half to over 80% of all customer cramming complaints happened "like the customer said it did." ¶¶96-99, 103-06. These allegations establish scienter. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *see also Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (scienter pleaded by alleging "executives reviewed specific reports that should have alerted them to the problems they later allegedly misrepresented"); *In re Volkswagen "Clean Diesel*," 2017 WL 66281, at *12 (N.D. Cal. Jan. 4, 2017) (reports showed CEO's scienter).[17]

---

[17] The differences between this case and Defendants' cases, *Medtronic*, 618 F. Supp. 2d at 1033, *In re Patterson Cos., Inc. Secs. Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1032-

***CenturyLink Managers Instructed Sales Employees to Cram.*** CenturyLink managers instructed representatives to quote a single price for bundled packages with optional services in training sessions and at monthly meetings—sales pitches that were approved by Olsen, and were "highly illegal." ¶82; *Minneapolis Firefighters' Relief Ass'n v. Medtronic*, 2010 WL 11469576, at *2, 7-8 (D. Minn. Feb. 3, 2010) (noting training of illegal sales tactics).

***Government Investigations and CenturyLink's Cramming Commitments***. Before the Class Period, Congress and regulators began to scrutinize cramming, prompting CenturyLink to tout itself as an industry leader by publicly committing to Senator Klobuchar to "step up to the plate" to address it. ¶¶47-48.  At the same time, CenturyLink repeatedly committed to abide by regulations prohibiting cramming, with Defendant Cole certifying annually that he was "familiar with the Company's day-to-day operations" and that CenturyLink was "complying with…consumer protection rules," including those prohibiting cramming.  ¶50.  Further, after the Arizona Attorney General investigated CenturyLink's misconduct, the Company entered into a settlement requiring CenturyLink "officers, directors, and managerial employees" to closely monitor the Company's sales

---

33 (D. Minn. 2007), and *In re Apple Computer, Inc. Securities Litigation*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) (DB 30), show just how strong the inference of scienter is here.  In *Medtronic*, there was "no allegation…that any individual Defendant actually studied" the relevant data.  618 F. Supp. 2d at 1033.  Here, witnesses reported that Defendants not only reviewed the data, but challenged the numbers because they were so high, and then had their accuracy confirmed. ¶105.  Similarly, in *Patterson,* plaintiffs failed to allege how internal sales figures differed from publicly reported ones, 479 F. Supp. 2d at 1030, and in *Apple*, plaintiffs only alleged that "Defendants could have known about the…problems." 243 F. Supp. 2d at 1026.

practices.  ¶¶132-35, 138; *see, e.g., Medtronic*, 2010 WL 11469576, at *7-8 (settlement

requiring senior management to monitor sales practices establish scienter); *Volkswagen*,

2017 WL 66281, at *15 (defendants' "detailed representations to

regulators…confirming…compliance" supported scienter); *No. 84 Emp'r-Teamster Joint

Council Pension Tr. Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th

Cir. 2003).

   ***At Least One Whistleblower Was Terminated After Alerting Post to the Fraud,***

***While Others Were Disregarded.*** Defendant Post was directly informed of the cramming

misconduct here by a whistleblower in October 2016, who asked him "why customers were

being given multiple accounts and being billed for things they did not ask for."  ¶144-46.

Immediately after she did so, she was summarily terminated for pretextual reasons.  ¶¶143-

47.  While Defendants seek to impugn Plaintiffs' witnesses for failing to similar report this

misconduct internally (DB 9), the Complaint alleges they did just that.  Specifically, FE-7

repeatedly reported instances of cramming to the "tips" hotline, but the Company never

addressed them.  ¶98.  Likewise, FE-9 repeatedly "dinged" sales representatives for

cramming but no action was ever taken, while FE-11 was terminated for refusing to cram.

¶97, 147.  These facts establish scienter.  *Wells Fargo*, 282 F. Supp. 3d at 1099-1100

(terminations seemingly aimed at silencing whistleblowers supported scienter).

