# EXHIBIT A

MOTLEY RICE LLC
GREGG S. LEVIN (admitted *pro hac vice*)
JOSHUA C. LITTLEJOHN (admitted *pro hac vice*)
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
jlittlejohn@motleyrice.com

MOTLEY RICE LLC
WILLIAM H. NARWOLD (admitted *pro hac vice*)
One Corporate Center
20 Church St., 17th Floor
Hartford, CT  06103
Telephone:  860/882-1681
860/882-1682 (fax)
bnarwold@motleyrice.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
AELISH M. BAIG (201279)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
aelishb@rgrdlaw.com

Lead Counsel for Plaintiffs

Liaison Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY HEFLER, MARCELO MIZUKI, GUY SOLOMONOV, and UNION ASSET MANAGEMENT HOLDING AG, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:16-cv-05479-JST <br><br> <u>CLASS ACTION</u> |
| Plaintiffs, | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| WELLS FARGO & COMPANY, JOHN G. STUMPF, JOHN R. SHREWSBERRY, CARRIE L. TOLSTEDT, TIMOTHY J. SLOAN, DAVID M. CARROLL, DAVID JULIAN, HOPE A. HARDISON, MICHAEL J. LOUGHLIN, AVID MODJTABAI, JAMES M. STROTHER, JOHN D. BAKER II, JOHN S. CHEN, LLOYD H. DEAN, ELIZABETH A. DUKE, SUSAN E. ENGEL, ENRIQUE HERNANDEZ, JR., DONALD M. JAMES, CYNTHIA H. MILLIGAN, FEDERICO F. PEÑA, JAMES H. QUIGLEY, JUDITH M. RUNSTAD, STEPHEN W. SANGER, SUSAN G. SWENSON, and SUZANNE M. VAUTRINOT, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.      SUMMARY ...................................................................................................1

II.     INTRODUCTION AND OVERVIEW ........................................................1

        A.      Wells Fargo Stressed Its "Vision and Values" Culture to Investors.......................4

        B.      Cross-Selling Was Core to Wells Fargo's Growth ................................7

        C.      The Officer Defendants' Compensation Practices Created Perverse
                Incentives to Keep Cross-Selling Targets Unattainably High ................9

        D.      Senior Executives at Wells Fargo Knew of Widespread Misconduct
                Related to the Company's Sales Practices ................................10

        E.      Amid Increasing Regulatory Scrutiny of Wells Fargo's Sales Practices,
                Defendants Refused to Disclose and Outright Denied Problems Within Its
                Sales Culture ................................12

        F.      Wells Fargo Quietly Retaliated Against Branch-Level Employees Who
                Reported Problems ................................17

III.    PARTIES ...................................................................................................20

IV.     CONTROL PERSONS ................................................................................25

V.      JURISDICTION AND VENUE ..................................................................31

VI.     FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS
        DURING THE CLASS PERIOD ................................31

        Wells Fargo Investor Day Boasted of the Virtues of the Company's Cross-Sell
        Strategy and the Revenues to Be Driven by Its Methods ..................................38

        Wells Fargo and Top Executives Falsely Denied Claims that Sales Culture
        Caused Employees to Break the Law ..................................64

        Even as Evidence of Fraudulent Sales Conduct Mounted and Government
        Investigations Increased in Intensity, Top Executives and the Director Defendants
        Continued to Misrepresent and Conceal the Material and Illegal Elements of the
        Cross-Sell Strategy and Their Impact on Wells Fargo's Financial Condition..................71

        Wells Fargo Fired Tolstedt But Called It "Retirement," Failing to Disclose the
        Termination Was Because of Fraudulent Sales Practices – While Continuing to
        Report False Cross-Sell Metrics and Strategy ..................................78

VII.    THE TRUE FACTS CONCERNING KNOWN AND LONGSTANDING
        FRAUDULENT CONDUCT BEGAN TO BE DISCLOSED ..........................82

        Stumpf Testified Before Congress Twice and Admitted Knowledge of Fraudulent
        Conduct as Early as 2011..................................90

| | | | |
|---|---|---|---|
| 1 | | September 20, 2016 Testimony ................................................................92 |
| 2 | | September 29, 2016 Testimony ................................................................93 |
| 3 | | September 20, 2016 Testimony ................................................................96 |
| 4 | | The Wells Fargo Board Announced the Immediate Termination of Tolstedt – and Clawed Back $60 Million from Stumpf and Tolstedt........................................97 |
| 5 | VIII. | ADDITIONAL POST-CLASS PERIOD EVENTS AND ADMISSIONS ....................99 |
| 6 | | Wells Fargo Fired Stumpf..........................................................................99 |
| 7 | | Federal and State Agencies Launched Civil and Criminal Investigations into Wells Fargo's Sales Practices ...............................................................101 |
| 8 | | |
| 9 | | Simultaneous with Government Investigations, Multiple State Agencies Suspended Business Alliances with Wells Fargo Further Damaging Shareholder Value ..................................................................................................103 |
| 10 | | |
| 11 | | Former Employees Reported and Wells Fargo Admitted It May Have Fired or Otherwise Retaliated Against Employees Who Sought to Report Misconduct Even Through the Company's Ethics Hotline .............................................105 |
| 12 | | |
| 13 | | 2017 Brought Additional Disclosures Cementing Defendants' Knowing Wrongdoing Including Claims of Evidence Destruction and Emails Confirming Defendants' Concealment of Ongoing Investigations and Retaliation Against Employees ..........................................................................................111 |
| 14 | | |
| 15 | | After the September 2016 Disclosures and Settlements, New Account Openings Plummeted, Further Evidencing that Previous Results Were Inflated by the Fraud .....113 |
| 16 | | |
| 17 | IX. | LOSS CAUSATION/ECONOMIC LOSS ................................................117 |
| 18 | X. | INAPPLICABILITY OF SAFE HARBOR ................................................122 |
| 19 | XI. | INSIDER TRADING.........................................................................123 |
| 20 | XII. | APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET....................................................................................126 |
| 21 | | |
| 22 | XIII. | CLASS ACTION ALLEGATIONS .......................................................128 |
| 23 | COUNT I | ....................................................................................................129 |
| 24 | | For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5 Against the Company and the Speaking Defendants ....................................................129 |
| 25 | COUNT II | ...................................................................................................130 |
| 26 | | For Violation of §20A of the 1934 Act Against Carroll, Loughlin, Modjtabai, Sloan, Stumpf and Tolstedt.....................................................................130 |
| 27 | | |
| 28 | | |

COUNT III .......................................................................................................132

      For Violation of §20(a) of the 1934 Act Against Defendants ...........................132

PRAYER FOR RELIEF ....................................................................................133

JURY DEMAND ...............................................................................................133

## I.  SUMMARY

1.      Lead Plaintiff, Union Asset Management Holding, AG ("Union" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of news releases issued by Wells Fargo & Company ("Wells Fargo" or the "Company"), Wells Fargo's filings with the U.S. Securities and Exchange Commission ("SEC") and media and analyst reports about the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a securities fraud class action on behalf of all persons who purchased Wells Fargo common stock between February 26, 2014 and September 20, 2016, inclusive (the "Class Period").  The action is brought against several current and former Wells Fargo officers and directors including, the Company's former Chairman and Chief Executive Officer ("CEO"), John G. Stumpf ("Stumpf"), Chief Financial Officer (current "CFO"), John R. Shrewsberry ("Shrewsberry"), former CFO and current CEO, Timothy J. Sloan ("Sloan"), former Senior Executive Vice President of Community Banking, Carrie L. Tolstedt ("Tolstedt"), and others, for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.  Additional claims are set forth herein under §§20(a) and 20A of the 1934 Act.

## II.  INTRODUCTION AND OVERVIEW[1]

3.      This action is centered on Defendants' (defined below) repeated misrepresentations and omissions about a core element of Wells Fargo's business: its acclaimed "cross-selling" business model.  That model found its roots in the bank's "Vision and Values," which emphasized the significance of customer relationships.  Defendants touted this strategy throughout the Class Period, despite knowing that the Company's overly aggressive cross-sell targets, extreme sales environment

---

[1]      Unless otherwise indicated, all emphases are added and all internal citations, quotation marks and footnotes are omitted.

and related incentive compensation programs were corrupting, rather than reinforcing, Wells Fargo's purported corporate values and cross-selling business model.

4. The truth about Wells Fargo's "Vision and Values" and its cross-selling business model began to emerge in September 2016, when the federal government's Consumer Financial Protection Bureau ("CFPB") imposed on Wells Fargo the largest financial penalty it has ever levied against an institution. The CFPB and other regulators sought to punish Wells Fargo for its "widespread illegal practice of secretly opening unauthorized deposit and credit card accounts," as the agency explained. The CFPB's Director, Richard Cordray, later testified about Wells Fargo's cross-selling business activities, best summarizing them in a single sentence: "The fraudulent conduct occurred on a massive scale." This "massive" fraud materially corrupted Wells Fargo's overarching representations to investors during the Class Period that its "Vision and Values" and visionary cross-selling business model gave investors key reasons to invest in Wells Fargo's common stock.

5. The government found that at the same time that Defendants promoted Wells Fargo to investors on these grounds, Wells Fargo was also "cross-selling" "products" by illicit or even illegal means, flagging millions of suspicious credit card and account openings as fraudulent. Specifically, the government found that Wells Fargo had:

(1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts from their owners' other accounts, all without their customers' knowledge or consent;

(2) submitted applications for credit cards in customers' names using customers' personal identifying information without their knowledge or consent;

(3) enrolled customers in online banking services that they did not request; and

(4) ordered and activated debit cards using customers' information without their knowledge or consent.

6. As news of the government's factual findings spread throughout the financial markets and national media, the U.S. Senate and House of Representatives called Stumpf, at the time Wells Fargo's CEO, to account for the fraud at two hearings. At those hearings, the former CEO admitted that he knew about the fraud and revealed even more facts showing, just as the government found, "fraudulent conduct on a massive scale."

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

7. Indeed, thousands of Wells Fargo employees, incentivized by a toxic, high-pressure sales culture and ill-conceived compensation plan, turned to committing fraud by opening millions of unauthorized and undisclosed accounts in the names of their customers for the sole purpose of achieving otherwise unobtainable sales targets. Missing targets was a fireable offense not only at the ground level but well up the chain of command, and employees engaged in a variety of improper practices to avoid discipline, save their jobs, and earn bonuses including by, for example, forging signatures on paperwork, faking phone calls to customers and opening accounts, transferring funds and activating credit cards all without customer permission. To the extent employees did not engage in, or turn a blind eye to, these activities, they competed with those who did, often fell behind and faced discipline and termination.

8. Ruthless pressure was exerted from the top down and reinforced the mantra that employees must meet the targets no matter the cost.[2] Those whose branches/regions lagged, faced discipline and termination. Those whose branches/regions excelled received bonuses, promotions and/or transfers to other areas of the country to spread their aggressive (albeit fraudulent) sales tactics.

9. Congressional testimony provided in the aftermath of the fraud confirmed that Wells Fargo has been aware of these illegal practices since at least 2011.[3] Since 2013, the Company's highest executives (and even its Board of Directors (the "Board")) have been aware that fraudulent sales activity had reached a "significant scale."[4] But, even as Wells Fargo retained outside consultants to address the problem, federal and state regulators investigated, and journalists asked tough questions, Wells Fargo refused to take meaningful steps to remediate its broken sales culture,

---

[2] *See Former Wells Fargo Employees Describe Toxic Sales Culture, Even At HQ*, National Public Radio, Oct. 4, 2016, http://www.npr.org/2016/10/04/496508361/former-wells-fargo-employees-describe-toxic-sales-culture-even-at-hq.

[3] *See generally An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response Before the Senate Committee on Banking, Housing, and Urban Affairs*, 114 Cong. (Sept. 20, 2016) (hereinafter "Senate Tr."), attached hereto as Exhibit A.

[4] *Id.* at 24.

failed to disclose the widespread fraud and related investigations to investors, and affirmatively denied allegations related to the improper sales practices.

10.    Even more troubling, as the problem persisted and as investigations mounted, Defendants continued their aggressive sales and incentive programs, and consistently touted the successes of cross-sell to investors.  The price of Wells Fargo stock increased in lockstep and, although faced with investigations and with knowledge that the problem was of a significant magnitude, certain of the Defendants sold or disposed of massive amounts of personal holdings of Company stock.  The insiders also benefited from an executive compensation scheme tied, both directly and indirectly, to cross-sell metrics.  The extent of the fraud did not begin to emerge until September 8, 2016, when the various regulators who were investigating – the Office of the Comptroller of the Currency ("OCC"), the CFPB and the Los Angeles City Attorney – imposed $185 million in fines on Wells Fargo and forced it to reassess its business.

**A.    Wells Fargo Stressed Its "Vision and Values" Culture to Investors**

11.    Before and during the Class Period, Defendants touted the Company's cross-sell strategy and the bank's emphasis on ensuring positive customer relationships as factors that distinguished Wells Fargo from its banking peers.  Investors, in turn, accepted that Wells Fargo's culture was a valuable asset and that its cross-selling business model added value to the Company.

12.    Wells Fargo's "Vision and Values" culture was repeatedly explained to investors in statements to the media, annual reports and SEC filings.  Stumpf, the Company's now former CEO, who proclaimed himself to be the "keeper of the culture," viewed that culture as Wells Fargo's singular most important asset.[5]  He stated in the Company's 2014 Annual Report that "culture is the most important part of a company's success," and that Wells Fargo's culture was defined by "[r]elationships."[6]  Likewise, in the 2015 Annual Report, Stumpf, the so-called "master modeler of

---

[5]    Interview by Erick Schatzker with John G. Stumpf, CEO, Wells Fargo & Co., on Bloomberg TV (Dec. 8, 2014).

[6]    Wells Fargo & Co., Investor Annual Report at 3 (2014).

the 'vision and values,'"[7] emphasized that "[r]elationships are at the core of our culture" and stressed that:

> No document better captures our relationship-based culture and focus on customers than *The Vision & Values of Wells Fargo*, which was first published more than 20 years ago.  (I invite you to read our Vision & Values at wellsfargo.com.)
>
> We bring the *Vision & Values* to life each day through delivering on our six priorities: putting customers first, growing revenue, managing expenses, living our vision and values, connecting with communities and stakeholders, and managing risk.[8]

13.    Indeed, Wells Fargo's Vision and Values document was purportedly the Company's "guide . . . toward growth and success."[9]  By way of example, the following excerpts are taken from the Company's Vision and Values document that was in effect between 2012 and 2015:[10]

- "*What's right for customers . . . Our customers – external and internal – are our friends.  We advocate for their best interests*."[11]

- "The *reason* we wake up in the morning is to help our customers succeed financially and to satisfy all their financial needs.  *The result is we make money because of our focus on serving customers, not the other way around*.  This time-tested vision will forever be what matters to Wells Fargo.  We'll never put the stagecoach ahead of the horses."[12]

- "*Reputation.  We will not engage in activities or business practices that could cause permanent or irreparable damage to our reputation*."[13]

- "We want compliance and risk management to be part of our culture, an extension of our code of ethics.  Everyone shapes the risk culture of our company.  *We encourage all team members to identify and bring risk forward.  We should thank them for doing so*."[14]

---

[7]    Maria Aspan, *Wells Fargo's John Stumpf, the 2013 Banker of the Year*, Am. Banker at 5, Nov. 21, 2013, http://www.castconsultants.com/wp-content/uploads/2013/12/Wells-Fargo-John-Stumpf-the-2013-Banker-of-the-Year.pdf.

[8]    Wells Fargo & Co., Investor Annual Report at 4 (2015).

[9]    Wells Fargo & Co., Quarterly Report (Form 10-Q) at 3 (May 7, 2014).

[10]    *See The Vision & Values of Wells Fargo* (Wells Fargo & Co. 2012) (hereinafter "2012 *Vision & Values*").

[11]    *Id.* at 9.

[12]    *Id.* at 5 (some emphasis omitted).

[13]    *Id.* at 19.

[14]    *Id.*

- "*The customer value of cross-selling . . . The core of our vision-based strategy is 'cross-selling' – the process of offering customers the products and services they need, when they need them, to help them succeed financially*."[15]

14.     Simply stated, the Company's cross-sell business model was its "secret sauce."[16] Stumpf repeatedly assured the public and investors that if "you hire great people, put your customers first, and invest in your communities, your shareholders will do really, really well."[17]

15.     Shareholders gave Stumpf's and Wells Fargo's words great weight.  Analysts highlighted the Company's "culture" and noted in their research that Wells Fargo's focus on building strong customer relationships gave it a significant competitive advantage in the marketplace.  For example, BMO Capital Markets ("BMO Capital") "believe[d] one of the strengths at Wells Fargo, which cannot be replicated, is its culture . . . .  In our view, [Wells Fargo]'s disciplined culture has enabled the bank to manage the more challenging revenue and regulatory environment better than its peers."[18]  Similarly, Guggenheim Securities, LLC ("Guggenheim") believed the Company's culture "differentiate[d] it from many of its peers."[19]  Therefore, both before and during the Class Period, investors were convinced that Wells Fargo's "Vision and Values" culture gave Wells Fargo a competitive advantage, enabling the Company to stand out from others in the banking sector.  Against this backdrop, Wells Fargo repeated over and over again during the Class Period, false and misleading statements to investors extolling its strong cross-sell metrics, which were, in significant part, based on fraudulent sales practices.

---

[15]   *Id.* at 22.

[16]   Hilary Burns, *Wells Fargo CEO John Stumpf on economy, culture after regulators' probes*, Charlotte   Bus.   J.,   Dec.   3,   2015,   http://www.bizjournals.com/charlotte/ blog/bank_notes/2015/12/wells-fargo-ceo-john-stumpf-on-economy-culture.html.

[17]   *Id.*

[18]   Peter J. Winter & Lana Chan, *Wells Fargo: Takeaways From Investor Day* at 2 (BMO Capital Markets May 21, 2014).

[19]   Marty Mosby & Mason Mosby, *WFC – BUY – Reflections After Returning from Investor Day* at 4 (Guggenheim Securities, LLC May 23, 2014).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                          - 6 -

## B.    Cross-Selling Was Core to Wells Fargo's Growth

16.    Cross-selling was integral to the Company's culture, business operations and growth strategy during the Class Period.  The practice was introduced in the late 1980s by Richard Kovacevich ("Kovacevich"), who was the then-CEO of Norwest Corporation ("Norwest").[20]  When Norwest merged with Wells Fargo in 1998, Kovacevich brought the practice to Wells Fargo.  Cross-selling was a powerful addition to Wells Fargo's culture.  This business model[21] was supposedly designed to drive growth by selling more products to more  customers.  The stated goal was to sell each customer household at least eight consumer products – a selling motto called "Gr-eight."[22]  The Company was often lauded for its effectiveness, which prompted one commentator to note "Wells Fargo is the most successful bank at cross-selling."[23]  As Shrewsberry explained in May 2014: "Our relationship focus and cross-sell capability is hopefully legendary at this point.  It's been our vision for decades.  We stuck to it.  You will hear about it all day today woven through the presentations by my colleagues about each of their businesses, and it's a difference maker."[24]

17.    Defendants likewise represented to investors that cross-selling was viewed as a core aspect of Wells Fargo's vision and an essential performance metric and defining characteristic, setting Wells Fargo apart from other banks.  In a 2006 version of the Company's Vision and Values statement, Kovacevich claimed that cross-selling was "'our most important strategy . . . [b]ecause it

---

[20]    Emily Glazer, *From 'Gr-eight' to 'Gaming,' a Short History of Wells Fargo and Cross-selling*, Wall St. J., Sept. 16, 2016, http://blogs.wsj.com/moneybeat/2016/09/16/from-gr-eight-to-gaming-a-short-history-of-wells-fargo-and-cross-selling/ (hereinafter "Glazer, *Gr-eight*").

[21]    The OCC formally recognized Wells Fargo's sales and incentive compensation structure as a "business model": "The Bank's **business model** emphasized sales of the Bank's products and services to Bank customers.  As part of this model, the Bank set sales goals and established an incentive compensation structure that emphasized sales of Bank products and services to customers by Bank employees."  Consent Order for Civil Money Penalty at 1-2, *In re Wells Fargo Bank, N.A.*, AA-EC-2016-67 (Sept. 1, 2016).

[22]    Glazer, *Gr-eight*, *supra* n.20.

[23]    Saul Perez, *Why cross-selling is part of Wells Fargo's strategy*, Market Realist, Oct. 9, 2014, http://marketrealist.com/2014/10/why-cross-selling-part-of-wells-fargos-strategy/.

[24]    Transcript of 2014 Investor Day at 7 (May 20, 2014) (hereinafter "2014 Investor Day Tr.").

1    is an "increasing returns" business model.'"[25]   This emphasis on the practice continued until the end

2    of the Class Period.   Stumpf echoed Kovacevich in the Company's 2012 Vision and Values

3    statement, describing cross-selling as "[t]he core of our vision-based strategy."[26]   At other

4    opportunities, Stumpf claimed that "cross-sell expertise is a significant and sustainable competitive

5    advantage for us";[27] that "[b]eing best in class in cross-sell is an important competitive advantage for

6    Wells Fargo";[28] and that "cross-sell is still absolutely critical to our operating philosophy."[29]   The

7    head of Retail Banking during the Class Period, Tolstedt, also emphasized that "the cross-sell model

8    . . . ties directly to our vision of helping our customers succeed financially and meeting all of their

9    needs.   Together, the density and cross-sell model drive revenue."[30]   Indeed, Wells Fargo's public

10   filings illustrate the importance of the practice: "[O]ur failure to execute this strategy effectively

11   could have a material adverse effect on our revenue growth and financial results."[31]   Most such

12   filings during the Class Period similarly touted cross-sell growth.

13          18.   Analysts also understood the significance of cross-selling.   Morningstar Corporate

14   Credit Research ("Morningstar") wrote in July 2013 and again in early 2014 about client asset

15   growth in Wells Fargo's Retail Banking unit, concluding that the Company's leadership and

16   business strategy of cross-selling its products across clients and households was indeed "vaunted"

17   and "intact,"[32] which led to continued financial strength:

18          Retail brokerage client assets grew 12% during the year, wealth management client
             assets expanded 7%, and retirement assets – both individual and institutional – grew

19

---

20   [25]   Geoffrey Gannon, *An Analysis of Wells Fargo & Company (WFC)*, Ezine @rticles, May 31,
         2006, http://ezinearticles.com/?An-Analysis-of-Wells-Fargo-and-Company-(WFC)&id=209516.

21   [26]   2012 *Vision & Values* at 22, *supra* n.10.

22   [27]   Transcript of Morgan Stanley Financials Conference at 2 (Feb. 1, 2011).

23   [28]   Transcript of Goldman Sachs Financial Services Conference at 3 (Dec. 10, 2013).

24   [29]   *Id*. at 11.

25   [30]   2014 Investor Day Tr. at 12, *supra* n.24.

26   [31]   Wells Fargo & Co., Annual Report (Form 10-K) at 129 (Feb. 26, 2014) (emphasis omitted).

27   [32]   Jim Sinegal, *Wells Fargo Achieves Another Record Quarter as Mortgage Revenues Fall* at 9
         (Morningstar Equity Research Jan. 14, 2014).

28

by double digits.  In our view, the fact that these balances are growing as fast as or faster than deposits is a sign that the company's vaunted cross-selling expertise is intact.  In fact, reported products per household grew across the bank's segments.[33]

### C.    The Officer Defendants' Compensation Practices Created Perverse Incentives to Keep Cross-Selling Targets Unattainably High

19.    Wells Fargo's compensation structure further ingrained cross-selling into the Company's business operations.  Much like the employees selling Wells Fargo's products, Stumpf's, Tolstedt's, Shrewsberry's, Sloan's, and David M. Carroll's ("Carroll") compensation was tied directly to cross-selling metrics.  Hence, as a consequence of increasing cross-selling ratios supported in significant part by fraudulent practices, the Officer Defendants (defined below) profited lavishly.

20.    In addition to top line and earnings growth, individual performance metrics in the Company's executive compensation scheme were inextricably connected to cross-selling.  In determining Tolstedt's incentive compensation, the Board "considered, among other things . . . [Tolstedt's] success in achieving strategic objectives in the business line[] for which [she was] responsible . . . , including success in furthering the Company's objective[] of cross-selling products from other business lines to customers."[34]  Shrewsberry received incentive compensation, in addition to stock options and salary, because of his "integral part in the Company's achievement of 2015 financial priorities."[35]  Sloan's incentive compensation was determined by his role in increasing deposits and loan growth in Wholesale Banking, where he "provided strong and effective strategic, operational and financial leadership" and would "continue to be critical to achieving the Company's strategic priorities."[36]  Finally, the Board recognized Carroll's achievement of "a number of important strategic objectives, including continued net customer asset inflows in Retail Brokerage,

---

[33]   *Id.* at 7.

[34]   Wells Fargo & Co., Proxy Statement (Schedule 14A) at 50 (Mar. 17, 2015) (hereinafter "2015 Proxy Statement").

[35]   Wells Fargo & Co., Proxy Statement (Schedule 14A) at 51 (Mar. 16, 2016) (hereinafter "2016 Proxy Statement").

[36]   *Id.* at 52.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

as well as growth in loan balances and deposits."[37]   The following chart summarizes the compensation received by several of the Officer Defendants in 2014 and 2015:[38]

| Name | Incentive Compensation[39] 2014-2015 | Total Compensation 2014-2015 |
|---|---|---|
| Carrie L. Tolstedt | $15,150,094 | $18,609,939 |
| John G. Stumpf | $33,000,083 | $40,744,995 |
| John R. Shrewsberry | $13,750,072 | $16,481,405 |
| Timothy J. Sloan | $17,600,137 | $21,486,826 |
| David M. Carroll | $15,250,094 | $18,792,424 |
| **Totals:** | **$94,750,480** | **$116,115,589** |

21.     Many of the Defendants also enriched themselves by selling or otherwise disposing of their personal holdings of Wells Fargo common stock during the Class Period.  ¶¶244-249.  Given their insider roles, these individuals were able to take advantage of material, non-public information, including the various internal and regulatory investigations regarding Wells Fargo's cross-selling business model, as they traded and disposed of massive amounts of Wells Fargo stock.

22.     By any measure, the sales and incentives practices that ultimately developed as a result of the Company's overly aggressive cross-sell goals were at odds with Wells Fargo's publicly-touted Vision and Values, and the way that Defendants presented cross-selling to investors.  But Defendants chose not to change course.

**D.      Senior Executives at Wells Fargo Knew of Widespread Misconduct Related to the Company's Sales Practices**

23.     At least as early as 2011, following an "uptick in bad sales behavior" in 2009 and 2010, internal reports began to surface within Wells Fargo that its employees were engaging in unlawful sales practices.[40]   The Company hired an outside firm, Q & A Research Inc., to

---

[37]   *Id.*

[38]   2015 Proxy Statement at 56; 2016 Proxy Statement at 57.

[39]   2015 Proxy Statement at 56; 2016 Proxy Statement at 57.

[40]   Emily Glazer, *How Wells Fargo's High-Pressure Sales Culture Spiraled Out of Control*, Wall St. J., Sept. 16, 2016, http://www.msn.com/en-us/money/companies/inside-wells-fargos-high-pressure-sales-culture/ar-BBwffcR (hereinafter "Glazer, *Inside Wells Fargo*").

1  investigate,[41] and beginning in 2011, the Company started firing approximately 1,000 employees per

2  year in connection with fraudulent sales practices.  It has since been revealed the Company was also

3  firing certain employees who reported, or refused to engage in, such practices.  In April 2012, Wells

4  Fargo began generating "Quality of Sales Report Cards" ("QSRs") to track cross-selling figures

5  (numbers of accounts opened, funded and for which signatures were obtained) and grade each

6  branch on cross-selling; however the QSRs set only minimum thresholds and did not require full

7  compliance.[42]

8       24.    Also in 2012, recognizing that Wells Fargo's sales and incentive programs were

9  rewarding illegal behavior, the Company reduced sales goals and implemented ethics training to

10  address the uptick in fraud.  Indeed, Stumpf acknowledged these changes in sworn testimony before

11  Congress:

> 12  [Stumpf:] I wanna tell you that we did do things. . . .  By 2012, [the Consumer
> Business within Wells Fargo] w[as] reducing goals and doing more ethics training.
> 13  By 2013, corporate resources were brought in.  And we – and we worked with the
> OCC.  In 2014, more reductions in goals.[43]

14

15  Yet, the misconduct continued to escalate in the years that followed.  For example, Stumpf admitted

16  under oath that he was aware of fraudulent activity of a "significant scale" as of 2013,[44] a year in

17  which the employee firings were at their peak and surpassing firings seen in 2011 and 2012.[45]

18       25.    Even though Wells Fargo's senior executives knew that the Company's cross-selling

19  misconduct had reached a "significant scale" by 2013, when some employees complained to the *Los

20  Angeles Times* in late 2013 about the Company's sales culture in the Los Angeles region, a Wells

21  Fargo spokesperson stated that the misconduct was limited to "a small number of our team

---

22  [41]   Thomas R. Fox, *Wells Fargo Week, Part III – The Bank Knew All Along*, FCPA Compliance &
   Ethics (Sept. 21, 2016), http://fcpacompliancereport.com/2016/09/wells-fargo-week-part-iii-the-
23  bank-knew-all-along.

24  [42]   *Id.* at 4.

25  [43]   "Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized
   Customer Accounts Before the H. Comm. on Fin. Servs.," 114th Cong., at 16 (Federal News Service
26  Sept. 29, 2016) (hereinafter "House Tr."), attached hereto as Exhibit B.

27  [44]   Senate Tr. at 24.

28  [45]   House Tr. at 15.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                       - 11 -

1   members." Far from "a small number," Wells Fargo's sales misconduct spanned across at least 40

2   states, and involved millions of accounts that more than 5,000 employees systematically fabricated

3   in response to Wells Fargo's "cross-selling" incentives and pressure. Later confronted with some of

4   these facts, Stumpf admitted this obvious point under oath: "5,000 people don't just do 5,000

5   random things on their own."[46] This systematic, nationwide cross-selling misconduct eventually

6   reached the attention of government officials.

7        **E.**     **Amid Increasing Regulatory Scrutiny of Wells Fargo's Sales**
                **Practices, Defendants Refused to Disclose and Outright Denied**

8                 **Problems Within Its Sales Culture**

9        26.     In early 2014, the OCC, in connection with the investigation that it initiated in 2013,

10   directed Wells Fargo to "address weaknesses in compliance risk management" by requiring the

11   Company to establish a comprehensive program addressing unfair and deceptive sales practices.[47]

12   The OCC also would assess the Company's sales practices during its upcoming examination into

13   Wells Fargo's governance processes.[48] Thus, at the beginning of the Class Period in early 2014:

14   (1) the OCC was closing in; (2) thousands of employees had been terminated; (3) some of those

15   employees had actually reported the improper sales practices to Human Resources; and yet the

16   relentless pressure to meet sales quotas persisted while the Company continued to tout its

17   "legendary" cross-selling to investors. None of this was disclosed to investors. Instead, Wells Fargo

18   doubled down. Throughout 2014, the Company issued numerous false and misleading statements

19   regarding sustained cross-sell ratios and the significance and successes of cross-selling to the

20   Company:

21       •   <u>February 26, 2014 (Form 10-K)</u>: "Our primary strategy to achieve this vision
          is to increase the number of our products our customers utilize and to offer

22           them all of the financial products that fulfill their needs. . . . We can grow by
          expanding the number of products our current customers have with us, gain

23

24

25   [46]   Senate Tr. at 29.

26   [47]  *Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs*, 114th Cong., at
    5 (Sept. 20, 2016) (statement of Thomas J. Curry, Comptroller of the Currency) (hereinafter "Curry

27   Statement").

28   [48]  *Id.*

new customers in our extended markets, and increase market share in many businesses."[49]

- <u>February 26, 2014 (Form 10-K)</u>: "Selling more products to our customers – 'cross-selling' – is very important to our business model and key to our ability to grow revenue and earnings especially during the current environment of slow economic growth and regulatory reform initiatives."[50]

- <u>May 7, 2014 (Form 10-Q)</u>: "We have steadily increased the growth rate of this higher cross-sell . . . through product enhancements and consistent focus."[51]

- <u>May 20, 2014 (Wells Fargo & Co. Investor Day Presentation)</u>: "[H]elping our customers succeed financially": "We estimate to achieve our long-term goal of an average of eight products per household will mean around 100 million additional products, owned and used by new and existing customers, satisfying all their [financial] needs."[52]

- <u>May 20, 2014 (Tolstedt at the Wells Fargo & Co. Investor Day Presentation)</u>: "[T]he cross-sell model . . . . This ties directly to our vision of helping our customers succeed financially and meeting all of their needs. Together, the density and cross-sell model drive revenue."[53]

- <u>November 13, 2014 (Shrewsberry at the Bank of America Financial Services Conference)</u>: "You can see in this slide that we have generated more fee income per average asset than our peers. This outperformance demonstrates our consistent focus on earning more of our customers' business and our culture of cross sell."[54]

27.     Unbeknownst to investors, the OCC's investigation of the Company continued throughout 2014 and into 2015. In April 2015, the OCC advised Wells Fargo in a "Matters Requiring Attention" letter ("MRA") to address the lack of a formalized governance framework related to sales practices within the Company.[55]

---

[49]   Wells Fargo & Co., Annual Report (Form 10-K) at 30 (Feb. 26, 2014).

[50]   *Id*. at 129.

[51]   Wells Fargo & Co., Quarterly Report (Form 10-Q) at 4 (May 7, 2014).

[52]   2014 Investor Day Tr. at 20, *supra* n.24.

[53]   *Id*. at 12.

[54]   Transcript of Bank of America Merrill Lynch Banking & Financial Services Conference at 4 (Nov. 13, 2014).

[55]   Curry Statement at 6, *supra* n.47.

