# EXHIBIT D

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| **Glen F. Post, III (CEO)** | • As CenturyLink's CEO during the Class Period, Defendant Post would have had access to an internal audit showing that CenturyLink overbilled more than 175,000 customers in one state and potentially over-billed more than 3.5 million customers in various states, as well as CenturyLink's responses to civil investigative demands showing that 600 of 700 (83%) of consumer complaints were substantiated. ¶¶5, 29, 108, 177-78. <br><br>• He regularly held himself out as personally familiar with CenturyLink's strategies, its results, the causes for those results, CenturyLink's Code of Conduct policies, CenturyLink's regulatory risks, including by speaking about those topics on CenturyLink investor calls, signing SEC statements containing representations about them and associated SOX Certifications, and introducing the Company's Code of Conduct on its website. ¶¶41, 57, 60, 115, 117-18, 151, 193-99, 201-02, 205-06, 210, 215, 221, 226-27, 229, 231, 233-35, 237, 238-40, 256, 261-62, App'x A. <br><br>• He was personally involved in setting CenturyLink's revenue projections. ¶¶67-69. <br><br>• He had access to a dashboard system that showed nearly up-to-the-minute data on sales, revenues, and disciplinary action at the employee level. ¶75. <br><br>• He was regularly informed about large numbers of FCC, state attorney general, BBB, and formal written complaints, including cramming complaints, made on behalf of customers. ¶¶103-04. <br><br>• He received monthly reports about cramming complaints, reviewed them, complained that they were too high, and was informed that they were accurate, but would not change CenturyLink's practices because he was unwilling to sacrifice revenues to reduce complaints. ¶¶105-08. <br><br>• After FE-5 spoke to Defendant Bailey and Brian Stading about cramming and Bailey acknowledged that cramming was occurring and said that the Company "ha[d] to do something about [its] call centers," Post created a new position for Bailey relating to business ethics and customer interactions. ¶110. Bailey reported "directly" to Post at all relevant times. ¶34. <br><br>• He was aware of CenturyLink's undisclosed attempt to reduce cramming by eliminating quotas for sales representatives, and personally recognized Kathy Flynn for her work on the project. ¶111. |

- 1 -

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| | - He attributed to other causes the decline in CenturyLink's revenues caused by its undisclosed attempt to reduce cramming, and the increase in CenturyLink's revenues caused by its abandonment of those efforts. ¶¶115, 117-18, 210, 215, 221, 226-27, 229, 231, 233-35. |
| | - He directly oversaw Defendant Puckett at the time she was promoted to oversee sales, which coincided with CenturyLink's attempt to remedy misconduct, and when she left unexpectedly and without explanation shortly after revenues fell as a result. ¶¶116, 188. |
| | - He served as CenturyLink's CEO when, shortly after CenturyLink's abandonment of its attempt to reduce cramming, the SEC asked the Company to provide additional details about revenue drivers for its consumer segment and CenturyLink failed to disclose the Company's recent attempt to reduce cramming, its abandonment of that attempt, and the material impact on revenues of those events. ¶¶121-24, 187. |
| | - He was directly involved in the ouster of Joseph Zimmel, a long-time CenturyLink director and member of the Audit Committee who would have reviewed CenturyLink's response to SEC questions about the drivers of CenturyLink's consumer segment revenues that were received immediately following CenturyLink's temporary effort to fix cramming, shortly after CenturyLink's response was sent. ¶¶125-29. Zimmel accused Defendant Post of being "deliberately misleading in a material way" in its disclosures about Zimmel's removal from the Board. ¶129. |
| | - The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Defendant Post, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink "expressly denied" cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254. |
| | - A CenturyLink whistleblower, Heidi Heiser, brought her concerns about the widespread cramming she witnessed to Defendant Post and was fired shortly thereafter. ¶¶146-47. |
| | - Shortly after Heiser was fired, CenturyLink again touted its Code of Conduct, which Defendant Post introduced and which provided that CenturyLink would be "truthful and demonstrate integrity in all |

