**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION<br>This Document Relates to:<br>Civil Action No. 18-296 (MJD/KMM) | **MDL No. 17-2795 (MJD/KMM)**<br><br>Oral Argument Requested |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION ............................................................................................. 1

ARGUMENT.................................................................................................... 2

I.    PLAINTIFFS' OPPOSITION DOES NOT REMEDY THE
      COMPLAINT'S FAILURE TO STATE A CLAIM............................................ 2

      A.    The Opposition's Rhetoric About "Cramming" Is Not Supported By
            The Complaint ................................................................................ 2

      B.    Plaintiffs' "Audit" Claims Are Speculation ...................................... 4

      C.    Plaintiffs' "Behavioral Coaching" Allegations Make No Sense.......... 7

      D.    Plaintiffs' Comparisons to Wells Fargo Are An Opportunistic
            Distraction .................................................................................. 10

II.   THE COMPLAINT FAILS TO STATE A SECTION 10(B) CLAIM................. 12

      A.    Plaintiffs Fail To Plead Any Actionable Misstatement Or Omission ........ 12

            1.    Plaintiffs Fail To Plead Falsity As To CenturyLink's Revenues............. 12

            2.    Plaintiffs Fail To Plead Falsity As To CenturyLink's Strategies
                  And Policies ........................................................................ 14

            3.    Plaintiffs Fail To Plead Falsity As To Defendants' Optimism,
                  Opinions, And Expectations About CenturyLink's Business................. 16

      B.    Plaintiffs Fail To Adequately Plead Scienter ............................................. 17

      C.    Plaintiffs Fail To Adequately Plead Loss Causation.................................. 21

III.  THE COMPLAINT FAILS TO STATE A SECTION 20(A) CLAIM................. 22

CONCLUSION ............................................................................................. 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adaptive Broadband Sec. Litig.*,
  2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..........................................................20

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ...............................................................................22

*Brown v. Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) .............................................................................6

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ..............................................................................20

*Cement & Concrete Works Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ..............................................................16

*Cornwell v. Credit Suisse Group*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010) .................................................................19

*In re First Merchants Acceptance Corp. Sec. Litig.*,
  1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ...........................................................6

*In re Foundry Networks, Inc. Sec. Litig.*,
  2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ....................................................17

*Fraker v. Bayer Corp.*,
  2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) .........................................................5

*Friedman v. Rayovac Corp.*,
  295 F. Supp. 2d 957 (W.D. Wis. 2003) ...............................................................13

*Garden City Empls. Ret. Sys. v. Psychiatric Sols., Inc.*,
  2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ...................................................20

*Gebhardt v. ConAgra Foods, Inc.*,
  335 F.3d 824 (8th Cir. 2003) .............................................................................13

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................13

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ................................................11, 16

*Hensley v. Imprivata, Inc.*,
  260 F. Supp. 3d 101 (D. Mass. 2017) .................................................................17

## TABLE OF AUTHORITIES
### Continued

Page(s)

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) ...................................................................3, 4, 18, 19

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ..........................................................................................17

*Jensen v. Thompson*,
  2018 WL 1440329 (D.S.D. Mar. 22, 2018) ......................................................22

*Kushner v. Beverly Enters., Inc.*,
  317 F.3d 820 (8th Cir. 2003) ............................................................................22

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006).................................................................15

*Lesavoy v. Gattullo-Wilson*,
  170 F. App'x 721 (2d Cir. 2006) .........................................................................4

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...........................................................................21

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011) ..................................................5, 12

*Mauss v. NuVasive, Inc.*,
  2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ..................................................13

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
  641 F.3d 1023 (8th Cir. 2011) ...........................................................................22

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009).................................................................15

*Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) .......................................................................................16

*Ong v. Chipotle*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018).................................................................15

*In re Pfizer Inc. Sec. Litig.*,
  2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ......................................................17

*Pound v. Stereotaxis, Inc.*,
  8 F. Supp. 3d 1157 (E.D. Mo. 2014)...............................................................3, 18

**TABLE OF AUTHORITIES**
Continued

Page(s)

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ................................................20

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...............................................16

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) .........................................15, 16

*In re Retek Inc. Sec.*,
2005 WL 3059566 (D. Minn. Oct. 21, 2005) ........................21

*RSM Prod. Corp. v. Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009)......................................5

*Ryan v. Ryan*,
889 F.3d 499 (8th Cir. 2018) ..................................................4

*SEC v. Goldstone*,
233 F.Supp.3d 1169 (D.N.M. 2017) ......................................17

*Shaev v. Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) .................10, 11, 12

*Shoemaker v. Cardiovascular Sys., Inc.*,
2017 WL 1180444 (D. Minn. Mar. 29, 2017) ..........................3

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ...................................17

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)....................................18

*In re Target Corp. Sec. Lit.*,
275 F. Supp. 3d 1063 (D. Minn. 2017).................................13

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017) ............................17

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) .....................10, 11, 17

**Statutes**

Private Securities Litigation Reform Act................................ *passim*

iv

## TABLE OF AUTHORITIES
**Continued**

Page(s)

**Other Authorities**

Federal Rule of Civil Procedure 12 ...............................................................................4

