```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
        ----------------------------------------------------------
 3                                    )
        In re: CenturyLink Sales      )   File No. 17-MD-2795
 4      Practices and Securities      )         (MJD/KMM)
        Litigation                    )
 5                                    )   Minneapolis, Minnesota
                                      )   June 7, 2019
 6                                    )   8:03 a.m.
                                      )
 7      ----------------------------------------------------------
                                      )
 8      Benjamin Craig, et al.,       )   File No. 18-CV-296
                                      )         (MJD/KMM)
 9             Plaintiffs,            )
                                      )   Minneapolis, Minnesota
10      vs.                           )   June 7, 2019
                                      )   8:03 a.m.
11      CenturyLink, Inc., et al.,    )
                                      )
12             Defendants.           )
                                      )
13      ----------------------------------------------------------

14

15            BEFORE THE HONORABLE MICHAEL J. DAVIS
               UNITED STATES DISTRICT COURT JUDGE
16

17                      (MOTIONS HEARING)

18

19

20

21

22

23

24
           Proceedings reported by shorthand reporter; transcript
25      produced by computer.
```

```
 1    APPEARANCES

 2      For the Plaintiffs:      Bernstein, Litowitz, Berger &
                                 Grossmann, LLP
 3                               MICHAEL D. BLATCHLEY, ESQ.
                                 MICHAEL M. MATHAI, ESQ.
 4                               44th Floor
                                 1251 Avenue of the Americas
 5                               New York, New York 10020

 6                               Lockridge, Grindal & Nauen, PLLP
                                 GREGG M. FISHBEIN, ESQ.
 7                               Suite 2200
                                 100 Washington Avenue South
 8                               Minneapolis, Minnesota 55401

 9                               Stoll, Stoll, Berne, Lokting &
                                 Shlachter, PC
10                               KEITH S. DUBANEVICH, ESQ.
                                 KEIL M. MUELLER, ESQ.
11                               Suite 500
                                 209 Southwest Oak Street
12                               Portland, Oregon 97204

13                               Zimmerman Reed, PLLP
                                 BRIAN C. GUDMUNDSON, ESQ.
14                               Suite 1100
                                 80 South Eighth Street
15                               Minneapolis, Minnesota 55402

16                               Zimmerman Reed, PLLP
        (Via Telephone)          HART L. ROBINOVITCH, ESQ.
17                               Suite 145
                                 14646 North Kierland Boulevard
18                               Scottsdale, Arizona 85254

19                               Gustafson Gluek, PLLC
                                 LING S. WANG, ESQ.
20                               Suite 2600
                                 120 South Sixth Street
21                               Minneapolis, Minnesota 55402

22                               Hellmuth & Johnson
                                 ANNE T. REGAN, ESQ.
23                               8050 West 78th Street
                                 Edina, Minnesota 55439

24

25
```

1     <u>APPEARANCES</u> (Cont.)

2

      For the Defendants:        Cooley, LLP
3                                PATRICK E. GIBBS, ESQ.
                                 3175 Hanover Street
4                                Palo Alto, California 94304

5                                Cooley, LLP
                                 SARAH M. LIGHTDALE, ESQ.
6                                55 Hudson Yards
                                 New York, New York 10001
7
                                 Cooley, LLP
8                                DOUGLAS P. LOBEL, ESQ.
      (Via Telephone)            DAVID A. VOGEL, ESQ.
9                                Suite 1500
                                 11951 Freedom Drive
10                               Reston, Virginia 20190

11                               Cooley, LLP
      (Via Telephone)            JEFFREY M. GUTKIN, ESQ.
12                               5th Floor
                                 101 California Street
13                               San Francisco, California 94111

14                               Cooley, LLP
                                 GEORGINA INGLIS, ESQ.
15                               Suite 700
                                 1299 Pennsylvania Avenue NW
16                               Washington, D.C. 20004

17                               Winthrop & Weinstine, PA
                                 WILLIAM A. McNAB, ESQ.
18                               Suite 3500
                                 225 South Sixth Street
19                               Minneapolis, Minnesota 55402

20    Court Reporter:            LORI A. SIMPSON, RMR-CRR
                                 Suite 146
21                               316 North Robert Street
                                 St. Paul, Minnesota 55101

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                       IN OPEN COURT
 3              THE COURT:  Let's call the first matter, please.
 4              COURTROOM DEPUTY:  In re: CenturyLink
 5    Sales Practices and Securities Litigation, Civil Case
 6    No. 17-MD-2795; and Benjamin Craig, et al. vs. CenturyLink,
 7    et al., Civil Case No. 18-CV-296.
 8              Counsel, please state your appearances for the
 9    record.
10              MR. GUDMUNDSON:  Good morning, Your Honor.  Brian
11    Gudmundson for the plaintiffs.
12              THE COURT:  Good morning.
13              MS. REGAN:  Good morning, Your Honor.  Anne Regan
14    on behalf of the plaintiffs.
15              THE COURT:  Good morning.
16              MS. WANG:  Good morning, Your Honor.  Ling Wang on
17    behalf of the plaintiffs.
18              THE COURT:  Welcome.
19              MR. DUBANEVICH:  Good morning, Your Honor.  Keith
20    Dubanevich for the plaintiffs in the securities case.
21              THE COURT:  Good morning.
22              MR. BLATCHLEY:  Good morning, Your Honor.  Michael
23    Blatchley from Bernstein, Litowitz, Berger & Grossmann for
24    the lead plaintiff in the securities action.
25              THE COURT:  Good morning.
```

```
 1              MR. MATHAI:  Good morning, Your Honor.  Michael
 2    Mathai from Bernstein, Litowitz, Berger & Grossmann for lead
 3    plaintiff in the securities action.
 4              THE COURT:  Good morning.
 5              MR. FISHBEIN:  Good morning, Your Honor.  Gregg
 6    Fishbein, Lockridge, Grindal & Nauen, on behalf of
 7    plaintiffs in the securities case.
 8              THE COURT:  Good to see you.
 9              MR. FISHBEIN:  Good to see you.
10              MR. MUELLER:  Good morning, Your Honor.  Keil
11    Mueller with Stoll Berne on behalf of the plaintiffs in the
12    securities action.
13              THE COURT:  Good morning.
14              MR. McNAB:  Good morning, Judge Davis.  Bill
15    McNab, Winthrop & Weinstine, on behalf of the CenturyLink
16    defendant.
17              THE COURT:  It's always good to see you.
18              MR. McNAB:  Thank you, Your Honor.
19              MR. LOBEL:  Good morning, Your Honor.  Douglas
20    Lobel on behalf of CenturyLink.
21              THE COURT:  Good morning.
22              MS. LIGHTDALE:  Good morning, Your Honor.  Sarah
23    Lightdale from Cooley on behalf of the defendants in the
24    securities case.
25              THE COURT:  Good morning.
```

1          MR. GIBBS:  Good morning, Your Honor.  Patrick

2    Gibbs, also from Cooley, on behalf of the defendants in the

3    securities case.

4          THE COURT:  Good morning.

5          MS. INGLIS:  Good morning, Your Honor.  Georgina

6    Inglis on behalf of the defendant in the securities case.

7          THE COURT:  All right.  I believe we have -- who

8    is on the line so we can make a record of that?  Is anyone

9    on the telephone line?  Please note your appearance.

10          MR. ROBINOVITCH:  Hart Robinovitch from Zimmerman

11    Reed for plaintiffs in the consumer case.

12          THE COURT:  Good morning.

13          MR. GUTKIN:  Good morning, Your Honor.  Jeff

14    Gutkin from the Cooley firm for defendant.

15          THE COURT:  Good morning.

16          MR. VOGEL:  Good morning, Your Honor.  David Vogel

17    from Cooley's Reston office on behalf of CenturyLink.

18          THE COURT:  Good morning.

19          All right.  Those of you that are on the telephone

20    line, I would ask you to mute your phones so I don't have to

21    hear your dog or music playing in the background.  Come on,

22    people can laugh.  It's 8:00 in the morning.

23      (Laughter)

24          THE COURT:  Let's proceed.  Do I have an update of

25    what's going on?

 1           MR. GUDMUNDSON:  Yes, Your Honor.  Good morning.

 2           THE COURT:  Good morning.

 3           MR. GUDMUNDSON:  Brian Gudmundson again on behalf

 4     of plaintiffs.  I'm here with an update for Your Honor on

 5     the status in the consumer cases.

 6           The parties on May 20th mediated the case in front

 7     of Judge Layn Phillips.  We entered into a term sheet four

 8     days later and have settled the case tentatively.

 9           The structure of the settlement is a closed

10     nonreversionary fund, which is going to be comprised of a

11     monetary fund of $15.5 million.  There will be $3 million

12     for claims administration.  There will be more provisions

13     related to claims administration, which I'm happy to

14     discuss.  We will also be negotiating injunctive nationwide

15     relief.

16           One of the important things that the parties are

17     going to be doing, and we have a request for Your Honor

18     related to this, is conducting some confirmatory discovery,

19     which we believe will take some time.  And to that end the

20     parties would like to request that the Court enter a stay of

21     our proceeding so that we can conclude negotiations in

22     preparation of a settlement agreement and present this

23     settlement, tentative settlement, to the Court for

24     preliminary approval as soon as possible.

25           Right now we anticipate that that process will

 1    take until approximately mid August, early September,

 2    although it may be sooner.  We are working very hard to try

 3    to get things done.  If it takes a little longer, it's

 4    because the efforts are -- not because the efforts are not

 5    being pursued strong, but because there's just a lot of work

 6    to do.

 7            Really that's all I have for you, Your Honor.

 8    We're pleased to provide updates in the interim if the Court

 9    desires to know what's going on --

10            THE COURT:  I do.

11            MR. GUDMUNDSON:  -- as these weeks and months

12    proceed.  So we would be happy to establish status

13    conferences or simply check in with Your Honor and schedule

14    according to your wishes.

15            THE COURT:  I think it would be best that you just

16    every 30 or 45 days send me an update signed by both parties

17    so I know that everyone is agreeing to what's being said.

18            MR. GUDMUNDSON:  Sure.  Would a letter ECF'd and

19    submitted to your chambers be sufficient?

20            THE COURT:  Yeah, I believe that -- I think that's

21    best, so everyone knows what's going on --

22            MR. GUDMUNDSON:  Sure.

23            THE COURT:  -- instead of having it just sent to

24    my chambers.

25            MR. GUDMUNDSON:  Unless the Court has any

1    questions, I really have nothing further, Your Honor.

2            THE COURT:  All right.  Thank you.

3            MR. GUDMUNDSON:  Thank you.

4            THE COURT:  Any response?  Good seeing you again.

5            MR. LOBEL:  Good seeing you, Your Honor.  Very

6    pleased to be here today.  I agree with --

7            THE COURT:  It's warm.

8            MR. LOBEL:  It is warm.  I've been here when it's

9    cold and I've been here when it's warm.

10           Your Honor, I agree with everything that

11   Mr. Gudmundson said.  We are pleased that we were able to

12   reach a tentative settlement.  We think this is a very

13   reasonable compromise for the class in light of the strong

14   arguments that we believe we had with respect to the motion

15   to compel arbitration with respect to class certification

16   issues.  We think it's a fair and reasonable outcome for the

17   class, and we also think it has great benefits for judicial

18   economy given the likely duration of this matter no matter

19   what happened on the pending motions.

20           So we are committed to working hard to efficiently

21   complete the confirmatory discovery.  We will document the

22   settlement and we will set up an orderly and efficient

23   claims process, and we give you our word that we're

24   committed to do that.

