# EXHIBIT C

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF ANOKA                                  TENTH JUDICIAL DISTRICT

Case Type:  Other Civil
(Consumer Protection)

State of Minnesota, by its Attorney General,        Court File No. 02-CV-17-3488
Keith Ellison,

                    Plaintiff,

        vs.                                    **FIRST AMENDED COMPLAINT**

CenturyTel Broadband Services LLC,
d/b/a CenturyLink Broadband; Qwest
Broadband Services, Inc., d/b/a
CenturyLink; and Qwest Corporation,
d/b/a CenturyLink QC,

                    Defendants.

        The State of Minnesota, by its Attorney General, Keith Ellison, for its First Amended

Complaint against the above-referenced Defendants ("CenturyLink"), alleges as follows:

                            **INTRODUCTION**

        1.      CenturyLink promises a simple, low rate to Minnesota consumers for internet and

cable television service.  But CenturyLink has fraudulently charged some Minnesota consumers

more than the price the company quoted to them at the time of sale.  To make matters worse,

CenturyLink has often refused to honor its quoted rates after consumers bring the price

misrepresentations to the company's attention.  CenturyLink's pattern and practice of making

false statements about the price consumers would pay has injured tens of thousands of Minnesota

consumers who have purchased the company's service.  The State of Minnesota brings this

action to stop CenturyLink's long-standing fraudulent practices and to enforce Minnesota's

consumer protection laws.

## PARTIES

2.      Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8; the Uniform Deceptive Trade Practices Act, Minnesota Statutes sections 325D.43–.48; the Consumer Fraud Act, Minnesota Statutes sections 325F.68-.694; and has common law authority, including *parens patriae* authority, to bring this action to enforce Minnesota's laws, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of – and provide full relief for – violations of Minnesota's laws.

3.      CenturyTel Broadband Services, LLC is a Louisiana limited liability company, doing business in Minnesota as CenturyLink Broadband. Its principal place of business is 100 CenturyLink Drive, Monroe, Louisiana 71203. It is registered with the Minnesota Secretary of State pursuant to the Minnesota Limited Liability Company Act. CenturyTel Broadband Services, LLC, acting in concert with other entities affiliated with CenturyLink, Inc., provides communications services in the State of Minnesota and it is a subsidiary of CenturyLink, Inc., a Louisiana corporation.

4.      Qwest Broadband Services, Inc. is a Delaware corporation, doing business in Minnesota as CenturyLink. Its principal place of business is 100 CenturyLink Drive, Monroe, Louisiana 71203. It is registered with the Minnesota Secretary of State pursuant to the Minnesota Foreign Corporation Act. Qwest Broadband Services, Inc., acting in concert with other entities affiliated with CenturyLink, Inc., provides communications services in the State of Minnesota and it is a subsidiary of CenturyLink, Inc., a Louisiana corporation.

5.      Qwest Corporation is a Colorado corporation, doing business in Minnesota as CenturyLink QC. Its principal place of business is 100 CenturyLink Drive, Monroe, Louisiana

71203.  It is registered with the Minnesota Secretary of State pursuant to the Minnesota Foreign Corporation Act.  Qwest Corporation, acting in concert with other entities affiliated with CenturyLink, Inc., provides communications services in the State of Minnesota and it is a subsidiary of CenturyLink, Inc., a Louisiana corporation.

## JURISDICTION

6.    Minnesota Statutes section 8.31 and common law authority provide this Court with jurisdiction over the subject matter of this action.

7.    This Court has personal jurisdiction over CenturyLink as a result of CenturyLink and its affiliated entities' sales to and dealings with Minnesota consumers.  CenturyLink conducts business in Minnesota and has committed acts causing injury to consumers located in Minnesota.

## VENUE

8.    Venue in Anoka County is proper under Minnesota Statutes section 542.09 because this cause of action arises in part in Anoka County.  CenturyLink does and has done business in Anoka County, and CenturyLink's unlawful acts have harmed Anoka County residents, among others.

## FACTUAL BACKGROUND

### I.    CENTURYLINK SELLS ITS INTERNET AND CABLE TELEVISION SERVICES IN A PRICE-SENSITIVE MARKET.

9.    For decades, CenturyLink and its related entities offered regulated telephone service to Minnesota residents.  The sale of regulated telephone service provided the company with predictable revenue from a high-margin product.  As a result of the company's long history of providing these regulated services, many Minnesotans view CenturyLink as a telephone company operating in a predictable and regulated market.

10. In recent years, CenturyLink has experienced accelerating losses from sales of its telephone services, including losing out on nearly $600 million of revenue per year from these "legacy services." More recently, CenturyLink has branched into other lines of business. The company now sells internet and cable television service to Minnesota residents. CenturyLink competes with other cable television and internet providers, satellite television companies, and cellular providers for market share for these services.

11. But these new "strategic products" provide CenturyLink with substantially lower margins than the company's legacy telephone services. In recent years, the sales from these new services have been insufficient to offset the company's dramatic losses in revenue from legacy services.

12. Glen Post, CenturyLink's Chief Executive Officer at the time the State filed this lawsuit, told investors concerned about these mounting revenue losses that the company was responding to these market dynamics with "aggressive marketing." But what CenturyLink has not revealed to the public is that for years the company engaged in a lengthy course of prohibited conduct by falsely promising low prices and discounts to attract price-sensitive consumers. Through the patterns and practices described in this Complaint, CenturyLink has deceptively charged tens of thousands of Minnesota consumers more than it promised them at the time of sale.

## II.  CENTURYLINK USES COMPLEX AND DECEPTIVE PRICING PRACTICES.

13. CenturyLink has engaged in a pattern and practice of deceptive conduct and false statements that have caused confusion among a large number of Minnesota consumers. CenturyLink first developed a complex and massive set of ever-changing pricing rules that deceived consumers. CenturyLink then layered these deceptive prices on top of a complicated

computer billing system that prevented its agents from quoting accurate prices. The company also maintained a number of policies, practices, and procedures that instructed its agents not to honor its offers. CenturyLink is aware that its deceptive conduct defrauded Minnesota consumers, and the company refused to timely correct its conduct. As result of the company's long-standing and illegal conduct, tens of thousands of Minnesota consumers have been harmed by their purchase of CenturyLink service.

**A.**      **For Years CenturyLink Created and Maintained Thousands of Prices, Promotions, and Complex Pricing Rules That Confused Consumers.**

14.    The State asked CenturyLink to produce information about the prices it charges to Minnesota consumers for internet and cable television services. CenturyLink has produced approximately 9,000 pages of documents it stated were an "overview" of its pricing policies. The company claimed that the State's request that CenturyLink produce full information about its prices was "unduly burdensome."

15.    These pricing documents reveal a complex and elaborate pricing system in which layers of conditions and exceptions can affect the rates paid by consumers. To quote an accurate price, CenturyLink's sales agents must accurately process this information and then explain the final price to consumers at the time of sale.

16.    There has been a recurring disconnect between the quotes CenturyLink has given to consumers and the actual prices they were charged, supposedly based on hidden rules contained in the company's complex billing system, which CenturyLink claims are "trade secrets." The disconnect happens in many ways, but the bottom line is that CenturyLink routinely fails to live up to its promises about the total prices consumers will pay for its services, and CenturyLink has fraudulently over-billed tens of thousands of Minnesota consumers.

1.    Calculating the Actual Cost That CenturyLink Will Charge for Internet and Television Service Starts with Determining Which of the Company's Thousands of Base-Rate Scenarios Apply.

17.    CenturyLink's base rates depend on several factors.  By using combinations from only four factors – the speed of the consumer's internet connection, the presence or absence of CenturyLink e-mail service, the manner in which CenturyLink connects a consumer's home to the Internet, and the number of channels included in its television packages – CenturyLink's pricing scheme starts with more than 1,500 different scenarios that can affect the base rates that CenturyLink will charge.

18.    In part through the use of extensive and complicated base-rate pricing, CenturyLink has defrauded tens of thousands of Minnesota consumers into paying more for their service than they agreed to pay.

2.    CenturyLink Offers Promotional Pricing Without Explaining the Thousands of Company Rules and Exceptions That Cause Consumers To Pay More.

