# Exhibit B

Court File No. 02-CV-17-3488

# Defendants' Consolidated Response to the State's Motions to Amend the Complaint and to Amend the Scheduling Order

## Document filed as a public document with redactions pursuant to parties' stipulation and November 28, 2017 Stipulated Protective Order

## Unredacted version filed separately as a confidential document pursuant to parties' stipulation and November 28, 2017 Stipulated Protective Order

STATE OF MINNESOTA                           DISTRICT COURT

COUNTY OF ANOKA                              TENTH JUDICIAL DISTRICT

_____

State of Minnesota, by its Attorney General,         Case Type:  Other Civil
Keith Ellison,                                       (Consumer Protection)

                  Plaintiff,                         Court File No. 02-CV-17-3488
                                                     Judge Daniel A. O'Fallon
            v.
                                             **DEFENDANTS' CONSOLIDATED
CenturyTel Broadband Services LLC, d/b/a     RESPONSE TO THE STATE'S
CenturyLink Broadband; Qwest Broadband       MOTIONS TO AMEND THE
Services, Inc., d/b/a CenturyLink; and Qwest COMPLAINT AND TO AMEND
Corporation, d/b/a CenturyLink QC,           THE SCHEDULING ORDER**

                  Defendants.

_____

        The State of Minnesota's motions – noticed ***almost a month after discovery ended*** – are

a blatant effort to obtain a "do-over" of two years of investigation and litigation that did not go

well for the State.  The State seeks to both:  (1) ***reopen*** discovery; and (2) ***more than triple*** the

scope of the case.  Granting these motions would effectively: create a new lawsuit, greatly

expand discovery, and potentially add years of litigation, based on the State's newest contention

that it is suing for damages related to "tens of thousands" of customers.  The Court should not

reward these tactics with a second bite at a much larger apple.

**<u>MOTION TO AMEND COMPLAINT</u>**

        The State's Motion to Amend its Complaint comes far too late, is extremely prejudicial,

and is inappropriate for multiple other reasons.

        ***<u>Too Late</u>.***  For many months before discovery closed, the State was well aware of the

alleged problems its proposed amendment seeks to cure.  But the State made a tactical decision

to wait until ***after*** discovery closed to radically revise its Complaint.  The State now seeks to add

66 new customers to 34 previously described in the initial Complaint, but the State had already

identified each of these customers – and had even drafted declarations for them – ***before March 2018***.  The State has offered no excuse for its delay.  Minnesota courts rightly take a dim view of such belated tactical maneuvering.

The State fails to tell the Court the *real* reason it wants to add 66 more customers.  Twenty-one of the 35 customers listed in the original Complaint dismantled the State's case at their depositions by asserting that that ***they are not owed or seeking restitution*** – testimony completely contrary to the State's claims.  Faced with this damaging testimony, the State is trying to backfill by adding twice as many customers.

The State claims that its proposed, extensive amendments are an attempt to respond to Judge Meslow's July 23, 2018, Order ("July Order").  This is pure pretext.  That July Order merely applied common sense, preexisting law predating this lawsuit for years:  that the State must prove a "causal nexus" to obtain restitution damages for individual customers.  The State's decision to ignore existing law, which was "called out" in the July Order, cannot justify a wholesale rewrite of its pleading after discovery closed.

***<u>Severe Prejudice to CenturyLink</u>.***  The State initiated this lawsuit after investigating CenturyLink ***for over fourteen months***.  The initial Complaint named 35 customers; CenturyLink deposed 33 of them, at great effort and expense.  Now, after discovery has closed, the State seeks to add 66 more customers to the Complaint, obligating CenturyLink to double its previous effort (assuming the Court extends discovery to allow that).  Restarting the case, tripling the size of the lawsuit, requiring essentially a new scheduling order, and pushing off summary judgment and trial for months or years is substantial prejudice by any measure.  And, again, the State has offered no explanation as to why it did not include these 66 customers in the initial lawsuit.

***Inappropriate Amendments.***  Finally, the State's proposed amendments violate the minimum standards for an amendment:  they are "futile," "scandalous," and "repetitive."  The proposed amendments are futile because the State offers no evidence that they would survive summary judgment.  The proposed amendments are scandalous because they repeatedly misrepresent CenturyLink's documents to put CenturyLink in a false light.  And, the State claims the proposed amendments do not affect the scope of its lawsuit, so they are merely repetitive.

## MOTION TO AMEND SCHEDULING ORDER

Similarly, the State's related motion to reopen discovery:  (1) comes far too late; and (2) is unjustified and without the necessary showing of "unusual circumstances" and "excusable neglect" that would justify filing past the deadline it seeks to extend.

***Too Late.***  The State has no explanation for why it waited until 22 days after the close of discovery to notice its motion.  Virtually every reason it identifies for reopening discovery involves things it knew before discovery closed – often, *months* earlier.  If the State believed it ran out of time to take depositions, it has only itself to blame for its lack of diligence.  The State's extensive investigation before filing the lawsuit provided it thousands of CenturyLink documents, which were available the day discovery opened.  Yet, instead of starting depositions immediately, the State inexplicably waited ***four months*** before noticing its first deposition.  The time that the State squandered is now the time the State seeks to recoup.

***No Unusual Circumstances or Excusable Neglect.***  Nor has the State justified its request to reopen discovery.  The State incorrectly identifies the standard as "good cause;" in fact, because it seeks to extend an expired deadline, it must show "unusual circumstances" and "excusable neglect" – neither of which it has or could do.  Indeed, the State fails even the lower standard of "good cause."  CenturyLink has already produced tens of thousands of documents,

answered dozens of interrogatories, responded to hundreds of document requests, and produced

23 witnesses who sat for over 100 hours of depositions.

Each justification the State offers for obtaining more discovery is based on incomplete or

incorrect facts:

- The State claims it needs to depose an independent financial analyst on whose analysis CenturyLink relies; ***but*** the State fails to mention that CenturyLink disclosed this analyst (and his analysis) in February 2018, and the State made ***no effort*** to depose him during discovery.

- The State claims that CenturyLink still owes it discovery responses; ***but*** as CenturyLink's concurrently filed briefs demonstrate, the State is wrong – CenturyLink has fully responded to the extent required by this Court's rules.

- The State claims it needs to depose some additional CenturyLink employees; ***but*** the State could have deposed (or sought the depositions) of each of these employees long before discovery closed, but chose not to.

- The State claims its Amended Complaint requires additional discovery; ***but*** even assuming the Court allows the amendments, the State has not explained what discovery it needs or placed any limits on its second bite at the apple.

