**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to: | |
| Civil Action No. 18-296 (MJD/KMM) | |

**DEFENDANTS' ANSWER TO**
**CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

GENERAL RESPONSES ...........................................................................................1

RESPONSES TO SPECIFIC ALLEGATIONS ........................................................2

I.  PRELIMINARY STATEMENT .......................................................................3

II.  JURISIDCTION AND VENUE .....................................................................12

III.  PARTIES .......................................................................................................13

    A.  Plaintiffs ............................................................................................13

    B.  Defendants ..........................................................................................14

IV.  FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD ....18

    A.  CenturyLink Touts Revenue Growth Through Acquisitions And Its Purportedly Superior Customer Service And Marketing Practices ...........................................19

        1.  CenturyLink Represented That It Met and Exceeded Regulators' Customer Service Standards And That Risks Of Non-Compliance With Those Standards Were Merely Hypothetical .......................................................22

        2.  CenturyLink Told Investors that Its Results Were Driven By Its "Honest and Personal Service," Superior "Customer Experience" and Strategic "Bundling" Strategy ...............................................................................29

    B.  CenturyLink's Revenues Were Secretly Driven By An Institutionalized Company-Wide Sales Cramming Apparatus ........................................................34

        1.  CenturyLink's Senior Management Imposed "Ridiculous" Sales Quotas That Could Not Be Met Without Engaging In Deception ........................36

        2.  CenturyLink Strictly Enforced Senior Management's Excessive Sales Quotas By Disciplining and Terminating Employees Who Did Not Meet Them .................................................................................................38

        3.  CenturyLink Managers Instructed Employees on the Deceptive Sales Pitches that Sales Representatives Would Use to Cram ...........................41

        4.  CenturyLink Secretly Transformed Its "Customer Service" Department Into A Sales and Revenue Retention Operation ........................................41

        5.  CenturyLink's Enforcement of Unobtainable Sales Quotas Led to Rampant Cramming ...........................................................................43

i

6.     CenturyLink Documented Instances of Cramming and Reported Them to the Executive Defendants ..........................................................46

C.     CenturyLink's Senior Management Recognized the Unsustainability of the Company's Boiler Room Sales Practices and Secretly Attempted to Address Them ..........................................................................................................51

D.     The SEC Questions CenturyLink About Its Consumer Segment Disclosures and the Company's Compliance With Item 303 ..........................................57

E.     A CenturyLink Director Loudly Resigns, Warning that His Removal and Defendant Post's Conduct Raised "Serious Governance, Transparency and Honesty Issues" ..................................................................................59

F.     The Arizona Attorney General Investigates and Accuses CenturyLink of Fraudulent and Deceptive Conduct, Which CenturyLink "Expressly Denies" .....62

G.     CenturyLink Distinguishes Its Sales and Marketing Practices as Honest and Legitimate, Criticizing Competitors for Boosting Revenues By "Adding Fees" ..66

H.     CenturyLink's Cramming Practices Continue Unabated While the Minnesota Attorney General Issues A Civil Investigative Demand and A Whistleblower Urges Defendant Post to Address the Fraud ..........................................67

I.     CenturyLink Continues to Falsely Deny and Downplay Reports of Sales Misconduct ............................................................................................70

V.    THE TRUTH REGARDING CENTURYLINK'S BOILER ROOM PRACTICES IS REVEALED IN A SERIES OF CORRECTIVE DISCLOSURES ..................................73

A.     A Whistleblower Exposes CenturyLink's Wells Fargo-Like Scheme .................73

B.     The Minnesota Attorney General Details CenturyLink's Fraudulent Sales Practices ............................................................................................78

VI.   POST-CLASS PERIOD EVENTS ..................................................................84

VII.  SCIENTER ............................................................................................89

VIII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................96

A.     Materially False And Misleading Statements And Omissions Concerning CenturyLink's Business Strategies and Financial Performance ..........................97

1.     False and Misleading Statements Concerning CenturyLink's Purported Focus on Customer "Needs" ..........................................98

2.     False And Misleading Statements Concerning CenturyLink's Reported Revenues ..........................................................................103

3.      False And Misleading Statements Concerning CenturyLink's Service "Bundling" Strategies ............................................................105

4.      False And Misleading Statements Concerning CenturyLink's Pricing and Discounting Strategies and the Demand for and Quality of CenturyLink's Offerings ...........................................................................108

B.      False And Misleading Statements Covering Up Defendants' Secret Attempt to Address the Company's Cramming Crisis ...........................................111

1.      False And Misleading Statements Concerning Defendants' "Pivot" and Revenue Rebound Based on A Purported Shift in Strategy to Focus on High ARPU Customers ...........................................................114

C.      Materially False And Misleading Statements And Omissions Concerning CenturyLink's Purported Business Integrity, Legal Compliance, and Honesty In Sales Practices.................................................................123

D.      Materially False And Misleading Statements And Omissions Concerning CenturyLink's Regulatory Risks.................................................132

E.      False and Misleading Omissions In CenturyLink's SEC Filings ........................135

IX.     LOSS CAUSATION.....................................................................137

X.      CLASS ACTION ALLEGATIONS .......................................................139

XI.     PRESUMPTION OF RELIANCE ........................................................141

XII.    NO SAFE HARBOR ....................................................................143

XIII.   CAUSES OF ACTION .................................................................143

COUNT I
FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 PROMULGATED THEREUNDER
(Against Defendants CenturyLink, Post, Ewing, Cole, Puckett And Douglas)..............143

COUNT II
FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
(Against Defendants Post, Ewing, Cole, Puckett, Douglas And  Bailey).......................148

XIV.    PRAYER FOR RELIEF ................................................................151

XV.     JURY DEMAND.......................................................................151

AFFIRMATIVE DEFENSES...................................................................152

Defendants, by and through their undersigned attorneys, hereby answer and respond to the Consolidated Securities Class Action Complaint (the "Complaint"), dated June 25, 2018 (the "Complaint").

## GENERAL RESPONSES

**First General Response:**  Except as otherwise expressly stated herein, Defendants generally deny each and every allegation in the Complaint, including, without limitation, any allegations in the table of contents, preamble, introduction, headings, subheadings, unnumbered paragraphs and footnotes of the Complaint.

**Second General Response:**  Defendants generally deny any liability to any putative class members that Plaintiffs purport to represent.

**Third General Response:**  Defendants generally deny any defined terms in the Complaint to the extent they constitute allegations directed at Defendants.  Notwithstanding the foregoing, Defendants adopt the defined terms as defined in the Complaint solely for the purpose of this Answer.

**Fourth General Response:**  Defendants generally lack knowledge or sufficient information to form a belief as to the truth of allegations concerning the statements or opinions of unidentified purported former CenturyLink employees and, on that basis, deny those allegations.

**Fifth General Response:**  The Executive Defendants lack knowledge or sufficient information to form a belief as to the truth of any allegations concerning actions or statements made prior to or after their respective terms of employment at CenturyLink.  Accordingly, (a) Defendant Puckett lacks knowledge or sufficient information to form a belief as to the truth of any allegations concerning actions or statements after June 2, 2015; (b) Defendant Douglas lacks knowledge or sufficient information to form a belief as to the truth of any allegations concerning

actions or statements prior to February 2016 and/or after June 2017; (c) Defendant Ewing lacks

knowledge or sufficient information to form a belief as to the truth of any allegations concerning

statements or actions after November 1, 2017; and (d) Defendant Cole lacks knowledge or

sufficient information to form a belief as to the truth of any allegations concerning actions or

statements after April 8, 2018.

**Sixth General Response:**  Defendants reserve the right to challenge the authenticity of

all sources and documents referred to or purportedly quoted from in the Complaint, and to assert

that any of the sources or documents referred to or purportedly quoted from by Plaintiffs in the

Complaint are covered by the attorney-client privilege, the work product doctrine, and/or

otherwise applicable privileges.

**Seventh General Response:**  Defendants reserve the right to seek to amend or

supplement their Answer as may be necessary or appropriate.

**Eighth General Response:**  In each allegation where Plaintiffs have quoted,

summarized, or characterized a portion of a document, Defendants do not admit that the

underlying document completely and accurately describes the subject matter addressed therein

and respectfully refer the Court to any such document in its entirety for a true and complete

account of its contents.

## RESPONSES TO SPECIFIC ALLEGATIONS

**PREAMBLE:**  Lead Plaintiff the State of Oregon by and through the Oregon State
Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public
Employee Retirement Fund ("Oregon") and named plaintiff Fernando Alberto Vildosola, as
trustee for the AUFV Trust U/A/D 02/19/2009 ("Vildosola," and collectively with Lead Plaintiff,
"Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by
their undersigned attorneys, allege the following against CenturyLink, Inc. ("CenturyLink" or the
"Company") and the Executive Defendants (defined below), upon personal knowledge as to
themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief as to allegations concerning matters other than
themselves and their own acts is based upon the investigation conducted by and through counsel,

which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning CenturyLink and the Executive Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by CenturyLink with the U.S. Securities and Exchange Commission ("SEC"), the Federal Communications Commission ("FCC"), and other governmental bodies, including state public utility commissions; (iv) publicly filed documents and discovery from the Minnesota Attorney General's investigation into CenturyLink; (v) CenturyLink's corporate website; (vi) interviews with former CenturyLink employees; (vii) information and documents obtained through requests made under the Freedom of Information Act ("FOIA") and similar state open records laws, including from the FCC, numerous state Attorneys General and other governmental bodies; and (viii) other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiffs bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who purchased, or otherwise acquired, the securities of the Company from March 1, 2013 to July 12, 2017, inclusive (the "Class Period"), subject to certain exclusions addressed below (the "Class"). Defendants in this action are: CenturyLink; Glen F. Post, III ("Post"), CenturyLink's former CEO; R. Stewart Ewing, Jr. ("Ewing"), CenturyLink's former CFO; David D. Cole ("Cole"), CenturyLink's former Executive Vice President and Controller, Karen Puckett ("Puckett"), CenturyLink's former Global Head of Sales; Dean J. Douglas ("Douglas"), former President, Sales and Marketing; and G. Clay Bailey ("Bailey"), former Senior Vice President and Treasurer.  Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

**Response to Preamble:**  The preamble to the Complaint contains Plaintiffs' characterization of their claims, the putative class, and proposed Class Period, plaint, as well as legal conclusions, and therefore no response is required.  To the extent a response is required, Defendants admit that the preamble identifies the lead and named Plaintiffs and the Defendants to this Action.  With respect to the remaining allegations in the preamble, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

## I.    PRELIMINARY STATEMENT

1.    This case arises out of CenturyLink's years-long practice of routinely and systematically misquoting prices and improperly billing customers for services they did not request.  This illegal practice, termed "cramming," was so endemic and institutionalized at

CenturyLink that, according to an internal CenturyLink audit, the Company potentially <u>overbilled 3.5 million customers</u> – a number representing <u>over half</u> of CenturyLink's 5.9 million broadband subscribers and <u>one-third</u> of its 12 million wireline subscribers.

1.      Defendants deny the allegations in paragraph 1.

2.      The Company's systemic overbilling was condoned and encouraged by the Company's senior leadership, which depended upon these corrupt practices to meet the financial projections Defendants provided to Wall Street. Naturally, the fact that the Company overbilled half of its customers had a material financial impact on the Company's reported financial results. But CenturyLink never once disclosed that the Company's reported revenues could be called into question, let alone suggest any hint of wrongdoing.

2.      Defendants deny the allegations in paragraph 2.

3.      To the contrary, during the Class Period, Defendants told investors that the Company's sales practices were beyond reproach, and publicly committed that CenturyLink would never "<u>place or record an order for our products and services for a customer without that customer's authorization</u>." Instead, Defendants falsely attributed CenturyLink's substantial revenue and subscriber growth in its consumer and small business segments to the Company's focus on "customer needs" and its "customer first" sales approach, competitive "bundling" marketing strategy, and strict adherence to the Company's Unifying Principles: "fairness, honesty and integrity." These and similar representations were critical to investors, and gave them confidence that the Company would weather the declines in the Company's long distance wireline services, effectively compete with cable operators to sell broadband high speed internet and television services, and continue to generate dependable and sustainable cash flows.

3.      To the extent the allegations of paragraph 3 purport to quote, summarize, or characterize a document, which Plaintiffs have not identified, containing statements made by any Defendant, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 3 differ in any way from the contents of that document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 3.

4.      Unfortunately for investors, these representations were entirely at odds with reality. Contrary to Defendants' representations, CenturyLink:

- routinely added services to customers' accounts without authorization, which would result in customers being charged for services they did not need, request or approve;

- routinely and repeatedly lied to customers about the prices they would be charged, including by misrepresenting the terms and conditions required to obtain promotional discounts, the duration of discounted prices and other contract terms, and penalties for cancellation;

- systematically misquoted the prices of customer contracts by failing to disclose that "bundled" and other multiple service packages included fees for optional services that the customer did not need or authorize – a sales pitch developed by CenturyLink management, taught to sales trainees, and promoted at monthly sales meetings; and

- concealed other highly material contract terms and misled customers concerning significant limitations on their service including the suitability or availability of particular services (such as the available speed of broadband), the existence of "early termination fees," and other material terms.

4.     Defendants deny the allegations in paragraph 4.

5.     These deceptive practices were documented in the Company's computer systems, reviewed by the Company's quality assurance analysts, recorded in scores of employee termination and disciplinary investigations and proceedings, and detailed in internal audits and reports reviewed by senior management.  <u>Indeed, CenturyLink potentially overbilled up to half of its subscribers.</u>  Such widespread cramming did not escape the attention of the Company's senior management.

5.     Defendants deny the allegations in paragraph 5.

6.     In fact, the Company's senior leadership directly and purposefully encouraged this behavior by imposing unachievable sales quotas on sales employees.  In the words of former CenturyLink employees, the Company's sales quotas – which were dictated by the Executive Defendants and based on the revenue projections they approved were "insane," so "ridiculously high you had to cheat to get your numbers" and "impossible to meet unless you were engaged in shady practices."  The Company's senior management closely monitored and enforced strict compliance with these quotas, and terminated sales employees who did not meet them.  That punishment was meted out even though, during a significant portion of the Class Period, it meant that over half of all sales employees were disciplined for failing to meet CenturyLink's quotas.

6.     Defendants deny the allegations in the first sentence of paragraph 6.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the second sentence of paragraph 6 and, therefore, deny them.  With respect to the remaining allegations in paragraph 6, Defendants lack knowledge or sufficient information to form a belief

as to the truth of those allegations and deny that they provide a complete and accurate description

of the subject matter described therein and, on that basis, deny each of them.

7.      As explained by numerous former employees, however, at CenturyLink, the "numbers are the numbers," and the Company refused to adjust quotas despite the fact that they could not be met without engaging in fraud. At the same time, employees who exceeded sales goals were rewarded with cash bonuses and recognized as honorees in the Company's "Circle of Excellence" program – even if those sales were achieved through deceptive means. In fact, as reported by former CenturyLink employees, "Circle of Excellence" honorees were often the very same employees who were engaged in deceptive practices and cited for illegal cramming.

7.      Defendants lack knowledge or sufficient information to form a belief as to the truth

of the allegations regarding the statements of former CenturyLink employees in paragraph 7 and,

therefore, deny them. Defendants deny each and every remaining allegation in paragraph 7.

8.      The cramming culture at CenturyLink was such an ingrained and endemic part of the Company's business that, during the Class Period, the Executive Defendants internally acknowledged the problem and secretly took significant steps to address it. For example, in April 2014, Defendant Bailey – who worked "directly" for Defendant Post in dealing with the Company's billing systems and call centers – acknowledged that cramming was occurring on a significant scale, and agreed that "[w]e've got to do something about our call centers." Shortly thereafter, Defendant Post sent out an internal Company email announcing that Defendant Bailey would be responsible for business ethics and how the Company deals with customers.

8.      Defendants deny that a "cramming culture" existed at CenturyLink and deny

Plaintiffs' characterization of CenturyLink. Defendants admit that on May 14, 2015 Post sent an

email describing Bailey's new position at CenturyLink. To the extent the allegations in paragraph

8 purport to quote, summarize, or characterize that email or another document, which Plaintiffs

have not identified, Defendants refer the Court to the contents of those documents. To the extent

the allegations in paragraph 8 differ in any way from the contents of those documents, Defendants

deny every such allegation. Except as expressly admitted herein, Defendants deny each and every

allegation in paragraph 8.

9.      Next, just months later, CenturyLink implemented a significant change to the Company's sales employee performance assessment model specifically in order to address the Company's unethical sales practices. Although the new method was an initial success – with customer complaints and terminations for unethical behavior declining significantly – it was soon

followed by a decline in sales. Unwilling to tolerate any drop in revenues, CenturyLink's senior management reverted back to strict quota-enforcement almost immediately. At the same time, the Executive Defendants continued to receive and review monthly reports detailing the thousands of customer and regulator "cramming" and billing complaints which confirmed the scope and seriousness of the fraud.

9.      Defendants deny the allegations in paragraph 9.

10.     Instead of disclosing the truth – that CenturyLink's cramming practices were a material driver of the Company's revenues, and that efforts to address them had led to a sharp decline in sales – Defendants concocted a false story to explain the Company's fluctuating financial results. In fact, at the same time, the SEC directly questioned the Company about the adequacy of its disclosures concerning the performance of the consumer segment and the Company flatly denied any material information was omitted – despite the fact that the Company had turned its entire sales operation upside down, and back again, because its revenues were so drastically impacted by illegal billing.

10.     Defendants admit that CenturyLink received letters from the SEC in August and September 2015 requesting more information about CenturyLink's reported financial statements and responded to those letters. Defendants deny that the allegations in paragraph 10 provide a complete and accurate description of the subject matter of that correspondence. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 10.

11.     Unwilling to report a continued slowdown in sales, CenturyLink returned to form, and the Company's billing misconduct again continued to drive customer complaints and began to attract the attention of the news media and regulators. But even as complaints and state regulator and news media investigations mounted, the Company refused fix its broken sales culture, failed to disclose the widespread fraud and related investigations, and affirmatively denied allegations of improper sales practices.

11.     Defendants deny the allegations in paragraph 11.

12.     For example, in April 2016, CenturyLink quietly settled an investigation into its billing practices by the Arizona Attorney General, agreeing to a nominal $150,000 payment while "expressly" denying each and every one of the regulator's allegations. And although CenturyLink agreed to adopt changes to prevent further cramming, the Company swiftly disregarded the measures it promised the Arizona Attorney General it would follow.

12.     Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General in April 2016, in which it agreed to make a $150,000 payment and generally denied the Arizona Attorney General's allegations. To the extent that the allegations

of paragraph 12 purport to quote, summarize, or characterize the settlement agreement and its terms, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 12 differ in any way from the contents of the settlement agreement, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 12.

13.    In May 2016, just a month later, the Minnesota Attorney General served CenturyLink with a civil investigative demand following scores of complaints by Minnesota customers. While Defendant Post would later attempt to take personal credit for "cooperating with the AG's office since the inquiry began," Minnesota Attorney General Lori Swanson made clear that CenturyLink did everything in its power to quash the investigation and keep CenturyLink's billing practices a secret. For example, when responding to General Swanson's discovery requests, CenturyLink falsely denied documents existed – but when the Attorney General subpoenaed CenturyLink's vendors, they "promptly" produced the documents CenturyLink claimed did not exist. CenturyLink's response to the Minnesota Attorney General was consistent with how it handled the Arizona Attorney General and other state regulator investigations into the Company – the Company tried to get by with only paying a nominal fine and agreeing to cosmetic changes, but never actually intended to reform its practices. As explained by one former employee, CenturyLink's senior management would rather "pay the fines" than "kowtow" to a state Attorney General.

13.    Defendants admit that, in May 2016, the Minnesota Attorney General served CenturyLink with a civil investigative demand. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the last sentence of paragraph 13 and, therefore, deny them. To the extent that the remaining allegations of paragraph 13 purport to quote, summarize, or characterize a document, which Plaintiffs have not identified, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 13 differ in any way from the contents of the document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 13.

14.    Several months later, as a similar scandal involving the unauthorized opening of customer accounts at Wells Fargo began to make headlines, a CenturyLink whistleblower, Heidi Heiser, brought her concerns over the cramming she witnessed directly to the attention of CenturyLink's CEO, Defendant Post. Specifically, in an online town hall meeting in October 2016, during which Company employees had the opportunity to post questions to an online message board for review by Defendant Post, Heiser asked the CEO "why customers were being

given multiple accounts and being billed for things they did not ask for" – again alerting CenturyLink's senior-most executives to the practices they had previously attempted to address. Consistent with the manner in which the Company treated other employees who challenged CenturyLink's practices, the whistleblower's post was promptly removed, and she was terminated just two days later.

14.    CenturyLink admits that Heidi Heiser was formerly employed at CenturyLink and was terminated in October 2016.  CenturyLink denies that Heiser posed a question on a message board for review by CenturyLink executives in October 2016.  Defendant Post denies ever having reviewed a question posed by Heiser.   Defendants otherwise lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 14 and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

15.    As CenturyLink sought to scuttle the Minnesota Attorney General's investigation and fired employees who challenged the Company's sales culture, the Executive Defendants doubled down on their false portrayal of CenturyLink's "customer first" approach.  For example, in a May 2016 investor conference call, the Executive Defendants sought to distinguish the Company from CenturyLink's competitors, representing that – unlike other providers – CenturyLink did <u>not</u> "add[] a lot of fees" to customers' bills.  At the same time, the Company continued to tout its "honest and personal service" and pointed investors to its Code of Conduct, in which CenturyLink promised it would not "misstate facts or mislead consumers through Company advertisements or promotions," "engage in unethical or deceptive sales practices," or "<u>place or record an order for our products and services for a customer without that customer's authorization</u>."

15.    Defendants admit that CenturyLink held an investor conference call on or about May 2016.  To the extent that the allegations of paragraph 15 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 15 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 15.

16.    The truth concerning the Company's fraudulent practices began to be revealed on June 16, 2017, when *Bloomberg* published a story revealing that a CenturyLink whistleblower, Heiser, was fired after raising her concerns about the Company's fraudulent business practices

with Defendant Post. That article, titled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme," addressed Heiser's account of CenturyLink's practice of charging customers for services they did not request, the striking parallels to the Wells Fargo scandal, and the fact that these practices had led to "many millions" of dollars in improperly recorded revenues. As a result of these revelations, the Company's stock declined significantly on extraordinarily heavy volume.

16.     Defendants admit that *Bloomberg* published an article on June 16, 2017, titled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme." To the extent that the allegations of paragraph 16 purport to quote, summarize, or characterize the article, Defendants refer the Court to the contents of that article. To the extent the allegations in paragraph 16 differ in any way from the contents of the article, Defendants deny every such allegation. To the extent Plaintiffs purport to describe the price of CenturyLink's stock or volume of trading on certain dates, it is a matter of public record. Defendants deny that the allegations in paragraph 16 accurately and completely describe the factors affecting stock price movements described therein. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 16.

17.     The next trading day, on June 19, 2017, CenturyLink's securities continued to decline after additional reports of consumer class actions filed in the following days alleging systemic billing misconduct in numerous states across the country.

17.     To the extent Plaintiffs purport to summarize or characterize unspecified reports or complaints, Defendants deny that the allegations of paragraph 17 provide an accurate and complete description of the subject matter described therein and refer the Court to the contents of those documents. To the extent the allegations in paragraph 17 differ in any way from the contents of those documents, Defendants deny every such allegation. To the extent Plaintiffs purport to describe the price of CenturyLink's stock on certain dates, it is a matter of public record. Defendants deny that the allegations in paragraph 17 accurately and completely describe the factors affecting stock price movements described therein. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 17.

18.     Then, on July 12, 2017, the Minnesota Attorney General announced that it had filed a lawsuit against CenturyLink alleging violations of state consumer protection laws after a year-long investigation.  As detailed in news reports, the Minnesota Attorney General's complaint, which was posted on its website, provided extensive detail as to how the Company defrauded Minnesota consumers by refusing to honor the prices they were quoted.  Among other things, the complaint cited internal Company employee emails and call recordings detailing that "maybe 1 out of 5 [customers] are quoted correctly or close enough."  The details provided in the Minnesota Attorney General's complaint also further revealed the financial impact of the Company's fraudulent practices – documenting scores of instances where customers were charged hundreds of dollars more than they should have been.

18.     Defendants admit that on July 12, 2017, the Minnesota Attorney General announced that it had filed a lawsuit against CenturyLink.  To the extent that the allegations of paragraph 18 purport to quote, summarize, or characterize the Minnesota Attorney General complaint, website publications, or other news reports, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 18 differ in any way from the contents of the documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 18.

19.     Analysts reacted sharply to the news, and downgraded their ratings on the Company's stock. CenturyLink's stock declined immediately in a statistically significant manner on extraordinarily high volume, causing substantial investor losses.

19.     To the extent that the allegations of paragraph 19 purport to quote, summarize, or characterize analyst reports or other documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 19 differ in any way from the contents of the documents, Defendants deny every such allegation.  To the extent Plaintiffs purport to describe the price of CenturyLink's stock or trading volume on certain dates, it is a matter of public record.  Defendants deny that the allegations in paragraph 19 accurately and completely describe the factors affecting stock price movements described therein. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 19.

20.    CenturyLink's illegal billing practices are now the subject of investigations by state Attorneys General around the country, the Company has been forced to adopt changes to address the cramming practices that undergirded the Company's reported growth, and CenturyLink's revenues have stagnated as a result.  Indeed, the Company's stock price is currently trading at approximately $18.00 per share, or less than half of its Class Period high.

20.    To the extent Plaintiffs purport to describe the price of CenturyLink's stock or its reported financial results on certain dates, those are matters of public record.  Defendants admit that CenturyLink has received and responded to information requests and inquiries from some states.  Defendants deny that the allegations in paragraph 20 accurately and completely describe the factors affecting stock price movements and financial results described therein.  With respect to the remaining allegations in paragraph 20, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

21.    Through this action, Plaintiffs and other CenturyLink investors seek to hold the Company and the Executive Defendants accountable for this misconduct, and recover the significant losses caused by their fraud.

21.    Paragraph 21 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein.

## II.    JURISIDCTION AND VENUE

22.    This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, § 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

22.    Paragraph 22 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein.

23.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

23.    Paragraph 23 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein.

24.     Venue is proper in this District under Section 17 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c) because the Company has significant operations in this District and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination of the materially false and misleading statements set forth herein, occurred in this District.

24.     Paragraph 24 asserts legal conclusions to which no response is required; to the

extent a response is required, Defendants deny the allegations therein.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

25.     Defendants deny the allegations in paragraph 25.

### III.     PARTIES

#### A.     Plaintiffs

26.     Lead Plaintiff State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") operates and oversees public funds for the benefit of retired public employees. The Oregon Public Employee Retirement Fund is a state pension fund for retired public employees overseeing $77 billion in assets under management as of April 30, 2018. As reflected in its certification filed herewith, Oregon purchased CenturyLink securities during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

26.     Defendants deny that Lead Plaintiff Oregon has suffered any damages based on the

allegations in the Complaint.  Defendants otherwise lack knowledge or sufficient information to

form a belief as to the truth of the allegations in the remainder of paragraph 26 and, therefore, deny

them.

27.     Named Plaintiff Vildosola purchased CenturyLink securities during the Class Period. Fernando Alberto Vildosola resides in the State of California and is trustee for AUFV Trust U/A/D 02/19/2009.  As reflected on the certification filed herewith, AUFV Trust U/A/D 02/19/2009 purchased CenturyLink's 7.60% Senior Notes due September 15, 2039 (the "7.60% Senior Notes") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

27.     Defendants deny that Named Plaintiff Vildosola suffered any damages based on the

allegations in the Complaint.  Defendants otherwise lack knowledge or sufficient information to

form a belief as to the truth of the allegations in the remainder of paragraph 27 and, therefore, deny them.

**B.    Defendants**

28.    Defendant CenturyLink is a Louisiana corporation headquartered at 100 CenturyLink Drive, Monroe, Louisiana 71203. CenturyLink's common stock trades on the New York Stock Exchange under the symbol "CTL."

28.    Defendants admit the allegations in paragraph 28.

29.    Defendant Post was at all relevant times the CEO, President, and a director of CenturyLink.  During the Class Period, CenturyLink announced that Defendant Post would be succeeded in his role as CEO of CenturyLink on January 1, 2019, or about 15 months after the Company's then-pending merger with Level 3 Communications, Inc. ("Level 3") was expected to close.  Then, on March 9, 2018, after the end of the Class Period, and just several weeks after CenturyLink disclosed the results of its internal investigation into the misconduct at issue in this case, the Company announced that Defendant Post would in fact be leaving far sooner – on May 23, 2018, following the Company's 2018 Annual Shareholders' Meeting.

29.    Defendants admit that Post was CenturyLink's CEO during the proposed Class Period.  Defendants admit that CenturyLink closed its merger with Level 3 Communications, Inc. on November 1, 2017.  Defendants admit that on, June 1, 2017, CenturyLink announced that Post planned to step down from his role as CEO on January 1, 2019.  Defendants further admit that, on March 6, 2018, CenturyLink announced that Defendant Post would step down as CEO on May 23, 2018, and that the Company held its 2018 Annual Shareholder Meeting on May 22, 2018.  To the extent the allegations in paragraph 29 purport to quote, summarize, or characterize a document, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 29 differ in any way from the contents of the document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 29.

30.    Defendant Ewing was, at all relevant times, the CFO and Executive Vice President of CenturyLink. Ewing resigned his post shortly after CenturyLink closed its acquisition of Level 3 on November 1, 2017.

30.     Defendants admit that Ewing was CenturyLink's CFO during the proposed Class Period and that he resigned as CFO on November 1, 2017. Defendants further admit that CenturyLink closed its acquisition of Level 3 on November 1, 2017. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 30.

31.     Defendant Cole was at all relevant times Executive Vice President and Controller of CenturyLink, and served as the Company's principal accounting officer during the Class Period. On March 27, 2018, Cole informed the Company of his decision to step down from the Company effective April 8, 2018.

31.     Defendants admit that Cole was the Executive Vice President and Controller of CenturyLink during the proposed Class Period, and that he announced his decision to step down from that role on March 27, 2018, effective April 8, 2018. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 31.

32.     Defendant Puckett spent 15 years at CenturyLink until the Company unexpectedly announced her departure on June 2, 2015. From 2009 through October 2014, Puckett served as CenturyLink's Executive Vice President and COO. From November 2014 until she left the Company in August 2015, she served as CenturyLink's President of Global Markets. During the Class Period, Puckett was the highest ranking executive with direct oversight of the consumer segment sales division. In the June 2, 2015 announcement describing her departure, which came just four months after she was promoted to global head of sales, Post said that "Karen and I have mutually arrived at a conclusion that, after 15 years of hard work and extensive contributions, she will retire from the company." Puckett forfeited over $2.2 million worth of CenturyLink stock upon termination of her employment.

32.     Defendants admit that Puckett was employed at CenturyLink for 15 years, that she served as CenturyLink's Executive Vice President from 2009 to October 2014 and as CenturyLink's President of Global Markets from November 2014 to June 2015, and that she received her last paycheck from CenturyLink in August 2015. Defendants further admit that on June 2, 2015 CenturyLink announced Puckett's departure in a press release titled "CenturyLink announces retirement of Karen Puckett, CenturyLink's President of Global Markets." To the extent that the allegations of paragraph 32 purport to quote, summarize, or characterize the press release, Defendants refer the Court to the contents of that document. To the extent the allegations

in paragraph 32 differ in any way from the contents of the press release, Defendants deny every such allegation. Puckett's CenturyLink compensation and equity holdings were described in relevant SEC filings during the proposed Class Period and are a matter of public record. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the last sentence of paragraph 32 and, therefore, deny them. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 32.

33.     Defendant Douglas took over Puckett's role. He began his employment at CenturyLink as President, Sales and Marketing in February 2016, and was later named President, Enterprise Markets. On April 28, 2017 CenturyLink disclosed that Douglas would be a member of the "senior leadership" team reporting to Post after the Level 3 merger closed and, on June 1, 2017, confirmed certain executive compensation that Douglas would receive in connection with that role in a Form 8-K filed with the SEC. However, less than two months later, following the disclosures of the Company's widespread cramming practices alleged herein, on June 22, 2017, CenturyLink disclosed that Douglas had "decided to leave the company at the close of the Level 3 transaction." In doing so, Douglas forfeited over $2 million in compensation.

33.     Defendants admit that Defendant Douglas began his employment at CenturyLink as President, Sales and Marketing in February 2016 and was later named President, Enterprise Markets. Defendants admit that CenturyLink issued an 8-K on April 28, 2017, which described Douglas's expected role at CenturyLink. Defendants further admit that CenturyLink issued another press release on June 22, 2017, which announced Douglas's planned departure from CenturyLink. To the extent that the allegations of paragraph 33 purport to quote, summarize, or characterize those documents, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 33 differ in any way from the contents of those documents, Defendants deny every such allegation. Douglas's CenturyLink compensation and equity holdings were described in relevant SEC filings during the proposed Class Period and are a matter of public record. Defendants otherwise lack knowledge or sufficient information to form a belief as to the truth of the allegations in the last sentence of paragraph 33 and, therefore, deny them. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 33.

34.     Defendant Bailey held numerous positions during his 25-year career at CenturyLink.  During the Class Period, Bailey served as the Company's Senior Vice President and Treasurer and, as such, had significant involvement in the Company's financial affairs and, under the Company's bylaws, had general custody of all of the funds and securities of the Company and authority to sign all bills of exchange or promissory notes of the Company.  In 2014, Defendant Bailey served as CenturyLink's Senior Vice President of Operations with oversight over "all [CenturyLink's] region operations."  In 2015, Defendant Post asked Bailey to serve as "Senior Vice President of Operations Transformation."  As described by Defendant Post, in that role, Defendant Bailey oversaw a team "devoted to…bringing really a better customer experience at every touch point for our customers."  Defendant Ewing explained that, in this position, "Clay basically works directly for [Defendant Post], and he's in charge of really taking a look at all of our processes to see how we can streamline our processes to enable us to be easier to do business with from a customer perspective."  During the Class Period, Defendant Bailey served as a spokesperson for the Company, including in investor conference calls and presentations.  Previously, Defendant Baily served as the lead of the Company's Regulatory and Legislative teams at both the state and federal levels, and served as a spokesperson for the Company in its interactions with regulators.

34.     Defendants admit that Bailey has been employed at CenturyLink for more than 25 years and previously served as CenturyLink's Senior Vice President and Treasurer, as CenturyLink's Senior Vice President of Regional Operations, and that he also previously led CenturyLink's regulatory and legislative teams.  Defendants further admit that, in 2015, Bailey was named CenturyLink's Senior Vice President of Transformation.  Defendants further admit that Bailey sometimes spoke during CenturyLink conference calls with investors.  To the extent the allegations in paragraph 34 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 34 differ in any way from the contents of the document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 34.

