## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

MDL No. 17-2795 (MJD/KMM)

This Document Relates to:
Civil File No. 18-296 (MJD/KMM)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

## TABLE OF CONTENTS

I.    Preliminary Statement ................................................................................. 1

II.   Statement of Facts ...................................................................................... 3

      A.    Summary of Plaintiffs' Claims ....................................................... 3

III.  Procedural History ...................................................................................... 6

IV.   Legal Standards .......................................................................................... 6

V.    The Class Satisfies Rule 23(a)'s Prerequisites ........................................ 8

      A.    Numerosity Is Satisfied .................................................................. 8

      B.    Commonality Is Satisfied ............................................................... 9

      C.    Typicality Is Satisfied ................................................................... 10

      D.    Adequacy Is Satisfied ................................................................... 11

VI.   The Court Should Certify The Class Under Rule 23(B)(3) ................... 13

      A.    Common Questions of Law And Fact Predominate..................... 13

            1.    Plaintiffs Are Entitled To A Presumption Of Reliance Under
                  The Fraud On-The Market Doctrine Because Market
                  Efficiency Is Established ................................................... 14

                  a.    CenturyLink Securities Traded on a National
                        Securities Exchange ..................................... 16

                  b.    Trading Volume ............................................. 17

                  c.    Analyst Coverage .......................................... 18

                  d.    Market Makers And Arbitrageurs ................ 18

                  e.    SEC Form S-3 Eligibility .............................. 19

                  f.    Causal Relationship Between Information and Stock
                        Price............................................................. 20

                  g.    Market Capitalization.................................... 22

                  h.    Public Float ................................................... 22

            i.      Bid-Ask Spread .................................................................... 23

     2.     Plaintiffs Are Entitled To A Presumption Of Reliance Under
             *Affiliated Ute* ....................................................................... 24

     3.     Common Issues of Damages Predominate ...................................... 24

   B.     A Class Action Is Superior To Other Adjudicative Methods. .................... 25

VII.   Lead Counsel Should Be Appointed Class Counsel ............................................. 26

VIII.  Conclusion ............................................................................................. 27

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005) ...................................................................... 9

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) .......................................................................................... 24

*Alpern v. UtiliCorp United, Inc.*,
    84 F.3d 1525 (8th Cir. 1996) .......................................................................... 10

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997) .......................................................................................... 13

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
    568 U.S. 445 (2013) ................................................................................ 7, 14, 15

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) .......................................................................... 2, 6, 13, 14

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
    2016 WL 4098741 (D. Minn. July 28, 2016) ......................................... *passim*

*Bennett v. Sprint Nextel Corp.*,
    298 F.R.D. 498 (D. Kan. 2014) ........................................................................ 9

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ............................................................ *passim*

*In re CenturyLink Sales Practices and Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019) .............................................................. 6

*In re Charter Commc'ns, Inc., Sec. Litig.*,
    2005 WL 4045741 (E.D. Mo. June 30, 2005) ................................................ 9

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) ........................................................................ 9

*DeBoer v. Mellon Mortg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) .......................................................................... 10

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008) ...................................................................... 17

iv

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................ 13, 14

*Fogarazzao v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................. 24

*Första AP-Fonden v. St. Jude Med., Inc.*,
  312 F.R.D. 511 (D. Minn. 2015).........................................................*passim*

*In re GenesisIntermedia, Inc. Sec. Litig.*,
  232 F.R.D. 321 (D. Minn. 2005)................................................................... 9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .............................................................. 13, 14, 15, 20

*In re HealthSouth Corp. Sec. Litig.*,
  261 F.R.D. 616 (N.D. Ala. 2009)................................................................. 22

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ....................................................................................... 6

*Kimball v. Frederick J. Hanna & Assoc., P.C.*,
  2011 WL 3610129 (D. Minn. Aug. 15, 2011) .............................................. 7

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ............................................ 15, 16, 22, 23

*Lockwood Motors, Inc. v. Gen. Motors Corp.*,
  162 F.R.D. 569 (D. Minn. 1995).................................................................... 8

*Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  1989 WL 91110 (D. Minn. May 24, 1989)......................................... 1, 7, 25

*In re NYSE Specialists Sec. Litig.*,
  260 F.R.D. 55 (S.D.N.Y. 2009) ................................................................... 25

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995).............................................................. 7, 13

*Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*,
  678 F.3d 640 (8th Cir. 2012) ........................................................................ 7

*Rattray v. Woodbury Cty., IA*,
  614 F.3d 831 (8th Cir. 2010) ........................................................................ 7

*In re Retek Inc. Sec. Litig.*,
    236 F.R.D. 431 (D. Minn. 2006) ............................................................ 11, 18, 19, 24

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) .................................................................... 13

*In re SciMed Sec. Litig.*,
    1993 WL 616692 (D. Minn. Sept 29, 1993) ............................................ 8, 9

*In re Select Comfort Corp. Sec. Litig.*,
    202 F.R.D. 598 (D. Minn. 2001) .............................................................. 26

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................ 17, 20

## OTHER AUTHORITIES

17 C.F.R. § 239.13 ........................................................................................ 19

Fed. R. Civ. P. 23 ...................................................................................... *passim*

H.R. Rep. No. 104-369, 1995 U.S.C.C.A.N. 730 (1995) .............................. 12

Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") and named plaintiff Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009 ("Vildosola," and collectively with Lead Plaintiff, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) to certify this action as a class action and to appoint Plaintiffs as Class Representatives, and, pursuant to Fed. R. Civ. P. 23(g), to appoint Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Stoll Stoll Berne Lokting & Shlachter P.C. ("Stoll Berne") as Class Counsel.

