# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION**<br><br>This Document Relates to:<br><br>Civil Action No. 18-296 (MJD/KMM) | **MDL No. 17-2795 (MJD/KMM)**<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Oral Argument Requested |

Patrick E. Gibbs, CA Bar No. 183174
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5535
Facsimile: (650) 618-0387
pgibbs@cooley.com

Sarah Lightdale, NY Bar No. 4395661
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6374
Facsimile: (212) 479-6275
slightdale@cooley.com

Ryan Blair, CA Bar No. 246724
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6047
Facsimile: (858) 527-2750
rblair@cooley.com

Douglas P. Lobel, VA Bar No. 42329
David A. Vogel, VA Bar No. 48971
Dana A. Moss, VA Bar No. 80095
COOLEY LLP
Reston Town Ctr., 11951 Freedom Dr.
Reston, Virginia 20190-5656
Telephone: (703) 456-8000
dlobel@cooley.com
dvogel@cooley.com
dmoss@cooley.com

William A. McNab, MN Bar No. 320924
Thomas H. Boyd, MN Bar No. 0200517
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 604-6400
wmcnab@winthrop.com
tboyd@winthrop.com

Jerry W. Blackwell, MN Bar No. 186867
BLACKWELL BURKE P.A.
431 South 7th Street, Suite 2500
Minneapolis, MN 55415
Telephone: (612) 343-3200
blackwell@blackwellburke.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

RELEVANT BACKGROUND ......................................................................... 4

I.    THE PARTIES AND THE PUTATIVE CLASS ....................................... 4

II.   THE ALLEGED MISREPRESENTATIONS ............................................ 5

III.  THE ALLEGED CORRECTIVE DISCLOSURES ................................... 6

STANDARD OF REVIEW ............................................................................... 7

ARGUMENT ..................................................................................................... 9

I.    PLAINTIFFS CANNOT SATISFY THE RULE 23(B)(3) PREDOMINANCE REQUIREMENT BECAUSE INDIVIDUAL QUESTIONS OF RELIANCE OVERWHELM QUESTIONS COMMON TO THE CLASS ............................................................. 9

    A.   PLAINTIFFS CANNOT PROVE CLASS-WIDE RELIANCE WITH THE *BASIC* PRESUMPTION ......................... 9

        1.   THE BASIC PRESUMPTION CAN BE REBUTTED BY THE PRODUCTION OF EVIDENCE OF NO "FRONT-END" OR "BACK-END" PRICE CHANGES ............................................................... 9

        2.   THE EVIDENCE SHOWS NO "FRONT-END" PRICE IMPACT ................................................................. 12

            a.   Almost Universally, the Alleged Misstatements Did Not Inflate the Price of CenturyLink Stocks ...... 12

            b.   Plaintiffs Cannot Demonstrate Front-End Price Impact by Reference to Four of the 52 At-Issue Dates ......................................................................... 13

            c.   In Light of the Undisputed Evidence, Plaintiffs Cannot Credibly Argue All Alleged Misrepresentations "Maintained" the Prices ............. 14

        3.   THE EVIDENCE ALSO SHOWS NO "BACK-END" PRICE IMPACT ................................................................. 16

            a.   The Allegedly "Corrective" Disclosures Revealed Nothing More than the Fact of Litigation ................................................................. 16

# TABLE OF CONTENTS
(continued)

Page

       b.    The June 19 Disclosure Did Not Cause a Material Drop in the Price of CenturyLink Stock ........................................................ 18

B. PLAINTIFFS CANNOT PROVE CLASS-WIDE RELIANCE WITH THE *AFFILIATED UTE* PRESUMPTION ............................................. 19

    1. DEFENDANTS DID NOT HAVE A DUTY TO DISCLOSE .......................................................... 19

    2. PLAINTIFFS CANNOT TURN A CASE ABOUT AFFIRMATIVE MISREPRESENTATIONS INTO A CASE ABOUT OMISSIONS ............................... 21

II. PLAINTIFFS HAVE NOT OFFERED A DAMAGES METHODOLOGY THAT IS COMMON TO THE PUTATIVE CLASS AND CONSISTENT WITH THEIR LIABILITY THEORY ...... 23

A. PREDOMINANCE REQUIRES PROOF THAT CLASS-WIDE DAMAGES CAN BE MEASURED IN A WAY THAT IS CONSISTENT WITH PLAINTIFFS' LIABILITY CASE ........................................................... 23

B. PLAINTIFFS' EXPERT FAILS TO IDENTIFY A DAMAGES MODEL WITH THE SPECIFICITY REQUIRED BY *COMCAST* ............................... 25

C. PLAINTIFFS' EXPERT FAILS TO SHOW HOW HIS "OUT-OF-POCKET METHOD" COULD BE APPLIED IN A WAY THAT IS CONSISTENT WITH PLAINTIFFS' LIABILITY CASE ................................................ 29

D. *HALLIBURTON I* DOES NOT CHANGE PLAINTIFFS' BURDEN UNDER *COMCAST* ...................... 32

III. OREGON DOES NOT MEET THE TYPICALITY OR ADEQUACY REQUIREMENTS OF RULE 23(A)(3) AND (A)(4) ........ 33

A. THROUGHOUT THE CLASS PERIOD, OREGON HAD UNIQUE ACCESS TO INFORMATION AND AN OPPORTUNITY TO UNCOVER THE ALLEGED FRAUD ....... 34

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

B.   OREGON CONTINUED PURCHASING CENTURYLINK
SECURITIES EVEN AFTER LEARNING OF THE
ALLEGED FRAUD ....................................................................... 36

C.   OREGON DID NOT IN FACT RELY ON ANY OF THE
ALLEGED MISSTATEMENTS OR OMISSIONS ...................... 38

IV.   EVEN IF A CLASS CAN BE CERTIFIED, THE COURT
SHOULD SHORTEN THE CLASS PERIOD ........................................... 40

A.   THE JUNE 16, 2017, *BLOOMBERG* ARTICLE FULLY
DISCLOSED ALLEGATIONS OF CENTURYLINK'S
FRAUD TO THE MARKET ........................................................... 41

B.   THE JUNE 19 ARTICLE AND JULY 12
ANNOUNCEMENT PROVIDED NO ADDITIONAL
INFORMATION TO THE MARKET ............................................. 42

CONCLUSION ............................................................................................ 44

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ............................................................................................... *passim*

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    No. 03-cv-1519, 2007 WL 276150 (D.N.J. Jan. 25, 2007).......................................... 42

*In re Am. Italian Pasta Co. Sec. Litig.*,
    No. 05-cv-0725, 2007 WL 927745 (W.D. Mo. Mar. 26, 2007) ........................... 42, 43

*In re Apollo Grp., Inc. Sec. Litig.*,
    No. 04-cv-2147, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008) .................................... 44

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    879 F.3d 474 (2d Cir. 2018)....................................................................................... 16

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................... *passim*

*Beaver Cty. Emps' Ret. Fund v. Tile Shop Holdings, Inc.*,
    No. 14-cv-786, 2016 WL 4098741 (D. Minn. 2016)............................................ 20, 21

*Berwecky v. Bear, Stearns & Co.*,
    197 F.R.D. 65 (S.D.N.Y. 2000) ................................................................................. 38

*In re BP p.l.c. Sec. Litig.*,
    No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).......................... 25, 29

*Catogas v. Cyberonics*,
    292 F. Appx. 311 (5th Cir. 2008).............................................................................. 43

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................................. *passim*

*In re Credit Suisse First Bos. Corp. (Lantronix Inc.) Analyst Sec. Litig.*,
    250 F.R.D. 137 (S.D.N.Y. 2008) ............................................................. 13, 15, 16, 17

*Davidson v. Wilson*,
    973 F.2d 1391 (8th Cir. 1992) .................................................................................. 34

*In re Domestic Drywall Anti. Litig.*,
No. 13-MD-2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017) .......................... 25, 29

*Ebert v. Gen. Mills, Inc.*,
823 F.3d 472 (8th Cir. 2016) ...................... 7

*Eckstein v. Balcor Film Investors*,
58 F.3d 1162 (7th Cir. 1995) ...................... 40

*In re Fed. Nat'l Mortg. 'Ass'n Secs., Derivative & ERISA Litig.*,
247 F.R.D. 32 (D.D.C. Jan. 7, 2008) ...................... 42

*Ferreras v. Am. Airlines*,
946 F.3d 178 (3d Cir. 2019)...................... 8

*Find-What Investor Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...................... 10

*In re Finisar Corp. Sec. Litig.*,
No. 11-cv-01252, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ...................... 12

*In re GenesisIntermedia Sec. Litig.*,
232 F.R.D. 321 (D. Minn. 2015)...................... 33, 34, 38

*George v. China Auto. Sys., Inc.*,
No. 11-cv-7533, 2013 WL 3357170 (S.D.N.Y. 2013) ...................... 37

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ...................... 10, 11, 16, 41

*Hayes v. MagnaChip Semiconductor Corp.*,
No. 14-cv-01160, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ...................... 44

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
818 F.3d 775 (8th Cir. 2016) ...................... 10, 11, 15

*Jensen v. Thompson*,
No. 17-cv-4014, 2018 WL 1440329 (D.S.D. Mar. 22, 2018)...................... 20

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) ...................... 23

*Landry v. Price Waterhouse Chartered Accountants*,
123 F.R.D. 474 (S.D.N.Y. 1989) ...................... 36

- ii -

*Laventhall v. Gen. Dynamics Corp.*,
   704 F.2d 407 (8th Cir. 1983) ................................................................. 20

*Loritz v. Exide Techs.*,
   No. 13-cv-02607, 2015 WL 6790247 (C.D. Cal. July 21, 2015) .................. 22, 25, 29

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ............................................................. 17

*In re Monsanto*,
   493 B.R. 852 (Bankr. D.N.M. 2013) ...................................................... 33

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 ....................................................................................... 11

*In re NationsMart Corp. Sec. Litig.*,
   130 F.3d 309 (8th Cir. 1997) ................................................................. 20

