# Exhibit 6

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MINNESOTA
 3
 4    ***********************************
 5    IN RE: CENTURYLINK SALES PRACTICES
 6    AND SECURITIES LITIGATION
 7                            MDL No. 17-2795 (MJD/KMM)
 8    This Document Relates to:
 9    Civil File No. 18-296 (MJD/KMM)
10    ***********************************
11
12        30(B)(6) DEPOSITION OF THE STATE OF OREGON,
13              MICHAEL VITERI AS REPRESENTATIVE
14                   THURSDAY, MARCH 5, 2020
15                         VOLUME I
16
17      BE IT REMEMBERED THAT, the 30(B)(6) deposition of THE
18   STATE OF OREGON, MICHAEL VITERI AS REPRESENTATIVE was
19   reported by Mary C. Soldati, Registered Professional
20   Reporter and Certified Shorthand Reporter, on Thursday,
21   March 5, 2020, commencing at the hour of 9:35 a.m., the
22   proceedings being reported at the Offices of Stoll
23   Berne, PC, 209 SW Oak, Suite 500, Portland, Oregon
24   97204.
25
                                                        Page 1
```

1    intelligence.  They use natural language processors to

2    go through 10-Ks and 10-Qs to get a sense of the tone of

3    senior management and what they're saying or not saying.

4    That could be significant.

5         So it's public information, but it's not          13:37:09

6    necessarily financial information.

7       Q.  I see.  And your testimony is that the active

8    managers that OST uses are relying not just on financial

9    market information, but also other resources; is that

10   correct?                                                13:37:29

11              MR. MUELLER:  Object to the form of the

12   question.

13              THE WITNESS:  Other unique data sources or

14   research that potentially adds value -- that they

15   believe adds value.                                     13:37:42

16   BY MR. MARTIN:

17      Q.  Can you give me an example of some of these other

18   unique data sources that active managers rely on, as

19   they attempt to beat indices?

20      A.  Sure.  Many trades end up having trade           13:37:56

21   publications, whether it be oil or energy or retail or

22   mall or real estate.

23        Many managers might subscribe to lesser known

24   trade publications.  They might try to gather data from

25   those trade publications or any data those managers     13:38:18

Page 129

```
 1   testify, but he's not being offered as an expert witness

 2   on efficiency markets.

 3             He's been prepared on the six topics that

 4   you've identified, and it's starting to get a little bit

 5   outside those topics.  But I'll let him continue to          14:08:27

 6   answer the questions.

 7             MR. MARTIN:  Keil, I'm asking about a policy

 8   document that is put out by the Oregon State Treasury.

 9   I think it's clearly within the scope of the notice.

10             MR. MUELLER:  You're asking about the policy       14:08:41

11   document, but your questions are going beyond the scope

12   of just the policy.

13             So I've made my objection.  You can ask your

14   question.

15             MR. MARTIN:  Okay.                                 14:08:48

16   BY MR. MARTIN:

17      Q.  So did you finish your answer?

18      A.  Could you restate the question?

19      Q.  Yeah.  It's a challenge.

20      A.  Next.                                                 14:09:02

21      Q.  Yeah.  The question that I was asking was, it's

22   difficult to beat the market, but -- under the

23   semi-strong hypothesis, but Oregon's strategy is

24   expressly to select active managers that can and will,

25   right?                                                       14:09:28
```

Page 149

