# Exhibit N

1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2
3   ------------------------------------------------------------
                                    )
    IN RE:  CENTURYLINK SALES       ) File No. 17-md-2795
4   PRACTICES AND SECURITIES        )        (MJD/KMM)
    LITIGATION                      )
5                                   )
                                    )
6   This relates to:               ) Courtroom 8E
    18-cv-296(MJD/KMM)              ) Minneapolis, Minnesota
7                                   ) Tuesday, October 1, 2019
                                    )
8   ------------------------------------------------------------

9
              BEFORE THE HONORABLE KATE M. MENENDEZ
10        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11

12                    **PRETRIAL CONFERENCE**

13

14

15

16

17

    TRANSCRIBER:              RENEE A. ROGGE, RMR-CRR
18                            1005 United States Courthouse
                              300 South Fourth Street
19                            Minneapolis, Minnesota 55415
                              (612)664-5107
20

21

22

23        Proceedings recorded by digital recording;
             Transcript produced by computer.
24

25

```
1       APPEARANCES:

2       Lead Counsel for          BERNSTEIN LITOWITZ BERGER &
        Plaintiffs and the          GROSSMANN LLP
3       Class:                    MICHAEL D. BLATCHLEY, ESQ.
                                  MICHAEL M. MATHAI, ESQ.
4                                 1251 Avenue of the Americas
                                  New York, New York 10020
5
                                  STOLL STOLL BERNE LOKTING &
6                                   SHLACHTER P.C.
                                  TIMOTHY S. DeJONG, ESQ.
7                                 KEIL M. MUELLER, ESQ.
                                  209 SW Oak Street, #500
8                                 Portland, Oregon 97204

9       Liaison Counsel for       LOCKRIDGE GRINDAL NAUEN PLLP
        Plaintiffs and the        GREGG M. FISHBEIN, ESQ.
10      Class:                    100 Washington Avenue S, #2200
                                  Minneapolis, Minnesota 55401
11
        For the Defendants:       COOLEY LLP
12                                PATRICK E. GIBBS, ESQ.
                                  3175 Hanover Street
13                                Palo Alto, California 94304

14                                COOLEY LLP
                                  LAUREN GERBER LEE, ESQ.
15                                55 Hudson Yards
                                  New York, New York 10001
16
                                  WINTHROP & WEINSTINE PA
17                                WILLIAM A. McNAB, ESQ.
                                  225 South Sixth Street, #3500
18                                Minneapolis, Minnesota 55402

19

20                                     *   *   *

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S

 2                      IN OPEN COURT

 3                         *   *   *

 4              THE COURT:  Okay.  Welcome, everybody.

 5              We are here for a pretrial conference, which seems

 6     like it should be early in the litigation.  I know we've

 7     been at this for a while.  But we are here to set a schedule

 8     and discovery limitations that will control next steps in

 9     this part of the litigation.

10              I want to begin by making sure I know who is here.

11     If I could get the plaintiffs to -- plaintiffs' counsel to

12     introduce yourselves, starting here, I think.

13              MR. DeJONG:  Tim DeJong with Stoll Berne in

14     Portland.

15              THE COURT:  DeJong?

16              MR. DeJONG:  Yes.

17              THE COURT:  Okay.  Welcome.  How are you?

18              MR. DeJONG:  Very good.  Thank you.

19              THE COURT:  All right.

20              MR. MATHAI:  Michael Mathai with Bernstein

21     Litowitz Berger & Grossmann, New York.

22              THE COURT:  Excellent.  Welcome to you.  And it's

23     Mathai?

24              MR. MATHAI:  Yes, ma'am.

25              THE COURT:  Okay.  Good.  Welcome.
```

1          MR. BLATCHLEY:  Good afternoon, Your Honor.  Mike

2     Blatchley from Bernstein Litowitz Berger & Grossmann.

3          THE COURT:  All right.  Welcome to you as well.

4          MR. BLATCHLEY:  Thank you.

5          MR. MUELLER:  Good afternoon, Your Honor.  Keil

6     Mueller with Stoll Berne.

7          THE COURT:  All right.  Welcome.

8          MR. FISHBEIN:  Good afternoon, Your Honor.  Greg

9     Fishbein, Lockridge Grindal Nauen.

10          THE COURT:  Okay.  Welcome, Mr. Fishbein.

11          MR. FISHBEIN:  Thank you.

12          THE COURT:  And we have somebody in the back row.

13          UNIDENTIFIED MALE SPEAKER:  Yes.  Good afternoon,

14     Your Honor.  (Inaudible) on behalf of lead counsel and

15     (inaudible).

16          THE COURT:  Okay.  Thank you.  Welcome.

17          And here on behalf of the defendants today.

18          MR. GIBBS:  Good afternoon, Your Honor.  Patrick

19     Gibbs from Cooley.

20          THE COURT:  Excellent.  Welcome.

21          MR. MCNAB:  Good afternoon, Judge Menendez.  Bill

22     McNab, Weinstine, on behalf of the defendants.

23          THE COURT:  Good to see you again.

24          MR. MCNAB:  Thank you, Your Honor.  You as well.

25          MS. LEE:  Good afternoon, Your Honor.  Lauren Lee

 1    for Cooley on behalf of the defendants.

 2              THE COURT:  Okay.  Welcome to you as well.

 3              And have you all decided in most matters who is

 4    going to be taking the lead for this table?

 5              MR. BLATCHLEY:  I will, Your Honor.

 6              THE COURT:  Okay.  Great.  Mr. Blatchley.

 7              And how about for you all?

 8              MR. GIBBS:  I will, Your Honor, with a couple of

 9    exceptions for items touching on (inaudible).

10              THE COURT:  Great.  Okay.

11              Let's jump right in.  This is, I have to say,

12    probably one of the more complicated pretrial conferences

13    I've had, in large part, because there's quite a few areas

14    of dispute.  And I'm just going to kind of lead us through

15    some of them.  I have made some plans with respect to some

16    areas of disagreement.  I need to hear from you about

17    others, but I want to make sure to hear everyone out.

18              At the end what I may do is send you back to the

19    drawing board to agree on a little bit more language with

20    respect to a couple of discreet areas where what I'm

21    inclined to do is something between the two options that you

22    have proposed.  And I find it tends to be a little more

23    workable to have you take a stab at that language in the

24    first instance rather than me.  I am happy to do it, but I

25    tend to know fewer things about the nuances of your case and

1    that makes my efforts occasionally ham-handed.  So -- but we

2    will see if that is what arises when we move forward.

3            Why don't we go ahead and get started with the

4    sort of big, right-out-of-the-gate question about the extent

5    to which it is appropriate to expect the defendants to

6    produce all of or a large part of documents that have been

7    produced in other cases in an effort to save time and

8    resources.

9            So if you want to come to the podium on behalf of

10   the plaintiffs and let me know your thoughts about what

11   exactly you're advocating for and why you think that makes

12   sense.

13            MR. BLATCHLEY:  Thank you, Your Honor.  Can you

14   guys -- can I be heard?

15            THE COURT:  Good.

16            MR. BLATCHLEY:  Thank you again, Your Honor.  And

17   I'm glad you started there.

18            As you will note in the draft 26(f) report that we

19   submitted, that's kind of one of the first things that we

20   have tried to get defendants' cooperation on in terms of

21   streamlining and making discovery very efficient in this

22   case.  We think that --

23            And, again, I just want to make sure the court is

24   aware.  The actual request that we put in our 26(f) report,

25   it's limited to the three actions, the related actions as we

1    define them.  That's the Minnesota Attorney General's

2    pending litigation against CenturyLink; it is the consumer

3    case that Your Honor knows very, very well; and the related

4    derivative action that is, again, part of the MDL.

5           We asked for the production of those documents

6    right out of the gate because, again, those are documents

7    that the defendants have already reviewed, collected.

8    They've done their privilege review.  They've produced to

9    another party.  And we believe they're indisputably relevant

10   to our case.

11          And, in particular, the Minnesota Attorney General

12   production is -- I don't think there can be a reasonable

13   dispute about its relevance here.  You know, we've had this

14   conversation with defendants for two months now.  I haven't

15   heard a cogent articulation of how it could be possibly

16   irrelevant to this case, but that's the position that we

17   understand that they're taking.

18          Again, we provided some cites in our letter to

19   Your Honor on Friday.  Our complaint is replete with

20   references to discovery and allegations in the Minnesota

21   Attorney's General action.  The fact that 3.5 million

22   customers, again, representing between a third and a half of

23   CenturyLink's overall customer base, were overbilled, that

24   is an allegation that's derived from the Minnesota Attorney

25   General action.  That, again, is something that -- and other

1    attorney general actions and investigations.  That's

2    something that goes to materiality, falsity scienter to the

3    core, aspects and elements that we're required to prove in

4    this case.

5            We haven't heard anything from the defendants

6    about let's, okay, so we'll agree to produce that part of

7    the discovery.  And, again, that would be, you know, more

8    burdensome from defendants' point of view if they wanted to

9    parse it out, as they seem to want to do.

10           THE COURT:  Okay.  Let me ask a couple of

11   questions on this vein.

12           You asked for an awful lot of discovery in this

13   case.  You're seeking permission to have unlimited document

14   requests.  And, in fact, you seem to have already served

15   more document requests than the other side is suggesting as

16   a limit, which we'll put off for a moment what that would

17   mean if I agree with them.

18           If you receive some sort of blanket order

19   requiring them to produce the things that have already been

20   produced, how will we all collectively be assured that there

21   will be a commensurate reduction in discovery practices that

22   you undertake because they will be unnecessary and

23   redundant?

24           MR. BLATCHLEY:  I think, Your Honor, first off, I

25   think the production of those documents would, again, help

1     the parties understand what the scope of discovery already

2     is.  We're kind of at a very, you know, significant

3     disadvantage here in terms of figuring out what that

4     universe is.  I don't have a crystal ball, because I haven't

5     seen the documents that have been produced in that

6     litigation.

7           I understand the court's concern about, okay, so

8     you will get all this litigation anyways, but you still need

9     to prove your case.  So, of course, we're entitled to other

10    documents down the road.

11          Again, Your Honor, I think the way we -- the way

12    we manage that potential issue that you flagged is by having

13    an agreement about when the substantial completion of

14    document discovery is going to be.  That's another thing

15    that defendants have opposed.  They do not want that

16    deadline.

17          THE COURT:  Yep, we will talk about that in a

18    minute.  But before we get to sort of the mechanics, my

19    question is this:  Presumably, just to use the document

20    requests that you have already served as a hypothetical

21    example, some of those document requests are inclusive of

22    information that you would expect to be produced in the

23    attorney general's -- in the discovery that was produced

24    with respect to the attorney general litigation.  Right?

25          So who is going to take the, if I were to grant

1    some degree of this replicated production, who is going to

2    take the production, overlay it against your requests and

3    decide what is no longer necessary or what is contemplated?

4    Is that something you will do?  Do you expect them to do a

5    production that responds to all your requests, even if what

6    they're referring to are in the other production?  How do

7    you anticipate this working as a practical matter?

8              MR. BLATCHLEY:  As a practical matter -- that's a

9    great question, Your Honor.  As a practical matter, this is

10   how I think it should proceed.  We get the production of the

11   three-litigation discovery.  I mean, literally, it's a push

12   of a button.  Defendants have that on a hard drive.  They

13   can -- they can drop it off tomorrow.  We do the job of

14   reviewing that production and seeing what is left in the

15   discovery we're going to need in our case.

16             And I want to just make one thing very clear about

17   these productions.  This is something that's routinely done

18   in cases like this one, when you have related -- you know,

19   Judge Davis approved of it in the case we cited in the

20   26(f).

21             THE COURT:  I think it's quite clear to me from

22   looking at the case law from both sides that I have the

23   discretion to decide this; that as part of my authority to

24   try to craft a schedule and a set of discovery obligations

25   and understandings, I have the authority to manage it in

1    whatever way seems the most likely to be efficient.

2              You cite cases that show where a judge has called

3    that tie --

4              MR. BLATCHLEY:  Right.

5              THE COURT:  -- in favor of requiring production.

6    They cite cases where a judge has called that in the

7    opposite.

8              I think everybody would probably agree, although

9    I'll certainly give the defendants the right to quibble, but

10   that I have the authority to do it.  I'm trying to figure

11   out the extent to which it makes sense.

12             MR. BLATCHLEY:  Sure.  And I'll tell you why it

13   makes sense here.  The attorney general allegation -- the

14   discovery in that case is directly relevant to core things

15   that we must prove in this case.  It was cited by Judge

16   Davis in five separate parts of his opinion.  It's relevant

17   to the defendants' scienter.

18             The discovery in the Minnesota Attorney General's

19   action is a core part of why we believe defendants,

20   including, you know, CEO Glen Post, who took credit,

21   personal credit for responding to the Minnesota Attorney

22   General's civil investigative demand during our class

23   period -- that becomes relevant, and it sets it apart from

24   every other case that they might cite to you that says you

25   don't get discovery in related litigation.  I think that

1    that's an important point to note.

2            I also want to say just as a practical matter what

3    we're asking for here is the Minnesota Attorney General's

4    discovery.  That is a universe, according to the briefs, and

5    defendants might say something different or let me know

6    something different today, but according to the briefs that

7    have been filed in that case that is a universe of about 300

8    or so thousand pages of documents.  And I just want to make

9    clear that that, in terms of the case we're talking about in

10   prosecuting the securities fraud claim like this one, is a

11   very relatively modest production.

12           We believe that as soon as that is produced we can

13   go through it, we can make calls, we can, you know, learn

14   what might be helpful in terms of organizing the ESI

15   discovery in this case, which is another related dispute

16   we're having.  We think that, you know, if there are search

17   terms and custodians that CenturyLink has negotiated with

18   the Minnesota Attorney General -- we don't understand why

19   we're not being shared -- that information is not being

20   shared with plaintiffs, because obviously it's not

21   privileged or work product if they're sharing it with an

22   adversary.  And we can go through and with our witness

23   interviews, the folks that we investigated, to build our

24   complaint and to make the allegations that we made, figure

25   out what the holes might be in terms of what is missing.

1           Clearly, the Minnesota Attorney General is not

2      proving the same set of claims that we are.  That is

3      something I'm sure defendants will talk about.  But they

4      already have this repository of documents that they can

5      literally push a button and send us tomorrow, and we can

6      then efficiently, much more efficiently manage the discovery

7      in this case, the documents that we might need.

8           And just one --

9           THE COURT:  The ease is only one factor, though.

10     I mean, if this were easy to send piles of irrelevant

11     documents or of documents to which you are not entitled, the

12     ease wouldn't make you more entitled.  The fact that it's

13     been collated in a related case doesn't make you entitled.

14     What might make you entitled is that the topics contained in

15     that discovery are topics that you are very likely to both

16     request and, were there to be a kerfuffle, succeed in

17     getting an order for the production of in this case.

18          So you focus a lot on the AG investigation, but

19     you're actually asking for production from three related

20     cases.  Tell me how the derivative litigation is as robustly

21     co-relevant.

