# Exhibit H

Page 1

1          UNITED STATES DISTRICT COURT
2              DISTRICT OF MINNESOTA
3
4
5

   _____
6  IN RE: CENTURYLINK SALES        )
   PRACTICES AND SECURITIES        )
7  LITIGATION                      )
                                   ) MDL NO.
8                                  ) 17-2795 (MJD/KMM)
                                   )
9  THIS DOCUMENT RELATES TO:       )
   CIVIL FILE NO. 18-296 (MJD/KMM) )
10                                 )
   _____)
11
12
13
14
15          REMOTE PROCEEDINGS OF THE
16    VIDEOTAPED EXPERT DEPOSITION OF BRUCE DEAL
17             FRIDAY, APRIL 24, 2020
18
19
20
21  REPORTED BY KIMBERLY EDELEN,
22  CSR. NO. 9042, CRR, RPR.
23
24
25

Page 2

1    REMOTE PROCEEDINGS OF THE VIDEOTAPED EXPERT
2    DEPOSITION OF BRUCE DEAL, TAKEN ON BEHALF OF THE
3    PLAINTIFF AND THE CLASS, AT 9:06 A.M., FRIDAY,
4    APRIL 24, 2020, BEFORE KIMBERLY A. EDELEN, C.S.R.
5    NO. 9042, CRR, RPR.
6
7    REMOTE APPEARANCES OF COUNSEL
8    FOR THE PLAINTIFF AND THE CLASS:
9                 BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
                  BY:  MICHAEL D. BLATCHLEY, ESQ.
10                     ---AND---
                  MICHAEL M. MATHAI, ESQ.
11                1251 AVENUE OF THE AMERICAS
                  NEW YORK, NEW YORK 10020
12                212.554.1400
                  MICHAELB@BLBGLAW.COM
13                MICHAEL.MATHAI@BLBGLAW.COM
14                ---AND---
15                STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
                  BY:  KEIL M. MUELLER, ESQ.
16                209 SW OAK STREET
                  SUITE 500
17                PORTLAND, OREGON 97204
                  503.227.1600
18                KMUELLER@STOLLBERNE.COM
19
20    FOR THE DEFENDANTS CENTURYLINK, INC., GLEN F. POST,
      III, R. STEWART EWING, JR., DAVID D. COLE, KAREN
21    PUCKETT, DEAN J. DOUGLAS AND G. CLAY BAILEY:
22                COOLEY LLP
                  BY:  RYAN BLAIR, ESQ.
23                4401 EASTGATE MALL
                  SAN DIEGO, CALIFORNIA 92121
24                858.550.6047
                  RBLAIR@COOLEY.COM
25    (REMOTE APPEARANCES CONTINUED ON FOLLOWING PAGE)

Page 3

1    REMOTE APPEARANCES OF COUNSEL (CONTINUED)
2    FOR THE DEFENDANTS CENTURYLINK, INC., GLEN F. POST,
     III, R. STEWART EWING, JR., DAVID D. COLE, KAREN
3    PUCKETT, DEAN J. DOUGLAS AND G. CLAY BAILEY:
4                   COOLEY LLP
                    BY:  CHRISTOPHER J. MARTIN, JR., ESQ.
5                   55 HUDSON YARDS
                    NEW YORK, NEW YORK 10001
6                   212.479.6484
                    CMARTIN@COOLEY.COM
7
                    ---AND---
8
                    COOLEY LLP
9                   BY:  CAITLIN B. MUNLEY, ESQ.
                    1299 PENNSYLVANIA AVENUE, NW
10                  SUITE 700
                    WASHINGTON, D.C. 20004
11                  202.776.2557
                    CMUNLEY@COOLEY.COM
12
13
14
15   ALSO PRESENT:  TROY JOHNSON, VIDEOGRAPHER
                    MICHAEL HARTZMARK, Ph.D.
16
17
18
19
20
21
22
23
24
25

```
                                            Page 7

 1                      BRUCE DEAL,

 2     having been first duly sworn by the reporter, was

 3              examined and testified as follows:

 4              THE WITNESS:  I do.

 5              THE VIDEOGRAPHER:  Okay.  You may proceed,

 6     Counsel.

 7

 8                      EXAMINATION

 9     BY MR. BLATCHLEY:

10          Q    Thank you, everyone.  And thank you,

11     Mr. Deal, for bearing with us on the -- on the

12     technical aspects and making yourself available

13     remotely.  I really do appreciate it.  I know how

14     difficult at times it is for everyone, so thank you

15     for doing this and being here.

16              If I could, can I get you again to state

17     your full name for the record.

18          A    Sure.  It's Bruce Deal, B-r-u-c-e, last

19     name Deal, D-e-a-l.

20          Q    And provide your home address, please.

21          A    Home address is 98 Hawthorne Drive,

22     Atherton, California 94027.

23          Q    So, Mr. Deal, I know you're an experienced

24     deposition witness, but I want to just, again,

25     because we're remote deposition, quickly just go
```

Page 84

1    kind of the key issue in some sense on those back

2    end corrective disclosures.

3            I realize that was a long answer but

4    hopefully that gave a little color around your

5    description.

6        Q    It was helpful.

7            So and, again, I hate to go back to the

8    elevator version, but, again, what you're saying is

9    that because of the nature of the disclosures, you

10   know, it's really not clear if they caused the stock

11   to decline?

12       A    That's -- I'm being a little -- I'm sort of

13   waffling a little bit on there just thinking about

14   it out loud.

15           I haven't -- put it this way:  I haven't

16   done an analysis to say was there other information

17   on those days that also caused it to -- the stock

18   price to drop.

19           So that may well be an issue and that's

20   sort of a form of what we were discussing before.

21   But I think to the extent -- let's just accept in a

22   more hypothetical sense that that was the only thing

23   that happened and there's no dispute about the fact

24   that the filing of the lawsuit, that did -- you

25   know, following those the stock price dropped.

Page 85

1           I think the problem with that from an
2    economic perspective and a damages model perspective
3    is that's not the same as a revelation of an actual
4    truth.   That's -- you know, you can certainly
5    imagine especially in this Wells Fargo environment
6    that that reflects concerns about oh, maybe there is
7    something out there.
8           And I discussed this quite extensively in
9    my report and I looked to equity analysts as to say
10   is this a substantive disclosure that would truly
11   suggest that the discounted value of the future cash
12   flows has meaningfully changed, or is this more
13   likely a signal of potential concern but not
14   something that's an obvious driver of fundamental
15   economic value here.
16          And my conclusion is it's much more of the
17   latter, that it's -- that it's not an allegation
18   that we didn't get the contract.   It's -- there's
19   nothing in it that was new in concept.   Allegations
20   of cramming and billing concerns have been around
21   for a long time.   But in that environment of Wells
22   Fargo it's obviously a concern of oh, maybe there's
23   something here, but -- but it's no more than that.
24       Q    I'll follow up on your statement there.   So
25   you're not suggesting -- you said it's not new in

Page 86

1    concept.  You're not suggesting that the

2    whistleblower lawsuit that was filed on the

3    corrective disclosure was known sometime prior to

4    that date, right?

5         A    That's correct.  And I'm surely not saying

6    that the market somehow knew six months before that

7    Ms. Heiser was going to file a lawsuit or had a

8    draft of it or anything like that.  I'm not aware of

9    anything like that.

10             It's a more general statement that in kind

11   of consumer facing businesses like this, and this

12   being, you know, telecom, Internet, consumer

13   services, all of that, these are very common

14   allegations.  I myself have been involved in cases

15   involving these kind of things, so...

16        Q    In those cases --

17        A    You cut out.  I don't know if your -- I

18   missed the first few words of that.

19        Q    I was saying -- can you hear me?

20        A    I can hear you, yes.

21        Q    Yeah.

22             You weren't a defendant in those cases,

23   were you?

24        A    No.  No.  Fortunately, I don't know if this

25   has been your experience as well, as someone who

Page 87

1    spends their life dealing with disputes all the

2    time, I've actually -- knock wood, I've never

3    actually been a party to one, so, no, no, this is in

4    my expert capacity.  Thanks for clarifying that.

5         Q    Right.  So, again -- but you're not saying

6    that Ms. Heiser's lawsuit, the facts contained in

7    that lawsuit, the other information disclosed on

8    June 16th was publicly known or somehow existed in

9    the market prior to that time?

10        A    Again, I agree with that certainly as to

11   the specifics.  I'm not aware that Ms. Heiser's

12   lawsuit or even any of the subsequent lawsuits that

13   are referenced in the Complaint, that those -- that

14   specific information about those specific lawsuits

15   was known.

