# Exhibit I

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MINNESOTA

3

4    ***********************************

5    IN RE: CENTURYLINK SALES PRACTICES

6    AND SECURITIES LITIGATION

7                        MDL No. 17-2795 (MJD/KMM)

8    This Document Relates to:

9    Civil File No. 18-296 (MJD/KMM)

10   ***********************************

11

12      30(B)(6) DEPOSITION OF THE STATE OF OREGON,

13          MICHAEL VITERI AS REPRESENTATIVE

14             THURSDAY, MARCH 5, 2020

15                   VOLUME I

16

17     BE IT REMEMBERED THAT, the 30(B)(6) deposition of THE

18   STATE OF OREGON, MICHAEL VITERI AS REPRESENTATIVE was

19   reported by Mary C. Soldati, Registered Professional

20   Reporter and Certified Shorthand Reporter, on Thursday,

21   March 5, 2020, commencing at the hour of 9:35 a.m., the

22   proceedings being reported at the Offices of Stoll

23   Berne, PC, 209 SW Oak, Suite 500, Portland, Oregon

24   97204.

25

                                              Page 1

1

2                           A P P E A R A N C E S

3

4    Appearing on behalf of the Plaintiff:

5    MR. KEIL M. MUELLER

6    STOLL BERNE PC

7    209 SW Oak Street, Suite 500

8    Portland, Oregon  97204

9    kmueller@stollberne.com

10          -AND-

11    MR. MICHAEL BLATCHLEY

12    BERNSTEIN LITOWITZ BERGER & GROSSMAN

13    1251 Avenue of the Americas

14    New York, New York 10020

15    michaelb@blbglaw.com

16

17    Appearing on behalf of the Defendant:

18    MR. CHRISTOPHER L. MARTIN

19    COOLEY LLP

20    55 Hudson Yards

21    New York, New York 10001

22    cmartin@cooley.com

23

24

25

Page 2

1

2                       APPEARANCES

3

4   Appearing on behalf of the Defendant:

5   MR. RYAN BLAIR

6   COOLEY LLP

7   4401 Eastgate Mall

8   San Diego, Califoria 92121

9   rblair@cooley.com

10

11

12   Also present:   Deena Bothello, Keith Dubanevich

13                    Lani Milton, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3

 4              THE VIDEOGRAPHER:  We are now on the record.

 5    The time is 9:35.  Today's date is Thursday March 5,        09:38:58

 6    2020.

 7              This is the start of the video recorded

 8    deposition of Michael Viteri.  It's being taken in the

 9    matter of CenturyLink Sales Practices and Securities

10    Litigation.  It is filed in the U.S. District Court in     09:39:14

11    the District of Minnesota and the MLD number is 17-2795.

12    This deposition is being held at Stoll Berne, located in

13    Portland, Oregon.

14              My name is Lani Milton.  I am the

15    videographer from the firm Veritext, here with court       09:39:35

16    reporter, Mary Soldati, also with the firm Veritext.

17              Counsel, could you please introduce

18    yourselves and association for the record.

19              MR. MARTIN:  Chris Martin of Cooley LLP on

20    behalf of the Defendants.                                  09:39:49

21              MR. BLAIR:  Ryan Blair, also from Cooley

22    LLP, on behalf of Defendants.

23              MR. MUELLER:  Keil Mueller of Stoll Berne on

24    behalf of the plaintiffs and the witness.

