# Exhibit A

Page 1

1           UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3

4

5

6   IN RE: CENTURYLINK SALES        )
    PRACTICES AND SECURITIES        )
7   LITIGATION                      )
                                    ) MDL NO.
8                                   ) 17-2795 (MJD/KMM)
                                    )
9   THIS DOCUMENT RELATES TO:       )
    CIVIL FILE NO. 18-296 (MJD/KMM) )
10                                  )
                                    )
11

12

13

14

15          REMOTE PROCEEDINGS OF THE

16    VIDEOTAPED EXPERT DEPOSITION OF BRUCE DEAL

17            FRIDAY, APRIL 24, 2020

18

19

20

21   REPORTED BY KIMBERLY EDELEN,

22   CSR. NO. 9042, CRR, RPR.

23

24

25

```
                                         Page 2
 1   REMOTE PROCEEDINGS OF THE VIDEOTAPED EXPERT
 2   DEPOSITION OF BRUCE DEAL, TAKEN ON BEHALF OF THE
 3   PLAINTIFF AND THE CLASS, AT 9:06 A.M., FRIDAY,
 4   APRIL 24, 2020, BEFORE KIMBERLY A. EDELEN, C.S.R.
 5   NO. 9042, CRR, RPR.
 6
 7   REMOTE APPEARANCES OF COUNSEL
 8   FOR THE PLAINTIFF AND THE CLASS:
 9               BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
                 BY:  MICHAEL D. BLATCHLEY, ESQ.
10                    ---AND---
                 MICHAEL M. MATHAI, ESQ.
11               1251 AVENUE OF THE AMERICAS
                 NEW YORK, NEW YORK 10020
12               212.554.1400
                 MICHAELB@BLBGLAW.COM
13               MICHAEL.MATHAI@BLBGLAW.COM
14               ---AND---
15               STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
                 BY:  KEIL M. MUELLER, ESQ.
16               209 SW OAK STREET
                 SUITE 500
17               PORTLAND, OREGON 97204
                 503.227.1600
18               KMUELLER@STOLLBERNE.COM
19
20   FOR THE DEFENDANTS CENTURYLINK, INC., GLEN F. POST,
     III, R. STEWART EWING, JR., DAVID D. COLE, KAREN
21   PUCKETT, DEAN J. DOUGLAS AND G. CLAY BAILEY:
22               COOLEY LLP
                 BY:  RYAN BLAIR, ESQ.
23               4401 EASTGATE MALL
                 SAN DIEGO, CALIFORNIA 92121
24               858.550.6047
                 RBLAIR@COOLEY.COM
25    (REMOTE APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

Page 3

1  REMOTE APPEARANCES OF COUNSEL (CONTINUED)
2  FOR THE DEFENDANTS CENTURYLINK, INC., GLEN F. POST,
   III, R. STEWART EWING, JR., DAVID D. COLE, KAREN
3  PUCKETT, DEAN J. DOUGLAS AND G. CLAY BAILEY:
4                 COOLEY LLP
                  BY:  CHRISTOPHER J. MARTIN, JR., ESQ.
5                 55 HUDSON YARDS
                  NEW YORK, NEW YORK 10001
6                 212.479.6484
                  CMARTIN@COOLEY.COM
7
                  ---AND---
8
                  COOLEY LLP
9                 BY:  CAITLIN B. MUNLEY, ESQ.
                  1299 PENNSYLVANIA AVENUE, NW
10                SUITE 700
                  WASHINGTON, D.C. 20004
11                202.776.2557
                  CMUNLEY@COOLEY.COM
12
13
14
15  ALSO PRESENT:  TROY JOHNSON, VIDEOGRAPHER
                   MICHAEL HARTZMARK, Ph.D.
16
17
18
19
20
21
22
23
24
25