   ***Defendants Held Themselves Out as Personally Familiar with the Company's***

***Revenue Drivers and Were Directly Questioned About Them By the SEC***. Defendants

held themselves out to investors as personally familiar with the Company's bundling

strategy, model, and metrics. For example, Defendants discussed at length whether (and to

what degree) various strategies drove CenturyLink's results, including CenturyLink's ARPUs compared to its competitors, and the credit profiles of CenturyLink customers. E.g., ¶¶201-02, 205-06, 208-10, 213-17, 220-24, 226-35, App'x A. Defendant Douglas told investors that CenturyLink executives were "constantly monitoring what our competitors are doing in the marketplace," and simultaneously held CenturyLink out as a company that did <u>not</u> "add a lot of fees" to customer bills. ¶¶184, 191, 220.

Further, the SEC specifically questioned CenturyLink about the drivers of its consumer segment performance, citing Item 303 (which required disclosure of material revenue drivers), but the Company did not disclose cramming. It is implausible that Defendants were unaware of practices impacting <u>between a third and a half of all CenturyLink customers</u> when responding to these questions—particularly because they came immediately after Defendants made and then abandoned efforts to fix cramming. *See Medtronic*, 2010 WL 11469576, at *7-8 (scienter alleged where executives made repeated statements attributing sales growth to legitimate factors); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("the inference that [defendant] did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described finances did not inquire into basis for statements).

***The Practices Impacted CenturyLink's Core Operations.*** The CenturyLink consumer and small and medium business units accounted for well over one-third of CenturyLink's revenues, their performance was a central focus for investors, and that performance was dramatically impacted by cramming and attempts to address it—strongly

indicating Defendants' knowledge. ¶¶37-38, 55-61, 184; *see In re McLeodUSA Inc., Sec. Litig.*, 2004 WL 1070570, at *6 (N.D. Iowa Mar. 31, 2004) (should assume "individuals in top management…are aware of matters central to that business's operation"); *DFC Global Corp.*, 2015 WL 3755218, at *16 (same).

*CenturyLink Expressly Denied Sales Misconduct.*   As the Company's sales misconduct led to an explosion of consumer complaints and news investigations, the Company "expressly denied" wrongdoing, represented that it "fully disclosed" all contract terms, minimized reports of misconduct as isolated incidents in which employees failed to "follow routine billing processes," and said the Company promptly investigated and fairly resolved complaints. ¶¶133-34, 136, 148-51. These specific denials were false. *See Avaya*, 564 F.3d at 270 & n.43 (in issuing a denial, ignorance is not exculpatory).

*Defendants Had A Motive to Lie*. Defendants are wrong to claim the Complaint does not allege their motive to mislead investors. DB 25. First, the subject of Defendants' misrepresentations concerned the Company's illegal cramming, which Defendants were naturally motivated to conceal—particularly in light of the Defendants Post and Cole's representations to regulators and legislators that CenturyLink did not engage in these practices. ¶¶45-50, 135. *See Neborsky v. Valley Force Composite Techs.*, 2014 WL 3767011, at *7-8 (S.D. Cal. July 29, 2014) (motive to "hide…illegal activity" supports scienter); *Monroe Co. Empls. Ret. Sys. v. Southern Co*., 2018 WL 1558577, at *24-25 (N.D. Ga. Mar. 29, 2018) (motive to avoid regulatory scrutiny supports scienter).

Second, Defendants were motivated to conceal the Company's cramming practices in light of the need for these revenues to both service the Company's high debt load and

39

pay dividends in the face of severe structural threats to CenturyLink's business (which were revealed to be urgent before the Class Period, when CenturyLink was forced to slash its dividend). ¶56; *see In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (motive to conceal deterioration of finances supports scienter); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (attempt to forestall default could plead motive), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011); *Tellabs*, 513 F.3d 702, 710 (7th Cir. 2008) (explaining reckless gamble can show motive).

Third, Defendants' short-lived attempt to address cramming, and the consequences for CenturyLink executives, demonstrates motive. As the Complaint alleges, revenues immediately declined when the Company attempted to reduce cramming—and, when revenues declined, Defendant Puckett was terminated. Further, when the Company reverted to its prior model, revenues rebounded, enabling Defendants to report glowing results in the consumer segment, reverse a year-long share price decline, and improved the metrics that determined compensation. These facts demonstrate that Defendants' "motivating fears were realistic," and provide identifiable, concrete, and personal reasons for Defendants to conceal these practices. *Cabletron*, 311 F.3d at 39; *Dep't of Treasury of the State of N.J. and Div. of Invest. v. Cliffs Nat'l Res., Inc.*, 2015 WL 6870110, at *4 (D.N.J. Mar. 5, 2015) (defendants' motives to retain jobs supported scienter).