28.     Two months later, in June 2015, the OCC issued another supervisory letter that required Wells Fargo "*to take significant action to address the inappropriate tone at the top*" by responding to the following observations:

> [T]he lack of an appropriate control or oversight structure given corporate emphasis on product sales and cross-selling; . . . the lack of an effective enterprise-wide customer complaint process; the lack of a formalized governance process to oversee sales practices and effectively oversee and test branch sales practices; and the failure of the Bank's audit services to identify the above issues or to aggregate sales practice issues into an enterprise[-level] view.[56]

29.     The letter also noted that the Company's sales and incentive program was deficient and instructed the Company to:

> [T]ake certain corrective actions to address the practices at issue, including improving processes to manage sales practices risk; re-evaluating compensation and incentive plans to ensure they did not provide an incentive for inappropriate behavior; improving processes to independently oversee sales practices risk at an enterprise-wide level; accelerating the implementation of a fully effective customer complaint process and establishing policy and processes for evaluating complaints related to protected classes; having management of the Bank's Community Bank division establish effective oversight, as well as a testing and quality assurance function, to review branch sales practices; and having the Bank's audit services develop an enterprise-wide risk management process for sales practices.[57]

30.     The OCC directed Wells Fargo to "remediate any consumer harm that resulted from the sales practices at issue" and ordered Wells Fargo "to retain an independent consultant to conduct a thorough review of the [Company]'s approach to enterprise-wide sales practices and to assess consumer harm."[58]

31.     Other regulators were opening investigations as well.  By May 2015, probes by the Los Angeles City Attorney and the CFPB into Wells Fargo's sales and compensation practices were underway.[59]  The Los Angeles City Attorney's nearly 18-month investigation led to a May 2015 lawsuit alleging that the Company had opened accounts and charged fees without customer consent, failed to inform customers that those accounts had been opened and caused further negative financial

---

[56] *Id.* at 6-7.

[57] *Id.* at 7.

[58] *Id.*

[59] *See* Senate Tr. at 30.

harm in violation of California law. Wells Fargo expressly denied each and every allegation made in the lawsuit and continued to laud its cross-sell growth to investors, and maintained that its culture was "'focused on the best interests of its customers and creating a supportive, caring and ethical environment for our team members.'"[60]

32.  Later that year, at the November 18, 2015 Bank of America Financial Services Conference, an analyst inquired about Wells Fargo's sales practices and cross-selling and the potential for regulatory action. Rather than acknowledge Los Angeles's lawsuit or that the Company was being investigated by several federal agencies, Carroll brushed the question aside by claiming that Wells Fargo had been praised by regulators for its sales practices: "[T]he question that you may have been heading towards about any regulatory issues around sales practices or cross-selling or those kinds of things, as long as we stick to that plan base, *we've had terrific reaction from our regulators from a compliance standpoint on that*."[61]

33.  By any measure, throughout 2015, Defendants continued to present Wells Fargo's cross-selling activities to investors in a favorable light by repeatedly touting the significance and success of Wells Fargo's cross-sell strategy in statements to the public:

- February 25, 2015 (Form 10-K): "Our 'cross-selling' efforts to increase the number of products . . . is a key part of our growth strategy . . . . Selling more products to our customers – 'cross-selling – is very important to our business model and key to our ability to grow revenue and earnings . . . ."[62]

- August 5, 2015 (Form 10-Q): "Cross-sell: Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs. Our approach is needs-based as some customers will benefit from more products, and some may need fewer. We believe there is continued opportunity to earn more business from our customers as we build lifelong relationships with them."[63]

---

[60]  E. Scott Reckard, *Suit seeks damages for all victims of alleged Wells Fargo customer abuses*, L.A. Times, May 13, 2015, http://www.latimes.com/business/la-fi-wells-fargo-consumer-lawsuit-20150513-story.html.

[61]  Transcript of Bank of America Merrill Lynch Banking & Financial Services Conference at 8 (Nov. 18, 2015) (hereinafter "2015 Fin. Servs. Conf."). Notably, Carroll was a member of Wells Fargo's Operating Committee at the time he made this statement. *See also* ¶¶55-85.

[62]  Wells Fargo & Co., Annual Report (Form 10-K) at 126 (Feb. 25, 2015) (emphasis omitted).

[63]  Wells Fargo & Co., Quarterly Report (Form 10-Q) at 11 (Aug. 5, 2015).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                               - 15 -

34. In fact, at no time during the Class Period did Defendants disclose or otherwise address the increasing regulatory scrutiny concerning the Company's core business model, nor the fraudulent activities that contradicted the Company's favorable statements about its cross-selling strategy and metrics.

35. U.S. Senator Pat Toomey made this point to Stumpf in September 2016:

> [Senator Toomey:] ***Well, we haven't been able to discover such a disclosure and the SEC clearly requires disclosure of material adverse circumstances. And I don't know how this could not be deemed material.*** I think the market cap lost nine percent over the last couple of weeks [and] that's pretty material.[64]

36. A September 28, 2016 letter from U.S. Senators Jeff Merkley, Elizabeth Warren and Bob Menendez to the SEC further highlighted the fact that Wells Fargo concealed its sales misconduct and related investigations:

> Mr. Stumpf admitted that he became aware of widespread fraud at the bank in 2013, yet neither he nor the company disclosed that information to investors until . . . September 2016. . . . [D]uring quarterly earnings calls, ***Mr. Stumpf personally touted Wells [Fargo's] cross-sell ratio – its measure of the average number of accounts per customer – as well as Wells [Fargo's] success in opening new deposit accounts and credit card accounts. He did so apparently with knowledge that many of these retail accounts were created without customer authorization***.
>
> ***The SEC has previously found securities fraud when an executive makes misleading statements on earnings calls***.[65]

37. That same letter also referenced inaccurate Sarbanes-Oxley Act of 2002 ("SOX") certifications that had been executed by Stumpf and others:

> Mr. Stumpf's testimony under oath before the Senate Banking Committee raises questions about whether he violated the Sarbanes-Oxley Act. According to his testimony before the Banking Committee, ***Mr. Stumpf became aware of the widespread fraud occurring at his bank in 2013, yet Mr. Stumpf and the company's CFO submitted certifications relating to SEC filings after 2013 that did not indicate any knowledge of this massive fraud***.[66]

38. On October 4, 2016, in a public letter to then-U.S. Attorney General Loretta E. Lynch, 14 U.S. Senators demanded that the U.S. Department of Justice ("DOJ") initiate a criminal

---

[64] Senate Tr. at 14.

[65] *See* Letter from U.S. Senators Jeffrey A. Merkley, Elizabeth Warren & Robert Menendez to Mary Jo White, Chair, SEC at 2-3 (Sept. 28, 2016) (hereinafter "Letter to SEC").

[66] *Id.*

investigation to "thoroughly investigate the culpability of senior executives at the bank."[67]  The letter

denounced Wells Fargo's senior management for failing to alert the market of the widespread fraud

and the Company's failure to address known, systemic and illegal sales practices:

> ***Mr. Stumpf testified under oath that he became aware of employees creating fraudulent bank accounts in 2013.  Yet for years thereafter, Mr. Stumpf did not disclose that information to investors . . . .***[68]

39.     The Company's egregious failure to meet its disclosure obligations was not lost on

corporate governance experts.  As reported by *The Charlotte Observer* in January 2017:

> "On the basis of what we know, it's hard to argue this wasn't material," said Philip Nichols, professor of legal studies and business ethics at University of Pennsylvania's Wharton School.  "I cannot understand why they didn't think that was.  It just makes me laugh."

> \*         \*         \*

> In Wells Fargo's case, Nichols said, it was "pretty clear" the problems with fake accounts at a bank famous for getting multiple products in customers' hands should have been publicly disclosed.[69]

**F.     Wells Fargo Quietly Retaliated Against Branch-Level Employees Who Reported Problems**

40.     In addition to Defendants' efforts to keep material information about the illegal sales

practices and investigations from investors and the public, Wells Fargo also went to great lengths to

silence branch employees who knew about the fraudulent sales practices.  The Company retaliated

against those employees who tried to report the problems to their managers or compliance staff, in

violation of federal whistleblower protection laws and Wells Fargo's own (stated) compliance and

ethics policies.

41.     Wells Fargo promoted its ethics and anti-retaliation policies as a significant part of its

publicly-touted "Vision and Values" culture.  The Company's Vision and Values document

emphasized that "compliance and risk management [are] part of our culture, an extension of our

---

[67]   *See* Letter from U.S. Senators Mazie K. Hirono, Elizabeth Warren, Tammy Baldwin, *et al.*, to Loretta E. Lynch, U.S. Attorney General at 1 (Oct. 4, 2016).

[68]   *Id.* at 2.

[69]   Deon Roberts, *Emails show Wells Fargo kept sales probe to itself for at least 6 months*, Charlotte Observer, Jan. 11, 2017, http://www.charlotteobserver.com/news/business/banking/bank-watch-blog/article125973184.html (hereinafter "Roberts, *Kept Sales Probe to Itself*").

code of ethics."[70]  That document also "encourage[d] all team members to identify and bring risk forward.  We should thank them for doing so."[71]  Similarly, Wells Fargo's written Code of Ethics was supposed to provide a safe harbor for employees who reported inappropriate conduct:

> ***We do not engage in or tolerate retaliation of any kind*** against anyone for providing information in good faith about suspected unethical or illegal activities, including possible violations of this Code, violations of laws, rules, or regulations by others, or concerns regarding accounting, internal accounting controls, or auditing matters.[72]

42.     Stumpf assured the Senate during a September 20, 2016 hearing that Wells Fargo had "ethics lines, we have a culture in the company if you see something that you don't think is proper, raise your hand, talk to a manager."[73]  But these policy statements paid mere lip service to compliance and protections from retaliation.   In reality, Wells Fargo's incentive structure encouraged managers to punish retail bank employees who reported wrongdoing.

43.     As set forth in detail below at ¶¶206-210, retaliation clearly was tied to Defendants' scheme, and reported instances of retaliation were widespread.[74]  Wells Fargo retaliated against branch-level employees with reprimands, termination or the filing of inaccurate or incomplete reports to credentialing regulators.  Numerous former Company employees have come forward with detailed accounts of retaliation for reporting unethical and illegal sales tactics.  By way of example, between 2011 and 2015, Wells Fargo filed false and misleading reports with the Financial Industry Regulatory Authority ("FINRA"), a non-governmental organization that regulates member brokerage firms on the terminations of employees related to the illegal behavior.  These reports, filed on what is known as a "Form U5," did not just conceal key information from those investigating the malfeasance at Wells Fargo.  The false and misleading Form U5s made it nearly impossible for fired

---

[70]  2012 *Vision & Values* at 19, *supra* n.10.

[71]  *Id.*

[72]  *Our Code of Ethics & Business Conduct: Living Our Vision & Values* at 7 (Wells Fargo & Co. 2016).

[73]  Senate Tr. at 6.

[74]  *See* Matt Egan, *Wells Fargo admits to signs of worker retaliation*, CNNMoney, Jan. 24, 2017, http://money.cnn.com/2017/01/23/investing/wells-fargo-retaliation-ethics-line/ (hereinafter "Egan, *Admits to Signs*").

1    employees, who were trying to do the right thing, to find subsequent equivalent employment in the

2    banking industry.[75]  The Company's fraudulent reporting to FINRA likely had a chilling effect on

3    other employees who witnessed inappropriate conduct.

4           44.     Specific examples of wrongful terminations came to light following Wells Fargo's

5    settlement with regulators in September 2016.  During the September 20, 2016 Senate hearing,

6    Senator Menendez asked Stumpf whether he read his emails, and Stumpf responded that he did.

7    Then, Senator Menendez read a New Jersey woman's 2011 email to Stumpf, in which she described

8    improper sales tactics she felt were wrong.  Senator Menendez asked Stumpf if he had read it.  "I

9    don't remember that one," Stumpf replied.  "OK, well she was fired.  So, so much for the safe

10   haven," Senator Menendez said.[76]  Other examples were highlighted in lawsuits and news reports.  A

11   lawsuit filed by two former Wells Fargo bankers alleged that the Company retaliated against them

12   for reporting a "co-worker's continued opening of rogue accounts and the number of customers

13   receiving service charges for bank accounts they had never approved."[77]  Additionally, a January 24,

14   2017 *CNNMoney* report included several accounts of employees who were terminated for refusing to

15   open fraudulent accounts, including employees who, in an effort to follow the Company's Vision

16   and Values policy, reported the inappropriate conduct to Wells Fargo's purportedly anonymous

17   ethics hotline.[78]  Indeed, as further reported by *CNNMoney*, Wells Fargo actually admitted in a

18   January 2017 town hall meeting to signs of worker retaliation: "Wells Fargo says it has found

19   evidence that at least some of these whistleblower retaliation claims published by CNNMoney and

20

21

22

---

23   [75]   *See* Letter from U.S. Senators Elizabeth Warren, Ron Wyden & Robert Menendez to Timothy J. Sloan, President & CEO, Wells Fargo & Co. (Nov. 3, 2016).

24   [76]   Senate Tr. at 37.

25   [77]   Howard Yune, *As Wells Fargo scandal unfolds, St. Helena whistleblower recalls ordeal*, Napa
26   Valley Register, Oct. 9, 2016, http://napavalleyregister.com/news/local/as-wells-fargo-scandal-
     unfolds-st-helena-whistleblowerrecalls-ordeal/article_dfeb4847-8463-53d8-bea3-6ec2446912df.html
27   (hereinafter "Yune, *Scandal Unfolds*").

28   [78]   Egan, *Admits to Signs*, *supra* n.74.

1    elsewhere may have merit. . . .  Asked to clarify if that means there were signs of retaliation, a Wells

2    Fargo spokeswoman told CNNMoney: 'Yes, that is how I would read it.'"[79]

**III.    PARTIES**

45.    Lead Plaintiff Union was appointed as such by Court order dated January 5, 2017.
Dkt. No. 58.  Union's funds purchased Wells Fargo common stock during the Class Period, and were
damaged by Defendants' conduct as alleged herein.

46.    Plaintiff Gary Hefler ("Hefler") purchased Wells Fargo common stock during the
Class Period and was damaged by the conduct alleged herein.

47.    Plaintiff Marcelo Mizuki ("Mizuki") purchased Wells Fargo common stock during
the Class Period, as detailed in his attached Certification, including purchases made
contemporaneously with certain Officer Defendants' sales of Wells Fargo common stock and was
damaged by the conduct alleged herein.

48.    Plaintiff Guy Solomonov ("Solomonov") purchased Wells Fargo common stock
during the Class Period, as detailed in his attached Certification, including purchases made
contemporaneously with certain Officer Defendants' sales of Wells Fargo common stock and was
damaged by the conduct alleged herein.

49.    Plaintiffs Hefler, Mizuki and Solomonov are collectively referred to as the "Named
Plaintiffs."

50.    Defendant Wells Fargo is a diversified financial services company that provides
retail, commercial, and corporate banking services principally in the United States.  Wells Fargo is a
Delaware corporation with its headquarters located in San Francisco, California.  Founded in 1852,
Wells Fargo is the world's second largest bank by market capitalization and has $1.9 trillion in assets
and $1.2 trillion in deposits.[80]  The Company offers banking, insurance, investments, mortgage, and
consumer and commercial finance services to over 70 million customers.[81]  Wells Fargo operates

---

[79] *Id.*

[80] Wells Fargo & Co., Quarterly Report (Form 10-Q) at 3-4 (Nov. 3, 2016).

[81] *Id.* at 3.

through three segments: Wholesale Banking, Wealth and Investment Management, and Community Banking.[82] The Community Banking segment offers diversified financial products and services for consumers and small businesses. These products include checking and savings accounts, credit and debit cards, automobile, student, and small business loans, investments, insurance and trust services, and mortgage and home equity loans.[83]

51. Defendant Stumpf– during the entirety of the Class Period – was Chairman of the Board and CEO of Wells Fargo. Stumpf served as the Company's CEO from 2007 until October 2016, as a director from 2006 to October 2016 and as President from 2005 until November 2015. Stumpf received 2014 and 2015 compensation of $19.3 million and $19.3 million, respectively.

52. Defendant Shrewsberry is, and was during part of the Class Period, the Company's CFO. Shrewsberry received 2014 and 2015 compensation of $8.1 million and $9.05 million, respectively. Shrewsberry served on the Operating Committee, which was led by Stumpf and responsible for setting the tone at the top of the Company and establishing and reinforcing the Company's risk management culture.

53. Defendant Tolstedt was at all relevant times during the Class Period until her resignation on July 31, 2016, the Company's Senior Executive Vice President of Community Banking. At various times during the Class Period, Tolstedt reported directly to Stumpf and/or Sloan. Tolstedt also served on the Company's Operating Committee, which was led by Stumpf and was responsible for setting the tone at the top of the Company and establishing and reinforcing the Company's risk management culture. Tolstedt received 2014 and 2015 compensation of $9.5 million and $9.05 million, respectively.

54. Defendant Sloan is Wells Fargo's current CEO. During the Class Period, Sloan was Wells Fargo's CFO, Chief Operating Officer, and Head of the Company's Wholesale Banking. As of October 13, 2016, he serves as the Company's CEO. Sloan also served on the Company's Operating Committee, which was led by Stumpf and was responsible for setting the tone at the top of

---

[82] *Id.* at 3, 15-16.

[83] *Id.* at 15.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1  the Company and establishing and reinforcing the Company's risk management culture.  Sloan

2  received 2014 and 2015 compensation of $17.6 million and $21.4 million, respectively.

3       55.    Defendant Carroll is, and was during the Class Period, the Company's Senior

4  Executive Vice President in charge of the Company's Wealth, Brokerage and Retirement Group.

5  Carroll was also a member of the Company's Operating Committee, which was led by Stumpf and

6  responsible for setting the tone at the top of the Company and establishing and reinforcing the

7  Company's risk management culture.

8       56.    Defendant David Julian ("Julian") is, and was during the Class Period, the

9  Company's Chief Auditor.  Julian was also a member of the Company's Operating Committee,

10  which was led by Stumpf and responsible for setting the tone at the top of the Company and

11  establishing and reinforcing the Company's risk management culture.

12      57.    Defendant Hope A. Hardison ("Hardison") is, and was at all relevant times during the

13  Class Period, the Company's Senior Executive Vice President and Human Resources Director.  In

14  September of 2015, Hardison became the Company's Chief Administrative Officer.  Hardison was

15  also a member of the Company's Operating Committee, which was led by Stumpf and responsible

16  for setting the tone at the top of the Company and establishing and reinforcing the Company's risk

17  management culture.

18      58.    Defendant Michael J. Loughlin ("Loughlin") was at all relevant times during the

19  Class Period the Company's Senior Executive Vice President and Chief Risk Officer.  As Chief Risk

20  Officer, Loughlin oversaw all of the Company's risk taking activities, and was required by the

21  Company's corporate governance policies to participate in executive sessions with the Board's Risk

22  Committee.[84]  Loughlin was also a member of the Company's Operating Committee, which was led

23  by Stumpf and responsible for setting the tone at the top of the Company and establishing and

24  reinforcing the Company's risk management culture.

25      59.    Defendant Avid Modjtabai ("Modjtabai") was at all relevant times during the Class

26  Period Head of Consumer Lending.  Modjtabai was also a member of the Company's Operating

27

28  [84]    The Risk Committee is discussed below at ¶82(a).

Committee, which was led by Stumpf and responsible for setting the tone at the top of the Company and establishing and reinforcing the Company's risk management culture.

60.    Defendant James Strother ("Strother") is, and was during the Class Period, the Company's General Counsel.  Strother was also a member of the Company's Operating Committee, which was led by Stumpf and responsible for setting the tone at the top of the Company and establishing and reinforcing the Company's risk management culture.

61.    The Defendants identified in ¶¶51-60 are herein referred to as the "Officer Defendants."

62.    Defendant John D. Baker II ("Baker") is, and was at all relevant times during the Class Period, a Wells Fargo director and member of the Company's Audit and Examination Committee ("Audit Committee"), as well as the Corporate Responsibility Committee ("CRC") and Credit Committee.  Defendant Baker joined the Board in 2009.

63.    Defendant John S. Chen ("Chen") is, and was at all relevant times during the Class Period, a Wells Fargo director and member of the Company's Human Resources Committee ("HRC").  Defendant Chen joined the Board in 2006.

64.    Defendant Lloyd H. Dean ("Dean") is, and was at all relevant times during the Class Period, a Wells Fargo director, member of the Company's CRC, Governance and Nominating Committee ("GNC") and Risk Committee, as well as the Chair of the HRC.  Defendant Dean joined the Board in 2005.

65.    Defendant Elizabeth A. Duke ("Duke") is, and has been since January 1, 2015, a Wells Fargo director and member of the Company's Credit and Risk Committees.  On January 26, 2016, Duke became a member of the Company's Finance Committee.

66.    Defendant Susan E. Engel ("Engel") is, and was at all relevant times during the Class Period, a Wells Fargo director and member of the Company's Credit, Finance, and HR Committees. Defendant Engel, who joined the Board in 1998, informed the Company on February 28, 2017, that she would not seek reelection and would retire from the Board on April 25, 2017.

67.    Defendant Enrique Hernandez, Jr. ("Hernandez") is, and was at all relevant times during the Class Period, a Wells Fargo director, member of the Company's CRC and Chair of the

1   Finance and Risk Committees.  Hernandez joined the Board in 2003 and was, during the period from

2   2014 to March 1, 2016, a member of the Company's Audit Committee.

3        68.    Defendant Donald M. James ("James") is, and was at all relevant times during the

4   Class Period, a Wells Fargo director and member of the Company's Finance and HR Committees.

5   Defendant James joined the Board in 2009.

6        69.    Defendant Cynthia H. Milligan ("Milligan") is, and was at all relevant times during

7   the Class Period, a Wells Fargo director, member of the Company's CRC, GNC and Risk

8   Committee, as well as the Chair of the Credit Committee.  Defendant Milligan joined the Board in

9   1992.

10        70.    Defendant Federico F. Peña ("Peña") is, and was at all relevant times during the Class

11   Period, a Wells Fargo director and member of the Company's Audit Committee and GNC.  On

12   March 1, 2016, Peña also succeeded Judith M. Runstad as the Chair of the CRC and a member of the

13   Risk Committee.  Defendant Peña joined the Board in 2011.

14        71.    Defendant James H. Quigley ("Quigley") is, and was at all relevant times during the

15   Class Period, a Wells Fargo director, member of the Company's Credit and Risk Committees and the

16   Chair of the Audit Committee.  Defendant Quigley joined the Board in 2013.

17        72.    Defendant Judith M. Runstad ("Runstad") is, and was at all relevant times during the

18   Class Period, a Wells Fargo director, and from 2014 to March 1, 2016, a member of the Credit,

19   Finance and Risk Committees, and Chair of the CRC.  Defendant Runstad joined the Board in 1998.

20        73.    Defendant Stephen W. Sanger ("Sanger") is, and was at all relevant times during the

21   Class Period, a Wells Fargo director, Lead Director of the Board of Directors,  member of the HRC

22   and Risk Committee, as well as the Chair of the GNC.  Defendant Sanger joined the Board in 2003.

23        74.    Defendant Susan G. Swenson ("Swenson") is, and was at all relevant times during the

24   Class Period, a Wells Fargo director and member of the Company's Audit Committee and GNC.

25   Defendant Swenson joined the Board in 1998.

26        75.    Defendant Suzanne M. Vautrinot ("Vautrinot") is, and has been since February 24,

27   2015, a Wells Fargo director and member of the Company's Audit Committee.  On February 23,

28   2016, Vautrinot became a member of the Company's Credit Committee.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST               

76.     The defendants named in ¶¶62-75 and Stumpf are sometimes referred to herein as a group as the "Director Defendants."

77.     All Defendants named herein are collectively referred to as "Defendants."

## IV.     CONTROL PERSONS

78.     As officers, directors and controlling persons of a publicly held company whose common stock was and is traded on the New York Stock Exchange ("NYSE") and is governed by the provisions of the federal securities laws, the Officer and Director Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Officer and Director Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

79.     The Officer and Director Defendants participated in the drafting, preparation and/or approval of the various SEC filings, shareholder and investor reports and other publicly disseminated communications complained of herein and knew of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and executive and managerial positions with Wells Fargo, each of the Officer and Director Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Wells Fargo and its business or adopted by the Company materially false and misleading.

80.     The Officer and Director Defendants, because of their positions of control and authority as officers and/or directors were able to and did control the content of the various SEC filings, news releases and other public statements pertaining to the Company during the Class Period.  Each of the Officer and Director Defendants was provided with copies of documents alleged

1   herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

2   opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Officer

3   and Director Defendants is responsible for the accuracy of the public reports and news releases

4   detailed herein and is therefore liable for the representations contained therein.

5        81.    The Company, the Officer Defendants and the Director Defendants are liable as

6   participants in a fraudulent scheme and course of business that operated as a fraud on purchasers of

7   Wells Fargo's common stock by disseminating materially false and misleading statements and/or

8   concealing material adverse facts. The scheme: (i) deceived the investing public regarding Wells

9   Fargo's business, operations, management, and the intrinsic value of Wells Fargo's common stock;

10  and (ii) caused Lead Plaintiff's funds, Named Plaintiffs and other members of the Class to purchase

11  Wells Fargo's common stock at artificially inflated prices.

12       82.    The Director Defendants, in particular, due to their membership on Board

13  committee(s) whose charge was to oversee the implementation of controls over risk, compensation,

14  human resources and governance, had the power and ability to control the Company's conduct,

15  reputation and disclosures by virtue of the charters governing each committee. For example, during

16  the Class Period, the Company's Board maintained seven separate standing committees, including

17  the Risk Committee that oversaw the Company's three main reportable segments – Community

18  Banking, Wholesale Banking and Wealth and Investment Management – while also overseeing the

19  Company's communications to investors about those businesses. The Risk Committee oversaw the

20  six other standing committees of the Board – Audit Committee, HRC, CRC, GNC, Finance

21  Committee and Credit Committee. The powers and responsibilities of each committee are set forth

22  below:

23       (a)    <u>Risk Committee</u>. The Risk Committee's primary responsibility is to oversee

24  every other Board committee. The Risk Committee oversaw the Company's risk-management

25  framework, and its members included the Chairs of every other Board committee. The Risk

26  Committee's charter required the committee to meet at least quarterly, and to meet in separate

27  executive sessions with the Company's Chief Risk Officer Loughlin (and other members of

28

1   management as it determines appropriate).[85]   In addition to its governance obligations, the Risk

2   Committee also oversaw Loughlin's performance in his role as the Company's Chief Risk Officer.

3   The Risk Committee charter also required each of the members of the Board's other committees to

4   bring to the attention of his or her committee Chair, or the Chief Risk Officer, any risk issues that

5   such committee member believed should be discussed by the committee.

6           (b)    Audit and Examination Committee.  During the Class Period, the Board also

7   maintained the Audit Committee.  The Audit Committee – according to its charter – oversaw, among

8   other things, the integrity of the Company's financial statements and the adequacy and reliability of

9   disclosures to stockholders, including management activities related to accounting and financial

10   reporting and internal controls.  These obligations included, among other things: (i) reviewing and

11   discussing, prior to filing, the Company's quarterly unaudited and annual audited financial

12   statements, including the Company's disclosures under Management's Discussion and Analysis of

13   Financial Condition and Results of Operations; (ii) reviewing the Company's earnings news releases,

14   prior to release; (iii) reviewing disclosures to the Audit Committee by the CEO and CFO regarding

15   any significant deficiencies or material weaknesses in the design or operation of internal controls;

16   and (iv) monitoring the Company's progress towards correcting, and resolving any matters that

17   could materially jeopardize the Company's financial condition, such as unacceptable control

18   conditions and deviations from policy.[86]

19           (c)    Corporate Responsibility Committee.   The CRC, by its formal charter,

20   reviewed, approved and recommended to the Risk Committee for its approval, the Company's

21   reputation risk management framework.  In addition, the CRC monitored the Company's reputation

22   generally, including with customers, and "review[ed] and receive[ed] updates and reports from

23   management" regarding, among other things, "customer service matters and other metrics relating to

24

25

---

[85]   The Risk Committee met six times in 2014, six times in 2015 (according  to the Company's
proxy statements) and at least four times in 2016 (per the committee's charter).

[86]   The Audit Committee met ten times in  2014, 14 times in 2015 (according to the Company's
proxy statements) and at least nine times in 2016 (per the committee's charter).

the Company's brand and reputation," and "the Company's complaints management policies and processes, including complaints relating to customers."[87]

(d)  <u>Human Resources Committee</u>.  The HRC was responsible for the Company's overall compensation strategy, including incentive compensation practices, which did not encourage excessive risk taking.  The HRC was also responsible for overseeing the implementation of risk management methodologies for incentive compensation plans and programs for senior executives and other top officials.  In making the 2014 annual incentive compensation award determinations for Carroll, Sloan, Modjtabai, and Tolstedt, the HRC considered, among other things, success in furthering the Company's objectives of cross-selling products from other business lines to customers.[88]

(e)  <u>Governance and Nominating Committee</u>.  The GNC was responsible for ensuring the adequacy of the Company's corporate governance and oversaw the Company's engagement with stockholders and other interested parties concerning governance matters, according to the Company's proxy statements.[89]  The GNC's Chair, Sanger, sat on the Risk Committee throughout the Class Period and the Risk Committee's charter obligated Sanger to communicate with the GNC.

(f)  <u>Finance Committee and Credit Committee</u>.  The last two standing committees of the Board during the Class Period were the Finance Committee and the Credit Committee, which oversaw the financial risk management policies and processes used to assess and manage market risk, interest rate risk, and other credit-related activities, including the credit stress testing, respectively.  Hernandez served as the Chair of the Finance Committee throughout the Class Period

---

[87]  The CRC met three times in 2014, three times in 2015 (according to the Company's proxy statements) and at least another three times in 2016 (per the committee's charter).

[88]  The HRC met five times in 2014, another five times in 2015 (according to the Company's proxy statements) and at least three times in 2016 (per the committee's charter).

[89]  The GNC met three times in 2014, four times in 2015 (according to the Company's proxy statements) and at least three times in 2016 (per the committee's charter, updated on November 29, 2016).

1   while he also served as the Chair of the Risk Committee.[90]  Milligan served as the Chair of the

2   Credit Committee during the Class Period.[91]

3       83.     Board members on the above listed committees had knowledge of the unlawful sales

4   practices as early as 2011, and knew that such activity had reached a "significant scale" by 2013.

5   They received additional reports on sales misconduct through 2015.  According to a letter, dated

6   January 5, 2017, that the Company sent to nine U.S. Senators over the signature of Defendant

7   Sanger, in 2015, Tolstedt addressed sales integrity issues with the full Board:

8           [U.S. Senator's Question:] To the extent applicable, please provide the date
            on which Wells Fargo's auditors raised the unacceptable sales practices (or a related
9           issue) with a Board member.

10          [Wells Fargo Response:] **In October 2015, Carrie Tolstedt addressed the
            Board of Directors on sales practices**.  In November a member of the KPMG audit
11          engagement team made inquiry of the Chair of the Audit & Examinations Committee
            regarding that meeting.  External auditors also attended Audit & Examinations
12          Committee meetings where sales integrity issues were referenced in Committee
            materials.
13
            84.     The following chart shows the members of the Board during the Class Period:
14

15

16

17

18

19

20

21

22

23

24

25   ───────────────
     [90]   The Finance Committee met three times in 2014, four times in 2015 (according to the
26   Company's proxy statements) and at least another four times in 2016 (as required under the
     committee's charter, updated on November 23, 2016).
27
     [91]   Similarly, the Credit Committee met four times in 2014, eight times in 2015 (per the Company's
28   proxy statements) and at least four times in 2016 (per the committee's charter).

| | Risk | Audit and Examination | Corporate Responsibility (CRC) | Human Resources (HRC) | Governance and Nominating (GNC) | Finance | Credit |
|---|---|---|---|---|---|---|---|
| | | | **Chairman of The Board – CEO John Stumpf** | | | | |
| Hernandez | Chair | X[92] | X | | | Chair | |
| Quigley | X | Chair | | | | | X |
| Dean | X | | X | Chair | X | | |
| Runstad | X | | Chair[93] | | | X[94] | X |
| Sanger | X | | | X | Chair | | |
| Milligan | X | | X | | X | | Chair |
| Peña | X[95] | X | Chair | | X | | |
| Duke | X[96] | | | | | X | X[97] |
| Baker | | X | X | | | | X |
| Swenson | | X | | | X | | |
| Vautrinot | | X[98] | | | | | X[99] |
| Engel | | | | X | | X | X |
| Chen | | | | X | | | |
| James | | | | X | | X | |

85.　　The Operating Committee.　While Stumpf was both the CEO of the Company and Chairman of the Company's Board of Directors, he also led the Company's Operating Committee, which was comprised during the Class Period of defendants Stumpf, Sloan, Tolstedt, Shrewsberry, Carroll, Loughlin, Modjtabai, Julian, Hardison and Strother.　The Operating Committee met every Monday and reportedly managed all of the Company's business lines, including the Company's Community Banking business, which Tolstedt led during the Class Period.　The Operating Committee was responsible for, among other things, setting the tone at the top with regard to the Company's risk management culture, promoting proactive risk management, and ongoing risk training.

---

[92]　Hernandez sat on the Audit Committee from 2014 to 2015.

[93]　Runstad sat on CRC from 2014 until March 1, 2016, when Peña took over that role.

[94]　Runstad sat on the Finance Committee from 2014 to 2015.

[95]　Peña sat on the Risk Committee starting in 2016.

[96]　Duke sat on the Risk Committee starting in 2015.

[97]　Duke sat on the Credit Committee starting in 2016.

[98]　Vautrinot sat on the Audit Committee starting in 2015.

[99]　Vautrinot sat on the Credit Committee starting in 2016.

## V. JURISDICTION AND VENUE

86.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims asserted herein arise under §§10(b), 20(a) and 20A of the 1934 Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

87.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Wells Fargo is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## VI. FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

88.     <u>False and Misleading Statement</u>.  On February 26, 2014, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2013.[100]  On the same day, the Company published its 2013 Annual Report, which emphasized that Wells Fargo had generated record earnings because the Company had continued to focus on meeting its customers' financial needs, and in so doing had achieved record cross-sell across the Company.  The 2013 Annual Report also suggested that that strategy could lead to growth even during a weak economy:

> Our vision is to satisfy all our customers' financial needs . . . . ***Our primary strategy to achieve this vision is to increase the number of our products our customers utilize and to offer them all of the financial products that fulfill their needs.  Our cross-sell strategy, diversified business model and the breadth of our geographic reach facilitate growth in both strong and weak economic cycles*** . . . .
>
> **Financial Performance**
>
>          \*      \*      \*
>
> ***[W]e continued to focus on meeting our customers' financial needs and achieved record cross-sell across the Company*** . . . .