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| | our dealings," would "truthfully market, promote, advertise and sell our products" and would not "engage in unethical or deceptive sales practices," including "plac[ing] or record[ing] an order for our products and services for a customer without that customer's authorization," in the Company's Form 10-K, which Post signed. ¶151, Ex. C. He also touted CenturyLink's work "to improve the customer experience" and "customer-centric mindset" after Heiser was fired. ¶151.<br><br>• He held himself out as overseeing CenturyLink's response to the Minnesota Attorney General's investigation, which the Attorney General characterized as "lackluster" and deceptive. ¶¶168, 181.<br><br>• Although he had previously announced that he would remain CenturyLink's CEO following its merger with Level 3 until 2019, he unexpectedly announced on March 6, 2018, just three months after CenturyLink announced the results of its investigation into sales misconduct at the Company, that he would retire in May 2018 instead. ¶177. |
| R. Stewart Ewing, Jr. (EVP and CFO) | • As CenturyLink's CFO during the Class Period, Defendant Ewing would have had access to an internal audit showing that CenturyLink overbilled more than 175,000 customers in one state and potentially over-billed more than 3.5 million customers in various states, as well as CenturyLink's responses to civil investigative demands showing that 600 of 700 (83%) of consumer complaints were substantiated. ¶¶5, 30, 108, 178.<br><br>• He regularly held himself out as familiar with CenturyLink's strategies, its results, the causes for those results, CenturyLink's Code of Conduct policies, and CenturyLink's regulatory risks, including by speaking about those topics on CenturyLink investor calls and signing SEC statements containing representations about them and associated SOX Certifications. ¶¶41-42, 118, 193-99, 210, 216-17, 222, 232, 235, 237, 238-40, 256, 261-62, App'x A.<br><br>• He was personally involved in setting CenturyLink's revenue projections. ¶¶67-69.<br><br>• He had access to a dashboard system that showed nearly up-to-the-minute data on sales, revenues, and disciplinary action at the employee level. ¶75. |

- 3 -

## Summary of Scienter-Related Complaint Allegations

| Defendant | |
|---|---|
| | - He served as CenturyLink's CFO when, shortly after CenturyLink's abandonment of its attempt to reduce cramming, the SEC asked the Company to provide additional details about revenue drivers for its consumer segment and CenturyLink failed to disclose the Company's recent attempt to reduce cramming, its abandonment of that attempt, and the material impact on revenues of those events. ¶¶121-24, 187.<br><br>- The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Ewing, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254.<br><br>- He attributed to other causes the decline in CenturyLink's revenues caused by its undisclosed attempt to reduce cramming, and the increase in CenturyLink's revenues caused by its abandonment of those efforts. ¶¶210, 216-17, 222, 232, 235, App'x A. |
| **David D. Cole (EVP and Controller)** | - As CenturyLink's EVP and Controller during the Class Period, Defendant Cole would have had access to an internal audit showing that CenturyLink overbilled more than 175,000 customers in one state and potentially over-billed more than 3.5 million customers in various states, as well as CenturyLink's responses to civil investigative demands showing that 600 of 700 (83%) of consumer complaints were substantiated. ¶¶5, 31, 108, 178.<br><br>- He personally certified under penalty of perjury that he was "familiar with the Company's day-to-day operations" and the applicable "consumer protection rules" governing CenturyLink's business, and affirmed that the Company was "complying with applicable service quality standards and consumer protection rules," including those prohibiting the "unauthorized switching to another telecommunications provider and unauthorized inclusion, or addition of services, commonly known as slamming and cramming," in 35 states and over 100 jurisdictions. ¶¶50, 185.<br><br>- He regularly held himself out as familiar with CenturyLink's strategies, its results, the causes for those results, CenturyLink's Code of Conduct policies, CenturyLink's regulatory risks, including by signing |