## INTRODUCTION

This putative shareholder class action rests on the inherently implausible theory that CenturyLink materially inflated its reported revenues over a four-year period by systematically billing its customers for unwanted products and services, a practice referred to as "cramming." But the Complaint does not allege facts sufficient to support that theory.[1] *See* ECF No. 278, Defendants' Motion to Dismiss ("Mot."). Plaintiffs' Opposition, ECF No. 286 ("Opp."), doubles down on their theory, but tacitly confirms the lack of allegations sufficient to support it: rather than showing why the existing Complaint states a claim for securities fraud, the Opposition systematically mischaracterizes it, and strains to analogize this case to an unrelated scandal at a completely different company. But rhetoric in a brief is no substitute for the allegations missing from the Complaint. Plaintiffs' claims fail because Plaintiffs have failed to allege adequate facts in *their* Complaint, about *this* Company, and *these* Defendants, to show that any statements or omissions were actionably false, Mot. 15-24, made with scienter, *id*. at 24-32, or caused Plaintiffs' investment losses, *id.* at 32-33. The Complaint does not meet the heightened pleading standards of the PSLRA, and nothing in the Opposition repairs those pleading defects.

---

[1] Except where otherwise indicated, capitalized terms are defined in the Motion and emphases are supplied.

## ARGUMENT

**I.    Plaintiffs' Opposition Does Not Remedy The Complaint's Failure To State A Claim**

Plaintiffs' Opposition draws on several strategies: it mischaracterizes what the Complaint says, draws implausible inferences from vague comments attributed to anonymous former employees, and attempts to ride the coattails of litigants in other cases. All are improper and should be rejected.

### A.    The Opposition's Rhetoric About "Cramming" Is Not Supported By The Complaint

The Complaint largely rests on a patchwork of comments attributed to 20 FEs. The Opposition argues that these comments show that "cramming" was "endemic," "systematic[]," "routine[]," and a "crisis" at CenturyLink, Opp. 1, 4, 9-11, 22-23, 32-34, 35, 56, and that cramming "was condoned and encouraged by the Company's senior leadership, which depended on these corrupt practices to meet the financial projections Defendants provided to Wall Street." Opp. 1. But the Complaint is devoid of support for these bare conclusions.

Plaintiffs cannot, and do not, dispute that: no FE is alleged to have personal knowledge of any billing issues affecting more than a tiny percentage of CenturyLink's millions of customers; no FE estimated, or provided a reasoned basis for Plaintiffs to estimate, the financial impact of alleged "cramming" on CenturyLink's $4 billion-plus quarterly revenues; and no FE suggests that any Defendant knew of, much less "condoned and encouraged [and] depended on," Opp. 1, a vast cramming scheme. Mot.

8-10.  Instead, many of Plaintiffs' FEs appear to be recounting "office gossip."[2]

*Shoemaker v. Cardiovascular Sys., Inc.*, 2017 WL 1180444, at \*9 (D. Minn. 2017).

Under "clear" Eighth Circuit law, their allegations must be "disregarded as unreliable."

*Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014) (citing *Horizon*

*Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009)) (rejecting FE

allegations where "information [is] second or third-hand; or [plaintiff] fails to establish

that the witnesses 'would have a basis to know what [defendants] knew'").

Because Plaintiffs cannot point to a single FE whose account, standing alone,

actually supports their story, the Opposition conflates and exaggerates them.  For

example, the Opposition repeatedly refers to CenturyLink "internal investigations" that

"substantiat[ed] half to over 80%" of cramming complaints.  Opp. 3, 7, 23, 35.  This is an

inaccurate amalgam of comments attributed to FE-18 and FE-19.  FE-18 said only that

CenturyLink substantiated cramming in "about half" of a *subset* of the "hundreds" of

total billing complaints CenturyLink fielded monthly, ¶¶103-04, while FE-19 described a

review of 700 "consumer" (*not* "cramming") complaints received *over four years*.  ¶108.

The only plausible inference to be drawn from those FEs is that cramming affected a tiny

fraction of a percent of CenturyLink's customers.  Mot. 10.  The Opposition thus argues

that they reviewed only "a small subset" of CenturyLink's cramming complaints, Opp.

23, but the Complaint itself alleges that the data reviewed by FE-18's team was

comprehensive.  ¶104.

---

[2] *See, e.g.*, ¶73 (speculation by FE-6, a call center employee for six months, that "sales quotas were impossible to hit unless you were engaged in shady practices").

Similarly, the Opposition repeatedly mischaracterizes an alleged comment by Clay Bailey to FE-5 ("we've got to do something about our call centers") as an "admission" of a "massive cramming problem." Opp. 46. On its face, this does not remotely suggest an acknowledgment that cramming was a "widespread problem." Opp. 10-11. In any event, an email that FE-5 sent to Bailey after their interaction, Ex. 26, incorporated by reference in the Complaint, ¶110, shows that the two did not discuss cramming problems at all: FE-5 told Bailey how FE-5 had "improved … sales results … in Boise Idaho." Ex. 26.[3] *See Horizon*, 580 F.3d at 764 (objectively inaccurate anonymous witness statement weakens inferences from witness's other statements).

Notwithstanding the Opposition's overblown rhetoric, there are no well-pleaded allegations in the Complaint showing "widespread" or "systematic" cramming at CenturyLink, much less that any Defendant or other executive was aware of any such thing. *See also infra* at 18-19.