25           THE COURT:  I know that you are.  I respect both

1    sides and what you've done.  It's amazing.  I didn't expect

2    it.  When I received notice that there was a settlement, I

3    was happy to see that.

4              MR. LOBEL:  Thank you.

5              THE COURT:  Not because of court efficiency, but I

6    think from a business perspective, I thought it was best.

7              MR. LOBEL:  Thank you very much.

8              THE COURT:  All right.  Let's call the next

9    matter.

10             COURTROOM DEPUTY:  I called them both.

11             THE COURT:  Oh, you called them both.  Let's

12   proceed.

13             MR. GIBBS:  Good morning again, Your Honor.

14   Patrick Gibbs from Cooley on behalf of CenturyLink and the

15   individual defendants in the securities case.

16             THE COURT:  Good morning.

17             MR. GIBBS:  Your Honor, we have some slides that

18   we're prepared to display electronically, but I also have

19   hard copies if the Court would like me to hand up some

20   copies.

21             THE COURT:  Please.  Would you, please.

22             MR. GIBBS:  Certainly.  How many copies would the

23   Court like?

24             THE COURT:  I need three: one for myself, one for

25   my court reporter, and one for my law clerk.

1          MR. GIBBS:  May I approach, Your Honor?

2          THE COURT:  You may.

3          MR. GIBBS:  Thank you.

4       (Documents handed to the Court)

5          MR. DUBANEVICH:  Your Honor, if I can interrupt?

6     Just from a housekeeping perspective --

7          THE COURT:  Turn the microphone on.

8          MR. DUBANEVICH:  Good morning, Your Honor.  I

9     would like to interrupt just for housekeeping purposes.

10    It's 8:10 a.m. and we understood that you had a hard stop at

11    9:00.  If that's not correct, I just kind of wanted to

12    figure out what our timing was this morning.

13         THE COURT:  It's a hard stop at 9:00.

14    Unfortunately I have to be at -- well, we'll see how it

15    goes.  It's a hard stop at 9:00.  It's my 50-year college

16    reunion.  I don't know why, but they want me to be there.

17    They want to honor me at every event possible, and we've

18    been getting e-mails and calls from the president of the

19    college and so that's what we are putting up with and so --

20    but this is more important to me than being there on time

21    and so we'll try for the 9:00 hard stop and if we need to go

22    past that, we'll just have to go past that.

23         MR. DUBANEVICH:  Thank you, Your Honor.

24         MR. GIBBS:  Thank you, Your Honor.  I'm mindful

25    that we are fairly short of time.  Before launching into a

1    long presentation, I wanted to first ask if there's any

2    particular part of our motion that the Court is particularly

3    interested in discussing with us or if you have any

4    questions that you would like me to address.

5              THE COURT:  I need you to focus on the area that

6    you think is most important and usually that's the weakest

7    part of your argument.

8              MR. GIBBS:  That's fine, Your Honor.  Thank you.

9              THE COURT:  You know that's where the opposing

10   side is going to go, so let's deal with those issues.

11             MR. GIBBS:  That's fine, Your Honor.  Thank you.

12   I would like to begin with a reminder of the plaintiffs'

13   theory of the case and what that implies for their pleading

14   burden.

15             As the Court knows, this whole series of cases

16   really begins with a set of consumer class actions that the

17   Court was just discussing with some of my colleagues and the

18   question is how do the plaintiffs try to turn a set of

19   consumer class actions into a securities class action.

20             It's obviously not securities fraud for the

21   company to have been sued in some consumer class actions.

22   Consumer class actions get filed routinely across the

23   country and it doesn't by itself amount to securities fraud.

24             And so what the plaintiffs in the securities case

25   have done to try to convert these consumer class actions

1    into the basis for a securities class action is to lay out

2    an incredibly aggressive theory of the case.

3            And the theory is not only was there some amount

4    of improper billing at CenturyLink, but, in fact, the

5    alleged improper billing was, in effect, the business

6    strategy.  This is how they ran the company.  This is where

7    the revenue came from.

8            So, in other words, the plaintiffs' theory of the

9    case is that for over four years CenturyLink systematically,

10   routinely across the entire company intentionally overbilled

11   millions of customers by hundreds of millions of dollars to

12   such an extent that it materially inflated the revenues of a

13   company whose quarterly revenues during that period

14   routinely exceeded $4 billion every quarter, consumer

15   revenues hovering around a billion and a half dollars every

16   single quarter.

17           So the implication of that theory is that this

18   alleged overbilling scheme would have to be absolutely

19   massive, would have to be absolutely routine across the

20   entire company and, most importantly for securities fraud

21   purposes, the senior executives of the company, the people

22   speaking to the market would have to know that it was going

23   on, would have to know that it was going on to such an

24   extent that it was materially inflating the company's

25   revenues.

1          That's the burden they've taken on with the theory

2     of the case they have laid out, and we would respectfully

3     submit the complaint currently before the Court does not

4     come close to carrying the burden they bear.

5          Before getting into the particular allegations, I

6     want to start with just the question of whether this is even

7     a plausible theory as it's laid out in the complaint.

8     Obviously the Court needs to draw reasonable inferences in

9     the plaintiffs' favor, but a complaint also has to meet some

10    threshold level of plausibility, as we've learned from the

11    Supreme Court.

12         And in this case the theory is, as I said, for

13    four and a half years CenturyLink systematically and

14    routinely overbilled millions of people by hundreds of

15    millions of dollars.  Those overbillings would have been

16    reflected in bills that were sent to customers.  This is not

17    something that could be plausibly hidden from people for

18    very long because people get bills and they pay their bills.

19         According to plaintiffs, CenturyLink has been

20    caught in this scheme in a very public way.  That's how they

21    claim the so-called truth has come out.  And yet the world

22    we see reflected in the complaint looks nothing like the

23    world we would see if a company had been caught overbilling

24    millions of people by hundreds of millions of dollars over

25    four and a half years and been very publicly caught.

1           Let's start with the fact that according to

2   plaintiffs' theory of the case, CenturyLink's historical

3   revenues were materially inflated by fraud and that's been

4   publicly disclosed.

5           Not only, though, has there been no restatement of

6   those previously publicly-reported revenues, but, in fact,

7   CenturyLink's independent audit firm has continued to issue

8   clean audit opinions for financial statements that include

9   the very revenue numbers that the plaintiffs claim were

10  materially inflated.

11          And the company has been caught and yet nobody has

12  done anything about it.  There are no other indicia in the

13  complaint of the kind of public fallout that one would

14  expect to see if an overbilling scheme of this magnitude had

15  come to light.

16          So just as a starting point, the scheme itself is

17  implausible to begin with.  The complaint does not describe

18  a set of circumstances one would expect to see if that

19  scheme really had occurred and really had come to light,

20  which is necessary for there to be a securities fraud claim.

21  And so just as a starting point, we think the theory laid

22  out in the complaint is implausible.

23          So the question is whether they have alleged

24  sufficient facts to support a reasonable inference in their

25  favor that this scheme existed, that this scheme materially

1    inflated the company's revenues over this period, and

2    whether the complaint alleges particularized facts

3    sufficient to support a strong inference of scienter, which

4    is that the senior executives, the people speaking to the

5    market actually knew this scheme was going on and actually

6    knew it was happening on such a massive scale that it was

7    materially inflating the company's revenues.

8              Now, as we've said in the briefing, given that

9    there's been no public admission or public finding or

10   confirmation that this supposed scheme even existed, the

11   plaintiffs try to make out their case through 20 former

12   employees that they claim they interviewed and they purport

13   to report in their complaint what these people told them.

14             The facts attributed, the statements attributed to

15   these 20 former employees do not come close to establishing,

16   A, that there was such a massive, company-wide, systematic

17   overbilling scheme or, B, that any of the senior executives,

18   that any of the individual defendants or any of the speakers

19   knew that this scheme existed and was materially inflating

20   the company's revenues.

21             I've got slide 5 from our presentation up in front

22   of the Court.  First of all, the 20 former employees are a

23   tiny fraction of the overall employee base of this very

24   large company.

25             Seventeen of them do not purport to have spoken to

1    a single one of the individual defendants.  As we've cited

2    case law out of the Eighth Circuit and elsewhere, that alone

3    means those former employees, 17 of them, have nothing to

4    say about the defendants' state of mind.  They add nothing

5    to the scienter question that I personally think is the

6    clearest weakness in the complaint.

7            Twelve of these former employees worked in very

8    low-level sales and customer service positions, usually only

9    in one location, for their tenure at the company.  Those

10   people have nothing to say about any kind of company-wide or

11   systematic scheme.  They could have observed at most things

12   happening in a single call center.

13           Eight of the former employees actually

14   affirmatively describe a set of policies and practices that

15   were in place for resolving customer complaints and billing

16   issues at CenturyLink.

17           This is important because I think it's crucial for

18   the Court to have in mind the kinds of billing issues that

19   the plaintiffs are routinely alluding to are a fact of life

20   in a customer-facing business of this scale.

21           This is a company, as I said, that's serving

22   millions of customers all around the United States.  They're

23   doing business by telephone with individual consumers on a

24   massive scale.  They have millions of customer interactions

25   every year.  It is inevitable that there will be some

1   routine level of billing mistakes, billing complaints,

2   billing inquiries and the like.

3          The fact that the company has a structure that is

4   set up to address and resolve those types of billing issues

5   makes crystal clear that at least up to some level billing

6   complaints, billing disputes, issues like this are routine.

7   They are not indicative in and of themselves of a massive

8   company-wide scheme to inflate revenue by intentionally

9   overbilling customers.

10          Five of these former employees worked at

11   CenturyLink for less than a year during the alleged class

12   period.

13          Only two of these former employees purport to

14   describe some level of company-wide customer billing issues

15   or complaints.  And this is one of the only areas where the

16   complaint purports to provide any type of quantitative

17   information about customer complaints.  Those allegations,

18   though, routinely slip in both cramming, which is what the

19   plaintiffs claim happened here, and, quote, other billing

20   issues, which are not described or explained in any way.

21          But in any event, to the extent those former

22   employees are describing some level of customer complaints

23   across the company, the numbers they're giving amount to a

24   tiny fraction of the company's customers during the period

25   in question.  There's nothing about that number of

1    complaints alone described by those former employees that

2    would suggest a massive company-wide scheme to intentionally

3    inflate revenues through billing fraud.

4        And then, finally, oddly for a case that is

5    premised primarily on an alleged overstatement of revenue

6    through billing fraud, we only have one former employee who

7    even worked in the finance department.  This was a low-level

8    finance department employee who only -- who has nothing to

9    say about some company-wide scheme to cram or inflate

10   revenue through billing fraud.

11       So the sum of all this is we don't have a single

12   former employee who purports to estimate the financial

13   impact of cramming on CenturyLink's revenues.  We don't have

14   a single former employee who is telling the Court that any

15   individual defendant or any other senior CenturyLink

16   executive encouraged, condoned, or directed people to charge

17   customers for things they hadn't ordered.  None of them

18   purports to have gone to any of the defendants and informed

19   them that there was some massive, widespread, systematic

20   cramming of customers.