19.    CenturyLink told the State that it has "hundreds of promotional offers at any time," and that the company's "extensive" use of these confusing promotions would require "enormous" productions to fully explain the scope of its complex prices.

20.    The promotions CenturyLink has disclosed typically include a matrix of complex and subtle information, starting with the conditions and exceptions governing the promotion. These conditions and exceptions vary by promotion but typically identify which consumers or products are supposedly eligible to receive the promotion and price.  The conditions and exceptions also specify additional actions that consumers must take – or cannot take – after their purchase to preserve their eligibility for the promotion.  CenturyLink's promotional conditions and exceptions are further restricted by additional exceptions identifying additional promotions

that are incompatible with the offered promotion. CenturyLink's promotional materials also impose special ordering instructions for CenturyLink's sales agents, who are paid commissions based on the number of customers they sign up for the company's services.

21.    These promotional offer matrices contain a large amount of information that would have to be accurately processed by the company, with the outcome then explained to consumers at the time of sale if the company is to quote an accurate price to consumers. CenturyLink uses as many as 29 conditions and exceptions per promotion. Some promotions identify up to 138 "disqualifying" combinations of promotions. The standard ordering process requires CenturyLink's agents to perform up to 93 steps to add internet and television service to consumers' accounts. The promotional matrices reveal as many as 19 additional or special steps per promotion that CenturyLink's agents must perform to apply promotions to consumers' accounts.

22.    Collectively, these documents – which provide an overview of just some of CenturyLink's promotional offerings – reveal more than 2,000 conditions and exceptions that CenturyLink uses to increase the price it charges consumers above what it promises them at the time of sale. The pricing documents – which CenturyLink marked "Trade Secret" (meaning they are hidden from consumers) – collectively identify nearly 3,800 disqualifying combinations of promotions that ostensibly make a consumer ineligible to receive a promotion.

23.    Through its pattern and practice of using complicated promotions with extensive rules, CenturyLink has misrepresented the price of its internet and cable television services to tens of thousands of Minnesota consumers.

3.    CenturyLink Adds Dozens of Fees on Top of Its Base Rates.

24.    On top of its base rates, CenturyLink adds any number of its dozens of one-time and monthly recurring fees to consumers' bills.  CenturyLink classifies some fees as relating to accessories, equipment, activation, shipping and handling, and installation.  CenturyLink also adds at least one "fee" (the "Internet Cost Recovery Fee") for which the classification or purpose is not readily apparent, but which is added to the bills of its internet subscribers.  Other fees apply depending on the type of service consumers purchase.  In some cases, the extra fees can add up to more than the base rates that CenturyLink promises.  In part through the long-standing use of its undisclosed fees, CenturyLink has defrauded tens of thousands of Minnesota consumers into paying more for their service than they agreed to pay.

4.    CenturyLink Has Acknowledged That the Company's Pricing Policies Are Too Complex.

25.    CenturyLink has conceded that its pricing structure is complex and deceptive. Numerous corporate documents show the company acknowledging that it has too many offers, and that its offers, prices, and promotions are "complex" and "confusing."   An employee responsible for communicating CenturyLink's complex pricing policies to sales agents called the process a "nightmare."   CenturyLink's executives agree.   Maxine Moreau, the President of CenturyLink's Consumer Division, and Dean Douglas, CenturyLink's President of Sales and Marketing during the State's investigation, have each acknowledged the "complexity" of CenturyLink's prices.  Ms. Moreau has further conceded that, before the State's investigation and lawsuit, CenturyLink's pricing model used "hidden fees."   Jeffrey Storey, the company's current CEO, acknowledged after the State's lawsuit that CenturyLink had "very complex pricing and promotional plans" which were not "customer-friendly."

02-CV-17-3488

Filed in District Court
State of Minnesota
6/26/2019 3:13 PM

26.    These well-founded admissions by CenturyLink executives came after CenturyLink engaged in a lengthy course of prohibited conduct that deceived tens of thousands of Minnesota consumers into paying more for service than they agreed to pay.  In fact, shortly after the State filed this action to put an end to CenturyLink's repeated violations of Minnesota law, the company commissioned a six-month audit that reviewed more than 32 billion billing records.  CenturyLink issued a press release that summarized the findings of that audit, which conceded that CenturyLink's "pricing and promotions were complex and caused confusion" and that customers did not receive discounts they were offered at the point of sale.  The audit also showed that CenturyLink did not address its over-billing of customers in a timely manner.

**B.    For Years, CenturyLink Made It "Very Difficult" for Its Agents To Accurately Quote the Price and Terms of the Company's Service.**

27.    CenturyLink compounded the deceptive nature of its massive set of pricing rules by engaging in a pattern and practice of prohibited conduct that made it "very difficult" for CenturyLink to quote an accurate price to consumers.

28.    For example, there is no single repository at CenturyLink that contains complete information about the price and terms of the company's numerous and complex offers.  Instead, company documents show that CenturyLink agents must use up to thirty applications during the sales process "to do their job."  A senior director overseeing CenturyLink's call center agents confirmed that it is "tricky" for agents to use these applications.   Additionally, because CenturyLink's massive pricing scheme constantly changes, these systems continually need to be updated.  When CenturyLink fails to keep these systems up to date with its ever changing prices, the information agents use to quote prices to customers is inaccurate.

29.    CenturyLink has acknowledged that requiring its sales agents to use these numerous screens is a "hindrance" to accurately quoting prices and causes consumers to have "a

frustrating series of unrelated actions with various parts of [CenturyLink]." CenturyLink employees "pray" for the consolidation of CenturyLink's billing systems to make the company's sales process "less complex."

30.    CenturyLink's systems remain "complex" and "confusing" in part because CenturyLink has improperly resisted efforts to consolidate and modernize its "legacy systems" – those billing systems acquired through the company's decades-long acquisitions and which do not effectively communicate with each other. In fact, one of CenturyLink's ordering tools "never interacted" with the company's "billing system" or pricing resources. A company employee with more than four decades of experience at CenturyLink acknowledged that the company continued to build upon an unreliable billing system that may date back to the 1960s. As far back as 1986, CenturyLink considered replacing this faulty system but determined that it did not want to spend the money to do so. This ancient system remains the primary system CenturyLink uses to bill Minnesota consumers. CenturyLink's current CEO, Mr. Storey, admits that CenturyLink's continued reliance on these legacy systems places numerous "bottlenecks" and "hurdles" in the way of its agents. In fact, Mr. Storey has conceded that CenturyLink "as a company [has] made it too hard" for agents "to do the right thing for the customer."

31.    These bottlenecks and hurdles take numerous forms. The information displayed on agents' numerous screens contains "incorrect" prices and displays prices that are "not accurate." This inaccurate information leads to CenturyLink agents making "invalid" or "inaccurate" price quotes. Other documents show that the company's ordering tools permit agents to offer consumers discounts that are "incompatible" with other elements of the offer and which ultimately will "not be honored" and increase the price consumers pay. Additional documents show that CenturyLink's various pricing plans do "not quot[e] correctly" in the

company's computer systems, which the company has described in internal communications as "a major issue." CenturyLink even compiles "defect" reports and various lists documenting the most common ways the company makes false promises to consumers through its billing systems.

32.     Despite knowing it provides agents with unreliable and inaccurate information, CenturyLink simply instructs its agents to "trust your tools" even though using these inaccurate tools "result[s] in the customer being misquoted for their monthly rate." In fact, CenturyLink's sales agents cannot even see whether the pricing information that appears on their screens – and that they quote to consumers – will show up on consumer's bills. This "chronic issue" – in which CenturyLink representatives offer discounts that its billing system later removes and "will not actually discount at bill time" – has "always" existed at CenturyLink. In these situations, CenturyLink does not notify consumers to tell them that "they will not receive [the discount] on their account." Instead consumers discover that CenturyLink is charging them more than the company promised when consumers receive their bill.