Just because the State has virtually unlimited resources does not mean it needs to use

them all. This lawsuit (and the investigation that preceded it) has gone on long enough.

CenturyLink has more than sufficiently responded to the State's overwhelming discovery

requests. Neither the proposed Amended Complaint nor the additional discovery would change

the nature of the State's claims, or the proof the Court will require. The Court should deny both

motions to amend.

## **BACKGROUND**

### I.    THE STATE'S COMPLAINT SEEKS DAMAGES FOR "TENS OF THOUSANDS" OF TRANSACTIONS BASED ON 35 EXEMPLARY CUSTOMER TRANSACTIONS

The State filed this lawsuit on July 12, 2017. Asserting two counts under the State's

consumer-protection statutes, Minn. Stat. §§ 325D.44 & 325F.69, the State primarily seeks two

types of damages – (1) per-customer restitution and (2) civil penalties – for what it asserted were "thousands" of customer transactions.  Compl. ¶¶ 72-84; Moss Decl. Ex. 20 at 2.[1]

Unlike many consumer-protection lawsuits that allege a single pattern or scheme that affects all customers consistently, here the State has no such theory.  Instead, the State pleads a series of purportedly "illustrative" billing "experiences" which, in effect, reduce to the complaint that CenturyLink "failed to keep its promises."  The Complaint does not describe any consistent promise that CenturyLink allegedly made to all or most customers, or any consistent way by which it allegedly broke this promise.  Further, the State alleges no way to identify the customers to whom CenturyLink purportedly broke its promises, or by how much each customer was allegedly damaged by the conduct.

The initial Complaint identified 35 customers whom, the State alleged, were overbilled because of a variety of allegedly broken promises.  Compl. ¶¶ 27-63.  There is no set of common facts among these allegations, other than that each customer was allegedly mistreated in some way.  For example, these four customers described their claims in their affidavits very differently:

- M.B. (Compl. ¶ 44) – alleges that CenturyLink failed to disclose a leased *modem fee*;

- D.G. (Compl. ¶ 56) – alleges he was not told that he needed to sign up for "*autopay*" and "*paperless billing*" to receive a promotional discount;

- P.J. (Compl. ¶ 62) – alleges that he did not receive a *$150 Visa gift card* that CenturyLink offered to *new business customers* on a promotional flyer; and

- P.H. (Compl. ¶ 60) – alleges a door-to-door sales agent did not mention any *one-time charges* for Internet and phone services.

---

[1]    Citations to "Moss Decl." refer to the Declaration of Dana J. Moss in Support of Defendants' Response to the State's Motion to Compel Discovery and Motion for Sanctions

Lobel Decl. ¶ 17 & Exs. 26-29.[2]

Thus, for the State to prove that CenturyLink violated Minnesota law "thousands" of times, the Court must review evidence *specific* to each customer's transaction:  what CenturyLink specifically promised that customer; what pricing or services CenturyLink delivered; how much the customer was billed; how much the customer ultimately paid; whether CenturyLink provided credits or other adjustments as a result of the customer's experiences; and whether CenturyLink still owes the customer anything (or *vice versa*).

Claiming these 35 customers were merely "examples" of CenturyLink's alleged misconduct, the State asserted that its Complaint sought damages and injunctive relief for "thousands" of allegedly mistreated and overbilled customers statewide.  Moss Decl. Ex. 20 at 2. The State has never identified each of these "thousands" of customers, or provided proof that would be admissible at trial to support their alleged claims.  Instead, the State has produced written correspondence from several thousand Minnesotans, over a period of several years, raising all manner of individualized complaints and disputes with CenturyLink that customers could raise with any telecommunications company.  The State seeks unspecified restitution and civil penalties for each of these customers, again despite no consistent or common fact issues among these individuals other than the claim that they were CenturyLink customers, and were mistreated or owed money.

---

[2]    Citations to "Lobel Decl." refer to the Declaration of Douglas P. Lobel in Support of Defendants' Response to the State's Motion Amend the Complaint and Motion to Amend the Scheduling Order.

## II. THE STATE TOOK EXTENSIVE DISCOVERY FROM CENTURYLINK OVER THE PAST TEN MONTHS

Before filing its lawsuit, the State investigated CenturyLink for *14 months*. It issued two Civil Investigative Demands ("CIDs"), in May 2016 and July 2016. Lobel Decl. ¶ 2. In response, CenturyLink produced over 23,000 pages of documents and hundreds of call records. The State also obtained over 91,000 call records and other documents from CenturyLink's third-party vendors as part of its investigation. The State also obtained more than 1,000 pages of materials from a third party, for which CenturyLink was a sales agent. *Id.* ¶ 3.

The State had previously represented to the Court that it could complete discovery by June 1, 2018, and be trial-ready by November 12, 2018. *Id.* ¶ 4 & Lobel Decl. Ex. 1. Judge Meslow ordered discovery to commence on November 16, 2017. *Id.* ¶ 5 & Ex. 2. He initially allowed six months for discovery, but extended the discovery period to 9½ months by *joint* request. Fact discovery closed on September 3, 2018. *Id.* ¶ 6 & Ex. 3.

Despite having tens of thousands of pages of CenturyLink documents and a huge head start from the CID process, the State was very slow to start discovery. The State did not issue written discovery until December 13, 2017 (a month after discovery started), and did not serve its first deposition notice until March 23, 2018 – *four months after discovery had started*. *Id.* ¶¶ 7, 10. CenturyLink was far more diligent – it had already deposed 16 customers (as discussed below) before the State noticed its first deposition. Thus, instead of commencing depositions immediately based on the enormous information it had already gathered in the CID process, the State effectively frittered away four months of the 9½ months allowed for discovery.

Despite its leisurely start, the State ended up taking *enormous* discovery from CenturyLink, but most of it was tangential to its case. The State largely chose not to focus on individual customer's transactions, but instead on *company-wide issues*, such as business

processes, computer systems, and general policies and procedures.  Nevertheless, the State

obtained a great deal of discovery:

- CenturyLink's responses to 41 interrogatories – supplemented multiple times, resulting in almost 900 pages of responses.

- Almost 63,000 pages of documents (or computer documents), in response to the State's document requests.

- Over 100 hours of deposition testimony, conducted in 23 depositions of CenturyLink personnel in seven different cities throughout the country, using 273 numbered exhibits, and resulting in over 5,000 pages of transcripts.

*Id.* ¶ 8.