35.     The Defendants referenced above in ¶¶29-34 are collectively referred to herein as the "Executive Defendants."  The Executive Defendants, because of their high- ranking positions and direct involvement in the everyday business of CenturyLink and its subsidiaries, directly participated in the management of CenturyLink's operations, including its public reporting functions, had the ability to, and did control, CenturyLink's conduct, and were privy to confidential information concerning CenturyLink and its business, operations and financial statements, as alleged herein.

35.     The first sentence of paragraph 35 does not contain factual allegations and, therefore, does not require a response.  With respect to the remaining allegations in paragraph 35, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

36.     CenturyLink and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

36.     Paragraph 36 contains factual allegations which do not require a response. To the extent that paragraph 36 contains factual matters, Defendants deny the allegations therein.

## IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD

37.     CenturyLink is the third largest telecommunications company in the United States, and provides a wide variety of telecommunication, internet and similar services to approximately 12 million customers.  The Company's main offerings include local and long-distance telephone services, broadband internet access, and video services.  Although CenturyLink changed its reporting segments at certain points during the Class period, the Company's consumer segment was, at all times, a major driver of the Company's financial success.  The consumer segment accounted for a third or more of the Company's revenues during the Class Period, or up to $6 billion or more annually, and was a central focus for CenturyLink's investors.

37.     Defendants lack knowledge or information sufficient information to form a belief as to the truth of the allegations concerning what revenue segments were a "central focus for CenturyLink's investors," and, therefore, deny them.  Defendants admit that, at times during the proposed Class Period, CenturyLink was the third largest telecommunications provider in the United States and served over ten million customers.  Defendants admit the remaining allegations in paragraph 37.

38.     Although it was not separately reported, CenturyLink's Small and Medium Business ("SMB") sales also served as a significant source of revenue for the Company.  Former Employee No. 1 ("FE-1"), who worked at CenturyLink for approximately 18 years, including as a Manager of Customer Care and Sales in the Southeastern United States until February 2018, estimated that the SMB business was approximately 20% of the size of the consumer segment, and employed the same, call-center based sales apparatus as the consumer segment.

38.    Defendants admit that CenturyLink's Small and Medium Business sales were not separately reported in SEC filings.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and, therefore, deny them.

### A.    CenturyLink Touts Revenue Growth Through Acquisitions And Its Purportedly Superior Customer Service And Marketing Practices

39.    Throughout the Class Period, CenturyLink touted its purportedly superior "customer-first" approach as a key distinguishing feature and a driver of the Company's success. Even before the Class Period, the Company told investors that this approach would enable the Company to succeed where its competitors had fallen short.

39.    Defendants admit that CenturyLink maintained a "customer-first" approach to service.  Defendants deny that the allegations in paragraph 39 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 39 purport to quote, summarize, or characterize a document, which Plaintiffs have not identified, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 39 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 39.

40.    Through a series of acquisitions, including the Company's $11.6 billion acquisition of Embarq in July 2009, its $24 billion acquisition of Qwest in April 2011, and its $2.5 billion acquisition of Savvis in July 2011, CenturyLink had grown to become the third largest telecommunications provider in the United States by the beginning of the Class Period.  During this period of extraordinary growth, the Company repeatedly told investors that its success would be based on providing a superior "customer experience" relative to its competitors.  Specifically, the Company told investors that CenturyLink would grow revenues and add subscribers through its superior "marketing strategy" and "customer care system," all while maintaining strict adherence to the Company's Unifying Principles, including "fairness, honesty and integrity." According to CenturyLink, these were the key "differentiators" that were the basis for the Company's success.  As CenturyLink claimed, "our employees keep our customers at the center of everything we do."

40.    Defendants admit that CenturyLink acquired: Embarq in July 2009 for approximately $11.6 billion, Qwest in April 2011 for approximately $24 billion, and Savvis in

July 2011 for approximately $2.5 billion. Defendants further admit that, at times during the

proposed Class Period, CenturyLink was the third largest telecommunications provider in the

United States. Defendants admit that CenturyLink has intended to provide superior customer

service to its customers but deny that the allegations in paragraph 40 provide a complete and

accurate description of the subject matter described therein. To the extent the allegations in

paragraph 40 purport to quote, summarize, or characterize documents, which Plaintiffs do not

identify, Defendants refer the Court to the contents of those documents. To the extent the

allegations in paragraph 40 differ in any way from the contents of those documents, Defendants

deny every such allegation. Except as expressly admitted herein, Defendants deny each and every

allegation in paragraph 40.

41. CenturyLink also told investors that its "customer first" business model would enable the Company to grow revenues in the markets where Embarq and Qwest had previously competed, but had fallen short. For example, Defendant Ewing, CenturyLink's CFO, told investors that CenturyLink would be able to leverage is superior "customer service and marketing efficiencies" to grow revenues in markets previously served by Embarq by changing "what they've been doing from a marketing standpoint and [using] the approach that we're using." Similarly, Defendant Post, CenturyLink's CEO, explained that the Company would "drive revenues and to create synergies in the Embarq areas" by deploying CenturyLink's IT and "billing systems, [which] we think [will] create a better customer experience and reduce costs significantly from a customer service standpoint." Immediately after the Embarq acquisition closed in July 2009, CenturyLink began to highlight the revenues the Company was generating from its superior marketing capabilities. For example, during the Company's November 5, 2009 third-quarter conference call, Defendant Post said this strategy was "going very well" and "already making a difference" due to the change to "local market focus." As Post explained:

> We have implemented our aggressive Broadband strategy and Embarq market in the third quarter. And among a number of things this effort included consumer promotional pricing for high-speed internet and the targeting of non-customers with our Pure Broadband products. It has proven very successful and obviously contributed to our Broadband customer growth during the quarter.

41. Defendants admit that CenturyLink maintained a "customer-first" approach to

service but deny that the allegations in paragraph 41 provide a complete and accurate description

of the subject matter described therein. To the extent the allegations in paragraph 41 purport to

quote, summarize, or characterize documents, which Plaintiffs have not identified, Defendants

refer the Court to the contents of those documents.  To the extent the allegations in paragraph 41

differ in any way from the contents of those documents, Defendants deny every such allegation.

Defendants further admit that CenturyLink hosted a conference call for investors on November 5,

2009.  To the extent the allegations in paragraph 41 purport to quote, summarize, or characterize

the transcript, Defendants refer the Court to the contents of that transcript.  To the extent the

allegations in paragraph 41 differ in any way from the contents of the transcript, Defendants deny

every such allegation.  Except as expressly admitted herein, Defendants deny each and every

allegation in paragraph 41.

42.    CenturyLink similarly told investors that adopting its sales and marketing approach in areas formerly served by Qwest enabled the Company to take back market share Qwest had previously ceded to competitors.  During a presentation at the UBS Global Media and Communications Conference on December 8, 2010, Defendant Ewing explained that CenturyLink would operate its newly-acquired Qwest division "the same way we operate legacy CenturyLink today."  As with Embarq, Defendants touted the Company's success in applying the CenturyLink approach to Qwest markets.  For example, during a September 13, 2012 investor call, Defendant CFO Ewing claimed "[w]e're seeing results in the Qwest markets from just the local model that we've implemented." Ewing claimed these results were due to the CenturyLink model, where managers are "responsible for serving our customers out there and really gathering the information that helps define the way we compete against the cable company in that market."

42.    Defendants admit that Defendant Ewing participated in a UBS Global Media

Communications Conference on December 8, 2010.  To the extent the allegations in paragraph 42

purport to quote, summarize, or characterize the transcript of that conference, Defendants refer the

Court to the contents of that transcript.  To the extent the allegations in paragraph 42 differ in any

way from the contents of the transcript, Defendants deny every such allegation.  Defendants further

admit that CenturyLink participated in a conference with investors on September 13, 2012.  To the

extent the allegations in paragraph 42 purport to quote, summarize, or characterize the transcript

of that conference call, Defendants refer the Court to the contents of that transcript.  To the extent

the allegations in paragraph 42 differ in any way from the contents of the transcript, Defendants

deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 42.

        **1.**        **CenturyLink Represented That It Met and Exceeded Regulators' Customer Service Standards And That Risks Of Non-Compliance With Those Standards Were Merely Hypothetical**

43.      CenturyLink carefully crafted a public image as an honest steward of its telecommunications infrastructure by repeatedly claiming that it met and exceeded the customer service standards and consumer protection laws governing its business.  During the Class Period, CenturyLink was subject to significant regulation by the Federal Communications Commission (the "FCC"), which regulates interstate communications, state utility commissions, which regulate intrastate communications, and other regulators that enforce rules to protect consumers and promote competition.

43.      The second sentence of paragraph 43 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein.  With respect to the remaining allegations in paragraph 43, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

44.      One critical set of regulations designed to protect consumers from unscrupulous sales and billing conduct targets a practice known as "cramming."  "Cramming" refers not only to the situation in which a customer is charged for a service he or she did not authorize or request, but also encompasses other improper practices in which customers are not properly informed of the terms or conditions of services.  For example, the FCC defines "cramming" as "placing unauthorized, misleading or deceptive charges on a consumer's telephone bill" or failing to "clearly or accurately describe all of the relevant charges when marketing a service."[1]  Many states and municipalities have enacted legislation specifically outlawing cramming that describe the practice similarly.[2]

---

[1]  Another illegal practice, "slamming," occurs when a service provider switches a consumer's traditional wireline telephone company for local, local toll, or long distance service without permission.  Given the similarity between the terms, even professionals in the telecommunications industry refer to "slamming" when they instead mean "cramming," and vice versa.  As used herein, both "cramming" and "slamming" refer to the practice of "cramming" unless otherwise noted.

[2]  For example, Wisconsin prohibits a service provider from initiating "any price increase or other subscription change without giving the consumer prior notice," and specifically targets

44.     The first sentence of paragraph 44 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein. To the extent the allegations in paragraph 44 purport to quote, summarize, or characterize those regulations or other documents, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 44 differ in any way from the contents of those documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 44.

45.     The illegal practice of cramming became a prominent concern of the public prior to the Class Period. In May 2010, Senator John D. Rockefeller IV, the then-Chair of the Senate Committee on Commerce, Science, and Transportation (the "Senate Committee"), opened an investigation to examine the extent of third-party cramming. That investigation culminated in a July 12, 2011 Senate Committee report that found, among other things, that AT&T, Verizon, and Qwest (which CenturyLink acquired in April 2011) had reaped more than $650 million from third-party billing.[3]

45.     Defendants admit that in May 2010, Senator John D. Rockefeller IV, the then-Chair of the Senate Committee on Commerce, Science, and Transportation (the "Senate Committee"), opened an investigation concerning third-party billing on landline telephone bills but deny that the allegations in paragraph 45 completely or accurately describe the subject matter described therein. Defendants further admit that the Senate Committee issued a report titled "Unauthorized Charges on Telephone Bills" on July 12, 2011 detailing its findings. To the extent the allegations in paragraph 45 purport to summarize or characterize the report, Defendants refer the Court to the contents of the report. To the extent the allegations in paragraph 45 differ in any way from the

---

notice concerning the "duration of the promotional offer" and the "terms that would apply after the promotional offer expired." Similarly, California Public Utilities Commission General Order 168 Part 4 provides that "[c]ramming occurs when an unauthorized charge is placed on a Subscriber's telephone bill," and defines an "unauthorized charge" as "any charge placed upon a Subscriber's telephone bill for a service or goods that the Subscriber did not agree to purchase, including any charges that resulted from false, misleading, or deceptive representation."

[3] U.S. Senate Committee on Commerce, Science, and Transportation, Staff Report on Unauthorized Third-Party Charges on Telephone Bills (July 12, 2011).

contents of the report, Defendants deny every such allegation.  Except as expressly admitted

herein, Defendants deny each and every allegation in paragraph 45.

46.    During the Senate Committee's investigation, CenturyLink sought to distance itself from third-party cramming and to assure regulators that its billing practices were appropriate.  For example, in an October 24, 2011 submission to the FCC addressing cramming, CenturyLink highlighted the purported integrity and rigor of the Company's processes relating to third-party billing.  Among other things, the Company told the FCC that it "monitors customer inquiries and complaints" about third-party billing and that the Company's "customer inquiry and complaint process focuses on customer satisfaction." According to the Company, "CenturyLink has a customer-friendly dispute resolution process to address complaints about alleged cramming."

46.    Defendants admit that CenturyLink submitted a document entitled "Comments of

CenturyLink to Notice of Proposed Rulemaking" to the FCC on October 24, 2011.  Defendants

further admit that CenturyLink consistently maintained that its billing practices were appropriate

but deny that the allegations in paragraph 46 provide a complete and accurate description of the

subject matter described therein.  To the extent the allegations in paragraph 46 purport to quote,

summarize, or characterize CenturyLink's FCC submission, Defendants refer the Court to the

contents of the submission.  To the extent the allegations in paragraph 46 differ in any way from

the contents of the submission, Defendants deny every such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 46.

47.    CenturyLink even sought to present itself as an industry leader in combatting cramming. In a March 21, 2012 letter to CenturyLink, U.S. Senator Amy Klobuchar (D- Minn.) asked that CenturyLink voluntarily agree to limit third-party billing, noting that doing so would represent a "significant step to cracking down on cramming." Senator Klobuchar told CenturyLink that "consumers shouldn't have to open their phone bills every month to find an endless array of ghost charges they never authorized" and urged him to "step up to the plate" and remove third-party billing for services outside CenturyLink's network. Recognizing the political and public relations benefits of taking that step – and that third-party (as opposed to direct service) billing was not a significant source of revenues to the Company – CenturyLink agreed to the change a week later.

47.    Defendants admit that, on March 21, 2012, Senator Amy Klobuchar (D- Minn.)

sent CenturyLink a letter, and that CenturyLink subsequently removed third-party billing for

services outside of CenturyLink's network.  To the extent the allegations in paragraph 47 purport

to quote, summarize, or characterize this correspondence, Defendants refer the Court to the contents of that correspondence. To the extent the allegations in paragraph 47 differ in any way from the contents of the document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 47.

48.    Thereafter, CenturyLink repeatedly highlighted its "voluntary" move to remove third-party billing in an attempt to distinguish itself from competitors, present the false impression to investors and regulators that the Company engaged in ethical and transparent billing practices, and to avoid further governmental oversight of its actual billing practices. For example, in a June 25, 2012 submission to the FCC, CenturyLink argued that the proposed rules were unnecessary because CenturyLink had already agreed to limit third-party billing. In doing so, CenturyLink highlighted its purported commitment to its customers, explaining that "CenturyLink values its customers and seeks to treat them fairly and equitably in our delivery of products and services, including billing." Similarly, in a November 18, 2013 response to the FCC for further comment on the proposed rules, CenturyLink portrayed itself as an industry leader in combatting cramming practices:

> CenturyLink values our customers and seeks to treat them fairly and equitably in our delivery of products and services, including billing. And we share the Commission's goals of ensuring consumers are not subjected to unauthorized third-party charges. In that vein, CenturyLink determined mid- summer 2012 to reduce the scope of our third-party billing services, essentially foregoing most third-party enhanced-services billing….

> Our decision to reduce third-party billing activities was shared by other major U.S. wireline providers. And those billing reductions became operative coincident with additional regulations associated with the Commission's 2012 Cramming Order. The combination of these activities, we believe, has produced an environment associated with wireline carrier third-party billing that does not warrant additional government intervention.

48.    Defendants admit that CenturyLink consistently sought to treat customers fairly and equitably. Defendants further admit that CenturyLink made submissions to the FCC on June 25, 2012 and on November 18, 2013 regarding proposed rules. To the extent the allegations in paragraph 48 purport to quote, summarize, or characterize those submissions, Defendants refer the Court to the contents of those submissions. To the extent the allegations in paragraph 48 differ in any way from the contents of these submissions, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 48.

49.    CenturyLink also specifically agreed to abide by consumer protection standards throughout the country in representations to the FCC and to state and local authorities. Under the 1992 Cable Act, the FCC promulgated consumer protection standards in connection with cable television service, and empowered local authorities to enforce the FCC's standards and to promulgate their own, stricter standards. The FCC's standards – the very baseline CenturyLink was required to meet – required CenturyLink to, among other things, give subscribers 30 days' advanced notice of any changes in rates, promptly issue refunds and credits for overcharges, and promptly answer customer calls. As CenturyLink expanded its provision of cable services, the Company entered into numerous franchise agreements with local authorities in which it agreed to abide by the FCC standards, or even stricter rules.

49.    Defendants admit that CenturyLink consistently aimed to abide by relevant and applicable consumer protection standards. To the extent the allegations in paragraph 49 purport to quote, summarize, or characterize CenturyLink's communications or agreements with the FCC or other regulators, which Plaintiffs do not specifically identify, Defendants refer the Court to those communications or agreements. To the extent the allegations in paragraph 49 differ in any way from the contents of these submissions, Defendants deny every such allegation. Paragraph 49 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 49.

50.    CenturyLink was also required to comply with consumer protection laws in the states where the Company conducted business, as well as similar rules enforced by the Federal Trade Commission ("FTC"), the Consumer Financial Protection Bureau and state Attorneys General. In fact, every year during the Class Period, Defendant Cole personally certified under penalty of perjury that he was "familiar with the Company's day-to-day operations" and the applicable "consumer protection rules" governing CenturyLink's business, and affirmed that the Company was "complying with applicable service quality standards and consumer protection rules," including those prohibiting the "unauthorized switching to another telecommunications provider and unauthorized inclusion, or addition of services, commonly known as slamming and cramming," in 35 states and over 100 jurisdictions.

50.    The first sentence of paragraph 50 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants admit that CenturyLink was required to comply with relevant and applicable laws and rules in jurisdictions wherein CenturyLink operated. To the extent the allegations in paragraph 50 purport to quote, summarize, or

characterize CenturyLink's or Cole's public filings, statements, or certifications, which Plaintiffs

do not specifically identify, Defendants refer the Court to those documents.  To the extent the

allegations in paragraph 50 differ in any way from the contents of those documents, Defendants

deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every

allegation in paragraph 50.

51.    Government enforcement of these consumer protection laws took on particular
significance during the Class Period.  Beginning in the fall of 2014, the FTC and attorneys general
from all 50 states pursued claims and obtained multimillion-dollar settlements from AT&T and T-
Mobile for illegal third-party cramming.  In the AT&T case, which settled for $105 million, the
government alleged that customers had requested refunds of more than 40% of the charges placed
by some third parties – which should have rung "alarms inside AT&T" – but AT&T refused to
refund the amounts, capping any refunds at only two months' worth of charges no matter how long
the customer had been improperly charged. These highly publicized enforcement actions alerted
the Executive Defendants to the significant consequences the Company's illegal cramming would
invite.

51.    To the extent the allegations in paragraph 51 describe or characterize regulatory

enforcement actions or settlements involving other corporations, Defendants lack knowledge or

sufficient information to form a belief as to the truth of the allegations and, therefore, deny them.

Defendants deny the allegations in the last sentence of paragraph 51.

52.    For this reason, CenturyLink itself repeatedly told investors that compliance with
these laws and regulations was critical to the Company's success, and that the consequences of
noncompliance would be highly material.  In SEC filings prior to and throughout the Class Period,
CenturyLink represented that it faced hypothetical risks in connection with the high level of
regulatory oversight it experienced.  For example, in the Company's 2013 Annual Report filed
with the SEC on February 27, 2014, CenturyLink warned that the Company was subject to
"significant" regulations by the FCC and state utility commissions, that the "agencies responsible
for the enforcement of these laws, rules and regulations may initiate inquiries or actions based on
customer complaints or on their own initiative," and that such actions could "have a material
adverse effect on our operations."  In other words, the Company told investors that noncompliance
with consumer protection laws was a mere "risk" – not that this risk was likely materialize.  As
Defendant Bailey explained in testimony before the Public Service Commission of Utah before
the Class Period, the risk warnings contained in CenturyLink's SEC filings were "not intended to
suggest that the risks are likely outcomes."

52.    Defendants admit that compliance with applicable and relevant laws and

regulations is important to CenturyLink's success as a business and that CenturyLink sometimes

described risks associated with regulatory oversight in public filings but deny that the allegations in paragraph 52 provide a complete and accurate description of the subject matter described therein. To the extent the allegations in paragraph 52 purport to quote, summarize, or characterize a document, which Plaintiffs have not identified, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 52 differ in any way from the contents of the document, Defendants deny every such allegation. Defendants further admit that CenturyLink filed its 2013 Annual Report with the SEC on February 27, 2014, and that the Annual Report contained a description of risks and risk warnings. To the extent the allegations in paragraph 52 purport to quote, summarize, or characterize the Annual Report, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 52 differ in any way from the contents of the document, Defendants deny every such allegation. Defendants deny that Bailey testified before the Public Service Commission of Utah. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 52.

53. And this is exactly how investors understood CenturyLink's purported risk warnings, particularly given that CenturyLink at the same time assured investors that the Company strictly complied with the regulations governing its business. Among other things, CenturyLink published, and disseminated to investors on its website, a Code of Conduct. In that document, CenturyLink acknowledged the importance of complying with laws and regulations governing its customer interactions, and claimed to adhere to certain proscriptions on unethical conduct. Pursuant to the Code of Conduct, CenturyLink assured investors that the Company would be "truthful and demonstrate integrity in all our dealings," "[n]ever encourage or direct employees to achieve business results at the expense of ethical conduct or compliance with the Code or the law," and "truthfully market, promote, advertise and sell our products" – a requirement that was part of the Company's "commitment to act honestly in all business affairs." Specifically, with regard to customer interactions, the Code assured investors that "[a]ll descriptions of our products, services, and prices must be truthful and accurate," and the Company would not "misstate facts or mislead consumers through Company advertisements or promotions." Most significantly, the Code stated that the Company would not "engage in unethical or deceptive sales practices," including "plac[ing] or record[ing] an order for our products and services for a customer without that customer's authorization."

53. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 53. Defendants admit that CenturyLink

published on its website a Code of Conduct.  To the extent the allegations in paragraph 53 purport

to quote, summarize, or characterize the Code of Conduct, Defendants refer the Court to the

contents of that document.  To the extent the allegations in paragraph 53 differ in any way from

the contents of the document, Defendants deny every such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 53.

54.     CenturyLink touted its Code of Conduct in SEC filings throughout the Class Period.
For example, CenturyLink's 2014 Form 10-K stated that "[w]e have adopted written codes of
conduct that serve as the code of ethics applicable to our directors, officers and employees," that
the Code of Conduct was "available in the 'Corporate Governance' section of our website" and
that, to the extent "we make any changes (other than by a technical, administrative or non-
substantive amendment) to, or provide any waivers from, the provisions of our code of conduct
applicable to our directors or executive officers, we intend to disclose these events on our website
or in a report on Form 8-K filed with the SEC."  Based on these statements, the Company assured
investors that they could take comfort in the Company's sales practices and the accuracy of its
public disclosures.

54.     Defendants admit that CenturyLink's 2014 Form 10-K referenced the CenturyLink

Code of Conduct and certified the accuracy of CenturyLink's public disclosures.  To the extent the

allegations in paragraph 54 purport to quote, summarize, or characterize the 2014 Form 10-K,

Defendants refer the Court to the contents of that document.  To the extent the allegations in

paragraph 54 differ in any way from the contents of the document, Defendants deny every such

allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in

paragraph 54.

### 2.     CenturyLink Told Investors that Its Results Were Driven By Its "Honest and Personal Service," Superior "Customer Experience" and Strategic "Bundling" Strategy

55.     Not only did the Company tout its purported compliance with the laws governing
CenturyLink's sales practices, CenturyLink told investors that those sales and marketing practices
would help it combat structural challenges facing the Company's business.  CenturyLink's core
business was historically focused on providing local and long distance telephone service – which
the Company called "legacy services."  But by the beginning of the Class Period, those services
were in severe structural decline because, as the Company explained in its 2014 Form 10-K, "an
increasing number of consumers are willing to substitute cable, wireless and electronic
communications for traditional voice telecommunications services."  This well-recognized

phenomenon, often referred to in the industry as customers' "cutting the cord," presented a significant threat.

55.    Defendants admit that CenturyLink sometimes discussed sales and marketing practices on conference calls with investors and its strategies for combatting the decline of landline telephone service and its impact on CenturyLink's business.  Defendants further admit that CenturyLink's business was historically focused on providing local and long distance telephone service and that CenturyLink sometimes referred to those services as "legacy services." Defendants deny that the allegations concerning CenturyLink's business provide a complete and accurate description of the subject matter described therein and deny Plaintiffs' characterization of the decline in landline usage as a "significant threat."  Defendants further admit that CenturyLink filed its 2014 Form 10-K on February 25, 2015.  To the extent that the allegations of paragraph 55 purport to quote, summarize, or characterize the Form 10-K, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 55 differ in any way from the contents of the 2014 Form 10-K, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 55.

56.    Indeed, immediately before the Class Period, investors were alerted to just how significant a threat this trend posed to the Company's long-term financial health.  Specifically, just before the beginning of the Class Period, CenturyLink announced a massive 25% dividend cut – a move that Defendant Post said was prompted by rating agencies' concerns about the Company's ability to service its debt.  The market reacted severely to this development, which sparked concerns over the Company's financial health and led numerous analysts to downgrade the Company's stock, which fell 22.6% on the announcement.

56.    Defendants admit that before the beginning of the Proposed Class Period, on or about February 13, 2013, CenturyLink announced an approximately 25% dividend cut but deny that the allegations in paragraph 56 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 56 purport to summarize or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the

contents of that document.  To the extent the allegations in paragraph 56 differ in any way from

the contents of the document, Defendants deny every such allegation.  To the extent Plaintiffs

purport to describe the price of CenturyLink's stock on certain dates, it is a matter of public record.

Defendants deny that the allegations in paragraph 56 accurately and completely describe the

factors affecting stock price movements described therein.  Except as expressly admitted herein,

Defendants deny each and every allegation in paragraph 56.

      57.     To counter the structural decline in wireline services and reassure investors about the Company's ability to continue generating the cash flows required to fund its dividend, CenturyLink began to focus on selling what it termed "strategic services," which included consumer broadband, cable television, and similar newer technologies.  As Defendant CEO Post explained, the Company's "strategic priorities" included increasing sales of "consumer broadband and video" as a key to driving "long-term profitable growth and value for our shareholders."  The Company's ability to successfully grow these business lines and return to "revenue stability" was of critical importance to investors – indeed, it was a focus of every conference call during the Class Period.

      57.     Defendants admit that CenturyLink's business during the proposed Class Period

was focused, at least in part, on its "strategic services," which included consumer broadband, cable

television, and other technologies, and that some Defendants discussed "strategic services" on

conference calls with investors during the proposed Class Period, but deny that the allegations in

paragraph 57 provide a complete and accurate description of the subject matter described therein.

To the extent the allegations in paragraph 57 purport to quote, summarize, or characterize a

document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that

document.  To the extent the allegations in paragraph 57 differ in any way from the contents of the

document, Defendants deny every such allegation.  Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 57

regarding issues of importance to unspecified investors.  Except as expressly admitted herein,

Defendants deny each and every allegation in paragraph 57.

58.     In fact, throughout the Class Period, Defendants repeatedly highlighted the marketing and sales strategies the Company purportedly used to grow new subscribers, prevent customers from leaving, and increase sales – and falsely credited these practices as responsible for CenturyLink's reported revenues.  Specifically, the Company told investors that one of its key marketing initiatives involved selling these services as "bundled" packages, in which consumers bought more than one of voice, data, and video products as a single package.  Defendants regularly explained that customers who purchased bundles were less likely to "churn," or leave the Company for a competitor, than were customers who only purchased a single product.  This marketing approach was highlighted in the Company's SEC filings throughout the Class Period, in which CenturyLink explained that "[o]ur strategy is to enhance our communications services by offering a comprehensive bundle of services…to further enhance customer loyalty."

58.     Defendants admit that CenturyLink's marketing and sales strategies were sometimes mentioned in SEC filings and during conference calls with investors during the Proposed Class Period but deny that the allegations in paragraph 58 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 58 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 58 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 58.

59.     The Executive Defendants also touted the Company's "bundling" marketing strategy on investor conference calls.  For example, on an August 3, 2016 conference call, Defendant Douglas explained that the Company's ongoing "shift" to targeting "bundled customers" drove "better ARPU," or "average revenue per user," as well as a "longer lifetime revenue base for that customer."  According to Douglas, the Company was seeing "churn level for our pure customers, or standalone high-speed customers" that was "double that of what we're seeing in those bundled customers," explaining this signified a "very, very significant churn rate in those [pure, non-bundled] customers."  Defendants touted the Company's ability to cross-sell products as a reason for optimism about CenturyLink's revenue prospects throughout the Class Period.

59.     Defendants admit that CenturyLink sometimes discussed its "bundling" marketing strategy on investor conference calls but deny that the allegations in paragraph 59 provide a complete and accurate description of the subject matter described therein.  Defendants further

admit that CenturyLink hosted a conference call for investors on August 3, 2016.  To the extent the allegations in paragraph 59 purport to quote, summarize, or characterize the transcript of the conference call, Defendants refer the Court to the contents of that transcript.  To the extent the allegations in paragraph 59 differ in any way from the contents of that transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 59.

60.    The Company also told investors that one of the keys to its sales strategy was the use of the Company's call centers.  During the Class Period, the Company operated 18 call centers throughout the country, each of which was managed by a Call Center Director.  Call Center Directors reported to Linda Olsen, CenturyLink's Vice President of Consumer Contact Centers, who in turn reported to Defendant CEO Post.  In numerous SEC filings before and throughout the Class Period, CenturyLink explained that "[w]e…rely on our call center personnel to promote sales of services that meet the needs of our customers" and that "[o]ur approach to our…<u>residential customers  emphasizes customer-oriented sales, marketing and service</u>."

60.    Defendants admit that Linda Olsen was, at times during the proposed Class Period, employed by CenturyLink as a Senior Vice President for Contact Centers Sales and Care.  Defendants further admit that call centers were sometimes mentioned on investor conference calls or in CenturyLink's SEC filings during the proposed Class Period, but deny that the allegations in paragraph 60 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 60 purport to quote, summarize, or characterize CenturyLink's SEC filings, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 60 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 60.

61.    The Company's representations were critical to investors' evaluation of CenturyLink stock – particularly in light of the structural challenges facing the Company's business.  For example, at the beginning of the Class Period, analysts at Morningstar Inc. noted that, while CenturyLink reported "nicely improved customer metrics in the consumer and small business segment recently, we expect competition and declining demand will continue to steadily erode revenue and margins in this business."  Accordingly, the analysts were hopeful that

CenturyLink would regain ground in those expanded territories through the "strategies [CenturyLink] employed in the past, such as empowering local management and using more direct marketing, to improve performance at both Embarq and Qwest."

61.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the first sentence of paragraph 61 and, therefore, deny them.  To the extent the allegations in paragraph 61 purport to quote, summarize, or characterize a Morningstar Inc. analyst report, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of that report.  To the extent the allegations in paragraph 61 differ in any way from the contents of that report, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 61.

## B.    CenturyLink's Revenues Were Secretly Driven By An Institutionalized Company-Wide Sales Cramming Apparatus

62.    Defendants' representations touting the Company's "customer first" focus, superior customer service approach, and legal compliance were false. In reality, fraudulent sales practices were at the very core of the Company's business model.

62.    Defendants deny the allegations in paragraph 62.

63.    During the Class Period, CenturyLink implemented a boiler-room sales apparatus in which intense pressure was exerted on sales personnel – including employees in so-called "customer service" positions – to bill for CenturyLink products and services without regard to whether customers wanted or requested them. This pressure took the form of impossibly high sales quotas, which employees were required to meet under threat of termination, as well as rewards and incentives for generating sales regardless of how they were obtained. Under this constant pressure, customer service employees turned to deceptive practices to hit their numbers, including cramming, misquoting prices, and falsification of contracts. Indeed, some of the deceptive sales pitches CenturyLink used were developed by Company managers and discussed at monthly sales meetings.

63.    Defendants deny the allegations in paragraph 63.

64.    To ensure that the Company kept as much revenue from these improper charges as possible, CenturyLink established a "customer service" apparatus staffed by hundreds of call center representatives who were coached on how to "save" sales and given strict limits on the amount of "credits" they could issue to customers who had been improperly billed.  The Executive Defendants knew, through direct communications from subordinates and regular reporting, that these rules and incentives led to rampant illegal cramming.  Specifically, and as set forth in detail below, CenturyLink engaged in the following illegal and deceptive "cramming" practices:

- <u>Adding unauthorized services to customers' bills</u>. As confirmed by numerous former employees, including FE-4, FE-7, FE-11, FE-13, FE-14, FE-15, CenturyLink routinely added services to customers' accounts without authorization, which would result in customers being charged for services they did not need, request or approve.

- <u>Misquoting and deceiving customers concerning the prices they would be charged, including by misrepresenting or omitting key promotional terms</u>. As reported by FE-5, FE-7, FE-9, FE-11 and FE-13 detailed in complaints filed by the Arizona and Minnesota Attorneys General, CenturyLink routinely represented that a customer would be charged one price for a particular service but would in fact be charged another.

- <u>Misleading customers about other material terms</u>. CenturyLink omitted and concealed highly material contract terms or misled customers concerning significant limitations on their service. As reported by FE-5, FE-9 and FE-11, one established, companywide and management-endorsed practice involved quoting a customer a price without disclosing that the price included additional fees for optional services.

64.    Defendants deny the allegations in paragraph 64.

65.    These illegal and deceptive practices had a material, undisclosed effect on the Company's financial condition. As was revealed after the end of the Class Period, these practices resulted in CenturyLink potentially "<u>over-bill[ing] more than 3.5 million customers</u>" – a number representing over <u>half</u> of CenturyLink's 5.9 million broadband subscribers and <u>one-third</u> of its 12 million wireline customers.

65.    Defendants deny the allegations in paragraph 65.

66.    This extraordinary overbilling rate did not happen by accident, or escape the attention of the Executive Defendants. To the contrary, as set forth below, these practices were recorded in the Company's computer systems, regularly reported to the Executive Defendants and driven by a punitive sales quota system they approved. In fact, CenturyLink itself has admitted that these deceptive sales practices originated in the offices and conference rooms at its corporate headquarters in Monroe, Louisiana. In CenturyLink's words, its sales and billing "practices are run out of its headquarters" and "the consumer sales and billing channels at CenturyLink have all reported to common management, and have all been subject to common sales and billing policies that apply across all consumer channels." CenturyLink's lawyer explained to the Judicial Panel on Multidistrict Litigation that "the decision-makers are in Monroe," and that CenturyLink's call centers "just implement the policies from Louisiana."