## I.    PRELIMINARY STATEMENT

This securities fraud class action against CenturyLink, Inc. ("CenturyLink" or the "Company") and six of its senior officers arises out of Defendants' years-long practice of routinely and systematically "cramming" customer accounts—misquoting prices and improperly billing customers fees and services they did not authorize—in order to create a false image of financial success. Defendants' false and misleading statements to investors concealed these practices and the fact that CenturyLink's purported financial results depended on them. Investors were significantly damaged when Defendants' misconduct was revealed in a series of disclosures.

Courts in the Eighth Circuit have repeatedly held that "[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1989 WL 91110, at *3 (D. Minn. May 24, 1989) (citation omitted). The Supreme Court has also consistently

recognized the importance of private securities class actions as an integral component in enforcing the federal securities laws. *See, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224 (1988).

Through this motion, Plaintiffs seek to certify a class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), consisting of:

> all persons and entities that purchased or otherwise acquired publicly traded CenturyLink common stock or 7.60% Senior Notes due September 15, 2039, during the period between March 1, 2013 to July 12, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[1]

Certification is appropriate under Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  In addition, certification is appropriate under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R.

---

[1] The proposed Class excludes (i) Defendants; (ii) CenturyLink's affiliates and subsidiaries; (iii) the officers and directors of CenturyLink and its subsidiaries and affiliates at all relevant times; (iv) members of the immediate family of any excluded person; (v) heirs, successors, and assigns of any excluded person or entity; and (vi) any entity in which any excluded person has or had a controlling interest.  All references to the "Complaint" and to "¶__" are to Plaintiffs' Consolidated Securities Class Action Complaint filed June 25, 2018 (ECF No. 143), and all references to "ECF No. __" are to the docket in *Craig v. CenturyLink, Inc.*, No. 18-296 (MJD/KMM).  Unless otherwise noted, all internal citations and quotation marks have been omitted and emphasis added.

Civ. P. 23(b)(3).  As discussed below, the proposed class readily satisfies these requirements.

Accordingly, Plaintiffs request certification of the Class defined above, the appointment of Plaintiffs as Class Representatives, and the appointment of Bernstein Litowitz and Stoll Berne as counsel for the Class.

## II.    STATEMENT OF FACTS

### A.    Summary of Plaintiffs' Claims

Defendants' secret, systemic practice of illegally "cramming" customer accounts continued for many years and affected millions of CenturyLink's customers. ¶¶ 44, 178.[2] According to numerous former employees and internal documents, CenturyLink's cramming practices were widespread, were "happening all the time, all day, every day" and "clearly occurring in every state" in which the Company does business. ¶¶ 65, 89, 107, 178.  But Defendants never suggested the Company's billing practices could be called into question.  To the contrary, Defendants told investors CenturyLink would never "place or record an order for our products and services for a customer without that customer's authorization"—a clear denial of any cramming practices.  ¶ 15, 240.

Defendants instead claimed that CenturyLink's revenue growth was driven by its focus on excellent customer service, its "bundling" marketing strategy, its focus on

---

[2]  Defendants include CenturyLink, former CEO Glen F. Post, III; former CFO R. Steward Ewing. Jr.; former Controller David D. Cole; former Global Head of Sales Karen Puckett; former President, Sales and Marketing Dean J. Douglas; and former Treasurer G. Clay Bailey.

"customer needs," and its faithfulness to CenturyLink's Unifying Principles of "fairness, honesty and integrity" and Code of Conduct. ¶¶ 32, 40-42, 52-54, 60, 190-200. Defendants also repeatedly claimed that the Company met and exceeded the customer service standards and consumer protection regulations governing its business, and that noncompliance with these rules was only a hypothetical "risk." ¶¶ 43, 52. Defendants' representations were critical to investors in the face of a structural decline in wireline services, competition, and concerns about CenturyLink's ability to generate sustainable cash flows needed to pay the Company's dividend. ¶¶ 57, 61.

These statements, however, were false. In reality, CenturyLink drove revenues not through its bundling strategies or by focusing on customer needs but by: (1) adding services to customer accounts without authorization; (2) lying to customers about the prices they would be charged; and (3) misleading customers concerning material terms of their contracts. ¶¶ 63-64, 88-94. According to numerous witnesses, CenturyLink's illegal practices were well-known and encouraged by CenturyLink's senior management, who not only enforced "ridiculous" sales quotas that were impossible to meet but also actively instructed employees to engage in deceptive sales pitches. ¶¶ 67-108.

In 2014, CenturyLink's senior leadership internally acknowledged the cramming practices at its call centers, and attempted to address them. ¶¶ 109-11. However, after instituting changes to performance metrics and eliminating quotas for sales employees, CenturyLink's sales numbers declined drastically. ¶¶ 111-12. Unwilling to tolerate the drop in revenues, CenturyLink senior management quickly reverted to the prior model—and both cramming and CenturyLink revenues quickly returned to their prior levels. ¶ 112.