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mtg. Corp.*,
   No. 08-cv-0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................ *passim*

*Postawko v. Mo. Dep't of Corr.*,
   910 F.3d 1030 (8th Cir. 2018) ............................................................... 8, 9

*Rand–Heart of N.Y., Inc. v. Dolan*,
   812 F.3d 1172 (8th Cir. 2016) ............................................................... 43

*Rocco v. Nam Thai Elecs, Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ........................................................... 38

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
   No. 14-CV-4394, 2018 U.S. Dist. LEXIS 61457 (S.D.N.Y. Apr. 11,
   2018) ............................................................................................. 24, 29, 32

*In re Safeguard Scientifics*,
   216 F.R.D. 577 (E.D. Penn. 2003) ......................................................... 38

*Schwab v. E*TRADE Fin. Corp.*,
   285 F. Supp. 3d 745 (S.D.N.Y. 2018), *aff'd* 752 F. Appx 56 (2d Cir.
   2018) ....................................................................................................... 22

*Schwab v. E*TRADE Fin. Corp.*,
   752 F. Appx. 56 (2d Cir. 2018) ............................................................. 21

*Shores v. Sklar*,
   647 F.2d 462 (5th Cir. 1981) ............................................................. 39, 40

*Singleton v. Fifth Generation, Inc.*,
  No. 5:15-CV-474, 2017 U.S. Dist. LEXIS 170415 (N.D.N.Y. Sept. 27,
  2017) ............................................................................................................ 24, 29, 32

*Stuart v. State Farm Fire & Cas. Co.*,
  910 F.3d 371 (8th Cir. 2018) ........................................................................ 8

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ...................................................................... 17

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018)...................................................... 21, 41, 42

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).......................................................................................... 8

*In re Zonagen, Inc. Sec. Litig.*,
  322 F. Supp. 2d 764 (S.D. Tex. 2003) ........................................................ 11

## Other Authorities

Fed. R. Civ. P. 23(a)(1)-(4) ................................................................................ 8

Fed. R. Civ. P. 23(b)(3) ......................................................................... *passim*

Rule 10b–5 ............................................................................................................ 10

Rule 10b-5(b) ..................................................................................................... 20

Rule 23 ...................................................................................................... *passim*

Rule 23(a) .................................................................................................. 7, 8, 33

Rule 23(b) .................................................................................................. 7, 8, 39

The Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Motion") (Dkt. 188) should be denied because Plaintiffs[1] have not met their burden of establishing that reliance and damages can be proven on a class-wide basis. In addition, the Motion should be denied because Oregon is an atypical and inadequate class representative; it is subject to unique defenses rarely present in securities litigation that will consume fact discovery and the trial of this case.

***Plaintiffs Cannot Prove Reliance on a Class-Wide Basis.*** Plaintiffs rest on two presumptions to prove reliance of the putative class members on the misstatements and omissions alleged in the Consolidated Securities Class Action Complaint ("Complaint" or "Compl.") (Dkt. 143). Without these presumptions, Plaintiffs cannot show that common issues predominate over individual questions as required by Rule 23(b)(3) of the Federal Rules of Civil Procedure. Neither presumption applies here.

Plaintiffs primarily rely on the "fraud-on-the-market" presumption. They allege that affirmative misrepresentations on 55 dates over a four-plus-year period directly affected the price of CenturyLink, Inc. ("CenturyLink") common stock and 7.60% Senior Notes due September 15, 2039 ("Notes"), and thus the Court can presume, under *Basic*

---

[1]    "Plaintiffs" are Lead Plaintiff the State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employees Retirement Board, on behalf of the Oregon Public Employees Retirement Fund ("Oregon"), and Named Plaintiff Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009 ("Vildosola").

*Inc. v. Levinson*, 485 U.S. 224 (1988), that every putative class member relied on those statements.  However, the facts rebut the presumption:

- On only *four* of the 52 dates for which Plaintiffs claim CenturyLink's alleged misstatements affected the price of CenturyLink securities[2] did the price of CenturyLink stock significantly increase;

- Plaintiffs' expert has not established a statistically significant link between *any* alleged misrepresentations and changes in the price of CenturyLink stock and Notes, including for those four dates; and

- Plaintiffs' expert has failed to establish that any of the three "corrective disclosures" actually "corrected" the alleged misrepresentations.

Based on this evidence of lack of price impact, the *Basic* presumption is rebutted, and Plaintiffs must prove by a preponderance of the evidence that the alleged misrepresentations in fact inflated the price of CenturyLink common stock and Notes. For these same reasons, they cannot do so.

Plaintiffs also claim a class-wide presumption of reliance on alleged omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  But in this Circuit, the presumption arises only when the seller breached a clear duty to disclose information, generally in the context of face-to-face transactions.  Plaintiffs have failed to identify a clear duty to disclose (even when asked through an interrogatory), and virtually all of the at-issue transactions were conducted on impersonal markets.  Furthermore, the *Affiliated Ute* presumption does not apply to cases, like this one, that center on alleged affirmative misstatements as opposed to omissions.

---

[2]    Plaintiffs allege CenturyLink made misstatements on 55 days, but the misstatements in total could theoretically have affected the price of CenturyLink securities on only 52 trading days.  *See* Blair Decl. Ex. 1 at ¶ 9 n.10.

*Plaintiffs' Damages Model is Not Connected to Their Liability Case.*  Plaintiffs have not shown that damages can be calculated on a class-wide basis, precluding certification under Rule 23(b)(3).  Plaintiffs' expert has opined that a common damages methodology could account for damages over the entire four-plus-year Class Period, but it is clear from his report and deposition that he has not done any work to show how he would or could calculate damages consistent with Plaintiffs' theory of liability.  His damages model—which is simply a calculation involving the subtraction of one number from another—fails to account for the theory of this case.

*Oregon is an Atypical and Inadequate Representative.*  Oregon is subject to unique non-reliance defenses that make it entirely different from all other putative class members:

- While it was purchasing CenturyLink securities, ***Oregon was conducting a law enforcement investigation*** of the alleged sales and billing practices it now claims CenturyLink concealed;

- Despite claiming to have learned about an alleged consumer fraud by CenturyLink in June 2017, Oregon inexplicably ***continued to purchase CenturyLink securities***; and

- Oregon admits it ***did not read or review the documents*** containing the alleged misstatements and omissions prior to purchasing CenturyLink securities, and that doing so was not part of its investment strategy.

Each of these issues raises significant questions about Oregon's reliance on the alleged misrepresentations and omissions, which will distract from the claims of other putative class members during discovery and at trial.

*The Class Period Should End on June 16, 2017.*  Even if the Court certifies a class, the Class Period should end on June 16, 2017—not on July 12, 2017, as Plaintiffs propose.  On June 16, *Bloomberg* published an article that revealed allegations of a

consumer fraud by CenturyLink; Oregon itself testified that it was the day the "dam broke" and the "market underst[ood], as a whole, what was occurring."  Post-June 16, purchasers cannot prove reliance on a class-wide basis under *Basic* or *Affiliated Ute*, because after this date, the price of CenturyLink securities no longer reflected any of the misrepresentations or omissions alleged in the Complaint.  Accordingly, if a class is to be certified (and it should not be), the Class Period must end on June 16, 2017.

## RELEVANT BACKGROUND

### I.    THE PARTIES AND THE PUTATIVE CLASS

CenturyLink is a Louisiana-based telecommunications company whose operating subsidiaries provide integrated services to enterprise and residential customers in the United States and abroad.  Compl. at ¶¶ 28, 37.  It is among the largest providers of communication services to enterprises.  *Id.* at ¶ 37.  The Executive Defendants[3] held senior positions at CenturyLink during the Class Period.  *Id.* at ¶¶ 29–34.

Oregon alleges that it traded CenturyLink common stock throughout the Class Period.  *See id.* at ¶ 26.  Vildosola alleges that the AUFV Trust U/A/D 02/19/2009 purchased 30,000 units of Notes on January 30, 2015.  *See id.* at ¶ 27.

Plaintiffs seek to certify the following class, subject to certain exclusions not relevant here:

> All persons and entities that purchased or otherwise acquired
> publicly traded CenturyLink common stock or 7.60% Senior

---

[3]    The "Executive Defendants" are Defendants Glen F. Post, III, R. Stewart Ewing, Jr., David D. Cole, Karen Puckett, Dean J. Douglas, and G. Clay Bailey, collectively.  Together, CenturyLink and the Executive Defendants are referred to as "Defendants."

Notes due September 15, 2039, during the period between March 1, 2013 to July 12, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

Plaintiffs' Memorandum in Support of the Motion ("Mem.") (Dkt. 190).

## II.    THE ALLEGED MISREPRESENTATIONS

Plaintiffs claim that CenturyLink routinely misquoted prices and improperly billed consumer and small business customers for services they did not request, a practice they describe as "cramming." Compl. at ¶ 1. Plaintiffs further claim that CenturyLink and the Executive Defendants misled shareholders by "falsely attribut[ing] CenturyLink's substantial revenue and subscriber growth in its consumer and small business segments to the Company's focus on 'customer needs' and its 'customer first' sales approach, competitive 'bundling' marketing strategy, and strict adherence to the Company's Unifying Principles: 'fairness, honesty and integrity.'" *Id.* at ¶ 3. According to Plaintiffs, the revenue and subscriber growth in CenturyLink's consumer and small business segments was, instead, driven entirely by the practices Plaintiffs refer to as "cramming." *Id.* at ¶ 2.

Plaintiffs allege that Defendants made false and misleading statements on 55 different dates during the Class Period. *Id.* at ¶¶ 190–263 & App. A. Plaintiffs claim throughout their Complaint that Defendants "repeatedly" told investors false information and "touted" untrue facts about CenturyLink's business model, strategy, revenue drivers, sales and billing practices, and culture. *See id.* at ¶¶ 15, 39, 40, 42, 48, 52, 54, 55, 58, 59, 151, 185, 193, 195, 208, 226. Plaintiffs claim that these allegedly false statements were "critical" to investors. *See id.* at ¶¶ 3, 61.