```
1      A.   Correct.
2      Q.   And they do that, at least in part, by exploiting
3  market inefficiencies, right?
4           MR. MUELLER:  Object to the form of the
5  question.                                              14:09:39
6           THE WITNESS:  I would say that they're
7  implementing market strategies that exploit dislocation.
8  BY MR. MARTIN:
9      Q.   Dislocation is another word for inefficiency; is
10 it not?                                                14:09:55
11          MR. MUELLER:  Object to the form.  You can
12 answer.
13 BY MR. MARTIN:
14     Q.   Dislocation is a form of inefficiency; is it not?
15     A.   Not in this context, not if you're talking about  14:10:24
16 Efficient Market Hypothesis.
17          It's three different forms and dislocation.  To
18 me, they mean different things.
19          So again, I brought up the closed end fund
20 strategy, which is primarily invested in by high net   14:10:38
21 worth individuals and their certified financial
22 planners.
23          Typically, there's a road show that goes out when
24 the fund is started.  A closed-end fund, it's not like a
25 mutual fund, open ended, you stick your money in the S&P  14:10:51
```

Page 150

1    Q.   So do you remember which news articles you read?

2    A.   They're on Bloomberg.  I have no idea who was the

3    author.

4    Q.   Do you recall reading any articles about

5    CenturyLink prior to the ones you're thinking about now?      15:36:56

6    A.   No.

7    Q.   No?

8    A.   It was really kind of the June 16th whistleblower

9    article that came out on Bloomberg.  And then the

10   subsequent one that came out on the 19th of June.             15:37:11

11        And then the attorney general article, not

12   article, but lawsuit and that information came out

13   July 12th, I think 2017.

14   Q.   And you remember reading those articles

15   independent of seeing them referenced in the Complaint,       15:37:25

16   I take it?

17   A.   I remember the whistleblower because it was

18   CenturyLink and it happened right around the time as

19   Wells Fargo.

20        So the subsequent releases and data, it was              15:37:38

21   just -- that's just noise.  It's just more information.

22   This was going on.  It was systemic.

23   Q.   I see.

24        So you view the CenturyLink -- sorry.  You view

25   the -- what is it?  The June -- it's somewhere.  The          15:37:53

Page 193

```
 1    Bloomberg article about --
 2       A.   June 16th.
 3       Q.   June 16th.  You view that as the significant
 4    news, and everything after that you said you was just
 5    more of the same?                                            15:38:09
 6              MR. MUELLER:  Objection.  That's beyond the
 7    scope of the noticed topics.
 8              THE WITNESS:  That was the significant news,
 9    in which it came out that those sales practices, the
10    cramming that was going on, the bait and switch or I        15:38:20
11    guess lying, extortion or whatever you want to call it,
12    that was going on, and the fact within that news
13    article, the senior management had been hiding them.
14              They had known for a long period of time.
15    They knew what the practices were.  So I just recall        15:38:34
16    that it was -- it's pretty similar to what was going on
17    with Wells Fargo at the same time.
18    BY MR. MARTIN:
19       Q.   You said that the June 16th article was the big
20    one, and then you said the subsequent releases and data,    15:38:46
21    that's just noise.  Is that your testimony?
22              MR. MUELLER:  Objection.  Beyond the scope
23    of the noticed topics.  You can testify as to your
24    personal opinion.
25              THE WITNESS:  More substantiation of what         15:38:57
```

Page 194

1  was going on.

2  BY MR. MARTIN:

3     Q.  Substantiation of the June 16th article?

4     A.  Of the cramming and the illegal sales practices

5  that were going on at CenturyLink.  It was more                    15:39:07

6  information that kept on coming out.  And price drops

7  that were occurring at that time on June 16th, June 19th

8  and June 12th does.

9     Q.  June 12th or July?

10    A.  I'm sorry.  June 16th, June 19th, July 12th.               15:39:20

11    Q.  I see.  So you thought the June 19th and July

12 13th [sic] confirmed what was in the 16th article?

13           MR. MUELLER:  Same objection.  He can

14 testify to his personal knowledge.

15           THE WITNESS:  Provided further                            15:39:40

16 substantiation that this was systemic.  This was

17 happening for quite a while, and it was happening across

18 multiple states, across more than half their client

19 base.

20 BY MR. MARTIN:                                                      15:39:52

21    Q.  Those articles referenced allegations and

22 lawsuits, correct?

23           MR. MUELLER:  Same objections.

24           THE WITNESS:  My recollection was that the

25 first article that came out June 16th was really the                15:40:03