22          MR. BLATCHLEY:  So I think this is -- that's a

23     good question.  I think the Minnesota Attorney General

24     investigation is undoubtedly relevant for all of the reasons

25     I laid out, but I think with respect to the derivative

1    action -- again, defendants will correct me -- I believe

2    that there has not been document discovery in that case.  So

3    I'm not sure if that's really a live issue.  I think your

4    next question might be what about the consumer case and are

5    there differences in the consumer case.

6         THE COURT:  Well, discovery in the consumer case

7    was much more narrowly tailored to issues that were before,

8    or are still, were before Judge Davis before.

9         MR. BLATCHLEY:  Right.

10        THE COURT:  You know, some of this has nothing to

11   do with what you want.  For instance, extensive discovery

12   surrounding arbitration provisions probably is not your cup

13   of tea.

14        MR. BLATCHLEY:  Your Honor, and we recognize the

15   differences in those issues, and, again, our focus is not on

16   the consumer discovery.  It is very much more focused on the

17   Minnesota Attorney General discovery for that obvious

18   reason.

19        But I don't know if you -- I mean, if you looked

20   at page 2 of our Rule 26(f) report, defendants say that our

21   case is about, you know, plaintiffs' lawyers took efforts to

22   manufacture a case out of a consumer case.  So if that's

23   the, you know, the position defendants are going to take and

24   they are going to try to prove that we are nothing more than

25   a consumer case that, you know, they say failed or fails, we

1    should get that discovery too.  And just as a matter of,

2    just again, practicality, it's a push of a button for them

3    to produce it.

4            THE COURT:  So it's your position that everything

5    related to the attorney general litigation about, you know,

6    alleged cramming, alleged practices that, you know, could

7    arguably constitute misrepresenting services provided or

8    bills to be submitted, alleged mishandling of consumer

9    complaints on a somewhat systemic level, that those are all

10    exactly things that you need to prove in order to establish

11    that publicly-made comments about the success of the

12    defendants were false?

13            MR. BLATCHLEY:  Your Honor, I don't --

14            THE COURT:  Or misleading?

15            MR. BLATCHLEY:  Yes, false and misleading.  Your

16    Honor, I'm not -- I want to make sure I'm not -- I'm

17    understanding your question correctly.

18            THE COURT:  Well, it was inartfully phrased, so

19    good luck.

20            MR. BLATCHLEY:  I would say I am positive

21    defendants are going to say later in this case that it is

22    certainly my obligation to prove all of the things that you

23    just mentioned in order for me to prevail at class

24    certification, at summary judgment, at trial.  I guarantee

25    they will make the statement that you just made about my

16

 1   obligations.

 2        Again, what I have to do is prove that the

 3   defendants made false and materially misleading statements

 4   with scienter.  I think the discovery in the Minnesota

 5   Attorney General's action goes a long way in helping us do

 6   that, but, again, I haven't seen that discovery and I can't

 7   make that judgment call as we sit here today.

 8        I do know that there is no burden whatsoever in

 9   defendants producing it.

10        THE COURT:  Yes, touch of a button.  Got that.

11   Okay.  Thank you.  Can you grab a seat?  I think I'm going

12   to go back and forth on the individual issues, unless that

13   gets dizzying, just to keep things focused.

14        MR. BLATCHLEY:  Sure.

15        THE COURT:  All right.  Your turn.

16        MR. GIBBS:  Thank you, Your Honor.  Again, Pat

17   Gibbs from Cooley for the defendants.

18        Let me first address the push of the button, which

19   I've read and heard more times than I can count.

20        It is true, as a technological matter, we can copy

21   an electronic data set and we can produce it.  That does not

22   define the scope of the burden that we would incur by virtue

23   of producing wholesale the entire attorney general

24   litigation production in this case.

25        As the court may have noticed, I don't have the

17

1    same teams of lawyers working across all these different

2    cases.  We have different lawyers with different areas of

3    expertise.  I have a team of securities litigators.  Those

4    securities litigators have not poured through the

5    300,000-plus documents that have been produced in the

6    Minnesota AG case.  If I produce them to plaintiffs' counsel

7    in this case, I have to have that team of lawyers pour over

8    that 300,000-plus pages of documents.  That is an enormous

9    expense and an enormous burden, and it's not justified by

10   anything that plaintiffs' counsel have said so far.

11          THE COURT:  Okay.  His arguments would be, one,

12   they're obviously relevant because the degree of things that

13   need to be proven with respect to the Minnesota Attorney

14   General case overlap with at least part of what the

15   defendants need to prove too.

16          The fact that you and your team have yet to review

17   them all, although I note some overlap of counsel, is less

18   relevant than the fact that they've already been screened

19   for privilege or, you know, highly confidential work product

20   type material and, therefore, that need doesn't arise.

21          Help me understand what it is you would be doing

22   when you review all 300 before you sit -- hit send, other

23   than trying not to hit send.

24          MR. GIBBS:  Well, I'm not saying I would

25   necessarily have to do it before I hit send, but I'm saying

1    in order to defend the case I can't have a team of lawyers

2    litigating a securities case that's turned over

3    300,000 pages of documents to plaintiffs' counsel --

4           THE COURT:  Absolutely.  That's true.

5           MR. GIBBS:  -- that my team hasn't looked at.

6           THE COURT:  That's true.

7           MR. GIBBS:  So it's not pre-production.  It's just

8    that it adds it to the body of documents that my team has to

9    review and absorb for purposes of defending this case, which

10   we don't have to do just because it's been produced in the

11   Minnesota AG case.

12          To the point about the substantive overlap, with

13   all due respect, plaintiffs' counsel has never once

14   articulated any reason why every single document produced in

15   the Minnesota AG case is even remotely relevant or within

16   the scope of discovery in this case.

17          THE COURT:  Give me an example of a set that

18   isn't.  His point is he hasn't seen that discovery.  I've

19   been trying to imagine the sorts of discovery in this data

20   set that -- it was easy for me to imagine in the consumer

21   litigation, things that wouldn't be relevant that would make

22   the touch of a button arguably over-inclusive.  Help me

23   understand what that might be here.

24          MR. GIBBS:  I can come up with a number of

25   examples.  First of all, the plaintiffs here are claiming

1     that CenturyLink engaged in systematic overbilling of

2     customers in a way that materially inflated its financial

3     results.  The Minnesota AG is not limited to looking at

4     complaints about billing practices that necessarily inflated

5     the company's revenues at all, much less did so on such a

6     scale that they materially inflated the company's reported

7     revenue.  So the Minnesota AG may be looking at all sorts of

8     individual customer billing complaints, some of which will

9     have nothing to do with overbilling, but the Minnesota AG

10     might still think are relevant to whether there's been some

11     kind of consumer fraud on an individual Minnesota consumer.

12              THE COURT:  Well, wouldn't it be true that if

13     there is an allegation that, hypothetically speaking,

14     shenanigans were taking place with respect to individual

15     consumers that didn't necessarily put more money in the

16     pocket of the defendants, but otherwise, you know, kept in

17     abeyance consumer dissatisfaction or avoided having

18     customers go somewhere else, that those serve the same

19     purpose of proving up that later statements made about the

20     financial robustness of the defendants were false?

21              MR. GIBBS:  I don't think that's an allegation

22     that's been made here.

23              THE COURT:  Okay.

24              MR. GIBBS:  That's not my understanding of the

25     complaint that Judge Davis reviewed for purposes of denying

1    our motion to dismiss.  I think the -- the plaintiffs'

2    complaint in this case by necessity identifies some very

3    specific billing practices that they call cramming that they

4    claim inflated the company's revenues.  And that's what

5    Judge Davis relied upon in denying our motion to dismiss.

6           The Minnesota AG's lawsuit, its discovery, isn't

7    anywhere near as limited in terms of the types of billing

8    issues that are relevant to the Minnesota AG.  It's a

9    consumer protection statute.  There could be violations that

10   have nothing to do with extra revenue from the customer in

11   any way.

12          THE COURT:  Would you say that the complaint in

13   the Minnesota AG case is the best way to discern the

14   existence or absence of overlap factually?

15          MR. GIBBS:  I don't know that I know for sure

16   what's the best way to determine the factual overlap.

17          THE COURT:  I mean, right now I just have to kind

18   of take your word for it --

19          MR. GIBBS:  I understand.

20          THE COURT:  -- like they haven't seen it.

21          MR. GIBBS:  I understand, Your Honor, although I

22   think the nature of the claims -- so this goes in part to

23   your question -- the nature of the claims itself is

24   sufficiently different that I think there is little reason

25   to believe the overlap is anywhere near as complete as

1    plaintiffs' counsel makes it sound.

2         And I don't understand why we're spending all this

3    time talking and arguing about a wholesale production of a

4    large volume of documents from another case, when we could

5    just be talking about what's actually relevant to this case.

6         It may very well be that some of the documents

7    we've produced to the Minnesota AG are discoverable here,

8    but I don't know why it's more efficient to have a big fight

9    over producing all of them as opposed to just doing this the

10   way we normally do it, which is they make requests about

11   their case, we object and respond, we meet and confer, and

12   we produce documents that are agreed upon or that are

13   ordered by the court as relevant to this case.  It's not

14   that hard.  It doesn't need to be this complicated.

15        THE COURT:  Well, they're not trying to make it

16   complicated.  They're trying to make it easier.  They're

17   trying to right out of the gate get 300,000 documents.

18        MR. GIBBS:  I understand.

19        THE COURT:  Right now you're proposing a system

20   that I can't even say the date on which you will hit send.

21   It seems like the system you all are proposing requires them

22   to serve discovery requests, you to mull them over, you to

23   serve responses and in some period of time later, which I

24   think might be 60 days, that you begin rolling production to

25   end at an unknown time in the future.  But also I think

1    there's a caveat in there that the 60 days could be after

2    the disputes are agreed upon or I've resolved them?

3              MR. GIBBS:  I'm not sure that's quite right, Your

4    Honor, but there's no --

5              THE COURT:  Okay.  But it seems like we're talking

6    pretty far in the future.

7              MR. GIBBS:  Well, to be fair, Your Honor, the

8    reason I'm doing that is because I now have a set of

9    document requests from them.  It's over a hundred document

10   requests.  Some of them are breathtakingly broad.  And

11   without knowing for sure how narrow they're going to get, I

12   don't want to commit to something that I can't actually

13   accomplish.  If we can narrow the scope, we can shorten the

14   deadlines.  I don't have a problem with being under a

15   deadline.  I'm not trying to kick out the time period for no

16   reason, but I am trying to rationalize it and focus it on

17   what's relevant to this case.

18             And in that regard, plaintiffs' counsel just says

19   over and over again indisputably relevant.  Now, the only

20   thing he's ever said specific to that is there are some

21   things about the Minnesota AG case that are referenced in

22   his complaint and Judge Davis cited those allegations in his

23   ruling.  Fair enough.  If they want to ask for documents

24   specific to those allegations, we can talk about that and

25   there's probably some documents we could produce in fairly

23

1   short order that would be responsive to those types of

2   document requests.  But the fact that they have taken some

3   allegations made by the Minnesota AG and dropped them into

4   the complaint here doesn't make every scrap of discovery

5   produced in the Minnesota AG case suddenly relevant to this

6   case.

7            Counsel referenced there are 3.5 million customer

8   allegations.  It's not true.  It is based on a document that

9   is -- whose contents and meaning are hotly disputed in the

10  Minnesota AG case; but if they want to see that document, we

11  can produce that document.  That doesn't require us to

12  produce wholesale 300,000-plus documents that have all been

13  produced to the Minnesota AG.  It's a pretty simple way to

14  get at the things that are actually relevant to this case,

15  and it doesn't require wholesale reproduction of something

16  from another case.

17           I understand the court's concern about timing.

18  And as I said, as long as we're talking about a reasonable

19  scope, we can set deadlines.  I don't have a problem with

20  deadlines, but what I have a problem with is a scope that

21  appears to me to be virtually unlimited.

22           THE COURT:  So 300,000 documents in a case of this

23  size isn't really virtually unlimited.  I mean --

24           MR. GIBBS:  I'm talking about the requests, Your

25  Honor.  I agree 300,000 by itself.  But the point is -- the

24

1    court's first question I think is very important.

2            THE COURT:  How is this functionally going to

3    narrow future requests.  It's just going to give you a giant

4    pool from which to draw in the beginning.

5            MR. GIBBS:  Correct.  I -- you know, we've all

6    been around the block.  I don't think that them getting the

7    300-plus-thousand documents is going to take a single

8    custodian off their custodian list.  I don't think it's

9    going to take a single search term off their list of

10   required search terms.  I don't think it's going to cause

11   them to withdraw any of the one-hundred-plus requests with

12   subparts that they've already made.  It's just going to be

13   an avenue to more discovery.  And I understand why they want

14   it.  I don't blame them, but it imposes a significant burden

15   on us.  And I just don't think that's the most efficient way

16   to get at whatever documents are actually relevant to the

17   case they're trying to prove here.

18           THE COURT:  How come you couldn't achieve the

19   economy of scale by bringing a team member from the other

20   litigation who's familiar with the 300,000 documents?

21           MR. GIBBS:  A few reasons.  First of all, there's

22   simple bandwidth concerns.  The Minnesota AG case is

23   barrelling towards, I think, a February trial date.  Believe

24   me, the first thing I asked for when we got the ruling

25   denying our motion to dismiss was how many of those people

1    can I get on my team.  The answer is zero.  They are running

2    at a ridiculous pace.  They have been briefing summary

3    judgment, and now they're racing to trial.  If I could do

4    it, I would.  I can't.  I mean, I certainly don't want my

5    securities lawyers to have to reinvent the wheel, but they

6    are fully engaged at a pace that I just -- I can't add to

7    that.

8              THE COURT:  Okay.  Thank you.  You can be seated.

9              MR. GIBBS:  Thank you.

10             THE COURT:  I will give you the last word,

11   Mr. Blatchley.  Is it Blatchley?

12             MR. BLATCHLEY:  Blatchley.

13             THE COURT:  Blatchley.  I got it right.  And then

14   I start to doubt myself, so --

15             MR. BLATCHLEY:  Thank you, Your Honor.  Just a

16   couple quick points.

17             And I just want to make sure, because I've never

18   heard an argument quite like the one we just heard from

19   defendants' counsel about burden.  We're talking about

20   Rule 34.  We're talking about producing documents, not, you

21   know, what -- that the burden in producing documents, not

22   what might ultimately be at issue in the case, what the

23   factors are of relevance and proportionality.  This is a --

24             THE COURT:  Well, it has to do with

25   proportionality.  His point is if he has to review 300,000

1    documents that are in your hands for harvesting and, you

2    know, responding to summary judgment motions or filing

3    affirmative summary judgment motions or your class cert

4    motion, you know, he wouldn't be representing his clients if

5    he didn't know what was in that pool.  So proportionality

6    includes -- it cannot be just the hit of a button,

7    otherwise, you know, you would get everything, and that

8    isn't clearly the rule.