16        Q    Got it.

17             And then certainly the same is true of the

18   July 12th corrective disclosure, you're not

19   suggesting that investors were aware of the

20   investigation by the Minnesota attorney general or

21   the, you know, facts set forth in the Complaint that

22   they filed prior to July 12th of 2017?

23             MR. BLAIR:  Objection.  Object to the form.

24             THE WITNESS:  I would certainly agree to

25   the last part of that because, again, I have no

Page 88

1    reason to think that investors knew about the actual

2    filing of the lawsuit.

3          I don't actually know about the first part

4    of your statement, which is was it -- was there

5    knowledge that there was some investigation going

6    on.  I don't know that.  I don't think it really

7    changes your question, as I understand the specific

8    things pointed to is the actual filing of the

9    lawsuit.

10          But I just -- I don't want to imply that I

11    know more than I do know about what was public about

12    that Minnesota situation.

13    BY MR. BLATCHLEY:

14        Q    Yeah.  So I just want to clarify that.

15          So did you look at whether there was any

16    public indication of the Minnesota attorney

17    general's investigation prior to July 12th?

18        A    I don't -- the answer is no in the sense I

19    don't specifically recall any information about it.

20    I think -- I do cite something -- as I recall, I

21    cite something else in Minnesota, I think

22    Senator Klobuchar's, but I think that may be

23    something, you know, different, as I recall.

24          But I'm not aware -- certainly, Mike, I'm

25    not aware of any -- I didn't specifically analyze

Page 89

1    what that lawsuit -- and that's not really my -- my
2    contention isn't that that -- anything specific
3    about that was known.  That's not my -- my view.
4         Q    Okay.  And then certainly if there was
5    anything, it would be in your Appendix B.  And
6    assuming there's nothing in Appendix B concerning a
7    Minnesota investigation prior to July 12th, we're on
8    the same page?
9              MR. BLAIR:  Object to the form.
10              THE WITNESS:  I think I agree with that.
11    I'm not aware of anything in Appendix B that would
12    suggest that it was, but I don't recall or I don't
13    remember specifically looking for that.
14    BY MR. BLATCHLEY:
15         Q    Yeah.  Investors in the public didn't know
16    about a lawsuit before -- the filing of the lawsuit
17    before it was filed.  How about that?
18         A    Were you stating that specific -- I mean, I
19    think I could probably answer it more generally if I
20    understand your question is I'm not -- I'm not
21    contending or I don't have any information to
22    suggest that investors knew about any of the
23    specific lawsuits that are mentioned in the
24    Complaint prior to them hitting the press release
25    times and things like that.

Page 90

1        I'm not -- this isn't the sort of oh,

2    that -- that information, specific information was

3    leaked two weeks before or anything like that.  I

4    don't -- I suppose that's possible but that's not

5    what I understand to be the facts.

6        Q    Okay.  And so, again, on -- let's just --

7    June 16th, setting aside June 19th for the moment,

8    and July 12th, of the three dates, the corrective

9    disclosure dates.

10        Are you with me on that?

11        A    So we're talking about the first and the

12    third?

13        Q    Yeah.

14        A    Yeah.

15        Q    And did you agree with Dr. Hartzmark that

16    there was a statistically significant stock price

17    decline on those dates following the corrective

18    disclosures?

19        A    Yes, I think, is the answer to that.  Give

20    me a second.  I just want to get to my table

21    summarizing that.

22        I've got a table -- or a figure here.  My

23    analysis is -- let me see here.  Here we go.

24        Yes.  I'm on Figure 12 just to reference

25    that on Page 85.  So both Dr. Hartzmark and I find

Page 91

1    statistically significant negative abnormal returns

2    on June 16th and July 12th.

3        Q    And so, again, your opinion referring back

4    to Paragraph 7, that second clause, what you're

5    really talking about is your opinion about the

6    Wells Fargo environment making it difficult to

7    determine whether those disclosures are actually

8    responsible for the stock price declines as a

9    measure of investor's harm.

10            Is that an accurate way to say it?

11       A    Put it this way:  I certainly agree that

12   the Wells Fargo environment is a factor that has to

13   be considered here.  That it has created a

14   heightened awareness and potential concern about

15   consumer-based companies, so I agree with that.

16           That said, I think the -- there's also a

17   more general concern here about the idea that can

18   the filing of a lawsuit with allegations, is that

19   itself truly a corrective disclosure, you know, or

20   is that simply -- even if we all agree, oh, that

21   moved the stock price, that people were worried that

22   oh, my gosh, a $12 billion lawsuit, what if that's

23   even ten percent likely to be true, you know, the

24   stock could go down.

25           But that's not the same as revealing the

```
                                              Page 123

 1                  FRIDAY, APRIL 24, 2020;

 2                       12:55 P.M.

 3

 4

 5                       BRUCE DEAL,

 6    having been previously duly sworn by the reporter,

 7        was examined and testified further as follows:

 8

 9           THE VIDEOGRAPHER:  Okay.  The time is now

10    12:55 p.m. and we are back on the record.

11

12                  EXAMINATION (resumed.)

13    BY MR. BLATCHLEY:

14        Q     Mr. Deal, I'd like to just start by I think

15    clarifying something you had said earlier, making

16    sure I have a correct understanding of what you were

17    saying.

18              So the question I have is is it necessary

19    to have a statistically significant increase in

20    price in order to show price impact?

21        A     That's an -- that's an interesting

22    question.  I think -- my experience is in practice

23    that it's not necessarily a requirement but it's the

24    most common starting point in a situation, like in

25    this case on the up side of inflation, looking for
```

Page 124

1    increases, obviously on the down side of the

2    corrective disclosures.

3             It certainly is a theoretical at least

4    argument that, you know, the inflation or the

5    statement itself might have otherwise inflated or

6    otherwise deflated the stock price, but other

7    factors caused it to go the opposite direction so

8    you don't observe it.

9             That -- I mean, conceptually that can

10   certainly happen.  There's no, you know, kind of

11   theoretical problem with that.

12            I think, again, my experience is as a

13   practical matter that's very, very difficult to show

14   and to identify that, so I wouldn't rule it out as a

15   possibility, but, again, as a practical matter I

16   find that to be typically a starting premise for any

17   price impact analysis.

18       Q    Okay.  So the starting premise is not a

19   requirement; is that right?

20       A    I certainly don't think it's a legal

21   requirement, necessarily, although I think

22   there's -- some of the cases that I'm aware of seem

23   to be suggesting that if you can't show price change

24   in the perspective direction, that itself is -- I'm

25   paraphrasing, strong evidence or whatever on it.

1          But I'm speaking more from a theoretical
2    perspective, you can imagine news that otherwise
3    would if it was the only thing known caused the
4    statistically significant increase or decrease, and
5    if there's a perfectly offsetting other information
6    theory, I think in practice that's very hard to do.
7        Q    So I guess I'm asking a little different
8    question.  Say the example that you just mentioned,
9    the offsetting information, it's certainly
10   possible -- or would you agree that it's possible
11   that you could have a false statement together with,
12   I guess we'll call it confounding information or
13   some other statement that offsets the impact that
14   the statement would otherwise have, would you agree
15   that that's a possibility?
16       A    Yeah.  I think it's at least a theoretical
17   possibility, sure.
18       Q    And in that scenario you wouldn't expect to
19   see a statistically significant increase in stock
20   price?
21       A    Not given the hypothetical you just said,
22   which is a sort of perfectly offsetting news in the
23   opposite direction.  Almost by definition that
24   wouldn't occur.  So the real challenge, of course,
25   is how do you identify the fact that the news that

Page 126

1    you're focused on would otherwise have caused it.

2            It's a form of the same issue that we've

3    been talking about of parsing out.  It's kind of a

4    in your face form of it in that if there's not even

5    a statistically significant movement in the expected

6    direction, I find again as a practical matter that

7    sets the bar awfully high and I don't see anyway in

8    this case it could be overcome.

9        Q    So here's what I want to go through.  So

10   it's certainly a theoretical possibility, as you

11   just said, that if you have offsetting information

12   you wouldn't expect to see a statistically

13   significant increase in the price even though there

14   would be price impact, correct?

15       A    Yeah.  Before I answer the question, you're

16   a little quiet to me.  I don't know if you are to

17   other people.  I don't know if there's a way to get

18   a little closer to the mike.

19       Q    Let me -- sorry.  Let me -- is this better?

20   Can you hear me?

21       A    Yeah.  I can hear you and that is a

22   little -- a little bit better for me.  Thank you.