25              MR. BLATCHLEY:  Michael Blatchley from         09:39:58
```

Page 6

1    Bernstein Litowitz Berger & Grossman on behalf of the

2    plaintiffs.

3            MS. BOTHELLO:   Deena Bothello on behalf of

4    the witness.

5                                                    09:40:17

6            STATE OF OREGON, MICHAEL VITERI AS

7                    REPRESENTATIVE,

8    was thereupon produced as a witness and, after having

9    been sworn on oath, was examined and testified as

10   follows:

11

12                    EXAMINATION

13

14   BY MR. MARTIN:

15      Q.  Good morning, Mr. Viteri.  As I just said, my    09:40:20

16   name is Chris Martin.  My colleague Ryan Blair and I are

17   with the law firm Cooley, and we represent the

18   Defendants in this case.

19          At the outset, I just want to thank you for

20   sitting in this deposition today.  We appreciate your    09:40:29

21   time, and we're going to do our best today to work

22   efficiently so we can get you out of here as quickly as

23   possible.

24          So I'm going to start with a few introductory

25   questions, and then we can talk about the ground rules    09:40:40

Veritext Legal Solutions
866 299-5127

1    for today's deposition.

2          Is that okay?

3    A.   Sure.

4    Q.   Will you please state your name for the record?

5    A.   Michael Viteri.                                    09:40:48

6    Q.   And you are an employee of the State of Oregon,

7    correct?

8    A.   That is correct.

9    Q.   And what is your official title as of today?

10   A.   Senior Investment Officer, Public Equities.        09:40:57

11   Q.   And will you please describe for your me your

12   primary responsibilities in your current roles?

13   A.   Primary responsibilities for managing all aspects

14   of publicly traded securities and overseeing external

15   managers on behalf of Oregon State Treasury by various   09:41:13

16   clients.

17   Q.   And when you say "all aspects of publicly traded

18   securities," can you give me an example of what you

19   mean?

20   A.   The simplest level, we end up Oregon State -- on    09:41:26

21   behalf of Oregon State Treasury, we manage multiple

22   internally managed strategies, so we're directly

23   managing stock portfolios, U.S. and non-U.S. strategies.

24          And we oversee external managers; we hire,

25   retain, terminate external managers on behalf of OPERF   09:41:43

1    and other clients for the purposes of investment

2    management services.

3        Q.  Is it correct to say that you're managing

4    investment portfolios for a number of state funds,

5    correct?                                          09:41:57

6        A.  Correct.

7        Q.  One of them is OPERF; is that correct?

8        A.  That is correct.

9        Q.  And what does OPERF stand for, for the record?

10       A.  Oregon Public Employees' Retirement Fund.     09:42:01

11       Q.  Okay.  And I think you, in your answer a moment

12   ago, you mentioned both a portfolio and a fund.

13           Can you just explain, for the record, what the

14   difference is between those two?

15       A.  I apologize.  Sure.  We're managing internal   09:42:16

16   portfolios on behalf of the fund.

17           So we're internal investment managers and we

18   oversee the external investment managers as well.

19       Q.  Are the portfolios specific to particular funds

20   or is it portfolios across multiple funds?          09:42:32

21       A.  In this case the internal portfolios we manage

22   are specifically for OPERF.

23       Q.  Okay.  What about apart from OPERF?

24           MR. MUELLER:  Counsel, I just want to state

25   for the record, as we stated in our objections to your  09:42:45

Page 9

1    30(b)(6) notice.

2             The witness here today is testifying on

3    behalf of Oregon, as its defined in the Complaint.

4             I think we all understand that that's the

5    Oregon State Treasury and Oregon Public Employees      09:42:57

6    Retirement Board on behalf of OPERF, the Oregon Public

7    Employees Retirement Fund.

8             Mr. Viteri is not here to testify on behalf

9    of other state funds.

10            MR. MARTIN:  Okay.  I understand plaintiff's   09:43:12

11   objection.

12            Are you instructing the witness not to

13   answer?

14            MR. MUELLER:  He can answer the question.

15            MR. MARTIN:  Okay.                             09:43:19

16   BY MR. MARTIN:

17      Q.  The question was, what about a part from OPERF?

18      A.  Could you put it in another context?

19      Q.  Sure.  So I think you testified a moment ago that

20   you were managing portfolios for multiple funds on      09:43:32

21   behalf of the Treasury; is this correct?

22      A.  That is correct.

23      Q.  And I asked if the portfolios are specific to

24   funds or if the portfolios are across multiple funds.

25            What is the answer to that question?           09:43:45

1      A.  We manage portfolios for OPERF.  We manage

2    portfolios for Common School Fund.  We manage portfolios

3    for State Accident Insurance Fund.

4      Q.  And are those all separate portfolios?

5          In other words, is the portfolio for the Common        09:44:02

6    School Fund separate from the portfolio from OPERF?

7      A.  That is correct.

8      Q.  And the portfolio for the State Accident

9    Insurance Fund is separate from the portfolio from

10   OPERF?                                                      09:44:17

11     A.  That is correct.

12     Q.  Okay.  Who do you report to in your current role?

13     A.  I report directly to the chief investment

14   officer, John Skjervem.  S-K-J-E-R-V-E-M.  And he is the

15   chief investment officer.                                  09:44:34

16     Q.  And in his role as chief investment officer, he

17   oversees all investment activities of the Department of

18   Treasury?

19          MR. MUELLER:  Object to form.

20   BY MR. MARTIN:                                             09:44:48

21     Q.  You can answer.

22     A.  Yes.

23     Q.  And in addition to the investment activities that

24   you described a moment ago relating to global equities,

25   what other investment activities does he oversee?          09:45:00

Page 11

1    2008.

2          Prior to that, I was at a small equity shop hedge

3    fund called Fan Asset Management in Mountain View,

4    California, from 1999 to 2000.  Part of that was Arizona

5    State Retirement System again for a three-year period;          10:01:25

6    so '97, '98, '99.

7       Q.  Okay.  Do you understand that the Lead Plaintiff

8    in this litigation is -- I want to make sure I get this

9    right -- the State of Oregon by and through the Oregon

10   State Treasurer and Oregon Public Employees Retirement          10:01:42

11   Board on behalf of the Oregon Public Employees

12   Retirement Fund?

13      A.  I believe that is correct.  I think it's in the

14   Complaint.  If you want to give me a copy, I can

15   double-check what you said.                                     10:01:55

16      Q.  Your understanding is that the Lead Plaintiff in

17   this case is the State of Oregon?

18              MR. MUELLER:  Objection.

19   BY MR. MARTIN:

20      Q.  Let me ask it a different way.                           10:02:03

21          What is your understanding of who the Lead

22   Plaintiff is in this case?

23      A.  The Lead Plaintiff -- is ultimately the losses

24   that were incurred by the Oregon Public Employees

25   Retirement System Fund.  That's not a person.  It's its        10:02:19

                                                    Page 24

1    own entity.

2         And on behalf of that entity, the Oregon State

3    Treasury and OPERF, Oregon Public and Portland TriMet

4    System Board act as fiduciaries.

5         So I would say it's the combination of those          10:02:38

6    fiduciaries that are acting on behalf of the Oregon

7    Public Employees Retirement System Fund.

8         And I think that's what you just articulated as

9    far as at lengthy description of who is bringing the

10   lawsuit.                                                    10:02:54

11   Q.   Okay.   Is your understanding that the State of

12   Oregon Public Employee Retirement System Fund is its own

13   legal entity?

14   A.   It's a fund, so yes.

15        MR. MUELLER:   I'm going to object to that to         10:03:08

16   the extent it calls for a legal conclusion.

17   BY MR. MARTIN:

18   Q.   So for the sake of simplicity today, I'm going to

19   refer to the Lead Plaintiff as the State of Oregon.

20        And when I say the "State of Oregon," you             10:03:20

21   understand that I mean the State and its subdivisions

22   and agencies, correct?

23        MR. MUELLER:   And we're going to object to

24   that question for the reasons that we've stated.

25        That definition you've just offered is               10:03:36

                                                               Page 25

1    on the Bloomberg terminal that you referenced earlier?

2    A.   Not with respect to this particular Complaint.

3    Q.   I'm not sure I understand.

4         So you testified earlier that you learned about

5    this lawsuit for the first time by reading about it in          10:29:03

6    the news media; is that correct?

7    A.   In that case, I misspoke.   I learned about

8    multiple lawsuits that were occurring through reading

9    news articles in Bloomberg.

10        And this would be lawsuits that were brought         10:29:23

11   about July 12th, 2017 by the Minnesota Department of

12   Justice, information that came out in other lawsuits,

13   back to -- I believe June 19th, 2017 there were multiple

14   consumer lawsuits happening at the time.

15        Those are the lawsuits which I was referring to.     10:29:47

16   Q.   So I'm asking about this lawsuit.   When did you

17   learn about this lawsuit?

18   A.   Within the last couple of weeks.

19   Q.   Do you remember a date or around when you learned

20   about this lawsuit?                                         10:30:01

21   A.   Not specifically.

22   Q.   How did you come to learn about the existence of

23   this lawsuit?

24   A.   I believe one of the first conference calls we

25   had with Stoll Berne was a week ago Wednesday, probably    10:30:19

Page 46

```
1    cramming, and not only overcharging, but illegal

2    activity; was happening at CenturyLink in charging

3    customers.

4    BY MR. MARTIN:

5       Q.  And the answer that you just gave, what is the        10:33:13

6    basis for it?

7              MR. MUELLER:  Object to the form of the

8    question.

9              THE WITNESS:  I don't understand "basis."

10   If you could explain that.                                   10:33:25

11   BY MR. MARTIN:

12      Q.  You just explained your understanding of what

13   this case is about, correct?

14      A.  Correct.

15      Q.  And how did you come to have that understanding        10:33:31

16   of what this case is about?

17              MR. MUELLER:  Object to the form of the

18   question.  And again, object to the extent that there's

19   a topic -- for which we've designated another witness on

20   this issue.                                                  10:33:45

21              Mr. Viteri can answer to the extent he

22   knows.