```
                                                  Page 7
 1                     BRUCE DEAL,
 2     having been first duly sworn by the reporter, was
 3              examined and testified as follows:
 4              THE WITNESS:  I do.
 5              THE VIDEOGRAPHER:  Okay.  You may proceed,
 6     Counsel.
 7
 8                      EXAMINATION
 9     BY MR. BLATCHLEY:
10        Q    Thank you, everyone.  And thank you,
11     Mr. Deal, for bearing with us on the -- on the
12     technical aspects and making yourself available
13     remotely.  I really do appreciate it.  I know how
14     difficult at times it is for everyone, so thank you
15     for doing this and being here.
16              If I could, can I get you again to state
17     your full name for the record.
18        A    Sure.  It's Bruce Deal, B-r-u-c-e, last
19     name Deal, D-e-a-l.
20        Q    And provide your home address, please.
21        A    Home address is 98 Hawthorne Drive,
22     Atherton, California 94027.
23        Q    So, Mr. Deal, I know you're an experienced
24     deposition witness, but I want to just, again,
25     because we're remote deposition, quickly just go
```

Page 65

1    just say he didn't do it, but to actually show the

2    kinds of things that would need to be done and the

3    challenges associated with those and whether it is

4    likely it either could be done at all or whether

5    there's any, for example, price impact, those sorts

6    of things.

7              So I've gone beyond just a simple critique,

8    but I agree at a high level it's sort of under a

9    headline of, you know, quote/unquote shortcomings by

10   which I think are your words of Dr. Hartzmark's

11   analysis.

12   BY MR. BLATCHLEY:

13       Q   So were you given the assignment of figure

14   out whether it's possible or likely to be possible,

15   you know, to, like you said, to do a damages model

16   and to show price impact?

17       A   I certainly wasn't asked to develop all the

18   way through a methodology to identify price impact.

19   That's the plaintiffs' burden, as I understand it,

20   in these matters.

21             So I was asked to identify whether -- to

22   discuss whether or not what Dr. Hartzmark has

23   proposed is sufficient.  I believe it's not.  And

24   to -- as I said before, go beyond that to analyze

25   all the things that I've been talking about, which

Page 114

1      A    I don't believe that's true.

2      Q    You talked about -- let me put that another

3    way.  Is it fair to say that allegations of

4    third-party cramming might not put investors on

5    notice of other types of cramming?

6      A    If I understand your question, it's sort of

7    a form of the fact that there have been concerns

8    about billing and services for years, let's -- in

9    the earlier years they may have been about

10   third-party issues.

11           The question is is that specifically

12   putting consumers on notice that in a world where

13   there's not third-party issues but there nonetheless

14   can be "Hey, I didn't authorize this service" or

15   "You gave me a triple play instead of a double play"

16   or all kinds of variations, certainly at the highest

17   level I think it does put investors on notice that

18   there are concerns in these consumer-facing

19   companies about, you know, unauthorized charges, I

20   think in a broad category they're the same.

21           Are they exactly the same, no, they're not

22   exactly the same, but, again, in my experience and

23   even like we just said, it wasn't only third-party

24   services that were at issue before.

25           And having worked on cases involving these

1   kind of issues over many years, I do think -- well,

2   to put it in the extreme, I certainly don't think an

3   investor in CenturyLink would say I'm shocked that

4   there are allegations in the Heiser lawsuit that

5   there was pressure to add services, not from third

6   parties, but from the company itself.

7            I do think that investors would be on

8   notice that there's certainly going to be concerns

9   about unauthorized charges, even if they're not

10  third-party charges, given all the history of these

11  kind of companies.

12           Even if the allegations aren't the same

13  exactly in terms of third party versus other things,

14  but they certainly belong in the same family of

15  concerns about unauthorized charges.

16  Q    Have you done any analysis to determine the

17  actual amount of cramming that was going on at

18  CenturyLink during the class period?

19  A    No is the answer to that.  I do have

20  analysis in my report about levels of complaints

21  which I think speak to those questions, but I have

22  not myself been asked to do an analysis of the

23  incident, the frequency of complaints or of

24  cramming, quote, unquote, unauthorized services.

25           I haven't done any independent analysis of

Page 116

1    that.  But, again, I do have information to speak to

2    those questions in my report.

3         Q    So just, for example, you haven't looked at

4    any internal CenturyLink documents, have you?

5              MR. BLAIR:  Object to the form.

6              THE WITNESS:  Not that I recall or recall

7    citing.  I'd need to look at my Exhibit B or my

8    Appendix B to see if there were any on there, but

9    this is not a -- certainly at a high level this is

10   not an analysis of the kind of internal operations