Fourth, the Minnesota Attorney General investigation Defendant Post was overseeing, news reports concerning customer complaints in competitive markets, and the Wells Fargo scandal and resulting fallout provided a powerful motive to keep the

Company's practices a secret. *See Reese*, 747 F.3d at 572 (motive pleaded where information hidden was "the focus of both public and government inquiries").

*Suspicious Resignations*. Puckett left, just three months after being promoted to head global sales, immediately following a decline in revenues due to CenturyLink's attempt to address cramming (¶¶32, 115-17); Douglas was forced out just three months after being promoted to serve on CenturyLink's senior leadership team immediately after the fraud was revealed (¶¶33, 162); Zimmel was kicked off the board after CenturyLink submitted correspondence to the SEC that failed to disclose billing misconduct (¶189); and Post unexpectedly retired nearly a year earlier than planned, just weeks after CenturyLink announced the results of its investigation into the sales misconduct at issue in this case. ¶29. Multiple, suspiciously-timed resignations of CenturyLink senior executives likewise support scienter. *See Nash Finch*, 502 F. Supp. 2d at 882 (unexpected resignations support scienter); *see In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) ("corporate reshuffling" supports scienter).

Considered collectively, as they must be, these allegations easily give rise to a strong inference of scienter. *See Wells Fargo*, 2018 WL 1070116, at *10-11.[18]

### D.   Defendants' Scienter Arguments Are Meritless

In the face of these detailed allegations, Defendants ask the Court to infer that they had no idea about the cramming practices that drove the Company's reported financial results and to excuse their conduct as a failure to appreciate that CenturyLink's efforts to

---

[18] A summary exhibit categorizing scienter allegations by Defendant is attached as Ex. D.

address them "did not always work perfectly." DB 25. These allegations eliminate any basis to conclude, as a matter of law, that Defendants were simply mistaken about the Company's actual practices and their impact on results.

Importantly, Plaintiffs do not allege that Defendants "designed a scheme to cram millions of customers"—but, just like in *Wells Fargo*, cramming was the natural, known consequence of CenturyLink's boiler-room sales practices. DB 25. Moreover, scienter is even more compelling here because Defendants not only knew about the widespread cramming issues, they made Companywide changes to address them, and then abandoned that effort when revenues declined. In other words, the Complaint not only alleges their motives, but demonstrates that Defendants acted on them. *Cf.* DB 25. Under these circumstances, it would be "absurd to suggest that management was without knowledge" of the true facts. *Shaev*, 2017 WL 1735573, at *13-15.

### 1. Former CenturyLink Employee Accounts Demonstrate Scienter

Defendants' lead argument is that the Court must disregard every allegation from 17 CenturyLink former employees because their accounts are not sufficiently reliable. As Judge Magnuson has recognized, however, the argument that a "Court should not credit the testimony of…confidential witnesses" is "not an appropriate argument to make in a motion to dismiss." *Medtronic*, 2010 WL 11469576, at *2, 4. Rather, courts routinely accept such accounts and accord them great weight when, as here, the allegations are detailed, well-corroborated, coherent, plausible, and numerous. *See, e.g., St. Jude.*, 836 F. Supp. 2d at 897 (approving witness accounts because frauds are "rarely conducted in the open"); *Cabletron*, 311 F.3d at 29; *see also Nash Finch*, 502 F. Supp. 2d at 874 (crediting

42

witnesses when accounts were detailed and corroborated); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008) (crediting former employee accounts that corroborated one another).

Defendants do not actually claim that the 17 witness accounts fail to meet this standard. Instead, Defendants argue that a confidential witness must have "interacted directly" with a named defendant to be reliable, and that employees who were "remotely situated" from top executives must be disregarded. DB 25-26.[19] But this is not the law—witness allegations satisfy the PSLRA's pleading requirements when the complaint provides "a sufficient general description of the personal sources of the plaintiffs' beliefs." *Novak*, 216 F.3d at 314.