89.     <u>False and Misleading Statement</u>.   In addition to addressing the Company's 2013 financial performance, the Form 10-K and 2013 Annual Report specifically discussed the impact of Wells Fargo's cross-selling efforts in each of its key business segments and stated that its cross-sell efforts were a very important part of the Company's overall business strategy:

---

[100]  The February 26, 2014 Form 10-K was signed by Stumpf, Sloan, Richard Levy ("Levy"), Baker, Dean, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger and Swenson.

**Community Banking** offers a complete line of diversified financial products and services for consumers and small businesses. . . . ***Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs. Our retail bank household cross-sell was a record 6.16 products per household in November 2013, up from 6.05 in November 2012 and 5.93 in November 2011.***

\* \* \*

**Wholesale Banking** . . . ***Wholesale Banking cross-sell was a record 7.1 products per customer in September 2013, up from 6.8 in September 2012 and 6.5 in September 2011***.

\* \* \*

**Wealth, Brokerage and Retirement** . . . ***Wealth, Brokerage and Retirement cross-sell reached a record 10.42 products per household in November 2013, up from 10.27 in November 2012 and 10.05 in November 2011***.

90. <u>False and Misleading Statement</u>. The February 26, 2014 Form 10-K and 2013 Annual Report further identified the Company's cross-selling efforts as key to its revenue and earnings growth and purported to warn investors that if these efforts were unsuccessful, the Company's financial results could suffer:

> ***Our "cross-selling" efforts to increase the number of products our customers buy from us . . . is a key part of our growth strategy, and our failure to execute this strategy effectively could have a material adverse effect on our revenue growth and financial results. Selling more products to our customers – "cross-selling" – is very important to our business model and key to our ability to grow revenue and earnings*** . . . .

91. <u>Material Omission</u>. Wells Fargo failed to disclose in the "Legal Actions" section of the Form 10-K (or anywhere else for that matter) that by this time the OCC already was "notified" and "active[ly]" investigating potential unsafe or unsound practices in risk management and oversight of the Company's sales practices. Senate Tr. at 30. Wells Fargo also failed to disclose in its Form 10-K that high level executives, including Stumpf, were aware of sales practice issues of a "significant scale" at this time. ¶196(a); Senate Tr. at 24; *see also* ¶155.

92. Finally, the Form 10-K attached the false and misleading certifications of defendants Stumpf and Sloan executed pursuant to §302 of SOX, and covered also by §§304 and 906, which certified that Stumpf and Sloan had designed and evaluated internal and disclosure controls over financial reporting, and falsely assured the reliability of financial reporting and that the 2013 financial statements fairly and accurately presented the financial condition of the Company:

I, . . . certify that:

1.      I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2013, of Wells Fargo & Company;

2.      Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, . . . not misleading* . . . ;

3.      *Based on my knowledge, the financial statements, and other financial information* included in this report, *fairly present in all material respects the financial condition*, results of operations and cash flows of the registrant . . . ;

4.      *The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) *and internal control over financial reporting* (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)      Designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant . . . is made known to us . . . ;

   (b)      Designed such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . .;

   (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures . . . ; and

   (d)      *Disclosed in this report any change in the registrant's internal control over financial reporting* that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      *The registrant's other certifying officer(s) and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)      *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting* which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)      *Any fraud, whether or not material, that involves management or other employees* who have a significant role in the registrant's internal control over financial reporting.[101]

---

[101] In connection with each subsequent quarterly and annual reports Wells Fargo filed with the SEC in the Class Period, defendants Stumpf, Sloan and/or Shrewsberry executed false SOX certifications, in substantially identical forms as those attached to the February 26, 2014 Form 10-K. *See* ¶¶102, 115, 120, 130, 137, 145, 149, 157, 164, 178.

\*     \*     \*

[And, under SOX §906, that the] Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

93.     On February 27, 2014, Barclays published an analyst report about the Company's 2013 Form 10-K.  That report provided market participants with Barclays' favorable rating of Wells Fargo stock while citing "cross-selling" as one of the factors that made Wells Fargo a good investment:

*We expect its cross-selling traction to continue as it drives further revenue* and expense synergies from its WB acquisition.

\*     \*     \*

**Cross-sell metrics**: its retail household cross-sell metric stood at 6.16, up from 6.15 at 3Q13.  Meanwhile, its commercial cross-sell metric was 7.1 as of 4Q13, up from 7.0 in 3Q13.

94.     <u>False and Misleading Statement</u>.  Wells Fargo's Vision and Values statement in effect in 2014 and 2015, repeatedly referenced in the Company's public filings during the Class Period, included the following false and misleading statements:

- "*What's right for customers* . . .  Our customers – external and internal – are our friends.  *We advocate for their best interests*."[102]

- "The reason we wake up in the morning is to help our customers succeed financially and to satisfy all their financial needs.  The result is *we make money because of our focus on serving customers, not the other way around*.  This time-tested vision will forever be what matters to Wells Fargo.  *We'll never put the stagecoach ahead of the horses*."[103]

- "*Reputation.  We will not engage in activities or business practices that could cause permanent or irreparable damage to our reputation*."[104]

95.     On March 18, 2014, the Company filed its Form 14(A) DEF Proxy Statement ("2014 Proxy Statement") with the SEC.  The 2014 Proxy Statement included some of the annual reports, including Audit and Compensation, of the Board's committees and also emphasized that the

---

[102]  2012 *Vision & Values* at 9, *supra* n.10.

[103]  *Id*. at 5 (some emphasis in original).

[104]  *Id*. at 19.

Company's risk management culture was rooted in the vision and value of meeting customers'
needs. In addition, the report identified the responsibilities of the Board committees, explained that
executive incentive compensation for Carroll, David Hoyt (former Senior Executive President of
Wholesale Banking), Modjtabai and Tolstedt was in part measured by cross-sell success and
referenced Stumpf, the Board and the Operating Committee as *the* individuals responsible for setting
the "tone at the top" of the organization with regard to risk management and the Company's
"culture":

> Key elements of our risk management framework and culture include
> understanding and following our overall enterprise statement of risk appetite, which
> describes the nature and level of risks that we are willing to take to achieve our
> strategic and business objectives, and the "tone at the top" set by our Board, CEO
> and Operating Committee members, which consists of our Chief Risk Officer and
> other senior executives.

> \*　　　\*　　　\*

> In making the 2013 annual incentive compensation award determinations for Messrs.
> Carroll and Hoyt, and Mses. Modjtabai and Tolstedt, the HRC considered, among
> other things, the following:

> \*　　　\*　　　\*

> - . . . success in furthering the Company's *objectives of cross-selling products
>   from other business lines to customers, continuing to strengthen risk
>   management practices in our businesses* . . . .

96. <u>False and Misleading Statement</u>. On April 11, 2014, the Company issued a release
announcing its first quarter of 2014 financial results. The release detailed Wells Fargo's cross-
selling growth and metrics across its reporting lines, stating:

**WELLS FARGO REPORTS RECORD QUARTERLY NET INCOME**
**Q1 Net Income of $5.9 Billion, Up 14 Percent YoY; EPS of $1.05**

- Continued strong financial results:

  - Net income of $5.9 billion, up 14 percent from first quarter 2013
  - Diluted earnings per share (EPS) of $1.05, up 14 percent
  - Revenue of $20.6 billion, compared with $21.3 billion

> \*　　　\*　　　\*

***Regional Banking***

- Retail banking

- Retail Bank household cross-sell ratio of 6.17 products per household, up from 6.10 year-over-year
- Primary consumer checking customers up a net 5.1 percent year-over-year

\*     \*     \*

**Wholesale Banking** . . . .

\*     \*     \*

- Cross-sell of 7.2 products per relationship up from 7.1 in prior quarter and 6.8 in first quarter 2013

\*     \*     \*

**Wealth, Brokerage and Retirement** . . . .

\*     \*     \*

***WBR cross-sell*** ratio of 10.42 products per household, up from 10.33 in first quarter 2013.

97.     <u>False and Misleading Statement</u>.  On April 11, 2014, the Company held a conference call for analysts and investors concerning its first quarter 2014 financial results.  Defendants Stumpf and Sloan hosted the call.  During the call, Defendants touted Wells Fargo's record cross-sell growth that served as a fundamental driver of the Company's business, ultimately resulting in growth in income and earnings per share ("EPS"):

[Sloan:] *[W]e had strong year over year growth in the fundamental drivers of our business: in commercial and consumer loans, deposits, cross-sell*, . . . which resulted in growth in net income, capital, and earnings per share, and produced higher returns on assets and equity.

98.     Following the Company's first quarter 2014 earnings release, Wells Fargo's stock traded at over $48.00 per share and securities analysts praised the Company's operational performance and continued emphasis on management's cross-selling strategy.  For example, on April 14, 2014, RBC Capital Markets ("RBC") analysts wrote a report that pointed to factors that the analysts believed would offer growth opportunities.  The RBC report – which included an "Outperform" rating – noted the expectation that the Company would deliver above-average growth

1  primarily through market share gains and ***increased cross-selling*** of both its legacy Wells Fargo and

2  newer Wachovia customers.[105]

3      99.    On April 25, 2014, BMO Capital upgraded the Company's stock. BMO Capital

4  addressed the Company's cross-selling strategic advantage, particularly the strength of cross-sell

5  through its branches and overall sales culture:

6      •     Despite its dominant size, Wells Fargo increased its US deposit market share from
   10.7% in 2012 to 11.1% in 2013 ***by leveraging its branch network, its cross-sell***

7      ***focused sales culture and status as a flight-to-quality bank***.[106]

8      100.    The Company's stock price reached $50.01 on May 2, 2014.

9      101.    <u>False and Misleading Statement</u>. On May 7, 2014, the Company filed its Form 10-Q

10  for the period ending March 30, 2014.[107] The Form 10-Q reiterated the Company's first quarter

11  2014 financial results as set forth in the April 11, 2014 news release, and falsely stated that the

12  Company's business strategy and "Vision and Values" – including its cross-sell strategy – was

13  designed to increase the number of products customers ***utilize and need***. The Company again added

14  that its cross-sell strategy would drive growth even during a weak economy:

15      ***We use our Vision and Values to guide us toward growth and success. Our***

16  ***vision is to satisfy all our customers' financial needs .... Important to our***
   ***strategy to achieve this vision is to increase the number of our products our***

17  ***customers utilize and to offer them all of the financial products that fulfill their***
   ***needs. Our cross-sell strategy, diversified business model and the breadth of our***

18  ***geographic reach facilitate growth in both strong and weak economic cycles***.

19      *    *    *

20  ***We had strong year-over-year growth or improvement in the fundamental drivers***
   ***of our business: commercial and consumer loans, deposits, cross-sell***, credit, and

21  expense management, which resulted in growth in net income, EPS and capital.

22      *    *    *

23  We grew our primary consumer checking customers by a net 5.1% from a year ago
   (February 2014 compared with February 2013). ***We have steadily increased the***

24

25      [105]    Joe Morford, *1Q14: The Streak Continues* at 2 (RBC Capital Markets Apr. 14, 2014).

26      [106]    Peter J. Winter, *Deserves a Higher Premium, Upgrading to Outperform and Raising PT to $55* at

27  1 (BMO Capital Markets Apr. 25, 2014).

28      [107]    The May 7, 2014 Form 10-Q was signed by the Company's Controller Levy.

*growth rate of this higher cross-sell, more profitable customer base* over the past four quarters through product enhancements and consistent focus.

102.     The Form 10-Q contained SOX certifications, signed by Stumpf and Sloan, that were substantially identical to the certifications set forth in ¶92.

<u>Wells Fargo Investor Day Boasted of the Virtues of the Company's Cross-Sell Strategy and the Revenues to Be Driven by Its Methods</u>

103.     On May 20, 2014, the Company held its Investor Day conference for analysts and investors.  During the conference, the Company – through specific representations by Stumpf, Tolstedt, Carroll and Modjtabai – emphasized its commitment to cross-selling and the positive financial results Wells Fargo had achieved due to the effectiveness of its cross-selling strategy.  In fact, Stumpf indicated that more deposits and more credit cards were important to the Company's revenue growth.  Shrewsberry characterized Wells Fargo's cross-selling performance capability as "legendary":

> [Stumpf:] We have the broadest coast-to-coast banking franchise, and in serving these customers, we want to help them succeed financially. . . .
>
> . . . But if I had to pick just one number, one area I would focus most on, I could only pick one, it would be revenue.  Because when you are growing revenue, you are growing the business.
>
> \*        \*        \*
>
> *And what is revenue?  It is deposits and loans and more credit cards, deeper cross-sell, longer relationships, more assets under management*.
>
> \*        \*        \*
>
> [Shrewsberry:] *Our relationship focus and cross-sell capability is hopefully legendary at this point.  It has been our vision for decades.  We've stuck to it*.[108]

104.     <u>False and Misleading Statement</u>.  In addition, during the Investor Day conference, defendant Tolstedt, as head of Community Banking, discussed the financial performance of that segment and the growth resulting from its cross-selling efforts, emphasizing that Wells Fargo's cross-selling of products to its existing customers was helping those customers succeed financially and meet all of their needs.  Notably, Tolstedt highlighted that credit card sales grew by 30% and that cross-sell was helping drive revenue:

---

[108]  2014 Investor Day Tr. at 3, 7, *supra* n.24.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1      [Tolstedt:] We've also earned more business from our existing customers over the last two years. For example, ***we saw outstanding growth in our credit card business***
2      ***with retail bank credit card penetration up 30%*** . . . .

3                       \*       \*       \*

4      Ensuring the right physical distribution density, format mix, and site quality so that we can grow households faster than the market, complemented by our very strong
5      virtual distribution. ***Second, the cross-sell model. This ties directly to our vision of helping our customers succeed financially and meeting all of their needs.***
6      ***Together, the density and cross-sell model[s] drive revenue***.[109]

7      105.   <u>False and Misleading Statement</u>. During the same conference, Tolstedt, Modjtabai,

8 Carroll and Mike Johnson ("Johnson") (EVP of Commercial) each made material misrepresentations

9 concerning the Company's cross-sell strategy and that the Company's growth in cross-sell numbers,

10 which it had promised investors in years prior, was remarkable because cross-sell growth was

11 achieved in the midst of slow customer demand. Notably, Modjtabai credited Defendant Tolstedt's

12 Community Banking team for its work and told investors that reported growth was not gained by

13 compromising the quality of the bank's portfolios:

14      [Modjtabai:] Two years ago we said that we are going to increase cross-sell and we did. ***We increased cross-sell both in the retail household base, as well as in***
15      ***the consumer lending customer base. At the time we showed you very strong account growth and we continued with that, and that has been in very strong***
16      ***partnership and collaboration with my partners and friends, Carrie Tolstedt's Community Banking team and David Carroll's Wealth Brokerage and Retirement***
17      ***teams***.

18      As a result, our portfolios grew. As you can see, these are very strong numbers in their own right, but when you compare these to the fact that there was
19      still slow demand from consumers, I think these are really remarkable growth in our portfolios.

20
21      ***It is important to note that we did not get this growth by compromising the quality of our portfolio***.[110]

22      106.   <u>False and Misleading Statement</u>. Gary Wolfe ("Wolfe"), Carroll and Johnson

23 addressed how customer trust was driving the cross-sell business model with Wolfe specifically

24 referencing the strength of the Company's credit card business growth. Wolfe, like Modjtabai,

25 credited Tolstedt's group in the Community Banking for the increased credit card numbers:

26

---

27 [109] *Id*. at 11-12.

28 [110] *Id*. at 26.

> [Wolfe:] *Carrie Tolstedt's business model is our salesforce for our consumer credit products for our existing customers, and they do a great job in selling and cross-selling our products. When Carrie refers to a 30% growth in credit card penetration, it's because her sales team accomplished that goal.*
>
> \* \* \*
>
> *85% or 83% [of our credit cards] come from the store channel today as a cross-sell through Carrie Tolstedt's world.*[111]

107. <u>False and Misleading Statement</u>. Carroll, discussing the Wealth and Investment Management Business, credited the Company's "culture" with getting its customers into the right products:

> [Carroll:] *[T]he culture of this company of getting the customer to the right place to the right product, it gives me huge optimism. I can't think of anyone in our industry that converts relationships to cross-sell to top-line revenue growth better than Wells Fargo.*[112]

108. Finally, in addressing cross-sell, Johnson described the depth of the Company's customer relationships with its customer base, and stated unequivocally that Wells Fargo's customers viewed the Company as "trusted advisors":

> [Johnson:] [A]bout two-thirds of our revenue comes from noninterest income. That is also very broad-based. I think that speaks to the fact that we are, again, back to the longevity of the relationships we have with our customers, *as well as the success we are having with cross-sell.*
>
> \* \* \*
>
> But I think the most important part is this demonstrates that *our clients are viewing us as a trusted advisor, and that only comes about through deep relationships. Those deep relationships result in cross-sell opportunities.*[113]

109. Between May 20-23 of 2014, investment analysts praised the Company's statements during the Investor Day conference and its assurances regarding the value of cross-selling. The reports emphasized the Company's strong risk management and due diligence:

<u>Deutsche Bank</u>:

---

[111] *Id.* at 31.

[112] *Id.* at 41.

[113] *Id.* at 61-62.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

> *The overall message hasn't changed in terms of mgmt remaining focused on driving good risk adjusted growth, mostly by further penetrating its current customer base – or as mgmt calls it, "cross sell*."

Jefferies:

> *We continue to like WFC due to its defense nature (sound risk mgmt., revenue diversity, and ability to improve efficiency).*[114]

*       *       *

> **Plenty of runway for growth**.  WFC has ample growth opportunities across its businesses.  ***Examples include increasing debit/credit card penetration helped* by** new card offerings . . . .

UBS:

> **Management is focused on growth and execution of cross-selling strategy**

> WFC's investor day highlighted a growth strategy – the presentations mention growth 116 times versus 39 mentions of costs.  ***The strategy for growth is unchanged and focuses on cross-selling across all products and client segments with particular attention paid to cards* . . . .**

Guggenheim:

> The reasons we believe WFC has not been forced to overhaul its risk management system and spend meaningfully more expense dollars is that ***its track record has displayed the effectiveness of the current system***, WFC insists that every team member take responsibility for risk management, encourages and expects early problem identification, and has a system of constant monitoring with thorough due diligence.

110.   <u>Reasons Why Defendants' Statements in ¶¶88-108 Were Knowingly False and Misleading</u>: Defendants' statements set forth in ¶¶88-108 concerning: (i) reported financial statements and cross-sell metrics; (ii) the Company's overall cross-selling strategy and that the

---

[114]   During the May 20, 2014 Investor Day, Loughlin, at the time the Company's Chief Risk Officer, emphasized the significance of risk management as a key contributor to the Company's success.  Ironically, Loughlin stated that as part of its risk management, the Company encouraged escalating problems and identifying them early.  He added that one of the easiest ways to be fired was failing to escalate a problem:

> [Loughlin:] Escalating problems has always been a core strength at Wells Fargo.  ***The fastest way to lose your job at Wells Fargo is failure to escalate a problem***.  Where we have improved on this course strength is our ability to identify problems early in one business and then canvas the other businesses to see if they had the same issue.  That way we can control the problem while it is small and manageable.

*Id*. at 76.  It would later be revealed that the exact opposite was true.  In fact, as reported by former employees, escalating problems, particularly problems related to unauthorized account openings, was a good way to get fired.  *See, e.g.*, ¶¶40-44, 206.

purported purpose of such strategy was to provide customers with products they needed; (iii) risk management and effectiveness of internal controls over financial reporting; and (iv) the Company's "culture" and related business practices, as set forth in its Vision and Values, were each knowingly false and misleading for the following reasons:

(a)    Defendants knew or deliberately disregarded that during the period leading up to and including the Class Period, Wells Fargo's cross-selling sales and incentive practices led to widespread, serious misconduct, including the opening of millions of fake credit card or deposit accounts in the names of customers who did not authorize the account openings; employees were creating fake personal identification or PIN numbers to open fake debit cards, using phony email addresses to enroll customers in additional services that customers did not request via forgery or other illegal means – all culminating in "fraudulent conduct [that] occurred on a massive scale," as the government found (¶¶4-5, 194, 180-181).

(b)    Defendants knew or deliberately disregarded that Wells Fargo materially and artificially inflated the cross-sell metrics that it reported to investors by including millions of accounts in those metrics that Wells Fargo either fabricated completely, or created by engaging in serious, pervasive sales misconduct. Reportedly, to inflate cross-selling metrics, Wells Fargo's senior management turned an otherwise conservative and stable retail banking business into a sales "pressure cooker" via sales incentives and penalties. These sales incentives and penalties took the form of financial bonuses when employees hit sales targets, and termination threats (followed by terminations) when they did not. Senior management's pressure cooker sales incentives and penalties, in turn, gave thousands of employees powerful incentives to engage in a wide array of unethical, unlawful and fraudulent sales practices to inflate the cross-selling metrics that Wells Fargo reported to investors, and that contradicted the meaning and purpose of Wells Fargo's "cross-selling" business model altogether. The scope of the fraud was far-reaching and supports the inference that Defendants knew or recklessly disregarded the falsity of their cross-selling statements made in 2014. That malfeasance included:

- using made-up email addresses to open fake accounts, sometimes referred to as "ghost accounts";

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST      - 42

- • opening deposit and checking bank accounts without client authorization or knowledge, including forging customer signatures on application cards;

- • using fake contact and customer information to open accounts without authorization so customers would not discover the fake accounts;

- • applying for and opening credit card accounts without customer authorization or knowledge, including submitting phony and forged credit applications to the credit bureaus;

- • transferring funds from one account to another without the customer's authorization, to make it appear as though an unauthorized account had in fact been legitimately funded with permission (Wells Fargo sometimes referred to this aspect of its misconduct as "simulating" accounts);

- • using customer's electronic signature from one account, to open different accounts without customer's authorization;

- • engaging in sham calls, *i.e.*, friends would impersonate customers and then provide phony "authorizations" to open fake accounts for real customers;

- • opening custodian checking accounts for customers' children without authorization; and

- • stealing from customers.

(i)    Defendants also knew or deliberately disregarded facts demonstrating that the improper methods that Wells Fargo employed to execute "cross-selling" contradicted the stated meaning of "cross-selling," which Wells Fargo told investors simply referred to "[s]elling more products to more customers."[115]    These improper methods further belied the Company's statements that it designed its culture and strategy of cross-selling to meet its customers "needs," or to drive customer satisfaction.  Instead, Wells Fargo implemented cross-selling as a performance management system that incentivized and rewarded employees to push products on customers that customers did not want or need and without customers' consent, through forgery or other improper means.  Wells Fargo's high-pressure tactics and incentives led employees to open millions of deposit and credit card accounts in the names of customers without the customers' knowledge or authorization, and ultimately generated unearned fee income and illusory growth in the form of false "cross-selling" financial metrics.  Moreover, certain Defendants' annual incentive compensation

---

[115] *See, e.g.*, Wells Fargo & Co., Annual Report (Form 10-K) at 129 (Feb. 26, 2014).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

1  depended, in part, on these very cross-selling metrics, and they were indeed rewarded handsomely

2  for hitting the cross-selling targets.  ¶¶19-21.

3                 (ii)      Defendants also knew or deliberately disregarded the fact that Wells

4  Fargo assigned unreasonable sales objectives to management-level employees in Wells Fargo's

5  Retail Banking business who, in turn, put enormous pressure on lower-level sales employees to meet

6  and obtain often unobtainable quotas, or face termination.  The investigation conducted in

7  connection with the preparation of this Complaint uncovered reports that management's pressure to

8  meet sales goals was "soul-crushing," and that this pressure came from the Company's top

9  leadership while filtering down to branch employees.  For example, some district managers

10 reportedly had quotas of up to 200 "solutions" per day.  (A "solution" consisted of a new product –

11 like a credit card, or new service – like another checking account.)  Branch managers had quotas as

12 well, and if those quotas were not met, they faced discipline and termination.  Moreover, in some

13 branches, bankers reportedly were required to generate certain numbers of business accounts and

14 mortgage referrals per day.  Some sales personnel (who called customers to offer credit card

15 applications) were reportedly required to make 200 calls per day and complete more than 20

16 applications per month to obtain a bonus, or, faced a "discussion" with their manager, write-up or

17 termination.  Finally, Wells Fargo's management reportedly increased the pressure to generate cross-

18 selling numbers during the month of January, when managers would increase sales employees' sales

19 targets, sometimes doubling or even tripling the targets.

20                (iii)     To implement cross-selling, area presidents reportedly exerted extreme

21 pressure on district managers, requiring the district managers to call their branches three and four

22 times per day to communicate the consequences of not meeting sales goals.  Branch managers

23 tracked cross-selling activities, sometimes on an hourly basis, often patrolling personal bankers'

24 desk areas to inquire how many accounts had been opened, requiring them to work late at night

25 ("call nights") and on weekends (reportedly without pay),[116] and writing them up or terminating

26 _____

[116] The United States Department of Labor has launched an investigation into whether Wells Fargo

27 has violated labor statues by forcing unpaid overtime.  Matt Egan, *Wells Fargo made me work
   overtime without extra pay*, CNNMoney, Sept. 30, 2016,

28 http://money.cnn.com/2016/09/30/investing/wells-fargo-workers-wage-theft-overtime/.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                - 44 -

1   them if quotas were not met.  Wells Fargo further tracked cross-selling statistics regularly and

2   graded each branch's cross-selling numbers.

3                  (iv)    In addition to designing sales policies and practices that encouraged

4   and rewarded unlawful behavior and fomented an unethical "culture," the Company and its senior

5   executives (including the Officer Defendants) knew or deliberately disregarded facts showing Wells

6   Fargo's "risk management practices" actually perpetuated the very "risk" that had materialized in the

7   form of widespread, serious sales misconduct.  Wells Fargo's risk management practices reportedly

8   included an ***early warning system*** that gave branch managers an opportunity to shred evidence of

9   their branch's misconduct ***before*** "compliance" employees inspected the branches.  Indeed, after the

10  Class Period, *Vanity Fair* published an article disclosing the late night shredding of documents and

11  forgery of account documents to conceal the unethical behavior, no doubt allowing compliance

12  employees to file clean reports.  ¶210.

13                 (v)    Stumpf knew or deliberately disregarded facts showing the scope and

14  severity of the unethical and unlawful behavior fomented by Wells Fargo's cross-selling incentives

15  and culture.  At least one branch manager reported the misconduct to Stumpf as early as 2011.  At

16  that time, an Assistant Vice President and branch manager wrote Stumpf an email expressing

17  frustration that Wells Fargo's sales policies pressured her and her staff to open accounts and move

18  money around just for the sake of showing illusory growth.  Wells Fargo reportedly fired her after

19  she sent the following message in an email to Stumpf in 2011:

20      [Senator Menendez quoting Branch Manager:] "I'm currently," and I'm quoting now,
        "I am currently an assistant vice president manager at a [branch] in northern New
21      Jersey.  I have been an employee of Wachovia for over 22 years, of which Wells
        Fargo acquired.  I'm writing to you because as a team member I feel hurt and
22      disappointed with this company."

23          "***There are challenges that team members are faced, with but those should
        not be the reason to move money from one account to another and to fool the***
24      ***motivator . . . .***"

25          "***These funds that are moved to new accounts to show growth, when in
        actuality there is no net gain to the company's deposit base, is wrong.***  In the past
26      months ***I was placed on warning for not meeting these goals*** and the reason that the
        bankers underneath me do not is because I will not tolerate the movement of existing
27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                    - 45 -

1    money just because we need checking account solutions and profit proxy to move to
2    the motivator.  ***These accounts make no sense for the customer***."[117]

3         (c)     Stumpf further knew or deliberately disregarded facts showing the scope and

severity of the unethical and unlawful behavior fomented by Wells Fargo's cross-selling incentives

and culture.  Indeed, he testified that he knew the cross-selling misconduct had reached a "significant

scale" by the end of 2013, and that he told the Board about it.  ¶¶9, 196(a).

         (d)     In addition, by virtue of their membership on Wells Fargo's Operating

Committee, Stumpf and other senior executives further knew or deliberately disregarded and failed

to disclose facts pertaining to Wells Fargo's abusive cross-selling practices, which made the

Company's cross-selling metrics, and related statements about the purpose and meaning of cross-

selling, materially false and misleading.  Stumpf led the Operating Committee, which included the

heads of Wells Fargo's business functions such as Officer Defendants Sloan, Tolstedt, Modjtabai,

Loughlin and Carroll.  According to the Company's 2014 proxy materials, the Operating Committee

met weekly, ***to review***, among other things, strategic, operational, and risk issues at the enterprise

level.  Wells Fargo further admitted the sales misconduct problems were "likely raised with Ms.

Tolstedt ***in or around 2011***," and she sat on the Operating Committee and reasonably raised these

issues at the committee's meetings.[118]  By 2013, there is no question that the Operating Committee

learned more facts showing the scale and severity of the cross-selling misconduct.  Stumpf's

testimony to the House of Representatives shows the Operating Committee did discuss the

Company's improper sales activities, at least by 2013, and likely during the Operating Committee's

weekly meetings because that was when Stumpf recalled the issue being brought out of the business

"line" (Tolstedt's Community Banking unit) and into the "corporate" level that the Operating

Committee ran:

         [Representative Hill:] Yeah.  And you had 14 meetings at the audit committee
         during 2015, according to your proxy.

---

[117]  ***See*** Senate Tr. at 37.

[118]  *An Examination on Wells Fargo's Sales Practices and Management and Board Oversight*,
Background Paper at 5, attached hereto as Exhibit C (hereinafter "Background Paper").

***But operating committee meets every Mondays***, so the one question I have is, when was – ***do you remember this being talked about at that operating level when line managers bring their top concerns to you*** and was it in this same time frame, it wasn't until maybe two years after this really manifesting itself in Los Angeles?

[Stumpf:] ***Yeah***, it was being managed within the business.

[Representative Hill:] Yeah.

[Stumpf:] In 2011, it – there's – each business has their own corporate or their own compliance, their own sales efficacy and so forth. So it was brought out of the sales part into the line's control function.

And then by 2012, they were producing goals. ***By 2013, is where we brought the corporate resources in, like corporate human resources, corporate investigations and so forth because we had saw a spike in that behavior***.[119]

*See* ¶196(a).

(e)    Wells Fargo and the Officer Defendants further knew or deliberately disregarded facts showing the Company's cross-selling metrics and other statements were materially false and misleading by virtue of the expanding investigations into the cross-selling misconduct. By the time that Wells Fargo made the cross-selling statements identified above (¶¶88-109) in 2014, the Company had already launched internal investigations into the issue and secretly started firing employees, under the cover of arbitration clauses that made it impossible for fired employees to air the reasons for their terminations in court. Specifically, as reported by a *Wall Street Journal* investigative report, dated September 17, 2016, titled "Wells Fargo Tripped By Its Sales Culture – Hourly Targets and Fear of Firings Drove Employees to Break the Rules," "[f]or five years [beginning in 2011], Wells Fargo conducted investigations into improper practices, hired consultants and tinkered with sales and compensation incentives." The report relied on interviews with more than three dozen current and former Wells Fargo area presidents, district managers, branch managers and other bank employees. *The Wall Street Journal*'s investigation also uncovered a continuous "investigation" ***that began in 2011***, morphed and spread over five years. These undisclosed investigations continuing in 2015, were reported by *The Wall Street Journal* in September 2016 and later confirmed through testimony as discussed below:

---

[119]  *See* House Tr. at 64.

1          (i)       In 2011, Wells Fargo hired an outside firm called Q & A Research Inc.

2    to research and investigate Wells Fargo's employee issues, that found – among other things – that

3    some bank employees felt uncomfortable with what certain managers had asked them to do, when

4    pushing customers to sign up for products they may not want or need, according to *The Wall Street*

5    *Journal.*

6          (ii)      In 2012, Tolstedt's Community Banking unit assembled a "task force"

7    to identify suspicious patterns in sales practices and examine geographic areas where customer

8    complaints of aggressive sales practices were prevalent, including Southern California, as *The Wall*

9    *Street Journal* uncovered.  That review, reportedly found that a local management team in the Los

10   Angeles area was very aggressive in the use of questionable tactics to achieve sales targets.  Wells

11   Fargo has since admitted that in 2012, it changed the way it handled reports of "unauthorized

12   accounts," by assigning it to a risk management function in the Community Banking business.  In

13   April 2012, the Company began generating a report called the Quality of Sales Report Card (or

14   QSR) to monitor how their bankers were performing.  The QSR was reportedly generated weekly

15   and specifically identified: (i) how many accounts were opened; (ii) how many had actually been

16   funded within three months of being opened; and (iii) how many accounts had signature cards at the

17   time the accounts were opened.

18         (iii)     In 2013, due to concerns that some bankers might be trying to

19   manipulate the sales-integrity metrics, and particularly the rate of accounts funded within the first 30

20   days, by "simulating" funding of the accounts through transfers of funds, Wells Fargo initiated what

21   it has called a "data analysis" to identify bankers who were opening accounts in which money was

22   initially deposited, but then removed and no further account activity occurred.[120]

23         (iv)      In 2013, the OCC received complaints and thus launched an

24   investigation into potential sales misconduct at Wells Fargo.[121]  *See* ¶¶23-25.  In early 2014, the

25   OCC uncovered sales problems and directed Wells Fargo to address weaknesses in compliance risk

26

27   [120]  *See* Background Paper at 4, *supra* n.118.

28   [121]  *See also* Curry Statement, *supra* n.47.

through the establishment of a comprehensive compliance risk management program related to unfair and deceptive practices. *See, e.g.*, ¶26. At that time, the OCC concluded that it needed to assess the Company's cross-selling and sales practices as part of its upcoming examination of the bank's governance processes. Also during 2014, Wells Fargo expanded its internal investigation into fake or simulated accounts to a national scope.[122]

       (v)    Defendants further knew or deliberately disregarded that the credit card penetration rates and growth metrics that they touted to investors rested, in part, on illusory credit cards and unsustainable growth that cross-selling misconduct generated, as discussed below in detail (¶155(f)).