- 4 -

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| | SEC statements containing representations about them and corresponding with the SEC about the topic. ¶¶60, 194-99, 201-02, 205-06, 237, 238-40, 256, 261-63, App'x A.  He was personally involved in setting CenturyLink's revenue projections. ¶¶67-69.<br><br>• He served as CenturyLink's EVP and Controller when, shortly after CenturyLink's abandonment of its attempt to reduce cramming, the SEC addressed letters to him asking the Company to provide additional details about revenue drivers for its consumer segment, and he personally responded on CenturyLink's behalf and failed to disclose the Company's recent attempt to reduce cramming, its abandonment of that attempt, and the material impact on revenues of those events. ¶¶121-24, 187.<br><br>• The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Cole, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254. |
| **Karen Puckett (President, Global Markets)** | • As CenturyLink's COO and President, Global Markets during the Class Period, Defendant Puckett would have had access to an internal audit showing that CenturyLink overbilled more than 175,000 customers in one state and potentially over-billed more than 3.5 million customers in various states, as well as CenturyLink's responses to civil investigative demands showing that 600 of 700 (83%) of consumer complaints were substantiated. ¶¶5, 32, 108, 178.<br><br>• She was promoted to CenturyLink's sales at the same time CenturyLink attempted to reduce cramming by eliminating quotas for sales representatives, participated in several investor conference calls in that role, and left the Company shortly after the effort was abandoned when revenues fell as a result. ¶¶32, 116, 188, 285(e), 285(g), 297.<br><br>• She was personally involved in setting CenturyLink's revenue projections. ¶¶67-69. |

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| | - She discussed the strategy of keeping prices low but adding fees in meetings with FE-15, who repeatedly voiced concerns about it to her. ¶70.<br><br>- She had access to a dashboard system that showed nearly up-to-the-minute data on sales, revenues, and disciplinary action at the employee level. ¶75.<br><br>- She was regularly informed about large numbers of FCC, state attorney general, BBB, and formal written complaints, including cramming complaints, made on behalf of customers. ¶¶103-04.<br><br>- She received monthly reports about cramming complaints, reviewed them, complained that they were too high, and was informed that they were accurate. ¶¶105-06.<br><br>- FE-19 stated that Puckett was not willing to sacrifice revenues to reduce complaints. ¶¶107-08.<br><br>- She regularly held herself out as familiar with CenturyLink's strategies, its results, and the causes for those results, by speaking about those topics on CenturyLink investor calls. ¶209, App'x A. |
| **Dean J. Douglas (President, Sales and Marketing)** | - As CenturyLink's President, Sales and Marketing during the Class Period, he would have had access to an internal audit showing that CenturyLink overbilled more than 175,000 customers in one state and potentially over-billed more than 3.5 million customers in various states, as well as CenturyLink's responses to civil investigative demands showing that 600 of 700 (83%) of consumer complaints were substantiated. ¶¶5, 33, 108, 178.<br><br>- Although CenturyLink announced that he would form part of the "senior leadership" team at the Company following its merger with Level 3, and disclosed Defendant Douglas would be receiving certain executive compensation in connection with that role on June 1, 2017 – just five days after Bloomberg disclosed the filing of the Heiser whistleblower complaint – CenturyLink announced that Douglas "had decided to leave the company." ¶33.<br><br>- He was promoted to oversee CenturyLink's sales immediately following the termination of Defendant Puckett, shortly after CenturyLink abandoned its effort to reduce cramming when revenues fell as a |

- 6 -

## Summary of Scienter-Related Complaint Allegations

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
|  | result, and participated in several investor conference calls in that role. ¶¶33, 118, 188, 285(f), 285(g), 298.<br><br>• He regularly held himself out as familiar with CenturyLink's strategies, its results, and the causes for those results, including by speaking about those topics on CenturyLink investor calls. ¶¶59, 223-24, 228, App'x A. For example, during a May 4, 2016 earnings call, he claimed that he and CenturyLink did "a lot of competitive analysis" and that, unlike CenturyLink, its competitors "add[ed] a lot of fees." ¶224.<br><br>• The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Douglas, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254.<br><br>• He attributed to other causes the increase in CenturyLink's revenues caused by its undisclosed abandonment of its attempt to reduce cramming. ¶¶223-24, 228. |
| G. Clay Bailey (SVP, Treasurer) | • As CenturyLink's SVP and Treasurer during the Class Period, he would have had access to an internal audit showing that CenturyLink overbilled more than 175,000 customers in one state and potentially over-billed more than 3.5 million customers in various states, as well as CenturyLink's responses to civil investigative demands showing that 600 of 700 (83%) of consumer complaints were substantiated. ¶¶5, 34, 108, 178.<br><br>• He served as CenturyLink's Senior Vice President of Operations in 2014, with oversight over all regional operations, and as Senior Vice President of Operations Transformation in 2015, in which role he oversaw a team "devoted to…bringing…a better customer experience." ¶34.<br><br>• He discussed CenturyLink's corporate strategy of keeping prices low but adding fees in meetings with FE-15. ¶70 |