## B.   Plaintiffs' "Audit" Claims Are Speculation

The Opposition relies heavily on an allegation that "an internal CenturyLink audit" showed that "the Company potentially overbilled 3.5 million customers." ¶1. The Opposition alludes to this allegation no less than ten times. Opp. 1, 3-6, 22, 24, 46, 48. But the Complaint admits that Plaintiffs lifted it wholesale from a discovery letter brief

---

[3] Plaintiffs do not dispute that Exhibit 26 is incorporated by reference or challenge its authenticity, but complain that it should not be used to draw "factual inferences." Opp. 43 n.19. Plaintiffs cannot hide behind Rule 12 to escape a document on which they based their Complaint. *See, e.g.*, *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018); *Lesavoy v. Gattullo-Wilson*, 170 F. App'x 721, 724 (2d Cir. 2006).

filed by the Minnesota Attorney General ("AG") in its pending state court lawsuit against CenturyLink.  ¶178 ("*[A]ccording to the Minnesota Attorney General*, … an internal 'nation-wide audit' . . . showed 'various billing problems'").

Courts have long recognized that plaintiffs may not blindly parrot unproven arguments advanced by other litigants in other lawsuits, which is precisely what Plaintiffs have done here.  "Attorneys have a non-delegable duty to make a reasonable inquiry into whether the factual contentions made in a complaint have evidentiary support," and that duty is not satisfied merely by quoting briefs filed in other cases.  *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *19-21 (C.D. Cal. 2011) (striking allegations that "quote[d] and cite[d] to unproven, untested allegations in complaints filed in separate lawsuits, as if they were facts" because plaintiffs did "not reasonably investigate[] the allegations they copied"); *Fraker v. Bayer Corp.*, 2009 WL 5865687, at *5 (E.D. Cal. 2009) (striking allegations copied from regulatory proceeding and consent decree); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (similar).

The Opposition shows that Plaintiffs have not conducted even a rudimentary investigation of their "audit" allegation.  Plaintiffs have never seen any "audit" matching the Complaint's description; in fact, Plaintiffs apparently believe that even the Minnesota AG has never seen such a document.[4]  Opp. 24.  Worse, the Opposition layers yet more

---

[4] Although irrelevant to the Motion, Plaintiffs misconstrue the state court proceedings. The notice of motion attached to the Opposition (ECF No. 287-2) is unrelated to the now-resolved discovery disputes addressed in the briefing from which Plaintiffs copied the Minnesota AG's "audit" claim.

speculation on top of the argument Plaintiffs initially copied.  As stated in the Minnesota AG's letter and alleged in the Complaint, a lone CenturyLink document reflects "potential[] over-billing."  ¶178.  In the Opposition, this morphs into *multiple* "audits" that not only "*confirm[]*" overcharges, but also calculate those overcharges at "*hundreds of dollars each*" and *show each one to be the product of deliberate sales agent fraud*.[5] Opp. 6, 23 n.5, 48.  None of this is in the Complaint.[6]

In short, Plaintiffs' central "audit" claim is not only borrowed, but also enormously exaggerated, and Plaintiffs lack any independent basis for it.  The Court cannot, on this flimsy foundation, draw the sweeping inference that Plaintiffs seek (*e.g.*, that "over half of CenturyLink's 5.9 million broadband subscribers" were intentionally overcharged, ¶1).  *See Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) ("[W]e are not required, even at this preliminary stage, to draw unreasonable inferences . . . .").  If the Court can infer anything at all, it is no more than the fact that the Complaint's bare allegation of "potential over-billing" was first made by another litigant

---

[5] Plaintiffs argue that "potential over-billing" must result from intentional misconduct. Opp. 24, 48.  But that is not a logical inference.

[6] Plaintiffs argue that they are entitled to speculate with impunity about the existence or substance of any document termed an "audit."  Opp. 24.  The case law they cite does not say or support that.  *Cf. In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *11 & n.5 (N.D. Ill. 1998) (declining to resolve, at the pleading stage, an accounting firm's argument that the "specifics" of its audit *process* were proper).

in another contested case—which hardly supports a conclusion that Defendants schemed to inflate CenturyLink's revenues through "cramming."[7]

### C.     Plaintiffs' "Behavioral Coaching" Allegations Make No Sense

The Opposition also attaches outsized importance to a theory outlined briefly in the Complaint.  Plaintiffs allege that, in 2014, CenturyLink "senior management" implemented "a new 'behavioral coaching model' for its sales employees," which evaluated performance on the basis of subjective quality assessments in lieu of quantitative metrics.  ¶111.  Allegedly, the change reduced cramming, which in turn caused consumer revenues to decline in the fourth quarter of 2014.  ¶¶111-15.  Plaintiffs claim that CenturyLink "senior management" then "almost immediately" "went back to the old model of enforcing quotas," ¶¶112, 114, such that cramming was again driving revenue growth by the third quarter of 2015.  ¶117; Opp. 11.