21       Without any allegations like that, you simply

22   cannot get to a finding of particularized allegations

23   supporting a strong inference of scienter at the least.  We

24   also don't think you can get to any reasonable inference

25   that this scheme existed in the first place, but without

1    some link between whatever was happening on the ground in

2    the call centers and the senior executives, there simply

3    cannot be a finding of scienter here.

4            I want to focus quickly on the three former

5    employees who allegedly spoke to the defendants.  One of

6    them, Former Employee 15, describes really nothing other

7    than a disagreement with senior management about the

8    marketing strategy.  This former employee didn't like the

9    fact that the base price for products was set low and then

10    there were fees associated with those prices.  This has

11    nothing to do with charging customers for products and

12    services they didn't order.  It's a disagreement about how

13    the products should be priced and brought to market.  It's

14    irrelevant to the plaintiffs' claim.

15            Former Employee 19 --

16            THE COURT:  Well, 15, it's a little bit more than

17    that.  It's not just a simple disagreement about the

18    business strategy.  FE-15 alleges that Defendant Puckett,

19    Defendant Bailey, and Victory created a strategy to mislead

20    the customers.

21            MR. GIBBS:  With all due respect, Your Honor, I'm

22    not sure I would agree that the strategy that Former

23    Employee 15 is describing is a strategy to mislead the

24    customer.  What that former employee describes is we're

25    going to price the base product at a certain level, but

1   there will also be fees associated with it.  Whether that

2   misleads the customer depends on how it's described to the

3   customer.  This person has nothing to say about that.

4           This person's personal discomfort with that

5   approach to the business doesn't amount to the company

6   intentionally misleading its customers, much less on a

7   massive scale sufficient to inflate revenues.

8           THE COURT:  We'll hear from the plaintiff, but I

9   think I can read correctly and I think FE-15 warned that the

10  strategy would mislead customers and Puckett, Bailey, and

11  Victory pushed forward with the strategy anyway, knowing

12  that it would likely lead to cramming.

13          MR. GIBBS:  I understand, Your Honor --

14          THE COURT:  That's being alleged and so let's be

15  careful how we characterize what these witnesses are saying.

16          MR. GIBBS:  Fair enough, Your Honor, although I

17  don't think I would agree with the knowing that this would

18  mislead the customers.  FE-15 thought it would mislead the

19  customers.  I don't know how FE-15 can conclude that

20  Puckett, Bailey, and Victory agreed that it would mislead

21  the customers.  That seems to be something that one could

22  have a different view on.

23          But in any event, it's also a different type of

24  conduct than what I understand the complaint to be

25  describing as cramming, which is charging customers for

1    products and services they didn't order.  That seems to me

2    to be a different issue, are they correctly disclosing all

3    aspects of the pricing for a given product or a service.

4            Former Employee 19 purports to have had

5    discussions with Post and Puckett about how to resolve

6    customer complaints, but is one of the employees I mentioned

7    before who confirms that there were policies and procedures

8    in place to resolve them.

9            I don't think anything in the allegations about

10   Former Employee 19 supports the inference that there was a

11   widespread, company-wide, systematic scheme to inflate

12   revenues by charging customers for things they didn't order.

13           And then finally we have Former Employee 5, who

14   has alleged to have spoken to Defendant Bailey.  Plaintiffs

15   have laid out a fairly detailed set of allegations about an

16   interaction between these two at the Breakers Hotel in Palm

17   Beach, followed by an e-mail that the complaint purports to

18   describe in some detail.

19           The problem is, having described that e-mail in

20   such detail in their complaint, it is now incorporated by

21   reference into their complaint.  We've submitted it to the

22   Court as Exhibit 26 to my declaration.

23           The e-mail makes quite clear that their

24   interaction had nothing to do with cramming or overbilling

25   customers at all.  It is flatly inconsistent with the

1    plaintiffs' allegation.  And under basic federal court

2    pleading law, where there is a conflict between the

3    allegations in the complaint and a document properly

4    incorporated by reference, the document controls.

5              Now, some of the other specific allegations I want

6    to touch on briefly.

7              We don't think they come close to establishing

8    either the alleged scheme or scienter on the part of any of

9    the individual defendants or any of CenturyLink's other

10   senior executives.

11             There's a series of allegations about something

12   that's characterized as an internal CenturyLink audit.  That

13   allegation is lifted entirely out of a discovery letter

14   briefing in a separate case brought by the Minnesota

15   Attorney General.  We have laid out in the briefs the

16   reasons why that doesn't meet the pleading standard.

17             In their opposition plaintiffs have massively

18   mischaracterized their own allegation about this Minnesota

19   Attorney General assertion.  Having said in their complaint

20   there was one internal CenturyLink audit showing that there

21   was potential overbilling of three and a half million

22   customers, in the opposition they say there are multiple

23   audits which show hundreds of dollars of overbilling per

24   customer, none of which is actually in the complaint.  And I

25   would respectfully urge the Court to please focus on the

1   complaint, not the way the complaint is characterized in the

2   opposition brief.

3         In any event, the Court does not have before it

4   any information about what this purported internal audit is,

5   who created it, how they created it, whether it's in any way

6   reliable.  But even taken at face value, the fact that

7   3.5 million customers were, quote, potentially overbilled

8   doesn't get you to there was a massive, company-wide,

9   systematic scheme to inflate revenues by overbilling

10  customers.

11        Plaintiffs have also focused on this story of how

12  the company allegedly tried to change its sales practices

13  and to adopt something plaintiffs call a behavioral coaching

14  model.  They claim that having adopted this model, they saw

15  sales plummet and immediately reversed course and went back

16  to the old way of doing things, after which revenues bounced

17  back up.  The problem is this set of allegations also is

18  flatly inconsistent with judicially-noticeable facts.

19        Now, I think, again, if the Court focuses not on

20  how the plaintiffs characterize that allegation, but on the

21  allegations themselves, it's a conglomeration of things

22  attributed to a handful of confidential witnesses or former

23  employees, none of whom actually tells the story that

24  plaintiffs lay out either in their complaint or in the

25  opposition.  They sort of cobbled together statements from a

1    handful of people to put this story together.

2            But more importantly, in all objective respects,

3    the story is clearly untrue.  They claim that in the fourth

4    quarter of 2014 the company saw some drastic reduction in

5    consumer revenues by virtue of having changed its sales

6    model and that the revenues rebounded later in 2015.

7            We have shown the Court, from the company's

8    publicly-reported revenue numbers, there was no drastic

9    decline in consumer revenues in the fourth quarter of 2014.

10   Those revenues actually went up slightly in that period from

11   the period before.  Nor was there a dramatic increase later

12   in 2015 after the company allegedly abandoned this

13   behavioral coaching model.

14           So the story doesn't add up.  It is inconsistent

15   with judicially-noticeable facts.  It does not support the

16   plaintiffs' claim.

17           It is also inconsistent with the facts in the

18   sense that the story purports to say that Former Employee 5

19   had his conversation with Mr. Bailey in the spring of 2014

20   and immediately after that Mr. Bailey was promoted into a

21   role that led to the creation of this new behavioral

22   coaching model.

23           The problem is judicially-noticeable documents

24   confirm that Mr. Bailey was not appointed to that position

25   until sometime in 2015, not in 2014.  And, as I said, the

1    revenue -- the changes in the reported consumer revenue

2    don't match up with the story they're telling.

3          Now, plaintiffs have strained, really strained to

4    try to argue that this case is just like the *Wells Fargo*

5    case, and we have briefed this issue extensively.  I won't

6    dwell on it here except to note a couple of very important

7    factors.

8          In *Wells Fargo* it was effectively conceded, it had

9    been found in a consent decree by a federal regulator that

10   Wells Fargo employees had created over one and a half

11   million fake deposit accounts and over a half of million

12   fake credit card accounts for customers.  The fact that that

13   conduct had occurred was not meaningfully in dispute in the

14   *Wells Fargo* cases.

15         The issue that Judge Tigar was grappling with,

16   over a series of motions to dismiss, was to what extent have

17   the plaintiffs alleged facts showing that Wells Fargo's

18   board knew about these things during the class period.

19   That's what the majority of those opinions is devoted to.

20         We do not have anything like that federal

21   regulator finding here.  We don't have an admission or a

22   finding that there was overbilling or intentional

23   overbilling happening on some kind of massive scale.  So

24   that's a key distinction.

25         Setting that distinction aside, in finding

1    scienter in the *Wells Fargo* cases, Judge Tigar walked

2    through what he called a battery of particularized factual

3    allegations that he believed supported an inference that the

4    board knew of and did nothing about illegal activity.  We do

5    not have anything like that battery of particularized

6    factual allegations here.

7             And given the shortness of time, I won't sit here

8    and read the slides to the Court, but we've laid out here

9    all of the different factual allegations, the red flags that

10   Judge Tigar noted.

11            THE COURT:  Didn't he note that the imposition of

12   strict sales quotas and close tracking by a company

13   established scienter?

14            MR. GIBBS:  He did not note that that by itself

15   established scienter, not at all.  In fact, Judge Tigar

16   noted repeatedly that his finding of scienter was not based

17   on any individual allegation like that, but was based on the

18   totality of the allegations, which is why we've tried to lay

19   out as many of them here as we could.  I agree that one of

20   the things the judge looked at in that case was the

21   existence of sales quotas.

22            THE COURT:  Let's spend some time on this.

23            MR. GIBBS:  Sure.

24            THE COURT:  Go ahead.

25            MR. GIBBS:  Okay.  Let me go back, then.  So these

1    are some of the objective factors I alluded to before.

2            By the time Judge Tigar was considering the

3    motions to dismiss in the *Wells Fargo* cases, there had been

4    a public disclosure, not meaningfully disputed by the

5    company, that their employees had created over 2 million

6    fake accounts.  This had, by definition, inflated this

7    cross-sell metric that Wells Fargo had repeatedly reported

8    along with its financial results, talking about the number

9    of different Wells Fargo accounts that they were selling

10   into each household.  By the time Judge Tigar was

11   considering those motions, regulatory bodies had leveled

12   fines against Wells Fargo of over $185 million.

13           And, again, as I said, Judge Tigar's decision was

14   based on this aggregation of red flags that he found alleged

15   in the complaints there.  Now, as I said, the plaintiffs are

16   trying very hard in this case to try to echo some of those

17   red flags in *Wells Fargo*, but I believe Judge Tigar's

18   opinions are quite clear that the finding of scienter is not

19   based on any individual one of those red flags by itself,

20   but rather on the combination of all of them.

21           We don't have anything like the combination of red

22   flags here that Judge Tigar was considering in the *Wells*

23   *Fargo* cases.  For one thing, one of the primary red flags

24   that Judge Tigar alludes to repeatedly in his opinions is

25   the fact that Wells Fargo's CEO at the time testified before

1    Congress and admitted that Wells Fargo's directors and

2    officers had known about the fraud for many years before it

3    came to light and before it ended.  That was a key red flag

4    for him.  There is nothing like that alleged in this case.

5           Judge Tigar alluded to a former Wells Fargo banker

6    who had sent multiple letters directly to the board

7    detailing the very specific allegation of unauthorized

8    customer accounts that were completely ignored by the board

9    and that this person persisted a number of times over a

10   period of time.