33.     CenturyLink engaged in this prohibited conduct over an extended period of time, only abandoning some aspects of its schemes in response to litigation and investigation by state attorneys general. CenturyLink only stopped using one of the computer systems it used to remove discounts it promised to consumers after a state attorney general investigating the company discovered the fraud at the core of that system. Numerous internal communications show that CenturyLink was aware of the fraudulent nature of that system for years, and the company continued to use the system, thereby defrauding Minnesota consumers. In another instance, CenturyLink informed its employees one week after the State's lawsuit that "[s]tarting immediately" the company was abandoning the sale of its television service. Internal communications show that the company abandoned the product because of the chronic "billing

issues" with that product, which the company knew about, yet it continued to use, thereby defrauding a large number of Minnesota consumers. The President of CenturyLink's Consumer Division succinctly described CenturyLink's pattern and practice of prohibited conduct when she admitted that CenturyLink has made it "very difficult for a rep to be able to quote [prices] accurately to customers."

### C. CenturyLink Refuses To Honor Its Offers.

34.    Scores of documents show that CenturyLink simply refuses to honor its promised offers to consumers, even where CenturyLink knows that systematic problems with its billing system caused consumers not to receive the discounts they were promised.

35.    In fact, the problem of charging consumers more than they were promised is so widespread at CenturyLink that the company has developed a euphemism for its fraud: "the misquote." Derivations of the word misquote appear in hundreds of documents CenturyLink produced to the State. But CenturyLink does not believe a misquote is a problem it needs to correct. CenturyLink tells its agents that "a price misquote is not a legitimate reason to request" an adjustment to a consumer's account. Instead, agents are instructed to "sustain" the fraudulent charges.

36.    CenturyLink refuses to honor its offers, in part, because the company is constantly seeking to decrease the credits it provides to consumers who complain that CenturyLink has over-billed them. CenturyLink's documents show that the company sets "targets" that require call center agents to reduce the number and amount of billing adjustments they provide to the consumers CenturyLink overbills, in order to save the company millions of dollars each year. CenturyLink refers to these initiatives as "Revenue Protection." These initiatives result in the

company denying billing adjustments to the consumers that CenturyLink has over-billed and failed to make whole.

37.     Not only does CenturyLink refuse to refund the consumers it charges, the company refuses to correct their bills going forward.  CenturyLink maintains official policies that prohibit agents from using recurring discounts to correct consumers' bills to reflect the price the company promised.  Other official policies direct agents responding to consumer complaints to attempt to try and make a new sale, rather than honoring CenturyLink's offer, as consumers request.  Internal documents show that these policies have been in place for years.  This lengthy course of prohibited conduct has resulted in harm to tens of thousands of Minnesota consumers that CenturyLink has overbilled and failed to make whole.

### III.    CENTURYLINK HAS FRAUDULENTLY OVER-BILLED TENS OF THOUSANDS OF MINNESOTA CONSUMERS AND HAS ROUTINELY REFUSED TO HONOR ITS OFFERS.

38.     CenturyLink has regularly misquoted the price of its internet and television services to Minnesota consumers.  In response to a complaint from the Minnesota Attorney General's Office on behalf of a consumer, a CenturyLink employee stated that, of the sales recordings she reviews, "maybe 1 out of 5 are quoted correctly or close enough.  I have one today quoted $39 and its over $100 monthly."  She further stated that "in many cases, the customer calls in for several months and [is] promised callbacks, passed around, or cut off before going to the AG, PUC, FCC, or BBB."  Her April 22, 2015, e-mail reads as follows:

**From:** Ornelas, Diana L
**Sent:** Wednesday, April 22, 2015 11:30 AM
**To:** Orr, Dan
**Subject:** RE: Minn Attorney General complaint, ███████████████

I understand and also like to get it when the call is still available. I have so many I get every day and honestly, I could say maybe 1 out of 5 are quoted correctly or close enough. I have one today quoted $39 and its over $100 monthly. So I tend to get on the defensive for the customer at times because of the large amount that are misquoted. As in many cases, the customer calls in for several months and promised call backs, passed around, or cut off before going to the AG, PUC, FCC or BBB and we are unable to review the calls. Hopefully in the future we can have them saved for a longer period or a better resolution would be to get that person back to the sales rep or sales rep manager on the first call to the company after the service is installed. Then the issue could be reviewed, resolved and feeback/training provided.

39.     In a May, 2015 recording obtained by the State, another CenturyLink employee laments that there are "not enough people to do the work" of responding to the "whole pile of Minnesota [complaints]" that "usually come in groups of 10."

40.     CenturyLink has already admitted to failing to provide promised discounts to at least 12,094 Minnesota consumers through one of the company's billing systems ("ORKO"). Based upon the limited ORKO data that CenturyLink has provided for approximately ████ Minnesota consumers, CenturyLink has likely over-billed tens of thousands of Minnesota consumers – not merely the 12,094 consumers the company has already identified. These numbers are consistent with CenturyLink's internal documents that show, where the data is available, that CenturyLink fraudulently over-billed consumers in 46% of its sales transactions. Further, of the thousands of calls CenturyLink reviews each month, CenturyLink has acknowledged that its agents fail to make proper disclosures on ██% of sales calls.

Filed in District Court
State of Minnesota
6/26/2019 3:13 PM

41.    The following paragraphs contain examples of 100 Minnesota consumers' interactions with CenturyLink.[1]    As these stories make clear, CenturyLink's material misrepresentations about the price consumers will pay for their service are the type of statements upon which reasonable and prudent persons rely.    CenturyLink's false statements have been widely disseminated and have injured tens of thousands of Minnesota consumers who have purchased the company's service.    **The State is pursuing relief on behalf of every single Minnesota consumer CenturyLink has defrauded.  The State's case is not limited to the 100 consumers specifically included in this Complaint, nor the 12,094 consumers CenturyLink has admitted to defrauding, nor the tens of thousands of defrauded consumers identified in CenturyLink's ORKO data.**

42.    **B.T.** uses his Ph.D. in applied economics to scrutinize financial information for his employer.  CenturyLink offered him internet service for $14.95 per month for one year and $24.95 per month for a second year.  CenturyLink actually charged him a base rate of $29.95 per month.  **CenturyLink repeatedly refused to honor its offer** and threatened to charge him a $200 penalty if he cancelled his service, even though the company's complaint file states that CenturyLink listened to the recording of the sales call and confirmed the "misquote." CenturyLink told B.T. that "no one at CenturyLink can get you that price," even though the company had promised it to him.

---

[1] This Complaint includes the representative and illustrative experiences of 100 Minnesotans to describe how CenturyLink has deceived consumers.  The State's allegations are not confined to the consumers described in this Complaint.  These experiences are non-exclusive examples that generally illustrate CenturyLink's unlawful conduct.  In some cases after the Attorney General's Office intervened, CenturyLink agreed to apply at least partial credits to consumers' accounts following the company's price misrepresentations.

02-CV-17-3488

CASE 0:18-cv-00296-MJD-JFD    Doc. 178-3    Filed 07/01/19    Page 17 of 44    Filed in District Court
State of Minnesota
6/26/2019 3:13 PM

43.    **K.S.** needed low-cost internet service for her daughter to complete her homework. CenturyLink offered her internet service for $14.99 per month for six months but failed to charge her the promised rate. **A supervisor would not honor CenturyLink's offer** and claimed she had "used up" her discounts and denied that the company had offered her internet service for $14.99 per month. CenturyLink's complaint file states that the company listened to the sales call and confirmed CenturyLink's offer of service for $14.99 per month.

44.    CenturyLink offered internet service to **K.Z.** for a base rate of $19.95 per month but charged him a base rate of $37 instead. **A supervisor refused to honor CenturyLink's offer**, telling him he was "misquoted." CenturyLink told him that the company's offers are "not binding commitments" and discounts are "a gift from us to you" that CenturyLink can rescind at its discretion. CenturyLink later told him that "the system" had "auto-removed" a discount from his account, thereby raising the price of his service above what CenturyLink promised.

45.    **H.D.H.** agreed to keep her basic CenturyLink plan after the company promised her the same rate for another year. CenturyLink increased her bill by more than 50% the following month. She provided her confirmation number, but the company **repeatedly refused to honor its offer**, claiming that CenturyLink can "give you all the confirmation numbers in the world," but if CenturyLink "quotes you [a rate] not available it's going to get denied." CenturyLink told her the previous agent she spoke to did not "even know what offers we have to offer in the first place" and claimed that what the company previously promised her was "irrelevant."