## III.   MOST OF THE 35 CUSTOMERS IDENTIFIED IN THE INITIAL COMPLAINT TESTIFIED CONTRARY TO THE STATE'S CLAIMS

CenturyLink deposed 33 of the 35 customers identified in the Complaint.[3]  That process

was eye opening.  The testimony largely discredited the State's restitution claims and

demonstrated that the State will go to any lengths to win, regardless of the truth.

The State alleges that it is seeking restitution for all 35 customers.  Compl. at 23.  In

support, the State produced affidavits – each drafted by the State's counsel – claiming that

CenturyLink owes each customer restitution.  Lobel Decl. ¶ 17.  But the depositions of the

customers entirely rebutted the State's central claim – *21* customers testified that they *are not*

*seeking restitution* and/or that *CenturyLink does not owe them money*.  *Id.* ¶ 16.  For example:

- C.A. (Compl. ¶ 39): "No, I'm not looking for no money or nothing."
- H.R. (Compl. ¶ 37): "Personally, I don't seek anything."
- L.F. (Compl. ¶ 41):  "I'm not looking for any money."
- T.H. (Compl. ¶ 38):  "No.  I believe they've [] taken care of my situation already."
- A.K. (Compl. ¶ 49): "I'm not claiming that I want CenturyLink to pay me something."
- O.N. (Compl. ¶ 48):  "No, they don't" – that CenturyLink does not owe him anything.

---

[3]     One of the 35 withdrew from the lawsuit; another lived far out of the State.

- P.O. (Compl. ¶ 43): "I would say that we're at a point where CenturyLink doesn't owe me. I mean the bill was revised appropriately, ultimately, yes."

*Id.* & Lobel Decl. Exs. 5-25.

The State-drafted affidavits also are far from comprehensive pictures of the relevant facts on which the Court can rely – they ritually omit numerous other relevant details such as:

- Ignoring written disclosures that CenturyLink provided to customers – the declarations solely focus on customers' recollections of their phone calls with CenturyLink;[4]

- Ignoring credits that CenturyLink applied to bills; and

- Omitting events that occurred after the affidavits were signed.

The State drafted these one-sided, incomplete affidavits not to present the facts accurately, but as a litigation strategy to help it prevail in its lawsuit.

## IV. THE STATE IS ATTEMPTING TO HIT THE RESET BUTTON ON ITS LAWSUIT BY ADDING 66 ADDITIONAL CUSTOMERS TO THE COMPLAINT AND REOPENING DISCOVERY

On September 25, 2018 – 22 days after fact discovery closed – the State first noticed its motions to amend its Complaint and to reopen discovery. Its briefs also disclose the State's intentions for proceeding with the lawsuit: a mammoth summary judgment motion, the likes of which this Court may have never seen.

**Amended Complaint.** The State's proposed Amended Complaint seeks to add 66 customers as additional "examples" of the "tens of thousands" of allegedly mistreated customers. But the State could have added any or all of these additional 66 customers at any point before or during discovery. ***Records show that the State has known about all 66 of these customers since***

---

[4]    It is widely agreed by courts that written notices provided shortly after sale (such as in "welcome packages," or viewed and accepted during online installation – both methods used by CenturyLink) are fully enforceable even if they were not disclosed at the point of sale. *E.g.*, *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 519-20 (3d Cir. 2007); *Rasschaert v. Frontier Commc'ns Corp.*, No. 12-3108 (DWF/JSM), 2013 WL 1149549, at *6 (D. Minn. Mar. 19, 2013).

**February 28, 2018**, when the Court entered an Amended Scheduling Order to extend discovery into September 2018.  Lobel Decl. Exs. 3 & 4.  None of these customers has been deposed yet.

Furthermore, the State now claims that its Amended Complaint is up to 10 times larger than the initial Complaint.  The Amended Complaint asserts violations of Minnesota law for "tens of thousands" of customer transactions.  Am. Compl. ¶ 13.  This is an ***order of magnitude larger*** than the initial Complaint, which the State said only reached "thousands" of transactions.  *See supra* p. 4.

**Reopening of Discovery.**  Purportedly based on its significantly larger Amended Complaint, the State seeks to reopen discovery.  It assembles a hodge-podge of reasons it needs more discovery – CenturyLink will address them in turn later – but the State proposes no end date to or limitation of discovery.  For example, the State does not ask for three months to conduct specific depositions it has identified.  Mem. MASOat 4-5.[5]  Rather, it asks (*id.* at 7) for undefined additional discovery based on the Amended Complaint – without identifying ***what*** additional discovery it seeks, why it needs it, or ***how long*** that discovery will take.  This is in addition to the 9½ months of discovery in which the State served 199 document requests and took 23 CenturyLink employee depositions, obtaining over 100 hours of testimony, not to mention the pre-litigation discovery it served.

**Massive Summary Judgment Motion.**  Buried in one of its briefs, the State discloses how it intends to prove damage claims for restitution and civil penalties for "tens of thousands" of customers.  At the end of its brief on the Motion to Amend the Scheduling Order, the State says:

---

[5]    Citations to "Mem. MASO" refer to the State's Memorandum of Law in Support of Its Motion to Amend Scheduling Order.

> [The State] may move for summary judgment on these tens of
> thousands of violations and substantially narrow the scope of this
> action at trial.

Mem. MASO at 7. One can only imagine this filing. To prove violations for "tens of thousands"
of separate transactions, the State will need *evidence specific to each transaction* – evidence of
CenturyLink's purported "promises," evidence of how CenturyLink allegedly breached those
promises, and evidence of how each customer was overbilled as a result (and did not receive
credits at a later time). This would require tens or hundreds of thousands of pages of exhibits.
Almost none of it will be admissible, because no affidavits or deposition testimony exist for
"tens of thousands" of customers.

## ARGUMENT

## I.    THE COURT SHOULD DENY THE STATE'S REQUEST TO AMEND ITS COMPLAINT

Despite the State's attempt to portray its proposed Amended Complaint as something
helpful to CenturyLink and the Court, in fact it is an entirely new lawsuit, three to ten times the
size of the initial Complaint, and filed *after* the close of *extensive, extremely time consuming,
and expensive* discovery. Coming at the thirteenth hour, the State has no possible explanation
for its decision to delay its motion past the close of discovery; its brief does not even
acknowledge the belated timing of the filing, much less attempt to justify or explain it. The
Court should not permit the State to end-run this Court's well-established procedures by
rewriting its case on the eve of summary judgment and trial.