66.    To the extent the allegations in paragraph 66 purport to quote, summarize, or characterize a document or transcript, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 66

differ in any way from the contents of the document, Defendants deny every such allegation.

Defendants deny each and every remaining allegation in paragraph 66.

### 1.    CenturyLink's Senior Management Imposed "Ridiculous" Sales Quotas That Could Not Be Met Without Engaging In Deception

67.    CenturyLink's billing misconduct was driven by the sales quota system that CenturyLink put in place to meet the ambitious revenue targets that the Company promised Wall Street.  The Executive Defendants, including Defendants Post, Ewing, and Puckett, were personally involved in approving revenue forecasts and sales quotas that contemplated and, in fact, necessitated improper sales practices.

67.    Defendants deny the allegations in paragraph 67.

68.    According to FE-1, sales quotas were based on revenue targets that would be set by senior management during annual meetings.  Once the revenue targets were determined, the marketing department would figure out which and how many products needed to be sold to hit those targets – *i.e.*, how many high speed internet connections, Prism TV subscriptions, access lines, etc.  Those figures would then be given to Linda Olsen, and she and other directors would divvy up the units by head count and assign quota numbers to each call center.  According to FE-1, the quotas were based on the revenue projections that management had set – not on what the Company's sales force historically achieved.  As FE-1 explained, "it was all revenue driven" and did not "make sense" based on prior sales.  However, according to FE-1, CenturyLink's senior management had no interest in looking at any analytics that would take prior sales experience, or any other factors, into account.  At CenturyLink, FE-1 said, the "number was the number."

68.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 68 and, therefore, deny them.

69.    Former Employee No. 2 ("FE-2"), who worked in Financial Planning and Analysis as a Financial Analyst II from April 2013 through April 2016, confirmed that revenue projections would be presented to the Executive Defendants, including Defendants Post, Ewing, Cole, and Puckett, including by FE-2's boss.  The Executive Defendants would then sign off on the projections, and those numbers became the working plan. FE- 2, who worked on revenue forecasting and variance analyses for Prism TV, among other things, said that once the Company started receiving the actual numbers, a new analysis was run and the outlook would be updated every quarter, and the Executive Defendants received these updates.  According to FE-2, CenturyLink's revenue forecasts were often out of whack.  As FE-2 explained, "A lot of times I'd get unit projections and would think, 'Are we really going to do this?' Just looking at what we had done [historically] it was always mind blowing.  In a market where we'd never sold over 1,700 units, all of a sudden we're going to push 2,500 units next month."

69.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 69 and, therefore, deny them.

70.     Former Employee No. 15 ("FE-15"), who worked as a Regional President in the Southern United States from 2009 through 2014, explained that CenturyLink's marketing strategy involved trying to compete with cable companies and other providers on price – but then charge fees, terms and charges to help the Company recover the revenue lost by keeping the price point low. FE-15 recalled that, in 2014, "there was a big push to keep the price point low but add fees," and FE-15 discussed this strategy in meetings with Defendant Puckett, Defendant Bailey and Victory. FE-15 repeatedly voiced concerns about it, particularly to Defendant Puckett, but was told FE-15's approach was too naïve.  According to FE-15, however, "Putting fees out here that mask the issue or not talking about them fairly…I didn't feel comfortable with that."

70.     Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 70 and, therefore, deny them.

71.     According to former CenturyLink sales representatives, the sales quotas established by CenturyLink senior management were impossible to meet without committing fraud. For example, Former Employee No. 3 ("FE-3"), an inbound call center sales representative who worked at CenturyLink from April 2010 through December 2013, confirmed that the Company encouraged deceptive sales practices by having "ridiculous" sales quotas for the numerous products CenturyLink offered. As FE-3 explained, monthly quotas required customer service representatives to sell approximately 20 TV subscriptions, 30 internet subscriptions, 20 regular phone lines, and a certain number of long distance plans, as well as added features like LineGuard, Caller ID, three-way calling and @Ease. FE-3 said that the sales quotas were unreasonable, and did not reflect what employees who were dealing honestly with customers could be expected to sell.

71.     Defendants deny the allegations in the first sentence of paragraph 71.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 71 and, therefore, deny them.

72.     Former Employee No. 4 ("FE-4"), who worked as a CenturyLink Inbound Sales and Care Representative from March 2014 through January 2015, similarly confirmed that CenturyLink's monthly sales quotas were "insane" and strictly enforced.  Indeed, failure to hit the sales quotas for three months in a row was the reason FE-4 was terminated from CenturyLink. FE-4 explained that CenturyLink's quotas included selling approximately 30-40 phone lines and bundles per month; 25-35 internet subscriptions per month; and seven to 10 television subscriptions per month.  FE-4 said that, for in-bound call representatives, these quotas were difficult to meet because most customers were calling in to complain about their bills and wanted to disconnect their service not purchase additional ones.  However, according to FE-4, this is what CenturyLink expected inbound call representatives to do: sell additional products and services to complaining customers.  FE-4 said that sales representatives were told that they had 10 minutes per call to figure out the customer's problem, resolve it, and then make a sale.

72.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 72 and, therefore, deny them.

73.    Similarly, Former Employee No. 5 ("FE-5"), who worked as a Consumer and Business Sales Manager in Boise, Idaho from February 2009 through June 2016, said that CenturyLink sales employees repeatedly talked about how "crazy" the Company's quotas were. According to FE-5, the Company continued to steadily increase the sales goals throughout his tenure and, based on interactions with call center employees, it was clear that "their sales goals were so ridiculously high you had to cheat to get your numbers." Likewise, according to Former Employee No. 6 ("FE-6"), who worked as an Inbound Sales Representative from April through September 2015 and sold internet and cable services to residential customers, the sales quotas were "impossible to hit unless you were engaged in shady practices."

73.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 73 and, therefore, deny them.

### 2.    CenturyLink Strictly Enforced Senior Management's Excessive Sales Quotas By Disciplining and Terminating Employees Who Did Not Meet Them

74.    CenturyLink's billing misconduct was perpetuated through the strict, punitive enforcement of the sales quotas senior management imposed. As confirmed by FE-1, FE-5, Former Employee No. 7 ("FE-7"),[4] and Former Employee No. 8 ("FE-8"),[5] CenturyLink's quotas for sales representatives were enforced as follows: In the first month an employee missed his or her sales goals, he or she would be put on a "documented discussion," a formal discussion with a supervisor that was the first disciplinary step. If the employee missed a sales goal for two months in a row, he or she would receive a written warning; if sales goals were missed for three months there was a formal warning of dismissal; and if goals were missed four consecutive months, the employee would be fired. As FE-5 explained, as the Company raised sales quotas, the monthly targets were harder to meet, which led to sales representatives to "store" any sales in excess of the monthly quota, and then post-date those sales so they would appear on the next month's statistics.

74.    Defendants deny the allegations in the first sentence of paragraph 74. Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 74 and, therefore, deny them.

75.    CenturyLink senior management closely monitored compliance with sales quotas, and discussed disciplining sales representatives who missed them every month. As E-8 explained, Olsen (CenturyLink's Director of Inbound Sales and Care), the relevant director and manager from

---

[4]  FE-7 worked as a Customer Care & Sales Supervisor from 2010 to 2018 in the Midwestern United States.
[5]  FE-8 worked as a Lead HR Business Partner from 2012 until 2016.

each of CenturyLink's call centers, and an HR Business Partner would hold monthly calls to discuss employee sales performance and discipline – including how many representatives missed their targets, the status of the disciplinary action for those individuals, and what the next disciplinary step would be. In those meetings, Olsen and the HR Business Partners would review a spreadsheet that had a tab for each call center, and rows for each of the employees at each center. The spreadsheet rows would turn red if an employee did not hit their numbers. The excel sheet also included notes for the disciplinary actions taken for poor sales performance, as well as detailed information concerning the performance of each representative (including gross revenue, revenue per order, revenue per call, calls per hour, and revenue per hour). In fact, according to FE-8, most Company personnel – including the Executive Defendants (including Defendants Post, Ewing and Puckett) – had access to a dashboard system that provided nearly up-to- the-minute data on sales and revenues, including employee-level information. The workbooks would reflect this effectively "real time" data, and would also include notes on any disciplinary action taken for cramming.

75. Defendants admit that some CenturyLink managers monitored progress towards sales targets, but deny that the allegations in paragraph 75 provide a complete and accurate description of the subject matter described therein. Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 75 and, therefore, deny them.

76. As FE-3 explained, the high employee turnover rate at the Company illustrated that the quotas were unobtainable – about 15 to 30 new employees were brought in every other month, maybe a third would be with the Company three months after training. After three years, FE-3 was the eighth-most senior employee in a 60-employee call center. FE-3's own experience at CenturyLink illustrates just how unreasonable the quotas were. In 2012, FE-3 was named a Circle of Excellence honoree, meaning that her/his sales were in the top 1% of the Company and s/he had a picture taken with Defendant Post. However, the following year, when FE-3 was responsible for selling Prism TV, s/he was terminated for failing to meet CenturyLink's monthly quotas.

76. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 76 and, therefore, deny them.

77. Significantly, CenturyLink sales representatives were not the only employees accountable for meeting quotas – call center supervisors, managers and directors were as well. Former Employee No. 9 ("FE-9"), who worked at CenturyLink from 2002 through 2016, including as a Residential Customer Service Representative and as a National Order Help Desk ("NOHD") Representative in the Midwestern United States, explained that this environment not only drove unethical behavior, but a tendency for call center managers not to do anything about it. Although supervisors could terminate employees for unethical conduct, there was no reason to do so because of the need to hit quotas.

77.     Defendants admit that CenturyLink employees were given sales targets but deny that the allegations in paragraph 77 provide a complete and accurate description of the subject matter described therein.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 77 and, therefore, deny them.

78.     CenturyLink's sales goals were enforced even when, as inevitably occurred, doing so resulted in a majority of sales employees being disciplined. According to FE-8, for about seven months in a row in 2014, over half of all employees would have been written up for failing to meet the monthly quota. Similarly, FE-1 similarly estimated that about 70% to 80% of all sales agents could be in corrective action at one time.

78.     Defendants deny the allegations in the first sentence of paragraph 78.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 78 and, therefore, deny them.

79.     But at CenturyLink, the quotas were never adjusted. FE-7 said that when he questioned Olsen about strict enforcement of sales quotas, she responded:  "That's our culture. If you don't get to 90% [of your quota], we're going to churn to the next person."

79.     Defendants deny the allegations in the first sentence of paragraph 79.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 79 and, therefore, deny them.

80.     The sales quotas imposed by CenturyLink, and the punitive manner in which they were enforced, contrasted sharply with the practices at the predecessor companies that CenturyLink acquired. For example, Former Employee No. 10 ("FE-10"), who began her/his career at Embarq and then worked at CenturyLink in the NOHD in the Southern United States from July 2009 through December 2016, said the sales culture changed dramatically after CenturyLink took over:  "It became totally toxic." According to FE-10, "CenturyLink only cared about profits."

80.     Defendants deny the allegations in the first sentence of paragraph 80.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 80 and, therefore, deny them.

### 3.    CenturyLink Managers Instructed Employees on the Deceptive Sales Pitches that Sales Representatives Would Use to Cram

81.    The Company's management not only encouraged cramming through its aggressive quotas, but also specifically instructed sales representatives to use deceptive sales pitches and promotions, and even disciplined employees for failing to do so. For example, according to FE-9, during every sales training s/he did at CenturyLink throughout out a 14-year career, the trainers would instruct representatives that they could quote a single price for internet service without disclosing underlying fees (such as the maintenance fee, internet recovery fee, and other charges) that might be included, so long as the customer did not ask. These instructions were given at monthly sales meetings and sales strategy courses by Company trainers and would have been approved by Olsen, FE- 9 said, because "everything" on training "had to go past her desk and be approved beforehand." According to FE-9, representatives were specifically told that if a customer "doesn't ask you don't have to tell them" that the single quoted price included other, optional products. FE-9 was even disciplined for not hitting quotas because s/he spent too much time, according to his superiors, telling customers what their actual charges would be.

81.    Defendants deny the allegations in the first sentence of paragraph 81.  Defendants

lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations

in paragraph 81 and, therefore, deny them.

82.    FE-5 likewise said that when s/he attended a training class, "the facilitators were straight up telling new hires just to tell people what the total price was and not what all the items were" – which FE-5 knew from her/his experience was in violation of both Company policy and federal regulations. Former Employee No. 11 ("FE-11"), who worked as a Retention Specialist from 2006 through 2016 in the Southeastern United States, similarly confirmed that this practice – quoting one price but not disclosing that individual services included in the package were optional – would be encouraged by his/her call center manager at monthly meetings. According to FE-11, "That is cramming; it's highly illegal, and we were instructed to do it."

82.    To the extent the allegations in paragraph 82 contain legal conclusions, no response

is required.  Defendants otherwise lack knowledge or sufficient information to form a belief as to

the truth of the allegations in paragraph 82 and, therefore, deny them.

### 4.    CenturyLink Secretly Transformed Its "Customer Service" Department Into A Sales and Revenue Retention Operation

83.    CenturyLink's billing misconduct was also facilitated by CenturyLink's creation of a "customer service" department whose primary function was to sell services – not resolve complaints or provide customer service – as well as a complaint escalation department that was designed to minimize any refunds the Company owed customers.

83.    Defendants deny the allegations in paragraph 83.

84.    During the Class Period, CenturyLink employed approximately 250 to 450 "retention specialists" who were tasked with preventing customers who would complain about their bills from terminating their contracts with CenturyLink. Former Employee No. 12 ("FE-12"), who worked as a Retention Specialist from December 2015 through December 2017 in the Southeastern United States, explained that retention specialists' compensation was tied to the number of accounts they could "save" – i.e., prevent from disconnecting – and that retention specialists were instructed to "save by selling."  FE-12 said that retention specialists would get a bonus if their retention rate was 85% or higher – meaning they were able to "save" 85% or more of all threatened disconnects.

84.    Defendants admit that CenturyLink employed customer service representatives during the proposed Class Period, but deny that the allegations in paragraph 84 provide a complete and accurate description of the subject matter described therein.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 84 and, therefore, deny them.

85.    Even though retention specialists were responsible for addressing billing disputes and "saving" customer accounts, FE-12 said that retention specialists were limited in the amount of "credits," or refunds, they could offer customers to resolve billing disputes. Specifically, credits for more than $50 needed a supervisor's approval, and the Company's computer systems made it physically impossible to give back credits for more than three months' worth of charges. Along similar lines, FE-10 reported that retention specialists were limited to giving out credits of around $3.50 to $5 per customer. At the same time, FE-11 reported, retention specialists were also required to sell CenturyLink services, and had minimum sales quotas just like regular CenturyLink sales representatives.

85.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 85 and, therefore, deny them.

86.    In addition to a team of "retention specialists," CenturyLink also created a National Order Help Desk, or NOHD, that handled customer "escalation" complaints – i.e., complaints in which a customer demands to "speak to a supervisor" – to account for the overflow of calls the Company received about improper bills and other complaints. FE-9, who worked at the NOHD from 2009 through 2015, explained that approximately 90% of the escalation calls s/he received were from customers complaining that they had fees and charges added onto their accounts without their knowledge. According to FE-9, if the customer was able to prove he or she had been misquoted, NOHD employees offered to honor the misquoted price for the current month and the next month – but would not honor the price for a longer period than that.

86.    Defendants admit that CenturyLink's National Order Help Desk addressed customer complaints, among other things, but deny that the allegations in paragraph 86 provide a

complete and accurate description of the subject matter described therein. Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 86 and, therefore, deny them.

87.    But CenturyLink made it difficult for customers to receive any refund at all. According to Former Employee No. 13 ("FE-13"), who worked as a NOHD Consultant from 2010 until 2014 in the Western United States, CenturyLink made it nearly impossible for customers to successfully challenge the wrongful charges they incurred. FE-13 explained that it was the Company's policy that customers had the responsibility to confirm the accuracy of their bill, and if they did not verify the information provided during their price quote, that was their problem. FE-13 explained that, because recordings of sales calls were only kept for about a month, it was virtually impossible for a customer to challenge a misquoted price or fraudulent bill. This is because under most promotions, the first month would be free, and customers would only receive their first "real" bill after that. According to FE-13, time was the biggest ally to the Company when it came to customer disputes. The Company put the burden on customers to prove the Company was wrong, but also implemented a policy of deleting the call recordings – the evidence that could show the customer had been misquoted – at around the same time the customer would learn he or she had been misled.

87.    Defendants deny the allegations in the first sentence of paragraph 87. Defendants

lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations

in paragraph 87 and, therefore, deny them.

## 5.    CenturyLink's Enforcement of Unobtainable Sales Quotas Led to Rampant Cramming

88.    The combination of quotas set without regard to sales representatives' ability to meet them and the severity with they were enforced led to the expected result – customer service and sales representatives turned to deceptive sales practices.

88.    Defendants deny the allegations in paragraph 88.

89.    According to FE-11, cramming was "happening all the time, all day, every day," and that representatives who engaged in these practices included high sales performers who the Company named as "Circle of Excellence" honorees. Similarly, FE- 13 said that, while s/he worked in complaint escalations, s/he received calls from customers complaining that their bills charged different rates than they were quoted – and from customers who had been wrongfully charged early termination fees – every single day. FE-13 said that s/he also received calls from customers who said that phone lines appeared on their bills that they had not requested once or twice per week. According to FE-13, there was a lot of cramming and unethical behavior, that cramming was widespread throughout the Company, and that it was encouraged by the Company's aggressive enforcement of sales quotas.

89.     Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 89 and, therefore, deny them.

90.     FE-7, who served as a Customer Care & Sales Supervisor, explained that there were "many, many instances of people doing things that we knew were unethical," including cramming. FE-7 explained that one frequently "slammed" service was the Company's @Ease computer protection package, which, at one point, cost $5 per month for a two-month promotional period, and would then increase to $10 per month after the promotional period ended. According to FE-7, sales representatives would add @Ease service to customers' accounts without explaining that the promotional rate would expire or that they were adding the service at all, as sales of these products enabled representatives to meet their corrective action limit quota. As FE-7 explained, adding @Ease "counted as a sale and would make sure you weren't going to lose your job for missing your numbers." FE-4 similarly confirmed that adding CenturyLink's @Ease service to a customer's bill was a common, daily occurrence. Although CenturyLink did not explicitly instruct employees to add @Ease without the customer's knowledge, the culture at the Company encouraged this conduct. FE-4 said that CenturyLink wanted employees to sell, and there were never any negative repercussions for adding services like @Ease to customer accounts.

90.     Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 90 and, therefore, deny them.

91.     Former CenturyLink employees explained that the same "cramming" practices used in residential sales were also employed when selling to small-medium business customers. Former Employee No. 14 ("FE-14"), who began as a sales representative on the residential side in March 2014 but was then promoted to the small business and enterprise units before leaving the Company in October 2017, explained that sales representatives who "crammed" customers were the best performers, and thus were promoted to the business side. After being promoted, FE-14 explained, those same individuals would continue the same practices that led to their promotion in the first place.

91.     Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 91 and, therefore, deny them.

92.     FE-14 described a typical tactic: a representative selling CenturyLink's small business services would tell a customer the options, provide a quote, and tell the customer to call back when the customer was ready to complete the order. However, the sales agent would then secretly place the order at that time and label the sale a "self-install." A "self- install" was selected to ensure that a technician would not arrive at the customer's business and alert the customer to the fact that service (from CenturyLink's standpoint) had, in fact, been ordered. FE-14 repeatedly received phone calls from customers looking to complete an order and would pull their information up on the Company's computer system and see that the order had in fact been placed during the original phone call. FE-14 reported instances of orders already having been placed, and was told management would investigate the problem, but did not see any evidence that anyone was ever disciplined for this practice.

92.     Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 92 and, therefore, deny them.

93.     The financial impact of these cramming practices was highly material.  Indeed, thousands of consumer complaints, including those obtained through Plaintiffs' open records requests and the Minnesota Attorney General's investigation, reveal that CenturyLink customers – including elderly consumers living on fixed incomes – were routinely overbilled hundreds of dollars each, and that the Company institutionalized a policy of refusing to honor confirmed, quoted prices.  For example:

- L.F. switched to CenturyLink to save money, but her/his first bill was more than double the price CenturyLink had quoted. L.F. contacted CenturyLink and was told that s/he would receive credits for the overcharge, but the next month's bill was even higher. L.F. called CenturyLink in November 2013 requesting to disconnect his/her service, but continued to receive bills despite calling the company a second time in November, three times in January 2014, and two more times in February 2014.  CenturyLink refused to cancel L.F.'s bill of $412.31 for services that L.F. sought to disconnect months before.

- J.F., a retired engineer, was offered internet service for a base rate of $19.99 per month, but received a bill for $367.33, including internet service for a base rate of $71. CenturyLink told J.F. that the Company had "verified" the $19.99 offer but would not honor the promised rate.

- S.H., a 70-year-old former director of a non-profit organization, purchased a CenturyLink package that the Company said would cost approximately $54 per month. S.H. was charged $103.87 and after calling CenturyLink, was promised that the bill would be fixed – but the Company charged $76.46 and $77.96 the following two months.

- When S.J. signed up for CenturyLink's internet service in October 2016, she was told by a CenturyLink representative that she could cancel without paying an early termination fee. A few months later, when S.J. tried to cancel, she was told that she would have to pay a $200 fee.  The company refused to honor its promise to cancel her service for no charge and instead offered to reduce the $200 cancellation fee to $146.20.

- K.T., a 76-year-old retiree, was promised a rate of $62.14 and $40.91 for the first and second months and then $85.92 per month for the rest of the year – but he was actually charged $172.24 the first month, or more than $100 above the promised price. CenturyLink then falsely promised to fix his bill.

- M.H., who is 81 years old and lives on a budget, agreed to keep her service after CenturyLink promised her the same rate for another year – but CenturyLink increased her bill and then charged her a series of changing rates. CenturyLink then refused to give her the rate she was promised, claiming that there were no

promotion that could give her the promised price, and then threatened to charge her a $200 cancellation penalty if she terminated her service – even though the CenturyLink agent she spoke to confirmed that the Company had lied to her.

93.    Defendants deny the allegations in the first and second sentences of paragraph 93.

Defendants lack knowledge or sufficient information to form a belief as to the truth of the

remaining allegations in paragraph 93 and, therefore, deny them.

94.    The above examples illustrate the financial impact of CenturyLink's cramming practices, which was so sizeable that it could not have escaped the attention of the Executive Defendants.

94.    Defendants deny the allegations in paragraph 94.

### 6.    CenturyLink Documented Instances of Cramming and Reported Them to the Executive Defendants

95.    In all events, CenturyLink's senior management and the Executive Defendants were directly informed of the Company's cramming practices, and the rampant billing misconduct that was at the core of the consumer and small business sales strategy.

95.    Defendants deny the allegations in paragraph 95.

96.    To start, the Company's improper sales practices were documented and monitored through the Company's "quality assurance" program, and reported to managers through a "coaching" process that focused on ensuring sales and rarely led to discipline for billing misconduct. For example, NOHD employees were instructed to record and "coach" sales representatives about mishandled calls and, in doing so, routinely documented instances of cramming and other improper sales practices in the Company's computer systems, and communicated the violations to the representatives' supervisors. FE-9 explained that NOHD representatives were to investigate the reasons behind a customer's complaint and document them in a report in the Company's Order Quality Management, or OQM, system. According to FE-9, NOHD representatives would document cramming incidents in the OQM, which included various "codes" for violations of Company policy. These codes were listed in a drop-down menu and included, for example, misquoting a price, making improper or inaccurate notes in a customer's call history, or placing an "unauthorized service on account" – the Company's code for "cramming." FE-10 said that, at one point, s/he was filling out a form for reports addressing unauthorized charges at least once a day and, at minimum, at least once or twice per week. As both FE-9 and FE-10 reported, OQM reports were automatically sent to the sales representative's supervisor, who was then responsible for "coaching" the representative and addressing the violation.

96.    Defendants deny the allegations in the first and second sentence of paragraph 96. Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 96 and, therefore, deny them.

97.    But because supervisors' compensation depended on meeting quotas, the corrective "coaching" or discipline rarely occurred. According to FE-9, although sales representatives were ostensibly supposed to have a quality rating of over 93% (meaning they could not have more than 7 OQM findings for every 100 calls), FE-9 knew of representatives who were reported for cramming every day who were never reprimanded. As FE-9 explained, "How many times do I have to ding this person? How do you keep them and not fire them? It was because just their immediate supervisor was reviewing them.  The supervisor would discuss the OQMs with them and could [fire] them or discipline them. But if I'm a supervisor why would I do that if they're selling all that stuff?"

97.    Defendants deny the allegations in the first sentence of paragraph 97.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 97 and, therefore, deny them.

98.    FE-7 similarly reported that, despite extensive documented instances of cramming, responsible employees were rarely disciplined. FE-7 explained that when investigating complaints of cramming, s/he would pull the recording (if one existed) of the phone call, allow the representative to listen to it and allow the representative to explain the other side of the story, and then formulate a recommendation for FE-7's supervisor, the Call Center Director, who would then discuss the issue with Human Resources. FE-7 stated that there were a lot of sales representatives who were repeat offenders and had multiple documented incidents of unethical sales conduct but were not disciplined. FE-7 recalled one sales representative who had 13 documented cases of unethical sales behavior that were logged in the Company's coaching database but was never disciplined. FE-7 said that, because s/he had access to the Company's coaching database, s/he could see complaints s/he had made about certain sales representatives did not result in any corrective action. When s/he failed to see any corrective action measures taken, FE-7 would call the Company's integrity or "tips" line, which would assign a confirmation number to the complaint that could be used to check on any follow-up investigation. In numerous cases, FE-7 would report instances of cramming, and go back and check the status of the complaints s/he reported. None of those complaints were ever updated to reflect they had been addressed.

98.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 98 and, therefore, deny them.

99.    The sales practices used at the Company's call centers were also documented and reviewed by a separate Quality Assurance department.  As explained by Former Employee No. 16 ("FE-16"), who worked as CenturyLink's Manager of Customer Experience from April 2011 to July 2015, the Company's Quality Assurance team would review four calls made by each sales

representative every month, score those calls, and provide feedback in reports in a system called Q-FINITY. The calls would be scored by a team of approximately 88 workers (66 contracted by an overseas outside vendor and 22 located in the U.S.) on about 26 or 27 different metrics or questions, such as whether the representative reviewed what the customer currently had in service, offered the customer other products, and quoted the correct rates and internet speed. Once a call was reviewed and scored, the representative's supervisor would be notified by email, and could then pull up the report on the Q-FINITY system. Any team leader, director or vice president also had access to the QA call scores, and every month FE-16's team would compile a report that was sent to team leaders, directors, VPs, and regional VPs analyzing trends and other metrics from the scoring data.

99. Defendants admit that CenturyLink had a Quality Assurance department but deny that the allegations in first sentence of paragraph 99 provide a complete and accurate description of the subject matter described therein. Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 99 and, therefore, deny them.

100. Two circumstances prevented this QA review from providing an effective check on inappropriate sales behavior. First, according to FE-16, the review and enforcement of the QA findings was the responsibility of call center supervisors who were not incentivized to discipline employees. As FE-16 explained, although the QA results were at one time factored into compensation for call center managers and supervisors, the QA metric was removed from monthly bonus compensation in 2014 for all call center director-level employees and below – a decision that was implemented by Olsen and approved by Senior Vice President Consumer Sales & Care, Kathy Victory. As a result, according to FE-16, "supervisors were 100% not incentivized for QA."

100. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 100 and, therefore, deny them.

101. Second, the QA department was effectively eliminated in February 2015 for cost reasons, and the responsibility for QA was given to call center supervisors. FE-16 had "grave concerns" over the elimination of the QA department, which s/he expressed to Olsen and Victory, given "how valuable our practice was in calling out inappropriate behaviors and changing behaviors at the call centers." FE-16 explained that moving the QA process in-house and having supervisors review calls was not effective because poor reviews made the supervisors look bad. As a result, after the QA department was eliminated, "supervisors were not conducting reviews at all" and "were just checking the boxes they needed to."

101. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 101 and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

102.    Despite the fact that CenturyLink employees who routinely witnessed cramming and other deceptive sales practices reported that this misconduct was rarely punished, the conduct was so widespread that – even though "rarely" addressed – the Company's human resources department still disciplined employees for cramming on a routine basis. FE-17, who was Director of Human Resources for consumer and small business sales from April 2011 until December 2016 and oversaw over 8,000 employees, said her/his team received complaints from call center sales employees about the unreasonableness of sales goals and would get exit survey data from employees who left the Company who said they were not being paid enough to be put under the kind of pressure they were subjected to. FE-17 said that CenturyLink employees were frequently terminated for cramming accounts, and those employees would tell Company investigators that they crammed customer accounts because they were under pressure to make sales and felt they had to do so or would risk losing their jobs. FE-17 said the cramming issues were documented in exit interviews, and that these facts were shared with call center directors, as well as FE-17's supervisor, Vice President of Human Resources Kathy Flynn. Former Employee No. 20 ("FE-20"), who worked as an HR Business Partner from 1995 through April 2015, similarly confirmed that cramming and unethical sales behavior was always an issue at CenturyLink, employee turnover was horrible, and the major reason people would leave was due to the fact that sales goals were impossible to meet – a concern that was expressed to CenturyLink's HR department during exit interviews and other separation processes.

102.    Defendants deny the allegations in the first sentence of paragraph 102.  Defendants

lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations

in paragraph 102 and, therefore, deny them.

103.    The complaints concerning customer cramming and other deceptive sales practices were also regularly reported to the Executive Defendants in monthly reports generated by the Company's Executive & Regulatory Services division. Former Employee No. 18 ("FE-18") worked as one of three managers of that division from 2009 through March 2014 and was responsible for handling complaints from the FCC, state attorneys general and the Better Business Bureau, as well as "executive complaints," or formal written complaints to Defendant Post and other "C-level" executives. FE-18 dealt with hundreds of complaints per month, and the majority of those were customers who said they had been defrauded through cramming or otherwise improperly billed. Of the cramming complaints FE-18's team reviewed, about half were substantiated and "did, in fact, happen like the customer said it did." FE-18 explained that top performing sales employees and Circle of Excellence honorees were frequently identified as repeat offenders – i.e., were identified in customer complaints for cramming – and that FE-18 and other managers in her/his division repeatedly told Victory that this was the case.  Former Employee No. 19 ("FE-19"), who worked as a Manager of Executive Complaints from 2009 through June 2013, similarly reported that top sales performers were often the worst offenders regarding cramming, a fact that FE-19 team looked into and confirmed multiple times.

103.    Defendants deny the allegations in the first sentence of paragraph 103.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 103 and, therefore, deny them.

104.    FE-18's team emailed monthly reports to CenturyLink's senior leadership – including Defendant Post, Defendant Puckett, Victory and Olsen – reporting on the number, types and categories of complaints from the FCC, state agencies, the BBB and direct customer escalations. According to FE-18, the majority of the complaints were billing related, and the reports specifically identified "slamming/cramming" as a complaint category. As FE-18 explained, the data on these complaints were discussed with CenturyLink senior management, including Victory, on conference calls focused on operations reviews. FE-16, who was involved in this monthly reporting, confirmed that billing complaints were always one of the key things the reports would analyze. According to FE-16, the "complaint that always stood out was misrepresenting prices. We always had those issues."

104.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 104 and, therefore, deny them.

105.    FE-19 likewise confirmed that Defendant Post, Defendant Puckett, and Victory were sent and reviewed monthly reports concerning the cramming complaints that CenturyLink received, and those reports included specific category of complaints for cramming – a "very common and widespread" issue cited by customers. According to FE- 19, after reviewing the reports, Defendant Post, Defendant Puckett and Victory would often complain to FE-19 that the number of complaints was inaccurate and too high. As FE-19 explained, the numbers reported to senior management were accurate – and FE-19 would confirm the accuracy of the reports and the team's process to Defendant Post,    Defendant Puckett and Victory, who never provided any justification for believing the numbers were wrong. According to FE-19, this was because Defendant Post and Defendant Puckett knew the numbers were accurate and only claimed they were not "so they didn't have to deal with it."

105.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 105 and, therefore, deny them.

106.    FE-19's team was responsible for investigating customer complaints submitted by regulatory bodies like state Attorneys General, public utility commissions, and the FCC, and would review an average of 4,000 complaints per month, half of which were related to billing issues and cramming, as well as customer escalation complaints about cramming addressed to Defendant Puckett and Defendant Post. Defendant Post would often ask FE-19's team to look into complaints addressed to him, resolve them, and report back. When FE-19 would report back to Defendant Post about the resolution, he would often complain about it – typically, according to FE-19, Defendant Post would say that FE-19's team had given the customer too much compensation.

106.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 106 and, therefore, deny them.

107.    FE-19 explained that, despite the substantial number of complaints and evidence of cramming – which was clearly occurring in every state in which CenturyLink did business – CenturyLink's senior leadership refused to meaningfully address the problem. FE-19 said that FE-19's team would provide recommendations about what could be done to reduce cramming to Defendant Post, Defendant Puckett and Victory, but they never acted on those recommendations.

107.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 107 and, therefore, deny them.

108.    According to FE-19, this was because Defendant Post, Defendant Puckett and other senior executives were not willing to lose revenues in order to reduce the number of complaints. To illustrate, FE-19 described CenturyLink's response to at least four state Attorney General civil investigative demands issued between 2009 and 2013 in which 600 out of 700 consumer complaints (or 83%) were substantiated by FE-19's team. Despite repeated civil investigative demands, CenturyLink refused to change its practices. According to FE-19, CenturyLink senior leadership simply did not take the Attorney General investigations seriously – indeed, FE-19 reported that senior management would rather "just pay the fines" than "kowtow" to state Attorneys General.

108.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 108 and, therefore, deny them.

### C.    CenturyLink's Senior Management Recognized the Unsustainability of the Company's Boiler Room Sales Practices and Secretly Attempted to Address Them

109.    By the beginning of the Class Period, the Company's improper sales practices became a central focus of the Executive Defendants. In April 2014, FE-5 alerted both her/his manager, Northwest Region Vice President Brian Stading, and Defendant Bailey of the cramming issues s/he encountered. Specifically, on or around April 23-27, 2014 at the Company's "Circle of Excellence" event at the Breakers Hotel in Palm Beach, Florida, Stading introduced FE-5 to Defendant Bailey specifically so that FE-5 could address the constant and rampant cramming and misquoting problems s/he encountered to CenturyLink's most senior-level managers. In that discussion, FE-5 explained the complaints and issues with cramming s/he was experiencing. In response, Defendant Bailey acknowledged these cramming issues were occurring, and told Stading and FE-5 that "We've got to do something about our call centers."