4

To conceal the fact that cramming was a significant driver of CenturyLink revenues—which had sharply declined in response to Defendants' efforts to address cramming and rebounded after CenturyLink abandoned that effort—Defendants falsely attributed CenturyLink's fluctuating revenues to benign causes, such as an organizational realignment, purported marketing efforts to attract "high-value customers" and pursuing "higher value bundled sales and select pricing increases." ¶¶ 117-19.

After CenturyLink returned to form, its billing misconduct began to attract the attention of the news media and regulators. But even as complaints and investigations mounted, the Company refused fix its sales culture, and affirmatively denied allegations of improper conduct. In May 2016, following scores of complaints from Minnesota customers, the Minnesota Attorney General initiated an investigation that threatened to expose the truth. ¶¶ 142, 168. CenturyLink did everything it could to frustrate the investigation and keep its billing practices a secret, including by falsely denying the existence of documents that CenturyLink's vendors "promptly" produced. ¶ 168.

The truth concerning CenturyLink's deceptive sales practices and their financial impact was revealed in a subsequent series of disclosures. On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme," which reported that a CenturyLink employee had filed a whistleblower complaint that detailed CenturyLink's cramming practices. ¶ 152. As that report revealed, the whistleblower was terminated after bringing her concerns about cramming directly to CenturyLink management. ¶ 147. Additional news stories followed, including a June 19, 2017 *Bloomberg* report that noted that consumers all over the country had been impacted

by CenturyLink's cramming, that additional actions had been filed, and that damages were significant. ¶ 158.

Last, on July 12, 2017, media outlets reported that the Minnesota Attorney General had filed a complaint against CenturyLink following a year-long investigation, citing extensive evidence detailing the Company's fraudulent sales practices. ¶ 163. As a result of these disclosures, the price of CenturyLink's securities declined in a statistically significant matter. ¶ 266.

## III.    PROCEDURAL HISTORY

Defendants filed a motion to dismiss the Complaint, which was denied in full on July 30, 2019. *See In re CenturyLink Sales Practices and Sec. Litig.*, 403 F. Supp. 3d 712 (D. Minn. 2019). Since then, Plaintiffs and their counsel have vigorously pursued discovery, consulted with numerous experts, and otherwise worked to develop the record supporting the claims of the Class. Beginning in December 2019, CenturyLink began to disclose that it would pay tens of millions of dollars—including to the State of Minnesota—to resolve numerous Attorney General investigations and proceedings into the very billing misconduct at issue here.

## IV.    LEGAL STANDARDS

The U.S. Supreme Court has long recognized that private securities class actions serve as a "necessary supplement to [SEC] action," by affording relief to those injured by securities laws violations and deterring wrongdoing. *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964); *see also Basic Inc.*, 485 U.S. at 231 (noting that securities class actions "constitute[] an essential tool for enforcement of the 1934 Act's requirements").

Consistent with this well-established authority, courts in the Eighth Circuit and across the country have repeatedly held that "[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." *Moorhead,* 1989 WL 91110, at *3.

Whether an action should be certified as a class action is governed by Rule 23, which requires Plaintiffs to demonstrate "numerosity," "commonality," "typicality," and "adequacy of representation" under Rule 23(a), and "predominance" and "superiority" under Rule 23(b). *Rattray v. Woodbury Cty., IA*, 614 F.3d 831, 835 (8th Cir. 2010). At this stage, merits questions may be "considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 445, 465-66 (2013).

The Court has "broad discretion to decide whether certification is appropriate," *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012), and "the substantive allegations in the plaintiff's complaint are accepted as true when determining if the proposed class is acceptable." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 688 (D. Minn. 1995). "When there is a question as to whether certification is appropriate, the Court should give the benefit of the doubt to approving the Class." *Kimball v. Frederick J. Hanna & Assoc., P.C.*, 2011 WL 3610129, at *3 (D. Minn. Aug. 15, 2011) (Davis, J.). As discussed below, Plaintiffs amply satisfy Rule 23's requirements.

## V.    THE CLASS SATISFIES RULE 23(A)'S PREREQUISITES

### A.    Numerosity Is Satisfied

"Courts generally assume that the numerosity requirement is satisfied in class actions involving nationally traded securities." *In re SciMed Sec. Litig*., 1993 WL 616692, at * 3 (D. Minn. Sept 29, 1993).  While "[t]here is no absolute number that satisfies the numerosity requirement," a proposed class with approximately 40 members has been found to satisfy the numerosity requirement.  *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995) (quoting 3B Moore's Federal Practice ¶ 23.05[1] at 23-143-45 (2d ed. 1995)).