- 5 -

### III.    THE ALLEGED CORRECTIVE DISCLOSURES

Plaintiffs claim that investors learned the "truth" about CenturyLink's cramming scheme through three corrective disclosures on June 16, June 19, and July 12, 2017. *See id.* at ¶¶ 152–171. Plaintiffs allege that each of these disclosures caused the price of CenturyLink common stock and the Notes to decline in a "statistically significant" manner. *See id*. at ¶¶ 154, 160, 171, 266.

The evidence, however, does not support that these disclosures revealed a previously concealed "truth" about CenturyLink's sales and billing practices or revenue trends. Most notably, ***not one*** of 14 leading market analysts lowered their target price estimates for CenturyLink in the week following the June 16 and June 19 disclosures. *See* Blair Decl. Ex. 1 at ¶ 115. The first analyst to lower its target price estimate for CenturyLink did so on June 29. *See id.* In fact, another analyst ***raised*** its target price estimate for CenturyLink two weeks after the alleged disclosures on July 5. *See id.*

In their commentaries on the lawsuit after the June 16 and June 19 disclosures, analysts specifically noted the decline in significance of CenturyLink's consumer segment, and they viewed this decline as weakening any potential impact of the news. *See id.* at ¶¶ 117–22. Other analysts found the lawsuit to be a "mere distraction," and another noted that the subject of the June 16 disclosure—the reporting of a former employee's lawsuit alleging a "Wells Fargo-type" fraud at CenturyLink—would be inconsequential for CenturyLink's investors. *See id.*

Analysts were likewise dismissive of the alleged corrective disclosure on July 12, 2017. After this "disclosure," analysts reiterated their opinion in June that a lawsuit filed

- 6 -

by the Minnesota Office of the Attorney General ("MNAG") against CenturyLink should have a "limited impact," and that the issue had "been blown out of proportion in terms of timing and possible financial relevance." *Id.* at ¶ 126. Another analyst similarly noted that the stock sell-off after the July 12 disclosure "looks overdone." *Id.* at ¶ 127.

Finally, CenturyLink's stock price did not move with or in response to specific news related to the June 19 statement. *Id.* at ¶ 157. Although at least three news stories discussing the lawsuits against CenturyLink were published over the weekend prior to Monday, June 19, CenturyLink's stock opened at the same price level as it closed on Friday, June 16—and, in fact, ***increased*** right after the market opened. *Id.* at ¶ 158. Furthermore, any major price declines on June 19 were not preceded by any news releases. *Id.* at ¶ 159. Finally, the overall 1.4 percent decline in price on June 19 was not unique to CenturyLink: at least one of CenturyLink's main competitors had a ***greater price decrease*** on the same day. *Id.* at ¶ 160. Thus, market factors, not the June 19 statement, were responsible for stock price changes.

## **STANDARD OF REVIEW**

Plaintiffs "must meet all of the requirements of Rule 23(a) and must satisfy one of three subsections of Rule 23(b)." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016) (quotations omitted). Although the Court has broad discretion to certify a class, it must conduct a "rigorous analysis" to determine whether the requirements have been met. *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018).

Under Rule 23(a), Plaintiffs must ***prove*** that (1) the class is so numerous that joinder of the putative class members is impractical; (2) there are questions of law or fact

common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; ***and*** (4) the class representatives are able to represent the class fairly and adequately. Fed. R. Civ. P. 23(a)(1)-(4); *see Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").

Plaintiffs "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 32 (2013). Here, Plaintiffs have moved for certification under subsection (b)(3) of Rule 23, *see* Mem. at 13, which requires proof that "questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374–75 (8th Cir. 2018) (quoting Fed. R. Civ. P. 23(b)(3)).

Plaintiffs bear the burden of proving compliance with each Rule 23 requirement by a preponderance of the evidence. *See Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard."); *Ferreras v. Am. Airlines*, 946 F.3d 178, 184 (3d Cir. 2019) ("Rule 23 . . . requires a showing that each of the Rule 23 requirements has been met by a preponderance of the evidence at the time of class certification."). In determining whether Plaintiffs have met their burden of proof, the Court is permitted to consider merits questions to the extent "they are relevant in determining whether the Rule 23 prerequisites for class certification are satisfied." *Postawko*, 910 F.3d at 1037.

**ARGUMENT**

**I.    PLAINTIFFS CANNOT SATISFY THE RULE 23(B)(3) PREDOMINANCE REQUIREMENT BECAUSE INDIVIDUAL QUESTIONS OF RELIANCE OVERWHELM QUESTIONS COMMON TO THE CLASS**

Under the "rigorous analysis" standard, Plaintiffs have not proven that common questions predominate over individual questions of reliance.  Accordingly, Plaintiffs do not meet the predominance criterion of Rule 23(b)(3), precluding certification of a class.

**A.    Plaintiffs Cannot Prove Class-Wide Reliance with the *Basic* Presumption**

In attempting to prove that each putative class member relied on each of the alleged misstatements, Plaintiffs rely on the "fraud-on-the-market" presumption of reliance established by *Basic*.  *See* Mem. at 14–15.  However, the movement of CenturyLink's stock and Note prices in response to the alleged misstatements and corrective disclosures rebuts that presumption.  In the face of this evidence, Plaintiffs cannot carry their burden of proving that the fraud-on-the-market presumption applies in this case and that the predominance requirement has been satisfied.

**1.    The Basic Presumption Can Be Rebutted by the Production of Evidence of No "Front-End" or "Back-End" Price Changes**

To establish that every member of a putative class of investors "relied" on alleged misstatements, courts may employ a class-wide presumption of reliance established by *Basic*.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281–82 (2014) ("*Halliburton II*").  The *Basic* presumption substitutes for individualized proof of each buyer's reliance on the alleged misrepresentations.  *Basic*, 485 U.S. at 221.  To invoke it,

Plaintiffs must show that the "misrepresentation . . . was reflected in the market price at the time of the transaction." *Halliburton II*, 573 U.S. at 278.

A defendant can rebut the *Basic* presumption at the class certification stage by producing evidence that the alleged misrepresentation did ***not*** cause a change in market price. *Halliburton II*, 573 U.S. at 279, 284 ("Defendants should at least be allowed to defeat the [*Basic*] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price."); *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 780 (8th Cir. 2016) ("[T]he protracted *Halliburton* litigation clarified that there is an additional question at the class certification stage— whether the Rule 10b–5 defendant can rebut the *Basic* presumption with evidence showing an absence of price impact."); *see also Find-What Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 n.32 (11th Cir. 2011) (as part of the reliance inquiry, courts must examine "whether the defendant's fraud in fact affected . . . the purchase price").

Once Defendants produce the rebuttal evidence, Plaintiffs have the burden of persuasion to show, by a preponderance of the evidence, that the alleged misrepresentations had a price impact when each putative class member purchased the securities. *Halliburton II*, 573 U.S. at 276 ("The *Basic* presumption does not relieve plaintiffs of the burden of proving—before class certification—that this requirement is met"); *accord Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320 (3d Cir. 2014) ("The introduction of evidence to rebut a presumption destroys that presumption, leaving

only that evidence and its inferences to be judged against the competing evidence and its

inferences to determine the ultimate question at issue.").

There are two points when a defendant can "sever the link" between the alleged

misstatements and the market price: (1) by directly showing that the alleged

misrepresentations did not cause a price change at the time they were made (so-called

"***'front-end' price impact***"); *or* (2) by showing that the alleged "corrective disclosures"

did not deflate the price of the underlying security—either at all, or for reasons related to

the earlier misrepresentations ("***'back-end' price impact***").  *Halliburton II*, 573 U.S. at

279–280 ("[T]he *Basic* presumption . . . c[an] be rebutted by appropriate evidence,

including evidence that the asserted misrepresentation (*or* its correction) did not affect the

market price of the defendant's stock.") (emphasis added).  Where defendants make

either showing and "sever the link" between the alleged misstatements and market prices,

"'the basis for finding that the fraud has been transmitted through the market [is] gone.'"

*Id*. at 281 (quoting *Basic*, 485 U.S. at 248); *Best Buy*, 818 F.3d at 782 ("[W]hen plaintiffs

presented a *prima facie* case that the *Basic* presumption applies to their claims,

defendants had the burden to come forward with evidence showing a lack of price

impact.") (citing Fed. R. Evid. 301); *accord In re Moody's Corp. Sec. Litig.*, 274 F.R.D.

480, 490, 492–93 (denying class certification in securities fraud case where defendants

showed "alleged misrepresentation[s did not] cause[] a statistically significant increase);

*In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 780–81 (S.D. Tex. 2003) (defendant

in securities fraud case "rebutted the presumption of reliance by presenting evidence that

none of the statements remaining at issue in th[e] case had an effect on the stock price").

- 11 -

### 2.    The Evidence Shows No "Front-End" Price Impact

The evidence shows that the alleged misrepresentations did ***not*** inflate the price of CenturyLink securities.  Before examining the specific evidence here, it is important to note that Plaintiffs rely significantly on the opinion of their expert—who recently had his opinion about a "front-end" price impact analysis in another case rejected by a court.  *See In re Finisar Corp. Sec. Litig.*, No. 11-cv-01252, 2017 WL 6026244, at \*6–8 (N.D. Cal. Dec. 5, 2017) (in securities fraud case, front-end price impact opinions provided by plaintiffs' expert were subject to "criticisms [that] are valid," such that "[d]efendants ha[d] demonstrated by a preponderance of the evidence that the [at-issue] statement had no price impact.").  Here, Plaintiffs' expert has provided ***no*** analysis of front-end price impact, and CenturyLink's expert has demonstrated that there was no readily discernible impact.

### a.    Almost Universally, the Alleged Misstatements Did Not Inflate the Price of CenturyLink Stocks

No "front-end" price impact exists here.  Plaintiffs' expert has performed no analysis whatsoever of the extent to which the alleged misstatements actually affected CenturyLink prices.  On the other hand, CenturyLink's expert, Bruce Deal, has shown the absence of front-end price impact, because ***on 48 of the 52 days for which Plaintiffs allege CenturyLink's misrepresentations affected the price of CenturyLink Securities, there was no statistically significant positive price movement in CenturyLink stock***.  Blair Decl. Ex. 1 at ¶ 72.