```
 1   providing other -- other -- concentrating on -- on -- on
 2   key customers, and not addressing what was actually
 3   happening, what was actually boosting revenues, at
 4   CenturyLink, which was these practices on cramming and
 5   basically kind of illegal, unethical -- but mostly            15:54:28
 6   illegal activity.
 7           When the news came out, that's when the stock
 8   price took a hit.  As more information came out on June
 9   19th -- I'm sorry -- on the 19th and then on the 12th,
10   again the substantiation that this was systemic.  It was     15:54:43
11   happening throughout the board and price dropped again.
12   BY MR. MARTIN:
13      Q.  So your position is what made June different from
14   these earlier complaints is that it was a systemic
15   top-down scheme.  That is the difference, in your view?      15:55:00
16               MR. MUELLER:  Objection.  Misstates
17   testimony.  Witness is not here to offer expert opinion
18   testimony.  You can answer the question.
19               THE WITNESS:  It has to do the fact that
20   senior management lied about the cramming practices and     15:55:12
21   illegal practices, sales practices that CenturyLink was
22   engaging in.  They perpetrated the lie.
23   BY MR. MARTIN:
24      Q.  But your view is that the practices themselves
25   may have been known prior to that?                           15:55:27
```

Page 203

1          MR. MUELLER:  Objection.  Misstates
2    testimony.
3          THE WITNESS:  There may have been some
4    individual instances of something happening, but not in
5    any meaningful systematic way that I recall.             15:55:39
6          All that information -- the dam broke on
7    June 16th, 2017.
8    BY MR. MARTIN:
9       Q.  I understand that.  I'm trying to figure out why
10   Oregon believes that that -- the dam broke on that day, 15:55:53
11   given all of this news prior to that.
12      A.  Because it came out --
13         MR. MUELLER:  Objection.  That's outside the
14   scope of the...
15         THE WITNESS:  At that time, it came out with   15:56:04
16   a whistleblower complaint and lawsuit, that management
17   knew of these practices, that these practices were
18   inflating revenue at CenturyLink.
19         These practices were illegal and
20   unsustainable and management still hid that.  When the  15:56:20
21   information came out that senior management had been
22   lying, that basically broke the trust of the investment
23   community, and that's why you ended up seeing a price
24   drop happening on June 16th.
25         Again, more information on June 19th;          15:56:34

Page 204

```
 1   their service, their understanding of what the customers
 2   want, when in fact, it was the shenanigans that were
 3   going on with respect to how they were treating clients.
 4      Q.  And then I presume that Oregon reviewed the
 5   materials cited in Appendix A prior to purchasing            16:13:49
 6   CenturyLink securities?
 7      A.  What time period are you speaking?
 8      Q.  Has the State of Oregon, prior to initiating this
 9   litigation, had the State of Oregon ever read any of the
10   documents cited in Appendix A?                               16:14:14
11      A.  I have no knowledge as to whether any of Oregon's
12   managers had read these specific documents.
13          They very well might have written -- or read
14   10-Ks, 8-Ks, been involved in earnings call.
15          But again, we give our managers that discretion       16:14:32
16   as part of their research process.
17      Q.  You have no idea whether anyone in Oregon or its
18   external managers read any of the documents listed in
19   Appendix A?
20      A.  Over what time frame?                                 16:14:46
21      Q.  Prior to the commencement of this litigation.
22      A.  I have no recollection.  We certainly did
23   internally.  And I have no knowledge of any of our
24   external managers having -- I have no knowledge of
25   managers specifically looking at these documents             16:15:01
```

Page 215

```
 1    referenced in Appendix A.
 2       Q.  I just want to make sure I understand what you
 3    said correctly, based on what I'm seeing.
 4            You said you have no recollection, you certainly
 5    did not internally or certainly did internally?              16:15:13
 6       A.  We managed three portfolios internally that had
 7    exposure to CenturyLink, their systematic strategies,
 8    quantitative strategies.
 9            We don't do fundamental internal analysis, so
10    there's no reason for internal portfolio managers,           16:15:31
11    myself or any of my co-workers, to look at these
12    documents or to sit in on earnings calls.  Our
13    strategies are systematic.
14       Q.  You wouldn't rely on these documents in executing
15    the strategies that you've explained to me that are          16:15:48
16    internal to OST?
17              MR. MUELLER:  Object to the form of the
18    question.
19              THE WITNESS:  No.
20              MR. MARTIN:  Let's break for five minutes.         16:16:20
21              THE VIDEOGRAPHER:  We are off the record at
22    4:15.
23              (Break taken.)
24              THE VIDEOGRAPHER:  We are back on the record
25    at 4:25.                                                     16:25:20
```

Page 216