9         MR. BLATCHLEY:  But I think in this context, Your

10   Honor, when we're talking about a defendant who has the team

11   of attorneys who has reviewed those materials, it's not a

12   very persuasive argument to say, oh, we might have to review

13   them again because we're not willing to shift litigation

14   associates around.  I think it's a -- if the documents are

15   relevant to this case, they will know about them.  They will

16   know about them regardless of whether they're in the

17   attorney general production or we get them from some other

18   avenue.

19        THE COURT:  And if the documents aren't relevant

20   to the case, why should you have them?

21        MR. BLATCHLEY:  Exactly, Your Honor.  That's what

22   the problem is here.  I want to go back to quickly what

23   Mr. Gibbs had said about that point.  He said they're not

24   relevant because the attorney general can look at a number

25   of things.  You did not hear Mr. Gibbs say that this is what

1    he has looked at and this is what the production is or this

2    is what is at issue in that lawsuit.

3         My understanding, again, maybe defense will

4    correct me, but the two central things that I understand

5    them with the attorney general are affirmatively moving for

6    summary judgment on has to do with kind of two issues, and

7    those two issues are directly relevant to what we have to

8    prove in our case.  One is this -- again, this goes back to

9    the documents that we've been discussing about the internal

10   audits and the $3.5 million number of customers overbilled,

11   that has to do with closers that were offered to customers

12   at various times during calls that were not honored.  And

13   the second is customers who were promised fixed rates, but

14   were actually charged more, including in terms of the cost

15   recovery fee or some other fee that it's called.  Those are

16   two things that are at the core of our case.

17        They also talk about -- in our complaint we've

18   alleged a practice by defendants, by CenturyLink in

19   protecting revenue.  That's the term that has been used in

20   the documents citing the Minnesota Attorney General action.

21   Those documents have to do with numerous allegations in our

22   complaint where we say that CenturyLink set up a process

23   that was intentionally designed to keep as much of the

24   overcharges as possible.  I understand that there are policy

25   documents at issue in the Minnesota Attorney General action

1    that actually bear that out, and that is one of the things

2    that -- there's undoubtedly core critical relevant

3    information, that we might get some documents that don't

4    really matter all that much to the litigants here is in no

5    way a justification to start picking out and introducing the

6    tremendous burden of going a document by document kind of

7    process when you can --

8          THE COURT:  I don't mean to be snide, but one of

9    my big concerns here is I don't think this is going to

10   change what you all do at all.  And I'm not criticizing you

11   for that.  You will begin with this as, you know, valuable

12   discovery in the bank.  You haven't expressed that you will

13   reduce the number of documents requests that you are going

14   to serve or that you will, you know, withdraw other

15   discovery requests.  It gives you a whole bunch of stuff

16   right out of the gate, but I really don't see how it

17   actually reduces any of what you are planning to do.

18         MR. BLATCHLEY:  So let me just address that in the

19   most kind of practical terms I can think of at the moment,

20   although I am sure there are other examples.

21         One of the arguments we've been having with

22   defendants' counsel is their unwillingness to share with us

23   search terms and other ESI parameters.  This is actually in

24   a case; a court recently cited this very issue that we're

25   having.  It's the *In Re Broiler Chicken Antitrust*

29

1    *Litigation.*  I'm happy to give you the cite.  The court says

2    when you --

3              THE COURT:  Go ahead and give me the cite.

4              MR. BLATCHLEY:  Sorry.  It's 2017 Westlaw, WL,

5    4417447.

6              What the court said there in ordering a production

7    of, you know, documents that had previously been produced to

8    the Florida Attorney General in that case was that, listen,

9    this is going to be a long discovery road and what we can do

10   by streamlining and making discovery more expeditious is to

11   give plaintiffs those documents.  In doing so, they will

12   begin to see the kind of language that's used in defendants'

13   own documents.  They will be able to identify custodians

14   that might be important.  They will be able to help

15   defendants negotiate search terms that is fair to both sides

16   and actually identify the documents that we are going to

17   need to prove our case.

18             And what I'm worried about and what the concern

19   is, is if we're doing this kind of one-sided "I'll tell you

20   the search terms I used after I run the searches process,"

21   is that we're going to, of course, say, well, you didn't run

22   the right ones; and then we're doing the search again; then

23   we're before Your Honor again saying that this wasn't good

24   enough, this wasn't sufficient.

25             By giving us that discovery now, we can take a

1    look at that and gauge in a cooperative effort with

2    defendants in figuring out what the right search terms, ESI

3    protocol and other parameters are going to be in this case.

4    I see it as a very beneficial way to move this forward,

5    particularly given the core relevance of the majority of the

6    documents based, again, without having seen them, on what

7    the attorney general is actually trying to prove in that

8    case.

9          THE COURT:  So help me with a hypothetical.  Let's

10    say you have a document request that you've already served

11    seeking something specific with respect to consumer

12    complaints.  Are you going to withdraw that document request

13    if you get the discovery produced in the attorney general

14    case?

15          MR. BLATCHLEY:  Well, I don't think -- I'm just

16    trying to take the hypothetical -- I don't think our

17    documents requests are that broad.  We're happy to share

18    them with you and talk about that, but --

19          THE COURT:  Well, give me an example of one that

20    is better at my analogy than the one I just made up.

21          MR. BLATCHLEY:  Yeah.  So -- so just taking --

22    complaints related to I guess what would be Minnesota.  I

23    think that would be a document request that we could think

24    about modifying in response to, you know, if we had gotten

25    production.

 1              But I think what is -- I think what we're kind of

 2      missing in terms of kind of going back and forth on the

 3      document-by-document question -- and the complaint, we don't

 4      have a hundred requests.  We have fifty.  But I think the

 5      issue that we're missing here is that the way discovery

 6      works in cases nowadays with ESI, the real work is in

 7      figuring out the search terms.

 8              THE COURT:  I understand.  We're going to talk

 9      about that in a moment.  I share your skepticism about the

10      proposal the defendants have made, but that doesn't to me

11      mean that this is the solution.

12              MR. BLATCHLEY:  And all of which is to say that

13      getting that part of the case right, getting the right

14      searches conducted, the right custodians done, is going to

15      be a lot more productive in terms of actually getting the

16      right documents produced in this case than going by a

17      document, you know, individual document requests issue.

18      They're going to say, well, we're only going to give you a

19      narrow slice of whatever your document request is seeking.

20      We're going to meet and confer with them, and we're going to

21      come up with the right boundaries.  But the real work in

22      identifying what those documents actually are are search

23      terms, custodians and date ranges.

24              THE COURT:  Okay.  Thank you.

25              All right.  Let's pivot to substantial completion,

1    and let's talk about the -- and let's start with the

2    defendants, if you don't mind, unless this is a different

3    one of your team members.

4              MR. GIBBS:  No.  This is me.

5              THE COURT:  And I also want to talk about the

6    search terms.  Is this also you?

7              MR. GIBBS:  Yes, Your Honor.

8              THE COURT:  Okay.  I have to confess I don't

9    really understand your proposal.  Is it true that you do not

10   want production to start until disagreements about any

11   objections have been resolved?

12             MR. GIBBS:  That's -- that's not how I understand

13   what we're proposing to do, but let me -- let me quickly

14   check the language.

15             THE COURT:  Okay.  Good.  I have to confess that

16   I'm having a difficult time discerning exactly what you see

17   happening from your proposal, but that may well just be that

18   I don't understand the language that you are proposing.

19             MR. GIBBS:  Would the court like me to refer to

20   the report or --

21             THE COURT:  Whatever works.  I just want to know

22   what you're advocating for, so I can find out whether I

23   agree or not.

24             MR. GIBBS:  I think part of the problem here is

25   that the two parties are starting so far apart, I'm not sure

1    we ever really got the issues to ground.  I mean, the

2    plaintiffs' position was it should start immediately with

3    full production from all these other cases and, by the way,

4    substantial completion by December 13th of this year.  You

5    know, plus, you've seen the scope of the document requests.

6           And so I -- I will admit that in the course of the

7    discussions a lot of what we're trying to do is make sure

8    that we don't end up getting jammed with a schedule that's

9    just not feasible.

10          So there's nothing in my view that's written in

11   stone about -- about where we are on the proposals.  I just

12   think the parties, you know, the discussions stop like this.

13          THE COURT:  Well, for instance, you have a bunch

14   of document requests sitting on your desk to which you are

15   supposed to respond by Friday; is that right?

16          MR. GIBBS:  Right.

17          THE COURT:  And tell me what it is that you

18   envision happening on Friday and after Friday.

19          MR. GIBBS:  Well, what I would envision happening

20   on Friday is we will serve our responses and objections.  I

21   suspect I will get an email from Mr. Blatchley about five

22   seconds later asking for a time to meet and confer, and we

23   will set a time to meet and confer.  And I would expect that

24   we would start a discussion, usually on a request-by-request

25   basis, about exactly the items that he's mentioned,

1    custodians, search terms, that sort of thing.

2           But I do think, again, part of the difficulty here

3    is plaintiffs are proposing that we start negotiating search

4    terms within seven days after we've served responses and

5    objections.  Given the nature of the requests that we've

6    received, I'm not sure that process makes sense because the

7    first question we're going to have is, Do we even have

8    agreement as to the scope of documents that should be

9    produced, much less the mechanics of how we do it.

10          And so I think our concern about his proposal was

11   we're going to start kicking search terms back and forth

12   when we're a hundred miles apart, in terms of just the scope

13   of what should be produced in response to each request.

14   Now, I mean, that's fine, I guess.  It doesn't make much

15   sense to us if the parties are still debating between Point

16   A and Point B about what's the substance of what we will

17   agree to produce.

18          THE COURT:  Okay.  Let's say there's ten document

19   requests.  You file pages of generic objections as to all

20   ten and indicate a willingness to provide certain documents

21   with respect to each.  I hope that's what we see Friday?

22          MR. GIBBS:  I would expect so, yes.

23          THE COURT:  Okay.  They -- you agree to meet and

24   confer.  You meet and confer right away.  Some of these

25   things are not controversial, and you can talk about

1    custodians and search terms.

2         MR. GIBBS:  Okay.  That's fine.  I would agree

3    with that.

4         THE COURT:  So I perceive you as saying that until

5    all the issues are resolved you don't want to negotiate

6    search terms, but what I hear you -- or what I perceive

7    you -- your position in writing.  What I hear you saying is

8    that talking about search terms can happen all along as to

9    things about which there's no dispute, but we all have to

10   recognize that it's an iterative process that's going to

11   have multiple waves and that there might be some issues that

12   the parties are so far apart on that it is not practical to

13   talk about search terms.

14        MR. GIBBS:  That is what I'm saying.

15        Now, I think, to your point about the iterative

16   process, I think that's very important because some of

17   the -- for some of the requests the custodians will overlap.

18   All right.  And so we'll be talking about search term

19   parameters for the same set of custodians, some overlapping

20   custodians for different requests.  Some may be

21   noncontroversial, and maybe we'll agree on search terms.

22   Others we're still talking about scope and -- and we'll get

23   to search terms when it makes sense.

24        Part of that process usually involves testing the

25   search terms against a set of documents, and so I'm a little

1    bit worried about locking in for some without understanding

2    it all.

3          But conceptually I don't have any problem with

4    saying, you know, to the extent we can agree as to this

5    particular document request on a reasonable scope of

6    production, I don't have a problem discussing right then how

7    we would go about finding them with search terms,

8    understanding that it is an iterative process.

9          THE COURT:  One of the things that I read some of

10   the materials to suggest is that you think that the

11   appropriate time for the plaintiffs to chime in about your

12   search terms is after you've already begun the production

13   and they get to see whether it's satisfactory or not.  I'm

14   not exactly hearing you draw that clear of a hurdle now.

15         MR. GIBBS:  No, I wouldn't -- I wouldn't insist on

16   that hurdle.  I'm fine having a conversation with them.  I'm

17   fine with testing them and telling them what the results

18   are.

19         And we've often had discussions like, okay, I ran

20   the search terms we talked about; some of them are producing

21   hundreds of thousands of hits, so that's too broad; I want

22   to take that one off; do you agree?  We can have that

23   conversation.

24         THE COURT:  And presumably you aren't taking the

25   position that you don't have to disclose your search terms?

1          MR. GIBBS:  No, no.

2          THE COURT:  Okay.  Okay.  Talk to me about timing

3    for substantial production.  Let's assume that I don't

4    require you to disclose everything that's been produced --

5    let me ask you about the Minnesota Attorney General

6    production.

7          MR. GIBBS:  Yes.

8          THE COURT:  It's presumably Bates numbered in a

9    way that reflects that it was produced in that case, right?

10         MR. GIBBS:  Yes.

11         THE COURT:  If you produce the same documents in

12   this case, will you keep those Bates numbers or are you

13   going to act as though they're being born for the very first

14   time?  Are you going to take their document requests and go

15   into your clients', you know, databases and look for them

16   anew, even though they might have already been culled and

17   put into that document production?

18         MR. GIBBS:  I don't have a fixed view as between

19   those two things.  I want to do whatever is most

20   cost-efficient and effective for my client.  I could imagine

21   a circumstance where it makes more sense to use the

22   Minnesota Attorney General production as its own database to

23   search for production in this case.  And so, in other words,

24   I don't have a fixed view as to whether we should just

25   pretend the Minnesota AG production doesn't exist.  In fact,

1    I don't think we have to do that.

2            THE COURT:  Well, it can't be.  I mean, if that's

3    your position, then your claim that it's inefficient to

4    produce it doesn't ring true, because you'd have to be

5    reexamining 300 -- let's assume only a hundred thousand of

6    these documents overlap.  You'd have to be reexamining all

7    those hundred thousand, finding them, reexamining them for

8    privilege, reexamining them for, you know, highly

9    confidential work product.  It can't be that it's equally

10   plausible that you would start from scratch, right, for that

11   reason?  I mean, presumably, if nothing else is true about

12   the 300,000, they've been screened for privilege.

13           MR. GIBBS:  Yes, they have.

14           THE COURT:  And they've been screened for highly,

15   you know, secretive -- secret sauce recipes or whatever else

16   might constitute the ultra-confidential documents in a case

17   like this.

18           MR. GIBBS:  Yes.  I understand.  I would need

19   to -- I just -- I'm not trying to be difficult.  I'm just --

20   I understand the court's point that it seems likely that to

21   the extent we think there are responsive documents in the

22   Minnesota AG production, it probably makes sense to start

23   there.  My only hesitation on that, actually, is I want to

24   make sure there's nothing that limited the input into that

25   database that would somehow have me leaving out something

39

1    I've said I'm going to produce, actually.  I just think the

2    devil might be in the details.

3              THE COURT:  Yeah.

4              MR. GIBBS:  But I understand the court's point.

5    I'm not -- I'm not looking to use documents that require

6    privilege screening when I could use a set of documents that

7    don't.  I completely agree.  That makes no sense, and I

8    wouldn't do that.

9              THE COURT:  So your point is kind of that the

10   Minnesota Attorney General production could be both over and

11   under-inclusive.