23            But I think your question was with the sort

24   of -- you know, is it possible that there's price

25   impact given the presence of offsetting information

1    effectively.  I think it's a -- if I understand the

2    question it's essentially the same question, to say

3    could there be -- if you had a method that you could

4    identify that had this news come out on its own, it

5    would have had a price impact, but, again, it was

6    offset by some other information there, again,

7    theoretically, sure, I think that's possible.

8         And in that case, I don't know the case law

9    so there's a -- there's sort of another branch of it

10   but from a legal standard of what -- and I can't

11   really speak to that, but as an economic proposition

12   it's at least theoretically possible.

13       Q    Got it.

14            Okay.  So, again, let's just maybe take

15   your contract example, right.  You're talking about

16   you falsely announce a contract and that causes the

17   stock to go up.  Say the next quarter you say the

18   contract is doing just fine, right.

19            In that example there's a false statement,

20   right?  You're with me on my hypothetical?

21       A    Yeah.  The premise is that there really

22   never was a contract, as I understand your

23   hypothetical.

24       Q    Right.  Yeah.

25            And, you know, the company reports results

1   that are totally in line with expectations.  In that

2   scenario you wouldn't expect to see a statistically

3   significant stock price increase, would you?

4       A    I think what you're describing is sort of

5   what sometimes people refer to as a price

6   maintenance sort of situation, where if there was

7   some initial inflationary and you kind of repeat the

8   same information effectively, we wouldn't

9   necessarily -- it's not new news to the market at

10  that point in time, so we wouldn't expect that news

11  on its own -- to the extent it's essentially just a

12  repetition of previous expectations, I wouldn't

13  expect that to move the price, if that's your

14  question.

15      Q    And so we'll take that.

16          And then the next example is an event,

17  let's say, building on kind of the first

18  hypothetical, you know, the next -- the next

19  quarter, you know, analysts have their estimates,

20  and you have the contract that doesn't exist, but

21  the company also truthfully discloses that its like

22  major manufacturing facility has this huge fire and

23  the stock -- would you expect in that case, this

24  negative information, could have a, you know --

25  could decline -- could cause a stock price decline,

Page 129

1    even a statistically significant one, and there

2    could still be price impact?

3         A    Let me just repeat that.  So I got the fire

4    part of the hypothetical.  Are you saying on the

5    same day they also disclosed that -- when they

6    disclosed the truth that they never had the

7    contract?

8         Q    No.  They're lying about the contract

9    again.

10        A    Well, I guess -- I think it's sort of back

11   to the same example.  I think what you're describing

12   is a form of the price maintenance, that with the --

13   with the fire it goes down and you expect that to go

14   down, but for that there's not, let's say in a

15   perfect world you're able to figure that out.  Okay.

16   That's the only thing that moved it and it moved it

17   exactly what you would expect and therefore --

18            Again, I think it's price maintenance.  To

19   the extent there's a price impact, again, I think

20   you're sort of stepping over the line a little bit

21   into legal territory a little more than economic

22   territory.

23            I mean, I agree as an economist that had

24   you disclosed that you didn't have a contract, we

25   would expect it to go down.  You repeated the same

Page 130

1  false information so nothing happened.  It wasn't a

2  change in expectations.  Whether that qualifies as

3  quote/unquote price impact is I think essentially

4  kind of a legal question.  But, again, I agree that

5  but with different news the price could move.

6      Q    And, again, I guess just so I'm clear, you

7  agree to the premise that -- I don't want to comment

8  with counsel that you could have a significantly

9  significant decline, say the fire example, you could

10  introduce another false statement on that date, say

11  we got another new contract, when you really didn't,

12  and the overall price decline could be statistically

13  significant in a negative direction, but there could

14  still be price impact based on that false statement.

15          Do you agree with that?

16      A    I think I followed your -- your somewhat

17  increasingly complicated hypothetical, but I think

18  you're stating it as clearly as you can state it so

19  I'll give you credit on that.

20          Again, I think the answer is yes, in that

21  what -- the challenge, of course, is being able to

22  identify and measure that price impact.  But from a

23  conceptual perspective, you know, super bad news

24  that dropped the stock price, combined with a lie

25  that should have increased it by a bit, you know, it

Page 131

1    may be kind of initially mapped in there by the big
2    drop, but one has to propose a method to actually
3    show how you would parse that apart.
4            I think it's easy to just sort of
5    theoretically say that that's true.  It's very
6    difficult to actually do that.  But I don't
7    disagree, it's conceptually possible.
8        Q    Okay.  And like you just mentioned, it's
9    very -- or you were saying it's difficult to parse
10   those different effects out, and that's not
11   something you attempted to do here in your report,
12   right?
13       A    I certainly didn't attempt to literally do
14   the parsing and quantify that.
15           I did do things related to that as we
16   talked about to identify the confounding information
17   on days I did -- again, I did do the initial event
18   study to identify kind of the starting point of how
19   many days even went up, versus these four it went
20   down, which is eight, versus which no significant
21   change, which is the remainder, so all these things
22   speak to that but I didn't literally do the parsing.
23       Q    Okay.  And just one last point.  I think
24   you're going to agree with it.  I don't think it's
25   controversial.  Suppose in our, again, hypothetical

1  example we falsely mask the contract on day one --

2  let me try something else.  Bring us back to our

3  contract example.

4          Say my contractual partner, Company B,

5  announces -- falsely announces that we got a

6  contract and Company A, our company, that we were

7  talking about, their stock inflates in response to

8  that news.  And you have the next quarter

9  Company A -- let me just do this again.

10          Company A affirms the false contract.  You

11  wouldn't expect a statistically significant increase

12  in price in that example, would you?

13     A    I think the answer is I wouldn't expect it,

14  but just to make sure I get your hypothetical, your

15  partner announces it, you don't deny it in quarter

16  one, both -- both stocks go up.

17          The next quarter you again -- you may

18  affirmatively say yeah, I mean, it's a lie but you

19  say yeah, we do have this contract out there.

20     Q    Yeah.

21     A    With the market having already

22  quote/unquote baked into the price --

23     Q    Yeah.

24     A    -- the expectation that you got it, I

25  wouldn't expect to see an incremental change unless

Page 133

1    there was some -- it was a bigger contract --

2         Q    Right.

3         A    -- or something like that, but if it's just

4    literally a repetition of the news, even if they

5    didn't make the original false statement but didn't

6    make the denial of it, the market may well have

7    learned of it that way.

8         Q    Okay.  So let's say in our hypothetical --

9    I'm trying to think.

10              So we have -- we have a contract and we

11   truthfully have the contract and we announce the

12   contract.  And the following in between quarters the

13   contract is broken by our partner and it turns out

14   they're suing us.

15              It's a total disaster and we're filing our

16   annual report the next quarter, and it requires us

17   to disclose literally that fact and we don't say

18   anything, would you expect a material increase in --

19   I'm sorry, a statistically significant increase in

20   price based on that omission?

21              MR. BLAIR:  Object to the form.

22              THE WITNESS:  I -- I think I understand

23   your hypothetical.  I think you meant decrease but I

24   understand the point.

25              It's sort of you have the truth.  This

Page 134

1    contract has fallen apart.  You're positing a legal
2    obligation to tell people that and you don't.  I
3    wouldn't expect at that point -- the market is still
4    operating under the understanding that you do have
5    it until you actually disclose it, so I wouldn't
6    expect it to drop until somehow it's disclosed.
7    BY MR. BLATCHLEY:
8        Q    And in that impact the false -- sorry, the,
9    I guess, the actual admission would have a price
10   impact, it just wouldn't be reflected as a
11   statistically significant increase in price?
12       A    Again, under your hypothetical you would
13   never expect an increase in price.  I think you're
14   talking about the opposite, a decrease in price,
15   right.
16       Q    I was -- I think we might be passing each
17   other.
18            No.  That's the point.  It's not -- I'm
19   talking about the impact from the false statement.
20       A    I thought in your statement it was the
21   market knew we had a contract, the contract falls
22   apart.  When the market learns the truth of that, I
23   expect the stock to drop.
24       Q    Yeah.  Sorry.  Let me clarify.
25            We have the contract.  We truthfully have

Page 135

1    it.  We announce it.  Our stock price has gone up.

2        A    Yeah.

3        Q    During the quarter the contract falls

4    apart.  It's a disaster.  We're required to disclose

5    those facts in the following quarter.  We don't

6    disclose those facts.  Okay.

7        A    Right.

8        Q    Would that failure to disclose, that

9    omission, be expected to cause -- all else equal, be

10   expected to cause a significant increase --

11   statistically significant increase in price?