23              THE WITNESS:  I read through the Complaint.

24   BY MR. MARTIN:

25      Q.  Okay.  So the explanation that you provided just       10:33:50
```

Page 49

1    now is based solely on information you learned by

2    reading the Complaint; is that correct?

3                MR. MUELLER:  Object to the form of the

4    question.

5                THE WITNESS:  Predominantly, but it's also    10:34:00

6    informed by news information that I had read over the

7    last few years on other lawsuits that CenturyLink was

8    involved in.

9                Again, going back to the State of Minnesota

10   DOJ suit, which would have happened back in July 12th,    10:34:22

11   2017, and immediately after that, information on other

12   lawsuits that were happening.

13               That was part of the normal news information

14   that would flow through something like Bloomberg.  In

15   fact, I believe it was Bloomberg that broke the story,    10:34:37

16   the whistleblower story on the newswire.

17   BY MR. MARTIN:

18       Q.  Prior to meeting with counsel a week ago and

19   talking with them on the phone, did you have an

20   independent recollection of knowing about consumer    10:34:53

21   lawsuits that had been filed against CenturyLink?

22               MR. MUELLER:  Object to the form of the

23   question.  Asked and answered.

24               THE WITNESS:  I do have some recollection.

25   BY MR. MARTIN:    10:35:06

                                                          Page 50

1    funds.

2        Q.   Okay.  So to prepare for today, you read the

3    Complaint, you reviewed the spreadsheet, you

4    participated in two telephonic conferences and you

5    participated in an all-day meeting, correct?                11:06:42

6            MR. MUELLER:  Object to form.

7            THE WITNESS:  Correct.

8    BY MR. MARTIN:

9        Q.  Did you do anything else to prepare for your

10   testimony today?                                           11:06:47

11       A.   No.

12       Q.   Okay.  I want to begin talking about the various

13   entities that are in play here and how they work

14   together.

15           So can you explain the function of the Oregon      11:07:06

16   State Treasury at a high level?

17       A.   The Oregon State Treasury has statutory authority

18   and responsibility to manage all the state investment

19   pools.

20           These investment pools would be -- an example of   11:07:35

21   these investment pools would be Oregon Public

22   Retirement -- Public Employees Retirement System Fund or

23   Fund, Common School Fund, State Accident Insurance Fund,

24   Oregon Short-Term Fund.

25           So at a broad level, Oregon State Treasury         11:07:57

                                                               Page 67

1    provides an investment management function for those

2    state tools.

3        Q.   And Oregon State Treasury is an agency of the

4    State of Oregon?

5        A.   That is correct.                                    11:08:08

6        Q.   And where are its offices located?

7        A.   Oregon State Treasury is headquartered in Salem,

8    Oregon, the capital.

9             Our investment management offices are located in

10   Tigard, Oregon.                                              11:08:24

11       Q.   Tigard?

12       A.   Correct.

13       Q.   And is Oregon State Treasury governed by a person

14   or a board?

15            MR. MUELLER:   Object to the form of the           11:08:36

16   question.

17            THE WITNESS:   Oregon State Treasury is led

18   by an elected official.   At this point in time, it's

19   Tobias Reed.

20   BY MR. MARTIN:                                               11:08:45

21       Q.   And when was Tobias Reed elected to be Oregon

22   State Treasurer?

23       A.   I believe three years ago.

24       Q.   And who is -- and the State of Oregon Treasurer

25   today, Tobias Reed, is responsible for all of the           11:09:02

Page 68

1    activities of the Oregon State Treasury?

2                    MR. MUELLER:  Object to the form.

3                    THE WITNESS:  Yes.

4    BY MR. MARTIN:

5         Q.   Including the activities of the investment          11:09:12

6    management division?

7                    MR. MUELLER:  Object to the form.

8                    THE WITNESS:  I would agree.

9    BY MR. MARTIN:

10        Q.   And who is the Oregon State Treasurer ultimately     11:09:24

11   answerable to?

12                   MR. MUELLER:  Object to the form.

13                   THE WITNESS:  I believe the voters of the

14   State of Oregon.  He's an elected official.

15   BY MR. MARTIN:                                                 11:09:39

16        Q.   Okay.  What about the Oregon Investment Council?

17   What is that entity, if it is an entity?

18                   MR. MUELLER:  Object to the form.

19                   THE WITNESS:  I'm not sure of the legal

20   definition of the Oregon Investment Council, whether it        11:09:53

21   is an entity or not.

22   BY MR. MARTIN:

23        Q.   What is it?

24                   MR. MUELLER:  Object to the form.

25                   THE WITNESS:  If you ask what it is, again,     11:10:13

Page 69

1    to me that's almost a legal question on what form it

2    takes legally, so I'm not prepared to answer that

3    question.

4    BY MR. MARTIN:

5        Q.   No, I'm not asking for a legal conclusion.        11:10:22

6             I'm just asking the State of Oregon what the

7    Oregon Investment Council is.

8        A.   The Oregon Investment Council is comprised of the

9    treasurer and four other board members, which are

10   appointed by the State of Oregon Governor's Office.        11:10:34

11            And their responsibility -- fiduciary one to all

12   the investment activity of the Oregon State Treasurer's

13   Office.

14            At least that's my understanding of it.  Legally,

15   I think there's differences of opinion from a legal        11:11:04

16   perspective, but I'm not qualified to answer that

17   question.

18       Q.   Right.  But you understand that Oregon Investment

19   Council or the OIC is responsible for overseeing the

20   activities of -- investment activities of the Oregon       11:11:15

21   State Treasurer?

22                MR. MUELLER:  Object to the form.

23                THE WITNESS:  I would say they're

24   responsible for overseeing the investments made on

25   behalf of OPERF Common School Fund and the other           11:11:27

Page 70

1    clients, the other state investment pools for which we

2    manage money -- for which the Oregon State Treasurer's

3    Office manages money.

4    BY MR. MARTIN:

5        Q.  And when you say "responsible for overseeing,"        11:11:40

6    what do you mean?

7        A.  For managing, contracting, terminating investment

8    management services.

9        Q.  Are they involved in setting investment

10   philosophies for the Oregon State Treasurer -- excuse        11:11:54

11   me -- the Oregon State Treasury?

12       A.  I would say they're a party to that.

13       Q.  What about investment objectives?  Does the

14   Oregon Investment Council set investment objectives for

15   the Oregon State Treasury?        11:12:18

16       A.  I would more aptly describe it as staff in Oregon

17   State Treasury set investment objectives, which are

18   either approved or not approved by the Oregon Investment

19   Council.

20       Q.  Ultimately, the Oregon Investment Council decides        11:12:26

21   whether the strategies proposed by the Oregon State

22   Treasury are ones that will be pursued by the Treasury,

23   correct?

24              MR. MUELLER:  Object to the form.