11   of CenturyLink.  That's not what I was asked to do.

12   BY MR. BLATCHLEY:

13        Q    I want to clarify it because I think it's

14   important.

15             Have you looked at any internal CenturyLink

16   documents dated during the class period?

17             MR. BLAIR:  Same objection.

18             THE WITNESS:  Just give me a moment here.

19             I think the answer is no, to the extent

20   what you're referring to is any nonpublic

21   information.  I certainly have lots of analysis and

22   listings of kind of CenturyLink documents, meaning

23   earnings releases, things like that.

24             But I took your question to be have I had

25   any access to nonpublic data or e-mails, things like

1    that.  The answer is no.

2    BY MR. BLATCHLEY:

3        Q    Okay.  That was the question.

4        A    Okay.

5        Q    Thank you for clarifying it was nonpublic

6    information.

7            So you say in Paragraph 58 that, you know,

8    Dr. Hartzmark hasn't shown how the corrective

9    disclosures -- I think that's what you mean -- were,

10   in fact, internally different than concerns in

11   history, the instances you cite in the preceding

12   paragraphs.

13           Is that an accurate way to put it?

14       A    Yes.  I think I say pretty close to those

15   words in the last sentence on Page 34.

16       Q    So beyond listing these examples, right,

17   that you have in Paragraph 56, 57, did you read all

18   these articles in connection with this report?

19       A    Did I personally read every word of every

20   article?  No.

21       Q    Okay.  So what did you do to evaluate the

22   differences between these instances and the

23   corrective disclosures?

24           MR. BLAIR:  Object to the form.

25           THE WITNESS:  I'm not quite sure I

Page 118

1   understand your question.

2   BY MR. BLATCHLEY:

3       Q    Maybe I'm asking it the wrong way.

4           You're saying that Dr. Hartzmark didn't do

5   that.  You yourself didn't do that either; is that

6   right?

7           MR. BLAIR:  Objection.  Misstates

8   testimony.

9           THE WITNESS:  I don't think I'd quite agree

10  with that.  I mean, Dr. Hartzmark hasn't done

11  anything about this, so that's -- I think other

12  than -- well, I don't think he's really done

13  anything with regards to this.  He just sort of says

14  I'm assuming everything in the Complaint is true.

15          I -- I -- I have shown, and we've just been

16  discussing fairly extensively, the fact that there's

17  certainly -- to the extent there's typically a

18  premise in a securities case, that the corrective

19  disclosure information was not known prior to that.

20  I say well, in the larger sense that's not true

21  here, that it certainly is not accurate to say that

22  the disclosures would have been the first

23  opportunity for investors to understand that there

24  are concerns about unauthorized charges.  That's

25  absolutely not true as a premise.

1           And that's not -- again, the Complaint

2     itself doesn't say those words, so I think it's

3     important to understand that that's typically a

4     premise of no public information, then oh, suddenly

5     we discover that you didn't get that big contract,

6     to go back to my hypothetical.

7           So what I'm pointing out is that kind of

8     implied premise isn't there in this case.  That

9     doesn't mean, to the discussion we've been having

10    for a while now, that it's not quite the same as

11    saying the investors knew all the specifics of all

12    the lawsuits.  I don't think that's true.

13          But it calls into question the typical

14    causal link of no public information, then oh, my

15    gosh, they didn't get the contract out there.  I

16    don't -- I don't think that is well -- I don't think

17    that's a justified assumption.

18          So then that leads to the question of -- of

19    which I'm referring to here, of well, what is

20    different, if anything, about these.  Why -- why

21    might one think these are something different from

22    just normal course, right.  You always get some

23    complaints about that, and they've even been sued

24    before, right.

25          And I note in my discussion that the Wells

Page 120

1   Fargo type environment, which the Complaint itself
2   clearly hangs its hat on the Wells Fargo type
3   environment here, that that was an additional factor
4   in the environment.  There's been nothing that I've
5   seen that suggests that this was a Wells Fargo kind
6   of situation.
7           I haven't seen anything that Dr. Hartzmark
8   has done or whatever that would say not only were
9   these substance -- were these allegations in a
10  lawsuit that this is Wells Fargo 2, but, in fact,
11  that turned out to be true.  They paid a gazillion
12  dollars in fines.  You know, there was a huge shake
13  up in the company.  I haven't seen anything to
14  suggest that.
15          And that's where I say what's new about
16  that besides the fact the environment and the
17  heightened awareness.  Dr. Hartzmark certainly
18  hasn't done any of that analysis.
19          MR. BLAIR:  Mike, we've been going 90
20  minutes.  Maybe it's a good time for maybe a little
21  longer break than ten, I guess.
22          MR. BLATCHLEY:  Yeah.
23          MR. BLAIR:  On the left coast it would be
24  lunch but I just wanted --
25          MR. BLATCHLEY:  That's totally fine.  I