Here, the Complaint details how the witnesses were directly involved in CenturyLink's sales practices (¶¶70-82, 84-87, 89-92), personally responded to customer complaints (¶¶96-108), formulated revenue projections (¶¶68-69), investigated, disciplined and terminated employees for sales misconduct (¶¶102), developed and implemented a program to address cramming (¶¶111), communicated with senior management about these

---

[19] Defendants' argument that the witness accounts are not sufficiently "reliable" is particularly curious given their improper introduction of documentary evidence that corroborates their accounts. Specifically, Defendants submitted the purported email referenced by FE-5, who spoke with Vice President Brian Stading and Defendant Bailey about the rampant cramming. ¶109. Notably, Defendants' ability to identify this witness—who was described similarly to every other former employee cited by Plaintiffs—and the email referenced by FE-5, provides powerful evidence of the reliability of his account, and that of the other witnesses cited by Plaintiffs. And although this email corroborates FE-5's account, Defendants' improperly cite it here to draw factual inferences in their favor—the very practice recently criticized in *Khoja v. Orexigen Therapeutics, Inc.*, 2018 WL 3826298, at *7 (9th Cir. Aug. 13, 2018). The Court should reject this tack out of hand.

activities (¶¶103-10), and each tells a strikingly consistent story concerning the fraud.  *See, e.g., Countrywide*, 554 F. Supp. 2d at 1058 n.10 (rejecting argument to discount "low-level employees"); *Nash Finch*, 502 F. Supp. 2d at 875 (witnesses in sales "would likely have reason to know" about promotional practices); *N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*, 709 F.3d 109, 124 (2d Cir. 2013) (witnesses who originated loans would know about underwriting); *In re LDK Solar Sec. Litig.,* 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) ("personal firsthand knowledge" is unnecessary; only requirement is that "context and access to critical information makes [source] reasonably reliable"); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *16 (same).[20]

In any event, contrary to Defendants' brief, at least <u>seven</u> former employees interacted directly with Defendants and other senior executives whose state of mind may be imputed to CenturyLink, and each of the other witnesses describe with particularity important details concerning the fraud.[21]  For example, FE-8, FE-17, FE-16, FE-17 and

---

[20] Defendants' own cases undermine the "direct interaction" rule they urge here.  In *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014), <u>none</u> of the confidential witnesses were in a "position to testify reliably about <u>any</u> relevant fact."  In *Shoemaker v. Cardiovascular Sys., Inc.*, 2017 WL 1180444, at *9 (D. Minn. Mar. 29, 2017), no witnesses interacted with defendants, the complaint did not explain how witnesses knew the information they provided, and many witnesses simply recounted "office rumor."  In *In re K-V Pharm. Co. Sec. Litig.*, 2014 WL 1272452, at *12 (E.D. Mo. Mar. 27, 2014), no sufficient basis was pleaded for the witnesses' "beliefs" about the subject of testimony.

[21] These executives include Kathy Victory (¶¶100, 104-07), Kathy Flynn (¶¶102, 111), Linda Olsen (¶¶60, 68, 75, 79, 81, 100-01, 104), and Brian Stading (¶109), who were sufficiently senior that their state of mind can be imputed to CenturyLink.  *See, e.g., St. Paul Travelers*, 2006 WL 2735221, at *4 n.3; *see also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) ("an individual whose

FE-20—all senior human resources managers—consistently described the same executive-driven effort to address cramming by changing CenturyLink's sales model. Each confirmed the initiative, the reasons behind it, and that it was abandoned when revenues declined—and these allegations are corroborated by FCC complaint data and the Company's reported results.

Other witnesses were directly involved in sales or investigating cramming complaints, and so had first-hand knowledge of CenturyLink's practices. ¶76 (FE-3 terminated for failing to meet quotas after being named as a Circle of Excellence nominee the prior year); ¶¶97-98 (FE-7 and FE-9 reported cramming on the "tips" line and through OQM, but nothing was done); ¶¶68, 74, 78 (FE-1, FE-5, FE-7, FE-8 corroborated the disciplinary process for enforcing quotas and senior management's refusal to adjust unachievable quotas); ¶¶81-82 (FE-9, FE-5, and FE-11 confirmed CenturyLink managers instructed sales representatives to cram in training sessions and at monthly meetings). These are precisely the kinds of witness accounts accepted by courts.