       (f)    All of the facts identified above show that certain of the Defendants knowingly or recklessly made materially false and misleading statements about the Company's cross-selling activities which they knew or should have known were materially false and misleading.

      111.   <u>False and Misleading Statement</u>. On July 11, 2014, the Company issued a news release reporting its financial results for the second quarter of 2014 reporting continued cross-sell growth in the Retail Banking, Wholesale Banking and Wealth, Brokerage and Retirement. The release states:

> ***Regional Banking***
>
> -   Retail banking
>
>   -   ***Retail Bank household cross-sell ratio of 6.17 products per household, up from 6.14 year-over-year***
>
>   -   ***Primary consumer checking customers up a net 4.6 percent year-over-year***
>
>               *     *     *
>
> <u>***Wholesale Banking***</u> . . . .
>
>               *     *     *

---

[122] *Hearing Before the Senate Committee of Banking, Housing, and Urban Affairs*, 114th Cong. (Sept. 20, 2016) (Statement of John Stumpf) (hereinafter "Stumpf Statement") at 4 ("In ***2014***, the Sales and Service Conduct Oversight Team ***expanded the simulated funding review to a national scope***.").

- ***Cross-sell of 7.2 products per relationship, up from 6.9 in second quarter 2013 driven by new product sales to existing customers***

  \*       \*       \*

**Wealth, Brokerage and Retirement** . . . .

  \*       \*       \*

   ***WBR cross-sell ratio of 10.44 products per household, up from 10.35 a year ago***.

112.    <u>False and Misleading Statement</u>.  On July 11, 2014, the Company held a conference call for analysts and investors concerning its second quarter 2014 financial results.  The call was hosted by Stumpf and Shrewsberry.  During the call, Defendants repeated the financial results and cross-sell growth results that had been reported in the news release of the same day, particularly in Retail Banking, Wholesale Banking and Wealth Brokerage and Retirement.

113.    On July 11, 2014, Jefferies published a report titled, "Wells Fargo & Co. (WFC) Core Metrics Progressing Well; '15 Estimate Up a Nickel.'"  The Jefferies report addressed the Company's cross-selling strategy and specifically expressed its confidence in the Company's growth trajectory, noting specifically that underlying growth "***metrics continue to show good momentum, with cross-sell***, ***credit card volumes/penetration rates***."

114.    <u>False and Misleading Statement</u>.  On August 6, 2014, the Company filed its Form 10-Q for the period ending June 30, 2014.  The Form 10-Q was signed by Levy.  The report underscored the material importance of cross-sell to the Company's overall growth strategy and financial results and stated that the Company's culture and business practices were supported by prudent risk management practices:

> ***Our cross-sell strategy, diversified business model and the breadth of our geographic reach facilitate growth in both strong and weak economic cycles.  We can grow by expanding the number of products our current customers have with us, gain new customers in our extended markets, and increase market share in many businesses***.

  \*       \*       \*

> ***Our ability to grow primary customers is important to our results because these customers have more interactions with us, have higher cross-sell and are more than twice as profitable as non-primary customers***.

  \*       \*       \*

> *Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs.*

> \*    \*    \*

> *Our risk culture is strongly rooted in our Vision and Values, and in order to succeed in our mission of satisfying all our customers' financial needs and helping them succeed financially, our business practices and operating model must support prudent risk management practices.*[123]

> \*    \*    \*

> The Company's management evaluated the effectiveness, as of June 30, 2014, of the Company's disclosure controls and procedures. The Company's chief executive officer and chief financial officer participated in the evaluation. Based on this evaluation, the Company's chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective as of June 30, 2014.

115. The Form 10-Q also contained SOX certifications signed by Stumpf and Shrewsberry that were substantially identical to the certifications set forth in ¶92.

116. <u>False and Misleading Statement</u>. On September 10, 2014, the Company made a presentation at the Barclays Global Financial Services Conference. During the conference, Shrewsberry compared Wells Fargo's financial performance to its peers. In that regard, he stated that the Company generated more fee income than its peers in large part due to the Company's focus on cross-selling. Sloan failed to disclose that reported cross-sell growth was inflated by known, pervasive and unlawful sales practices:

> [Shrewsberry:] *[W]e generate more fee income per average assets than our peers. This outperformance demonstrates our consistent focus on earning more of our customers' business and our culture of cross-sell.*

117. After the September 10, 2014 Barclays conference, Wells Fargo's stock traded above $51 per share.

118. <u>False and Misleading Statement</u>. On October 14, 2014, the Company issued a news release reporting its financial results for the third quarter of 2014. The release states:

> *Regional Banking*

> •     Retail banking

---

[123] The Vision and Values statement regarding the Company's risk culture was repeated throughout the Class Period in each of its annual statements.

- Primary consumer checking customers up a net 4.9 percent year-over-year
- Retail Bank household cross-sell ratio of 6.15 products per household, unchanged year-over-year

\* \* \*

***Consumer Lending Group***

\* \* \*

- Consumer Credit

  - ***Credit card penetration in retail banking households rose to 39.7 percent, up from 36.0 percent in prior year***

\* \* \*

**Wholesale Banking** . . . .

\* \* \*

  - ***Cross-sell of 7.2 products per relationship, up from 7.0 in third*** quarter 2013 driven by new product sales to existing customers

\* \* \*

**Wealth, Brokerage and Retirement** . . . .

\* \* \*

  ***WBR cross-sell ratio of 10.44 products per household, up from 10.41 a year ago***.

119.   <u>False and Misleading Statement</u>.   Following the release of the Company's third quarter financials, the Company held a conference call for analysts and investors to discuss the results.  During that call, the Company repeated the foregoing financial results and falsely assured investors that all necessary litigation accruals had been disclosed and accounted for.  The Company made no mention of ongoing investigations into the Company's toxic sales culture, which had already resulted in thousands of firings:

  [Shrewsberry:] *Well, we've mentioned that this month's elevated – or this quarter's elevated level reflects primarily litigation accruals.  And as a result there's not much more specific color we can offer except to point you to our crystal clear disclosure in our Qs and K that describe everything that's probable and estimable and then some*.

  And like anything else, it's hard to know whether you're cresting or not until you're on the other side of it.  So we feel this is a somewhat higher level than it's been recently, *and we think it's well disclosed*.

120.  <u>False and Misleading Statement</u>.  On November 5, 2014, the Company filed its Form 10-Q for the period ending September 30, 2014 with the SEC.  The Form 10-Q repeated the financial results and cross-sell metrics addressed in the October 14, 2014 news release.  The Form 10-Q attached false SOX certifications signed by Stumpf and Shrewsberry that were substantially identical to the certifications set forth in ¶92.

121.  Senior management continued to promote cross-selling at every opportunity, including in one-on-one meetings with analysts, as a report from RBC shows.  On November 5, 2014, RBC published a report titled, "Wells Fargo & Co. Highlights from Recent Company Visit," describing its meetings with senior executives at Wells Fargo including "CEO John Stumpf, CFO John Shrewsberry, Treasurer Paul Ackerman, Head of Consumer Lending Avid Modjtabai, Chief Risk Officer Mike Loughlin, as well as Jim Rowe and John Campbell from Investor Relations."  The wide-ranging RBC report noted "cross-sell" and commitment to risk management, including the Company's "ability to identify and escalate problems quickly," were factors supporting RBC's favorable investment analysis.

122.  On November 6, 2014, RBC published another report titled "WFC – Highlights From Wells Fargo BAAB Presentation."  The report stated:

> **Focused on Increased Cross-Selling**.  At the same time, Wells is looking to *increase its client penetration rates and improve the cross-sell activities across business lines*. . . .  The efforts to *improve cross-sell activity* have been gaining momentum with ~*11% of WBR revenues directly traceable* to other businesses. With the implementation of Partners-On-Demand in 2013, bankers and brokers are working together to generate new business, and in fact WBR currently receives roughly ~*$1B in closed investment leads per month from the community bank, up ~31% on average from 2011 (prior to the roll-out of these cross-sell initiatives)*.

123.  <u>False and Misleading Statement</u>.  On November 6, 2014, Wells Fargo gave a presentation at the BancAnalysts Association of Boston Conference during which the Company addressed, among other things, the question of whether it was more difficult to cross-sell after the financial crisis of 2008.  Carroll responded that the Company was able to continue cross-selling effectively because it focused on "*doing things the right way*":

> [Carroll:] The regulators are very intently focused on maintaining the sanctity of the legal entities particularly the Fed and bank charter and so Reg W has always been important.  But I would say *all of the market participants are much more disciplined around referrals, compensation agreements and things like that*.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

Obviously underwriting criterion have really tightened up in the last five or six years. *So I would tell you I think it is harder to do cross sell and do it well and stay within the good graces of the regulators which sort of gets to my comment on our focus on execution, doing things the right way*.

124.    On December 14, 2014, BMO Capital analysts published a report after hosting meetings with the Company's Investor Relations head, Jim Rowe ("Rowe").  Afterward, the BMO Capital analyst wrote that the "two main areas for WFC to drive revenue growth are loan growth and growing its fee income business, with the biggest opportunity in its trust and investment business, which equals 35% of total fee income and 17% of total revenues, a bigger contributor to revenues than mortgage banking."  They also wrote:

> *One of the strengths at Wells Fargo that cannot be replicated is its culture, which is focused on serving the customer and increasing profitability through strong cross-sell*.  The average Wells Fargo consumer customer uses six products. Part of the reason for WFC's culture is the long tenure of both senior management and relationship managers.  WFC has been focused on this for decades and the *cross-sell opportunities are built into its systems*.

125.    In the context of generating credit card revenue, the analysts viewed the Company's credit card strategy as "deeper penetration" of its existing customer base.  The analysts similarly wrote – in connection with the Company's Wealth Management Business – that "[f]or *years*" "Wells Fargo has been *developing the right incentives and systems to promote cross-selling*/referrals between the community bank and the private bankers/retail brokers, which are beginning to take hold."

126.    <u>False and Misleading Statement</u>.  On January 14, 2015, the Company issued a news release reporting Wells Fargo's financial results for the fourth quarter of 2014.  The Company stated:

*Regional Banking*

- Retail banking

    - Primary consumer checking customers up 5.2 percent year-over-year

    - Retail Bank household *cross-sell ratio of 6.17 products per household, up from 6.16 year-over-year*

*           *           *

*Consumer Lending Group*

*           *           *

• Consumer Credit

　　• ***Credit card penetration in retail banking households rose to 41.5 percent, up from 37.0 percent in prior year***

　　　　*　　　*　　　*

**Wholesale Banking** . . . .

　　　　*　　　*　　　*

• Cross-sell of 7.2 products per relationship, up from 7.1 in fourth quarter 2013 driven by new product sales to existing customers

　　　　*　　　*　　　*

**Wealth, Brokerage and Retirement** . . . .

　　　　*　　　*　　　*

***WBR cross-sell ratio of 10.49 products per household, up from 10.42 a year ago***.

127.　　<u>False and Misleading Statement</u>.　On January 14, 2015, Wells Fargo held a conference call for analysts and investors to discuss the Company's fourth quarter 2014 and fiscal year 2014 financial results.  During the call, Stumpf emphasized high growth rates in the Company's credit card business.  But, unbeknownst to investors, these growth rates rested, in material part, on fraudulent credit cards:

[Shrewsberry:] We've also been successfully adding retail bank households. Through November, our ***year-to-date household growth rate was the highest since 2015***. Meeting the financial needs of these new households will help drive across our diversified product line.

Our debit and credit card businesses are examples of where we've had success and yet still have opportunities for continued growth. . . .

Our ***credit card penetration rate increased to 42%, up from 37% a year ago. Credit card purchase volume grew 17% from a year ago, reflecting account growth*** and increased usage among our existing customers.

　　　　*　　　*　　　*

[Analyst:] ***I had a question on your credit card growth strategy***. I think most would agree that credit card asset yields have held up quite well in this low-rate environment relative to other asset classes. Would you consider competing more aggressively on rates in an effort to grow your share of outstanding balances, particularly since the high-return business, where you arguably have room to give up a bit on pricing while still generating returns that are attractive relative to other lower-return, lower-yielding asset classes?

[Stumpf:] Well, let me say it this way: ***First of all, we love the card business, especially for our Community Bank customers. And we have grown from the low to mid-20%s penetration to now to 42% of our customers carry our credit card. And we like that business a whole lot***. Not only from the balances we get, but to be relevant to our customers as far as handling their payments, providing them services that are even around payments and so forth for them. We want to provide great value; pricing sure is part of that.

128.    <u>False and Misleading Statement</u>.  On February 25, 2015, the Company filed a Form 10-K report for the fiscal year ended December 31, 2014.[124]  The report repeated the financial and cross-sell results that Wells Fargo had published in its January 14, 2015 news release.  On the same day, the Company published its Annual Report to Stockholders for fiscal 2014.   Stumpf's introductory remarks in the 2014 Annual Report falsely assured investors that the Company's emphasis on culture was a strength for Wells Fargo:

[Stumpf (Introductory Message):] I have always believed ***that culture is the most important part of a company's success***.  It is the heart of any organization and a significant contributor to long-term performance and stability.

This is certainly true for Wells Fargo . . . .

Today, I sum up Wells Fargo's culture with this word: "Relationships."  It captures the passion we all share for serving our key stakeholders — customers, communities, investors, and team members.  ***To earn their trust***, we strive to do the right thing and ***act under the highest ethical standards where honesty, trust, and integrity matter***.

129.    Finally, the Form 10-K again conceded that the Company's risk culture was dependent on the "tone at the top" and stated that the Company "could" face increased costs to its reputation "in the event" it did not comply with increased regulatory requirements.  As detailed herein, ¶¶23-31, Defendants already knew that internal findings had or would lead to increased costs:

***Our risk culture is strongly rooted in our Vision and Values, and in order to succeed in our mission of satisfying all our customers' financial needs and helping them succeed financially***, our business practices and operating model must support prudent risk management practices.

\*      \*      \*

***Our risk culture seeks to promote proactive risk management and puts the customer first by implementing an ongoing program of training, performance management, and regular communication.  Our risk culture also depends on the "tone at the top" set by our Board, CEO, and Operating Committee members***.

---

[124]  The Form 10-K was signed by Stumpf, Shrewsberry, Levy, Baker, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger and Swenson.

130.    The Form 10-K also attached false SOX certifications signed by Stumpf and Shrewsberry that were substantially similar to the certifications set forth in ¶92.

131.    <u>Material Omission</u>.  Wells Fargo failed to disclose in the "Legal Actions" section of the Form 10-K (or anywhere else for that matter) that by this time the OCC already was "notified" and "active[ly]" investigating potential unsafe or unsound practices in risk management and oversight of the Company's sales practices.[125]  Wells Fargo also failed to disclose in its Form 10-K that high-level executives, including Wells Fargo's CEO, were aware of sales practice issues of a "significant scale" two years earlier in 2013.  ¶¶9, 196(a).

132.    <u>False and Misleading Statement</u>.  On March 17, 2015, the Company filed its Form 14(A) DEF Proxy Statement with the SEC.  The 2015 Proxy Statement represented that the "HRC ***continued to enhance our strong compensation risk-management practices* to** discourage imprudent short-term risk taking by requiring executives to bear the long-term risk of their activities."[126]

133.    <u>False and Misleading Statement</u>.  On April 14, 2015, the Company issued a news release discussing its financial results for the first quarter of 2015.  The release discussed, among other things, the results of the Company's cross-selling efforts:

**WELLS FARGO REPORTS $5.8 BILLION IN NET INCOME**
**Diluted EPS of $1.04, Revenue Up 3 Percent from Prior Year**

\*        \*        \*

- Net income of $5.8 billion, compared with $5.9 billion in first quarter 2014
- Diluted earnings per share (EPS) of $1.04, compared with $1.05
- Revenue of $21.3 billion, up 3 percent

\*        \*        \*

- ***Strong growth in average loans and deposits***:

  - Total average loans of $863.3 billion, up $39.5 billion, or 5 percent, from first quarter 2014

\*        \*        \*

---

[125]  Senate Tr. at 30.

[126]  2015 Proxy Statement at 36.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                               - 57 -

***Regional Banking***

- Retail banking

  - Primary consumer checking customers up 5.7 percent year-over-year
  - ***Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.17 year-over- year***.

134.    On April 14, 2015, Morningstar analysts issued a report underscoring that Wells Fargo had reported increased income of 6.7% sequentially for its largest unit, Community Banking. Morningstar further stated that Wholesale Banking's results had increased 3.25%.  The analysts attributed the growth specifically to Tolstedt's Community Banking segment.  The analysts wrote that the incentives Wells Fargo provided to employees to grow cross-sell results were well worth the expense:

> ***Wells Fargo's emphasis on cross-selling is associated with significant incentive spending***.  ***We see these expenses as worthwhile*** in building long-term customer relationships and consequently, switching costs.

135.    Similarly, on April 15, 2015, analysts from RBC published a report titled, "Wells Fargo & Co. 1Q15: Consistency in Operating Trends Continues."  Among other things, the analysts commented that "Wells reported 1Q15 EPS of $1.04 beating both our $0.93 estimate and the $0.98 consensus due in part to $0.07/share of tax benefits."  The analysts further commented on solid fee gains over the quarter.  "While acknowledging the challenges of regulatory reform and a sluggish economy" – the analysts wrote – "we still expect the company to deliver above-average ***growth primarily through market share gains and increased cross-selling*** of both its legacy Wells and newer Wachovia customers."

136.    On May 6, 2015, the Company filed its Form 10-Q for the period ending March 31, 2015.  Among other statements and omissions, the Form 10-Q stated:

> [Wells Fargo] strive[s] to make risk management a competitive advantage by ***working hard to ensure that appropriate controls are in place to reduce risks to our customers***, maintain and increase our competitive market position, ***and protect Wells Fargo's long-term safety, soundness and reputation***.[127]

---

[127]   Wells Fargo & Co., Quarterly Report (Form 10-Q) at 3 (May 6, 2015).

137. The Form 10-Q contained SOX certifications, signed by Stumpf and Shrewsberry, that were substantially identical to the certifications set forth in ¶96.

138. <u>False and Misleading Statement</u>. On May 29, 2015, the Company gave a presentation at the 2015 Sanford C. Bernstein Strategic Decisions Conference. During the conference, an analyst specifically asked Stumpf about regulatory investigations and whether Stumpf was concerned that the Company was pushing products onto customers that the customers did not want. Stumpf rejected the notion that Wells Fargo could cross-sell products that customers did not need, as such conduct was not in the best interest of the customers or Wells Fargo. Instead, according to Stumpf, the Company's sales culture and business practices helped satisfy customers' financial needs:

> [Analyst:] There's a question about the regulatory investigations. A key part of your strategy has been sales. You have always been revenue focused on cross-selling. Sometimes that might be able to go too far and I guess there's been some investigations; ***are you selling the wrong thing to the wrong people***?

> ***How do you make sure you're pushing a sales culture but not giving a customer something that they don't need or don't understand***?

> . . . [Stumpf:] Our culture for 163 years has been to help our customers succeed financially and provide all their ***financial needs. It is not in our interest, not in our team members' interest, not in our customers' interest, surely not in our shareholders' interest to have a customer have a product or service they didn't want, don't need, or it doesn't help them***.

139. After the conference, Wells Fargo's stock price continued to trade above $56 per share.

140. On June 23, 2015, Morningstar analysts published a report consolidating its recently published research, noting that since Stumpf expertly ran Wells Fargo, the Company was not "'too big to manage.'" Importantly, Morningstar noted that the Company provided its employees with incentives to grow the bank's cross-selling efforts:

> ***Wells Fargo's longstanding focus on cross-selling helps lock in customer relationships and access to low-cost funding – namely, $1 trillion in deposits at a cost of only 9 basis points as 2014 came to a close***.

> *        *        *

> ***Wells Fargo's emphasis on cross-selling is associated with significant incentive spending. We see these expenses as worthwhile in building long-term customer relationships and consequently, switching costs***.

141. <u>False and Misleading Statement</u>.  On July 14, 2015, the Company reported its financial results for the second quarter of 2015.  The Company noted the cross-selling results for its three business units, purporting to show growth in two out of the three units:

**WELLS FARGO REPORTS $5.7 BILLION IN NET INCOME**
**Diluted EPS of $1.03, Revenue of $21.3 Billion**

- Continued strong financial results:

  - Net income of $5.7 billion, in line with second quarter 2014
  - Diluted earnings per share (EPS) of $1.03, compared with $1.01

\*      \*      \*

- Strong growth in average loans and deposits

\*      \*      \*

***Regional Banking***

- Retail banking

  - Primary consumer checking customers up 5.6 percent year-over-year
  - ***Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.17 year-over- year***

\*      \*      \*

<u>**Wholesale Banking**</u> . . . .

\*      \*      \*

Wholesale Banking reported net income of $2.0 billion, up $214 million, or 12 percent, from first quarter 2015.  Revenue of $6.1 billion increased $171 million, or 3 percent, from prior quarter.  Net interest income increased $147 million, or 5 percent, on broad based loan growth . . . .

\*      \*      \*

<u>**Wealth, Brokerage and Retirement**</u> . . . .

\*      \*      \*

***WBR cross-sell ratio of 10.53 products per household, up from 10.44 a year ago***.

142. <u>False and Misleading Statement</u>.  On the same day, July 14, 2015, the Company held a conference call for analysts and investors to discuss the second quarter 2015 financial results. Stumpf and Shrewsberry hosted the call.  In addition to repeating the cross-sell metrics referenced in the July 14, 2015 news release, Stumpf and Shrewsberry misled investors about the adequacy of the

Company's litigation accrual disclosures, stating that even though the accruals were not itemized, all issues were likely already known to the market:

> [Analyst McDonald:] Just a question, John, on the efficiency ratio. You were at the high end of your range the last couple of quarters. Do you see opportunities to drive down the efficiency ratio prior to rates going up? Or is it more likely to stay still at the upper end of the range until we see interest rates move higher?
>
> [Shrewsberry:] I think it's going to stay in the upper part of the range until revenue moves higher, which will probably happen as a result of – or at least most meaningfully over a short period of time because of rates moving higher.
>
> We are spending the money that we think we need to spend to run a great business today and manage risk as well as invest in the future around things that customers want, things that we needed to be a well-run, resilient compliant, risk managed, technologically savvy firm and that gets us to 58% plus or minus, which I would remind you is a very good number for a bank of our size.
>
> \*       \*       \*
>
> [Analyst:] **Did you indicate how much your legal accrual was for the period**?
>
> [Shrewsberry:] **We didn't. We've indicated the size of operating losses in total. The amount of the change – and the amount of the change is reflected-reflects increased litigation accruals, but we don't split that out from our other operating losses**.
>
> [Analyst:] **And are those legal accruals for issues related – disclosed in the 10-K or for new ones**?
>
> [Shrewsberry:] **It's for a variety of matters, most of which you would already be familiar with**.

143. On July 15, 2015, Barclays analysts published a report commenting on the Company's second quarter 2015 results. Barclays noted that "EPS matched consensus" estimates and that "WFC benefits from a talented management team, diversified business mix, and a retail deposit base that helps drive the highest NIM amongst its U.S. large-cap peers," and that they expected "**cross-selling traction to continue as it drives further revenue** and expense synergies from its [Wachovia Bank] acquisition."

144. <u>False and Misleading Statement</u>. On August 5, 2015, the Company filed its Form 10-Q for the period ending June 30, 2015. The Form 10-Q repeated financial results referenced in the July 14, 2015 news release.

145. The Form 10-Q contained SOX certifications, signed by Stumpf and Shrewsberry, that were substantially identical to the certifications set forth in ¶92.

146.    On September 16, 2015, the Company presented at the Barclays Global Financial Services Conference.  During the conference, the Barclays analyst quoted from the Company's oft-repeated Vision and Values statement regarding cross-sell and providing customers only the products that customers needed:

> [Goldberg (Barclays Analyst):] I thought it would be interesting to actually take some quotes from that Vision and Values publication.

> *          *          *

> "**Our strategy is not product-centric, it's customer-centric, selling all the financial products a customer needs**."

> "**Cross-selling is what we call needs-based selling.  It's our most important strategy**."[128]

147.    <u>False and Misleading Statement</u>.  On October 14, 2015, the Company reported its financial results for the third quarter of 2015.  In its release, the Company stated:

> "Wells Fargo's strong third quarter results reflected the ability of our diversified business model to generate consistent **financial performance in an uneven economic environment** while continuing to meet our customers' **financial needs**," said Chairman and CEO John Stumpf.

> *          *          *

***Regional Banking***

- Retail banking

  - Primary consumer checking customers up 5.8 percent year-over-year

  - Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.15 year-over-year

> *          *          *

***Consumer Lending Group***

> *          *          *

- Consumer Credit

  - ***Credit card penetration in retail banking households rose to 42.9 percent, up from 39.7 percent in prior year***

> *          *          *

---

[128]   Barclay's Global Financial Services Conference Transcript at 1 (Sept. 16, 2015).

**Wholesale Banking** . . . .

                 \*      \*      \*

- Cross-sell of 7.3 products per relationship, up 0.1 from third quarter 2014

                 \*      \*      \*

**Wealth and Investment Management (formerly Wealth, Brokerage and Retirement)** . . . .

                 \*      \*      \*

       ***Brokerage and Wealth cross-sell ratio of 10.52 products per household, up from 10.44 a year ago***.

148. <u>False and Misleading Statements</u>. On November 4, 2015, the Company filed its Form 10-Q for the third quarter of 2015. The Form 10-Q reiterated the segment cross-sell metrics that were included in the October 14, 2015 financial news release and added the following representations concerning the Company's cross-sell strategy and how the strategy purportedly served customers' needs:

       <u>**Cross-sell**</u> ***Our cross-sell strategy is to increase the number of products*** our customers use by offering financial products ***that satisfy their financial needs***. ***Our approach is needs-based*** as some customers will benefit from more products, and some may need fewer.

149. The Form 10-Q attached the false SOX certifications signed by Stumpf and Shrewsberry that were substantially similar to the certifications set forth in ¶92.

150. <u>False and Misleading Statement</u>. On November 18, 2015, the Company gave a presentation at the Bank of America Merrill Lynch Banking and Financial Services Conference. During the conference, Carroll was asked about any regulatory hurdles. Carroll stated that the Company followed a disciplined set of best practices and that the regulators had reacted positively from a "compliance standpoint":

       [Carroll:] Our fundamental pitch . . . [i]t's calibrated to your time horizon, your goals, your financial literacy, your risk tolerance. ***And we've got the tools in place well established, well understood and with that, we've built a set of best practices, fundamental behaviors that we know lead to much more profitable sticky relationships***.

                 \*      \*      \*

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

*And the question that you may have been heading towards about any regulatory issues around sales practices or cross-selling or those kinds of things, as long as we stick to that plan-based, we've had terrific reaction from our regulators from a compliance standpoint on that.*[129]

151.    Throughout November 2015 and December 2015, the Company's stock price traded at prices as high as $56.00 per share.

Wells Fargo and Top Executives Falsely Denied Claims that Sales Culture Caused Employees to Break the Law

152.    On December 1, 2015, *The Wall Street Journal* published a story about Wells Fargo's cross-selling culture, but Wells Fargo denied that it had engaged in any improper conduct.  The article stated that the OCC and the San Francisco Federal Reserve were investigating whether the bank pushed employees too hard to meet sales quotas and whether it had done enough to prevent questionable behavior.  This article also referred to the Los Angeles City Attorney's lawsuit against Wells Fargo, filed in May 2015, and to stories from current or former employees who had addressed the same conduct in a *Los Angeles Times* piece, dated December 21, 2013.  Wells Fargo, however, specifically denied the allegations levied against it: "A bank spokesperson . . . said **the bank disagrees** with the allegations in the lawsuit . . . . '***Wells Fargo's sales culture is focused on the best interest of its customers and creating a supportive, caring and ethical environment for our team members*.'"[130]

153.    The Company's denials were consistent with previous public denials of any systematic or widespread wrongdoing tied to the Company's sales culture.  For example, in the December 2013 *Los Angeles Times* article, Sloan disclaimed any knowledge of an overbearing sales culture within the bank.  In January 2014, Sloan told the *American Banker* that "I disagree with the

---

[129]  2015 Fin. Servs. Conf. at 9-10, *supra* n.61.

[130]  Emily Glazer, *Regulators Probe Extent Wells Fargo Went To Push Cross-Selling Culture*, Wall St. J., Dec. 1, 2015.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

L.A. Times story."[131]  Wells Fargo also formally denied legal claims that employees were fired after being directed by mangers to open accounts in the name of family members.[132]

154.    Moreover, responding to the Los Angeles City Attorney's lawsuit making many of the allegations reported by the *Los Angeles Times* in December 2013 and by *The Wall Street Journal* in December 2015, Wells Fargo was even more blunt.  The Company stated in its formal answer: "***Wells Fargo generally denies each and every allegation contained in the City's unverified Complaint***."[133]

155.    <u>Reasons Why Defendants' Statements Were Knowingly False and Misleading</u>: Defendants' statements set forth in ¶¶111-154 concerning: (i) reported financial statements and cross-sell metrics; (ii) the Company's overall cross-selling strategy and that the purported purpose of such strategy was to provide customers with products they needed; (iii) risk management and effectiveness of internal controls over financial reporting; and (iv) the Company's "culture" and related business practices, as set forth in its Vision and Values, were each knowingly false and misleading for the following reasons:

(a)    Defendants knew or deliberately disregarded that during the period leading up to and including the Class Period, Wells Fargo's cross-selling sales and incentive practices led to widespread, serious misconduct, including: (i) the opening of millions of fake credit card or deposit accounts in the names of customers who did not authorize the account openings; (ii) the creation of fake personal identification or PIN numbers to open fake debit cards; and (iii) the use of phony email addresses to enroll customers in additional services that customers did not request via forgery or other illegal means – all culminating in "fraudulent conduct [that] occurred on a massive scale," as the government found (¶¶4-5, 194, 180-181).

---

[131]  Kevin Wack, *Wells Execs Stuck to the Script as Evidence of Sales Abuses Mounted*, Am. Banker, Dec. 21, 2016.

[132]  Wells Fargo & Company's and Wells Fargo Bank, N.A.'s General Denial of and Affirmative Defenses to Plaintiffs' Complaint, filed on June 2, 2015 in *The People of the State of California v. Wells Fargo & Company, et al.*, No. BC580778 (Cal. Super. Ct., L.A. Cty.).

[133]  *Id*. at 1.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

(b)     Defendants knew or recklessly disregarded that Wells Fargo's cross-selling incentives, quotas and penalties severely undermined the Company's cross-selling metrics and cross-selling strategy, and turned the Company's retail branches into a "pressure cooker."

(c)     Stumpf knew of the sales misconduct by 2011, and admittedly understood that the problems had reached a "significant scale" by 2013; he conveyed these facts to Wells Fargo's Board by 2013 (¶¶9, 110(b), 196(a)).

(d)     Wells Fargo's Operating Committee met weekly, and the cross-selling misconduct rose to its attention likely by 2011, when Tolstedt learned of the misconduct (¶¶110(d)).

(e)     Defendants knew or deliberately disregarded that Wells Fargo's internal investigations, which started in 2011, continued to expand alongside parallel investigations by government agencies in 2014 and 2015.  These investigations made clear to Company leadership, including the Officer and Director Defendants, that Wells Fargo's cross-sell strategy had fostered a sales culture in which employees, under intense pressure to sell more and more products to Wells Fargo's clients, created phony accounts, forged signatures, destroyed records, and engaged in unlawful and unethical practices, in order to create the false appearance of successful "cross-selling" business practices and metrics.  As detailed above in ¶110(e), the investigations in 2011, 2012, 2013 and 2014 had already resulted in mass firings, an internal task force and the beginnings of an OCC investigation.  The OCC investigation was "active" and notified in 2013.  In early 2014, the OCC uncovered sales problems and directed Wells Fargo to address weaknesses in compliance risk through the establishment of a comprehensive compliance risk management program related to unfair and deceptive practices.  *See* ¶110(e).  At that time, the OCC concluded that it needed to assess the Company's cross-selling and sales practices as part of its upcoming examination of the bank's governance processes.  *Id.*  During the same year, 2014, Wells Fargo expanded its internal investigation into fake or simulated accounts.  *See* Stumpf Statement at 4 ("In 2014 the Sales and Service Conduct Oversight Team **expanded the simulated funding review to a national scope**.").  In 2015, as these material investigations continued to expand, Defendants continued to conceal them:

(i)     In 2015, Wells Fargo hired two more outside consultants – Accenture and PricewaterhouseCoopers ("PwC") – in response to an OCC directive related to Wells Fargo's

sales culture. Also in 2015, the OCC's investigation uncovered additional sales problems that required corrective action and wrote a letter to Wells Fargo specifically stating that the bank **lacked a formalized governance framework to oversee sales practices**. The letter reportedly "included an MRA[134] requiring [Wells Fargo] to address the governance of sales practices within its Community Bank division." In June of 2015, the OCC sent a supervisory letter to Stumpf issuing five MRAs that required the bank "to take significant action to address **the inappropriate tone at the top**" – issues that were admittedly the responsibilities of Stumpf and the Operating Committee. The OCC wrote to Stumpf that Wells Fargo had the following, serious problems, including: (a) the lack of an appropriate control or oversight structure given corporate emphasis on product sales and cross-selling; (b) the lack of an enterprise-wide sales practices oversight program; (c) the lack of an effective enterprise-wide customer complaint process; (d) the lack of a formalized governance process to oversee sales practices; and (e) the failure of the bank's audit services to identify the above issues or to aggregate sales practice issues into an enterprise view.

(ii) The June 2015 OCC letter also issued a series of instructions to address Wells Fargo's internal systemic problems that were the direct result of cross-selling misconduct. **First**, the OCC instructed Wells Fargo to take certain corrective actions to address the issue, including: (a) improving processes to manage sales practices risk; (b) re-evaluating compensation and incentive plans to ensure they did not provide an incentive for inappropriate behavior; (c) improving processes to independently oversee sales practices risk at an enterprise-wide level; (d) accelerating the implementation of a fully effective customer complaint process and establishing policy and processes for evaluating complaints related to protected classes; (e) having management of the bank's Community Banking division establish effective oversight, as well as a testing and quality assurance function, to review branch sales practices; and (f) having the Company's audit services develop an enterprise-wide risk management process for sales practices, as

---

[134] As the OCC explained to the Senate, MRAs have particular significance: "MRAs describe practices that deviate from sound governance, internal control, and risk management principles, and have the potential to adversely affect the bank's condition, including its financial performance or risk profile, if not addressed; or result in substantive noncompliance with laws and regulations, enforcement actions, supervisory guidance, or conditions imposed in writing in connection with the approval of any application by the bank."