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| | - FE-5 told Defendant Bailey about cramming practices at the Company in April 2014, in response to which he acknowledged it was occurring and Defendant Bailey stated: "We've got to do something about our call centers." ¶109.<br><br>- After the discussion with FE-5 and Regional Vice President Brian Stading in April 2014, he was placed in a new position relating to business ethics and customer interactions by Defendant Post. ¶110.<br><br>- The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Bailey, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254. |
| | In addition to being established through the Executive Defendants listed above, Defendant CenturyLink's scienter is established through the scienter of the following non-party senior executives: |
| CenturyLink, Inc. | Kathy Victory: SVP, Consumer Sales & Care (¶100)<br><br>- Victory discussed the strategy of keeping prices low but adding fees in meetings with FE-15. ¶70.<br><br>- She personally approved removal of Quality Assurance metrics from bonus compensation in 2014. ¶100.<br><br>- FE-16 expressed "grave concerns" about eliminating the QA department to Victory. ¶101.<br><br>- She was repeatedly informed that top-performing sales employees and Circle of Excellence nominees were frequently identified as engaging in cramming. ¶103.<br><br>- She was regularly informed about large numbers of FCC, state attorney general, BBB, and formal written complaints, including cramming complaints, made on behalf of customers. ¶¶103-04. |

- 8 -

| Defendant | **Summary of Scienter-Related Complaint Allegations** |
|---|---|
| | <ul><li>She received monthly reports about cramming complaints, reviewed them, specifically complained that they were too high, and was informed that they were accurate. ¶105.</li><li>The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Victory, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254.</li></ul><u>Kathy Flynn: VP, Human Resources (¶102)</u><ul><li>Flynn was informed that employees crammed frequently and did so because of pressure to make sales and felt they would lose their jobs. ¶102.</li><li>She worked on CenturyLink's undisclosed attempt to reduce cramming by eliminating quotas for sales representatives, and was directly praised by Defendant Post for her work on the project. ¶¶111-14.</li><li>The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Flynn, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254.</li></ul><u>Linda Olsen: VP, Consumer Contact Centers (¶60)</u><ul><li>Each month, Olsen participated in call center reviews in which Olsen, call center directors and managers, and a human resources representative would discuss employee sales quota performance, resulting discipline, and any instances of employee cramming misconduct using excel sheets with effectively "real time" employee-level sales data. ¶75.</li></ul> |

- 9 -

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
| | - She was challenged by FE-7 about strict enforcement of sales quotas, but stated: "That's our culture. If you don't get to 90% [of your quota], we're going to churn to the next person." ¶79.<br>- She personally approved training for employees that instructed them to quote single prices for bundles without disclosing that optional services were included. ¶¶81-82.<br>- She personally approved removal of Quality Assurance metrics from bonus compensation in 2014. ¶100.<br>- FE-16 expressed "grave concerns" about eliminating the QA department to Olsen. ¶101.<br>- She was regularly informed about large numbers of FCC, state attorney general, BBB, and formal written complaints, including cramming complaints, made on behalf of customers. ¶104.<br>- The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Olsen, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254.<br><br>Brian Stading: VP, Northwest Region (¶109)<br><br>- He was informed about widespread cramming problems by FE-5 and, in April 2014, specifically in order to enable FE-5 to bring these issues to the attention of CenturyLink senior management, Stading introduced FE-5 to Defendant Bailey in Palm Beach, Florida. In that meeting, Defendant Bailey agreed with FE-5 about the cramming problem and stated: "We've got to do something about our call centers." ¶109.<br>- The Arizona Attorney General's Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, [and] managerial [and] supervisory employees," including Stading, required CenturyLink to closely monitor consumer complaints and take several affirmative steps in dealing with consumers, including confirming material terms of transactions. ¶135. In addition, |

- 10 -

CASE 0:18-cv-00296-MJD-JFD   Doc. 163-4   Filed 10/12/18   Page 12 of 12

| Defendant | Summary of Scienter-Related Complaint Allegations |
|---|---|
|  | CenturyLink issued several "express[] deni[als]" of cramming and billing misconduct in the Assurance of Discontinuance. ¶¶185, 247-254. |

- 11 -