Once again, Plaintiffs' Opposition spins a dramatic tale that is not supported by the factual allegations in the Complaint.  Their theory that any model change occurred at all is pieced together from vague comments attributed to three HR employees (FE-8, FE-17, and FE-20, ¶¶74, 102) and one regional manager (FE-1, ¶38), which do not support the inferences that Plaintiffs attempt to draw from them.  *See, e.g.* ¶114 (reflecting that FE-8 described only "less focus[] on a metrics-heavy scorecard" in "2014-2015").  In any event, no FE is alleged to have said that any Defendant directed any coaching model

---

[7] The same is true for Plaintiffs' cutting-and-pasting from more recent litigation advocacy pieces by the Minnesota AG, as well as a complaint by a former employee that resulted in zero findings of fact and a resolution between the parties.  Opp. 13-14, 24, 48, 53.

change; no FE is alleged to have discussed the reasons for or impact of any model change with any Defendant; and no FE would have had access to information about CenturyLink's top-line sales or customer complaint numbers. Mot. 7-8.

Plaintiffs' story is contradicted by objective, judicially noticeable facts. The dramatic revenue swings at the heart of Plaintiffs' story—a sharp decline in late 2014 followed by a return to growth in 2015—simply *did not occur*. From 2013 through the beginning of 2016, CenturyLink's quarterly consumer revenues fluctuated around $1.5 billion, and all changes in late 2014 through 2015 were well within that range. Exs. 1-16, 28-31.[8]  Consumer revenues did not fall "drastically" in the fourth quarter of 2014, ¶115, Opp. 11; they went *up*, from $1.491 billion to $1.494 billion. Exs. 30 at 13, 11 at 31. And far from seeing "rejuvenated results" in the third quarter of 2015, Opp. 11, ¶117, CenturyLink had only a minor increase in consumer revenues, from $1.502 million to $1.509 million.[9]  Exs. 13 at 33, 14 at 36.

Plaintiffs' story is also inconsistent with the Complaint. Plaintiffs argue that "immediately after [FE-5 spoke with Bailey in April 2014], Defendant Post put Bailey in a new position relating to customer interactions, and CenturyLink attempted a dramatic reform of its sales practices . . . ." Opp. 47. But Bailey was not promoted to Senior Vice President of Operational Transformation until *May 2015*. ¶34; Ex. 33 at 6. This cannot

---

[8] Exhibits 28-34 are exhibits to the second Gibbs Declaration dated November 9, 2018.

[9] The Opposition also relies on the purported revenue decline in late 2014 to portray the timing of Karen Puckett's departure as "suspicious," Opp. 40, 41, and CenturyLink's Item 303 disclosures as inadequate. Opp. 11, 21. As there was no revenue decline, these theories fail too.

be reconciled with Plaintiffs' narrative that the new model, pushed by Bailey in his new role, was adopted in 2014.  Opp. 10.

Finally, Plaintiffs' effort to illustrate a correlation between CenturyLink's revenues and cramming incidents is misleading and inapt.  ¶120.  The Complaint contains a graph that purports to compare two trend lines ("Consumer Strategic Revenues" and "FCC Cramming and Billing Complaints"), from the beginning of 2015 to the middle of 2017.[10]  But their revenue line reflects only a subset of CenturyLink's Consumer business (Strategic), which in turn was only one of two business segments for which CenturyLink reported revenues.  *See, e.g.*, Exs. 2 at 4-5, 13 at 32-33.  Plaintiffs offer no justification for this cherry-picking.  Indeed, plotting *all* Consumer Revenues would produce a graph with no apparent pattern.  *See* Ex. 34.  Similarly, while some of the FCC complaints that Plaintiffs claim they analyzed evidently addressed "Cramming" while others addressed "Billing," ¶120, Plaintiffs do not explain how technical "Billing" glitches could have been reduced by "behavioral coaching" or why they did not simply graph the "Cramming" complaints.  In any event, the graph suggests that the number of CenturyLink customers who complained to the FCC about *either* "Cramming" *or* "Billing" in this period ranged from 310 to 675, which amounted to less than 0.01% of CenturyLink's broadband subscribers and 0.006% of its wireline subscribers.  ¶1; Ex. 4 at 3.

---

[10] Selecting this date range permitted Plaintiffs to avoid plotting 2014 revenues, which would show an increase at the end of that year instead of the "dip" they allege.  ¶115.

### D.    Plaintiffs' Comparisons to Wells Fargo Are An Opportunistic Distraction

The Opposition refers to a recent scandal at Wells Fargo more than *30 times*, in the apparent hope that saying their case is "indistinguishable" can make it so.  Opp. 3.  It is not.  Mot. 7 n.5.

The facts underlying the Wells Fargo scandal—which Plaintiffs never explain— are irrelevant here.  The success of Wells Fargo's retail bank depended on "cross-selling" multiple products and services to existing customers.  *See Shaev v. Baker*, 2017 WL 1735573, at *2 (N.D. Cal. 2017).  Wells Fargo closely tracked and published its "cross-sell numbers," an unaudited, non-GAAP figure representing the average number of products sold per household.  *See id.*  To boost that metric, bankers were required to open a set number of new product accounts *each day*.  *See id.*  Between 2008 and 2016, 17 whistleblower complaints, coupled with scores of investigations and media reports, culminated in revelations that Wells Fargo's "cross-sell figures [were] based on 1,534,280 unauthorized deposit accounts and 565,443 unauthorized credit-card accounts."  *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1096 (N.D. Cal. 2017) (noting "a critical performance metric was based on a significant number of fraudulent accounts").  In 2016, under oath before Congress, Wells Fargo's then-CEO admitted that its directors and officers had known about this fraud for many years.  *Shaev*, 2017 WL 1735573, at *5.  Indeed, by 2016, 5,300 Wells Fargo employees had been fired for it.  *See id.*  Fines by the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, and the Los Angeles City Attorney totaled $185

million.  ECF No. 287-1 ¶10.  Against that extraordinary backdrop, a California federal district judge declined to dismiss shareholder derivative claims for breaches of fiduciary duties as well as securities law claims.  *See Shaev*, 2017 WL 1735573 (derivative claims); *In re Wells Fargo*, 282 F. Supp. 3d 1074 (same); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116 (N.D. Cal. 2018) (direct PSLRA claims).