11          There were at least ten different legal actions

12   filed against the company during the class period repeating

13   this very specific allegation of unauthorized customer

14   accounts.  The L.A. City Attorney was one of the lawsuits

15   that was filed.  There was at least one whistleblower

16   complaint that led to the Department of Labor making a

17   finding of reasonable cause to believe that this type of

18   activity had occurred.  Now, I expect plaintiffs will say

19   here we have lots of lawsuits too and so that's similar.

20          There's a really, really important distinction.

21   Judge Tigar -- and Judge Tigar specifically says this in his

22   opinion.  He was not citing the lawsuits as evidence that

23   the conduct had occurred.  What he was doing with the

24   lawsuits was saying the fact that these lawsuits are getting

25   filed over and over and over and over again and making the

1    very same specific factual allegation is part of what put

2    the board on notice that this was happening.

3         The lawsuits here, all of the consumer lawsuits

4    that were filed, they were filed after the so-called truth

5    came to light.  Nobody can seriously claim that the consumer

6    class actions filed here, after the first of the alleged

7    corrective disclosures, somehow put CenturyLink's senior

8    executives or directors on notice of this supposed massive

9    scheme to inflate revenues.  It's a key distinction.

10         The only reason Judge Tigar is looking at the

11   lawsuits in *Wells Fargo* is because they were happening

12   during the class period before the fake account scheme was

13   publicly disclosed, and he was saying the filing of those

14   lawsuits with this very specific allegation is one of the

15   things that put the board on notice that this was happening

16   at the company.  That's not true here.

17         I would note too, by the way, there's a very

18   important distinction between *Wells Fargo* and the

19   allegations in this case.  There's no circumstance in which

20   bankers opening up a credit card or deposit account for a

21   customer without the customer's knowledge is excusable,

22   right?  It is inherently fraudulent.  It is inherently

23   criminal.  It is not the type of conduct that would be the

24   subject of a routine billing dispute where someone might not

25   have understood the charges they were going to see on their

1    bill.  That's a very, very different type of conduct.

2            Judge Tigar also noted -- and, again, this is

3    during the class period.  This is not part of the revelation

4    of the fraud.  This is something happening during the class

5    period that Judge Tigar felt put the defendants on notice of

6    what was happening at Wells Fargo.  It was a *Los Angeles*

7    *Times* article based on interviews with 28 former and seven

8    current employees and internal bank documents and records.

9    There is not anything analogous to that here during the

10   class period.

11           Now, plaintiffs might say their complaint refers

12   to reports from former employees and that sort of thing,

13   but, again, nobody is claiming that the amended complaint

14   here somehow put senior executives at CenturyLink on notice

15   that this was happening during the class period.  It's a

16   fundamental difference and the attempt to analogize to that

17   fails.

18           Judge Tigar cited several significant regulatory

19   interventions, including OCC supervisory letters that the

20   board didn't respond to at all, took no action to respond

21   to.

22           There were over 5,300 employees terminated, again,

23   during the class period, 5,300 terminated during the class

24   period for this conduct and yet the conduct continued over

25   and over and over and over again.

1              There were also allegations describing not just

2      the fact that senior executives and directors at Wells Fargo

3      received reports about sales issues, but reports that

4      documented increases in reports.  So there were at least

5      some allegations about the content of the reports, which is

6      a key distinction between *Wells Fargo* and this case.

7              Here we have some generic allegations saying that

8      some of the senior executives received reports about billing

9      complaints or billing disputes or sales issues.  None of

10     them describes the content of the reports in a way that

11     would suggest that those reports put CenturyLink's

12     executives on notice of a massive company-wide scheme

13     happening on such a scale that it was materially inflating

14     the company's revenues.

15             Unlike opening fake customer accounts, which is by

16     no means routine or normal, it is inherently a red flag that

17     something is going on wrong in the business, the fact that

18     you have customer complaints about bills, that you have

19     disputes about bills, that is, at least at some level, a

20     normal part of a consumer-facing business like this.

21             And so the fact that Post and other executives got

22     reports that there were -- showing that there were customer

23     complaints is not a red flag.  It does not put them on

24     notice of this kind of massive scheme to inflate revenues

25     through billing fraud.

1          THE COURT:  Well, they just didn't get complaints

2     on the billing.  That's insulting to me.  The reason why

3     they got the complaints were because of what?  You tell me.

4     Because people were being billed for things that they did

5     not receive.

6          MR. GIBBS:  You're alluding to the former employee

7     allegations about the reports that went to senior

8     executives?

9          THE COURT:  Yes.

10          MR. GIBBS:  Yes.

11          THE COURT:  You just said they got reports of

12     billing disputes.  Please.  An executive is not going to get

13     a report on billing errors.  They're going to be important

14     errors and that there are going to be allegations of

15     misconduct.

16          MR. GIBBS:  With all due respect, Your Honor, I

17     don't know what's in the reports that are being described in

18     the complaint because they're not described with very much

19     specificity.

20          I will note that the allegations that purport to

21     describe reports going to senior executives routinely say

22     the reports involve complaints about cramming and other

23     billing issues.  I don't know what that means.

24          I think it's clear from their allegations that

25     reports and complaints about cramming do come up in the

1    business.  That is true.  I don't think that's in dispute.

2    Again, there's a huge gap --

3              THE COURT:  Are you saying your executives

4    wouldn't know what cramming meant?

5              MR. GIBBS:  No, not at all, Your Honor.  I'm

6    saying when I look at the complaint and they describe

7    reports talking about complaints about cramming and other

8    billing issues, I have no way of knowing how much of the --

9    how many instances of cramming they're reporting and what

10   are the other billing issues.  There's a wide range of

11   things that could be categorized as other billing issues.  I

12   don't know what they're talking about.  We don't know what

13   those reports said.

14             I don't think that -- a senior executive receiving

15   a report that says there are customers who claim they were

16   crammed, there are customers who claim they were charged for

17   something they didn't order by itself does not put someone

18   on notice that this is happening intentionally, that this is

19   happening in such a widespread and systematic way that it is

20   actually inflating the revenues of a company whose quarterly

21   revenues routinely exceed $4 billion, whose consumer

22   revenues routinely exceed one and a half billion dollars

23   every three months.

24             So the question is not were the executives aware

25   that customers sometimes complained about cramming.  That is

1    alleged in the complaint.  The complaint does allege there

2    were reports sent up to senior management that indicated

3    there were reports of cramming.

4         There's a huge gap between that fact and saying

5    the senior executives of the company knew that cramming was

6    happening systematically across the entire company on such a

7    scale that it actually materially inflated the company's

8    $4 billion a quarter in revenue.  It's just too wide of a

9    gap.

10        There's no reasonable inference to be made, much

11   less a strong inference, which is required for scienter,

12   from the mere allegation that senior executives were aware

13   that allegations of cramming had been made.  Plaintiffs' own

14   former employee witnesses say that not all complaints from

15   customers were confirmed.  Some of them were confirmed.

16   Some of them were not confirmed.

17        So, again, the fact that senior executives were

18   made aware of allegations of cramming, it's not a red flag

19   and it certainly doesn't show that these people were aware

20   of this massive scheme to inflate revenues through fraud.

21   You're reacting to my red flag comment.

22        THE COURT:  Well, if you're a senior executive,

23   you have people underneath you and if something gets to the

24   senior executive's desk, I think that indicates some kind of

25   flag, whether or not it's red, pink, or bright red, because

1    there's -- the senior executive has other people taking a

2    look at what's happening with the business and is not going

3    to be bothered with just a routine complaint from a

4    consumer.

5             MR. GIBBS:  Well, I don't want to quibble over

6    what "flag" means, so let me move away from that language.

7             THE COURT:  Isn't that true?  Just tell me the

8    pyramid that's in a company, in your company.  A senior

9    executive just is not going to receive a complaint from a

10   customer that's paying $150 a month on a bill.

11            MR. GIBBS:  Probably not, but I guess --

12            THE COURT:  Probably not?

13            MR. GIBBS:  Yeah, probably not.  I don't know.  It

14   depends on the escalation procedures.  It depends on what we

15   mean by "senior executive."  Did the CEO get individual

16   complaints?  Maybe directly.  I don't know.  But we don't

17   know from the complaint either.

18            THE COURT:  Well, you know what a senior executive

19   is because you're using the term.

20            MR. GIBBS:  Fair enough.  So let's talk about the

21   individual defendants.  Do I think the individual defendants

22   might have been made aware of individual --

23            THE COURT:  Well, no.  Use my hypothetical.

24            MR. GIBBS:  So I don't disagree with Your Honor's

25   notion that something has to have some level of importance

 1    to get up to the most senior executives in the company.  I

 2    don't disagree with that.

 3              THE COURT:  Okay.  And the higher it goes, the

 4    more serious it is?

 5              MR. GIBBS:  Probably true.

 6              THE COURT:  And that would be a signal that it

 7    might be a red flag?

 8              MR. GIBBS:  It might be.

 9              THE COURT:  Okay.

10              MR. GIBBS:  It might be.

11              THE COURT:  All right.

12              MR. GIBBS:  It might not be.  The senior --

13              THE COURT:  More than likely it would be?

14              MR. GIBBS:  I don't know that I would agree with

15    that, Your Honor.

16              THE COURT:  Okay.

17              MR. GIBBS:  It's entirely plausible to me that

18    senior executives might receive regular reports that tell

19    them here's what our level of customer complaints are this

20    month, we've received X number of customer complaints.  They

21    might get those reports.

22              The fact that they get reports isn't necessarily

23    indicative of a problem.  It certainly indicates that the

24    information they are receiving is information they think

25    they need to have to do their job.  But not everything

1        that's reported to a senior executive --

2                THE COURT:  But they would have to know what is in

3        the complaints.  Just because you get a number, let's say

4        you get X number of complaints, the senior executive is not

5        going to sit there and say, oh, okay, that number is not

6        high enough for me to be concerned about it.  They're going

7        to be what is the complaint, what is the problem, what is

8        the problem that's causing it to get to my desk.

9                Why are you doing this to me, like I -- I was

10       chief judge of this court and I can tell you that what

11       landed on my desk became a red flag and so -- I guess I was

12       a senior executive, right?

13               And even as a judge, something my staff gives me

14       and it lands on my desk, that's going to be a red flag that

15       an attorney has done something or a *pro se* litigant has done

16       something.  That means I have to take a look at it.  It's

17       not something, oh, it's a piece of paper and I say shred it.

18               MR. GIBBS:  I'm not suggesting it's a piece of

19       paper and you shred it, Your Honor.  What I'm pointing out

20       is the law requires particularized --

21               THE COURT:  I understand the law, but don't say

22       that a senior executive is going to get a piece of paper and

23       it may not indicate a red flag, because it's serious when it

24       gets to a senior executive.  And don't tell me that you

25       don't know what a senior executive is.

```
1              MR. GIBBS:  I will say neither of those things,
2    Your Honor.
3              THE COURT:  All right.  Let's move on.
4              MR. GIBBS:  My only point is --
5              THE COURT:  Let's move on.  I understand what your
6    point is.
7              MR. GIBBS:  Thank you, Your Honor.  I'm mindful of
8    time.
9              THE COURT:  I threw you off, so let's move on to
10   the other issues that you want to talk about.