46.    **R.T.** is a 62-year-old businessman from Blaine. He used CenturyLink's on-line chat feature to purchase CenturyLink internet service for $29.95 per month for two years, and television service for $39.97 per month for one year and $59.96 per month the next year:

███████████ my contract for internet is not up for a few months

Gianna C.: I can put ypu in a promotion of 2 years for $29.95 by adding PrismTV

███████████ looks good, I will look at the channel line ups and then decide, the package you are listing above is what tv package, does this include tehrental equipment costs

Gianna C.: It includes everything R █████

Gianna C.: It is the essential package.

Gianna C.: If you set it up with me today I can also offer you $25 off in your monthly bill so you are going to be paying $39.97 for the first year and $59.96 for the second year.

CenturyLink charged him $194.84 the month after he accepted this offer. CenturyLink billed him at least $107.68 per month the following months. R.T. repeatedly asked for the rate promised to him, and **CenturyLink refused to honor its written offer**. CenturyLink later told him that its television service was "not a regulated or tariffed [sic] product" so CenturyLink could "raise or lower the base product price as determined by CenturyLink."

47.     **J.S.** is an occupational therapist. She accepted CenturyLink's offer of internet and television service for $91.83 per month for one year. CenturyLink **repeatedly failed to honor its promise** and charged her $202.04, $103.43, $116.97, $108.15, and $128.26, respectively, the first five months she had this package. CenturyLink told her its billing system is "complicated" and "hard to explain" and that sales agents can offer promotions that the system then "removes."

48.     **A.G.** is an attorney. Door-to-door CenturyLink agents sold him a package they promised in writing would cost $90.82 the first full month, $140.11 for the second through twelfth months, and $199.10 for the thirteenth through thirty-sixth months:

**CenturyLink repeatedly refused to honor its offer,** charging him hundreds of dollars more than its written offer in the following months. CenturyLink later claimed that he had received "all the discounts" he was "qualified" to receive.

49.    **K.N.** is 60 years old and lives in Britt. CenturyLink promised him internet service for a base rate of $29.95 per month but **failed to bill him as promised,** charging him a base rate of $61 instead. CenturyLink told him, "you're doing math, and you're trying to break [the cost] down in a way that it's not supposed to be broken down . . . there's no 'this is how much it costs.'" K.N. asked how much the company would charge him the next month, and CenturyLink said, "honestly, you're not going to know . . . until the next bill prints." CenturyLink later wrote to him stating he was "ineligible" for the offer CenturyLink promised him and that he had accepted months earlier.

50.    CenturyLink has routinely refused to honor its offers without adequately reviewing or considering customers' complaints that they were charged more than they were quoted. CenturyLink gives a variety of excuses to Minnesota residents as to why it will not honor the prices quoted to them. For example, a CenturyLink supervisor told **B.P.**, a Hibbing business owner, that **CenturyLink is "not responsible" for its sales agents' offers**.

51.     **J.M.** lives in Isanti and has served in the Army National Guard for 19 years. CenturyLink offered him a "Price for Life" package for $88.99 per month, including taxes and fees, but **refused to honor its offer** and charged him more than the amount it had guaranteed "for life."

52.     **M.J.** is a hydrologist.  CenturyLink offered him internet service for a total price of $38.10 per month for one year, but charged him $78.99 and $186.27 in the following two months.  When M.J. contacted CenturyLink about its fraudulent overbilling, the company told him it could not honor its promise, and instead offered him internet service for $55 per month, as a part of the company's "Price for Life" program.  CenturyLink did not honor this promise either, and **continued to overcharge M.J. after promising him a fixed price for life.**

53.     **A.H.** worked in administration at a local university before her retirement. CenturyLink promised her a package for a total price $95 per month, as a part of the company's "Price for Life" Promotion.  **CenturyLink did not honor its promise**, and charged more than the price it guaranteed for life, including one month in which it charged her nearly three times the amount it promised her.

54.     **M.M.** is a substitute school teacher and lives in Apple Valley.  CenturyLink offered him a "Price for Life" promotion for $42.73 per month, but charged him more than that amount in the following months.  M.M. contacted CenturyLink to ask what had happened to the "Price for Life" promotion that CenturyLink promised him, and **the company said that it could not honor its quote.**

55.     CenturyLink offered a package to 36-year-old paralegal **S.A.** for $92 per month. CenturyLink charged her a series of fluctuating rates over $135 per month and told her **nothing could be done to correct her bill.**

56.    **V.D.** used CenturyLink's on-line chat feature to purchase a package for a "total cost" of "$81.92 per month." In the following months, **CenturyLink refused to honor its offer** and charged her significantly more than this amount, including one month in which the company charged her $174.38.

57.    **A.H.** is retired and lives on a fixed income. She purchased a package from CenturyLink for $100.90 per month before taxes, but CenturyLink charged her a series of fluctuating rates as high as $284.57 after she accepted the offer. **CenturyLink did not honor its promised rate.**

58.    **J.H.** is a 50-year-old businesswoman. CenturyLink offered her a package for a total of $74 per month for one year. CenturyLink repeatedly charged her more than it promised, and **repeatedly refused to honor its offer**, telling her the offer she accepted somehow did not exist.

59.    CenturyLink offered a package to 72-year-old **S.G.** for a total of $106 per month but charged her fluctuating rates well above the promised price. She repeatedly called the company, which told her it **would not honor the rate she had been promised** and that the confirmation numbers CenturyLink provided her did not matter.

60.    Retiree **W.L.** purchased a CenturyLink package for $129.92 per month. **CenturyLink told her the discounts it promised "did not stick" to her account**, and the company then charged her more than it promised. CenturyLink also told 55-year-old **J.F.**, a retiree who previously worked in the insurance industry, that a promotion did not "stick" to her account after the company **refused to honor the price it had promised her.** CenturyLink also charged **K.E.**, a 27-year-old from Bloomington, more than it promised her and **said her price did not "stick"** because CenturyLink had been "lazy" in entering her information into

20

02-CV-17-3488

CASE 0:18-cv-00296-MJD-JFD    Doc. 178-3    Filed 07/01/19    Page 22 of 44    Filed in District Court
State of Minnesota
6/26/2019 3:13 PM

CenturyLink's computer.  The company also told her it was normal for her bill to fluctuate even though she had been promised a fixed rate.

61.    CenturyLink promised **A.B.,** a mathematics professor, a fixed-rate contract for twelve months, but CenturyLink fraudulently increased the amount it charged him for its Internet Cost Recovery Fee after he accepted CenturyLink's offer.  CenturyLink falsely told him the Federal Communications Commission increased the amount of this fee, and the company threatened to charge him $200 to cancel his service, even though CenturyLink **refused to honor** the fixed-rate pricing it promised.  CenturyLink also over-billed **D.B.,** a 23-year-old resident of Little Falls, by adding several fees – including the Internet Cost Recovery Fee – to her bill even though the company told her that her quoted rate included "everything."

62.    School bus driver **J.C.** purchased a package that CenturyLink promised in writing would cost a total of $47.92 for the first month and $83 for the second through twelfth months. CenturyLink charged her between $96.99 and $157.53 in the following months, and the company **repeatedly refused to honor its offer.**  CenturyLink also charged **D.E.,** a 29-year-old who operates heavy machinery, a series of fluctuating rates above what he had been promised. CenturyLink told him it **would not honor the price he was offered** and told him he could not cancel his service because he had agreed to a contract.

63.    **F.L.** accepted CenturyLink's offer of internet service for $19.95 per month, but CenturyLink **repeatedly failed to bill her as promised,** charging her base rate of $34.95 and an Internet Cost Recovery Fee that CenturyLink had not disclosed.

64.    CenturyLink promised retiree **W.S.** a package for $59.95 per month but charged a series of fluctuating rates significantly above this amount, and **CenturyLink repeatedly refused to honor its offer.**  CenturyLink offered **J.S.,** a retired teacher and minister, a package for

02-CV-17-3488

CASE 0:18-cv-00296-MJD-JFD    Doc. 178-3    Filed 07/01/19    Page 23 of 44    Filed in District Court
State of Minnesota
6/26/2019 3:13 PM

$92.44 the first month, $214.87 the second month, and then $144.91 for the remainder of the contract. CenturyLink charged her fluctuating rates well above what it promised, and the **company denied her many requests to simply be charged what the company promised.**

65.    CenturyLink repeatedly increased the price it charged 77-year-old **M.R.** even though she accepted a "price lock" offer from CenturyLink. Or, as CenturyLink documents put it, the company **"lied outright to an elderly sick customer."**

66.    CenturyLink offered a package to 39-year-old engineer **D.B.** for $65 per month, but charged him significantly more. When D.B. contacted CenturyLink about its overbilling, the company told him that the company's systems were not communicating with each other, and **refused to honor its offer.** CenturyLink promised **M.V.**, a safety and fleet director, a package for $123.13 per month for three years, but **repeatedly charged him more** and refused to honor its promise of a fixed price for three years.