### A.    The State's Motion is Far Too Late

The most glaring and straightforward basis on which to deny the State's requested
amendments is that the request comes far too late – long after the close of discovery.

The State brandishes the standard of "liberal" permission to amend pleadings. Mem. MAC at 4, 6.[6] But this "liberality" of granting leave for an amended pleading is not absolute – it "depends in part upon the stage of the action and in great measure upon the facts and circumstances of the particular case." *Ray v. Dronen*, No. A04-1635, 2005 WL 757931, at *2 (Minn. Ct. App. Apr. 5, 2005). In particular, waiting until discovery closes to move to amend is, *ipso facto*, a basis to deny the motion. *Cf. Mashak v. Meeks-Hull*, No. A11-638, 2012 WL 118316, at *2 (Minn. Ct. App. Jan. 17, 2012) (denying motion to amend filed "after the close of discovery"); *Breidenbach Co., LLC v. Prosperity Real Estate Invs., LLC*, No A09-1730, 2010 WL 2813382, at *6 (Minn. Ct. App. July 20, 2010) (denying motion to amend filed after discovery was completed, because it would have required reopening discovery); *Ray*, 2005 WL 757931, at *3 (denying motion to amend after close of discovery, because "the parties' ability to conduct [ ] discovery [on the new claims] is now severely limited").

The State does not provide a single fact justifying why it waited until well after the close of discovery to file its Motion to Amend, or why it could not have filed earlier. Not one. Instead, the State harkens to an event from months earlier: Judge Meslow's Order on July 23, 2018 ("July Order"), discussing the appellate decision in *State v. Minn. Sch. of Bus., Inc.*, 915 N.W.2d 903, 909-10 (Minn. Ct. App. 2018), which the State calls the "*Globe*" case. Mem. MAC at 6-8. But even then, the State does not explain why it waited 65 days after Judge Meslow's July Order to notice its Motion. Nothing prevented the State from moving during discovery in this case, or at a minimum, shortly after Judge Meslow issued his July Order. The Court should not reward the State's inexplicable lack of diligence.

---

[6]     Citations to "Mem. MAC" refer to the State's Memorandum of Law in Support of Its Motion to Amend the Complaint.

The State cannot hide behind *Globe* to justify its thirteenth-hour amendments.  The *Globe* opinion applies the "causal nexus" rule – which has long existed in Minnesota law and logically requires that the State prove a "causal nexus" between a defendant's conduct and each customer's damages.  *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn. 2001).  So when the State claims it needs to amend its pleading based on *Globe*, in fact it is implicitly conceding it needs to amend its pleading based on the "causal nexus" rule that long predated the Court of Appeals' holding in *Globe* and the State's 2017 Complaint.  The State cannot use its initial refusal to abide by long-standing precedent as the excuse for its post-discovery motion to amend its pleading.

Instead of supplying reasons why it chose to move so late, the State suggests that CenturyLink should have known the amendments were coming.  Mem. MAC at 8.  But CenturyLink could not know what proposed amendments the State was going to make, and certainly could not have predicted that the State would add 66 additional customers – or predicted which consumers would be added.  CenturyLink cannot defend a lawsuit, or take discovery on claims, where it has not seen the pleading.  *Old Republic Nat'l Title Ins. Co. v. Minn. Office Plaza, LLC*, No. A09-544, 2010 WL 155175, at *3 (Minn. Ct. App. Jan. 19, 2010) (denying motion to amend, even though plaintiffs informed defendant months earlier that it would be amending because court was "not persuaded that [defendant] should be expected to conduct discovery on claims not yet included in the suit").

### B.    The State's Amendments Would Substantially Prejudice CenturyLink

Despite the State's glib, conclusory assertion to the contrary, Mem. MAC at 6, the State's attempt to expand massively its Complaint well past the close of discovery is ***extraordinarily prejudicial*** to CenturyLink.

Prejudice to the defendant is a common reason Minnesota courts refuse to allow plaintiffs to amend their complaints, and prejudice includes the imposition of an unjustifiable, significant extension or delay to the case. *Old Republic*, 2010 WL 155175, at *3; *Borrero v. Gustafson*, No. A07-0273, 2008 WL 2020396, at *2 (Minn. Ct. App. May 13, 2008).

### 1. The State is Massively Increasing the Size of Its Complaint

The number of transactions at issue in the Amended Complaint is three to ten times the size of the initial Complaint.

The State is adding claims of 66 customers nowhere mentioned in the initial Complaint – essentially ***tripling*** the number of customers for whom it seeks restitution and civil penalties. The State does not contend that these new 66 customers only came to the State's attention after discovery closed. ***In fact, the State's counsel drafted affidavits for these 66 customers before March 2018*** – some even ***before*** filing the initial lawsuit. Nothing prevented the State from attempting to add these 66 customers at a much earlier time, and certainly before discovery closed. *See* Lobel Decl. Ex. 4. Instead, it appears that the State added the 66 customers to cure the deficiencies the depositions revealed in the cases of the original 35 customers.

The State also says that the Amended Complaint covers "tens of thousands" of transactions. Mem. MTA at 4. By comparison, earlier in the litigation it said its initial Complaint covered "thousands" of transactions. Thus, the State apparently believes that its proposed Amended Complaint is around ten times larger in scope.

### 2. The Court Will Need to Set an Entirely New Schedule – Essentially Starting an New Lawsuit

The Court would need to reset the entire case schedule if the Court allowed the proposed amendment. To permit CenturyLink a fair opportunity to take discovery on and defend itself

02-CV-17-3488

CASE 0:18-cv-00296-MJD-JFD    Doc. 179-2    Filed 07/10/19    Page 17 of 31    Filed in District Court
State of Minnesota
2/21/2019 10:59 AM

against the claims of these new 66 customers and "tens of thousands" of alleged violations, the

Court would need to allow significant time for the following:

- **<u>Time for State to Identify Customers.</u>**  The July Order requires the State to identify, for each transaction for which it asserts damages, the name of the customer, the nature of the violation, facts sufficient to demonstrate the customer's reliance, and the amount of damages.  Six months after the Court issued the July Order, the State has failed to comply with that Order.  It will take the State ***months*** to provide that information, if it is even possible.

- **<u>Time to Review Account Records.</u>**  Assembling and reviewing each customer's account file is a highly fact-intensive task.  CenturyLink's internal team and counsel needed weeks to gather and review the accounts of the 35 customers named in the initial Complaint, about the same amount of time it took to assemble records for the 38 plaintiffs named in the Consumer MDL.[7]  Pedersen Decl. ¶ 14.