109.    Defendants deny the allegations in the first sentence of paragraph 109. Defendant Bailey denies the allegations in the last sentence of paragraph 109 and lacks knowledge or

sufficient information to form a belief as to the truth of the remaining allegations in paragraph 109. The other Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 109 and, therefore, deny them.

110.    After this discussion, Defendant Post sent out a corporate-wide email saying that the Company was creating a new position for Defendant Bailey on business ethics and how the Company deals with customers.  After receiving the email announcing the new position, FE-5 sent Defendant Bailey an email reminding him of their conversation at the Breakers and asked to be a part of the team that was going to be fixing the call center issues.

110.    Defendants admit that on May 14, 2015 Post sent a corporate-wide email describing Bailey's new role as SVP, Operational Transformation.  Defendant Bailey admits that he received an email on May 23, 2015 in response to Post's corporate-wide email which referenced a discussion that had taken place between Bailey and the sender in 2014.    To the extent the allegations in paragraph 110 purport to quote, summarize, or characterize that correspondence, Defendants refer the Court to the contents of that correspondence.  To the extent the allegations in paragraph 110 differ in any way from the contents of that correspondence, Defendants deny every such allegation.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in paragraph 110 and, therefore, deny them.

111.    At around the same time, CenturyLink's senior management began to develop a new behavioral coaching model for its sales employees – another action that was prompted by the complaints the Company's cramming and deceptive practices had generated. In 2014, FE-17's team developed a new way to measure employee performance. Instead of judging employees on numerous metrics, which FE-17 said were impossible to meet, FE-17's team developed a new "behavioral coaching" model which judged employees on three overall criteria: how many customers did the employee help, did the employee resolve all issues the customer presented, and did they provide good customer service. Flynn was convinced to adopt this change, and supervisors were trained to provide behavioral coaching (rather than focusing on metrics) using this criteria. According to FE-17, when this new system was rolled out, it was initially well received. Defendant Post recognized Flynn for her work on the project, and employees provided positive feedback, boosting morale. According to FE-17, the number of complaints from customers declined significantly, as did terminations for unethical behavior.

111.    Defendants deny the allegations in the first sentence of paragraph 111.  Defendants

lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations

in paragraph 111 and, therefore, deny them.

112.    However, after only a few months, CenturyLink's sales numbers took a downturn. According to FE-17, after the decline in sales, the Company's senior management reverted back to the old metrics system almost immediately because CenturyLink senior management could not tolerate any drop in sales.

112.    Defendants lack knowledge or sufficient information to form a belief as to the truth

of the allegations in paragraph 112 and, therefore, deny them.

113.    Numerous other former employees confirmed the change in the disciplinary model, and the impact on sales.  For example, FE-20 confirmed that the switch to behavioral coaching model was done, in part, as an attempt to lower the number of cramming incidents. FE-20 described how employees who were determined, through an HR investigation, to have committed unethical sales behavior would say that it was something they felt they had to do in order to keep their jobs – and the effort to reduce this pressure motivated the switch to behavioral coaching. According to FE-20, "Recruiting couldn't even keep the turnover. We were having so much discipline and so many investigations, and we were hearing in the exit interviews that it was because of the sales quotas," so CenturyLink  had to stop enforcing them so strictly.

113.    Defendants lack knowledge or sufficient information to form a belief as to the truth

of the allegations in paragraph 113 and, therefore, deny them.

114.    Similarly, FE-1 recalled a change in corrective action policy around 2014 whereby sales representatives received behavioral coaching while supervisors were to be held accountable for sales numbers. According to FE-1, after this change was adopted, sales fell off "very quickly," and thereafter the Company went back to the old model of enforcing quotas at the sales representative level. Similarly, FE-8 recalled a change to a behavioral coaching model in 2014-2015 which was less focused on a metrics-heavy scorecard. Like FE-17, FE-8 said that while the change was initially well received, it immediately led to a significant drop in sales. As FE-8 reported, "I remember results dropping drastically when people were no longer being managed to a number."

114.    Defendants lack knowledge or sufficient information to form a belief as to the truth

of the allegations in paragraph 114 and, therefore, deny them.

115.    Rather than reveal the truth – that the Company was desperately trying to address the deceptive company-wide sales and marketing practices at the Company's call centers that had secretly driven a material portion of the Company's reported results – CenturyLink concocted a false story to explain the revenue declines. For example, in announcing CenturyLink's 2014 fourth

quarter results on February 11, 2015, Defendant Post blamed the "weaker" revenues on a recent reorganizational alignment and warned that this realignment could "result in some additional negative impact on our sales momentum in the first half of 2015" – an explanation that provided cover for the sales dip associated with the Company's relaxing of the strict quota-enforcement system, and the time needed to ramp sales back up again after the behavioral coaching model was aborted. When the Company's first quarter results and CenturyLink's consumer segment missed revenue estimates, Defendants again blamed the sales alignment, and again, analysts credited Defendants' explanations. For example, UBS noted that consumer segment revenues were approximately $8 million below estimates while Oppenheimer – which also expected better results – noted "[w]eakish [f]undamentals" in the consumer segment. No analyst suspected that these results were driven by CenturyLink's attempt to remedy cramming.

115.    Defendants deny the allegations in the first sentence of paragraph 115. Defendants admit that CenturyLink reported its 2014 fourth quarter results on February 11, 2015 and subsequently hosted a conference call for investors on February 11, 2015. To the extent the allegations in paragraph 115 purport to quote, summarize, or characterize the transcript of that conference call, Defendants refer the Court to the contents of that transcript. To the extent the allegations in paragraph 115 differ in any way from the contents of the transcript, Defendants deny every such allegation. To the extent the allegations in paragraph 115 purport to quote, summarize, or characterize an unspecified UBS analyst report, Defendants refer the Court to the contents of that report. To the extent the allegations in paragraph 115 differ in any way from the contents of the report, Defendants deny every such allegation. To the extent the allegations in paragraph 115 purport to summarize or characterize CenturyLink's 2015 first quarter earnings report, Defendants refer the Court to the contents of that report. To the extent the allegations in paragraph 115 differ in any way from the contents of the report, Defendants deny every such allegation. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the last sentence of paragraph 115 and, therefore, deny them. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 115.

116.    Just a month later, on June 2, 2015, and just three months after the Company announced that Defendant Puckett had been promoted to the head of global sales, CenturyLink announced that Defendant Puckett was leaving the Company. No explanation was given for her

departure. A press release announcing the move quoted Puckett as saying that she was "looking forward to spending more time with my family and considering other leadership opportunities that allow me to continue to have a significant impact."

116.    Defendants admit that on June 2, 2015, CenturyLink announced that Puckett was

leaving CenturyLink in a press release titled "CenturyLink announces retirement of Karen Puckett,

CenturyLink's President of Global Markets."   To the extent the allegations in paragraph 116

purport to quote, summarize, or characterize the press release, Defendants refer the Court to the

contents of that press release.   To the extent the allegations in paragraph 116 differ in any way

from the contents of the press release, Defendants deny every such allegation.   Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 116.

117.    Shortly thereafter, CenturyLink's return to the metrics-based system and strict enforcement of sales quotas began to take hold. For example, during the Company's third quarter 2015 earnings call on November 4, 2015, Defendant Post highlighted a "solid quarter" in the consumer segment, with revenues growing $18 million year-over-year. Defendant Post did not disclose the true driver of this sales growth – i.e., the Company's undisclosed cramming practices – but rather credited CenturyLink's strategy of "attracting more high-value customers" and pursuing "higher value bundled sales and select pricing increases."

117.    Defendants deny the allegations in the first sentence of paragraph 117.  Defendants

admit that CenturyLink hosted a conference call for investors on November 4, 2015 to discuss its

2015 third-quarter earnings report.  To the extent the allegations in paragraph 117 purport to quote,

summarize, or characterize the transcript of that conference call, Defendants refer the Court to the

contents of that transcript.  To the extent the allegations in paragraph 117 differ in any way from

the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted

herein, Defendants deny each and every allegation in paragraph 117.

118.    By year-end, the return of the Company's prior sales practices had taken effect, and the Company was able to again report favorable results to Wall Street. For example, in announcing year-end results on February 10, 2016, Defendant Post attributed the reported rebound in revenues to the "aggressive corrective action" the Company had taken, as well as the realignment of the sales force and new leadership appointments (e.g., Douglas's replacement of Puckett). For his part, Defendant Ewing told investors that "churn reduction" as well as a concerted effort to "keep the

customers we have and try to make some of the price declines and credits that we've been issuing smaller" led to the improved results.

118.    Defendants deny the allegations in the first sentence of paragraph 118.  Defendants admit that CenturyLink hosted a conference call for investors on February 10, 2016 to discuss the 2015 year-end financial results.  To the extent the allegations in paragraph 118 purport to quote, summarize, or characterize the transcript of the conference call, Defendants refer the Court to the contents of that transcript.  To the extent the allegations in paragraph 118 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 118.

119.    These representations had their intended effect, and reversed a nearly year- long share price decline. Analysts at UBS noted that the Company's financials were above guidance and ahead of UBS's expectations, and that "revenues beat across the board." Barclays likewise cited the "healthy strategic services growth led by solid consumer results," calling out the 6% year-over-year revenue growth in consumer revenues and higher ARPU, while JPMorgan analysts were reassured and "expect[ed] revenue trends to continue to move in the right direction." Over the next several trading days, the Company's shares shot up, increasing over $4 per share, and began trading at their highest levels in over six months.

119.    Defendants deny the allegations in the first sentence of paragraph 119.  To the extent the allegations in paragraph 119 purport to quote, summarize, or characterize analyst reports, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those reports.  To the extent the allegations in paragraph 119 differ in any way from the contents of those reports, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 119.

120.    Data that Plaintiffs obtained through FOIA requests to the FCC confirm that customer complaints and consumer segment revenues tracked the Company's efforts to address the widespread deceptive billing practices at the Company. Based on quarterly data obtained through a FOIA request to the FCC (which was only available for the first quarter of 2015 to the present), the number of customer cramming complaints rose dramatically after the Company abandoned the behavioral coaching model and reverted back to its strict enforcement of sales quotas. The uptick in complaints since the beginning of 2015 is all the more striking given that, as complaints were growing, the number of CenturyLink subscribers was decreasing substantially throughout the Class Period.



Consumer Strategic Revenues vs. FCC Cramming and Billing Complaints
Q1 2015 – Q2 2017

120.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 120, or data as plotted in the chart inserted in paragraph 120, and, therefore, deny them.

### D.    The SEC Questions CenturyLink About Its Consumer Segment Disclosures and the Company's Compliance With Item 303

121.    At the same time CenturyLink publicly attributed its rejuvenated revenue growth to a shift in strategy, the Company was pointedly instructed by the SEC to disclose any known trends that impacted its consumer segment results. Specifically, in correspondence from the SEC's Division of Corporation Finance on August 11, 2015 to Defendant Cole, the SEC requested that CenturyLink provide more information concerning the revenue composition of the Company's consumer segment, as well as the Company's "marketing and sales efforts" of its "strategic" services. In doing so, the SEC specifically cited the Company's need to comply with Item 303(a) of Regulation S-K and Securities Act Release No. 33-8350, which requires disclosure of, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

121.    Defendants admit that on August 11, 2015, the SEC sent a letter requesting that CenturyLink provide additional information to the SEC but deny that the allegations in paragraph 121 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 121 purport to quote, summarize, or characterize that letter, Defendants refer the Court to the contents of that letter.  To the extent the allegations in paragraph 121 differ in any way from the contents of the letter, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 121.

122.    Under Item 303, CenturyLink was required to disclose the fact that the Company's illegal and deceptive sales practices were a material driver of the Company's reported revenue in the consumer and small business segments – and that the Company's efforts to alter those practices, and reduce cramming, had resulted in a decline in revenue. CenturyLink's senior management were aware of and/or specifically approved significant changes to the Company's sales employee discipline and compensation scheme in order to address these practices. The Executive Defendants further recognized that, when these changes were made, they immediately and materially impacted revenues.  Moreover, that revenue decline was so significant that CenturyLink reverted back to its prior method of disciplining sales employees almost immediately.

122.    The first sentence of paragraph 122 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein. Defendants deny the remaining allegations in paragraph 122.

123.    On September 8, 2015, the SEC again questioned CenturyLink about the Company's disclosures concerning the operating performance of its consumer segment, stating that additional information about the operating margins of strategic and legacy services was necessary and "material for a complete investor understanding."

123.    Defendants admit that on September 8, 2015, the SEC sent a letter requesting that CenturyLink provide additional information to the SEC but deny that the allegations in paragraph 123 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 123 purport to quote, summarize, or characterize that letter, Defendants refer the Court to the contents of that letter.  To the extent the allegations in paragraph

123 differ in any way from the contents of the letter, Defendants deny every such allegation.

Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 123.

124.    In a September 22, 2015 response letter to the SEC from Defendant Cole, which copied CenturyLink's Audit Committee Chair W. Bruce Hanks, CenturyLink misleadingly claimed that "price compression and customer disconnects caused by competition" were the primary drivers of performance. In other words, despite the clear requirements of Item 303 and the Executive Defendants' knowledge that changes in the Company's sales practices had dramatically impacted consumer revenues – and despite being directly questioned about it by the SEC – CenturyLink continued to conceal the material impact its sales practices was having on the Company's financial performance.

124.    Defendants admit that on September 22, 2015, Cole sent a letter to the SEC and copied Bruce Hanks, but deny that the allegations in paragraph 124 provide a complete and accurate description of the subject matter described therein and further deny that CenturyLink made any misleading statements to the SEC.  To the extent the allegations in paragraph 124 purport to quote, summarize, or characterize that letter, Defendants refer the Court to the contents of that letter.  To the extent the allegations in paragraph 124 differ in any way from the contents of the letter, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 124.

E.    **A CenturyLink Director Loudly Resigns, Warning that His Removal and Defendant Post's Conduct Raised "Serious Governance, Transparency and Honesty Issues"**

125.    Shortly after CenturyLink responded to several pointed questions from the SEC about its consumer segment disclosures, one of the Company's longtime directors accused CenturyLink and Defendant Post of conduct that raised "serious governance, transparency and honesty issues," and warned the Company that a press release it had prepared was "incomplete and inaccurate" and "deliberately misleading in a material way."

125.    To the extent the allegations in paragraph 125 purport to quote, summarize, or characterize a document, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 125 differ in any way

from the contents of the document, Defendants deny every such allegation. Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 125.

126.    Specifically, beginning in November 2015, Defendant Post and other senior members of the Company's Board began to orchestrate the removal of former director Joseph Zimmel, who had served on the Board since 2003 and was then one of four members of the Company's audit committee. As a member of the audit committee, Zimmel would have been aware of and reviewed the Company's responses to the SEC about the lack of disclosure surrounding the Company's consumer segment.

126.    Defendants admit that Joseph Zimmel served on CenturyLink's board of directors

from 2003 until 2016 and was once a member of the Board's audit committee. Defendants lack

knowledge or sufficient information to form a belief as to the truth of the allegations in the last

sentence of paragraph 126 and, therefore, deny them. Except as expressly admitted herein,

Defendants deny each and every allegation in paragraph 126.

127.    As revealed in email correspondence that Zimmel forced CenturyLink to publicly file with the SEC, Zimmel was presented with an ultimatum by the Board's chair in December 2015 after several directors "decided [Zimmel] had to go." Zimmel said his forced resignation was improperly orchestrated without input from the rest of the Board, and was contrary to their wishes. As Zimmel put it, except for the "Monroe or Monroe related directors," all disinterested Board members said that removing Zimmel from the Board "was wrong, that it was not good for the company, that I added a lot of value, that I was an important and needed voice on the board."

127.    To the extent the allegations in paragraph 127 purport to quote, summarize, or

characterize a document, which Plaintiffs do not specifically identify, Defendants refer the Court

to the contents of that document. To the extent the allegations in paragraph 127 differ in any way

from the contents of the document, Defendants deny every such allegation. Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 127.

128.    Most concerning for investors, however, is that the facts surrounding Zimmel's ouster would not have become public if Zimmel had not forced the Company's hand by specifically stating in an email to Defendant Post, Board Chairman Bill Owens, CenturyLink General Counsel Stacey Goff and CenturyLink's outside counsel that "[a]nything short of disclosing the full and accurate account of events would be misleading in a material way." At Zimmel's suggestion, CenturyLink publicly filed the emails he exchanged with them in a Form 8-K on January 25, 2016.

128.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations regarding the alleged concerns of unspecified investors and, therefore, deny them.  Defendants admit that CenturyLink filed a Form 8-K on January 25, 2016 which contained as exhibits email correspondence with Joseph Zimmel, but deny that the allegations in paragraph 128 provide a complete and accurate description of the subject matter described therein.  To the extent the allegations in paragraph 128 purport to quote, summarize, or characterize the Form 8-K, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 128 differ in any way from the contents of Form 8-K, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 128.

129.    As reflected in that correspondence, CenturyLink's senior leadership went to significant lengths to conceal the true facts concerning Zimmel's ouster. As Zimmel told Defendant Post and Goff in those emails, the original draft press release CenturyLink prepared announcing Zimmel's departure was "incomplete and inaccurate" and "deliberately misleading in a material way." As Zimmel explained, the conduct of the Company's senior leadership "raised serious governance, transparency and honesty issues" –    and only further corroborates the Executive Defendants' proclivity to mislead.

129.    Defendants deny the allegations in the first sentence of paragraph 129.  To the extent the allegations in paragraph 129 purport to quote, summarize, or characterize email correspondence, Defendants refer the Court to the contents of that correspondence.  To the extent the allegations in paragraph 129 differ in any way from the contents of that correspondence, Defendants deny every such allegation.  Defendants deny the remaining allegations in paragraph 129.

130.    After the end of the Class Period, Zimmel's replacement, Martha Bejar, was one of the two members of the Board appointed as the "special committee" responsible for investigating the billing misconduct at issue in this case.

130.    Defendants admit that Martha Bejar joined CenturyLink's board of directors on January 19, 2016 and that she was one of two members appointed to a special committee after the

end of the proposed Class Period which was tasked with reviewing CenturyLink's policies, procedures and practices relating to consumer sales, service and billing.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 130.

**F.    The Arizona Attorney General Investigates and Accuses CenturyLink of Fraudulent and Deceptive Conduct, Which CenturyLink "Expressly Denies"**

131.    After CenturyLink returned to its prior sales model, billing complaints again began piling up – leading consumers to lodge complaints with their state attorneys general. Those state attorneys general soon began to investigate the reasons behind the rising tide of complaints against the Company.

131.    Defendants admit that CenturyLink has received and responded to information requests and inquiries from some state states but lack knowledge or sufficient information to form a belief as to the truth of the allegations regarding the purpose of those investigations or the reasons for consumer complaints, neither of which Plaintiffs specifically identify.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 131.

132.    Beginning no later than March 2016, the Arizona Attorney General launched such an investigation. This investigation found that CenturyLink had engaged in numerous deceptive practices in the sale and marketing of internet and telephone services that violated the Arizona Consumer Fraud Act and, specifically, that CenturyLink had:

- Failed to adequately disclose material qualifying conditions that applied to promotional rates, such as the requirement that consumers enter into a term commitment or that they authorize CenturyLink to automatically withdraw monthly payments from their financial accounts;

- Failed to adequately disclose the advertised promotion rate would end before the consumers' term commitments expire, thus requiring consumers to continue purchasing services at a non-promotional rate for the remainder of the term;

- Failed to disclose that if consumers cancel their contract before their term commitment expires, they will be charged an early termination fee;

- Failed to disclose that a consumer will be required to purchase or lease a modem-router for high speed internet service;

- Failed to disclose that a consumer would be charged an installation fee for certain services;

- Billed consumers at rates higher than those it represented during sales calls with consumers;

- Billed consumers an early termination fee when the consumer cancelled his or service upon discovering that CenturyLink was charging the consumer higher rates than those it represented during the sales call;

- Billed consumers for periods of service before such services were connected, for services that were never connected, and for products that were never received, without subsequently giving those consumers a credit for such charges;

- Billed consumers for services and products that the consumer never requested without subsequently giving those consumers a credit for such charges;

- Failed to process consumers' service cancellation requests in a timely manner and billing them for the period of time such service remained connected following the consumers' requested cancellation date, without providing a subsequent credit for such period of time; and

- Charged consumers full price for leased modems that consumers returned to CenturyLink within the required time frame and, in many cases, subsequently referring the consumers' accounts to collection when the consumers refused to pay for returned modems.

132.    To the extent the allegations in paragraph 132 purport to quote, summarize, or characterize reports related to the Arizona Attorney General investigation that concluded with an Assurance of Discontinuance in April 2016, which Plaintiffs fail to specifically identify, Defendants refer the Court to the contents of those reports.  To the extent the allegations in paragraph 132 differ in any way from the contents of those reports, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 132.

133.    In the face of the Attorney General's findings, CenturyLink quietly agreed to a settlement in which it promised to take a number of measures intended to prevent consumers from being misled and improperly charged. Specifically, on April 5, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General in which the Company (falsely) denied any wrongdoing, and where it "expressly denie[d]" each and every one of the Arizona Attorney General's allegations. Indeed, in the Assurance of Discontinuance, CenturyLink claimed that all terms, materially qualifying conditions, termination fees, availability of high speed internet speeds, modem/router purchase requirements and installation fees were "fully disclosed."

133.    Defendants admit that on April 5, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General in which CenturyLink denied each and every one of the Arizona Attorney General's allegations and any wrongdoing in general.  To the extent the allegations in paragraph 133 purport to quote, summarize, or characterize the Assurance of Discontinuance, Defendants refer the Court to the contents of the Assurance of Discontinuance. To the extent the allegations in paragraph 133 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 133.

134.    Despite the seriousness of the Arizona Attorney General's allegations, CenturyLink resolved the inquiry with a modest $150,000 payment to cover the Attorney General's fees and costs. CenturyLink claimed that it settled the case solely as a "means of efficiently closing the Attorney General's investigation into this matter" and that the settlement did not represent "any admission of guilt, wrongdoing, violation or sanction." Rather, CenturyLink broadly denied "any violation of state, federal, or local law," that "any actions, inactions or practices of CenturyLink were a consumer fraud or otherwise legally improper," or that "any Arizona Consumers who are residential customers of CenturyLink suffered or incurred any damage or loss for which the law provides recourse."

134.    Defendants admit that CenturyLink agreed to make a $150,000 payment to the Arizona Attorney General to cover fees and costs as part of a negotiated settlement.  To the extent the allegations in paragraph 134 purport to quote, summarize, or characterize a document, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 134 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 134.

135.    Nevertheless, as part of the Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, managerial [and] supervisory    employees," CenturyLink also agreed to comply with a number of prospective requirements intended to ensure compliance with the Arizona consumer protection laws, including:

- sending consumers a confirmation of the charges included in their bills after three days of a sale;

- conducting an investigation into any consumer complaints in which a customer alleges being charged for a product or service that was not requested, being charged at a price that was not accurately quoted, or being charged for a modem/router that the customer claimed to have properly and timely returned;

- agreeing that no customer bills would be sent to collections until an investigation was completed and the results were provided to the consumer; and

- confirming with the customer internet speeds before processing a customer's high speed internet order.

135.    Defendants admit that on April 6, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General.  To the extent the allegations in paragraph 135 purport to quote, summarize, or characterize the Assurance of Discontinuance, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 135 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 135.

136.    To investors who were unfamiliar with CenturyLink's actual sales practices, the settlement did not appear to reflect any sanction whatsoever – as CenturyLink should have been following the steps required by the agreement in the first place. Indeed, CenturyLink led investors to believe that none of these requirements represented a change in CenturyLink's practices, and the Company "expressly denie[d] that its policies, practices or procedures that may be inconsistent with those set forth in this Assurance of Discontinuance fail to meet or violate any applicable standard."

136.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the first sentence of paragraph 136 and, therefore, deny them.  To the extent the allegations in paragraph 136 purport to quote, summarize, or characterize a document, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 136 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 136.

137.    Due to CenturyLink's strongly worded express denials, and the relatively modest $150,000 payment, the significance of the Arizona Attorney General's investigative findings was

obscured from investors. Indeed, CenturyLink did not disclose the Arizona Attorney General's investigation or its settlement in any SEC filing or other public release, and the settlement was not identified or cited by any other public news or other source until months later. As a result, the market barely registered this development, and instead continued to be misled by Defendants' false and misleading statements.

137.    Defendants deny the allegations in the second sentence of paragraph 137.

Defendants lack knowledge or sufficient information to form a belief as to the truth of the

remaining allegations in paragraph 137 and, therefore, deny them.

138.    Unfortunately for investors and consumers, CenturyLink ignored the Assurance of Discontinuance as well. While the settlement required CenturyLink to implement the steps described above, according to former CenturyLink employees, there is no evidence CenturyLink took any of the affirmative measures required by the order when dealing with Arizona consumers, or any other CenturyLink customers. To the contrary, according to FE-9, "It went in the opposite direction. It got even worse."

138.    Defendants deny the allegations in the first sentence of paragraph 138.  Defendants

lack knowledge or sufficient information to form a belief as to the truth of the allegations in the

last two sentences of paragraph 138 and, therefore, deny them.

### G.    CenturyLink Distinguishes Its Sales and Marketing Practices as Honest and Legitimate, Criticizing Competitors for Boosting Revenues By "Adding Fees"

139.    Just weeks later, the Company again reported favorable results in its consumer segment, which had been buoyed by the improper sales practices identified by the Arizona Attorney General. But instead of disclosing the impact of its actual sales practices on revenues or addressing the Arizona Attorney General settlement, CenturyLink attributed its success to strategy "adjustments."

139.    Defendants admit that on May 4, 2016 CenturyLink announced its 2016 first-

quarter financial results.  Except as expressly admitted herein, Defendants deny each and every

allegation in paragraph 139.

140.    Specifically, when reporting the Company's first quarter results on May 4, 2016, Defendant Douglas highlighted a change in emphasis to "bundled broadband services" that was purportedly enabling the Company to sign up customers who were "less precluded to churn" and were going to generate a "higher ARPU." Most significantly, Douglas clarified that any difference between CenturyLink's ARPU figures and those of the Company's competitors was the result of its competitors charging unwanted fees –   something that Douglas falsely told investors CenturyLink did not do:

So I would tell you that our ARPUs are consistent with what you'd see at an ARPU level in our competitors. And we see competition adding a lot of fees. And so, that's where there might be a little bit of a delta, but we're working through, and constantly monitoring what our competitors are doing in the marketplace, with regard to the average ARPUs in our business.

140.    Defendants admit that on May 4, 2016, CenturyLink hosted a conference call with investors to discuss first quarter 2016 financial results.  To the extent the allegations in paragraph 140 purport to quote, summarize, or characterize the transcript of that conference call, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 140 differ in any way from the contents of the document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 140.

### H.    CenturyLink's Cramming Practices Continue Unabated While the Minnesota Attorney General Issues A Civil Investigative Demand and A Whistleblower Urges Defendant Post to Address the Fraud

141.    Just one week after Defendant Douglas assured investors of the Company's sales practices and ARPUs, on May 12, 2016, the Minnesota Attorney General's Office sent a civil investigative demand to CenturyLink following a growing wave of complaints from Minnesota consumers who had been victimized by the very same deceptive practices as millions of other customers across the country.

141.    Defendants admit that the Minnesota Attorney General's Office sent CenturyLink a civil investigative demand on May 12, 2016.  With respect to the remaining allegations in paragraph 141, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

142.    As would be revealed only after the end of the Class Period, Defendant Post and CenturyLink's senior managers immediately sprung into action after receiving the civil investigative demand. Indeed, CenturyLink's senior management recognized that this new investigation, following on the heels of CenturyLink's settlement with the Arizona Attorney General's inquiry, threatened to expose Defendants' scheme. As discussed further below, after the Class Period, the Minnesota Attorney General disclosed that Defendants engaged in a series of obstructionist tactics to frustrate the investigation.

142.    Defendants deny the allegations in paragraph 142.

143.    As CenturyLink's senior management was attempting to keep the Minnesota Attorney General at bay, Defendants continued to receive repeated reports, both internally from employees and externally from customers and regulators, concerning the fraudulent practices carried out in the Company's call centers. One such employee, Heidi Heiser, who worked as customer service and sales agent in Arizona beginning in August 2015, brought those issues directly to the attention of Defendant Post.

143.    CenturyLink admits that Heidi Heiser was formerly employed by CenturyLink as a customer service and sales agent in Arizona beginning in or around August 2015.  CenturyLink and Post each deny that Heiser ever alerted Post about fraudulent billing practices or other "issues." The Executives Defendants otherwise lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 143 concerning Heidi Heiser and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 143.

144.    As she would later allege in a whistleblower lawsuit, like the former CenturyLink employees cited above, Heiser witnessed CenturyLink customers being charged for services that they did not request and that CenturyLink's sales quota and disciplinary systems encouraged this conduct. As Heiser and numerous former employees confirm, this inevitably led to rampant cramming and charging of unauthorized services on customer accounts, which meaningfully contributed to the revenues that CenturyLink reported to investors.  According to Heiser:

> CenturyLink management had not only created the workplace incentives, sales practices, and lack of oversight that encouraged the fraudulent assignment of unauthorized lines or services, and related charges, to customer accounts, but they were knowingly and intentionally ignoring the customer complaints about such practices and enforcing such policies that allowed CenturyLink to keep payments received on unauthorized charges and to encourage more such payments.

144.    Defendants admit that Heidi Heiser filed a lawsuit against CenturyLink that was later voluntarily dismissed by Heiser.  To the extent the allegations in paragraph 144 purport to quote, summarize, or characterize the complaint filed by Heiser, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 144 differ in any way from

the contents of the document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 144.

145.    At the same time Heiser became increasingly troubled by CenturyLink's fraudulent business practices – which she reported to her direct supervisor (Christine Wells) and as well as two other supervisor-managers (Denise Medina and Michael Del Campo) – a strikingly similar fraudulent scheme at U.S. banking giant Wells Fargo began to make headlines. Specifically, on September 8, 2016, regulators investigating Wells Fargo announced $185 million in fines for the undisclosed company practice of sales representatives adding accounts without customers' knowledge, triggering extensive media coverage and congressional investigations. According to the CenturyLink whistleblower, there were "frightening parallels between the Wells Fargo Bank scandal and what she saw happening at CenturyLink."

145.    CenturyLink denies that Heiser reported fraudulent business practices to Christine Wells, Denise Medina, or Michael Del Campo. The Executive Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations concerning Heiser's state of mind and communications with her supervisors in the first sentence of paragraph 145 and, therefore, deny them. To the extent the allegations in paragraph 145 purport to quote, summarize, or characterize news reports or other documents, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 145 differ in any way from the contents of those unspecified documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 145.

146.    After none of her complaints led to any discipline or action by CenturyLink management, Heiser brought her concerns to the Company's CEO. Specifically, in an online Townhall meeting where Company employees had the opportunity to post questions to online message board for review by Defendant Post in October 2016, Heiser posted an online question asking the CEO "why customers were being given multiple accounts and being billed for things they did not ask for" – again alerting CenturyLink's senior-most management to the cramming practices they had monitored for years.

146.    CenturyLink and Post deny that Heiser posted an online question for Post to review, and Post specifically denies reviewing any message from Heiser. Defendants otherwise lack knowledge or sufficient information to form a belief as to the truth of the allegations concerning

Heiser's actions and communications as alleged in paragraph 146 and, therefore, deny them. Defendants deny the remaining allegations in paragraph 146.

147.    Heiser's question was removed from the message board shortly after she posted it and just two days later, Heiser was alerted she had been suspended – and later terminated – as retaliation for blowing the whistle. While the Company claimed Heiser was being terminated for hanging up on customers, those disconnections were caused by technical issues that Heiser had for months repeatedly sought help in remedying from her managers, and had never before been raised as a concern. As demonstrated by CenturyLink's termination of FE-11, who was fired for refusing to "cram" and sell a "full service" package to a 90-year-old customer who only wanted a line with local service and caller ID, CenturyLink's termination of Heiser for a pre-textual reasons was hardly unique. This was how the Company perpetuated its undisclosed and unlawful billing scheme.

147.    CenturyLink admits that Heiser was terminated from her employment at CenturyLink.  CenturyLink denies that Heiser posted to an online town hall message board in October 2016, denies that any such post was removed, and denies that Heiser's disconnections were caused by technical issues.  CenturyLink otherwise lacks knowledge or sufficient information to form a belief as to the truth of the remaining allegations concerning Heiser and, therefore, deny them.  The Executive Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 147 concerning Heiser and, therefore, deny them. Defendants also lack knowledge or sufficient information to form a belief as to the truth of the allegations concerning FE-11 and, therefore, deny them.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 147.

### I.    CenturyLink Continues to Falsely Deny and Downplay Reports of Sales Misconduct

148.    As the Company's misconduct continued unabated, and consumer complaints grew to outsized levels, CenturyLink's practices began to attract the attention of local news outlets. In late 2016 and early 2017, complaints over CenturyLink's billing misconduct began to make headlines, particularly in those areas – such as Seattle, Washington, Portland, Oregon, Omaha, Nebraska, Boise, Idaho, Denver, Colorado, and Minneapolis, Minnesota – where CenturyLink had expanded operations and sought to compete with cable providers.

148.    Defendants deny that CenturyLink engaged in any misconduct.  Defendants admit that CenturyLink, during the proposed Class Period, had some customers in Seattle, Washington, Portland, Oregon, Omaha, Nebraska, Boise, Idaho, Denver, Colorado, and Minneapolis, Minnesota.  Defendants lack knowledge and sufficient information to form a belief as to the truth of the remaining allegations in paragraph 148 and, therefore, deny them.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 148.

149.    For example, a February 1, 2017 report by KGW television in Oregon detailed how a Portland resident was promised a discount on her phone, internet and cable TV but after signing up with CenturyLink, was charged nearly four times that rate and was unable to get CenturyLink to correct her bill. As the resident explained, "I felt like it was back-alley tactics." In responding to the story, CenturyLink issued a statement denying any wrongdoing, falsely claiming that:

> CenturyLink strives to provide the best possible service at all times. As a customer-first business, we take any complaint seriously and work diligently to provide each customer with a fair and quick resolution. And where our investigations into complaints show that process changes can improve the customer experience, we make improvements and incorporate them into our employee training and customer outreach.

149.    Defendants admit that CenturyLink issued a statement in response to a KGW television report in or around February 2017.  To the extent the allegations in paragraph 149 purport to quote, summarize, or characterize CenturyLink's statement or that news report, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 149 differ in any way from the contents of those documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 149.