Here, the numerosity requirement is met because: (1) CenturyLink's common shares were actively traded on the New York Stock exchange during the Class Period; (2) CenturyLink had approximately 567 million shares of common stock issued and outstanding on average during Class Period; (3) CenturyLink's common stock traded at a weekly average of over 28.7 million shares, with an average weekly turnover of 5.1%; (4) CenturyLink's publicly traded bonds, including the 7.60% Senior Notes, were actively traded on open, well-developed and efficient markets; and (5) CenturyLink's 7.60% Senior Notes had an amount outstanding of $800 million at the end of the Class Period, and were held by at least 120 institutional investors (and likely by hundreds, if not thousands, of other investors). Hartzmark Report (Ex. C to the Blatchley Decl.), ¶¶ 99, 105, 128, Exs. I, XI.  This more than meets the numerosity requirement.  *See, e.g., Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *3 (D. Minn. July 28, 2016) (class

met numerosity requirement where 5.175 million shares of stock were sold in public offering).[3]

### B.    Commonality Is Satisfied

Commonality is easily satisfied in securities cases.  *See GenesisIntermedia*, 232 F.R.D. at 328 (commonality satisfied where common legal theory – *i.e.*, violations of federal securities laws – is linked to a common group – *i.e.*, securities purchasers).  Where "the documents and public reports at issue were uniform and broadly distributed…there are…several issues of fact common to members of the proposed Plaintiff class."  *In re SciMed Sec. Litig,* 1993 WL 616692, at *3.  In fact, "questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact." *In re DaimlerChrysler AG Sec. Litig.,* 216 F.R.D. 291, 296 (D. Del. 2003); *see also In re Charter Commc'ns, Inc., Sec. Litig.*, 2005 WL 4045741, at *11 (E.D. Mo. June 30, 2005) ("Courts repeatedly have held that common questions regarding defendants' liability are appropriate for class-wide treatment, even if there are individual differences in Class members' damages.").

Here, there are numerous common questions of law and fact, including: (a) whether Defendants' misrepresentations and omissions violated the federal securities laws; (b)

---

[3] *See also In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 328 (D. Minn. 2005) (numerosity satisfied where 380,000 shares traded per day during class period and more than 23 million shares of stock were outstanding); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 505 (D. Kan. 2014) (citing threshold of 20-50 class members and finding that class of bondholders including 224 institutional investors met numerosity requirement); *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684 (N.D. Ala. 2005) (class of at least 80 bondholders met numerosity requirement).

whether Defendants misrepresented material facts about CenturyLink's billing practices and financial performance during the Class Period; (c) whether Defendants are liable for the alleged misrepresentations and omissions described herein; (d) whether Defendants' misrepresentations and omissions caused the Class members to suffer a compensable loss; and (e) whether Class members have sustained damages, and the proper measure of damages. ¶ 271. As any one of these common questions would suffice, Plaintiffs meet the commonality requirement.

### C.    Typicality Is Satisfied

"The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Like all other Class members, Oregon and the Vildosola purchased CenturyLink's publicly traded securities during the Class Period at prices artificially inflated by Defendants' misrepresentations and omissions. ¶¶ 26-27, 270. In addition, Plaintiffs, like all other Class members, were subsequently damaged when the price of CenturyLink's publicly traded securities declined after the truth of Defendants' fraud was revealed. ¶¶ 26-27, 270. Because the proposed Class Representatives have claims that are typical of the claims of the Class, bring claims under the same federal securities law and seek the same relief as other Class members, the typicality requirement is satisfied.

### D.    Adequacy Is Satisfied

Plaintiffs more than satisfy the adequacy requirement of Rule 23(a)(4), which asks: "(1) whether the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Retek Inc. Sec. Litig.,* 236 F.R.D. 431, 435 (D. Minn. 2006).  Plaintiffs readily satisfy both prongs of that standard.

First, Oregon—an institutional investor that provides retirement benefits to Oregon's public employees—purchased CenturyLink securities during the Class Period at prices artificially inflated by Defendants' misrepresentations and omissions, and suffered significant damages when the price of CenturyLink's publicly traded securities declined when the truth was revealed. ¶¶ 26-27, 270.  Plaintiff Vildosola similarly purchased CenturyLink's 7.6% Notes during the Class Period and was damaged when the price of those securities declined in response to the alleged corrective disclosures.  ¶¶ 26-27, 270.

Both Oregon and Vildosola have submitted sworn declarations attesting to their work on behalf of the Class, including through investigating and filing the consolidated complaint, defeating Defendants' motion to dismiss, and vigorously pursuing the claims of the proposed class in discovery, including by retaining and consulting with experts and propounding and responding to document requests, third party subpoenas, and other discovery.  *See* Declaration of Brian de Haan in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("De Haan Decl.") (Ex. D to the Blatchley Decl.), ¶¶ 4-10; Declaration of Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009 in Support of Plaintiffs' Motion for Class

11

Certification and Appointment of Class Representatives and Class Counsel ("Vildosola Decl.") (Ex. E to the Blatchley Decl.), ¶¶ 4-10. Further, Plaintiffs have been diligently overseeing counsel's efforts, frequently discuss case updates with counsel, and are committed to fulfilling their responsibility to maximize the recovery on behalf of the class. De Haan Decl., ¶¶ 8-9; Vildosola Decl., ¶¶ 8-9; Blatchley Decl., ¶ 2. In addition, the fact that Lead Plaintiff Oregon is an institutional shareholder that shares the Class's common interests supports a finding of adequacy. *See* H.R. Rep. No. 104-369, 34 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 (the Private Securities Litigation Reform Act of 1995 was enacted "to increase the likelihood that institutional investors will serve as lead plaintiffs.").