Remarkably, while Plaintiffs can demonstrate statistically significant positive price movement for only four dates, there was statistically significant ***negative*** price movement for eight of those 52 dates. *Id.* In other words, when considering the total pool of the misstatements Plaintiffs allege, ***those alleged misstatements were more likely to be associated with a material price <u>decline</u> than a material price <u>increase</u>***.

For example, among the alleged misrepresentations Plaintiffs identified on October 31, 2016, are then-CEO Glen Post's statement that "while we still have more improvement to achieve on a year over-year basis in the third quarter, we added higher ARPU customers, lower churn and fewer . . . high-risk credit customers in the quarter." Compl. at ¶ 233. Far from there being any inflationary effect, what followed was a statistically significant ***negative*** abnormal return on that date of -12.7%. Blair Decl. Ex. 1 at Ex. 18A. Likewise, despite Plaintiffs' allegations of inflationary misrepresentations on seven other dates, on each of the subsequent trading days CenturyLink's stock experienced a statistically significant ***negative*** abnormal return. Further, for 40 of the other 44 relevant dates, there was ***no statistically significant abnormal price movement in CenturyLink stock.*** *Id.* at Ex. 18A.

> **b.** ***Plaintiffs Cannot Demonstrate Front-End Price Impact by Reference to Four of the 52 At-Issue Dates***

Plaintiffs are left with just four of 52 relevant trading days on which there was statistically significant positive price movement. Four out of 52 does not justify certifying the class.

*First*, even if Plaintiffs could somehow show that the particular alleged misrepresentations caused the positive price movement on the four dates—and they have not—those four dates pale in comparison to the forty-eight dates on which there was either no statistically significant abnormal price movement or statistically significant *negative* price movement. The Court should not rely solely on the tiny minority of price impacts where, overall, the alleged misrepresentations generally are immaterial to the prices.

*Second*, CenturyLink disclosed other key information on these dates that likely resulted in the positive price impact. For example, on three of those four dates, CenturyLink disclosed revenue and earnings-per-share figures that were more positive than the market expected. Blair Decl. Ex. 1 at ¶¶ 73–76. Plaintiffs' expert has made no attempt to disentangle the alleged misrepresentations from these positive financial results and other confounding statements. *Id.* at ¶¶ 68–72.

Overwhelmingly, the alleged misrepresentations did not have any statistically significant impact on the price of CenturyLink securities. The link between the alleged misstatements and stock price thus severed, the Court should deny Plaintiffs' Motion.

### c. *In Light of the Undisputed Evidence, Plaintiffs Cannot Credibly Argue All Alleged Misrepresentations "Maintained" the Prices*

Plaintiffs likely will respond that, for all 52 trading days, the alleged misrepresentations provided "just exactly enough positive information" to offset exactly whatever negative information was also provided to investors at each time, and thus prevent significantly negative abnormal price movement—a so-called "price

- 14 -

maintenance" theory.  Courts are rightfully dubious of such theories.  "A theory that statements maintained an inflated stock price is not evidence that can refute otherwise overwhelming evidence of no price impact." *Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at \*18; *see also Best Buy*, 818 F.3d at 783 (price maintenance theory "provided no evidence" that disproved defendant's showing that price impact was absent); *In re Credit Suisse First Bos. Corp. (Lantronix Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 145 (S.D.N.Y. 2008) (rejecting "price maintenance theory" given that "Rule 23 determinations must be based on 'relevant facts'").

Here, neither Plaintiffs nor their expert have articulated the details of any particular price maintenance theory.[4]  To the contrary, Plaintiffs allege in the Complaint that "Defendants' . . . plan, scheme and course of conduct . . . enabled Defendants to ***artificially inflate*** the price of CenturyLink stock and other securities."  Compl. at ¶ 281. Nor could Plaintiffs concoct a plausible price maintenance theory now, considering that they have alleged misrepresentations on numerous "information-rich" dates, each of which featured disclosures of many financial metrics and other complex communications. Blair Decl. Ex. 1 at ¶ 60.  Even were they now to manufacture a price maintenance theory on reply, it could not extinguish the overwhelming evidence that the alleged misstatements simply did not affect the price of CenturyLink securities.  Plaintiffs present

---

[4]    Plaintiffs' brief contains a single statement that CenturyLink's alleged misstatements "inflated *or maintained* the market price of CenturyLink's securities." *See* Mem. at 15.  But Plaintiffs' expert repeatedly refused to explain whether he believes this is a "price maintenance" case.  Blair Decl. Ex. 2 at 161:10–162:3.

no basis for the Court to make a highly implausible assumption that the amount of unspecified negative information exactly balanced the alleged misrepresentations many dozens of times.

### 3.    The Evidence Also Shows No "Back-End" Price Impact

Defendants can also rebut the *Basic* presumption by showing that later corrective disclosures did not materially deflate the price of the underlying security for reasons related to the earlier misrepresentations—meaning the market was not relying on those misrepresentations to materially inflate the price. *Halliburton II*, 573 U.S. at 280; *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) (holding "evidence that the market learned the truth . . . without any accompanying decline in the price of [the] stock" could show that alleged misstatements "did not actually affect the stock's market price" under *Halliburton II*); *Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at *13 ("Expert testimony on back-end price impact is also admissible and directly relevant at the class certification stage.").

The market reaction to the allegedly corrective disclosures provides further evidence of no price impact. *First*, none of the three disclosures provided new public information contrary to the alleged misrepresentations; *second*, there was no significant price decline associated with the June 19 disclosure.

### a.    The Allegedly "Corrective" Disclosures Revealed Nothing More than the Fact of Litigation

*First*, none of the three alleged disclosures revealed new information about CenturyLink's sales and billing practices. Instead, the market learned only that a single

- 16 -

employee had launched a speculative lawsuit, and that other litigations eventually followed.  Because the alleged disclosures revealed litigation, and did not "correct" the alleged misrepresentations, Plaintiffs cannot demonstrate any back-end price impact.

Courts have repeatedly held that, where the only new information disclosed prior to a stock price decline is the fact of litigation or regulatory action, the decline "more logically occurred because the market feared that [the] lawsuit" could harm the corporation.  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187–88 (4th Cir. 2007); *see also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("[S]tock prices may fall upon the announcement of an SEC investigation. . . . That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent.").

The announcement of litigations against CenturyLink did not "correct" any alleged misrepresentations.  When reports of a single whistleblower's lawsuit came to light on June 16, 2017, they did not reveal anything new about CenturyLink's sales and billing practices—only that a single employee had filed an unproven complaint.  Nor did the consumer lawsuit or the MNAG lawsuit provide any new information besides tack-on allegations.  This is especially so because the generic suggestions of cramming practices in the whistleblower's complaint were consistent with preexisting public information about both CenturyLink and the telecommunications industry broadly.  Blair Decl. Ex. 1 at ¶¶ 56–58.

Thus, all investors could have learned from the allegedly "corrective" disclosures were the fact of a whistleblower lawsuit against CenturyLink on June 16, 2017, the fact

of a consumer class action on June 19, 2017, and the fact of the MNAG litigation on July 12, 2017. Analyst notes following the disclosures confirm that these lawsuits themselves were the relevant new information, repeatedly highlighting the "lawsuits and regulatory actions" as a primary concern. Blair Decl. Ex. 1 at ¶¶ 117–130. Other analysts found the whistleblower lawsuit to be a "mere distraction." *Id.* Initial investor sensitivity was likely heightened in the wake of the Wells Fargo scandal. *Id.* at ¶¶ 108–09. But in fact, analysts did not believe a "Wells-Fargo like scheme" had been revealed, as not one of them lowered their target price estimates for CenturyLink stock in the one-week period following the June 16 and June 19 disclosures. *Id* at ¶ 115. Because the disclosures revealed only the fact of litigation, they did not "correct" any of the "misrepresentations" Plaintiffs allege, and any price impact is wholly absent.

### b.    The June 19 Disclosure Did Not Cause a Material Drop in the Price of CenturyLink Stock

**Second**, the evidence proves that the alleged "corrective disclosure" on June 19, 2017, did not cause any significant downward movement in the price of CenturyLink's stock. Plaintiffs' expert acknowledged that the price change on that date was statistically insignificant within scientifically acceptable levels. *See* Expert Report of Michael L. Hartzmark ("Hartzmark Rep.") (Dkt. 191-3) ¶ 82, Appendix D ¶ 9; Blair Decl. Ex. 2 at 110:9–112:8.[5] CenturyLink's expert performed the same analysis and similarly

---

[5]    During his deposition, Plaintiffs' expert, Dr. Hartzmark, initially denied that there is any "scientifically-accepted level of certainty" in this context. Blair Decl. Ex. 2 at 109:14–110:16. When shown a portion of his own report stating that the 95 percent confidence level is the "scientifically-accepted level of certainty," Dr. Hartzmark

concluded that CenturyLink stock did not experience a negative abnormal return that was statistically significant.  Blair Decl. Ex. 1 at ¶ 143.

Moreover, the intraday movement of CenturyLink stock on June 19 is inconsistent with there being any curative disclosure for that date.  The stock price moved sharply higher when that trading day began and there is little evidence that any particular intra-day news story moved the stock's price.  *Id.* at ¶¶ 155–162.  In fact, at least one of CenturyLink's main competitors had a ***greater price decrease*** on the same day.  *Id.* at ¶ 160.  Further, it is implausible that, in a purportedly efficient market, the June 19 price movement could be tied to the June 16 disclosure, and therefore there is no basis for using a two-day abnormal return for the June 19 disclosure and ignoring the lack of statistically significant movement that day.  *Id.* at ¶ 163.