```
 1    of senior management broke the trust of the investment
 2    community; is that accurate?
 3        A.   I would say that's accurate.  And it was
 4    crystallized in the price drops that had occurred.  The
 5    investment community relies on senior management of           16:27:05
 6    publicly traded companies to be truthful in what they're
 7    representing.
 8        Q.   And your view after June 16th, 2017, is that
 9    CenturyLink had perpetrated an enormous fraud on the
10    investing public; is that accurate?                           16:27:22
11        A.   The senior management had engaged the six
12    individuals; Glen Post Stewart Ewing, David Cole and
13    three other defendants.
14             They were senior management.  They were the ones
15    that were covering up.  They were the ones that knew          16:27:39
16    that was going on.
17        Q.   And that's what made June 16th, 2017 so
18    significant?
19             MR. MUELLER:  Objection.
20             THE WITNESS:  June 16th, June 19th and then          16:27:48
21    subsequent to that, July 12th.  Those are all
22    significant dates.
23    BY MR. MARTIN:
24        Q.   Right.  And they were significant again because
25    they revealed the company to be essentially engaged in        16:28:02
```

Page 218

1  going on with -- with the customers.

2          MR. MUELLER: Just answer the questions.

3  BY MR. MARTIN:

4    Q.  So I just want to make sure I understand your

5  testimony.                                              16:29:52

6        So on June 16th, 2017 the State of Oregon

7  understands for the first time that CenturyLink is

8  engaged in widespread fraud. That's your testimony?

9    A.  I would say the market understands, as a whole,

10 what was occurring at that point in time.              16:30:11

11       Not just Oregon. Oregon -- its managers were

12 aware of the information that was coming out and a new

13 pricing reflected in the pricing that occurred on that

14 particular day, the price drop occurred as a reflection

15 of the news information that came out on cramming and on  16:30:27

16 senior management basically lying about what was going

17 on with the period.

18   Q.  Right. So your response to that information is

19 to go out and buy more. Why?

20         MR. MUELLER: Objection to the form of the     16:30:40

21 question.

22         THE WITNESS: Can you specify which -- which

23 accounts or which managers you're referring to?

24 BY MR. MARTIN:

25   Q.  Do you have a recollection of trading CenturyLink   16:30:52

Page 220

```
 1   securities after the corrective disclosures alleged in
 2   the Complaint?
 3       A.   I don't have a recollection, other than what is
 4   maybe -- what's in this buy and sell report.
 5       Q.   Let's take a look at Exhibit 21 again.              16:31:07
 6       A.   Sure.
 7       Q.   Let's look at the last page.  Last five entries.
 8   Do these five entries reflect that Oregon State Treasury
 9   employees were purchasing CenturyLink securities within
10   weeks of supposedly learning that the company was            16:31:44
11   engaged in a systematic fraud?
12       A.   This report shows that the internal S&P 500
13   portfolio and risk premium portfolio did, in fact, buy
14   CenturyLink portfolios on those trade dates.
15       Q.   And the trader on those trades would have been      16:32:04
16   you, correct?
17       A.   Myself or one of my proxies, one of my investment
18   officers if I was gone that day.
19       Q.   Right.  So you testified that on June 16th, 2017
20   CenturyLink, "broke the trust of the investment              16:32:24
21   community."  That's a quote.
22            And now, is it correct that within weeks you were
23   buying more CenturyLink stock?
24               MR. MUELLER:  Object to the form of the
25   question.                                                    16:32:37
```

Page 221