12             MR. GIBBS:  Yes.

13             THE COURT:  Okay.  So let's imagine you get a

14   document request -- let's imagine that I don't order

15   production of the Minnesota Attorney General production.

16   You are following a more traditional path of document

17   request, response.  Is it your intention to begin rolling

18   production or is it your intention to wait until, you know,

19   some quotient of disagreements has been resolved to begin

20   compiling production?  What's your plan?

21             MR. GIBBS:  We can -- we can begin rolling

22   production.  I don't have any objection to that.

23             THE COURT:  Okay.

24             MR. GIBBS:  And, for example, counsel mentioned

25   that he understands there have been a number of policy type

1    of documents produced in the Minnesota AG case.  That's

2    true.  I'm not sure they're all relevant here, but as a

3    category of documents that's not a particularly

4    controversial one.  That seems like the type of document I

5    would expect we could produce pretty quickly.

6              THE COURT:  Okay.  How many document requests do

7    you believe the other side has served already?

8              MR. GIBBS:  I believe they are numbered 48, but

9    almost all of them have substantial numbers of subparts.  So

10   when you count up all the subparts, it's over a hundred.

11   That's why we are using that number.

12             THE COURT:  Okay.  And when are you advocating, if

13   I do not grant the Minnesota Attorney General production

14   request, when are you advocating for the substantial

15   production deadline?  Let me just say it can't be at the

16   very end because that's how, you know, horrible things

17   happen.

18             MR. GIBBS:  I completely understand.  No.  I

19   believe the date we had proposed was in April, with the idea

20   that fact discovery would continue for another six months or

21   so.  There's a table at pages 25 and 26 of the joint report.

22   Let me see if I can find it.

23             THE COURT:  I've got it.  Yeah, yeah, yeah.  I've

24   got it.  I'd forgotten that you had a date in there.  I

25   apologize.  I think it is April.

1          MR. GIBBS:  Yes.  It's, actually, it's early in

2     the table.

3          THE COURT:  Or in the alternative April 30th.

4          MR. GIBBS:  Correct.

5          THE COURT:  So you're -- you're okay -- okay.

6     Thank you.  I think we've talked about these issues.

7     Anything else you want to add before I turn to opposing

8     counsel?

9          MR. GIBBS:  No, Your Honor.

10         THE COURT:  Okay.  All right.  Your turn.

11         So I share opposing counsel's observation that in

12    some ways I think we failed to completely have a meeting of

13    the minds, because you all were talking about very different

14    paradigms.

15         It appears that the position that the defendants

16    are taking are that they will respond to document requests

17    with undoubtedly piles of objections, but some agreement

18    that you will engage in a meet and confer; the easy stuff

19    will begin rolling production right away; there will be

20    ongoing conversations about search terms that are mutual;

21    they will tell you what they are using; you will suggest

22    things that can be added; as always, there will be testing;

23    if ones are proven to be unworkable, they will come back; if

24    you can't agree on the importance of a particular custodian

25    or term, you bring those to me for my resolution; and that

1    they will get a substantial production completed by

2    April 30th.  Tell me what is unworkable about that plan.

3    I'm -- I'm less interested in whether it matches what you

4    thought was their original plan and more interested in

5    trying to find common ground.

6              MR. BLATCHLEY:  Got it.  Okay.  So if I may just

7    quickly, that's not what was written in their proposal, but

8    I --

9              THE COURT:  Yes, I knew that you would be unable

10   to resist doing exactly what I told you not to do.

11             MR. BLATCHLEY:  I'm sorry.  I'm sorry.

12             THE COURT:  That's all right.  I wouldn't either

13   if I was in your shoes.  Yes.

14             MR. BLATCHLEY:  I appreciate that.

15             So I think the problems -- let me just highlight

16   one big problem I think we have with that proposal, although

17   it is a much more sensible proposal from plaintiffs'

18   perspective to actually talk about search terms, custodians

19   and the like, where we can agree on the scope of document

20   production.  Again, it's a very -- I'm very concerned about

21   that given where we are on our relative positions on

22   relevance and the rest.

23             So one of the things I would like to highlight

24   that I think is a problem with Mr. Gibbs' deadline, a

25   substantial completion deadline of April 30th, it has to do

```
1    with class certification.

2              THE COURT:  I wanted to talk to you all about --

3              MR. BLATCHLEY:  Yeah.

4              THE COURT:  -- the way these work together.

5    Finish your thought.  I'm sorry to interrupt.

6              MR. BLATCHLEY:  So the thought that -- you know,

7    we had pushed for a very, you know, an early substantial

8    completion deadline, knowing that deadlines help motivate

9    parties to negotiate and impose discipline and help us get

10   that discovery worked out as soon as we can.  We think

11   that's important.

12             Defendants' position is to -- again, now that

13   they're saying April 30th is an okay date, that is after

14   class certification briefing is completed.  And in our

15   negotiations on the schedule, defendants proposed something

16   that I have actually never seen before, which is a class

17   certification schedule that has interim deadlines between --

18             THE COURT:  This is the first time I saw this as

19   well.

20             MR. BLATCHLEY:  Yeah.

21             THE COURT:  Just to be very transparent, I

22   petitioned some colleagues.  No one's heard of this.

23             MR. BLATCHLEY:  Yeah.

24             THE COURT:  It's interesting, but scary.  I can

25   see challenges with it; I can see appeals to it.  And I do
```

1   want to talk about this as its own sort of discussion point.

2   Go ahead.  Tell me --

3            MR. BLATCHLEY:  So I was just going to say the

4   problem with their date, for example, is that it -- there's

5   a date.  And I'm not sure what I -- I entirely understand

6   what defendants mean by their class certification schedule,

7   but it sounds like they serve --

8            THE COURT:  But you kind of agreed to this

9   woven --

10           MR. BLATCHLEY:  We did.  And I will tell you just,

11  if I may, really briefly why --

12           THE COURT:  Sure, we might as well talk about this

13  now as well.

14           MR. BLATCHLEY:  -- why we did that.  The

15  problem -- it seems that defendants say, okay, you have to

16  produce your documents by a deadline right after we file our

17  class certification motion.  And we received defendants'

18  document requests today.  I've got -- imagine they believe

19  all of them relate to class certification, putting a

20  substantial completion date for plaintiffs that is about

21  four or five months before defendants' substantial

22  completion date.  It really ties and is really one-sided in

23  defendants' favor in that regard, again, if I'm

24  understanding the proposal correctly.

25           THE COURT:  Show me where on -- and I'm just

45

1    working off the summary chart on page 25 -- show me where

2    your understanding of the deadline they put on your

3    obligation to produce things related to class cert is.

4            MR. BLATCHLEY:  So, yeah, I think you actually

5    have to go a page earlier.

6            THE COURT:  Okay.

7            MR. BLATCHLEY:  There is -- page 23(3)(i)(ii).

8            THE COURT:  I see it here.

9            MR. BLATCHLEY:  Document production related, blah,

10   blah, blah, must be there.  And it's, again, a later -- I

11   think that's the only date that's pertinent to what we're

12   talking about, but they have -- you know, it's a document

13   deadline, then a deposition deadline.

14           And just so you understand why we agreed to this,

15   what I -- I don't like defendants' proposal.  I think it

16   doesn't make any sense.  I think, you know, the parties are

17   able to get the discovery they need whether it's related to

18   class certification.  I don't think you can break out class

19   certification versus other merits discovery.  I think that

20   has repeatedly been recognized by courts as something that

21   doesn't make sense.  But I think they were pushing it

22   because there was a concern that they would want to depose

23   our expert and not have what they need to depose the expert

24   by the time that they had to -- to file their opposition.

25   So I think that that's where that's coming from.

1    We were -- we were reluctant, but willing to

2    engage, again, because we're trying to get to the answer,

3    you know, an agreeable answer in good faith here, although I

4    think it doesn't make sense, certainly with respect to

5    document production and substantial completion.  Again, we

6    had that deadline almost immediately after we filed our

7    opening motion for class certification.  We have document

8    requests to defendants that we believe will be relevant to

9    class certification.  And if defendants aren't producing

10    them until after class certification is over --

11        THE COURT:  But their proposal -- their proposal

12    isn't that this is unilateral.  Their proposal is that

13    document production related to class certification must be

14    completed by January 6th.  I guess their point is they don't

15    have to give you your stuff until you've already filed your

16    opening brief?

17        MR. BLATCHLEY:  So I think that that's what that

18    means.  I didn't read defendants' proposal, at least in our

19    discussions, as being -- I read this as being related to

20    what our obligation would be to produce.

21        THE COURT:  To them.

22        MR. BLATCHLEY:  What they would use to oppose the

23    motion as opposed to what they might have to produce to us

24    in terms of, you know, documents pertaining to whatever it

25    might be, damages, loss causation, market -- whatever, you

1    know, those issues might be.

2         THE COURT:  Okay.  Let's put aside for a moment,

3    although I recognize this is an illusory thing to say, but

4    the question of the -- the unique woven class cert schedule.

5    Do you believe that the substantial completion date has to

6    precede your opening filing?

7         MR. BLATCHLEY:  Your Honor, I don't think we do.

8    We would like to get documents, as many as we can, before

9    the opening filing, but we don't believe that it's necessary

10   to be substantially complete before then.  We think we will

11   have enough with what our experts have been able to get from

12   something like third parties and from, you know, the

13   material that we already have to do the opening motion and

14   to get the documents that we believe will be produced by

15   that time.

16        THE COURT:  You want substantial completion to be

17   done before your reply filing?

18        MR. BLATCHLEY:  Yes, we want a substantial

19   completion deadline -- again, it's in the chart.  I believe

20   it's on December 12th?

21        THE COURT:  But that, yeah, that's if you get your

22   date.  If we had to make some adjustments, could we

23   adjust -- you know, I'll be really candid.

24        MR. BLATCHLEY:  Sure.

25        THE COURT:  I think the full substantial

1    production by December 13th seems ambitious.

2         I hear an audible snark coming from the

3    defendants' table.

4         But it seems unrealistic.  I'm cautiously

5    optimistic that we have seen the end of the list of issues

6    about which you can't agree and everything else will be

7    complete unanimity moving forward; but even if that were the

8    case, this is going to be a very large production.

9         So given that I don't think December 13th is a

10   realistic date, if we were to push things back in the

11   substantial production, how much time do you -- or

12   substantial completion of document production, how much time

13   do you want between the substantial completion deadline and

14   your reply?

15        MR. BLATCHLEY:  I assume if we're keeping -- I

16   think it kind of depends.  I'm just trying to, you know, if

17   articulating --

18        THE COURT:  You gave yourself just under two

19   months in this.

20        MR. BLATCHLEY:  Yeah, I think we have a 45-ish

21   opening opposition reply in our schedule.  I hope that's

22   accurate.

23        THE COURT:  Something like that.

24        MR. BLATCHLEY:  I think we would -- I think we

25   would want what we said in our -- in the proposal.  I think

1    that that timing is generally fine with, give or take,

2    60 days before we file our reply.  Does that make --

3             THE COURT:  So if you can have those documents 45

4    to 60 days before your reply, that's what you want.  And if

5    we have to adjust the -- this somewhat unusual design

6    backward in order to accommodate the substantial production

7    date, you are okay with it replicating its current pattern

8    as long as you have roughly 45 or 60 days between the

9    substantial completion deadline and your reply being due?

10   And you are okay with not having substantial completion

11   ahead of your initial motion for class cert filing as long

12   as there's a good faith on the part of the defendants to try

13   to get you the stuff you absolutely need?

14            MR. BLATCHLEY:  Correct.

15            THE COURT:  Okay.  Is there any -- I confess that

16   this is a new model to me, but that doesn't mean it's not a

17   good model, and I have a feeling I'm about to be persuaded

18   why it's awesome.  But is there anything else about this

19   kind of merged class cert discovery briefing schedule that

20   you don't like, other than just its relative lack of

21   familiarity?

22            MR. BLATCHLEY:  The -- so I don't like the fact

23   that we're breaking up or trying to break up class

24   certification document production in this matter.  I think

25   that that's something that does not make any sense.

1          THE COURT:  Well, that happens quite a bit.  I

2     mean, unless you push your class certification deadline all

3     the way back to your summary judgment deadline, it happens

4     quite a bit that you, at some midstream point, you file your

5     class cert motion, right, I mean, and that's inherent in

6     either version of this path that you've set, unless what you

7     are really advocating for is pushing class cert to the very

8     end.

9          MR. BLATCHLEY:  No, I'm not, Your Honor, at all.

10    We think we need to get the class certification motion, and

11    Rule 23 is crystal clear in this regard, as early as

12    practical.

13         And, again, just for context, the reason we were

14    willing to agree to this weird schedule, defendants

15    originally proposed having a year-long class certification,

16    nearly a year-long class certification briefing process,

17    which we, you know, we couldn't, we thought that was

18    unrealistic and against Rule 23; but in order to accommodate

19    the concern about, I guess, expert depositions and being

20    jammed, we thought that this was a sensible compromise just

21    on that piece.  So --

22         THE COURT:  But your agreement to the urgency of

23    this briefing universe assumes your victory on the

24    substantial completion deadline; and if you can't have that,

25    then we got to nudge it backwards some.

1          MR. BLATCHLEY:  Nudging the class certification

2     schedule backward?

3          THE COURT:  Yes.

4          MR. BLATCHLEY:  Yes, I think that that -- I think

5     that that would be -- I don't love it, but I can see there

6     might be -- again, I don't think there's dramatic moves from

7     where we are on those dates that we proposed.  I don't think

8     it makes sense.  I think, again, that while defendants might

9     have, you know, some arguments about why they think document

10    discovery should be an extraordinary long time period here,

11    I just want to remind the court that this is a company

12    that's done its own internal investigation.  It told

13    investors it reviewed 10 million documents in the course of

14    four months.  They can do the document discovery.  When it

15    suits their needs to be timely, they can do it.

16         THE COURT:  Okay.  Thank you.

17         All right.  Tell me what your thoughts are about

18    your creative pitch for kind of an interwoven schedule with

19    respect to class cert, Mr. Gibbs, and also tell me how soon

20    you could live with the substantial production deadline and

21    what changes, if any, you think that would necessitate

22    making to the proposed schedule.

23         MR. GIBBS:  I'd be happy to, Your Honor.

24         So I don't actually think it's that unusual.  I

25    don't know whether I've done it just like this in a

1    securities class action.  I've certainly done interim

2    discovery deadlines like that in other class actions.

3              THE COURT:  Oh, I've seen interim discovery

4    deadlines.  I haven't seen the weaving in with class -- with

5    expert work.

6              MR. GIBBS:  Well, and so the reason for that is

7    because of developments in the case law in class

8    certification in securities cases in recent years.  Expert

9    testimony, in my view, has become considerably more

10   important.  In fact, it's usually the only thing we're

11   really arguing about.

12             And so what I'm trying to ensure is that I get a

13   fair shot at taking the deposition of whoever they propose

14   is the lead plaintiff with documents and a fair shot at

15   deposing whatever experts they put forward in support of

16   their motion for class certification.  I assume if we put

17   any experts forward in our opposition that they will want

18   the same thing in return.