12       A    I think the answer is no.  I think the way

13   you're phrasing that -- it's sort of if they had

14   done what they were supposed to do, it would have

15   gone down?  It does go down but you're asking do I

16   expect it to go up, no, I don't expect it to go up

17   in that case because it's essentially not changing

18   the mix of information.

19       Q    And you're saying -- again, the premise of

20   a lot of your opinion is that there's a physical be

21   it quantifying or measuring that mix of information.

22            Is that a fair statement?

23       A    I certainly agree with that, that there's a

24   lot of information.  You have alleged 55 days of

25   inflation, 52 of which where they expected to move

```
                                              Page 150
 1   adds -- that in and of itself is a challenge in this

 2   case to which there's nothing in the damages model

 3   that would deal with that.

 4        Q    So let's talk about the fear, uncertainty

 5   and doubt for just a second.

 6             Can you tell me where that comes from?

 7   What does that mean?

 8        A    Well, the first time I heard it was very

 9   early in my career in some of the Microsoft

10   litigation where the competitor might try and create

11   a fear, uncertainty and doubt about a competitor's

12   product, for instance.  Our word processor is great.

13   You know, theirs has all kind of problems.  There so

14   you're kind of creating -- the first I heard of this

15   acronym FUD, F-U-D, and -- but it was in this

16   environment of, you know, I'm not sure if they're

17   really going to be able to make their release, this

18   new version, or will it fix the bugs, will it do

19   those kind of things.

20             So it stems from that.  But I think it's

21   appropriate to think about it in this case as well,

22   where Wells Fargo, I think, as they made actual

23   disclosures of fines being paid, things like that, I

24   think it's fair to say it was a significant issue at

25   Wells Fargo.
```

1          And in that environment if one sort of
2    creates an atmosphere to say this might look like
3    that, meaning this situation might look more like a
4    Wells Fargo, that would be using that situation and
5    the uncertainty around it, well, maybe it is, maybe
6    it isn't.  Boys, if it's that, that's going to be
7    bad.
8          It's that environment that -- and I think
9    that's pretty clear in this case, that when I look
10   at the actual press releases, when I look at your
11   Complaint, there's a lot of references to Wells
12   Fargo in there.
13         In my experience that would be, you know,
14   kind of equivalent to where I first saw this decades
15   ago.
16   Q    So let me just follow up on a few points
17   there.  The context in which you saw -- you're
18   referring to Microsoft.  Is that like the Microsoft
19   antitrust matters?  Am I right about that?
20   A    Yes.
21   Q    And just to be clear, that wasn't in the
22   context of loss causation in a securities class
23   action, right?
24   A    I certainly agree with that.  I mean, I
25   don't recall whether there was any securities class

Page 152

1    action as part of that.  I didn't personally work on

2    any of those if there were.

3            But it's a much broader concept than

4    something that's specific to securities class

5    action, that's for sure.

6        Q    Yeah.  I'm just not familiar with it.

7            So, you know, it's helpful for the

8    explanation.  Again, it's in the antitrust context

9    that you first learned of this term, and in that --

10       A    Well --

11       Q    Yeah.  I'm trying to see what it means in

12   terms of securities practices, because I've never

13   heard the term used in connection with securities

14   practices.

15       A    Yeah.  I mean, to be clear it's not an

16   antitrust specific term by any stretch.

17       Q    It's usually -- yeah.

18       A    It may have come up in those antitrust

19   cases as part of what are the competitive or

20   allegedly anticompetitive practices of Microsoft.

21   But it's a much more general concept of either

22   creating fear, uncertainty and doubt, which was at

23   least the allegation in Microsoft, that they

24   affirmatively created these -- this environment.

25            It would be as if your firm -- and I don't

Page 153

1   recommend you doing this, and I'm not suggesting

2   that you do it, but if you were to say oh, Cooley,

3   those guys aren't going to be around for very long.

4   They got some really terrible attorneys, or I've

5   heard that -- you know, it's that sort of, you know,

6   kind of rumors or fear just kind of creating this

7   environment where then you are able to capitalize on

8   that.

9           I'm not alleging -- I'm not alleging.  I

10  sound like a lawyer.  I'm not suggesting that, you

11  know, you as the plaintiff lawyers or whatever had

12  anything to do with Wells Fargo.  But that's an

13  example of an event that will create an environment

14  of fear, uncertainty and doubt, even if it's not an

15  intentional -- initially an intentional direction at

16  CenturyLink.

17          I do see, based on kind of the equivalency

18  in the tech industry where FUD starts, I do see some

19  equivalency in the way the headlines seem to have

20  come out, the press releases, things like that, an

21  attempt to really tie the allegations in CenturyLink

22  regarding, you know, cramming as we've been

23  describing it, to the Wells Fargo situation.

24          So it has analyses there of this might well

25  be that, or here's a potential $12 billion lawsuit.

Page 154

1    So I do think that there's some real analogies

2    there.   But it's not something that one would

3    necessarily expect to see.   It's not specific to

4    antitrust.   It's not specific to securities class

5    actions.   It's more of a general phenomenon.

6        Q    So -- and again, the Microsoft context is

7    Microsoft was going around creating this

8    environment, and that was an anticompetitive thing

9    that they did wrong in that case?

10       A    I don't remember how those specific

11   allegations got resolved.   I mean, there were lots

12   of things in the Microsoft case, so it was part of

13   the mix of what are the tactics that Microsoft is

14   doing and what of those are legitimate.

15           But I would also say it wasn't only a

16   Microsoft tactic.   It's something that, with all due

17   respect to my brother here in Silicon Valley, it's

18   something that's been done a long, long time in

19   tech.   It's a very common situation.

20           And it's not just limited to tech, too, but

21   if you can create some FUD out there -- and even if

22   you didn't create it, if you can capitalize on it,

23   so, you know, let's say some third law firm failed

24   and it's like okay, well, that creates a whole worry

25   environment, again, if you can kind of capitalize

Page 155

1    that on by suggesting that somehow, you know, Cooley

2    or whoever is more like that, that would be a way of

3    you not creating the FUD environment, but perhaps

4    trying to capitalize on it.

5              Again, this is all completely hypothetical

6    to be clear on the record.

7    Q    Yeah.  I'm just trying to say, because this

8    concept is kind of, you know, a key part of your

9    report and I'm trying to understand it.

10             So you're not saying plaintiffs created

11   this environment, right?  That's not what you're

12   trying to say?

13   A    I agree with that.  The environment was

14   really created by Wells Fargo presumably, you know,

15   whatever -- potentially their actions but certainly

16   we observed with Wells Fargo in my limited

17   experience and my reading of the press reports and

18   things, and I cite a little bit in my report, I

19   mean, they paid very large fines, for example.

20             And I understand that they reported, you

21   know, large layoffs of people.  And, I mean, I think

22   it's fair to say it was a real thing at Wells Fargo

23   there.  So I don't have any reason to think that,

24   you know, lawyers of any sort created that.

25             But it did create a different environment

1  before and after that suddenly the question of is

2  this limited essentially to Wells Fargo or is this

3  something that's much more widespread and we should

4  have broader concerns.

5      Q    So have you -- is there academic research

6  quantifying this concept that you're taking from

7  these other context?

8      A    I'm not sure what even you mean,

9  quantifying.  You mean describing FUD as a concept

10  and how it can be used in an anticompetitive way?

11      Q    Yeah.  Or measuring it.

12      A    Certainly I -- again, I can't cite as I sit

13  here right now, but I know that there -- well, to

14  the best of my recollection there was and there is,

15  therefore, existing research in -- as I recall in

16  the context of Microsoft and some of these kind of

17  antitrust issues that FUD is something that is

18  explored in the research.

19          I can't cite specific papers and things

20  right now but I have a recollection that it's a

21  topic that's explored.

22          I'm not sure what exactly you mean by

23  "quantified."  I mean, I'm not sure how one would

24  exactly quantify it as you're describing.  I mean,

25  it's a measure.

Page 157

1          So -- but it certainly -- it is something
2     that, again, to the best of my recollection the
3     researchers and others have -- have analyzed in
4     various contexts.
5          Q    So maybe this is a better question.
6     Outside of the Microsoft experience that you
7     described, have you studied FUD?  Like is that
8     something that you're holding yourself out as an
9     expert on?
10         A    I'm not sure that one ever thinks of
11    studying FUD specifically.  I certainly have had
12    that -- I certainly had the concept of FUD.  I -- I
13    definitely analyzed that in other cases.  Again,
14    it's a pretty common aspect in the technology
15    environment.  I can't necessarily think of the
16    specific cases --
17         Q    Yeah.
18         A    -- where it's come up.  But I'm
19    underscoring the fact that it's not -- I mean, I
20    appreciate the fact maybe it's a new concept in your
21    experience there, but in terms of is this something
22    that, you know, almost anybody in the technology
23    industry, for instance, back in the '90s and since
24    then, if you said oh, you know, look at that FUD,
25    you know, that Cisco is spreading or whatever, I

1    it somehow paints a reputation of the company.