25              THE WITNESS:  I would agree with that.        11:12:37

Page 71

1    BY MR. MARTIN:

2        Q.  And what about specific investment strategies?

3    What is Oregon Investment Council's role in evaluating

4    or adopting specific investment strategies?

5                MR. MUELLER:  Object to the form.          11:12:54

6                THE WITNESS:  In the majority of the cases

7    when there's an investment, a new investment being made,

8    a manager that isn't known or isn't part of the

9    historical record of investing on behalf of OPERF,

10   staff, through the chief investment officer, bring        11:13:13

11   presentations and recommendations for hire to the Oregon

12   Investment Council.  So the supplies to public equities,

13   fixed income, private equity, real estate and

14   alternative investments.

15   BY MR. MARTIN:                                            11:13:32

16       Q.  Does the Oregon Investment Council set the

17   allocation of client funds across those different

18   products that you just mentioned?

19       A.  I would say they approve allocations which are

20   recommended by staff.                                     11:13:53

21       Q.  Treasury staff will recommend allocations across

22   both equities, real estate and then Oregon Investment

23   Council approves or disapproves of those

24   recommendations, correct?

25       A.  Correct.                                          11:14:09

Page 72

1      Q.  Okay.  What about OPERF; Oregon Public Employee

2   Retirement Board.  What is it?

3      A.  They're the state entity that is responsible for

4   administering the system.

5      Q.  And when you say "administering the system" what      11:14:30

6   do you mean?

7      A.  The system being the liabilities or the monies

8   owed to current retirees and future retirees.

9          So they're responsible for managing beneficiary

10  payments or retirement checks and future retirement      11:14:45

11  benefits.  It's administrative in nature.

12     Q.  Apologies for interrupting.  Does OPERB play any

13  role whatsoever in the investment of OPERB assets?

14     A.  No.

15     Q.  Okay.                                              11:15:07

16          MR. MARTIN:  I'd like to mark as Exhibit 16,

17  a document from the Oregon Secretary of State's website

18  titled, Office of the State Treasurer Agency

19  Subdivisions.

20          (Exhibit No. 16 marked for identification.)      11:15:49

21  BY MR. MARTIN:

22     Q.  Have you had a chance to look at Exhibit 16?

23     A.  Yes.

24     Q.  So taking a look at the investment -- well, first

25  of all, does this document accurately reflect the       11:16:23

Page 73

1    constituent divisions of the Oregon State Treasury?

2        A.   Seems to be missing one.

3        Q.   And which one do you think it's missing?

4        A.   The Oregon Savings Growth Plan, which is the

5    State's 457 plan.                                    11:16:49

6        Q.   So that is a separate division of the Oregon

7    State Treasury?

8        A.   I would say it's a division of -- that falls

9    under OPERB, PERS.   It's another pool of assets that

10   Oregon State Treasurer manages.   It's the 457 plan.    11:17:18

11       Q.   And it manages those assets separate and apart

12   from the investment division?

13                MR. MUELLER:   Object to the form of the

14   question.

15                THE WITNESS:   Restate the question.      11:17:29

16   BY MR. MARTIN:

17       Q.   Is the Oregon Savings Growth Plan, my

18   understanding is that you just testified that it's a

19   separate division or subdivision of the Oregon State

20   Treasury; is that correct?                            11:17:41

21       A.   No.   I would say it's another pool of assets

22   which Oregon State Treasury manages.

23       Q.   Through the investment division?

24       A.   Through the investment division.

25       Q.   I see.   Okay.   Well, take a look at the      11:17:59

Page 74

1    investment division paragraph and just read it for a

2    moment.

3        A.   Page 3.

4        Q.   Page 3, yes.

5        Okay.   Have you had a chance to read that          11:18:39

6    paragraph?

7        A.   Yes, I have.

8        Q.   Okay.   Is the investment division referenced here

9    the only division of the Oregon State Treasury that

10   manages investments?                                     11:18:51

11       A.   They're the only division of State Treasury that

12   manages investments on behalf of the particular entities

13   indicated in this particular paragraph.

14       And that would be OPERF, State Accident Insurance

15   Fund, Oregon Short-Term Fund, Common School Fund, then   11:19:19

16   mentioned down below, the State's Deferred Compensation

17   Plan, which is the Oregon State Retirement.

18       Q.   What other divisions of the -- sorry -- the

19   Oregon State Treasury are managing investments?

20            MR. MUELLER:   Object to the form of the        11:19:35

21   question.

22            THE WITNESS:   Could you define management,

23   please?

24   BY MR. MARTIN:

25       Q.   What do you understand management in this context   11:19:53

Page 75

1  to mean?

2      A.  Could you define management, please?

3      Q.  Well, I'm asking.

4      A.  I asked you first.

5      Q.  The difference is that you don't get to ask          11:20:04

6  questions.

7          So I'm asking you, what do you understand

8  investment management to mean?

9      A.  Investment management services are the services

10  that we provide -- I say "we."  I'm sorry.          11:20:18

11          Oregon State Treasury provides, on behalf of

12  its -- the different state pools, the different clients

13  it has.

14          Those are specific investment management

15  services; buying and selling stock, investing in private          11:20:32

16  equity, investing in real estate, investing in

17  alternatives, investing in fixed income instruments.

18          That's what I define myself to be investment

19  management services.

20      Q.  Does any subdivision of the Oregon State Treasury          11:20:49

21  provide those services, other than the investment

22  division described at the top of page 3 of Exhibit 16?

23      A.  I would say the Oregon Savings Network, which is

24  at the bottom of page 3, provides services similar to

25  the Oregon Savings Growth Plan.          11:21:10

Page 76

1           Apart from OPERF, which has fixed income and

2    public equity positions, which other funds listed here

3    have fixed income or public equity positions?

4               MR. MUELLER:  Objection.  Beyond the scope

5    of the -- what the witness is designated here to testify    11:31:51

6    about.

7               You can answer in your personal capacity.

8               THE WITNESS:  Common School Fund has public

9    equity and fixed income portfolios and positions.

10              State Accident Insurance Fund has public    11:32:05

11   equity and fixed income positions and portfolios.

12              I would also say the Oregon Savings Growth

13   Plan, State's 457 plan; a volunteer plan in which

14   individual state employees can opt into it.  That also

15   holds public equity and fixed income investments, namely    11:32:29

16   in the form of 40 Act Funds, mutual funds.

17   BY MR. MARTIN:

18       Q.   And you and your team are responsible for all of

19   the public equity investments made using the assets of

20   OPERF, the State Accident Insurance Fund, the Common    11:32:50

21   School Fund and OSG 457?

22       A.   OSGP.

23              MR. MUELLER:  Same objection.

24              THE WITNESS:  Yes.

25   BY MR. MARTIN:    11:33:04

Page 84