```
                                              Page 121
 1   haven't eaten.  I can do that as well.
 2              THE WITNESS:  Like I said, I can weigh in.
 3   I wouldn't mind getting a bite to eat.  I don't need
 4   a long time, I think, so I'm fine with like a half
 5   hour.
 6              MR. BLATCHLEY:  Ryan, do you want to
 7   just -- do you want to just e-mail and we'll get
 8   together by e-mail, like let's call it 45 minutes?
 9   Is that okay or do you want shorter?
10              MR. BLAIR:  30 or 45 works for us.
11              MR. BLATCHLEY:  Okay.  And I'll e-mail you
12   guys if we're not obviously back together.
13              MR. BLAIR:  Okay.  Why don't we go off the
14   record.
15              THE VIDEOGRAPHER:  Okay.  The --
16              THE WITNESS:  I can offer up the idea if
17   you only have 15 more minutes to go, I'm happy to
18   stay on.  Just a suggestion.
19              MR. BLATCHLEY:  No.  I got a little bit
20   more.  Sorry, guys.
21              THE WITNESS:  Oh, well.  Okay.  A half hour
22   for lunch is fine.
23              THE VIDEOGRAPHER:  So the time is
24   12:00 p.m. Pacific standard time.  We are off the
25   record.
```

Page 122

1          (Lunch recess taken at 12:00 p.m.)

2

3      \\\

4      \\\

5      \\\

6      \\\

7      \\\

8      \\\

9      \\\

10     \\\

11     \\\

12     \\\

13     \\\

14     \\\

15     \\\

16     \\\

17     \\\

18     \\\

19     \\\

20     \\\

21     \\\

22     \\\

23     \\\

24     \\\

25     \\\