Ignoring the other four witnesses who interacted directly with CenturyLink's senior management, Defendants attempt to discount the allegations of another three who did—FE-15, FE-19, and FE-5—as describing mere "disagreements" with management. This is wrong. FE-19 described how Defendants Post and Puckett said the number of cramming

---

knowledge is imputed to the corporation [need not] also 'make' the material misstatement").

complaints was too high—and FE-19 would verify the numbers for Defendants again.[22] FE-15, a regional vice president, repeatedly expressed concerns to Puckett about the strategy to lure cable customers with low prices—but then add fees to compensate for the lost revenue—confirming Defendants' awareness that, in reality, it was CenturyLink, not its competitors, that added fees.  ¶140.

And when FE-5 told Defendant Bailey in April 2014 about the "constant and rampant cramming and misquoting" he witnessed, Bailey <u>agreed</u> these fraudulent practices were occurring and that the Company had "to do something about" it—which is clearly not a "disagreement."  ¶109.[23]

### 2.    The Complaint's Other Allegations Also Establish Scienter

Defendants' other arguments, which attack the allegations in isolation, are meritless. DB 29-30; *Tellabs*, 551 U.S. at 326.

<u>First</u>, Defendants seek to disclaim knowledge of CenturyLink's massive cramming problem by contending that—(1) Bailey's admission that it existed, (2) the findings of two state Attorneys General investigations, and (3) the results of internal audits showing that one-third and one-half of all CenturyLink customers were overbilled—do "nothing to

---

[22] Defendants nonsensically argue that "FE-19 does not claim that Post ever saw or reviewed individual customer complaints," when, in fact, that is precisely what FE-19 establishes—as Defendant Post told FE-19 that, in responding to complaints addressed to him, FE-19's team had given customers too much compensation.  ¶106.

[23] Defendants' cases are inapposite. In *In re Patterson Cos.*, 479 F. Supp. 2d at 1031-32, an employee's concerns about feasibility of sales goals did not establish that projections were knowingly false while in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009), the witnesses disagreed with technical accounting judgments.

suggest that any Defendant" was put on notice.  Setting aside the litany of other facts that support scienter, these allegations alone more than establish Defendants' knowledge.

To start, Defendants' dismissal of FE-5's conversation with Bailey as revealing "nothing that anyone in [Bailey's] shoes did not already know" ignores that immediately after it occurred, Defendant Post put Bailey in a new position relating to customer interactions, and CenturyLink attempted a dramatic reform of its sales practices—all of which is quintessential scienter evidence.  *See, e.g., Green Tree*, 270 F.3d at 665 ("classic" fact pattern establishing scienter is where defendants "knew facts or had access to information suggesting that their public statements were materially inaccurate").[24] Defendants' fact-based contentions concerning the details of this conversation will be the subject of discovery (DB 28), but are entirely inappropriate on a motion to dismiss.

The government investigations likewise support scienter.  CenturyLink's April 2016 Arizona Attorney General settlement expressly required management to monitor sales practices.  *See* ¶135; *Medtronic*, 2010 WL 11469576, at *7-8.  And Defendant Post claimed he was personally responsible for responding to General Swanson's investigation which, unknown to investors, had been pending since the middle of the Class Period. ¶181.  The inference of scienter is particularly strong here, as General Swanson accused CenturyLink of stonewalling the investigation.  *See* ¶¶13, 168, 181; *see also Siracusano v. Matrixx*

---

[24] *Freudenberg*, 712 F.Supp.2d at 197-98 (accounts of discussions contradicting statements established scienter); *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (meetings with defendants addressing "difficulties" established scienter); *In re Moody's*, 599 F. Supp. at 515 (same).

47

*Initiatives, Inc.*, 585 F.3d 1167, 1182-83 (9th Cir. 2009) (lawsuits evidenced scienter); *America West*, 320 F.3d at 943 n.21; *Wells Fargo*, 2017 WL 1735573, at *12 n.11.