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

1   the OCC explained to the Senate.  **Second**, the OCC also instructed Wells Fargo to remediate any

2   consumer harm that resulted from the sales practices at issue.  *See* ¶¶28-30.  **Third**, the OCC also

3   ordered Wells Fargo to retain an independent consultant to conduct a thorough review of the bank's

4   approach to enterprise-wide sales practices and to assess consumer harm.  The OCC issued its

5   findings in October 2015, February 2016 and May 2016.

6                    (iii)    Contemporaneous with the expansion of the OCC investigation and its

7   findings and instructions discussed above, in May of 2015, the CFPB launched *its* investigation into

8   Wells Fargo's unlawful sales practices.[135]   In June and July 2015, Wells Fargo provided sales

9   practices information to the CFPB, according to the Company's written responses to questions from

10  the Senate.  During this time, the Company also reportedly hired consulting firm Accenture (along

11  with the law firm Skadden, Arps, Slate, Meagher & Flom LLP) to conduct an investigation into the

12  sales misconduct, and Wells Fargo's Board was **briefed regularly** about the investigation's progress,

13  according *The Wall Street Journal.*

14                   (iv)    Also in mid-2015, and also in response to the OCC's investigation,

15  Wells Fargo retained PwC to evaluate deposit products, unsecured credit cards and other customer

16  transactions during 2011-2015 to determine whether customers may have incurred financial harm

17  from having been provided an account or service they may not have requested.  *See* ¶¶28-30; Stumpf

18  Statement, *supra* n.120.  PwC reportedly used Wells Fargo's account records and other data

19  analytics to determine who may have incurred fees or other bank charges from unauthorized account

20  openings.[136]

21                   (f)    Separate and apart from the foregoing, Wells Fargo's stated "credit card

22  penetration" rates throughout the Class Period (*see, e.g.*, ¶155(f)), along with the metrics that it used

23  _____

[135]   Electronic meeting calendar events suggest Stumpf may have met with the CFPB telephonically
24  numerous times before the Company told the CFPB about the City of Los Angeles lawsuit regarding
     sales misconduct.  These electronic meeting calendar events suggest Stumpf met telephonically with
25  the CFPB on October 9, 2013, October 17, 2013, January 17, 2014, February 13, 2014, January 12,
     2015, January 15, 2015 and February 4, 2015.

26  [136]   *See* September 16, 2016 report by *The Wall Street Journal, The Wall Street Journal Online*,
     "How Wells Fargo's High-Pressure Sales Culture Spiraled Out of Control; Hourly targets, fear of
27  being fired and bonuses kept employees selling even when the bank began cracking down on abuses;
     'not a team player.'"
28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
     SECURITIES LAWS 3:16-cv-05479-JST                                              - 68 -

1   to promote credit card penetration growth,[137] were also knowingly false and misleading.  Each of

2   these three types of statements – relating to the Company's credit card penetration rates, quarterly

3   growth and annual growth – all were false and misleading throughout the Class Period because

4   unsustainable cross-selling misconduct inflated those metrics with fraudulent or unwanted credit

5   cards:

6           (i)      Stumpf has admitted that **5.8%** of all new consumer credit cards

7   opened during the 2011-2015 timeframe were unauthorized or not activated.[138]  These illusory credit

8   cards exaggerated the Company's credit card penetration numbers, making them appear to be more

9   favorable than they really were.  *See* ¶¶4-5, 180-181, 194.  The Company's October 14, 2016

10  quarterly supplement further admits that Wells Fargo never corrected its credit card penetration

11  metrics, while attempting to minimize the impact of illusory credit cards by claiming "the maximum

12  impact in ***any one quarter*** was not greater than **86 basis points**, or ~2%."

13          (ii)     Subtracting at least "86 basis points" of spurious credit cards from the

14  Company's credit card penetration metrics in any one quarter in the Class Period, shows the numbers

15  were materially false when issued.  For example, in the first quarter of 2014, reducing the 0.94 bps

16  of ***reported*** quarterly growth  by 0.86 bps (the "86 basis points" identified above) would cause that

17  0.94 bps of growth to drop to 0.08, for ***a decline of 91%***.  Had Wells Fargo made a similar

18  adjustment to its other credit card penetration "growth" metrics in any other quarter during the Class

19  Period, the effect would have been similarly material.

20          (iii)    The credit card penetration growth rates were also materially false and

21  misleading for another, independent reason: the cross-selling that drove the purported credit card

---

[137]   Wells Fargo defined "credit card penetration" percentages to be the percentage of "retail banking deposit households that have a credit card with Wells Fargo," and reported any growth in that percentage in quarterly and annual percentage point differences.  For example, when Wells Fargo reported first quarter 2014 credit card penetration of 38.0%, it also stated that this 38.0% metric had grown by 94 basis points on a quarterly basis and had grown 389 basis points over the first quarter of 2013, or increased by 3.98 percentage points when considering the annual increase.  Wells Fargo reported these three types of metrics on a quarterly basis throughout the Class Period.  On July 15, 2016, Wells Fargo stated that it changed its method for calculating credit card penetration rates, as discussed in footnote 141, below.

[138]   This number will increase materially because Wells Fargo must increase the scope of PwC's study to comply with the government's instructions on this subject, which will simply increase the magnitude of Wells Fargo's credit card misrepresentations.

"growth" was based, in material part, on fraudulent sales practices. The cross-selling practices in Tolstedt's Community Banking unit were material to Wells Fargo's credit card business because – as Wells Fargo bragged to investors – the Retail Banking business delivered more than 80% of the credit card business's new cardholders *and* delivered them for half the cost that Wells Fargo's competition paid to add new credit card customers to their businesses. ¶106.

(iv) Yet, Defendants knew or recklessly disregarded the fact that this cheap supply of credit card "growth" depended upon a cross-selling strategy marked by pervasive sales misconduct.[139] On September 20, 2016, Stumpf told the Senate that Wells Fargo made limited reductions to sales incentives in 2012, 2014 and 2015, to reduce this sales misconduct.[140] To the extent Stumpf's testimony warrants any credit on this point, it shows that *merely reducing* sales employees' incentives to engage in misconduct caused credit card penetration growth to *fall in late 2014 or early 2015*, as the following summary of the Company's growth rates shows:[141]



**Credit Card Growth Slows in Response To Limited Efforts To Reduce Sales Misconduct**
Credit Card Penetration (Percentages) and Annual Changes in Credit Card Penetration (Basis Points)

---

[139] *See, e.g.*, ¶¶4-5.

[140] Senate Tr. at 5.

[141] In the second quarter of 2016, Wells Fargo changed its methodology for reporting credit card penetration percentages in a way that added approximately 1.90 to 2.00 percentage points to its reported credit card penetration percentages; 2.00 percentage points have been subtracted from the reported percentages in second quarter of 2016 in this chart in order to provide comparable metrics that more closely follow the reporting convention that Wells Fargo applied before the second quarter of 2016.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

(v)     When Wells Fargo made limited reductions to sales incentives, it knew or recklessly disregarded the fact that any attempt to reduce sales-related misconduct would also reduce its ability to grow its credit card business.  Wells Fargo's executives saw that fact in real-time, but concealed that growth rates rested on unsustainable cross-selling misconduct.

(g)     Additionally, throughout 2015, certain of the Defendants continued to realize financial compensation that they obtained, in part, by achieving cross-selling targets. *See* ¶¶19-21.

(h)     All of the facts identified above were either known to or deliberately disregarded by the Defendants, and demonstrated that the statements, identified above, were materially false and misleading when made.

Even as Evidence of Fraudulent Sales Conduct Mounted and Government Investigations Increased in Intensity, Top Executives and the Director Defendants Continued to Misrepresent and Conceal the Material and Illegal Elements of the Cross-Sell Strategy and Their Impact on Wells Fargo's Financial Condition.

156.    Underline{False and Misleading Statement}.  On January 15, 2016, Wells Fargo reported its earnings for the fourth quarter of 2015.  In its release, the Company stated:

*Regional Banking*

- Retail banking

  - ***Primary consumer checking customers up 5.6 percent year-over-year***

  - ***Debit card purchase volume of $73 billion in fourth quarter, up 8 percent year-over-year***

  - Retail Bank household cross-sell ratio of 6.11 products per household, compared with 6.17 year-over-year

                    *       *       *

*Consumer Lending Group*

                    *       *       *

- Consumer Credit

  - ***Credit card purchase volume of $19 billion in fourth quarter, up 12 percent year-over-year***

  - ***Credit card penetration in retail banking households rose to 43.4 percent, up from 41.5 percent in prior year***

                    *       *       *

**Wholesale Banking** . . . .

          *       *       *

- Cross-sell of 7.3 products per relationship, up 0.1 from fourth quarter 2014

          *       *       *

**Wealth and Investment Management (formerly Wealth, Brokerage and Retirement)** . . . .

          *       *       *

*Brokerage and Wealth cross-sell ratio of 10.55 products per household, up from 10.49 a year ago*.

157. <u>False and Misleading Statement</u>. On February 24, 2016, Wells Fargo filed its report on Form 10-K for the year ended December 31, 2015 with the SEC, which repeated the false cross-sell metrics in the January 15, 2016 news release. The Form 10-K was signed by Stumpf and Shrewsberry.[142] The February 24, 2016 Form 10-K also attached the false SOX certifications signed by Stumpf and Shrewsberry that were substantially similar to the certifications set forth in ¶92. On the same day, the Company issued its 2015 Annual Report to stockholders and emphasized, among other things, the Company's "relationship based culture," and its commitment to risk management:

Relationships are at the core of our culture

*[O]ur highest honor is the trust that customers place in us*. . . .

*No document better captures our relationship-based culture and focus on customers than The Vision & Values of Wells Fargo, which was first published more than 20 years ago*.

158. <u>False and Misleading Statement</u>. In addition to repeating the false cross-sell metrics that Wells Fargo reported in the January 15, 2016 news release, the Annual Report noted the material significance of cross-selling and emphasized how the Company purportedly based that strategy to the needs of its customers:

<u>**Cross-sell**</u> *. . . Cross sell is the result of serving our customers well, understanding their financial needs . . . . Our approach to cross-sell is needs-based as some customers will benefit from more products*, and some may need fewer.

---

[142] The Form 10-K was also signed by Levy, Baker, Chen, Dean, Duke, Engel, Hernandez, Milligan, Peña, Quigley, Sanger, Swenson and Vautrinot.

*     *     *

*Products included in our retail banking household cross-sell metrics must be retail products and have the potential for revenue generation and long-term viability.*[143]

159.    Additionally, the Annual Report included the following statements claiming Wells Fargo's "strong risk culture":

- *A strong risk culture starts with the tone at the top, which is set by the Company's Board of Directors, CEO, Operating Committee (which consists of our Chief Risk Officer and other senior executives) and other members of senior management, and emphasizes a prudent approach to taking and managing risk.*

*     *     *

- *Wells Fargo's incentive-based compensation practices are designed to balance risk and financial reward in a manner that does not provide team members with an incentive to take inappropriate risk or act in a way that is not in the best interest of customers.*[144]

160.    <u>Material Omission</u>.  Further, Wells Fargo failed to disclose in the "Legal Actions" section of the Form 10-K (or anywhere else for that matter) that by this time the OCC already was "notified" and "active[ly]" investigating potential unsafe or unsound practices in risk management and oversight of the Company's sales practices.[145]  Wells Fargo also failed to disclose in its Form 10-K that high-level executives, including Stumpf, were aware of sales practice issues of a "significant scale" years earlier.  ¶¶9, 169(a).

161.    <u>False and Misleading Statement</u>.  On April 14, 2016, the Company announced its financial results for the first quarter of 2016, discussing, among other things, the impact of cross-selling on its Retail Banking unit:

**WELLS FARGO REPORTS $5.5 BILLION IN QUARTERLY NET INCOME; Diluted EPS of $0.99; Revenue Up 4 Percent from Prior Year**

---

[143]  In February 2016, according to Stumpf, Wells Fargo began the process of remediating the deposit and credit card customers that PwC identified.  Stumpf testified that of the more than 82 million deposit accounts and nearly 11 million credit card accounts that Wells Fargo opened during the 2011 – 2015 time frame, PwC "identified approximately *1.5 million* such accounts (or 1.9%) that could have been unauthorized" and PwC identified a population of approximately *565,000* consumer credit cards that had never been activated or used by the customer.

[144]  Wells Fargo & Co., Investor Annual Report at 58 (2015).

[145]  Senate Tr. at 30.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

- Continued strong financial results:
  - Net income of $5.5 billion, compared with $5.8 billion in first quarter 2015
  - Diluted earnings per share (EPS) of $0.99, compared with $1.04

\*　　　\*　　　\*

***Regional Banking***

- Retail Banking
  - Primary consumer checking customers up 5.0 percent year-over-year

\*　　　\*　　　\*

  - ***Retail Bank household cross-sell ratio of 6.09 products per household, compared with 6.13 year-over-year***

\*　　　\*　　　\*

**Wholesale Banking** . . . .

\*　　　\*　　　\*

Wholesale Banking reported net income of $1.9 billion, down $183 million, or 9 percent, from fourth quarter 2015. Revenue of $7.0 billion increased $399 million, or 6 percent, from prior quarter . . . .

\*　　　\*　　　\*

- ***Cross-sell of 7.3 products per relationship, up from 7.2 products in first quarter 2015***.

162. Before the Company issued its April 14, 2016 news release, the Company had already begun negotiating a potential settlement with the regulators concerning the unauthorized opening of accounts and credit cards. The settlement negotiations started in March 2016 and were ultimately disclosed six months later in September 2016. *See* ¶208 (January 11, 2017 *The Charlotte Observer* article: "Emails show Wells Fargo kept sales probe to itself for at least 6 months").

163. <u>False and Misleading Statement</u>. On May 4, 2016, the Company filed its Form 10-Q for the first quarter of 2016. In addition to repeating the cross-sell metrics reported in the April 14, 2016 news release, the Company again falsely stated that its cross-sell strategy was – "needs-based":

> **Cross-sell** We aspire to create deep and enduring relationships with our customers by providing them with an exceptional experience and by discovering their needs and delivering the most relevant products, services, advice, and guidance. ***An outcome of offering customers the products and services they need, want and value is that we earn more opportunities to serve them, or what we call cross-***

*sell. . . . **Our approach to cross-sell is needs-based as some customers will benefit from more products, and some may need fewer**.*

164. The Form 10-Q was signed by Levy and also contained SOX certifications signed by Stumpf and Shrewsberry that were substantially similar to the certifications set forth in ¶92.

165. <u>False and Misleading Statement</u>. On May 24, 2016, the Company held an Investor Day conference in San Francisco for analysts and investors. Defendants Stumpf and Tolstedt hosted the conference. Presentation materials at the conference described "Household growth and products per household," as follows:

- Households & Cross-sell: Retail checking households: +5.3% from 2013; Household & Cross-sell: Average Products Held per Household: 6.36 in 2013 and 6.29 in 2015;

- Total Products: Total Products Held: +4.2% from 2013;

- Revenue Drivers: Products Used Monthly: +7.8% from 2013; and

- Revenue Drivers: Total Deposit and Investment Balances: +10.8% from 2013.

166. Tolstedt further represented at the conference that Wells Fargo anchored its cross-selling business practices in satisfying customer needs:

[Tolstedt:] ***[P]roducts per household or cross-sell, the first thing we anchor ourselves on is our vision of satisfying our customers' needs and helping them succeed financially. And so everything that we do is really about that***.

167. <u>False Statement</u>: Additionally, during the May 24 conference, attendees asked Stumpf and Shrewsberry why the Company appeared to say "cross-selling" fewer times in 2016 as compared to previous conferences:

[Rowe:] At the Investor Day in 2014, you guys mentioned the word cross-sell 80 times, which is down from 110 times in 2010. Don't have the final tally yet for this year, but I suspect it's lower than two years ago. ***So, maybe talk to is there a change in emphasis in terms of the Company in terms of how approaches the consumer or change in consumer's behavior, just because that's a phrase that we heard many, many times from Wells Fargo previously and seem to hear about it less in today's sessions***.

. . . [Stumpf:] No, you know what, I wouldn't take that as any indication of how we have – that we've fundamentally changed the business. Whether you call it cross-sell or you call it mining the relationships that we have, fulfilling our vision of satisfying our customers' ***financial needs***, you can call it whatever you want. I think the word that John started the morning about was and to really reinforce the day, it's about relationships. And so the business hasn't fundamentally changed in terms of how we think about our relationships and how we think about serving our customers.

[Sloan:] The absolute best opportunity for us to do more business is with our existing customers, and we have, as you heard today, a very compelling culture, view, mutual value exchange, as we think about serving our customers. ***And when they are thrilled, we are thrilled. And nothing has gotten – we are as committed today as we've been to deepening customer relationships, helping them succeed financially, partnering using plural pronouns and that will result in more cross-sell, deeper relationships, more satisfied customers, more raving fans and that's what's it's all about. There is no change in that area***.

168. On May 25, 2016, Evercore analysts issued a report discussing the Company's May 24, 2016 conference titled, "Investor Day Wrap: Targets Sliced, but Still a Conservative Drive Down the Fairway." The report discussed, among other things, the growth in the Company's credit card business due to its cross-selling ability:

**Wells Fargo hosted its Investor Day yesterday in San Francisco**. Bottom line: While long-term profitability targets were cut due to the challenging rate and operating environment, such is not a major surprise, and we remain positive on the bank's L/T above-peer returns.

\* \* \*

**Card biz growth to remain above industry pace with greater cross-sell and new products**. . . . ***Mgmt noted they have improved their penetration rates with 43.2% of checking customers now holding a WFC card, versus 33.5% in 2012***.

169. On May 25, 2016, analysts from Oppenheimer issued a report titled, "Wells Fargo Investor Day Takeaways: The Right Business Model For The Economy." Regarding cross-selling, the analysts wrote as follows:

Throughout the day the watchword this year was "***relationship***" banking rather than "***cross-sell***" as in the past, which we found an odd sign of the time. The ***company had been using the "cross sell" mantra since the Norwest days in the late 1980s*** but apparently in the politically charged post crisis environment the idea that one would "sell" a financial product is somehow not PC. In reality of course it is all just smart business and customer service, anticipating needs and wants, and ***Wells is a model for how it should be done***.

170. After the Company's Investor Day of May 24, 2016, Wells Fargo stock continued to trade at artificially inflated prices above $50.00 per share.

171. <u>False and Misleading Statement</u>. After the May 24 conference, Defendants continued to promote Wells Fargo's cross-selling business model. On June 3, 2016, for example, an analyst asked Sloan at the 2016 Sanford C. Bernstein Strategic Decisions Conference whether the

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1  Company's cross-sell business model, which "has been a linchpin of the Wells Fargo's strategy"

2  over the last two or three years, had changed:

> [Analyst:] [T]hat came in from the audience about cross sell, which has been a linchpin of the Wells Fargo's strategy philosophy. ***It did seem like there was a little less emphasis or mentioning of that strategy at the Investor Day last week.  Is that just a change in nomenclature or does it get tougher as you get better at it?***  Does technology change the ability to do it?"
>
> [Sloan:] ***Yes, I think it's much more of just the change in the nomenclature because the way we think about our business is that we are very relationship oriented*** – you probably heard the word relationship used more than maybe even risk last week.  And it's very relationship oriented and so when we bring a relationship into Wells Fargo we want to broaden that relationship.  Sometimes we use the word cross-sell.  Sometimes we use the word intensity.  Sometimes we use the word penetration.  It's all the same and that is how do we take a relationship and broadened it over time not only to satisfy our customers but bring additional revenue to Wells Fargo and, as you broaden those relationships, you also lower the risk of the relationship because you know your customer better. ***But the fundamental strategy has not changed at all.***[146]

12      172.   <u>False and Misleading Statement</u>.  On June 17, 2016, the *American Banker* magazine

13  published the text of an interview with Sloan, who was the Company's Chief Operating Officer at

14  the time.  During the interview, Sloan was specifically asked about cross-selling and whether the

15  Company had gone too far in cultivating a sales culture that pushed employees too hard to sell

16  products that customers may not have wanted.  Sloan implied, without disclosing the true set of

17  circumstances, that the Company engaged in cross-selling correctly and appropriately, making sure it

18  followed regulations and satisfied customers' needs:

> [American Banker:] On the topic of cross-selling – Wells has come under scrutiny for its strong sales culture.  ***Is there any sense that the bank has pushed that strategy to the limit?***
>
> [Sloan:] ***No.  Because when you think of our vision, it's to satisfy our customers' financial needs***, and to help them succeed financially.  We know a lot about our customers, and so doesn't it make sense that we would use our data and match it with our product set to try to broaden our relationship with our customer?
>
> How we do it, how we talk about it, ***making sure that we do it correctly, and appropriately – and making sure we follow regulations*** – that will continue to evolve. ***But the fundamental strategy that we have is not going to change***.

---

[146]  Transcript of Sanford C. Bernstein Strategic Decisions Conference at 16 (June 3, 2016).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                                    - 77 -

Wells Fargo Fired Tolstedt But Called It "Retirement," Failing to Disclose the Termination Was Because of Fraudulent Sales Practices – While Continuing to Report False Cross-Sell Metrics and Strategy

173.    On July 12, 2016, the Company issued a news release announcing the retirement of Tolstedt and stating that Mary Mack would be taking over as Head of Community Banking. The news release characterized Tolstedt as among the Company's most valued executives, never mentioning the true facts and events that led to a largely forced retirement:

> **Wells Fargo's Carrie Tolstedt to retire at year's end; Mary Mack to succeed her as head of Community Banking effective July 31**
>
> Tolstedt led the nation's largest retail banking branch network
>
> Wells Fargo & Company announced today that Carrie Tolstedt, the company's head of Community Banking, *has decided to retire at year's end after a long and successful career* . . . .
>
> . . . *The Community Bank enjoys industry leadership in many areas, including retail deposit market share, debit card transaction volume*, small business lending and mobile banking. Additionally, *Tolstedt's team is a leader in building and deepening customer loyalty and team member engagement across the business* . . . .
>
> "A trusted colleague and dear friend, Carrie Tolstedt has been one of our most valuable Wells Fargo leaders, *a standard-bearer of our culture, a champion for our customers, and a role model for responsible, principled and inclusive leadership," said John Stumpf* . . . .
>
> . . . Through her transition to retirement, she will continue to report to Tim Sloan, the company's president and chief operating officer, working closely with him and Mack, who also will report to Sloan. Mack's successor in her Wells Fargo Advisors role will be announced at a later date.

174.    <u>False and Misleading Statements</u>. On July 15, 2016, the Company issued a news release announcing its financial results for the second quarter of 2016. The release discussed cross-selling results, this time only for the Company's Retail Banking unit:

> **WELLS FARGO REPORTS $5.6 BILLION IN QUARTERLY NET INCOME;**
> **Diluted EPS of $1.01; Revenue Up 4 Percent from Prior Year**
>
> • Continued strong financial results:
>
>   • Net income of $5.6 billion, compared with $5.7 billion in second quarter 2015
>   • Diluted earnings per share (EPS) of $1.01, compared with $1.03
>   • Revenue of $22.2 billion, up 4 percent
>
> \*       \*       \*
>
> • Strong growth in loans and deposits . . . .

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST                                                       - 78 -

    \*    \*    \*

- ***Regional Banking***

  - Retail Banking
    - Primary consumer checking customers up 4.7 percent year-over-year

    \*    \*    \*

    - ***Retail Banking household cross-sell ratio of 6.27 products per household, compared with 6.32 year-over- year***.

175.　<u>False and Misleading Statement</u>.　On July 15, 2016, the Company held a conference call for analysts and investors to discuss the Company's second quarter 2016 financial results. During the call, Stumpf noted that the Company had previously announced that Tolstedt was retiring.　However, Stumpf continued to knowingly conceal the fact that the Company had made substantial findings of unlawful and unethical activity and fraud within its Community Banking segment as part of its investigation, which not only exposed millions of customers to unlawful fees and potential identity theft, but put the Company in the crosshairs of numerous government investigations.　Instead, Stumpf and Shrewsberry falsely emphasized that Wells Fargo was committed to "transparency . . . and ensur[ing] customers are ***receiving the right products to meet their financial needs***," with Stumpf claiming that Tolstedt had built an extraordinary franchise that met the needs of millions of customers:

> [Stumpf:] Before I conclude, I want to highlight the announcement we made earlier this week, Carrie Tolstedt, Head of Community Banking who has been with Wells Fargo for 27 years ***has decided to retire at year end.　She and her team have built an extraordinary franchise***, one that meets the needs of millions of customers nationwide, and has served investors very well for decades.

> [Shrewsberry:] Turning to our business segments, starting on page 14, community banking earned $3.2 billion in the second quarter, down 1% from a year ago, and 4% from the first quarter. . . .

> ***We continually work to enhance customer satisfaction and transparency, and ensure customers are receiving the right products to meet their financial needs, because the key to our success is long-lasting customer relationships built on trust***.

176.　Following the release of Wells Fargo's financial results on July 15, 2016, Wells Fargo stock traded at prices above $48 per share.

177. <u>False and Misleading Statement</u>. On August 3, 2016, the Company filed its Form 10-Q for the second quarter of 2016.[147] The Form 10-Q included the following statements referencing generic modifications to Wells Fargo's cross-sell metrics, but falsely claiming that this was due to "ongoing changes in Community Banking's business and products" and without referencing the various on-going investigations into the Company's sales practices:

> As described below, ***in second quarter 2016 we modified our methodology for Community Banking to better align our cross-sell metrics with ongoing changes in Community Banking's business and products***. For similar reasons, we are currently in the process of evaluating changes in our cross-sell methodology for Wholesale Banking and [Wealth and Investment Management].
>
> *          *          *
>
> As previously mentioned, ***we are currently evaluating changes in our cross-sell methodology to better align our metrics with ongoing changes in Wholesale Banking's business and products***.[148]

178. The Form 10-Q also attached false SOX certifications signed by Stumpf and Shrewsberry, that were substantially similar to the certifications set forth in ¶92.

179. <u>Reasons Why Statements in ¶¶156-178 Were Knowingly False and Misleading</u>: Defendants' statements set forth in ¶¶156-178 concerning: (i) reported financial statements and cross-sell metrics; (ii) the Company's overall cross-selling strategy and that the purported purpose of such strategy was to provide customers with products they needed; (iii) risk management effectiveness of internal controls over financial reporting; (iv) the Company's "culture" and related business practices, as set forth in its Vision and Values, were each knowingly false and misleading for the following reason; and (v) Tolstedt's "retirement":

(a) Defendants knew or deliberately disregarded that during the period leading up to and including the Class Period, Wells Fargo's cross-selling sales and incentive practices led to widespread, serious misconduct, including the opening of millions of fake credit card or deposit accounts in the names of customers who did not authorize the account openings; the creation of fake personal identification or PIN numbers to open fake debit cards, and the use of phony email

---

[147] The Form 10-Q was signed by Levy.

[148] Wells Fargo & Co., Quarterly Report (Form 10-Q) at 12-14 (Aug. 3, 2016).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                - 80 -

addresses to enroll customers in additional services that customers did not request via forgery or other illegal means – all culminating in "fraudulent conduct [that] occurred on a massive scale," as the government found (¶¶4-5, 180-181, 194).

        (b)    Defendants knew or recklessly disregarded that Wells Fargo's cross-selling incentives, quotas and penalties severely undermined the Company's cross-selling metrics and cross-selling strategy, and turned the Company's retail branches into a "pressure cooker."

        (c)    Stumpf knew of the sales misconduct by 2011, and admittedly understood that the problems had reached a "significant scale" by 2013; he conveyed these facts to Wells Fargo's Board by 2013 (¶¶9, 110(b), 196(a)).

        (d)    Wells Fargo's Operating Committee met weekly, and the cross-selling misconduct rose to its attention likely by 2011, when Tolstedt learned of the misconduct (¶¶9, 110(b), 196(a)).

        (e)    Defendants further knew or deliberately disregarded that the credit card penetration rates and growth metrics that they touted to investors rested, in part, on illusory credit cards and unsustainable growth that cross-selling misconduct generated.

        (f)    Ongoing internal investigations had found that in excess of 5% of the sales employees in the Community Banking segment had engaged in a wide ranging scheme to inflate the Company's financial performance figures by, among other things, opening millions of unauthorized deposit and credit card accounts. Such findings resulted in mass terminations of employees, ultimately reaching more than 5,000 firings. Moreover, statements regarding Tolstedt's decision to retire were materially false and misleading when made as Defendants, and specifically Stumpf and Sloan, knew that there was more to the story regarding Tolstedt's "retirement" than was reported publicly (¶196(c)). In truth, Tolstedt was forced to retire in part due to the investigations and findings regarding unethical and unauthorized sales practices.

        (g)    Further, certain Defendants continued to realize financial compensation that they obtained, in part, by achieving cross-selling targets (¶¶19-21).

(h)     All of the facts identified above were either known or deliberately disregarded by the Officer Defendants and Director Defendants, and demonstrated that Wells Fargo's statements, identified above, were materially false and misleading when made.

## VII.     THE TRUE FACTS CONCERNING KNOWN AND LONGSTANDING FRAUDULENT CONDUCT BEGAN TO BE DISCLOSED

180.     On September 8, 2016, the CFPB published its enforcement action and Consent Order with Wells Fargo detailing the Company's fraudulent practices, which were centered on a corporate culture intent on growing its cross-selling opportunities in an unlawful fashion and without its customers' consent.   The agency also imposed a fine of $100 million citing the Company's widespread illegal activity.   The announcement noted that the underlying facts were known to the Company prior to the CFPB probe through an internal investigation that had revealed widespread fraudulent practices:

**Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts**

Bank Incentives to Boost Sales Figures Spurred Employees to Secretly Open Deposit and Credit Card Accounts

Today the Consumer Financial Protection Bureau (CFPB) fined Wells Fargo Bank, N.A. $100 million for the **widespread illegal practice of secretly opening unauthorized deposit and credit card accounts**.   Spurred by sales targets and compensation incentives, employees boosted sales figures by **covertly** opening accounts and funding them by transferring funds from consumers' authorized accounts without their knowledge or consent, often racking up fees or other charges. **According to the bank's own analysis, employees opened more than two million deposit and credit card accounts that may not have been authorized by consumers**. . . .

"**Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses**," said CFPB Director Richard Cordray.

181.     The September 8, 2016 CFPB announcement explained that the widespread illegal conduct was not caused by rogue sales staff, but had been driven by the Company's culture and had been further spurred by financial incentives to bank employees to report growing cross-sell product sales:

**In recent years, the bank has sought to distinguish itself in the marketplace as a leader in "cross-selling"** these products and services to existing customers who did not already have them.   When cross-selling is based on efforts to generate more business from existing customers based on strong customer satisfaction and excellent customer service, it is a common and accepted business practice. **But here the bank**

*had compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking*, and the bank failed to monitor the implementation of these programs with adequate care.

According to today's enforcement action, thousands of Wells Fargo employees *illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets*.  The Dodd-Frank Wall Street Reform and Consumer Protection Act prohibits unfair, deceptive, and abusive acts and practices.  Wells Fargo's violations include:

- **Opening deposit accounts and transferring funds without authorization**: According to the bank's own analysis, employees opened roughly 1.5 million deposit accounts that may not have been authorized by consumers. *Employees then transferred funds from consumers' authorized accounts to temporarily fund the new, unauthorized accounts*.  This widespread practice gave the employees credit for opening the new accounts, allowing them to earn additional compensation and to meet the bank's sales goals. *Consumers, in turn, were sometimes harmed because the bank charged them for insufficient funds* or overdraft fees because the money was not in their original accounts.

- **Applying for credit card accounts without authorization:** *According to the bank's own analysis, Wells Fargo employees applied for roughly 565,000 credit card accounts that may not have been authorized by consumers.  On those unauthorized credit cards, many consumers incurred annual fees*, as well as associated finance or interest charges and other fees.

- **Issuing and activating debit cards without authorization:** Wells Fargo employees requested and issued debit cards without consumers' knowledge or consent, going so far as to create PINs without telling consumers.

- **Creating phony email addresses to enroll consumers in online-banking services**: Wells Fargo employees created phony email addresses not belonging to consumers to enroll them in online-banking services without their knowledge or consent.

182.   Also on September 8, 2016, the OCC issued a press release announcing it had assessed a $35 million penalty against Wells Fargo and had ordered the bank to make restitution to customers who were harmed by the bank's "unsafe or unsound" sales practices.  These practices included the unauthorized opening of deposit or credit card accounts and the transfer of funds from authorized, existing accounts to unauthorized accounts.  The $35 million civil money penalty reflected a number of factors, including the bank's failure to develop and implement an effective enterprise risk management program to detect and prevent the unsafe or unsound sales practices, and the scope and duration of the practices.

183. The OCC Consent Order for a Civil Money Penalty, which sets forth the above terms, also required Wells Fargo to take corrective action to establish an "enterprise wide sales practices risk management and oversight program to detect and prevent unsafe or unsound sales practices." The OCC's actions were taken "in coordination with" the CFPB and the Los Angeles City Attorney.[149]

184. In response to the regulatory settlements, on September 8, 2016, Wells Fargo issued a news release that did not deny the allegations, as it had done previously. *See* ¶¶152-154. Rather, the Company largely confirmed the CFPB's contentions and indicated that Wells Fargo had entered into the settlement agreements with regulators to "put[] th[e] matter behind [them]." Nevertheless, the release shockingly (and wrongfully) blamed lower-level employees for "acting counter" to the values of the bank. That false information, blaming branch employees to deflect attention away from sales and incentive practices imposed by senior management, helped buoy the stock price from decline that would occur with later disclosures:

**Wells Fargo Issues Statement on Agreements Related to Sales Practices**

*Wells Fargo Bank, N.A., a subsidiary of Wells Fargo* & Company, *reached agreements* with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, and the Office of the Los Angeles City Attorney, *regarding allegations that some of its retail customers received products and services they did not request*.