Notwithstanding Plaintiffs' best efforts to invoke and mimic the unique facts in the Wells Fargo cases, the allegations in their Complaint do not remotely resemble them.  To start, CenturyLink's audited revenues reported in accordance with GAAP are not analogous to the bespoke "cross-sell" metric that Wells Fargo used.  Moreover, there is no allegation that CenturyLink inflated its revenues by opening millions of fake customer accounts, *cf. In re Wells Fargo*, 282 F. Supp. 3d at 1096, nor is there any plausible allegation that thousands of CenturyLink employees engaged in fraudulent sales practices.  *Cf. Shaev*, 2017 WL 1735573, at *5.  No one from CenturyLink has testified under oath (before Congress or otherwise) that its board and senior management were on notice of rampant fraud for years.  *Cf. id.*  And the unprecedented regulatory penalties levied against Wells Fargo (at least $185 million) simply dwarf the other matters that Plaintiffs point to here (*e.g.*, a 2016 inquiry that CenturyLink "resolved . . . with a modest $150,000 payment to cover the [Arizona] Attorney General's fees and costs," ¶134, and a pending litigation with the Minnesota AG).  Indeed, Plaintiffs do not dispute that, as CenturyLink repeatedly warned investors, such matters are not uncommon in the telecommunications industry.  Mot. 14 n.21.

11

In the end, Plaintiffs' efforts to draw parallels to Wells Fargo largely turn on the facts that CenturyLink employs sales representatives and has used quantitative targets to incentivize and measure their performance. Opp. 34. But the same might, of course, be said of hundreds of companies across the United States. Setting sales quotas does not constitute securities fraud (or violate any other laws). *See infra* at 17.

Ironically, Plaintiffs' repeated allusions to Wells Fargo only underscores their own pleading failures. The Wells Fargo court observed that the shareholder plaintiffs there had *not* tried to plead their claims by relying on any other lawsuits as if "the allegations asserted in them are factually true . . . ." *Shaev*, 2017 WL 1735573, at *11 (citing *Countrywide*, 2011 WL 4389689, at *19-21). Over and over, by contrast, Plaintiffs here attempt to do just that. *See, e.g.*, Opp. 3, 4, 12-13, 15. The Court should reject this tactic.

## II.   The Complaint Fails To State A Section 10(b) Claim

### A.   Plaintiffs Fail To Plead Any Actionable Misstatement Or Omission

#### 1.   Plaintiffs Fail To Plead Falsity As To CenturyLink's Revenues

The root cause of Plaintiffs' failure to plead falsity as to any of Defendants' statements is their inability to allege *facts*—as opposed to conjecture or conclusions—to show that CenturyLink's revenues were materially overstated by cramming. Mot. 15-20. While Plaintiffs argue that they need not allege "*the specific amounts* by which CenturyLink's revenues were inflated," Opp. 21, this is a straw man; they do not provide even an approximation of "how and to what extent" revenues were supposedly inflated,

as they must to plead material falsity of those revenues under the PSLRA.[11]  *See* Mot. 15 (citing *In re Target Corp. Sec. Lit.*, 275 F. Supp. 3d 1063,1076-77 (D. Minn. 2017)).  As a result, Plaintiffs' claims of false revenues—premised on the unestimated effect on unspecified revenue lines of an unknown number of unauthorized charges that resulted from unproven fraud by unknown CenturyLink employees that were not caught and reversed by the safeguards that Plaintiffs admit CenturyLink had in place—are speculative and conclusory.

Having based their claim on allegations that CenturyLink's revenues were materially inflated, *e.g.*, ¶¶192, 203, Plaintiffs now appear to argue that the amount of revenue at issue is legally irrelevant because investors would want to know if "any" of the company's revenues resulted from "illegal conduct."  Opp. 22.  That proposition has no basis in law, and none of Plaintiffs' case cites support it.  In *Gentiva*, plaintiffs identified a specific subset of revenues impacted by specific instances of Medicare fraud that created "serious … civil and criminal liability."  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013).[12]  Here, by contrast, Plaintiffs' falsity allegations are expressly based on "the siz[e]" of the "financial impact" of the misconduct that they

---

[11] Plaintiffs' effort to construct a lesser standard than this for pleading falsity, Opp. 21-22, fails; in the cases they cite, the plaintiffs *did* plead particularized facts reflecting "how" financial statements were false.  *See, e.g.*, *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 974 (W.D. Wis. 2003) (net sales reduced by $59.3 million).