11             MR. GIBBS:  We've cited some cases from the Eighth
12   Circuit.  We think those cases stand for the proposition
13   that if you are going to claim revenues or some other metric
14   like that were misstated, you have to give at least some
15   indication of the scale or at least allege sufficient facts,
16   again, to support a reasonable inference that the thing was
17   happening on such a scale that it materially impacted
18   revenues.  We don't think they've done that here.
19             I want to touch briefly on another category of
20   statements which have to do with the company's strategies,
21   their code of conduct, their expectations for behavior.
22   We've cited the Court to cases recognizing those kinds of
23   statements are not tantamount to a guaranty that nobody ever
24   violates the code of conduct.  The fact that some number of
25   employees sometimes violated the code of conduct does not
```

1   translate the code of conduct itself into a materially false

2   statement.

3            I'll touch on a few other categories of

4   allegations the plaintiffs use to try to establish scienter.

5   Actually, I want to set that aside for now, Your Honor.  I

6   want to focus on a slightly bigger picture approach.

7            For scienter the Court needs to be apprised of

8   specific allegations going to each individual defendant's

9   state of mind, and I don't see how the Court can read this

10  complaint and have confidence that any specific individual

11  defendant was put on notice of facts suggesting that

12  cramming was happening on such a large massive scale that it

13  was materially inflating the company's revenues or that it

14  was happening so routinely that it rendered the company's

15  aspirational statements and code of conduct to be materially

16  false or misleading.

17           And I would simply urge the Court to please

18  carefully review the allegations as to each of the

19  individual defendants rather than the more impressionistic

20  high-level arguments that the plaintiffs make about senior

21  executives.

22           Your Honor, I want to just note before I sit

23  down -- we've made the point similar to this -- there are a

24  couple of individual defendants, Puckett and Douglas, who

25  are only alleged to have made very specific and limited

1    statements that the plaintiffs seek to hold them liable for.

2    All of the statements made by all of the other defendants, I

3    would be remiss if I didn't point out that Puckett and

4    Douglas are slightly differently situated and the Court

5    needs to consider individuals on an individual basis.

6              But with that, unless the Court has questions, I

7    would like to reserve the rest of my time.

8              THE COURT:  Thank you very much.

9              Counsel.

10             MR. DUBANEVICH:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. DUBANEVICH:  To remind the Court, my name is

13   Keith Dubanevich and I am here on behalf of the plaintiffs

14   in the securities case.

15             We have a very limited number of handouts which I

16   will circulate, but let me step back for a second and say

17   that these cases, the customer cases and the security cases,

18   are really a simple set of cases.  They're not complex at

19   all.

20             CenturyLink told its customers that they could get

21   TV for 49.95 and instead they billed them 149.95 and they

22   forced them to take Internet services.  That's illegal, it's

23   cramming, and it's fraud.  And they did that millions of

24   times, not once, not twice, not a hundred, not a thousand,

25   but millions of times.

1            Similarly, they told investors, just like the

2      State of Oregon, that they would never place or record an

3      order for a product that was not authorized by the customer,

4      so Oregon, just like every other investor in the country,

5      can think, okay, I've got a company that is going to comply

6      with the law, they are going to tell me what they're doing,

7      and I'm entitled to rely upon it.

8            But what do we know that they did?  They placed

9      millions of unauthorized orders for products that nobody

10     wanted.  And it gets worse.  When people called and said I

11     don't want Internet, they were charged an early cancelation

12     fee.  When people called and said you're billing me 149.99 a

13     month and you said it was going to be 49, they said, oh, we

14     never offer anything for $49 a month.  And, Your Honor, if

15     this was isolated, we wouldn't be here.

16            So what we have is a company that recognized that

17     cramming and selling services to customers that didn't want

18     those services, that resulted in substantial revenue to the

19     company.  And that practice of cramming and misbilling

20     people was well-known and widespread throughout the company.

21     It was not isolated to Arizona.  It was not isolated to

22     Minnesota.  It was across the company.

23            Now, unfortunately for investors, we didn't know

24     that.  We bought under the belief that this was a company

25     that was going to comply with the law, that was going to

1    comply with what they said in their SEC statements and what

2    they told investors, but that's not what happened.

3              In June of 2017 *Bloomberg News* reported that when

4    a whistleblower, a former employee, had complained to the

5    management that we were selling stuff to people that didn't

6    want it, she got fired.  And the *Bloomberg News* reporters

7    are saying this is just like Wells Fargo and the next

8    trading day CenturyLink's stock went down.  And then not

9    surprisingly, customers recognized, geez, if this

10   whistleblower is correct, maybe this is a systematic

11   problem.

12             THE COURT:  I have read your papers.  I understand

13   all that.

14             MR. DUBANEVICH:  So let me turn to --

15             THE COURT:  Let's get to what the defendant has

16   argued.  Scienter is very important here and we spent some

17   on that and I want you to spend some time on that.

18             MR. DUBANEVICH:  I would.  And if I can, Your

19   Honor, let's set up the law for a second.  We are here on a

20   motion to dismiss, not a motion for summary judgment.  When

21   I saw their 34 exhibits, I swear it must have been a summary

22   judgment motion, but it's not.  Your Honor knows --

23             THE COURT:  I understand.  That's just a practice

24   that we've evolved to for the last 25 years.  Everything

25   turns into a summary judgment.

1            MR. DUBANEVICH:   However, this Court has actually

2    said in the *Retek* case in 2005 and the Ninth Circuit Court

3    of Appeals has recognized that in these securities cases it

4    has become rampant and it is unfair and it should not be

5    tolerated.   The court in the Ninth Circuit case of *Khoja*,

6    which was cert denied last month by the U.S. Supreme Court,

7    the court in the Ninth Circuit said this is unfair, it is

8    unacceptable, and it should not be tolerated.

9            So I just want to point out that we're not here on

10   a summary judgment motion.   Their exhibits are incomplete.

11   They refer to SEC filings, but they're only excerpts.   Their

12   code of conduct that they attach is dated January of 2018.

13   Well, that's clearly not applicable in 2013, '14, and '15.

14   So I don't think Your Honor should look at their exhibits at

15   all.

16           So let's go directly to the points they raised in

17   their reply, and the first is that there is no evidence that

18   this was a widespread problem and they wrap that around

19   their complaints about Former Executive -- Former Employee

20   Number 5 and they seek to introduce an e-mail between one

21   person and a senior vice president, Mr. Bailey.   As Your

22   Honor is well aware, this is not the time for you to assess

23   anybody's credibility, Mr. Bailey's, Former Employee 5, or

24   anybody else's.

25           But if you take a look at the *Signet Jewelers*

1    case, a case that we cited to Your Honor in January in our

2    letter to the Court, the court there rejected the

3    defendant's arguments that, geez, a former employee's

4    statements that were reported in the complaint should not be

5    considered because they didn't know what they were doing,

6    they weren't probative.  The court said that's not

7    appropriate at a motion to dismiss stage.

8              So what we have, however, are allegations that

9    talk specifically about each of the former employees.  And

10   Former Employee 5, we specified his job title, a consumer

11   and business sales manager.  We identified his job location,

12   Boise, Idaho.  We identified the job responsibilities.  He

13   was an inbound sales manager who sold Internet and cable

14   services.  We identified the duration of his employment.

15   There is simply no basis to disregard our allegations about

16   FE-5 or any other former employee.

17             We provided Your Honor a chart that identifies

18   these former employees and that chart shows that these

19   people are located all over the company.  They're not

20   located just in Arizona or just in Minnesota.  They're

21   located in all of the regions where the company does

22   business and they're from the company's headquarters in

23   Louisiana.

24             So if you take a look at the standard that this

25   Court described in *St. Jude Medical Securities Litigation*,

1     it's clear that we have met that standard and Your Honor

2     should consider the former employees.

3             And going back to that e-mail that counsel

4     referred to and that they attached, we did not incorporate

5     it by reference at all in our complaint.  Indeed, it's not

6     been properly authenticated.  It was printed by a Mr. Steven

7     Young and we have no idea who he is.

8             But even if Your Honor considers that exhibit, the

9     e-mail confirms that an Eric Adams met with Senior Vice

10    President Bailey in 2014, senior vice president, and he met

11    with another person and they discussed customer service

12    issues.  And that's the e-mail that they submit.

13            Now, frankly, that's very similar to paragraph 109

14    of our complaint in which we say that FE-5 alerted both his

15    manager, Northwest Region Vice President Brian Stading, and

16    Senior Vice President Bailey at this Circle of Excellence

17    event that the problems were constant and rampant, cramming

18    and misquoting problems.  And in that discussion this former

19    employee said that in response Mr. Bailey, senior vice

20    president, acknowledged the cramming issues and told

21    Stading, another executive, and FE-5 we've got to do

22    something about it.

23            Now, these allegations in our complaint are very

24    similar to the allegations in the *Galestan vs. OneMain* case,

25    a case that we cited in January in our letter to Your Honor.

1    There the plaintiffs relied upon former employees and the

2    defendant claimed that the allegations didn't show any

3    specific conversation with the executive, just what the

4    defendant is arguing here.

5            The court in that case rejected it and the reason

6    is, just as in this case, the defendants participated in

7    numerous meetings and conferences and they received a

8    monthly e-mail that disclosed the problems in that case.  In

9    addition, just as we allege here, the defendants there had

10   access to reports that detailed the company's problems, in

11   that case productivity.  And the court in that case said

12   that's more than sufficient to show that the executives knew

13   what was going on.

14           In their reply CenturyLink takes great issue with

15   our citation to the Minnesota Attorney General's letter

16   brief in which they describe an audit, an internal audit at

17   CenturyLink that shows that CenturyLink overbilled three and

18   a half customers.  That makes up more than half of their

19   broadband customers.  That's a significant amount of

20   customers.

21           Now, our allegations are not based solely on the

22   Minnesota AG's allegations, not even close.  We've

23   interviewed at least --

24           THE COURT:  Three and a half million?

25           MR. DUBANEVICH:  Three and a half million, Your

1   Honor.

2               THE COURT:  You said three and a half.

3               MR. DUBANEVICH:  Very short people apparently.

4   Three and a half million.  Thank you.

5               We've interviewed at least 20 former employees.

6   We've obtained extensive materials through public records

7   requests.  And our investigation is very similar to the

8   investigation in the *Pension Trust Fund vs. DeVry* case that

9   we cited to Your Honor, and that's a Northern District of

10  Illinois case in which the court said confidential or former

11  employee statements are sufficient to establish that the

12  defendants knew what was going on at the company.

13              So let's talk a little bit about what our former

14  employees said.  Former Employee 3 said the sales quotas

15  were unreasonable and did not reflect what employees who

16  were dealing honestly with its customers could expect to

17  sell.  We pled that the executives at the company

18  established those quotas.

19              Former Executive -- Former Employees 5, 7, 9, 11,

20  and 13 said that CenturyLink routinely represented to

21  customers that they would be charged one price for a

22  particular service, but it would, in fact, charge a

23  different price.

24              We've established that FE-5 said every time I went

25  to a training, the facilitators were straight up about

1    telling new hires just tell them the total price.  Don't

2    tell them anything about options.  Don't tell them anything

3    about fees.

4            Numerous of these former employees, 4, 7, 11, 13,

5    14, 15, said CenturyLink routinely added services to

6    customer's accounts without authorization.  This isn't an

7    isolated problem, Your Honor.