67.    CenturyLink charged 41-year-old Minneapolis resident **C.A.** more for service than the company offered, and **CenturyLink refused to honor its offer**. CenturyLink also **refused to honor the offer** it promised to **S.B.**, a 63-year-old bookkeeper from Vadnais Heights, after the company falsely promised to fix her bill.

68.    Retiree **J.F.** helped her elderly mother purchase a CenturyLink package, which the company promised would cost a total of $75.95 per month for three years. CenturyLink charged her mother a bewildering set of rates that varied nearly every month over the next three years, and the company **repeatedly refused to honor the promised rate.**

69.    CenturyLink falsely promised to charge **A.B.**, an Eagan electrician, a total of $59.17 per month for service, but charged him fluctuating rates and **repeatedly refused to honor the amount it quoted him**. CenturyLink falsely promised to bill **P.C.,** a software

developer from Blaine, $19.95 per month and instead charged him $24.95 per month plus $3.99 for the Internet Cost Recovery Fee that the company failed to mention. CenturyLink **refused to honor its offer**.

70.    **T.C.** is an 80-year-old retired stock broker from Saint Paul. CenturyLink offered him a package for $125 per month and charged him fluctuating rates above the promised amount, including one bill as high as $239.91. CenturyLink falsely claimed the extra charges were taxes, and the company **refused to honor its offer.** CenturyLink also charged a series of ever-changing rates above the $74 per month it offered **M.G.**, a 56-year-old Bloomington resident, including as much as $227.29 in the following months. CenturyLink also **fraudulently over-billed B.G.**, a 77-year-old part-time mail carrier, charging her a series of fluctuating rates averaging nearly double the $109 per month it offered her.

71.    CenturyLink charged **R.W.**, a 58-year-old insurance agent, hundreds of dollars more than it promised her for service, and **CenturyLink did not honor its promise** about the cost of her service. CenturyLink offered a package to **D.B.**, a retired sales manager, for $85 per month, but CenturyLink charged him a series of rates reaching approximately double the rate it promised in the following months, and **CenturyLink refused to honor its promised rate**.

72.    **W.R.** is a semi-retired consultant. CenturyLink offered him a package for $58.14 per month, but **failed to honor its offer** and charged him approximately $75 in each of the following months. CenturyLink offered **T.K.,** an insurance claims manager, a package for $115 per month for one year. **CenturyLink refused to honor its offer** and fraudulently overcharged him in the following months.

73.    CenturyLink promised **P.L.** of Eden Prairie that the price of her service would be $118 per month, including all taxes and fees. **CenturyLink failed to honor this promise**, and

charged her significantly more than the $118 she agreed to pay, including several months in which CenturyLink charged her over $200. CenturyLink told **T.L.,** a retired baker, that the cost of his package would be $122.89 per month. CenturyLink repeatedly charged T.L. more than the price it promised, and told him that the company **could not honor the price it offered him.**

74.    CenturyLink promised **J.M.**, a retired telephone company employee, a promotion that would reduce her bill by $20 each month. CenturyLink did not honor its promise, and instead increased her bill. CenturyLink then offered J.M. a new package for $64.95 per month, but charged her a series of higher rates, including rates more than double the amount it promised. **CenturyLink refused to honor its promises, and told J.M. that CenturyLink's computer had probably "rejected these offers" after she accepted them.**

75.    CenturyLink offered human resource manager **C.O.** a package for $59.79 per month, but failed to honor its promise, charging her approximately $75 per month in the following months. CenturyLink promised banker **T.P.** a package including internet, television, and telephone service for a total monthly price of $130. CenturyLink charged him significantly more than the promised price, and when T.P. contacted CenturyLink about his bills, **the company told him that there was nothing it could do to bring his bill down to the amount it promised him.**

76.    **D.R.** owned his own business before he retired. CenturyLink offered him internet service for $46.60 per month, including all taxes and fees. **CenturyLink did not honor its offer**, and charged D.R. approximately double the price it offered him in the following months. CenturyLink offered business manager **J.R.** a package for $49.95 per month, but continually charged him more than the offered amount. When J.R. contacted CenturyLink to correct his bill, **the company confirmed that it had quoted him $49.95, but refused to honor its quote.**

77.    CenturyLink offered licensed psychologist **E.R.** internet service for $19.99 per month, but **failed to honor its offer** and charged E.R. more than the price she agreed to pay. **F.S.** is a professor of writing and literature.  CenturyLink charged him between approximately $82 and $89 each month, despite originally promising that his monthly price would be $68, and later falsely offering to lower his price to $65 per month.  Each time F.S. contacted CenturyLink about its overbilling, **the company confirmed that it was charging him more than the rate it offered him, but it continued to overbill him.**

78.    **S.W.** is a client relations and operations coordinator.  CenturyLink **refused to honor multiple offers** to S.W., and billed her significantly more than the rates it promised her. **B.B.** is 67 years old and lives in Eden Prairie.  CenturyLink offered her telephone and television service for $50 per month.  CenturyLink added unauthorized charges to her account and **charged her between nearly double and more than four times the amount it quoted her each month.**

79.    **A.U.** has degrees in mathematics and physics, and spent her career working in the telecommunications industry.  CenturyLink offered her internet service for $29.99 per month, but refused to honor its offer and later told A.U. that **there was nothing CenturyLink could do to get her the price it promised.**  CenturyLink then offered A.U. a new rate, but did not honor this offer either, and CenturyLink charged A.U. a series of rates sometimes more than double what it promised.

80.    CenturyLink offered Woodbury resident **J.J.** a package for a total price of $91.87. Over the following months, CenturyLink charged J.J. significantly more than $91.87 each month, and told her that **there was no way CenturyLink could honor the price that it had quoted her.**

81.     CenturyLink offered registered nurse **C.M.** internet service for $25 per month for twelve months, but **failed to honor its offer** and charged her more than the quoted amount each month.  **D.H.** has an M.B.A., and works for a church.  CenturyLink offered him a package for a total rate of $55 per month, but charged him more than three times that amount.  When D.H. contacted CenturyLink about his bill, **the company told him that it could not honor the rate it promised.**  CenturyLink quoted D.H. a new rate and then failed to honor that rate as well.

82.     **G.W.** lives in St. Paul and is a small business owner.  CenturyLink offered G.W. a package for $114 per month, but charged him significantly more than this amount.  When G.W. contacted CenturyLink about these charges, the company **refused to honor its offer** and told him that the agent who made the offer had lied to him.

83.     CenturyLink offered Woodbury resident **J.W.** a package for $83.91, but charged her more than that amount each month.  J.W. contacted CenturyLink, but the company told her that **there was no way CenturyLink would honor the price it quoted.**

84.     **K.F.** is a nurse.  CenturyLink offered her a package for $113.93 per month. CenturyLink refused to honor its original offer and **overbilled K.F. by nearly $1,000** in the following months.

85.     **C.D.** is retired and lives in Hopkins.  CenturyLink offered her a package for $83.92 per month beginning in the second month, but repeatedly overcharged her and failed to honor its original offer.  **D.D.** is 72 years old and worked in law enforcement for 26 years. CenturyLink offered him a "price lock" at $44.95 per month for three years.  CenturyLink **did not honor its offer** to keep his price fixed, and increased his price before the three-year term was over.

86.    **L.K.** is 48 years old and works part-time as a store manager.  CenturyLink quoted her $112 per month for internet and television service, but repeatedly charged her more than the promised amount.  **P.T.** is a web developer and lives in Shoreview.  CenturyLink promised him internet service for $19.95 per month for three years, but charged him more than double this amount.  CenturyLink told P.T. that it **could not honor its quote**.