- **<u>Time for Depositions.</u>**  CenturyLink deposed 33 of the customers identified in the initial Complaint over a 13-week period, scattered all over the state.  Lobel Decl. ¶ 9.  It would now have to spend twice the resources, over twice the time, to depose these 66 additional customers.

- **<u>Cost and Effort.</u>**  The proposed amendment would ***massively*** increase CenturyLink's costs and effort to defend the lawsuit.  Reviewing the 66 new customers' account information; deposing them; preparing summary judgment papers for them; and preparing for trial for 100 customers – each one presenting its own mini-lawsuit – would require triple the effort of the current 34 customers.  Pedersen Decl. ¶¶ 19-20.

---

[7]    CenturyLink's experience is that it is extremely time-consuming to compile and examine the records for even a single customer, many of whom have been with CenturyLink for several or many years.  CenturyLink does not maintain each customer's entire account records for each service in a single database.  Instead, account records – including billing records; equipment records; notes of communications; contracts; online chats; emails; letters; service installation records; online orders; complaint files; and telephone recordings – are kept in many different databases that need to be separately searched for each customer.  Pedersen Decl. ¶ 20.  For both this lawsuit (the initial 35 customers) and the parallel federal consumer class actions lawsuits (with 38 named plaintiffs), CenturyLink needed dozens of weeks to compile and review the customers' records.  *Id.* ¶ 19.

### 3. The State's Addition of 66 Customers Does Not Cure Its Improper Attempt to Seek Damages for "Tens of Thousands" of Customers

The State appears unconcerned about the problems its proposed Amended Complaint would unleash, by claiming that its Amended Complaint asserts claims for "tens of thousands" of customers. The State necessarily must believe that it is immaterial whether the Complaint has "examples" of 34 or 100 customers. Compl. ¶ 26 (customers listed in Complaint are meant only to be "examples"); Am. Compl. ¶ 41 (same). That is a glib and demonstrably false notion.

The State obviously cannot prosecute a trial seeking damages for "tens of thousands" of separate transactions, where each one stands alone. The Court surely would not countenance the State showing up at trial to demand restitution damages for some customer and some transaction nowhere mentioned in the pleadings – that would be tantamount to trial by surprise, and would trample on CenturyLink's due process rights. *Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 917-18 (Minn. 2012) (pleading rules require "information sufficient to fairly notify the opposing party of the claim against it").[8] The State's position is also inconsistent with the July Order, which requires the State to provide details of each customer's claim – including the facts of that customer's reliance, and the amount of damages – to assert a claim for that customer.

The Court can put the lie to the State's argument by posing a simple rhetorical question: if the customers identified in the Complaint are merely illustrative examples to the State's claims and do not limit the scope of State's claims (as the State contends), then **why does the State need to add 66 new customers at all?** The answer is obvious: The depositions of the 33 the original customers went poorly for the State, so it is trying to bolster its case by pouring in twice as many

---

[8]    Trying to justify its massive lawsuit, the State claims it is "obligated to aggressively enforce Minnesota's consumer protection statutes." Mem. MASO at 7. But the State's "obligations" are still bound by limitations such as due process and the rules of civil procedure. Minn. R. Civ. P. 1 (rules govern "all suits of a civil nature"); *Sandberg v. Comm'r of Revenue*, 383 N.W.2d 277, 281-82 (Minn. 1986) (State, as litigant, was bound by rules of civil procedure).

02-CV-17-3488

Filed in District Court
State of Minnesota
2/21/2019 10:59 AM

new customers, making it extraordinarily costly and difficult for CenturyLink to depose and

defend against the State's (undoubtedly) one-sided presentation of their stories too.  Indeed,

taking the State's logic to the extreme, the State might as well have offered an amendment with

1,000 customers, not merely 100, and in its view, the conclusion would be the same – nothing

about the scope of the case will have changed.  Just stating the proposition demonstrates its

illogic.  The State is obviously concerned that it will not be permitted to file a summary

judgment motion or go to trial on "tens of thousands" of unique transactions, and thus is tripling

the size of its Complaint by adding the 66 additional customers.

For these reasons, allowing the State to triple the size of the case well after the close of

discovery would be extraordinarily prejudicial to CenturyLink and the Court should not

countenance this gross undermining of the rules of civil procedure.

### C.     The State's Proposed Amendments Are Improper

Finally, the Court should deny the State's request to amend its Complaint strictly because

the proposed amendments are pointless:  they are "futile," "redundant," and "scandalous."

#### 1.     The Amendments Are Futile

The State's proposed amendments are "futile."  The State offers no evidence to support

their viability.  Nor is it even possible:  if indeed the State seeks restitution and civil penalties for

"tens of thousands" of completely separate and unique transactions that are based on different,

non-uniform communications, then *no* amount of amendments are *ever* going to present that case

properly.

A proposed amendment is "futile" if the plaintiff does not offer "evidence" that the claim

can survive a summary judgment motion against it.  *Granlund v. Lumley*, No. A06-970, 2007

WL 1412910, at *5-6 (Minn. Ct. App. May 15, 2007) (denying motion to amend because

proposed claim would not survive summary judgment); *Brunell v. Kyle*, No. A06-886, 2007 WL

1121362, at *5 (Minn. Ct. App. Apr. 17, 2007) (affirming denial of motion for leave to amend because plaintiff did not submit evidence sufficient to meet necessary elements of proposed new claims); *Merrill ex rel. Kelly v. Guttormsson*, No. A06-690, 2007 WL 2245085, at *3 (Minn. Ct. App. Aug. 7, 2007) (affirming denial of motion to amend where "appellant has failed to provide evidence showing causation").

The State's proposed amendment asserting "tens of thousands" of claims is untriable and, consequently, futile. This Court cannot, in the span of a few days or weeks – or even months – hear testimony to establish liability for "tens of thousands" of customers' separate and independent transactions. Mem. MASO at 7 (State recognizes it might need "to solicit the testimony of tens of thousands of Minnesota consumers" at trial).

The State's plan to avoid the rules of evidence is to submit "tens of thousands of violations" ***through summary judgment***. *Id.* But that is no solution either. First, the Court might shudder at the thought of what that summary judgment motion will look like. The State will have to provide tens of thousands, if not hundreds of thousands, of pages of documents to support that motion. The Court will need to review tens of thousands of independent transactions, each with its own unique facts, including (like the "illustrative" examples) different "promises" that were allegedly not "honored" in different ways and by different amounts, to determine which customers were mistreated and how they were, and for those that were, if any are still owed money (taking into account payments and credits). And all of this will be without the benefit of testimony from – and cross examination of – the customers. Of course, almost none of these materials can meet the State's evidentiary burden – there will be no admissible testimony for the vast majority of transactions.