150.    CenturyLink continued to issue statements like these and similar false denials to at least six local news stations from October 2016 through the end of the Class Period, consistently denying any systemic billing problems, claiming that such complaints were the result of an isolated failure to properly "follow routine billing processes," that the Company promptly investigated and resolved the complaint, and had "put in a new review process for pending offers, installed a new bill estimation tool and the company is simplifying promotional offers." These statements were materially false and misleading because, as Defendants knew, customer complaints were not "taken seriously." Instead, CenturyLink arbitrarily limited refunds by placing limits on customer

"credits" and customer complaints were in fact treated as additional sales opportunities. Nor was CenturyLink a "customer first" business and the improper and inaccurate bills were not isolated – they were a core part of CenturyLink's business model.

150.    Defendants admit that CenturyLink sometimes issued statements in response to a news reports from October 2016 through the end of the proposed Class Period.  To the extent the allegations in paragraph 150 purport to quote, summarize, or characterize CenturyLink's statements or other news reports, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 150 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 150.

151.    At the same time – despite having implemented CenturyLink's cramming scheme, and separately having been informed about it in myriad ways, including through monthly reporting, communications in connection with investigations by at least two state Attorneys General, and directly by Heiser – Defendants continued to represent that the Company was focused on customers and engaged in ethical sales practices. During the Company's February 8, 2017 earnings call, Defendant Post claimed that CenturyLink had worked hard to "improve the customer experience and make sure that we're more competitive in the marketplace in certain areas," reassuring investors that "we approach our responsibilities each day with a customer-centric mindset."  And days later, on February 23, 2017, the Company again touted its Code of Conduct in its Form 10-K for the fiscal year 2016 – which, as before, assured investors that the Company would be "truthful and demonstrate integrity in all our dealings," would "truthfully market, promote, advertise and sell our products" and would not "engage in unethical or deceptive sales practices," including "plac[ing] or record[ing] an order for our products and services for a customer without that customer's authorization."

151.    Defendants admit that CenturyLink was focused on customers and engaged in ethical sales practices but otherwise deny the allegations in the first sentence of paragraph 151. Defendants admit that CenturyLink hosted a conference call with investors on February 8, 2017 and filed its Form 10-K for the fiscal year 2016 on February 23, 2017.  To the extent the allegations in paragraph 151 purport to quote, summarize, or characterize the transcript of that February 8 2017 call or the 2016 Form 10-K, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 151 differ in any way from the contents of those

documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 151.

## V.    THE TRUTH REGARDING CENTURYLINK'S BOILER ROOM PRACTICES IS REVEALED IN A SERIES OF CORRECTIVE DISCLOSURES

### A.    A Whistleblower Exposes CenturyLink's Wells Fargo-Like Scheme

152.    On Friday June 16, 2017, the truth concerning CenturyLink's billing practices and their impact on the Company's financial condition began to be revealed. On that day, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme," which reported that Heidi Heiser, the former CenturyLink customer service and sales agent who alleged that she had been fired after publicly raising the issue of the Company's cramming business model to Defendant Post, had filed a whistleblower complaint against the Company. As the article explained, Heiser's complaint revealed that the Company had engaged in a practice of charging customers for services they neither authorized nor requested. The article further explained that, according to Heiser's complaint, to deal with customers complaining about having charges crammed onto their bills, CenturyLink customer service personnel were "directed 'to inform the complaining customer that CenturyLink's system indicated that the customer had approved the service,' . . . and as a result 'it was really the customer's word against CenturyLink.'"

152.    Defendants deny the allegations in the first sentence of paragraph 152. Defendants admit that, on June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme." To the extent the allegations in paragraph 152 purport to quote, summarize, or characterize that article, Defendants refer the Court to the contents of the article. To the extent the allegations in paragraph 152 differ in any way from the contents of the article, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 152.

153.    The article also explained that Heiser was fired two days after directly informing Defendant Post of these practices at an internal, Company-wide question-and-answer session. In addition, the article connected the revelations to the recently-uncovered fraud at Wells Fargo, noting that "[t]he complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to 'many millions' of dollars."

153.    Defendants admit that, on June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme." To the extent the allegations

in paragraph 153 purport to quote, summarize, or characterize the transcript of that article,

Defendants refer the Court to the contents of the article. To the extent the allegations in paragraph

153 differ in any way from the contents of the article, Defendants deny every such allegation.

Except as expressly admitted herein, Defendants deny each and every remaining allegation in

paragraph 153.

154.   This disclosure partially corrected Defendants' prior materially misleading statements and omissions concerning CenturyLink's purportedly "customer first" sales practices, and also revealed that the Company's revenues had been inflated by cramming. Market reaction to the news was swift. As a result of these revelations, the Company's stock declined significantly, falling $1.23 per share – nearly 5% – on heavy volume, from the previous day's close of $26.95 to close at $25.72 on June 16, 2017.

154.   Defendants deny the allegations in the first sentence of paragraph 154. Defendants

admit that CenturyLink's stock closed at $26.95 per share on June 15, 2017, and closed at $25.72

per share on June 16, 2017. To the extent Plaintiffs purport to describe or characterize the price

of CenturyLink's stock or the trading volume of stock on certain dates, it is a matter of public

record. Defendants deny that the allegations in paragraph 154 accurately and completely describe

the factors affecting stock price movements described therein. Except as expressly admitted

herein, Defendants deny each and every allegation in paragraph 154.

155.   Analysts immediately reacted and reassessed their views of CenturyLink stock based on these revelations, and connected the share price decline to the disclosures of the Company's misconduct contained in Heiser's lawsuit. For example, in a June 16, 2017 report, a CFRA analyst downgraded his rating on CenturyLink stock in direct reaction to these revelations, citing "increased risks" after reports of "a lawsuit filed by a former employee, accusing CTL of running a Wells Fargo like scheme."

155.   Defendants lack knowledge or sufficient information to form a belief as to the truth

of the allegations in the first sentence of paragraph 155. To the extent the allegations in paragraph

155 purport to quote, summarize, or characterize a CFRA analyst report, Defendants refer the

Court to the contents of the report. To the extent the allegations in paragraph 155 differ in any

way from the contents of the report, Defendants deny every such allegation. Except as expressly

admitted herein, Defendants deny each and every remaining allegation in paragraph 155.

156.    Analysts and market observers also recognized that the revelations in the Heiser lawsuit had wide-ranging impact on the Company's business. For example, on June 16, 2017, technology and communications publication CRN cited an industry professional whose company worked with CenturyLink who expressed shock at the practices revealed in the lawsuit. As reported in the article, this CenturyLink business partner "told CRN that he thought 'slamming,' or the illegal practice of switching a consumer's telephone service without authorization, was a thing of the past." The article further explained that these practices would likely impact future business, as CenturyLink's customers would raise questions about the Company's practices. Similarly, in a June 19, 2017 note, Morgan Stanley reported that the share price decline was triggered by "[n]ews that CenturyLink was facing a lawsuit alleging that the company overcharged customers in Arizona by adding additional services," stressing that additional information concerning the "scope of the alleged activity" and the "degree to which this appears to be an isolated incident, or something with broader geographic and financial scope" would further impact their view of the Company's stock.

156.    Defendants lack knowledge or sufficient information to form a belief as to the truth

of the allegations in the first sentence of paragraph 156. To the extent the allegations in paragraph

156 purport to quote, summarize, or characterize a June 16, 2017 CRN article, Defendants refer

the Court to the contents of the article. To the extent the allegations in paragraph 156 differ in any

way from the contents of the article, Defendants deny every such allegation. To the extent the

allegations in paragraph 156 purport to quote, summarize, or characterize a June 19, 2017 Morgan

Stanley note, Defendants refer the Court to the contents of the note. To the extent the allegations

in paragraph 156 differ in any way from the contents of the note, Defendants deny every such

allegation. Except as expressly admitted herein, Defendants deny each and every remaining

allegation in paragraph 156.

157.    Defendants immediately scrambled to minimize the impact of the revelations in the *Bloomberg* article. In articles published on June 16, 2017 in technology and communications publications *Ars Technica* and *CRN*, CenturyLink claimed that the conduct alleged in Heiser's complaint was "completely inconsistent with our company policies, culture, and Unifying Principles, which include honesty and integrity," and pleaded ignorance on the part of the Company's senior executives, stating that "our leadership team was not aware of this matter until the lawsuit was filed."

157.    Defendants deny the allegations in the first sentence of paragraph 157.  Defendants admit that *Ars Technica* and *CRN* published news articles on June 16, 2017.  To the extent the allegations in paragraph 157 purport to quote, summarize, or characterize these articles, Defendants refer the Court to the contents of those articles.  To the extent the allegations in paragraph 157 differ in any way from the contents of those articles, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 157.

158.    The next trading day, however, news worsened for CenturyLink investors.  On Monday, June 19, 2017, at 9:30 a.m., *Bloomberg* reported that a consumer class action lawsuit arising out of CenturyLink's billing misconduct had been filed in California the night before. The article explained that the lawsuit detailed how "Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged" were "consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink." The article noted that the "damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers." Shortly thereafter, numerous consumer class action lawsuits were filed in courts across the country.

158.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the first sentence of paragraph 158.  To the extent the allegations in paragraph 158 purport to quote, summarize, or characterize a June 19, 2017 *Bloomberg* article, Defendants refer the Court to the contents of the article.  To the extent the allegations in paragraph 158 differ in any way from the contents of the article, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 158.

159.    This disclosure further partially corrected Defendants' prior materially misleading statements and omissions concerning CenturyLink's sales practices, and also further revealed the scope of misconduct at CenturyLink and the degree to which the Company's revenues had been materially inflated by cramming.

159.    Defendants deny the allegations in paragraph 159.

160.    The market again reacted quickly. CenturyLink's shares dropped significantly by a further $0.36, or 1.4%, to close at $25.36. The price of CenturyLink's 7.60% Senior Notes similarly declined significantly, dropping nearly 6% from a June 16, 2017 closing price of $984.30 to close at $926.05 on June 19, 2017.

160.    Defendants admit that CenturyLink's stock closed at $25.36 per share on June 19, 2017.  Defendants further admit that the price of CenturyLink's 7.60% Senior Notes closed at $984.30 on June 16, 2017 and closed at $926.05 on June 19, 2017.  To the extent Plaintiffs purport to describe or characterize the price of CenturyLink's stock or 7.60% Senior Notes on certain dates, it is a matter of public record.  Defendants deny that the allegations in paragraph 160 accurately and completely describe the factors affecting stock price movements described therein.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 160.

161.    Analysts continued to report on the revelations contained in the consumer lawsuits that were filed across the country. For example, on June 26, 2017, an analyst from Barclays issued a report explaining the risks to CenturyLink in light of the revelations in the complaints filed in the weeks before and the Company's subsequent nearly 10% drop in share price, and noted that these disclosures "could serve as an overhang for the shares for some time."

161.    Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the first sentence of paragraph 161.  To the extent the allegations in paragraph 161 purport to quote, summarize, or characterize a June 26, 2017 Barclays analyst report, Defendants refer the Court to the contents of the report.  To the extent the allegations in paragraph 161 differ in any way from the contents of the report, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 161.

162.    Significantly, on June 22, 2017, the Company disclosed that Defendant Douglas – who had been the senior-most executive responsible for consumer sales and was just appointed by Defendant Post in April 2017 to serve as a member of the combined Company's senior leadership team – would be leaving the Company as soon as the merger closed. In doing so, Douglas forfeited more than $3 million in compensation in the form of time-based and performance-based restricted shares that had been granted him in February 2017 – a pay package that the Company confirmed in a Form 8-K filed on June 1, 2017, just three weeks prior to the abrupt leadership change.

162.    Defendants admit that, on June 22, 2017, CenturyLink announced that Douglas would leave CenturyLink after the merger with Level 3 closed.  Defendants further admit that Douglas had been previously appointed to CenturyLink's senior leadership team in April 2017. Defendants further admit that CenturyLink filed a Form 8-K on June 1, 2017.  To the extent the allegations in paragraph 162 purport to quote, summarize, or characterize the Form 8-K or other CenturyLink statements, which Plaintiffs do not specify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 162 differ in any way from the contents of those documents, Defendants deny every such allegation.  Douglas's CenturyLink compensation and equity holdings were described in relevant SEC filings during the proposed Class Period and are a matter of public record.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the last sentence of paragraph 162 and, therefore, deny them.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 162.

## B.    The Minnesota Attorney General Details CenturyLink's Fraudulent Sales Practices

163.    Investors soon learned far more about the scope of CenturyLink's billing fraud. On July 12, 2017, the last day of the Class Period, news reports disclosed that the Minnesota Attorney General filed suit against CenturyLink in Minnesota state court following a year-long investigation that cited internal Company documents, emails, and call recordings revealing extensive detail as to how the Company fraudulently charged Minnesota consumers in violation of Minnesota's consumer protection laws.

163.    Defendants deny the allegations in the first sentence of paragraph 163.  Defendants admit that on July 12, 2017, the Minnesota Attorney General filed an initial complaint against CenturyLink in Minnesota state court but deny that the allegations concerning the lawsuit in paragraph 163 provide a complete and accurate description of the subject matter described therein. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 163.

164.    The Minnesota Attorney General's complaint provided significant and newly disclosed detail concerning the means by which the Company cheated customers. Specifically, citing internal Company documents and non-public correspondence obtained through the Minnesota Attorney General's year-long investigation, the complaint detailed how CenturyLink's complex pricing systems, exception-laden promotional strategies, and myriad fees contributed to CenturyLink sales representatives systematically misquoting and misrepresenting prices to customers that the Company refused to honor. The complaint cited 35 specific examples of customers who were defrauded, and provided significant detail as to how the Company's billing scheme was carried out. For example, the complaint cited an April 2015 email from a Company employee stating that she got "so many" complaints per day and that:

> maybe 1 out of 5 [customers] are quoted correctly or close enough. I have one today quoted $39 and its [actually] over $100 monthly. So I tend to get on the defensive for the customer at times because of the large amount that are misquoted. As in many cases, the customer calls in for several months and promised call backs, passed around, or cut off before going to the AG, PUC, FCC or BBB . . . .

164.    Defendants admit that the Minnesota Attorney General filed an initial complaint against CenturyLink in Minnesota state court on July 12, 2017 but deny that the allegations concerning the lawsuit in paragraph 164 provide a complete and accurate description of the subject matter described therein.   To the extent the allegations in paragraph 164 purport to quote, summarize, or characterize the complaint, Defendants refer the Court to the contents of the complaint.   To the extent the allegations in paragraph 164 differ in any way from the contents of the complaint, Defendants deny every such allegation.   To the extent the Minnesota state court complaint purports to quote, summarize, or characterize other documents, which Plaintiffs have not specifically identified, Defendants refer the Court to the contents of those documents.   To the extent the allegations from the Minnesota state court complaint, repeated in paragraph 164, differ in any way from the contents of those documents, Defendants deny every such allegation.   Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 164.

165.    In a May 2015 conversation recorded by CenturyLink that was obtained and cited by the Minnesota Attorney General, another Company employee stated that "there are not enough

people to do the work" of responding to the complaints, and that there was a "whole pile of Minnesota [complaints] to go through…they usually come in groups of 10."

165.    Defendants admit that the Minnesota Attorney General filed a complaint against CenturyLink in Minnesota state court but deny that the allegations concerning the lawsuit in paragraph 165 provide a complete and accurate description of the subject matter described therein. To the extent the allegations in paragraph 165 purport to quote, summarize, or characterize the complaint, Defendants refer the Court to the contents of the complaint.    To the extent the allegations in paragraph 165 differ in any way from the contents of the complaint, Defendants deny every such allegation.    To the extent the Minnesota state court complaint purports to quote, summarize, or characterize other documents or recordings, which Plaintiffs have not specifically identified, Defendants refer the Court to the contents of those documents or recordings.    To the extent the allegations from the Minnesota state court complaint, repeated or summarized in paragraph 165, differ in any way from the contents of those documents or recordings, Defendants deny every such allegation.    Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 165.

166.    The lawsuit also revealed that the Company had systematically refused to honor the prices it quoted customers, and internally documented this fraudulent practice. Citing internal recordings and reviews of internal Company documents, the complaint detailed how CenturyLink refused to correct customers' improper and fraudulent bills. For example:

- A sales representative told a customer that "no one can get you that price" even though the Company's complaint file states that CenturyLink listened to a recording of the phone call and internally confirmed the "misquote" by the sales representative;

- A CenturyLink representative admitted to a customer that "you were misquoted," but that "I can't give it [the quoted price] to you, no one can";

- A CenturyLink representative told a customer that its offers are "not binding";

- Another CenturyLink representative told a customer that the discounts that it had offered need not be honored because they are "a gift from us to you";

- After a CenturyLink customer called to complain that her bill had increased more than 50% the month after CenturyLink promised to change her rate, and cited the confirmation number she was given, the representative told her that CenturyLink can "give you all the confirmation numbers in the world" but that if CenturyLink "quotes you [a rate] not available it's going to get denied."

166.    Defendants deny the allegations in the first two sentences of paragraph 166. To the extent the allegations in paragraph 166 purport to quote, summarize, or characterize the Minnesota state court complaint, Defendants refer the Court to the contents of the complaint. To the extent the allegations in paragraph 166 differ in any way from the contents of the complaint, Defendants deny every such allegation. To the extent the Minnesota state court complaint purports to quote, summarize, or characterize other documents or recordings, which Plaintiffs have not specifically identified, Defendants refer the Court to the contents of those documents or recordings. To the extent the allegations from the Minnesota state court complaint, repeated or summarized in paragraph 166, differ in any way from the contents of those documents or recordings, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 166.

167.    The details provided in the Minnesota Attorney General's complaint also further revealed the financial impact of the Company's fraudulent practices. For example, in the 35 examples cited in the complaint, the fraudulent pricing added from $10 to over $100 increases in monthly charges, in many cases more than doubling customers' bills. In a press conference held the same day the suit was filed, General Swanson said that, while unsure of the precise number of Minnesota customers impacted or the amount of restitution that would be required, she expected the numbers to be "very, very significant."

167.    Defendants deny the allegations in the first two sentences of paragraph 167. To the extent the allegations in paragraph 167 purport to quote, summarize, or characterize the Minnesota state court complaint, Defendants refer the Court to the contents of the complaint. To the extent the allegations in paragraph 167 differ in any way from the contents of the complaint, Defendants deny every such allegation. To the extent the Minnesota state court complaint purports to quote, summarize, or characterize other documents, which Plaintiffs have not specifically identified,

Defendants refer the Court to the contents of those documents or recordings.  To the extent the allegations from the Minnesota state court complaint, repeated or summarized in paragraph 167, differ in any way from the contents of those documents or recordings, Defendants deny every such allegation.  Defendants admit that Minnesota Attorney General Swanson held a press conference on July 12, 2017.  To the extent the allegations in paragraph 167 purport to quote, summarize, or characterize the press conference, Defendants refer the Court to the contents of the press conference.  To the extent the allegations in paragraph 167 differ in any way from the contents of the press conference, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 167.

168.    The Minnesota Attorney General's complaint and General Swanson's press conference announcing the lawsuit were covered extensively in the press. For example, a July 12, 2017 *Bloomberg* article reporting on the lawsuit revealed that the Minnesota Attorney General had been investigating CenturyLink for over a year. The article explained that, contrary to CenturyLink's claims that it had cooperated in the investigation, the Company had in fact frustrated the Attorney General's inquiry by falsely claiming that certain customer call recordings did not exist. In fact, General Swanson obtained them immediately as soon as her office subpoenaed a third-party CenturyLink vendor that had custody of the calls. The report also explained that the Company had also refused to provide basic pricing information, claiming doing so was "unduly burdensome." Similarly, the Minnesota *Star Tribune* confirmed CenturyLink attempted to conceal its unlawful practices, reporting that General Swanson said that CenturyLink was "lackluster" in responding to the State's investigation. According to General Swanson, in the course of the investigation, "[t]he company was contacted hundreds of times," and that "[t]his issue has been going on for a long, long time. We felt the need for judicial intervention."

168.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 168 and, therefore, deny them.  Defendants admit that *Bloomberg* published an article on July 12, 2017 concerning the Minnesota Attorney General's complaint against CenturyLink.  Defendants deny that the *Bloomberg* article completely or accurately described the Minnesota Attorney General's complaint.  To the extent the allegations in paragraph 168 purport to quote, summarize, or characterize the article, Defendants refer the Court to the contents of the article.  To the extent the allegations in paragraph 168 differ in any

way from the contents of the article, Defendants deny every such allegation. Defendants admit

that the *Minnesota Start Tribune* published an article concerning the Minnesota Attorney General's

complaint against CenturyLink. To the extent the allegations in paragraph 168 purport to quote,

summarize, or characterize the article, Defendants refer the Court to the contents of the article. To

the extent the allegations in paragraph 168 differ in any way from the contents of the article,

Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny

each and every remaining allegation in paragraph 168.

169.    Analysts reacted sharply to the news. The same day, Morningstar published an
analyst report in which it reported on the Minnesota Attorney General and consumer lawsuits.
Morningstar analysts noted complaints of "similar overbilling practices in a number of other states,
such as Oregon, Colorado, and Arizona," and explained that "it is likely that other states will follow
suit in bringing legal actions against CenturyLink." On the sole basis of the revelations in the
Minnesota Attorney General's complaint and the assessment that the problem was widespread,
Morningstar's slashed its fair value estimate for CenturyLink stock by over 6%.

169.    Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in the first sentence of paragraph 169 and, therefore, deny them. To the extent

the allegations in paragraph 169 purport to quote, summarize, or characterize a Morningstar analyst

report, Defendants refer the Court to the contents of the report. To the extent the allegations in

paragraph 169 differ in any way from the contents of the report, Defendants deny every such

allegation. Except as expressly admitted herein, Defendants deny each and every remaining

allegation in paragraph 169.

170.    These disclosures further corrected Defendants' prior materially misleading
statements and omissions concerning CenturyLink's sales practices. These disclosures also
revealed that the Company's institutionalized cramming model went beyond adding unrequested
services to customers' accounts and also included charging and misrepresenting fees, and
systematically refusing to honor the prices offered to customers. Last, these revelations informed
investors that the Company and its senior executives had knowledge of the extensive problems
with CenturyLink's sales practices but concealed them from the state regulators.

170.    Defendants deny the allegations in paragraph 170.

171.    Once again, the market reacted severely to these revelations, with CenturyLink stock declining in a statistically significant manner, falling by $0.75 per share, or 3.23%, on extraordinarily high volume, to close at $22.50 on July 12, 2017, causing investors substantial losses.

171.    Defendants admit that CenturyLink's stock closed at $22.50 per share on July 12, 2017.  To the extent Plaintiffs purport to describe or characterize the price of CenturyLink's stock or the trading volume on certain dates, it is a matter of public record.  Defendants deny that the allegations in paragraph 171 accurately and completely describe the factors affecting stock price movements described therein.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 171.

## VI.    POST-CLASS PERIOD EVENTS

172.    On its second quarter August 2, 2017 earnings call, CenturyLink disclosed that it had formed a special committee to investigate the Company's consumer billing practices – but Defendant Post refused to answer any questions about the investigation, the Company's billing practices, or their impact on the Company, stating that "we cannot speak for the work [of the committee] before it's complete."

172.    Defendants admit that CenturyLink hosted a conference call for investors on August 2, 2017 concerning its second quarter 2017 earnings report.  To the extent the allegations in paragraph 172 purport to quote, summarize, or characterize the transcript of that conference call, Defendants refer the Court to the contents of the transcript.  To the extent the allegations in paragraph 172 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 172.

173.    On October 23, 2017, CenturyLink entered into a stipulated consent order with the Minnesota Attorney General in which it agreed to dramatically reform its sales practices in Minnesota. Specifically, CenturyLink agreed to "in a clear and conspicuous manner disclose to Minnesota consumers at the time of sale" significantly more information than the Company had throughout the Class Period, including the monthly base prices of services, an itemization of fees, the time period during which quoted prices applied, information about whether CenturyLink guaranteed the fees, and any restrictions or conditions on a customer's ability to receive the quoted prices. The consent order also prohibited CenturyLink from charging Minnesota consumers

amounts greater than those that had been disclosed, to refuse to honor quoted prices on the basis of undisclosed conditions or restrictions, and required the Company to "implement processes and procedures, and provide sufficient training designed to ensure" that the Company made adequate disclosures to consumers. That CenturyLink was required to stipulate to providing such basic information and assurances confirmed that the Company's representations about its customer service and sales practices throughout the Class Period were materially false and misleading, as they did not include even basic measures to ensure customers were quoted the correct price or that customer complaints were properly investigated and handled.

173.    Defendants admit that on October 23, 2017, CenturyLink entered into a stipulated consent order with the Minnesota Attorney General.  To the extent the allegations in paragraph 173 purport to quote, summarize, or characterize the consent order, Defendants refer the Court to the contents of the consent order.  To the extent the allegations in paragraph 173 differ in any way from the contents of the consent order, Defendants deny every such allegation.  Defendants deny the allegations in the last sentence of paragraph 173.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 173.

174.    On December 7, 2017, the Company announced the results of the Special Committee's investigation into the Company's sales and billing practices. Although CenturyLink claimed that this investigation "did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing" – despite the overwhelming evidence cited above confirming the contrary – the Company admitted several key findings demonstrating that its Class Period statements were materially false and misleading when made. These findings included that:

- "[s]ome of the Company's products, pricing and promotions were complex and caused confusion, and the resulting bills sometimes failed to meet customer expectations";

- "limitations in the Company's ordering and billing software made it difficult to provide customers with estimates of their bills and confirmation of service letters that reflected all discounts, prorated charges, taxes and fees";

- "[s]ystems and human errors led to certain customers not receiving an offered point-of-sale discount"; and

- "[t]he Company did not fully address this issue in a timely manner for some customers."

174.    Defendants admit that, on December 7, 2017, CenturyLink issued a press release describing the Special Committee's review of CenturyLink's policies, procedures and practices relating to consumer sales, service and billing.  To the extent the allegations in paragraph 174 purport to quote, summarize, or characterize the press release, Defendants refer the Court to the contents of the press release.  To the extent the allegations in paragraph 174 differ in any way from the contents of the report, Defendants deny every such allegation.  Defendants deny that the report admitted that CenturyLink made any materially false or misleading statements during the proposed Class Period.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 174.

175.    These admissions confirmed several key allegations in the whistleblower complaint and, as news media reports were quick to point out, they contradicted the Company's claims of management's innocence.  For example, on December 13, 2017, the telecommunications website Techdirt published an article titled "After Investigating Itself, CenturyLink Proclaims There's Just No Way It Committed Billing Fraud," mocking the committee for finding "precisely what CenturyLink CEO Glen Post hoped they would." As the report noted, the Special Committee's findings were in "stark contrast to what whistleblowers and numerous state investigations have so far discovered." To date, CenturyLink has refused to produce any documents or information underlying the committee's investigation to the Minnesota Attorney General or the plaintiffs in the consumer class actions, broadly claiming those materials are subject to work product and attorney-client privileges.

175.    Defendants deny the allegations in the first sentence of paragraph 175.  Defendants admit that the on December 13, 2017, the website Techdirt published an article titled "After Investigating Itself, CenturyLink Proclaims There's Just No Way It Committed Billing Fraud." To the extent the allegations in paragraph 175 purport to quote, summarize, or characterize the article, Defendants refer the Court to the contents of the article.  To the extent the allegations in paragraph 175 differ in any way from the contents of the article, Defendants deny every such allegation.  To the extent the allegations in paragraph 175 purport to quote, summarize, or characterize documents containing legal arguments CenturyLink made in other cases, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those

documents.  To the extent the allegations in paragraph 175 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 175.

176.    On December 18, 2017, Defendant Post conceded that the reduction of CenturyLink's operating cash flows – which had been curtailed by the Company's inability to continue generating revenues through cramming – to the decline in CenturyLink's share price. Specifically, in an internal Company email sent one week before Christmas, Defendant Post told employees that, "[b]ecause of the reductions we have experienced in operating cash flow, I have decided it is best that we not pay the holiday bonus that we have previously paid for many years at CenturyLink." In that email, Post said that "we must make progress in stabilizing and growing our cash flows," noting that "this cash flow issue has contributed to the decline in our stock price we have seen over this past year."  Several weeks later, on January 11, 2018, Defendant Post sent an internal memo announcing a pay freeze for 2018, again citing the Company's lowered stock price. At the same time, Defendant Post earned more than $14 million in compensation in 2017, and over $50 million during the Class Period.

176.    Defendants deny that CenturyLink's operating cash flows or revenues had been materially affected by cramming.  Defendants admit that, on December 18, 2017, Post sent a company-wide email concerning holiday bonuses, and, on January 11, 2018, Post sent an internal memo concerning employee compensation for 2018 but deny that Plaintiffs have completely or accurately characterized the contents of those emails.  To the extent the allegations in paragraph 176 purport to quote, summarize, or characterize those documents, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 176 differ in any way from the contents of those documents, Defendants deny every such allegation.  Post's CenturyLink compensation and equity holdings were described in relevant SEC filings during the proposed Class Period and are a matter of public record.  Defendants otherwise lack knowledge or sufficient information to form a belief as to the truth of the allegations in the last sentence of paragraph 176 and, therefore, deny them.  To the extent the allegations in paragraph 176 purport to quote, summarize, or characterize those public records, Defendants refer the Court to the contents of those records.  To the extent the allegations in paragraph 176 differ in any way from the contents of

those records, Defendants deny every such allegation.  Except as expressly admitted herein,

Defendants deny each and every remaining allegation in paragraph 176.

177.    On March 6, 2018, Defendant Post – who had previously announced his intention to stay on with the Company as CEO until January 1, 2019 – unexpectedly announced that he would retire in May 2018, immediately following the Company's annual shareholder meeting. Post resigned from the Company on May 23, 2018. Post had served as CenturyLink's CEO for more than 26 years and been with the company for 42 years.

177.    Defendants admit that, on March 6, 2018, Post announced he would retire in May

2018, and that Post did retire on May 23, 2018 following CenturyLink's annual shareholder

meeting which was held on May 23, 2018.  Defendants admit that Post had served as

CenturyLink's CEO for 26 years and had been employed by CenturyLink for 42 years.  Except as

expressly admitted herein, Defendants deny each and every allegation in paragraph 177.

178.    Numerous investigations by state attorneys general and other regulatory authorities into CenturyLink's fraudulent billing practices remain pending, and discovery in those actions has only further confirmed the extent of Defendants' fraud. For example, on March 14, 2018, the Minnesota Attorney General filed a letter brief revealing that discovery in its case revealed "that CenturyLink charged over 12,000 Minnesota consumers more than CenturyLink promised" and that information produced in another state investigation showed that "CenturyLink over-billed more than 175,000 customers in that state." Moreover, according to the Minnesota Attorney General, discovery in that case disclosed that an internal "nation-wide audit" conducted by CenturyLink showed "various billing problems, including that CenturyLink potentially over-billed more than 3.5 million customers in various states" – amounting to over half of CenturyLink's 5.9 million broadband subscribers. These facts confirm the systemic nature of CenturyLink's billing misconduct, and that such a companywide, institutional practice could not have escaped the attention of CenturyLink's senior management but could have only been carried out with the explicit approval or reckless disregard of the Executive Defendants.

178.    Defendants deny the allegations in the first sentence of paragraph 178.  Defendants

admit that, on March 14, 2018, the Minnesota Attorney General filed a letter brief in Minnesota

state court regarding a discovery dispute.  To the extent the allegations in paragraph 178 purport

to quote, summarize, or characterize the letter brief, Defendants refer the Court to the contents of

the letter brief.  To the extent the allegations in paragraph 178 differ in any way from the contents

of the letter brief, Defendants deny every such allegation.  To the extent the letter brief purports to

quote, summarize, or characterize other documents, which Plaintiffs have not specifically identified, Defendants refer the Court to the contents of those documents. To the extent the allegations from the letter brief, repeated or summarized in paragraph 178, differ in any way from the contents of those documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 178.

## VII.    SCIENTER

179.    Numerous facts, considered collectively, demonstrate that CenturyLink and the Executive Defendants knew that they were misrepresenting the Company's sales practices, the bases for the consumer segment's reported revenues, and the sustainability of those revenues or, at a minimum, acted with severe recklessness.

179.    Defendants deny the allegations in paragraph 179.

180.    First, as noted above, Defendants were directly informed of sales misconduct occurring at a massive scale throughout the Company, which directly demonstrates scienter. For example, in April 2014, FE-5 directly informed Defendant Bailey of the cramming issues s/he encountered, and Defendant Bailey acknowledged that cramming was occurring and stated that "We've got to do something about our call centers." Shortly thereafter, Defendant Post sent a Company-wide email stating that the Company was creating a position for Bailey concerning business ethics and how the Company deals with customers. At around the same time, the Company implemented a dramatic reform of how it assessed sales personnel in an effort to address the cramming crisis at the Company. This change was accompanied by a companywide communication blast, and Kathy Flynn was recognized by Defendant Post for her work on the project. However, after the Company's sales numbers took a downturn shortly after the change, the Company's senior management reverted back to the old metrics system immediately. Because, as CenturyLink has admitted, all sales and billing policies were made by managers at CenturyLink's headquarters, these significant companywide changes could only have occurred with the knowledge and/or specific approval of the Executive Defendants.

180.    Defendants deny the allegations in the first, fourth, sixth, and seventh sentences of paragraph 180. Bailey denies the allegations in second sentence of paragraph 180. The remaining Executive Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 180. Defendants admit that Post sent a company-wide email announcing Bailey's new position as Senior Vice President, Operational Transformation on May 14, 2015 but deny that the email was sent "shortly thereafter" April 2014.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in the fifth sentence of paragraph 180.

181.    The Executive Defendants were also made aware of the investigations initiated by
the Arizona and Minnesota state Attorneys General, and their findings were communicated to the
Executive Defendants. Indeed, after the end of the Class Period, Defendant Post attempted to take
credit for personally responding to the Minnesota Attorney General's investigation. In a July 23,
2017 internal email to Company employees, Post claimed that "we have been fully cooperating
with the AG's office since the inquiry began" in May 2016, and "we had several phone meetings
with the AG's office about the information provided and were never told they thought we were
being uncooperative." Moreover, customers reported instances of improper billing directly to the
Executive Defendants, including Defendants Post and Puckett, who tracked the Company's
investigation into and response to those complaints. As FE-19 reported, typically, Defendant Post
complained that the Company offered too much compensation to resolve customer billing
complaints. Last, when a whistleblower, Heiser, raised concerns about rampant sales misconduct
directly with Defendant Post in October 2016 in a companywide forum, she was promptly
terminated.

181.    Defendants admit that CenturyLink was aware of investigations initiated by the

Arizona and Minnesota state Attorneys General and of the purported findings of the investigations.