Plaintiffs have also retained qualified counsel, further supporting a finding of adequacy. In appointing class counsel, the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Oregon and Vilodola retained Bernstein Litowitz and Stoll Berne, two firms that are eminently qualified to represent the class in this case and have a wealth of experience and successfully prosecuting securities fraud actions. Bernstein Litowitz and Stoll Berne successfully litigated numerous motions before the Judicial Panel for Multidistrict Litigation, defeated Defendants' motion to dismiss, negotiated a case schedule and ESI protocol, propounded discovery, pursued third-party subpoenas, and

have conducted significant work with experts to pursue the claims of the Class. Moreover, Bernstein Litowitz and Stoll Berne have substantial experience in securities class action litigation and have successfully prosecuted class actions in state and federal court, including in the District of Minnesota. Blatchley Decl., Exs. A, B. Since the inception of the litigation, Bernstein Litowitz and Stoll Berne have zealously represented the interests of the class, will continue to do so, and should be appointed Class Counsel under Rule 23(g).

## VI.    THE COURT SHOULD CERTIFY THE CLASS UNDER RULE 23(B)(3)

### A.    Common Questions of Law And Fact Predominate

According to the Supreme Court, "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Basic,* 485 U.S. 224. Moreover, "[c]ommon questions need only predominate; they need not be dispositive of the litigation." *In re Potash Antitrust Litig.*, 159 F.R.D. at 693. "At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence . . . . If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016).

The predominance inquiry looks to the elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 809-10 (2011) ("*Halliburton I*"). "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."

13

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*"). Because the Supreme Court has held that falsity, materiality, and loss causation are common issues to a class, *Amgen*, 568 U.S. at 474-75, predominance in a securities fraud action often turns on the reliance element. *Halliburton I*, 563 U.S. at 810.

Plaintiffs are entitled to a presumption of classwide reliance under the fraud-on-the-market theory established in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), and reaffirmed in *Halliburton II*. Under those precedents, Plaintiff may satisfy Section 10(b)'s reliance element by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. *Halliburton II*, 573 U.S. at 283-84. To invoke the *Basic* presumption, Plaintiff must establish that (1) the alleged misrepresentations were public; (2) the stock traded in an efficient market; and (3) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *Halliburton I*, 563 U.S. at 811. As discussed below, the *Basic* standard is satisfied.

### 1. Plaintiffs Are Entitled To A Presumption Of Reliance Under The Fraud-On-The-Market Doctrine Because Market Efficiency Is Established

The fraud-on-the-market presumption is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies;" therefore, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."

*Halliburton II*, 573 U.S. at 258, 268.  Thus, "a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458.

Plaintiffs are entitled to a presumption of reliance under *Basic*'s "fraud-on-the-market" theory because each of the prerequisites for the presumption—publicity, market timing, and market efficiency—are satisfied.  On publicity, Plaintiffs allege that Defendants made material misrepresentations and omissions in their public statements to investors that artificially inflated or maintained the market price of CenturyLink's securities. *See, e.g.,* ¶¶ 267-77. On market timing, Plaintiffs allege that they bought CenturyLink securities during the Class Period, and suffered losses when the artificial inflation came out of the price of those securities when the truth was disclosed.  *Id.*  Finally, as demonstrated below, CenturyLink stock and the 7.6% Notes traded in efficient markets.

As set forth in the Hartzmark Report, the markets for CenturyLink common stock and the 7.6% Senior Notes were efficient during the Class Period.  Courts in the Eighth Circuit have relied on the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) ("*Cammer*") and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) ("*Krogman*"), to decide whether a market is efficient.  *See Beaver Cty. Emps.' Ret. Fund*, 2016 WL 4098741, at *8-9 (analyzing the *Cammer* and *Krogman* factors); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 518 (D. Minn. 2015) (same).

The *Cammer* factors address: "(1) a stock's average weekly trading volume; (2) the number of security analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) whether the company is eligible to file an SEC Form S-3; and (5) empirical facts showing a cause and effect relationship

15

between unexpected corporate events or financial releases and an immediate response in the stock price." *Första AP-Fonden*, 312 F.R.D. at 518 (citing *Cammer*, 711 F. Supp. at 1286-87).

The *Krogman* factors are: "(6) the company's market capitalization, (7) the bid-ask spread for stock sales, and (8) float (the percentage of shares held by the public, as opposed to insiders)." *Första AP-Fonden*, 312 F.R.D. at 518 (citing *Krogman*, 202 F.R.D. at 478). In addition, this Court has looked to other factors, such as whether a stock shows "autocorrelation," which measures "how predictable a stock's pricing is based on historical data," absence of which is supportive of an efficient market, and whether a stock is traded on a major stock exchange. *Id.*

Dr. Hartzmark's Report analyzes each of these factors and confirms that CenturyLink's common stock and the 7.6% Senior Notes traded on efficient markets during the Class Period.

### a.    CenturyLink Securities Traded on a National Securities Exchange

Throughout the Class Period, CenturyLink's common stock was traded on the New York Stock Exchange ("NYSE"), one of the most efficient securities markets in the world. Hartzmark Report, ¶¶ 23, 37-38.  Courts have routinely held that securities listed on the NYSE trade in an efficient market.  Hartzmark Report, ¶¶ 37-38; *see Cammer,* 711 F. Supp. at 1292 ("at a minimum, there should be a presumption…that certain markets are developed and efficient for virtually all the securities traded there: The New York and

16

American Stock Exchanges[.]"); *see also Första AP-Fonden*, 312 F.R.D. at 519 (stock trading on the NYSE weighed in favor of market efficiency).