### B.    Plaintiffs Cannot Prove Class-Wide Reliance with the *Affiliated Ute* Presumption

Plaintiffs claim that they are also entitled to a class-wide presumption of reliance ***on alleged omissions***.  Mem. at 24 (citing *Affiliated Ute*).  This "non-disclosure" presumption does not apply because (1) Plaintiffs have not identified a duty to disclose; and (2) this case is about affirmative misrepresentations, not omissions.

#### 1.    *Defendants Did Not Have a Duty to Disclose*

The *Affiliated Ute* presumption only "applies to claims involving primarily a failure to disclose by one with a duty to disclose."  *Beaver Cty. Emps' Ret. Fund v. Tile*

---

admitted both that a 95 percent confidence level is the "scientifically-accepted level of certainty" and that the stock price decline observed on June 19, 2017, fails to meet this standard.  *Id.* at 110:17–112:06; Hartzmark Rep. App. D at 9.

*Shop Holdings, Inc.*, No. 14-cv-786, 2016 WL 4098741, at *7 (D. Minn. 2016). The Eighth Circuit has recognized that such a duty generally arises only in the context of face-to-face transactions. *See In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997).

Plaintiffs have not alleged that Defendants had any duty to disclose to the market the information that Plaintiffs allege was omitted, and they refused to respond to interrogatories seeking the identification of any such duty. *See* Blair Decl. Ex. 3. A duty to disclose does not arise automatically. *See Jensen v. Thompson*, No. 17-cv-4014, 2018 WL 1440329, at *11 (D.S.D. Mar. 22, 2018) ("[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."). Nor have Plaintiffs identified a relationship between the parties that might give rise to such a duty. *See NationsMart*, 30 F.3d at 322 ("The complaint alleged no direct contact between the plaintiffs and the defendants, so the plaintiffs are not entitled to the presumption of reliance for the non-disclosure of material information.").

Plaintiffs' failure to identify a duty to disclose means that Plaintiffs may not rely on the presumption under *Affiliated Ute*. *See Laventhall v. Gen. Dynamics Corp.*, 704 F.2d 407, 413 (8th Cir. 1983) ("*Affiliated Ute* involved parties that had dealt directly with each other and there clearly was a duty of disclosure owed. The plaintiffs there had a right to expect the defendants would fully disclose all material information. There is no such relationship in the instant case.").

- 20 -

### 2. *Plaintiffs Cannot Turn a Case About Affirmative Misrepresentations Into a Case About Omissions*

*Affiliated Ute* creates a presumption of class-wide reliance in non-disclosure cases **only** where "the 'thrust' of the plaintiffs' allegations is omissions and not affirmative misrepresentations." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 288 (D. Minn. 2018); *see also Schwab v. E*TRADE Fin. Corp.*, 752 F. Appx. 56, 58–59 (2d Cir. 2018) ("The *Affiliated Ute* presumption of reliance under this Court's precedent is appropriate in cases involving **primarily** a failure to disclose . . . ."). The non-disclosure presumption exists for cases primarily about omissions because "it is a practical impossibility for a plaintiff in a non-disclosure case to demonstrate reliance." *Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *8.

The "thrust" of this case is alleged affirmative misrepresentations, not omissions. The Complaint extensively alleges that CenturyLink and the Executive Defendants made dozens of affirmative misstatements about the Company's sales practices and drivers of revenue changes over a four-plus-year period. *See* Compl. at ¶¶ 90–267, Appendix A. Plaintiffs' primary focus is the "truth" of what ***Defendants affirmatively*** communicated to the investing public. *See* Mem. at 3 ("***Defendants told investors*** CenturyLink would never 'place or record an order for our products and services for a customer without that customer's authorization'—a clear denial of any cramming practices."); 3–4 ("***Defendants instead claimed*** that CenturyLink's revenue growth was driven by its focus on excellent customer service, its 'bundling' marketing strategy, its focus on 'customer

needs,' and its faithfulness to CenturyLink's Unifying Principles of 'fairness, honesty, and integrity,' and Code of Conduct.").

Because this case centers on affirmative misstatements, and Plaintiffs are not forced to prove reliance on one or more non-disclosures, the *Affiliated Ute* presumption of reliance is unavailable. *See Waggoner v. Barclays plc*, 875 F.3d 79, 96 (2d Cir. 2017) ("[T]he Plaintiff's complaint alleges numerous affirmative misstatements by the Defendants. The Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements."); *Loritz v. Exide Techs.*, No. 13-cv-02607, 2015 WL 6790247, at *21 (C.D. Cal. July 21, 2015) ("This is thus not a case where Plaintiffs must show that they relied on [the defendant's] silence.").

Plaintiffs' attempt to recast alleged misstatements as omissions should be rejected. *See e.g.*, Mem. at 24. Courts routinely see through such a gambit because by definition every affirmative misstatement necessarily omits the truth. *See, e.g.*, *Schwab v. E*TRADE Fin. Corp.*, 285 F. Supp. 3d 745, 753 (S.D.N.Y. 2018), *aff'd* 752 F. Appx 56 (2d Cir. 2018) ("The failure to disclose the alleged falsity of a representation does not transform a misrepresentation case into an omission case and allow a plaintiff to seek refuge in the *Affiliated Ute* presumption."); *Waggoner*, 875 F.3d at 96 ("The *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what have been described as 'half-truths,' nor does it apply to misstatements whose only omissions is the truth that the statement misrepresents."). As the Tenth Circuit explained:

> Any fraudulent scheme requires some degree of concealment,
> both of the truth and of the scheme itself. We cannot allow
> the mere fact of this concealment to transform the alleged
> malfeasance into an omission rather than an affirmative act.
> To do otherwise would permit the *Affiliated Ute* presumption
> to swallow the reliance requirement almost completely.

*Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000).

Put simply, this case is about the truth of statements Defendants made to investors,

not omissions. Accordingly, the *Affiliated Ute* presumption does not apply.

## II. PLAINTIFFS HAVE NOT OFFERED A DAMAGES METHODOLOGY THAT IS COMMON TO THE PUTATIVE CLASS AND CONSISTENT WITH THEIR LIABILITY THEORY

Plaintiffs fail to establish that common issues predominate for a second reason:

Plaintiffs do not have a way of systematically calculating damages on a class-wide basis

consistent with their liability case.

### A. Predominance Requires Proof that Class-Wide Damages Can Be Measured in a Way that is Consistent with Plaintiffs' Liability Case

To establish predominance, Plaintiffs must show that "damages are susceptible of

measurement across the entire class." *Comcast*, 569 U.S. at 35. Among other things, this

requires Plaintiffs to put forward a damages model that is "consistent with [their] liability

case." *Id.* "If the model does not even attempt to do that, it cannot possibly establish that

damages are susceptible of measurement across the entire class for purposes of Rule

23(b)(3)." *Id.* As with other requirements of Rule 23, this is not a mere pleading rule,

but instead requires Plaintiffs to prove the required elements by a preponderance of the

evidence. *Id.* In assessing whether Plaintiffs have proven that class-wide damages can

be measured in a way that is consistent with their liability case, the Court "must conduct a rigorous analysis to determine whether that is so." *Id.*

Meeting this "rigorous" standard is no small task. "[W]hile a plaintiff does not need to 'implement' or 'test' his methodology at the class certification stage, he must still provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand." *Singleton v. Fifth Generation, Inc.*, No. 5:15-CV-474 (BKS/TWD), 2017 U.S. Dist. LEXIS 170415, at *59–60, *70 (N.D.N.Y. Sept. 27, 2017). Thus, in applying *Comcast*, courts have not hesitated to deny class certification where plaintiffs have failed to provide enough detail to satisfy the "rigorous analysis" that the Supreme Court requires. *See id.* (denying class certification because "Plaintiff has failed to propose a sufficiently-detailed and suitable model to ensure the alleged price premium for Tito's vodka due to the 'handmade representation.'"); *see also Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840, at *19 ("When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified."); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-4394, 2018 U.S. Dist. LEXIS 61457, at *57–60 (S.D.N.Y. Apr. 11, 2018) (rejecting plaintiffs' assertion that their expert "*could* accommodate a certain factor or *could* account for specific issues by using inputs"; "even though [the expert] is unable to answer what would be relevant to apportioning damages . . . his methodology somehow simultaneously accounts for all relevant differences between class members without

- 24 -

requiring individualized determinations"); *see also In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Plaintiffs have failed to meet their burden of showing that damages can be measured on a class-wide basis consistent with their theories of liability."); *In re Domestic Drywall Anti. Litig.*, No. 13-MD-2437, 2017 WL 3700999, at *14 (E.D. Pa. Aug. 24, 2017) (finding no predominance where damages model was "riddled with assumptions that divorce the model from the facts"); *Loritz*, 2015 WL 6790247, at *22 ("On this record, Plaintiffs fail to show a damages theory tied to their theory of liability.").

Plaintiffs' only "evidence" on this point is the opinion of their expert, Dr. Hartzmark.  Mem. at 24–25; Mem. at Ex. C ¶ 10, Op. 3.  But as discussed below, Dr. Hartzmark does not actually describe a model for calculating damages in this case, much less offer any testimony showing how his proposed damages "method" would be consistent with Plaintiffs' theory of liability in this case.  As such, Dr. Hartzmark's opinion does not come close to satisfying the "rigorous analysis" that the Supreme Court required in *Comcast*.  *Comcast*, 569 U.S. at 33 (emphasis in original).

## B.   Plaintiffs' Expert Fails to Identify a Damages Model With the Specificity Required By *Comcast*

Dr. Hartzmark claims that damages can be measured by applying what he calls the "out-of-pocket method."  Mem. at Ex. C ¶¶ 10, 184.  This "out-of-pocket method" would compensate class members for the difference between what they paid for CenturyLink securities on a given date, on the one hand, and the true (or "but-for") value of the securities as of that date, absent the alleged misrepresentations or omissions.  *Id.* at ¶ 186.

To be clear, the "out-of-pocket method" is not a damages "model" (and indeed, Dr. Hartzmark himself very carefully avoids calling it a model, instead referring consistently to a "method").  In truth, it is nothing more than a proposed measure of damages, much like saying that the plaintiff in a breach of contract case should be paid the difference between what he would have received had the contract been performed and what he actually received.  It is, in other words, a purely abstract and conceptual description of how damages should be measured.  It does not show how damages could be calculated in this case, or that such a calculation could be done on a class-wide basis.