19             THE COURT:  For their reply.

20             MR. GIBBS:  So that's -- that's why we've done it.

21   I mean, the class certification process has become very

22   expert dependent.  I will be shocked if they don't have an

23   expert offering a report in support of their motion.  And I

24   just want a fair shot to depose them.  And I've described

25   for counsel a recent situation where we agreed to a briefing

1    schedule without any parameters or deadlines for these types

2    of expert matters, and I was told, great, our expert is

3    available seven days before your brief is due, have fun,

4    good luck.  And, you know, I don't want to be in that

5    position again.

6         THE COURT:  Well, I've been educated about this,

7    because I think in my -- in my experience, although I've had

8    several class cases before me, an increasing number, I

9    haven't had a securities case and I haven't seen the

10   centrality of the expert work.  And I understand that you

11   can't quite be on notice about the universe that they are

12   going to rely upon until you get their brief, which is what

13   triggers your expert work, which is what's going to trigger

14   their expert work and their reply.

15        MR. GIBBS:  That's exactly right.

16        THE COURT:  So given that, and given the fact that

17   although they find it perhaps curious, I'm not persuaded

18   that it doesn't make sense, but I agree with you that I

19   think December 13th is ambitious.  I agree with them that I

20   don't think it's fair for the substantial production date to

21   post-date their reply.  So help me pick something in

22   between.

23        MR. GIBBS:  Well, so I personally am indifferent

24   to when they do their class certification motion.  So the

25   only piece of that particular puzzle that I care about is

54

1    the substantial completion date.

2              THE COURT:  Mm-hmm.

3              MR. GIBBS:  And, you know, I can't tell you the

4    world will end if you give me something before April 30th,

5    but, candidly, I think that's actually fairly ambitious for

6    a case like this.

7              Counsel has said, in effect, the 300,000-plus

8    documents that they want from the Minnesota AG case is but a

9    drop in the bucket for this case.

10             THE COURT:  I don't know if they've said that.

11   They -- they haven't agreed that it's coextensive with

12   everything they might need.

13             MR. GIBBS:  He's suggested that's a --

14             THE COURT:  And it's not, because obviously --

15             MR. GIBBS:  -- relatively small production for a

16   case like this, which implies the case as a whole will be

17   much larger.  You know, I don't know what it's ultimately

18   going to be.  I'm sure that we're going to disagree about

19   what it should be.  I just -- I don't think there's some

20   massive difference to the plaintiffs whether it's

21   substantial completion on April 30th versus February 28th or

22   March 15th.  It could make a pretty big difference at my end

23   in terms of, you know, whether I'm killing my associates or

24   not.

25             THE COURT:  Mm-hmm.  Don't do that.

 1          MR. GIBBS:  I don't want to do that.

 2          THE COURT:  Okay.  Thank you.

 3          MR. GIBBS:  Thank you, Your Honor.

 4          THE COURT:  Let's go on to our next of many items.

 5          Okay.  Mr. Blatchley, can you come back?  Sorry.

 6     You are going to get your steps in, although at any point

 7     you could just hand the baton to one of your able

 8     colleagues.

 9          A little trouble that right out of the gate your

10     50 is their 84 on document requests.

11          MR. BLATCHLEY:  Oh.  Oh, sorry, Your Honor.

12          THE COURT:  Hopefully, there's an answer that you

13     both agree on about how many document requests you've

14     actually served.

15          MR. BLATCHLEY:  Again, it was -- our requests are

16     numbered 1 through 48.  There are subparts.  I am sure they

17     consider those to be unique requests.  We consider them the

18     same part of the request.  We can come to an agreement on

19     that --

20          THE COURT:  Okay.

21          MR. BLATCHLEY:  -- one way or the other.

22          THE COURT:  Okay.  Good.  I don't want to have to

23     mediate that.

24          So what happens if I say that you only get 100

25     document requests, which is what their request was?  Are you

1       going to withdraw the requests you've served?

2              MR. BLATCHLEY:  Again, assuming you agree that

3       each subpart is its own request, I think what we would -- if

4       you were to rule that, I think we would address that with

5       defendants on the meet and confer.  I think that, you know,

6       again, we -- we didn't understand defendants to have the

7       disagreement on the subpart on the initial requests.

8              THE COURT:  Okay.  How many requests for admission

9       have been served already?

10             MR. BLATCHLEY:  Zero.

11             THE COURT:  Okay.  So the only thing that's been

12      served that has a disagreement about limits is the document

13      requests?

14             MR. BLATCHLEY:  I believe that's correct.

15             THE COURT:  So I am not going to adopt a schedule

16      with no limit on document requests.  I think that that

17      encourages discovery that's disproportionate or risks being

18      even more disproportionate to the needs of the case.  But

19      help me guess -- help me understand what you think would be

20      an appropriate number.  It's not going to be 25.

21             MR. BLATCHLEY:  Well, Your Honor, I think just in

22      terms of being reasonable, considering the universe of what

23      we had served, I think we might at some point later in the

24      litigation require additional requests on issues that we

25      haven't learned about yet.  So we would ask that the number

1    be larger than what we have served to date, but it can be a

2    number in the range of half of the amount that we've served.

3            THE COURT:  So I -- your, at least, your goal in

4    your opening service was to be a large, a significant chunk

5    of the documents that you want.  And then what you are

6    looking at is clean up and additional things that you

7    discover?  It's not that this is batch one of an already

8    planned three batches?

9            MR. BLATCHLEY:  That is absolutely correct, Your

10   Honor.  And, again, the idea was to get discovery moving as

11   quickly as possible and, again, with the comment that I

12   think in these cases it's really more about the ESI

13   discussion than it is about the requests themselves.

14           THE COURT:  Okay.  I am going to do 160 document

15   requests.  I expect you all to figure out what that means;

16   and if you can't, bring that to me; but I have yet to have

17   to mediate that fight, and I think that this probably

18   shouldn't be the time that I have to decide what's a subpart

19   and what's not a subpart.  I think you guys can figure that

20   out.

21           I am going to do 75 requests for admission.

22           Let me say that to the extent this is my decision,

23   and I do not speak for Judge Davis, but if he suggests that

24   you bring discovery disputes to me, I am open to a request

25   to expand discovery limitations if there's a particular

1    showing for why that's necessary based on the actual facts

2    of the case.

3              So I don't just want you to view that as carte

4    blanche now.  You are going to have to make a pretty darn

5    good showing, but I am open to those requests if

6    appropriate.  I think it's better to start with some limits

7    and try to -- try to adhere to them.

8              So it's going to be -- what did I just say for

9    document requests?

10             MR. BLATCHLEY:  160, Your Honor.

11             THE COURT:  Oh, good.  That's what I wrote down,

12   but I forgot to circle it.

13             And 75 for requests for admission.

14             Let's talk about the limitations on depositions.

15   You all have proposed 250; you all have proposed 150.

16   There's a number right between those that I am tempted by.

17   Tell me why that's not workable.  200.

18             MR. BLATCHLEY:  Your Honor, that -- I can get into

19   the background of why we propose 250.  They had 300 for

20   plaintiffs' discovery in the consumer case.  But if Your

21   Honor wants to do 200, that sounds like a fine number.

22             THE COURT:  I want to do, yeah, I want to do 200.

23             And, again, if there's a reason, you know, let's

24   say you find the smoking gun witness and you need four more

25   hours, hopefully you could stipulate to something like that;

1    but if you couldn't, let me know.

2             Anything you want to be heard on on that front,

3    sir?  I don't mean to just let him have the podium.

4             MR. GIBBS:  No, Your Honor.

5             THE COURT:  Okay.  All right.  Okay.  You can be

6    seated again, sir.

7             I think we've got to talk about a few other things

8    that I probably need opposing counsel's insight on.

9             Let's -- all right, Mr. Gibbs.  Let's go to

10   deadlines for adding parties and deadlines for amending the

11   pleadings.

12            So it's my understanding that I think the

13   plaintiffs have recommended a post-fact deadline for adding

14   parties.  That is really not workable, in my opinion,

15   because if there were to be a party amended, which I think

16   frankly is not super likely, but if there were to be a

17   meaningful party added, we're just inviting a new entire era

18   of discovery and fighting about all the things that have

19   maybe been resolved already in the case.

20            On the other hand, I don't think 45 days from

21   today is particularly workable either because, in theory,

22   the thing that could trigger the addition of a party is that

23   they learn something that they don't know, and it seems

24   pretty unlikely that they are going to learn a whole lot in

25   the next 45 days if you are not able to really gear up

1    production faster than that.

2         MR. GIBBS:  That's a fair point, Your Honor.  The

3    only thing I would say is the reason we thought a fairly

4    short time line was appropriate is because given the nature

5    of the case.  The only -- the only reason they would

6    plausibly add a new party is if it's somebody else who

7    allegedly made a false statement that they think violates

8    10(b).  They already know who made the statements.  I don't

9    think discovery is going to uncover a whole new vein of

10   alleged false statements here.  So I just think it's very

11   unlikely.

12        And for the reasons you suggest, we don't think a

13   cut-off date after fact discovery is closed, but, more than

14   that, I think a party who gets added even very late in the

15   fact discovery process is going to argue they've been

16   prejudiced if, for example, a whole bunch of depositions

17   have been taken before they were added as a party.

18        So there's nothing magic about the 45 days.  My

19   concern is I don't want to be in a situation where a bunch

20   of depositions have been taken, a new defendant comes in and

21   says I need to go and redepose people who have been deposed,

22   because I didn't get a fair shot at asking my questions.

23        THE COURT:  Okay.  While you're there, what's your

24   position about whether the automatic deadlines in the

25   schedule, both to add parties and to amend the pleadings,

1    should require a showing of good cause or should be with the

2    agreement of the parties?

3              MR. GIBBS:  I think at this point -- well, I think

4    I think about them differently.  I don't think they need our

5    agreement to add a party.  Whether they should get the

6    court's permission or not, I don't really have a strong view

7    on.  I think amending the pleadings is different.

8              You know, the pleadings process in securities

9    cases is a lot unlike really any others.  And so I, you

10   know, I think it's fair to treat the pleadings here as much

11   more settled than in a typical case, and I would say for

12   that they should have to get our agreement or court approval

13   at this point.  They've had a very specific complaint

14   approved under some very important procedural rules; and if

15   they're going to change it now, we would want to be heard

16   about that.

17             THE COURT:  Okay.  And, presumably, although you

18   might not have a particular strong vote about adding a

19   party, I might.

20             MR. GIBBS:  Yes.

21             THE COURT:  Okay.  And when do you think the

22   deadline for amending the pleadings should be, for bringing

23   the motion to amend the pleadings, or if you agree to, if

24   you decide that their suggestion is appropriate, to

25   submitting that to the court and laying the table for the

 1    case?

 2              MR. GIBBS:  Well, with apologies, I don't remember

 3    whether we proposed a date on that or not.

 4              THE COURT:  Yeah, I think that you guys have a

 5    date of -- your date for amendment is after the close of

 6    discovery, which is confusing based on your general

 7    hesitation to have amendment.

 8              MR. GIBBS:  Yes, I understand, Your Honor.  I

 9    can't tell you that I know the thinking behind that.  I'm

10    just not sure.

11              THE COURT:  Okay.

12              MR. GIBBS:  Yeah, I just don't know, Your Honor.

13              THE COURT:  Okay.  I'm going to talk to opposing

14    counsel.  Before you sit down -- okay.  We'll talk about

15    privileged stuff in a minute.

16              MR. GIBBS:  Okay.  Thank you.

17              THE COURT:  Okay.  Mr. Blatchley, let's talk about

18    adding parties and adding pleadings.  My initial instinct is

19    this:  To pick a date for both that is sometime in the

20    relatively near future, but not so unreasonable that you

21    won't have received and processed any discovery.  I am fine

22    doing separate dates or joint dates.  I believe that you

23    should have to show cause for adding parties.  Hopefully the

24    amendments to pleadings could be agreed to, especially if

25    they're early.  I'm very concerned by a date that is --

63

1    coexists with the other fact discovery.  I don't quite

2    understand what your thinking is.  So help me see.

3              MR. BLATCHLEY:  So, and, again, Your Honor, this

4    is -- we're, plaintiffs are amenable to moving those

5    deadlines.  And I appreciate the court's concern and

6    Mr. Gibbs' concern about parties being added late.  We do

7    think that the universe of potential parties is obviously a

8    very small one.  And it was just a concern, the deadline

9    being late in the case, was a concern about there is new

10   scienter evidence.  For example, with respect to a party

11   that has not been named, that's one of the reasons why we

12   think there isn't really a prejudice to those individuals

13   because they will presumably be involved in the case

14   somewhat because the company is going to be involved, but

15   that --

16             THE COURT:  But let's say they're gone.  I mean, I

17   don't know who these people are, so this is utterly

18   hypothetical, but --

19             MR. BLATCHLEY:  And I don't think it's worth -- we

20   are fine moving those deadlines up.  I should have just said

21   that.

22             THE COURT:  Oh, okay.

23             MR. BLATCHLEY:  I just wanted to provide --

24   provide the court with a little bit of background on our

25   thinking behind those deadlines.  And, you know, I think so

1    long as -- as we have a deadline for amendment and adding

2    parties that is somewhere in the neighborhood of after

3    substantial completion, plaintiffs would be fine with that.

4         With respect to when that -- if that were to

5    happen, if we were to amend the pleadings, I'm almost

6    certain we would get a motion from Mr. Gibbs about that

7    seeking to dismiss that.  So I'm not sure if there's going

8    to be a real issue there in terms of the -- you know, at

9    least from plaintiffs' perspective, we're not going to amend

10   the pleadings or add parties without a very good reason to

11   do so.

12        THE COURT:  Okay.  So you would be -- you would be

13   in agreement with some sort of good cause requirement.  You

14   want the date to be after the date for substantial

15   production; and it's okay if it's the same date as long as

16   it's not too soon, and it's okay if it's not too far away.

17        MR. BLATCHLEY:  That -- that's accurate, except

18   with respect to we don't think there should be a requirement

19   showing a good cause.  I'm just anticipating I'm going to

20   get a motion requiring me to show that.

21        THE COURT:  Okay.  This is -- so how do you

22   envision it working if I weren't to require a motion to show

23   good cause?  You envision that you would file the proposed

24   amended complaint and that would shift the ball to their

25   court to move to disallow it, but either way I would, in

65

1    theory, be applying a good cause standard.  So isn't it

2    better to be kind of transparent about it?

3            MR. BLATCHLEY:  That's perfectly fine, Your Honor.

4    I just --

5            THE COURT:  Okay.  Okay.  Thank you.  Hang on one

6    second.  Let me see -- and I suggest that Mr. Gibbs'

7    prediction is correct, that given the unique nature of

8    securities litigation these are probably less likely than

9    sometimes, but it's better to be clear I think going

10   forward.