2         Q    So, again, turning back to our disclosure,

3    again, on June 16th, you're saying that the FUD is

4    at some level responsible for the cause of the

5    decline.  Is that -- is that right?

6         A    Close, I think.  I'd say this post Wells

7    Fargo -- and by "post Wells Fargo" I mean after some

8    of at least the initial information about Wells

9    Fargo was coming out, I think it's fair to say that

10   that increased the concern or potential concern by,

11   you know, customers, investors, others, about, you

12   know, kind of issues associated with unauthorized

13   charges or accounts or variations of that.

14            So the environment is -- has this situation

15   in it, this FUD situation in it, and I think that

16   when I view the stock price reaction and I

17   understand the context and I look at the analysts'

18   feedback, it does -- it is consistent to me with the

19   market -- the heightened uncertainty because the

20   market was aware before this of general allegations

21   of cramming as we've talked about.

22            I think it does explain the environment in

23   which we observe stock price decreases as the market

24   would be concerned about that.  Then when I look at

25   the analysts' response to it, I see many of the

Page 163

1    analysts themselves saying this seems like it's a
2    reaction to, you know, concerns about Wells Fargo
3    and uncertainty.  We don't see it -- many of them
4    saying we don't see it as being a big deal
5    necessarily.  I'm obviously paraphrasing.  They
6    don't use those exact terms.  Or as significant, or
7    what would be consistent with the type of decline in
8    stock price.
9          So I view it as why do I see a pretty
10   significant stock price decline, even setting aside
11   other news.  If one just accepts the simple premise
12   that it was associated with that, why would that be.
13   I see the FUD environment out there and to me that's
14   consistent with it.
15         But, again, it's a broader -- it's a
16   broader concern of just the fact that these are
17   lawsuits anyways, so even if it didn't move as much
18   as it did, it could still be a concern.  But I think
19   the FUD helps explain the environment in which one
20   does observe an increase and some significant
21   decreases.
22     Q    Again, it's one of the contributing causes
23   of the decline in the FUD environment?
24     A    I think that's a fair statement, yeah, that
25   I think that the FUD environment is -- it allows one

Page 164

1   to understand what otherwise might not have caused

2   as big a stock price decline, why do we observe as

3   big a stock price decline as we do on those days, so

4   I think that's fair.

5        Q    And your opinion is, you know, the FUD kind

6   of environment didn't cause the stock price decline

7   prior to June 16th, right?

8             MR. BLAIR:  Object to the form.

9             THE WITNESS:  Well, I haven't studied that.

10  I focused on the days that were in your Complaint.

11  I'm not aware of other dates, put it this way,

12  where -- where you could point to it and say, you

13  know, that stock price decline seems to have a

14  similar pattern.  It plays into existing concerns

15  about, you know, cramming and the Wells Fargo type

16  allegations.  I'm not aware of any but I haven't

17  really studied it.

18  BY MR. BLATCHLEY:

19       Q    Maybe I'll ask it differently.  Other than

20  FUD you haven't identified any other confounding

21  information on any of the three disclosure dates

22  that you believe caused the decline?

23       A    If I understand your question, you're

24  saying that the three disclosure dates that you're

25  alleging that I've studied here, the question is

1    what other confounding information is there.

2              I haven't studied that question in detail.

3    I'm not -- I don't -- they're not earning disclosure

4    dates so they don't have the same kinds of issues

5    as, you know, many of the dates on the inflationary

6    side.

7              There may be other things on those days as

8    well, but I haven't studied that in detail.  I'm not

9    aware of a significant number.  I think -- I do

10   see -- especially on the first and the third day,

11   when I look at the intraday information, you know, I

12   do see a connection -- let's take the first day

13   between when this news comes out and the intraday,

14   prices do seem to decline.

15             So I don't dispute that there's a likely

16   connection between those two, and it's not that

17   there was also, oh, our plant blew up that day.  I'm

18   not aware of any of that type of confounding

19   information.

20             I think that was your question, Mike,

21   wasn't it?

22        Q    Yeah.

23             And just speaking of your intraday

24   analyses, you even pulled news articles on those

25   dates.  And, I mean, you can let me know if I'm

1    common in securities cases.  As you're saying,

2    well -- I mean, you know, you could imagine a

3    pattern that would say the stock dropped in the

4    morning because they said my plant blew up, and then

5    when this news came out, nothing changed.

6          So you typically want to look at the

7    intraday saying -- as I recall, Dr. Hartzmark

8    himself looked at intraday things as well just to

9    say we expect the information to be confounded in

10   the stock price quickly and, A, is it, and B, is

11   there at least -- you know, can one not dismiss out

12   of hand to put it in a negative that this is the --

13   this is related to it.

14         And I agree, I certainly can't dismiss out

15   of hand that these -- the press releases about the

16   lawsuits do seem to have directionally had some

17   impact on the stock price.  Again, there could be

18   some other confounding things in there but this

19   pattern to me is suggestive that, you know, we can't

20   just -- we can't rule out these.  And it's --

21   anyway...

22   BY MR. BLATCHLEY:

23      Q     So thank you for that.

24            So one of the things I think you already

25   mentioned is that you look at analyst reports, and

1   in, you know, assessing whether an analyst report

2   would be helpful to your analysis of the stock price

3   reaction, I assume you'd want to understand the

4   content of those reports; is that right?

5        A    Sure.  I mean, I think that's a very

6   general statement, if I understand it.

7        Q    Right.  It's not just the fact that there's

8   an analyst report, but it's what the analyst report

9   actually says that matters, right?

10       A    Yeah.  I certainly -- I mean, I think -- I

11  agree with that.  It sounds right to me.  I mean,

12  just the fact of an analyst report isn't

13  particularly informative in and of itself.

14       Q    Right.  And so I think we're on the same

15  page.

16            So it's also -- like you do analysis

17  elsewhere about price targets, and you would agree

18  with me that it's appropriate -- again, I'm talking

19  about the content of the analyst's report -- the

20  reasons why an analyst changes their price target is

21  important.

22            Would you agree with that?

23       A    Sure.  And, I mean, I have that discussion

24  in my report itself.  I've analyzed those questions

25  saying well, A, I don't see very many price changes,

1   which itself is informative, but where I do see

2   price changes I dig a little deeper to say okay,

3   well, what are they saying.

4           Is it because they say I see a lawsuit is

5   filed the stock price dropped, I got to believe that

6   lawsuit is almost certainly true, and therefore it's

7   going to affect future cash flows, or what are they

8   saying around that.

9           Are there other things that have caused

10  them to change their price target.  Are they noting

11  a lawsuit, but what are they crediting in terms of

12  the likely underlying substance to it or what's the

13  effect of it.  So absolutely I agree with that and

14  that's what I've done.

15      Q    So -- okay.  And you would also agree, I

16  think, then when you're looking at this kind of --

17  this two-day window context that we're talking

18  about, any statements by the company itself; is that

19  right?

20      A    I'm not entirely sure what you mean, but

21  you confused me with the two-day window thing in

22  there.  You're -- I mean --

23      Q    Yeah.

24      A    -- I agree the company statement could be

25  relevant but I'm not sure what it means by the two

Page 193

1    day.

2        Q    It means when you're assessing what caused

3    the, you know, stock to react on these two days, the

4    16th and the 19th, statements by the company would

5    be something you'd want to consider?

6        A    Sure.

7        Q    Okay.  And so --

8        A    I certainly agree that statements by the

9    company could be relevant, if it's a general

10   question like that.

11       Q    Yeah.  I think it's even a specific one.  I

12   mean, you said analysts and what they said would be

13   important.  I understand that analysts mostly get

14   their information from a company.

15            Would you agree with that?

16       A    No.  I don't think that's true.  I agree

17   analysts often get a lot of information from

18   companies, but at most -- I guess it depends on how

19   you consider -- what you define as "most."

20            Certainly they would get information about

21   financial data that's typically coming from the

22   company, so in that sense it's most.  But it's also

23   very true that analysts -- one of their big claims

24   to adding value is that they're not just parrots

25   receiving what the company told them; otherwise,

Page 194

1    they would presumably not add any value.