```
1        Q.  And the senior investment officer you mentioned

2   whose responsible for fixed income, Jeff Nolan?

3        A.  Nolan, N-O-L-A-N.

4        Q.  Got it.  He's responsible for all of the fixed

5   income investments made using the assets of OPERF, the      11:33:22

6   State Accident Insurance Fund, the Common School Fund

7   and OSGP 457?

8              MR. MUELLER:  Same objection.

9              THE WITNESS:  That is correct.  Jeff Nolan

10  joined us a year and a half ago, so he's relatively new     11:33:38

11  to the fund.

12  BY MR. MARTIN:

13       Q.  Okay.  What is the source of the assets that are

14  in the Public Employee's Retirement Fund, OPERF?

15       A.  Could you rephrase that, please?                   11:33:51

16       Q.  Sure.  So you're responsible for managing the

17  public equity assets of the Public Employees Retirement

18  Fund, correct?

19       A.  Correct.

20       Q.  And what are those assets?                         11:34:06

21       A.  I'm not clear on what you mean; what are those

22  assets?  Those assets are part of the OPERF fund.

23       Q.  Right.  Where do those assets come from?

24       A.  Two sources; investment returns and contributions

25  from state entities that are a part of the PERS return      11:34:38
```

Page 85

1    intelligence.  They use natural language processors to

2    go through 10-Ks and 10-Qs to get a sense of the tone of

3    senior management and what they're saying or not saying.

4    That could be significant.

5         So it's public information, but it's not          13:37:09

6    necessarily financial information.

7       Q.  I see.  And your testimony is that the active

8    managers that OST uses are relying not just on financial

9    market information, but also other resources; is that

10   correct?                                               13:37:29

11             MR. MUELLER:  Object to the form of the

12   question.

13             THE WITNESS:  Other unique data sources or

14   research that potentially adds value -- that they

15   believe adds value.                                    13:37:42

16   BY MR. MARTIN:

17      Q.  Can you give me an example of some of these other

18   unique data sources that active managers rely on, as

19   they attempt to beat indices?

20      A.  Sure.  Many trades end up having trade          13:37:56

21   publications, whether it be oil or energy or retail or

22   mall or real estate.

23         Many managers might subscribe to lesser known

24   trade publications.  They might try to gather data from

25   those trade publications or any data those managers     13:38:18

Page 129

```
 1    have.

 2         So for instance, the number of shale or oil

 3    drilling that's going on.  Oil derricks that are in

 4    current use.

 5         That information isn't readily -- it's publicly     13:38:31

 6    available.  You have to buy it for a fee, but that's a

 7    source of -- that's a unique source of data.

 8         Some managers or a particular manager I know uses

 9    it in the attempt to add value in that particular sector

10    of the market.  That's an example.                       13:38:47

11    Q.  And that's information that they're using that is

12    not -- the reason it's an advantage is because they're

13    using the information, but it's not available to the

14    broader market; is that right?

15    A.  It's available --                                    13:38:59

16              MR. MUELLER:  Object to the form of the

17    question.

18              THE WITNESS:  It's available to the broader

19    market at a fee.

20    BY MR. MARTIN:                                           13:39:05

21    Q.  But it's not as efficiently incorporated into the

22    market as the information that's available for free,

23    correct?

24              MR. MUELLER:  Object to the form of the

25    question.                                                13:39:22
```

Page 130

1      Q.  For the transactions listed here that were made

2  by internal managers, how would it be possible to figure

3  out who at Treasury made the decision to buy or sell

4  each security here?

5      A.  All three of those cases I mentioned those          14:45:43

6  portfolios.

7      Q.  I see.  So which three did you not make the

8  investment decision on?

9      A.  Could you repeat that again?

10     Q.  So you said you -- as to the transactions that      14:45:58

11  were made internally at OST, you said all but three you

12  made personally?

13     A.  No, no, no.  I said I made the investments.  I

14  was the portfolio manager trader on the 59 GX, the risk

15  premium portfolio, S&P 500 portfolio, and the RAFI       14:46:17

16  portfolio during the time of this -- of the

17  class-action.

18     Q.  You made the investment decision?

19     A.  I made the investment decision.  I was portfolio

20  manager and trader.                                       14:46:34

21     Q.  I see.  And so just to be clear, are there any

22  transactions here by Treasury that were not made by you

23  personally?  And by here, I mean in exhibits 20 and 21.

24     A.  I may have handed off portfolio management

25  responsibility when I was on vacation to one of the       14:46:58

Page 168

```
 1    during the class period related to the misstatements and

 2    omissions alleged in the Complaint?

 3              MR. MUELLER:  Same objections.

 4              THE WITNESS:  So, yes.  Again, I would say

 5    south of 10 million.                          15:18:21

 6    BY MR. MARTIN:

 7       Q.  Right.  But presumably the State of Oregon's

 8    position is that it lost a certain amount of money on

 9    its CenturyLink position during the class period; is

10    that correct?                                 15:18:34

11       A.  Correct.

12       Q.  And what I'm asking is, of that loss, how much of

13    it does the State of Oregon attribute to the

14    misstatements and omissions alleged in the Complaint?

15              MR. MUELLER:  I'm going to object again,   15:18:46

16    just beyond the scope of the noticed topics.

17              You can answer if you know.

18              THE WITNESS:  I would say it allocates all

19    the loss attributed to misleading statements and

20    omissions made by century CenturyLink senior executives  15:19:06

21    during the class-action period, which came out in a

22    rather large way with the June 16th Bloomberg article on

23    a whistleblower, as to the cramming practices at

24    CenturyLink.

25              Suits, the following Monday, on June 19th,    15:19:29
```

Page 186

 1    of multiple consumer-related actions.  And then finally

 2    on June 12th, the Department of Justice of Minnesota

 3    announcing their lawsuit.

 4              As more and more information was uncovered,

 5    the actual shenanigans, the misbehavior, the unethical,    15:19:46

 6    illegal practices that CenturyLink was engaging in as

 7    far as its sales efforts came to light.  Prices in the

 8    stock dropped, reached a new market level, and that's

 9    the basis for the loss.

10              The market didn't have that information         15:20:08

11    prior to the time.  Senior management was obfuscating,

12    was lying really about it.

13              When information finally came out, the new

14    market price limit was reached.  And that captured what

15    was actually going on.  That is where the loss occurred.  15:20:22

16    BY MR. MARTIN:

17       Q.  So to circle back to the question, the State of

18    Oregon's position is that all of the loss that it

19    incurred on its CenturyLink position during the class

20    period is attributable to the misstatements and          15:20:36

21    omissions alleged in the Complaint?

22              MR. MUELLER:  I'm going to object again.

23    The notice topic is for gains and losses.

24              You questions now are about damages.  That's

25    not a noticed topic.  It wouldn't be an appropriate       15:20:46

                                                    Page 187

```
 1    topic if it were a noticed topic.

 2           If Mr. Viteri has a personal view on this,

 3    he can testify.