```
                                        Page 123
 1                FRIDAY, APRIL 24, 2020;
 2                     12:55 P.M.
 3
 4
 5                     BRUCE DEAL,
 6    having been previously duly sworn by the reporter,
 7       was examined and testified further as follows:
 8
 9         THE VIDEOGRAPHER:  Okay.  The time is now
10    12:55 p.m. and we are back on the record.
11
12                 EXAMINATION (resumed.)
13    BY MR. BLATCHLEY:
14       Q    Mr. Deal, I'd like to just start by I think
15    clarifying something you had said earlier, making
16    sure I have a correct understanding of what you were
17    saying.
18          So the question I have is is it necessary
19    to have a statistically significant increase in
20    price in order to show price impact?
21       A    That's an -- that's an interesting
22    question.  I think -- my experience is in practice
23    that it's not necessarily a requirement but it's the
24    most common starting point in a situation, like in
25    this case on the up side of inflation, looking for
```

Page 124

1    increases, obviously on the down side of the

2    corrective disclosures.

3         It certainly is a theoretical at least

4    argument that, you know, the inflation or the

5    statement itself might have otherwise inflated or

6    otherwise deflated the stock price, but other

7    factors caused it to go the opposite direction so

8    you don't observe it.

9         That -- I mean, conceptually that can

10   certainly happen.  There's no, you know, kind of

11   theoretical problem with that.

12        I think, again, my experience is as a

13   practical matter that's very, very difficult to show

14   and to identify that, so I wouldn't rule it out as a

15   possibility, but, again, as a practical matter I

16   find that to be typically a starting premise for any

17   price impact analysis.

18   Q    Okay.  So the starting premise is not a

19   requirement; is that right?

20   A    I certainly don't think it's a legal

21   requirement, necessarily, although I think

22   there's -- some of the cases that I'm aware of seem

23   to be suggesting that if you can't show price change

24   in the perspective direction, that itself is -- I'm

25   paraphrasing, strong evidence or whatever on it.

1            But I'm speaking more from a theoretical
2    perspective, you can imagine news that otherwise
3    would if it was the only thing known caused the
4    statistically significant increase or decrease, and
5    if there's a perfectly offsetting other information
6    theory, I think in practice that's very hard to do.
7        Q    So I guess I'm asking a little different
8    question.  Say the example that you just mentioned,
9    the offsetting information, it's certainly
10   possible -- or would you agree that it's possible
11   that you could have a false statement together with,
12   I guess we'll call it confounding information or
13   some other statement that offsets the impact that
14   the statement would otherwise have, would you agree
15   that that's a possibility?
16       A    Yeah.  I think it's at least a theoretical
17   possibility, sure.
18       Q    And in that scenario you wouldn't expect to
19   see a statistically significant increase in stock
20   price?
21       A    Not given the hypothetical you just said,
22   which is a sort of perfectly offsetting news in the
23   opposite direction.  Almost by definition that
24   wouldn't occur.  So the real challenge, of course,
25   is how do you identify the fact that the news that

Page 126

1  you're focused on would otherwise have caused it.

2        It's a form of the same issue that we've

3  been talking about of parsing out.  It's kind of a

4  in your face form of it in that if there's not even

5  a statistically significant movement in the expected

6  direction, I find again as a practical matter that

7  sets the bar awfully high and I don't see anyway in

8  this case it could be overcome.

9    Q    So here's what I want to go through.  So

10  it's certainly a theoretical possibility, as you

11  just said, that if you have offsetting information

12  you wouldn't expect to see a statistically

13  significant increase in the price even though there

14  would be price impact, correct?

15    A    Yeah.  Before I answer the question, you're

16  a little quiet to me.  I don't know if you are to

17  other people.  I don't know if there's a way to get

18  a little closer to the mike.

19    Q    Let me -- sorry.  Let me -- is this better?

20  Can you hear me?

21    A    Yeah.  I can hear you and that is a

22  little -- a little bit better for me.  Thank you.

23        But I think your question was with the sort

24  of -- you know, is it possible that there's price

25  impact given the presence of offsetting information

Page 127

1    effectively.  I think it's a -- if I understand the

2    question it's essentially the same question, to say

3    could there be -- if you had a method that you could

4    identify that had this news come out on its own, it

5    would have had a price impact, but, again, it was

6    offset by some other information there, again,

7    theoretically, sure, I think that's possible.

8              And in that case, I don't know the case law

9    so there's a -- there's sort of another branch of it

10   but from a legal standard of what -- and I can't

11   really speak to that, but as an economic proposition

12   it's at least theoretically possible.

13        Q    Got it.

14             Okay.  So, again, let's just maybe take

15   your contract example, right.  You're talking about

16   you falsely announce a contract and that causes the

17   stock to go up.  Say the next quarter you say the

18   contract is doing just fine, right.

19             In that example there's a false statement,

20   right?  You're with me on my hypothetical?

21        A    Yeah.  The premise is that there really

22   never was a contract, as I understand your

23   hypothetical.

24        Q    Right.  Yeah.

25             And, you know, the company reports results

690faa3297449be3

Page 128

1    that are totally in line with expectations.  In that

2    scenario you wouldn't expect to see a statistically

3    significant stock price increase, would you?

4        A    I think what you're describing is sort of

5    what sometimes people refer to as a price

6    maintenance sort of situation, where if there was

7    some initial inflationary and you kind of repeat the

8    same information effectively, we wouldn't

9    necessarily -- it's not new news to the market at

10   that point in time, so we wouldn't expect that news

11   on its own -- to the extent it's essentially just a

12   repetition of previous expectations, I wouldn't

13   expect that to move the price, if that's your

14   question.

15       Q    And so we'll take that.

16            And then the next example is an event,

17   let's say, building on kind of the first

18   hypothetical, you know, the next -- the next

19   quarter, you know, analysts have their estimates,

20   and you have the contract that doesn't exist, but

21   the company also truthfully discloses that its like

22   major manufacturing facility has this huge fire and

23   the stock -- would you expect in that case, this

24   negative information, could have a, you know --

25   could decline -- could cause a stock price decline,

```
                                        Page 222

 1   STATE OF CALIFORNIA        )

 2   COUNTY OF LOS ANGELES      )    ss.

 3

 4        I, Kimberly A. Edelen, C.S.R. No. 9042, in and

 5   for the State of California, do hereby certify:

 6        That prior to being examined, the witness named

 7   in the foregoing deposition was by me duly sworn to

 8   testify the truth, the whole truth and nothing but

 9   the truth;

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named, and

12   thereafter reduced to typewriting under my

13   direction, and the same is a true, correct and

14   complete transcript of said proceedings;

15        That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the

18   transcript { } was {X} was not required.

19        I further certify that I am not interested in

20   the event of the action.

21        Witness my hand this 27th day of April,

22   2020.

23

24

          KIMBERLY A. EDELEN, C.S.R. NO. 9042

25
```