Defendants also attempt to downplay the findings of internal CenturyLink audits by arguing they only confirmed instances of inadvertent "overbilling"—not "cramming"—which is an illogical and implausible inference, and one Defendants are not entitled to on this motion. Whatever distinction between "overbilling" and cramming" Defendants are attempting to draw is refuted by the Minnesota Attorney General, who made clear these audits confirmed that "CenturyLink had committed 184,865 <u>violations of [a] State's consumer protection statutes</u>." Ex. B at 2. In other words, the audits confirmed the amount of times CenturyLink <u>deceptively</u> overbilled—*i.e.*, "crammed"—customers. *Id.*

<u>Third</u>, despite the fact that Defendants overbilled between <u>one-third and one-half of all of its customers</u>—and received regular reports about this misconduct—CenturyLink claims it was not "widespread" or "material" enough for Defendants to have known about it. DB 30. But courts routinely find scienter alleged with far less compelling facts. *See, e.g., Medtronic*, 2010 WL 11469576, at *7 (product constituting 6% of revenues was "enough to raise at least a plausible inference that senior management would have known"). To take one example, the *Wells Fargo* court held sales misconduct impacting only 2% of all customer accounts was material enough that senior executives must have known about it. ¶186; *Wells Fargo*, 2017 WL 1735573, at *13-14.[25]

---

[25] If anything, Defendants' cases support Plaintiffs. *Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 210, 233 (S.D.N.Y. 2009) (no scienter based solely on "title and job responsibilities"; scienter alleged as to company); *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1203-04 (S.D. Fla. 2015) (rejecting scienter because

Fourth, Defendants claim that Plaintiffs' allegations that CenturyLink's false denials of misconduct show scienter "make no sense." DB 31. But courts routinely hold that such denials support scienter, because defendants either knew the denial was false, or were severely reckless in issuing the denial without knowing the facts. *See Avaya*, 564 F.3d at 270 & n.43 (3d Cir. 2009) (in issuing a denial, ignorance is not exculpatory); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 596 (W.D. Tex. 2014) (offering assurances when company "is in danger is more than misleading – this constitutes direct lying"); *Garden City Empls. Ret. Sys. v. Psychiatric Sols., Inc*., 2011 WL 1335803, at *52 (M.D. Tenn. 2011) (characterization of events as "minor" established scienter); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) ("denials indicate that [defendants] were either sufficiently familiar with the facts, or severely reckless in not being familiar"); *In re Novo Nordisk Sec. Litig*., 2018 WL 3913912, at *7 (D.N.J. Aug. 16, 2018) (false denials support scienter).

Fifth, Defendants are wrong to argue that the fact that the SEC questioned CenturyLink about its consumer segments revenues—at the same time those revenues were being impacted by the Company's efforts to reduce cramming—does not support scienter. DB 31. There is a strong inference that Defendants would have uncovered the actual reason behind CenturyLink's fluctuating revenues before responding to a request from

---

statements concerned matters that "evade ready detection," and distinguishing cases involving a government investigation).

CenturyLink's primary securities regulator that highlighted their obligation to disclose it.[26]
¶¶121-24; *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (regulator correspondence raises inference of scienter).[27]

Last, Defendants contend that the resignations of senior executives who knew about the billing misconduct do not contribute to scienter.  DB 31.[28]  But the argument that there may be "many reasons not related to fraud why people resign" ignores the actual circumstances of their departures, and Defendants do not articulate any innocent reasons. DB 31.  *See supra* at 40-41.[29]

---

[26] Whatever its relevance, Defendants are wrong to claim the SEC was "satisfied" by CenturyLink's response (DB 31)—an unsupported and inappropriate factual contention— especially given that Plaintiffs allege the Company misled the SEC, which would thus have no reason to question it.  Indeed, in its letters to the SEC, CenturyLink represented that it would not assert the SEC's comments "as a defense in any proceeding initiated by…any person under the federal securities laws," as it attempts to do here.  *See* Ex. E; *see also Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc*., 633 F. Supp. 2d 763, 796 (D. Ariz. 2009) (SEC decisions are "irrelevant" to scienter).

[27] Defendants' cases are inapposite. *Cf. In re Ceridian*, 542 F.3d 240, 248 (8th Cir. 2008) (SEC investigation into "unrelated accounting errors" did not result in any findings of wrongdoing, and facts compelled inference of incompetence); *Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1151 (E.D. Mo. 2014) (SEC correspondence concerned interpretation of technical accounting rules, and allegations were undermined by defendants' "repeatedly and accurately explaining how the company" was interpreting rule).

[28] Again ignoring *Tellabs*, CenturyLink omits Post's premature departure following the disclosure of the fraud alleged in this case.  ¶29.