The amount of the settlements, which Wells Fargo had fully accrued for at June 30, 2016, totaled $185 million, plus $5 million in customer remediation.

The company issued the following statement related to today's news:

*Wells Fargo reached these agreements consistent with our commitment to customers and in the interest of putting this matter behind us*. Wells Fargo is committed to putting our customers' interests first 100 percent of the time, and we regret and take responsibility for any instances where customers may have received a product that they did not request.

Our commitment to addressing the concerns covered by these agreements has included:

---

[149] On November 18, 2016, the OCC further announced that it was revoking certain provisions of its original deal and that Wells Fargo would be required to comply with a host of new restrictions, including that the OCC could reject the hiring of senior executives, ban the payments of "golden parachutes" and closely review any branch openings and closures by Well Fargo.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST                                                    - 84 -

- An extensive review by a third party consulting firm going back into 2011, which we completed prior to these settlements. The review included consumer and small business retail banking deposit accounts and unsecured credit cards opened during the period reviewed.

- As a result of this review, $2.6 million has been refunded to customers for any fees associated with products customers received that they may not have requested. Accounts refunded represented a fraction of one percent of the accounts reviewed, and refunds averaged $25.

- ***Disciplinary actions, including terminations of managers and team members who acted counter to our values***.

- Investments in enhanced team-member training and monitoring and controls.

185. On September 8, 2016, it was also announced that Wells Fargo would pay $50 million to the City and County of Los Angeles for allegedly opening fake accounts in customers' names, as well as pay restitution to affected customers. Los Angeles City Attorney Mike Feuer, called the settlement "a major victory for consumers."[150] The $50 million in civil penalties is the largest the Los Angeles City Attorney's Office has ever secured.

186. On September 9, 2016, Piper Jaffray analysts issued a report that described their expectation that Wells Fargo shares would trade lower in light of the CFPB announcement and the disclosure that Wells Fargo had terminated more than 5,300 employees for the opening of unauthorized accounts:

> ***We are incrementally more negative on shares of WFC following further revelations about the unauthorized account issues that have surfaced over the past day***. Since our initial note (here), we learned that 5,300 employees have been let go due to their involvement in setting up unauthorized accounts, which was a bigger amount than we initially expected given WFC was considered one of the better-managed large banks (2% of workforce). ***In addition, the public relations fallout appears larger than we initially expected*** given the optics of the issue at hand. We expect this additional spotlight on WFC could open the bank to greater scrutiny from regulators and community groups, particularly if the broader public continues to take an interest in the issue (e.g., an article in Vanity Fair magazine).

> - . . . ***We would expect the stock to see incremental pressure in the near-term*** given the issues described will bring up a series of questions about internal controls within the bank.

*     *     *

---

[150] Dakota Smith, *Wells Fargo to pay $185 million in fines over unauthorized accounts*, L.A. Daily News, Sept. 8, 2016, http://www.dailynews.com/business/20160908/wells-fargo-to-pay-135-million-in-fines-over-unauthorized-accounts.

1    •    *. . . We believe WFC will have a difficult time meeting Street expectations for earnings growth in a low rate environment while the stock screens as expensive at 13.0x . . . .*

2

3    187.    On Friday, September 9, 2016, the price of the Company's stock fell from the prior

4    day's close of $49.90 per share to a close of $48.72 per share on September 9, 2016, on high trading

5    volume of 32 million shares – compared to the 14 million shares that traded on September 8.

6    188.    On September 13, 2016, *The Motley Fool* published an article about Tolstedt, who

7    oversaw the Community Banking segment wherein thousands of employees had created millions of

8    fake bank and credit card accounts:

9    **Wells Fargo's Massive Fraud Made This Woman Filthy Rich**

10   **Overseeing a massive fraud translated into generational wealth for one Wells Fargo executive**.

11

12   Just in case you weren't outraged enough at the fact that thousands of employees at Wells Fargo fraudulently opened up to 2 million accounts for customers without their consent, then I have a chart for you. ***It reveals the one***

13   ***person who, more than anyone else, appears to have personally benefited from the fraud***.

14

15   I'm referring to Carrie Tolstedt, the executive who oversaw Wells Fargo's community banking division for much of the past decade. ***That includes the years***

16   ***from 2011 to 2015, when more than 5% of the employees under her watch engaged in a wide-ranging, systematic scheme to boost revenue by taking advantage of millions of unwitting customers***.

17

18   As an aside, Wells Fargo claims that only 1% of its employees engaged in this behavior. This is based on the fact that it fired approximately 1,000 employees a year over five years, equating to 1% of its branch-based staff each year. But if you

19   aggregate the terminations, which I believe offers a more accurate reflection of the underlying point, then you get 5,300 terminations, or 5.3% of its 100,000 branch-

20   based employees.

21   Wells Fargo reported two months ago that Tolstedt had ***decided to retire*** at the end of this year, though she stepped down from her role overseeing the bank's

22   branch network on July 31. "A trusted colleague and dear friend, Carrie Tolstedt has been one of our most valuable Wells Fargo leaders, a standard-bearer of our culture,

23   a champion for our customers, and a role model for responsible, principled and inclusive leadership," said chairman and CEO John Stumpf at the time.

24   As a parting gift, Tolstedt will earn a purported $93 million payday,

25   according to *The Financial Times*, the lion's share of which stems from the exercise of stock awards that she received from the bank along the way. The bank's latest

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST        - 86 -

proxy filing shows that the 27-year Wells Fargo veteran owns more than 2.5 million shares of stock in one way, shape, or form.[151]

189.    That same day, the Company also issued a news release announcing that it would eliminate the sales goals and incentives that substantially contributed to the fraudulent conduct, as Defendants knew:

**Wells Fargo to Eliminate Product Sales Goals for Retail Bankers**

***Wells Fargo & Company, announced today that it will eliminate all product sales goals in retail banking, effective January 1, 2017***.

"Our objective has always been and continues to be to meet our customers' financial needs and drive customer satisfaction," said CEO John Stumpf. "We are eliminating product sales goals because we want to make certain our customers have full confidence that our retail bankers are always focused on the best interests of customers."

. . . "The elimination of product sales goals represents another step to reinforce our service culture, helps ensure that nothing gets in the way of our ability to achieve our mission, and is consistent with our commitment to providing a great place to work," concluded Stumpf.

190.    On September 13, 2016, the price of Wells Fargo stock fell another 3%, from a close of $48.54 per share on September 12, 2016, to a close of $46.96 per share on September 13, 2016, on huge volume of 59 million shares traded – compared to the 35.5 million shares that traded on September 12.

191.    On September 14, 2016, *CNNMoney* reported that the DOJ had issued subpoenas to Wells Fargo regarding the opening of millions of fake accounts at the bank and further reported that multiple U.S. attorneys' offices were investigating Wells Fargo.[152]

192.    On the same day, September 14, 2016, *Bloomberg* published an article reporting that Stumpf had been subpoenaed to testify before Congress on September 20, 2016:

Wells Fargo's scandal surrounding allegations that it opened two million accounts for customers without their knowledge is proving to be far-reaching. Chief Executive Officer John Stumpf faces damage to the bank's reputation and his

---

[151]  John Maxfield, *Wells Fargo's Massive Fraud Made This Woman Filthy Rich*, The Motley Fool, Sept. 13, 2016, https://www.fool.com/investing/2016/09/13/wells-fargos-massive-fraud-made-this-woman-filthy.aspx.

[152]  Matt Egan, *et al.*, *U.S. opens investigation into Wells Fargo fake accounts scandal*, CNNMoney, Sept. 14, 2016, http://money.cnn.com/2016/09/14/investing/wells-fargo-investigation-federal-fake-accounts/.

personal legacy and has been called to testify before Congress next week, while investor Warren Buffett lost $1.4 billion after Wells Fargo shares fell 3.3 percent.[153]

193.    On September 16, 2016, a *Reuters* article discussed the 7.5% stock price decline caused by the surprise revelations that the Company had created millions of bank accounts and applied for credit cards without account holders' permission.  The article noted specifically that Wells Fargo had not previously provided investors with any indication of the scale and scope of the malfeasance, the disclosure of which caused $19 billion in market losses:

> A phantom account scandal at Wells Fargo & Co has put the U.S. bank's disclosure policies under a harsh spotlight.
>
> Despite press reports that a federal regulator and the Los Angeles prosecutor were investigating sales practices at retail branches of the San Francisco-based lender, the bank, which agreed to a $190 million settlement, *gave investors no indication of the scale of the problem*.
>
> *The surprise spooked investors and has lopped roughly $19 billion off its market value since the probe disclosed last week that* Wells employees had created roughly 2 million accounts for customers without their knowledge in order to meet internal sales targets.  The bank has fired 5,300 people over the scandal.
>
> While the settlement barely makes a dent in the $23 billion of profit the bank earned last year, *the scandal's aftermath has caused a 7.5 percent drop in Wells' stock compared with a roughly 2.4 percent decline for the Dow Jones US Banks Index*.
>
> Investors, analysts and legal experts who spoke to Reuters said Wells Fargo'[s] silence did not mean it had broken the law.  But there is broad agreement *that it made matters worse by not being more forthcoming with Chief Executive John Stumpf* under pressure to explain why this happened on his watch.
>
> "Look, they're lawyered up to the sky.  They did the minimum legally required.  Do I think that that's fair to investors or that that's all that investors need to know or want to know?  No I do not," said Nell Minow, vice chair of ValueEdge advisors, a corporate governance advisory firm.
>
> "*It further diminishes their already significantly diminished credibility in terms of their willingness to be transparent*."
>
> *        *        *
>
> Meanwhile, Stumpf will testify before the Senate Banking Committee next week and U.S. prosecutors have begun an investigation into the bank's sales practices.

---

[153] *Wells Fargo's Fake Account Scandal Snares CEO Stumpf*, Bloomberg, Sept. 14, 2016 (hereinafter "*Scandal Snares CEO*").

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

"It is a scandal of almost unimaginable proportions," former U.S. Securities and Exchange Commission Chairman Arthur Levitt told Reuters this week. "You cannot hold management immune from its consequences."

MATERIAL OR NOT?

The tactics deployed in its branches were not a surprise for Wells. The bank had been looking into them since 2011, when it started firing employees over "inappropriate sales conduct." A Los Angeles Times investigation published in 2013 described a "pressure-cooker sales culture" at the bank.

***No mention is made of the bank's internal probe, or authorities' probes in the "legal actions" section of its latest quarterly or annual securities filings***. The bank also did not say until this week that during the second quarter it had set aside money for the settlement.

Stumpf has since apologized and said management takes responsibility for what happened. Spokesman Mark Folk said the bank did not believe it had to disclose information to investors ahead of the settlement.

"Each quarter, we consider all available relevant and appropriate facts and circumstances in determining whether a litigation matter is material and disclosed in our public filings," he said. "Based on that review, we determined that the matter was not material."

\*       \*       \*

Experts said Wells Fargo would have been wise to at least flag the issue earlier.

"They should have tried to get control over the release of the news, so that it wasn't ***a bombshell*** that went off on someone else's schedule." Said Erik Gordon, a University of Michigan business professor.

"Now they're in the terrible position of looking like they did something and hid it."[154]

194.    On September 20, 2016, the CFPB, through its Director, Richard Cordray, provided testimony before the U.S. Senate's Banking, Housing, and Urban Affairs Committee on "Wells Fargo's Unauthorized Accounts," reiterating the agency's findings and describing the fraud as a ***staggering corporate-wide breach of trust***:

***The fraudulent conduct [at Wells Fargo] occurred on a massive scale***. As detailed in our Order, Wells Fargo opened 1,534,280 deposit accounts that may not have been authorized, including transferring funds from some customer accounts without their knowledge or consent. Wells Fargo also initiated applications for 565,443 credit card accounts that may not have been authorized, by using consumers'

---

[154] Dan Freed & Ross Kerber, *Wells Fargo Faces Scrutiny Over Lack of Scandal Disclosure*, Reuters, Sept. 16, 2016, http://www.reuters.com/article/us-wells-fargo-accounts-disclosure-idUSKCN11M0A8.

information without their knowledge or consent.  ***These activities . . . represent a staggering breach of trust and conduct that should never occur at any bank***. . . .

> ***The gravity and breadth of the fraud that occurred at Wells Fargo cannot be pushed aside as the stray misconduct of just a few bad apples.  As one former federal prosecutor has aptly noted, the stunning nature and scale of these practices reflects instead the consequences of a diseased orchard.***  As our Order describes, Wells Fargo built and refined an incentive-compensation program and implemented sales goals to boost the cross-selling of products, but did so in a way that made it possible for its employees to pursue unfair and abusive sales practices.  It appears that the bank did not monitor the program carefully, allowing thousands of employees to game the system and inflate their sales figures to meet their sales targets and claim higher bonuses.  ***Rather than put its customers first, Wells Fargo built and sustained a program where the bank and many of its employees served themselves instead, violating the basic ethics of a banking institution, including the key norm of trust***.[155]

**Stumpf Testified Before Congress Twice and Admitted Knowledge of Fraudulent Conduct as Early as 2011**

195.    On September 20, 2016 and September 29, 2016, Stumpf testified under oath before the Senate Committee on Banking, Housing, and Urban Affairs and the House Financial Services Committee, respectively.   Among other things, Stumpf provided testimony that essentially established the Company's knowledge of the wrongdoing and its failure to disclose it.  In fact, after Stumpf's testimony on September 20, 2016, the Company issued a news release discussing that testimony, accepting responsibility for the unethical behavior, yet continuing to state falsely that Wells Fargo "never directed . . . team members to provide products . . . to customers that they did not want."  Thus, the true scope of the issues and management's knowledge and involvement in the pervasive malfeasance continued to be concealed:

> **Wells Fargo Chairman and CEO John Stumpf Outlines a Series of New Actions to Strengthen Culture and Rebuild Trust of Customers and Team Members at Senate Banking Committee Hearing**
>
> **Accepts Accountability for Wrongful Sales Practices**
>
> In testimony today before the U.S. Senate Banking Committee on Banking, Housing, and Urban Affairs, Wells Fargo & Company Chairman and Chief Executive John Stumpf addressed the wrongful sales practices that have taken place in the company's retail banking business, outlined the actions to eliminate them, and emphasized the company's commitment to rebuild trust going forward.

---

[155]   *Hearing  Before the Senate Committee on Banking, Housing, and Urban Affairs*, 114 Cong., at 1-2 (Sept. 20, 2016) (Statement of Richard Cordray, Consumer Financial Protective Bureau).

*I accept full responsibility for all unethical sales practices in our retail banking business* . . . .

"I want to make it very clear that *we never directed nor wanted our team members to provide products and services to customers that they did not need or want*."

\* \* \*

In his testimony, Stumpf also outlined key actions to ensure its culture is wholly aligned with the interests of its customers, including:

- Ending product sales goals for everyone in the retail banking business to make certain nothing gets in the way of doing what is right for customers;

- Sending customers a confirmation email within one hour of opening any deposit account and an acknowledgement letter after submitting a credit card application;

- Contacting all deposit customers across the country, including those who have already received refunded fees, to invite them to review their accounts with their banker and calling the credit card customers identified in the review to confirm whether they need or want their credit card;

- Expanding the scope of its customer account review and remediation to include 2009 and 2010;

- Conducting an independent, enterprise-wide review of our sales practices.

"I am making a personal commitment to rebuilding our customers' and investors' trust, the faith of our team members, and the confidence of the American people," Stumpf said.

196. The details of Stumpf's two-day testimony before Congress established his knowledge of the fraudulent accounts and that the misconduct was tied to Wells Fargo's sales and incentive programs. His testimony also confirmed the knowledge of many of the Office and Director Defendants. That testimony further showed that the Company essentially fired Tolstedt (or forced her into retirement) in July 2016 because of the wrongdoing and that Wells Fargo made no disclosure of the misconduct in question (or of the government investigations related thereto). Highlights of the testimony are set forth below:

(a) Stumpf and the Board knew by late 2013 (and possibly as early as 2011) that extensive wrongdoing had occurred within Wells Fargo's retail banking segment, including the unauthorized opening of bank and credit card accounts:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1  September 20, 2016 Testimony

2  [Senator Shelby:] When did the senior management, you and others you deemed senior management, learn about this fraud?

3

4  [Stumpf:] I can speak to myself, . . . and I believe others, it was 2013. Before that, it was being dealt with the audit and compliance within the business unit.[156]

5  *       *       *

6  [Senator Corker:] *I'm asking you when the board became aware that you had a unit that was involved in committing fraud*?

7

8  [Stumpf:] *Yeah, it would have been later 2013 and then 2014 and on*.

9  *       *       *

10  [Stumpf:] I – I – I think that was later in 2013. . . . And it's to best of what I remember, *but it was sometime later '13, surely in '14*.[157]

11  *       *       *

12  [Senator Reed:] In 2013 when you learned of this, what did you do? . . . Did you inform the regulators or instruct someone to inform the regulators of a growing problem?

13

14  . . . [Stumpf:] [O]ur primary and prudential regulator was informed at that time.

15

16  [Senator Reed:] *Did you inform the board at that time*?

17  [Stumpf:] Yes. *I can't recall the exact meeting. . . but it was sometime in '13. And I know in 2014, various committees of the board were made aware of this. The risk committee, the audit and examination, the Corporate Responsibility*.[158]

18

19  *       *       *

20  [Senator Crapo:] When did each of those notify you? Or did you notify them at some point? In what order did they get involved and when?

21

22  [Stumpf:] I don't know that I have precise dates. But I'll give you a general timeline. The City of LA lawsuit was sometime in the May timeframe of 2015, well I, '13 maybe it was.

23

24  I'm sorry I'm missing on dates here. And then the OCC was involved, we shared with them and when we learned of their lawsuit, we, well it was actually in

25

26  [156] Senate Tr. at 6.

27  [157] *Id*. at 11.

28  [158] *Id*. at 12.

1  '15 I'm sorry, 2015, May of '15. And then we shared that information with the CFPB. **But the OCC was involved with us prior to probably the 2013 timeframe**.

2

3  [Senator Crapo:] So the OCC probably would have been involved first even before the City of Los Angeles?

4  [Stumpf:] They are our principle regulator and **yes**.[159]

5  \*          \*          \*

6  [Senator Vitter:] When did you and folks at your level, like board members, know of this activity on any significant scale? Was it 2013, which you have suggested, or was it earlier?

7

8  [Stumpf:] **2013**.[160]

9  September 29, 2016 Testimony

10  [Representative Neugebauer:] Mr. Stumpf, you testified that you learned of these violations some time in 2013. When did you inform the Board that this was an issue?

11

12  [Stumpf:] Yes. So the Board had high-level ethics, line, comments or questions, or high-level kinds of activities around people who left the company, involuntary, terminations, **really through the 2011 through 2013 time frame**. After we learned . . . .

13

14  [Representative Neugebauer:] I want you to repeat that. You said the Board was having some discussions as early as 2011 about this?

15

16  [Stumpf:] **I was saying that the Board, from 2011 to 2013, would get reports at a Committee level**, at a high-level about ethics, lines, requests, or information at not a granular but maybe at the company level.

17

18  [Representative Neugebauer:] But you didn't find out about it until 2013?

19  [Stumpf:] In 2013, I became aware there was an issue in the Southwestern part of the country and by 2014 then – this was late in the year – **by 2014, we started to provide more information to more Committees of the Board. And then by 2015 the Board had a – the Risk Committee Board had a complete report on that issue**.

20

21

22  [Representative Neugebauer:] **As Chairman of the Board, the CEO, when did you tell the board we have a problem**?

23  [Stumpf:] **It was in 2015 that we had a full report . . . 2014 we were starting to get more granular information that this was a risk area for the company to focus on**.

24

25  [Representative Neugebauer:] Did you ever disclose this issue on a 10-K filing?

26

27  [159] *Id*. at 21.

28  [160] *Id*. at 24.

1    . . . [Stumpf:] As recently as our second quarter Q this year, when we use **our disclosure teams and compliance teams to look at this issue**, the facts and circumstances, **we believe we're not material**.[161]

2

3                          *          *          *

4    [Representative Hill:] Yeah.  And you had 14 meetings at the audit committee during 2015, according to your proxy.

5    But **operating committee** meets every Mondays, so the one question I have is, when was **– do you remember this being talked about at that operating level when line managers bring their top concerns to you and was it in this same time frame, it wasn't until maybe two years after this really manifesting itself in Los Angeles**?

6

7

8    [Stumpf:] **Yeah**, it was being managed within the business.

9    [Representative Hill:] Yeah.

10   [Stumpf:] In 2011, it – there's – each business has their own corporate or their own compliance, their own sales efficacy and so forth.  So it was brought out of the sales part into the line's control function.

11

12   And then by 2012, they were producing goals.  **By 2013, is where we brought the corporate resources in, like corporate human resources, corporate investigations and so forth because we had saw a spike in that behavior**.[162]

13

14        (b)    Through its cross-sell and manipulative conduct, Wells Fargo stole from its

15   customers:

16   September 29, 2016 Testimony

17   [Representative Duffy:] Did Wells Fargo employees steal from a million to 2 million other customers, yes or no?

18

19   [Stumpf:] **In some cases they did**.

20   [Representative Duffy:] They did?

21   [Stumpf:] **Yes**.

22   [Representative Duffy:] **And so as Wells Fargo, back to 2011 is stealing from their customers and by the way**, banking is based on trust . . .

23   [Stumpf:] **Correct**.[163]

24

25

_____

26   [161]  House Tr. at 8.

27   [162]  *Id*. at 64.

28   [163]  *Id*. at 19-20.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST                                                    - 94 -

(c)     Tolstedt's retirement in July 2016 was, in part, precipitated by communications regarding the findings of an internal investigation of the unauthorized opening of accounts.  Senator Warren also asked Stumpf questions concerning Tolstedt's departure from Wells Fargo in July of 2016.  The Senator provided context in asking Stumpf these questions:

September 20, 2016 Testimony

[Senator Corker:] So, she [Tolstedt] left after 27 years . . . .

. . . *I assume her departure after 27 years was based on this issue.  Is that correct*?

[Stumpf:] *It was based on a number of issues.  This was one of them*. . . .

[Senator Corker:] So she, in essence, was terminated over this issue?

[Stumpf:] No, Carrie chose to retire.  Tim Sloan, our chief operating officer, with my consultation had discussion with her, and it was sometime in June or July, and said we want to go in a different direction.[164]

*       *       *

[Senator Warren:] [I]n July of this year just two months before the settlement was announced and before those facts became public . . . .

*       *       *

Before Ms. Tolstedt retired, it said – and this is from your letter, quote, "***Senior management and the board were aware*** of the pending litigation, investigation and discussions with our regulators, relating to sales practices when Ms. Tolstedt indicated her decision to retire."

. . . Were you personally aware of the massive problem that occurred under Ms. Tolstedt's watch in July when she announced her retirement?

[Stumpf:] I was aware that we were involved in discussions with the city attorney, the OCC and the CFPB, yes.

[Senator Warren:] So you had some indication there was a massive problem?

[Stumpf:] *We had some indication that we had one percent of our people who were doing the wrong thing*.[165]

(d)     The Company had pulled credit reports on customers who were the subject of unauthorized credit card applications.  Stumpf also testified that when any credit card accounts are

---

[164] Senate Tr. at 11.

[165] *Id*. at 39-40.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

opened, credit bureau activity is triggered. "I know that when a credit bureau is requested, it has an impact on your credit score," to which Senator Tester replied, "[w]ell, this is a big deal." Stumpf responded, "[y]es, it is." Senator Tester further stated:

> [Senator Tester:] Well, I think it's really important that you understand that it's – it's – this is a big deal. I mean it's a big deal. And I know you feel bad about it. We feel bad about it. But the truth is there's real world implications here on young families on old families that are going to be put into a poverty situation because of this, even though we think it's just a few hundred bucks in fees. It's more than that, much more than that.[166]

(e)      Wells Fargo never disclosed the known misconduct (or the government investigations related to that misconduct) in any of its Class Period filings with the SEC:

September 20, 2016 Testimony

> [Senator Toomey:] **When did you begin to disclose in SEC filings that you had this potentially material adverse set of circumstances that could certainly have huge damage to your reputational value**?
>
> . . . [Stumpf:] **I don't know.**
>
> [Senator Toomey:] **Well, we haven't been able to discover such a disclosure and the SEC very clearly requires disclosure of material adverse circumstances. And I don't know how this could not be deemed material.** I think the market cap lost nine percent over the last couple of weeks, that's pretty material.
>
> *      *      *
>
> [Senator Toomey:] I get that those dollar amounts may not qualify as material to a bank the size of Wells Fargo but the **reputational damage done to the bank clearly is material. And that has been manifested by this huge, adverse movement in stock prices.**[167]
>
> *      *      *
>
> [Senator Merkley:] You signed, Oxbanes – Sarbanes-Oxley reports. Did you ever reveal the problems with this high pressure sales strategy, in terms of fraudulent credit accounts?
>
> *      *      *
>
> [Senator Merkley:] **Did you ever disclose the systemic problem of fraudulent accounts to your investors**?
>
> [Stumpf:] **It was not a material event.**

---

[166] *Id.* at 19.

[167] *Id.* at 14.

[Senator Merkley:] *So you bragged on the one end, about the intensive ability to get cross-selling and how that would be beneficial. But the problems that came from that strategy. The very problems that dozens and dozens of people have shared their stories about how it was on the ground. And you can only blame them for ethical lapses. You never disclosed you had a systemic problem*.

\* \* \*

[Senator Merkley:] You sign those reports personally, that's what Sarbanes-Oxley was, didn't think that that was material? When you're saying, this is our big – this is our big win is our cross-selling strategy, not to disclose it, also had a dark side?

[Stumpf:] There was a lot of things that our customers do and a lot of businesses that we have. This is one ratio . . . .[168]

(f)    The Company's fraudulent business practices violated retail customers' trust and that the Company would need to work hard to regain this trust:

[Senator Shelby:] Mr. Stumpf, is – isn't a lot of banking based on integrity or trust by your customers in the bank itself?

\* \* \*

[Stumpf:] You know, Senator, you think about it exactly the way I think about it. *Trust is the core element of any relationship, and surely in the financial services business*. . . .

[Senator Shelby:] Do you believe you violated that trust?

[Stumpf:] *There is no question with some of our customers we have violated trust* . . . .[169]

## The Wells Fargo Board Announced the Immediate Termination of Tolstedt – and Clawed Back $60 Million from Stumpf and Tolstedt

197.    On September 27, 2016, the Wells Fargo Board issued a news release, and on September 28, 2016 filed a Form 8-K, announcing the termination of Tolstedt and the potential forfeiture of her stock options. In relevant part, the news release stated as follows:

The Independent Directors of the Board of Directors of Wells Fargo & Company today announced that they have launched an independent investigation into the Company's retail banking sales practices and related matters. A Special Committee of Independent Directors will lead the investigation, working with the Board's Human Resources Committee and independent counsel Shearman & Sterling LLP. Chairman and CEO John Stumpf, a member of the Board, has recused himself from all matters related to the Independent Directors' investigation and deliberations.

---

[168] *Id*. at 33.

[169] *Id*. at 7.

The Independent Directors have taken a number of initial steps they believe are appropriate to promote accountability at the Company. They have agreed with Mr. Stumpf that he will forfeit all of his outstanding unvested equity awards, valued at approximately $41 million based on today's closing share price, and that he will forgo his salary during the pendency of the investigation. In addition, he will not receive a bonus for 2016. Carrie Tolstedt, until recently Head of Community Banking, has left the Company, and the Independent Directors have determined that she will forfeit all of her outstanding unvested equity awards, valued at approximately $19 million based on today's closing share price. Ms. Tolstedt will not receive a bonus for 2016 and will not be paid severance or receive any retirement enhancements in connection with her separation from the Company. She has also agreed that she will not exercise her outstanding options during the pendency of the investigation. These initial actions will not preclude additional steps being taken with respect to Mr. Stumpf, Ms. Tolstedt or other executives as a consequence of the information developed in the investigation.

198. The September 28, 2016 Form 8-K stated in relevant part as follows:

*As part of these actions [related to recent legal and regulatory settlements]*, the Company agreed with Carrie Tolstedt, former Senior Executive Vice President (Community Banking), that *Ms. Tolstedt would separate from employment effective September 27, 2016*, that Ms. Tolstedt would not exercise any outstanding stock options previously awarded by the Company until the completion of the ongoing investigation being conducted by the Company and its Board of Directors and that, at the conclusion of the investigation the Board of Directors would have the authority to determine the extent to which such options will be forfeited. To ensure that no stock options could be exercised pending this agreement, the Board of Directors issued a precautionary notice of termination for cause of which was rescinded.

199. On September 29, 2016, Stumpf testified before the House Financial Services Committee. During that hearing, Stumpf affirmed his knowledge of the widespread wrongdoing and termination of employees. Stumpf further confirmed that committees of the Company's Board were receiving reports concerning the unauthorized accounts as early as 2011 and that by 2015, the Risk Committee of the Board had received a full report. *See* House Tr. at 5-6, 8. On that same day, the Company issued a news release concerning Stumpf's September 29, 2016 testimony:

In testimony today before the U.S. House Financial Services Committee, Wells Fargo & Company Chairman and Chief Executive Officer John Stumpf reiterated the company's commitment to addressing improper sales practices within its retail bank, including actions the Independent members of the Board of Directors have taken to ensure executive accountability. Stumpf also reviewed changes and improvements made by the bank to date, and provided an update on its customer remediation program.

*              *              *

Stumpf also provided an update on key actions the company is taking to reinforce that its culture is wholly aligned with the interests of customers. *This included announcing that the company is accelerating the process for the elimination of product sales goals for retail banking team members from January*

*1, 2017 to October 1, 2016*. He said the reason for the action is that, "We want to make sure nothing gets in the way of doing what is right for customers."

Another change Stumpf emphasized was that the company now sends customers a confirmation email approximately one hour after opening any retail deposit account and an acknowledgement letter after submitting a credit card application.

Stumpf reported that as part of its effort to ensure that customers have only products they want and need, the company has begun contacting those with open credit card accounts identified by PricewaterhouseCoopers as possibly being unauthorized. For retail deposit account customers, the company has refunded fees and is contacting every single one of them across the country in order to ensure a full understanding of every customer affected by this problem. Stumpf emphasized that "We should have done more sooner, but we will not stop working until we get this right."

"I am fully accountable for all unethical sales practices in our retail banking business, and I am fully committed to fixing this issue, strengthening our culture, and taking the necessary steps and actions to restore our customers' trust," Stumpf said.

## VIII. ADDITIONAL POST-CLASS PERIOD EVENTS AND ADMISSIONS

200.     After the Class Period, new disclosures and events (in addition to Stumpf's testimony before the House Committee) continued to inform the investors and the public of the breadth of the misconduct at Wells Fargo and the related reputational damage to the Company.

<u>Wells Fargo Fired Stumpf</u>

201.     On October 12, 2016, the Company announced that Stumpf had retired as the Company's CEO. The move came after two congressional hearings during which he admitted that he knew about the Company's widespread sales misconduct. Stumpf was penalized in that he did not receive a severance package and relinquished $41 million in unvested equity, one of the biggest ever forfeitures of pay by the head of a bank. Still, Stumpf left with total compensation over $120 million. Upon his departure, the Board decided to split the Chairman and CEO roles going forward, replacing him with Sanger (as Chairman) and Sloan (as CEO):

**Wells Fargo Chairman, CEO John Stumpf Retires; Board of Directors Elects Tim Sloan CEO, Director; Appoints Lead Director Stephen Sanger Chairman, Director Elizabeth Duke Vice Chair**

Wells Fargo & Company announced today that Chairman and Chief Executive Officer John Stumpf has informed the Company's Board of Directors that he is retiring from the Company and the Board, effective immediately. The Board has elected Tim Sloan, the Company's President and Chief Operating Officer, to succeed him as CEO, and Stephen Sanger, its Lead Director, to serve as the Board's

1    non-executive Chairman, and independent director Elizabeth Duke to serve as Vice
2    Chair.  Sloan also was elected to the Board.

3        Sloan's appointment to CEO and election to the Board are effective
     immediately. He will retain the title of President.

4    202.    In addition to the departure of Stumpf, several other top executives also had quietly

5    departed the Company in the summer of 2016, before the market was informed of the magnitude and

6    scope of the Wells Fargo sales scandal.  For example, in October 2016 *The Charlotte Observer*

7    reported that Kenneth Zimmerman ("Zimmerman"), head of the Company's deposit groups, who

8    reported directly to Tolstedt, left the Company.  Zimmerman had been with the bank for 19 years:

9        Kenneth Zimmerman, who headed Wells Fargo's deposit products group,
     made a personal decision to depart from the company at the end of July,
10   spokeswoman Richele Messick said. Zimmerman left the company after initially
     making a personal decision in January to take a leave of absence, Messick said.

11

12                          *      *      *

13   ***Zimmerman had reported to Carrie Tolstedt, the executive who ran the
     community banking unit at the center of the [unauthorized accounts] controversy***.

14                          *      *      *

15       Last month, the bank disclosed that ***Claudia Russ Anderson***, the top risk
     manager for ***community banking, had begun a six-month leave of absence and
16   been replaced in her role***.

17       A source familiar with the issue said 58-year-old Anderson, who has been
     with the company for more than three decades, has two elderly parents who needed
18   her help.

19   203.    On March 1, 2017, the Company announced the Board had decided that eight

20   Operating Committee members would not only forfeit their 2016 cash bonuses, but also "up to 50%"

21   of their performance equity awards "received in 2014 that vested following 2016."  The Company

22   explained that the decision taken against, among others, Sloan, Shrewsberry, Carroll, Modjtabai and

23   Loughlin was "based on the accountability of all those in senior management for the overall

24   operational and reputation risk of the company."

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
     SECURITIES LAWS 3:16-cv-05479-JST                                          - 100 -

Federal and State Agencies Launched Civil and Criminal Investigations into Wells Fargo's Sales Practices

204.    As additional details concerning the Company's business practices continued to become public, multiple government investigations put further pressure on the Company to uncover, disclose and correct the wrongdoing:

(a)    On September 27, 2016, Wells Fargo reported that its sales practices were being investigated by a variety of government officials and that the independent directors of the Board had retained the law firm of Shearman & Sterling LLP to assist in the bank's internal investigation of those practices:

> Federal, state and local government agencies, including the United States Department of Justice, and state attorneys general and prosecutors' offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations relating of certain sales practices of the Company that were the subject of settlements with the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency and the Office of the Los Angeles City Attorney announced by the Company on September 8, 2016.