[12] *See also Mauss v. NuVasive, Inc.*, 2015 WL 10857519, at *9 (S.D. Cal. 2015) (relying on *Gentiva* to sustain allegations that specific reported revenue, sales, and expenditure figures were rendered false by healthcare fraud); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("ConAgra overstated its net income for 1999 and 2000 by 8 per cent.").

allege.  ¶94.  Yet the Complaint never hints at what that supposed size was, nor does it support any reasonable inference that "cramming" was so widespread that it plausibly could have materially inflated CenturyLink's reported revenues.  This fails the PSLRA.

As a fallback, Plaintiffs purport to have alleged "numerous facts quantifying the material impact on the Company's revenues."  Opp. 3, 22-23.  Those so-called "facts" boil down to allegations lifted impermissibly from the ongoing Minnesota AG litigation, *supra* at 4-7, vague and uncreditable FE accounts that, for example, cramming occurred "all the time," ¶89; *supra* at 2-4, and the internally inconsistent "behavioral coaching model" story.  *Supra* at 7-9.  Even taken at face value (which, under the law, they may not be), none of them serve to "quantify" Plaintiffs' revenue falsity allegations at all.

### 2.    Plaintiffs Fail To Plead Falsity As To CenturyLink's Strategies And Policies

The Complaint alleges that dozens of statements about undisputedly legitimate business strategies and policies were false when made because, essentially, CenturyLink's true business strategy was cramming.  Mot. 21.  The Opposition backs away from this and argues instead that those statements were actionably false because Defendants knew cramming was "pervasive."  Opp. 4.  This fails too.

At most, the Complaint alleges that some unspecified number of CenturyLink employees did not comply with the standards, practices, and procedures that CenturyLink had adopted, or live up to its corporate goals for meeting customer expectations.[13]  *See,*

---

[13] The Complaint also alleges that such employees were terminated as a matter of course. ¶102.

*e.g.*, ¶¶53, 174. *Ong v. Chipotle*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018), shows that this does not give rise to federal securities law liability. Mot. 21-22. The statements at issue in *Chipotle* included, as here, strong affirmations of the company's core "commit[ments]" to its customers and detailed descriptions of the "programs," "departments," and "operating standards" designed to fulfill those commitments. 294 F. Supp. 3d at 219. The *Chipotle* plaintiffs similarly argued falsity based on allegations that executives "ignored" violations and left open loopholes for misconduct; that theory was rejected. *See id.* at 219, 232-33. To evade this, Plaintiffs cartoonishly suggest that CenturyLink so encouraged cramming that it was "included as an option … in the Company's internal computer systems." Opp. 26. But the cited allegations in the Complaint actually describe systems for "document[ing] cramming incidents" and "addressing the violation." ¶96.

Plaintiffs also argue that CenturyLink's Code of Conduct should be deemed false because employees were warned, in addition to many other things, that "[w]e must … [n]ever place or record an order for our products and services for a customer without that customer's authorization." ECF No. 287-3 at 13. In effect, Plaintiffs seek to hold CenturyLink liable for adopting a Code of Conduct that was specific and firm. Opp. 26, 29-30. The law is exactly the opposite; courts recognize that a corporate code of conduct is "inherently aspirational" and does not "imply[] that all staff . . . always adhere to its aspirations."[14] *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-*

---

[14] Plaintiffs' reliance on *Lapin v. Goldman Sachs Group., Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006), and *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09

*Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).

### 3.    Plaintiffs Fail To Plead Falsity As To Defendants' Optimism, Opinions, And Expectations About CenturyLink's Business

The Motion identifies numerous challenged statements that are inactionable as a matter of law because they were immaterial puffery, opinions, or forward-looking.  Mot. 22-24.  Plaintiffs' response again falls back on Wells Fargo, but that court's conclusion that certain statements were not puffing was expressly tailored to their unique "context" (among other things, their maker was overseeing an investigation of suspicious sales patterns).  *See Hefler,* 2018 WL 1070116, at *7.  Plaintiffs back away from many of the opinion statements that the Complaint expressly alleged were false, and for the rest they make the bare assertion that they have met the *Omnicare* standard. Opp. at 30-31 & n.13. However, that ignores the Supreme Court's warning that pleading falsity of an opinion is "*no small task for an investor*," and requires an extraordinary, fact-specific showing that Plaintiffs do not pretend to try to make.  *Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015).  And Plaintiffs' attempt to dispute that many challenged statements were forward-looking is supported only by a cite to an inapposite out-of-circuit discussion of mixed present/future statements.  Opp. at 31 & n.14.  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

---

(S.D.N.Y. 2009) is unavailing.  Opp. 29.  Those cases, which addressed conflicts of interest on the part of purportedly independent research analysts, do not "stand for the proposition that the publication of a general statement of ethical standards, without more, is a basis for liability."  *Cement & Concrete Works Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 n.1 (N.D. Cal. 2013) (distinguishing *Lapin*).

Plaintiffs' scattershot approach serves only to underscore their failure to draft the Complaint with the precision that is required by the PSLRA.[15]

### B.    Plaintiffs Fail To Adequately Plead Scienter

Under the PSLRA, Plaintiffs must allege particularized *facts* giving rise to a *strong* inference that each individual Defendant acted with scienter, or intent to defraud. Nothing in the Complaint meets this high bar.  Mot. 25-32.