8            One person, who spent over 14 years at

9    CenturyLink, said during every sales training they did, the

10   trainers would instruct representatives that they could

11   quote a single price for Internet service without disclosing

12   underlying fees.  Employees knew that was wrong.

13           But according to FE-11, cramming was rampant.  It

14   was happening all the time and every day.  13 says it was

15   widespread throughout the company.

16           For example, if you look at 18, that person worked

17   as one of three managers of the Regulatory Services

18   Division.  It was responsible for handling complaints from

19   the SEC, from State Attorneys General, the Better Business

20   Bureau, and executive complaints.  Executive complaints are

21   complaints that go straight to the C-suite office that then

22   go down to Former Employee 18's group and they investigate

23   that.  And of the cramming complaints that that group

24   reviewed, about half did, in fact, happen exactly the way

25   the customer said it.

1              FE-19 also confirmed that Defendant Post,

2      Defendant Puckett, and Defendant Victory were sent and

3      reviewed monthly reports concerning cramming reports that

4      CenturyLink received, and those reports had a specific

5      category for cramming complaints and FE-19 said this was

6      very common and widespread.

7              But that's not all, Your Honor.  We researched

8      what the Arizona Attorney General alleged and we obtained

9      all of the publicly-available information about that case.

10     And the Arizona Attorney General alleged -- guess what?

11     -- CenturyLink billed customers at rates higher than those

12     it represented during sales calls, they billed customers

13     early termination fees when the customer canceled the

14     service after getting a bill that reflected a price they

15     didn't want to pay, that CenturyLink billed customers for

16     periods of service before the services were connected.

17     That's what the Arizona Attorney General said.

18             But wait.  There's more.  We allege that the

19     Minnesota Attorney General found that CenturyLink charged

20     over 12,000 Minnesotans more than was promised.  And in

21     another case, another state found that 175,000 customers in

22     that state alone were overbilled.

23             But we did not rely upon just what we read in the

24     Minnesota AG's case.  We conferred with the Minnesota --

25             THE COURT:  Before we move on, it has nothing to

1    do with this, but I didn't understand why the Arizona

2    Attorney General only -- they settled for $170,000, right?

3              MR. DUBANEVICH:  175 -- in another case.  We're

4    not sure it happened in Arizona, but we know Arizona brought

5    their case.  We have Minnesota that brought their case.  And

6    a separate state apparently investigated and found 175,000

7    problems.

8              THE COURT:  You submitted so much paper.  But

9    there was one settlement for 170 --

10             MR. DUBANEVICH:  Yes.  That was Arizona.

11             THE COURT:  That was Arizona.  Just my own

12   interest, any reason why such a low amount?

13             MR. DUBANEVICH:  No, Your Honor.  I can tell you

14   from my experience as a former deputy in the Oregon

15   Department of Justice, but that would be outside the record.

16   But suffice it to say that CenturyLink did enter into an

17   assurance of voluntary compliance, which included injunctive

18   relief that the company and its officers were obligated to

19   comply with.

20             THE COURT:  Okay.  Go ahead.  I'm sorry to bother

21   you with that.

22             MR. DUBANEVICH:  We didn't -- no problem, Your

23   Honor, and I appreciate questions.  It makes it a lot more

24   enjoyable for me as well.

25             We didn't rely just upon what we read in the

1    Minnesota AG's filing.  We actually conferred with the

2    Minnesota AG's office to confirm that they indeed conducted

3    their own investigation and had a good-faith basis to make

4    the allegations they did.

5             Now, CenturyLink has complained, geez, we didn't

6    cite to or say anything about the audit other than what was

7    reported by the Minnesota AG.  And that's correct.  We would

8    love to see the audit, Your Honor, but CenturyLink is taking

9    great lengths to not disclose it to anybody.  But when we

10   get into discovery, we're confident that that audit will

11   indeed confirm exactly what the Minnesota Attorney General's

12   Office described as showing.

13            Now, CenturyLink has complained that, gee whiz, we

14   shouldn't be allowed to rely upon or cite to allegations in

15   other lawsuits.  Let me do a little bit of a pause to

16   address some of the cases that they mentioned.

17            One is *Maine vs. Countrywide*.  In that case the

18   court found that the allegations were parroted almost word

19   for word from another lawsuit.  We have not done that.  And

20   the court found that plaintiff's counsel did not speak to

21   any of the sources on which the allegations were made, did

22   not examine any of the underlying documents, did not contact

23   the attorneys in the other cases whose allegations were

24   parroted.

25            That is not at all the situation here.  We clearly

1    have conferred with the Minnesota AG's office.  We have

2    collected voluminous documents.  We have interviewed at

3    least 20 former employees.  We have conducted exhaustive

4    investigation.

5           So let me turn to the defendants' argument that

6    this behavioral coaching idea just simply doesn't make any

7    sense.

8           So let's set this up.  CenturyLink is getting

9    thousands upon thousands of complaints every month.  They've

10   got an internal audit that shows they've got a cramming

11   problem.  The executives are getting monthly reports, if not

12   more frequent, that shows that they have cramming problems.

13          How do they know that?  Because they are having

14   such a high turnover and at exit interviews the employees

15   are saying these quotas are impossible for us to meet and

16   they're admitting that the only way they can meet those

17   quotas is by cramming.

18          So the company recognizes it has a problem, that

19   it is inconsistent with its code of conduct to be doing

20   that.  So instead they change to what's called behavioral

21   coaching.  FE-17, a director of human resources who reported

22   to Executive Vice President Kathy Flynn, said what we did is

23   we changed to a behavioral coaching model in which employees

24   were judged on the quality of their services, not on sales

25   metrics.  We also pled that Defendant Post, one of the

1    senior executives in the company, recognized Flynn for her

2    work on the project.

3            We quoted and referred to FE-20, who said that,

4    yes, indeed they switched to a behavioral coaching model.

5    And she said we were having so much discipline and so many

6    investigations and we were hearing in the exit interviews

7    that it was because of the sales quotas, so CenturyLink had

8    to stop enforcing it.

9            So what happened?  So they converted to a model

10   that's behavioral, which is to advise customers of the true

11   price of the product they want and sell them only the

12   product that the customer wants.

13           And what happens?  Revenues went down.  Well, how

14   do we know that?  Well, according to FE-1, she said as soon

15   as the behavioral model was adopted, sales fell off very

16   quickly.  FE-8 says I remember results dropping drastically

17   when people were no longer being managed to a number.

18           Not surprisingly, when sales dropped in June of

19   2015, Defendant Puckett left the company to spend more time

20   with her family.  Now, CenturyLink --

21           THE COURT:  But the amount -- the percentage

22   amount didn't drop that much.

23           MR. DUBANEVICH:  Your Honor, the problem is that

24   CenturyLink changed the way they reported their data during

25   the class period and the filings that they have submitted,

1    Your Honor, are incomplete.  They are merely excerpts.  So

2    that evidence is not in front of you.

3           We believe that when an investigation takes place,

4    we will show that it was sufficient enough that the company

5    changed course and decided to abandon the behavioral

6    coaching model and go back to the cramming methodology that

7    they had used for many years.  Defendant Puckett was fired,

8    we believe, because of that.

9           And so CenturyLink might not like these

10   allegations, they might even disagree with them, but at this

11   stage of the case, Your Honor, these are the allegations the

12   Court must presume are true.

13          So let's turn to the *Wells Fargo* case.  We've

14   provided --

15          THE COURT:  The reason I brought that up is

16   because you're alleging that an article in the *Wall Street*

17   *Journal* -- what was it, a 4.5 percent drop?  This was a very

18   low percent drop.

19          MR. DUBANEVICH:  It was enough that it got the

20   company's attention so that they had to change course.  But

21   what they didn't do is tell the investors why there was a

22   drop.  They didn't tell the investors that it was because

23   they abandoned cramming because they had problems and they

24   converted to a behavioral coaching model.  And they didn't

25   tell investors that, geez, that behavioral coaching model

1    resulted in decreased revenue, so we're going to go back to

2    cramming.  They didn't tell investors that.  If they had, we

3    might not be here.  But they didn't tell investors that.

4              So let me turn to the *Wells Fargo* case for a

5    second.  In *Wells Fargo* -- as Your Honor can see from our

6    handouts, on the left what we did is we took defendants'

7    description of the *Wells Fargo* case and on the right we

8    simply showed Your Honor what our allegations are and, not

9    surprisingly, they are very similar to *Wells Fargo* with one

10   big difference.  The conduct here was more widespread, it

11   was more significant, and it took place over a longer period

12   of time.

13             We clearly talk about the company executives in

14   both companies imposing very strict sales quotas.  We talk

15   about a theory of bundling products and selling products to

16   customers that don't want those products.  That's pretty

17   similar to what they did in *Wells Fargo*.

18             So let me move off *Wells Fargo* and get to

19   scienter.  We don't have to prove at this stage anything.

20   All we have to do is make a reasonable inference, a strong

21   inference, but that does not license the Court to resolve

22   disputed facts at this stage.  We just need to plead enough

23   information that there is a reasonable inference.

24             One of the cases we cited uses a baseball analogy,

25   which is a tie goes to the runner.  If we have pled facts

1    which give a reasonable inference, they might have a similar

2    story, but if both of those stories are reasonable, the tie

3    goes to the runner and you must deny their motion.  So let

4    me suggest that Your Honor look at both the *DeVry* and the

5    *Signet Jewelers* case.  Those are the cases that talk about

6    the tie goes to the runner.

7         The inference of scienter need not be irrefutable,

8    Your Honor, or even the most plausible of competing

9    inferences.  As long as it is as least as compelling as any

10   opposing inference, the complaint adequately alleges

11   scienter.

12        So what have we pled?  We pled that the executives

13   established the sales quotas.  We pled that company systems

14   kept track of whether people met their sales quotas and

15   whether cramming was occurring.  We have pled that those

16   reports went to the senior executives.

17        We have pled that at least on a number of

18   occasions there were actual conversations with executives

19   about cramming.  Indeed, we pled that Defendant Post

20   complained about the number of complaints he was saying --

21   seeing about cramming.  That's specific and that is clear

22   knowledge that they had a problem.

23        We have clearly established that Defendant Bailey

24   had a conversation about cramming, and he acknowledged the

25   existence of that.

1            We've established through FE-8 that there are
2       these reports, a dashboard system that provided
3       up-to-the-minute data on sales and revenue.
4            We've established through FE-15 that that person
5       discussed the pricing problems with Puckett, Bailey, and
6       Victory.
7            We've said that FE-16 said that there were
8       problems that were recorded in something -- a system called
9       Q-Finity.  Any team leader, director, or vice president had
10      access to that system and they would compile a report every
11      month and send that report to team leaders, directors, VPs,
12      and regional VPs.
13           FE-18 said CenturyLink's senior leadership, Post,
14      Puckett, Victory, and Olsen, got reports on the number and
15      types and categories of complaints from the FCC, from state
16      agencies, the Better Business Bureau, and direct customer
17      escalations.  These are reports that went directly to the
18      top of the company.