87.    **M.H.** is 52 years old and works as a management analyst.  CenturyLink promised him internet service for $45.87 per month beginning in the second month, including all taxes and fees.  CenturyLink charged M.H. more than the amount it promised.  When he called CenturyLink about its overbilling, the company would not review the recording of his sales call, and **refused to honor its offe**r.

88.    **L.U.** lives in St. Paul and develops trainings for county workers.  CenturyLink offered her internet service for a total price of $34.70 per month for one year, but charged her $185.26 the first month after she accepted this offer, and continued to charge her more than the price it promised her in the following months.

89.    **K.N.** is retired, and previously worked as a registered radiologic technologist and was the supervisor of a lab at a hospital.  A door-to-door CenturyLink agent offered him a package for a total price of $105.90 per month for one year, but the company **did not honor its offer**.  When K.N. called CenturyLink to find out why the company overcharged him, it told him that the agent who made the original offer had "scammed" him to get a commission.  Despite this admission, CenturyLink did not correct K.N.'s billing.  When he decided to cancel one of his services, CenturyLink offered him internet service only for $45 per month, as a part of the company's "Price for Life" program.  CenturyLink **failed to honor this offer as well**, and charged him $55 per month.

90.    **J.M.** owns a small marketing business, and purchased CenturyLink's internet and telephone service for his business for $74.99 per month.   In his first month of service, CenturyLink charged him $362.20.   CenturyLink refused to honor its offer, and charged him more than $120 per month in the following months.

91.    **J.H.** lives in Minneapolis and works in business development.   CenturyLink promised him internet and television service for a total price of $72 per month.   CenturyLink **did not honor its offer** and billed him a series of fluctuating rates above the amount it promised.

92.    **D.V.** is retired and previously worked as a sheet metal worker and gas pipe fitter. CenturyLink offered him a package for a total price of $104.34 per month, including all taxes and fees.   CenturyLink did not honor its offer and repeatedly overbilled him, including in one month when the company charged him $175.87.   When D.V. contacted CenturyLink about its overbilling**, the company tried to disclaim its actual offer.**   CenturyLink told D.V. it would continue to charge him more than its quoted price, and if he did not like it, CenturyLink would shut off his service.

93.    CenturyLink promised Saint Louis Park resident **J.O.** internet and television service for $94.14 per month for 12 months, but charged her $176.74 in the first month after she accepted this offer.   J.O. called CenturyLink about its overbilling, and the company confirmed that it had promised her a price of $94.14 per month, and then **refused to honor this promise**.

94.    CenturyLink called Woodbury resident **J.J.** and offered her a package for $120 per month, but charged her $507.35 in the first month after she accepted this offer.   J.J. contacted CenturyLink about this bill, and **the company told her that it would not honor the offer she had been promised.**

95.    A door-to-door CenturyLink agent offered 48-year-old **L.D.** a package for $80.63 in the first month of service, $96.91 in the second month of service, and $106.93 per month in the third through twelfth months of service.  CenturyLink told her that its quoted prices included all taxes and fees, and wrote these prices down.  **CenturyLink failed to honor its written offer,** and overbilled L.D. by hundreds of dollars in the following months.

96.    **M.B.** lives in Eden Prairie and owns and operates elderly care centers. CenturyLink offered him a package that would cost $32.80 in the first month, $39.25 in the second month, $68.93 per month in the third through twelfth months, and $130.91 per month after one year.  CenturyLink did not honor its promise, and charged M.B. $250.82 in the first month of service, and a series of fluctuating rates above the prices it promised in the following months.  M.B. called CenturyLink about these bills, and a CenturyLink agent told him that she could not fix the bill because of an issue with her computer.  CenturyLink continued overbilling M.B., eventually overbilling him by hundreds of dollars.

97.    H.R. is an assistant professor with a Ph.D.  CenturyLink offered him internet service for $29.95 per month but charged him more than double that rate.  An agent told him it was not possible to receive his internet service for $29.95 per month and that nothing could be done to get the rate CenturyLink promised.

98.    **T.H.** is 24 years old and has an accounting degree.  CenturyLink promised him internet service for $28.93 per month but charged him $44.67.  A supervisor told him **CenturyLink would not honor its offer**.  The company then wrote to him and claimed it "does not guarantee that promotional discounts are available and the number of available discounts have restrictions and qualifications."

99.    A door-to-door CenturyLink agent sold a package to **C.A.**, a retiree from Spring Lake Park, that the agent promised would cost a total of $100 per month for one year and $115 per month the second year.   The agent told C.A. those rates included all charges.   The agent's offer sheet listed no charges other than the $100 and $115 rates:

REGULAR PACKAGE PRICE:
$115 _____ (2ND YEAR)
PROMOTIONAL PRICE:
$100 _____ (1ST YEAR)

CenturyLink charged him more than it promised and **refused to honor the written offer**.   Yet the company told C.A. it would charge him a cancellation penalty if he terminated his service.

100.    Internal CenturyLink documents show that the company has a policy not to honor its sales agents' offers under certain scenarios, including when agents do not properly enter a promotion into CenturyLink's billing system.

101.    For example, **L.F.** accepted CenturyLink's offer to receive internet service for $19.01 per month, but CenturyLink charged her $55.99 the following month.   CenturyLink told L.F. that the offer she had accepted appeared in CenturyLink's billing system, but that **CenturyLink would not honor that offer**.

102.    **K.K.** is a legal assistant.   CenturyLink promised her internet service for $24.99 per month, but the company charged her a base rate of $44.95 per month.   CenturyLink claimed the offer she had already accepted was "not available" to her.   **CenturyLink refused to honor its offer.**   The threat of a cancellation penalty trapped K.K. into staying with CenturyLink.

103.    **P.O.** is a 61-year-old certified public accountant.   He purchased a CenturyLink package for $55.91 per month, but CenturyLink actually charged him $97.95.   The company claimed that its "system" showed P.O. should have been billed even more.   **Multiple**

**CenturyLink agents refused to honor the promised rate,** and the company charged him $103.39 the following month. CenturyLink later wrote to him claiming its "billing system automatically block[ed]" the offer CenturyLink had promised.

104.    **M.B.** is a mother of six, and her family lives on a budget. She purchased CenturyLink's internet service, which the company offered to her for $29.95 per month. CenturyLink actually charged her a base rate of $39.95. **CenturyLink refused to honor its offer**, telling M.B. that the offer she had already accepted was "not available."

105.    **J.F.** is a retired engineer. CenturyLink offered him internet service for a base rate of $19.95 per month. The company then sent him a bill for $367.33, including internet service for a base rate of $71. A CenturyLink agent told him that the company had "verified" the offer but that **CenturyLink would not honor the promised rate**.

106.    **P.W.** is a mortgage processor who previously investigated fraud claims for a bank. CenturyLink sold him a package, but the company **did not bill him as promised** and threatened to charge him an early termination penalty if he cancelled his service.

107.    **R.S.** purchased a CenturyLink package that the company promised would cost $75 per month. R.S. asked about additional fees and CenturyLink mentioned only a one-time charge. CenturyLink charged R.S. fluctuating rates between $108.41 and $310.10 the following months. CenturyLink **refused to honor its offer**.

108.    **O.N.** is retired. CenturyLink offered him a package for approximately $50 per month. CenturyLink **never billed him as promised** and charged him as much as $258.46 in one month after he accepted CenturyLink's offer.

109.    CenturyLink sold a package to **A.K.** that the company promised would lower his monthly rate. CenturyLink actually increased the price of A.K.'s service by nearly $50 per

31

month.  A.K. repeatedly called CenturyLink, which then falsely promised to bill him $87 per month – all taxes and fees included.  CenturyLink charged him $111.84, $114.85, $115.85, $122.84, and $123.88 the following months.  A.K. kept contacting the company, but **CenturyLink repeatedly failed to bill him as promised.**  When he cancelled his service, CenturyLink charged him an early cancellation penalty.

110.   **R.K.** and **D.G.** are a married couple.  CenturyLink promised them internet service for $19.95 per month but charged them a base rate of $29.95.  A supervisor **refused to honor CenturyLink's offer.**  CenturyLink told them it had "misinformed" them when they purchased the service but that $29.95 per month was "the only rate" the company would now honor.