The State has not provided any evidence of "tens of thousands" of violations, and certainly has not demonstrated how it can prove "tens of thousands" of violations at summary judgment or at trial – and it essentially concedes it cannot. Because the proposed amended claims cannot survive summary judgment, they are legally "futile." That alone is a basis to deny the requested amendment.

### 2. The Amendments Are Redundant

If one were to accept the State's argument, its amendments do not change its claims at all. The State contends that it is merely adding illustrative facts and examples to its existing claims. Mem. MAC at 4-7. Indeed, although the proposed Amended Complaint contains additional factual allegations, Am. Compl. ¶¶ 25-37 & 40, it avers the same two causes of action. The amendments thus serve no functional purpose and are merely redundant. *Envall v. Indep. Sch. Dist. No. 704*, 399 N.W.2d 593, 597 (Minn. Ct. App. 1987) (denying motion to amend "because it was simply a 'rehash' of the original complaint"). The State's contention is also mutually inconsistent with its separate argument that the amendments are necessary to comply with, in its view, a change in law created by the *Globe* case. Mem. MAC at 6-8.

### 3. The Amendments Are Immaterial and Scandalous

Where a complaint contains allegations that are "immaterial" to the claims, courts strike those allegations if they are "scandalous." *Cf. Sanders v. Reg'l Fin. Corp. of S.C.*, No. 1:17-293-CMC-SVH, 2017 WL 3026069, at *2 (D.S.C. July 14, 2017) (striking allegation from complaint because its purpose was to harass and embarrass defendant); *Patrick Collins, Inc. v. Bolinger*, No. 1:12-cv-01136-SEB-MJB, 2013 WL 12291914, at *2 (S.D. Ind. Sept. 25, 2013) (striking allegations attempting to cast plaintiff and counsel in disparaging light because they were "intended to harass"); *McKinney v. Bayer Corp.*, No. 10-cv-224, 2010 WL 2756915, at *2 (N.D.

Ohio July 12, 2010) (striking allegations in pleading about defendant as "immaterial and scandalous").

The State's amendments are filled with misquotes from CenturyLink employees and documents, creating utterly false notions about admissions of wrongdoing that, in fact, are nothing of the sort. As but a few examples:

| State's "Fact" | The Actual Record |
| --- | --- |
| "Ms. Moreau has further conceded that, before the State's investigation and lawsuit, CenturyLink's pricing model used 'hidden fees.'" (Proposed Am. Compl. ¶ 25 - Baldwin Aff. #1 Exhibit C) | Misrepresents what she said – She merely said that "there's no hidden fees" in a new pricing model (Lobel Decl. Ex. 33 - 8/2/17 CTL Earnings Call Tr. at 11) |
| "CenturyLink fraudulently over-billed consumers in [ ]% of its sales transactions." (Proposed Am. Compl. ¶ 40 - Baldwin Aff. #1 Exhibit C) | State misrepresents what the "[ ]%" figure means – it refers to transaction requiring manual attention; it was not a reference to "fraudulent overbilling" (Baldwin Aff. # 3 Exhibit G) |
| "Internal documents suggest that after identifying these errors, CenturyLink does not correct consumers' accounts to 'honor [its] promis[es].'" (Mem. MTC at 20) | State completely misrepresents the document, which nowhere said anything about CenturyLink procedures in general, nor discloses any intent not to honor promises. It referred to a one-time event and provided instructions on how a CenturyLink sales agent could "honor her promise" to a specific customer (Baldwin Aff. # 3, Exhibit HH) |
| "Despite knowing it provides agents with unreliable and inaccurate information, CenturyLink simply instructs its agents to 'trust your tools' even though using these inaccurate tools 'result[s] in the customer being misquoted for their monthly rate.'" (Proposed Am. Compl. ¶ 32 - Baldwin Aff. #1 Exhibit C) | The State manufactures a false statement by juxtaposing fragments from two different documents. The phrase "Trust Your Tools" was a header in a training document. The other quote is from a completely different document, that *warned* sales representatives that misquotes *could* happen if they fail to "follow the process" for adding discounts or bundles. Nowhere does a document say the "tools" will "result" in misquotes. (Lobel Decl. Exs. 34-35) |

Lobel Decl. ¶ 18.

These misquotes, therefore, are "immaterial" because they do not support the State's

claims – the actual facts are entirely different. *Cf. Schlosser v. Univ. of Tenn.*, No. 3:12-cv-534,

2014 WL 5325350, at \*3-4 (E.D. Tenn. Oct. 20, 2014) (where plaintiff's allegation was false

inference of record, the statement "ha[d] no possible bearing" on plaintiff's claims, and was

"clearly false and therefore immaterial").  Charitably, the most obvious reason the State would

include these unnecessary but highly-misleading statements, is to paint CenturyLink in a bad

light and try to gain an improper litigation advantage.  The State is attempting to damage

CenturyLink's reputation through these false statements.

For all these reasons, the Court should deny the State's Motion to Amend its Complaint.

## II.     THE COURT SHOULD DENY THE STATE'S REQUEST TO REOPEN DISCOVERY AND AMEND THE SCHEDULING ORDER

The Court should similarly deny the State's extraordinarily belated motion to reopen

discovery.

### A.     <u>The State's Lack of Diligence Does Not Justify a Discovery Extension</u>

The Court should deny the State's motion to reopen discovery for three reasons:  (1) it

comes too late; (2) the State has not acted diligently in discovery; and (3) the State has already

taken extensive discovery on CenturyLink.

#### 1.     *The State's Motion Comes Far Too Late*

Fact discovery closed September 3, 2018.  Inexplicably, the State did not file the notice

of its motion for more discovery until September 25, 2018.  Thus, the State's motion is ***not*** to

merely extend discovery; it is to ***reopen*** closed discovery.  The State never explains why it could

not have filed the motion earlier, because it has nothing to say.  Indeed, the State's late filing is

in open defiance of the Court's instructions.  The original Scheduling Order (entered November

16, 2017) states:  "Any motion to extend any deadline contained in this Scheduling Order must

be heard before the expiration of that deadline." Lobel Decl. Ex. 2. That rule mimics Minn. R.