Defendants admit that Post sent an internal email in or around July 2017 regarding CenturyLink's

response to the Minnesota Attorney General investigation. To the extent the allegations in

paragraph 181 purport to quote, summarize, or characterize the email, Defendants refer the Court

to the contents of the email. To the extent the allegations in paragraph 181 differ in any way from

the contents of the email, Defendants deny every such allegation. Defendants admit that some

consumer complaints were sometimes reported to CenturyLink executives. CenturyLink admits

that Heiser was terminated from her employment from CenturyLink in or around October 2016.

CenturyLink and Post deny that Heiser raised concerns with Defendant Post in October 2016 in a

companywide forum. The remaining Executive Defendants lack knowledge or sufficient

information to form a belief as to the truth of allegations in paragraph 181 related to Heiser and,

therefore, deny them. With respect to the remaining allegations in paragraph 181, Defendants lack

knowledge or sufficient information to form a belief as to the truth of those allegations and deny

that they provide a complete and accurate description of the subject matter described therein and,

on that basis, deny each of them.

182.    Second, the Executive Defendants received regular routine reporting that directly informed them of the extent and nature of the widespread billing practices at the Company's call centers. Numerous employees, including FE-16, FE-18, and FE-19, confirmed that the Executive Defendants – including Defendants Post, Ewing, and Puckett – received monthly reports by email that provided data on customer complaints about customer billing, including from state regulators, the FCC, and the BBB, and that these reports specifically identified "cramming." As FE-16 explained, the "complaint that always stood out was misrepresenting prices," because the Company "always had those issues." Indeed, as a former CenturyLink employee explained, the Company's "coaching" systems included an option in its drop-down menu for "cramming," demonstrating just how institutionalized these practices were. The Company's cramming practices were also recorded in the Company's Q-FINITY reporting system, documented in reports to supervisors and managers, tracked in monthly sales worksheets, reflected in HR investigations, exit surveys, and disciplinary and termination proceeding materials, and discussed in monthly meetings by senior management. For these reasons, it would be implausible for Defendants to claim they were unaware they were occurring.

182.    Defendants deny the allegations in the first, fifth, and last sentence of paragraph

182.  Defendants lack knowledge or sufficient information to form a belief as to the truth of the

allegations in the second, third, and fourth sentences of paragraph 182 and, therefore, deny them.

183.    Third, the Company's billing scheme was implemented by the Executive Defendants, who dictated the revenue projections and sales targets the Company's sales force was required to meet. Not only did the Executive Defendants set the Company's revenue targets, senior management closely monitored and enforced the sales quotas required to meet them. The Executive Defendants had access to "real time" sales and revenue data through the Company's dashboard system, and could track the revenues and sales at the employee-level. In fact, as described by FE-8, Olsen, an HR Business Partner, and the relevant directors and managers of each call center would hold monthly meetings to review sales employee performance and tracking of quotas, and discuss the discipline for employees who missed targets. Despite regular reporting and evidence that sales quotas were simply unobtainable, CenturyLink's managers refused to adjust them. As FE-8 explained, sales targets went unchanged even when over half of all employees failed to meet them for a significant portion of the Class Period, while and FE-1 reported that between 70% to 80% of all sales employees were under some sort of corrective action for missing quotas at any given time. The same managers charged with setting and monitoring quotas – including Olsen – were informed of the fraudulent practices and customer complaints that enforcement of these quotas encouraged. Indeed, CenturyLink managers even trained sales employees to engage in cramming by instructing them to quote a single price to customers without breaking out optional service fees. These facts raise a strong inference that Defendants knew that cramming was a significant problem at the Company when they made their misrepresentations.

183.    Defendants deny the allegations in the first and last sentence of paragraph 183. Defendants admit that some CenturyLink executives set revenue projections and monitored sales performance.  With respect to the remaining allegations in paragraph 183, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

184.    Fourth, Defendants paid careful attention to the drivers of the Company's revenues and made regular representations to the market about them – and can therefore not plausibly deny knowledge of a practice that impacted up to half of all CenturyLink customers.  On numerous conference calls, Defendants discussed whether (and to what degree) various strategies affected the Company's results and reported on, for example, specific details concerning the efficacy of CenturyLink's "bundling" strategy, the amount of CenturyLink's ARPU compared to its competitors, and the credit profiles of CenturyLink customers. As Defendant Douglas admitted, CenturyLink executives were "constantly monitoring what our competitors are doing in the marketplace," and thus also obviously knew what the Company itself was doing. Given that the Executive Defendants paid close attention to the drivers of the Company's and its competitors' revenues, there is a strong inference that they were aware of a key driver – rampant sales misconduct – that, according to an internal CenturyLink audit, may have impacted between a third and a half of all CenturyLink customers.

184.    Defendants admit that some CenturyLink executives sometimes discussed "revenue drivers" in public statements.  To the extent the allegations in paragraph 184 purport to quote, summarize, or characterize documents, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 184 differ in any way from the contents of those documents, Defendants deny every such allegation. Defendants deny the allegations in the last sentence of paragraph 184.  With respect to the remaining allegations in paragraph 184, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

185.    Fifth, the Company repeatedly represented to numerous constituencies and public regulators not to engage in fraudulent sales practices, and affirmatively denied that it engaged in sales misconduct alleged herein. Throughout the Class Period, Defendant Cole and the Company

certified compliance and entered into numerous agreements with public utilities which required the Company to explicitly agree to avoid engaging in the very misconduct alleged herein. Moreover, in entering into an Assurance of Discontinuance with the Arizona Attorney General, the Company explicitly agreed to refrain from the same conduct that would be revealed as Company practice by Heiser's and the Minnesota Attorney General's complaints. Indeed, in the Arizona Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, managerial [and] supervisory employees," the Company "expressly deni[ed]" allegations that it engaged in billing misconduct. And, in responding to media inquiries detailing customer complaints, the Company asserted that any identified problems were in conflict with Company policy or were the result of other, innocuous causes. These false denials were part of the senior leadership's overriding culture in dealing with investigation into and criticism of its sales practices. As FE-19 reported, no matter the facts, CenturyLink's executive leadership would rather "pay the fines" than "kowtow" to a state Attorney General and actually reform the Company's practices. These facts further confirm that Defendants either knew their statements were false, or were reckless in making them.

185.    Defendants admit that CenturyLink has denied the allegations regarding sales misconduct described in the Complaint and that CenturyLink has stated that it does not condone or authorize fraudulent sales practices.  To the extent the allegations in paragraph 185 purport to quote, summarize, or characterize other agreements with public utilities, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 185 differ in any way from the contents of those documents, Defendants deny every such allegation.  Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General.  To the extent the allegations in paragraph 185 purport to quote, summarize, or characterize the Assurance of Discontinuance, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 185 differ in any way from the contents of that document, Defendants deny every such allegation.  To the extent the allegations in paragraph 185 purport to quote, summarize, or characterize other CenturyLink statements, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those statements.  To the extent the allegations in paragraph 185 differ in any way from the contents of those statements, Defendants deny every such allegation.  Defendants deny the allegations in the third and fifth sentences of paragraph 185.

The last sentence of paragraph 185 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein. Defendants lack knowledge or sufficient information to form a belief as to the truth of the allegations in the sixth sentence of paragraph 185 and, therefore, deny them. Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 185.

186.    Sixth, sales misconduct was so widespread and material at the Company that Defendants had to have known about it. Cramming resulted in overbilling of up to 3.5 million customers, representing between one-third and one-half (or more) of the Company's subscribers. Heiser characterized the scandal at CenturyLink as "Wells Fargo- like," but the scale of misconduct at CenturyLink was far more pervasive than at Wells Fargo. Wells Fargo has said that the number of unauthorized or fraudulent accounts at issue there represented approximately 2% of all such accounts at Wells Fargo. At CenturyLink, between a third and a half of all subscribers may have been overbilled. Moreover, as detailed above in ¶93, the amounts of fraudulent charges at CenturyLink amounted to hundreds of dollars per customer are far greater than the total amount of fraudulent accounts at Wells Fargo, which totaled approximately $2.5 million. Given the pervasive nature of the alleged misconduct, Defendants cannot plausibly claim they were ignorant of it during the Class Period.

186.    To the extent the allegations in the second sentence of paragraph 186 purport to quote, summarize, or characterize Heidi Heiser's complaint, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 186 differ in any way from the contents of that document, Defendants deny every such allegation. Defendants deny the remaining allegations in paragraph 186.

187.    Seventh, the SEC specifically asked the Company to provide more detailed information about its reported revenues and marketing and sales efforts of its consumer segment, further underscoring the importance of the Company's disclosures about its actual sales practices. In fact, the SEC was questioning the Company's disclosures about these practices at the same time the Company had undertaken significant efforts to address illegal cramming at the Company – but then aborted those efforts after they led to a decline in sales. The fact that the Company's primary securities regulator sought additional disclosure concerning the reasons for the performance of the Company's consumer segment – and the fact the Company and Defendant Cole refused to provide such disclosure – also raises a strong inference that Defendants knew or were reckless in not knowing about the fraud.

187.    Defendants admit that the SEC sent CenturyLink a letter requesting additional information about its financial statements in August 2015. To the extent the allegations in

paragraph 187 purport to summarize or characterize the SEC letter, Defendants refer the Court to

the contents of that document.  To the extent the allegations in paragraph 187 differ in any way

from the contents of that document, Defendants deny every such allegation.  The last sentence of

paragraph 187 asserts legal conclusions to which no response is required; to the extent a response

is required, Defendants deny the allegations therein.   Except as expressly admitted herein,

Defendants deny each and every remaining allegation in paragraph 187.

188.    Finally, several members of CenturyLink's senior leadership departed under suspicious circumstances. On February 11, 2015, Defendant Puckett, who had previously served as CenturyLink's COO for 5 years, was elevated to a position leading CenturyLink's global head of sales and revenue. Less than four months later, however, she was summarily terminated, and forfeited equity awards that would later be valued at over $2 million. In similar circumstances, on April 28, 2017, CenturyLink announced that Defendant Douglas, Puckett's successor, would be a member of the senior leadership team reporting to Defendant Post after the Level 3 merger closed. Less than two months later, after investors began to learn the truth about the Company's widespread sales misconduct, CenturyLink announced that Douglas would be leaving the Company. In so doing, Douglas forfeited more than $2 million in compensation. It is implausible that these executives left voluntarily, forfeiting millions of dollars in compensation, shortly after being promoted. The termination of Defendants Puckett and Douglas – the senior-most executives with direct responsibility for consumer segment sales – adds to the inference of scienter.

188.    Defendants deny the allegations in the first and seventh sentences of paragraph 188.

Defendants admit: that Puckett had served as CenturyLink's COO between 2010 and 2015; that,

on February 11, 2015, CenturyLink announced that Puckett would assume the role of Global Head

of Sales and revenue; and that, on June 2, 2015, CenturyLink announced that Puckett would resign.

Defendants admit that a press release issued on April 28, 2017 described Douglas's role at

CenturyLink, and that, on June 22, 2017 CenturyLink announced Douglas's planned departure

from CenturyLink.  Puckett's and Douglas's CenturyLink compensation and equity holdings were

described in relevant SEC filings during the proposed Class Period and are a matter of public

record.  Defendants otherwise lack knowledge or sufficient information to form a belief as to the

truth of the allegations in the third and sixth sentences of paragraph 188 and, therefore, deny them.

To the extent the allegations in paragraph 188 purport to quote, summarize, or characterize

CenturyLink press releases, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 188 differ in any way from the contents of those documents, Defendants deny every such allegation.  The last sentence of paragraph 188 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 188.

189.   Similarly, Joseph Zimmel, the former director and audit committee member, was ousted from the Board under suspicious circumstances. Investors only learned about the background concerning his removal because Zimmel forced the Company to disclose it. Zimmel was forced off of the Board just weeks after the Company responded to the SEC's inquiry questioning the bases for the consumer segment's operating performance. And Zimmel himself said his forced departure, and the Board's handling of the matter, "raised serious governance, transparency and honesty issues" and that the Company attempted to portray those events to the investing public in an "incomplete[,] inaccurate[,]" and "deliberately misleading" way. The unusual circumstances of Zimmel's ouster, as well as his role on the Company's audit committee, the timing of significant companywide employee performance changes and their corresponding revenue impact, adds to the inference of scienter.

189.   Defendants admit that former CenturyLink director Joseph Zimmel, a former director and audit committee member, resigned from the CenturyLink Board of Directors on January 19, 2016.  To the extent the allegations in paragraph 189 purport to quote, summarize, or characterize a CenturyLink public filing, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 189 differ in any way from the contents of the document, Defendants deny every such allegation.  The last sentence of paragraph 189 asserts legal conclusions and does not require a response; to the extent a response is required, Defendants deny the allegations therein.  Except as expressly admitted herein, Defendants deny each and every remaining allegation in paragraph 189.

## VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

190.   Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions, including those concerning: (1) the nature of the Company's "customer first" business strategy and, particularly, CenturyLink's purported strategy of providing

products and services according to customers' "needs" and its purported practice of "bundling" its products and services; (2) the reasons and factors driving the Company's financial performance, including the drivers of the revenues it reported from consumers and small business customers, the impact of the Company's "bundling" marketing strategy, and the quality and demand for the Company's services; (3) the reasons behind CenturyLink's fluctuating financial results, which had been secretly impacted by the Company's quickly-aborted effort to address its deceptive sales practices cramming crisis; (4) CenturyLink's business conduct, particularly as it related to sales practices, business integrity, and ethical standards, as well as the Company's statements minimizing, and denying the Company's fraudulent billing practices in response to news reports that began to highlight them; and (5) CenturyLink's material omissions under Item 303.

190. To the extent the allegations in paragraph 190 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 190 differ in any way from the contents of those documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 190.

### A. Materially False And Misleading Statements And Omissions Concerning CenturyLink's Business Strategies and Financial Performance

191. Throughout the Class Period, Defendants misled investors concerning the reasons for the Company's financial performance and the business strategies the Company purportedly used to drive subscriber and revenue growth. Specifically, the Company claimed the Company adhered to a "customer first" marketing approach and enhanced revenues and "customer loyalty" through its service "bundling" strategy. Defendants also falsely attributed revenue growth and performance to the Company's strategy of implementing price increases, focusing on retention and higher ARPU customers, as well as its purported transparent billing and CenturyLink's purported practice of not charging the "additional fees" its competitors did.

191. To the extent the allegations in paragraph 191 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 191 differ in any way from the contents of those document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 191.

192. These statements were materially false and misleading. In reality, the Company did not place customers first or provide services based on customers' "needs," but "only cared about profits" and routinely charged customers for services they did not need and did not authorize. Further, the Company did not grow revenues through a "bundling" strategy, by imposing selective

price increases, focusing on higher ARPU customers, or by providing transparent billing and avoiding the "additional fees" its competitors charged. In fact, the opposite was true: the Company routinely added services and charged customers' accounts without their approval and refused to honor the prices customers had been quoted. These practices were so ubiquitous that imposing "additional fees" for unauthorized services and other fraudulent sales practices were a material undisclosed contributor to the Company's reported revenues.

192.    To the extent the allegations in paragraph 192 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 192 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 192.

### 1.    False and Misleading Statements Concerning CenturyLink's Purported Focus on Customer "Needs"

193.    Throughout the Class Period, Defendants repeatedly emphasized CenturyLink's purported strategy of selling services and growing subscribers by focusing on providing services that met its customers' "needs," and how this focus helped the Company to effectively compete with cable companies that were often able to offer cheaper prices for similar services. For example, on June 24, 2015, Defendant Post and CenturyLink CTO Aamir Hussain presented at the CenturyLink Inc. Financial Analyst Day.  During the presentation, Post stated that CenturyLink was:

> [F]ocus[ed] on our customers, their needs, the customer experience in all that we do. It really is about the customer. As we transform this Company, because it has to come from the customer, not what we think is best. What does the customer need to really -- for us to create value for that customer, bring them what they need, how they need their services, their communication services or IT services?

> *    *    *

> [W]e have talked about our focus on the customer today. And I know maybe that sounds a little trite. But so many customers -- so many companies fail to really focus on the customer. And it is about creating value for that customer in a way and the customer experience being something they can walk away with really makes him want to do business with CenturyLink in this case, very important.

Confirming the Company's purported strategy of focusing on CenturyLink's customers' needs, Hussain stated that CenturyLink had "a team focused on that and their job is day- in/day-out just rationalize all the product sets that [the Company has] out there, make the network and products simple and easy to use for [its] customers."  Hussain stressed that "[w]e underline all that with a

world-class project management and metrics team and their job is to … [d]eliver a solution that gets to the customer when they need, what they need and where they need it. That is key for us."

193.   Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors. Defendants further admit that CenturyLink held a CenturyLink Inc. Financial Analyst Day on or about June 24, 2015.   To the extent that the allegations of paragraph 193 purport to quote, summarize, or characterize the transcript of that Analyst Day, Defendants refer the Court to the contents of that transcript. To the extent the allegations in paragraph 193 differ in any way from the contents of the transcript, Defendants deny every such allegation.   With respect to the remaining allegations in paragraph 193, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

194.   Defendants made similar statements in the Company SEC filings during the Class Period, on earnings calls, and during other public presentations. For example, on March 1, 2013, the first day of the Class Period, CenturyLink filed its Form 10-K annual report for fiscal year 2012 (the "2012 Annual Report") with the SEC. In its 2012 Annual Report, CenturyLink stated that it "rel[ied] on [its] call center personnel to promote sales of services that meet the needs of our customers."   According to CenturyLink, its "approach" to its "residential customers emphasizes customer-oriented sales, marketing and service with a local presence."   CenturyLink stated that it "market[ed] [its] products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties."

194.   Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings, in conference calls with investors, or in public presentations.   To the extent the allegations in paragraph 194 purport to quote, summarize, or characterize CenturyLink's 2012 Annual Report, Defendants refer the Court to the contents of that document.   To the extent the allegations in paragraph 194 differ in any way from the contents of the document, Defendants deny every such allegation.   With respect to the remaining allegations in paragraph 194, Defendants lack knowledge or sufficient information to form a belief as to the

truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

195.    CenturyLink repeated these statements throughout the Class Period, including in its annual reports filed on Form 10-K for fiscal year 2013 (the "2013 Annual Report"), filed on February 27, 2014; fiscal year 2014 (the "2014 Annual Report"), filed on February 24, 2015; fiscal year 2015 (the "2015 Annual Report"), filed on February 25, 2016; and fiscal year 2016 (the "2016 Annual Report"), filed on February 23, 2017. Each of these reports were signed by Defendants Post, Ewing and Cole.

195.    To the extent the allegations in paragraph 195 purport to quote, summarize, or characterize CenturyLink's 2013, 2014, 2015, and 2016 Annual Reports, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 195 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 195.

196.    In its 2015 and 2016 Annual Reports, CenturyLink represented that its "sales and marketing strategy [was] to enhance [its] sales by offering solutions tailored to the needs of [its] various customers and promoting our brands," and that its "offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments."

196.    To the extent the allegations in paragraph 196 purport to quote, summarize, or characterize CenturyLink's 2015 and 2016 Annual Reports, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 196 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 196.

197.    CenturyLink also represented that its business strategy for specific services was based on the Company "meeting customer care needs." For example, referring to its consumer segment and "strategic services" – such as the Company's broadband and television services – CenturyLink's 2012 Annual Report represented that the Company's strategy for maintaining and increasing its customers was "based on pricing, packaging of services and features, quality of service and meeting customer care needs." The Company repeated this same statement in its 2013, 2014, 2015, and 2016 Annual Reports. Similarly, during investor conference calls on March 9, 2015, June 4, 2015 and March 7, 2016, Defendant Ewing stated "[w]e're committed to being the broadband leader in our markets, offering advanced broadband services that meet the needs of our customers."

197.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors.  To the extent the allegations in paragraph 197 purport to quote, summarize, or characterize CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 197 differ in any way from the contents of those documents, Defendants deny every such allegation.  Defendants admit that CenturyLink held investor conference calls on or about March 9, 2015, June 4, 2015, and March 7, 2016.  To the extent that the allegations in paragraph 197 purport to quote, summarize, or characterize those transcripts, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 197 differ in any way from the contents of those transcripts, Defendants deny every such allegation.  With respect to the remaining allegations in paragraph 197, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

198.    With respect to CenturyLink's "legacy services" – i.e., the "traditional" voice, data and long distance phone services that were threatened by a structural shift to wireless and other newer technologies – the Company represented in its 2012 Annual Report that its "strategy to reduce access line loss" was "based primarily on [its] pricing, packaging of services and features, quality of service and meeting customer care needs."  CenturyLink made nearly identical representations concerning its strategy to "reduce" or "manage access line loss" and legacy services revenues in its 2013, 2014, 2015, and 2016 Annual Reports.

198.    To the extent the allegations in paragraph 198 purport to quote, summarize, or characterize CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 198 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 198.

199. Defendants specifically highlighted the Company's focus on "customer needs" as responsible for CenturyLink's results. For example, during CenturyLink's 2014 second quarter conference call on August 6, 2014, Defendant Post attributed the "significant improvement" and impressive $4.11 billion quarterly "core" revenues, which represented "a significant improvement from the 2% and 3% declines in year-over-year core revenues in the first-quarter 2013 and 2012, respectively," as "reflecting the commitment and dedication of our employees to meet the needs of our customers."

199. Defendants admit that, at various points during the proposed Class Period,

Defendants discussed business strategies in SEC filings or in conference calls with investors.

Defendants admit that CenturyLink held an investor conference call on or about August 6, 2014.

To the extent that the allegations of paragraph 199 purport to quote, summarize, or characterize

the transcript of that conference call, Defendants refer the Court to the contents of that document.

To the extent the allegations in paragraph 199 differ in any way from the contents of the transcript,

Defendants deny every such allegation. With respect to the remaining allegations in paragraph

199, Defendants lack knowledge or sufficient information to form a belief as to the truth of those

allegations and deny that they provide a complete and accurate description of the subject matter

described therein and, on that basis, deny each of them.

200. The statements set forth above in ¶¶193-199 were materially false and misleading and omitted material facts because, as described in Section IV, rather than offer "solutions tailored to the needs" of customers or pursuing strategies based on customers' "purchasing needs," CenturyLink disregarded and undermined its customers' "needs." Despite the fact that CenturyLink's customers were entitled to and expected transparent, accurate, and fair quotes and bills, CenturyLink engaged in systematic cramming in which the Company routinely misquoted prices and omitted the prices of optional services when selling to customers. Moreover, the Company fraudulently added services to customers' bills that those customers did not request or authorize – let alone need. Rather than pursue strategies or solutions focused on customer "needs," CenturyLink disregarded its customers' "needs" by repeatedly refusing to honor prices that customers had been quoted.

200. To the extent the allegations in paragraph 200 purport to quote, summarize, or

characterize those documents, which Plaintiffs do not identify, Defendants refer the Court to the

contents of those documents. To the extent the allegations in paragraph 200 differ in any way

from the contents of those documents, Defendants deny every such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 200.

### 2. False And Misleading Statements Concerning CenturyLink's Reported Revenues

201.    Throughout the Class Period, Defendants told investors that the Company had taken a number of measures to achieve "revenue stability" – the point at which increased revenues from lower margin "strategic" services would offset slowing revenue declines from high-margin "legacy services" – and eventually return the Company to profitability. Indeed, this was analysts' central concern during the Class Period, and a topic of discussion in virtually every public presentation CenturyLink gave. For this reason, investors and analysts were highly attuned to the Company's revenue performance.

201.    Defendants admit that, at various points during the proposed Class Period,

Defendants discussed business strategies in SEC filings or in conference calls with investors.  To

the extent the allegations in paragraph 201 purport to quote, summarize, or characterize a

document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that

document.  To the extent the allegations in paragraph 201 differ in any way from the contents of

the document, Defendants deny every such allegation.  Defendants lack knowledge or sufficient

information to form a belief as to the truth of the allegations in the last two sentences of paragraph

201.  With respect to the remaining allegations in paragraph 201, Defendants lack knowledge or

sufficient information to form a belief as to the truth of those allegations and deny that they provide

a complete and accurate description of the subject matter described therein and, on that basis, deny

each of them.

202.    During every earnings announcement during the Class Period, Defendants told investors that the Company was achieving consistent "progress" toward CenturyLink's publicly-described goal of reaching "revenue stability" through key business strategies, including the Company's "bundling" strategy and pricing and discount initiatives, and the quality of and demand for specific CenturyLink products and services that Defendants claimed were responsible for revenue performance. The false and misleading statements concerning the Company's reported revenues, and the representations describing the reasons driving them and the Company's financial performance, are set forth in the chart attached hereto as Appendix A.

202.     Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors.  To the extent the allegations in paragraph 202 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 202 differ in any way from the contents of the document, Defendants deny every such allegation.   To the extent the allegations in paragraph 202 purport to quote, summarize, or characterize Plaintiffs' Appendix A, no response is required because Appendix A is not properly part of the Complaint.   To the extent a response is required, Defendants deny that any of CenturyLink's reported financial statements were false and misleading.  To the extent that Appendix A quotes, summarizes, or characterizes CenturyLink's reported financial statements, Defendants refer the Court to those reported financial statements. To the extent that the allegations in paragraph 202 differ in any way from the contents of those reported financial statements, Defendants deny such allegation.  With respect to the remaining allegations in paragraph 202, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

203.     The statements in Appendix A were materially false and misleading because they omitted the material fact that the Company's revenue and financial performance was due, at least in part, to the undisclosed illegal cramming practices alleged herein. Specifically, these representations created the false impression that the Company's financial performance resulted from the pursuit of legitimate business strategies and the purported demand for CenturyLink's services – and that therefore "revenue stability" was achievable in the near term – when, in reality, the Company's results depended upon and were materially impacted by the Company's undisclosed cramming practices.

203.     To the extent the allegations in paragraph 203 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 203 differ in any way from

the contents of the document, Defendants deny every such allegation.  To the extent the allegations

in paragraph 203 purport to quote, summarize, or characterize Plaintiffs' Appendix A, no response

is required because Appendix A is not properly part of the Complaint.   To the extent a response

is required, Defendants deny that any of CenturyLink's reported financial statements were false

and misleading.    To the extent that Appendix A quotes, summarizes, or characterizes

CenturyLink's reported financial statements, Defendants refer the Court to those reported financial

statements.  To the extent that the allegations in paragraph 203 differ in any way from the contents

of those reported financial statements, Defendants deny such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 203.

204.    Further, the Company's statements attributing revenue performance to purportedly legitimate factors concealed the highly material risks and consequences that the Company's illegal activities invited.  In reality, the Company's undisclosed practices were fundamentally unsustainable because they were inflated through fraud, and exposed the Company to the highly probable outcome that these revenues would disappear when CenturyLink's misconduct was uncovered.  Indeed, that is exactly what happened.

204.    Defendants deny the allegations in paragraph 204.

### 3.    False And Misleading Statements Concerning CenturyLink's Service "Bundling" Strategies

205.    Defendants represented that one of the most important marketing strategies the Company pursued to grow consumer revenues involved "bundling" – selling numerous services to a single customer – which the Company said led to greater customer loyalty, helped mitigate "legacy" revenue declines, increased service usage, and enabled the Company to effectively compete. For example, in its SEC filings during the Class Period, the Company represented that CenturyLink's "bundling" strategy:

- Presented significant "value" to customers: "We offer our customers the ability to bundle together several products and services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company."[6]

- Helped "maintain customer relationships": "We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide

---

[6] 2012 Annual Report, 2013 Annual Report, 2014 Annual Report, 2015 Annual Report, 2016 Annual Report.

our customers with a complete offering of integrated communications services." Similarly, CenturyLink stated that its "sales and marketing" "strategy [was] to enhance [its] communications services by offering a comprehensive bundle of services…to further enhance customer loyalty."[7]

- Positively impacted customer "retention": "While bundle price discounts have resulted in lower average revenues for our individual services," the Company "believe[d] service bundles continue to positively impact [its] customer retention."[8]

- Helped mitigate legacy service declines: As part of its effort to "mitigate" declines in its legacy services, the Company remained "focused on efforts to … promote long-term relationships with our customers through bundling of integrated services."[9]

- Attracted customers and led to increased usage of services: CenturyLink claimed that, "in addition to bundle discounts, we also offer limited time promotions on our broadband service for prospective customers who want our broadband service in their bundle, which further aids our ability to attract and retain customers and increase usage of our services."[10]

- Enabled CenturyLink to effectively compete: CenturyLink represented that "[i]n order to remain competitive, we believe continually increasing connection speeds is important. As a result, we continue to invest in our network, which allows for the delivery of higher speed broadband services. We also continue to expand our marketing and product bundling efforts by offering a variety of bundled products and services with various pricing discounts, as we compete in a maturing market in which a significant portion of consumers already have broadband services."[11]

205. Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors. To the extent the allegations in paragraph 205 purport to quote, summarize, or characterize

---

[7] 2012 Annual Report, 2013 Annual Report, 2014 Annual Report.

[8] 2012 Annual Report, 2013 Annual Report, 2014 Annual Report, 2015 Annual Report, and 2016 Annual Report.

[9] 2012 Annual Report, 2013 Annual Report, 2014 Annual Report, 2015 Annual Report, 2016 Annual Report; CenturyLink's Quarterly Reports on Form 10-Q filed on August 8, 2013, November 8, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 5, 2017; and Definitive Proxy Statement on Form DEF 14A filed April 10, 2013, April 16, 2014, April 8, 2015, April 5, 2016, and April 13, 2017.

[10] 2012 Annual Report and 2013 Annual Report.

[11] 2014 Annual Report, 2015 Annual Report, and 2016 Annual Report.

CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, CenturyLink's Quarterly Reports filed on August 8, 2013, November 8, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 5, 2017, and CenturyLink's Definitive Proxy Statements filed April 10, 2013, April 16, 2014, April 8, 2015, April 5, 2016, and April 13, 2017, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 205 differ in any way from the contents of those documents, Defendants deny every such allegation.  With respect to the remaining allegations in paragraph 205, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

206.    Defendants also made similar statements concerning the benefits and impact of the Company's "bundling" strategy during investor conference calls and presentations throughout the Class Period, including those set forth in paragraphs ¶¶58-59 above and set forth in the chart attached as Appendix A.

206.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors.  To the extent the allegations in paragraph 206 purport to quote, summarize, or characterize Plaintiffs' Appendix A, no response is required because Appendix A is not properly part of the Complaint. To the extent a response is required, Defendants deny that any of CenturyLink's reported financial statements were false and misleading.  To the extent that Appendix A quotes, summarizes, or characterizes CenturyLink's reported financial statements, Defendants refer the Court to those reported financial statements.  To the extent that the allegations in paragraph 206 differ in any way from the contents of those reported financial statements, Defendants deny every such allegation. With respect to the remaining allegations in paragraph 206, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide

a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

207.    The statements set forth above in ¶¶205-06 describing CenturyLink's "bundling" strategy were materially false and misleading because, as described in Section IV, rather than "offer…customers the ability to bundle multiple products," CenturyLink fraudulently and routinely added services that customers did not request and did not wish to "bundle." As set forth above in Section IV, CenturyLink's "bundling" strategy was frequently pursued by omitting key facts concerning "bundled" service packages, such as the existence and/or price of charges for individual services included within a "bundle" (e.g., @Ease and LineGuard), as well as terms and conditions for "bundle" package discounts. Moreover, CenturyLink routinely refused to honor requests by customers to cancel services, including requests to cancel services that customers never agreed to or requested. Thus, in truth, CenturyLink's strategy was not to "enhance" its services by "offering a comprehensive bundle of services" but to inflate the Company's revenues by adding improper charges and services to customers' bills. Rather than "promote long-term relationships" and "enhance customer loyalty," these practices greatly jeopardized the Company's ability to retain customers and ultimately threatened the sustainability of the Company's reported revenues.

207.    To the extent the allegations in paragraph 207 purport to quote, summarize, or characterize any document cited in paragraphs 205 and 206, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 207 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 207.

### 4.    False And Misleading Statements Concerning CenturyLink's Pricing and Discounting Strategies and the Demand for and Quality of CenturyLink's Offerings

208.    Defendants also repeatedly claimed that specific pricing and marketing strategies, as well as the quality and demand for specific CenturyLink services, were responsible for the financial performance of CenturyLink's consumer segment.

208.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed pricing and marketing strategies, the quality of and demand for some CenturyLink services, and the financial performance of CenturyLink's consumer segment in public statements.  With respect to the remaining allegations in paragraph 208, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny

that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

209. Among other things, Defendants represented that CenturyLink's strategy of imposing select "price increases" on certain products and changing various offered "discounts" impacted revenues. For example, during a February 11, 2015 investor call addressing fourth-quarter and year-end 2014 results, Defendant Puckett explained that select price increases in CenturyLink's Prism TV services, as well as "price increases" on "different categories of really access lines and other places," had a "positive impact" on the $1.494 billion in consumer revenues CenturyLink reported for the quarter. According to Defendant Puckett, these price increases were based on a methodology that CenturyLink had effectively used before, explaining that "we have a pretty good methodology that we've used over the years in terms of the lifecycle of products and price increases. We're just following our process there."

209. Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors. Defendants admit that CenturyLink held an investor conference call on or about February 11, 2015. To the extent that the allegations of paragraph 209 purport to quote, summarize, or characterize the transcript of that conference call, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 209 differ in any way from the contents of the transcript, Defendants deny every such allegation. With respect to the remaining allegations in paragraph 209, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

210. Defendants similarly highlighted CenturyLink's supposedly attractive "higher bandwidth and IPTV" services as responsible for revenues in the consumer segment in the first and second quarters of 2015. For example, during a November 4, 2015 conference call addressing the Company's third quarter 2015 results, Defendant Post explained that "[f]aster broadband speeds and hosting solutions are at the top of many of customers' list of needs," and that CenturyLink consumer revenues experienced "solid year-over-year growth" by "attracting more high-value customers and we have increased our ARPU through the continued launch of GPON, higher-value bundled sales and select pricing increases." Similarly, on December 7, 2015, at the UBS Global Media and Communications Conference, in response to an analyst's questions concerning revenue stability, Defendant Ewing stated, "if you look at the consumer side of the business, between the increase in revenues that we have seen from high-speed Internet as well as

our Prism TV service and price increases, select price increases that we have done, we've been able to see real stable revenue on the consumer side."

210.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors. Defendants admit that CenturyLink held an investor conference call on or about November 4, 2015.  To the extent that the allegations of paragraph 210 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 210 differ in any way from the contents of the transcript, Defendants deny every such allegation.  With respect to the remaining allegations in paragraph 210, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

211.    These statements were materially false and misleading. It was materially false and misleading to represent that select price increases, based on pricing strategies that CenturyLink had "used over the years in terms of the lifecycle of products," were responsible for revenue gains when, in truth, a highly material portion of the Company's reported revenues was obtained through fraudulent cramming. Further, it was false and misleading for Defendants to attribute revenue growth to "attracting more high-value customers" and increased ARPU through "higher-value bundled sales and select price increases" while concealing that CenturyLink's higher ARPU was at least in part achieved through illegal cramming.