Indeed, at least one court has noted it was "[un]able to locate a single case where the market for a NYSE-traded security was deemed inefficient," holding that the fact that the security traded on the NYSE "strongly favors a finding of market efficiency." *In re DVI Inc. Sec. Litig.,* 249 F.R.D. 196, 208 (E.D. Pa. 2008).

### b.    Trading Volume

An "[a]verage weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citing *Cammer*, 711 F. Supp. at 1286). The average weekly trading volume of the CenturyLink common stock was 27.8 million shares, or 4.9% of outstanding shares, Hartzmark Report, ¶ 25, Ex. I, which easily satisfies the first *Cammer* factor. *See Första AP-Fonden*, 312 F.R.D. at 519 (weekly trade volumes of at least four million shares, with 4.58% of shares outstanding, weighed in favor of market efficiency).

The 7.6% Senior Notes also had a high frequency of trading during the class period: the 7.6% Senior Notes had an average turnover rate of 2.5%, with a median of 1.8%, and traded on all possible trading days from the time it was issued during the Class Period. Hartzmark Report, ¶¶ 116-19; Exs. XI, XII; *see Winstar*, 290 F.R.D. at 447 (bond turnover over 2% justifies "strong presumption" of efficient market). In addition, the average trade size was large: the average dollar transaction size in par value for the 7.6% Senior Notes was $97,735 during the Class Period. Hartzmark Report, ¶¶ 111-12. Theses volumes and

trade values support the conclusion that the market for CenturyLink common stock and the 7.6% Senior Notes was efficient.

### c.    Analyst Coverage

During the Class Period, more than 50 analysts covered CenturyLink, with an average of 19 analysts covering the Company per week.  Hartzmark Report, ¶¶ 19, 31, 132; Ex. II.  *See Första AP-Fonden*, 312 F.R.D. at 519 (coverage by 24 analysts weighed in favor of market efficiency).  The number of analysts following CenturyLink was greater than at least 80% of the common stocks on the NYSE and NASDAQ.  Hartzmark Report, ¶ 31.  Analysts closely watched CenturyLink, publishing over 1,000 reports and actively participating on 17 conference calls during the Class Period.  Hartzmark Report, ¶¶ 28-29; Exs. III-A, III-B; *see In re Retek Inc.*, 236 F.R.D. at 436-37 (that company was "subject of 244 analyst reports during the class period" weighed in favor of efficiency of market).  As to the 7.6% Senior Notes, analysts such as Fitch and S&P Global issued numerous reports specifically addressing CenturyLink's debt securities.  Hartzmark Report, ¶ 122, 124.  During the Class Period, analysts also hosted 38 investor conferences, and CenturyLink was discussed in approximately 11,500 published articles.  Hartzmark Report, ¶¶ 29, 32; Ex. III-C; Appendix C.  The heavy coverage of CenturyLink by analysts and the media weighs in favor of market efficiency.

### d.    Market Makers And Arbitrageurs

"The existence of market makers and arbitrageurs" is persuasive evidence of market efficiency because it "would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling

stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. CenturyLink's common stock was actively traded on the NYSE by at least 1,668 institutional investors during the Class Period. Hartzmark Report, ¶¶ 39-40; Exs. IV, V. And there were opportunities for arbitrage throughout the Class Period, given that the amount of short interest in CenturyLink common stock ranged from 24.1 million shares to 114.9 million shares, with an average of 47.3 million shares. Hartzmark Report, ¶¶ 41-42; Ex. VI. Further, Dr. Hartzmark identified 343 separate market makers for the 7.6% Senior Notes during the Class Period. Hartzmark Report, ¶¶ 115, 126; Ex. XV; *In re Retek Inc. Sec. Litig.*, 236 F.R.D. at 436-37 (existence of 44 market makers weighed in favor of finding of market efficiency). And more than 120 institutional investors held at least 21-33% of the 7.6% Senior Notes at year-end from 2013 to 2016. Hartzmark Report, ¶ 128; Ex. XVI; *see Första AP-Fonden*, 312 F.R.D. at 519 (active trading by institutional investors, who held "large percentage" of stock, weighed in favor of market efficiency). These facts support the conclusion that CenturyLink common stock and the 7.6% Senior Notes traded on an efficient market.

### e.    SEC Form S-3 Eligibility

As explained in *Cammer*, eligibility to file an abbreviated SEC Form S-3, which is only available to issuers that have been filing reports under the Exchange Act for at least 12 months, have a public float of $75 million, and meet certain other requirements, is highly probative of efficiency. 17 C.F.R. § 239.13; *see Cammer*, 711 F. Supp. at 1287 ("[I]t is the number of shares traded and value of shares outstanding that involve the facts which imply

efficiency."). CenturyLink met these requirements, and, in fact, filed at least three Forms S-3 during the Class Period. Hartzmark Report, ¶¶ 43-45; 130-32.