To calculate damages, Dr. Hartzmark proposes to use an "event study" in order to create an "inflation ribbon."  The "inflation ribbon" would attempt to measure the amount of fraud-related inflation in the price of CenturyLink's securities on each day of the proposed Class Period, and this daily inflation amount would provide the inputs for the "out-of-pocket" formula.  Mem. at Ex. C ¶¶ 188, 189.  But this is where Dr. Hartzmark's opinion stops.  He does not offer any testimony showing how this "inflation ribbon" would be calculated in this case, much less in a way that is consistent with Plaintiffs' theory of liability in this case.

This gap is important because Dr. Hartzmark himself admits that an event study cannot calculate the amount of inflation due to fraud, nor can it calculate the "but-for" price of a security (that is, the price at which the security would have sold absent the alleged misrepresentations or omissions).  *Id.* at ¶¶ 189, 190.  In other words, without more, an event study cannot calculate an "inflation ribbon."  Rather, an event study by

itself can only identify the change in the price of a security on a given date that is due to company-specific factors (as opposed to market or industry factors).  *Id.* at ¶ 186.

Thus, to get from the results of the event study to the calculation of an "inflation ribbon," Dr. Hartzmark would have to identify company-specific price movements (called "residual" or "abnormal" returns) that are causally linked to the alleged fraud—*e.g.*, either an increase in price following an alleged misstatement or a decrease in price after the market learned the previously undisclosed "truth"—and then apply them to every day in the proposed Class Period.  *Id.* at ¶ 186.  Although Dr. Hartzmark admits that this work would have to be done, his opinion offers no insight into whether or how it could be done in this case.  He says only that calculating this inflation amount would require what he calls "parsing and scaling the abnormal returns."  *Id.* at ¶ 190.

During his deposition, Dr. Hartzmark explained that by "parsing," he means that he may need to disaggregate "the price reaction to the alleged corrective disclosure to account for the loss caused by the fraud" to separate it from the stock price reaction from "nonfraud" events or disclosures.  Blair Decl. Ex. 2 at 143:4–13.  He also explained that he would have to "scale" the inflation ribbon to account for how the inflation caused by the alleged fraud may have varied over time.  *Id.* at 143:14–21. But again, Dr. Hartzmark admits that he has not actually done any of this "parsing" or "scaling" work here, and more importantly, he did not explain how it would be done in this case, nor could he say for sure that it could be done here, in a way that is consistent with Plaintiffs' theory of liability.  *Id.* at 138:6–11.

In fact, Dr. Hartzmark was unable to explain much of anything during his

deposition:

- **He did not know what the allegations in this case are.**  When asked how
  he would calculate the inputs for his inflation ribbon for this specific case,
  he admitted that he "doesn't know what the allegations are."  *Id.* at 141:24–
  142:2.

- **He had not calculated an inflation ribbon for this case.**  When asked to
  explain exactly how he would actually calculate the "inflation ribbon" for
  this action, he refused to answer, stating, "[t]hat's an obvious question of
  loss causation.  I have not been asked to do a loss causation analysis."  *Id.*
  at 136:20–22; *see also* 165:19–21.

- **He could not say whether an inflation ribbon can be calculated for this
  case.**  When asked whether a damages ribbon *could* be calculated for this
  case, he responded "I've not calculated a damages ribbon."  *Id.* at 138:6–
  11.

- **He could not say how he would calculate an inflation ribbon for this case.**
  When asked how he *would* calculate a damages ribbon, he admitted that "I
  have not determined the techniques that would be used to calculate the
  inputs."  *Id.* at 147:2–4.

- **He did not analyze the reasonableness of the assumption that the
  corrective disclosures were revelations of fraud.**  When asked how he
  would go about figuring out how much of the price reaction is fraud-related
  if it is determined that it is an overreaction, he once again repeated "I have
  not done a loss causation report."  *Id.* at 154:21–155:11.

- **He has not considered whether the alleged fraud varied over the Class
  Period.**  When asked whether the fraud-related inflation in this case
  remained constant over the Class Period, he responded that he has "not

examined whether the losses caused by the fraud varied or not over the

[C]lass [P]eriod . . . ." *Id.* at 161:12–162:3.

Unable to say whether or how he could apply his "out-of-pocket method" to the facts of

this case, Dr. Hartzmark repeatedly fell back on a bare conclusion that he can adapt this

method to whatever the evidence ends up showing in this case—in other words, "trust

me." *See* Blair Decl. Ex. 2 at 146:17–147:9 (testifying that "whatever the inputs are"

would be put into his inflation ribbon and "applied classwide").  This is precisely the type

of vague and conclusory approach that courts have rejected under the "rigorous analysis"

required by *Comcast*.  *See Singleton*, 2017 U.S. Dist. LEXIS 170415, at *59–60, *70;

*Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840, at *19; *Royal Park Invs. SA/NV*, 2018

U.S. Dist. LEXIS 61457, at *57–60; *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17;

*In re Domestic Drywall Anti. Litig.*, 2017 WL 3700999, at *14; *Loritz*, 2015 WL

6790247, at *22.

### C.    Plaintiffs' Expert Fails to Show How His "Out-Of-Pocket Method" Could Be Applied in a Way that Is Consistent With Plaintiffs' Liability Case

Dr. Hartzmark's failure to identify or propose any technique for parsing or scaling

the inflation ribbon for his damages model is particularly problematic in the context of

Plaintiffs' theory of liability in this case.

First, Plaintiffs identify five categories of allegedly inflationary misrepresentations

in their Complaint.  *See* Compl. at § VIII.  The impact of each of these five categories of

alleged misstatements will have to be calculated both separately and jointly, because

some of these categories might have different price impacts, and Plaintiffs might prove

some but not others.  Blair Decl. Ex. 1 at ¶ 12.  But Dr. Hartzmark's methodology does not address how any impacts of these different types of statements could be disaggregated.

Second, Plaintiffs' Complaint identifies 52 different days, spread across each quarter over a 4-plus-year Class Period that were supposedly impacted by the allegedly inflationary disclosures. On each of these days, a large amount of information was disclosed other than the alleged misstatements.  Blair Decl. Ex. 1 at ¶ 60.  As Dr. Hartzmark testified, any inflation ribbon will need to disaggregate the impact of the allegedly fraudulent statements on those dates from any price reaction based on nonfraud. *Id.* at Ex. 2 at 143:4–13.  However, he has not proposed a method that explains how this disaggregation could possibly be done.

Third, Plaintiffs allege that CenturyLink's "cramming" scheme changed over time. According to Plaintiffs, in 2014, CenturyLink's senior leadership "acknowledged the cramming practices" in its call centers and took steps to address the issue by making changes to CenturyLink's "Quality Assurance" model, creating a new position dedicated to improving customer experience, and developing a new behavioral coaching model to measure employee performance.  Compl. ¶¶ 8, 100–101, 110–11, 114.  Plaintiffs allege that these steps ***decreased*** the amount of cramming.  *Id.* at ¶ 111.  But, according to Plaintiffs, at a later time, CenturyLink allegedly made the decision to "revert[] back to the old metrics system," thereby causing a new rash of cramming.  Compl. ¶ 112; Mem. at 4–5.  Thus, as Dr. Hartzmark admits, the inflation ribbon will need to be scaled to account

for the periods when Plaintiffs allege that CenturyLink's statements were not fraudulent. Blair Decl. Ex. 2 at 142:25–143:20.  Again, though, Dr. Hartzmark has not proposed any way to account for these variations in his damages methodology.

Fourth, the alleged corrective disclosures revealed only accusations and investigations of alleged fraud and were announced into an environment that was already primed for fear, uncertainty, and doubt regarding Wells Fargo-like fraud.  As such, Dr. Hartzmark agreed that it is necessary for any damages model to disaggregate the price reaction due to the possibility of a Wells Fargo-like fraud, from whatever fraud, if any, Plaintiffs are actually able to prove.  *Id.* at 154:21–155:9.  However, he has not articulated any method for doing so.

Finally, during the Class Period, the telecommunications industry as a whole was undergoing massive change due to decreased demand for services such as land lines, and increasing demand for supply of bandwidth due to audio, video, and data transmissions. Blair Decl. Ex. 1 at ¶ 9.  Any inflation ribbon will need to be scaled to account for these industry changes.  *Id.*  As Defendants' expert explains in his report, "these economic facts and circumstances make it very difficult, if not impossible, to identify exactly what information was (or wasn't) moving CenturyLink's stock price, let alone by how much on those 52 days."  *Id.*

Ultimately, Dr. Hartzmark provided no detail about how he could disaggregate the impact of fraud-related statements from other Company actions or disclosures, how he could scale the inflation ribbon to account for variations in the fraud over the Class

Period, or what techniques he would use to reliably calculate class-wide damages. *See* Blair Decl. Ex. 2 at 154:21–156:9, 165:2–166:5. Indeed, without any analysis of the facts of Plaintiffs' case and what techniques could be used to apply those facts to the inflation ribbon, Dr. Hartzmark's opinion could, essentially, be put forth in any securities action. Simply put, Dr. Hartzmark's bare assurances fall well short of what Rule 23(b)(3) and *Comcast* require. *Royal Park Invs. SA/NV*, 2018 U.S. Dist. LEXIS 61457, at \*57–60; *Singleton*, 2017 U.S. Dist. LEXIS 170415, at \*59–60, \*70.

### D.    *Halliburton I* Does Not Change Plaintiffs' Burden Under *Comcast*

Dr. Hartzmark spent much of his deposition arguing that, as a legal matter, Plaintiffs are not required to prove loss causation at the class certification stage. *See, e.g.*, Blair Decl. Ex. 2 at 143:22–144:1. True enough, as an abstract point of law. But that legal point is completely irrelevant to whether Plaintiffs have met their burden under *Comcast* to show that damages can be calculated on a class-wide basis in a manner that is consistent with Plaintiffs' theory of liability.