11           Okay.  I think that what I want to talk about now

12   is the privilege issues.  I want to talk about what I

13   perceive as two issues that are outstanding in anticipating

14   future privilege questions.  The first is whether -- whether

15   the defendants should be required to create a privilege log

16   as to either the privileged communications or work product

17   communications of -- between themselves or their

18   representatives and their counsel in the related cases in

19   all cases.

20           You've proposed that there is a kind of joint

21   exception to not require privilege logging related to this

22   litigation, but you don't want that proposal to extend to

23   post-complaint date communications in the other cases.  Is

24   that right?

25           MR. BLATCHLEY:  I think that that's correct, Your

1    Honor.

2                THE COURT:  Okay.  Tell me about this.

3                MR. BLATCHLEY:  And I think that to the extent it

4    would -- there's all things, I think we could certainly --

5    without giving up right away, the reason before that was --

6    was that, you know, listen, it's not a huge production log.

7    I don't think a lot of our requests are going to -- to

8    impinge on what they are doing in the related cases.  But

9    plaintiffs would agree, I believe, unless I get some yells

10   over here --

11               THE COURT:  Your Post-It's ready to rush over to

12   the podium.

13               MR. BLATCHLEY:  -- that we can agree that any of

14   the litigation in the MDL need not be logged.  Counsel in

15   that -- in that litigation would be fine not logging.

16               THE COURT:  Not logging from the triggering date

17   of the complaint forward?

18               MR. BLATCHLEY:  Yes.  Exclusively between the

19   parties and their counsel.

20               THE COURT:  Okay.  And that applies to work

21   product as well.

22               MR. BLATCHLEY:  Correct, Your Honor.

23               THE COURT:  Okay.  Good.  That's the line I was

24   thinking that makes sense.

25               Mr. Gibbs, do you want to talk me out of ruling in

1   your favor on that?  Your co-counsel thinks you should not

2   talk, perhaps.

3           MR. GIBBS:  I think, yes, Your Honor, I figure

4   I've been (inaudible).

5           THE COURT:  Sure, sure.

6           MR. GIBBS:  No, Your Honor, that's fine.  I think

7   counsel referenced only one of the related cases, but I

8   think what the court is proposing is --

9           THE COURT:  These related cases you don't have to

10  log from the date of the complaint forward.  I'm not talking

11  about other litigation, although I really doubt that it's

12  going to be part of document requests, completely unrelated

13  litigation, but the protection that you all extend to one

14  another is communications or work product post-date of this

15  complaint in any of these related MDL cases.

16          MR. GIBBS:  I think that would be fine, Your

17  Honor.  I just want to let the court know that in the

18  protective order that was entered in the consumer side of

19  the case by Judge Davis there is a provision in that regard.

20  I think it's -- I think it is driving at essentially what

21  Your Honor is proposing to do here, but I wanted you to be

22  aware of it.  I have a clean copy, if you would like.

23          THE COURT:  That would be awesome.  Thank you.  I

24  forgot to look for that.

25          MR. GIBBS:  But Mr. McNab thought of it this

1    morning.

2              THE COURT:  Yeah, can you bring that up?

3              MR. GIBBS:  The relevant language is on page 10 of

4    the protective order at paragraph 13.

5              MR. McNAB:  May I, Your Honor?

6              THE COURT:  Yeah.  Yeah, please.

7              MR. McNAB:  Thank you.

8              THE COURT:  Thank you.

9              MR. GIBBS:  And this one does not actually have

10   the limitation to these related cases, although --

11             THE COURT:  Page 10?

12             MR. GIBBS:  Page 10.

13             THE COURT:  Okay.

14             MR. GIBBS:  Paragraph 13, at the very bottom of

15   the page.

16             THE COURT:  Mm-hmm.  Okay.  So what do you think

17   the relevance is of the fact that --

18             Actually, do you mind grabbing a seat just so --

19             MR. BLATCHLEY:  Sure.

20             THE COURT:  We make our best recording from that

21   microphone, and I don't want to miss out if this is about to

22   be something we continue to discuss.

23             MR. GIBBS:  Thank you, Your Honor.

24             THE COURT:  Okay.  So are you -- are you

25   disagreeing with the line I just drew?

```
1                MR. GIBBS:  No, I'm not disagreeing with the line

2        you just drew.

3                THE COURT:  Okay.

4                MR. GIBBS:  I just thought you'd want to know that

5        there's an order --

6                THE COURT:  I do.

7                MR. GIBBS:  -- in a related case that has similar

8        language.

9                THE COURT:  Yeah, that a higher power has said the

10       same thing.  That's reassuring.

11               MR. GIBBS:  Yeah.  We were -- I was going to

12       propose that we just do what was done in the other case.  I

13       don't have a problem with adding the express qualifier that

14       it's these related cases.  That --

15               THE COURT:  Okay.  I will just to be consistent

16       with what I had said, but I think as a practical matter --

17               MR. GIBBS:  I agree.

18               THE COURT:  -- it will be a vanishingly small

19       privilege log of post-June 18th, 2017, communications that

20       are with you and counsel -- your client and counsel that

21       aren't in the MDL that would ever be relevant.  So --

22               MR. GIBBS:  I agree, Your Honor.

23               THE COURT:  Go ahead.

24               MR. McNAB:  Just a definitional thing, because we

25       talked a lot about these related cases and then we talked
```

1   about the MDL.  Earlier this afternoon these related cases

2   included the Minnesota AG case, and I think that that should

3   fall under this blanket description as well.

4           THE COURT:  Okay.  And do I assume that you

5   intended that?

6           MR. BLATCHLEY:  It wouldn't -- our discussion just

7   now I understand it should be just MDL exclusive of the

8   Minnesota Attorney General action.  However, I don't think

9   we would, you know --

10          THE COURT:  It might be the exception that

11  swallows the rule if we carve it out.

12          MR. BLATCHLEY:  Yeah.

13          THE COURT:  Okay.  Thank you.  Thanks for your

14  flexibility.

15          So it will be MDL and the related Minnesota

16  Attorney General action, as an appropriate way to describe

17  it?

18          MR. GIBBS:  I think so, Your Honor.

19          MR. BLATCHLEY:  That's fine, Your Honor.  Again,

20  in our letter to Your Honor we just pointed out there are

21  post-class period developments that could occur with other

22  counsel that we would be interested in seeing.

23          THE COURT:  Okay.  And those will be on a log, and

24  you can fight about it then.

25          MR. BLATCHLEY:  Correct.

1          THE COURT:  Okay.  Thank you.

2          MR. BLATCHLEY:  Thank you.

3          MR. GIBBS:  Thank you, Your Honor.

4          THE COURT:  Okay.  Mr. Blatchley.  If you need a

5    minute to consult.  Okay.  Let's talk about the Rule 502(d)

6    thing.

7          So I've done some research on this.  I've done

8    some reading.  It seems -- it seems like your position is

9    that they only get, in your mind, the protections of 502(d)

10   if they agree to do no privilege review whatsoever?

11         MR. BLATCHLEY:  Your Honor, let me just make sure

12   that I --

13         THE COURT:  Okay.

14         MR. BLATCHLEY:  -- I've clarified that for you.

15   I -- that was not our intent.

16         THE COURT:  Okay.

17         MR. BLATCHLEY:  And I apologize if we've been

18   unclear in that in any way.  It is not a no review

19   requirement in order to get the protection.  It was similar

20   to -- and I'm not sure if Your Honor had an opportunity to

21   read the letter we submitted to Your Honor on Friday.  It's

22   language like the one in the Target protective order saying

23   if you do some sort of streamline review, you get to invoke

24   the protection.  Again, we thought that was very consistent

25   with what the rule is supposed to do.  It's supposed to make

1    discovery less expensive, more expeditious.  We were trying

2    to encourage defendants to get us the documents quicker.

3    That's why --

4            THE COURT:  It's supposed to do other things too.

5    It's supposed to avoid expensive litigation about

6    inadvertently disclosed things.  It's supposed to reduce the

7    level of panic that defendants who are going to be producing

8    ginormous volumes of information might have even after a

9    privilege review.  So it's not that its value,

10   protectiveness or efficiencies, only come with some kind of

11   abdication of privilege review.

12           MR. BLATCHLEY:  Right, but, Your Honor, but the

13   whole idea behind the rule is so that you are not in that

14   situation, but the idea is to reduce costs and burden.  I

15   just haven't heard anything from the other side about

16   wanting to do that.  And so just in terms of allowing for

17   that protection, why not just tell us that you've done some

18   sort of limited review and you want the protection.  That's

19   all we ask.

20           THE COURT:  What if they tell you we've done a

21   super robust review and we want the protection and here's

22   our stuff in a timely fashion and it's not your concern how

23   we spend our own internal money?

24           MR. BLATCHLEY:  I think, again, the -- our problem

25   with that kind of language or that notion is just we're not

1    serving the purpose of the rule.  That's it.

2            THE COURT:  Okay.  Thank you.

3            I don't need to hear from you on that one.

4            MR. GIBBS:  May I just (inaudible) --

5            THE COURT:  Yes, you may.  You may.  One of the

6    first things I learned from Judge Rosenbaum is when I was

7    winning not to stand up, but I'm just --

8            MR. GIBBS:  My purpose is not to argue, but just

9    to alert the court there is also a provision covering this

10   subject in the protective order from the consumer case.

11           THE COURT:  Awesome.  Tell me where.

12           MR. GIBBS:  Page 9, paragraph 12.

13           THE COURT:  And are you -- do you think page 9,

14   paragraph 12 strikes the right balance?

15           MR. GIBBS:  We do, Your Honor.

16           THE COURT:  Thank you.

17           MR. GIBBS:  Thank you.

18           THE COURT:  Can I ask a question?  You seem to

19   suggest -- I guess the answer is always yes if I'm the one

20   sitting up here.  You seem to suggest in your letter that

21   letters weren't necessary and that I could just look at the

22   ESI protocol and the protective order to identify these

23   areas of disagreement.  Did I receive the ESI protocol and

24   the protective order in anything but your letter?

25           UNIDENTIFIED MALE SPEAKER:  No, Your Honor.

1           THE COURT:  Did it come to the court in some other

2     way?

3           UNIDENTIFIED MALE SPEAKER:  No, Your Honor.

4           THE COURT:  Okay.  We've spent a fair amount of

5     time trying to decide whether you'd filed something online,

6     whether you'd sent it to Judge Davis' chambers, whether

7     you'd sent it to me and I lost it.  So your point wasn't

8     that the letters were inappropriate.  It's that the advocacy

9     that was attached to A and B was not needed?

10          MR. GIBBS:  That's correct.

11          THE COURT:  I think -- yeah.

12          MR. MCNAB:  Your Honor, I guess as a member of the

13    local bar, it's been our experience that either you have a

14    motion or you don't have a motion and in connection with

15    26(f) and Rule 16 that the materials are presented to the

16    court the way, you know, the parties expect the court to

17    receive with here are the things we agree upon in a 26(f)

18    report, here are some things we agree upon, some things upon

19    which we don't agree in a proposed protective order.

20          I think that maybe it was the final submission of

21    the proposed protective order and ESI protocol by email from

22    one of the parties that made it less than crystal clear that

23    this was the last iteration.  We agree with them; we had

24    reached impasse; the parties had agreed these are the two

25    documents that we want the court to have.  We did disagree

75

1    with the parties submitting additional argument, if you

2    will --

3                    THE COURT:  Okay.  Got it.

4                    MR. MCNAB:  -- in the form of letter briefs.

5                    THE COURT:  But you thought it was appropriate for

6    me to receive those two exhibits in that form.  You just

7    didn't like the additional advocacy.

8                    MR. MCNAB:  The editorial, yes, Your Honor.

9                    THE COURT:  Okay.  Thank you.  You can be seated.

10                   MR. MCNAB:  Thank you, Your Honor.

11                   THE COURT:  So I think that I can address -- why

12   don't we just go through quickly what I'm going to do.

13                   I am not going to require production of the

14   attorney general production.  I thought a lot about this.

15   I've done a lot of review of both cases.  I think that I

16   have the authority to do so.  I think that it would probably

17   make sense on the part of the defendants, if they chose to

18   do so, but I don't believe that it is the most efficient way

19   to handle discovery in this case.  I don't think it's

20   actually going to promote any efficiencies.  I don't think

21   it's going to reduce the number of document requests, the

22   number of discovery disputes, and, frankly, I think it could

23   actually create some delay.

24                   If the defendants thought that the best way to

25   handle this was to turn it all over and say ask us if you

76

1     need anything else, that would be different, but that's not

2     what I'm hearing.  And they have reasonable thoughts about

3     why it is both over and under-inclusive and thoughts about

4     how it doesn't actually save them time.

5            I'm not convinced it's going to save you all time.

6     It's just going to get you what you really want a lot

7     sooner, which I appreciate.  And I am going to try to create

8     pressure on the defendants to make productions quickly, but

9     just because there's an already gathered pool that may

10    contain many, but not all, of the things you want doesn't

11    mean that's the right place to start.

12           With respect to substantial completion, I have to

13    spend a little bit of time looking at these dates.  I agree

14    that there needs to be a deadline for substantial good faith

15    attempt to get the document requests produced.  I suspect it

16    will be somewhere between December and April.  And what I

17    need to do is look through the way these dates weave with

18    the other dates for class certification to make sure that

19    everybody has the opportunity to do what they need to do.

20           I share the plaintiffs' desire to get this case

21    resolved quickly rather than slowly.  I also think it's

22    important to get discovery made as soon as possible so that

23    depositions can be facilitated.

24           I am sympathetic to the fact that some of your

25    team is getting ready for a big trial, but the defendants

1   are very well resourced, and I'm not -- there's not only a

2   finite number of lawyers in the universe that could help you

3   with this.  So I'm not persuaded that you can't do both

4   things at once.  It would be different if we had a much less

5   resourced party on the side of the defendants.  And I'm not

6   saying that limitations are no object, but I don't -- I

7   don't agree that that convergence is going to take all

8   pressure off.

9          I am going to adopt some version of the kind of

10   creative interspersing of expert discovery related to class

11   certification with class briefing.  It sounds like, unless

12   we had enough time to just do a fully multi-tiered process,

13   this is an efficient way to manage that, especially with

14   the -- what I've learned is the increasing centrality of

15   expert testimony in this arena, but I want to look and

16   figure out how I can make that work with the other things

17   I'm going to do to the production issues.

18          I've already told you about the limits I'm going

19   to impose on document discovery and requests for admission.

20   Those will be captured in this order, but you can go ahead

21   and use those as you're moving forward.

22          I am going to include a clear deadline to add

23   parties and pleadings with a requirement of a showing of

24   good cause.  Let me say that although there's a requirement

25   of a showing of good cause, I really would like you to agree

1    if there is a proposal to add a really obvious defendant,

2    especially somebody who has been in the mix all along and

3    won't really suffer undue prejudice, or to add to include

4    clarifying language or specific language.  Let's try to

5    agree about those sort of things.  I don't want to fight

6    just for a fight.

7            We've agreed, and I appreciate it, on what has to

8    be logged and what doesn't have to be logged in the

9    privilege issue.