2            So they're talking to customers, they're

3    doing other kinds of things frequently, so they get

4    lots of information from the company but it's

5    hopefully in some sense not just the company.

6        Q    And it's hopefully -- I mean, you would

7    agree they're not going to ignore what the company

8    would say, right?

9        A    Not going to what?

10       Q    Ignore what the company might say.

11       A    Well, that's a little harder question to

12   answer because I've certainly seen situations where

13   analysts were quite clear they didn't think that

14   management had any credibility and they were

15   ignoring what management was saying.  I suspect

16   you've been involved in some of those cases as well.

17           But as a general matter, I agree with that.

18   That they -- unless there's sort of some unique

19   circumstance, they typically would, you know, at

20   least see what management is saying.

21       Q    And certainly, again, the company's

22   statement is not irrelevant to assessing a stock

23   price decline in response to the corrective

24   disclosures?

25       A    I certainly don't think it's irrelevant as

1    a concept.  Whether or not it -- you know, if it's a

2    specific matter and a detailed matter, you know, the

3    mix of information all those kind of things, but as

4    a general concept you can't dismiss it out of hand.

5    I agree with that.

6        Q    Do you -- do you believe it's irrelevant

7    here?

8        A    You mean company statement?

9        Q    Yes.

10       A    Again, not -- not out of hand.  Are you --

11   if there's something else specific you're thinking

12   about, I'm happy to look at it or something, but...

13       Q    Okay.  What about in assessing, you know,

14   again, we're talking about this two-day window issue

15   and what's, you know, causing the stock price to

16   decline and, you know, what's appropriate to look

17   at.

18            Would it be relevant to you to consider

19   anything that, say, the investor relations personnel

20   at the company itself were saying about the reasons

21   behind the stock price decline?

22            MR. BLAIR:  Objection to form.

23            THE WITNESS:  I -- I feel like you're

24   dancing around something that you just want to show

25   me.  If you want to just show it to me, I'm happy to

Page 196

1    look at it.  But I'm not -- out of hand you

2    obviously can't dismiss that.  That it's always

3    irrelevant, no, it's not always irrelevant.

4    BY MR. BLATCHLEY:

5        Q    Would it be important to you?

6             MR. BLAIR:  Same objections.

7             THE WITNESS:  Again, it really depends on

8    what's -- what's in it and other things.  It's hard

9    to make such a blanket statement.  It's not

10   irrelevant.

11   BY MR. BLATCHLEY:

12       Q    What about let's say a major investor, like

13   one of the top, you know, investors in the company,

14   let's say they make a statement or, you know,

15   disclose a position of that, would that be something

16   that's important for you to consider?

17       A    Again, you're asking such general

18   questions, I'm not sure, Mike, if one could answer

19   them.  They're not -- I mean, one never sort of just

20   dismisses out of hand that, but, you know, it really

21   depends on what it is.  I mean, just the fact that

22   someone took a big position in a company, I mean,

23   that may or may not be interesting or important.

24       Q    Again, I think what we're talking about is

25   when we're doing this analysis of what's causing the

Page 197

1    stock price to decline, you've been saying that

2    there are some things that you'd want to look at

3    which are the analyst reports, we've agreed on that.

4    You said it's potentially relevant what the company

5    says.

6            Would you want to consider, you know, like

7    a five percent holder makes a statement or discloses

8    a position, would that be something you'd want to --

9    if that happens during the time period we're talking

10   about?

11           MR. BLAIR:  Objection to form.

12           THE WITNESS:  I'm not trying to be evasive

13   or dismissive.  I just -- you can't make sort of

14   just some blanket statement.  And I'm not trying --

15   I'm certainly not doing any kind of a microanalysis

16   of oh, this news story moved it this much, that

17   moved it that much, all of that.  But the broad

18   facts I think are not in dispute here.

19           There were lawsuits filed.  The stock price

20   moved.  It moved quite quickly initially.  It didn't

21   move statistically significantly on the 19th, so I'm

22   not sure -- it's like you're -- anyway, I'm not

23   quite sure where you're going with this and I'm a

24   little confused honestly.

25   \\\

Page 198

1    BY MR. BLATCHLEY:

2        Q    You know what a 13D filing is, right?

3        A    Yes.

4        Q    And it's for, you know, you get

5    five percent of the company, you have to disclose

6    your position and a couple other things.  Is that

7    fair?

8        A    That's -- yes.  That's my understanding.

9        Q    And are you aware of academic literature

10   addressing stock price reactions in connection with

11   13D filings?

12       A    Again, same answer as before, that I'm not

13   going to be able to quote you specific papers, but

14   that's absolutely the kind of things finance guys

15   love to study.

16       Q    And generally there would be a positive

17   impact upon the filing of a 13D according to those

18   studies?

19       A    I'd have to look at the -- I'd have to look

20   at the literature and see.  I mean, I'm not -- I

21   think it kind of depends on who's taking the

22   position and why and those sorts of things, so I'm

23   not sure you can make it a simple statement.

24       Q    That's fair, but it could have an impact on

25   price reaction?

1      A    When you say "have an impact on price

2   reaction," I think what you're asking is could the

3   fact that they disclosed hey, you know, Carl Icahn

4   is taking a five percent position in the company, is

5   that the sort of thing that might move the stock

6   price, yeah, I think it could, if that's your

7   question.

8      Q    So let me just turn to, I guess I want to

9   look at 30 -- 31B.   I think it's probably easier

10   this way.

11      A    I'm there.

12      Q    I'm sorry, guys.   I just need a minute.

13      A    I do have the paper copy if you want to

14   just refer to that.

15      Q    So I'm looking at your -- you've got one,

16   two, three, four -- you've got 6/19 Insurance

17   Information Institute Database.   Do you see where I

18   am?

19      A    When you say -- do you want me to be

20   looking at --

21      Q    I'm sorry.   Yeah.   Hopefully I'm on the

22   right thing.   I'm on Exhibit 31B.   Are you with me?

23   I'm sorry.

24      A    Almost.   I'm just getting my -- okay.   All

25   right.   I'm on 31B, yeah.

Page 200

1    Q    And just looking down -- again, let me just

2  back up one second, did you read all these articles

3  before they went into the report or was this

4  something handled by the staff?

5    A    Primarily the staff, under my direction.

6    Q    Okay.  So you've got -- you've got these

7  disclosures June 19th, 2017 at 9:02, the Morgan

8  Stanley analyst report?

9    A    Yes.

10    Q    And then after that you've got the

11  June 19th, 2017, 9:40 Denver Business Journal Online

12  news article?

13    A    Yes.

14    Q    So I don't know if I've done this correctly

15  but I just introduced -- or I tried to introduce.

16  Let me know if you get it -- Exhibit 31 which has

17  been marked for the record.

18    A    I do see it.  Congratulations on that.

19    Q    So just looking at that -- yeah.  Sorry.

20    A    Hang on a second.  It's just spinning here.

21  Wait.  There, it's coming up.  Okay.

22             (Deposition Exhibit 31

23          was marked for identification.)

24  BY MR. BLATCHLEY:

25    Q    So I just want to direct you, the time

1  stamp or at least the one that we've -- this is the

2  document that you've produced, this is at 9:30 in

3  the morning Eastern time on the 19th.

4      A    Okay.

5      Q    I just didn't -- I didn't see it in your

6  31B or your exhibit on the 19th of 31A.  And let me

7  know if I just missed it, but then I just want to

8  ask you a couple questions about it.

9      A    As I sit here right now I don't see it on

10  the list.

11      Q    So it's fair to say that that article is

12  not in this exhibit either, you know, referenced as

13  part of the -- you know, one, two, three, four,

14  five -- I mean, I assume, and let me know if I'm

15  wrong, the articles listed in 31B, are those

16  referenced in 31A on the chart?

17      A    Yes.  I think that's accurate.

18      Q    Okay.  So this Bloomberg article --

19      A    Sorry.  Just to be clear --

20      Q    Yeah.

21      A    -- there are -- oh, 31A is just the

22  intraday trading on the 19th.  31B includes articles

23  from the 17th and the 18th as well, as well as like

24  before trading opens on the 19th, so there's more

25  listed on 31B than there are red dots on 31A.