 4           THE WITNESS:  I believe so.

 5    BY MR. MARTIN:                                    15:20:58

 6       Q.  Okay.

 7       A.  Market and market recovery information is based

 8    on truthful information that comes from senior

 9    management, through 10-Ks, 10-Qs, there's the

10    expectation that senior management is honest.        15:21:11

11           If they're holding back information on the actual

12    practices, if they're holding information on illegal

13    sales practices, which ended up generating excess

14    revenues, that's not sustainable.  It ends up being

15    illegal, and it's artificially propping up the price.  15:21:31

16           That price was popped when -- when --

17       Q.  Thank you.  All right.  I'm going to switch gears

18    a little bit and ask about Topic 5, which is Oregon's

19    knowledge about CenturyLink sales and billing practices,

20    complaints about those practices prior to June 16th,    15:21:48

21    2017?

22           Does any unit of the State of Oregon collect

23    consumer complaints about businesses that operate in

24    Oregon?

25           MR. MUELLER:  Objection.  Outside of the --      15:22:01
```

Page 188

1    we established earlier, we're all on the same page.

2            Our point of view is that the plaintiff is

3    defined in the Complaint.  Mr. Viteri is here to testify

4    on behalf of that plaintiff.

5            If he has personal knowledge on the question    15:22:16

6    you've specifically asked, he can answer it.

7    BY MR. MARTIN:

8        Q.  I'm asking if Oregon State Treasury knows whether

9    any unit of Oregon collects consumer complaints about

10   businesses that operate in Oregon.                      15:22:30

11       A.  I believe so, but I'm not sure.  I'm not familiar

12   with those entities.  I'm not involved in that on a

13   day-to-day basis.

14       Q.  So you don't know whether Oregon receives

15   hundreds, thousands, tens of thousands of consumer       15:22:45

16   complaints in a year?

17            MR. MUELLER:  Same objection.

18            THE WITNESS:  No.  Oregon State Treasury

19   certainly doesn't receive that information.

20   BY MR. MARTIN:                                           15:22:54

21       Q.  I'm not asking if Oregon State Treasury receives

22   that information.

23          I'm asking if any unit of the State of Oregon

24   receives that information.

25            MR. MUELLER:  Same objection.                   15:23:09

Page 189

1              THE WITNESS:  I don't know.

2    BY MR. MARTIN:

3        Q.  And is it the case that customer complaints made

4    to the State of Oregon are particularly common with

5    respect to the telecommunications industry?          15:23:36

6              MR. MUELLER:  Same objection.

7              THE WITNESS:  I don't know.

8    BY MR. MARTIN:

9        Q.  So you don't know what kind of information the

10   State of Oregon collects in the way of consumer      15:23:52

11   complaints?

12             MR. MUELLER:  Same objection.

13             THE WITNESS:  That is correct.  I don't

14   know.

15   BY MR. MARTIN:                                        15:24:01

16       Q.  And you don't know the channels through which an

17   Oregon consumer can report a sales and billing complaint

18   to the State of Oregon?

19             MR. MUELLER:  Same objection.

20             THE WITNESS:  That is correct.              15:24:13

21   BY MR. MARTIN:

22       Q.  Or what happens when a complaint is made?

23             MR. MUELLER:  Same objection.

24             THE WITNESS:  That is correct.

25   BY MR. MARTIN:                                        15:24:20

Page 190

1      Q.  Or whether there is a determination as to whether

2    a complaint is meritorious or not?

3              MR. MUELLER:   Same objection.

4              THE WITNESS:   That is correct.

5              MR. MARTIN:   Let's take a five-minute break.      15:24:46

6              THE VIDEOGRAPHER:   We are off the record at

7    3:24.

8              (Break taken.)

9              THE VIDEOGRAPHER:   Back on the record at

10   3:34.                                                       15:34:55

11   BY MR. MARTIN:

12     Q.  Mr. Viteri, you testified earlier today that you

13   have a specific recollection of reading certain news

14   articles about CenturyLink; is that accurate?

15     A.  That's correct.                                       15:35:09

16     Q.  And tell me about that recollection.

17     A.  Sure.  It all stems from a good friend of mine,

18   who is a former portfolio manager at Arizona State

19   Retirement System.  He was a fixed income portfolio

20   manager.                                                    15:35:23

21          He left to go join Quest, which eventually became

22   CenturyLink.  And I would visit him a couple times as

23   friends in Denver.

24          So when the information came out on CenturyLink,

25   right around the same time as Wells Fargo, I was just      15:35:37

                                                     Page 191

1      Q.  So do you remember which news articles you read?

2      A.  They're on Bloomberg.  I have no idea who was the

3   author.

4      Q.  Do you recall reading any articles about

5   CenturyLink prior to the ones you're thinking about now?    15:36:56

6      A.  No.

7      Q.  No?

8      A.  It was really kind of the June 16th whistleblower

9   article that came out on Bloomberg.  And then the

10  subsequent one that came out on the 19th of June.    15:37:11

11      And then the attorney general article, not

12  article, but lawsuit and that information came out

13  July 12th, I think 2017.

14      Q.  And you remember reading those articles

15  independent of seeing them referenced in the Complaint,    15:37:25

16  I take it?

17      A.  I remember the whistleblower because it was

18  CenturyLink and it happened right around the time as

19  Wells Fargo.

20      So the subsequent releases and data, it was    15:37:38

21  just -- that's just noise.  It's just more information.

22  This was going on.  It was systemic.

23      Q.  I see.

24      So you view the CenturyLink -- sorry.  You view

25  the -- what is it?  The June -- it's somewhere.  The    15:37:53

Page 193

1    Bloomberg article about --

2        A.   June 16th.

3        Q.   June 16th.   You view that as the significant

4    news, and everything after that you said you was just

5    more of the same?                                    15:38:09

6              MR. MUELLER:   Objection.   That's beyond the

7    scope of the noticed topics.

8              THE WITNESS:   That was the significant news,

9    in which it came out that those sales practices, the

10   cramming that was going on, the bait and switch or I    15:38:20

11   guess lying, extortion or whatever you want to call it,

12   that was going on, and the fact within that news

13   article, the senior management had been hiding them.

14              They had known for a long period of time.