[29] Defendants' cases are inapposite.  *See Kurtzman v. Compaq Comp. Corp*., 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) (no facts connected resignations to fraud, and circumstances suggested poor performance); *Zucco Partners*, 552 F.3d at 1002 (resignations were not "uncharacteristic" of typical hiring and firing or suspicious); *Henningsen*, 161 F. Supp. 3d at 1205 (no facts connected activist investor board representative's resignation, which accompanied investor's divestiture, to fraud); *Dillard*

### E.    The Complaint Adequately Pleads Loss Causation

Loss causation is governed by Rule 8(a)'s notice pleading standards. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). As courts in this District have explained, Rule 8 "simply requires a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *In re Retek Inc. Sec.*, 2005 WL 3059566, at *3 (D. Minn. Oct. 21, 2005) (citing *Dura*, 544 U.S. at 346-47). Plaintiffs easily meet this low burden. *Id.*

The Complaint alleges that CenturyLink's cramming misconduct began to be revealed on June 17, 2016, when *Bloomberg* reported on Heiser's whistleblower complaint revealing these practices and the fact that she was fired after raising concerns about them with Defendant Post. ¶¶152-54. Market reaction was swift, CenturyLink stock dropped nearly 5% on heavy volume, and analysts connected the decline to the revelations. ¶¶154-56. On June 19, 2017, *Bloomberg* reported on a consumer class action lawsuit on behalf of "potentially millions" of CenturyLink customers who had been defrauded—prompting another statistically significant decline. ¶158.  Last, on July 12, 2017, after a year-long investigation, the Minnesota Attorney General disclosed it filed a lawsuit against CenturyLink that provided extensive detail concerning the Company's practices and their financial impact. ¶¶163-68. CenturyLink's stock fell dramatically in response. ¶¶169-71.

The Complaint ties revelation of the fraud to these corrective disclosures, thereby easily surpassing *Dura*'s requirement to provide "defendant[s] with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Retek*, 2005 WL 3059566,

---

*v. Platform Spec. Prod. Corp.*, 2016 WL 10586301, at *8 n.2 (S.D. Fla. 2016) (resignations occurred months before fraud was revealed and "no facts" suggested their involvement).

at *3 (citing *Dura*, 544 U.S. at 346-47). Courts in this district and around the country regularly hold such allegations plead loss causation. *See, e.g.*, *St. Paul*, 2006 WL 2735221, at *4 (disclosures of attorney general complaint and analyst reports).

In response, Defendants argue that loss causation is not alleged because the disclosures involve "contested allegations and speculation." DB 32.  But as the Sixth Circuit recently explained in *Norfolk County Retirement System v. Community Health Systems, Inc.*, "every representation of fact is in some sense an allegation, whether made in a complaint, newspaper report, press release, or under oath," and a complaint can serve as a disclosure for loss causation purposes if "the market <u>could</u> have perceived [its allegations] as true."  877 F.3d 687 at 696.  Indeed, courts in this Circuit and elsewhere routinely find nearly identical disclosures sufficient. *See, e.g.*, *St. Paul*, 2006 WL 2735221, at *4 (government complaint); *Health Sys., Inc.*, 877 F.3d at 695-96 (competitor's complaint); *Singer v. Reali*, 883 F.3d 425, 446-47 (4th Cir. 2018) (subpoena); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (subpoena, noting "infinite" ways to plead causation); *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324-25 (5th Cir. 2014) (investigations).  Here, the Complaint clearly alleges the market "<u>could</u> have perceived" the allegations in the detailed whistleblower complaint, the consumer class actions, and the findings of the Minnesota Attorney General were true.  ¶¶152-78, 264-66.

Defendants' cases are not to the contrary. In *In re Express Scripts, Inc.*, the court found loss causation insufficiently alleged because plaintiffs did "not plead any facts… establish[ing] the truth of the allegations" in the disclosure-triggering complaint.  2010 WL

2671456, at *17 (E.D. Mo. June 30, 2010).   But here, Plaintiffs allege detailed facts substantiates the truth of the allegations in the three disclosure-triggering sets of complaints.  *Magro v. Freeport-McMoran Inc.* stands for the unremarkable proposition that "the announcement of an investigation, without more, is insufficient to establish loss causation."  2018 WL 3725781, at *9.  But filing a complaint is not the same thing as announcing an investigation, and the complaints here provided detail concerning Defendant Post's involvement, call recordings revealing that maybe "one in five" customers were quoted correctly, and prompted CenturyLink's own internal investigation—which found customers were misled.  ¶174; *Amedisys*, 769 F.3d at 324-25.