(b)    On September 30, 2016, the Company further reported that the "extensive review" conducted by an independent consulting firm actually went back to 2011 and that since the announcement of the settlements, the review had been expanded to include 2009 and 2010:

> An extensive review was performed by an independent consulting **firm going back to 2011, which was completed prior to these settlements**.  This review was conducted to identify financial harm stemming from potentially unauthorized accounts. . . . Since the announcement of the settlements, the review has been voluntarily expanded to include 2009 and 2010.

(c)    On October 4, 2016, 14 U.S. Senators wrote a public letter to Attorney General Loretta E. Lynch calling for a criminal investigation of the Company and urging the DOJ to thoroughly investigate the culpability of senior executives at the bank:

> Mr. Stumpf testified under oath **that he became aware of employees creating fraudulent bank accounts in 2013.  Yet for years thereafter, Mr. Stumpf did not disclose that information to investors**.

(d)    On October 5, 2016, the California Department of Justice served a search warrant on Wells Fargo in connection with its investigation into allegations of criminal identity theft over its creation of millions of unauthorized accounts.  Documents filed along with the search warrant reportedly stated there was probable cause to believe Wells Fargo violated two sections of

1    the state penal code – one outlawing certain types of impersonation, the other outlawing the

2    unauthorized use of personal information.  Both violations can be charged as felonies, punishable by

3    imprisonment for more than a year.

4              (e)      On October 27, 2016, four U.S. Senators sent a letter to KPMG asking it about

5    the quality of its audits of Wells Fargo.  "KPMG conducted audits assessing Wells Fargo's internal

6    control over its financial statements," they wrote.  "But none of KPMG's audits identified any

7    concerns with illegal behavior that resulted in the creation of over two million unauthorized accounts

8    by thousands of employees . . . .  In fact, in each of your audits, your firm concluded that Wells

9    Fargo 'maintained . . . effective internal control over financial reporting.'"  The Senators requested

10   that KPMG answer, among other questions, whether it was aware of any of the illegal sales practices

11   committed by Wells Fargo from 2011-2015.

12             (f)      In October of 2016, management consulting firm cg42 conducted a study and

13   analysis of Wells Fargo, including a survey of 1,000 Wells Fargo customers and another 500 primary

14   customers of other top ten banks, which concluded that the "***Wells Fargo fallout could tally

15   $4 billion in revenue," and up to a "30% customer drop***."  As reported by *CNBC*, the study further

16   found that "[t]he bank stands to lose $99 billion in deposits."  The study also concluded that "'[t]he

17   breach of trust the scandal created has fundamentally changed the way that they think about their

18   institution, the way they think about the bank.'"

19             (g)      On November 3, 2016, Wells Fargo stated in its Form 10-Q that its sales

20   practices were being investigated by the SEC.  Wells Fargo stated that it had responded, the

21   investigation was ongoing, and that it planned to raise its litigation reserves to $1.7 billion.

22             (h)      On November 28, 2016, the California State Senate Committee on Banking

23   and Financial Institutions, which had been conducting a further investigation of Wells Fargo's sales

24   practices, issued a Background Paper in advance of an oversight hearing held "to highlight new

25   information that ha[d] come to light since the September settlement agreements," including Wells

26   Fargo's responses to a series of written questions posed by the U.S. Senate Committee on Banking,

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

Housing, and Urban Affairs.[170]  The Background Paper included Wells Fargo's responses and set forth the numbers of potentially unauthorized accounts opened by state, as well as the incentive pay rates and who had been held accountable by position and geographic area.  The paper further stated that PwC had found that "approximately 623,000 consumer and business credit card accounts could have been unauthorized, and approximately 1.5 million deposit accounts could have experienced simulated funding."

(i)      On December 23, 2016, the DOJ issued a subpoena for a key whistleblower, Yesenia Guitron ("Guitron"), to testify before a grand jury in San Francisco.  Guitron had reportedly claimed that Wells Fargo made it virtually impossible to meet sales goals without cheating.  She also claimed that Wells Fargo managers responded to her concerns by falsifying papers to show poor performance, barring her from obtaining family medical leave, and ultimately firing her.

Simultaneous with Government Investigations, Multiple State Agencies Suspended Business Alliances with Wells Fargo Further Damaging Shareholder Value

205.     As the fallout from the disclosures of the fraudulent opening of accounts continued to grow, multiple municipalities announced suspension of business with Wells Fargo:[171]

- **California**: On September 28, 2016, the California State Treasurer, John Chiang, announced the imposition of sanctions against Wells Fargo, rebuking the bank in a letter to Stumpf and the bank's Board: "'How can I continue to entrust the public's money to an organization which has shown such little regard for the legions of Californians who have placed their financial well-being in its care?' . . . Chiang informed the bank that for the next year, his office [would] not invest in Wells Fargo securities, use the bank to buy stocks or bonds, or appoint the bank to underwrite certain bond offerings."[172]

- **Illinois**: On October 3, 2016, Illinois State Treasurer Michael Frerichs announced that Illinois would suspend Wells Fargo (which had worked with the state since

---

[170]  Background Paper at 3, *supra* n.118.

[171]  On October 11, 2016, it was also widely reported that Wells Fargo lost its accreditation with the Better Business Bureau as a result of the bogus account scandal.  *See, e.g.*, Jeff Cox, *Wells Fargo just lost its accreditation with the Better Business Bureau*, CNBC, Oct. 11, 2016, http://www.cnbc.com/2016/10/20/Wells-Fargo-just-lost-its-accreditation-with-the-better-business-bureau-html.

[172]  Michael Corkery & Stacy Cowley, *California Suspends Ties with Wells Fargo*, N.Y. Times, Sept. 28, 2016, http://nyti.ms/2daytbA.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1970) from handling approximately $30 billion of state investment funds annually, as well as the underwriting of state debt and the handling of new bond sales.[173]

- **Chicago**: On October 5, 2016, the City Council of Chicago, with the support of Mayor Rahm Emanuel, approved a measure to freeze Wells Fargo out of any work with Chicago, including underwriting its bonds. Treasurer Kurt Summers announced he was divesting $25 million the city had invested with Wells Fargo.[174]

- **Ohio**: On October 14, 2016, Ohio Governor John Kasich announced that Ohio would bar Wells Fargo from "participating in future state debt offerings and financial services contracts initiated by state agencies under his authority" and "would seek to exclude Wells Fargo from participating in debt offerings initiated by the Ohio Public Facilities Commission."[175]

- **Massachusetts**: On October 18, 2016, Massachusetts Treasurer Deborah Goldberg instructed her staff to immediately remove Wells Fargo from Massachusetts's approved list of underwriters for a term of one year. Massachusetts spokesperson Chandra Allard stated that Massachusetts "isn't convinced that Wells Fargo has grasped the level of seriousness of their actions nor have they addressed systemic failures within their organization."[176]

- **San Francisco**: On December 14, 2016, San Francisco's Board of Supervisors suspended Wells Fargo from providing services to the city as a broker-dealer, in commercial banking and in commercial paper, for two years. The measure, sponsored by supervisor John Avalos, also removed Wells Fargo from securities investments and counterparty/repurchasing agreements. "[T]he Board of Supervisors unanimously passed a resolution urging the district attorney to investigate Wells Fargo executives and calling on the San Francisco Retirement Board to terminate all financial dealings with the bank."[177]

---

[173]  Press Release, Office of Illinois State Treasurer, "Treasurer Frerichs Suspends $30 Billion in Investment Activity from Wells Fargo for Predatory and Illegal Banking Practice" (Oct. 30, 2016).

[174]  Elizabeth Campbell, *Chicago Ends Business with Wells Fargo as Fallout Grows*, Bloomberg, Oct. 5, 2016.

[175]  Daniel Bases, *Ohio Latest to Bar Wells Fargo from State Business*, Reuters, Oct. 14, 2016, http://www.reuters.com/article/us-wells-farg-accounts-ohio-idUSKBN12E27k.

[176]  Gintautas Dumcius, *Massachusetts should end any business arrangements with Wells Fargo, Congressmen James McGovern and Stephen Lynch say*, MassLive, Oct. 17, 2016, http://www.masslive.com/politics/index.ssf/2016/10/massachusetts_should_end_any_b.html.

[177]  Emily Green, *SF officials losing patience with scandal-plagued Wells Fargo*, S.F. Chron., Dec. 13, 2016, http://www.sfgate.com/politics/article/SF-officials-losing-patience-with-scandal-plagued-10794593.php.

Former Employees Reported and Wells Fargo Admitted It May Have Fired or Otherwise
Retaliated Against Employees Who Sought to Report Misconduct Even Through the Company's
Ethics Hotline

206.    Meanwhile, numerous Wells Fargo employees have come forward with stories of information showing that Wells Fargo fired them in retaliation for reporting unethical sales tactics and the unbearable pressure to meet unrealistic sales goals, which contradicts Wells Fargo's claims that it protected whistleblowers and encouraged their reports.

(a)    For example, on September 19, 2016, *Everyday Money* published an article titled "Bank-High-Pressure Sales Techniques Are the 'Norm,' Workers Say":

> [A] former Wells Fargo branch manager, Julie Miller, **reported she was told to increase sales by more than 35% every year**.  Khalid Taha, a San Diego-based personal banker who left Wells Fargo in July [2016], reported he had a daily quota to open approximately 10 to 15 personal accounts, two to three other types of accounts, and two to three new credit cards or loans, as well as to find a daily referral for an insurance or mortgage product.
>
> **The goals were unreasonable and created a "culture of harassment and fear when we did not meet them**," said Miller, who left Wells Fargo in 2013.  She added bankers became so desperate to meet their quotas, they would resort to underhanded schemes.
>
> *        *        *
>
> "One way to beat the system was to "churn" accounts, in which bank employees closed an account and then immediately opened up a new one for the same customer," Miller said.  Additionally, bankers would automatically open a debit card account for a customer every time a new checking or savings account was started—without giving the customer a chance to decline.  And signing customers up for online banking and credit cards, as part of the account on-boarding process, was another method [employees used] to add "new product" . . . .

(b)    In addition, on September 26, 2016, *The New York Times* published an article titled "Wells Fargo Workers Claim Retaliation for Playing by the Rules," indicating that in February 2011, Rasheeda Kamar ("Kamar"), a Wells Fargo employee for 22 years, sent an email voicing her concerns directly to Stumpf.  Kamar never received a reply but was terminated soon after.[178]

(c)    In September 2013, Bill Bado, a former Wells Fargo banker from Pennsylvania, reportedly refused to open fake accounts.  He reached out to Wells Fargo Human

---

[178]  Stacey Cowley, *Wells Fargo Workers Claim Retaliation for Playing by the Rules*, N.Y. Times, Sept. 26, 2016, https://www.nytimes.com/2016/09/27/business/dealbook/wells-fargo-workers-claim-retaliation-for-playing-by-the-rules.html.

1    Resources via email and the anonymous ethics hotline, and was terminated eight days later.  One

2    anonymous Human Resources official reported to *CNNMoney* that the bank had a method in place to

3    retaliate against tipsters.[179]

4             (d)     On September 26, 2016, a *CNNMoney* report titled "Wells Fargo Workers:

5    Fake Accounts Began Years Ago" discussed and recounted interviews with multiple former Wells

6    Fargo employees who state that the opening of false accounts was occurring as early as 2007:

7         **Wells Fargo's fake accounts have been around a long time**.

8             Almost a dozen Wells Fargo workers told CNNMoney that the shocking
9         tactic – where employees opened unauthorized accounts to meet unrealistic sales
         goals – has been around much longer than the bank has acknowledged

10            "These practices were going on way before 2011," said Susan Fischer, a
11        former Wells Fargo branch manager, who worked at the bank for five years, starting
         in 2004.

12                              *        *        *

13            ***Fischer said she remembers her district manager instructing her in 2007 to***
14        ***make the employees reporting to her open unauthorized accounts***. . . .

15            "My district manager told me, 'Do whatever you need to do,'" Fischer said.

16            ***But Fischer ran into trouble when she refused take part in fraudulent***
17        ***activity.  Superiors said she wasn't hitting her goals***.  Soon, Fischer got so stressed
         from her work environment that she had to take a medical leave of absence and
18        wasn't allowed to return.

19                              *        *        *

20            ***Fischer's account matches those of other employees, who spoke to***
21        ***CNNMoney, where the bank made employees' lives difficult when they couldn't***
         ***meet sales targets, whether via legitimate or illegal tactics***.

22                              *        *        *

23            Emilie Ward, another Wells Fargo teller in Chaska, Minnesota, told
24        CNNMoney that "100% this began long before 2011."

25            Ward joined Wells Fargo in 2008 and said customers often had no idea about
26        accounts being opened.

27    _____

28    [179]  Egan, *Admits to Sign*, *supra* n.74.

"They would set up debit cards people didn't know about and have them mailed to the bank," she said.

Another former teller, Rebecca Lewis, said she saw unauthorized accounts – especially credit cards – opened when she was hired in March 2009 in Idaho. *Her attempts to flag the issue by calling the ethics hotline backfired, echoing allegations other former workers who say they were retaliated against.*[180]

(e)    On September 28, 2016, U.S. Senators Jeff Merkley, Elizabeth Warren, and Bob Menendez requested that the SEC investigate whether Wells Fargo violated whistleblower protection laws by firing employees after they tried to report misconduct:[181]

*Mr. Stumpf admitted that he became aware of widespread fraud at the bank in 2013*, yet neither he nor the company disclosed that information to investors until the CFPB Consent Order became public in September 2016.  In the interim, *during quarterly earnings calls, Mr. Stumpf personally touted Wells' cross-sell ratio* – its measure of the average number of accounts per customer – as well as Wells' success in opening new deposit accounts and credit card accounts.  *He did so apparently with knowledge that many of these retail accounts were created without customer authorization*.

*      *      *

Mr. Stumpf claimed under oath that the firing of more than 5000 employees for creating more than two million possibly fake accounts was not "material" to investors.  But Mr. Stumpf personally emphasized the company's increasing number of retail accounts and growing cross-sell ratio on quarterly earnings calls with investors and analysts, and a number of analyst reports from that period recommend purchasing Wells Fargo stock in part because of those strong numbers.  Mr. Stumpf and Wells Fargo investors clearly believed that the cross-sell ratio and the number of retail accounts were material to investment decisions – and yet Mr. Stumpf did not disclose that those numbers had been inflated by millions of fraudulent accounts.

*      *      *

*Wells Fargo has reportedly fired several employees who had reported misconduct to their superiors or called Wells Fargo's internal ethics hotline*.

*      *      *

Both Sarbanes-Oxley and the Dodd-Frank Wall Street Reform and Consumer Protection Act have anti-retaliation provisions to protect employee whistleblowers who report certain types of fraud and violations of securities law.

---

[180]  Matt Egan, *Wells Fargo Workers: Fake accounts began years ago*, CNNMoney, Sept. 26, 2016, http://money.cnn.com/2016/09/26/investing/wells_fargo_fake_accounts_before_2011/.

[181]  *See* Letter to SEC, *supra* n.65.

For instance, Sarbanes-Oxley prohibits a publicly-traded company from terminating or discriminating against an employee who provides information about what he or she reasonably believes is a type of fraud, a violation of any SEC rule or regulation, or a violation of federal law related to fraud against shareholders.

\*    \*    \*

Published reports and court filings indicate that Wells Fargo harassed and ultimately terminated employees for raising concerns about the creation of fake deposit and credit card accounts.[182]

(f)    On September 29, 2016, *McClatchy.com* published an article discussing a lawsuit filed in 2010 by two former Wells Fargo bankers, Guitron and Judi Klosek.[183] As noted in another article, "[b]y March 2009, [Guitron] began complaining to her supervisor, who still works for Wells Fargo in private banking, about the co-worker's continued opening of rogue accounts and the number of customers receiving service charges for bank accounts they had never approved, according to court documents. But her alerts to superiors up the chain of command – first to human resources officers, then to regional and area managers, and finally an email to CEO John Stumpf – brought no end to the repeated opening of unnecessary accounts."[184]

(g)    On October 7, 2016, *National Public Radio* in a segment called, "The Wells Fargo Hustle," reported Company employees faced unrelenting pressure to sell products in branches across the country, including the San Francisco branch where CEO Stumpf worked, and through which he would walk and observe.[185] They were required to open as many new accounts as possible and were given unrealistic sales quotas of 15 to 20 per day, even in branches with little or no daily walk-in traffic. Employees were also pressured to make their numbers at any cost. They were told to call their friends and relatives to get them to open accounts and were coached on how to inflate numbers and create fake accounts. Ashley, a former Wells Fargo personal banker, explained that

---

[182] *Id.*

[183] Teresa Welsh, *Wells Fargo may have retaliated against employees who reported false account practices as early as 2010*, McClatchy.com, Sept. 29, 2016, http://www.mcclatchydc.com/news/nation-world/national/article104899191.html.

[184] Yune, *Scandal Unfolds*, *supra* n.77.

[185] *Wells Fargo Hustle*, National Public Radio, Oct. 7, 2016, http://www.npr.org/templates/transcript/transcript.php?storyId=497084491.

1  following a "coaching session" – a meeting, in a locked room, with two managers who threatened

2  that "[i]f you don't meet your solutions, you will be fired, and it's going to be on your permanent

3  record" – she became physically ill at her desk.[186]  In fact, the Company fired Ashley when she

4  refused to meet the quotas, and stamped her Form U5 record, "[f]ailure to perform job duties." Eric,

5  another former Wells Fargo employee, was forced to quit after he developed stomach issues and an

6  eye twitch.[187]  Wells Fargo reportedly marked another employee, Jeremy's, Form U5 with a note

7  that he had "admitted to opening up fraudulent accounts" after he had reported the fraudulent

8  behavior to his district managers, the ethics hotline and quit when he "was told basically he could

9  quit or the bank was going to open an investigation into him, whether he gave people accounts

10  without their consent. And there was a good chance if that happened he'd be fired."[188]

11  (h)  On October 13, 2016, *Reuters* published an article titled, "Wells Fargo

12  Complaints Show Flaws in Federal Whistleblower Program."  The article specifically discussed

13  retaliation claims made by Wells Fargo employees:

14  **Former Wells Fargo & Co general manager Claudia Ponce de Leon filed a
   whistleblower complaint in December 2011 with federal labor regulators, alleging
15  she was fired for telling superiors about employees opening unauthorized
   accounts**.

16  Nearly five years later, she has not been interviewed by investigators at the
17  Labor Department's Occupational Safety and Health Administration (OSHA), said
   her attorney Yosef Peretz.

18  **Her complaint claiming retaliation by Wells Fargo for reporting potential
19  misconduct is one of several dozens filed against the bank over the last 14 years,
   Reuters has found**.

20  *   *   *

21  As of Oct. 6, the agency had yet to close out 34 of the **91 complaints** it has
22  received **since fiscal year 2002 from Wells Fargo employees alleging they faced
   retaliation after reporting potential wrongdoing**, according to department data
23  obtained through a Reuters public records request.

24  *   *   *

25  [186]  *Id.*

26  [187]  *Id.*

27  [188]  *Bad  Form,  Wells  Fargo*,  National  Public  Radio,  Oct.  28,  2016,
28  http://www.npr.org/templates/transcript/transcript.php?storyId=499805238.

*In late September, Reuters identified Ponce de Leon and at least four other former Wells Fargo employees who reported to OSHA between 2009 and 2014 that they were fired for raising concerns about the opening of unauthorized accounts and credit cards*. Of the five OSHA complaints seen by Reuters, Ponce de Leon's case has been pending since December 2011 . . . .

(i)    On November 3, 2016, Senators Elizabeth Warren, Ron Wyden, and Robert Menendez wrote to Sloan suggesting that Wells Fargo retaliated against its employees by filing "hundreds of Form U5 reports," which may have been "inaccurate or incomplete":

[O]ur staff *has obtained data* from a major securities industry regulator, the Financial Industry Regulatory Authority (FINRA), indicating that between 2011 and 2015, *Wells Fargo filed reports on the terminations of over 200 employees related to the illegal behavior that ultimately resulted in the bank's September 2016* settlement with the Consumer Financial Protection Bureau (CFPB) and other regulators. *These reports, known as Form U5s, confirm that Wells Fargo had ample information about the scope of fraudulent sales practices occurring at the bank long before the CFPB settlement, and they raise additional questions about Wells Fargo's response to this illegal activity. In addition, public reports indicate that Wells Fargo may have filed inaccurate or incomplete Form U5s for fired employees and that the bank may have done so to retaliate against whistleblowers*. If this is the case, then it would appear that Wells Fargo concealed key information from regulators . . . .

(j)    According to an article published in the *Daily Mail* on October 2, 2016, Wells Fargo ignored a petition signed by more than 5,000 employees which claimed it was impossible for them to keep up with sales targets legally.[189]  Another article published in *America Prospect* further elaborated on the petition.  The Committee for Better Banks:

launched an online petition calling on the bank to end its sales goal "obsession," which ultimately garnered more than 11,000 signatures.  Bank workers brought the petition signatures to several local bank branches, and then to the 2015 shareholders meeting in St Louis as they tried to publicize the detrimental impacts of high sales quotas on both workers and consumers.[190]

207.    Wells Fargo has since admitted that it has seen examples of retaliation against its employees.  On January 24, 2017, *CNNMoney* reported that the Company had "found evidence that at least some of these whistleblower retaliation claims . . . may have merit."  Asked to clarify if that

---

[189]  Jennifer Smith, *Wells Fargo bosses 'ignored a petition signed by thousands of workers asking them to get rid of unrealistic sales goals' two years before lawsuit over sham accounts*, Daily Mail.com, Oct. 2, 2016, http://www.dailymail.co.uk/news/article-3818517/Wells-Fargo-bosses-ignored-petition-signed-thousands-workers-asking-rid-unrealistic-sales-goals-two-years-lawsuit-sham-accounts.html.

[190]  *See* Justin Miller, *First and Foremost, the Wells Fargo Scandal Is About Workers*, Am. Prospect, Oct. 4, 2016, http://prospect.org/article/first-and-foremost-wells-fargo-scandal-about-workers.

means there were signs of retaliation, a Wells Fargo spokeswoman told *CNNMoney*: "Yes, that is how I would read it."

2017 Brought Additional Disclosures Cementing Defendants' Knowing Wrongdoing Including Claims of Evidence Destruction and Emails Confirming Defendants' Concealment of Ongoing Investigations and Retaliation Against Employees

208. On January 11, 2017, *The Charlotte Observer* published an article titled "Emails Show Wells Fargo kept sales probe to itself for at least 6 months." The article was stunning and provides evidence that the Company was in discussions with the CFPB about phony account openings for six months prior to September 2016. The article noted that *The Charlotte Observer* had uncovered emails that provided proof of those conversations:

> *Wells Fargo knew as early as March 2016 that a regulator was formally investigating its sales practices, according to emails obtained by the Observer that shed more light on when the San Francisco-based bank became aware of the probe*.

> Documents show the Consumer Financial Protection Bureau in discussions with Wells' attorneys, including in Charlotte, about the investigation *six months before the CFPB fined it $100 million* over unauthorized customer accounts. The emails connected to the investigation, requested under the Freedom of Information Act, have not been previously reported.

> *The records raise fresh questions about why Wells Fargo did not disclose the investigation to the public or investors before the fine was announced. Under federal securities regulations, companies must disclose "material" information – matters that a "reasonable" investor would deem important in deciding whether to buy a stock*.

> \*        \*        \*

> The earliest of the emails pertaining to the CFPB investigation dates to March 8, before Wells Fargo reported quarterly financial results for the first three months of 2016.

> *The bank's securities filings for that quarter and the second quarter of 2016 do not mention probes by the CFPB or the other two authorities that fined the bank:* the Office of the Comptroller of the Currency and the city and county of Los Angeles.

> \*        \*        \*

> The emails show ongoing discussions between the CFPB and Wells Fargo attorneys over the course of last year leading up to the fine's announcement.

> In one email dated March 16, CFPB enforcement attorney Lawrence Brown told Wells attorneys Robert McGahan and David Rice, both based in Charlotte, that he "greatly" appreciated the bank's "pledge to be transparent and cooperate quickly and fully with the Bureau's investigation."

\*       \*       \*

Richard Clayton, research director for CtW Investment Group, a Washington, D.C.-based organization that advocates on behalf of labor union pension funds holding about 12 million Wells Fargo shares, said it's "distressing" the bank did not inform investors of the investigation sooner.

209.    On February 21, 2017, Wells Fargo announced that – based on the Board's investigations – that it had fired *for cause* four current and former prominent senior managers in Community Banking.  Those individuals included Claudia Russ Anderson, the former Community Banking Chief Risk Officer, who the Company had previously stated in October 2016 had taken a leave of absence.  *See* ¶202.  All of the individuals who were fired forfeited their bonuses and unvested options:

> Wells Fargo & Company today announced employment terminations based on its Board of Directors' ongoing independent investigation into the Company's retail banking sales practices and related matters.
>
> Four current or former senior managers in Community Banking have been terminated by the Company for cause by a unanimous vote of the Board:
>
> • Claudia Russ Anderson – Former Community Bank Chief Risk Officer
>
> • Pamela Conboy – Arizona Lead Regional President
>
> • Shelley Freeman – Former Los Angeles Regional President (now head of Consumer Credit Solutions)
>
> • Matthew Raphaelson – Head of Community Bank Strategy and Initiatives
>
> None of these executives will receive a bonus for 2016 *and they will forfeit all of their unvested equity awards and vested outstanding options*.

210.    On January 24, 2017, *Vanity Fair* published an article titled "Explosive Report Suggests Vast Cover-Up at Wells Fargo."  The article reported that employees were typically provided 24 hours' notice before annual reviews and inspections which provided time for them to destroy incriminating evidence.  The article also described the shredding of evidence and further referenced the forging of documents to make accounts appear legitimate:

> *Managers and employees* at the bank's roughly 6,000 branches across the U.S. typically *had at least 24 hours' warning about annual reviews conducted by risk employees*, current and former Wells Fargo employees and executives said. *That gave many employees time to cover up improper practices*, such as opening accounts or signing customers up for products without their knowledge.

*Often, managers would call for all hands on deck at a branch to stay late into the evening – or sometimes all night – to shred documents or forge signatures if they weren't there*, some current and former managers said.  For instance, they would go through desks to find signature cards that hadn't been approved, *make sure wire forms* had been filled out properly and that documents in a "control binder" like cash or teller audits were filled out, said Ivan Rodriguez, a former branch banker at Wells Fargo for about six years until 2013.  Some branches that opened accounts for customers without the customer present would cut and paste a signature the bank had on file for the customer and add it to the required signature card, Mr. Rodriguez said.

After the September 2016 Disclosures and Settlements, New Account Openings Plummeted, Further Evidencing that Previous Results Were Inflated by the Fraud

211.    After the disclosure of the fraudulent account opening activity in September 2016, new customer account openings sharply declined as the reputational effect of the fraud began to materialize.  Current customers closed accounts and potential new customers were choosing to bank elsewhere.

212.    On October 14, 2016, the Company reported in its third quarter 2016 financial statement supplement that for the month of September 2016, new account openings plunged 25% and credit card applications fell by 20%:

**Monitoring customer activity in Retail Banking**

*In the month of September*

\*        \*        \*

- Customer visits with bankers, account openings and applications were down on lower referrals, marketing activity and product offerings

  - Customer visits with branch bankers were down 10% YoY

  - ***Consumer checking account opens down 25% YoY***

    - Change in Account Opens = (143)K YoY vs. Total # of Accounts = 33.2 million

  - Credit card applications down 20% YoY.

213.    On October 14, 2016, *The New York Times* reported:

**Wells Fargo Says Customers Shied Away After Scandal**

Wells Fargo disclosed on Friday that ***new account openings had taken a nose-dive since the scandal over illegal activity at the bank erupted***: Bank executives said customers opened 25 percent fewer checking accounts and applied for 20 percent fewer credit cards in September compared with a year ago.

Wells Fargo executives acknowledged that customers may have shunned the bank as the extent of the problems came to light.

\*       \*       \*

Although it was too early to assess the impact the declines might have on the bank's bottom line, the fallout from its widespread creation of sham deposit accounts and credit cards dating back to 2005 was clearly taking its toll.

\*       \*       \*

In an interview, the bank's chief financial officer, John R. Shrewsberry, attributed the decline partly to the bad publicity and to the fact that customers were "irritated with Wells Fargo in September."[191]

214.    On November 17, 2016, the Company reported its "October Retail Banking Customer Activity":

***Key Takeaways***

**Customer Interactions**

\*       \*       \*

- ***Branch banker interactions were down*** from September 2016 (linked month "LM") and YoY primarily driven by a slowdown in new account openings

**Deposit Balances and Accounts**

\*       \*       \*

- ***Consumer account opens were down 27% LM and 44% YoY*** primarily due to a full month impact of customer reaction to the sales practices settlement and reduced marketing activities

- ***Customer-initiated account closures were up modestly, 3%, both LM and YoY***

**Debit and Credit Cards**

\*       \*       \*

- ***New credit card applications continued their downward trend with applications down 35% LM and 50% YoY*** primarily due to reduced marketing activities and a full month impact of customer reaction to the sales practices settlement

**Customer Experience Surveys**

---

[191]   Michael Corkery, *Wells Fargo Says Customers Shied Away After Scandal*, N.Y. Times, Oct. 14, 2016, https://www.nytimes.com/2016/10/15/business/dealbooks/wells-fargo-says-customers-shied-away-after-scandal.html?_r=o.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

- **Customer loyalty scores were down both LM and YoY . . . .**[192]

215.    On November 12, 2016, *Bloomberg* published an article titled "Wells Fargo New Accounts Tumble 44% in Wake of Scandal":

**Wells Fargo New Accounts Tumble 44% in Wake of Sales Scandal**

> Wells Fargo & Co. said **retail customers opened 44 percent fewer new accounts in October** from a year earlier in the wake of the bank's record-setting settlement with regulators over its cross-selling scandal.

> **The drop was 27 percent from September** and is showing signs of stabilizing this month, Mary Mack, the lender's head of community banking, said in a conference call Thursday. **New credit-card applications dropped by half to 200,000 in October**.[193]

216.    On February 13, 2017, *The Motley Fool* illustrated the decline in the opening of new checking accounts – comparing 2016 to 2015 and noting declines of more than 40%:



217.    On February 17, 2017, Wells Fargo reported its "January Retail Banking Customer Activity," which illustrated that this trend is only worsening with time:

- Consumer checking account opens . . . down 0.2 million, or 31%, YoY

---

[192]  Wells Fargo, Wells Fargo Reports October Retail Banking Customer Activity at 2 (Nov. 17, 2016).

[193]  Jennifer Surane, *Wells Fargo New Accounts Tumble 44% in Wake of Sales Scandal*, Bloomberg, Nov. 12, 2016, https://www.bloomberg.com/news/articles/2016-11-17/wells-fargo-says-account-openings-tumbled-44-in-October.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

- Customer-initiated consumer checking account closures were up 1% L[ast] M[onth] and 4% YoY

                   \*        \*        \*

- New consumer credit card applications . . . down .2 million, or 47% YoY.

218. On the same day, *The Mercury News* published an article titled, "Wells Fargo Customers Avoid Bank Amid Accounts Scandal."[194] The article quoted an independent banking analyst who explained the "[t]wo primary factors" "driving" the Company's latest numbers: "'***These are legitimate, real numbers compared to the old numbers that were greatly inflated*** because the bank was opening bogus accounts . . . . And the notoriety over *the accounts scandal is prompting some existing customers to close their accounts and keeping some new people from opening their first accounts*."[195]

219. Similarly, *Bloomberg*, in a February 17, 2017 piece titled, "Wells Fargo New Accounts Drop 31% as Scandal Impact Drags On," reported that the new data reflected Wells Fargo's inability to "reverse" the deepening crisis, as "January marks *the fifth consecutive month that new accounts and credit-card applications have fallen*."[196] And, "[t]he *47 percent decline in credit-card applications last month was the worst since October*, when applications dropped 50 percent."[197] Most importantly, the article stated, "Shrewsberry warned investors last week" that "[f]ewer new accounts may affect the pace of revenue growth [because] . . . *Wells Fargo earned more than half of its 2016 profit from community banking*."[198]

---

[194] George Avalos, *Wells Fargo customers avoid bank amid accounts scandal*, Mercury News, Feb. 17, 2017, http://www.mercurynews.com/2017/Wells-Fargo-customers-avoid-bank-amid-accounts-scandal/.

[195] *Id.*

[196] Laura J. Keller, *Wells Fargo New Accounts Drop 31% as Scandal Impact Drags On*, Bloomberg, Feb. 17, 2017, 10:09 AM PST, https://www.bloomberg.com/news/articles/2017-02-17/wells-fargo-new-accounts-decline-31-as-scandal-impact-drags-on.

[197] *Id.*

[198] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1    **IX.    LOSS CAUSATION/ECONOMIC LOSS**

2        220.    Plaintiffs incorporate by reference the allegations in ¶¶1-219 set forth above.  During

3    the Class Period, Defendants publicly disseminated material, false and misleading statements and

4    omitted material facts concerning the Company's true financial condition.    The material

5    misrepresentations and omissions included issues concerning: (i) the Company's cross-sell metrics

6    and growth; (ii) the Company's overall cross-sell strategy and culture; and (iii) the Company's risk

7    management and effectiveness of disclosure and internal controls.  The conduct alleged herein and

8    the materially false and misleading statements and omissions made during the Class Period caused

9    Wells Fargo's common stock to trade at artificially inflated prices as high as $58.52 per share during

10   the Class Period – and operated as a fraud on investors in the Company's common stock.

11       221.    Specifically,  during  the  Class  Period,  Defendants  repeatedly  boasted  of  the

12   Company's financial performance both annually and on a quarterly basis and attributed its strong

13   performance in large part to its core business model of cross-selling products to its customers across

14   business segments.  *See*, *e.g.*, ¶104.  Defendants added that such cross-selling was designed to fulfill

15   Wells Fargo's  customers'  financial  needs.   *See*, *e.g.*, ¶¶104, 114.   The  Company's  reported

16   performance was said to be directly attributable to its cross-sell strategy.  *See, e.g.*, ¶¶107, 143, 171.