*Sales quotas*.  Plaintiffs argue the individual Defendants "were responsible for setting sales quotas."  Opp. 33.  The existence of quotas, even those that salespeople may have disliked or found difficult to meet, simply do not "amount to securities fraud."  *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1001 (N.D. Cal. 2017); *Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101, 122 (D. Mass. 2017); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *13 (N.D. Cal. 2003).[16]

*FE allegations*.  Plaintiffs also maintain that statements attributed to anonymous FEs in the Complaint establish scienter.  Opp. 42.  Even by Plaintiffs' own account, the

---

[15] Defendants Dean Douglas and Karen Puckett cannot be held liable for the statements of more senior executives under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). No allegations in the Complaint show that they "approved or ratified the[] statements [of others]."  *Cf. In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822 at *12 (D.N.J. 2017) (quoting *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. 2012)); *SEC v. Goldstone*, 233 F.Supp.3d 1169, 1225-26 (D.N.M. 2017) (testimony that defendant "directed" the challenged statements).

[16] Contrary to Plaintiffs' misleading parenthetical, Opp. 34, the Wells Fargo court did not hold otherwise.  *Cf. In re Wells Fargo*, 282 F. Supp. 3d at 1099-1100 (scienter pleaded based on unique facts including "testi[mony] before Congress that the Board … had 'connected the dots on customer harm,'" and defendants' "access to the underlying cross-sell metrics and employee whistleblower complaints").

FEs on the whole describe routine business activities and management of CenturyLink's employees. *Id.* at 43. In any event, the FE allegations could only be credited if the FEs 'would have a basis to know what [Defendants] knew.'" *Pound*, 8 F. Supp. 3d at 1166.[17] Plaintiffs cannot dispute that just a few of their FEs are alleged to ever have spoken to any Defendant about anything, Mot. 10-11, and none of them have a basis to claim insight into any Defendant's state of mind. Accordingly, Plaintiffs argue instead that four (unspecified) FEs spoke to *other* CenturyLink executives. Opp. 44 n.21. But, even assuming *arguendo* that their states of mind could be imputed to CenturyLink under Eighth Circuit law (*but see Horizon*, 580 F.3d at 767 (noting open question)), this fails too. For example, with respect to Linda Olsen (¶¶60, 68, 75, 79), the Complaint alleges that: Olsen's job was to supervise call centers; she used quarterly revenue targets set by others to assign sales quotas to centers; she used a spreadsheet to track sales performance; and she once stated that salespeople who did not at least approach their quotas would face adverse consequences. There is no basis for an inference that Olsen (or, by Plaintiffs' reasoning, CenturyLink) knew of the "systematic" and "endemic" fraud, Opp. 1, that (Plaintiffs claim) caused materially false financial results.[18] *See Horizon*, 580 F.3d at 767.

---

[17] Plaintiffs' cases are not to the contrary. *Cf., e.g., In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 901 (D. Minn. 2011) ("witness stated that she/he had personal knowledge of the information provided," and "job titles and responsibilities show that").

[18] The same is true for Kathy Victory (Senior Vice President alleged to have been involved in management of customer sales and complaints, ¶¶70, 101, 103-05, 107), Kathy Flynn (Vice President alleged to have been involved in HR decisions, ¶¶102, 111),

***Reports of customer complaints.***  The Complaint alleges that some Defendants received reports of a few thousand "billing and cramming" complaints from CenturyLink's millions of customers, and that substantiated complaints were resolved by giving customers compensation.  Mot. 17 n.22; *see supra* at 3.  This cannot support an inference that the Defendants knew that CenturyLink's reported revenues were materially overstated.  Plaintiffs' cases bear this out.[19]

***Executive resignations.***  The Complaint alleged that certain departures were "suspicious" because executives forfeited equity.  ¶188; Mot. 31-32.  The Opposition abandons that and argues instead that their *timing* was "suspicious."  Opp. 41.  But revenues *did not* decline before Puckett left, *see supra* at 8; Glen Post retired *six months* (not "just several weeks") after the conclusion of an independent board investigation, ¶¶29, 174; Dean Douglas, along with several others not mentioned in the Complaint, left after the closing of CenturyLink's acquisition of Level 3 and a consequential restructuring of the executive team, Ex. 32; and Plaintiffs never explain how Joseph Zimmel's departure from the Board has anything to do with their case, aside from noting

---

and Brian Stading (Northwest Region Vice President alleged to have introduced FE-5 to Bailey, ¶109).

[19] *Cf., e.g., Cornwell v. Credit Suisse Group*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (internal reports provided "direct knowledge of information contradicting . . . public statements") (cited Opp. 35).

that it was "after the Company responded to the SEC's inquiry" (which went nowhere).

¶189; Opp. 41.  The facts in Plaintiffs' cited cases do not remotely resemble these.[20]

**Motive.**  Plaintiffs argue that Defendants were motivated to conceal the "illegal

cramming" scheme because CenturyLink needed it to service debt and dividends.  Opp.

39-40.  Scienter may only be inferred from "motive" allegations if they show that "the

executives' careers and the very survival of the company were on the line."  *In re*

*Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002); *PR Diamonds, Inc. v. Chandler*, 364

F.3d 671, 690 (6th Cir. 2004).  The Complaint says nothing about CenturyLink's debt or

dividend burdens; to the contrary, it emphasizes that CenturyLink *cut* its dividend before

the Class Period, and describes only industry-wide business headwinds.  ¶¶55-56.