19           So what did they actually tell investors?  Did
20      they tell investors that they were generating revenue from
21      all the cramming and misrepresentations?  No, not at all,
22      Your Honor.
23           What they said is they will never place or record
24      an order for our products and services for a customer
25      without that customer's authorization.  They said our focus,

1    on the first day of the class period, is meeting the needs

2    of our customers.  They repeated that over and over in every

3    report throughout the class period.

4            They not only said it's important what's to the

5    benefit of the customer, but they said it is not important

6    what we think is best.  That's what Defendant Post told

7    analysts.  Well, that's completely inconsistent with their

8    behavior of cramming and selling stuff to people that don't

9    want it, and that occurred consistently throughout the class

10   period.

11           So let me turn to their code of conduct.

12   Defendants have taken issue with, gee whiz, you can't hold

13   somebody responsible to a code of conduct and they cite, for

14   example, a couple of cases that were very aspirational.

15   Geez, we try to do the best thing.  We try to comply with

16   the law.  There was a recent Second Circuit case where

17   the --

18           THE COURT:  Let's not spend time on this.

19           MR. DUBANEVICH:  Excuse me?

20           THE COURT:  Don't spend time on --

21           MR. DUBANEVICH:  I will not.

22           THE COURT:  It's not aspirational.

23           MR. DUBANEVICH:  Okay.  So let me then finish with

24   whether there was any impact on the stock because of their

25   misrepresentations.  Let me circle back on this issue and

1    let's set the tone for the law.

2              As this court said in March of 2005 in the *Retek*

3    order, in the Eighth Circuit the causation requirement for

4    damages is not very stringent.  Plaintiffs only need to show

5    some causal nexus between defendant's improper conduct and

6    plaintiff's losses.

7              This court said in *In re Buca* that plaintiff need

8    not prove loss causation with particularity.  Rather, a

9    short and plain statement in accordance with FRCP 8(a)(2) is

10   sufficient.  Your Honor, that's consistent with the *St. Jude*

11   case and with *Dura*.

12             And what we have clearly established and Your

13   Honor can see in our chart is that when the facts started

14   coming out, first with the news report of the whistleblower

15   being sued -- I'm sorry, being fired and then when consumers

16   started filing cases and made their allegations more public

17   and then when the Minnesota Attorney General filed her

18   complaint at that time, that's when the market realized what

19   was going on at CenturyLink and on each of those occasions

20   the stock fell precipitously.  That is all we need to

21   allege.  When we get into discovery, we will be able to show

22   it without any doubt.

23             But, Your Honor, I believe that our complaint

24   adequately pleads a cause of action under the applicable law

25   and the defendants' motion should be denied.

1          Do you have any questions?

2          THE COURT:  Thank you very much.

3          MR. DUBANEVICH:  Thank you, Your Honor.

4          THE COURT:  Counsel.

5          MR. GIBBS:  Thank you, Your Honor.  I would like

6    to circle back to scienter, if I may.  I'm glad counsel

7    agrees with me that it is not just a reasonable inference,

8    but a strong inference that's required and for that purpose.

9          THE COURT:  And I agree with you too.

10          MR. GIBBS:  Thank you, Your Honor.

11       (Laughter)

12          MR. GIBBS:  I'm not surprised by that.  I'm highly

13    confident in that position.

14          Your Honor, I'm not here to defend or minimize

15    cramming and I'm not trying to suggest that a report of

16    cramming going to a senior executive is not a serious thing.

17    If I left that impression, I want to apologize because

18    that's not our position.

19          THE COURT:  Thank you.  That's the impression I

20    got.

21          MR. GIBBS:  All I'm trying to point out is to

22    support a strong inference of scienter, given the theory of

23    the case here, the information going to Mr. Post and the

24    other senior executives would need to be described in enough

25    detail that the Court can reach a strong inference that this

1    information put them on notice not just that cramming was

2    occurring, again, not to minimize that, but to distinguish

3    between some amount of cramming happening and cramming

4    happening so systematically on such a massive scale that it

5    results in a material overstatement of the company's

6    revenue.  To support that inference you would have to have

7    far more detail than you have in the complaint before you.

8         I think that the Court can reasonably infer from

9    the facts alleged in this complaint that information and

10   reports went to Mr. Post and other senior executives

11   indicating that there were reports of cramming happening.

12        And, again, not to minimize that, but there is a

13   wide gulf between senior executives knowing that there are

14   instances of some employees violating company policy on the

15   one hand versus it's happening on such a massive scale that

16   it's actually inflating their $4 billion a quarter in

17   quarterly revenue.  I think it's just a bridge too far given

18   the very high pleading burden imposed by the PSLRA.  Unless

19   the Court has any further questions on that, I'll move on.

20        I want to touch briefly on *Wells Fargo*.  I

21   actually think plaintiffs' handout on that is actually quite

22   telling.  What they've highlighted and analogized to this

23   case are three sentences where we simply describe the

24   plaintiffs' theory of the case in *Wells Fargo*.

25        And I have no doubt that the plaintiffs' theory of

1    the case here is intentionally modeled on the theory of the

2    case in *Wells Fargo*.  That doesn't mean that the allegations

3    here across the board are so similar that Judge Tigar's

4    decisions in *Wells Fargo* should control or even be

5    persuasive here.

6         What they haven't highlighted, what they haven't

7    tried to meaningfully analogize to the facts alleged in

8    their complaint are the ones I was talking about covering

9    two slides, about all the things that Judge Tigar

10   characterized as red flags.  They don't even discuss it

11   here.  They don't highlight the sentences where we call out

12   some of those red flags in the brief.  They have nothing to

13   say about all of the particular -- the battery of

14   particularized factual allegations that I discussed with

15   Your Honor at some length, and that's the difference.  You

16   don't get to *Wells Fargo* controls this case just by saying

17   we've articulated a theory that's very much like their

18   theory in that case.

19         THE COURT:  Well, plaintiffs are going to have to

20   come back up and deal with Tigar's holding and the analysis

21   of his opinion.  And then I'll give you a chance to respond.

22         MR. GIBBS:  Thank you, Your Honor.

23         I want to touch briefly on the Minnesota AG

24   discussion and the assertions in that discovery letter.  I

25   have to say counsel's presentation to you just now is the

1        very first time I've ever heard any mention of plaintiffs'

2        counsel talking to the Minnesota AG's Office about the

3        assertions in that letter.  It's not in the complaint.  It's

4        not in the briefing.  It is not a basis for the Court to

5        accept that allegation if it's otherwise not inclined to.

6              The story about behavioral coaching and the

7        alleged decline in revenue, counsel focused on statements

8        attributed to a couple of former employees about sales

9        dropping dramatically.  Now, we've pointed the Court to the

10       publicly-reported revenue numbers, which presumably is what

11       the defendants would have been responding to, right?  The

12       concern is they want to be able to report favorable

13       financial results.

14             We've pointed Your Honor to the specific financial

15       reports that were actually reported in that time period.

16       Their response is to quote a couple of former employees who

17       worked in human resources who say sales dropped

18       dramatically.

19             I don't know how one could possibly ignore the

20       publicly-reported revenue numbers and conclude, based on the

21       word of a couple of people in HR, that sales dropped

22       dramatically and that was the impetus for changing this

23       policy.  I don't think that supports a reasonable inference,

24       much less a strong inference, of scienter.

25             Your Honor, may I consult briefly with my team and

```
1    see if we have anything else we want to say?
2              THE COURT:  You may.
3              MR. GIBBS:  Thank you, Your Honor.
4        (Mr. Gibbs and Ms. Lightdale confer)
5              MR. GIBBS:  Your Honor, with that, I'll yield and
6    be ready to respond to whatever counsel has to say about
7    Wells Fargo.
8              THE COURT:  Did you want to talk about the
9    termination of the whistleblowers at all?
10             MR. GIBBS:  I would be happy to, Your Honor.
11             THE COURT:  Please.
12             MR. GIBBS:  So I'm not sure which allegation the
13   Court is focused on.  I'm happy to talk about any of them.
14   I think --
15             THE COURT:  FE-11 and FE-7 and FE-9.
16             MR. GIBBS:  Let me get to those allegations.  I
17   guess what I would say about them is I'm personally a little
18   skeptical of them, but I understand the procedural posture
19   requires the Court to accept factual allegations as true and
20   so I'm not going to quibble with them at that level.
21             I guess what I would say, though, is whatever is
22   going on with those individual employees, again, we're
23   talking about fairly low-level sales folks in individual
24   call centers.  I don't think that has anything to do with
25   what the senior-most executives in the company knew about.
```

1              THE COURT:  What about the executive resignations?

2              MR. GIBBS:  I think the executive resignations,

3       we've pointed out in the briefing, based on some of the

4       public disclosures around those resignations, that the

5       plaintiffs' allegations are in certain respects just not

6       correct.

7              But I think more importantly than that, the

8       suggestion that Puckett was fired because of this thing

9       around behavioral coaching and what happened to revenues,

10      it's sheer speculation.  It's just made up.  There's no one

11      in the complaint who says I know why Puckett was fired and

12      it has something to do with revenue or behavioral coaching

13      or changes in the sales model.  It is sheer speculation.

14             I mean, they have a four-and-a-half-year class

15      period.  Some executives left during that four and a half

16      years.  There's nothing suspicious or nefarious about that.

17      Given the sheer length of their class period and all of the

18      events they describe in their class period, it's inevitable

19      that those departures could be related in time to various

20      events in their complaint.  I mean, the complaint is

21      describing conduct happening over a four-and-a-half-year

22      period.

23             There's no specific factual allegations to support

24      even a reasonable inference that any of those departures are

25      in any way related to the allegations the plaintiffs are

1    making here.  It's not enough for them to say some

2    executives left and to speculate that that departure has

3    something to do with these sales issues or anything else.

4    The record is simply bare on that.  It's nothing but

5    speculation.

6            THE COURT:  Do you want to check with your

7    colleagues?

8            MR. GIBBS:  I think I should, Your Honor.  Thank

9    you.

10        (Mr. Gibbs and Ms. Lightdale confer)

11            MR. GIBBS:  Your Honor, I won't belabor the point,

12    but I want to refer Your Honor to slide 23 in our

13    presentation, which is the one that touches on the executive

14    resignations and lays out the reasons why we think their

15    allegations are not consistent with the publicly-disclosed

16    and judicially-noticeable facts about those resignations,

17    but I don't think we need to belabor it here.

18            THE COURT:  Thank you.

19            Counsel, before you get started, why don't we take

20    a stretch break so my court reporter can have a few minutes.

21        (Pause)

22            THE COURT:  All right.  You may be seated.

23            MR. DUBANEVICH:  Thank you, Your Honor.

24            THE COURT:  There's no rush anymore.  I've missed

25    my meetings.

1          MR. DUBANEVICH:  I apologize.

2          THE COURT:  I mean I missed the ceremony.

3          MR. DUBANEVICH:  I'm getting close to my 50th as

4     well and I'm not sure I want to go either.

5          THE COURT:  I will be there this afternoon, but

6     this morning I won't be.

7          MR. DUBANEVICH:  I want to directly address Your

8     Honor's questions about the *Wells Fargo* case.  And not

9     surprisingly, we think it is remarkably similar.  In that

10    case Judge Tigar went out of his way to describe the

11    high-pressure sales tactics and quotas that the senior

12    management put in place for the company.  If you look at the

13    defendants' slides, slide 13, we talked about cross-selling

14    and here they were bundling.