111.   CenturyLink promised **A.L.** a "price lock" package for $73.90 per month.  **CenturyLink never charged him as promised**, billing him $227.48, $84.06, $97.27, $98.34, $88.34, and $90.27 in the months after CenturyLink sold him the "price lock."

112.   CenturyLink knows it provides consumers with inaccurate information.  This knowledge is so ingrained that a specialist responding to a Minnesota complaint simply assumed that CenturyLink would not have provided the consumer with accurate information:

**From:** CENTURYLINK TCS Tier 2 █████████████████████████
**Sent:** Tuesday, February 17, 2015 12:01 PM
**To:** Brewer, Mary C
**Cc:** CENTURYLINK TCS Tier 2
**Subject:** FW: █████████████

Good Afternoon Mary,

Below are our final findings. We do apologize, however we were unable to retrieve the requested .wav file. Though based on experience, I hope you agree, I think that the agent would not have told the customer that they could not get the Price for Life back.  The agent did not start until 9/22/14 and would not have had the experience at the time of this call to properly set the expectations.  Please let us know if any additional information is needed.

If you have any questions or concerns please let me know.

Jessica Wylie
Research & Resolution Specialist, Qualfon CDA

113.    **Fr. U.** is a retired accountant.  He accepted CenturyLink's offer to upgrade the speed of his internet service with no increase in the monthly rate.  CenturyLink failed to follow through on its promised rate, and when Fr. U. contested the increase, a supervisor told him that **CenturyLink's agents need more training.**

114.    CenturyLink promised internet service to **S.G.** for $19.95 per month. CenturyLink charged her a base rate of $29.95 per month.  She reported the misrepresentation to CenturyLink, which **did not honor its promise**.

115.    **J.T.** is a retired engineer and purchased a three-year "premium price lock" package that CenturyLink promised would cost a total of $106.94 per month.  **CenturyLink would not honor the "locked" $106.94 rate** and charged him a series of fluctuating rates averaging more than $144.

116.    CenturyLink offered internet service to **D.G.**, a retired school teacher from Eveleth, for $29.95 per month.  **CenturyLink did not bill him as promised,** charging him a base rate of $39.95.

117.    **S.H.** is a 70-year-old former director of a non-profit organization.  She purchased a CenturyLink package that the company said would cost a total of approximately $54 per month.  CenturyLink actually charged her $103.87.  When S.H. called about the bill, a supervisor told her the discrepancy would be fixed the following month.  The company charged her $76.46 and $77.96 the following months.  **CenturyLink then refused to honor its offer.**

118.    CenturyLink sold a new plan to **D.S.** that the company claimed would lower the price of his service.  CenturyLink **charged him more than it promised**, increasing his bill by $27.51 the following month.

119.    CenturyLink sold a package to 76-year-old retiree **K.T.** that the company promised would cost $62.14 for the first month, $40.91 for the second month, and $85.92 for the third through twelfth months.    CenturyLink charged K.T. $172.24 the first month and then **falsely promised to fix his bill**.

120.    **P.H.**, a retired school teacher, purchased a package that CenturyLink promised would save her money and cost approximately $50 per month.    **CenturyLink failed to bill her as promised.**

121.    **B.K.** is a freelance art director.    He purchased internet service for $29.95 per month, but CenturyLink actually charged him a base rate of $71.    CenturyLink **refused to honor its offer**, claiming there were no promotions available to him, even though B.K. had already accepted such an offer.

122.    **P.J.**, a business owner, purchased a CenturyLink package, but **the company failed to bill him as promised,** charging him hundreds of dollars more that it promised during the time he received service.

123.    **M.H.** is 81 years old and lives on a budget.    She agreed to keep her service after CenturyLink promised her the same rate for another year.    CenturyLink increased her bill and then charged her a series of changing rates.    **CenturyLink refused to give her the rate it promised**, telling her "there's just no promotions that exist" that could keep the price of her service the same as she had been promised.    CenturyLink threatened to charge her a $200 cancellation penalty if she terminated her service.    When M.H. asked if CenturyLink had "lied to [her]" about the price of its service, an agent responded, "I would say so.    Yes."    She asked to speak with a supervisor.    The agent would not transfer her, claiming CenturyLink's employees are "all in different . . . locations" and "there's nothing my facility would be able to

do about [the misrepresentation]." CenturyLink later wrote to her claiming that its "system" would have "automatically blocked any attempt" to keep the price of her service the same, even though CenturyLink had promised her just that.

## IV. CENTURYLINK FRAUDULENTLY IMPOSED RATE INCREASES ON CONSUMERS WHO PURCHASED PRICE LOCKS OR OTHER FIXED-RATE PLANS FROM THE COMPANY.

124.    As noted in the examples above, CenturyLink has quoted monthly prices that turn out to be inaccurate for a variety of reasons. CenturyLink often fails to honor the base rate it promises consumers.

125.    In addition, the price quotes are sometimes inaccurate for the added reason that the company failed to include a monthly charge called an "Internet Cost Recovery Fee" in its actual price quotes given to Minnesota consumers, even when consumers ask about additional fees or the total price they will pay. *See e.g.*, R.T. (told price quote included "everything" but charged more, including Internet Cost Recovery Fee); C.A. (promised quote included all taxes and fees but still charged additional Internet Cost Recovery Fee); R.S. (charged more than quoted, including Internet Cost Recovery Fee, even after asking about all additional fees); A.B (promised fixed-rate plan but charged for increased Internet Cost Recovery Fee.); D.B. (told quoted price included "everything" but charged other fees including Internet Cost Recovery Fee).

126.    In other cases, CenturyLink misrepresents and minimizes the price of the company's internet service by not disclosing this fee during the sales conversation in which consumers and CenturyLink primarily discuss the base cost of CenturyLink's internet service. *See e.g.*, B.T. (charged more than promised, including unmentioned Internet Cost Recovery Fee); H.R. (charged more than double what CenturyLink promised, plus Internet Cost Recovery Fee company did not mention in sales conversation); K.K. (deceived by $20 per month in base rate

plus unmentioned Internet Cost Recovery Fee); M.B. (charged more than promised, including unmentioned Internet Cost Recovery Fee); J.F. (billed base rate nearly four times promised rate plus Internet Cost Recovery Fee); A.L. (paid fluctuating rates above promised offer, including unmentioned Internet Cost Recovery Fee); S.G. (charged base rate of 50% more than quoted plus unmentioned Internet Cost Recovery Fee); D.G. (charged more than promised, including unmentioned Internet Cost Recovery Fee); B.K. (billed more than double quoted offer plus mentioned Internet Cost Recovery Fee); F.L. (charged nearly double promised rate plus undisclosed Internet Cost Recovery Fee); P.C. (charged more than promised, including unmentioned Internet Cost Recovery Fee).

127.     CenturyLink's so-called Internet Cost Recovery Fee is charged to Minnesota consumers who have internet service with the company.  The fee started at $0.99 per internet connection, per month, was raised to $1.99 per internet connection, per month, and is now $3.99 per internet connection, per month.  That means each consumer now pays an added $47.88 per year to CenturyLink just in Internet Cost Recovery Fees, despite receiving nothing of tangible value in return for being forced to pay this fee.

128.     CenturyLink has also fraudulently imposed these annual increases in the Internet Cost Recovery Fee on consumers who purchased "price locks," promotions, or other term agreements that CenturyLink represented as providing a fixed or guaranteed rate for a period of time, typically one or two years.  By using terms like "price lock" or "term agreement," CenturyLink implied that the amount consumers would pay CenturyLink each month would remain fixed or "locked."  These representations, however, were false, as internal CenturyLink documents show that consumers on these agreements were not spared from these predicable

increases in CenturyLink's Internet Cost Recovery Fee – price increases which the company controlled.

129.    CenturyLink has also misrepresented the nature of the Internet Cost Recovery Fee to consumers who notice it on their multi-page bills, sometimes falsely calling it:  a federal fee; a fee for their internet line; a phone tax; an undisputable charge; a FCC-regulated fee; a form of insurance; a fee that is negotiated with each state; or a fee for the consumer's phone line.  An internal CenturyLink communication from April of 2016 produced to the State acknowledges that the company has "misinformed" consumers by calling the Internet Cost Recovery Fee "a tax," a false description repeated on recordings produced to the State.  CenturyLink has also acknowledged it has "gotten into some legal trouble for mis-representing [the Internet Cost Recovery Fee] as government agency fees."  The Internet Cost Recovery Fee is not any of these things.  It is simply part of the base monthly rate that CenturyLink charges for internet service, but that the company has artificially listed separately on its bills as a "fee" to make its base rates appear lower to price-sensitive customers.