Gen. Prac. 111.04, which states that a party must, "except in unusual circumstances," file a

motion to extend a deadline prior to the deadline.

Minnesota courts rightly take an extraordinarily dim view of motions to reopen discovery

long after discovery has closed that could have been filed much sooner. *E.g.*, *Grace Cap. LLC v.*

*Mills*, No. 27-cv-08-4767, 2009 WL 5454442, at 6-7 (Minn. Dist. Ct. July 21, 2009) *aff'd in*

*part, reversed in part on other grounds* 2010 WL 3396817 (Minn. Ct. App. Aug. 31, 2018)

(denying motion to reopen discovery filed after close); *Pressler v. Theis*, No. A06-2449, 2008

WL 3347632, at *2 (Minn. Ct. App. Nov. 13, 2007) (holding no "good cause" existed to reopen

discovery, where motion was filed after close, and where movant did not show it acted

diligently); *L.J. v. Peng*, No. Co-96-2197, 1997 WL 228960, at *4 (Minn. Ct. App. May 6, 1997)

(affirming denial of motion for extension to discovery filed "two and one-half months" late).

Here, the State has not even attempted to explain why it waited so long to file its motion.

The Court should not reward such dilatory tactics.

### 2. *The State Had Ample Time to Take this Discovery*

The State's request for more discovery is implausible; the State has had more than

enough time to conduct discovery. It simply was not diligent or efficient.

First, discovery has already far exceeded the State's initial projections. It originally

asked for discovery through June 2018. Lobel Decl. ¶ 4 & Ex. 1. Discovery actually closed

three months later. It is disingenuous for the State to now suggest it only belatedly realized it has

not had enough time to conduct discovery. Certainly, at some point in discovery, it would have

dawned on the State that it was running out of sufficient time to complete its discovery. Or,

perhaps, the State would have realized that the case was more complex and would require more

discovery than initially thought. But under either scenario, as the above-cited authorities

demonstrate, it was incumbent on the State to approach the Court at *that* time, and not *after*

discovery closed.

Second, the State was not diligent in starting depositions – thus, it cannot complain that it

ran out of time to conduct them. Unlike most litigants, the State did not start discovery from

scratch. It had a running start with a 14-month, two-CID process, that provided tens of

thousands of pages of documents to the State before it ever filed its Complaint. Nothing

prevented the State from launching into depositions as soon as discovery opened.[9] Yet, the State

did not send out notice of its first deposition until March 23, 2018 – four months after the start of

discovery. CenturyLink had already *taken* 16 depositions before the State even *noticed* its first

deposition. Courts will not reward a dilatory party for its lack of diligence by granting it more

time. *E.g.*, *Cargill, Inc. v. Jorgenson Farms*, 719 N.W.2d 226, 231-32 (Minn. Ct. App. 2006)

(denying motion to extend discovery where plaintiff was not diligent in conducting it); *Griffin v.

Parents in Comty. Action, Inc.*, No. C8-96-2142, 1997 WL 406612, at *4 (Minn. Ct. App. July

22, 1997) (same).

Finally, the State cannot possibly contend it needs more time to obtain documents from

CenturyLink. It has been collecting documents from CenturyLink *for more than two years*. *Cf.

Funk v. O'Connor*, No. A16-1645, 2017 WL 5243514, at *7 (Minn. Ct. App. Nov. 13, 2017),

*aff'd* 916 N.W.2d 319 (Minn. 2018) (affirming denial of request for additional discovery, where

initial discovery was produced a year earlier); *Merkl v. Pendleton*, No. A04-2015, 2005 WL

2008694, at *3 (Minn. Ct. App. Aug. 23, 2005) (denying motion for additional discovery where

movant had "more than a year to conduct discovery").

---

[9]     The State also had the option of taking depositions during the CID process if it so chose.

- 23 -

### 3. *CenturyLink Has Already Produced Extensive Discovery*

Finally, in deciding whether to allow the State to take yet more discovery, the Court should consider that the State has already taken *extensive* discovery from CenturyLink. CenturyLink produced over 85,000 pages of documents in response to the State's document requests, and 23 of its employees were deposed for over 100 hours spanning over 5,000 pages of testimony. Enough is enough. *Cf. Lindholm v. Carleton Coll.*, No. A15-1846, 2016 WL 3461941, at *7 (Minn. Ct. App. June 27, 2016) (affirming denial of motion for additional depositions where party had already taken 16 depositions over 37 hours spanning 1,627 pages of testimony); *Funk*, 2017 WL 5243514, at *7 (denying motion for additional discovery, where respondents had already produced 12,000 pages of documents).

### B. The State Has Not Demonstrated "Good Cause," Much Less "Unusual Circumstances," to Reopen Discovery

Ignoring both the timing of its motion as well as CenturyLink's massive discovery responses to date, the State offers a hodge-podge of reasons that its claims constitute "good cause" to justify reopening discovery. Mem. MASO at 2-6. None, individually or collectively, does.

*The Standard is Not "Good Cause."* As an initial matter, the State applies the wrong standard. Where, as here, the State seeks to extend a deadline *after* it has expired, Minn. R. Gen. Prac. 111.04 requires the State to show "unusual circumstances" – a standard it ignores. Similarly, under Minn. R. Civ. P. 6.02, a court may not grant an extension to a deadline after it has passed unless the State can show its failure to move prior to the deadline was "the result of excusable neglect" – another standard the State ignores. There is nothing "unusual" about the litany of excuses the State offers, and certainly, the State has not tried to excuse its post-

expiration motion.  The Court could and should deny the State's motion to reopen discovery
solely because the State has not attempted to meet the proper standard.

*__David Hall Deposition__.*  The State's leading argument for more time is that it needs to
depose a third-party financial analyst, David Hall, based on information CenturyLink provided
on November 2, 2018.[10]  Mem. MASO at 3.

The State's purported need to depose Mr. Hall is not "good cause," because the State
could and should have deposed him months ago.  CenturyLink identified Mr. Hall to the State in
interrogatory responses on ***February 23, 2018***.  CenturyLink explained the analysis he had done,
provided his conclusions, and produced the data he used for his calculations.  Moss Decl. ¶ 7.
Yet at no time before discovery closed did the State notice Mr. Hall's deposition, or even
informally discuss with CenturyLink dates for his potential deposition.  Lobel Decl. ¶ 11.  The
State had ***every opportunity*** to take his deposition, but passed.  Its failure to act does not create a
basis to obtain more time.  The Court should not grant leave to the State ***after*** discovery closes to
depose someone it could have, but chose not to, depose for months ***before*** the deadline.