211.    Defendants admit that CenturyLink held an investor conference call on or about November 4, 2015.  To the extent that the allegations of paragraph 211 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 211 differ in any way from the contents of the transcript, Defendants deny every such allegation.  To the extent the allegations in paragraph 211 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 211 differ in any way from the contents of the document, Defendants deny every such

allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 211.

212.    It was also materially false and misleading for Defendants to represent that "consumer demand" for the Company's purportedly "attractive" high-bandwidth and Prism TV offerings was responsible for the Company's consumer revenue growth when, in reality, a highly material portion of CenturyLink's reported revenues were achieved through illegal cramming.  In truth, as described above in Section IV, the Company's revenue performance was materially impacted by CenturyLink's routine failure to properly disclose terms and conditions concerning pricing discounts, systematic refusal to honor prices quoted to customers at the time of sale, and other improper and illegal billing practices.

212.    To the extent the allegations in paragraph 212 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 212 differ in any way from the contents of the document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 212.

**B.    False And Misleading Statements Covering Up Defendants' Secret Attempt to Address the Company's Cramming Crisis**

213.    As set forth above in Section IV, by 2014, Defendants recognized that CenturyLink's institutionalized cramming had reached crisis levels, that the Company had to "do something about our call centers," and secretly undertook dramatic steps to address it. Specifically, CenturyLink implemented a significant change to the Company's sales employee performance assessment model, switching to a "behavioral" coaching model in which the failure of sales representatives to meet quotas no longer led to immediate termination. While the new method led to a sharp decline customer complaints and terminations for unethical behavior after several months, the change also led to a decline in sales. As soon as sales declined, however, the Company reverted back to the prior method almost immediately because CenturyLink's senior management could not tolerate any decline in revenues.

213.    To the extent the allegations in paragraph 213 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to Section IV of the Complaint.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 213.

214.    The steps that CenturyLink took to address the cramming crisis – and its quick abandonment of those measures – had an immediate and material effect on the Company's reported

financial performance. Instead of disclosing the true reasons for those results, however, Defendants created a false narrative that declining revenues (and the later rebound) were the result of a deliberate strategy the Company pursued to focus on "higher value" customers, generate higher ARPU and reduce "churn."

214.    Defendants deny the allegations in paragraph 214.

215.    Specifically, Defendants represented that a "pivot" to reinvigorate the Company's "bundling" strategy, additional promotional efforts, select price increases and changes to the Company's customer targets were responsible for the fluctuations in the performance of the Company's consumer segment. For example, during the Company's August 5, 2015 earnings call for second quarter 2015, Defendant Post told investors that the Company was "tightening our credit policies for our internet-only customers to reduce sales to customers who tend to change internet providers frequently, leaving unpaid balances when they exit."   In other words, Defendant Post sought to blame a decline in revenues on supposedly less creditworthy customers, while at the same time suggesting that the Company's effort to address this "problem" was also responsible for the reported decline in revenues. Indeed, Defendant Post represented that the Company's "credit tightening" strategy would help ensure more consistent and sustainable revenues from more dependable, paying customers going forward.

215.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors. Defendants admit that CenturyLink held an earnings call on or about August 5, 2015. To the extent that the allegations of paragraph 215 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 215 differ in any way from the contents of the transcript, Defendants deny every such allegation. With respect to the remaining allegations in paragraph 215, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

216.    Similarly, at the Oppenheimer Technology, Internet & Communications Conference on August 12, 2015, in a response to a question about competing on price with cable providers, Defendant Ewing explained the changes CenturyLink had made to its "discount" pricing strategy and efforts to tighten credit requirements:

So we are still somewhat discounted, I believe, to the cable companies. Although, again, as I mentioned, we have increased our prices both for our

broadband customers as well as our Prism TV customers to keep up with the content cost increases there.

The other thing that we are doing is we are doing less discounting on the front end in terms of customers. As well as increasing our credit requirements somewhat, especially for the customers who don't buy their Internet in a bundle, who basically just come to us and want standalone high-speed Internet service. So we're increasing the credit requirements there a little bit to try to mitigate some of the churn that we've been seeing there.

216.    Defendants admit that Oppenheimer hosted a Technology, Internet & Communications Conference on or about August 12, 2015.  To the extent that the allegations of paragraph 216 purport to quote, summarize, or characterize any transcript, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 216 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 216.

217.    In subsequent quarters, Defendants continued to represent that these strategies were responsible for the consumer segment's performance, and would continue having the intended effect of increasing ARPU and reducing churn in an effort to drive revenue growth over the long term. For example, during the Company's third quarter 2015 earnings call on November 4, 2015, Defendant Ewing explained that "high-speed internet and Prism TV net subscriber growth was negatively impacted" due to "tightening our credit and collection processes," but that "these adjustments had little impact on revenue and should actually help improve our broadband growth in 2016 due to lower churn."

217.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors. Defendants admit that CenturyLink held an earnings call on or about November 4, 2015.  To the extent that the allegations of paragraph 217 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 217 differ in any way from the contents of the transcript, Defendants deny every such allegation.  With respect to the remaining allegations in paragraph 217, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they

provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

218.    The representations in ¶¶213-17 above were materially false and misleading.  It was materially false and misleading to blame the consumer segment's faltering performance on strategies to "tighten" credit requirements and shift to higher ARPU customers when, in reality, the decline in revenues was attributable to a corresponding decline in illegal cramming, and the Company's secret efforts to "do something about" its call centers.

218.    To the extent the allegations in paragraph 218 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 218 differ in any way from the contents of the document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 218.

### 1.    False And Misleading Statements Concerning Defendants' "Pivot" and Revenue Rebound Based on A Purported Shift in Strategy to Focus on High ARPU Customers

219.    As set forth in Section IV, CenturyLink abandoned the behavioral coaching model and returned to its prior strict enforcement of sales quotas almost "immediately" after the reduction in cramming led to a decline in revenues. And not long after the Company reverted back to the metrics-based system, CenturyLink returned to form, with cramming and revenues rebounding in short order.

219.    To the extent the allegations in paragraph 219 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to Section IV of the Complaint. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 219.

220.    Again, rather than disclose the true reasons behind the changes in the Company's financial performance, Defendants attributed the rebound to the supposedly legitimate steps that the Company had taken to address the disappointing results in the first half of 2015. Specifically, over the next several quarters, Defendants characterized the rejuvenated consumer segment performance as the result of a shift in strategy. At the same time, Defendants sought to distinguish CenturyLink's sales practices from its competitors, highlighting the Company's purportedly legitimate and conservative approach to issuing price discounts and credits, and its refusal to "add a lot of fees" to customers' bills.

220.    Defendants admit that, at various points during the proposed Class Period, Defendants discussed business strategies in SEC filings or in conference calls with investors but deny that the allegations in paragraph 220 completely or accurately describe the subject matter discussed therein.  To the extent the allegations in paragraph 220 purport to quote, summarize, or characterize a document, which Plaintiffs do not identify, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 220 differ in any way from the contents of the document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 220.

221.    For example, in announcing year-end results on February 10, 2016, Defendant Post highlighted the "aggressive corrective action" the Company had taken – including the realignment of the sales force and new leadership appointments (referencing Douglas' replacement of Puckett) – to address the slumping revenue numbers in the first two quarters of the year.

221.    Defendants admit that CenturyLink held an earnings call on or about February 10, 2016.  To the extent that the allegations of paragraph 221 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 221 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 221.

222.    Similarly, on that call, Defendant Ewing told investors that the improved results were the result of a renewed focus on "churn reduction" and strategy change to "keep the customers we have and try to make some of the price declines and credits that we've been issuing smaller." In other words, Defendant Ewing attributed the improved performance to a more conservative approach to providing discounts and credits – suggesting that the Company had previously been overly generous in issuing "credits" to resolve customer billing disputes.

222.    Defendants admit that CenturyLink held an earnings call on or about February 10, 2016.  To the extent that the allegations of paragraph 222 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 222 differ in any way from the contents of the transcript,

Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 222.

223.    Defendants repeated these same themes in the following quarterly earnings report. Specifically, during the Company's first quarter 2016 earnings call on May 4, 2016, Defendant Douglas told investors that consumer segment results were impacted by the Company's effort to refocus on its "bundling" strategy explaining. According to Defendant Douglas, although the purported strategy "pivot" had led to temporary subscriber declines, it would soon translate into more dependable and sustainable revenues as a result of lower churn and higher ARPU:

> Some of the pressures that we're facing in the business have to do with a slight adjustment in strategy. For example, in the high-speed internet realm, what we did was we pivoted from an approach that was pure broadband, to one that's more traditional bundled broadband. We did that in the latter part of FY15. And so, we're starting to work through what that means in the first part of FY16, and we expect that, that will continue to work through the middle part of the year of FY16. But that pivot to the more traditional approach to high-speed bandwidth in the consumer segment especially, should allow us to have customers that have -- less proclivity to churn and a higher ARPU. So we think that is going to be something that we will benefit from in the second half of the year and into 2017.

223.    Defendants admit that CenturyLink held an earnings call on or about May 4, 2016. To the extent that the allegations of paragraph 223 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 223 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 223.

224.    Most importantly, Douglas further clarified that the purported shift in broadband strategy was based on a "competitive analysis" and that the Company's ARPU figures were legitimate and, unlike those of CenturyLink's competitors, were not inflated by unwanted fees:

> Question – Oppenheimer Analyst: Can you give some examples of what you mean by, more advanced broadband services, or more bundled broadband services? Also how does your ARPU -- maybe can talk about your broadband average ARPU, and maybe how does that compare to your competitors? ….
>
> Answer – Dean Douglas: Okay. So let's talk about the examples of what we mean by bundled broadband services, so that the traditional high-speed internet services are really what you'd expect in a double play or triple play. So it's not only a high

speed, but it's also video, and some voice technology as well. And so, that's pretty much a typical broadband suite of services.

When you look at the Prism adds that we did in the first quarter of this year, 53% of them were with new customers. So you're now starting to see services like Prism attract new customers, that were not customers of Century Link, and they're dragging along broadband services with that video play. So 98% of those customers that signed up for Prism in the first quarter, also signed up for our broadband services.

And so, we see in those markets that bundling the technologies, broadband, video and the like, really do provide a much more compelling offering for both our customer base, as well as our folks that were with either competitors or didn't have the service at all, but nonetheless were not customers of CenturyLink. And so, as we think about how we go forward with -- to the marketplace, we obviously do a lot of competitive analysis.

So I would tell you that our ARPUs are consistent with what you'd see at an ARPU level in our competitors. And we see competition adding a lot of fees. And so, that's where there might be a little bit of a delta, but we're working through, and constantly monitoring what our competitors are doing in the marketplace, with regard to the average ARPUs in our business.

224.    Defendants admit that CenturyLink held an earnings call on or about May 4, 2016. To the extent that the allegations of paragraph 224 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 224 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 224.

225.    The statements in ¶¶221-24 above were materially false and misleading. It was materially false and misleading for Defendants to attribute the rebound in consumer revenues to the "corrective actions" Defendant Post described because, in truth, these revenue gains were driven by the illegal cramming practices Defendants failed to correct. It was also materially false and misleading for Defendant Ewing to represent that revenue growth was the result of the Company limiting the amount of "credits" it gave customers while omitting the highly material fact that CenturyLink had for years employed a policy of limiting the amount of credits it would offer customers who were improperly billed and, in fact, routinely and systematically failed to honor the prices customers were quoted. It was also false and misleading for Defendant Douglas to represent that CenturyLink's competitors "add[ed] a lot of fees" and to imply that CenturyLink did not (and this was the reason for the "delta" in the ARPU) because, in truth, CenturyLink systematically and unlawfully added fees and other unauthorized charges to customers' bills.

-117-

225.     Defendants deny the allegations in paragraph 225.

226.     Defendants continued to issue numerous false and misleading statements concerning the purported "pivot" in strategy that coincided with the rebound in consumer revenues. For example, during the Company's second quarter 2016 earnings call on August 3, 2016, Defendants again highlighted bundling and credit tightening as responsible for the Company's disappointing broadband subscriber numbers, while touting the higher ARPU supposedly generated by this shift.  For example, Defendant Post noted that "we continue to pivot toward the sale of higher speed, higher value bundle offerings, to better credit quality customers," who have "higher ARPU, lower churn, and a much higher lifetime value than lower speed, lower credit, standalone broadband customers."

226.     Defendants admit that CenturyLink held an earnings call on or about August 3, 2016.  To the extent that the allegations of paragraph 226 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 226 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 226.

227.     Defendant Post claimed that this strategy would prove beneficial, stating that "this is the right approach for the long term health of our business, even though it does have an impact on broadband units, some of which we saw during the second quarter." Defendant Post downplayed any concerns about subscriber net losses, however, noting that approximately 20% of the 65,000 broadband subscriber decline the Company reported for the quarter was "driven by a higher than expected number of slow and non-paying customer churn" and that a "significant percentage of the churn is related to standalone broadband customers who are less loyal than our traditional bundled customers."  In other words, Defendant Post explained that the subscriber declines were caused by the very problems Defendants' purported shift in strategy was intended to address.

227.     Defendants admit that CenturyLink held an earnings call on or about August 3, 2016.  To the extent that the allegations of paragraph 227 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 227 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 227.

228.   On that same conference call, Defendant Douglas reiterated the Company's ongoing "shift" to target "bundled customers" as helping to drive "better ARPU, as well as a longer lifetime revenue base for that customer." According to Douglas, the Company was seeing "churn level for our pure customers, or standalone high-speed customers" that was "double that of what we're seeing in those bundled customers," explaining that this signified a "very, very significant churn rate in those [pure, non-bundled] customers." Douglas further clarified that, in addition to the shift to more dependable bundled customers, the Company was and would continue generating revenue growth through price increases, noting that "we're continuing to drive some of those price increases into the second half, and we'll see those manifest themselves in the second half, as well."

228.   Defendants admit that CenturyLink held an earnings call on or about August 3, 2016.  To the extent that the allegations of paragraph 228 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 228 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 228.

229.   In addition, Defendants also began to highlight another strategic initiative focused on customer retention. Specifically, Defendant Post told investors that CenturyLink had "increased the level of focus in [its] call centers in first call resolution for our customers." According to Defendant Post, the "focus on first call resolution is another change we believe may have affected our broadband additions for the quarter as we focus more on the customer issues rather than selling, but we believe the improved customer experience will improve customer retention and improve our revenue over time."

229.   Defendants admit that CenturyLink held an earnings call on or about August 3, 2016.  To the extent that the allegations of paragraph 229 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 229 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 229.

230.   Defendants continued to highlight the purported strategy shift in fielding questions about revenue and subscriber fluctuations, assuring investors that the Company's focus on "bundled" and higher ARPU customers would lead to more predictable and dependable cash flows. For example, during an August 10, 2016 presentation at the Oppenheimer Technology, Internet & Communications Conference, CenturyLink's Head of Investor Relations Tony Davis reminded

investors that "we're pivoting away from the sale of standalone broadband service and going back to more of a bundle play, higher ARPU, longer lifetime value of the customer, less churn. And so we're in the middle of that pivot as we talked a lot about on the quarter call."

230.     Defendants admit that CenturyLink held an earnings call on or about August 10, 2016.  To the extent that the allegations of paragraph 230 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 230 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 230.

231.     Similarly, during a September 21, 2016 presentation at the Goldman Sachs Communicopia Conference, Defendant Post discussed the purported shift in strategy, and the supposed benefits that would provide in terms of more dependable cash flows:

> We have decided that we -- we were focused on quantity, driving more customers in. We've changed our approach there. We look at the propensity of the churn of those single service customers, look at their credit worthiness. A lot of them weren't paying, and the ARPU issue.
>
> We believe that we are stronger and better off going forward to focus on high-value customers, not what's pointed at the numbers, but get really strong customers that are going to drive value, stability going forward that are more loyal and pay their bills.
>
> So we believe the high-value focus is very important for us and we are confident it could change the stability and the fluctuation in those numbers. So it's going to take some time to work through the base of that single service customer base, but we're seeing improvement already and we expect going into 2017 we'll see even more.

231.     Defendants admit that Goldman Sachs hosted the Communicopia Conference on or about September 21, 2016.  To the extent that the allegations of paragraph 231 purport to quote, summarize, or characterize any transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 231 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 231.

232.    On that same call, Defendant Ewing explained that the Company had implemented an initiative to prevent customers from leaving when the promotional discount periods on their contracts expired:

> The other thing that we're doing there is we're working on churn and mitigating churn. So what we find is that when customers come off of a promotion and their rate goes up, that's when they are most likely to churn. So we're putting programs in place that really won't help the fourth quarter so much as next year, but it will give us an opportunity to touch those customers to try to prevent that churn event from happening either by potentially keeping their rates lower than they would otherwise move up to or to try to help sell them to a higher speed service.

232.    Defendants admit that Goldman Sachs hosted the Communicopia Conference on or about September 21, 2016 but deny that there was a "call" on that date.   To the extent that the allegations of paragraph 232 purport to quote, summarize, or characterize a transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 232 differ in any way from the contents of the transcript, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 232.

233.    In reporting quarterly results for the third and fourth quarters of 2016, Defendants told investors that these strategies were working, and were reflected in the Company's reported results. For example, during an October 31, 2016 conference call to discuss the Company's third quarter results (and the announcement of the Level 3 acquisition), Defendant Post explained:

> We remain focused on continuing our pivot to higher quality broadband customers and while we still have more improvement to achieve on a year- over-year basis in the third quarter, we added higher ARPU customers, lower churn and fewer…high-risk credit customers in the quarter. So we are making that pivot with our consumer base and we saw those trends in the third quarter.

233.    Defendants admit that CenturyLink held an earnings call on or about October 31, 2016.  To the extent that the allegations of paragraph 233 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 233 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 233.

234.    Similarly, in reporting 2016 fourth quarter and year-end results on February 8, 2017, Defendant Post again cited the strategy shift as partly to blame for the reported slower growth in strategic consumer revenues, explaining that lower growth in consumer broadband revenue was "driven by unit declines as we shifted our marketing spend more toward bundled, higher-speed solutions and tightened our credit policy," as well as "slower growth in consumer video subscribers and revenues than originally anticipated, and that obviously had an impact on our results." Defendants further claimed that, despite this slowdown, the strategy had already begun to work. For example, Defendant Post told investors on that call that the "focus on improving our customer experience is beginning to be seen in our results, as we saw a 15 basis points improvement in consumer broadband churn year-over-year and a 30 basis point improvement in Prism TV churn."

234.    Defendants admit that CenturyLink held an earnings call on or about February 8, 2016.  To the extent that the allegations of paragraph 234 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 234 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 234.

235.    Defendants repeated this refrain during an investor presentation on March 7, 2017, where they explained that the shift in strategy had already impacted results, and would continue to do so. Defendant Ewing explained that, "on the consumer side, basically, we have upped our credit standards from a broadband consumer standpoint and we feel like the customers that we are signing up are better quality customers. They are for the most part 40 meg or higher, which tend to churn less." Defendant Post said this change would also help going forward, as the Company "continued to see improvement in our churn rate and reduce customer credits," and anticipated that "a significant portion of the second half improvement [included in 2017 guidance] to be driven by the improvement in the churn rate."

235.    Defendants admit that CenturyLink made hosted a "Company Conference Presentation" for investors on or about March 7, 2017.  To the extent that the allegations of paragraph 235 purport to quote, summarize, or characterize the transcript, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 235 differ in any way from the contents of the transcript, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 235.

236.    The statements set forth above in ¶¶226-35 were materially false and misleading. As described in Section IV, after CenturyLink aborted its attempt to address the cramming crisis at the Company, CenturyLink immediately reverted back to its prior deceptive sales practices, which quickly returned to serving as a material undisclosed driver of CenturyLink's reported financial results. Accordingly, it was materially false and misleading to claim that the Company's strategies to focus on "higher value," more "loyal" and "creditworthy" customers had contributed to the financial performance of the consumer segment because, in reality, the Company's results were materially impacted by CenturyLink's deceptive systemic cramming practices. Moreover, it was materially false and misleading to blame the Company's "other" presumably less "loyal" or "creditworthy" customers for CenturyLink's previous lackluster results when, in truth, CenturyLink routinely and systematically refused to honor the prices it quoted customers, failed to disclose key terms of contracts, and added services to customers' bills that they did not request or authorize. Further, it was materially false and misleading to claim that CenturyLink was attempting to improve its customer experience and customer retention when the Company had, in fact, returned to cramming its customers.

236.    Defendants deny the allegations in paragraph 236.

### C.    Materially False And Misleading Statements And Omissions Concerning CenturyLink's Purported Business Integrity, Legal Compliance, and Honesty In Sales Practices

237.    Throughout the Class Period, CenturyLink bolstered investors' confidence in its reported financial results and the legitimacy of the Company's operating activities by directing investors to the Company's official Code of Conduct, which was published on CenturyLink's website and introduced by a message from Defendant Post, publicly affirming its compliance with the numerous regulations governing its business, and denying any improper conduct.

237.    Defendants admit that, at various points during the proposed Class Period, CenturyLink's Code of Conduct was published on its website but deny that the allegations in paragraph 237 completely or accurately describe the subject matter discussed therein.  With respect to the remaining allegations in paragraph 237, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

238.    In each of CenturyLink's annual reports filed during the Class Period, CenturyLink stated as follows with respect to its Code of Conduct:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, in accordance with applicable

laws and rules promulgated by the SEC and the New York Stock Exchange. In the event that we make any changes (other than by a technical, administrative or non-substantive amendment) to, or provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC.

238.     To the extent the allegations in paragraph 238 purport to quote, summarize, or characterize CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 238 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 238.

239.     The Company's SEC filings referred to the Code of Conduct explicitly, and directed investors to the Code of Conduct on CenturyLink's website.  Further, according to each of CenturyLink's Definitive Proxy Statements for Fiscal Years 2013 through 2017, "[a]ll of our directors, officers and employees are required to abide by our long-standing ethics and compliance policies and programs, which include standards of business conduct."

239.     To the extent the allegations in paragraph 239 purport to quote, summarize, or characterize CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 239 differ in any way from the contents of those documents, Defendants deny every such allegation.  To the extent the allegations in paragraph 239 purport to quote, summarize, or characterize CenturyLink's 2013, 2014, 2015, 2016, and 2017 Definitive Proxy Statements, Defendants refer the Court to the content of those documents.  To the extent the allegations in paragraph 239 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 239.

240.     Under CenturyLink's Code of Conduct, CenturyLink committed that it would:

Never misstate facts or confuse or mislead consumers about Company advertisements or promotions….

Follow all applicable sales policies and procedures to ensure we do not engage in unethical or deceptive sales practices….

Never place or record an order for our products and services for a customer without that customer's authorization…..

Be truthful in all dealings with customers, employees, shareholders, business associates and the general public.

240.    To the extent the allegations in paragraph 240 purport to quote, summarize, or characterize CenturyLink's Code of Conduct, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 240 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 240.

241.    The statements set forth above in ¶¶238-40 were materially false and misleading because, as described in Section IV, CenturyLink systematically misquoted the prices of its services, denied promised discounts, and charged customers for services that they did not request. As the Company continued to engage in its institutionalized cramming scheme throughout the class period, customers complained and consumer advocacy groups and the media took notice. In articles and publicly-filed documents throughout the Class Period, when confronted with allegations of sales misconduct at the Company, CenturyLink repeatedly denied those allegations and/or made other false and misleading statements about the Company's practices, conduct, and attempts to remedy identified issues.

241.    Defendants admit that, in some cases, CenturyLink responded publicly to unproven allegations of misconduct.  With respect to the remaining allegations in paragraph 241, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

242.    For example, in response to an October 6, 2016 story published by a Seattle television station reporting on an investigation of CenturyLink by the Seattle Office of Cable Communications in connection with improper billing, the Company made the following statement:

Some of our customers have experienced customer service and billing challenges. We take these concerns seriously and have implemented process and system improvements designed to resolve their concerns. We are working diligently to identify immediate changes, as well as other changes that will require a few

months to implement. We're fully committed to resolving these issues as quickly as possible in order to ensure a high-quality experience for our customers," said Sue Anderson, vice president of operations in Washington.[12]

242.    Defendants admit that K5 News published an article on October 6, 2016.  To the extent the allegations in paragraph 242 purport to quote, summarize, or characterize this article, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 242 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 242.

243.    Similarly, when the Star Tribune reported that "[t]he Better Business Bureau of Minnesota ha[d] logged 1,150 complaints against CenturyLink in Minnesota since 2015, compared with 450 for Comcast, 300 for DirecTV and 170 for the Dish Network," CenturyLink spokeswoman Molly Clemen said, "We are committed to providing the best quality experience and will continue to work to meet and exceed our customers' expectations in our markets."[13]

243.    Defendants admit that the Star Tribune published an article on October 18, 2016.  To the extent the allegations in paragraph 243 purport to quote, summarize, or characterize this article, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 243 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 243.

244.    Months later, a Portland, Oregon news outlet reported on increasing complaints against the Company, noting that the Better Business Bureau had logged 11,954 complaints about CenturyLink in the prior three years and quoting a spokesperson for the Better Business Bureau who said:

> Consistently consumers are telling us about the same type of issues. They are signing up and they are understanding a certain price and when their bill does not

---

[12]  CenturyLink Held Accountable for Billing, Service Issues, KING5 NEWS, Oct. 6, 2016, http://www.king5.com/article/money/consumer/centurylink-held-accountable-for-billing-service-issues/329020908.

[13]  Why More Folks Aren't Cutting the Cord on Cable TV, Star Tribune, Oct. 18, 2016, http://www.startribune.com/why-folks-aren-t-cutting-the-cord-on-cable-tv/397326141/.

reflect that price they call in for corrections–they never see corrections on their bills. It's not isolated to folks in Oregon. We are seeing those complaints in the markets in which CenturyLink does business.14

CenturyLink offered the following misleading response:

> CenturyLink strives to provide the best possible service at all times. As a customer-first business, we take any complaint seriously and work diligently to provide each customer with a fair and quick resolution. And where our investigations into complaints show that process changes can improve the customer experience, we make improvements and incorporate them into our employee training and customer outreach. Improving the customer experience is our constant objective, and customer feedback, even if negative, is an important part of this continuous effort.

244.    Defendants admit that KGW8 News published an article on February 1, 2017.  To the extent the allegations in paragraph 244 purport to quote, summarize, or characterize this article, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 244 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 244.

245.    CenturyLink took a similar tack in responding to several other media reports about its billing misconduct. As above, in those instances, CenturyLink denied any systematic wrongdoing, characterized any claimed instances of improper billing as isolated and contrary to Company policy, and told the public that the Company would take swift action to remedy any inappropriate billing and correct any problems that had been identified. For example, in response to a report published by a Denver, Colorado television station, CenturyLink falsely represented that, "[a]s a customer-first business, we take any[14] complaint seriously and work diligently to provide each customer with a fair and quick resolution," and that where "investigations into complaints show that process changes can improve the customer experience, we make improvements and incorporate them into our employee training and customer outreach."[15] And in a news article about "dozens of [CenturyLink] cable subscribers who complained about billing nightmares and bait and switch sales tactics," CenturyLink responded to allegations by again emphasizing its purported commitment to and focus on its customers, stating that "CenturyLink values our customers and strives to provide the best possible experience and customer service at

---

[14]  Growing Pains: CenturyLink Consumer Complaints Spike as Service Expands, KGW8 NEWS, Feb. 1, 2017, http://www.kgw.com/article/news/investigations/growing-pains-centurylink-consumer-complaints-spike-as-service-expands/283-395525834.

[15]  Denver Better Business Bureau Issues Warning About CenturyLink, KDVR, Jan. 27, 2017, http://kdvr.com/2017/01/27/denver-better-business-bureau-issues-warning-about- centurylink/.

all times…. We are committed to providing the best quality experience and will continue to work to meet and exceed our customers' expectations."[16]

245.    Defendants admit that, in some cases, CenturyLink sometimes responded publicly to allegations of misconduct.  Defendants admit that KGW8 News published an article on February 1, 2017, that KDVR published an article on January 27, 2017, and that KING5 News published an article on May 25, 2017.   To the extent the allegations in paragraph 245 purport to quote, summarize, or characterize these articles, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 245 differ in any way from the contents of those documents, Defendants deny every such allegation.   With respect to the remaining allegations in paragraph 245, Defendants lack knowledge or sufficient information to form a belief as to the truth of those allegations and deny that they provide a complete and accurate description of the subject matter described therein and, on that basis, deny each of them.

246.    The statements set forth above in ¶¶238-45 were materially false and misleading. CenturyLink was not a "customer-first business," did not take the thousands of complaints and millions of violations "seriously" or "work diligently to provide each customer with a fair and quick resolution," and did not "strive[] to provide the best possible experience and customer service at all times." To the contrary, as described above in Section IV, CenturyLink's "customer service" apparatus was not designed to provide customer service but rather to promote sales, even sales obtained through fraud.  Indeed, rather than "provide each customer with a fair and quick resolution," the Company's customer service personnel were instructed to make sales rather than resolve complaints. Customer service personnel were in fact limited in the amount of "credits" they were permitted to provide to customers to resolve complaints – without regard to the nature of the complaints or the amount customers disputed – and were in fact rewarded for limiting the amount of "credits" they provided.

246.    To the extent the allegations in paragraph 246 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to the allegations in Section IV of the Complaint.  To the extent the allegations in paragraph 246

---

[16] CenturyLink Customers Complain About Billing Nightmares, KING5 NEWS, May 25, 2017, http:// www.king5.com/article/money/consumer/centurylink-customers-complain- about-billing-nightmares/441975389.

purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents. To the extent the allegations in paragraph 246 differ in any way from the contents of those documents, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 246.

247.   As discussed above, on April 6, 2016, CenturyLink entered into a publicly- filed Assurance of Discontinuance with the Arizona Attorney General. In the Assurance of Discontinuance, the Arizona Attorney General explained each alleged violation of Arizona Consumer law it believed CenturyLink engaged in, and – for each allegation – CenturyLink "expressly deni[ed]" the allegation. In fact, not only did CenturyLink deny the Attorney General's allegations of providing incomplete information, the Company affirmatively stated that it fully disclosed all such information to consumers.

247.   Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General on April 6, 2016. To the extent the allegations in paragraph 247 purport to quote, summarize, or characterize this document, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 247 differ in any way from the contents of that document, Defendants deny every such allegation. Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 247.

248.   Specifically, in response to the Arizona Attorney General's allegation that CenturyLink failed to adequately disclose material qualifying conditions to advertised promotional rates, CenturyLink stated that it:

> expressly denies these allegations and alleges that all material qualifying conditions that apply to its advertised promotional rates, including but not limited to term commitments and authorization that CenturyLink may automatically withdraw monthly payments from financial accounts were fully disclosed.

248.   Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General on April 6, 2016. To the extent the allegations in paragraph 248 purport to quote, summarize, or characterize this document, Defendants refer the Court to the contents of that document. To the extent the allegations in paragraph 248 differ in any way from

the contents of that document, Defendants deny every such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 248.

249.    In response to the Arizona Attorney General's allegation that CenturyLink failed to
adequately disclose that a promotion rate would end before the consumers' term commitment
expired, CenturyLink stated that it "expressly denies these allegations and alleges that these terms
were fully disclosed."

249.    Defendants admit that CenturyLink entered into an Assurance of Discontinuance

with the Arizona Attorney General on April 6, 2016.  To the extent the allegations in paragraph

249 purport to quote, summarize, or characterize this document, Defendants refer the Court to the

contents of that document.  To the extent the allegations in paragraph 249 differ in any way from

the contents of that document, Defendants deny every such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 249.

250.    In response to the Arizona Attorney General's allegation that CenturyLink failed to
adequately disclose early termination fees, CenturyLink stated that it "expressly denies these
allegations and alleges that these terms were fully disclosed."

250.    Defendants admit that CenturyLink entered into an Assurance of Discontinuance

with the Arizona Attorney General on April 6, 2016.  To the extent the allegations in paragraph

250 purport to quote, summarize, or characterize this document, Defendants refer the Court to the

contents of that document.  To the extent the allegations in paragraph 250 differ in any way from

the contents of that document, Defendants deny every such allegation.  Except as expressly

admitted herein, Defendants deny each and every allegation in paragraph 250.

251.    In response to the Arizona Attorney General's allegation that it sold consumers
levels of high speed internet that were not available at consumers' addresses when, CenturyLink
stated that it "expressly denies these allegations and alleges that these terms were fully disclosed."

251.    Defendants admit that CenturyLink entered into an Assurance of Discontinuance

with the Arizona Attorney General on April 6, 2016.  To the extent the allegations in paragraph

251 purport to quote, summarize, or characterize this document, Defendants refer the Court to the

contents of that document.  To the extent the allegations in paragraph 251 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 251.

252.    In response to the Arizona Attorney General's allegation that it failed to adequately disclose that a consumer will be required to purchase or lease a modem/router for high speed internet service, CenturyLink stated that it "expressly denies these allegations and alleges that these terms were fully disclosed."

252.    Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General on April 6, 2016.  To the extent the allegations in paragraph 252 purport to quote, summarize, or characterize this document, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 252 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 252.

253.    In response to the Arizona Attorney General's allegation that CenturyLink failed to adequately disclose that a consumer will be charged an installation fee for certain services and products, CenturyLink stated that it "expressly denies these allegations and alleges that these terms were fully disclosed."

253.    Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General on April 6, 2016.  To the extent the allegations in paragraph 253 purport to quote, summarize, or characterize this document, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 253 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 253.

254.    Furthermore, CenturyLink also "denie[d] any violation of state, federal, or local law, that any actions, inactions, or practices of CenturyLink were a consumer fraud or otherwise legally improper" and "expressly denie[d] that its policies,  practices, or procedures… fail to meet or violate any applicable standard."

254.    Defendants admit that CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General on April 6, 2016.  To the extent the allegations in paragraph 254 purport to quote, summarize, or characterize this document, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 254 differ in any way from the contents of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 254.

255.    CenturyLink's statements set forth above in ¶247-54 were materially false and misleading. CenturyLink was not "committed to customer service": it in fact employed a policy and practice of routinely engaging in misleading and deceptive practices which harmed its customers by, among other things, charging them for services and products they did not request, misquoting prices at the point of sale, and other similarly deceptive conduct, as set forth above in Section IV. Moreover, CenturyLink's "express[] deni[als]" of each of the allegations set forth in the Arizona Assurance of Discontinuance were false, because, as is set forth more fully above in Section IV, CenturyLink in fact engaged in the alleged activities. In addition, CenturyLink's denial that it violated any "state, federal, or local law" and "express[] deni[al] that its policies, practices, or procedures…fail to meet or violate any applicable standard" was false because CenturyLink's cramming scheme in fact violated numerous consumer protection laws and regulations.