### f. Causal Relationship Between Information and Stock Price

Finally, Plaintiffs have "allege[d] empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp at 1287. Here, Dr. Hartzmark examined the fifth *Cammer* factor by conducting an event study. ¶¶ 61-65; Apps. C, D. "Event studies are 'regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events.'" *Första AP-Fonden*, 312 F.R.D. at 520 n.4 (quoting *Halliburton II*, 573 U.S. 280). Events studies are "considered *prima facie* evidence of the existence of this causal relationship." *Winstar*, 290 F.R.D. at 448.

In the study, Dr. Hartzmark used generally accepted statistical methods to compare CenturyLink common stock price movements on "news" days to movements on "non-news" days. Hartzmark Report, ¶¶ 63-65; App. C. He found that CenturyLink common stock exhibited significant price movements more than nine times as frequently on news days than as on non-news days. Hartzmark Report, ¶¶ 74-75; App. E. Dr. Hartzmark also found there was no statistically significant autocorrelation of CenturyLink's common stock abnormal returns, which is consistent with the conclusion that CenturyLink common stock reacts quickly to unexpected events. Hartzmark Report, ¶¶ 79-83; Ex. X. Finally, although not necessary to show market efficiency, Dr. Hartzmark reviewed CenturyLink common stock's price movements in response to the alleged corrective disclosures alleged in the

20

Complaint, and found highly statistically significant price movements in response to each disclosure—which is consistent with a security that trades in an efficient market. Hartzmark Report, ¶¶ 84-88, Apps. C, E.

Dr. Hartzmark also employed an event study to analyze the cause and effect relationship between unexpected new information and CenturyLink's 7.6% Senior Notes prices, and concluded that new CenturyLink-specific information and large price movements of the 7.6% Senior Notes were related and could not be attributed to outside influences. Hartzmark Report, ¶¶ 153-82. First, Dr. Hartzmark found that the 7.6% Senior Notes responded information about CenturyLink's credit rating in a manner consistent with a finding of an efficient market. Hartzmark Report, ¶¶ 157-66; Ex. XIX. Second, Dr. Hartzmark examined the relationship between 7.60% Note price volatility and common stock volume—a proxy for CenturyLink-specific information—and found that the relationship was positive and highly statistically significant, which also supports a finding of market efficiency. Hartzmark Report, ¶¶ 167-70 Ex. XX. Third, Dr. Hartzmark determined that the 7.6% Note did not exhibit economically meaningful autocorrelation. Hartzmark Report ¶¶ 171-77. Finally, although not necessary to show market efficiency, Dr. Hartzmark reviewed the 7.60% Note's response to the corrective disclosures and found that each was associated with significant price movement in the price of the Senior 7.6% Notes—another finding consistent with market efficiency. Hartzmark Report, ¶¶ 178-81; Ex. XXI.

These analyses support a finding of market efficiency for CenturyLink's common stock and the 7.60% Notes during the Class Period. Hartzmark Report, ¶¶ 85-87, 182.

### g.     Market Capitalization

"Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478.   Throughout the Class Period, CenturyLink's market capitalization averaged approximately $17.9 billion, with a high of $23.9 billion, meaning that CenturyLink's market capitalization was generally greater than 89-95% of common stocks on the NYSE and NASDAQ.  Hartzmark Report, ¶¶ 47-50; Ex. VII; *see Första AP-Fonden*, 312 F.R.D. at 519 (market capitalization in the "billions of dollars" weighed in favor of market efficiency).  The 7.6% Senior Notes also had a high market value ranging from $587 million to $844 million during the class period.  Hartzmark Report, ¶ 134; Exs. XIV, XVII; *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 636 (N.D. Ala. 2009) ("For bonds, an analogous factor [to market capitalization] would be the total market value of the bonds calculated as the principal amount outstanding (face value) multiplied by the current price of the note.").   The high market capitalization and market value of the CenturyLink securities at issue supports a finding of market efficiency.

### h.     Public Float

"In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.  During the Class Period, the public float represented approximately 99.6% of CenturyLink's common stock, on average.  Hartzmark Report, ¶ 52.  There is no evidence that any insiders held any positions in the 7.6% Senior Notes.  Hartzmark Report, ¶ 138.  These high percentages of public

float support a finding of market efficiency.  *See Första AP-Fonden*, 312 F.R.D. at 519 (97.8% public float weighed in favor of market efficiency).

### i.    Bid-Ask Spread

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares. A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  During the Class Period, the average bid-ask spread for companies on the NYSE and NASDAQ (0.70%) was *17 times larger* than the bid-ask spread for CenturyLink common stock (0.04%). Hartzmark Report, ¶¶ 53-57.  As there are no reported bid-ask spreads for corporate bond markets, Dr. Hartzmark analyzed customer trades with reporting dealers and determined that the average bid-ask spread for the 7.6% Senior Notes was 2.48%, and the median bid-ask spread was 2.55%.  Hartzmark Report, ¶ 141; Ex. XVIII.  Dr. Hartzmark also analyzed potential market-making trades between dealers and determined that the average bid-ask spread for such trades was 1.10%, with a median bid-ask spread of 0.93%.  Hartzmark Report, ¶ 143; Ex. XVII.  These narrow bid-ask spreads support a finding of market efficiency.  *See Första AP-Fonden*, 312 F.R.D. at 519.