Apparently, Dr. Hartzmark believes that, because he plans to use a loss causation analysis to measure inflation, and *Halliburton I* holds that Plaintiffs do not have to prove loss causation at the class certification stage, Plaintiffs are somehow relieved of any obligation to explain, in any detail, how they intend to prove damages on a class-wide basis. Mem. at ¶ 190; Blair Decl. Ex. 2 at 143:22–144:1. But nothing in either *Halliburton I* or in *Comcast* supports that position. Plaintiffs are free to try and use a loss causation analysis to calculate damages, if they so choose. But having made that choice, *Comcast* still requires the Court to conduct a "rigorous analysis" of predominance under

- 32 -

Rule 23, which it can only do if Plaintiffs provide some level of detail about how they intend to calculate damages in a way that is consistent with Plaintiff's theory of liability in this case. The question of whether and when Plaintiffs are required to actually prove loss causation is beside the point.

Indeed, if accepted, Dr. Hartzmark's view would allow securities plaintiffs to obtain class certification by proving an efficient market and then saying, "event study." This would render *Comcast* a dead letter in securities class actions.

Simply put, at the class certification stage, if "damages c[an] be measured class-wide, [Plaintiffs] had an obligation to come forward with evidence thereof." *In re Monsanto*, 493 B.R. 852, 860 (Bankr. D.N.M. 2013). Plaintiffs chose not to provide any such evidence, and *Comcast* "does not allow [them] the luxury of waiting until trial." *Id.*

## III.  OREGON DOES NOT MEET THE TYPICALITY OR ADEQUACY REQUIREMENTS OF RULE 23(A)(3) AND (A)(4)

Where, like here, a named plaintiff is subject to unique defenses, the plaintiff is an atypical and inadequate class representative. *In re GenesisIntermedia Sec. Litig.*, 232 F.R.D. 321 (D. Minn. 2015) ("[W]here the representative parties are subject to unique defenses, their claim is not typical of the class."). At the class certification stage, the question is not whether unique defenses would be successful, but whether litigation of those defenses would create a sideshow. *See id.*

Oregon is differently situated from virtually every other class member:

> (1)    during the Class Period, it was conducting a law enforcement investigation of the very alleged sales and billing practices alleged in the Complaint;

(2)     it continued to purchase CenturyLink securities after it claims it
learned of the existence of what it describes as CenturyLink's fraud;
and

(3)     it admittedly did not read or review the documents containing the
alleged misstatements and omissions prior to purchasing
CenturyLink securities.

Each fact, considered separately or cumulatively, raises significant questions of non-

reliance that will consume the litigation if Oregon is appointed as a class representative.

### A.    Throughout the Class Period, Oregon Had Unique Access to Information and an Opportunity to Uncover the Alleged Fraud

Generally, an investor in securities is not a typical or adequate class representative

if it had unique access to information and an opportunity to detect the fraud prior to

purchase. *See Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir. 1992) (explaining that

the plaintiff's "opportunity to detect the fraud" is a relevant factor in determining whether

reliance was justified); *In re Indep. Energy Holdings plc Sec. Litig.*, 210 F.R.D. 476, 481

(S.D.N.Y. 2002) ("[W]here plaintiffs are privy to non-public information not available to

other investors, they may be subject to unique non-reliance defenses making them

atypical and inadequate class representatives.").

Contrary to the allegations of the Complaint, Oregon did not suddenly become

aware of allegations of systematic cramming against CenturyLink in June 2017.  Oregon

began investigating allegations of the very sales and billing practices alleged in the

Complaint in February 2014—more than three years before the corrective disclosures.

*See* Blair Decl. Ex. 4 (Oregon Department of Treasury, "AG Rosenblum Announces $4m

Settlement with CenturyLink" (December 31, 2019) ("In February 2014, Oregon DOJ

opened an investigation of CenturyLink in response to over 1,000 consumer complaints, including complaints about the company misrepresenting the price of services, failing to inform consumers of terms and conditions that could affect the price, and billing consumers for services they never received.")).  Oregon's investigation concerned the same sales practices that, according to the Complaint, CenturyLink allegedly concealed through false statements to the investing public.  *See id.* ("Oregon DOJ will continue to lead a separate securities class action lawsuit *arising from the same conduct*.") (emphasis added).  In connection with its investigation, Oregon had access to non-public documents and information—many of which were provided by CenturyLink in response to civil investigative demands.  *See, e.g.*, Blair Decl. Ex. 5.

During deposition testimony, Oregon explained that during the Class Period, it relied on external investment managers to actively manage Oregon assets because those managers had access to "unique information sources."  *See id.* at Ex. 6 at 129:7–15 (Q. "And your testimony is that the active managers that OST uses were relying not just on financial market information but also other resources; is that correct? [Objection omitted] A. Other unique data sources or research that potentially adds value.").  Oregon also testified that its active management strategies relied on "dislocations" in the market.  *See id.* at 149:21–150:7 ("Q. [I]t's difficult to beat the market, but – under the semi-strong hypothesis, but Oregon's strategy is expressly to select active managers that can and will, right? A. Correct. Q. And they do that, at least in part, by exploiting market inefficiencies, right? [Objection omitted] A. I would say that they're implementing market strategies that exploit dislocation.").

Oregon's unique access to non-public documents and information about CenturyLink and its practice of relying on "unique data sources or research" and "market dislocation" set it apart from virtually every other investor in the putative class. No other investor had unfettered access to consumer complaints, the ability to conduct law enforcement investigations, and possession of non-public information from the perpetrator of an alleged fraud well in advance of the corrective disclosure dates.

Questions about whether Oregon had unique information bearing on the truth of alleged misstatements and omissions—and whether it relied on those misstatements and omissions—loom large in fact discovery and any eventual trial in this action. Defendants have already spent, and will continue to spend, considerable time probing Oregon's non-reliance on the misstatements and omissions alleged in the Complaint. *See Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) ("Each of these plaintiffs would be required to devote considerable time to rebut the claim that their purchases were based not on the integrity of the market, but on non-public information that they received . . . .").

## B. Oregon Continued Purchasing CenturyLink Securities Even After Learning of the Alleged Fraud

Oregon ***continued to purchase CenturyLink securities*** even after allegedly learning of the alleged fraudulent scheme. *Cf. George v. China Auto. Sys., Inc.*, No. 11-cv-7533, 2013 WL 3357170, at *6 (S.D.N.Y. 2013) ("A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or

omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision.").

Oregon testified that news on June 16, 2017 of the former CenturyLink employee's complaint alleging a Wells Fargo-style fraud "basically broke the trust of the investment community."  Blair Decl. Ex. 6 at 204:15–24; *id.* at 204:6–7 ("A. All that information—the dam broke on June 16, 2017."); *id.* at 218:8–16.  Yet within weeks of learning of the complaint and the alleged fraud, Oregon purchased ***thousands*** of shares of CenturyLink common stock for the very fund that allegedly suffered losses on its CenturyLink positions.  Blair Decl. Ex. 7 (PL_0005123); *see also* Blair Decl. Ex. 6 at 221:7–14 ("Q. Do these five entries [on PL_0005123] reflect that Oregon State Treasury employees were purchasing CenturyLink securities within weeks of supposedly learning that the company was engaged in a systematic fraud?  A. This report shows that the internal S&P 500 portfolio and risk premia portfolio did in fact buy CenturyLink securities on those trade dates.").

These post-disclosure purchases make Oregon subject to unique non-reliance defenses in fact discovery and trial, which will prevent Oregon from serving as an effective class representative.  *See Rocco v. Nam Thai Elecs, Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000) ("[A] person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative."); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Penn. 2003) ("Defendants have shown that [the lead plaintiff] increased his holdings in

Safeguard stock even after public disclosure of the alleged fraud.  [The lead plaintiff] would have made—and in fact did—purchase stock regardless of the fraudulent omission.").

### C.    Oregon Did Not in Fact Rely on Any of the Alleged Misstatements or Omissions

Finally, Oregon admitted that it did not read any of the documents containing the alleged misstatements and omissions alleged in the Complaint.  This evidence creates a unique non-reliance defense that renders Oregon both an atypical plaintiff and an inadequate representative.  *See In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 333–34 (D. Minn. 2005) ("The Court determines that Plaintiffs have failed to satisfy their burden to show that common issues of fact and law will predominate, given that their theory of reliance does not apply to [putative class representative]; this creates a schism between and among class representatives and members.").

One way the reliance presumption is rebutted is when the named plaintiff did not actually see the documents containing the alleged omission, and thus could not have relied on the omission: *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir. 1981) ("If the plaintiff would have followed the same course of conduct even with full and honest disclosure, then the defendant's action (or lack thereof) cannot be said to have caused plaintiff's loss.").  If the named plaintiff did not rely on the document with the alleged omission, then the question of reliance becomes individualized and the Rule 23(b) predominance requirement is not met.  *See In re GenesisIntermedia*, 232 F.R.D. at 333–34 ("The Court determines that Plaintiffs have failed to satisfy their burden to show that

common issues of fact and law will predominate, given that their theory of reliance does not apply to [putative class representative]; this creates a schism between and among class representatives and members.").

That is the case here: Plaintiffs admit they did not read the document with the alleged omissions prior to purchasing CenturyLink's securities. Oregon never read it before filing the lawsuit:

> Q. Prior to initiating this litigation, had the State of Oregon ever read any of the documents cited in Appendix A [to the Complaint]?
>
> A. I have no knowledge as to whether any of Oregon's managers had read these specific documents.
>
> . . . .
>
> A. We don't do fundamental internal analysis, so there's no reason for internal portfolio managers, myself or any of my co-workers, to look at these documents or to sit in on earnings calls. Our strategies are systematic.
>
> . . . .
>
> Q. You wouldn't rely on these documents in executing the strategies that you've explained to me that are internal to OST?
>
> [Objection omitted]
>
> A. No.