10           I am going to embrace what I think is, more or

11   less, the defendants' position regarding 502(d).  I am going

12   to find similarly to as Judge Davis did that the 502(d)

13   productions apply, regardless of the zeal with which the

14   defendants choose to scour their documents before they hand

15   them over.  It will be an ambitious schedule, so there can't

16   be too much zeal there, but I don't think that the rule is

17   as narrowly construed as the plaintiffs advocate for, that

18   it -- that its efficiencies are only served by a significant

19   document production with relatively little culling.  I think

20   its efficiencies are served by reducing paranoia on both

21   sides in order to facilitate production, particularly in

22   massive -- not to threaten the defendants with the certainty

23   that these will be massive productions, but in cases that

24   give rise to massive productions, the more paranoid everyone

25   is about accidentally disclosing something that could be

1    read to weigh privilege, the more cumbersome that production

2    will become.  I think that's the real meaning of 502(d).

3    But it almost doesn't matter what the meaning was.  I'm not

4    necessarily an originalist.  It matters more how it applies

5    effectively in this case.  And so I find that applying its

6    protections, regardless of the exuberance of the defendants'

7    or of the plaintiffs' privilege review, is the appropriate

8    path to strike.

9         I am going to require something like we discussed

10   with respect to conversations about document requests.  This

11   is more or less what I expect, and I've got to mull over

12   whether to try to capture this in language in the 26(f)

13   report.

14        I expect there to be the service of document

15   requests that are as narrowly tailored as possible to get at

16   what you want, with the collective understanding that we all

17   share the responsibility for proportionality.

18        I expect that the defendants will respond not just

19   by raising every objection under the sun, but by trying to

20   tailor a response that can get at the important things.

21        I strongly expect parties to meet and confer

22   before you bring discovery disputes to me.  I am happy to do

23   my job and resolve discovery disputes, but I am always

24   disappointed if the briefing suggests that they're ships

25   passing in the night.  One side is objecting to what it

80

1    thinks the other one wants; the other side is asking for

2    something completely different.  That means you haven't met

3    and conferred.  So start meeting and conferring early.  Keep

4    it going up until you appear before me.

5            I ordinarily am very happy to use an informal

6    approach to discovery disputes and, if appropriate, I'm

7    willing to do it here.  However, I don't want that to mean

8    that you come to me at the drop of a hat.  So I'm trying to

9    strike the balance between really encouraging you to work

10   together and being available for you.  So I'm not going to

11   rule out informal discovery disputes if there's some

12   targeted thing we can do to make that happen.

13           I do expect the exchange -- it's not going to be

14   appropriate for either side, but I think this is probably

15   more directed at the defendant, not to share search terms

16   and custodians.  It is appropriate to have an ongoing

17   conversation about search terms and custodians.

18           I do not agree with approaches where either side

19   uses its own unilateral view of the case to frame what it

20   believes the appropriate scope of discovery is.  So I don't

21   expect to see that here, but sometimes an objection to the

22   discovery as being irrelevant is based entirely on one

23   party's own belief that its view of the case is the correct

24   one.  Obviously, that's not going to hold a whole lot of

25   persuasive weight with me.

1           As far as the timing on how to make this happen, I

2      want rolling production of documents, which means that this

3      is almost definitionally going to be a discussion, a

4      discourse, a dialogue to try to identify how to get the

5      documents that are needed and to try to identify custodians.

6           One last thing I will say is that I very much

7      believe that ESI protocols and fights about ESI terms and

8      custodians are about trying to figure out the best way to

9      get the documents that are asked for in document requests.

10     They don't have some separate life of generating discovery

11     that might not be asked for in a document request or that

12     might not be relevant to discovery.  So thinking about how

13     to tailor them to that end is the best way, and explaining

14     to me why a custodian or a search term is likely to produce

15     information that is the subject of an appropriate document

16     request is the best way to think about it, in my estimation,

17     and the best way to frame your advocacy if my optimism

18     proves unfounded and you are not able to work out all of the

19     areas of disagreement.

20          I think that I've foreshadowed either what I've

21     done or most of what I'm going to do.  Undoubtedly, I've

22     missed something.

23          Mr. Blatchley, why don't you go first and tell me

24     what you think I might have omitted and anything you want to

25     argue with me about.

1          MR. BLATCHLEY:  The one -- just, Your Honor, thank

2     you for your rulings.  The one thing I think that wasn't

3     discussed just now, which I would appreciate the court's

4     consideration of, is the privilege log deadlines.  At least

5     in the draft --

6          THE COURT:  Oh, okay.

7          MR. BLATCHLEY:  -- 26(f) report we had proposed I

8     believe it was 28 days after every rolling production.

9     Again, this is kind of part and parcel with our efforts to

10    encourage the parties to be forthcoming about -- about, you

11    know, producing discovery and producing privilege logs.

12         Defendants' proposal had privilege logs, no

13    deadline at all, interim deadline for producing privilege

14    logs and then a final production privilege log after the

15    close of fact discovery --

16         THE COURT:  Yeah, that won't work.

17         MR. BLATCHLEY:  -- which made no sense to us.  And

18    we just ask you to consider that and --

19         THE COURT:  So you are advocating for rolling logs

20    with each production?  So if a production generates, you

21    know, a hundred thousand documents, the 50 that have been

22    withheld should be the subject of a log within a month?

23         MR. BLATCHLEY:  Correct.

24         THE COURT:  Okay.  Thank you.  I'm going to ask

25    Mr. Gibbs what he thinks about that.

1           I share opposing counsel's observation that

2     getting the privilege log at the very end almost guarantees

3     a big fat fight at the very end.  So I'm trying to figure

4     out how to move it forward.  I can see that if we really are

5     going to have truly rolling production this might be

6     generating an awful lot of privilege logs, although I'm not

7     sure that's so bad because each one is, you know, its own

8     universe.  Tell me what you think.

9           MR. GIBBS:  Sure.  Two things.  The reason we

10     wanted to have a deadline, a final deadline after the close

11     of fact discovery is because plaintiffs want to reserve the

12     right to continue requesting new documents up until 30 days

13     before the close of fact discovery.  I can't produce a

14     privilege log before the documents are due.  If this,

15     whatever the time period is, applies to that final

16     production, then I suppose it's moot, but that was the

17     thinking behind it.

18           THE COURT:  Oh, you wanted time to issue your

19     privilege log after whatever the final production is?

20           MR. GIBBS:  Correct, correct.

21           THE COURT:  And is there a request to issue

22     document requests 30 days ahead of the end, so they can get

23     documents on the last day if needed?

24           MR. GIBBS:  That's my understanding.

25           THE COURT:  Okay.  Is that your plan?

1           MR. BLATCHLEY:  I believe that's correct.  I don't

2      want to misstate what the -- that sounds correct, Your

3      Honor.

4           THE COURT:  Okay.  So you want time to generate

5      that log afterwards, but you don't necessarily oppose

6      rolling logs?

7           MR. GIBBS:  I don't.  And to be clear, the

8      proposal was not that we withhold all of the privilege logs

9      until that final deadline.

10          THE COURT:  Okay.  I think there was a

11     miscommunication.

12          MR. GIBBS:  Yeah.  I apologize for that, Your

13     Honor.

14          THE COURT:  No.  That's all right.

15          MR. GIBBS:  We're fine with rolling privilege log

16     productions.  I didn't love the time, the specific time

17     frame they wanted to impose just because I don't know in

18     advance how big those logs are going to be.  They might vary

19     from one production to another.  You know, as long as people

20     are reasonable, I don't -- I don't have a problem with

21     setting some kind of deadline to make sure that they keep

22     flowing.  I just -- I don't know in advance how big the logs

23     are going to be for each production.  I don't know if it's

24     going to be concentrated in a single production.

25          THE COURT:  Okay.

1          MR. GIBBS:  I'm just trying to manage that

2     uncertainty.

3          THE COURT:  How about we say 30 days after you,

4     the rolling production, you prepare a privilege log, unless

5     the size of the withholding necessitates additional time, in

6     which case I expect you all to work together to figure that

7     out?

8          MR. GIBBS:  That would be fine, Your Honor.

9          THE COURT:  Okay.  Is that all right with you,

10    Mr. Blatchley?

11         MR. BLATCHLEY:  That sounds fine, Your Honor.

12         THE COURT:  Okay.  I'm going to have you back up,

13    because I sat you down before you were done with your list.

14         But tell me, while you are here, Any disagreement

15    you want to make with the lines that I've drawn or any

16    things you think I overlooked?

17         MR. GIBBS:  No, Your Honor.  I just have a

18    question --

19         THE COURT:  Okay.

20         MR. GIBBS:  -- about other dates further out in

21    the schedule.  We had different views about some of those.

22    My own view is I'm not sure it makes sense to actually

23    resolve things like summary judgment and trial dates.  And

24    for the trial date, in particular, this is an MDL.  We're

25    not going to try the case here, so I don't think it makes

1    any sense to set a trial date.

2              THE COURT:  Yeah, let's -- let's talk about this.

3    Thank you for pointing that out.  The list is very long.

4              Stay back up here for one second.

5              I recognize that there's a difference about

6    whether this case is -- where this case might be tried and

7    at what stage it might go back.  And I realize I totally

8    forgot to ask you about that, and that's important.  What's

9    your position about where it will be tried or might be tried

10   and when it needs to go back?

11             MR. GIBBS:  Yes.  Thank you, Your Honor.

12             So our read of the MDL rule is that it's just an

13   unconditional requirement that cases transferred to a

14   district like this, pursuant to the MDL rules, have to go

15   back to the transferor district for trial.  I don't think

16   there's any ambiguity in the rule about that.  We've cited

17   the *Lexecon, Inc., versus Milberg Weiss* case for that

18   proposition.  I haven't seen any authority to the contrary.

19   So in our view it's just a certainty that trial has to

20   happen in the transferor district.

21             At what point between now and trial the cases go

22   back, it appears to me it varies case to case and we don't

23   have a firm position on that right now.  We're trying to

24   balance the fact that this court obviously has some

25   familiarity with the matter, but I also am sensitive to the

1    fact that if the case is going to go to trial in a different

2    courtroom, we ought to give the other judge time to figure

3    out the case a little bit too, so --

4              THE COURT:  And will this whole case move as one

5    or will this case move in chunks to several other courts?

6              MR. GIBBS:  That's a good question.  If I'm

7    recalling correctly -- and I'm sure plaintiffs' counsel will

8    correct me if I am wrong -- I believe on the securities

9    class action side the cases were all filed in Louisiana,

10   with the exception of a bondholder case that was filed in

11   New York.

12             THE COURT:  Okay.

13             MR. GIBBS:  But the way I understand the sort of

14   lead plaintiff/lead counsel process, it's the lead

15   plaintiff/lead counsel have now subsumed the bondholder

16   claims within this case.

17             THE COURT:  And is the bondholder the IMG, or am I

18   mixing that up?

19             MR. GIBBS:  I believe that is, Your Honor.

20             THE COURT:  Okay.  So you think they all go to

21   Louisiana to be tried?

22             MR. GIBBS:  I do.

23             THE COURT:  Okay.  And you think there's no

24   question mark about the fact that they have to be tried in

25   Louisiana?

 1          MR. GIBBS:  That's my understanding of the rule,

 2     Your Honor.

 3          THE COURT:  And do you think that "tried" in the

 4     modern parlance also requires that they go to Louisiana for

 5     dispositive briefing or no?

 6          MR. GIBBS:  I haven't seen a rule to that effect.

 7          THE COURT:  Okay.

 8          MR. GIBBS:  I have seen cases transferred either

 9     before or during summary judgment briefing, which we've

10     cited in the papers.  I think if it were up to me, I

11     probably wouldn't do it in the middle of briefing on

12     dispositive motions.  I'd probably decide I think it should

13     go before or I think it should go after.  I don't have a

14     firm view on that right now.

15          THE COURT:  What do you think about me setting a

16     deadline by which the parties have to raise this issue to --

17     I mean, at some point we need that certainty of knowing

18     where this case is going to be tried and what judge is going

19     to be presiding over summary judgment.  What do you think

20     about, rather than setting these dates, we set sort of

21     aspirational a date for summary judgment and a date by which

22     this needs to be decided by Judge Davis?

23          MR. GIBBS:  "This" meaning whether it stays or

24     goes?

25          THE COURT:  I mean, who decides, in your

1    estimation, who decides at what stage it goes?  Judge Davis?

2            MR. GIBBS:  You know, I, actually, I think it's

3    the MDL panel.  I could be wrong about that, but I think

4    it's the MDL panel with input from Judge Davis.

5            THE COURT:  Okay.  I want to hear your perspective

6    on this question too.

7            Thank you, Mr. Gibbs.

8            All right.  Where do you think this case gets

9    tried?  Where do you think summary judgment happens?  Who

10   decides and when?

11           MR. BLATCHLEY:  Okay.  Thank you, Your Honor.

12           I think -- here's what I think plaintiffs'

13   position is on that, and we've articulated that in the

14   26(f).  We think -- just let me back up one second to just

15   correct a few things that I'm sure were entirely

16   inadvertent.

17           There were, let's see, six -- sorry -- five

18   securities cases filed.  *Craig*, which is the docket number,

19   the low docket number, that we have here was originally

20   filed in the Southern District of New York.  The second case

21   *Scott* was filed in Louisiana.  *Thummeti* was filed in

22   Louisiana.  *IMG* was also filed in New York, transferred to

23   Louisiana and then sent here.  Just for clarification

24   purposes.

25           It is correct that our client, the State of

1    Oregon, the lead plaintiff in this case, the only pleading

2    that they have filed in this case is the consolidated

3    complaint sustained by Judge Davis.  That is their first and

4    only pleading in this case.  They're statute -- you know,

5    empowered by statute, the private securities litigation

6    format to do that and to do, to have the power of a lead

7    plaintiff, to do a number of things that I don't think were

8    contemplated with respect to the MDL transfer in a lot of

9    the cases and certainly in decisions cited by defendants.

10           We cited to Your Honor the Manual For Complex

11   Litigation, which says one of the ways -- you know,

12   obviously, courts recognize that it's so much more efficient

13   if you are going to do all the discovery in one court if you

14   can be in that court for trial.  That's clearly more

15   efficient.  We cited a method that the Manual for Complex

16   Litigation has approved of doing that, which is asserting

17   venue is appropriate in this jurisdiction.  That's what we

18   did when we filed our complaint.  And those are the

19   arguments that we would make to keep the trial in this

20   case -- sorry -- to keep the trial in this court and before,

21   you know, Judge Davis.

22           We would also expect that there could be a

23   possibility of if -- and, again, this is I think the

24   technical question.  If the defendants want to move back to

25   Louisiana at any point before the closure of pretrial

91

1   proceedings, I think the way that they do that -- and,

2   again, I hope I'm not misstating the rule here -- is that

3   they would seek a request for suggestion from the court that

4   they do that, that Judge Davis would provide a suggestion to

5   the MDL panel -- that's the terminology I believe that's

6   used -- and he could say it should stay in Minnesota or

7   should go back to Louisiana at that time.  And I think that

8   that's the process that -- that would be followed.