1      Q    Yeah.  Yeah.  And so I guess on 31A I just
2   looked at No. 4 on the notes and sources, which I
3   think explains what you're describing, which is one,
4   two, three, four, five are stories or reports
5   released the prior weekend or before market.
6           Is that -- are we on the same page?
7      A    Yes.  I think that's right.
8      Q    Okay.  So, again, going back to the
9   Exhibit -- what did we call it? -- 31, I guess.  So
10  this is an article that -- do you understand that
11  this article is referenced in plaintiffs' Complaint?
12     A    I'd have to double-check but it wouldn't
13  surprise me.
14     Q    You understand that you've referenced this
15  article in your report, in other sections of your
16  report?
17     A    I certainly recognize the 12 billion number
18  in it, so I'm happy to double-check but I'll take
19  your word for it.
20     Q    And this, again, was referenced in the
21  Complaint -- plaintiffs' Complaint as one of the
22  articles in causing -- sorry, in the loss causation
23  truth emerges section?
24     A    Again, I'll take your word for it.
25     Q    Again, I just want to make sure.  You agree

Page 203

1    with me it's important to include when assessing --

2    again, I think you make a statement in your analysis

3    using this intraday price chart about the

4    reasonableness of the Complaint's allegations.

5            You agree with me that in doing that it

6    would be appropriate to consider what is alleged in

7    the Complaint?

8        A    I'm not quite sure of your question.

9    Sorry.  Maybe you could rephrase it.

10       Q    Yeah.

11           This is alleged as, you know, a

12   corrective -- or review of corrective information.

13   Your analysis on the intraday price decline does not

14   appear to include it.  And I'm just asking the

15   question why did you think it was appropriate not to

16   consider this article?

17       A    Well, I mean, you just said that I cited it

18   at a place so obviously I have considered it.  Your

19   specific question is why is it not listed on 31B?  I

20   don't know.  I'd have to go back and check on that.

21   But it certainly isn't changing any opinion.

22       Q    Yeah.  No.  I'm just concerned because, you

23   know, you spend a couple paragraphs, 144 you're

24   saying a two-day window is inappropriate, you got

25   147 where you are talking about the model and the

Page 204

1    decline on the 19th and why it's not appropriate to

2    consider a two-day window, and your support for that

3    is this exhibit about the intraday trading.

4              And I'm just wondering why we're not

5    talking about the article in the Complaint.

6         A    Well, I think maybe you're misunderstanding

7    what we've been talking about for the last bit.  The

8    support for a two-day window isn't based on how many

9    dots are on these charts or the specific price

10   movement of those.

11             It's based on a much more general

12   proposition that's reinforced by the intraday

13   analysis here, but it's not -- I mean, the

14   fundamental point is Dr. Hartzmark and I agree this

15   is an efficient market for the equity for

16   CenturyLink.

17             There is a statistically significant drop

18   on the 16th.  There is not a statistically

19   significant drop on the 19th.  I look at the

20   intraday news on the 16th and it does seem to be

21   moving in a consistent way with the framing, so I --

22   those all seem fine to me as far as they go to

23   suggest that the 16th one can't rule it out, but the

24   19th -- the idea that the two-day window is

25   somehow -- one would reach a different conclusion if

1  one had more dots or fewer dots or something like

2  that, that's not the point.

3      Q    So -- and again, I'm sorry.  I might have

4  given you the wrong paragraph.  164 is I think where

5  I was focused.

6          And, again, you said in these paragraphs

7  preceding 164 talking about the intraday price

8  analysis and how it supports your conclusion that

9  Dr. Hartzmark's blanket assumption that plaintiffs'

10 allegations will be shown to be true is not

11 supported.  And I'm wondering why when we're talking

12 about plaintiffs' allegations you're not including

13 the articles that are clearly alleged in the

14 Complaint.

15          MR. BLAIR:  Object to the form, asked and

16 answered.

17          THE WITNESS:  I think I've answered this as

18 much as I can.  You yourself have noted that I cite

19 this in my report.  I don't dispute that it's in the

20 Complaint.  It seems exactly consistent with, you

21 know, the general thrust of all of these corrective

22 disclosures that have been identified.  It doesn't

23 change anything there.

24          So as to why it's not specifically listed

25 on that chart, I don't know, I'd have to go back and

1    look but it doesn't change anything.   The chart is

2    intended to be illustrative of whether there's

3    anything in the intraday that would be inconsistent

4    with, you know, kind of the efficiency of the market

5    and therefore why one needs to think about two-day

6    windows, and I just don't see it.

7    BY MR. BLATCHLEY:

8        Q     Okay.   So in addition to the two-day window

9    you've also assessed -- you have some comments in

10   your analysis of the 7.6 percent bonds, right?

11       A     You're now switching topics, is that right,

12   to the bonds?

13       Q     I just want -- again, would it be

14   appropriate to not include this from your

15   consideration?

16            MR. BLAIR:   Object to form.

17            THE WITNESS:   Yeah.   I mean, we clearly

18   have talked about the fact that I considered it.

19   You've noted that I don't see it on my 31B and I can

20   go back and look and see, but that certainly doesn't

21   mean it hasn't been considered.

22            And as I review it on the screen --

23   although the version I see on the screen seems to be

24   missing a bunch of letters, so it's kind of hard to

25   read a little bit, at least on my screen.   But it

1    seems to be just a recitation of the same things.  I

2    don't know if your version seems to be missing a

3    bunch of letters, too.

4    BY MR. BLATCHLEY:

5         Q    Yeah.  And I apologize for that.  That's

6    the way it was produced to us.  And I wish it was

7    better quality but that's what we have.

8              But, you know, there is here a statement

9    from the company.  You know, it's -- again, it's

10   the -- the article that's, you know, discussed

11   extensively in the Complaint and the party's

12   submissions.

13        A    I mean, that doesn't seem wrong to me, but

14   one only has to glance at 31B to see 12 billion, you

15   know, show up in many, many headlines.  For

16   instance, the fact of the lawsuit was -- if you want

17   to point me to something that you think is unique

18   and new information in here, I'm happy to think

19   about that.  But I just don't see anything that's

20   extremely relevant about this.

21             There's nothing relevant about -- the fact

22   that it's not on my 31B doesn't change anything.

23        Q    So let me just turn back real quick again

24   to -- I'm sorry.  30 -- maybe it's on me.  30A and

25   30B.  And what I wanted to do -- I'll just make the

Page 208

1    simple point and maybe you can agree with me or you

2    won't.  30A has -- this is the intraday impact

3    analysis of June 16th.

4        A    Okay.

5        Q    And the last -- I'm looking at 17, I think

6    it's Page 184 -- I'm sorry, there's a series of

7    articles that are -- the last article with the time

8    stamp on here is 16:44, the Reuters story on

9    Page 183.

10       A    Yes.

11       Q    And then there's these additional articles

12   that we don't have a time stamp for, but they could

13   have been either published during the day or after

14   the close, correct?

15       A    Yeah.  I mean, I suppose -- I'm not sure

16   how one would figure it out.  I suppose in theory

17   they could be published before the day, before the

18   trading day started.  But they're certainly

19   published on that day, that's the way they are

20   dated, but they don't have a time stamp.

21       Q    So and then Exhibit 31A, the one we were

22   just -- I'm sorry.  31B, the one we were just

23   looking at, you know, discussing the disclosures

24   over the -- over the weekend and then on June 19th.

25       A    Okay.

Page 209

1        Q    So and I just wanted to -- you know, if you
2    could -- I don't know if you have it, but the
3    Complaint, which was previously marked as Exhibit 1,
4    I think it's in the folder.  Let me know if I need
5    to resubmit it.
6        A    Exhibit 1, the Complaint?
7        Q    Yeah.
8        A    All right.  I have it.
9        Q    Okay.  Paragraph 157.
10        A    It's revealing itself to me very slowly.
11    I'm getting there.
12            MR. BLAIR:  Hey, Mike.
13            MR. BLATCHLEY:  Yeah.
14            MR. BLAIR:  We've been going about an hour.
15    Maybe while he gets there, maybe we take five, ten
16    minutes.
17            MR. BLATCHLEY:  That would be totally fine.
18            THE WITNESS:  I'm there right now.  Do you
19    want to just finish this line of questioning and
20    then we can...
21    BY MR. BLATCHLEY:
22        Q    Yeah.  Well, this will take -- it's very
23    short.  Paragraph 157, it talks about, the second
24    sentence, you know, articles published on June 16th
25    in Ars Technica and CRN.

Page 210

1           I just wanted to point your, you know,

2    direction to those two articles, and then just get

3    you to confirm that neither of those two articles

4    are mentioned in Exhibits 31A or 30A, the ones that

5    we were just looking at.