15   They knew what the practices were.   So I just recall   15:38:34

16   that it was -- it's pretty similar to what was going on

17   with Wells Fargo at the same time.

18   BY MR. MARTIN:

19       Q.   You said that the June 16th article was the big

20   one, and then you said the subsequent releases and data,  15:38:46

21   that's just noise.   Is that your testimony?

22              MR. MUELLER:   Objection.   Beyond the scope

23   of the noticed topics.   You can testify as to your

24   personal opinion.

25              THE WITNESS:   More substantiation of what    15:38:57

Page 194

1    was going on.

2    BY MR. MARTIN:

3        Q.   Substantiation of the June 16th article?

4        A.   Of the cramming and the illegal sales practices

5    that were going on at CenturyLink.  It was more          15:39:07

6    information that kept on coming out.  And price drops

7    that were occurring at that time on June 16th, June 19th

8    and June 12th does.

9        Q.   June 12th or July?

10       A.   I'm sorry.  June 16th, June 19th, July 12th.     15:39:20

11       Q.   I see.  So you thought the June 19th and July

12   13th [sic] confirmed what was in the 16th article?

13               MR. MUELLER:  Same objection.  He can

14   testify to his personal knowledge.

15               THE WITNESS:  Provided further              15:39:40

16   substantiation that this was systemic.  This was

17   happening for quite a while, and it was happening across

18   multiple states, across more than half their client

19   base.

20   BY MR. MARTIN:                                          15:39:52

21       Q.   Those articles referenced allegations and

22   lawsuits, correct?

23               MR. MUELLER:  Same objections.

24               THE WITNESS:  My recollection was that the

25   first article that came out June 16th was really the    15:40:03

Page 195

Veritext Legal Solutions
866 299-5127

1   whistleblower article that Bloomberg came out, and they

2   reference it within the article that it was similar to

3   Wells Fargo.

4           And again, it was memorable to me because my

5   buddy was working at CenturyLink.  I wasn't kind of          15:40:14

6   brazen about it, because he came from Quest.

7   BY MR. MARTIN:

8       Q.  And you don't remember reading any articles

9   before or after those three?  It's just those three, the

10  ones that are the corrected disclosures in this case         15:40:27

11  that you recall reading about?

12          MR. MUELLER:  Objection.

13          THE WITNESS:  Before that no.  There was no

14  news articles out there.

15  BY MR. MARTIN:                                               15:40:35

16      Q.  There were no news articles about CenturyLink

17  prior to the corrected disclosure referencing the Hizer

18  article?

19          MR. MUELLER:  Objection.  Misstates

20  testimony.                                                   15:40:45

21          THE WITNESS:  There's no news articles that

22  I recall reading with respect to CenturyLink's

23  practices.

24  BY MR. MARTIN:

25      Q.  I see.                                               15:40:53

Page 196

1    Q.  I mean, I take it from what you testified earlier

2    that you think the news in March 2017, for example, is

3    not significant because it's just a couple of people

4    complaining.  Is that your position?

5              MR. MUELLER:  Object to the form of the          15:57:53

6    question.

7              THE WITNESS:  It was just a news article

8    about the unfortunate experiences that a couple

9    CenturyLink employees had.

10   BY MR. MARTIN:                                             15:58:03

11   Q.  Well, it's not a couple, right?  It says

12   complaints about the company to Oregon regulators jumped

13   by more than 54 percent in 2015 and then climbed another

14   11 percent last year.

15        That's more than a few customers, isn't it?          15:58:15

16             MR. MUELLER:  Object to the form of the

17   question.

18             THE WITNESS:  Again, I'm not too sure what

19   the jump is based on, but the number of complaints;

20   54 percent could be from two to three, so I don't have    15:58:24

21   information on that.

22             Both of these articles are highlighting two

23   individuals.

24   BY MR. MARTIN:

25   Q.  Are you aware of an Oregon Department of Justice       15:58:49

Page 206

1    investigation of CenturyLink?

2            MR. MUELLER:  Object to the question, so far

3    as it calls to him to answer -- for Mr. Viteri to answer

4    beyond knowledge on the plaintiff as defined in the

5    Complaint.                                          15:59:10

6            If you have any personal knowledge, you can

7    answer the question.

8            THE WITNESS:  I don't have any personal

9    knowledge of any investigation that DOJ was involved in,

10   other than in conjunction with counsel from Stoll Berne    15:59:24

11   and BLBG.

12   Q.  Did you just answer that question in your

13   individual capacity or in a representative capacity?

14       I'm trying to understand because I think you said

15   that you did not have personal knowledge of any        15:59:43

16   investigation.

17       Again, I'm not interested in your personal

18   knowledge.  I'm interested in the knowledge of the

19   entities that you represent here today, so --

20   A.  I'm representing OPERF and Oregon State Treasury.    15:59:53

21   Q.  And I'm asking what information -- excuse me.

22   I'm asking whether the entities you represent today

23   during this deposition are aware that the Oregon

24   Department of Justice had conducted an investigation of

25   CenturyLink?                                          16:00:13

Page 207

1           MR. MUELLER:   Objection.   I'm going to

2    object.   You haven't put a time period on this.

3           MR. MARTIN:   At any point.

4           MR. MUELLER:   Today is he aware?   Is that

5    the question?                                    16:00:23

6    BY MR. MARTIN:

7       Q.   Let's start with today.   Is -- are the entities

8    that you represent aware, today, of an Oregon DOJ

9    investigation of CenturyLink?

10      A.   The entities I represent, Oregon State Treasury   16:00:35

11   and OPERF, are aware of a class-action lawsuit that we

12   have against CenturyLink.

13           That class-action lawsuit was informed by

14   conversations with counsel, Stoll Berne, BLBG and the

15   Department of Justice.                           16:00:58

16      Q.   I'm asking if you are aware of an independent

17   Oregon Department of Justice investigation of

18   CenturyLink?

19      A.   No.

20      Q.   And that's true of any time period?   You're not   16:01:14

21   now nor have you ever been aware of an Oregon Department

22   of Justice investigation of CenturyLink.

23           Is that your testimony?

24           MR. MUELLER:   I'm also going to object to

25   this.   I assume this relates to Topic 5, which calls for   16:01:34

Page 208