Last, Defendants are wrong to argue that none of the disclosures revealed that the Company's billing practices had an impact on CenturyLink's financial results.  Heiser estimated the overcharges she witnessed were in the millions (¶¶144-46, 153), the consumer lawsuits estimated damages as hundreds of millions (¶158), the Minnesota Attorney General's complaint showed that nearly 80% of customers may have been misquoted, and General Swanson said damages were likely to be "very, very significant." ¶167.  And although CenturyLink has not yet been forced to restate its financial results, the Company entered into a consent order with the Minnesota Attorney General and admitted its billing practices misled customers.  ¶¶173-74.  This satisfies Rule 8.[30]

---

[30] *Markman v. Whole Foods Market, Inc.*, 269 F. Supp. 3d 779, 787 (W.D. Texas 2017), *aff'd at* 2018 WL 4770729 (5th Cir. Oct. 3, 2018), is inapposite because there, the complaint failed to demonstrate <u>any</u> connection between the disclosures prompting the stock price decline and the misrepresentations.

### F.    The Complaint Adequately Pleads a Claim for Violation of Section 20(a)

Section 20(a) of the Exchange Act creates liability for directly or indirectly controlling a primary violator of the securities laws. *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010); 15 U.S.C. § 78t(a). The statute is construed liberally and requires "only some indirect means of discipline or influence short of actual direction to hold a controlling person liable." *Id*. A plaintiff must allege (1) a "primary violator" violated the securities laws; (2) the control person "exercised control over the general operations of the primary violator"; and (3) the control person "possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated." *Id*. The PSLRA pleading standards do not apply to the second and third elements. *Id*. at 875. Except for Defendant Bailey, Defendants only Section 20(a) argument is that plaintiffs have not alleged a primary violation—which, as set forth above, fails. DB 33.

As to only Bailey, Defendants contend he must have exercised control over other individual defendants to be liable. *Id*. This is wrong—Plaintiffs need only allege that Bailey exercised control over CenturyLink's general operations and "possessed…the power to determine the specific acts" giving rise to the claim. *See Lustgraaf*, 619 F.3d at 878. Plaintiffs plainly do so—Bailey was CenturyLink's Senior Vice President of Operations and Treasurer, served as the Company's spokesperson before regulatory and legislative authorities and investors, and was charged with overseeing efforts to address cramming. ¶¶34, 110. As such, Bailey had control over CenturyLink's general operations,

was actively involved in CenturyLink's decisionmaking process with regard to the misconduct here, and thus had the requisite control.  *See Lustgraaf*, 619 F.3d at 873, 878.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

Dated:  Minneapolis, Minnesota
        October 12, 2018

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*Michael D. Blatchley*
John C. Browne
Michael D. Blatchley
Michael Mathai
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
johnb@blbglaw.com
michaelb@blbglaw.com
michael.mathai@blbglaw.com

Keith S. Dubanevich, OSB No. 975200
Timothy S. DeJong, OSB No. 940662
Keil M. Mueller, OSB No. 085535
**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
kdubanevich@stollberne.com
tdejong@stollberne.com
kmueller@stollberne.com

*Special Assistant Attorneys General and Counsel for Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement*

*Fund, Plaintiff Fernando Vildosola and*
*Lead Counsel for the Class*

Richard A. Lockridge, MN No. 64117
Gregg M. Fishbein, MN No. 202009
Kate M. Baxter-Kauf, MN No. 392037
**LOCKRIDGE GRINDAL NAUEN**
**P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4044
Facsimile: (612) 339-0981
ralockridge@locklaw.com
gmfishbein@locklaw.com
kmbaxter-kauf@locklaw.com

*Liaison Counsel for Lead Plaintiff the*
*State of Oregon by and through the*
*Oregon State Treasurer and the Oregon*
*Public Employee Retirement Board, on*
*behalf of the Oregon Public Employee*
*Retirement Fund and Plaintiff Fernando*
*Vildosola*