17       222.    In truth however, as alleged herein, the Company knew or deliberately disregarded

18   that each of these representations was materially false as: (i) the Company opened millions of

19   deposit  and  credit  card  accounts  for  customers  without  their  knowledge  to  generate  fees  and

20   compensation rewards for Wells Fargo employees; (ii) Company employees applied for and opened

21   credit card and bank deposit accounts on behalf of customers without their knowledge or consent;

22   (iii) employees in the Community Banking segment had engaged in a wide ranging scheme to inflate

23   the Company's financial performance figures by opening millions of unauthorized deposit and credit

24   card  accounts;  and  (iv)  the  Company's  reported  cross-sell  metrics  and  the  financial  results

25   derived from them were the product of pervasive misconduct.

26       223.    When the truth began to be disclosed in September 2016, Wells Fargo's stock price

27   suffered significant declines, as the artificial inflation was removed from the stock price.

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
     SECURITIES LAWS 3:16-cv-05479-JST                                          - 117 -

224.     On September 8, 2016, the CFPB published a press release and Consent Order with Wells Fargo detailing the Company's fraudulent practices.  *See* ¶180.

225.     On the same day, September 8, 2016, Wells Fargo issued a news release which did not deny the allegations as it had done previously (*see* ¶184).  Indeed, the Company confirmed the CFPB contentions.

226.     In response to the September 8, 2016 disclosures, the price of the Company's stock declined significantly from a close of $49.90 per share on September 8, 2016, to close at $48.72 per share on September 9, 2016, on high trading volume of 32 million shares.

227.     On Saturday, September 9, 2016, *The Wall Street Journal* published an article explaining that in light of the September 8, 2016 disclosures, "Wells Fargo's shares fell 2.4% . . . a worse drubbing than other bank stocks in a down day for markets overall."[199]  More specifically, the article noted how these disclosures had surprised investors and could have a negative impact going forward.[200]

> ***An immediate worry for investors is how customers react to news of how employees behaved***.  Regulators, for instance, said that Wells Fargo employees, often chasing sales goals and bonuses, created fake accounts for customers, invented personal identification numbers and moved funds between accounts without authorization.
>
> ***Those allegations could hurt the bank's ability to attract new customers***, ***could prompt current customers to look for another bank*** and affect the amount of products and services Wells Fargo is able to sell to new or existing customers, said Allen Tischler, a senior vice president at Moody's who focuses on U.S. banks.[201]

228.     On September 13, 2016, the Company also issued a news release that announced that it would eliminate the sales goals and incentives that drove the culture and environment known to Defendants to have substantially contributed to the fraudulent conduct:

---

[199]  Emily Glazer, *At Wells, A Solid Image Is At Risk*, Wall St. J., Sept. 16, 2016, at B1 (hereinafter "Glazer, *A Solid Image*").

[200]  This prediction proved true as following the public disclosure of the fraudulent conduct, new account openings fell precipitously in each of the calendar months afterward.  *See* ¶¶211-219.

[201]  Glazer, *A Solid Image*, *supra* n.196.

**Wells Fargo to Eliminate Product Sales Goals for Retail Bankers**

*Wells Fargo & Company, announced today that it will eliminate all product sales goals in retail banking, effective January 1, 2017.*

"Our objective has always been and continues to be to meet our customers' financial needs and drive customer satisfaction," said CEO John Stumpf. "We are eliminating product sales goals because we want to make certain our customers have full confidence that our retail bankers are always focused on the best interests of customers."

229. On September 13, 2016, the price of Wells Fargo stock fell significantly again, from a close of $48.54 per share on September 12, 2016, to a close of $46.96 per share on volume of 59 million shares traded, compared to the 35 million shares traded on September 12.

230. On September 14, 2016, Deutsche Bank published a Wells Fargo Alert titled "How Much More Pain is There?" The report specifically attributed the decline in Wells Fargo's stock price to the CFPB settlement and explained, among other things, that Wells Fargo was down -6% since the disclosure of the settlement on September 8, 2016. Deutsche Bank warned that the fallout might not yet be complete:

WFC stock is -6.6% over the last week, underperforming the BKX by 440bps as details surrounding WFC's sales tactics came to light. . . .

\* \* \*

**What happens to WFC from here?**

*We can't rule out additional legal and regulatory risk* (State AG's of NY and CA are investigating this issue per media reports this afternoon). That said, it's worth noting that WFC's 440bps of lag compare to a peak lag of 8% at BAC, 7% at MTB and 10% at JPM over different periods (with most of the pain in the first week or first month). *This suggests that the relative sell-off could be about 50% done*, although each instance is unique.

231. On September 14, 2016, UBS also issued a report explaining the significant and ongoing operational and share price impacts of the fraud-related disclosures. UBS stated that the Company's financial condition would be impacted negatively by the disclosures, and the corresponding need for the bank to change its business culture. Specifically, UBS informed investors that the disclosures went directly to the heart of the business model that Wells Fargo had used to convince the market that its financial performance was more robust than other banks:

**Wells' sales culture called into question**

*Wells' sales culture has been held out as a differentiated and value creating approach by both management and investors*, with above industry deposit growth shown as evidence.  However, after the recent regulatory inquiry and settlement, *we believe revenue growth could slow* as Wells shifts to new metrics and employees push cross-selling less aggressively

\*        \*        \*

**Distractions and compliance burdens could weigh on both revenues and expenses**

While we believe the direct impact of WFC's $185 million settlement regarding unauthorized accounts may be limited, *we expect this is an issue which is likely to linger for some time*.  The bank's sales culture has been viewed as a differentiating factor by both management and investors, and *this announcement could dent WFC's reputation* as being a more Main Street focused bank.[202]

232.    On September 14, 2016, it was also reported that the DOJ had issued subpoenas to Wells Fargo regarding the opening of millions of fake accounts at the bank and that multiple U.S. Attorneys' offices were investigating Wells Fargo.[203]  *See* ¶¶191-192.

233.    On the same day, September 14, 2016, *Bloomberg* published an article which reported that Stumpf had been subpoenaed to testify before Congress on September 20, 2016.[204]

234.    As a result of the news concerning the DOJ investigation and the congressional subpoena that had been issued to Stumpf, on September 15, 2016, Wells Fargo shares suffered a significant price decline from $46.52 at market close on September 14, 2016 to $46.15 on trading volume of more than 61 million shares.

235.    On September 20, 2016, Stumpf testified under oath before the Senate Committee on Banking, Housing, and Urban Affairs admitting, among other things, that both he and the Board knew in 2013 of the wrongdoing within the Company's Retail Banking segment, including the unauthorized opening of bank and credit card accounts.  *See* ¶196(a).

---

[202]  Brennan Hawken, *Identity Crisis: Regulatory Stumble Strikes to the Heart of Wells' Strategy* at 1, 3 (UBS Sept. 14, 2016).

[203]  On March 4, 2017, it was further reported that the DOJ is probing whether executives hid details from the Company Board and regulators as the problem grew over the years.  Patrick Rucker, *U.S. Justice Department targets Executives in Well Fargo probe*, CNN News March 4, 2017, http://www.reuters.com/article/wells-fargo-accounts-investigations-idUSL1N1G027Q.

[204]  *Scandal Snares CEO*, *supra* n.151.

236.     On September 20, 2016, the Company issued a news release discussing Stumpf's Senate testimony.  While the bank accepted responsibility for the unethical behavior, it continued to falsely state that senior management ***never directed anyone to provide products or services to customers that they did not want or need***.  ¶195.  Thus, the full scope of the malfeasance and how it was tied to sales and incentive practices imposed by senior management remained concealed.

237.     On September 21, 2016, J.P. Morgan issued a report that discussed ongoing corporate risks and downgraded Wells Fargo stock specifically due to the testimony Stumpf provided at the Senate hearing:

> ***We are downgrading Wells Fargo to Neutral from Overweight to reflect the uncertainty from heightened scrutiny around its sale practices which is likely*** to increase expenses and modestly slow revenue growth.  In addition, there is uncertainty about how long these investigations will go on and which other agencies will jump in,-including potential for criminal referrals.  There is also a big reputational hit to Wells Fargo from this scrutiny.  Longer term, we expect management to turn this but the timing is uncertain.[205]

238.     Wells Fargo's share price fell from a high of $47.20 on September 20, 2016 to a close of $45.83 on September 21, 2016 on massive volume of more than 64 million shares.

239.     Notably, after the Class Period, on September 26, 2016, *CNNMoney* published a report titled "Wells Fargo stock sinks to 2-1/2 year low" attributing the recent price declines to the fake account scandal and settlement disclosed in September 2016.  The report included the following chart illustrating the negative share price movement resulting from the disclosures of fraudulent conduct:

---

[205]  Vivek Juneja, *Senate Hearings Likely to Expand Probes; Uncertainty About Timing, Expenses - Downgrade to Neutral* at 3 (J.P. Morgan Sept. 21, 2016).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

Wells Fargo's terrible September

## X.   INAPPLICABILITY OF SAFE HARBOR

240.   As alleged herein, the Defendants acted with scienter because at the time that they issued public documents and other statements in Wells Fargo's name they knew, or with extreme recklessness disregarded the fact, that such statements were materially false and misleading or omitted material facts.  Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

241.   As set forth in detail throughout this Complaint, the Defendants, by virtue of their control over, and/or receipt, of Wells Fargo's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results.  The Defendants created, were informed of, participated in and knew of the scheme alleged herein to distort and suppress material information pertaining to Wells Fargo's financial condition, profitability and present and future prospects of the Company.  With respect to non-forward looking statements and omissions, the Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

242.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  None of the

statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

243.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Wells Fargo who knew that those statements were false when made. Moreover, to the extent that any of the Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures also were false and misleading because they did not disclose that the Defendants actually were engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.    INSIDER TRADING

244.    Certain of the Officer Defendants realized substantial financial benefits at the same time that they and the Company misrepresented and concealed Wells Fargo's fraudulent cross-selling conduct. Moreover, many of the executive officers had employment agreements containing huge incentive-based bonus structures which were tailored to reward each executive for cross-sell targets. *See* ¶95.

245.    At the same time the Company issued false and misleading statements, certain Defendants collectively sold 1,636,122 shares of their Wells Fargo stock at artificially inflated prices as high as $58.28 per share for illegal insider trading proceeds in excess of $85.6 million.

| Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Carroll | 04/15/14 | 71,800 | $48.54 | $3,485,172 |
| Carroll | 04/16/15 | 77,000 | $54.81 | $4,220,370 |
| Carroll | 04/22/16 | 62,300 | $50.28 | $3,132,444 |
|  | Total: | 211,100 |  | $10,837,986 |

| Name | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Loughlin | 02/28/14 | 25,794 | $46.54 | $1,200,453 |
| Loughlin | 09/02/14 | 10,000 | $51.55 | $515,500 |
| Loughlin | 10/29/14 | 10,000 | $51.77 | $517,700 |
| Loughlin | 01/23/15 | 10,000 | $53.47 | $534,700 |
| Loughlin | 04/27/15 | 19,696 | $55.10 | $1,085,250 |
| Loughlin | 06/02/15 | 20,000 | $55.98 | $1,119,600 |
| Loughlin | 12/09/15 | 20,000 | $54.48 | $1,089,600 |
| | Total: | 115,490 | | $6,062,802 |
| | | | | |
| Modjtabai | 04/15/14 | 55,000 | $48.60 | $2,673,000 |
| Modjtabai | 11/07/14 | 25,000 | $54.10 | $1,352,500 |
| Modjtabai | 04/16/15 | 70,000 | $54.65 | $3,825,500 |
| Modjtabai | 04/27/16 | 55,000 | $50.77 | $2,792,350 |
| | Total: | 205,000 | | $10,643,350 |
| | | | | |
| Sloan | 01/24/14 | 75,000 | $45.84 | $3,438,000 |
| Sloan | 04/28/14 | 80,000 | $48.65 | $3,892,000 |
| Sloan | 09/02/14 | 50,000 | $51.48 | $2,574,000 |
| Sloan | 01/23/15 | 25,000 | $53.51 | $1,337,750 |
| Sloan | 05/15/15 | 50,000 | $56.00 | $2,800,000 |
| Sloan | 10/22/15 | 24,000 | $54.28 | $1,302,720 |
| Sloan | 03/10/16 | 10,000 | $48.16 | $481,600 |
| Sloan | 08/08/16 | 20,500 | $48.92 | $1,002,860 |
| | Total: | 334,500 | | $16,828,930 |
| | | | | |
| Strother | 04/15/14 | 50,000 | $48.31 | $2,415,500 |
| Strother | 10/31/14 | 20,000 | $52.91 | $1,058,200 |
| Strother | 04/15/15 | 50,000 | $54.80 | $2,740,000 |
| Strother | 07/23/15 | 31,000 | $58.28 | $1,806,680 |
| Strother | 04/27/16 | 40,000 | $50.77 | $2,030,800 |
| | Total: | 191,000 | | $10,051,180 |
| | | | | |
| Stumpf | 11/06/14 | 160,663 | $54.02 | $8,679,015 |
| Stumpf | 11/07/14 | 168,534 | $54.08 | $9,114,319 |
| Stumpf | 12/11/15 | 30,000 | $53.72 | $1,611,600 |
| | Total: | 359,197 | | $19,404,934 |
| | | | | |
| Tolstedt | 11/11/14 | 219,835 | $53.76 | $11,818,330 |
| | | | | |
| **TOTALS:** | | **1,636,122** | | **$85,647,512** |

246. During Stumpf's September 29, 2016 House testimony, Representative Maloney noted specifically that Stumpf's stock sales were suspicious: "[O]n October 30, 2013, you sold $13 million worth of Wells Fargo stock on the open market. That is by far, the largest open market sale of Wells Fargo stock that you made in your 9 years as CEO," the Representative stated, asking "***did you dump $13 million of Wells Fargo stock, which you did through your family trust, right after***

*you found out that your bank had been fraudulently opening hundreds of thousands of scam accounts ripping off your customers*?" Stumpf attempted to avoid answering, but Representative Maloney interjected, "[e]xcuse me, excuse me," my "question was, did you dump the stock after you found out about the fraudulent accounts, because it seems that the timing is *very, very suspicious and it raises serious questions*."[206]

247.   On this suspicious stock sales issue, Representative Maloney continued:

> [Representative Maloney:] Did you sell these shares or not?
>
> [Stumpf:] I sold those shares and I sold them with proper approvals, with no view about anything that was going on with sales practices or anything else.
>
> [Representative Maloney:] Well, it seems very, very suspicious that your largest sale was right after your $1.8 trillion bank was turned into a school for scoundrels. You acknowledge that your bank fired over 5,300 people who got caught willfully defrauding your customers.
>
> And a recent lawsuit alleges you fired even more people because they refused to willfully defraud customers. And then, then you blame the low-level people, you fire them. *You make profits, then you dump the stock.*
>
> *So, I just have to say that it seems that when you found out about the fake accounts, instead of helping your customers, you first helped yourself.* So moving right along to the next question.[207]

248.   The SEC recognizes the establishment of a 10b5-1 trading plan as a potential, but not absolute, defense to accusations of insider trading when it is entered into by an insider "[b]efore becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. Therefore, trading plans properly set up under SEC Rule 10b5-1, 17 C.F.R. §240.10b5-1, "reduce the chance of [insiders] buying and selling based on confidential information"[208] and insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise

---

[206] House Tr. at 9.

[207] *Id.*

[208]   Tom Braithwaite, *Share Sale Signals from Bank Executives: Wells Fargo Chief Leads Insider Sales Among US Banks*, Financial Times, June 19, 2015, https://www.ft.com/content/9efdc672-15f1-11e5-be54-00144feabdc0.

issues as to a person's good faith."[209]  Notably, none of the stock sales referenced herein were reported to have been made pursuant to a 10b5-1 trading plan.

249.    The high rate of insider selling during the Class Period also is suspicious given that senior corporate insiders, including Stumpf, caused Wells Fargo to engage simultaneously in significant stock buybacks – approximately 501 million shares for approximately $24.2 billion – during the 11 quarters that coincided with the Class Period.  Stock buybacks are widely recognized as boosting a company's share price in the short term.[210]  Here, the stock buybacks allowed Wells Fargo's share price to be inflated further while certain of the Defendants sold massive amounts of Company stock.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

250.    Plaintiffs and the Class (defined below) will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

---

[209]  Thomas J. Griffith, Corporate Counsel's Guide to Insider Trading and Reporting §12:26 (2015).

[210]  As noted in one piece:

> By mopping up extra stock and keeping EPS up, buybacks are a convenient way for executives to maximize their own wealth.  It's a way for them to maintain the value of the shares and share options.  Some executives may even be tempted to pursue share buybacks to boost the share price in the short term and then sell their shares.  What's more, the big bonuses that CEOs get are often linked to share price gains and increased earnings per share, so they have an incentive to pursue buybacks even when there are better ways to spend the cash or when the shares are overvalued.

Ben McClure, *6 Bad Stock Buyback Scenarios*, Investopedia.com, http://www.investopedia.com/articles/stocks/10/ share-buybacks.asp (last visited Feb. 8, 2017).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

1    (e)    Lead Plaintiff's funds, Named Plaintiffs and other members of the Class

2    purchased Wells Fargo common stock between the time Defendants misrepresented or failed to

3    disclose material facts and the time the true facts were disclosed, without knowledge of the

4    misrepresented or omitted facts.

5    251.    At all relevant times, the market for Wells Fargo common stock was efficient for the

6    following reasons, among others:

7    (a)    Wells Fargo common stock met the requirements for listing, and was listed

8    and actively traded on the NYSE, a highly efficient and automated market.  Wells Fargo shares were

9    highly liquid during the Class Period, with an average daily volume of 3.8 million shares traded;

10    (b)    Wells Fargo, as a regulated issuer, filed periodic public reports with the SEC

11    and the NYSE;

12    (c)    Wells Fargo regularly communicated with public investors via established

13    market communication channels, including through regular disseminations of news releases on the

14    national circuits of major newswire services and through other wide-ranging public disclosures, such

15    as communications with the financial press and other similar reporting services; and

16    (d)    Wells Fargo was followed by several securities analysts employed by major

17    brokerage firms who wrote reports which were distributed to the sales force and certain customers of

18    their respective brokerage firms.  Each of these reports was publicly available and entered the public

19    marketplace.

20    252.    Therefore, the market for Wells Fargo common stock promptly digested current

21    information regarding the Company from all publicly available sources and reflected such

22    information in Wells Fargo's share price.  Under these circumstances, all purchasers of Wells Fargo

23    common stock during the Class Period suffered similar injury through their purchase of Wells Fargo

24    common stock at artificially inflated prices and a presumption of reliance applies.

25    253.    Plaintiffs and the Class also are entitled to a presumption of reliance under *Affiliated*

26    *Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

27    Defendants are predicated in part upon omissions of material fact of which there was a duty to

28    disclose.

## XIII.   CLASS ACTION ALLEGATIONS

254.    Plaintiffs bring this action as a class action on behalf of all persons who purchased Wells Fargo common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entities in which Defendants have or had a controlling interest.

255.    Members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Wells Fargo has more than 5 billion shares of stock outstanding, owned by hundreds, if not thousands, of people.

256.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether the 1934 Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of Wells Fargo common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

257.    Plaintiffs' claims are typical of those of the Class because Lead Plaintiff's funds, the Named Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

258.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

259.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5
### Against the Company and the Speaking Defendants[211]

260.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

261.    This Count is asserted against the Company and the Speaking Defendants and is based upon §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

262.    During the Class Period, the Company and the Speaking Defendants, singly and in concert, directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which they knowingly or with deliberate recklessness engaged in acts, transactions, practices and course of business that operated as fraud and deceit upon Named Plaintiffs, Lead Plaintiff's funds and the other members of the Class, made untrue statements of material facts and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Named Plaintiffs, Lead Plaintiff's funds and the other members of the Class.  The purpose and effect of said scheme, plan and unlawful course of conduct was to, among other things, induce Named Plaintiffs and Lead Plaintiff's funds – as well as the other members of the Class – to purchase Wells Fargo's common stock during the Class Period at artificially inflated prices.

263.    Throughout the Class Period, the Company acted through the Speaking Defendants, whom it portrayed and represented to the financial press and public as its valid representatives.  The willfulness, motive, knowledge and recklessness of the Speaking Defendants are therefore imputed to Wells Fargo, which is primarily liable for the securities law violations of the Speaking Defendants.

264.    As a result of the untrue statements of material facts and/or the failure to disclose material facts, the information Wells Fargo and the Speaking Defendants disseminated to the

---

[211]    Speaking Defendants include Stumpf, Sloan, Tolstedt, Carroll, Modjtabai, Loughlin and Shrewsberry.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

investing public was materially false and misleading as set forth above, and the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the false and misleading nature of these defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Wells Fargo common stock, Named Plaintiffs and Lead Plaintiff's funds, as well as the other members of the Class, purchased Wells Fargo common stock at artificially inflated prices during the Class Period. But for the fraud, Named Plaintiffs, Lead Plaintiff's funds and the other members of the Class would not have purchased Wells Fargo common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Wells Fargo common stock declined precipitously. Lead Plaintiff's funds, Named Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of its or their purchases of Wells Fargo common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

265. Named Plaintiffs, Lead Plaintiff's funds and other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

266. By reason of the foregoing, the Company and the Speaking Defendants directly violated §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and/or failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Named Plaintiffs and Lead Plaintiff's funds – and the other members of the Class – in connection with its or their purchases of Wells Fargo common stock during the Class Period.

### COUNT II

#### For Violation of §20A of the 1934 Act
#### Against Carroll, Loughlin, Modjtabai, Sloan, Stumpf and Tolstedt

267. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

268.    While Wells Fargo's securities traded at artificially inflated and distorted prices, certain Officer Defendants personally profited by selling a total of more than 1,636,122 million shares of Wells Fargo common stock while in possession of adverse, material non-public information about Wells Fargo, pocketing over $85.6 million in illegal insider trading proceeds, as detailed above.

269.    By contrast, for example, Lead Plaintiff's funds and the Named Plaintiffs purchased Wells Fargo stock contemporaneously with several of the Defendants as follows:

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead & Named Plaintiff(s) | Purchase Date | Shares Purchased | Price |
| Carroll | 4/15/2014 | 71,800 | $48.54 | Union fund | 4/22/2014 | 3,000 | $49.05 |
| Loughlin | 9/2/2014 | 10,000 | $51.55 | Solomonov | 9/2/2014 | 20 | $51.53 |
| Loughlin | 6/2/2015 | 20,000 | $55.98 | Union funds | 6/2/2015 | 70,000 | $56.37 |
| | | | | | 6/5/2015 | 2,947 | $56.58 |
| | | | | | 6/8/2015 | 5,021 | $56.16 |
| Loughlin | 12/9/2015 | 20,000 | $54.48 | Union funds | 12/9/2015 | 41,252 | $54.13 |
| | | | | | 12/9/2015 | 187,583 | $54.13 |
| | | | | | 12/15/2015 | 93,000 | $54.09 |
| Modjtabai | 4/15/2014 | 55,000 | $48.60 | Union fund | 4/22/2014 | 3,000 | $49.05 |
| Modjtabai | 11/7/2014 | 25,000 | $54.10 | Union fund | 11/10/2014 | 8,800 | $53.98 |
| Sloan | 4/28/2014 | 80,000 | $48.65 | Union fund | 5/12/2014 | 7,027 | $49.44 |
| Sloan | 9/2/2014 | 50,000 | $51.48 | Solomonov | 9/2/2014 | 20 | $51.53 |
| Sloan | 5/15/2015 | 50,000 | $56.00 | Union fund | 5/22/2015 | 6,920 | $56.18 |
| | | | | Solomonov | 6/1/2015 | 20 | $56.35 |
| Sloan | 10/22/2015 | 24,000 | $54.28 | Mizuki | 10/30/2015 | 91 | $55.00 |
| Stumpf | 11/6/2014 | 160,663 | $54.02 | Union fund | 11/10/2014 | 8,800 | $53.98 |
| Stumpf | 11/7/2014 | 168,534 | $54.08 | Union fund | 11/10/2014 | 8,800 | $53.98 |
| Stumpf | 12/11/2015 | 30,000 | $53.72 | Union fund | 12/15/2015 | 93,000 | $54.09 |
| Tolstedt | 11/11/2014 | 219,835 | $53.76 | Union fund | 11/18/2014 | 5,214 | $53.22 |

270.    Lead Plaintiff's funds, Named Plaintiffs and all other members of the Class who purchased shares of Wells Fargo stock contemporaneously with the sales of Wells Fargo common stock by Defendants Carroll, Loughlin, Modjtabai, Sloan, Stumpf and Tolstedt have suffered damages because:

1    (a)    In reliance on the integrity of the market, they paid artificially inflated prices

2  as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and

3    (b)    They would not have purchased the Wells Fargo stock at the prices they paid,

4  or at all, if they had been aware that the market prices had been artificially inflated by Defendants'

5  false and misleading statements and omissions alleged herein.

6    271.    By reason of the foregoing, Defendants Carroll, Loughlin, Modjtabai, Sloan, Stumpf

7  and Tolstedt violated §20A of the 1934 Act and are liable to these plaintiffs (or in the case of the

8  Lead Plaintiff, its funds) and the other members of the Class for the substantial damages suffered in

9  connection with their purchase of Wells Fargo common stock during the Class Period.

10    **COUNT III**

11    **For Violation of §20(a) of the 1934 Act**
     **Against Defendants**

12

13    272.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

14    273.    Defendant Stumpf acted as a controlling person of Wells Fargo within the meaning of

15  §20(a) of the 1934 Act.  By virtue of his position as Chairman of the Board and CEO of the

16  Company, his leadership of the Operating Committee and his ownership of more than 5 million

17  shares of Wells Fargo stock and options, Stumpf had the power and authority to cause Wells Fargo

18  to engage in the wrongful conduct complained of herein.  By reason of such conduct, Stumpf is

19  liable pursuant to §20(a) of the 1934 Act.

20    274.    In addition to Stumpf, each of the other Officer Defendants acted as a controlling

21  person of Wells Fargo within the meaning of §20(a) of the 1934 Act.  By virtue of their positions on

22  the Operating Committee of Wells Fargo, and their senior positions at the Company, each of the

23  Officer Defendants had the power and authority to cause Wells Fargo to engage in the wrongful

24  conduct complained of herein.  *See* ¶¶78-85.  By reason of such conduct, the other Officer

25  Defendants are liable pursuant to §20(a) of the 1934 Act.

26    275.    In addition to Stumpf, each of the other Director Defendants acted as a controlling

27  person of Wells Fargo within the meaning of §20(a) of the 1934 Act.  By virtue of their positions on

28  the Board of Wells Fargo, including various committees of the Board, each of the Director

1  Defendants had the power and authority to cause Wells Fargo to engage in the wrongful conduct

2  complained of herein. *See* ¶¶78-85. By reason of such conduct, each of the other Director

3  Defendants are liable pursuant to §20(a) of the 1934 Act.

4      276.    Wells Fargo, in turn, controlled Stumpf and the other Officer and Director

5  Defendants, and is a controlling person of those defendants within the meaning of §20(a) of the 1934

6  Act. Wells Fargo is liable pursuant to §20(a) of the 1934 Act as a result.

7                               **PRAYER FOR RELIEF**

8      WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

9      A.    Determining this action to be a proper class action and certifying Lead Plaintiff and

10  Named Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

11      B.    Declaring and determining that Defendants violated the 1934 Act by reason of the

12  acts and omissions alleged herein;

13      C.    Awarding compensatory damages in favor of Lead Plaintiff, Named Plaintiffs and the

14  other members of the Class against all Defendants, jointly and severally, for the damages sustained

15  as a result of the wrongdoing of Defendants, together with interest thereon;

16      D.    Awarding Plaintiffs and the Class the fees and expenses incurred in this action,

17  including, but not limited to, a reasonable allowance of fees for Plaintiffs' attorneys and experts;

18      E.    Granting equitable and/or injunctive relief as permitted by law, equity and federal

19  statutory provisions sued on hereunder; and

20      F.    Granting such other and further relief as the Court may deem just and proper.

21                               **JURY DEMAND**

22      Lead Plaintiff and Named Plaintiffs demand a trial by jury.

23  DATED: March 6, 2017                ROBBINS GELLER RUDMAN
                                          & DOWD LLP
24                                      SHAWN A. WILLIAMS
                                        AELISH M. BAIG
25                                      JASON C. DAVIS

26

27                                      _____
                                            s/ Shawn A. Williams
28                                         SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Liaison Counsel for Plaintiffs
MOTLEY RICE LLC
GREGG S. LEVIN (admitted *pro hac vice*)
JOSHUA C. LITTLEJOHN (admitted *pro hac vice*)
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)

WILLIAM H. NARWOLD (admitted *pro hac vice*)
One Corporate Center
20 Church St., 17th Floor
Hartford, CT  06103
Telephone:  860/882-1681
860/882-1682 (fax)

Lead Counsel for Plaintiffs

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS 3:16-cv-05479-JST

DocuSign Envelope ID: C42760B7-73E9-4B38-94DA-6FE727970C9B

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MARCELO MIZUKI ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

WELLS FARGO

DocuSign Envelope ID: C42760B7-73E9-4B38-94DA-6FE727970C9B

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of March, 2017.

DocuSigned by:

*Marcelo Mizuki*

20B7846C25AD46 MARCELO MIZUKI

WELLS FARGO

## SCHEDULE A

## SECURITIES TRANSACTIONS

Acquisitions

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 10/13/2015 | 200 | $52.01 |
| 10/30/2015 | 91 | $55.00 |
| 06/02/2016 | 5 | $51.05 |
| 07/13/2016 | 20 | $48.34 |
| 08/01/2016 | 16 | $47.97 |
| 09/02/2016 | 2 | $50.58 |

DocuSign Envelope ID: 15C2FD16-F256-4C66-9478-D47094840C62

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

GUY SOLOMONOV ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.   Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

WELLS FARGO

DocuSign Envelope ID: 15C2FD16-F256-4C66-9478-D47094840C62

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this $^2$____ day of March, 2017.

DocuSigned by:

_____

2703740CE2E0454 GUY SOLOMONOV

- 2 -

WELLS FARGO

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/09/2014 | 3,000 | $52.04 |
| 09/02/2014 | 20 | $51.53 |
| 12/01/2014 | 19 | $54.41 |
| 03/02/2015 | 19 | $54.79 |
| 06/01/2015 | 20 | $56.35 |
| 09/01/2015 | 22 | $52.08 |
| 12/01/2015 | 21 | $55.56 |
| 03/01/2016 | 25 | $47.24 |
| 06/01/2016 | 24 | $50.28 |
| 09/01/2016 | 23 | $50.91 |
| 09/01/2016 | 1 | $56.58 |

CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 6, 2017.

                                        s/ Shawn A. Williams
                              SHAWN A. WILLIAMS

                              ROBBINS GELLER RUDMAN
                                  & DOWD LLP
                              Post Montgomery Center
                              One Montgomery Street, Suite 1800
                              San Francisco, CA  94104
                              Telephone:  415/288-4545
                              415/288-4534 (fax)
                              E-mail: shawnw@rgrdlaw.com

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS 3:16-cv-05479-JST

**Mailing Information for a Case  3:16-cv-05479-JST Hefler v. Wells Fargo & Company et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon A Amjed**
  namjed@ktmc.com,mswift@ktmc.com

- **Aelish Marie Baig**
  AelishB@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Francis A. Bottini , Jr**
  fbottini@bottinilaw.com,sammirati@bottinilaw.com

- **Peretz Bronstein**
  peretz@bgandg.com

- **Darren J. Check**
  dcheck@ktmc.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,viapianoc@sullcrom.com,s&cmanagingclerk@sullcrom.com,brendan-cullen-5099@ecf.pacerpro.com,loevinsohnd@sullcrom.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason C Davis**
  jdavis@rgrdlaw.com

- **Ryan Thomas Degnan**
  rdegnan@ktmc.com

- **Miles F. Ehrlich**
  miles@ramsey-ehrlich.com,elese@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,amy@ramsey-ehrlich.com,tonya@ramsey-ehrlich.com

- **Eli Greenstein**
  egreenstein@ktmc.com,jhouston@ktmc.com,rnathcook@ktmc.com,yjayasuriya@ktmc.com

- **Barry R. Himmelstein**
  barry@himmellaw.com

- **Sverker K. Hogberg**
  hogbergs@sullcrom.com

- **Sverker Kristoffer Hogberg**
  hogbergs@sullcrom.com,carrjo@sullcrom.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **James Michael Hughes**
  jhughes@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Katharine Ann Kates**
  katharine@ramsey-ehrlich.com

- **Phillip C. Kim**
  pkim@rsenlegal.com

- **Richard H. Klapper**
  klapperr@sullcrom.com

- **Joy Ann Kruse**
  jakruse@lchb.com

- **Gregg S. Levin**
  glevin@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com

- **Joshua C Littlejohn**
  jlittlejohn@motleyrice.com

- **Betsy Carol Manifold**
  manifold@whafh.com,tuazon@whafh.com,cabrera@whafh.com,boyles@whafh.com,loritsch@whafh.com

CAND-ECF-                                                                                    Page 2 of 2

CASE 9:18-cv-00296-MJD-TFD   Doc. 1631   Filed 10/12/18   Page 149 of 2
Case 3:18-cv-08419-JST   Document 721   Filed 03/06/17   Page 147 of 147

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,ajanelle@motleyrice.com

- **Blair Allen Nicholas**
  blairn@blbglaw.com,Benjamin.Riesenberg@blbglaw.com,denab@blbglaw.com,ashley.lee@blbglaw.com,Avi@blbglaw.com,amyn@blbglaw.com,jessica.cuccurullo@l

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Ismail Jomo Ramsey**
  izzy@ramsey-ehrlich.com,elese@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,amy@ramsey-ehrlich.com,tonya@ramsey-ehrlich.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdavis@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Cadio R. Zirpoli**
  cadio@saveri.com,mogden@saveri.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Christopher      M Viapiano
Sullivan & Cromwell LLP
1700 New York Avenue, N.W., Suite 700
Washington, DC 20006
```