**Denials of wrongdoing.**  Plaintiffs' circular argument that they have pleaded

fraudulent intent because Defendants disclaim wrongdoing, Opp. 39, still makes no

sense, and the cases they cite do not support it.[21]

**Other "facts."**  The balance of the Opposition's long and winding scienter

arguments reduce to a handful of recurrent leitmotifs: baseless speculation about "audits,"

Opp. 46, 48; *see supra* at 4-7; other allegations impermissibly lifted from other cases and

regulatory matters, Opp. 36-38, 40, 47; *see supra* at 4-7 & n.7; and the so-called

"executive-driven effort to address cramming," which *could not have happened* as

---

[20] *Cf., e.g., In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. 2002) (resignations while "financials were being restated and as [the company] was conducting its own internal investigation").

[21] *Cf., e.g., Garden City Empls. Ret. Sys. v. Psychiatric Sols.*, *Inc.*, 2011 WL 1335803, at *52 (M.D. Tenn. 2011) (allegations described cover-up of illegal activities).

Plaintiffs describe.  Opp. 35, 40, 45-47; *see supra* at 7-9.  Each of these fails to withstand scrutiny on its own; "[c]onsidered collectively," therefore, they fail as well.  Opp. 41.

## C.    Plaintiffs Fail To Adequately Plead Loss Causation

The Complaint's skeletal loss causation allegations, which rest on so-called "corrective disclosures," Opp. 51, that consist of unproven allegations and media speculation, are inadequate.  Mot. 32-33.  Plaintiffs fall back on inapposite cases, Opp. 52, in which losses arose from an admission or actual corrective disclosure by *the defendant*.  *See, e.g., In re Retek Inc. Sec.*, 2005 WL 3059566, *2 (D. Minn. 2005) (earnings guidance withdrawn); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (loan charge-off).  But Plaintiffs' own authority confirms that "the announcement of an investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything."  *Lloyd* at 1209-10.

Plaintiffs also point out that Wells Fargo has "not yet restated its financial results." Opp. 3.  But the plaintiffs who sued Wells Fargo never claimed that the bank's audited GAAP revenues had been materially overstated; the fact that Wells Fargo did not restate them was thus utterly beside the point.  ECF No. 287-1 ¶15.  Here, in contrast, Plaintiffs' central allegation is that CenturyLink's revenues were materially overstated by systematically cramming customers—which is why the absence of a restatement, many

months after the purported disclosures, should cast doubt on Plaintiffs' claims of securities fraud.[22]

### III.    The Complaint Fails To State A Section 20(a) Claim

Plaintiffs' Section 20(a) claims against all Defendants necessarily fail because they have failed to plead a predicate violation of Section 10(b).  *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011).  As to Defendant Bailey in particular, his role made him *subordinate to* other Defendants, and Plaintiffs allege no facts to support their conclusion that Bailey "had the ability to control" or "exercised . . . control" over CenturyLink's day-to-day operations. *Jensen v. Thompson*, 2018 WL 1440329, at *17 (D.S.D. 2018) (dismissing § 20(a) claim).  Plaintiffs' speculation that Bailey was "charged with overseeing efforts to address cramming" should, along with their entire "behavioral model" story, be disregarded.  *See supra* at 7-9.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

---

[22] *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) (absence of restatement is "telling").  Plaintiffs' cases, Opp. 25, are not to the contrary.  *Cf., e.g. Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (absence of restatement did not *mandate* dismissal where PSLRA requirements were otherwise met) .

Dated:  November 9, 2018                    Respectfully submitted,

                                            */s/ Patrick E. Gibbs*

                                            Patrick E. Gibbs
                                            (CA Bar No. 183174)
                                            COOLEY LLP
                                            3175 Hanover Street
                                            Palo Alto, California 94304
                                            Phone:  (650) 843-5000
                                            Fax:  (650) 849-7400
                                            pgibbs@cooley.com

                                            Douglas P. Lobel
                                            (VA Bar No. 42329)
                                            David A. Vogel
                                            (VA Bar No. 48971)
                                            COOLEY LLP
                                            11951 Freedom Drive
                                            Reston, Virginia 20190
                                            Phone:  (703) 456-8000
                                            Fax:  (703) 456-8100
                                            dlobel@cooley.com
                                            dvogel@cooley.com

                                            Sarah M. Lightdale
                                            (NY Bar No. 4395661)
                                            Lauren Gerber Lee
                                            (NY Bar No. 4883500)
                                            COOLEY LLP
                                            1114 Avenue of the Americas
                                            New York, New York 10036
                                            Phone:  (212) 479-6000
                                            Fax:  (212) 479-6275
                                            slightdale@cooley.com
                                            lglee@cooley.com

                                            William A. McNab
                                            (MN Bar No. 320924)
                                            David M. Aafedt
                                            (MN Bar No. 27561X)
                                            WINTHROP & WEINSTINE, P.A.
                                            Capella Tower, Suite 3500

23

225 South Sixth Street
Minneapolis, MN 55402
Phone:  (612) 604-6400
Fax:  (612) 604-6800
wmcnab@winthrop.com
daafedt@winthrop.com

*Attorneys for Defendants CenturyLink,
Inc., Glen F. Post, III, R. Stewart Ewing,
Jr., David D. Cole, Karen Puckett, Dean
J. Douglas, and G. Clay Bailey*