15          What we know is that in the *Wells Fargo* case there

16    were one and a half million fake deposit accounts over --

17    and over 500,000 fake credit card accounts.  In our case we

18    have between a third and a half of their customers being

19    falsely billed or crammed.  Similar, if not greater, volume

20    of problems here.

21          They say that, gee whiz, you know, they haven't

22    been held responsible yet.  Well, that's why we're here,

23    Your Honor.  And they have apparently agreed to injunctive

24    relief with the customer plaintiffs.

25          In terms of whether the companies knew, well, the

1    Wells Fargo executive admitted under oath that they had

2    known about it for many years.  Well, that was testimony

3    that came long after the case was filed.  It wasn't

4    testimony or a public statement during the class period.

5           And here we have both Mr. Bailey admitting that he

6    was aware of cramming and we have evidence that monthly

7    reports went directly to Mr. Post and to other senior

8    executives notifying them of the changes in revenue, which

9    of course they track closely, and when they would have

10   complaints about cramming.

11          It would be foolish to say that a senior executive

12   at a public company does not take complaints to the FCC

13   seriously.  And when they get to his level, you must take

14   them very seriously, and he was getting those reports at

15   least on a monthly basis.

16          We know that Ms. Heiser told Mr. Post in 2016, by

17   posting a message on some sort of internal company blog or

18   e-mail, that there was cramming going on and this wasn't

19   okay.  So it's clear that the executives at CenturyLink knew

20   about the cramming and they condoned it because it led to

21   greater revenues.

22          Judge Tigar's description in his opinion indicates

23   that the defendants knew or deliberately disregarded their

24   cross-selling metrics when they reported to the public.  And

25   that's exactly what we have here.  The company disregarded

1    and ignored the data that they had about cramming and

2    misrepresentations to sell more services to their customers,

3    and they ignored that when they reported to the investing

4    public.  So Judge Tigar found indeed that there were

5    material misrepresentations and that the executives had

6    scienter.

7            And in our view, given that the consumer segment

8    made up over 30 percent of CenturyLink's revenues, it is

9    certainly fair for Your Honor to presume that a company

10   executive is going to be very particularly interested in

11   what is happening with a core business function.

12           And in this case 30 percent or more of their

13   revenue is coming from the consumer division.  Clearly an

14   executive should be paying attention to where that money is

15   coming from and how they're earning it.

16           Unless Your Honor has any further questions, I

17   would be happy to sit down.

18           THE COURT:  Well, hold on for a second.

19        (Pause)

20           THE COURT:  My understanding of the argument this

21   morning in dealing with *Wells Fargo* by the defendant is that

22   there were a number of elements within Tigar's opinion that

23   would not apply to the plaintiffs' case and I would like you

24   to address that issue.

25           MR. DUBANEVICH:  Sure.  Going back to their

1    slides, on page 14 they say there are not a number of red

2    flags in this case.

3            In point 1, as they mentioned, they talk about

4    Wells Fargo's CEO's testimony before Congress shows that

5    he knew about it.  What we have is evidence that Mr. Bailey

6    was specifically told there's a problem with cramming and he

7    acknowledged it.  And what we have is monthly reports that

8    are going to the senior executives that fully and

9    unequivocally disclose the extensive cramming and sales

10   misrepresentations that were taking place.  So that's

11   points 1 and 2.

12           THE COURT:  Okay.

13           MR. DUBANEVICH:  Point 3, the legal actions that

14   were taken.  Well, what we know is that Ms. Heiser was fired

15   for being a whistleblower and disclosing the problems of

16   cramming.  What we know is that Arizona brought a lawsuit

17   against CenturyLink.  What we know is that there were

18   customer complaints in the millions and customer lawsuits.

19   So, Your Honor, I think we've satisfied point number 3.

20           Point number 4, the Los Angeles Times interviews.

21   We've interviewed at least 20 former employees.  And as our

22   chart indicates, these are former employees from all over

23   the company in all regions, including the corporate office.

24           Point number 5, they talk about significant

25   regulatory interventions and OCC supervisory letters.  Your

1    Honor, what we know here is that CenturyLink did internal

2    audits, that they closely tracked complaints that were sent

3    to the Federal Communications Commission, that they closely

4    tracked complaints that went to state regulatory boards.  We

5    know for a fact that they were paying attention to Attorney

6    General investigations.  So I think we've more than

7    adequately satisfied point 5.

8         Point number 6, more than 5,300 Wells Fargo

9    employees were terminated.  We don't know how many employees

10   were terminated at CenturyLink, but we do know that they

11   were fired and we do know that they had an extraordinary

12   problem retaining employees, who said repeatedly I can't

13   meet the sales metrics.  And a lot of people said the only

14   way I can do it is by selling false information to the

15   customers and they couldn't do that, so they quit.  I think

16   we more than adequately fit number 6.

17        And then number 7, Wells Fargo received regular

18   internal investigation reports.  As I've said, Your Honor,

19   we've already cited at least two different kind of reports

20   that went to the C-suite that talked about both their sales

21   revenue, but also the reports of cramming.

22        So, Your Honor, I think we clearly fit into the

23   *Wells Fargo* --

24        THE COURT:  Thank you very much for making sure it

25   was clear to me.

1          MR. DUBANEVICH:  Thank you, Your Honor.

2          THE COURT:  Anything else, Counsel?

3          MR. GIBBS:  Yes, Your Honor.  If I may, I would

4     just like to respond to those specific points.

5          So as to point 1, the testimony from the CEO of

6     Wells Fargo in front of congressional committees.  Counsel

7     first said that testimony took place in 2016, which is late

8     or it may be even after the class period.  That's a red

9     herring.  The testimony concerned what the board and

10    management knew back in 2012 and '13 and '14 and '15, right

11    during the class period.  So the question of when he

12    testified is irrelevant.  The issue is what was he saying

13    about the senior executives' and board's knowledge during

14    the class period.

15         And I would encourage the Court to please read

16    Judge Tigar's decision.  He references that testimony

17    repeatedly.  It is a very important part of his analysis.

18    It is not present here.

19         The attempt to analogize the CEO's admission

20    before Congress that his executive team and the board knew

21    of illegal conduct for years is not remotely comparable to

22    the Bailey allegation even if you accept it at face value.

23    We think that the e-mail that we have put in front of the

24    Court is properly before the Court and completely undermines

25    that allegation, but even on its face it's not remotely

1    comparable.

2          Counsel said -- I'm sorry.  I tried to get the

3    words down, so I think this is accurate, but I don't have a

4    transcript.  But I heard counsel say that they had

5    identified reports that, quote, fully disclosed the extent

6    of the cramming that went to senior executives.  That's not

7    true.  That's not a fair characterization of what's in the

8    complaint.

9          The complaint says that reports about cramming and

10   other billing complaints went to executives.  That's not the

11   same as saying there's a report that disclosed -- fully

12   disclosed the total extent of the cramming, much less that

13   the reports showed cramming is happening on such a massive

14   scale that it could possibly have inflated their $4 billion

15   a quarter in revenue.

16         Also I heard counsel say we know that Heiser was

17   fired in retaliation.  We don't know that.  Those are

18   allegations in a lawsuit that was settled very quickly after

19   it was filed.  It's one lawsuit.

20         I will say that in discussing the lawsuits at

21   issue in *Wells Fargo*, Judge Tigar was very careful to say

22   that the plaintiffs in that case were not citing the

23   lawsuits to support the allegation that the unauthorized

24   account creation had occurred.  They were not citing them as

25   evidence that the allegations in the complaint were true.

1   They were citing them to say the sheer volume of complaints

2   filed throughout the five-year class period, making the very

3   same, very specific allegation that customers were opening

4   unauthorized accounts, was one of many things that would put

5   the board on notice during that period that this conduct was

6   occurring.

7          A single employee working out of her home office

8   in Arizona filing a wrongful discharge or retaliatory

9   discharge claim, which, by the way, is at the very end of

10  the class period here -- it's part of what plaintiffs claim

11  brought the truth to light -- is not remotely comparable to

12  the cascade of lawsuits that Judge Tigar cited as having put

13  the Wells Fargo board on notice that something was going on.

14         On the *Los Angeles Times* article, again, it's a

15  timing point.  Counsel's reference to the employees they

16  interviewed and the facts alleged in the amended complaint

17  is a red herring.  The reason why Judge Tigar cited the

18  *Los Angeles Times* article was not because it established the

19  truth that unauthorized accounts were being created.  He

20  cited it because it was published right in the heart of the

21  class period and put the directors on notice that Wells

22  Fargo employees were creating unauthorized accounts.

23         The amended complaint here that reflects all of

24  the plaintiffs' work and all of the former employee

25  interviews was not filed until like a year after the class

1      period ends.  Their complaint can't be analogized to a

2      newspaper article that comes out during the class period and

3      put the directors on notice of what was happening during the

4      class period.  So the analogy there is simply false.

5              Counsel referenced internal audits.  This again

6      gets to my point.  It's not enough to talk about reports,

7      documents, audits.  They have to have some indication of

8      what's actually in them.  Other than the allegation that's

9      lifted from the briefing in the Minnesota Attorney General

10     Office lawsuit, there's no allegation about what these

11     reports showed that would support an inference that the

12     reports put people on notice that this is happening on a

13     massive scale.

14             Counsel talked about exit interviews of employees.

15     I'd just go back to what I said about the alleged

16     retaliatory termination.  There's no connection between

17     individual employee exit interviews and the senior

18     executives who have been named as individual defendants

19     here.

20             I just want to close by emphasizing a point about

21     Judge Tigar's decision.  I'm citing language at page 13 of

22     the *Shaev*, S-h-a-e-v, *vs*. *Baker* case.  It's 2017 WL 1735573.

23     Judge Tigar wrote, quote, While any of these red flags might

24     appear relatively insignificant to a large company like

25     Wells Fargo when viewed in isolation, when viewed

1    collectively they support an inference that a majority of

2    the director defendants consciously disregarded their

3    fiduciary duties despite knowledge regarding widespread

4    illegal account-creation activities and therefore there is a

5    substantial likelihood of director oversight liability.

6              Now, the language that the judge is using there is

7    because in that part of the opinion he's analyzing a breach

8    of fiduciary duty claim.  He later cites back to that

9    discussion when he makes a finding as to scienter as part of

10   the securities fraud claim.  But that's the basis of his

11   finding.

12             And the point I wanted to emphasize here is it's

13   not enough to pluck one or two or three of the things out of

14   *Wells Fargo* and say we sort of ring a faint bell that's kind

15   of like this thing in *Wells Fargo*.  Wells Fargo's result

16   turned on all of those things considered collectively.  So

17   unless we have all of those things here, you can't reach the

18   same result based solely on what Judge Tigar did in the

19   *Wells Fargo* cases.

20             Thank you, Your Honor.

21             THE COURT:  Thank you.

22             Anything further?  If not, we'll adjourn for this

23   morning.  I will take this matter under advisement and get

24   my order out as quickly as possible.  Enjoy the weekend.

25   Thank you.

1        (Court adjourned at 9:53 a.m.)

2                          *       *       *

3

4

5        I, Lori A. Simpson, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9                  Certified by:    *s/ Lori A. Simpson*

10                              Lori A. Simpson, RMR-CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25