## V.    CENTURYLINK'S FRAUDULENT MISREPRESENTATIONS AND MATERIAL OMISSIONS DIRECTLY HARMED MINNESOTA CONSUMERS.

130.    Minnesota consumers have purchased CenturyLink's services based on the company's deceptive representations about the price of its services.  For multiple reasons, a "causal nexus" connects CenturyLink's prohibited conduct and the damage that conduct has inflicted upon Minnesota consumers.

131.    CenturyLink's fraudulent conduct and the harm Minnesota consumers have suffered cannot be separated.  CenturyLink's fraudulent conduct takes the form of false statements about the price the company will charge Minnesota consumers for their service.  If CenturyLink's statements about the price consumers pay are true, Minnesota consumers do not

suffer financial harm.  But when CenturyLink's statements about the price of its service are false, Minnesota consumers necessarily suffer financial harm when they purchase CenturyLink service. Consumers who are charged more for service than they agreed to pay are harmed by the exact amount they are charged above the amount CenturyLink falsely promised to charge.  There is no scenario in which CenturyLink's fraudulent misrepresentations could have failed to harm consumers.

132.    Additionally, consumers' decisions to purchase CenturyLink's services were based on the company's widely disseminated false promises about the price and terms of the company's service.  Statements about the price of a company's service are the type of representations which reasonable and prudent persons rely upon in deciding to purchase the company's service.  CenturyLink also intends that consumers rely on the company's false statements about the price of the company's service.  CenturyLink documents show that CenturyLink's promotions and discounts are intended to:  attract price-sensitive consumers; overcome consumers' objections to the price of the company's service; and "close the sale." Through the patterns and practices identified in this Complaint, CenturyLink deliberately engaged in a lengthy course of prohibited conduct that deceived a large number of consumers.

133.    Further, special circumstances exist that triggered a duty on the part of CenturyLink to disclose material facts about the prices consumers will pay.  First, CenturyLink had special knowledge which Minnesota consumers did not have at the time of their purchase of the full scope of the conditions, exceptions, and charges that CenturyLink uses to determine the prices to bill consumers.  Consumers do not possess this special knowledge; in fact, CenturyLink designated these rules "Trade Secret" during the State's investigation.  CenturyLink knows it operates in a price-sensitive market where consumers shop based on the final monthly rate they

will pay.  CenturyLink knew or had reason to know that potential customers would place their trust in CenturyLink and rely on the company to inform them of material facts relating to the cost of CenturyLink's service.  CenturyLink abused that trust by making verbal representations that included only a single price that consumers believed was the total price and by not disclosing that additional factors governing these offers would lead to a higher price.  Second, CenturyLink did not say enough to prevent the representations it made to consumers from being deceptive and misleading.

134.     The State brings this action to protect Minnesota consumers from CenturyLink's unlawful acts.

## COUNT I
## CONSUMER FRAUD

135.     The State of Minnesota re-alleges all prior paragraphs of this Complaint.

136.     Minnesota Statutes section 325F.69, subdivision 1 reads:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70

Minn. Stat. § 325F.69, subd. 1 (2016).

137.     The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes services.  *See* Minn. Stat. § 325F.68, subd. 2 (2016).

138.     CenturyLink has repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint, with the intent that others rely thereon in connection with the sale of its internet and television services.  Among other things, CenturyLink has falsely promised consumers that its service will

CASE 0:18-cv-00296-MJD-JFD    Doc. 178-3    Filed 07/01/19    Page 41 of 44    Filed in District Court
State of Minnesota
6/26/2019 3:13 PM

cost a particular price when in fact the company charges consumers another price as a result of the practices described in this Complaint.

139.    Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers have made payments to CenturyLink for goods and services that they otherwise would not have purchased or in amounts that they should not have been required to pay, thereby causing harm to those consumers.  There is a causal relationship between these injuries to Minnesota consumers and the wrongful conduct CenturyLink has engaged in that violates Minnesota Statutes section 325F.69.

140.    Given the representations it made, its special knowledge, and the circumstances described in this Complaint, CenturyLink had a duty to disclose material facts to potential customers in connection with its marketing and offering of goods and services to Minnesota consumers, including the additional prices and factors that would result in the company not honoring its quoted monthly prices.  By not doing so, the company failed to disclose material information in violation of Minnesota Statutes section 325F.69, subdivision 1.

141.    CenturyLink's conduct, practices, actions, and material omissions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.69.

## COUNT II
## DECEPTIVE TRADE PRACTICES

142.    The State of Minnesota re-alleges all prior paragraphs of this Complaint.

143.    Minnesota Statutes section 325D.44, subdivision 1 provides in part that:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> ***
>
> (9) advertises goods or services with intent not to sell them as advertised;

\*\*\*

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

\*\*\* or

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn. Stat. § 325D.44, subd. 1 (2016).

144.    CenturyLink has repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by engaging in the deceptive and fraudulent conduct described in this Complaint. CenturyLink's conduct caused a likelihood of confusion or misunderstanding among consumers regarding, among other things, the prices of CenturyLink's internet and television service. CenturyLink has advertised its services with the intent not to sell them at the advertised price because, among other things, CenturyLink has quoted prices to consumers that it later claims are impossible for consumers to receive.    CenturyLink has also made false and misleading statements about the reasons for, existence of, and amounts of price reductions it promised to Minnesota consumers but subsequently failed to deliver to those consumers.

145.    Due to the deceptive and fraudulent conduct described in this Complaint, consumers made payments to CenturyLink for goods and services that they otherwise would not have purchased or in amounts that they should not have been required to pay.

146.    Given the representations it made, its special knowledge, and the circumstances described in this Complaint, CenturyLink had a duty to disclose all material facts to potential customers in connection with its marketing and offering of goods and services to Minnesota consumers, including the additional prices and factors that would result in the company not honoring its quoted monthly prices.    By not doing so, the company failed to disclose material

information in violation of Minnesota Statutes section 325D.44, subdivision 1. There is a causal relationship between these injuries to Minnesota consumers and the wrongful conduct CenturyLink has engaged in that violates Minnesota Statutes section 325D.44.

147. CenturyLink's conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

## RELIEF

The State of Minnesota, by its Attorney General, Keith Ellison, respectfully asks this Court to enter judgment against CenturyLink awarding the following relief:

1. Declaring that CenturyLink's acts described in this Complaint constitute multiple, separate violations of Minnesota Statutes sections 325F.69 and 325D.44;

2. Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from violations of Minnesota Statutes sections 325F.69 and 325D.44;

3. Awarding restitution under the *parens patriae* doctrine, the general equitable powers of this Court, Minnesota Statutes section 8.31, and any other authority for all persons injured by CenturyLink's acts as described in this Complaint;

4. Awarding civil penalties pursuant to Minnesota Statutes section 8.31, subdivision 3, for each separate violation of Minnesota Statutes sections 325F.69 and 325D.44;

5. Awarding the State of Minnesota its attorneys' fees, litigation costs, and costs of investigation, as authorized by Minnesota Statutes section 8.31, subdivision 3a; and

6.    Granting such further relief as provided by law or equity, or as the Court deems appropriate and just.

Dated:  June 26, 2019

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

JAMES W. CANADAY
Deputy Attorney General

/s/ *Alex K. Baldwin*
ALEX K. BALDWIN
Assistant Attorney General
Atty. Reg. No. 0396340

445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
(651) 757-1020 (Voice)
(651) 296-7438 (Fax)
alex.baldwin@ag.state.mn.us

ATTORNEYS FOR STATE OF MINNESOTA

## MINN. STAT. § 549.211
## ACKNOWLEDGMENT

The party on whose behalf the attached document is served acknowledges through the undersigned counsel that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

Dated:  June 26, 2019

/s/ *Alex K. Baldwin*
ALEX K. BALDWIN
Assistant Attorney General