*__Ongoing Discovery Disputes__.*  The State claims more time is needed because
CenturyLink has not fully responded to discovery, or to the July Order.  Mem. MASO at 4-7.
But as explained in CenturyLink's concurrently-filed Response brief on the State's motions to
compel discovery and for discovery sanctions, CenturyLink has properly responded to the extent
required by the civil discovery rules, and has provided all information it possesses that Judge
Meslow required CenturyLink to produce.  Furthermore, even if CenturyLink owes additional

---

[10]    The State wrongly claims that CenturyLink was "withholding" this information.  As
CenturyLink's Response to the discovery motions demonstrates, the State is wrong about that
too.

02-CV-17-3488

CASE 0:18-cv-00296-MJD-JFD    Doc. 179-2    Filed 07/10/19    Page 28 of 31    Filed in District Court
State of Minnesota
2/21/2019 10:59 AM

information to the State, that would not logically provide a basis for the State to obtain additional time to serve even *more* discovery on CenturyLink.

_**Additional Employee Depositions.**_  The State identifies some additional employees it desires to depose.  Mem. MASO at 4-5.  But the State has not shown that the Court should reopen discovery for their depositions.

The State claims that CenturyLink did not make three employees (Ornelas, Orr, and Sellar) available for their depositions.  That is simply not true.  The State dropped the ball on each employee.

- On March 9, 2018, CenturyLink confirmed that Ornelas was available for a deposition on April 17, 2018, in Denver.  The State rejected the proposed date and never offered an alternative date for Ornelas.  Lobel Decl. Ex. 30.

- On April 4, 2018, the State asked CenturyLink for the availability of nine witnesses, including Orr, over ten business days in May.  CenturyLink confirmed the availability of three witnesses, although Orr was not one of them.  The State took those three depositions and never asked about Orr again.  *Id.* Ex. 31.

- On July 27, 2018, the State noticed Sellar's deposition.  CenturyLink informed the State that she ▮▮▮▮▮▮ was unavailable on the date the State selected.  The State never asked again about Sellar.  *Id.* Ex. 32.

*Id.* ¶ 13.  The State has no explanation for why it waited until after the close of discovery to request to reschedule these individuals' depositions.

The State then falsely claims that four other CenturyLink employees (Carson, Christian, Day, and Shelburne) were identified in document productions near the close of discovery.

Again, not so.  The State knew about each of these witnesses *long before* close of discovery:

- CenturyLink produced documents *as early as June 15, 2016*, that identified Carson on the subject on which the State wants to depose her.

- CenturyLink identified Christian to the State *on June 16, 2016*, as a person knowledgeable about the subjects on which the State wants to depose her.

- CenturyLink produced documents *as early as March 1, 2018*, that identified Day as a person knowledgeable about the subjects on which the State wants to depose her.

- CenturyLink identified Shelburne to the State *on June 16, 2016*, as a person knowledgeable about the subject on which the State wants to depose her.

*Id*. The State has no explanation for why it waited until after the close of discovery to raise its first requests for these individuals' depositions.

Finally, the State wrongly claims it could not depose another CenturyLink employee (Brewer) due to alleged "problems with CenturyLink's document productions." Mem. MASO at 5. That is also completely false. The State requested that CenturyLink produce all electronic documents in "native format." CenturyLink complied. The particular document in question was a Lotus Notes file – an industry-standard type of email database file. The State, apparently, did not have the ability to print out Lotus Notes files. CenturyLink had offered Brewer's deposition in Denver, and in fact had prepared her for the deposition and was awaiting the deposition when the State *cancelled it the night before* even though the State's counsel was in Denver for that and other depositions. The State never asked to reschedule her deposition. The State cannot claim this is CenturyLink's fault, and the State certainly cannot explain why it has not raised Brewer's deposition until after the close of discovery. Lobel Decl. ¶¶ 14-15.

The Court might also note that the State did not ask to take any depositions in the last two or three weeks before the close of discovery. *Id*. ¶ 12. If the State really wanted any of these eight depositions, it at least should have attempted to schedule them. This is just another example of the State's lack of diligence. It should not be rewarded with a reopening of discovery.

**_Amended Complaint._** Finally, the State ominously suggests that "additional discovery" is necessary for the proposed Amended Complaint – without explaining what discovery it needs,

Filed in District Court
State of Minnesota
2/21/2019 10:59 AM

or how long it will take. Mem. MASO at 7. The State has not even attempted to show that the proposed Amended Complaint serves as "good cause" to reopen discovery. *Cf. Lewis v. St. Cloud St. Univ.*, 693 N.W.2d 466, 473-75 (Minn. Ct. App. 2005) (affirming denial of motion to extend discovery after dispositive motion had been filed, where movant could not show how the additional discovery related to that pending motion). Furthermore, the suggestion that the proposed Amended Complaint might require additional discovery is inconsistent with the State's insistence that it is merely adding "pertinent facts" already known to CenturyLink and not to change the scope of the lawsuit. Mem. MAC at 1.

Indeed, any additional discovery on the proposed Amended Complaint would take many *months* and be enormously costly. As explained above, CenturyLink will need extensive time to prepare for and depose the 66 new customers added to the Amended Complaint. Furthermore, as explained in CenturyLink's concurrently-filed Opposition brief to the State's motion to compel, some of the information the State seeks would take *years* to produce.

<u>**CONCLUSION**</u>

For these reasons, CenturyLink respectfully requests that the Court deny the State's motions to amend its Complaint and to reopen discovery.

Dated: February 20, 2019                              WINTHROP & WEINSTINE, P.A.


                                                      By:  */s/ David M. Aafedt*
                                                      David M. Aafedt, #27561X
                                                      Joseph M. Windler, #0387758
                                                      225 South Sixth Street, Suite 3500
                                                      Minneapolis, Minnesota 55402
                                                      (612) 604-6400
                                                      daafedt@winthrop.com
                                                      jwindler@winthrop.com

02-CV-17-3488

Filed in District Court
State of Minnesota
2/21/2019 10:59 AM

COOLEY LLP
Douglas P. Lobel (*pro hac vice*)
David A. Vogel (*pro hac vice*)
Dana J. Moss (*pro hac vice*)
One Freedom Square
11951 Freedom Drive
Reston, Virginia 20190-5656
(703) 456-8000
dlobel@cooley.com
dvogel@cooley.com
dmoss@cooley.com

*Attorneys for Defendants*

198087181