255.    To the extent the allegations in paragraph 255 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to the allegations in Section IV of the Complaint.  To the extent the allegations in paragraph 255 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 255 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 255.

**D.    Materially False And Misleading Statements And Omissions Concerning CenturyLink's Regulatory Risks**

256.    Throughout the Class Period, CenturyLink represented that it faced hypothetical risks in connection with the high level of regulatory oversight it experienced. For example, in the Company's 2013 Annual Report, CenturyLink warned investors that the Company "operate[d] in a highly regulated industry and are therefore exposed to restrictions on our operations and a variety

of claims relating to such regulation" (emphasis in original). CenturyLink explained that it was subject to "significant" regulation by the FCC and state utility commissions, and that it was "generally" required to "obtain and maintain certificates of authority or licenses from [regulatory] bodies in most territories where we offer regulated services." The Company warned that "the prescribed service standards and conditions imposed on us in connection with obtaining or acquiring control of these licenses may impose on us substantial costs and limitations." It further warned:

> We are also subject to numerous requirements and interpretations under various international, federal, state and local laws, rules and regulations, which are often quite detailed and occasionally in conflict with each other. Accordingly, we cannot ensure that we are always considered to be in compliance with all these requirements at any single point in time. The agencies responsible for the enforcement of these laws, rules and regulations may initiate inquiries or actions based on customer complaints or on their own initiative.

CenturyLink substantially repeated the risk warnings set forth above in each Form 10-K and Form 10-Q it filed during the Class Period.

256.   Defendants admit that CenturyLink discussed risks associated with regulatory oversight during the proposed Class Period.  To the extent the allegations in paragraph 256 purport to quote, summarize, or characterize CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, or CenturyLink's Quarterly Reports filed on August 8, 2013, November 8, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 5, 2017, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 256 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 256.

257.   CenturyLink explicitly told investors not to interpret a hypothetical risk as one that was, in fact, likely to occur. As Defendant Bailey explained in testimony before the Public Service Commission of Utah before the Class Period, the risk warnings contained in CenturyLink's SEC filings were "not intended to suggest that the risks are likely outcomes."

257.   Defendants deny the allegations in paragraph 257.

258.   The statements set forth above in ¶¶256-57 were materially false and misleading. The statement that the service standards and conditions imposed on the Company in connection with obtaining licenses to operate in various locales "may" impose "substantial costs and

limitations" was materially misleading because it set forth the risk as a mere possibility when Defendants knew that the service standards imposed upon CenturyLink did, in fact, impose substantial limitations on the Company's existing operations. Indeed, as set forth above in Section IV, Defendants knew that the Company's institutionalized cramming model was explicitly prohibited by several of the service standards and conditions the Company represented it would comply with when entering into agreements with local regulators that were in effect during the Class Period.

258.    To the extent the allegations in paragraph 258 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to the allegations in Section IV of the Complaint.  To the extent the allegations in paragraph 258 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 258 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 258.

259.    Further, the statement that CenturyLink could not "ensure" that it could be considered "in compliance" with the requirements of "federal, state and local laws, rules and regulations" was materially misleading, because it set forth the risk of noncompliance with those laws as a mere possibility when, as set forth above in Section IV, Defendants knew that the Company's institutionalized cramming model was, in fact, in direct violation of several "federal, state and local laws, rules and regulations," and in any event that CenturyLink's conduct rendered it highly unlikely that the Company could be considered "in compliance" with applicable laws, rules, and regulations.

259.    To the extent the allegations in paragraph 259 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to the allegations in Section IV of the Complaint.  To the extent the allegations in paragraph 259 purport to quote, summarize, or characterize documents, which Plaintiffs do not identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 259 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation

in paragraph 259.  To the extent the allegations in paragraph 259 purport to quote, summarize, or characterize CenturyLink's 2012, 2013, 2014, 2015, and 2016 Annual Reports, or CenturyLink's Quarterly Reports filed on August 8, 2013, November 8, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 5, 2017, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 259 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 259.

260.    In addition, the statement that "[t]he agencies responsible for the enforcement of [the] laws, rules and regulations [to which the Company was subject] may initiate inquiries or actions based on customer complaints or on their own initiative" was materially misleading, because it characterized the risk of inquiries or enforcement actions as a mere possibility when, as set forth in Section IV, Defendants knew that, in fact, several inquiries and enforcement actions had been instituted against the Company, and that the Company's conduct in employing an institutionalized cramming model made further such inquiries and actions highly likely, not merely possible.

260.    To the extent the allegations in paragraph 260 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to the allegations in Section IV of the Complaint.  To the extent the allegations in paragraph 260 purport to quote, summarize, or characterize documents, which Plaintiffs do not specifically identify, Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 260 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 260.

E.    **False and Misleading Omissions In CenturyLink's SEC Filings**

261.    CenturyLink's SEC filings, including the Forms 10-Q and Forms 10-K filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303(a) of Regulation S-K and Securities Act Release No. 33-8350.  17 C.F.R. § 299.303. Among other things, Item 303 required CenturyLink to disclose, among other things, "any known trends or

uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

261.    The allegations in paragraph 261 contain legal conclusions to which no response is required.  To the extent the allegations in paragraph 261 purport to quote, summarize, or characterize CenturyLink's SEC filings, including its Forms 10-Q and Forms 10-K filed during the Class Period,  Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 261 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 261.

262.    Throughout the Class Period, CenturyLink was required under Item 303 to disclose the fact that the Company's illegal and deceptive sales practices were a material driver of the Company's reported revenue for its consumer and small business segments. As set forth above in Section IV, Defendants knew that these practices had a material impact on the Company's revenues and income, and presented a significant uncertainty given that these practices were illegal and the revenues and income they generated were therefore unsustainable. CenturyLink's senior management specifically approved significant changes to the Company's sales employee discipline and compensation scheme in order to address these practices in 2014. And once these changes to employee assessment and discipline were made, they immediately materially impacted revenues – so much so, that CenturyLink reverted back to its prior method of disciplining sales employees almost immediately.

262.    The allegations in paragraph 262 contain legal conclusions to which no response is required.  To the extent the allegations in paragraph 262 incorporate by reference the allegations in Section IV of the Complaint, Defendants incorporate by reference their answers to the allegations in Section IV of the Complaint.   To the extent a response is required, Defendants deny the allegations therein.

263.    CenturyLink was required to disclose this information to the SEC when the agency directly questioned the Company about its disclosures concerning the operating performance of its consumer segment and the Company's compliance with Item 303. For these reasons, among others, the Company's September 22, 2015 response letter attributing the consumer segment's performance to "price compression and customer disconnects caused by competition" – without disclosing the changes to the Company's sales practices and their impact on CenturyLink's revenues – was materially misleading, and only underscores the abject failure of CenturyLink to comply with Item 303.

263.    The allegations in paragraph 263 assert legal conclusions to which no response is required.  To the extent the allegations in paragraph 263 purport to quote, summarize, or characterize CenturyLink's response letter to the SEC, Defendants refer the Court to the contents of that document.  To the extent the allegations in paragraph 263 differ in any way from the content of that document, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 263.

## IX.    LOSS CAUSATION

264.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses. During the Class Period, Plaintiffs and the Class purchased CenturyLink securities at artificially inflated prices and were damaged thereby when the price of CenturyLink securities declined when the truth was revealed. The price of CenturyLink's securities significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized.

264.    The allegations in paragraph 264 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

265.    Specifically, Defendants' materially false and misleading statements misrepresented the true reasons behind the growth and fluctuations in the Company's reported revenues, the Company's prospects for future revenue growth, and its financial performance. When those statements were corrected and the risks concealed by them materialized, including when the disclosure of the Company's "Wells Fargo-like" scheme revealed that the Company had engaged in illegal sales practices including unauthorized cramming of customer accounts, investors suffered losses as the price of CenturyLink securities declined.

265.    The allegations in paragraph 265 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

266.    As a result of the disclosure of the truth of Defendants' fraud, CenturyLink's stock price declined over 16%, from a close of $26.95 on June 15, 2017 to close at $22.50 on July 12, 2017. Similarly, the price of the 7.60% Senior Notes suffered statistically significant declines, and ultimately fell nearly 6%, from a price of $97.533 on June 15, 2016 to a closing price of $91.887 on July 12, 2017. The disclosures that corrected the market price of CenturyLink securities and reduced the artificial inflation caused by the Defendants' materially false and misleading statements are summarized in the following chart, which identifies each corrective disclosure

event, the price declines in CenturyLink common stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date:

| Date | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 6/16/2017 | *Bloomberg* published a story revealing that a CenturyLink whistleblower was fired after raising concerns about the Company's fraudulent business practices with Defendant Post. | $25.72 | **-4.72%** | 0.03% |
| 6/19/2017 | Additional reports of consumer class actions alleging systemic billing misconduct. | $25.36 | **-2.35%** | 0.84% |
| 7/12/2017 | The Minnesota Attorney General announced that it filed a lawsuit against CenturyLink alleging violations of state consumer protection laws after a year-long investigation. | $22.50 | **-4.13%** | 0.74% |

266.    Defendants admit that CenturyLink's stock price closed at $26.95 on June 15, 2017 and closed on $22.50 on July 12, 2017.  Defendants further admit that CenturyLink's 7.60% Senior Notes price closed at $97.533 on June 15, 2016 and closed at $91.887 on July 12, 2017. The allegations in paragraph 266 otherwise assert legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

267.    Accordingly, as a result of their purchases of CenturyLink publicly traded securities, Plaintiffs and other members of the Class suffered economic loss and damages.

267.    The allegations in paragraph 267 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

## X.      CLASS ACTION ALLEGATIONS

268.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired CenturyLink's publicly traded securities during the period from March 1, 2013 to July 12, 2017, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; CenturyLink's affiliates and subsidiaries; the officers and directors of CenturyLink and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

268.    The allegations in paragraph 268 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

269.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CenturyLink's common shares were actively traded on the New York Stock Exchange. As of February 16, 2017, CenturyLink had approximately 546.6 million shares of common stock issued and outstanding. Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by CenturyLink or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

269.    Defendants admit that CenturyLink had 546.6 million shares of common stock issued and outstanding as of February 16, 2017.  The allegations in paragraph 269 otherwise assert legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations therein.

270.    Lead Plaintiff's and Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

270.    The allegations in paragraph 270 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

271.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a)     whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)     whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about, among other things, CenturyLink's billing practices and financial performance during the Class Period;

(c)     whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(d)     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(e)     whether the members of the Class have sustained damages, and the proper measure of damages.

271.    The allegations in paragraph 271 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

272.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

272.    The allegations in paragraph 272 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

273.    A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

273.    The allegations in paragraph 273 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

274.    The names and addresses of those persons and entities that purchased or acquired CenturyLink's securities during the Class Period are available from CenturyLink's transfer agent(s) or other sources. Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

274.    The allegations in paragraph 274 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

## XI.    PRESUMPTION OF RELIANCE

275.    Plaintiffs are entitled to a presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

275.    The allegations in paragraph 275 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

276.    Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    CenturyLink's common stock was actively traded in an efficient market on the NYSE;

(b)    CenturyLink's common stock traded at high weekly volumes, with an average of over 28.7 million shares traded each week during the Class Period. The average weekly turnover as a percentage of shares outstanding was approximately 5.1% (median of 4.3%), well surpassing the higher 2% threshold level of average weekly trading volume necessary for an efficient market;

(c)    CenturyLink's publicly-traded bonds, including CenturyLink's 7.60% Senior Notes, were listed and actively traded on over-the- counter markets and other national options exchanges, highly efficient markets, and promptly reacted to public information concerning CenturyLink;

(d)    As a regulated issuer, CenturyLink filed periodic public reports with the SEC;

(e)    CenturyLink was eligible to file registration statements with the SEC on Form S-3;

(f)    CenturyLink regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(g)    The market reacted promptly to public information disseminated by and concerning CenturyLink;

(h)    CenturyLink securities were covered by numerous securities analysts employed by major brokerage firms, including Barclays Capital, BMO Capital Markets, Bank of America Merrill Lynch, Citigroup, Cowen & Co., Deutsche Bank, Gabelli & Co., Goldman Sachs, Jeffries LLC, JPMorgan Chase & Co., Macquarie Research, Morgan Stanley, Nomura Securities International, Oppenheimer & Co., Raymond James & Associates, Inc., UBS, and Wells Fargo Securities;

-141-

(i)     Each of these reports was publicly available and entered the public marketplace;

(j)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of CenturyLink securities; and

(k)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired CenturyLink securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

276.     The first sentence of paragraph 276 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations therein.  To the extent Plaintiffs purport to describe the price or trading patterns or volume of CenturyLink's stock or bond prices on certain dates, it is a matter of public record.  Defendants deny that the allegations in paragraph 276 accurately and completely describe the factors affecting stock or bond price movements described therein.  Defendants admit to the allegations in subparagraphs (a), (d), (e), and (f) of paragraph 276.  With respect to the allegations in subparagraph (c), Defendants admit that some CenturyLink bonds, including the CenturyLink's 7.60% Senior Notes, were publicly traded during the proposed Class Period but lack knowledge or sufficient information to form a belief as to the truth of the remaining allegations in subparagraph (c).  Defendants admit that CenturyLink was covered by a variety of financial analysts during the proposed Class Period but lack knowledge or sufficient information to form a belief as to the truth of the allegations in subparagraph (h) of paragraph 276 and, therefore, deny them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (i) of paragraph 276 and, therefore, deny them.  Defendants deny the allegations in subparagraphs (j) and (k) of paragraph 276.

277.     Accordingly, the market for CenturyLink's publicly traded securities promptly digested current information with respect to CenturyLink from all publicly- available sources and reflected such information in the prices of those securities. Under these circumstances, all purchasers of the Company's publicly traded securities during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

277.    The allegations in paragraph 277 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

## XII.    NO SAFE HARBOR

278.    The statutory safe harbor applicable to forward-looking statements under certain
circumstances does not apply to any of the false or misleading statements pleaded in this
Complaint. The statements complained of herein were historical statements or statements of
current facts and conditions at the time the statements were made. Further, to the extent that any
of the false or misleading statements alleged herein can be construed as forward-looking, the
statements were not accompanied by any meaningful cautionary language identifying important
facts that could cause actual results to differ materially from those in the statements.

278.    The allegations in paragraph 278 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

279.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any
forward-looking statements pleaded herein, Defendants are liable for those false and misleading
forward-looking statements because at the time each of those statements was made, the speakers
knew the statement was false or misleading, or the statement was authorized or approved by an
executive officer of CenturyLink who knew that the statement was materially false or misleading
when made.

279.    The allegations in paragraph 279 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

## XIII.    CAUSES OF ACTION

### COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT
### AND RULE 10B-5 PROMULGATED THEREUNDER
### (Against Defendants CenturyLink, Post, Ewing, Cole, Puckett And Douglas)

280.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully
set forth herein.

280.    Paragraph 280 summarizes the allegations in the Complaint and no response is

required; to the extent a response is required, Defendants incorporate their answers to paragraphs

1 through 279 of the Complaint.

281.    During the Class Period, Defendants CenturyLink, Post, Ewing, Cole, Puckett and Douglas carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding CenturyLink's business, operations, management and the intrinsic value of CenturyLink stock and other securities; (ii) enabled Defendants to artificially inflate the price of CenturyLink stock and other securities; and (iii) caused Plaintiffs and other members of the Class to purchase CenturyLink common stock and other securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

281.    The allegations in paragraph 281 assert legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

282.    The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for CenturyLink common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein. The Executive Defendants are also sued as controlling persons as alleged below.

282.    The allegations in paragraph 282 assert legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

283.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CenturyLink as specified herein.

283.    The allegations in paragraph 283 assert legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

284.    These Defendants employed devices, scheme and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CenturyLink's value and performance and continued growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CenturyLink and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CenturyLink common stock during the Class Period.

284.    The allegations in paragraph 284 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

285.    These Defendants are liable for the following materially false and misleading statements and omissions made during the Class Period as alleged above in Section VIII:

(a)    Defendant CenturyLink: Defendant CenturyLink is liable for all the false and misleading statements and omissions made by itself, its spokespersons, and Defendants Post, Ewing, Cole, Puckett and Douglas, its senior most officers during the Class Period and lead spokespersons for the Company during that time, which are set forth above in Section VIII.

(b)    Defendant Post: Defendant Post is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q filed on August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 4, 2017 and Forms 10-K filed on March 1, 2013, February 27, 2014, February 24, 2015, February 20, 2016, and February 23, 2017 and for statements made in conference calls in which he participated during the Class Period, held on May 8, 2013, August 7, 2013, November 6, 2013, February 12, 2014, May 7, 2014, August 6, 2014, November 5, 2014, February 11, 2015, May 5, 2015, June 24, 2015, August 5, 2015, September 10, 2015, November 4, 2015, February 10, 2016, March 2, 2016, May 4, 2016, August 3, 2016, September 21, 2016, October 31, 2016, February 8, 2017, March 1, 2017, and May 3, 2017;

(c)    Defendant Ewing: Defendant Ewing is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q filed on August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 4, 2017 and Forms 10-K filed on March 1, 2013, February 27, 2014, February 24, 2015, February 20, 2016, and February 23, 2017 and for statements made in conference calls in which he participated during the Class Period, held on May 8, 2013, May 16, 2013, August 7, 2013, August 14, 2013, September 12, 2013, November 6, 2013, December 10, 2013, January 7, 2014, February 12, 2014, March 5, 2014, March 11, 2014, May 7, 2014, May 19, 2014, June 3, 2014, June 12, 2014, August 6, 2014, September 11, 2014, November 5, 2014, December 9, 2014, January 6, 2015, February 11, 2015, March 2, 2015, March 9, 2015, May 5, 2015, May 18, 2015, June 4, 2015, June 24, 2015, August 5, 2015, August 12, 2015, November 4, 2015, December 7, 2015, January 6, 2016, February 10, 2016, March 2, 2016, March 7, 2016, March 8, 2016, May 4, 2016, August 3, 2016, September 15, 2016, September 21, 2016, October 31, 2016, November 10, 2016, November 29, 2016, December 5, 2016, January 4, 2017, February 8, 2017, March 1, 2017, March 7, 2017, May 3, 2017, and May 22, 2017.

(d)     Defendant Cole: Defendant Cole is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q filed on August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 6, 2014, May 6, 2015, August 6, 2015, November 5, 2015, May 5, 2016, August 4, 2016, November 4, 2016, and May 4, 2017 and Forms 10-K filed on March 1, 2013, February 27, 2014, February 24, 2015, February 20, 2016, and February 23, 2017.

(e)     Defendant Puckett: Defendant Puckett is liable for the false and misleading statements and omissions made in conference calls in which she participated during the Class Period, held on: May 8, 2013, August 7, 2013, November 6, 2013, February 12, 2014, May 7, 2014, August 6, 2014, November 5, 2014, February 11, 2015, May 5, 2015, and August 5, 2015.

(f)     Defendant Douglas: Defendant Douglas is liable for the false and misleading statements and omissions made in conference calls in which he participated during the Class Period, held on: May 4, 2016, August 3, 2016, February 8, 2017, and May 3, 2017.

(g)     Defendants Post, Ewing, Cole, Puckett and Douglas are liable for all false statements made by other Defendants in conference calls in which they participated during the Class Period.

285.    Paragraph 285 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny that any Defendants made any false and misleading statements or omissions in any conference call with investors or in any public statement or SEC filing referenced in paragraph 285.  To the extent the allegations of paragraph 285 incorporate by reference the allegations Section VIII of the Complaint, Defendants incorporate by reference their answers to the allegations in Section VIII of the Complaint in their answer to the allegations in paragraph 285.  The Executive Defendants further deny that they could be liable for the statements made by CenturyLink or by any other Executive Defendants where the Executive Defendants did not have control or authority over the statement and its maker or makers.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 285.

286.    Defendants Post, Ewing, Cole, Puckett and Douglas, as senior officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of CenturyLink, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by CenturyLink. Defendants Post, Ewing, Cole, Puckett and Douglas had

direct involvement in the daily business of the Company and participated in the preparation and dissemination of CenturyLink's materially false and misleading statements set forth above.

286.    The allegations in paragraph 286 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

287.    The allegations in this Complaint establish a strong inference that Defendants Post, Ewing, Cole, Puckett and Douglas acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available.

287.    The allegations in paragraph 287 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

288.    Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market in which the securities traded, they paid artificially inflated prices for CenturyLink common stock and other securities, which inflation was removed from the stock and other securities when the true facts became known. Plaintiffs and the other members of the Class would not have purchased CenturyLink common stock and other securities at the prices they paid, or at all, if they had been aware that the market price had been artificially inflated by Defendants' misleading statements.

288.    The allegations in paragraph 288 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

289.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

289.    The allegations in paragraph 289 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

290.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of CenturyLink securities during the Class Period.

290.    The allegations in paragraph 290 assert legal conclusions to which no response is

required.  To the extent a response is required, Defendants deny the allegations therein.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
### (Against Defendants Post, Ewing, Cole, Puckett, Douglas And Bailey)

291.   Plaintiffs repeat and re-alleges each and every allegation set forth above as if fully set forth herein.

291.   Paragraph 291 summarizes the allegations in the Complaint and no response is required; to the extent a response is required, Defendants incorporate their answers to paragraphs 1 through 290 of the Complaint.

292.   Defendants Post, Ewing, Cole, Puckett, Douglas and Bailey acted as controlling persons of CenturyLink within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

292.   The allegations in paragraph 292 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

293.   By reasons of their high-level positions of control and authority as the Company's most senior officer and, in the case of Defendant Post, also as a CenturyLink director, the Executive Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by CenturyLink during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements to be corrected.

293.   The allegations in paragraph 293 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

294.   In their capacities as CenturyLink's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. Defendants Post, Ewing and Cole signed CenturyLink's SEC filings, and Defendants Post and Ewing signed CenturyLink's Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by CenturyLink during the Class Period.

294.   The allegations in paragraph 294 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

295.   In their capacities as CenturyLink's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein.

295.   The allegations in paragraph 295 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

296.   Defendants Post, Ewing and Cole signed CenturyLink's SEC filings, and Defendants Post and Ewing signed CenturyLink's Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by CenturyLink during the Class Period.

296.   Defendants admit that, at various points during the proposed Class Period, Defendants Post, Ewing, and Cole signed CenturyLink's SEC filings.  Defendants further admit that Defendants Post and Ewing signed CenturyLink's Sarbanes-Oxley certifications at various points during the Proposed Class Period.  Defendants otherwise deny the allegations in paragraph 296.

297.   Defendant Puckett served as CenturyLink's President, Global Markets, from November 1, 2014 until she left the Company on August 31, 2015. Prior to that, Puckett served as CenturyLink's President and COO from 2002 until July 2009, and as CenturyLink's Executive Vice President and Chief Operating Officer from July 2009 until November 1, 2014. From the beginning of the Class Period until her departure from the Company, Puckett was the Company's second-highest paid executive officer, was listed as one of CenturyLink's named executive officers in its proxy filings each year, and spoke frequently on the Company's conference calls. At CenturyLink, Puckett oversaw the Company's entire sales apparatus, including the Company's call centers, and was responsible for addressing this segment in the Company's investor presentations.

297.   Defendants admit that Puckett served as CenturyLink's President and COO from 2002 until July 2009, served CenturyLink's Vice President from 2009 to October 2014, served as CenturyLink's President of Global Markets from November 2014 to June 2015, that she received her last paycheck from CenturyLink in August 2015, that she was listed as one of CenturyLink's

named executive officers in CenturyLink's proxy filings at various points during the Proposed

Class Period, and that she sometimes spoke during CenturyLink investor conference calls during

the proposed Class Period. Defendants deny that paragraph 297 completely or accurately describes

Puckett's roles at CenturyLink. Puckett's CenturyLink compensation and equity holdings were

described in relevant SEC filings during the proposed Class Period and are a matter of public

record. Except as expressly admitted herein, Defendants deny each and every allegation in

paragraph 297.

298.    Defendant Douglas succeeded Puckett as the Company's President, Sales and
Marketing, in February 2016. Defendant Post explained that Douglas was brought in to "driv[e]
the ship" with respect to sales and revenue and, from the time he arrived until the end of the Class
Period, Douglas was the second-highest-paid executive, after Post. Douglas spoke regularly on the
Company's conference calls, particularly in connection with the Company's plans to improve sales
and revenues.

298.    Defendants admit that Douglas was CenturyLink's President, Sales and Marketing

beginning in February 2016 and that he sometimes spoke during CenturyLink conference calls

during the proposed Class Period. To the extent the allegations in paragraph 298 purport to quote,

summarize, or characterize documents, which Plaintiffs do not specifically identify, Defendants

refer the Court to the contents of those documents. To the extent the allegations in paragraph 298

differ in any way from the contents of those documents, Defendants deny every such allegation.

Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 298.

299.    Defendant Bailey worked for CenturyLink for over 25 years. During the Class
Period, Bailey served as the Company's Senior Vice President and Treasurer, as the Senior Vice
President of Operations with oversight over "all" of CenturyLink's region operations, as a Senior
Vice President in an operations transformation role leading a "transformation, of how we operate
the Company, how we serve the Company, bringing really a better customer experience at every
touch point for our customers." Defendant Ewing explained that Bailey worked directly for Post
and had a wide purview to study "all" of CenturyLink's processes.

299.    Defendants admit that Bailey was employed at CenturyLink for approximately 25

years and served as CenturyLink's Senior Vice President and Treasurer. To the extent the

allegations in paragraph 299 purport to quote, summarize, or characterize documents, which Plaintiffs do not specifically identify,  Defendants refer the Court to the contents of those documents.  To the extent the allegations in paragraph 299 differ in any way from the contents of those documents, Defendants deny every such allegation.  Except as expressly admitted herein, Defendants deny each and every allegation in paragraph 299.

300.    Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein. Defendants Post, Ewing, Cole, Puckett, Douglas and Bailey each acted with scienter, as set forth more fully in Section VII.

300.    The allegations in paragraph 300 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

301.    By virtue of their positions as controlling persons of CenturyLink and as a result of their own aforementioned conduct, Defendants Post, Ewing, Cole, Puckett, Douglas and Bailey together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

301.    The allegations in paragraph 301 assert legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Declaring that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such other and further relief as the Court may deem just and proper

## XV.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof as to any defense or issue that would otherwise rest on Plaintiffs or as to any element of Plaintiffs' claims, and reserving the right to amend this Answer to assert any additional defenses when, and if, in the course of their investigation, discovery, preparation for trial, or otherwise it becomes appropriate to assert such defenses, Defendants assert the following defenses.

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are contradicted by documentary evidence.

### THIRD AFFIRMATIVE DEFENSE

Any and all actions taken by Defendants were, at all times, lawful, proper, and consistent with their duties and obligations, and Defendants did not otherwise have any obligation or duty to take any other action or make any other disclosure.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Defendants had no duty to characterize the disclosed facts pejoratively.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Defendants did not breach any duty owed to Plaintiffs or members of the putative class.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Defendants did not make any false or misleading statements of material fact or omit to state any material facts.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, to the extent Plaintiffs and members of the purported putative class lack standing.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, to the extent they are beyond the applicable statute(s) of limitations and/or repose.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against individual Executive Defendants are barred, in whole or part, because, assuming arguendo that CenturyLink's filings or public statements contained false or misleading statements of material fact or omissions of material fact (which the individual Executive Defendants deny), each Executive Defendant acted with due diligence and/or did not know, and in the exercise of reasonable care could not have known or had reasonable grounds to believe, that any such statements or omissions existed in any of CenturyLink's filings with the SEC or press releases or any statement issued in connection therewith or otherwise.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs and members of the purported putative class knew or had reason to know the truth of the matters addressed in the alleged false or misleading statements of material fact or omissions of material fact on which their claims are based.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs and members of the purported putative class did not reasonably rely on the public filings or press releases or statements alleged in the Complaint that were alleged to be materially false or misleading when made.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because some or all of the matters now claimed by the Complaint to be the subject of false or misleading statements of material fact or omissions of material fact were publicly disclosed or were in the public domain and, as such, were available to Plaintiffs and members of the purported putative class and were at all times reflected in the price of CenturyLink's common stock.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs and members of the purported putative class at all relevant times had a duty to take reasonable action to minimize any damages allegedly sustained as a result of the facts alleged in the Complaint. Plaintiffs and members of the purported putative class failed to comply with that duty and are therefore barred from recovering any damages which might reasonably have been avoided.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because the conduct of persons and/or entities other than Defendants was the cause (or a suspending or intervening cause) of any damage, loss, or injury sustained by Plaintiffs or members of the purported putative class. Any alleged damages claimed to have been sustained by Plaintiffs or members of the purported putative class were therefore not actually or proximately caused by Defendants.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because of the lack of loss causation and because Defendants did not cause any losses. Plaintiffs have not suffered any injury or harm as a result of the actions of Defendants alleged in the Complaint.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because of the lack of transaction causation.  The actions or inactions of Defendants were not the sole or partial cause of any decision by a Plaintiff to purchase CenturyLink shares.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because any alleged depreciation in the value of CenturyLink's shares resulted from factors other than the false or misleading statements of material fact or omissions of material fact alleged in the Complaint.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs have failed to allege, and Plaintiffs and members of the purported putative class have not suffered, any cognizable injury attributable, in whole or part, to any conduct by Defendants.  Any damages which Plaintiffs seek to recover against Defendants were in fact caused by actions or omissions of Plaintiffs and members of the purported putative class and/or third parties.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because any alleged false or misleading statements of material fact were forward-looking statements.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, pursuant to the bespeaks caution doctrine because any alleged false or misleading statements of material fact contained sufficient cautionary language and risk disclosure.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because the alleged false or misleading statements of material fact were mere puffery or were vague statements of optimism.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because the alleged false or misleading statements of material fact are non-actionable statements that contain expressions of opinion that Plaintiffs have not alleged, and cannot prove, were not truly held.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs and members of the purported putative class would have purchased at-issue common stock shares even with full knowledge of the facts that they now allege were misrepresented or omitted (which Defendants deny).

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs and members of the purported putative class purchased shares of the at-issue common stock with actual or constructive knowledge of the risks involved in an investment in the stock, and thus assumed the risk that the value would decline if such risks materialized.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, to the extent the damages sought exceed those permitted under the Securities Act of 1933, the Securities Exchange Act of 1934, the Private Securities Litigation Reform Act, common law or any other applicable statute, rule or regulation.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Plaintiffs and members of the purported putative class cannot show scienter by Defendants.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Defendants believed and had a reasonable basis to believe that each of the statements alleged to be false or misleading was true when made.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims for attorneys,' accountants' and experts' fees are barred, in whole or part, because they have failed to state facts sufficient to support a claim for such fees.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Defendants are entitled to recover contribution from others for any liability incurred as a result of any of the alleged false or misleading statements of material fact, omissions of material fact, or other conduct alleged in the Complaint.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because this action may not be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

The putative class period is overbroad and, therefore, many of the purported putative class members are not entitled to any recovery.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Defendants at all times acted in good faith and in reasonable reliance upon the representations, reports, expert opinions and advice of others.  Defendants were entitled to, and did, rely upon representations,

reports, expert opinions and advice of others with respect to any of Defendants conduct at issue in the Complaint.  Defendants believed that those individuals upon whose representations, reports, expert opinions and advice she relied were, in fact, experts in their field and were competent to render the opinions they provided.  Defendants had no reasonable grounds to believe, that the representations, reports, expert opinions and advice provided were in any way inadequate, unfounded or incorrect, and assuming *arguendo* that they were (which Defendants deny), Defendants had no notice of this fact.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because the purported claims against Defendants, and the allegations upon which they are based, are improperly vague, ambiguous and confusing.  Defendants reserve the right to request a more definite statement.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because they fail to comply with the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the requirements of the Private Securities Litigation Reform Act.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, because Defendants did not directly or indirectly induce any act or acts alleged in the Complaint to constitute a violation of any federal securities law or regulation.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendant Puckett are barred, in whole or in part, to the extent that they rely on factual allegations following Defendant Puckett's disengagement from CenturyLink operations on June 2, 2015.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendant Douglas are barred, in whole or in part, to the extent that they rely on factual allegations prior to the commencement of Defendant Douglas' employment at CenturyLink in February 2016, and/or factual allegations following his resignation from CenturyLink in June 2017.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendant Ewing are barred, in whole or in part, to the extent that they rely on factual allegations following his resignation from CenturyLink in November 2017.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims against Defendant Cole are barred, in whole or in part, to the extent that they rely on factual allegations following Defendant Cole's resignation from CenturyLink on April 8, 2018.

## FORTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims against the Executive Defendants are barred, in whole or in part, to the extent that they that the Executive Defendants are liable for allegedly false or misleading statements over which they lacked ultimate authority or control.

## FORTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims for violations of Section 20(a) of the Exchange Act are barred, in whole or in part, because the Complaint does not demonstrate that each of the Executive Defendants were control persons within the meaning of Section 20(a) of the Exchange Act.

Dated: Palo Alto, California
        August 13, 2019

Respectfully submitted,

*/s/Patrick E. Gibbs*

-159-

Patrick E. Gibbs
(CA Bar No. 183174)
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304-1130
Phone: (650) 843-5000
Fax: (650) 849-7400
pgibbs@cooley.com

Douglas P. Lobel
(VA Bar No. 42329)
David A. Vogel
(VA Bar No. 48971)
COOLEY LLP
11951 Freedom Drive
Reston, Virginia 20190
Phone: (703) 456-8000
Fax: (703) 456-8100
dlobel@cooley.com
dvogel@cooley.com

Sarah M. Lightdale
(NY Bar No. 4395661)
Lauren Gerber Lee
(NY Bar No. 4883500)
COOLEY LLP
55 Hudson Yards
New York, New York 10001
Phone: (212) 479-6000
Fax: (212) 479-6275
slightdale@cooley.com
lglee@cooley.com

William A. McNab
(MN Bar No. 320924)
David M. Aafedt
(MN Bar No. 27561X)
WINTHROP & WEINSTINE, P.A.
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402
Phone: (612) 604-6400
Fax: (612) 604-6800
wmcnab@winthrop.com
daafedt@winthrop.com

*Attorneys for Defendants CenturyLink, Inc.,*
*Glen F. Post, III, R. Stewart Ewing, Jr.,*
*David D. Cole, Karen Puckett, Dean J.*
*Douglas, and G. Clay Bailey*