Therefore, all of the *Cammer* and *Krogman* factors support a finding that the markets for CenturyLink common stock and the 7.6% Senior Notes were efficient, and that the fraud-on-the-market presumption therefore applies.

### 2.    Plaintiffs Are Entitled To A Presumption Of Reliance Under *Affiliated Ute*

In cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Rather, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54. The *Affiliated Ute* presumption also applies in cases where both misrepresentations and omissions exist. *See Beaver Cty. Emps.' Ret. Fund*, 2016 WL 4098741, at *7. Here, Plaintiffs allege that CenturyLink failed to disclose its practice of illegally cramming customer accounts, and that its deceptive practices artificially inflated its revenues. *See* Compl. ¶¶ 2, 44, 65, 115, 122, 178. Thus, Plaintiffs are entitled to rely on the *Affiliated Ute* presumption. *See Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005).

### 3.    Common Issues of Damages Predominate

Common damages issues predominate here because Class members' damages can be calculated using common methodologies that apply uniformly to all Class members. And "[c]ourts frequently grant class certification despite individual differences in class members' damages." *In re Retek Inc.*, 236 F.R.D. at 436.

Specifically, Dr. Hartzmark demonstrates that damages can be determined using a standard "out of pocket" methodology that applies class-wide, which is "almost universally applied in federal securities litigation," and has been accepted by this Court in numerous cases. Hartzmark Report, ¶¶ 184-92; *see Första AP-Fonden*, 312 F.R.D. at 516 (noting

24

that "courts commonly accept methodologies similar to [the out-of-pocket method] for determining individual damages"); *Beaver Cty. Emps.' Ret. Fund*, 2016 WL 4098741, at *11 ("The Coffman Report [proposing the out-of-pocket method] satisfies what *Comcast* demands, that a viable calculation of damages can be made in this case."). Thus, damages are capable of measurement on a classwide basis, using a model consistent with Plaintiffs' liability case and common questions about damages predominate. *See Första AP-Fonden*, 312 F.R.D. at 517.

### B.    A Class Action Is Superior To Other Adjudicative Methods.

Finally, a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Fed. R. Civ. P. 23(b)(3). "[S]ecurities cases easily satisfy the superiority requirement of Rule 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009); *see also Moorhead*, 1989 WL 91110, at *6 ("[T]he class action is particularly appropriate for securities claims. Indeed, it must be deemed the *only* practical method of litigating these issues when the complex nature of the litigation and the comparatively small individual financial interests are considered.") (emphasis in original).

Rule 23(b)(3) sets forth four issues for the Court to consider in its analysis: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Here, each of these factors shows that the superiority requirement is met in this case. First, Plaintiffs seek to represent a Class of thousands of CenturyLink securities purchasers whose individual damages may be too small to make the expense of litigation worthwhile. *Första AP-Fonden*, 312 F.R.D. at 522 ("[T]he prohibitive costs of prosecuting a securities class action like this one, compared to the relatively small potential recoveries, make it unlikely that class members would want or be able to prosecute their claims on an individual basis, or that it would be more efficient for them to do so."). Second, counsel for Plaintiffs is unaware of any other litigation concerning this controversy already begun by or against Class members. Blatchley Decl., ¶ 3. Third, concentrating the litigation in this forum will promote judicial efficiency by resolving the claims of thousands of shareholders in one case. *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 611 (D. Minn. 2001). Finally, this case does not present any manageability concerns. *Id.*

## VII.    LEAD COUNSEL SHOULD BE APPOINTED CLASS COUNSEL

Rule 23(g) requires the Court to appoint class counsel when certifying a class. In appointing class counsel, the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). As discussed above, and as shown by the resumes attached to the Blatchley Decl. as Exhibits A and B, Lead Counsel has the substantial experience, knowledge, and resources necessary to fully represent the Class.

## VIII.  CONCLUSION

For the foregoing reasons, the Class should be certified, Plaintiffs should be appointed Class Representatives, and Bernstein Litowitz and Stoll Berne should be appointed Class Counsel.

DATED: January 21, 2020                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Michael D. Blatchley*
John C. Browne, NYS Bar No. 3922747
Michael D. Blatchley, NYS Bar No. 4747424
Michael M. Mathai, NYS Bar No. 5166319
Julia Tebor, NYS Bar No. 5119284
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
michaelb@blbglaw.com
michael.mathai@blbglaw.com
julia.tebor@blbglaw.com

Keith S. Dubanevich, OSB No. 975200
Timothy S. DeJong, OSB No. 940662
Keil M. Mueller, OSB No. 085535
**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
kdubanevich@stollberne.com
tdejong@stollberne.com
kmueller@stollberne.com

*Special Assistant Attorneys General and Counsel for Lead Plaintiff the State of Oregon by and through the Oregon State*

27

*Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund and Plaintiff Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009, and Lead Counsel for the Class*

Richard A. Lockridge, MN No. 64117
Gregg M. Fishbein, MN No. 202009
Kate M. Baxter-Kauf, MN No. 392037
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4044
Facsimile: (612) 339-0981
ralockridge@locklaw.com
gmfishbein@locklaw.com
kmbaxter-kauf@locklaw.com

*Liaison Counsel for Plaintiffs*

28