Blair Decl. Ex. 6 at 215:8–12, 216:9–19.[6]

---

[6]    Likewise, Vildosola testified that he had not reviewed any of the documents containing the alleged omissions prior to transacting in CenturyLink securities. *See* Blair Decl. Ex. 8 at 101:9–19 ("Q. During the [C]lass [P]eriod, did you review CenturyLink's SEC filings? A. No.").

- 39 -

These admissions rebut the presumption of reliance under *Affiliated Ute*. *Cf.*

*Shores*, 647 F.2d at 468 ("[Plaintiff] alleges that the Offering Circular contained material

misrepresentations and failed to state material facts necessary to make the statements

made no misleading. At the same time, he admitted that he never read or otherwise relied

on the Offering Circular. If the *Ute* presumption applies to these nondisclosures,

[plaintiff's] admission rebuts it."); *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1171

(7th Cir. 1995) ("People who did not rely on what was *in* the materials cannot have relied

on what was omitted; to them the public offering materials were so much waste paper.")

(emphasis in original).

## IV.    EVEN IF A CLASS CAN BE CERTIFIED, THE COURT SHOULD SHORTEN THE CLASS PERIOD

Even if the Court certifies a class (and it should not), the Class Period must end on

June 16, 2017, because any alleged misrepresentations and omissions were corrected—

and any presumption of class-wide reliance collapsed—on that date. *See* Mem. at 2

(seeking a Class Period of March 1, 2013 to July 12, 2017); *cf. Carpenters Pension Trust*

*Fund of St. Louis v. Barclays plc*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015) ("In the case of a

securities fraud class action, courts are required to cut off the class period on the date of a

statement or event that cures the market.") (quotations omitted).[7]

---

[7]    The length of the Class Period is properly resolved at the class certification stage
because it implicates the Rule 23(b)(3) predominance requirement. *See Medtronic*, 325
F.R.D. at 294 ("The Supreme Court's most recent decision in *Halliburton II* affirms the
Court's conclusion that the Court may modify the class period during the class-
certification stage.") (collecting cases).

### A.    The June 16, 2017, *Bloomberg* Article Fully Disclosed Allegations of CenturyLink's Fraud to the Market

The June 16, 2017 *Bloomberg* article detailed a whistleblower's lawsuit against CenturyLink, including allegations of a Wells Fargo-style fraud and knowledge of that fraud by the Company's senior executives.  *See* Blair Decl. Ex. 9.  Oregon testified that June 16, 2017, was the day "the dam broke" and that the revelations "basically broke the trust of the investment community" in CenturyLink.  *See* Blair Decl. Ex. 6 at 204:3–11; 204:20–24.  Oregon also testified that when the article was published, investors understood that CenturyLink might be perpetrating a massive fraud on customers.  *See id.* at 220:4–10 ("Q. So on June 16, 2017 the State of Oregon understands for the first time that CenturyLink is engaged in widespread fraud.  That's your testimony?  A. I would say the market understands, as a whole, what was occurring at that point in time.").

Because the June 16, 2017, article revealed (baseless) allegations of a fraudulent scheme to the market, it severed the link between the alleged misrepresentations and omissions and the price of CenturyLink securities.  *See Medtronic*, 325 F.R.D. at 295 ("The entire scheme at issue . . . was fully revealed to the public on June 28, 2011, and therefore the omission of the scheme could not have been reflected in the market price at the time of a transaction after that date.") (quotations omitted); *In re Fed. Nat'l Mortg. Ass'n Secs., Derivative & ERISA Litig.*, 247 F.R.D. 32, 38 (D.D.C. Jan. 7, 2008) ("The influx of curative information into the market rebuts this presumption because the fraud underlying the complaint is disclosed.").  The revelations also made reliance after June 16, 2017, unreasonable as a matter of law.  *See Medtronic*, 325 F.R.D. at 295 (holding

- 41 -

that on June 28, 2011, the facts at the center of the plaintiffs' claims were disclosed to the public, making reliance on misstatements after that date unreasonable).

Accordingly, post-June 16, 2017 purchasers cannot rely on the *Basic* or *Affiliated Ute* presumptions to prove reliance, and the Class Period must end on June 16, 2017. *See Medtronic*, 325 F.R.D. at 294 (noting that defendants can "rebut the presumption with respect to a discrete portion of the class by introducing evidence that this portion of the class purchased the securities after the date of the corrective disclosure"); *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-cv-0725, 2007 WL 927745, at *4 (W.D. Mo. Mar. 26, 2007) (closing class after first disclosure because "investors (and the market) knew on [the date of the first disclosure] that financial information previously disseminated by Defendants was suspect and should not be relied upon"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-cv-1519, 2007 WL 276150, at *4 (D.N.J. Jan. 25, 2007) (ending class period on February 7, 2001 because "prior to February 6th [purchasers] . . . could no longer reasonably rely on Defendants' positive statements").

**B.     The June 19 Article and July 12 Announcement Provided No Additional Information to the Market**

Plaintiffs attempt to justify a later end to the Class Period by citing a June 19 *Bloomberg* article and July 12 public statement by the MNAG as additional "partial corrective disclosures." Mem. 5–6. However, the June 19 article and July 12 announcement were not corrective disclosures because they "reiterated and reinforced" the June 16 article. *See Am. Italian Pasta Co.*, 2007 WL 927745, at *4; *Rand–Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016) ("Corrective disclosures must

present facts to the market that are new, that is, publicly revealed for the first time,

because, if investors already know the truth, false statements won't affect the price.")

(quotations omitted).

The June 19 article, which reported that a follow-on consumer class-action

complaint had been filed within a day of the whistleblower lawsuit, broke no new ground.

*See* Blair Decl. Ex. 10. The article repeated the previously reported allegations of fraud

and even described the class-action complaint as echoing the whistleblower's lawsuit.

*See id.* At most, the June 19 article was a "confirmatory disclosure," not a "corrective

disclosure." *See Catogas v. Cyberonics*, 292 F. Appx. 311, 314 (5th Cir. 2008)

("[C]onfirmatory information—that information already known to the market—may *not*

constitute such a corrective disclosure.") (emphasis in original).

Nor did the July 12 announcement by the MNAG provide new information to the

market. *See* Blair Decl. Ex. 11. The MNAG merely announced its state-court lawsuit

against CenturyLink but did not provided any "new, fraud-revealing analysis." *In re

Apollo Grp., Inc. Sec. Litig.*, No. 04-cv-2147, 2008 WL 3072731, at *3 (D. Ariz. Aug. 4,

2008). At bottom, the MNAG announcement publicized details of a state-wide fraud that

had previously been described as national. That is not a corrective disclosure. *See Hayes

v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160, 2016 WL 7406418, at *8 (N.D.

Cal. Dec. 22, 2016) (rejecting argument that subsequent disclosures that provided

additional details about extent of the fraud constituted partial corrective disclosures).

Tellingly, Oregon testified that the June 19 article and July 12 announcement were "noise" and "more substantiation of what was going on"—in other words, not new information to the market:

> A. I remember the whistleblower because it was CenturyLink and it happened around the time as Wells Fargo. So subsequent releases and data, it was just—that's just noise. It's just more information. This was going on. It was systemic.
>
> . . .
>
> Q. You said that the June 16th article was the big one, and then you said the subsequent releases and data, that's just noise. Is that your testimony?
>
> [Objection omitted]
>
> A. More substantiation of what was going on.

Blair Decl. Ex. 6 at 193:17–195:1.

The June 16 *Bloomberg* article severed the link between any misrepresentations or omissions and the price of CenturyLink securities, ending any presumption of reliance for post-June 16 purchases. Plaintiffs can articulate neither what misrepresentations or omissions remained uncorrected after June 16 nor what new information was revealed to the market on June 19 or July 12. Accordingly, the Class Period must end on June 16, 2017.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion or, in the alternative, certify a class with a shortened Class Period that ends on June 16, 2017.

- 44 -

Dated:  March 23, 2020                        Respectfully submitted,

                                              */s/ William A. McNab*
                                              William A. McNab (MN Bar No. 320924)
                                              David M. Aafedt (MN Bar No. 27561X)
                                              WINTHROP & WEINSTINE, P.A.
                                              Capella Tower, Suite 3500
                                              225 South Sixth Street
                                              Minneapolis, MN 55402
                                              Phone: (612) 604-6400
                                              Fax: (612) 604-6800
                                              wmcnab@winthrop.com
                                              daafedt@winthrop.com

                                              Patrick E. Gibbs (CA Bar No. 183174)
                                              COOLEY LLP
                                              3175 Hanover Street
                                              Palo Alto, California 94304
                                              Phone: (650) 843-5000
                                              Fax: (650) 849-7400
                                              pgibbs@cooley.com

                                              Ryan Blair (CA Bar No. 246724)
                                              COOLEY LLP
                                              4402 Eastgate mall
                                              San Diego, CA 92121
                                              Phone: (858) 550-6047
                                              Fax: (858) 527-2750
                                              rblair@cooley.com

                                              Douglas P. Lobel (VA Bar No. 42329)
                                              David A. Vogel (VA Bar No. 48971)
                                              Dana A. Moss, VA Bar No. 80095
                                              COOLEY LLP
                                              11951 Freedom Drive
                                              Reston, Virginia 20190
                                              Phone: (703) 456-8000
                                              Fax: (703) 456-8100
                                              dlobel@cooley.com
                                              dvogel@cooley.com
                                              dmoss@cooley.com

                                              Sarah M. Lightdale (NY Bar No. 4395661)

- 45 -

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Phone: (212) 479-6000
Fax: (212) 479-6275
slightdale@cooley.com

Jerry W. Blackwell (MN Bar No. 186867)
BLACKWELL BURKE P.A.
431 South 7th Street, Suite 2500
Minneapolis, MN 55415
Telephone: (612) 343-3200
blackwell@blackwellburke.com

*Attorneys for Defendants CenturyLink, Inc.,
Glen F. Post, III, R. Stewart Ewing, Jr.,
David D. Cole, Karen Puckett, Dean J.
Douglas, and G. Clay Bailey*

18935804v1