9          And, again, I think there's also the option that

10  you could have discussions between the judges.  Obviously,

11  after *Lexecon* courts were trying to figure out how do we,

12  you know, make it more efficient where we have cases where

13  everything in a case has happened in discovery, how do we

14  get the trial there.  I think the way -- one of the ways

15  that courts have figured out how to do that is to say once

16  it is transferred back to the court in which -- that

17  receives it back can then transfer it back to, for example,

18  the District of Minnesota.

19         Again, I think we're both in agreement at this

20  stage that the case is properly here now and this is

21  something for much later.

22         THE COURT:  So when we say "much later," do you

23  think that summary judgment is included at least in the kind

24  of superficial assessment as opposed to the more nuanced

25  case specific reasons that you talk about, maybe this case

1    being an exception where it's appropriate to try it here?

2    But let's say it's a case where that's not true and it has

3    to return home perhaps to Louisiana.  Do you anticipate in

4    the ordinary course that that includes summary judgment

5    being resolved here and then it goes home?

6              MR. BLATCHLEY:  Correct.  Absolutely, Your Honor.

7    I don't think there's any reason to --

8              THE COURT:  Change that up?  Okay.

9              MR. BLATCHLEY:  Not after Your Honor and the court

10   has spent so much time --

11             THE COURT:  Yeah.  Okay.

12             MR. BLATCHLEY:  -- in discovery.

13             THE COURT:  Do you think that we ought to set a

14   deadline by which we talk this through, or should the court

15   butt out and at some point one of you is going to raise it?

16             MR. BLATCHLEY:  Yeah, I believe defendants will.

17   I've been trying to get an answer out of defendants about

18   when they plan on making that motion.  I was told that the

19   parties get to keep to themselves when they decide to make

20   the motions they want to make.

21             THE COURT:  Okay.

22             MR. BLATCHLEY:  But, you know, I don't think in

23   principle we would oppose that.

24             THE COURT:  Okay.  I'll consult with Judge Davis

25   about this and see if he has any two cents.  He's got vastly

1    more experience than I do in managing MDLs.  So thank you.

2         MR. BLATCHLEY:  Yeah.  I would -- yeah.  And I

3    would expect, you know, given the pending Minnesota Attorney

4    General action, the fact that we haven't yet seen a

5    settlement in the consumer case, that it doesn't make any

6    sense at all, especially after Your Honor and Judge Davis

7    has spent so much time on this matter, for it to go back to

8    Louisiana.

9         THE COURT:  Okay.  Thank you.  Anything else on

10   your list?

11        MR. BLATCHLEY:  I did have just quickly two other

12   things.

13        I really appreciate and respect -- respect Your

14   Honor's decision concerning the MDL -- sorry -- the attorney

15   general documents.

16        I did want to just raise as a preliminary matter,

17   because I heard Mr. Gibbs say that he would be amenable to

18   producing all the documents in that litigation that relate

19   to what we term in the -- in our complaint as kind of the

20   internal audit allegations and the document -- the expert

21   report that has been produced in the case reflecting the

22   $3.5 million overbilling number.  And we would request that

23   Your Honor consider requiring the production of those

24   documents right away.  We don't seem to have a dispute over

25   them, and I think it would make sense to order those just be

1    produced.

2           And then second is with respect to the

3    transcripts, the deposition transcripts in the Minnesota

4    Attorney General action.  I think all of those are going to

5    be at some point relevant, because we're talking again about

6    overlapping witnesses, especially with respect to the

7    experts in that case, which are, you know, going to speak to

8    those internal audit allegations.

9           And then the unredacted pleadings, we still don't

10   have access to those, which, again, these are court

11   documents.  We now have a protective order, presumably.

12   We'd ask that those be produced, again with the push of a --

13   push of a button.

14           THE COURT:  Okay.  Thank you.

15           MR. BLATCHLEY:  Thank you.

16           THE COURT:  Mr. Gibbs, three categories there.

17   The first category, that Mr. Blatchley perceives you have

18   agreed to produce related to the audit and the 3.5 million

19   observation.

20           MR. GIBBS:  I used that as an example of something

21   they could ask for that would be very different from asking

22   for wholesale production of the entire Minnesota AG case

23   production.  I stand by that, and I'm happy to meet and

24   confer with them about that.  I don't think it's appropriate

25   to ask the court to issue an order on the fly when we

1   haven't actually hashed out exactly what that means, what

2   the scope is, what I, you know --

3          THE COURT:  What you're talking about.  Okay.

4          MR. GIBBS:  Yeah.  I'm sorry.  I don't think it's

5   fair to ask the court to put me under a discovery order

6   based on a colloquy here in court.  I'm happy to meet and

7   confer with Mr. Blatchley; and if we actually are in

8   agreement on what we're talking about, then we will produce

9   it.

10         THE COURT:  How about the transcripts?

11         MR. GIBBS:  The transcripts of all the

12  depositions?

13         THE COURT:  The deposition transcripts.

14         MR. GIBBS:  Honestly, I haven't had a chance to

15  think about that.  I mean, the unredacted pleadings I think

16  is probably pretty easy now that we have a protective order

17  in place.

18         THE COURT:  That's a "yes" on the unredacted

19  pleadings?

20         MR. GIBBS:  Yes.

21         THE COURT:  Okay.  I want to order you to do

22  something, so I'm going to order you to turn over the

23  unredacted pleadings.

24         But let's talk about the deposition transcripts

25  for a moment.  This seems like a really good example of

1    something that's just smart to turn over, unless there are

2    individual witnesses there that really have nothing to do

3    with this case.  Presumably, you have the list of how many

4    people were deposed, have been deposed in the Minnesota AG

5    case, and you could take a look and see what you think about

6    those.  Right?

7              MR. GIBBS:  It depends on who you mean by "you."

8    I personally don't have the list here in front of me.

9              THE COURT:  Of course not.

10             MR. GIBBS:  Of course, my team does.  And I'm more

11   than happy to consider it.  I understand the court's

12   guidance on that.

13             THE COURT:  Okay.

14             MR. GIBBS:  And -- but I'm only hesitating because

15   I don't personally know what's in there, if there's

16   testimony about individual consumers and their private

17   information.  You know, I may need to be worrying about

18   that.

19             THE COURT:  Okay.

20             MR. GIBBS:  But I understand what the court is

21   saying about that, so --

22             THE COURT:  Okay.

23             MR. GIBBS:  I just need some time with my other

24   team.

25             THE COURT:  I'm not going to micromanage either

1    the concession that opposing counsel thinks you made about

2    the audit or the deposition transcripts, except I think

3    you've heard my thoughts.

4              I am going to require you to produce the

5    unredacted pleadings as soon as is practicable.

6              MR. GIBBS:  Thank you, Your Honor.

7              THE COURT:  So one and three.

8              Yeah.

9              MR. BLATCHLEY:  Your Honor, I was just going to

10   mention the privacy issues.  Again, we thought we have a

11   protective order.

12             THE COURT:  He's going to look.  I think he's

13   going to give them to you, but I'm an optimist.

14             And, obviously, if you think that there's one

15   that's relevant that you are entitled to and they disagree,

16   that's the perfect thing to bring to me.  You can -- that's

17   probably an ideally discreet issue to bring through the

18   informal process too.  So --

19             Anything else on your list?

20             MR. BLATCHLEY:  Just one other thing --

21             THE COURT:  Okay.  Come on up.

22             MR. BLATCHLEY:  -- which I think you just alluded

23   to, just for clarity of moving forward.  It -- it seems that

24   it would be at least plaintiffs' preference to be able to

25   bring disputes to Your Honor, discovery disputes, you know,

1   in the, obviously, in the way that that best suits the

2   court.  I just wanted your guidance as to, you know, how we

3   should go about doing that.  Is a joint conference call --

4   should we contact chambers?  Would you like letter briefs?

5   And I was just -- I want to make sure that we're proceeding

6   in the way that the court wants, and I think, you know,

7   we'll take your guidance in that regard.  I just wanted to

8   get that cleared up.

9          THE COURT:  Okay.  Sure.  Let me just say that in

10   my opinion it takes two to tango, meaning you both have to

11   agree that the informal approach is the appropriate one for

12   a particular dispute.

13          Let me also say that the vast majority of disputes

14   in front of me are raised informally.  I'll tell you what

15   that looks like and how it works, but most people choose

16   that.  In part, it's cheaper.  I think in a case like this

17   the real value is it's much, much faster.

18          I leave it to either of you to decide that it's

19   not appropriate in a particular instance.  And I'm not going

20   to, you know, cast aspersions or have negative inferences if

21   you are not willing to bring it to me in that situation.

22          If you do choose formal briefing and I think it

23   would have been much more efficient to bring it informally,

24   I will point that out after the fact, but I'm not going to

25   require that just because one party wants it, the other has

```
 1      to yield.

 2              I think that, you know, sometimes it can be really

 3      good for targeted things.  There's 15 people that were

 4      deposed in the Minnesota AG case; 13 of them you are willing

 5      to turn over; 2 absolutely not.  You've got two pages of

 6      reasons why they should; you've got two pages of reasons why

 7      they shouldn't.  That's just a perfect one.

 8              If anybody is using the word "sanctions," I'd

 9      rather see that in a formal motion.  I don't expect to be

10      seeing that word much in this litigation.

11              If I feel like the informal process has made me so

12      remarkably available that I've created a monster, which I

13      have absolutely done in other -- another one of my cases

14      right now, I'll cut you off and say that you have to use the

15      formal process, because maybe it will slow things down.

16      Again, I don't expect that here.

17              Here's the way it works as a practical matter.

18      The meeting and conferring requirement is equally robust no

19      matter how you bring the dispute to me.

20              Also, Judge Davis is really in charge of this

21      case; and if he would prefer to handle these matters instead

22      of me, I will find that out and let you know that.  If he

23      would prefer that you start with me, but sometimes he will

24      get involved, he gets to call those shots.

25              If you want to bring something to my attention and
```

1    you can't work it out, you call Kathy, Exhibit A, and she'll

2    give you a date on my calendar.  Sometimes immediately I can

3    get you in within just a couple of days.  Other times we can

4    give you a week, if you need it, to get your ducks in a row.

5           The day before, and I'd like it to be by 5 o'clock

6    the day before the dispute call, you submit letters to

7    chambers' email, CC opposing counsel.  These aren't

8    confidential settlement letters, but just email them to the

9    court.

10          Try to strike a balance between, you know,

11   effective advocacy and being concise, because keep in mind I

12   will be getting these 5 o'clock the day before and you have

13   no idea what else I've got the next day.  So don't give me

14   an enormous ton.

15          You are free to cite law, but you don't always

16   have to.  You all know better than I do that the vast

17   majority of these decisions are based on the unique facts

18   and balances of the specific case and there isn't always a

19   case right on point.  You don't need to include the stock

20   language about proportionality and the Rules of Civil

21   Procedure.  Assume I've got all that.  But if there are a

22   couple of cases that really grapple with the issue that you

23   are talking about, feel free to cite them.  The same thing

24   goes for the exhibits.

25          I don't want to engage in a lot of time about the

1    history of your disagreement.  I'd like to know where the

2    disagreement lands now and what you're asking me to resolve.

3            If there's a particular interrogatory in dispute,

4    feel free to cut and paste it right into the letter.  I

5    don't necessarily need, you know, the 50 pages of

6    interrogatories and the 50 pages of responses just to look

7    at the one that matters; but if there is something you'd

8    like me to look at that's an attachment, you may totally

9    attach it.

10           I don't set a page limit for these.  I've only

11   rarely regretted that.  But I do hope that, you know, it

12   will be kind of constrained to just what I need to decide

13   the issue.

14           It's also totally acceptable to raise multiple

15   issues in these letters, as long as you all are in agreement

16   about what those multiple issues are going to be.  I'm

17   always a little bummed out because it suggests a meet and

18   confer failure if one side is writing a letter about three

19   issues and the other side is writing a letter about two

20   completely other issues.  That means you all don't know

21   what's brought you to my chambers.

22           I get on the phone.  I hear everybody out.  I will

23   record the call for you.  I issue a ruling right then

24   followed by a very brief order.

25           Everybody always wants to know whether you can

1    appeal it, although nobody ever has appealed one of my

2    rulings from an informal discovery dispute proceeding.  I

3    don't have a prohibition against appealing them.  I'm not

4    sure how excited Judge Davis is going to be to see an appeal

5    from something that you bring to me through this process.

6    Because there isn't a lengthy opinion, he'd have to listen

7    to the transcript or you would have to, you know, just brief

8    it up for him.

9            So, you know, choose your fights wisely.  You all

10   know that discovery discretion is left very much to the

11   magistrate judge in the first instance, not that I'm

12   infallible, but I think that allows a certain room for

13   mistakes before Judge Davis really wants to hear about it.

14   I leave that to your wisdom.

15           So that's kind of how it works.  And, like I said,

16   it's up to you whether to use it.  And it's perfectly

17   appropriate to use it for some disagreements and not for

18   others.

19           Did that answer your question?

20           MR. BLATCHLEY:  Yeah, that's very helpful.  Thank

21   you, Your Honor.

22           THE COURT:  Okay.  Any questions that have been

23   raised for you all as a result of that?

24           MR. McNAB:  No.  Thank you, Your Honor.  Our

25   client has had the benefit of both formal and

1    informal dispute --

2              THE COURT:  That's right.  I think we've done

3    both.

4              MR. McNAB:  So we appreciate that.  Thank you.

5              THE COURT:  Okay.  Good.

6         Well, you've got the podium.  Anything else?

7              MR. BLATCHLEY:  I think that's it, Your Honor.

8              THE COURT:  Okay.  I'm going to remember something

9    I forgot to ask you just as soon as I go home tonight and

10   try to put this into writing.

11             Mr. Gibbs, anything else?

12             MR. GIBBS:  No, Your Honor.

13             THE COURT:  Okay.  I think we are in recess.  I am

14   going to talk to Judge Davis about just a couple -- so we're

15   not in recess.  I'm going to talk to just Judge Davis about

16   a couple other things that have come up today.  And if I

17   feel like things that he decides can't just be captured in

18   the text of the 26(f) or something else, I'll email both

19   counsel and just let you know about that or where to look

20   for it in an order or the minutes.  But, otherwise, if he's

21   in agreement with the lines that I've drawn in terms of

22   managing the case, and if he's in agreement that I continue

23   to be the appropriate recipient of future disagreements,

24   let's assume that to be true.  Okay?

25             Now we are in recess.  Thank you, all.

1          MR. BLATCHLEY:  Thank you, Your Honor.

2          MR. MCNAB:  Thank you very much, Your Honor.

3          MR. GIBBS:  Thank you, Your Honor.

4                    (Court adjourned.)

5                         *   *   *

6          I, Renee A. Rogge, certify that the foregoing is a

7     correct transcript to the best of my ability from the

8     official digital recording in the above-entitled matter.

9                    Certified by:  /s/Renee A. Rogge
                                    Renee A. Rogge, RMR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25