6        A    I think you mean 30B.

7        Q    I'm sorry.  Yeah.  30B and 31B.  I'm sorry.

8    Thank you for that.

9        A    I mean, I'll sort of take your word for it

10   in the sense I certainly don't see the source.  But

11   the topic describe the sources that I used, which is

12   the Bloomberg sources, so I don't see Ars Technica

13   or CRN in the source.  Whether or not those sources

14   are looking at other ones is I suppose a different

15   question, but I'll take your word for it they're not

16   listed.

17       Q    So and I'll just -- again, I'll say those

18   are not articles included in your Appendix B; is

19   that right?

20       A    I'm not seeing them.

21       Q    And so you didn't read those articles in

22   coming to your conclusions -- or I'm sorry, your

23   opinions in the report?

24       A    Wrong.  I'd have to look and see if they're

25   in my list of docs considered.  I mean, you quote

Page 211

1    parts of them in here and I certainly relied on the

2    Complaint, but I don't recall specifically -- I'm

3    not sure if you're -- where exactly you're going

4    with these in the sense that no specific article

5    is -- they kind of make or break on any of these

6    sorts of points here.  So I don't see the relevance

7    of the questions, but I don't see them listed on

8    30B, so I think that's technically true, I guess.

9        Q    I'll make it easy.  So it's fair to say you

10   did not consider those articles in your analysis and

11   your accompanying discussion referencing

12   Exhibits 30B and 31B?

13            MR. BLAIR:  Object to the form.

14            THE WITNESS:  I think I've answered that as

15   much as I can.  I don't see them literally on the

16   list there.  So I think that kind of speaks for

17   itself in the sense that they're not there.

18            Whether or not they were in some broader

19   search and then excluded, I don't have any reason to

20   believe that but I don't know.

21            But I didn't -- to the extent they're not

22   on the list, obviously in some sense they're not

23   considered.  But neither is any specific article --

24   I mean, they're considered in their totality and an

25   illustration of the intraday trading, but it's not

Page 212

1    as though the particular substance of any of them is
2    being analyzed for a particular impact on the stock
3    price.  I think that would miss the point.
4              MR. BLATCHLEY:  Okay.  Should we take our
5    break?
6              MR. BLAIR:  Let's do it.
7              MR. BLATCHLEY:  Okay.
8              THE VIDEOGRAPHER:  The time is 3:12 p.m.
9    and we are off the record.
10          (Off the record from 3:12 - 3:30 p.m.)
11             THE VIDEOGRAPHER:  All right.  The time now
12   is 3:30 p.m.  We are back on the record.
13   BY MR. BLATCHLEY:
14        Q    Mr. Deal, can you hear me?  I'm sorry.
15   Just to -- is this okay?
16        A    I think so.  Can you say something else?
17             No.  Not hearing anything.
18        Q    Can you hear me now?
19        A    Yes.
20        Q    Sorry about that.
21             Mr. Deal, you're aware, and this in your
22   report, that Dr. Hartzmark is proposing an
23   out-of-pocket methodology for calculating classified
24   damages?
25        A    Yes.

Page 213

1    Q    And you're familiar with the out-of-pocket

2    methodology?

3    A    Yes.

4    Q    Are you aware that it is nearly universally

5    used to calculate classified damages in securities

6    fraud cases under Section 10b?

7    A    Yes.  In the large.  My quibble is not with

8    the idea of an out-of-pocket method.  I agree that

9    that is typically how damages are calculated.  It

10   has to do with everything else we've been talking

11   about today.

12        That just to say I'm going to use

13   subtraction and somehow there's going to be

14   inflation ribbon in my view is not sufficient.

15   Q    And, again, you're not proposing to do

16   damages methodology of your own?

17   A    I'm not proposing anything different from

18   out of pocket as a concept, no.

19   Q    And so your criticism here -- and I know

20   there's a lot in your report, but let me try to boil

21   it down if I could.

22        One, you say the price decline in the

23   corrective disclosure dates really can't be used as

24   a measure of inflation because, I think, of two

25   reasons, there's no corrective information and this

Page 214

1    whole FUD concept that you were talking about.  Is

2    that -- is that fair?

3         A    I mean, that's -- that's part of it.

4    That's not all of it.

5         Q    Just with respect to the corrective

6    disclosures.

7         A    Right.

8         Q    Okay.  And then the second --

9         A    I'm saying that -- do you want me to -- I'm

10   happy to give you the full answer if you want,

11   but...

12        Q    Well, just make sure I haven't, you know,

13   omitted anything you think is important.  You know,

14   I think your other criticism is that that's your

15   Figure 5 analysis, that there's a lot of

16   inflationary misstatements that are hard to

17   quantify, and that's -- again, the term I think you

18   used a lot today was complexity.  Is that -- is that

19   right?

20              MR. BLAIR:  Object to form.

21              THE WITNESS:  I agree that there's a lot of

22   complexity.  I've restated many times Dr. Hartzmark

23   hasn't done anything on the front end to measure

24   inflation.  I agree that there's a lot of complexity

25   there and we've been over that and I incorporate

Page 215

1    that into my answer, everything we've talked about
2    today.
3              Before you leave the corrective
4    disclosures, it's not just the fact that there's FUD
5    out there.  I think that's a contributing factor to
6    why we see the drop we see.  But even if the drop
7    were half as big but still statistically significant
8    and there wasn't any FUD or Wells Fargo, the core
9    problem of -- it's not actually a disclosure of
10   factual information from the company.  It's still a
11   core problem and I see that as being a very
12   important problem in the corrective disclosures.
13   BY MR. BLATCHLEY:
14       Q    The other information wasn't corrective; is
15   that fair?  That's your position?
16       A    I certainly -- yeah.  I think that's right.
17   Certainly on its face it's not corrective.  It's
18   not -- it's allegations in the lawsuit but on its
19   face that alone is not corrective information.
20       Q    So let me take that.  Whether or not the
21   corrective disclosure dates involve disclosure of
22   truly corrective information, actual corrective
23   disclosures I think is the term you used, or were
24   prompted by FUD, that issue is common to all class
25   members, right?

Page 216

1           MR. BLAIR:  Object -- objection to the

2    form.

3           THE WITNESS:  If I understand your

4    question, I think the answer is probably yes in the

5    sense that with the out-of-pocket type measure, you

6    are looking at the price of the security that's

7    faced by all investors.

8           So whether or not there's -- any of those

9    are corrective disclosures or those price drops can

10   be considered to be corrective disclosures, that's a

11   question about the impact on the price specific to

12   the allegations in the lawsuit that will affect all

13   investors.

14          I think that's your core question.  I don't

15   think there's, you know, one group of investors in,

16   you know, California that are going to be

17   differently affected by a group of investors in

18   Pennsylvania.  I'm using those obviously

19   conceptually.  I agree with that.  I think that was

20   your question.

21   BY MR. BLATCHLEY:

22      Q   It was my question.  And, again, just to

23   put it another way, nothing -- none of your

24   criticisms or any analysis -- I'm sorry.

25          None of your criticisms are directed by any

1    analysis that's unique to any individual class

2    member?

3                MR. BLAIR:  Object to the form.

4                THE WITNESS:  Again, I think I would agree

5    with that in concept.  I mean, obviously to the

6    extent it affects, you know, ribbons, parsing,

7    scaling, all of those things, any individual will

8    fall somewhere on there in their ribbon and their

9    calculation will be unique to their buy day and

10   their sell day or their hold day.  But two people

11   who otherwise have equal information I think are not

12   differently situated in terms of the concerns that

13   I'm raising.

14   BY MR. BLATCHLEY:

15       Q    Got it.

16            And so I think you said in your report and

17   throughout that, you know, I think it's that parsing

18   and scaling issue is really what you're talking

19   about and the complexity and the difficulty in doing

20   that.

21            Is your opinion that that is possible to do

22   in this case?

23            MR. BLAIR:  Object to the form, asked and

24   answered repeatedly.

25            THE WITNESS:  Yeah.  Based on what I've

Page 222

1   STATE OF CALIFORNIA        )

2   COUNTY OF LOS ANGELES      )    ss.

3

4         I, Kimberly A. Edelen, C.S.R. No. 9042, in and

5   for the State of California, do hereby certify:

6         That prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn to

8   testify the truth, the whole truth and nothing but

9   the truth;

10         That said deposition was taken down by me in

11   shorthand at the time and place therein named, and

12   thereafter reduced to typewriting under my

13   direction, and the same is a true, correct and

14   complete transcript of said proceedings;

15         That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the

18   transcript { } was {X} was not required.

19         I further certify that I am not interested in

20   the event of the action.

21         Witness my hand this 27th day of April,

22   2020.

23

24

              KIMBERLY A. EDELEN, C.S.R. NO. 9042

25