```
 1    knowledge prior to June 16, 2017.

 2              To the extent you're asking about knowledge

 3    prior to June 16th, 2017, that's a topic that's been

 4    noticed and Mr. Viteri can testify on behalf of Oregon.

 5              To the extent you're asking about later        16:01:51

 6    periods, that's not a topic that was noticed.

 7              MR. MARTIN:  I'm asking, just period:  Are

 8    you aware of an Oregon Department of Justice

 9    investigation, independent of lawsuit?

10              MR. MUELLER:  I'm saying he cannot answer on   16:02:07

11    behalf of Oregon as to the period prior to June 16,

12    2017.

13              He can answer for himself personally as to

14    any time there after.

15    BY MR. MARTIN:                                           16:02:16

16       Q.  Okay.  What's the answer?

17       A.  I'm not aware of any independent research or

18    investigation the Department of Justice have been doing,

19    apart from this particular -- the investigations they

20    were doing for this class-action lawsuit.               16:02:32

21       Q.  When you say the investigations that they're

22    doing for this class-action lawsuit, what are you

23    referring to?

24       A.  The analysis that was conducted in conjunction

25    with counsel, Stoll Berne and BLBG on the               16:02:47
```

Page 209

1    misrepresentations and omissions of CenturyLink's senior

2    staff with respect to the cramming and illegal sales

3    practices.

4          That was the data set.  That was the information

5    the that DOJ reviewed with counsel.                    16:03:07

6      Q.  Related to this litigation?

7      A.  Related to this litigation.

8              MR. MARTIN:  Exhibit 28 is a press release

9    issued by the Oregon Department of Justice on

10   December 31st, 2019, titled:  "AG Rosenblum announces    16:03:52

11   four million settlement with CenturyLink."

12              (Exhibit No. 28 marked for identification.)

13   BY MR. MARTIN:

14     Q.  Please review 28 and let me know when you're

15   ready.                                                  16:04:16

16              MR. MUELLER:  I'm going to go ahead and make

17   the same objection here.

18              MR. MARTIN:  I haven't asked a question.

19              MR. MUELLER:  Okay.

20   BY MR. MARTIN:                                          16:05:36

21     Q.  Does this document, Exhibit 28, refresh your

22   recollection that the Oregon Department of Justice

23   conducted an investigation of CenturyLink sales and

24   billing practices?

25              MR. MUELLER:  Same objections as before.     16:05:48

Page 210

1    The witness can testify on behalf of Oregon to any

2    knowledge of Oregon, as defined in the Complaint, about

3    billing practices prior to June 16, 2017.

4             Beyond that, he can testify in his -- to any

5    personal knowledge he may have.                    16:06:03

6             THE WITNESS:  I wasn't aware of this

7    settlement or the DOJ investigation and the resulting

8    four million dollar settlement, which seem to be more

9    consumer-related in nature.

10   BY MR. MARTIN:                                     16:06:16

11      Q.  So the entities you're testifying on behalf of

12   today were not aware of this investigation until today?

13            MR. MUELLER:  Objection.  Misstates

14   testimony.  The witness is also not here to testify on

15   behalf of the knowledge of the entities by the DOJ      16:06:32

16   investigation at any time after this date of June 16th,

17   2017, which is the topic you noticed.

18            THE WITNESS:  I was not aware.

19   BY MR. MARTIN:

20      Q.  Okay.  All right, I want to switch gears for a    16:06:50

21   minute.

22            I think this will be the last topic we discuss

23   today, well, for you anyway.

24            I'm going to mark as 29 the Consolidated

25   Securities Class-Action Complaint filed in this action  16:07:25

Page 211

1            Do you recall those questions?

2      A.  I do.

3      Q.  You also testified this afternoon about a number

4  of topics, including Oregon's outside investment

5  managers, Oregon's transactions in CenturyLink        16:35:19

6  securities, Oregon's policies and procedures.

7            Do you recall that testimony that you went

8  through with Mr. Martin?

9      A.  I do.

10     Q.  How is it that you are able to provide the      16:35:30

11  testimony that you provided to Mr. Martin?

12     A.  A number of things.  I reviewed a tome of

13  documents with respect to investment management

14  agreements, complaint spreadsheets, manager

15  presentations, and being familiar with and working with  16:35:54

16  Oregon State Treasury over the last 12 years.  I'm one

17  of the senior investment officers there, especially in

18  the public markets.

19            So that knowledge, preparation for this

20  particular deposition and my experience.  I've been in   16:36:08

21  the investment management business for 25 years, working

22  in another state retirement plan as well.

23     Q.  The tome of documents referred to, that's

24  something you did to prepare to be here and testify to

25  today?                                                   16:36:25

```
1                        CERTIFICATE

2

3         I, Mary C. Soldati, Registered Professional

4    reporter, Oregon and Washington Certified Shorthand

5    Reporter, hereby certify that said witness personally

6    appeared before me at the time and place set forth in

7    the caption hereof; that at said time and place I

8    reported in stenotype all testimony adduced and other

9    oral proceedings had in the foregoing matter; that

10   thereafter my notes were transcribed through

11   computer-aided transcription by me; and that the

12   foregoing pages constitute a full, true and accurate

13   record of all such testimony adduced and oral

14   proceedings had, and of the whole thereof.  I further

15   certify review of the transcript was requested.

16         In witness whereof, I have hereunto set my hand

17   this 10th day of March, 2020.

18

19

20                    <%9191,Signature%>

21

22                 Mary C. Soldati, RPR
                     CSR-WA No. 3406
23               Expires April 20, 2020

24                 CSR-OR No. 19-0457

25               Expires April 20, 2022


                                             Page 231
```

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

MDL No. 17-2795 (MJD/KMM)

This Document Relates to:
Civil File No. 18-296 (MJD/KMM)

### Errata Sheet to the Transcript of the March 5, 2020 Deposition of Michael Viteri

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 10 | 17 | "a part" to "apart" | Spelling |
| 13 | 6 | "treasury" to "Treasury" | Capitalization |
| 21 | 25 | "Approximately" to "approximately" | Capitalization |
| 25 | 9 | "at" to "a" | Typographical error |
| 35 | 18 | "EBLG" to "BLBG" | Typographical error |
| 52 | 7 | "teleco" to "telecom" | Typographical error |
| 70 | 25 | Add comma: "OPERF," | Typographical error |
| 72 | 12 | "the supplies" to "this applies" | Typographical error |
| 75 | 17 | Add word: "Retirement **System**" | Typographical error |
| 90 | 10 | Add word "2013 **to** July" | Typographical error |
| 103 | 11 | "tenants" to "tenets" | Typographical error |
| 104 | 19 | "consulting" to "Consulting" | Capitalization |
| 107 | 20 | "your" to "you're" | Typographical error |
| 116 | 14 | "in" to "and" | Typographical error |
| 124 | 21 | "it's" to "its" | Typographical error |
| 127 | 11 | "under perform" to "underperform" | Typographical error |
| 158 | 19 | "terminate" to "terminat**ed.**" | Typographical error |
| 161 | 9 | "Centrylink's" to "CenturyLink's" | Spelling |
| 162 | 10 | "Legacy" to "legacy" | Capitalization |
| 164 | 3 | "that terminated" to "that **was** terminated" | Typographical error |
| 166 | 6 | Delete word "~~and IMA~~" | Typographical error |
| 172 | 17 | "that" to "what" | Typographical error |
| 177 | 11 | Add period after "custody bank" | Typographical error |
| 178 | 24 | Delete word: "~~or~~ Oregon" | Typographical error |
| 181 | 17 | "BLG" to "BLBG" | Typographical error |
| 186 | 20 | Delete word: "~~century~~ CenturyLink" | Typographical error |

| 218 | 12 | Add comma: "Glen Post," | Typographical error |
| 230 | 14 | "years" to "years'" | Typographical error |
| 10 | 17 | "a part" to "apart" | Spelling |
| 13 | 6 | "treasury" to "Treasury" | Capitalization |

I, Michael Viteri, have read the foregoing transcript, and my testimony, as corrected, above is true and correct.

I hereby certify under penalty of perjury that the foregoing is true and correct.

Date: April 13 , 2020

MICHAEL VITERI