# Exhibit 1

```
 1            UNITED STATES DISTRICT COURT

 2               DISTRICT OF MINNESOTA

 3

 4   ---------------------------------------------x

 5   IN RE: CENTURYLINK SALES    MDL No. 17-2795

 6   PRACTICES AND SECURITIES         (MJD/KMM)

 7   LITIGATION

 8

 9   This Document Relates to:

10   Civil File No. 18-296

11   (MJD/KMM)

12   ---------------------------------------------x

13

14     VIDEOTAPED DEPOSITION OF MICHAEL L. HARTZMARK

15

16   DATE:        Tuesday, February 25, 2020

17   TIME:        9:55 a.m.

18   LOCATION:    Cooley LLP

19                3175 Hanover Street

20                Palo Alto, California

21

22   Reported By: Lynne Ledanois, CSR 6811

23   Job No. 3999961

24

25   PAGES 1 - 170
```

                                              Page 1

```
 1      work.                                     02:22
 2              My question to you is:  How do you
 3      know it can be done in this case?
 4              What work have you done to get
 5      comfortable that that parsing and scaling is    02:22
 6      possible here --
 7              MR. BLATCHLEY:  Objection, asked and
 8          answered.
 9   BY MR. GIBBS:
10      Q     -- in this case?                     02:22
11              MR. BLATCHLEY:  Asked and answered.
12          Objection.
13              THE WITNESS:  Again, what I've said is
14          that it is -- whatever that input is will be
15          applied classwide.                     02:22
16   BY MR. GIBBS:
17      Q     You're skipping over the work that's
18      necessary to get to the input.
19              I'm asking you:  Have you done any
20      work to get yourself comfortable that whatever    02:22
21      parsing and scaling may need to be done as part
22      of a loss causation analysis to identify an
23      inflation ribbon is possible in this case?
24              MR. BLATCHLEY:  Objection.  Same
25          reason.                                 02:22
```

Page 146

```
 1                 THE WITNESS:  You know, I haven't      02:23
 2        calculated the inputs.  I have not
 3        determined the techniques that would be used
 4        to calculate the inputs.
 5              But I can say whatever the inputs are,  02:23
 6        they would be applied classwide, and you
 7        would look at the inflation at the time of
 8        purchase and the time of sale.  It's very
 9        straightforward.
10   BY MR. GIBBS:                                        02:23
11        Q    You're not answering my question, with
12     all due respect.
13              So I started by asking you:  Are you
14     telling me that anytime they prove loss
15     causation, they, the generic plaintiffs, you can  02:23
16     always calculate an inflation ribbon?
17              And you said, whoa, I can't say
18     something so broad.
19              Where is the limiting principle?
20     Where is the case where they can prove loss        02:23
21     causation, but you can't reliably parse or scale
22     as needed to calculate an inflation ribbon?
23        A    I'll say it again.
24              Assuming that loss causation is
25     proven, that CenturyLink is demonstrated to be     02:23
```

Page 147

# Exhibit 2

1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF MINNESOTA

3

     IN RE:                              )

4                                        )

     CENTURYLINK SALES PRACTICES         ) MDL 17-2795

5    AND SECURITIES LITIGATION           ) (MJD/KMM)

                                         )

6                                        )

7

8

9            The ZOOM Audiovisual Deposition of

10              MICHAEL L. HARTZMARK, PH.D.

11                   June 5, 2020

12                  11:00 a.m. CST

13                    VIA ZOOM

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 1

```
 1    PRESENT VIA ZOOM:
      (All parties appearing remotely via ZOOM)
 2
            BERNSTEIN LITOWITZ BERGER & GROSSMANN
 3          MR. MICHAEL BLATCHLEY
            MR. MICHAEL MATHAI
 4          1251 Avenue of the Americas
            New York, New York 10020
 5          (212) 554-1593
            michaelb@blbglaw.com
 6          -AND-
            STOLL BERNE PC
 7          MR. KEIL M. MUELLER
            209 SW Oak Street
 8          Suite 500
            Portland, Oregon 97204
 9          kmueller@stollberne.com
                  Appeared on behalf of Plaintiffs.
10
11          COOLEY LLP
            MR. PATRICK E. GIBBS
12          3175 Hanover Street
            [!ADDRESS-B3]
13          Palo Alto, California 94304
            (650) 843-5535
14          pgibbs@cooley.com
            -AND-
15          COOLEY LLP
            MR. BRYAN KOCH
16          500 Boylston Street
            14th Floor
17          Boston, Massachusetts [!ZIP4]
            (617) 937-2355
18          bkoch@cooley.com
                  Appeared on behalf of Defendants.
19
      ALSO PRESENT:
20
            Mr. Peter Hess, Analysis Group
21
22    VIDEOGRAPHER: JOEL FREEDMAN
23    REPORTED BY:  JO ANN LOSOYA
      LICENSE #:   084-002437
24
25
                                           Page 2
```

```
 1                     EXAMINATION
      Witness                        Page    Line
 2
      MICHAEL L. HARTZMARK, PH.D.
 3
       By Mr. Gibbs                     4     23
 4     By Mr. Blatchley               148     18
       By Mr. Gibbs                   165      2
 5
                     * * * * * * * * * * * * * * *
 6
 7
                     INDEX OF EXHIBITS
 8
      EXHIBIT              DESCRIPTION              Page
 9
      Exhibit 1   Consolidated Securities Class       6
10                Action Complaint
      Exhibit 2   Expert Report of Michael L.         6
11                Hartzmark PhD dated
                  January 21, 2020
12    Exhibit 30  Expert Report of Bruce Deal         6
                  dated March 23, 2020
13    Exhibit 32  Reply Expert Report of             8
                  Michael L. Hartzmark PhD
14                dated May 4, 2020
      Exhibit 33  HARTZMARK-PARA 112 Table         129
15                Backup
16
17
18
19
20
21
22
23
24
25
                                            Page  3
```

```
 1              THE VIDEOGRAPHER:  Good morning.  We are
 2    going on the record at 11:11 a.m. on June 5th, 2020.
 3    This is Media Unit No. 1 of the video-recorded
 4    deposition of Michael Hartzmark taken by the counsel
 5    for the defense in the matter of CenturyLink Sales
 6    Practices and Securities Litigation filed in the
 7    United States District Court, District of Minnesota,
 8    Case No. 17-2795-MJD-KMM.
 9              This deposition is being held
10    remotely via Zoom.  My name is Joel Freedman.  The
11    court reporter is JoAnn Losoya.  We are from
12    Veritext Legal Solutions.
13              At this time, I'm going to ask all
14    counsels to put your appearances into the chat room
15    with your name and your firm, and the court reporter
16    will now swear in the witness.
17                  (Witness duly sworn.)
18    WHEREUPON:
19              MICHAEL HARTZMARK, PhD
20    called as a witness herein, having been first duly
21    sworn, was examined and testified as follows:
22              E X A M I N A T I O N
23    BY MR. GIBBS:
24         Q.   Thank you.  Just a couple of points for
25    the record before we get started.
```

Page  4

```
 1                    By my watch, when the videographer
 2     began the read in, it was actually 9:11 Pacific
 3     time.  So 11:11 Central time.
 4                    We are, as the videographer noted,
 5     taking this deposition remotely via Zoom by
 6     agreement of all parties.  I'll let anyone weigh in
 7     if they disagree with that.
 8                    To begin, Mr. Hartzmark, you
 9     understand that you are testifying here today under
10     oath just as if you were testifying in a court of
11     law?
12          A.    Yes.
13          Q.    And is there any reason why you would be
14     unable today to understand and answer my questions?
15          A.    No.
16          Q.    Okay.  Before the deposition began, we
17     had asked for you to have a number of documents
18     printed out and available to you in the room.  So I
19     just want to check and make sure that's been done.
20                    As I understand it, we asked for you
21     to have printed out and available to you a copy of
22     the Consolidated Securities Class Action Complaint
23     previously marked as Exhibit 1.
24                    Do you have that document with you?
25          A.    Yes, I do.
```

Page 5

```
 1                        (Deposition Exhibit 1 previously

 2                        marked for identification.)

 3   BY MR. GIBBS:

 4        Q.    Excellent.  Thank you.

 5                   We had also asked for you to have

 6   printed out and available to you the Expert Report

 7   of Michael L. Hartzmark, PhD, dated January 21,

 8   2020, previously marked as Exhibit 2.

 9                   Do you have that document with you?

10        A.    Yes, I do.

11                        (Deposition Exhibit 2 previously

12                        marked for identification.)

13   BY MR. GIBBS:

14        Q.    Excellent.

15                   We had asked to have printed out and

16   available to you the Expert Report of Bruce Deal

17   dated March 23, 2020, and previously marked as

18   Exhibit 30.

19                   Do you have that document with you?

20        A.    Yes, I do.

21                        (Deposition Exhibit 30

22                        previously marked for

23                        identification.)

24   BY MR. GIBBS:

25        Q.    Thank you.
```

                                              Page  6

```
 1                    And then, finally, we had asked the
 2      court reporter to premark and had asked for you to
 3      have available to you in the room a copy of the
 4      Reply Expert Report of Michael L. Hartzmark, PhD,
 5      dated May 4, 2020, and premarked as Exhibit 32.
 6                    Do you have that document in the room
 7      with you?
 8           A.    I have a copy of it.  There's no exhibit
 9      number but...
10           Q.    Let me just represent to you that that
11      document has now been marked as Exhibit 32, and just
12      to confirm, is the document I have just told you
13      that has been premarked as Exhibit 32, does it
14      appear to be a true and correct copy of your Reply
15      Expert Report in this matter?
16           A.    It does.  It's a signed copy.  It also
17      has the case information other than page 1.  It
18      starts on page 2 of 78, and the pages are
19      contiguously numbered.  So it does appear to be the
20      report.  There's Appendix A to the report and
21      Appendix B to the report.  So should I mark this or
22      does it matter?
23           Q.    Well, it's totally up to you.  I will
24      probably refer to it as your reply report.  I may
25      refer to it as Exhibit 32.  Those are the same thing
```

Page 7

1    now.  So if it helps you to have "Exhibit 32"

2    written on it, that's fine for you to go ahead and

3    do that.

4         A.    Yes.  Just to make sure, I have written

5    in the corner here "Exhibit 32" just in case I

6    forgot the numbers, especially between Mr. Deal and

7    my report.  So thank you.

8         Q.    Well, I sometimes do, too, but luckily we

9    only have four documents to work with today.  So

10   hopefully we will be able to keep it all straight.

11                        (Deposition Exhibit 32 was

12                        marked for identification.)

13   BY MR. GIBBS:

14        Q.    Speaking of your reply report, may I ask

15   you please to turn to page 63 of the report.

16        A.    This is my page 63?

17        Q.    Yes.

18        A.    Okay.  I'm there.

19        Q.    Is that your signature there on page 63?

20        A.    Yes.

21        Q.    Okay.  Thank you.

22                   Now, I want to turn back to the

23   beginning of your reply report.  And in particular,

24   I would like to direct your attention to page 2,

25   meaning your page 2, not the court's page 2.

Veritext Legal Solutions
866 299-5127

```
1            A.    My page 2, which is the start --
2     it starts with the Section B, Reply Opinions.
3            Q.    That's correct.
4                  And since we have touched on this
5     subject a couple of times, let me just say for the
6     record.  When I say "your page 2" or "the internal
7     page 2," those are the page numbers at the bottom of
8     the pages.  As you have noted because this is a copy
9     of your reply report that's been filed with the
10    court, there's a separate set of page numbers
11    running along the top of this copy that reflect the
12    pages of a document filed in court.
13                 For purposes of today's discussion,
14    I'm only going to refer to the page numbers at the
15    bottom of the pages, which are the page numbers you
16    used in your original report.  Is that okay?
17           A.    Yes.  That's fine.  And is that the case
18    with all four documents?
19           Q.    Yes.  I'll use the internal original page
20    numbers, not the court's page numbers.
21           A.    Very good.
22           Q.    Okay.  So turning back to page 2 of your
23    reply report, as you indicated, there is a heading.
24    It's letter B and labeled Reply Opinions, and
25    underneath that is a paragraph that is numbered 3.
```

Page 9

1    Is that a summary of the opinions offered by you in
2    this reply report?
3         A.    Yes.  Below that are three reply opinions
4    based on the information in Mr. Deal's report,
5    Exhibit 30, and my original opening report.
6         Q.    Okay.  So I want to spend a few minutes
7    with you making sure I understand the scope of the
8    opinions that you're offering with this reply
9    report, and first, I want to ask you about a
10   representation that lead plaintiff's counsel made to
11   the court in opposition to our motion for leave to
12   file a sur-reply and for leave to take additional
13   deposition time with you.  You don't need to see the
14   document.  I'm just going to read it to you.
15              So at page 8 of the plaintiff's
16   opposition to our motion for leave, lead plaintiff's
17   counsel argued, quote, "because defendants failed to
18   offer any opinion that there was a lack of price
19   impact, plaintiffs had no need to present contrary
20   affirmative price impact evidence.  Accordingly,
21   Dr. Hartzmark's reply report contained no new
22   statistical analyses and no new opinions other than
23   the entirely proper and completely expected
24   critiques of Mr. Deal's analysis" close quote.
25              Is that second sentence beginning

Page 10

1    with "accordingly" a true and correct description of

2    the scope of the opinions you've offered in your

3    reply report?

4         A.    Can you read the second sentence back to

5    me again?

6         Q.    Certainly.

7              Quote, "Accordingly, Dr. Hartzmark's

8    reply report contains no new statistical analyses

9    and no new opinions other than the entirely proper

10   and completely expected critiques of Mr. Deal's

11   analyses" close quote.

12        A.    And the question?

13        Q.    The question is whether that's a true and

14   correct description of the opinions offered in your

15   reply report?

16        A.    Yes.

17        Q.    Okay.  Now, I want to focus in more

18   closely on your reply opinion 3, which begins at the

19   bottom of page 2 and carries over for a couple of

20   lines onto page 3.

21              Do you have that in front of you?

22        A.    I do.  I just want to also suggest that

23   you read a document that I -- again, I don't have,

24   and sort of a legal explanation, but from an

25   economic perspective, what was in that second

1    sentence it's correct.

2         Q.    Okay.  Thank you.

3         A.    So now I'm on Reply Opinion 3, starting

4    with "Mr. Deal's report," is that correct?

5         Q.    Yes.  Yes.

6              As a general matter, am I correct in

7    understanding that this description of Reply Opinion

8    3 is describing the opinions set forth in your reply

9    report that relate to the question of price impact?

10        A.    They are related to the response to

11   Mr. Deal's report on whether or not there's evidence

12   of an absence of price impact.

13        Q.    You've anticipated my next question,

14   which is as I read this description of your Reply

15   Opinion 3, it is limited to your opinion about what

16   Mr. Deal's report and analyses do and do not prove

17   with respect to price impact; is that fair?

18        A.    Mr. Deal, as I read his report and

19   deposition, was not asked to evaluate whether or not

20   was there an absence of price impact.  In his

21   analysis of my report and his discussions of the

22   challenges of parsing, he neither presented evidence

23   that there was -- he did not present evidence that

24   there was an absence of price impact and, in fact,

25   based on a series of pieces of evidence in his

                                        Page 12

1    report, there's actually support for what I

2    understand to be price impact and that's what my

3    basic -- that's what my report suggests.

4         Q.    And let me just try to be more clear

5    because I'm not asking you to regurgitate for me the

6    substance of your opinion.  All I'm trying to do is

7    make sure I'm correctly understanding the scope of

8    the opinion you're offering.  Maybe this will help.

9              I'm trying to distinguish between an

10   opinion that focuses on what Mr. Deal's report and

11   analysis do and do not prove on the one hand, versus

12   a broader opinion about what the evidence does and

13   does not show that is not limited to Mr. Deal's

14   report.

15             Does that distinction make sense to

16   you?

17        A.    I believe so.  Mr. Deal's report fails to

18   present any evidence of an absence of price impact

19   and, in fact --

20        Q.    Sir, I need to interrupt you because my

21   question was very, very -- no, no, no.  Michael, he

22   is deliberately ignoring the question I have asked.

23   I asked it twice.

24             I am not asking you to repeat your

25   opinion to me, Dr. Hartzmark.  I'm asking you to

1    tell me if I am right or wrong in understanding the

2    scope of your opinion, and I'm telling you I

3    understand the scope of your opinion to be limited

4    to a critique of Mr. Deal's opinions; is that

5    correct?

6              MR. BLATCHLEY:  Objection to that

7    colloquy.  He's been answering your questions just

8    as you have asked them.  I'd ask that you permit the

9    witness to answer the question.

10             MR. GIBBS:  Answer the question now,

11   Dr. Hartzmark.

12             MR. BLATCHLEY:  And that you not

13   interrupt the witness.

14             MR. GIBBS:  Let's not interrupt me

15   either, Michael.

16   BY MR. GIBBS:

17        Q.    Dr. Hartzmark, is it correct that the

18   opinions summarized in the paragraph beginning on

19   page 2 of your reply report labeled Reply Opinion 3

20   is limited to a critique of Mr. Deal's opinions and

21   analysis regarding price impact, yes or no?

22             MR. BLATCHLEY:  Objection.

23   BY THE WITNESS:

24        A.    I can't say that it is limited in the

25   sense that it's based on both a response to

                                        Page 14

1    Mr. Deal's report and all of the information that

2    was included in what is Exhibit 2 to this

3    deposition, the Expert Report of Michael L.

4    Hartzmark.

5         Q.    I don't understand that answer.

6         A.    You asked whether Reply Opinion 3 was

7    based just on a response to Mr. Deal, correct?

8         Q.    Yes.

9         A.    And what I'm saying is yes, it is, with

10    the addition of the fact that I incorporate

11    information from the opening report as well in terms

12    of what the opinions are in opinion -- Reply Opinion

13    3.

14         Q.    That's fine.  In other -- go ahead.

15         A.    No, I'm done.

16         Q.    And just let me make sure I'm

17    understanding you correctly because I think you said

18    "yes" and then added a qualification so I want to

19    make sure I understand.

20                   If I understand you correctly, you're

21    telling me that the opinion that is summarized in

22    the paragraph labeled Reply Opinion 3 that begins on

23    page 2 of your reply report is a critique of

24    Mr. Deal's analysis and opinions that, in part,

25    refers to or incorporates information that's

Page 15

1    reflected in your opening report in this case; is

2    that correct?

3         A.    Yes.

4         Q.    Okay.  Let me ask a slightly different

5    question.  In your reply report, are you offering

6    any affirmative opinion to the effect that any of

7    the particular challenged statements in this case

8    had an impact on the price of CenturyLink's common

9    stock or bonds during the class period?

10              MR. BLATCHLEY:  Objection, form.

11   BY THE WITNESS:

12        A.    I was not asked to measure or offer a

13   complete analysis of the amount of price impact.

14   What I was asked to do was to reply to Mr. Deal,

15   incorporate the information in his report in my

16   opening report, and based on that, my opinion is

17   there's a lack of -- there's no evidence of a lack

18   of price impact.  However, there is evidence in his

19   report, although I didn't measure it and I didn't go

20   through a full economic analysis of that, but there

21   is evidence of price impact associated with the

22   alleged corrective disclosures.

23        Q.    So I'm not asking you whether your

24   opinion was complete, nor am I asking whether you

25   measured the amount of any price impact.  My

Veritext Legal Solutions
866 299-5127

```
1    question is simply whether in your reply report you

2    are offering an affirmative opinion that any of the

3    challenged statements actually had an impact on the

4    price of CenturyLink's common stock or bonds during

5    the class period?

6              MR. BLATCHLEY:  Objection, asked and

7    answered.

8    BY THE WITNESS:

9        A.    Yes.  As I stated, based on Mr. Deal's

10   report, my opening report, there is evidence and

11   support that is consistent with there being price

12   impact as defined, again, by the absence of -- I'm

13   sorry -- by defined as being 100 percent of the

14   price movement being caused by factors other than

15   those alleged in the Complaint.

16             MR. GIBBS:  I'm going to ask the court

17   reporter to reread my question.  You didn't answer.

18             MR. BLATCHLEY:  Objection, misstatement.

19                  (Record read as requested.)

20             MR. BLATCHLEY:  Is there a question?

21             MR. GIBBS:  Yeah.  I've asked the court

22   reporter to reread the question so he can answer the

23   question I asked.  That's the question pending.

24             MR. BLATCHLEY:  Objection, asked and

25   answered.  Hold on, Dr. Hartzmark.
```

Page 17

```
1                    Objection, asked and answered.
2                    MR. GIBBS:  No, he didn't answer it.
3          Answer the question, please.
4          BY THE WITNESS:
5               A.    I'm offering evidence that's consistent
6          with there being price impact.  But my opinion is
7          that Mr. Deal has not demonstrated and not presented
8          evidence that there is a lack of price impact, and
9          that is the opinion in Reply Opinion 3.
10                   I say, "as demonstrated below, the
11         analyses Mr. Deal does provide are insufficient to
12         show that defendant's misstatements did not impact
13         the prices of CenturyLink's securities.  To the
14         contrary, Mr. Deal's analyses support the opinion
15         that there is no evidence of a lack of price
16         impact."
17                   Now, that's a double negative.  No
18         evidence of a lack of price impact means that there
19         is actually to the contrary evidence that is
20         consistent with there being price impact.
21              Q.    What does it mean to say that you're
22         offering evidence of price impact?
23              A.    Well, let me just give a simple example.
24         If both Mr. Deal and I agree that a specific
25         misrepresentation or corrected disclosure needs to
```

Page 18

1    be parsed, that in itself is evidence of price

2    impact because it suggests that less than

3    100 percent of the price movements are associated

4    with -- with -- with other factors and, therefore,

5    more than zero percent of the price movements are

6    associated with the allegations.  So that is

7    evidence consistent with there being price impact.

8         Q.    Are you offering an expert opinion that

9    that is evidence of price impact?

10        A.    I defined -- wait.  Say that again.  I

11   think you said it without a word.  Say it again.

12        Q.    No, I didn't.

13              I'll ask the court reporter to repeat

14   the question I asked.

15        A.    Okay.

16                   (Record read as requested.)

17   BY THE WITNESS:

18        A.    Am I offering an opinion that there is

19   evidence of price impact?

20        Q.    No.  I'll reask the question.

21        A.    I mean, that's what I hear.

22        Q.    May I finish, please?

23              You described your view that if you

24   and Mr. Deal agree that parsing is required, you

25   interpret that to mean that at least some part of a

Page 19

1    price movement is caused by a corrective disclosure.

2               Now, to be clear, I disagree with

3    that interpretation, but my question is:  Are you

4    offering as an expert opinion this view that the

5    agreement on the need for parsing is evidence of

6    price impact?  Is that your expert opinion?

7         A.    I'm going to first state for the record

8    that Mr. Gibbs's suggestion that I was interrupting

9    him is likely due to the fact that we have a delay

10   between the picture and the sound and if he's going

11   to spend all day trying to harass me, I really don't

12   appreciate it.

13              As to the issue of parsing, by

14   itself, it suggests that the definition that I

15   provided, the clear definition that I provided that

16   an absence of price impact means that 100 percent or

17   the entirety of a price movement is explained by

18   other factors, okay, if you -- if you say that you

19   need to pars or disaggregate, you are implicitly

20   saying that you have to separate the other factors

21   from the impact of the allegations.

22        Q.    Mr. Hartzmark, that is not my question.

23   My question is whether what you just said is

24   something you are offering as an expert opinion as

25   an economist or is it something other than an expert

Page 20

1    opinion?

2         A.    It's based on --

3         Q.    I'm not asking what it is based on.  I'm

4    entitled to know what is the scope of the opinions

5    you are offering in your report.  I believe the

6    scope is ambiguous.  I'm entitled to a clear

7    explanation of what parts of your report you believe

8    and are offering as expert opinion and which parts

9    are not.  It's a simple question and we have now

10   spent the better part of 20 minutes going back and

11   forth because you won't answer my question and

12   instead just keep repeating your position.

13              MR. BLATCHLEY:  Objection to the colloquy

14   and the testimony by Mr. Gibbs.  I think it is

15   inappropriate.  He's trying to answer your questions

16   and I would just ask that you let him do that.

17   BY THE WITNESS:

18        A.    Based on my understanding that price

19   impact as it relates to your world, the legal world,

20   means that there is some impact on price and that

21   100 percent of that price movement has to be caused

22   by some other factor other than the allegations.

23   Okay.  That -- I'm not opining that that is the

24   case.  I'm -- I understand that to be the case and

25   that is the basis and the foundation of my opinion.

Veritext Legal Solutions
866 299-5127

1    I'm not opining what the Supreme Court meant.  I'm

2    accepting price impact as I understand it to be in

3    the Supreme Court in Halliburton II.

4         Q.    You don't consider yourself a legal

5    expert, correct?

6         A.    No.

7         Q.    And you don't offer yourself as an expert

8    in the legal significance of a given fact or piece

9    of evidence, correct?

10        A.    Correct.

11        Q.    And I'm going to try this one more time

12   and then I'll consider whether to move on.

13             Can you point me to any particular

14   challenged statement that you believe had a specific

15   impact on the price of CenturyLink's common stock or

16   bonds during the class period?

17             MR. BLATCHLEY:  Objection, asked and

18   answered, but go ahead and answer, please.

19   BY THE WITNESS:

20        A.    The statements on June 12 -- I'm sorry --

21   June 16, 2017, June 19, 2017, and July 12, 2017,

22   based on the economic framework and actually the

23   economic framework that is consistent with

24   Mr. Deal's, where I examined the statistical

25   significance of the price movement, the analysts and

Page 22

```
 1   the number of analysts that wrote reports about

 2   them, those corrective -- alleged corrective

 3   disclosures, about the commentary in those alleged

 4   corrective disclosures, about the impact on their

 5   targets or the recommendations of those, of the

 6   response of the company to those alleged corrective

 7   disclosures, the response of the board from those

 8   corrective disclosures, and the joint statistical

 9   significance of the bonds and the stock all suggest

10   that there is price impact from that.

11                In addition -- in addition,

12   Mr. Deal's report and -- suggests that there is

13   price impact from those alleged corrective

14   disclosures.

15        Q.    So two things.  First of all, I need to

16   clarify my question because I was intending to ask

17   you whether you could point to one of the challenged

18   statements and say whether you believe one of the

19   challenged statements had an impact on the price of

20   CenturyLink's common stock or bonds.  I believe you

21   just identified statements that plaintiffs have

22   characterized as corrective disclosures, but before

23   I get back to my question, I asked you a simple yes

24   or no question --

25        A.    Can you --
```

                                              Page 23

1           Q.     -- and you gave me several paragraphs --
2      can you let me finish what I'm saying?
3                   I asked you a simple yes or no
4      question whether you could point me to a statement
5      that had an impact on the price of CenturyLink's
6      common stock or bonds, and you gave me several
7      paragraphs regurgitating your opinions.
8                   If you keep doing that, I will go to
9      the court and I will get more deposition time
10     because you are not answering the very specific and
11     very direct questions I'm asking you.  So I'm going
12     to try again and I'm going to clarify it because my
13     question was unclear.
14                  So just to be clear, I'm asking about
15     the challenged statements, the ones that plaintiffs
16     in this case have claimed were false and misleading.
17                  First question:  Is that
18     clarification clear to you, yes or no?
19             MR. BLATCHLEY:  Just one second.
20             MR. GIBBS:  I want to know whether the
21     clarification is clear.  Does he understand the
22     clarification or not?
23             MR. BLATCHLEY:  In one moment but I am
24     objecting strenuously to this wildly inappropriate
25     characterization of the testimony.  He's been

                                          Page 24

1    answering your questions as they have been asked.

2         MR. GIBBS:  Michael, if you have an

3    evidentiary objection, assert it, and then stop

4    interrupting my examination.

5    BY MR. GIBBS:

6         Q.   Dr. Hartzmark, do you understand the

7    clarification I just explained, yes or no?

8              I don't want a colloquy.  I don't

9    want four paragraphs summarizing your report.

10             I want know if you understand the

11   distinction I just drew between the challenged

12   statements, the ones plaintiffs claimed were false

13   and misleading on the one hand, and the corrective

14   disclosures on the other hand?

15        A.   Well, given that you -- there's not

16   one -- one that I'm aware of in Mr. Deal's report

17   Complaint defining quote/unquote "challenged

18   statements," and that I answered the question before

19   exactly and, in fact, elucidated the reasons, and it

20   was not repetitive because if you can show me

21   anywhere in the record where I had repeated myself,

22   I find that offensive.

23             As to now after -- after you

24   corrected yourself and went back to what I

25   believe -- I mean, maybe you can show me in the

                                        Page 25

1    Complaint the term "challenged statement."  After

2    you redefined "challenged statement" as to be the

3    misrepresentations or omissions, which I believe is

4    the term in the Complaint, I now understand what you

5    mean by "challenged statements."

6           Q.    So with that clarification, can you point

7    me to any of the challenged statements that you

8    believe had a specific impact on the price of

9    CenturyLink's common stock or bonds during the class

10    period?  And that's a yes or no question.

11              MR. BLATCHLEY:  Objection, asked and

12    answered.

13    BY THE WITNESS:

14           A.    Well, again, the challenged statements I

15    believe, because, again, this is a term you are

16    using, is associated with what Mr. Deal and I and I

17    believe everybody prior to this particular

18    deposition called the front-end misrepresentations

19    and omissions.  Is that correct?

20           Q.    I would call them the alleged

21    misrepresentations and omissions, but if that's a

22    more useful term for you, I'm happy to use that

23    rather than challenged statements.

24           A.    As it relates to the front-end

25    misrepresentations, all I did was respond to the

Page 26

1  fact that Mr. Deal's preliminary and illustrative
2  analysis was insufficient to demonstrate or present
3  evidence of a lack of price impact based on the
4  front-end misrepresentations at all, and that's all
5  I did.  I did not examine the individual dates, nor
6  did he for that matter.
7       Q.   So is the answer to my question "no"?
8       A.   Well, other than the fact that there were
9  four dates with statistically significant returns,
10 the other 52 dates that are quote/unquote by you
11 "challenged statements" were never evaluated
12 sufficiently to determine whether there was or was
13 not price impact.
14      Q.   Is the answer to my question yes or no,
15 Dr. Hartzmark?
16           MR. BLATCHLEY:  Objection.
17 BY THE WITNESS:
18      A.   All I did was respond to Mr. Deal and I
19 did not -- there's nothing that I showed other than
20 the fact that his statistically significant returns,
21 which he and I both agreed upon, were statistically
22 significant and that was the analysis, but there are
23 another 48 dates that I did not examine so I did not
24 do -- I did not present any additional evidence
25 related to price impact on the front-end alleged

Page 27

1    misrepresentations and alleged omissions.

2         Q.    As to the four dates that you have

3    alluded to, the ones where you and Mr. Deal both

4    observed statistically significant abnormal returns

5    on dates when some of the alleged front-end

6    misrepresentations or omissions occurred, are you

7    offering an opinion to the effect that any of the

8    alleged misstatements or omissions were the cause of

9    those statistically significant abnormal returns?

10        A.    No.  My opinion as it relates to those

11   statistically significant returns is that Mr. Deal

12   did not present evidence that there -- I'm sorry --

13   evidence of a lack of price impact and that, in

14   fact, his discussion about how it might have been

15   caused by the alleged misrepresentations and

16   omissions and that parsing might be required and

17   that the issue was that it is difficult to pars is

18   implicit in his -- his -- his words that there's

19   price impact on those, but I did not do any

20   evaluation of those like I did with the corrective

21   disclosures -- alleged corrective disclosures.

22        Q.    Well, since we're on the four dates, let

23   me just try to wrap up with those.

24              So, again, I'm talking about the four

25   dates where both you and Mr. Deal observed

Page 28

1    statistically significant abnormal returns on dates

2    when some of the front-end allegedly false or

3    misleading statements were made, and just for the

4    record, as I understand it, the four dates that

5    we're talking about here are May 8, 2014;

6    November 5, 2015; December 7, 2015; and February 11

7    of 2016.

8                    Are we talking about the same

9    dates --

10        A.    Yes.

11        Q.    -- you and I?

12                    Okay.  If I understand your testimony

13    so far, you have not for any of those four dates

14    that I had just listed performed any economic

15    analysis to assess whether and to what extent the

16    abnormal returns on those dates resulted from any

17    particular statement or disclosure; is that fair?

18        A.    Yeah.  Neither Mr. Deal nor I

19    demonstrated that other factors caused 100 percent

20    of the price increase on those dates and, therefore,

21    there was no evidence presented of a lack of price

22    impact.

23        Q.    Do you know whether CenturyLink made any

24    disclosures on any of those four dates other than

25    what we've been referring to as the front-end

Page 29

1     alleged false statements or omissions?

2          A.    From Mr. Deal's report, it suggested that

3     they made what he calls information-rich

4     disclosures, which had a myriad of information, a

5     myriad especially of financial metrics because they

6     were November 5th was CenturyLink's Q3 results and

7     February 11th was CenturyLink's Q4 and annual

8     results.  So that's my answer.

9               MR. GIBBS:  I'm going to ask the court

10    reporter to reread my question, please.

11                    (Record read as requested.)

12    BY THE WITNESS:

13         A.    And as I said in my answer, relying on

14    Mr. Deal's analysis where he says there are, I don't

15    know, 40, 50, 60 metrics that are put forward, that

16    would suggest that there is potentially information

17    that might have impacted the stock that was not

18    associated with the allegations, but he never

19    demonstrated that that other information caused

20    100 percent of the price movement on that day, nor

21    did he demonstrate that the information on the

22    alleged disclosure made zero impact on the price on

23    those days.

24         Q.    Mr. Hartzmark, I'm not asking you about

25    what Mr. Deal did or didn't do.  I'm asking you what

Page 30

1    you did, and I'm entitled to an answer about what

2    you did.  So let me try again, but I want to preface

3    it by making clear I'm not asking you what Mr. Deal

4    did or did not do.  I'm asking what you did.  So

5    with that preface, let me ask again.

6                    As to the four dates we've been

7    discussing where both you and Mr. Deal observed

8    statistically significant abnormal returns on dates

9    when some of the front-end allegedly false or

10   misleading statements were made, it is my

11   understanding you have not performed any analysis to

12   evaluate whether there were also some potentially

13   confounding disclosures made on those dates, am I

14   correct in that understanding?

15             MR. BLATCHLEY:  Objection, asked and

16   answered.

17   BY THE WITNESS:

18        A.    Since you didn't understand my clear and

19   concise answer, let me tell you exactly what I did

20   as it relates to those four dates.

21                    In Mr. Deal's report starting on

22   page 43, in Paragraph 72, he discusses or he

23   provides what he believes is a purported economic

24   framework to evaluate whether there is price impact

25   on those days.  So I began on May 8, 2014, by

                                              Page 31

```
 1    reading Paragraph 73.  Paragraph 73 -- you asked me
 2    what I'm relying on for my economic and so I'm --
 3         Q.    I didn't ask you that at all.  That isn't
 4    actually what I asked you at all.  I was trying to
 5    find out what work you did and didn't do.
 6              MR. BLATCHLEY:  Mr. Gibbs, he's answering
 7    the question.  Just let him do that, please.
 8              THE WITNESS:  You just asked --
 9              MR. GIBBS:  He mischaracterizes the
10    question repeatedly.
11    BY THE WITNESS:
12         A.    The character -- you just said what work
13    did I do.  My work involved opening up Mr. Deal's
14    report, reading it carefully, and on Paragraph 73 --
15    let's take this date for example -- he states:  "The
16    first statistically significant price increase was
17    on May 8, 2014, the date that we agreed and I
18    answered, following the release of CenturyLink's Q1
19    2014 10-Q.  CenturyLink reported large additions to
20    both Prism TV and broadband high-speed internet
21    subscribers.  Plaintiffs provide no evidence that
22    these increases were driven partially or wholly, if
23    at all, by CenturyLink's misleading sales practice."
24              So even he concedes that it could be
25    partial.
```

Page 32

1              "In addition, there were other

2     positive factors reported that could also have

3     driven the price increase.  For instance,

4     CenturyLink's stock buyback had progressed at a

5     rapid rate.  Analysts at Macquarie stated, we

6     believe that CTL, as the most liquid wireline stock,

7     will benefit from a scarcity premium on the emerging

8     high-bandwidth theme."

9              And that's Paragraph 73.  That was

10    the work.  You asked for the economic framework that

11    I used.  You asked for the work that I did.  That is

12    what I looked at.  And from that and only that and

13    the fact from my opening report that there was a

14    statistically significant price impact, I conclude

15    that this is not evidence of a lack of price impact.

16         Q.    But you have not reached an independent

17    opinion as to whether or not there was confounding

18    news on May 8, 2014; is that correct?

19         A.    I have not done a loss causation analysis

20    on May 8, 2014.  I did not do a preliminary,

21    illustrative, or incomplete analysis.  I read and

22    responded solely to the analyses, and that is the

23    analyses from Mr. Deal related to May 8, 2014, that

24    is the completion, the whole of what he considers to

25    be an economic framework for evaluating that date.

Page 33

1    And that is what I utilized for my analysis.  I did

2    not do an independent analysis to determine whether

3    the losses -- or I'm sorry -- the gains on that day

4    were caused by the alleged misrepresentations or

5    other factors.  But nor did he.

6         Q.    Let me turn now to a different subject.

7    And in particular, I want to focus on Paragraph 113

8    of your reply report, please.  Let me know when you

9    have that in front of you, please.

10        A.    I have it in front of me.

11        Q.    Okay.  If I'm understanding this

12   paragraph correctly, you are -- starting with the 52

13   alleged misstatement dates that Mr. Deal discussed

14   in his report and you are expressing the view that

15   out of the 52 dates that Mr. Deal discussed, there

16   were only 25 that might reasonably be expected to

17   result in a positive price movement.  Am I

18   understanding that correctly?

19        A.    That is my conclusion based on my

20   analysis.

21        Q.    Okay.  I was not able to find anywhere in

22   your reply report a list of those 25 dates.  Did I

23   miss something or is it -- or are those dates

24   actually listed anywhere in your reply report?

25        A.    Those dates are based on Mr. Deal's I

Page 34

1    believe it's called figure -- I've got the report

2    here.  Mr. Deal presented a report -- I'm sorry.

3         Q.    I'm asking about your 25, not his 52,

4    just to be clear.

5         A.    Right.  But you can get the 25 from going

6    through the analyses, and there's certainly a backup

7    that I would have gone through.  Maybe the Analysis

8    Group person can tell me which table.  He's got --

9    there are so many tables.

10             MR. BLATCHLEY:  Dr. Hartzmark --

11   BY THE WITNESS:

12        A.    Figure 5 -- Figure 5 lists the dates, and

13   you can see, okay, that there are the announcement

14   types, and as you ask what type of work I did, well,

15   I looked at these Figure 5, I looked at this and I

16   said why would you expect, for example -- I can

17   barely read this -- that if there's an earnings

18   announcement on May 8, 2013, that there would be a

19   price response from a 10-K -- I'm sorry -- May 8,

20   2013, would you expect there to be a price response

21   from the 10-Q, especially in your report where you

22   talk about all those factors there and especially

23   since most academic research, in fact, all academic

24   research related to earnings go from the first

25   earnings announcement and not from the second

Page 35

1    earnings announcement and, in fact, I think Mr. Deal

2    understands that.

3               So needless to say, if you go through

4    here and look at all the repetition, if you go

5    through here and look at the proxies because having

6    been the CEO, Chairman of the Board, and president

7    of a public company and the CFO of a public company,

8    the proxies generally -- generally, not always, but

9    generally would not be expected this have been a

10    positive return because all I'm doing is boilerplate

11    stuff.  So that's the proxies.

12               So I'm looking at this and going,

13    okay, an investor conference, possibly, and then,

14    statement to a new source, and you wonder, okay,

15    what type of statement to the new source is that.

16               But Mr. Deal never took a look at

17    these, and if you go through these, you can find 27

18    of the 52 where it wouldn't be expected, that

19    doesn't mean that there couldn't be some material

20    information, but where you wouldn't expect it and,

21    in fact, in my event study which Doctor -- or Mr.

22    Deal criticized where he said I ad hocked or

23    selectively chose the earnings date and then in his

24    own report contradicted that whole issue of choosing

25    the earnings date, it's clearly the case that you

Page 36

```
 1    would want to look at earnings dates because that
 2    is -- that would be the relevance.
 3               So if I were doing an analysis like
 4    this, unless I had some objective measure, I would
 5    eliminate 27 of the 25 dates.
 6               MR. GIBBS:  Madam Court Reporter, would
 7    you please reread my question?
 8                    (Record read as requested.)
 9    BY MR. GIBBS:
10        Q.    Can you answer that question,
11    Dr. Hartzmark?
12               Yes, that's the question I asked.  I
13    would like to know, Dr. Hartzmark, whether you have
14    an answer to that question.
15        A.    Well, it's clear in the -- certainly in the
16    Paragraph 110 where this comes from, but while I
17    have identified more than 50 percent of the dates in
18    Mr. Deal's analysis on which a trained financial
19    economist would not necessarily expect to observe
20    statistically significant returns, the largest
21    category is associated with duplicate disclosures,
22    which might have been material, but would not
23    have -- I'm sorry -- but would not necessarily have
24    been unanticipated so would not have expected to
25    have impacted the price.  The Complaint alleges that
```

Page 37

1   numerous false and misleading statements were

2   repeated throughout the class period.

3             I don't know if you want me to read

4   this, but this tells you what it was and what I did

5   to take the 52 down to 25.

6        Q.   So I can assure you I don't want you to

7   read it to me.  I'd like you to answer my question.

8   Are the specific 25 dates referenced in your report

9   listed anywhere in the report, yes or no?  And if

10  you don't know, you can tell me that too.

11       A.   No.  It depends -- again, I reference

12  Mr. Deal's report Figure 5, okay.

13       Q.   Which has 52 dates in it.

14       A.   And the reason -- and then if you take

15  110, you can eliminate --

16       Q.   Dr. Hartzmark, it's a simple question.  I

17  don't know why you're arguing with me about this.

18            No, Michael, stop, I'm in the middle

19  of asking the witness a question so stop.

20            MR. BLATCHLEY:  You interrupted the

21  witness.

22            MR. GIBBS:  You have interrupted me now

23  twice.

24  BY MR. GIBBS:

25       Q.   Dr. Hartzmark, this is maybe the simplest

1    question any deponent has ever been asked, and I

2    don't know why it's so difficult for you to give me

3    a straightforward answer.

4              You had said of the 52 dates listed

5    in Figure 5 of Mr. Deal's report, you identified 25

6    that you thought could or might reasonably be

7    expected to result in a statistically significant

8    price movement.  My only question is whether those

9    specific 25 dates are listed anywhere in your

10   report.  Is the answer yes or no or you don't know?

11        A.    Well, it's certainly in what would be

12   backup because the dates were counted and we checked

13   each one.  The dates -- specific dates, let's see,

14   based on 10-Qs and 10-Ks, again, referring to

15   Mr. Deal's report, there -- and, again, you don't

16   want me to go through this.  I believe the

17   substantial majority -- all of them are listed in

18   Mr. Deal's Figure 5 and a substantial majority can

19   be identified specifically from Mr. Deal's report,

20   but I did not duplicate Figure 5 and list each day

21   in my report.

22        Q.    You referenced backup --

23              MR. BLATCHLEY:  Mr. Gibbs --

24              MR. GIBBS:  No, no, no.  Michael, I have

25   a question.  I haven't even asked the question.  You

Page 39

```
 1    don't get to object to your witness's answer.  Okay.
 2              You are still not answering the
 3    question, right.  I'm not asking you whether one
 4    could try to apply your framework and identify the
 5    dates you're talking about.  I've only asked you
 6    whether your report identified the specific 25 dates
 7    that you're alluding to.  I haven't seen it.  I take
 8    it from your roundabout answers that the answer is
 9    no, but you've alluded to backup.  So I understand
10    from your testimony so far that there is somewhere
11    an actual list of the 25 dates.  Let me just ask
12    you, yes or no, have I correctly understood that, is
13    there a list somewhere?
14              MR. BLATCHLEY:  So just objection --
15              THE WITNESS:  In Mr. Deal's report.
16              MR. BLATCHLEY:  Objection.
17              MR. GIBBS:  I'm not -- no, no, no.
18    BY MR. GIBBS:
19        Q.    Mr. Deal's report lists 52.  You spend a
20    considerable portion of your report talking about a
21    subset of 25.  You never list the specific 25 dates.
22    Do you have a list of the specific 25 dates
23    somewhere?
24        A.    Let me explain what I did.  I went --
25        Q.    No.  No.  I have three hours with you,
```

Page 40

```
 1    and I'm not going to listen to this filibuster --
 2              MR. BLATCHLEY:  Mr. Gibbs, you've got to
 3    let him answer the question when he starts to answer
 4    a question.
 5              MR. GIBBS:  No, I don't.  Michael, I
 6    don't.  I don't have to listen to a bunch of
 7    filibustering.  This is the simplest question
 8    anybody has ever been asked and the amount of
 9    argument and push back and roundabout and
10    misdirection that I'm getting is absolutely
11    outrageous, and I am a hair's breadth away from
12    pausing the deposition and calling the court because
13    this is ridiculous.
14              All I want to know is whether there's
15    a list of the 25 dates that are specifically
16    referenced repeatedly in your report, yes or no.
17         A.   There is no --
18              MR. BLATCHLEY:  And I want to clarify it
19    because I think the question, we might just be
20    speaking past each other.  In Paragraph 112, there
21    is a table.  I assume you are not referring to the
22    table in Paragraph 112.  I just wanted to try to see
23    if that simplified what we are arguing about to
24    proceed smoothly with this deposition.
25              MR. GIBBS:  No, it doesn't because I
```

Page 41

1    don't see a list of dates in there.  Do you?

2    BY MR. GIBBS:

3         Q.    I'm asking if there's a list of dates

4    somewhere, anywhere.

5         A.    There is no exhibit or table.  I exported

6    Figure 5 from Mr. Deal's report, went through,

7    checked off 10-Qs, 10-Ks.  It would have been

8    duplicative to do this, but if you need the

9    replication of that, it's in some backup document.

10              MR. GIBBS:  Okay.  I would -- I hereby

11   request a copy of that backup document so that I can

12   see the actual dates that are referenced repeatedly

13   in your report.

14              MR. BLATCHLEY:  Again, just for the

15   record, in case it helps, Paragraph 112 has a table

16   listing where the 25 are coming from.

17              MR. GIBBS:  I'm sorry.  What was that?

18   What was the end of that statement, listing what?

19              MR. BLATCHLEY:  Where the 25 are coming

20   from.

21              THE WITNESS:  And they tie to

22   Paragraph 110 where it's described.

23              MR. GIBBS:  Yes.  I have actually read

24   both paragraphs.  Thank you.

25              THE WITNESS:  And 111.

Veritext Legal Solutions
866 299-5127

1             MR. GIBBS:  I read that one, too.  And

2     yet I don't see a list of dates.

3     BY MR. GIBBS:

4         Q.    In Paragraph 113, after the sentence I

5     read to you earlier about the 25 dates that might

6     reasonably be expected to have event a positive

7     price movement, you go on to say, this -- quote,

8     "this, of course, does not account for other factors

9     I identified such as contemporaneous disclosure of

10    negative information, which could further reduce the

11    number of days on which positive stock price

12    movements could reasonably be expected," close

13    quote.

14             Do you have that language in front of

15    you?

16        A.    Yes.

17        Q.    Am I correct in understanding your report

18    that you did not go do an analysis to determine

19    whether there was a contemporaneous disclosure of

20    negative information and whether such information

21    reduced the number of days in which positive stock

22    price movements could reasonably be expected?

23        A.    As I described before on the front-end

24    misrepresentation -- alleged misrepresentation,

25    which are these dates, and omissions, I did not do

Page 43

1   any further analysis.

2        Q.    Referring back to the four dates out of

3   the 25 where both you and Mr. Deal identify

4   statistically significant abnormal returns, in your

5   view, does the existence of those abnormal returns

6   on four out of the 25 dates tell you anything about

7   whether the alleged false statements or omissions on

8   the other 21 dates had an impact on the price of

9   CenturyLink's common stock or bonds?

10             MR. BLATCHLEY:  Objection to form.

11  BY THE WITNESS:

12       A.    So are you asking if there's a dependence

13  between those four and the other 48 dates?

14       Q.    No.  I'm asking what I'm asked.  I'll ask

15  the court reporter to repeat the question.

16       A.    Read it back then.  It's not a clear

17  question.

18             (Record read as requested.)

19  BY THE WITNESS:

20       A.    No.  No.  I mean, like Mr. Deal, there's

21  nothing you can learn about whether there's evidence

22  of an absence of price impact on those other

23  21 days.

24       Q.    Do you draw -- so I would -- go ahead.

25       A.    No, you go ahead.

1          Q.    So just to be clear, my question was

2     whether the existence of abnormal returns on four

3     days tells you anything one way or the other about

4     the possibility of price impact from the alleged

5     misstatements or omissions on the other 21 days.  I

6     believe you said no, it doesn't.  Did I hear you

7     correctly?

8          A.    Yeah, but there's no evidence of a lack

9     of price impact for those 21 other days.

10         Q.    I'm asking whether it tells you one

11    thing -- either way.

12         A.    What?

13         Q.    I'll rephrase.

14               Just to set the context, I was asking

15    what inferences one might draw from the returns of

16    those four days.  Now, let me ask a slightly

17    different question.

18               In your view, does the absence of a

19    statistically significant abnormal return on the

20    other 21 days tell you anything about whether the

21    alleged false statements or omissions on those other

22    21 days had an impact on the price of CenturyLink's

23    common stock or bonds?

24         A.    No.  It doesn't tell you anything about

25    the price impact, whether there's an absence or

                                              Page  45

1  whether there is price impact.

2    Q.   And back to the four dates and the

3  abnormal return observed on those dates, does the

4  existence of those abnormal returns tell you

5  anything about whether any of the alleged false

6  statements or omissions on those four dates had an

7  impact on the price of CenturyLink's common stock or

8  bonds?

9       MR. BLATCHLEY:  Objection to form.

10  BY THE WITNESS:

11    A.   Well, I think Mr. Deal and I would agree

12  that, you know, that's something you would look at

13  as a start, but unless you do a complete price

14  impact and loss causation analysis, you can't make a

15  conclusion one way or another, whether or not

16  there's an absence of price impact.

17    Q.   Or price impact?

18    A.   Or price impact.

19    Q.   Okay.  And I may have misspoken.  So let

20  me just try to clarify the record here.

21       I have been talking about the 25 days

22  referenced in your report, four of which exhibited a

23  statistically significant positive abnormal return.

24  I may have suggested a couple of times in my

25  question that the remaining 21 did not exhibit any

Page 46

1    sort of abnormal return, but that's not actually the

2    case.  There were seven significant negative

3    abnormal returns and 14 without any statistically

4    significant abnormal returns.  Is that consistent

5    with your understanding?

6        A.    My understanding actually was that you

7    were stating that the other 21 did not have positive

8    statistically significant abnormal returns so I

9    answered that question based on that understanding.

10   If you want to ask it again related to negative

11   versus zero, I'm happy to answer that.

12       Q.    No, no, that's fair.  Okay.  That's what

13   I was trying to ask.  I think I may have misspoke

14   about the 21, but it doesn't change my question.  So

15   I think your answer is responsive to my question.

16            Let me --

17            MR. BLATCHLEY:  Patrick.

18            MR. GIBBS:  Yeah.

19            MR. BLATCHLEY:  Just a head's up, we're

20   coming up on an hour.  If there's a good breaking

21   point any time soon, I just wanted to flag that for

22   you.

23            MR. GIBBS:  Yeah, I appreciate that.

24   Actually, I have one question that I think -- it's a

25   request for an explanation of something in the

Page 47

```
 1    report that I think would be then a good break time
 2    right after that.
 3    BY MR. GIBBS:
 4         Q.    So, Dr. Hartzmark, I'm looking at
 5    Paragraph 115 of your reply report.  And you
 6    conclude the paragraph by saying, "thus the four
 7    days Mr. Deal identifies are approximately four
 8    times as many would be expected by chance."
 9              Do you see that language?
10         A.    Yes.
11         Q.    Can you help me understand the math you
12    used to arrive at four times as many as would be
13    expected by chance?
14         A.    Yes.
15         Q.    Okay.  Please do so.
16         A.    Simply, if you are thinking that
17    5 percent of the dates would be outliers and you
18    have 25 days, if you multiply .05 times 25, you get
19    right around one which would be the expected number
20    and here you have got four times as many.
21              MR. GIBBS:  Okay.  Thank you.
22              I think with that, it's a fine time
23    for a 10 or 15-minute break if that's okay with you.
24              THE WITNESS:  10 or 15 and then -- okay
25    and then we will do a short session and have some
```

Page 48

1    lunch.  I'll snack now to hopefully to be able to

2    last another -- maybe another hour.  Does that make

3    sense?

4                  MR. GIBBS:  Yeah, but I don't think --

5                  MR. BLATCHLEY:  Guys, can we just break

6    so we get off the record and then we will discuss

7    timing?

8                  MR. GIBBS:  That's fine.

9                  THE VIDEOGRAPHER:  The time is 12:17 p.m.

10   and we are off the record.

11                       (Whereupon, a break in the

12                        proceedings was taken.)

13                  THE VIDEOGRAPHER:  The time is 12:43 p.m.

14   Central time, and we are on the record.

15   BY MR. GIBBS:

16        Q.    Okay.  I wanted to follow up a little bit

17   on the issue we discussed just before the break.  We

18   were talking about Paragraph 115 of your reply

19   report, which notes that the number of days with

20   positive abnormal returns, four out of the 25 that

21   you're talking about there, is in your view four

22   times the number that would be expected by chance,

23   and you explained the math that you used to get to

24   that.

25                  So my follow-up question is am I

Page 49

1    understanding correctly that the conclusion one can

2    draw from that is that having four out of 25 days

3    with positive abnormal returns is not random?

4         A.    I didn't draw that conclusion per se.  It

5    I think that the -- I didn't do a test to determine

6    whether four was statistically significant as it

7    relates at the 95 percentile.

8              The point I was trying to do is that

9    Mr. Deal seemed to make a big deal out of the fact

10   that there as he called it were only, and I'm doing

11   air quotes, only four days out of the 52, which is

12   sort of a meaningless statement because he didn't

13   tell you what you would expect.

14             I just wanted to put some perspective

15   on that to say that not only is it out of 52 that's

16   wrong but the idea that four what are basically

17   earning dates for the most part, you know, is not

18   some small number as Mr. Deal seems to suggest.

19        Q.    But on your point about what one would

20   expect, you would agree with me that as a general

21   matter, and for CenturyLink in particular, dates

22   when the company announces earnings are inherently

23   more likely than other dates to result in

24   statistically significant returns, whether positive

25   or negative, correct?

Page 50

1           A.    Well, I would, but Mr. Deal appears to

2     not believe in that because in his -- in his

3     discussion and critique of my event study, and I'm

4     trying to find specifically here, he calls the fact

5     that I use indicator variables or dummy variables,

6     as I believe he calls it, and I just want to clarify

7     because I think it's important because that's

8     another one of his contradictions is he would

9     believe that earnings dates would have statistically

10    significant news, and my cause and effect analysis,

11    which he for some reason calls a so-called cause and

12    effect analysis, even though it's a common, you

13    know, for his part, what he calls a causation, it's

14    the court's that have caused it.  Needless to say,

15    the fact that there are four doesn't necessarily

16    tell you anything.  And the fact is as it relates to

17    price impact, as I said before, the 21 doesn't tell

18    you anything if the information is material and

19    anticipated or if it is offset by some other

20    information.

21          Q.    So setting aside your critique of

22    Mr. Deal, do you yourself draw any conclusions from

23    the fact that -- sorry.  Let me start over.

24                For purposes of price impact, do you

25    yourself draw any conclusions from the existence of

                                            Page 51

1   four days with positive abnormal returns out of 25,

2   does that tell you anything about price impact or

3   not?

4        A.   It tells me that it's likely there is no

5   evidence of a lack of price impact.  As we have gone

6   through this before as it relates to the alleged --

7   the alleged misrepresentations and omissions that I

8   only went as far as saying that that is potential

9   evidence of a lack of price impact -- that is

10  potential evidence that there is price impact, but

11  you need to do a full and complete as opposed to a

12  preliminary and illustrative examination to make the

13  determination and nor do the four dates in

14  seclusion -- nor do the four dates in seclusion tell

15  you that the other 21 could not have price impact

16  without a -- without an analysis.

17       Q.   So am I understanding you correctly that

18  you yourself don't believe there's any price impact

19  significance to the fact that there are four out of

20  25 days with positive abnormal returns?

21            MR. BLATCHLEY:  Objection, asked and

22  answered, and misstates testimony.

23  BY THE WITNESS:

24       A.   And the question makes no sense either.

25  You could have zero dates with statistically

Page 52

1    significant -- with statistically significant

2    positive returns and still have price impact.

3        Q.    I understand.

4        A.    It is not evidence of a lack of price

5    impact.

6        Q.    So I'm not asking about whether it's

7    evidence of a lack of price impact.  I'm asking you

8    whether you believe it is evidence of a price impact

9    or not?

10        A.    What is evidence of a lack of -- I'm --

11    go back because I'm totally confused at this point.

12        Q.    I want you for now to set aside your

13    disagreement with Mr. Deal.  I'm not asking you

14    about your disagreement with Mr. Deal.  I understand

15    it.  Okay.  What I'm asking is whether you for -- in

16    your own view, is there any significance for price

17    impact to the mere fact that there are four out of

18    25 days with positive abnormal returns?

19        A.    I couldn't measure but your -- it would

20    suggest there is -- no, I can't even say.  And,

21    again, the disagreement that I have with Mr. Deal is

22    based on his report as opposed to his deposition

23    testimony because in his report, he seems to suggest

24    that you need to have a statistically significant

25    return to have any chance that there's, you know,

```
 1    inflation introduced into a stock price, which he
 2    then in his deposition fully described why he was
 3    wrong with that statement.  And so, therefore, you
 4    can't infer anything by whether there's zero or
 5    four.  But, I mean, it's just those were four, those
 6    are the four that he looked at, those are the four
 7    that he said needed to be parsed, and -- but there's
 8    no evidence of a lack of price impact on those four
 9    dates, nor is there any evidence of a lack of price
10    impact on the other 21, nor is there evidence of a
11    lack of price impact on the other 27.
12         Q.   Do you agree -- well, let me start over
13    with that.  Let me ask a slightly different
14    question.
15              In your view, is there evidence of
16    price impact on the four dates where positive
17    abnormal returns were observed?
18         A.   Again, we have gone through this time and
19    time again as to my analysis of what we call the
20    front-end or the alleged misrepresentations or
21    omissions.  The evidence of price impact comes from
22    Mr. Deal's report, even though I don't even
23    necessarily agree.  The evidence is the fact that he
24    says that it will be difficult to pars, i.e.,
25    separate the price impact from -- of the alleged
```

Page 54

1    misrepresentations and alleged omissions from the

2    other information, the other factors that are

3    unrelated to the fraud.

4                  And -- and that in and of itself

5    says, okay, let's just put them in two buckets.

6    There's a bucket of price change that's associated

7    with the fraud and there's a bucket of price change

8    that's associated with the nonfraud, and that's

9    implicitly saying that there's price impact.

10                 But I -- I think you need a much more

11   in-depth analysis than Mr. Deal's preliminary and

12   illustrative analysis that he carries out in

13   Paragraph 72 to 76.  That's his full analysis of

14   front-end price impact.

15        Q.    Setting aside your interpretation of

16   Mr. Deal's discussion of the need to pars fraud from

17   nonfraud statements, setting that aside, do you

18   independently have a view of whether there is

19   evidence of price impact on the four dates out of

20   the 25 where there is a positive abnormal return?

21        A.    Well, as I stated --

22             MR. BLATCHLEY:  Objection.  One second.

23   Just objection, asked and answered.

24   BY THE WITNESS:

25        A.    Yeah, I mean, as I answered, I don't

Veritext Legal Solutions
866 299-5127

```
 1    know, at least three times before, I didn't do any
 2    independent analysis for those four dates other than
 3    to read Mr. Deal's alleged economic or purported
 4    economic framework, which consists of one paragraph
 5    per date which he points out, you know, a few of
 6    the, you know, 40 or 50 or 60 financial metrics and
 7    doesn't do anything to demonstrate that there's a
 8    lack of price impact.  There's no evidence in his
 9    report that there's a lack of price impact from
10    May 8, May 8, 2014; for November 5th, 2015; for
11    December 7th, 2015; nor February 11th, 2016, the
12    four dates.
13         Q.    Let me ask you a methodological question
14    if I could.  For dates on which you have a positive
15    abnormal return that is statistically significant,
16    such as these four dates, what work do you think one
17    would need to do in order to reach an economically
18    valid conclusion as to whether any of the alleged
19    false statements or omissions on those dates had an
20    impact on the price of the company's stock?
21         A.    It's speculative and it's associated with
22    loss causation, which we discussed in length in my
23    prior deposition as to separate it.  But you would
24    use the tools of loss causation to demonstrate that
25    100 percent of the price increase was associated
```

Page 56

1   with the other factors, and you would have to then

2   also, because that's not -- that's not -- that's

3   only the first step.  And then you'd have to make

4   sure this that there weren't, for example,

5   offsetting negative impacts of some other factors

6   that somehow cushioned the misstatement or the

7   omissions.  But I also don't understand the whole

8   concept here because as I understand it, especially

9   over a four and a half year period, the idea that

10  there has to be this mirror image is -- is just not

11  something that is generally the case between the

12  front-end and the back-end.

13      Q.   Is it your view that in order to evaluate

14  whether any of the alleged false statements or

15  omissions on any of these four dates had an impact

16  on the price of CenturyLink's stock, you would have

17  to go through this sort of back-end loss causation

18  analysis?

19      A.   I'm confused by that question.

20      Q.   I can try it again if you'd like.

21      A.   Sure, yeah, please.

22      Q.   Okay.  I'm trying to understand whether

23  you think it's possible to evaluate price impact

24  solely by looking at the front-end price reaction to

25  the alleged false statement or omission or without

Page 57

1   going and looking at the price reaction to the

2   alleged corrective disclosure?

3              MR. BLATCHLEY:  Objection, form.

4   BY THE WITNESS:

5       A.    I think -- and this is a personal view

6   that that I think that could be very difficult, if

7   not -- I mean, it could be difficult.

8              Let me give you an example.  You have

9   something that enhances revenue, possibly cramming,

10  or something of that nature, and over a four and a

11  half year period, you have basically a relatively

12  small amount at each period of time, and then you

13  have a disclosure that disclosed the aggregate

14  amount that had accumulated over time.  That's --

15  you know, that is a situation where you can't have

16  this sort of mirror that Doctor or Mr. Deal appears

17  to believe as the classic, and I put that in quotes,

18  securities case.  He describes this so-called

19  situation with the contract that doesn't exist where

20  there's a mirror image on the front-end that's

21  reflected in the decline on the back-end.

22              That is generally and, in fact, in my

23  experience almost never the case where you have

24  mirror image -- mirror images like that and,

25  therefore, the idea that only the, you know,

Page 58

1    front-end or only, you know, that you need to

2    demonstrate something on the front-end is a much

3    weaker proposition.

4         Q.    Yeah, I understand.  My question really

5    isn't whether front-end is the only way to assess

6    price impact.  I'm actually asking whether at least

7    conceptually it would ever be possible to test price

8    impact by looking only at the front-end, if you have

9    a view on that.

10        A.    Only on the front-end.

11        Q.    Hm-hmm.

12        A.    I think it could assist the trier of fact

13   by examining the front-end, but I wouldn't want to

14   rely wholly on the front-end because, again, as I

15   mentioned, and as is generally the case in

16   securities fraud, you have periods, you know,

17   usually one, two, five years where there are

18   accumulated impacts, and then it's, like, you know,

19   putting water into a plant and -- I'm sorry, into a

20   pitcher.  It's different than when I at one single

21   time take it out and pour it all into my glass.

22        Q.    Okay.  I think I understand that.  Let me

23   turn now to a slightly different subject.

24             I want to ask you a couple of

25   questions about Paragraph 108 of your reply report.

Page 59

```
 1     In this paragraph --
 2          A.    One second, please.
 3          Q.    Oh, yeah, sure, let me know when you're
 4     there.
 5          A.    Yes, I have read it.
 6          Q.    Okay.  You write -- in the second
 7     sentence you write, quote, "for example the
 8     Complaint alleges that the company made
 9     misrepresentations in its code of conduct but in my
10     experience, investors expect the company to adhere
11     to its code of conduct."  And I'm stopping there
12     although the sentence goes on.
13               Is it your expert opinion that
14     investors expect companies to adhere to their codes
15     of conduct?
16          A.    Well, I guess as an investor, a former
17     CEO and CFO, President and Chairman of the Board of
18     a public company, based on that, I would expect it.
19     It seems to be a natural.
20               You know, for example, I mean, if --
21     I mean, I don't expect to find out that the company
22     that I'm involved with has been sexually harassing
23     women even though the code of conduct says it won't.
24     I don't expect as an investor a company to be not
25     adhering to, you know, what it determines to be its
```

Page 60

```
 1    billing and sales practices.  And then -- so I guess
 2    that's based on an investor -- yeah, that it's --
 3    and a head of a former public company and just I
 4    guess economic logic.
 5         Q.    When you were the head of a public
 6    company, did your company publish its code of
 7    conduct or some similar statement of behavioral
 8    expectations for its employees?
 9         A.    Of the behavioral?
10         Q.    Yeah, code of conduct or some similar
11    thing outlining expectations for how your employees
12    would behave.
13         A.    Excuse me one second.  I just had a pop
14    up here.  Sorry.  Oh, no, no, no -- okay.  Somebody
15    else was using my zoom accounts.  I'm sorry.  Okay.
16                    Yeah, I'm sorry, I was flustered
17    there.  Could you please ask -- it was while I was
18    the head of my public company?
19         Q.    Yeah.  You have alluded to your
20    experience as a head of a public company, and my
21    question is in that -- in that -- while you were the
22    head of that public company, did the company have a
23    published code of conduct that investors would see?
24         A.    As it relates to certain issues, but the
25    one thing I can say is that if I -- if I take a code
```

Page 61

1    of conduct, let's assume it's a certain language

2    like we -- I understand alleged here and then I

3    repeat it every quarter, that in and of itself

4    doesn't -- I wouldn't expect anything to change

5    because it's the same language over and over again.

6    So just that would suggest --

7         Q.    I was asking a factual question, whether

8    the company you headed, which you've alluded to as

9    your experience, did you have a published code of

10   conduct, yes or no?

11        A.    I can't remember.  As it relates to what

12   issues?  Sexual harassment?  Accounting?  What --

13   what -- what -- what code of conduct are you talking

14   about?

15        Q.    I'm asking whether you had any published

16   code of conduct that your investors, your public

17   investors would have seen?

18        A.    Well, I know I had to certify my

19   financials, which indicated that I followed certain

20   conduct every quarter.

21              I can't recall.  I mean, I haven't

22   run my public company since 1999 so...but I think

23   the investors would be -- would have been quite

24   shocked if they would have found that, you know, I

25   don't know, that we were misstating revenue, and

Page 62

1    that, you know, somehow, that was, even though

2    our -- and our code conduct said we would use GAAP,

3    for example.

4        Q.    When you were the CEO of a public

5    company, did 100 percent of your employees comply

6    entirely with your codes of conduct 100 percent of

7    the time or did you ever have employees who

8    sometimes violated codes of conduct?

9             MR. BLATCHLEY:  Objection.

10   BY THE WITNESS:

11       A.    First of all, again, remember this is the

12   1990s, but we did have -- I know I remember we had

13   cases where there were sexual harassment violations,

14   where there were OSHA or EPA violations, and we had

15   to dismiss employees.  I don't recall whether there

16   were any -- I mean, there were no financial

17   violations.  I don't recall, though, whether I had

18   to dismiss, you know, an accountant -- accounting

19   person or whatever that might have violated GAAP or

20   my -- or the company's procedures -- practices and

21   procedures.

22       Q.    Do you think that violations of your

23   various codes of conduct by individual employees

24   rendered your codes of conduct false and misleading?

25            MR. BLATCHLEY:  Objection.

Page 63

1   BY THE WITNESS:

2        A.    I don't have a -- I don't have an opinion

3   on that.

4        Q.    You can't say?

5        A.    That my -- that's a legal question.  I

6   can't say.

7        Q.    Okay.  Well --

8        A.    If I published -- I mean --

9        Q.    Let me -- let me -- let me bring it back

10   to the language of your report.

11             You say in your report that in your

12   experience investors expect a company to adhere to

13   its code of conduct.  So let me ask the question a

14   slightly different way.

15             In your experience, do investors

16   expect a company to achieve 100 percent compliance

17   at all times by every single employee?

18             MR. BLATCHLEY:  Objection.

19   BY THE WITNESS:

20        A.    I don't have an opinion on that.  That's

21   just not something I have ever actually even

22   contemplated.

23        Q.    But you do have an opinion that investors

24   expect the company to adhere to its code of conduct.

25   You just don't have an opinion about what that

Page 64

1    means?

2          A.    No, I have an opinion that if I repeat

3    the code of conduct quarter after quarter, year

4    after year, that investors would be expected that I

5    would adhere to the code of conduct and --

6          Q.    And does adherence to the --

7                MR. BLATCHLEY:  Can we just let the

8    witness answer the question?

9                MR. GIBBS:  Yeah.  I was stopping.  I

10   didn't realize he was going to go on so I stopped.

11               THE WITNESS:  Okay.  Go ahead.

12   BY MR. GIBBS:

13         Q.    Are you done?

14         A.    Yes.

15         Q.    Okay.  So you said that investors would

16   expect the company to adhere to its code of conduct.

17   I'm trying to explore what you mean by adhere in

18   that sentence in your report.

19               Does adhere to its code of conduct

20   mean 100 percent compliance at all times by all

21   employees?

22               MR. BLATCHLEY:  Objection, vague -- hold

23   on one second.

24               Objection, vague, 100 percent

25   compliant.

1  BY THE WITNESS:

2       A.    I really don't have -- I -- it's -- it's

3  my opinion that investors assume that legal behavior

4  is taking place within companies and we know just by

5  the fact there is an SEC that there might be illegal

6  activities that are violations that take place.

7             As to this 100 percent, I have not --

8  I have never done research on that.  I don't know

9  what the research is.  You know, I don't -- maybe,

10 you know, maybe it materially, you know, adhere to a

11 code of conduct, I don't know.  But this is a legal

12 question, and I assume one that will be dealt with

13 by you-all.

14      Q.    Well, it's actually one that you have

15 expressed a view on here based on your experience in

16 your report, but if you can't give me any further

17 insight into what you mean by investors expect a

18 company to adhere to its code of conduct, then I'll

19 move on.

20      A.    Yeah, I --

21      Q.    One more point on the front-end and then

22 we will go enjoy a discussion about the back-end.

23             In cutting down Mr. Deal's 52 dates

24 to 25 dates, you have cut out dates where there was

25 a duplicate announcement, correct?

                                        Page 66

1        A.    Correct.  Duplicate in the sense of

2    duplicate financial information that was disclosed

3    and following the procedures of a, you know, sort of

4    academic-based earnings analysis, which would

5    examine the earnings disclosure dates and not the

6    10-Ks or 10-Qs.

7        Q.    Okay.  And in that regard, your point is

8    if the company discloses financial information on

9    day one and then some number of days later, it

10   repeats that same financial information, you

11   wouldn't expect the price of the company's stock to

12   react to the repetition of previously disclosed

13   financial information.  Have I understood you

14   correctly?

15       A.    Well, understand that in an efficient

16   market, you assume that unanticipated material

17   information will be -- there will be a reaction to

18   that.  So to the extent that material information is

19   disclosed in an earnings announcement that's

20   unanticipated, I would expect to see some price

21   reaction.

22             To the extent that it was based on a

23   financial -- material financial information that is

24   disclosed yet again in a 10-Q or a 10-K, it's not

25   unanticipated and, therefore, I wouldn't expect in

Page 67

1    an efficient market for there to be a price

2    response.  If there's additional information that

3    potentially is material in the 10-Q or 10-K, then I

4    would, you know, maybe one of these would have been

5    statistically significant.

6              But, again, I'm using an

7    academic-based approach even though Mr. Deal doesn't

8    consider it such, but I'm just, you know, on

9    earnings dates, that's generally the

10   information-rich days that he describes, not the

11   other -- not the other in the case, you know, 27

12   dates or repetitive dates.

13        Q.   And I asked you about how you would go

14   about testing for price impact for the 25 dates

15   where you might expect a price reaction.  I wanted

16   to ask you the same question for the 27 dates where

17   you believe that one would not expect any price

18   reaction to the alleged false or misleading

19   statements.

20              For those dates disclosures that you

21   would not expect to cause a sort of front-end price

22   impact, how would you go about testing whether there

23   was price impact for those types of disclosures?

24        MR. BLATCHLEY:  Objection, vague, but go

25   ahead.

Page 68

1    BY THE WITNESS:

2         A.    Yeah, and I have got to be careful

3    because you made some statements and I want to make

4    sure that I'm not endorsing those statements.

5              For those 27 days when, you know, for

6    example, the 10-K or 10-Q repeats a

7    misrepresentation, one would look at and do the same

8    type of analysis, you would look at the statistics,

9    you'd look at analysts, you would look at the

10   company, you would look at the media, you would look

11   at internal documents, all of those types of things

12   to try to get a sense of whether this is material

13   information that is repetitive and that's why the

14   market is not responding, or if it's materials

15   positive information associated with a

16   misrepresentation, is there offsetting information,

17   or if it's something that just simply maintains

18   expectations, then I would ask myself if I saw a

19   statistically significant price movement why I might

20   have seen that.  But at least I would have to go

21   through that those types of initial steps to begin

22   to look at whether or not there's evidence of a lack

23   of price impact.

24        Q.    For a disclosure of the type that you put

25   into the 27 dates, the days when you would not

Veritext Legal Solutions
866 299-5127

1    reasonably expect the stock price to react, is it

2    necessary to look at what we have been calling the

3    back-end in order to test whether the alleged false

4    statements or omissions had an impact on price or

5    can you do it without looking at the back-end?

6          A.    I think you can look at the front-end,

7    but the back-end tells you the story, especially in

8    a situation like this where you have a

9    non-confounded disclosure.  But I guess -- yeah,

10   that's my answer.

11         Q.    Okay.  The very first alleged false or

12   misleading statement in this case, if I'm recalling

13   correctly, is from March 1st of 2013.  It's the

14   filing of the company's annual report on form 10-K

15   for the 2012 fiscal year, and you can confirm that

16   by looking at page 41 of Mr. Deal's report, that's

17   Figure 5.

18         A.    Figure 5, page 41.

19         Q.    Yes.  Correct.

20         A.    Give me one second because I would like

21   to look at the information.  Oh, you did it again.

22   You didn't publish my appendices.  I'll note that

23   for the record, that the appendices to exhibit --

24   that's my reply report.  Oh, Exhibit 2 does not have

25   my appendices.  Okay.  So I'll go to Mr. Deal's --

Page 70

1    okay.  March 1st, it was a 10-K.  Right.  Correct.

2        Q.    Okay.  And so this one would be a

3    duplicate in the sense that it is repeating

4    financial information disclosed on the earnings

5    announcement that proceeded the filing of the 10-K,

6    correct?

7        A.    Yes.  That would -- yes.

8        Q.    Okay.  And so because it's repeating

9    financial information that was previously disclosed,

10    you would not have expected to see the market react

11    at least to the financial information that is

12    included in the March 1st, 2013 10-K, correct?

13        A.    React to the financial information, I

14    wouldn't necessarily -- again, I didn't say it has

15    to.  It might, but I wouldn't necessarily expect

16    there to be a statistically significant positive

17    return if it's just repeating the same information.

18        Q.    And to the extent that a disclosure is

19    repeating information previously disclosed and you

20    want to evaluate price impact, would you want to go

21    back and look at the original disclosure of that

22    information and see if there was a price impact?

23        A.    One could possibly do that.  It's not

24    necessary.  I mean, this could be maintaining

25    price -- maintaining prices.  The other issue could

Page 71

1    be that you might find -- you would want to do the
2    same type of analysis at least when you would take a
3    look at it and then you would have to examine the
4    confounding factors, try to understand whether it's
5    a growing thing, say revenue is often a growing
6    issue as you go through time and so it could be,
7    again, like I talked about drops, you know, a little
8    pour in a bucket as opposed to pouring out the
9    bucket of water.
10            So, yeah, that's -- that's something
11   you might want to try to do if you were trying to
12   show an absence of price impact.
13       Q.    Did you do that here?  Did you go look at
14   the earnings date that preceded the March 1st, 2010
15   10-K?
16       A.    As I have said now I would say it would
17   be at least four times, Mr. Deal did not do any
18   examination actually of this date other than to put
19   it in his Figure 5, and I was just opining that
20   there was no evidence of a lack of price impact on
21   the disclosures made on the 1st of March 2013.  And
22   that was the extent of my discussion.  I did not do
23   that and especially because Mr. Deal, as I
24   understand it, was not asked to evaluate whether
25   there was an absence of price impact nor did he

                                    Page 72

1    present any evidence of price impact or the absence

2    thereof for that particular date.

3         Q.    Do you know whether the plaintiffs in

4    this case are claiming that the February 13 earnings

5    announcement that preceded the March 1st 10-K was in

6    any way false or misleading?

7         A.    I don't recall.  You know, oftentimes

8    class actions are limited.  But that's a legal

9    question.  I don't know.  I just don't know.

10        Q.    Okay.  We have talked a little bit about

11   the use of what we have been calling back-end

12   evidence or back-end stock price movements, and we

13   have talked about using a loss causation analysis to

14   draw conclusions about price impacts.  I want to

15   turn to that subject.  Okay.

16               And to start with, I'd like to

17   explore with you how it is conceptually that one can

18   look at the stock price movement following a

19   corrective disclosure and reach conclusions about

20   the price impact of a prior alleged misstatement or

21   omission.  Are you with me?

22        A.    I believe so.  The -- Okay.  Yes.  So far

23   I'm with you.

24        Q.    Okay.  So we will start -- let's try to

25   make it a little bit concrete.  The first alleged

Veritext Legal Solutions
866 299-5127

1    corrective disclosure in this case is June 16 and it

2    relates to press reports about a lawsuit filed by a

3    former CenturyLink employee named Heidi Heiser.

4    Does that sound right to you?

5        A.    Yes.  I think I describe in my opening

6    report when I examined the statistical properties of

7    that that on -- well, yes.  I won't -- yep, that's

8    my understanding.  There's a Bloomberg story that

9    talks about sales practices and billing, et cetera,

10   associated with CenturyLink.

11       Q.    Okay.  I'd like you to explain to me

12   conceptually how it is that one can begin with the

13   stock price decline following the Bloomberg article

14   about the Heidi Heiser complaint and draw

15   conclusions about the price impact of alleged false

16   statements and omissions made many, many months or

17   even years earlier, how do you connect those two

18   things up conceptually?

19       A.    Well, it's the sort of thing you do in a

20   loss causation analysis, and I have done that where

21   you examine the corrective disclosures and linked

22   them back.  I think the -- you know, so, you

23   would -- you know, in a loss causation analysis do

24   that, but I haven't been asked to do a loss

25   causation analysis.

Page 74

1        Q.    That's fine.  I'm not asking you to.  I'm
2    asking you how does the stock drop following the
3    Heiser-related disclosure tell you anything about
4    the impact of allegedly false statements or
5    omissions made many months later?  How does one do
6    that conceptually?
7              I'm not asking you to run the
8    numbers.  I'm asking you conceptually what does
9    stock price decline following a corrective
10   disclosure have to do with alleged price impact of
11   statements or omissions made many months or years
12   earlier?
13       A.    Again, I would suggest that there's no
14   mirror image, meaning that Mr. Deal's analogy, his
15   example of the contract and linkage between the
16   falsity of the contract and then the disclosure of
17   that falsity, they're not mirror images.  You have
18   to take the corrective disclosure in a loss
19   causation of damages report that might be material
20   and go back and link it to various misstatements,
21   and as I say, various misstatements because you have
22   misstatements over a long period of time.
23              I'm the statistician, I'm the
24   economist, and therefore, I'm looking at the
25   numbers.  I haven't done that type of analysis

```
 1    because it's premature, it's not necessary, to
 2    demonstrate whether the market is efficient or
 3    whether the damages methodology can be applied
 4    class-wide and is common.
 5              But the linkage is really, again,
 6    something you would do in a loss causation report
 7    and something that you would do -- again, it's going
 8    to be really considered by the trier of fact.  In
 9    fact, as I understand it, the trier of fact has
10    already suggested that the misrepresentations at
11    least reasonably caused the losses that were
12    observed on June 16, June 19, and July 12, 2017.
13        Q.    What kind of work or analysis would one
14    have to do to establish the type of linkage that
15    you've referred to between the alleged corrective
16    disclosure on the one hand and the alleged false
17    statements or omissions on the other hand?
18        A.    For example, hypothetically, I have
19    examined situations where you show generally,
20    usually, internal documents, say, for example,
21    accounting issues, where there are, I don't know,
22    revenues, fees, costs, some type of financial metric
23    that are misstated, and then you look at the end and
24    you see there's a disclosure of that misstatement.
25    I mean, that links it together.  That's one
```

Page 76

1    hypothetical way and actually a real way that I have

2    looked at the issue that tie the back-end to the

3    front-end.

4        Q.    Okay.  So that's one example, but you are

5    not able to describe for me just conceptually how

6    you would do it across a number of cases?

7        A.    I think that would --

8              MR. BLATCHLEY:  Objection.  Go ahead.

9    BY THE WITNESS:

10       A.    I think that's entirely speculative at

11   this point.  I haven't been asked to do a loss

12   causation analysis nor has Mr. Deal.  I'm responding

13   to his report.  The four corners of my report

14   explain my opinions.  I was not examining -- I

15   didn't take into a loss causation analysis.

16       Q.    Okay.  Let me -- let me ask you then some

17   hypothetical questions because I believe I'm allowed

18   to do that.

19             Let's suppose that Heidi Heiser's

20   lawsuit was not revealing some fact previously

21   concealed by the company but, in fact, her lawsuit

22   was made up, overblown, wildly overstated.  In that

23   situation, would the stock price reaction to her

24   lawsuit establish price impact from alleged false

25   statements and omissions many months earlier?

Page 77

1             MR. BLATCHLEY:  Objection, form.

2    BY THE WITNESS:

3        A.    Well, I think your statement itself

4    established price impact because you suggested some

5    type of I'll call it amplification where it's

6    overblown, overstated.  That doesn't mean that it's

7    wrong or false.  If the trier of fact determines

8    that it is false and, therefore, 100 percent that

9    the reduction on the price at the corrective

10   disclosure by Ms. Heiser's suit, that that is

11   something, again, that I think will be determined at

12   trial, but to the extent when you say overblown or

13   amplified, that suggests that there's at least a

14   partial element of truth, it suggests that in a loss

15   causation time, one is going to have to, as I

16   mentioned, separate the fraud from the nonfraud and

17   you are hypothetically throwing what you called

18   consider overblown amounts to be nonfraud, but that

19   still tells you that there's a portion of that price

20   reduction, decline that is associated with the

21   misrepresentations that took place over the prior

22   period of time.  And as I understand it and as

23   Mr. Deal never demonstrated that 100 percent of that

24   decline was due to anything other than the fraud.

25       Q.    Do you think that Heidi Heiser's

                                          Page 78

1    complaint is a corrective disclosure if a single

2    CenturyLink employee one time engaged in one

3    instance of cramming for an entirely insignificant

4    amount of money, would Heidi Heiser's complaint,

5    therefore, be partially corrective and, therefore,

6    establish price impact?

7              MR. BLATCHLEY:  Objection.

8    BY THE WITNESS:

9         A.    I'm not -- I'm not here as a fact witness

10   or a trier.  I mean, I just can't take a

11   hypothetical like that and do it.  It depends on so

12   many different related factors, and it's just -- I

13   don't think that's a question that as a financial

14   economist that's been tasked with trying to

15   determine whether the market is efficient, trying to

16   demonstrate that there's a common damages

17   methodology, and then respond to Mr. Deal's report

18   where he didn't even look at the issue of meaningful

19   analysis of price impact on the last day or the

20   evidence that's lacking, I can't answer that legal

21   question or fact question.

22        Q.    Let me clarify it because I'm not

23   actually asking you a legal question or a fact

24   question.  So let me ask it a little more clearly.

25              As an economic matter, I want to ask

Page 79

```
 1    you to assume a set of facts and then tell me how
 2    you would view those facts as an economic matter.
 3    Okay.
 4                 So let's assume that there is a
 5    relatively small amount of cramming going on by
 6    employees at CenturyLink who were violating the
 7    company's code of conduct; when caught, they are
 8    disciplined; and the dollar amounts of the cramming
 9    is insignificant to the company's reported financial
10    reports or results.  Okay.
11                 Do you understand the hypothetical
12    set of facts I'm laying out for you?
13                 MR. BLATCHLEY:  Objection to the
14    hypothetical.
15                 Go ahead.
16    BY THE WITNESS:
17         A.   Yeah, I mean, I can understand the
18    hypothetical.  Whether they're facts, I don't know.
19    Maybe assumptions that you are asking me about.
20         Q.   I am.  I'm asking you to make these
21    factual assumptions so that I can then ask you a
22    question about how you would analyze those assumed
23    facts as an economist.  Okay.  Just like you have
24    done with the plaintiff's allegations.  Right.
25    You've assumed their allegations will be proven true
```

Page 80

 1    and you have offered a number of economic opinions

 2    based on that assumption.

 3              I'm asking you to assume a different

 4    set of facts, and I want to talk about how you would

 5    analyze this different set of assumed facts as an

 6    economist.

 7              So let me -- let me restate and

 8    refine it a little bit, if I may.

 9              I want you to assume that contrary to

10    what Ms. Heiser alleged in her complaint, that

11    CenturyLink's senior management did not condone or

12    encourage cramming.  They had policies and codes of

13    conduct that prohibited cramming.  Notwithstanding

14    those policies and codes of conduct, some relatively

15    small number of employees sometimes engaged in

16    cramming.  When they did so, they were disciplined,

17    and the total dollar amount of those instances was

18    insignificant to the company's reported financial

19    results.

20              With that set of assumed facts, would

21    the allegations in Heidi Heiser's lawsuit and the

22    resulting stock price reaction establish price

23    impact for any of the front-end allegedly false and

24    misleading statements in this case?

25              MR. BLATCHLEY:  Objection to the

Page 81

1    hypothetical, but go ahead and answer.

2    BY THE WITNESS:

3         A.    Would any of those facts establish price

4    impact on the front-end?  I have no opinion on price

5    impact on the front-end, but they certainly don't

6    establish a lack of price impact on the front-end.

7         Q.    All right.

8         A.    For the record, Mr. Gibbs, again, has

9    decided that my answer is funny.  I never -- I'll

10   tell my children that I do have a sense of humor,

11   but he was smiling.  I thought I was correct.

12        Q.    I was smiling, indeed.  I even chuckled a

13   little bit.  I suspect the video record will show

14   that as well.

15             What is it that you think the

16   Bloomberg report about Heidi Heiser's lawsuit

17   disclosed to the market?

18        A.    It's my understanding that the Heidi

19   Heiser lawsuit disclosed to the market issues

20   associated with financial reports possibly being a

21   little misleading, the cramming activity possibly

22   existing, and possibly even changing over time, the

23   issues associated with honesty at the corporation,

24   disclosed potential regulatory risks, various what

25   might be considered omissions, and that type of

                                        Page 82

1    information.

2       Q.    Do you think Ms. Heiser's allegations

3    about CenturyLink engaging in a Wells Fargo-like

4    scam was the revelation of an issue about financial

5    statements being potentially a little bit kind of

6    misleading, is that really your understanding?

7            MR. BLATCHLEY:  Objection, misstates

8    testimony.

9    BY THE WITNESS:

10      A.    Yeah, I didn't write the complaint.  I

11   understand that the allegations are such, but

12   that's -- again, you are asking me to interpret that

13   and I -- you are asking me for a factfinding

14   mission.  I'm not here as a factfinder as to whether

15   the allegations associated with Ms. Heiser's

16   disclosure is -- includes -- I mean, it's my

17   understanding that plaintiffs allege that it

18   includes all the issues that I discussed just

19   before, but I'm not here to determine one way or the

20   other.  It doesn't have any impact on my decision or

21   my opinion that there is -- the market is efficient,

22   that there is a common damages methodology and that

23   Mr. Deal has failed to provide any evidence of a

24   lack of price impact.

25      Q.    Let me ask you this:  Let's say that

Page 83

1    Heidi Heiser's allegations turn out to be simply
2    false, what she said was not true.  In that
3    situation, would the filing of her lawsuit and
4    reports about her lawsuit amount to corrective
5    disclosures?
6        A.    That's for the judge to determine.  At
7    this point, the judge has, as I understand, and I'm
8    not a lawyer but I did read the order, has said that
9    there's a reasonable idea that those disclosure
10   caused investor harm.
11       Q.    Again, I'm not asking you as a legal
12   matter.  I'm asking you as an economic matter.  If
13   Ms. Heiser's allegations were false, would you as an
14   economic matter believe it appropriate to use the
15   stock market's reaction to those allegations as a
16   measure either of loss causation or of price impact
17   from the allegedly false or misleading statements?
18            MR. BLATCHLEY:  Objection to the
19   hypothetical and asked and answered.
20   BY THE WITNESS:
21       A.    First of all, we haven't done a loss
22   causation analysis.  I'm not making any statements
23   related to the loss causation.  I haven't done it.
24   I haven't anticipated it.  For the purposes of my
25   report, and we went through this before, I assume

Page 84

1    the allegations will be proven true at trial.

2            If Ms. Heiser's allegations are found

3    to be false and the trier of fact determines that

4    the information disclosed revealed -- maybe it even

5    revealed worse abuses of the code of conduct and

6    financial, you know, I can't tell you.  It's up to

7    the finder of fact to make that determination.

8            What I can tell you is, first of all,

9    whatever his facts are, I can apply that.  If he

10   suggests that, yes, that's false, but yes, it

11   reveals weaknesses within the company and,

12   therefore, the allegations are true and that that

13   price represents a reasonable estimate of the harm

14   to investors because of misrepresentations, I can

15   apply that, I can calculate damages based on a

16   common methodology.

17           I can also say that, again, based on

18   the fact that there is a statistically significant

19   negative return on that date, that that follow on

20   analysts discussion both in terms of numbers,

21   commentary, and their recommendations, the board

22   actions, the internal documents, all of that would

23   suggest that there is price impact.  But it's

24   certainly the case that Mr. Deal never showed that

25   there's a lack of price impact from that, even if

Page 85

1    those allegations turn out to be false.

2         Q.    Let me try to -- let me try this a

3    slightly different way because I really am trying to

4    get at your understanding of how certain facts and

5    evidence should be viewed economically speaking.

6    Okay.

7                   So if I understand correctly, one way

8    in which an economist might use the stock price

9    reaction to a corrective disclosure to establish or

10   measure price impact from a prior misstatement or

11   omission is to test in essence whether the

12   corrective disclosure is revealing something that

13   those prior misstatements or omissions concealed.

14   And I understand your point about not needing a

15   mirror image disclosure, but am I -- understanding

16   that, am I correct that the way in which this loss

17   causation analysis relates to a price impact

18   analysis is if the disclosure is corrected, if it's

19   revealing at least in some sense something that the

20   alleged misstatements or omissions concealed, then

21   the market's price reaction to that revelation can

22   help us identify and calculate the price impact of

23   the prior misstatement or omission; is that fair?

24              MR. BLATCHLEY:   Objection, form.

25                   Go ahead and answer.

Page 86

1    BY THE WITNESS:

2        A.    You know, I don't think that is -- I

3    mean, maybe in a -- maybe in a perfect world you can

4    look at one price reaction and infer all the others,

5    but let me go back to my pitcher of water, okay, and

6    my empty glass of water.

7              If I do this -- I'm going to do this

8    five times.  Okay.  Now, I'm going to pour out this

9    water.  I can tell you how much water I poured out.

10   Can you tell me what each of the five amounts of

11   water that went in are?  That's the relationship

12   between the front-end and the back-end.

13             So, yes, it can sort of give me a

14   road map.  That's why courts have often used things

15   like constant dollar, constant percentage, and index

16   inflation as it relates to damages.  I mean,

17   inflation driven.  But is there a one-to-one -- I

18   mean, and wasn't that different than this where I'm

19   now going to do 3, 4, 5, 6, 7, 8, 9, 10.  I

20   basically have the same glass, but a whole different

21   set.  So that's your hypothetical in a glass of

22   water.

23       Q.    Respectfully, it's not, and I worked

24   pretty hard.

25             MR. BLATCHLEY:  Patrick --

Page 87

1          MR. GIBBS:  Michael, I'm about to ask a

2      question.  I haven't said anything yet.

3          MR. BLATCHLEY:  I was just going to

4      suggest that it has been an hour.  If there's a good

5      breaking point coming up, I just wanted to flag it.

6      That's all.

7          MR. GIBBS:  That's fine.  I wanted to

8      finish this sequence though.

9      BY MR. GIBBS:

10         Q.    So I worked pretty hard in my

11     hypothetical to note your strongly-held view that

12     the corrective disclosure does not have to be

13     identical to the alleged misstatement or omission or

14     the concealed fact.  Okay.  And I'm acknowledging

15     that again.

16              But surely you would agree that as an

17     economic matter, for the stock price reaction to a

18     corrected disclosure to have any bearing on price

19     impact from the alleged misstatement or omission,

20     there has to be some relationship between the fact

21     disclosed by the corrective disclosure on the one

22     hand and the facts concealed by the alleged

23     misstatement or omission on the other hand.

24              Can you agree with that?

25         A.    Yes.  There has to be some linkage

Page 88

1    between the corrective disclosure and the

2    information disclosed there and the information

3    that's misrepresented or omitted during the four

4    plus years prior, yes.

5         Q.    Okay.  And -- okay.  Wonderful.

6              Moving away from the factual

7    allegations in this case and purely as a conceptual

8    matter, can you also agree with me that if the

9    alleged corrective disclosure is an accusation that

10   turns out to be false, then the stock market's price

11   reaction to that false allegation tells you nothing

12   about the price impact of a prior alleged

13   misstatement or omission?

14        A.    I guess from my glass of water analysis

15   the amount of the corrective disclosure, whether

16   it's false or true, won't tell you anything about a

17   specific front-end misrepresentation or omission.

18   You can attempt to link it from an economic

19   perspective with respect to discussion of analysts,

20   with respect to what has been disclosed and the

21   information disclosed, but in terms of the

22   statistics and the economics behind it, I don't see

23   how it -- you know, unless you have the most perfect

24   world could even come close to mapping back there.

25              And here's one of the issues, and

Page 89

1    I've mentioned it before, economists -- in terms of

2    our role.  I'm not a trier of fact.  I don't deal

3    with nuance per se.  I have to deal with issues

4    associated with statistics to support my conclusions

5    and, therefore, on the front-end, the statistics,

6    you know, might -- might be, you know, very

7    different than on the back-end, but that's I guess

8    why the courts have generally focused, at least in

9    my experience, on the back-end.

10        Q.    So I literally have no idea what you just

11   told me.  So let me try to ask a different question.

12              Assuming, again, that an alleged

13   corrective disclosure turns out to be an accusation

14   that's false.  Are you saying there are

15   circumstances where you might nevertheless conclude

16   as an economic matter that the market's price

17   reaction to the publication of that false allegation

18   can be evidence of loss causation and/or evidence of

19   price impact from the alleged false or misleading

20   statements many months prior?

21              MR. BLATCHLEY:  Objection to the

22   hypothetical.

23   BY THE WITNESS:

24        A.    I think even your hypothetical, yes.

25   Hypothetically, again, you're taking a very

Veritext Legal Solutions
866 299-5127

```
1    narrow -- you're saying, okay, there's accusations
2    made by Ms. Heiser, they turn out to be false, but
3    then you have got to look beyond that.  Does it
4    signal to the investment community some issue with
5    respect to the internal controls with the company,
6    management's reputation and trust, other possible
7    underneath issues.  I can't answer that
8    specifically.
9                    What I can say is that assuming the
10   allegations are proven at trial, that the fact that
11   you have a statistically significant return, that
12   you have analyst discussion, that you have analyst
13   commentary, that you have analyst recommendations,
14   that you have board activity, that you have internal
15   discussion would suggest -- would suggest that
16   there's price impact.
17                    And I can go back to it again, that
18   if you want to be like Mr. Deal and just assume that
19   the facts are going to be proven at trial to be
20   false and that the judge is going to determine that
21   the company is not liable, then, yes, maybe you
22   could come up with some, you know, reason why, you
23   know, that that corrective disclosure and the price
24   impact is not -- I'm sorry -- and the price decline
25   is not price -- not evidence of price impact.
```

Page 91

1               But Mr. Deal has done nothing other

2     than assume away the case, put himself in the

3     trier -- put himself in as trier of fact to

4     demonstrate that none, 100 percent, of that price

5     decline is due to other factors.

6               MR. BLATCHLEY:  Patrick, can we pause

7     here for a break?  Is this a good time?

8               MR. GIBBS:  Now is a fine time for a

9     break.

10              THE VIDEOGRAPHER:  The time is 1:52 p.m.

11    Central time, and we're off the record.

12                    (Whereupon, a break in the

13                     proceedings was taken.)

14              THE VIDEOGRAPHER:  The time is 2:25 p.m.

15    Central time, and we are back on the record.

16    BY MR. GIBBS:

17       Q.    Before the break, we were talking a

18    little bit about the first alleged corrective

19    disclosure in this case, which is a news report on

20    Friday, June 16, 2017, concerning Heidi Heiser's

21    lawsuit.  I want to ask you a few follow-up

22    questions about that and about subsequent alleged

23    corrective disclosures.

24              And in particular, I'm looking at

25    Paragraph 152 of the Consolidated Securities Class

Page 92

```
 1    Action Complaint, which has been marked as
 2    Exhibit 1.  You don't have to, but if you could like
 3    to have it in front of you, that would be fine.
 4            A.    What page is that?
 5            Q.    71.
 6            A.    71.  Okay.  And it's Paragraph 152.
 7            Q.    Correct.
 8            A.    Okay.  Let me take a look.
 9                  Okay.  I have read Paragraph 152 of
10    the Complaint.
11            Q.    Okay.  And I want to be very clear that
12    I'm not asking you to read me the allegations in the
13    Complaint or repeat them to me.  I'm trying to get
14    your insights as an economist.
15                  So my question is in light of the
16    facts that were allegedly revealed by the press
17    about the Heiser lawsuit on June 16, 2017, do you
18    have any understanding as an economic matter what
19    additional facts were revealed by either the news
20    about several consumer class action lawsuits being
21    filed over the weekend and into June 19, or news
22    about the filing of the Minnesota Attorney General's
23    lawsuit on July 12?
24            A.    That's a lengthy question with three
25    dates.  So there's Heidi Heiser's announcement --
```

Page 93

```
1    read it back to me.  Maybe because I --
2         Q.    Let me -- I'll try --
3         A.    It was a lengthy question.
4         Q.    Let me try it to break it down.
5               As a very direct matter, I'm trying
6    to figure out whether you have a view as an economic
7    matter of whether the corrective disclosures after
8    June 16 revealed anything new, again from an
9    economic perspective?
10        A.    From an economic perspective, the price
11   reactions of the stock and the bonds after June 16,
12   meaning June 19 and July 12 in particular, is
13   consistent with the revelation of new material,
14   unanticipated information.
15        Q.    Do you have an understanding of what,
16   from an economic standpoint, the new or
17   unanticipated information was?
18             MR. BLATCHLEY:  Objection to form.
19   BY THE WITNESS:
20        A.    From an economic standpoint?
21        Q.    Yes.
22        A.    Again, I'm not being put up as I
23   understand it as a witness to interpret the law or
24   to prove whether the corrective disclosures were
25   true or not or approved liability.
```

Page 94

1              From an economic perspective what you

2    do is you first look or I look in a securities case

3    as the expert economist at the statistical evidence.

4    That's the first part of that.

5              What I then have done, as did

6    Mr. Deal, was look at the other evidence that

7    economists would often rely on such as the number of

8    analyst reports, what the analysts were saying, and

9    the nature of their recommendations.

10             In this particular case, I also -- I

11   looked at -- I looked at elements associated with

12   the filing of a 13D by Corvex.  I looked at the

13   follow-on denial by the company after the close of

14   the market.  I looked at the board activities.  I

15   looked at the -- I also noted as well that just

16   based on that period throughout June 16 to July 12

17   that Morningstar considered the fair market value to

18   have declined by $2 a share, which is not

19   statistically different from the decline that was

20   observed over that period, and that is sort of how

21   an economist would put that all into a pot.

22             And once I looked at all of that and

23   then evaluated Mr. Deal's analysis of that period,

24   realized that he had provided no evidence of a lack

25   of price impact and that based on the fact that he

Page 95

```
1    felt that parsing might be required or that some
2    so-called ambiguously defined factor such as what he
3    calls FUD, F as in fraud, U as in utility, and D as
4    in doubt, that that might have caused it, and to the
5    extent that the court might find that independent,
6    still does not provide evidence of a lack of price
7    impact.
8              So that's how I would look at it from
9    an economic perspective.
10        Q.    Can you put into words for me what it is
11   that shareholders knew from an economic perspective
12   at the end of the day on June 19 that they did not
13   know at the end of the day on June 16?
14        A.    One thing was the specifics associated
15   with the fact that there were substantial -- or
16   lawsuits that could have substantial liability
17   related to consumers.
18              The other thing that they learned
19   after the market closed on June 16 was that one of
20   the large shareholders was supporting the company.
21              Another thing that they learned after
22   June 16 was that the -- that, you know, they learned
23   about whatever the analysts' interpretation of the
24   information was because there were a number of
25   analyst reports that were issued.
```

Page 96

```
 1                    They learned -- there's one other
 2     element that they had learned related to June 19 --
 3     June 19 that -- well, that's all I can remember
 4     right now.  But that there was --
 5          Q.    Okay.
 6          A.    -- you know, new information.
 7          Q.    Thank you.
 8                    I want to ask a little bit about an
 9     issue where you and Mr. Deal have had something of a
10     debate and it relates to the length -- I think the
11     way to put it is the length of the event window
12     that's properly considered.
13                    In simple terms, I think Mr. Deal has
14     expressed the view that in looking for the price
15     impact of corrective disclosure, we should look at
16     the closing date on the date of the disclosure.
17                    You, at least as to June 16 through
18     June 19, have looked at what might be called a
19     two-day event window.  Am I fairly summarizing the
20     debate, the different positions?
21          A.    Well, it's not quite two days.  The
22     announcement took place at 1:50 so it is really two
23     hours.  That's Mr. Deal's opinion, that it should
24     respond within two hours.  And especially as it
25     relates to bond markets, it shows sort of a lack of
```

Page 97

```
 1    experience and knowledge that you would expect it
 2    to -- I mean, you know, obviously we went through it
 3    last time.  I have been involved in lots of bond
 4    cases.  I understand the institutional features and
 5    characteristics of bond markets, understand the
 6    difference between various securities markets and
 7    time of reaction, but yeah, he believes there should
 8    be, you know, two hours and I suggest that,
 9    especially the nature of the information, how it's
10    disclosed might require a greater amount of time
11    between the fact that it was disclosed by a third
12    party.
13                 It was information that Mr. Deal,
14    again another contradiction in his report, says at
15    one point, when he's talking about the two-day
16    window, oh, this is really relatively
17    straightforward information, and then on the other
18    hand says parsing it is something that is going to
19    be too challenging and too complex to be able to
20    account for it, but needless to say, this is
21    information that would be difficult to quantify, it
22    would take some time to fully digest and process,
23    and so the idea of the two-day window especially as
24    it relates to the 7.6 percent note is totally
25    appropriate, has academic basis, has the court
```

Page 98

1    endorsement, and I think for me I got that, and for

2    him, it's his basic opinion, personal opinion.

3        Q.    Let me turn to the academic support

4    because you mentioned it several times in your reply

5    report and you've mentioned it again here now.

6            In terms of academic support for a

7    two-day or longer event window, I see a citation to

8    a single article in footnote 115 at page 39 of your

9    reply report, which is citing an article by Craig

10   McKinley entitled Event Studies in Economics and

11   Finance.

12           Is there any other academic support

13   that you can point me to for the use of a two-day or

14   greater event window?

15       A.    Well, first of all, again, we're talking

16   about a corporate bond and the one article that I

17   can talk -- it is stock related.  There are a number

18   of articles related to the stock, but even the

19   article that talks about the speedy response, which

20   is consistent, potentially, with this type of --

21   certainly the stock, is Patel, I forgot who the

22   co-author is, where they talk about how it's

23   generally a fairly quick reaction, but that there's

24   also additional reaction overnight, and that makes

25   sense especially when you have a situation like we

Page 99

1    do here where you're at the end of the day, there's

2    a disclosure, there's one analyst report, which is

3    actually a recommendation to go from a buy to a

4    hold, so a negative recommendation based on the

5    disclosure, and then over the weekend and the next

6    day, there are a whole bunch of other analysts'

7    reports.  And as ou know, analysts themselves

8    provide information because they digest and then

9    disseminate that information throughout.

10                  So I'm not sure -- again, Mr. Deal

11    cites to no article.  It's his opinion.  I have

12    had -- you know, I'm not sure how many more articles

13    you want, but I have had my opinion accepted in

14    corporate bond matters by many courts and there it's

15    generally the case that multiple days are clearly

16    relevant.  You look at each one separately.  It is

17    different -- I agree that the analysis associated

18    with earnings announcements where everybody

19    congregates because it's preannounced when something

20    is going to happen, when, even though there are all

21    the metrics that Mr. Deal discusses come out

22    generally, they're looking at EPS, EBITDA, EBITDA

23    multiples, that that type of information is -- you

24    know, you can see the types of reaction, and we saw

25    the types of reaction to the Bloomberg that it

Page 100

1    happened, the initial reaction was within, you know,

2    minutes.

3         Q.    Are you finished?

4         A.    Yes.

5         Q.    Let me try one more time.  My question is

6    really rather simple.

7              Other than the McKinley article that

8    is cited in footnote 115 on page 39 of your reply

9    report, can you cite me to any specific academic

10   support for the use of a two-day or greater event

11   window in an event study?

12        A.    Boy, there's a whole series of articles,

13   especially the articles discussing merger

14   announcements, other types of offering announcements

15   where it's multiple day windows.  But I can't tell

16   right now.  I could go to my library or whatever,

17   but this is something that I think especially for

18   corporate bonds is just not controversial for

19   anybody experienced in the arena.

20        Q.    Let's set the bonds aside now.

21              Can you cite me to any academic

22   support for the use of a two-day or higher event

23   window in an event study looking at a common stock

24   prices other than the McKinley article cited in

25   footnote 115 on page 39 of your reply report?

                                        Page 101

 1          A.     I think I just mentioned those.  All of

 2     those would have been -- the corporate bond area is

 3     not as -- it hasn't been as researched as much so

 4     the issues associated with offerings, issues

 5     associated with the different types of information,

 6     there have been -- I mean, again, there's --

 7     there's -- there's a number of articles.  I can't,

 8     not offhand.  It has been a long time since I read

 9     those articles because there has really been a

10     noncontroversial issue.

11               Understand what I'm really saying is

12     that on June 16, there's a corrective disclosure.

13     The price goes down within minutes.  And over the

14     weekend, there are -- there's basically a cushioning

15     blow with the company issuing -- finally issuing

16     something that there's a misstatement.  There is the

17     announcement in the filing of Corvex's 13D.  There

18     is a filing the next day of a lawsuit and also a

19     number of analysts' reports.

20               What I'm saying is that the 19th, you

21     take it independently, is -- again, and I'm talking

22     stock because that's what you asked me about, stock,

23     is certainly economically interesting, given, as

24     Mr. Deal says, that there's weak statistical

25     significance, and therefore, you have to look at it

                                        Page 102

1    and just because it's not at the 95 percent

2    statistical significance level as opposed to the

3    94 percent statistical significance level doesn't

4    mean you immediately say there is no price impact.

5    You have to evaluate, was it cushioned in some way,

6    and therefore, even he has not offered evidence of a

7    lack of price impact from the disclosures on

8    June 19.

9         Q.    Let's talk about June 19 for just a

10   second.  I'll circle back to something I asked

11   earlier but asked it in slightly different way.

12              What did shareholders know at the end

13   of the day on June 19 about CenturyLink's alleged

14   conduct that they didn't know at the end of the

15   trading day on June 16?

16        A.    What did investors -- I'm not reading the

17   minds of investors.  I haven't been asked to read

18   the minds of investors.

19        Q.    That's funny.  You did earlier in your

20   report actually.  But setting that aside -- set

21   aside what investors learned, what disclosures were

22   made about CenturyLink's conduct on June 19 that

23   were in any way different from the disclosures made

24   on June 16?

25        A.    Well, I'll take you to the Complaint,

Page 103

```
 1    Paragraph 158.  The news worsened for CenturyLink
 2    investors.  On Monday, June 19, 2017, at 9:30 a.m.,
 3    Bloomberg reported that a consumer class action
 4    lawsuit arising of CenturyLink's billing misconduct
 5    had been filed in California the night before.  The
 6    article explained that the lawsuit detailed how
 7    Ms. Heiser's allegations of what she observed and
 8    what CenturyLink's corporate culture encouraged were
 9    consistent with the experience of hundreds of
10    thousands and potentially millions of consumers who
11    had been defrauded by CenturyLink.
12                  So that -- and I can continue, but
13    that at least is what the Complaint alleges.
14        Q.    Yeah, I have read the Complaint.  What
15    part of what you just read to me reflects new
16    information about CenturyLink's conduct, not about
17    the fact that someone else had filed a lawsuit but
18    about CenturyLink's conduct?
19        A.    Well, it's the case that, you know, that
20    this -- the Heiser allegations were consistent with
21    the experience of hundreds of thousands, potentially
22    millions of consumers.
23        Q.    You don't think that's what Heiser was
24    alleging in the first instance?
25        A.    I have no opinion on what Heiser was
```

Page 104

1    alleging other than the fact that she disclosed

2    information related to the allegations of financial

3    misconduct.

4         Q.    If you don't have a view about what

5    Heiser had alleged, then how do you know that what

6    you just read to me reflects new information about

7    CenturyLink's conduct?

8              MR. BLATCHLEY:  Objection, misstates

9    testimony.

10   BY THE WITNESS:

11        A.    Again, I'm not sure -- I've stated

12   countless times and been criticized by Mr. Deal that

13   I assume that will be demonstrated that it will be

14   new information.  It just seems to me on its face it

15   is new information.

16              If I tell you today that there is

17   somebody who suggests that there's a lack of

18   controls within a corporation and then additional

19   information comes out that cites that there are

20   potentially hundreds of thousands of consumers who

21   have been defrauded, that's additional information.

22   And as an economist, what I do is I look first at

23   the statistics, then I go to the analysts, then I go

24   to the company and internal documents, and you know,

25   but I'm not here to determine whether this is true

Page 105

1    or not true, nor am I here to do hypotheticals where

2    I assume zero liability.

3         Q.    Yeah, you only do hypotheticals assuming

4    100 percent liability, right?

5         A.    As an economist, expert economist, my

6    analysis has to assume -- if I assume zero

7    liability, I'll tell you what the damages are.  I

8    mean -- yeah.  And as I said, the I'll call it

9    incredible component to my common damages

10   methodology is that I can -- the common damages

11   methodology is applicable and is applied class-wide

12   whether liability is 100 percent or zero percent.

13        Q.    So you have cited the allegations in the

14   consumer class action about hundreds of thousands

15   and potentially millions of customers as potentially

16   new information about CenturyLink's conduct.  So let

17   me ask you, you recall that Heidi Heiser accused the

18   company of running what she called a Wells

19   Fargo-like scheme.  Do you recall that?

20        A.    I recall hearing about it, reading about

21   it but...

22        Q.    And from an economic perspective, can you

23   articulate for me the difference between a Wells

24   Fargo-like scheme in that context and something that

25   affected hundreds of thousands and maybe millions of

Page 106

1    customers?

2        A.    I have not considered that issue.    In

3    fact, I wasn't asked to distinguish between Heidi

4    Heiser's revelations and these revelations.

5        Q.    Let me go back to the two-day event

6    window.  In Paragraph 85 of your report, you

7    identify five reasons why you believe this event

8    window is appropriate in this case.  Is there any

9    academic literature or other specific support for

10   these factors supporting the use of a longer than

11   one day event window?

12       A.    Yes.  In fact, I wrote and had a

13   published article on corporate bonds that

14   discussed -- discussed these.

15            I mean, this is not -- this is just

16   not again controversial that it's going to take

17   longer, depending on -- actually, there's even

18   research that shows about liquidity at different

19   times of the day so you can talk about times of the

20   day, but that also if we're using close to close

21   affects it, and then the issue of how different

22   types of news get interpreted, there's academic

23   literature on that.  I mean, and as I said, earnings

24   released announcements are the focus of most finance

25   but there's other, and then whether it's

Page 107

1    quantifiable, you know, and unanticipated, whether

2    it's from a third party or whether the securities

3    are again a corporate bond or a stock.

4         Q.    Can you cite me to any academic

5    literature that supports these specific five factors

6    as a reason to use an event window of longer than a

7    day for corporate stock?

8         A.    Again, as I sit here today, I told you

9    Patel even talks about how overnight there is

10   something.  Why don't we look and see what Mr. Deal

11   cited for his opinion and maybe there's --

12   there's --

13        Q.    Was there a -- you just referenced a name

14   that we talked about overnight, was that a name,

15   Patel?

16        A.    Patel, yes.  I referenced it ten minutes

17   ago in this line.

18        Q.    Yeah, I know.  I'm just trying to make

19   sure we have it down.  I heard Patel.  Can you

20   elaborate?  Patel, who is Patel?  What his first

21   name, what publication are you talking about?

22        A.    Again, I have a 40-year history in

23   finance.  I began my career in finance in 1978.  Do

24   I remember every article and textbook that I have

25   read?  No.  I just said he's got a co-author as

                                    Page 108

1    well.  It is a well-known, Mr. Deal should know it,

2    or certainly the people in Analysis Group, where you

3    get a very quick response; and again, these are -- I

4    believe it's earnings responses only that they're

5    looking at so that's going to be quicker than

6    others, but there's also a discussion about how

7    these responses happen overnight.

8              But again, I -- I -- this is -- this

9    is somewhat common.  I am -- like I say, you could

10   go to Mr. Deal who comes up with his opinion and --

11        Q.    Any other specific studies or articles

12   you can cite me to?

13        A.    I'm trying to think.  I can't remember.

14   I mean, so much of it -- so much of it is sort of in

15   my past especially because an article that talks

16   about information disclosure is not sort of the

17   nouveau area in academic finance.  It's more

18   associated with the types of finance that my son

19   studies at University of Chicago.

20        Q.    When you look at these five factors and

21   you decide that an event window of more than a day

22   is warranted, is there some limiting principle that

23   tells you to go just to the end of the next day or

24   might we just as well go a whole another day?  Why

25   not go through June 20?

Page 109

```
 1        A.    Well, interestingly enough, I have been
 2    involved now in almost a dozen Canadian suits and
 3    there, they have determined that they want to look
 4    at ten-day windows, you know, in terms of the
 5    response of stocks to information.  There's no hard
 6    and fast rule.  You got to look at each disclosure
 7    on its own.
 8              I see studies, and I've seen in the
 9    courts of five days.  I -- I -- and you can look at
10    up Dynex I believe it is.  It is cited I believe on
11    my CV, where I think it took 37 days for the
12    security to react.  Again, it depends on the market,
13    it depends on the nature of the information.  You
14    can look at it and, in fact, you could look at
15    multi-day returns and, you know, it might take some
16    time to do it, but close to close, which is, again,
17    I'll agree that that's generally what you look at,
18    but, you know, first of all, that's done and the
19    academic research is based on using thousands of
20    companies.  Okay.  This is a single firm event study
21    and, therefore, you have got to -- you know, that's
22    what you're looking for is expertise and experience
23    and knowledge that people like myself have and there
24    are times where multi-day windows make -- are
25    correct.
```

Page 110

1        Q.     Is there any particular framework or

2    standard that one would apply to decide, for

3    example, here, that at the end of the day on June 19

4    is the right place to stop your event window?

5        A.     You mean that a two-hour window is the

6    appropriate window?

7        Q.     No.  I meant -- so you decided the right

8    window was until the end of the day on June 19,

9    correct?  That's your view, right?

10       A.     Oh, the June -- yeah, the June 19 window

11   was because the announcement took place at 9:30 a.m.

12   on June 19.  That's the beginning of the trading

13   day.

14       Q.     So what standard did you apply to decide

15   that the end of the day on June 19 was the right

16   place to stop instead of going on to the 20th or the

17   30th for that matter?

18       A.     Well, I think I did go on to the 20th

19   with respect to the corporate bonds.

20       Q.     I'm asking about the stock now.

21       A.     Oh, you are asking about the stock?

22              I probably showed the results and the

23   trier of fact could determine for this a specific

24   unique company.  I mean, again, we're talking about

25   a single firm event study interpreting information.

Page 111

1    I'm here to provide the trier of fact with

2    information.  If they believe that that a two-hour

3    window is the appropriate window, then that's for

4    them to decide, but if they see, you know, the type

5    of information that has been disclosed, if they see

6    that it came from a third party, if they see -- it's

7    not like analysts immediately ran out other than

8    CFRA to say, my God, this is a problem, don't buy

9    this stock.  It took, you know, what, three days

10   before a number of the analysts responded to this.

11               And you know, if the trier of fact

12   decides that's not appropriate, at the damages

13   stage, I will deal with it.  But I don't think -- it

14   doesn't affect my opinion about the efficiency of

15   the market, it doesn't affect my opinion associated

16   with the common damages methodology, and it

17   certainly doesn't affect my opinion that it's a

18   demonstration that there's a lack of price -- that

19   Mr. Deal has demonstrated that there's a lack of

20   price impact.

21        Q.    Is there any reason why you didn't go

22   beyond a single day in looking at the July 12

23   disclosures?

24        A.    I can.

25        Q.    But you didn't.  I'm asking whether

Page 112

1    there's any principled reason why you did that or

2    did you just do that because that maximized the

3    potential damages?

4              MR. BLATCHLEY:  Objection to the form of

5    the question.

6    BY THE WITNESS:

7         A.    That's -- that's sort of silly because

8    I'm not doing a damages analysis.  What I showed was

9    that there was a statistically significant movement.

10   If I were asked by Mr. Blatchley to do damages,

11   possibly I would go beyond that, if I could

12   demonstrate good reason for that, and, in fact, I

13   think the courts at least look at 90-day bounce

14   back.  As I said, the Canadian courts look at an

15   average over the ten days following a corrective

16   disclosure and, you know, our courts have generally

17   looked at multi-day returns, but I don't see how

18   that has anything to do with maximizing damages

19   because I haven't done a damages report or loss

20   causation report.  It might be that there's

21   substantially less when we cover damages than the

22   decline that we observed on July 12, 2017.

23              Again, Mr. Deal never did anything to

24   demonstrate that there was a lack of price impact on

25   that day, nor did he do anything to demonstrate that

Page 113

1    that, you know, that a common -- that it would be --
2    affect the common damages methodology and nor does
3    he disagree that the market is sufficient.
4         Q.   Let me ask you about something you
5    mentioned a couple of times now.  You referenced the
6    filing of a 13D by a shareholder who purchased some
7    additional stock I believe on the 19th of June,
8    2017.  Are you familiar with what I'm referring to?
9         A.   I don't think that's the -- I don't think
10   that's the -- are you referring to Paragraph 81 in
11   my report?
12        Q.   Let me check.
13             Yes.  I apologize.  I misspoke.  It
14   was after the close of market on the 16th.
15        A.   Correct.  There was a filing and it is
16   cited in footnote 108, a scheduled 13D filed at
17   2017-06-16 at 17:02:49, yes.
18        Q.   Okay.  And then just prior to that, you
19   mentioned an Oppenheimer analyst commenting on the
20   allegations.  Do you have that in front of you?
21        A.   Paragraph 80?
22        Q.   Yes.
23        A.   Let me read that again.
24        Q.   I'm sorry.  I'm sorry.  Paragraph 17.  I
25   apologize.  I'm looking at the June 19, 2017, report

Page 114

1    that referenced the possibility that this might be a

2    strong buying opportunity.  Do you see that?

3         A.    I'm confused.  What's 17?

4         Q.    Let me start over.  On page 34 of your

5    report, Paragraph 79 --

6         A.    34.

7         Q.    It carries over.

8         A.    Oh, there, okay, second --

9               MR. BLATCHLEY:  79?

10              MR. GIBBS:  Yeah, Paragraph 79.

11   BY MR. GIBBS:

12        Q.    Are you with me now?

13        A.    Okay.  Paragraph 79.  Okay.

14        Q.    So you see the analyst reporting the drop

15   in the price of CenturyLink's stock and suggesting

16   that it might provide a strong buying opportunity,

17   correct?

18        A.    I do.

19        Q.    Okay.  In your view, is it consistent

20   with the analysts believing that Heidi Heiser's

21   allegations revealed a year's long fraud on the

22   company's customers and its shareholders for the

23   analyst to suggest that this is a time to buy more

24   CenturyLink stock?

25        A.    Well, first of all, the question is

Page 115

1    ambiguous because you used the plural of analysts.

2    This is one analyst who considers it a buying

3    opportunity.

4         Q.   And is that consistent in your view with

5    that analyst believing that Heidi Heiser's

6    allegations have revealed a year's long fraud by the

7    company on its customers and its shareholders?

8         A.   It's consistent with, you know, a

9    revelation on July 12 of greater because, in fact,

10   there are a number of analysts who talk about it.

11              Again, this is one person's view.

12   Exactly what his view is and what his incentives are

13   for that view, I don't know, but if you took this by

14   itself, this might indicate that this analyst

15   believes there's a buying opportunity.  I don't know

16   whether he's looking at, you know, a 50 cent

17   opportunity or a dollar opportunity.  I don't think

18   he changed his price target or anything of that

19   nature, but that's his view and he's allowed to have

20   to have his view.

21        Q.   In your experience both as a --

22        A.   Let me -- can I add one --

23        Q.   Go ahead.

24        A.   -- one other component, though.  If that

25   view, especially since he has a number of customers,

Page 116

1    to the extent that he's overly optimistic might

2    induce some type of cushioning effect to what we

3    observe on June 19 because he's come out with a --

4    sort of a stable buying opportunity.

5         Q.    In your experience, as both the public

6    company executive and as an economist, does a

7    reasonable investor view the revelation of a year's

8    long fraud by management on the company, both on its

9    customers and on its shareholders, as a buying

10   opportunity?

11              MR. BLATCHLEY:  Objection.

12   BY THE WITNESS:

13        A.    For that particular analyst?  Sorry.

14   Michael what?

15              MR. BLATCHLEY:  Objection to the form of

16   the question.

17   BY THE WITNESS:

18        A.    Again, analysts are there.  They're

19   sometimes right, sometimes wrong.  What I find I

20   think most interesting, and it's in -- it really

21   comes from Mr. Deal's report, is that a substantial

22   number of analysts over this whole period changed

23   their estimates, especially for EBITDA, and they

24   also -- you know, one of the stronger analyst

25   analysts, Morningstar, reduced its fair value by an

                              Page 117

1    amount that's very close to the total amount of the

2    decline over all three days.  This is one -- this is

3    one analyst.  This is one analyst.

4                I mean, the other issue is that if I

5    were to take this as Mr. Deal might have, whether

6    that says it's a strong buying opportunity, it

7    certainly is evidence of price impact from the

8    disclosure and certainly at minimum is evidence that

9    there's not a lack of price impact from that

10   disclosure.  I mean, they even talked about it right

11   here, a 4.6 drop amid accusations of Wells

12   Fargo-scheme provides a strong buying opportunity.

13   Well, that would suggest that at least this analyst

14   believed that there was price impact from the

15   accusations.

16        Q.   Yeah, you understand we're not talking

17   about a price impact from the alleged corrective

18   disclosures.  We're talking about whether there's a

19   price impact from the alleged false statements or

20   omissions.  You understand that at least, don't you?

21                MR. BLATCHLEY:  Objection to the form of

22   the question.

23   BY THE WITNESS:

24        A.   Yeah, we're not talking about corrective

25   disclosures -- alleged corrective disclosures, we're

Page 118

1    talking about alleged misrepresentations and

2    omissions?

3         Q.    And to the extent we are talking about

4    price impact at the class certification stage, is it

5    your understanding that we're talking about whether

6    there was a price impact from the alleged corrective

7    disclosures?  Is that really your understanding?

8         A.    My understanding is that that there is

9    back-end and there's front-end, and that back-end

10   alone can demonstrate what the Supreme Court

11   suggests is price impact, but that's for you guys to

12   discuss with the judge as to what is price impact.

13   You think this is only on the front-end, only on the

14   front-end?

15        Q.    You understand how depositions work,

16   right?  I ask questions and you answer them.  Do you

17   understand that?

18        A.    Yes.

19             MR. BLATCHLEY:  Objection.

20   BY MR. GIBBS:

21        Q.    And is there some circumstance where you

22   understand that the witness's role in a deposition

23   is to ask the lawyer a question and demand an

24   answer?

25        A.    I was just asking a clarification.

Page 119

```
 1        Q.    I think any reasonable reader or watcher
 2   or listener would understand that that's not
 3   remotely what you just did.  But we'll move on.
 4              So my question to you earlier
 5   actually had nothing to do with the analyst.  I
 6   asked you whether in your experience as a public
 7   company executive and as an economist, do you
 8   believe that a reasonable investor would typically
 9   view the disclosure of a year's long fraud on
10   management and the company on both its customers and
11   its shareholders as a good reason to buy more stock
12   in the company?
13              MR. BLATCHLEY:  Objection to the form of
14   the question and the characterization of the
15   testimony.
16   BY THE WITNESS:
17        A.    Yeah, it depends what other information
18   is out, what the signal to the market is.  It
19   depends whether the analysts -- I don't know
20   whether -- you know, we have had all types of issues
21   associated with analysts, their incentives and their
22   conflicts.  I mean, that's too general a question.
23   And this is one analyst out of a number.  I can't
24   generalize from the views of one analyst, and this
25   is also one sentence from the report, and I can't
```

Page 120

```
 1    remember the rest of the report.
 2         Q.    Do you personally invest in individual
 3    stocks?
 4         A.    Mostly not.  I did -- I'll give a little
 5    shout out here.  I got in the IPO of Peloton, which
 6    opened at 27, even through the pandemic.  The other
 7    day, I was up at 48.  So I have paid for -- I have
 8    two Peloton bikes and my $40 per month subscription.
 9              So, yes, I'll sometimes buy
10    individual stocks, but the substantial proportion of
11    my assets, both my fixed income assets as well as my
12    equity, are managed by professional managers because
13    today I'm looking at a computer screen with
14    Mr. Gibbs' face on it.  I don't want to have to be
15    looking at a screen with stocks on it, and the only
16    way to do any reasonable investing on individual
17    stocks is to have somebody who does spend their day
18    looking at a computer screen.
19         Q.    If you were to find out that, and not
20    that this would ever happen because I'm a big fan of
21    the company, but if you were to find out
22    hypothetically that Peloton had engaged in a year's
23    long scheme to defraud its customers and its
24    investors, would you immediately think I think I'll
25    go buy more of that stock?
```

Page 121

```
1              MR. BLATCHLEY:  Objection to the
2    hypothetical.
3    BY THE WITNESS:
4         A.    Again, I would have to look at the
5    circumstances.  Right now, given the pandemic, we're
6    talking about a price movement of all of maybe a
7    dollar 50 in CenturyLink.  At Peloton -- if that
8    came out and Peloton went down, given how they're
9    going to come out of the -- you should be paying me
10   for this advice, but the fact is I think they're
11   going to come out of this pandemic unbelievable so I
12   still might consider there to be a strong buying
13   opportunity for Peloton, even if I found out there
14   was a problem.
15              Part of it would depend -- I mean,
16   you know, Oppenheimer called the management.  You
17   know, I don't have that access to John Foley, the
18   founder, but needless to say, I'm not sure how that
19   relates to this particular case, but you asked me if
20   I would do individual investing and there's one.
21        Q.    If you were to hear that someone had
22   filed a lawsuit accusing Peloton of engaging in a
23   year's long fraud on its customers and on its
24   investors, would you necessarily assume that that
25   accusation was true?
```

Page 122

1           MR. BLATCHLEY:  Objection to the form of

2    the question.

3    BY THE WITNESS:

4           A.    Yeah, I can't answer that.

5           Q.    You can't say yes, I would assume it's

6    true, or no, I wouldn't assume it's true?

7           A.    You have given me a one sentence.  No, I

8    can't.  I have to understand what context, you know,

9    what has been alleged, what the past behavior is.

10   You know, I'd probably look and see and try and get

11   a sense because it went public I think within the

12   last year.  So there are a whole bunch of factors

13   that I would look at before I would make that

14   investment decision but...

15          Q.    I wasn't asking about investment.  I was

16   asking about whether you would assume that the

17   agencies in the Complaint were true.

18          A.    Would I assume the allegations were true?

19          Q.    Yeah.

20          A.    I don't know.  Again, that's a

21   hypothetical.

22          MR. BLATCHLEY:  Just one second.

23   Objection, asked and answered.

24          MR. GIBBS:  I actually think he expressly

25   refused to answer, but okay.  Okay.

Page 123

1    BY MR. GIBBS:

2        Q.    Back to Patel -- I just want to make sure

3    I'm clear on this on the record.  You referenced an

4    article by Patel, you gave us some information about

5    what it's about so we can hopefully go find it.  But

6    it wasn't clear to me though whether you relied on

7    Patel's article or any other articles that are not

8    cited in your report in forming the opinions that

9    are reflected in your report?

10            MR. BLATCHLEY:  Objection.

11    BY THE WITNESS:

12        A.    Well, I guess I relied on the articles

13    that are in Appendix B.  The fact of the matter is,

14    and depending on how you defined "relied," I relied

15    on my class that Eugene Fama taught me and I relied

16    on my options pricing class that Ross taught me and

17    Scholls taught me.  I don't cite to them here

18    because that's part of the -- that's part of the

19    foundations of finance.  And it's, you know, if I

20    cited to every article, textbook that I have that

21    has been part of my -- you know, part of my

22    knowledge base over the last 40 years, it would be

23    bigger than this mound of paper.

24                So I cite to an article.  It's an

25    academic article.  It's a multi-day article.  I have

Page 124

1    utilized multi-day returns as have experts

2    throughout this industry because of commonly

3    accepted multi-day windows in litigation.  Multi-day

4    windows in litigation are often, there again, I will

5    say it again, because we're talking about single

6    firm event studies.  Single firm event studies have

7    idiosyncrasies that you don't get with academic

8    research.

9             MR. GIBBS:  All right.  So, I'm told that

10   we past the three-hour mark.  I have a couple of

11   closeout questions.  I will say for the record that

12   although I'm going to live up to my agreement and

13   stop asking questions because we're past the

14   three-hour mark, I'm going to reserve our rights on

15   that.  I think the witness has chewed up enormous

16   amounts of my time deliberately not responding to

17   various questions, filibustering for pages and pages

18   and pages in response to questions that should have

19   been yes or no.  So we're going to reserve on that,

20   but I just have a couple of very quick follow-up

21   questions and then we will yield for the time being.

22            MR. BLATCHLEY:  If I could just respond

23   to that.  Obviously, we object to that

24   characterization and, you know, Dr. Hartzmark has

25   been as appropriate as one could be as an expert

Page 125

1    witness and I would say something different for the
2    questioning but we'll allow this extra time for the
3    time being so we can wrap this up.
4              MR. GIBBS:  The record will speak for
5    itself, and the court may very well take up that
6    issue.
7    BY MR. GIBBS:
8         Q.   Mr. Hartzmark, my question for you is
9    have you been in communication with lead counsel
10   during the course of today's deposition --
11        A.   Yes.
12             MR. BLATCHLEY:  Yeah, objection, just
13   warning on any work product concerns.
14   BY MR. GIBBS:
15        Q.   And now I want to distinguish between
16   time when we have been on the record and time when
17   we have been off the record.  Is that distinction
18   clear to you, Mr. Hartzmark?
19        A.   Yes.
20        Q.   For the time when we have been on the
21   record during today's deposition, have you been in
22   contact in any way with lead counsel for plaintiffs
23   in this matter?
24        A.   No, other than his picture being in my
25   zoom video.

                                   Page 126

1      Q.    Okay.  So while we've been on the record

2    here today, have you received any text messages,

3    emails, or other written communication from

4    plaintiff's counsel while we have been on the

5    record?

6      A.    I have not even checked any emails or

7    text messages since we've been on the record so my

8    answer is that I have no knowledge of any emails,

9    text messages, or anything from counsel while we

10   were on the record.

11             MR. GIBBS:  All right.  Subject to the

12   reservation of rights I alluded to earlier, I'm done

13   for the day.

14             MR. BLATCHLEY:  So, Patrick, I just

15   wanted to ask, you had mentioned the -- because I

16   don't want it to be an issue at all -- the dates

17   concerning what was in I think Paragraph 112.  I

18   wanted to provide you the opportunity, I think we

19   can get that those for you.  I just didn't want that

20   to be a concern, if there's any questions that you

21   wanted to ask about that.

22             MR. GIBBS:  Oh, you can get them for me

23   now?

24             MR. BLATCHLEY:  That was the question.

25             MR. GIBBS:  Yeah.  I mean, I asked about

Veritext Legal Solutions
866 299-5127

```
 1    them several hours ago.  I would love to see them.
 2    If you have them and you can send them to me and you
 3    want to hold on and find out whether I have
 4    questions about them, I'm happy to do that.  I don't
 5    want to get in a pissing match over timing, but,
 6    yeah, if you have them right here at hand and can
 7    hold on for ten minutes while I confer with my team
 8    and decide whether there's anything we want to ask
 9    about that, that will be fine.  It's up to you.
10             MR. BLATCHLEY:  Why don't we break and
11    we'll come back in five minutes.  It is just matter
12    of making sure I can get them to you.
13             MR. GIBBS:  All right.
14             THE VIDEOGRAPHER:  The time is 3:18 p.m.
15    and we are off the record.  The deposition will
16    continue.
17                  (Whereupon, a break in the
18                   proceedings was taken.)
19             THE VIDEOGRAPHER:  The time is 4:06 p.m.
20    Central time, and we are on the record.
21             MR. GIBBS:  During the break, plaintiff's
22    counsel emailed to us a document.  I'm trying to
23    find the file name -- the document that plaintiff's
24    counsel emailed to us is a PDF file entitled
25    HARTZMARK-PARA 112 Table Backup, and as I understand
```

Page 128

1    it, the witness has this document in front of him.

2    The document has been sent to the court reporter and

3    we have asked for this document to be marked as

4    Exhibit 33.

5                        (Deposition Exhibit 33 was

6                        marked for identification.)

7    BY MR. GIBBS:

8        Q.    Mr. Hartzmark, do you have this

9    HARTZMARK-PARA 112 table backup document in front of

10   you?

11       A.    It was sent to my wife so I don't know if

12   that's the name, but I have this document, which is

13   a table, that's basically the export of Mr. Deal's I

14   believe it's Figure 5.

15            MR. BLATCHLEY:  Just to make it easier, I

16   can represent that my colleague Michael Mathai sent

17   the same document that you sent or that he sent you

18   to Dr. Hartzmark and that's the document he's

19   looking at.

20            MR. GIBBS:  Okay.  With the understanding

21   that the document the witness is looking at is the

22   same document I'm looking at and the same document

23   that's being marked as Exhibit 32, I do have some

24   questions about this.

25

                                              Page 129

1    BY MR. GIBBS:

2        Q.    Mr. Hartzmark, did this table exist

3    before the break that we just came back from or did

4    you create it during the break?

5        A.    I did not create this table, except in

6    its original form when I was writing the report.  As

7    I said, I literally exported Figure 5 and did some

8    checks and then sent it to my staff, who then had

9    had it checked.  As I mentioned, my computer is

10   sitting in front of me, and this is -- I have not

11   seen the backup before and this is the first time I

12   have seen this table.

13       Q.    Well --

14       A.    I mean, I would have seen it back when I

15   wrote the report, but first time today that I'm

16   seeing this table.

17       Q.    Okay.  So we have looked at the table and

18   as best we can tell from the table, there are 26

19   dates that fall into the categories listed in

20   your -- in your Paragraph 112, and so the backup

21   would suggest that the number of dates on which you

22   would not expect a significant stock price return is

23   26, not 27, and the number of dates on which you

24   would or could reasonably expect a stock price

25   return is also 26.  Are we reading that correctly?

Page 130

```
 1          A.     Again, I just -- yes.
 2          Q.     And so in those portions of your reply
 3    report where you reference 25 dates on which you
 4    could reasonably expect a stock price reaction and
 5    27 dates on which you would not expect a stock price
 6    reaction, would -- sorry, the paper ruffling is
 7    coming through on the microphone -- for those
 8    references, given this backup, should I understand
 9    that the report should read 26 dates on which you
10    would not expect a stock price reaction and 26 dates
11    on which you could reasonably expect one?
12          A.     To the extent this is correct, and I have
13    not spoken with or gone over this with my staff, if
14    this is the correct and then we didn't do any output
15    or production because it wasn't requested for this
16    deposition, if this is the correct table, then I
17    would check.  The only changes would be -- what --
18    this is paragraph -- oh, I'm sorry.  I'm looking at
19    Mr. Deal's report.
20                 Yeah, if we go back to this section,
21    there would be no changes in Paragraph 105, 106,
22    108, 109, it looks like 110, other than more than I
23    guess would be stricken in 110 because I have
24    identified so it's 26.  And in 112 it would be
25    included at least 26 dates or 50 percent of the 52
```

Page 131

1    date sample would be changed.

2              I don't know where -- I can go

3    through if you want me to.  I don't know where the

4    error is, but it certainly going from 27 to 26 and

5    52 percent to 50 percent and the basis for this was

6    only an illustrative table, it does not change my

7    opinions that the stock and the bond traded in

8    efficient markets, it doesn't change my opinion that

9    there's common damages methodology that can be

10   applied class-wide nor does it change my opinion

11   that Mr. Deal failed to provide any evidence of an

12   absence of price impact.

13       Q.    All right.  But just sitting here today,

14   you don't know whether the report and table are

15   correct or alternatively the table backup that's

16   just been produced to us and marked as Exhibit 33 is

17   correct?

18       A.    Well, I can say based on this table --

19   first of all, the report other than this edit to my

20   knowledge as I sit here today is correct.  This has

21   no influence on the -- on any of the opinions.  Deal

22   Figure 5 and if I want me to, I can go through --

23       Q.    No, I don't.  I definitely don't.

24       A.    Okay -- if you are concerned about the

25   dates.  But this is of no impact.  You can see, all

                                              Page 132

1    I did, as I stated on the record, I exported

2    Mr. Deal's table, or Figure 5, and I had initially

3    checked off, I sent it to my staff, and my staff

4    must have made an error.  Simple as that.

5         Q.    That's fine.  I don't want to spend

6    everyone's time walking through each of the dates

7    and asking you to redo the work.  I'm simply trying

8    to figure out whether we know which of the two sets

9    of numbers is correct, and the reason I'm asking is

10   because although I understand that it doesn't change

11   your opinion, I have got a bunch of questions and

12   answers now on the record that assume that the

13   correct numbers are 25 and 27.  I now have backup

14   for the table that got us to 25 and 27, and it says

15   26 and 26.  And so I don't know whether my record

16   now is completely garbled with the wrong numbers.

17              If you don't know right now whether

18   the backup is correct or the report and the table

19   are correct on this issue, that's fine, we will move

20   on.  I just wanted to know whether you know.

21        A.    I would have to rely on my staff.  In

22   terms of a garbled transcript, if you substitute 26

23   for 27 and 26 for 25, the transcript should be

24   clear.  I can't imagine that any of the questions or

25   answers that I gave to the questions would be

Page 133

1    affected based on that.  Especially because, again,

2    this was the front-end discussion, and all this was

3    meant to do was to illustrate the point about Mr.

4    Deal's report where he stated there were

5    quote/unquote, only four dates, and I put that in

6    perspective, and, in fact, as it relates to that

7    relative measure that I had in paragraphs -- the

8    paragraph where I talk about the random --

9    Paragraph 115, it would still be about one day.  The

10   difference is, what, about 1.2 versus 1.3 days.  So

11   this is not important.

12            And as I said before, in terms of

13   garbled discussion, 1 to 20 of those dates include

14   10-Ks and 10-Qs.  So again...

15        Q.    Are you finished with that answer?

16        A.    Sure.

17        Q.    A couple of follow-up questions on the

18   table in Paragraph 112 of your report.  Just to make

19   sure I understand that.  Now that I think we need to

20   do a little bit of unpacking on our side.  So I just

21   want to make sure I understand your categories.

22            You have five categories of allegedly

23   false and misleading disclosures that, in your view,

24   would not reasonably be expected to lead to a change

25   in the stock price and those categories are laid out

Page 134

1    in the chart in Paragraph 112 of your report,

2    correct?

3         A.    Yeah.   These are as described in

4    Paragraph 110.  You would not necessarily expect to

5    observe statistically significant returns.   The

6    largest category associated with this issue is the

7    10-Ks and 10-Q filings which follow -- followed the

8    earnings disclosures and the proxy statements which,

9    you know, generally don't have material information.

10   And then there are the reports to a business press

11   or, I'm sorry, reports that may be a media report

12   that it's, you know, like on the local television

13   news, it wasn't important for the business press to

14   pick up so it's really not disseminated, or Mr. Deal

15   included in his sample of 52 dates some dates that

16   were specified in the Complaint where there were

17   documents, you know, say maybe filed I guess after

18   the fact or nonpublic.

19              I don't recall specifically but you

20   can replicate this and to the extent that you think

21   it impacts any of the testimony, you and the

22   attorneys can decide what to do.

23        Q.    So all I really wanted was a yes or no

24   answer to my question, whether these are the five

25   categories.   But what I want to do now is get a bit

                                        Page 135

1    more insight into the last two, which you labeled no

2    dissemination of media reports to business press and

3    nonpublic document filed by the company.

4              So just first off, can you help me

5    understand what nonpublic document filed by the

6    company is?

7         A.    Nonpublic.  Sure.  Just give me a second.

8              I'm going through the appendix, which

9    is the alleged false and misleading statements, and

10    it appears that Mr. Deal has added -- I'm sorry,

11    added some false and misleading statements to

12    Appendix A of the Complaint.  So I can't find them

13    right there.  I'm trying to look.

14              Does anybody have a searchable file

15    where April 2016, April 6 or 7, 2016 shows up or

16    could be searched?  Because that will give an

17    example of what I'm talking about.  Again, I wrote

18    this a little while ago so I don't remember offhand,

19    and my staff would have done most of the work, but I

20    know I did some of it.

21              MR. BLATCHLEY:  If I might,

22    Dr. Hartzmark, it might just be easiest to refer to

23    the exhibit, 33.

24              THE WITNESS:  Exhibit 33.

25              MR. BLATCHLEY:  The new document that we

Page 136

1    just marked.

2         THE WITNESS:  Right.  Correct.  But he

3    asked a question, he wanted some description of what

4    a nonpublic document filed by the company is.

5         MR. BLATCHLEY:  Yes.

6         THE WITNESS:  And I am -- you're

7    saying...

8         MR. BLATCHLEY:  That that just might aid

9    what I think Mr. Gibbs is asking about.

10        THE WITNESS:  Okay.  Paragraph 111.

11   Third party disclosure that might not be immediately

12   widely disseminated.  Oh, okay.  I guess, yeah,

13   something like the AG consent order.  So you

14   wouldn't expect there to be a -- oh, here it is.

15             Here is the Complaint, Paragraph 133,

16   page 63, "In the face of the Attorney General's

17   findings, CenturyLink quietly agreed to a settlement

18   in which it promised to take a number of measures

19   intended to prevent consumers from being misled and

20   improperly charged.  Specifically on April 6, 2016,

21   CenturyLink entered into an assurance of

22   discontinuance with the Arizona Attorney General in

23   which the company (falsely) denied any wrongdoing

24   where it expressly denied each and every one of

25   Arizona Attorney General's allegations.  Indeed, in

Page 137

1     the assurance of discontinuance, CenturyLink claimed
2     that all terms material and qualifying conditions,
3     termination fees, availability of the high speed
4     internet speeds, modem router, purchase
5     requirements, and installation fees were fully
6     disclosed."
7              So not only -- I don't believe that
8     this is claimed as a misrepresentation or an
9     omission so it would appear that Dr. Deal's Figure
10    5, which is labeled -- has added dates, and in that
11    particular date, there is -- it even says here, it
12    sort of quietly -- and I believe my staff looked,
13    and there was no simultaneous filing.  I don't even
14    think it went out on the AG's site.
15             Needless to say, this is not
16    necessarily -- I don't even think there was any
17    public disclosure of this, and it's also not listed
18    in appendix -- oh, here's Figure 5 again -- overview
19    of 52 alleged inflationary dates, and he calls it
20    two categories of alleged misstatements and I don't
21    think the Complaint -- and I never realized this
22    before that his Figure 5 is wrong, but I don't think
23    the Complaint characterizes that as an alleged
24    misstatement.  So I think he's overstated the 52
25    dates.

Page 138

1              But needless to say, something that's
2    not publicly disclosed by the company, you wouldn't
3    expect there to be a statistically significant or
4    inflationary response of the market.
5    BY MR. GIBBS:
6        Q.    So I understand that point, but it would
7    also be the case, wouldn't it, that if it wasn't
8    publicly disseminated, it wouldn't support a claim
9    for fraud on the market either, would it?
10             MR. BLATCHLEY:   Objection.
11   BY THE WITNESS:
12       A.    If it's -- if it's not publicly
13   disseminated, it would not -- no, just the opposite.
14   Just the opposite.
15             So that particular -- that particular
16   disclosure on April 13th, 2017 -- Wait.  No.  It's
17   2016.  That particular disclosure that is improperly
18   included in Mr. Deal's exhibit suggests that there
19   would be an inflation -- it's an overview of 52
20   alleged inflationary dates, which is wrong,
21   statistically significant positive and negative
22   abnormal price changes are boldfaced.
23             So he's -- he's suggesting that on
24   April 7 there should be a statistically significant
25   return.  I'm saying no, you wouldn't expect it

                                      Page 139

1    because it wasn't a public document, and lo and

2    behold, there is zero for that date.  So that is

3    consistent and supportive of the market being

4    efficient and for there to be fraud on the market.

5         Q.    Why do you think that Mr. Deal improperly

6    included this April 6 assurance of discontinuance in

7    his list of alleged inflation dates?  Why do you

8    think it is improper?

9              MR. BLATCHLEY:  Objection.

10             THE WITNESS:  Why do I think it's

11   improper?

12             MR. BLATCHLEY:  Objection to form.

13   BY MR. GIBBS:

14        Q.    Yeah.  You just said Mr. Deal improperly

15   included that in his list of 52 alleged inflation

16   dates.  You said it with a great deal of contempt in

17   your voice.  I would like to know why you think it

18   is improper for him to include that?

19        A.    I don't understand the contempt...

20             MR. BLATCHLEY:  Objection to the form.

21             I would just -- I just want to say,

22   we've been going now for 20 minutes.  You said there

23   would be 10 minutes of questioning.  I'd like this

24   deposition that was supposed to be three hours to

25   end in short order, but I'd refer the witness to the

                              Page 140

```
 1    Complaint and the report.
 2              MR. GIBBS:  You know, Michael, while he's
 3    reviewing those materials, let me just say that the
 4    witness gave me a series of lengthy and
 5    sanctimonious lectures about the information in
 6    Paragraph 112 of his report and about the backup for
 7    it.  It took me 30 minutes to get a straight answer
 8    to the question of whether there is anywhere a list
 9    of those dates.  We finally got a list of those
10    dates at the very end of my questioning and it turns
11    out that either the report or the list is wrong.
12    And I'm going to explore this for as long as it
13    takes.  If you want it shut down, jump off the
14    phone, go for it.  I'll take it up with the court.
15    I'm entitled to understand what's going on.
16              Now, the witness has rather
17    sneeringly said that Mr. Deal improperly included
18    this date and this disclosure on his list of
19    allegedly false and misleading statements.  I'd like
20    to understand the basis for that testimony.
21    BY THE WITNESS:
22         A.   The basis for that comment is Appendix --
23    is the Complaint which I have in front of me,
24    pages -- and I'm going from the top, pages 157 of
25    165 through -- through 146 of 165.  Wait.  I've got
```

Page 141

1    it backwards.  I'm sorry.  Pages -- it's 146 of 165,

2    this is Appendix A to the Complaint.

3                    False and misleading statements

4    concerning revenue results.  Okay.  And it was my

5    understanding that this was the basis of Mr. Deal's

6    Figure 5.  Yet I now see that at least as it relates

7    to April 7, 2016, that he has put in another date

8    and another representation that is not in this, and

9    therefore, I'm saying that if he's suggesting, and

10   maybe that's -- I don't know how -- you know, maybe

11   he needs to be redeposed, but I don't know why that

12   date, and now I'm seeing there are other dates, are

13   included in his Figure 5.  I took his Figure 5 to be

14   the dates where there were, as he calls it,

15   categories of alleged misstatements.  I assumed

16   those were dates of misstatements, so...

17       Q.    But you now believe that -- you now

18   believe that April 6 is not a date of an alleged

19   misstatement and that's why you said he improperly

20   included it in his chart; is that right?

21       A.    Well, because it's not in Appendix A.

22       Q.    Let's look at the Complaint, please,

23   that's marked as Exhibit 1.  And let's start,

24   please, on page 90 of the Complaint.  Let me know

25   when you have that in front of you, please.

                                        Page 142

```
 1          A.    Okay.

 2          Q.    You see the heading there, Roman numeral

 3   VIII, Defendant's False and Misleading Statement.

 4   Do you see that?

 5          A.    I do.

 6          Q.    And in Paragraph 190 of the Complaint,

 7   the plaintiffs alleged that during the class period

 8   defendants made false or misleading statements about

 9   a number of subjects, and they're numbered 1 through

10   5.

11                Do you see that?

12          A.    Yes.

13          Q.    Okay.  And then I want you to roll

14   forward to page 113 of the Complaint with subheading

15   C.

16          A.    I'm sorry.  I took it apart.  I need to

17   put it back together again.  113C.

18          Q.    All right.  And that subheading says,

19   quote, "Materially false and misleading statements

20   and omissions concerning CenturyLink's purported

21   business integrity, legal compliance, and honesty in

22   sales practices."

23                Do you see that?

24          A.    Yes.

25          Q.    Okay.  Now, I would like to ask you to
```

Page 143

1    roll forward to page 118, Paragraph 247 of the

2    Complaint.

3              A.    Okay.

4              Q.    Are you there?

5              A.    I am.

6              Q.    And Paragraph 247 as well as

7    Paragraph 248, 250, 251, et cetera, is describing

8    precisely the April 6 assurance of discontinuance

9    that we were just talking about as one of the

10   alleged false statements made by the defendants

11   during the class period, correct?

12             A.    I don't see it's saying that there's a

13   statement.  It says as discussed above on April 6,

14   2016, CenturyLink entered into a publicly-filed

15   assurance of discontinuance.

16             Q.    Go ahead and continue.  So Paragraphs 247

17   through 254 is listing a series of statements

18   attributed to CenturyLink and alleged by the

19   plaintiffs to be materially false or misleading, and

20   if you have any question about that, I would refer

21   you to Paragraph 255, which says CenturyLink's

22   statements set forth above in Paragraphs 247 through

23   54 were materially false and misleading.

24                  Do you see that?

25             A.    It also states, and again, on page 113,

                                              Page 144

1    and maybe its omissions, I don't know, but I see --

2    yes, I see that.

3        Q.    Okay.  So is it still your position that

4    CenturyLink's statements in the assurance of

5    discontinuance are not alleged in the Complaint to

6    be among the allegedly false and misleading

7    statements by CenturyLink?

8        A.    Again, they're not in Appendix A, and

9    maybe they're false and misleading.  Again, it

10   doesn't affect my opinion whether you include those

11   dates or exclude those dates.

12       Q.    That's fine.  But you -- let me circle

13   back though.

14              As I understand what you have told me

15   about this category of statements, meaning in

16   Paragraph 112 of your reply report, this April 6,

17   2016, assurance of discontinuance, you concluded

18   that that document was not likely to have affected

19   the company's stock price because it wasn't

20   disseminated broadly enough to affect the stock

21   price; is that correct?

22              MR. BLATCHLEY:  Objection to the form of

23   the question.

24   BY THE WITNESS:

25       A.    I labeled it -- April 6 -- nonpublic

Page 145

1    document filed by company.  I don't -- that's all I

2    know with respect to this.  I believe, for example,

3    that one -- when one went to Bloomberg, Factiva, or

4    the other business media, there was no mention of

5    this.  And now just I would be speculating, it's

6    been too long, as to whether this was even disclosed

7    on this specific date, which I don't know.  So --

8    but again, whether it's in Figure 5, out of Figure

9    5, it is -- it is -- it doesn't affect my opinion,

10   this one date.

11        Q.    If the April 6, 2016, assurance of

12   discontinuance was not disseminated broadly enough

13   to have had an impact on CenturyLink's stock price,

14   could that statement or series of statements

15   logically support a claim of securities fraud under

16   a fraud on the market theory?

17             MR. BLATCHLEY:  Objection to form.

18   BY THE WITNESS:

19        A.    I can't answer that question.  That's a

20   legal question.

21        Q.    Okay.  But the statements that you have

22   put in the category in Paragraph 112 to your reply

23   report, nonpublic document filed by company, the

24   reason you put those --

25        A.    The two of the -- I'm sorry --

Page 146

1          Q.    Two dates, yeah, they're statements on

2     two dates that you put into the bucket you labeled

3     nonpublic documents filed by company, correct?

4          A.    Correct.

5          Q.    And the reason you put those statements

6     into that bucket is because you assessed those to be

7     statements that were not circulated broadly enough

8     to expect them to affect the company's stock price,

9     correct?

10              MR. BLATCHLEY:  Objection.

11    BY THE WITNESS:

12         A.    I'm not aware -- again, this is one

13    issue, and I can't remember whether it was even

14    disseminated at all, or whether it was -- I just

15    don't remember.

16         Q.    Tell me in your own words why you listed

17    the two dates listed under nonpublic document filed

18    by the company, and this is a list of dates where

19    you think one would not reasonably expect the price

20    of the company's stock to be impacted by the

21    statements, I would like you to tell me in your own

22    words why are those statements in that bucket?

23         A.    To the extent that a document is not -- a

24    nonpublic document is not disseminated, it shouldn't

25    have any impact on price in an efficient market.

Page 147

1          Q.    Okay.  Now, same questions about the

2     bucket immediately above that, no dissemination of

3     media report to business press.  First question is

4     how is that different from the bucket below it?

5          A.    Well, I believe what that is is wherein

6     there was some disclosure, again, like a local TV

7     show where they interview a person and that's it.  I

8     mean, again, Bloomberg doesn't have anything,

9     Factiva doesn't have anything, the business media

10    does not have any record of disseminating that,

11    again, localized interview.

12                I can again go through the Complaint

13    and try and find those, but that's -- that's -- that

14    is my -- that I believe is what that category means.

15                MR. GIBBS:  Okay.  That's all I have for

16    now.

17                E X A M I N A T I O N

18    BY MR. BLATCHLEY:

19         Q.    Dr. Hartzmark, I'd like to ask you just a

20    couple of questions concerning what Mr. Gibbs just

21    asked you about.

22                I'd like you to go through the

23    Complaint and look at the Table of Contents.

24         A.    I'm there.

25         Q.    You will see on page little Roman numeral

Page 148

1    iii of the Complaint, the section that says Roman

2    numeral VIII in the Table of Contents, it says

3    Defendants False and Misleading Statements, and it

4    refers --

5        A.    I can't -- Roman numeral iii?

6        Q.    Sorry.  That's the page number at the

7    bottom of the page.

8        A.    Oh, okay.  Yes.

9        Q.    And the Table of Contents, Roman numeral

10    VIII is saying Defendants False and Misleading

11    Statements.

12        A.    Yes, I see that.

13        Q.    And that starts at page 90 according to

14    the Table of Contents?

15        A.    Yes.

16        Q.    And you will see below that there's a

17    subheading that says Materially False and Misleading

18    Statements Or Omissions Concerning CenturyLink's

19    Business Strategies and Financial Performance?

20        A.    Yes.

21        Q.    And that starts on page 91 and goes

22    through page 100 under the Table of Contents?

23        A.    It goes through -- yes, the Table of

24    Contents through 100.

25        Q.    So I'm taking you through there.  So

                                        Page 149

1    there is subsection B, False and Misleading

2    Statements Covering Up Defendant's Secret Attempt to

3    Address the Company's Cramming Prices, and there's a

4    subheading there?

5         A.    Yes.

6         Q.    And you see subsection C, Materially

7    False and Misleading Statements Or Omissions

8    Concerning CenturyLink's Purported Business

9    Integrity, Legal Compliance, and Honesty in Sales

10   Practices?

11        A.    Yes.

12        Q.    And then there's subsection D, Materially

13   False and Misleading Statements and Omissions

14   Concerning CenturyLink's Regulatory Regs, that's on

15   page 120?

16        A.    Yes.

17        Q.    And then subsection E, False and

18   Misleading Statements and Omissions of CenturyLink's

19   SEC Filings, page 122, correct?

20        A.    Oops.  Yes.

21        Q.    And so you would agree with me that these

22   Table of Contents reflect that the false and

23   misleading statements alleged by plaintiffs include

24   all those statements between pages 90 and 122 in the

25   Complaint, correct?

                                      Page 150

```
 1              MR. GIBBS:  Objection, leading.  He's
 2    your witness.  You don't get to lead him.
 3    BY THE WITNESS:
 4         A.    Correct.
 5         Q.    Okay.  So now I'd like to direct your
 6    attention to the first section Mr. Gibbs referred
 7    you to as well, and that's Paragraph 190.
 8         A.    Paragraph 190, page 90, with the heading,
 9    Defendant's False Or Misleading Statements, yes.
10         Q.    You agree that that paragraph in
11    Paragraph 190 lists the false and misleading
12    misstatements and omissions alleged by plaintiffs in
13    this case?
14              MR. GIBBS:  Objection, leading.
15    BY THE WITNESS:
16         A.    Yeah, it lists the categories of the
17    misleading statements and omissions.
18         Q.    Okay.  I'd like you to direct your
19    attention to Paragraph 201 under the heading False
20    and Misleading Statements Concerning CenturyLink's
21    Purported Revenue.
22         A.    Paragraph 201 on page 95?
23         Q.    Correct.  It's under the heading False
24    and Misleading Statements Concerning CenturyLink's
25    Purported Revenues.
```

Page 151

1                    Do you see that?

2          A.    Yes.

3          Q.    And you would agree with me that just as

4    we discussed in the Table of Contents that these are

5    the false and misleading statements concerning

6    purported revenues alleged by plaintiffs, correct?

7                MR. GIBBS:  Objection, leading.

8    BY THE WITNESS:

9          A.    Yes.  Yes.  This is the false and

10   misleading statements concerning CenturyLink's

11   purported revenues, yes.

12         Q.    So Paragraph 202 of this section

13   concerning revenues, the last sentence of that

14   paragraph, I'd like you to read that.

15         A.    "The false and misleading statements

16   concerning the company's reported revenues and the

17   representations described in the reasons driving

18   them and the company's financial performance are set

19   forth in the chart attached hereto as Appendix A.

20         Q.    Okay.  And then the following paragraph

21   describes why those statements in Appendix A

22   concerning the company's reported revenues were

23   false; is that right?

24                MR. GIBBS:  Objection, leading.

25

                                      Page 152

1    BY THE WITNESS:

2        A.    The paragraph below it suggests -- it

3    doesn't suggest.  It states that the statements in

4    Appendix A were materially false and misleading

5    because they omitted the material fact that the

6    company's revenue and financial performance was due

7    at least in part to the undisclosed illegal cramming

8    practices alleged herein, specifically these

9    representations created false impression of the

10   company's financial performance resulted from the

11   pursuit of legitimate business strategies and the

12   purported demand for CenturyLink's services and,

13   therefore, revenues stability was achievable in the

14   near term when in reality the company's results

15   depended upon and were materially impacted by the

16   company's undisclosed cramming practices.  And

17   there's more, but I'll stop there.

18       Q.    So I'm correct in understanding that

19   Appendix A represents the statements referred to in

20   this paragraph concerning revenues and financial

21   performance; is that right?

22            MR. GIBBS:  Objection, leading.

23   BY THE WITNESS:

24       A.    That's correct.

25       Q.    Okay.  And it does not -- Appendix A is

                                          Page 153

1    not described in any other part of the Complaint; is
2    that right?
3                MR. GIBBS:  Objection, leading.
4    BY THE WITNESS:
5         A.    As I sit here today, that's my
6    understanding.
7         Q.    And it is your understanding is also that
8    if we go to the next category of misstatement, in
9    subheading 3, false and misleading statements
10    concerning CenturyLink's bundling strategies -- let
11    me withdraw that.
12                Go to section B, and there's
13    paragraph, the paragraph -- sorry -- subheading B
14    which is on page 102.
15         A.    102 is the false and misleading
16    statements covering up defendants secret attempt to
17    address the company's cramming crisis.
18         Q.    Right.  Correct.  That's Paragraph 213
19    through 218 at least in that subsection, correct?
20         A.    Correct.
21         Q.    And you don't see any reference to
22    Appendix B or, sorry, Appendix A in this section of
23    the Complaint, correct?
24                MR. GIBBS:  Objection, leading.
25

                                    Page 154

1    BY THE WITNESS:

2         A.    No, I do not see any reference to

3    Appendix A.

4         Q.    So am I correct in stating that Appendix

5    A referred to revenue misstatement and not the

6    statements set forth in this subsection?

7              MR. GIBBS:  Objection, leading.

8    BY THE WITNESS:

9         A.    That is correct.  It appears.

10        Q.    Okay.  I would ask the same questions

11   with the other categories of misstatements alleged

12   in the Complaint?

13        A.    So there's section C, page 113, I see no

14   reference to Appendix A, and section C, section D,

15   materially false and misleading statements and

16   omissions concerning CenturyLink's regulatory risks.

17   And then, again, I don't see anything referencing

18   Appendix A in that section either.

19        Q.    Right.  So I'm correct to state that

20   there's false and misleading statements alleged in

21   the Complaint in the sections we just discussed on

22   pages 90 to 122 and those are at issue in this case,

23   correct?

24              MR. GIBBS:  Objection, leading.

25

                                        Page 155

```
 1    BY THE WITNESS:
 2         A.    That's my understanding.
 3                   I just got a notice, I only have
 4    10 percent battery on my headphones.  But if you
 5    should leave me, I'll move on to speakerphone.  But
 6    yes.  Yes.
 7         Q.    Okay.  So can I direct your attention to
 8    paragraph 247, and I'll represent to you again just
 9    so we all orient everyone, this is under the
10    section:  Truly False and Misleading Statements and
11    Omissions Concerning CenturyLink's Purported
12    Business Integrity, Legal Compliance, and Honesty in
13    Sales Practices.  That's under the section and that
14    is where paragraph --
15         A.    247.
16         Q.    -- 247 begins, correct?
17               MR. GIBBS:  Objection, leading.
18    BY THE WITNESS:
19         A.    Correct.  247 discusses the April 6
20    entering into an assurance of discontinuance.
21         Q.    Correct.  That was referred to in your
22    earlier discussion with Mr. Gibbs, correct?
23               MR. GIBBS:  Objection, leading.
24    BY MR. BLATCHLEY:
25         Q.    -- and the Appendix A that we have
```

                                        Page 156

1    discussed earlier, correct?

2              MR. GIBBS:  Objection, leading.

3    BY THE WITNESS:

4         A.    Correct.

5         Q.    That's so am I correct that again this is

6    a statement that that issue in the case is allegedly

7    false and misleading by plaintiffs?

8              MR. GIBBS:  Objection, leading.

9    BY THE WITNESS:

10        A.    It appears to be.

11        Q.    I would ask you to read for the record

12   the beginning of Paragraph 247, which says "as

13   discussed above," I'd like you to read that into the

14   record.

15        A.    "As discussed above, on April 6, 2016,

16   CenturyLink entered into a publicly-filed assurance

17   of discontinuance with the Arizona Attorney General.

18   In the assurance of discontinuance, the Arizona

19   Attorney General explained each alleged violation of

20   the Arizona Consumer Law it believed CenturyLink

21   engaged in and for each allegation CenturyLink

22   expressly denied the allegation.  In fact, not only

23   did CenturyLink deny the Attorney General's

24   allegations in providing incomplete information, the

25   company affirmatively stated that it fully disclosed

                                      Page 157

1    all such information to consumers."

2        Q.    So I would just ask you, again, referring

3    to the first sentence of this paragraph, this

4    assurance of discontinuance, am I correct in

5    understanding it's a publicly-filed document?

6            MR. GIBBS:  Objection, leading.

7    BY THE WITNESS:

8        A.    It is actually entered into a

9    publicly-filed assurance of discontinuance.  But it

10   also indicates a denial, which would offset any I

11   guess -- you would have a positive and a negative

12   impact at that.

13           When you have a moment, I'm going to

14   need a break.  Sorry.

15           MR. BLATCHLEY:  Sorry.  Let me just

16   finish and we'll take a break.

17   BY MR. BLATCHLEY:

18       Q.    You see in paragraphs -- in

19   Paragraphs 249 and 248, CenturyLink is denying that

20   it engaged in any misconduct, is that a correct way

21   of reading that paragraph?

22           MR. GIBBS:  Objection, leading.  The

23   document speaks for itself.  Is he leaving?

24           MR. BLATCHLEY:  Dr. Hartzmark?

25               Dr. Hartzmark, do you need to take a

Page 158

break while we fix this issue?

THE VIDEOGRAPHER: Gentlemen, would you like to go off the record while he fixes it?

MR. BLATCHLEY: Yes. Patrick, do you mind, let's take five minutes so we can get this technical issue sorted out.

THE VIDEOGRAPHER: The time is 4:56 p.m. Central time, and we are off the record.

(Whereupon, a break in the proceedings was taken.)

THE VIDEOGRAPHER: The time is 5:03 p.m. Central time, and we are on the record.

BY MR. BLATCHLEY:

Q. So Mr. Hartzmark, we were discussing the statements alleged by the plaintiffs as false and misleading in the section under subsection C, materially false and misleading statements and omissions concerning CenturyLink's purported business integrity, legal compliance, and honesty in sales practices, am I right about that?

A. Yes. That was on page 113, and I believe we had gone to 247.

Q. And in Paragraph 247, it discusses the statements contained and the paragraphs that follow contained in the assurance of discontinuance that

1    CenturyLink entered into with the Arizona State

2    Attorney General; is that right?

3              MR. GIBBS:  Objection, leading.

4              MR. BLATCHLEY:  I'm just trying to orient

5    the witness.

6    BY THE WITNESS:

7         A.    Yes.  I said yes.

8         Q.    Sorry.  I didn't hear.  And again those

9    statements were contained in a publicly-filed

10   document; is that right?

11        A.    It appears --

12             MR. GIBBS:  Objection, leading.

13   BY THE WITNESS:

14        A.    -- to be a publicly-filed document

15   according to the Complaint, yes.

16        Q.    And if you go to Paragraph 255, can you

17   read that paragraph, the first sentence -- first two

18   sentences into the record for me?

19        A.    Sure.  Paragraph 255 says:  "That

20   CenturyLink's statements set forth above in

21   Paragraphs 247, 254 were materially false and

22   misleading.  CenturyLink was not, quote, committed

23   to customer service, end quote:  It, in fact,

24   employed a policy and practice of routinely engaging

25   in misleading and deceptive practices which harmed

Page 160

```
 1    its consumers by, among other things, charging them

 2    for services and products they did not request,

 3    misquoting prices at the point of sale, and other

 4    similarly deceptive conduct as set forth above in

 5    Section 4."

 6                    That's sentence one.  And then second

 7    sentence:  "Moreover, CenturyLink's, quote,

 8    expressed denials, end quote, of each of these

 9    allegations set forth in the Arizona assurance of

10    discontinuance were false because as is set forth

11    more fully above in Section 4, CenturyLink engaged

12    in the alleged activities."

13        Q.    I'm correct in stating that these

14    publicly-filed statements in the assurance of

15    discontinuance are alleged as false and misleading

16    because they did not disclose the truth about

17    CenturyLink's actual practices; is that an accurate

18    characterization?

19        A.    Yes.

20              MR. GIBBS:  Objection, leading.

21    BY MR. BLATCHLEY:

22        Q.    And if -- I want you to imagine a

23    hypothetical.  If the assurance of discontinuance

24    said something different such as CenturyLink

25    admitted to engaging in the conduct set forth by the
```

Page 161

1  Arizona Attorney General and admitted to violating

2  state, federal, and local law, and you know,

3  admitted that it's policies, practices, or

4  procedures failed to meet the applicable standard,

5  what would that statement -- would that statement be

6  expected to do -- to have a different price reaction

7  based on that statement?

8          MR. GIBBS:  Objection, lack of

9  foundation, calls for speculation.

10 BY THE WITNESS:

11     A.    That would be negative news.  So I would

12 expect that all else constant, the price would

13 decline.

14     Q.    And here the statements contained in the

15 publicly-filed assurance of discontinuance, I'm

16 again right in stating they denied allegations of

17 misconduct as set forth in the Arizona Attorney

18 General; is that right?

19          MR. GIBBS:  Objection, leading.

20 BY THE WITNESS:

21     A.    Yes.

22     Q.    Dr. Hartzmark, you had mentioned that

23 this publicly-filed document was not picked up by

24 the other business press.  Is that an accurate way

25 of stating your prior testimony?

                                    Page 162

1          A.    That's my I'll call it vague

2     recollection, that it was not timely disseminated to

3     the business press.  I don't know if it was delayed

4     or just not disseminated.

5          Q.    And it is true this was a publicly-filed

6     document which would be considered by investors,

7     correct?

8               MR. GIBBS:  Objection, asked and

9     answered, and leading.

10    BY THE WITNESS:

11         A.    Yes.  I mean, it's not a document, as we

12    have discussed in great detail, can be disclosed by

13    a third party, in this case the Arizona Attorney

14    General.  I'm not sure which part was

15    publicly-filed, whether it was Attorney General

16    publicly filing something or whether CenturyLink

17    issued an AK, I just don't recollect.

18         Q.    And in going back to our -- in going back

19    to our discussion, again this is a hypothetical,

20    supposing that CenturyLink did admit to state and

21    federal violations of law and did admit that it was

22    engaged in the misconduct, would you expect that the

23    dissemination and impact on price might be

24    different?

25               MR. GIBBS:  Objection, lack of

                                         Page 163

1   foundation, calls for speculation.

2   BY THE WITNESS:

3       A.   Well, given the corrective disclosures

4   and the fact that those were widely disseminated and

5   digested, it would suggest that if this happened

6   with Arizona, it would be as well, and we also know

7   that the Attorney General lawsuit was widely

8   disseminated -- Attorney General of Minnesota

9   lawsuit.

10      Q.   And there was a significant price

11  reaction when the Minnesota Attorney General lawsuit

12  was disclosed alleging the violations of the state

13  law; is that an accurate statement?

14      A.   Yes.

15      Q.   And regardless of whether this particular

16  set of misstatements are included in Mr. Deal's

17  analysis in Figure 5, what impact does that have on

18  your opinions concerning price impact in this case?

19      A.   It has no impact.

20           MR. BLATCHLEY:  That's all I have for

21  now.

22           MR. GIBBS:  All right.  I have some

23  follow-up questions.

24

25

                                    Page 164

```
 1              E X A M I N A T I O N

 2    BY MR. GIBBS:

 3         Q.    So, Mr. Hartzmark, Mr. Blatchley just led

 4    you through a series of questions designed to get

 5    you to say that the April 6, 2016, assurance of

 6    discontinuance was publicly-filed, and you complied

 7    with that.  But let me just make clear.  Do you know

 8    one way or the other whether the assurance of

 9    discontinuance was or was not publicly-filed or are

10    you simply accepting the allegation in the Complaint

11    at face value?

12         A.    I think I stated the answer in his

13    question, but I wasn't sure whether it was

14    publicly-filed by the State of Arizona or whether it

15    was an AK issued by the department.  I don't

16    recollect at this point.

17         Q.    Do you have any idea whether anybody

18    publicly filed it as you sit here today?

19              MR. BLATCHLEY:  Objection, asked and

20    answered.

21    BY THE WITNESS:

22         A.    Sitting here today, yeah, I don't -- I

23    have no recollection of this particular detail.

24         Q.    Okay.  But then as we discussed, in

25    Paragraph 112 of your reply report, and having
```

Page 165

1    referred to the backup for this table, I believe you

2    told me that you and/or your staff put this April 6,

3    2016, assurance of discontinuance into the bucket of

4    nonpublic documents filed by company and you

5    considered that a document that you would not expect

6    to have affected the company's stock price because

7    it wasn't disseminated broadly enough.  Was that

8    another error by your staff?

9        A.    You know, it says here it is filed by the

10   company so that answers the question.  It was

11   publicly-filed by the company, but I don't know --

12       Q.    It says nonpublic document filed by the

13   company.  What does that even mean?

14       A.    My understanding of a nonpublic document

15   filed by the company is this -- this assurance of

16   discontinuance -- I -- that possibly was -- possibly

17   was earlier.  I -- I don't recollect at this point.

18   I just don't recollect.

19       Q.    Okay.  And then Mr. Blatchley offered you

20   a hypothetical where in -- whereby the assurance of

21   discontinuance in his hypothetical included a series

22   of admissions by CenturyLink to having violated

23   various laws, et cetera, and despite your response

24   to a bunch of my hypotheticals, you very quickly

25   answered his hypothetical and said all else equal,

Page 166

1    if they had made those admissions in this assurance

2    of discontinuance, you would expect the price of

3    CenturyLink's stock to go down, but that can't

4    possibly be true, can it, because all else equal

5    would include the fact that the news wasn't picked

6    up by anybody, right?

7            MR. BLATCHLEY:  Objection to the

8    hypothetical.

9            MR. GIBBS:  In other words -- you can't

10   be serious.  You can't be serious, Michael.

11   BY MR. GIBBS:

12       Q.   Look, so, if the content of the assurance

13   of discontinuance was as Mr. Blatchley described but

14   everything else was literally equal, meaning nobody

15   in the business press or the general purpose press

16   or anybody else picked up on it and reported it, is

17   it your testimony that the content of that assurance

18   of discontinuance, even though not picked up by the

19   business press or the general purpose press would

20   have caused CenturyLink's common stock price to

21   decline?

22       A.   Again, my answer to Mr. Blatchley's

23   question was, as an economist, all else equal.  In

24   terms of the activities, if the same information,

25   all else equal meaning no revenue numbers, nothing

Page 167

1    of that nature came out, I would expect it to be

2    picked up by the press, expect it to be

3    disseminated, and expect there to be some reaction.

4         Q.    So -- and -- and what's the expert basis

5    for your expectation that if the content were as

6    Mr. Blatchley described it, it would have been

7    disseminated differently?  Are you an expert in how

8    the press covers state attorney general filings?

9         A.    I can't say specifically as an expert on

10   state attorney general filings, but I have examined

11   issues associated with disclosure, dissemination,

12   and digestion of information for, you know, again

13   40 years.

14        Q.    Okay.  You think that qualifies you to

15   testify on an expert basis that if the content of

16   this assurance of discontinuance had been as

17   Mr. Blatchley described it, it would have been

18   picked up by the business press and it would have

19   caused the price of CenturyLink's common stock to

20   decline; is that your testimony?

21        A.    I basically said, again, all else equal,

22   you would expect it to go down.  I didn't say how

23   much.  I didn't say statistically significant.  But

24   I mean, it would -- relatively speaking, it would go

25   down.

1          Q.     And let me add a little bit to the

2     hypothetical, if I may.  You are aware, are you not,

3     that the assurance of discontinuance that was filed

4     on April 6, 2019, reflected a settlement between

5     CenturyLink and the Arizona Attorney General's

6     office, correct?

7          A.     I believe that's in the Complaint.

8          Q.     In other words, unlike the Minnesota

9     Attorney General lawsuit, which was filed as a

10    contested matter, this April 6, 2016, assurance of

11    discontinuance was reflecting the resolution of an

12    investigation by the Arizona Attorney General in a

13    settlement with CenturyLink, that's consistent with

14    your understanding?

15         A.     It's consistent with my understanding.  I

16    don't know when it was announced.

17         Q.     Do you know what was the dollar amount of

18    the settlement between CenturyLink and the Arizona

19    Attorney General that's referenced in the assurance

20    of discontinuance?

21         A.     I do not.

22         Q.     If I were to add to Mr. Blatchley's

23    hypothetical the fact that the matter was settled

24    for a couple of hundred thousand dollars, a de

25    minimus amount for a company of CenturyLink's size

Page 169

1    and revenue, is it still your testimony that that

2    disclosure, that settlement would have caused the

3    price of CenturyLink's stock to decline?

4         A.    If it was disclosed and the -- all of the

5    underlying denials were now acceptances because that

6    was the hypothetical Mr. Blatchley gave me.

7         Q.    Yeah.  I'm adding to the hypothetical and

8    let me add one additional fact.  The additional fact

9    is it settled for a de minimus, small six figure

10   amount, all of that money was to go to reimburse the

11   Arizona Attorney General's office for its expenses

12   in conducting the investigation, none of it was

13   going to go to reimburse any customers.

14              Go ahead and add that to

15   Mr. Blatchley's hypothetical, and tell me is it

16   still your testimony that all else equal that set of

17   disclosures would have caused CenturyLink's stock

18   price to decline?

19              MR. BLATCHLEY:  Objection to the

20   hypothetical.

21   BY THE WITNESS:

22        A.    You're basically saying the amount would

23   offset the admittance of all types of allegations.

24   I'm not sure it would have any impact, a hundred

25   thousand dollars.

                                        Page 170

1        Q.    You just don't know either way?

2        A.    I don't know.

3              MR. GIBBS:  Okay.  I don't think I have

4    any further questions for Mr. Hartzmark.  I don't

5    know whether, Michael, you intend to do any further

6    testimony.  If you do, I might have questions for

7    you, but that's really up to you.

8              MR. BLATCHLEY:  I don't appreciate the

9    comment, but I think we're done for today.

10             MR. GIBBS:  Our rights are reserved as to

11   the time and further questioning for all the reasons

12   I stated earlier.  We're not necessarily done with

13   this, but I'm not going to ask any further questions

14   at this time.

15             MR. BLATCHLEY:  Our objections to your

16   position is also on the record.

17             THE VIDEOGRAPHER:  JoAnn, do you need to

18   get orders?

19                  (WHEREUPON, discussion was had

20                   off the record.)

21             THE VIDEOGRAPHER:  The time is 5:51 p.m.

22   We are off the record and this is end of the

23   deposition of Michael Hartzmark.

24                  (Witness excused at 5:51 p.m.)

25

                            Page 171

```
 1                    REPORTER CERTIFICATE

 2

 3             I, JO ANN LOSOYA, a Certified Shorthand

 4      Reporter within and for the County of Cook and State

 5      of Illinois, do hereby certify:

 6                         That previous to the commencement

 7      of the examination of the witness, the witness was

 8      duly sworn to testify the whole truth concerning the

 9      matters herein;

10                         That the foregoing deposition

11      transcript was reported stenographically by me, was

12      thereafter reduced to typewriting under my personal

13      direction and constitutes a true record of the

14      testimony given and the proceedings had;

15                         That the said deposition was taken

16      before me at the time and place specified;

17                         That I am not a relative or

18      employee or attorney or counsel, nor a relative or

19      employee of such attorney or counsel for any of the

20      parties hereto, nor interested directly or

21      indirectly in the outcome of this action.

22

23

24

25

                                                 Page 172
```

1           IN WITNESS WHEREOF, I do hereunto set my

2    hand this 9th day of June, 2020.

3

4

5

6

7

8

JO ANN LOSOYA, CSR

9           C.S.R. No. 84-002437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 173

# Exhibit 3

| | Date | Impact Date | Revenue | Customer | Financial Results | Fluctuating Results | Business Conduct | MD&A | Event | CATEGORY |
|---|---|---|---|---|---|---|---|---|---|---|
| [1] | 1-Mar-2013 | 1-Mar-2013 | X | | | | | | 10-K | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [2] | 10-Apr-2013 | 10-Apr-2013 | | X | X | | | | SEC Form DEF 14A | Proxy Statements without Material Unanticipated Information |
| [3] | 8-May-2013 | 9-May-2013 | X | | | | | | Earnings Announcement | |
| [4] | 10-May-2013 | 10-May-2013 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [5] | 7-Aug-2013 | 8-Aug-2013 | X | | | | | | Earnings Announcement | |
| [6] | 8-Aug-2013 | 9-Aug-2013 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [7] | 6-Nov-2013 | 7-Nov-2013 | X | | | | | | Earnings Announcement | |
| [8] | 7-Nov-2013* | 8-Nov-2013 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [9] | 10-Dec-2013 | 10-Dec-2013 | X | | | | | | Investor Conference | |
| [10] | 12-Feb-2014 | 13-Feb-2014 | X | | | | | | Earnings Announcement | |
| [11] | 27-Feb-2014 | 27-Feb-2014 | X | | | | | | 10-K | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [12] | 16-Apr-2014 | 16-Apr-2014 | | X | X | | | | SEC Form DEF 14A | Proxy Statements without Material Unanticipated Information |
| [13] | 7-May-2014 | 8-May-2014 | X | | | | | | Earnings Announcement | |
| [14] | 8-May-2014* | 9-May-2014 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [15] | 12-Jun-2014 | 12-Jun-2014 | X | | | | | | Investor Conference | |
| [16] | 6-Aug-2014 | 7-Aug-2014 | X | | | | | | Earnings Announcement | |
| | 7-Aug-2014 | 7-Aug-2014 | X | | | | | | 10-Q | |
| [17] | 5-Nov-2014 | 6-Nov-2014 | X | | | | | | Earnings Announcement | |
| [18] | 6-Nov-2014 | 7-Nov-2014 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [19] | 11-Feb-2015 | 12-Feb-2015 | X | | | | | | Earnings Announcement | |
| [20] | 24-Feb-2015 | 25-Feb-2015 | X | | | | | | 10-K | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [21] | 9-Mar-2015 | 9-Mar-2015 | X | X | | | | | Investor Conference | |
| [22] | 8-Apr-2015 | 8-Apr-2015 | | X | X | | | | SEC Form DEF 14A | Proxy Statements without Material Unanticipated Information |
| [23] | 5-May-2015 | 6-May-2015 | X | | | | | | Earnings Announcement | |
| [24] | 6-May-2015 | 7-May-2015 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [25] | 4-Jun-2015 | 4-Jun-2015 | | X | | | | | Investor Conference | |
| [26] | 24-Jun-2015 | 24-Jun-2015 | | X | X | | | | Financial Analyst Day | |
| [27] | 5-Aug-2015 | 6-Aug-2015 | X | | | | | | Earnings Announcement | |
| | 6-Aug-2015 | 6-Aug-2015 | X | | | | | | 10-Q | |
| [28] | 12-Aug-2015 | 12-Aug-2015 | | | X | X | | | Oppenheimer Conference | |
| [29] | 22-Sep-2015 | 22-Sep-2015 | | | X | X | | X | Response Letter to the SEC | Non-Public Document Filed by Company |
| [30] | 4-Nov-2015 | 5-Nov-2015 | X | | | | | | Earnings Announcement | |
| [31] | 5-Nov-2015 | 6-Nov-2015 | X | | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [32] | 7-Dec-2015 | 7-Dec-2015 | X | | | | | | Investor Conference | |
| [33] | 10-Feb-2016 | 11-Feb-2016 | X | | | | | | Earnings Announcement | |
| [34] | 24-Feb-2016* | 25-Feb-2016 | X | | | | | | 10-K | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [35] | 7-Mar-2016 | 7-Mar-2016 | | | X | X | | | Investor Conference | |
| [36] | 5-Apr-2016 | 6-Apr-2016 | | X | X | | | | SEC Form DEF 14A | Proxy Statements without Material Unanticipated Information |
| [37] | 6-Apr-2016 | 7-Apr-2016 | | | | | X | | AZ Assurance of Discontinuance | Non-Public Document Filed by Company |
| [38] | 4-May-2016 | 5-May-2016 | X | | | | | | Earnings Announcement | |
| | 5-May-2016 | 5-May-2016 | X | | | | | | 10-Q | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [39] | 3-Aug-2016 | 4-Aug-2016 | X | | | | | Earnings Announcement | |
| [40] | 4-Aug-2016 | 5-Aug-2016 | X | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [41] | 21-Sep-2016 | 21-Sep-2016 | | | X | X | | Goldman Sachs Conference | |
| [42] | 6-Oct-2016 | 6-Oct-2016 | | X | | | X | Statement to News Source | No Dissemination of Media Report to Business Press |
| [43] | 18-Oct-2016 | 18-Oct-2016 | | X | | | X | Statement to News Source | No Dissemination of Media Report to Business Press |
| [44] | 31-Oct-2016 | 31-Oct-2016 | X | | | | | Earnings Announcement | |
| [45] | 4-Nov-2016 | 4-Nov-2016 | X | | | | | 10-Q | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [46] | 27-Jan-2017 | 30-Jan-2017 | | X | | | X | Statement to News Source | No Dissemination of Media Report to Business Press |
| [47] | 1-Feb-2017 | 2-Feb-2017 | | X | | | X | Statement to News Source | No Dissemination of Media Report to Business Press |
| [48] | 8-Feb-2017 | 9-Feb-2017 | X | | | | | Earnings Announcement | |
| [49] | 22-Feb-2017* | 23-Feb-2017 | X | | | | | 10-K | Duplicates -- 10-K and 10-Q following Earnings Announcements |
| [50] | 13-Apr-2017 | 13-Apr-2017 | | | X | X | | SEC Form DEF 14A | Proxy Statements without Material Unanticipated Information |
| [51] | 3-May-2017 | 4-May-2017 | X | | | | | Earnings Call | |
| [52] | 25-May-2017 | 25-May-2017 | | X | | | X | Statement to News Source | No Dissemination of Media Report to Business Press |

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

MDL No. 17-2795 (MJD/KMM)

**Expert Report of Michael L. Hartzmark, Ph.D.**

**January 21, 2020**

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 5/30/13 | 6,585,577 | $35.23 | $0.54 | -1.11% | 0.38% | -1.07% | 0.00 | 0.83 | 0.55 | -0.23% | -0.88% | 0.01 | -1.31 | 19.21% |
| 5/31/13 | 12,839,955 | $34.15 | $0.00 | -3.07% | -1.43% | -0.30% | 0.00 | 0.83 | 0.57 | -1.31% | -1.76% | 0.01 | -2.65 | 0.92% ** |
| 6/3/13 | 6,059,090 | $34.47 | $0.00 | 0.94% | 0.60% | -0.24% | 0.00 | 0.87 | 0.58 | 0.42% | 0.52% | 0.01 | 0.76 | 44.73% |
| 6/4/13 | 6,115,357 | $34.76 | $0.00 | 0.84% | -0.55% | 1.29% | 0.00 | 0.88 | 0.58 | 0.31% | 0.53% | 0.01 | 0.78 | 43.75% |
| 6/5/13 | 7,853,308 | $34.93 | $0.00 | 0.49% | -1.35% | -0.13% | 0.00 | 0.87 | 0.60 | -1.22% | 1.71% | 0.01 | 2.50 | 1.38% * |
| 6/6/13 | 5,079,912 | $35.50 | $0.00 | 1.63% | 0.86% | 1.64% | 0.00 | 0.83 | 0.59 | 1.74% | -0.10% | 0.01 | -0.15 | 88.12% |
| 6/7/13 | 5,187,098 | $35.43 | $0.00 | -0.20% | 1.28% | -1.23% | 0.00 | 0.83 | 0.57 | 0.41% | -0.61% | 0.01 | -0.88 | 38.25% |
| 6/10/13 | 3,194,525 | $35.62 | $0.00 | 0.54% | -0.03% | 0.89% | 0.00 | 0.82 | 0.59 | 0.55% | -0.01% | 0.01 | -0.02 | 98.77% |
| 6/11/13 | 9,925,177 | $35.49 | $0.00 | -0.36% | -1.01% | 0.22% | 0.00 | 0.83 | 0.59 | -0.67% | 0.31% | 0.01 | 0.44 | 65.87% |
| 6/12/13 | 4,738,218 | $35.39 | $0.00 | -0.28% | -0.81% | 0.11% | 0.00 | 0.82 | 0.60 | -0.56% | 0.28% | 0.01 | 0.41 | 68.54% |
| 6/13/13 | 3,302,196 | $35.93 | $0.00 | 1.53% | 1.49% | 0.65% | 0.00 | 0.80 | 0.61 | 1.62% | -0.10% | 0.01 | -0.14 | 88.96% |
| 6/14/13 | 4,272,929 | $36.04 | $0.00 | 0.31% | -0.59% | 0.24% | 0.00 | 0.79 | 0.61 | -0.29% | 0.60% | 0.01 | 0.87 | 38.54% |
| 6/17/13 | 3,642,002 | $35.99 | $0.00 | -0.14% | 0.76% | -1.12% | 0.00 | 0.79 | 0.62 | -0.05% | -0.09% | 0.01 | -0.13 | 89.56% |
| 6/18/13 | 2,884,387 | $36.24 | $0.00 | 0.69% | 0.78% | 0.81% | 0.00 | 0.79 | 0.62 | 1.16% | -0.47% | 0.01 | -0.69 | 49.27% |
| 6/19/13 | 4,798,351 | $35.33 | $0.00 | -2.51% | -1.38% | -1.76% | 0.00 | 0.78 | 0.61 | -2.12% | -0.40% | 0.01 | -0.58 | 56.39% |
| 6/20/13 | 6,233,174 | $34.13 | $0.00 | -3.40% | -2.49% | -0.55% | 0.00 | 0.79 | 0.62 | -2.26% | -1.13% | 0.01 | -1.66 | 9.99% |
| 6/21/13 | 8,513,623 | $34.18 | $0.00 | 0.15% | 0.27% | 0.44% | 0.00 | 0.83 | 0.63 | 0.53% | -0.39% | 0.01 | -0.56 | 57.74% |
| 6/24/13 | 5,296,647 | $33.99 | $0.00 | -0.56% | -1.21% | 0.26% | 0.00 | 0.83 | 0.63 | -0.81% | 0.26% | 0.01 | 0.37 | 70.95% |
| 6/25/13 | 5,657,303 | $34.96 | $0.00 | 2.85% | 0.96% | 1.32% | 0.00 | 0.82 | 0.63 | 1.65% | 1.20% | 0.01 | 1.74 | 8.53% |
| 6/26/13 | 3,820,848 | $34.85 | $0.00 | -0.31% | 0.98% | 0.12% | 0.00 | 0.85 | 0.66 | 0.95% | -1.27% | 0.01 | -1.81 | 7.22% |
| 6/27/13 | 3,755,633 | $35.27 | $0.00 | 1.21% | 0.63% | 0.52% | 0.00 | 0.83 | 0.66 | 0.90% | 0.30% | 0.01 | 0.43 | 66.67% |
| 6/28/13 | 4,649,488 | $35.35 | $0.00 | 0.23% | -0.43% | -0.42% | 0.00 | 0.83 | 0.66 | -0.60% | 0.82% | 0.01 | 1.17 | 24.51% |
| 7/1/13 | 2,583,345 | $35.15 | $0.00 | -0.57% | 0.55% | -0.46% | 0.00 | 0.83 | 0.66 | 0.21% | -0.77% | 0.01 | -1.09 | 27.70% |
| 7/2/13 | 4,076,082 | $35.24 | $0.00 | 0.26% | -0.03% | 0.58% | 0.00 | 0.83 | 0.67 | 0.40% | -0.14% | 0.01 | -0.20 | 84.05% |
| 7/3/13 | 1,778,305 | $35.27 | $0.00 | 0.09% | 0.08% | 0.44% | 0.00 | 0.83 | 0.67 | 0.40% | -0.31% | 0.01 | -0.44 | 66.01% |
| 7/5/13 | 1,952,476 | $35.44 | $0.00 | 0.48% | 1.02% | -0.17% | 0.00 | 0.83 | 0.67 | 0.76% | -0.28% | 0.01 | -0.40 | 69.22% |
| 7/8/13 | 2,876,758 | $35.35 | $0.00 | -0.25% | 0.56% | 0.21% | 0.00 | 0.82 | 0.67 | 0.62% | -0.88% | 0.01 | -1.24 | 21.82% |
| 7/9/13 | 2,869,190 | $35.39 | $0.00 | 0.11% | 0.72% | -0.64% | 0.00 | 0.82 | 0.67 | 0.18% | -0.07% | 0.01 | -0.10 | 92.11% |
| 7/10/13 | 3,012,272 | $35.46 | $0.00 | 0.20% | 0.02% | -0.45% | 0.00 | 0.82 | 0.67 | -0.26% | 0.46% | 0.01 | 0.65 | 52.01% |
| 7/11/13 | 2,819,280 | $36.01 | $0.00 | 1.55% | 1.37% | 0.47% | 0.00 | 0.82 | 0.67 | 1.45% | 0.10% | 0.01 | 0.14 | 88.65% |
| 7/12/13 | 3,255,564 | $36.24 | $0.00 | 0.64% | 0.31% | -0.83% | 0.00 | 0.82 | 0.67 | -0.28% | 0.92% | 0.01 | 1.29 | 20.08% |
| 7/15/13 | 3,642,826 | $36.24 | $0.00 | 0.00% | 0.14% | -0.73% | 0.00 | 0.82 | 0.66 | -0.33% | 0.33% | 0.01 | 0.46 | 64.31% |
| 7/16/13 | 3,790,946 | $36.27 | $0.00 | 0.08% | -0.37% | 0.94% | 0.00 | 0.82 | 0.65 | 0.34% | -0.26% | 0.01 | -0.36 | 72.07% |
| 7/17/13 | 3,505,092 | $36.11 | $0.00 | -0.44% | 0.29% | 0.33% | 0.00 | 0.82 | 0.65 | 0.48% | -0.92% | 0.01 | -1.28 | 20.24% |
| 7/18/13 | 4,903,620 | $35.81 | $0.00 | -0.83% | 0.51% | -1.20% | 0.00 | 0.82 | 0.64 | -0.32% | -0.51% | 0.01 | -0.71 | 47.91% |
| 7/19/13 | 3,644,991 | $35.98 | $0.00 | 0.47% | 0.16% | 0.03% | 0.00 | 0.82 | 0.65 | 0.18% | 0.29% | 0.01 | 0.41 | 68.58% |
| 7/22/13 | 3,532,214 | $35.92 | $0.00 | -0.17% | 0.21% | -0.17% | 0.00 | 0.82 | 0.65 | 0.09% | -0.26% | 0.01 | -0.35 | 72.52% |
| 7/23/13 | 13,298,269 | $35.94 | $0.00 | 0.06% | -0.19% | 0.52% | 0.00 | 0.82 | 0.65 | 0.21% | -0.15% | 0.01 | -0.21 | 83.18% |
| 7/24/13 | 2,944,325 | $35.87 | $0.00 | -0.19% | -0.38% | -0.32% | 0.00 | 0.82 | 0.66 | -0.49% | 0.29% | 0.01 | 0.41 | 68.42% |
| 7/25/13 | 3,214,116 | $35.83 | $0.00 | -0.11% | 0.26% | -0.07% | 0.00 | 0.81 | 0.65 | 0.20% | -0.31% | 0.01 | -0.43 | 66.78% |
| 7/26/13 | 2,757,887 | $36.03 | $0.00 | 0.56% | 0.08% | 0.36% | 0.00 | 0.81 | 0.65 | 0.33% | 0.23% | 0.01 | 0.31 | 75.38% |
| 7/29/13 | 2,519,767 | $36.15 | $0.00 | 0.33% | -0.37% | 0.96% | 0.00 | 0.81 | 0.65 | 0.35% | -0.02% | 0.01 | -0.03 | 97.85% |
| 7/30/13 | 4,545,076 | $35.72 | $0.00 | -1.19% | 0.04% | -1.49% | 0.00 | 0.83 | 0.64 | -0.87% | -0.32% | 0.01 | -0.45 | 65.34% |
| 7/31/13 | 4,625,270 | $35.85 | $0.00 | 0.36% | 0.00% | -1.04% | 0.00 | 0.84 | 0.64 | -0.63% | 0.99% | 0.01 | 1.40 | 16.46% |
| 8/1/13 | 3,251,816 | $36.32 | $0.00 | 1.31% | 1.26% | 0.23% | 0.00 | 0.84 | 0.63 | 1.24% | 0.07% | 0.01 | 0.10 | 91.92% |
| 8/2/13 | 3,140,465 | $36.11 | $0.00 | -0.58% | 0.17% | 0.15% | 0.00 | 0.84 | 0.63 | 0.27% | -0.85% | 0.01 | -1.20 | 23.32% |
| 8/5/13 | 3,583,586 | $36.09 | $0.00 | -0.06% | -0.14% | 0.12% | 0.00 | 0.84 | 0.63 | -0.02% | -0.04% | 0.01 | -0.05 | 96.01% |
| 8/6/13 | 3,197,999 | $36.18 | $0.00 | 0.25% | -0.57% | -0.03% | 0.00 | 0.84 | 0.64 | -0.48% | 0.73% | 0.01 | 1.02 | 30.77% |
| 8/7/13 | 4,624,033 | $36.39 | $0.00 | 0.58% | -0.35% | 0.17% | 0.00 | 0.83 | 0.65 | -0.15% | 0.73% | 0.01 | 1.03 | 30.56% |
| 8/8/13 | 16,527,825 | $34.36 | $0.00 | -5.58% | 0.41% | -0.99% | 0.00 | 0.83 | 0.63 | -0.25% | -5.33% | 0.01 | -7.46 | 0.00% ** |
| 8/9/13 | 8,025,526 | $33.89 | $0.00 | -1.37% | -0.34% | -0.69% | 0.00 | 0.83 | 0.62 | -0.70% | -0.67% | 0.01 | -0.98 | 33.06% |
| 8/12/13 | 4,550,973 | $34.08 | $0.00 | 0.56% | -0.11% | 0.45% | 0.00 | 0.81 | 0.64 | 0.18% | 0.38% | 0.01 | 0.59 | 55.72% |
| 8/13/13 | 4,346,033 | $33.88 | $0.00 | -0.59% | 0.30% | -0.86% | 0.00 | 0.81 | 0.63 | -0.31% | -0.27% | 0.01 | -0.43 | 66.92% |
| 8/14/13 | 4,280,600 | $33.73 | $0.00 | -0.44% | -0.50% | 0.20% | 0.00 | 0.82 | 0.63 | -0.31% | -0.14% | 0.01 | -0.22 | 82.92% |
| 8/15/13 | 4,304,927 | $33.47 | $0.00 | -0.77% | -1.41% | 0.06% | 0.00 | 0.82 | 0.63 | -1.15% | 0.38% | 0.01 | 0.59 | 55.33% |
| 8/16/13 | 5,853,782 | $32.92 | $0.00 | -1.64% | -0.33% | -0.75% | 0.00 | 0.80 | 0.63 | -0.75% | -0.89% | 0.01 | -1.41 | 16.01% |
| 8/19/13 | 4,647,503 | $32.56 | $0.00 | -1.09% | -0.58% | -0.37% | 0.00 | 0.81 | 0.64 | -0.73% | -0.36% | 0.01 | -0.57 | 56.70% |
| 8/20/13 | 3,407,718 | $32.58 | $0.00 | 0.06% | 0.39% | 0.27% | 0.00 | 0.81 | 0.65 | 0.46% | -0.40% | 0.01 | -0.63 | 52.74% |
| 8/21/13 | 4,057,167 | $32.32 | $0.00 | -0.80% | -0.57% | -0.76% | 0.00 | 0.81 | 0.64 | -0.98% | 0.18% | 0.01 | 0.29 | 77.18% |
| 8/22/13 | 22,122,025 | $32.58 | $0.00 | 0.80% | 0.86% | -0.23% | 0.00 | 0.81 | 0.64 | 0.51% | 0.29% | 0.01 | 0.46 | 64.67% |
| 8/23/13 | 15,350,867 | $33.30 | $0.00 | 2.21% | 0.41% | 1.09% | 0.00 | 0.81 | 0.64 | 1.00% | 1.21% | 0.01 | 1.91 | 5.80% |
| 8/26/13 | 3,356,395 | $33.14 | $0.00 | -0.48% | -0.40% | -1.01% | 0.00 | 0.82 | 0.66 | -1.02% | 0.53% | 0.01 | 0.83 | 40.61% |

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 8/27/13 | 3,796,417 | $32.94 | $0.00 | -0.60% | -1.59% | 0.91% | 0.00 | 0.82 | 0.67 | -0.71% | 0.11% | 0.01 | 0.18 | 85.97% |
| 8/28/13 | 2,789,114 | $32.71 | $0.00 | -0.70% | 0.29% | -0.68% | 0.00 | 0.82 | 0.68 | -0.23% | -0.47% | 0.01 | -0.78 | 43.99% |
| 8/29/13 | 4,556,286 | $33.10 | $0.00 | 1.19% | 0.21% | 1.03% | 0.00 | 0.82 | 0.69 | 0.89% | 0.31% | 0.01 | 0.51 | 61.10% |
| 8/30/13 | 5,665,680 | $33.12 | $0.00 | 0.06% | -0.31% | 0.03% | 0.00 | 0.83 | 0.70 | -0.23% | 0.29% | 0.01 | 0.49 | 62.78% |
| 9/3/13 | 7,474,313 | $32.91 | $0.00 | -0.63% | 0.42% | -2.13% | 0.00 | 0.82 | 0.70 | -1.14% | 0.50% | 0.01 | 0.84 | 40.49% |
| 9/4/13 | 7,055,655 | $32.50 | $0.54 | 0.40% | 0.83% | 0.84% | 0.00 | 0.83 | 0.69 | 1.27% | -0.87% | 0.01 | -1.45 | 14.88% |
| 9/5/13 | 3,960,555 | $32.13 | $0.00 | -1.14% | 0.12% | -0.85% | 0.00 | 0.82 | 0.68 | -0.48% | -0.66% | 0.01 | -1.10 | 27.56% |
| 9/6/13 | 6,892,358 | $31.90 | $0.00 | -0.72% | 0.02% | -0.05% | 0.00 | 0.82 | 0.68 | -0.03% | -0.69% | 0.01 | -1.14 | 25.51% |
| 9/9/13 | 5,716,016 | $32.02 | $0.00 | 0.38% | 1.01% | -0.44% | 0.00 | 0.82 | 0.69 | 0.51% | -0.13% | 0.01 | -0.22 | 82.50% |
| 9/10/13 | 14,418,742 | $32.62 | $0.00 | 1.87% | 0.74% | 0.60% | 0.00 | 0.81 | 0.69 | 1.00% | 0.87% | 0.01 | 1.44 | 15.40% |
| 9/11/13 | 3,411,141 | $32.59 | $0.00 | -0.09% | 0.32% | -0.16% | 0.00 | 0.81 | 0.70 | 0.14% | -0.23% | 0.01 | -0.38 | 70.25% |
| 9/12/13 | 3,685,639 | $32.38 | $0.00 | -0.64% | -0.31% | 1.31% | 0.00 | 0.81 | 0.70 | 0.66% | -1.30% | 0.01 | -2.15 | 3.40% * |
| 9/13/13 | 2,966,766 | $32.34 | $0.00 | -0.12% | 0.27% | 0.01% | 0.00 | 0.81 | 0.67 | 0.20% | -0.32% | 0.01 | -0.52 | 60.22% |
| 9/16/13 | 3,519,170 | $32.27 | $0.00 | -0.22% | 0.57% | 0.44% | 0.00 | 0.81 | 0.67 | 0.73% | -0.94% | 0.01 | -1.54 | 12.67% |
| 9/17/13 | 2,456,657 | $32.43 | $0.00 | 0.50% | 0.42% | 0.24% | 0.00 | 0.81 | 0.67 | 0.47% | 0.03% | 0.01 | 0.05 | 96.25% |
| 9/18/13 | 3,694,997 | $32.55 | $0.00 | 0.37% | 1.22% | -0.38% | 0.00 | 0.81 | 0.67 | 0.69% | -0.32% | 0.01 | -0.52 | 60.37% |
| 9/19/13 | 3,666,097 | $32.71 | $0.00 | 0.49% | -0.17% | -0.20% | 0.00 | 0.80 | 0.67 | -0.31% | 0.80% | 0.01 | 1.29 | 20.01% |
| 9/20/13 | 5,997,935 | $32.28 | $0.00 | -1.31% | -0.72% | -0.87% | 0.00 | 0.79 | 0.69 | -1.20% | -0.12% | 0.01 | -0.19 | 84.78% |
| 9/23/13 | 3,655,468 | $32.24 | $0.00 | -0.12% | -0.47% | 0.41% | 0.00 | 0.79 | 0.69 | -0.11% | -0.01% | 0.01 | -0.02 | 98.40% |
| 9/24/13 | 3,905,540 | $32.17 | $0.00 | -0.22% | -0.25% | -0.58% | 0.00 | 0.80 | 0.69 | -0.63% | 0.42% | 0.01 | 0.68 | 49.71% |
| 9/25/13 | 3,563,460 | $32.00 | $0.00 | -0.53% | -0.27% | -0.03% | 0.00 | 0.79 | 0.66 | -0.28% | -0.25% | 0.01 | -0.42 | 67.40% |
| 9/26/13 | 2,496,826 | $32.11 | $0.00 | 0.34% | 0.37% | 0.73% | 0.00 | 0.79 | 0.66 | 0.73% | -0.39% | 0.01 | -0.66 | 51.21% |
| 9/27/13 | 3,471,455 | $31.78 | $0.00 | -1.03% | -0.40% | -0.67% | 0.00 | 0.80 | 0.66 | -0.81% | -0.22% | 0.01 | -0.37 | 71.11% |
| 9/30/13 | 5,619,988 | $31.38 | $0.00 | -1.26% | -0.60% | -0.12% | 0.00 | 0.80 | 0.66 | -0.61% | -0.65% | 0.01 | -1.11 | 27.03% |
| 10/1/13 | 5,556,554 | $31.76 | $0.00 | 1.21% | 0.81% | 0.09% | 0.00 | 0.79 | 0.66 | 0.64% | 0.57% | 0.01 | 0.97 | 33.20% |
| 10/2/13 | 4,283,450 | $31.61 | $0.00 | -0.47% | -0.05% | -0.32% | 0.00 | 0.80 | 0.66 | -0.31% | -0.16% | 0.01 | -0.28 | 78.11% |
| 10/3/13 | 4,214,069 | $31.19 | $0.00 | -1.33% | -0.90% | 0.25% | 0.00 | 0.80 | 0.66 | -0.61% | -0.72% | 0.01 | -1.21 | 22.90% |
| 10/4/13 | 3,263,308 | $31.20 | $0.00 | 0.03% | 0.71% | -0.26% | 0.00 | 0.80 | 0.66 | 0.34% | -0.30% | 0.01 | -0.51 | 60.99% |
| 10/7/13 | 3,576,159 | $31.41 | $0.00 | 0.67% | -0.85% | 1.18% | 0.00 | 0.78 | 0.67 | 0.06% | 0.62% | 0.01 | 1.04 | 30.04% |
| 10/8/13 | 4,449,659 | $31.28 | $0.00 | -0.41% | -1.20% | -0.55% | 0.00 | 0.77 | 0.68 | -1.37% | 0.96% | 0.01 | 1.61 | 11.04% |
| 10/9/13 | 7,853,078 | $32.19 | $0.00 | 2.91% | 0.07% | 1.09% | 0.00 | 0.75 | 0.68 | 0.74% | 2.17% | 0.01 | 3.62 | 0.04% ** |
| 10/10/13 | 8,815,816 | $33.34 | $0.00 | 3.57% | 2.20% | -0.17% | 0.00 | 0.75 | 0.73 | 1.51% | 2.06% | 0.01 | 3.28 | 0.14% ** |
| 10/11/13 | 4,051,609 | $33.22 | $0.00 | -0.36% | 0.63% | -0.03% | 0.00 | 0.82 | 0.72 | 0.48% | -0.84% | 0.01 | -1.28 | 20.34% |
| 10/14/13 | 4,474,771 | $32.68 | $0.00 | -1.63% | 0.41% | -0.86% | 0.00 | 0.81 | 0.72 | -0.32% | -1.30% | 0.01 | -1.98 | 4.98% * |
| 10/15/13 | 3,875,693 | $32.53 | $0.00 | -0.46% | -0.71% | -0.24% | 0.00 | 0.80 | 0.74 | -0.78% | 0.32% | 0.01 | 0.48 | 63.28% |
| 10/16/13 | 3,559,743 | $32.92 | $0.00 | 1.20% | 1.39% | 0.81% | 0.00 | 0.79 | 0.75 | 1.68% | -0.48% | 0.01 | -0.72 | 47.33% |
| 10/17/13 | 3,572,553 | $33.25 | $0.00 | 1.00% | 0.68% | 1.50% | 0.00 | 0.78 | 0.74 | 1.61% | -0.61% | 0.01 | -0.92 | 36.21% |
| 10/18/13 | 3,695,018 | $33.01 | $0.00 | -0.72% | 0.66% | 0.66% | 0.00 | 0.77 | 0.73 | 0.95% | -1.67% | 0.01 | -2.51 | 1.35% * |
| 10/21/13 | 3,656,342 | $32.99 | $0.00 | -0.06% | 0.01% | 1.21% | 0.00 | 0.76 | 0.71 | 0.81% | -0.88% | 0.01 | -1.28 | 20.33% |
| 10/22/13 | 3,628,492 | $33.42 | $0.00 | 1.30% | 0.57% | 0.10% | 0.00 | 0.78 | 0.69 | 0.45% | 0.86% | 0.01 | 1.25 | 21.52% |
| 10/23/13 | 3,397,083 | $33.39 | $0.00 | -0.09% | -0.47% | 0.06% | 0.00 | 0.78 | 0.69 | -0.37% | 0.28% | 0.01 | 0.41 | 68.56% |
| 10/24/13 | 3,284,482 | $33.22 | $0.00 | -0.51% | 0.33% | -1.18% | 0.00 | 0.78 | 0.69 | -0.60% | 0.09% | 0.01 | 0.13 | 89.30% |
| 10/25/13 | 3,589,224 | $33.27 | $0.00 | 0.15% | 0.44% | 0.74% | 0.00 | 0.77 | 0.69 | 0.81% | -0.66% | 0.01 | -0.95 | 34.30% |
| 10/28/13 | 3,844,839 | $33.52 | $0.00 | 0.75% | 0.13% | 0.36% | 0.00 | 0.78 | 0.70 | 0.31% | 0.44% | 0.01 | 0.64 | 52.32% |
| 10/29/13 | 4,926,083 | $33.81 | $0.00 | 0.87% | 0.56% | 1.07% | 0.00 | 0.78 | 0.70 | 1.14% | -0.28% | 0.01 | -0.40 | 68.72% |
| 10/30/13 | 2,943,781 | $33.53 | $0.00 | -0.83% | -0.48% | -0.16% | 0.00 | 0.78 | 0.69 | -0.52% | -0.30% | 0.01 | -0.44 | 65.73% |
| 10/31/13 | 4,128,752 | $33.86 | $0.00 | 0.98% | -0.38% | 0.13% | 0.00 | 0.77 | 0.69 | -0.25% | 1.24% | 0.01 | 1.81 | 7.27% |
| 11/1/13 | 3,978,389 | $33.58 | $0.00 | -0.83% | 0.29% | -0.25% | 0.00 | 0.76 | 0.71 | 0.00% | -0.83% | 0.01 | -1.21 | 23.03% |
| 11/4/13 | 3,476,054 | $33.76 | $0.00 | 0.54% | 0.36% | 0.54% | 0.00 | 0.77 | 0.71 | 0.62% | -0.08% | 0.01 | -0.12 | 90.51% |
| 11/5/13 | 5,697,242 | $33.38 | $0.00 | -1.13% | -0.27% | -1.72% | 0.00 | 0.78 | 0.72 | -1.49% | 0.36% | 0.01 | 0.53 | 60.06% |
| 11/6/13 | 4,634,868 | $33.89 | $0.00 | 1.53% | 0.48% | 0.58% | 0.00 | 0.77 | 0.71 | 0.74% | 0.79% | 0.01 | 1.15 | 25.40% |
| 11/7/13 | 13,537,330 | $31.81 | $0.00 | -6.14% | -1.30% | -0.71% | 0.00 | 0.77 | 0.71 | -1.54% | -4.59% | 0.01 | -6.65 | 0.00% ** |
| 11/8/13 | 10,077,843 | $31.33 | $0.00 | -1.51% | 1.34% | -0.86% | 0.00 | 0.77 | 0.72 | 0.38% | -1.89% | 0.01 | -2.73 | 0.72% ** |
| 11/11/13 | 3,244,043 | $31.51 | $0.00 | 0.57% | 0.07% | -0.40% | 0.00 | 0.73 | 0.74 | -0.29% | 0.86% | 0.01 | 1.21 | 22.93% |
| 11/12/13 | 5,193,576 | $31.43 | $0.00 | -0.25% | -0.23% | 0.51% | 0.00 | 0.74 | 0.74 | 0.16% | -0.41% | 0.01 | -0.58 | 56.27% |
| 11/13/13 | 4,161,553 | $31.48 | $0.00 | 0.16% | 0.84% | -0.74% | 0.00 | 0.75 | 0.73 | 0.04% | 0.12% | 0.01 | 0.17 | 86.28% |
| 11/14/13 | 4,252,132 | $31.84 | $0.00 | 1.14% | 0.50% | 0.08% | 0.00 | 0.75 | 0.72 | 0.38% | 0.76% | 0.01 | 1.07 | 28.51% |
| 11/15/13 | 3,779,806 | $32.10 | $0.00 | 0.82% | 0.42% | 0.20% | 0.00 | 0.75 | 0.73 | 0.42% | 0.40% | 0.01 | 0.56 | 57.76% |
| 11/18/13 | 4,607,338 | $32.19 | $0.00 | 0.28% | -0.36% | 0.86% | 0.00 | 0.74 | 0.72 | 0.32% | -0.04% | 0.01 | -0.05 | 96.01% |
| 11/19/13 | 4,567,618 | $32.01 | $0.00 | -0.56% | -0.19% | 0.26% | 0.00 | 0.75 | 0.71 | 0.01% | -0.57% | 0.01 | -0.81 | 41.76% |
| 11/20/13 | 5,437,589 | $31.80 | $0.00 | -0.66% | -0.36% | -0.61% | 0.00 | 0.70 | 0.70 | -0.69% | 0.04% | 0.01 | 0.05 | 95.93% |
| 11/21/13 | 5,369,796 | $31.08 | $0.54 | -0.57% | 0.82% | -0.72% | 0.00 | 0.70 | 0.70 | 0.05% | -0.61% | 0.01 | -0.90 | 37.04% |

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 8/21/14 | 3,367,515 | $40.91 | $0.00 | 0.29% | 0.30% | 0.00% | 0.00 | 0.48 | 0.56 | 0.29% | 0.00% | 0.01 | 0.00 | 99.64% |
| 8/22/14 | 1,860,889 | $40.80 | $0.00 | -0.27% | -0.19% | -0.24% | 0.00 | 0.48 | 0.56 | -0.07% | -0.20% | 0.01 | -0.23 | 82.03% |
| 8/25/14 | 3,472,700 | $41.27 | $0.00 | 1.15% | 0.48% | 0.25% | 0.00 | 0.46 | 0.56 | 0.50% | 0.65% | 0.01 | 0.76 | 45.08% |
| 8/26/14 | 2,574,155 | $41.14 | $0.00 | -0.31% | 0.11% | 0.02% | 0.00 | 0.47 | 0.58 | 0.20% | -0.52% | 0.01 | -0.61 | 54.63% |
| 8/27/14 | 2,306,702 | $40.76 | $0.54 | 0.39% | 0.03% | 0.56% | 0.00 | 0.48 | 0.59 | 0.48% | -0.09% | 0.01 | -0.11 | 91.55% |
| 8/28/14 | 2,738,159 | $40.86 | $0.00 | 0.25% | -0.16% | 0.08% | 0.00 | 0.48 | 0.59 | 0.11% | 0.13% | 0.01 | 0.16 | 87.50% |
| 8/29/14 | 2,500,622 | $40.99 | $0.00 | 0.32% | 0.34% | 0.51% | 0.00 | 0.47 | 0.58 | 0.61% | -0.29% | 0.01 | -0.35 | 73.06% |
| 9/2/14 | 3,422,613 | $40.86 | $0.00 | -0.32% | -0.05% | -0.19% | 0.00 | 0.47 | 0.57 | 0.02% | -0.34% | 0.01 | -0.40 | 68.64% |
| 9/3/14 | 2,855,259 | $41.02 | $0.00 | 0.39% | -0.06% | 0.32% | 0.00 | 0.47 | 0.58 | 0.30% | 0.09% | 0.01 | 0.11 | 91.53% |
| 9/4/14 | 3,624,736 | $41.06 | $0.00 | 0.10% | -0.15% | -0.09% | 0.00 | 0.45 | 0.58 | 0.03% | 0.06% | 0.01 | 0.08 | 93.92% |
| 9/5/14 | 3,061,319 | $41.47 | $0.00 | 1.00% | 0.51% | 0.21% | 0.00 | 0.45 | 0.58 | 0.50% | 0.50% | 0.01 | 0.59 | 55.32% |
| 9/8/14 | 7,919,078 | $40.58 | $0.00 | -2.15% | -0.29% | -0.32% | 0.00 | 0.46 | 0.58 | -0.16% | -1.98% | 0.01 | -2.37 | 1.95% * |
| 9/9/14 | 6,052,736 | $39.99 | $0.00 | -1.45% | -0.65% | -0.67% | 0.00 | 0.46 | 0.59 | -0.57% | -0.89% | 0.01 | -1.04 | 29.82% |
| 9/10/14 | 3,905,173 | $39.69 | $0.00 | -0.75% | 0.37% | -0.44% | 0.00 | 0.47 | 0.61 | 0.04% | -0.79% | 0.01 | -0.92 | 35.80% |
| 9/11/14 | 5,115,581 | $40.38 | $0.00 | 1.74% | 0.12% | 0.46% | 0.00 | 0.50 | 0.68 | 0.50% | 1.24% | 0.01 | 1.47 | 14.56% |
| 9/12/14 | 5,540,258 | $39.54 | $0.00 | -2.08% | -0.59% | -0.70% | 0.00 | 0.50 | 0.70 | -0.65% | -1.43% | 0.01 | -1.68 | 9.64% |
| 9/15/14 | 3,200,475 | $39.64 | $0.00 | 0.25% | -0.07% | 0.41% | 0.00 | 0.53 | 0.72 | 0.38% | -0.13% | 0.01 | -0.15 | 88.21% |
| 9/16/14 | 4,007,351 | $39.60 | $0.00 | -0.10% | 0.75% | 0.31% | 0.00 | 0.53 | 0.72 | 0.73% | -0.83% | 0.01 | -0.97 | 33.48% |
| 9/17/14 | 4,773,923 | $40.35 | $0.00 | 1.89% | 0.13% | 0.29% | 0.00 | 0.54 | 0.71 | 0.37% | 1.52% | 0.01 | 1.78 | 7.74% |
| 9/18/14 | 2,372,517 | $40.52 | $0.00 | 0.42% | 0.50% | 0.38% | 0.00 | 0.54 | 0.72 | 0.65% | -0.23% | 0.01 | -0.26 | 79.20% |
| 9/19/14 | 3,482,965 | $40.75 | $0.00 | 0.57% | -0.05% | 1.09% | 0.00 | 0.54 | 0.72 | 0.86% | -0.30% | 0.01 | -0.34 | 73.31% |
| 9/22/14 | 2,778,036 | $40.79 | $0.00 | 0.10% | -0.80% | 0.38% | 0.00 | 0.53 | 0.71 | -0.05% | 0.15% | 0.01 | 0.18 | 86.12% |
| 9/23/14 | 2,646,435 | $40.46 | $0.00 | -0.81% | -0.57% | -0.21% | 0.00 | 0.52 | 0.71 | -0.35% | -0.46% | 0.01 | -0.54 | 59.34% |
| 9/24/14 | 3,452,837 | $40.44 | $0.00 | -0.05% | 0.79% | -0.19% | 0.00 | 0.53 | 0.72 | 0.37% | -0.42% | 0.01 | -0.49 | 62.54% |
| 9/25/14 | 2,857,294 | $39.91 | $0.00 | -1.31% | -1.62% | 0.15% | 0.00 | 0.53 | 0.71 | -0.66% | -0.65% | 0.01 | -0.75 | 45.25% |
| 9/26/14 | 2,785,176 | $40.31 | $0.00 | 1.00% | 0.88% | -0.16% | 0.00 | 0.58 | 0.71 | 0.46% | 0.54% | 0.01 | 0.62 | 53.53% |
| 9/29/14 | 3,763,075 | $40.40 | $0.00 | 0.22% | -0.25% | 0.11% | 0.00 | 0.58 | 0.71 | 0.02% | 0.21% | 0.01 | 0.24 | 81.05% |
| 9/30/14 | 3,303,817 | $40.89 | $0.00 | 1.21% | -0.27% | 0.47% | 0.00 | 0.57 | 0.71 | 0.26% | 0.95% | 0.01 | 1.10 | 27.22% |
| 10/1/14 | 2,943,935 | $40.42 | $0.00 | -1.15% | -1.32% | -0.11% | 0.00 | 0.57 | 0.71 | -0.74% | -0.41% | 0.01 | -0.48 | 63.55% |
| 10/2/14 | 2,542,464 | $40.76 | $0.00 | 0.84% | 0.01% | -0.12% | 0.00 | 0.54 | 0.74 | 0.01% | 0.83% | 0.01 | 0.96 | 33.98% |
| 10/3/14 | 2,497,727 | $41.00 | $0.00 | 0.59% | 1.12% | 0.23% | 0.00 | 0.53 | 0.73 | 0.87% | -0.28% | 0.01 | -0.32 | 74.79% |
| 10/6/14 | 3,092,155 | $40.68 | $0.00 | -0.78% | -0.15% | 0.58% | 0.00 | 0.50 | 0.73 | 0.44% | -1.22% | 0.01 | -1.41 | 16.02% |
| 10/7/14 | 2,993,803 | $40.08 | $0.00 | -1.47% | -1.51% | 0.38% | 0.00 | 0.51 | 0.72 | -0.41% | -1.06% | 0.01 | -1.22 | 22.53% |
| 10/8/14 | 3,066,336 | $40.82 | $0.00 | 1.85% | 1.78% | -0.04% | 0.00 | 0.51 | 0.70 | 0.95% | 0.90% | 0.01 | 1.04 | 30.26% |
| 10/9/14 | 3,002,769 | $39.73 | $0.00 | -2.67% | -2.06% | -0.38% | 0.00 | 0.56 | 0.72 | -1.34% | -1.33% | 0.01 | -1.54 | 12.63% |
| 10/10/14 | 3,339,596 | $39.13 | $0.00 | -1.51% | -1.13% | 0.15% | 0.00 | 0.62 | 0.73 | -0.53% | -0.98% | 0.01 | -1.13 | 26.24% |
| 10/13/14 | 4,048,675 | $38.41 | $0.00 | -1.84% | -1.65% | -0.08% | 0.00 | 0.65 | 0.73 | -1.07% | -0.77% | 0.01 | -0.88 | 37.96% |
| 10/14/14 | 3,825,142 | $38.83 | $0.00 | 1.09% | 0.16% | -0.11% | 0.00 | 0.69 | 0.86 | 0.04% | 1.05% | 0.01 | 1.23 | 22.07% |
| 10/15/14 | 4,023,846 | $38.61 | $0.00 | -0.57% | -0.80% | 0.32% | 0.00 | 0.69 | 0.94 | -0.22% | -0.34% | 0.01 | -0.41 | 68.46% |
| 10/16/14 | 4,020,397 | $38.30 | $0.00 | -0.80% | 0.02% | -0.48% | 0.00 | 0.71 | 0.94 | -0.42% | -0.38% | 0.01 | -0.45 | 65.01% |
| 10/17/14 | 3,894,947 | $38.86 | $0.00 | 1.46% | 1.29% | 0.17% | 0.00 | 0.72 | 1.02 | 1.13% | 0.33% | 0.01 | 0.40 | 69.03% |
| 10/20/14 | 2,033,907 | $39.28 | $0.00 | 1.08% | 0.92% | 0.13% | 0.00 | 0.73 | 1.03 | 0.83% | 0.25% | 0.01 | 0.30 | 76.54% |
| 10/21/14 | 2,490,502 | $39.70 | $0.00 | 1.07% | 1.96% | -0.58% | 0.00 | 0.74 | 1.03 | 0.88% | 0.19% | 0.01 | 0.23 | 82.14% |
| 10/22/14 | 2,118,129 | $40.09 | $0.00 | 0.98% | -0.72% | -0.07% | 0.00 | 0.74 | 1.03 | -0.57% | 1.56% | 0.01 | 1.88 | 6.21% |
| 10/23/14 | 2,035,652 | $39.94 | $0.00 | -0.37% | 1.23% | -1.93% | 0.00 | 0.72 | 1.03 | -1.04% | 0.67% | 0.01 | 0.79 | 42.84% |
| 10/24/14 | 2,660,126 | $39.93 | $0.00 | -0.03% | 0.71% | 0.38% | 0.00 | 0.73 | 1.00 | 0.96% | -0.99% | 0.01 | -1.18 | 24.12% |
| 10/27/14 | 2,150,164 | $40.40 | $0.00 | 1.18% | -0.15% | 1.14% | 0.00 | 0.71 | 0.99 | 1.08% | 0.09% | 0.01 | 0.11 | 91.05% |
| 10/28/14 | 1,930,936 | $41.03 | $0.00 | 1.56% | 1.19% | 0.17% | 0.00 | 0.71 | 1.00 | 1.09% | 0.47% | 0.01 | 0.56 | 57.96% |
| 10/29/14 | 1,918,300 | $40.99 | $0.00 | -0.10% | -0.13% | 0.05% | 0.00 | 0.72 | 1.00 | 0.03% | -0.13% | 0.01 | -0.16 | 87.67% |
| 10/30/14 | 1,933,926 | $41.49 | $0.00 | 1.22% | 0.63% | -0.18% | 0.00 | 0.73 | 1.01 | 0.35% | 0.87% | 0.01 | 1.04 | 29.85% |
| 10/31/14 | 3,770,735 | $41.48 | $0.00 | -0.02% | 1.17% | 0.07% | 0.00 | 0.73 | 1.01 | 1.01% | -1.03% | 0.01 | -1.24 | 21.90% |
| 11/3/14 | 2,222,062 | $41.81 | $0.00 | 0.80% | -0.01% | 0.16% | 0.00 | 0.71 | 1.04 | 0.22% | 0.58% | 0.01 | 0.70 | 48.80% |
| 11/4/14 | 1,894,544 | $41.63 | $0.00 | -0.43% | -0.28% | 0.04% | 0.00 | 0.72 | 1.02 | -0.11% | -0.33% | 0.01 | -0.40 | 69.23% |
| 11/5/14 | 2,699,032 | $41.65 | $0.00 | 0.05% | 0.60% | -0.20% | 0.00 | 0.73 | 1.01 | 0.28% | -0.24% | 0.01 | -0.29 | 77.33% |
| 11/6/14 | 8,155,493 | $39.00 | $0.00 | -6.36% | 0.41% | -0.79% | 0.00 | 0.73 | 1.03 | -0.46% | -5.90% | 0.01 | -7.21 | 0.00% ** |
| 11/7/14 | 6,073,176 | $39.43 | $0.00 | 1.10% | 0.05% | 0.78% | 0.00 | 0.73 | 1.03 | 0.90% | 0.20% | 0.01 | 0.25 | 80.38% |
| 11/10/14 | 3,590,710 | $39.84 | $0.00 | 1.04% | 0.32% | -0.03% | 0.00 | 0.74 | 1.07 | 0.25% | 0.79% | 0.01 | 0.96 | 33.75% |
| 11/11/14 | 2,487,437 | $39.97 | $0.00 | 0.33% | 0.07% | -0.15% | 0.00 | 0.76 | 1.05 | -0.04% | 0.37% | 0.01 | 0.45 | 65.19% |
| 11/12/14 | 3,113,603 | $40.50 | $0.00 | 1.33% | -0.04% | 0.77% | 0.00 | 0.77 | 1.06 | 0.86% | 0.47% | 0.01 | 0.58 | 56.25% |
| 11/13/14 | 2,607,747 | $40.92 | $0.00 | 1.04% | 0.06% | 0.47% | 0.00 | 0.77 | 1.07 | 0.84% | 0.20% | 0.01 | 0.24 | 80.76% |
| 11/14/14 | 2,203,142 | $40.79 | $0.00 | -0.32% | 0.04% | 0.69% | 0.00 | 0.76 | 1.08 | 0.84% | -1.16% | 0.01 | -1.43 | 15.50% |
| 11/17/14 | 2,548,045 | $40.95 | $0.00 | 0.39% | 0.08% | -0.25% | 0.00 | 0.76 | 1.04 | -0.14% | 0.53% | 0.01 | 0.66 | 51.36% |

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 11/18/14 | 2,211,575 | $41.09 | $0.00 | 0.34% | 0.53% | -0.59% | 0.00 | 0.77 | 1.03 | -0.13% | 0.47% | 0.01 | 0.58 | 56.19% |
| 11/19/14 | 2,649,839 | $41.12 | $0.00 | 0.07% | -0.14% | -1.02% | 0.00 | 0.77 | 1.03 | -1.08% | 1.16% | 0.01 | 1.42 | 15.90% |
| 11/20/14 | 2,756,297 | $40.50 | $0.54 | -0.19% | 0.20% | -0.52% | 0.00 | 0.77 | 0.99 | -0.26% | 0.07% | 0.01 | 0.08 | 93.36% |
| 11/21/14 | 3,902,001 | $40.47 | $0.00 | -0.07% | 0.54% | -0.23% | 0.00 | 0.77 | 1.05 | 0.24% | -0.32% | 0.01 | -0.40 | 69.03% |
| 11/24/14 | 2,767,932 | $40.28 | $0.00 | -0.47% | 0.29% | -1.60% | 0.00 | 0.77 | 1.06 | -1.40% | 0.94% | 0.01 | 1.17 | 24.41% |
| 11/25/14 | 4,870,020 | $39.69 | $0.00 | -1.46% | -0.10% | -0.01% | 0.00 | 0.78 | 1.01 | 0.00% | -1.46% | 0.01 | -1.84 | 6.86% |
| 11/26/14 | 2,565,847 | $40.57 | $0.00 | 2.22% | 0.30% | 0.98% | 0.00 | 0.80 | 1.00 | 1.31% | 0.91% | 0.01 | 1.14 | 25.81% |
| 11/28/14 | 1,337,844 | $40.77 | $0.00 | 0.49% | -0.25% | 1.06% | 0.00 | 0.80 | 1.03 | 0.98% | -0.49% | 0.01 | -0.61 | 54.50% |
| 12/1/14 | 3,648,241 | $41.10 | $0.00 | 0.81% | -0.68% | -0.60% | 0.00 | 0.80 | 1.02 | -1.07% | 1.88% | 0.01 | 2.32 | 2.19% * |
| 12/2/14 | 4,086,908 | $40.72 | $0.00 | -0.92% | 0.64% | -2.25% | 0.00 | 0.77 | 0.97 | -1.59% | 0.66% | 0.01 | 0.81 | 41.97% |
| 12/3/14 | 4,758,746 | $40.06 | $0.00 | -1.62% | 0.40% | -1.01% | 0.00 | 0.77 | 0.94 | -0.52% | -1.11% | 0.01 | -1.35 | 18.09% |
| 12/4/14 | 3,527,638 | $40.05 | $0.00 | -0.02% | -0.11% | -0.09% | 0.00 | 0.77 | 0.96 | -0.07% | 0.05% | 0.01 | 0.06 | 95.43% |
| 12/5/14 | 3,106,620 | $39.68 | $0.00 | -0.92% | 0.17% | -0.23% | 0.00 | 0.77 | 0.96 | 0.01% | -0.94% | 0.01 | -1.14 | 25.79% |
| 12/8/14 | 2,721,614 | $39.77 | $0.00 | 0.23% | -0.71% | 0.55% | 0.00 | 0.77 | 0.96 | 0.08% | 0.14% | 0.01 | 0.18 | 86.01% |
| 12/9/14 | 3,224,288 | $39.10 | $0.00 | -1.68% | -0.02% | -3.19% | 0.00 | 0.76 | 0.96 | -2.97% | 1.29% | 0.01 | 1.57 | 11.95% |
| 12/10/14 | 2,901,101 | $38.40 | $0.00 | -1.79% | -1.63% | -0.31% | 0.00 | 0.75 | 0.88 | -1.39% | -0.40% | 0.01 | -0.48 | 63.04% |
| 12/11/14 | 2,042,830 | $38.80 | $0.00 | 1.04% | 0.48% | 0.26% | 0.00 | 0.77 | 0.88 | 0.72% | 0.33% | 0.01 | 0.40 | 68.87% |
| 12/12/14 | 3,533,777 | $37.58 | $0.00 | -3.14% | -1.62% | -0.70% | 0.00 | 0.77 | 0.88 | -1.74% | -1.40% | 0.01 | -1.73 | 8.57% |
| 12/15/14 | 3,685,440 | $37.78 | $0.00 | 0.53% | -0.63% | 0.39% | 0.00 | 0.81 | 0.90 | -0.04% | 0.58% | 0.01 | 0.70 | 48.28% |
| 12/16/14 | 3,856,590 | $37.89 | $0.00 | 0.29% | -0.85% | 0.62% | 0.00 | 0.81 | 0.90 | 0.00% | 0.29% | 0.01 | 0.35 | 72.43% |
| 12/17/14 | 2,894,587 | $38.69 | $0.00 | 2.11% | 2.04% | 0.48% | 0.00 | 0.80 | 0.90 | 2.20% | -0.09% | 0.01 | -0.11 | 91.01% |
| 12/18/14 | 3,127,366 | $39.48 | $0.00 | 2.04% | 2.42% | 0.22% | 0.00 | 0.80 | 0.91 | 2.29% | -0.25% | 0.01 | -0.31 | 75.85% |
| 12/19/14 | 4,133,051 | $39.70 | $0.00 | 0.56% | 0.46% | -0.01% | 0.00 | 0.80 | 0.92 | 0.23% | 0.33% | 0.01 | 0.42 | 67.87% |
| 12/22/14 | 2,419,168 | $40.19 | $0.00 | 1.23% | 0.40% | 0.76% | 0.00 | 0.80 | 0.92 | 1.15% | 0.09% | 0.01 | 0.11 | 91.43% |
| 12/23/14 | 1,615,878 | $40.23 | $0.00 | 0.10% | 0.18% | 0.29% | 0.00 | 0.81 | 0.94 | 0.56% | -0.46% | 0.01 | -0.60 | 55.13% |
| 12/24/14 | 887,602 | $40.18 | $0.00 | -0.12% | -0.01% | -0.05% | 0.00 | 0.81 | 0.93 | 0.09% | -0.22% | 0.01 | -0.28 | 78.20% |
| 12/26/14 | 1,377,826 | $40.48 | $0.00 | 0.75% | 0.33% | 0.31% | 0.00 | 0.81 | 0.93 | 0.71% | 0.04% | 0.01 | 0.05 | 96.10% |
| 12/29/14 | 2,047,890 | $40.53 | $0.00 | 0.12% | 0.10% | -0.44% | 0.00 | 0.82 | 0.94 | -0.19% | 0.32% | 0.01 | 0.41 | 68.06% |
| 12/30/14 | 1,870,680 | $40.09 | $0.00 | -1.09% | -0.48% | 0.00% | 0.00 | 0.82 | 0.93 | -0.26% | -0.83% | 0.01 | -1.08 | 28.12% |
| 12/31/14 | 1,695,636 | $39.58 | $0.00 | -1.27% | -1.03% | -0.53% | 0.00 | 0.83 | 0.94 | -1.21% | -0.06% | 0.01 | -0.08 | 93.95% |
| 1/2/15 | 2,203,929 | $39.59 | $0.00 | 0.03% | -0.02% | 0.58% | 0.00 | 0.83 | 0.95 | 0.68% | -0.65% | 0.01 | -0.86 | 39.43% |
| 1/5/15 | 3,036,874 | $38.75 | $0.00 | -2.12% | -1.82% | 0.25% | 0.00 | 0.83 | 0.95 | -1.14% | -0.98% | 0.01 | -1.29 | 20.13% |
| 1/6/15 | 4,186,158 | $38.27 | $0.00 | -1.24% | -0.89% | 1.01% | 0.00 | 0.86 | 0.95 | 0.33% | -1.57% | 0.01 | -2.04 | 4.41% * |
| 1/7/15 | 3,642,759 | $38.47 | $0.00 | 0.52% | 1.19% | -1.04% | 0.00 | 0.88 | 0.92 | 0.21% | 0.31% | 0.01 | 0.40 | 68.84% |
| 1/8/15 | 2,882,255 | $38.86 | $0.00 | 1.01% | 1.79% | 0.38% | 0.00 | 0.88 | 0.92 | 2.05% | -1.04% | 0.01 | -1.33 | 18.75% |
| 1/9/15 | 2,180,248 | $38.40 | $0.00 | -1.18% | -0.84% | -0.05% | 0.00 | 0.86 | 0.91 | -0.65% | -0.53% | 0.01 | -0.67 | 50.17% |
| 1/12/15 | 2,586,849 | $38.65 | $0.00 | 0.65% | -0.81% | 1.12% | 0.00 | 0.87 | 0.91 | 0.42% | 0.23% | 0.01 | 0.29 | 76.98% |
| 1/13/15 | 3,282,626 | $38.60 | $0.00 | -0.13% | -0.25% | 0.33% | 0.00 | 0.87 | 0.91 | 0.20% | -0.33% | 0.01 | -0.41 | 68.05% |
| 1/14/15 | 2,607,390 | $38.31 | $0.00 | -0.75% | -0.58% | 0.00% | 0.00 | 0.87 | 0.91 | -0.40% | -0.35% | 0.01 | -0.44 | 65.91% |
| 1/15/15 | 3,149,255 | $38.30 | $0.00 | -0.03% | -0.92% | 0.61% | 0.00 | 0.87 | 0.92 | -0.15% | 0.12% | 0.01 | 0.15 | 87.97% |
| 1/16/15 | 4,558,435 | $38.40 | $0.00 | 0.26% | 1.34% | 0.84% | 0.00 | 0.87 | 0.92 | 2.04% | -1.78% | 0.01 | -2.26 | 2.55% * |
| 1/20/15 | 2,498,302 | $38.74 | $0.00 | 0.89% | 0.16% | 0.30% | 0.00 | 0.84 | 0.90 | 0.49% | 0.39% | 0.01 | 0.49 | 62.33% |
| 1/21/15 | 3,483,161 | $38.63 | $0.00 | -0.28% | 0.49% | -0.11% | 0.00 | 0.85 | 0.71 | 0.39% | -0.67% | 0.01 | -0.96 | 33.90% |
| 1/22/15 | 3,538,262 | $39.37 | $0.00 | 1.92% | 1.53% | -1.67% | 0.00 | 0.85 | 0.71 | 0.16% | 1.76% | 0.01 | 2.51 | 1.34% * |
| 1/23/15 | 2,984,939 | $39.24 | $0.00 | -0.33% | -0.55% | -0.85% | 0.00 | 0.91 | 0.68 | -1.03% | 0.70% | 0.01 | 0.98 | 32.93% |
| 1/26/15 | 2,556,616 | $39.00 | $0.00 | -0.61% | 0.26% | -0.57% | 0.00 | 0.90 | 0.67 | -0.10% | -0.51% | 0.01 | -0.71 | 47.76% |
| 1/27/15 | 3,018,176 | $38.79 | $0.00 | -0.54% | -1.34% | -0.25% | 0.00 | 0.90 | 0.67 | -1.33% | 0.79% | 0.01 | 1.10 | 27.21% |
| 1/28/15 | 2,758,673 | $38.35 | $0.00 | -1.13% | -1.34% | 0.36% | 0.00 | 0.89 | 0.67 | -0.90% | -0.23% | 0.01 | -0.32 | 74.95% |
| 1/29/15 | 5,231,057 | $37.50 | $0.00 | -2.22% | 0.96% | -0.19% | 0.00 | 0.89 | 0.66 | 0.78% | -3.00% | 0.01 | -4.19 | 0.01% ** |
| 1/30/15 | 7,269,765 | $37.17 | $0.00 | -0.88% | -1.30% | 0.34% | 0.00 | 0.86 | 0.66 | -0.87% | -0.01% | 0.01 | -0.02 | 98.63% |
| 2/2/15 | 4,684,915 | $38.22 | $0.00 | 2.82% | 1.30% | 1.55% | 0.00 | 0.84 | 0.67 | 2.14% | 0.68% | 0.01 | 0.91 | 36.25% |
| 2/3/15 | 5,637,870 | $39.59 | $0.00 | 3.58% | 1.45% | 1.14% | 0.00 | 0.85 | 0.69 | 2.03% | 1.55% | 0.01 | 2.08 | 3.97% * |
| 2/4/15 | 3,856,682 | $39.41 | $0.00 | -0.45% | -0.39% | 0.38% | 0.00 | 0.88 | 0.72 | -0.05% | -0.41% | 0.01 | -0.54 | 59.23% |
| 2/5/15 | 5,445,432 | $38.43 | $0.00 | -2.49% | 1.05% | -0.28% | 0.00 | 0.89 | 0.71 | 0.75% | -3.24% | 0.01 | -4.33 | 0.00% ** |
| 2/6/15 | 3,626,682 | $38.56 | $0.00 | 0.34% | -0.32% | 2.13% | 0.00 | 0.85 | 0.73 | 1.27% | -0.94% | 0.01 | -1.16 | 24.71% |
| 2/9/15 | 11,608,076 | $39.67 | $0.00 | 2.88% | -0.42% | -0.13% | 0.00 | 0.85 | 0.69 | -0.46% | 3.34% | 0.01 | 4.13 | 0.01% ** |
| 2/10/15 | 5,651,826 | $40.18 | $0.00 | 1.29% | 1.07% | 0.06% | 0.00 | 0.84 | 0.68 | 0.96% | 0.32% | 0.01 | 0.38 | 70.82% |
| 2/11/15 | 5,111,343 | $40.52 | $0.00 | 0.85% | 0.03% | 0.46% | 0.00 | 0.84 | 0.69 | -0.13% | 0.98% | 0.01 | 1.13 | 25.96% |
| 2/12/15 | 12,709,861 | $39.29 | $0.00 | -3.04% | 0.99% | -0.62% | 0.00 | 0.84 | 0.68 | 0.43% | -3.46% | 0.01 | -3.99 | 0.01% ** |
| 2/13/15 | 4,680,862 | $39.46 | $0.00 | 0.43% | 0.42% | -0.44% | 0.00 | 0.84 | 0.68 | 0.08% | 0.36% | 0.01 | 0.41 | 68.35% |
| 2/17/15 | 4,018,714 | $39.23 | $0.00 | -0.58% | 0.18% | -0.19% | 0.00 | 0.84 | 0.68 | 0.05% | -0.63% | 0.01 | -0.72 | 47.13% |
| 2/18/15 | 10,148,625 | $37.51 | $0.00 | -4.38% | -0.03% | -0.57% | 0.00 | 0.84 | 0.68 | -0.39% | -3.99% | 0.01 | -4.57 | 0.00% ** |

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 2/12/16 | 10,674,957 | $28.61 | $0.00 | 4.84% | 1.96% | -0.22% | 0.00 | 1.06 | 1.19 | 1.65% | 3.18% | 0.01 | 2.69 | 0.82% ** |
| 2/16/16 | 5,918,759 | $28.92 | $0.00 | 1.08% | 1.69% | -0.67% | 0.00 | 1.11 | 1.14 | 0.97% | 0.12% | 0.01 | 0.10 | 92.34% |
| 2/17/16 | 7,100,608 | $29.73 | $0.00 | 2.80% | 1.66% | -0.91% | 0.00 | 1.12 | 1.14 | 0.67% | 2.13% | 0.01 | 1.75 | 8.26% |
| 2/18/16 | 8,243,833 | $30.32 | $0.00 | 1.98% | -0.46% | 1.32% | 0.00 | 1.14 | 1.10 | 0.82% | 1.17% | 0.01 | 0.95 | 34.41% |
| 2/19/16 | 6,510,894 | $29.73 | $0.00 | -1.95% | 0.01% | -0.68% | 0.00 | 1.14 | 1.14 | -0.87% | -1.08% | 0.01 | -0.87 | 38.56% |
| 2/22/16 | 5,476,039 | $29.99 | $0.00 | 0.87% | 1.45% | -0.28% | 0.00 | 1.17 | 1.18 | 1.25% | -0.37% | 0.01 | -0.31 | 76.08% |
| 2/23/16 | 6,814,060 | $29.25 | $0.00 | -2.47% | -1.24% | 0.41% | 0.00 | 1.17 | 1.19 | -1.09% | -1.38% | 0.01 | -1.13 | 25.88% |
| 2/24/16 | 7,120,802 | $30.01 | $0.00 | 2.60% | 0.45% | 0.48% | 0.00 | 1.18 | 1.18 | 0.96% | 1.64% | 0.01 | 1.35 | 18.11% |
| 2/25/16 | 4,701,352 | $30.41 | $0.00 | 1.33% | 1.16% | -0.16% | 0.00 | 1.19 | 1.20 | 1.05% | 0.29% | 0.01 | 0.23 | 81.69% |
| 2/26/16 | 4,829,897 | $30.17 | $0.00 | -0.79% | -0.18% | -0.17% | 0.00 | 1.16 | 1.19 | -0.55% | -0.24% | 0.01 | -0.19 | 84.71% |
| 2/29/16 | 6,387,755 | $30.59 | $0.00 | 1.39% | -0.80% | 0.05% | 0.00 | 1.16 | 1.19 | -1.02% | 2.42% | 0.01 | 1.99 | 4.94% * |
| 3/1/16 | 6,917,668 | $31.12 | $0.00 | 1.73% | 2.39% | -0.28% | 0.00 | 1.16 | 1.19 | 2.29% | -0.56% | 0.01 | -0.45 | 65.34% |
| 3/2/16 | 6,450,364 | $31.15 | $0.54 | 1.83% | 0.43% | 0.81% | 0.00 | 1.15 | 1.20 | 1.33% | 0.51% | 0.01 | 0.41 | 68.36% |
| 3/3/16 | 5,372,360 | $31.37 | $0.00 | 0.71% | 0.36% | 0.01% | 0.00 | 1.17 | 1.22 | 0.28% | 0.42% | 0.01 | 0.35 | 73.04% |
| 3/4/16 | 6,292,744 | $31.59 | $0.00 | 0.70% | 0.33% | -0.41% | 0.00 | 1.17 | 1.21 | -0.25% | 0.95% | 0.01 | 0.78 | 43.80% |
| 3/7/16 | 5,096,593 | $31.77 | $0.00 | 0.57% | 0.10% | 0.63% | 0.00 | 1.18 | 1.19 | 0.75% | -0.18% | 0.01 | -0.15 | 88.36% |
| 3/8/16 | 5,550,512 | $31.51 | $0.00 | -0.82% | -1.11% | 0.81% | 0.00 | 1.18 | 1.18 | -0.46% | -0.36% | 0.01 | -0.30 | 76.45% |
| 3/9/16 | 4,207,328 | $31.53 | $0.00 | 0.06% | 0.52% | -0.64% | 0.00 | 1.19 | 1.18 | -0.25% | 0.31% | 0.01 | 0.26 | 79.79% |
| 3/10/16 | 6,562,117 | $31.71 | $0.00 | 0.57% | 0.02% | 0.42% | 0.00 | 1.20 | 1.15 | 0.42% | 0.15% | 0.01 | 0.12 | 90.09% |
| 3/11/16 | 4,128,254 | $31.87 | $0.00 | 0.50% | 1.67% | -0.76% | 0.00 | 1.20 | 1.18 | 1.00% | -0.50% | 0.01 | -0.41 | 67.99% |
| 3/14/16 | 3,527,400 | $31.95 | $0.00 | 0.25% | -0.12% | 0.02% | 0.00 | 1.20 | 1.19 | -0.23% | 0.48% | 0.01 | 0.40 | 68.97% |
| 3/15/16 | 5,593,898 | $31.32 | $0.00 | -1.97% | -0.18% | 0.38% | 0.00 | 1.19 | 1.19 | 0.12% | -2.09% | 0.01 | -1.75 | 8.36% |
| 3/16/16 | 5,314,404 | $32.17 | $0.00 | 2.71% | 0.57% | 0.53% | 0.00 | 1.20 | 1.18 | 1.18% | 1.54% | 0.01 | 1.27 | 20.78% |
| 3/17/16 | 7,928,385 | $31.30 | $0.00 | -2.70% | 0.66% | 0.39% | 0.00 | 1.20 | 1.19 | 1.14% | -3.85% | 0.01 | -3.15 | 0.21% ** |
| 3/18/16 | 7,913,671 | $31.70 | $0.00 | 1.28% | 0.44% | -1.30% | 0.00 | 1.18 | 1.17 | -1.15% | 2.42% | 0.01 | 1.90 | 5.95% |
| 3/21/16 | 3,569,607 | $31.70 | $0.00 | 0.00% | 0.10% | 0.53% | 0.00 | 1.19 | 1.09 | 0.57% | -0.57% | 0.01 | -0.44 | 65.77% |
| 3/22/16 | 4,077,925 | $31.62 | $0.00 | -0.25% | -0.07% | -0.49% | 0.00 | 1.18 | 1.08 | -0.75% | 0.49% | 0.01 | 0.38 | 70.32% |
| 3/23/16 | 5,105,004 | $31.02 | $0.00 | -1.90% | -0.64% | 0.00% | 0.00 | 1.18 | 1.08 | -0.88% | -1.02% | 0.01 | -0.79 | 43.07% |
| 3/24/16 | 5,416,762 | $31.16 | $0.00 | 0.45% | -0.04% | 1.06% | 0.00 | 1.19 | 1.08 | 0.98% | -0.52% | 0.01 | -0.40 | 68.65% |
| 3/28/16 | 3,158,558 | $31.08 | $0.00 | -0.26% | 0.06% | 0.10% | 0.00 | 1.19 | 1.05 | 0.06% | -0.31% | 0.01 | -0.24 | 80.88% |
| 3/29/16 | 3,393,052 | $31.59 | $0.00 | 1.64% | 0.90% | 0.58% | 0.00 | 1.19 | 1.04 | 1.56% | 0.08% | 0.01 | 0.06 | 95.26% |
| 3/30/16 | 3,660,972 | $31.87 | $0.00 | 0.89% | 0.45% | -0.32% | 0.00 | 1.19 | 1.02 | 0.08% | 0.80% | 0.01 | 0.62 | 53.50% |
| 3/31/16 | 6,807,671 | $31.96 | $0.00 | 0.28% | -0.20% | -0.06% | 0.00 | 1.19 | 1.02 | -0.42% | 0.70% | 0.01 | 0.54 | 58.69% |
| 4/1/16 | 6,219,552 | $32.18 | $0.00 | 0.69% | 0.63% | -0.61% | 0.00 | 1.19 | 1.01 | 0.03% | 0.66% | 0.01 | 0.51 | 61.00% |
| 4/4/16 | 5,186,826 | $32.23 | $0.00 | 0.16% | -0.30% | 0.90% | 0.00 | 1.19 | 1.00 | 0.43% | -0.28% | 0.01 | -0.22 | 82.96% |
| 4/5/16 | 5,271,152 | $32.10 | $0.00 | -0.40% | -1.01% | 0.05% | 0.00 | 1.18 | 0.96 | -1.24% | 0.83% | 0.01 | 0.66 | 51.32% |
| 4/6/16 | 3,832,591 | $32.49 | $0.00 | 1.21% | 1.09% | -0.74% | 0.00 | 1.18 | 0.95 | 0.50% | 0.71% | 0.01 | 0.56 | 57.72% |
| 4/7/16 | 5,704,504 | $31.87 | $0.00 | -1.91% | -1.19% | -0.61% | 0.00 | 1.18 | 0.94 | -2.05% | 0.14% | 0.01 | 0.11 | 91.14% |
| 4/8/16 | 3,873,271 | $31.88 | $0.00 | 0.03% | 0.28% | -0.11% | 0.00 | 1.19 | 0.94 | 0.14% | -0.11% | 0.01 | -0.08 | 93.25% |
| 4/11/16 | 2,921,012 | $32.08 | $0.00 | 0.63% | -0.27% | -0.44% | 0.00 | 1.18 | 0.94 | -0.83% | 1.46% | 0.01 | 1.16 | 24.71% |
| 4/12/16 | 3,529,556 | $32.00 | $0.00 | -0.25% | 0.97% | 0.09% | 0.00 | 1.18 | 0.93 | 1.15% | -1.40% | 0.01 | -1.12 | 26.69% |
| 4/13/16 | 3,308,900 | $32.19 | $0.00 | 0.59% | 1.02% | -1.70% | 0.00 | 1.17 | 0.93 | -0.48% | 1.08% | 0.01 | 0.85 | 39.51% |
| 4/14/16 | 3,383,582 | $32.09 | $0.00 | -0.31% | 0.03% | 0.27% | 0.00 | 1.17 | 0.88 | 0.19% | -0.50% | 0.01 | -0.40 | 69.20% |
| 4/15/16 | 2,956,936 | $32.26 | $0.00 | 0.53% | -0.10% | 0.20% | 0.00 | 1.18 | 0.89 | -0.03% | 0.56% | 0.01 | 0.44 | 65.99% |
| 4/18/16 | 2,990,263 | $32.22 | $0.00 | -0.12% | 0.66% | 0.13% | 0.00 | 1.17 | 0.89 | 0.80% | -0.92% | 0.01 | -0.73 | 46.67% |
| 4/19/16 | 3,578,632 | $32.71 | $0.00 | 1.52% | 0.31% | 0.53% | 0.00 | 1.17 | 0.89 | 0.73% | 0.79% | 0.01 | 0.62 | 53.39% |
| 4/20/16 | 3,966,598 | $32.80 | $0.00 | 0.28% | 0.08% | -0.59% | 0.00 | 1.18 | 0.89 | -0.53% | 0.80% | 0.01 | 0.64 | 52.53% |
| 4/21/16 | 4,347,968 | $31.39 | $0.00 | -4.30% | -0.52% | -2.27% | 0.00 | 1.17 | 0.85 | -2.62% | -1.68% | 0.01 | -1.33 | 18.52% |
| 4/22/16 | 4,160,155 | $31.39 | $0.00 | 0.00% | 0.01% | 0.81% | 0.00 | 1.18 | 0.93 | 0.65% | -0.65% | 0.01 | -0.52 | 60.66% |
| 4/25/16 | 3,717,891 | $31.18 | $0.00 | -0.67% | -0.18% | 0.45% | 0.00 | 1.18 | 0.92 | 0.10% | -0.77% | 0.01 | -0.60 | 54.72% |
| 4/26/16 | 3,160,336 | $31.42 | $0.00 | 0.77% | 0.19% | -0.47% | 0.00 | 1.18 | 0.91 | -0.33% | 1.10% | 0.01 | 0.86 | 38.99% |
| 4/27/16 | 4,423,518 | $31.58 | $0.00 | 0.51% | 0.17% | 1.81% | 0.00 | 1.18 | 0.90 | 1.72% | -1.22% | 0.01 | -0.95 | 34.19% |
| 4/28/16 | 3,360,991 | $31.36 | $0.00 | -0.70% | -0.92% | -0.07% | 0.00 | 1.18 | 0.87 | -1.25% | 0.56% | 0.01 | 0.44 | 66.30% |
| 4/29/16 | 5,360,069 | $30.95 | $0.00 | -1.31% | -0.51% | 0.40% | 0.00 | 1.17 | 0.86 | -0.35% | -0.96% | 0.01 | -0.75 | 45.53% |
| 5/2/16 | 7,744,284 | $31.48 | $0.00 | 1.71% | 0.78% | 0.19% | 0.00 | 1.17 | 0.86 | 0.98% | 0.74% | 0.01 | 0.58 | 56.35% |
| 5/3/16 | 7,598,217 | $30.58 | $0.00 | -2.86% | -0.87% | -0.29% | 0.00 | 1.18 | 0.86 | -1.38% | -1.48% | 0.01 | -1.16 | 24.67% |
| 5/4/16 | 6,656,754 | $30.96 | $0.00 | 1.24% | -0.57% | 0.50% | 0.00 | 1.21 | 0.89 | -0.38% | 1.63% | 0.01 | 1.29 | 20.03% |
| 5/5/16 | 20,521,476 | $28.20 | $0.00 | -8.91% | 0.00% | -0.26% | 0.00 | 1.20 | 0.90 | -0.36% | -8.55% | 0.01 | -6.73 | 0.00% ** |
| 5/6/16 | 9,444,983 | $28.54 | $0.00 | 1.21% | 0.33% | 0.40% | 0.00 | 1.20 | 0.90 | 0.63% | 0.57% | 0.01 | 0.45 | 65.53% |
| 5/9/16 | 6,057,075 | $28.21 | $0.00 | -1.16% | 0.08% | -0.26% | 0.00 | 1.20 | 0.90 | -0.26% | -0.90% | 0.01 | -0.70 | 48.31% |
| 5/10/16 | 5,924,534 | $28.73 | $0.00 | 1.84% | 1.25% | 0.30% | 0.00 | 1.21 | 0.92 | 1.66% | 0.18% | 0.01 | 0.14 | 88.61% |
| 5/11/16 | 3,903,644 | $28.31 | $0.00 | -1.46% | -0.90% | 0.11% | 0.00 | 1.21 | 0.92 | -1.14% | -0.33% | 0.01 | -0.26 | 79.85% |

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Excess | | Coefficient | | | | | | |
| | | | | | Market | Industry | | | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 8/10/16 | 4,076,030 | $30.34 | $0.00 | 0.63% | -0.25% | 0.42% | 0.00 | 1.23 | 0.61 | -0.10% | 0.73% | 0.01 | 0.72 | 47.53% |
| 8/11/16 | 3,928,280 | $30.42 | $0.00 | 0.26% | 0.49% | -0.07% | 0.00 | 1.22 | 0.59 | 0.52% | -0.26% | 0.01 | -0.25 | 80.00% |
| 8/12/16 | 3,197,912 | $29.96 | $0.00 | -1.51% | -0.07% | -0.28% | 0.00 | 1.23 | 0.59 | -0.28% | -1.23% | 0.01 | -1.21 | 22.69% |
| 8/15/16 | 2,279,672 | $30.02 | $0.00 | 0.20% | 0.29% | -0.53% | 0.00 | 1.21 | 0.60 | 0.01% | 0.19% | 0.01 | 0.19 | 85.18% |
| 8/16/16 | 3,181,116 | $29.42 | $0.00 | -2.00% | -0.53% | -1.68% | 0.00 | 1.20 | 0.58 | -1.64% | -0.35% | 0.01 | -0.35 | 72.35% |
| 8/17/16 | 3,933,090 | $29.25 | $0.00 | -0.58% | 0.21% | 0.03% | 0.00 | 1.20 | 0.59 | 0.23% | -0.81% | 0.01 | -0.81 | 42.02% |
| 8/18/16 | 4,395,198 | $29.13 | $0.00 | -0.41% | 0.22% | -0.93% | 0.00 | 1.20 | 0.59 | -0.32% | -0.09% | 0.01 | -0.09 | 93.03% |
| 8/19/16 | 4,681,371 | $28.84 | $0.00 | -1.00% | -0.13% | -0.75% | 0.00 | 1.23 | 0.60 | -0.68% | -0.32% | 0.01 | -0.32 | 74.74% |
| 8/22/16 | 4,620,062 | $28.93 | $0.00 | 0.31% | -0.05% | 0.01% | 0.00 | 1.27 | 0.60 | -0.13% | 0.44% | 0.01 | 0.46 | 64.86% |
| 8/23/16 | 2,737,608 | $29.10 | $0.00 | 0.59% | 0.20% | -0.09% | 0.00 | 1.26 | 0.59 | 0.13% | 0.46% | 0.01 | 0.48 | 63.53% |
| 8/24/16 | 3,230,286 | $29.05 | $0.00 | -0.17% | -0.52% | 0.33% | 0.00 | 1.26 | 0.59 | -0.53% | 0.36% | 0.01 | 0.37 | 70.99% |
| 8/25/16 | 3,530,221 | $29.15 | $0.00 | 0.34% | -0.13% | 0.53% | 0.00 | 1.26 | 0.59 | 0.07% | 0.27% | 0.01 | 0.28 | 78.08% |
| 8/26/16 | 4,247,567 | $28.76 | $0.00 | -1.34% | -0.16% | -0.95% | 0.00 | 1.26 | 0.60 | -0.83% | -0.50% | 0.01 | -0.52 | 60.40% |
| 8/29/16 | 4,011,342 | $28.75 | $0.00 | -0.03% | 0.54% | 0.46% | 0.00 | 1.27 | 0.60 | 0.88% | -0.91% | 0.01 | -0.94 | 34.89% |
| 8/30/16 | 4,944,977 | $28.57 | $0.00 | -0.63% | -0.18% | -0.18% | 0.00 | 1.26 | 0.59 | -0.42% | -0.21% | 0.01 | -0.21 | 83.07% |
| 8/31/16 | 4,472,605 | $27.80 | $0.54 | -0.81% | -0.22% | 0.16% | 0.00 | 1.26 | 0.59 | -0.27% | -0.53% | 0.01 | -0.55 | 58.36% |
| 9/1/16 | 4,470,163 | $27.74 | $0.00 | -0.22% | 0.00% | 0.28% | 0.00 | 1.29 | 0.58 | 0.07% | -0.29% | 0.01 | -0.30 | 76.64% |
| 9/2/16 | 3,048,215 | $27.94 | $0.00 | 0.72% | 0.43% | 0.03% | 0.00 | 1.29 | 0.58 | 0.47% | 0.25% | 0.01 | 0.26 | 79.70% |
| 9/6/16 | 2,992,260 | $28.17 | $0.00 | 0.82% | 0.30% | 0.69% | 0.00 | 1.29 | 0.59 | 0.72% | 0.10% | 0.01 | 0.11 | 91.30% |
| 9/7/16 | 3,210,762 | $28.40 | $0.00 | 0.82% | 0.01% | 0.25% | 0.00 | 1.27 | 0.57 | 0.07% | 0.75% | 0.01 | 0.80 | 42.79% |
| 9/8/16 | 3,404,237 | $28.35 | $0.00 | -0.18% | -0.22% | -0.02% | 0.00 | 1.31 | 0.61 | -0.35% | 0.18% | 0.01 | 0.20 | 83.95% |
| 9/9/16 | 7,008,383 | $27.86 | $0.00 | -1.73% | -2.45% | -1.80% | 0.00 | 1.31 | 0.65 | -4.44% | 2.71% | 0.01 | 3.14 | 0.22% ** |
| 9/12/16 | 4,771,966 | $28.04 | $0.00 | 0.65% | 1.47% | 1.07% | 0.00 | 1.19 | 0.55 | 2.31% | -1.67% | 0.01 | -1.87 | 6.40% |
| 9/13/16 | 4,497,058 | $27.44 | $0.00 | -2.14% | -1.45% | -0.97% | 0.00 | 1.15 | 0.52 | -2.23% | 0.09% | 0.01 | 0.10 | 92.44% |
| 9/14/16 | 2,958,100 | $27.43 | $0.00 | -0.04% | -0.05% | -0.06% | 0.00 | 1.14 | 0.52 | -0.13% | 0.09% | 0.01 | 0.10 | 92.03% |
| 9/15/16 | 7,598,614 | $26.98 | $0.00 | -1.64% | 1.03% | 0.53% | 0.00 | 1.14 | 0.52 | 1.39% | -3.03% | 0.01 | -3.38 | 0.10% ** |
| 9/16/16 | 7,114,403 | $26.89 | $0.00 | -0.33% | -0.38% | -0.15% | 0.00 | 1.09 | 0.49 | -0.54% | 0.20% | 0.01 | 0.22 | 82.89% |
| 9/19/16 | 4,457,047 | $27.04 | $0.00 | 0.56% | 0.00% | -0.69% | 0.00 | 1.08 | 0.49 | -0.39% | 0.95% | 0.01 | 1.01 | 31.31% |
| 9/20/16 | 3,345,411 | $26.75 | $0.00 | -1.07% | 0.03% | -0.19% | 0.00 | 1.08 | 0.48 | -0.11% | -0.96% | 0.01 | -1.02 | 30.88% |
| 9/21/16 | 4,296,810 | $26.92 | $0.00 | 0.64% | 1.09% | 0.57% | 0.00 | 1.08 | 0.48 | 1.39% | -0.76% | 0.01 | -0.80 | 42.37% |
| 9/22/16 | 5,094,979 | $27.61 | $0.00 | 2.56% | 0.65% | 0.68% | 0.00 | 1.07 | 0.48 | 0.95% | 1.62% | 0.01 | 1.71 | 9.03% |
| 9/23/16 | 3,853,878 | $27.42 | $0.00 | -0.69% | -0.57% | 0.79% | 0.00 | 1.08 | 0.50 | -0.29% | -0.40% | 0.01 | -0.42 | 67.77% |
| 9/26/16 | 2,357,661 | $27.31 | $0.00 | -0.40% | -0.85% | 0.04% | 0.00 | 1.10 | 0.49 | -0.99% | 0.59% | 0.01 | 0.61 | 54.13% |
| 9/27/16 | 2,844,859 | $27.35 | $0.00 | 0.15% | 0.65% | 0.27% | 0.00 | 1.08 | 0.50 | 0.76% | -0.62% | 0.01 | -0.65 | 52.01% |
| 9/28/16 | 2,598,215 | $27.55 | $0.00 | 0.73% | 0.55% | -1.41% | 0.00 | 1.07 | 0.49 | -0.18% | 0.91% | 0.01 | 0.95 | 34.47% |
| 9/29/16 | 2,610,971 | $27.52 | $0.00 | -0.11% | -0.93% | 0.43% | 0.00 | 1.08 | 0.47 | -0.86% | 0.75% | 0.01 | 0.78 | 43.41% |
| 9/30/16 | 3,363,364 | $27.43 | $0.00 | -0.33% | 0.80% | -0.83% | 0.00 | 1.07 | 0.48 | 0.38% | -0.71% | 0.01 | -0.74 | 45.88% |
| 10/3/16 | 3,048,400 | $27.52 | $0.00 | 0.33% | -0.31% | 0.32% | 0.00 | 1.08 | 0.50 | -0.25% | 0.57% | 0.01 | 0.60 | 54.75% |
| 10/4/16 | 4,342,517 | $27.08 | $0.00 | -1.60% | -0.49% | -1.31% | 0.00 | 1.08 | 0.51 | -1.25% | -0.35% | 0.01 | -0.36 | 71.73% |
| 10/5/16 | 4,826,467 | $27.03 | $0.00 | -0.18% | 0.47% | -1.01% | 0.00 | 1.08 | 0.52 | -0.08% | -0.10% | 0.01 | -0.11 | 91.28% |
| 10/6/16 | 3,531,399 | $26.97 | $0.00 | -0.22% | -0.07% | -0.10% | 0.00 | 1.08 | 0.52 | -0.07% | -0.15% | 0.01 | -0.16 | 87.19% |
| 10/7/16 | 13,519,671 | $27.76 | $0.00 | 2.93% | -0.32% | -0.32% | 0.00 | 1.09 | 0.52 | -0.58% | 3.51% | 0.01 | 3.70 | 0.03% ** |
| 10/10/16 | 3,118,235 | $27.84 | $0.00 | 0.29% | 0.46% | 0.15% | 0.00 | 1.06 | 0.49 | 0.52% | -0.23% | 0.01 | -0.23 | 81.60% |
| 10/11/16 | 5,412,856 | $27.64 | $0.00 | -0.72% | -1.24% | 0.66% | 0.00 | 1.06 | 0.50 | -1.04% | 0.32% | 0.01 | 0.32 | 74.67% |
| 10/12/16 | 2,580,380 | $27.57 | $0.00 | -0.25% | 0.12% | 0.54% | 0.00 | 1.03 | 0.40 | 0.32% | -0.57% | 0.01 | -0.59 | 55.39% |
| 10/13/16 | 2,750,712 | $27.39 | $0.00 | -0.65% | -0.31% | 0.24% | 0.00 | 1.02 | 0.40 | -0.24% | -0.41% | 0.01 | -0.43 | 66.94% |
| 10/14/16 | 2,003,263 | $27.34 | $0.00 | -0.18% | 0.02% | -0.15% | 0.00 | 1.03 | 0.40 | -0.06% | -0.12% | 0.01 | -0.13 | 90.01% |
| 10/17/16 | 3,118,122 | $27.37 | $0.00 | 0.11% | -0.30% | 0.40% | 0.00 | 1.02 | 0.41 | -0.17% | 0.28% | 0.01 | 0.29 | 77.06% |
| 10/18/16 | 3,770,437 | $27.90 | $0.00 | 1.94% | 0.62% | -0.30% | 0.00 | 1.02 | 0.42 | 0.48% | 1.46% | 0.01 | 1.51 | 13.28% |
| 10/19/16 | 3,274,349 | $28.18 | $0.00 | 1.00% | 0.23% | 0.02% | 0.00 | 1.04 | 0.42 | 0.24% | 0.76% | 0.01 | 0.79 | 43.33% |
| 10/20/16 | 4,336,602 | $27.97 | $0.00 | -0.75% | -0.13% | -1.64% | 0.00 | 1.04 | 0.42 | -0.95% | 0.21% | 0.01 | 0.21 | 83.13% |
| 10/21/16 | 4,790,620 | $28.21 | $0.00 | 0.86% | -0.01% | -2.36% | 0.00 | 1.03 | 0.41 | -0.98% | 1.84% | 0.01 | 1.90 | 5.96% |
| 10/24/16 | 3,193,735 | $28.32 | $0.00 | 0.39% | 0.48% | -1.11% | 0.00 | 0.99 | 0.33 | 0.13% | 0.26% | 0.01 | 0.27 | 78.59% |
| 10/25/16 | 3,390,382 | $28.45 | $0.00 | 0.46% | -0.38% | -0.34% | 0.00 | 1.01 | 0.32 | -0.47% | 0.93% | 0.01 | 0.98 | 33.03% |
| 10/26/16 | 3,289,316 | $28.25 | $0.00 | -0.70% | -0.17% | -0.45% | 0.00 | 1.00 | 0.31 | -0.29% | -0.41% | 0.01 | -0.43 | 66.71% |
| 10/27/16 | 76,625,594 | $31.00 | $0.00 | 9.73% | -0.30% | 1.55% | 0.00 | 1.00 | 0.31 | 0.20% | 9.54% | 0.01 | 10.03 | 0.00% ** |
| 10/28/16 | 15,382,989 | $30.39 | $0.00 | -1.97% | -0.31% | -0.01% | 0.00 | 0.97 | 0.53 | -0.19% | -1.78% | 0.01 | -1.39 | 16.77% |
| 10/31/16 | 71,943,608 | $26.58 | $0.00 | -12.54% | -0.01% | 0.45% | 0.00 | 0.97 | 0.53 | 0.32% | -12.86% | 0.01 | -9.96 | 0.00% ** |
| 11/1/16 | 36,114,903 | $24.97 | $0.00 | -6.06% | -0.68% | -0.41% | 0.00 | 0.96 | 0.53 | -0.77% | -5.29% | 0.01 | -4.09 | 0.01% ** |
| 11/2/16 | 21,126,829 | $24.18 | $0.00 | -3.16% | -0.64% | -0.75% | 0.00 | 1.02 | 0.56 | -1.02% | -2.14% | 0.01 | -1.55 | 12.39% |
| 11/3/16 | 30,038,531 | $23.00 | $0.00 | -4.88% | -0.41% | 0.47% | 0.00 | 1.03 | 0.58 | -0.10% | -4.78% | 0.01 | -3.43 | 0.09% ** |
| 11/4/16 | 21,633,402 | $23.05 | $0.00 | 0.22% | -0.16% | 0.18% | 0.00 | 1.08 | 0.54 | -0.07% | 0.28% | 0.01 | 0.20 | 84.57% |

**Appendix E**
**CenturyLink, Inc. Common Stock Data**

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | [13] | [14] | [15] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Market | Excess Industry | | Coefficient | Excess | Predicted | Abnormal | Root | | |
| Date | Volume | Price | Dividend | Return | Return | Return | Intercept | Market | Industry | Return | Return | MSE | t-statistic | p-Value |
| 2/7/17 | 6,022,232 | $24.88 | $0.00 | -0.68% | 0.03% | 0.05% | 0.00 | 0.92 | 0.58 | 0.05% | -0.73% | 0.02 | -0.47 | 64.13% |
| 2/8/17 | 13,671,506 | $24.43 | $0.00 | -1.81% | 0.10% | 0.31% | 0.00 | 0.91 | 0.57 | 0.26% | -2.07% | 0.02 | -1.33 | 18.60% |
| 2/9/17 | 10,179,851 | $24.42 | $0.00 | -0.04% | 0.59% | 0.15% | 0.00 | 0.91 | 0.56 | 0.61% | -0.65% | 0.02 | -0.41 | 67.94% |
| 2/10/17 | 5,882,601 | $24.49 | $0.00 | 0.29% | 0.36% | 0.05% | 0.00 | 0.91 | 0.56 | 0.34% | -0.06% | 0.02 | -0.04 | 97.15% |
| 2/13/17 | 6,555,986 | $24.62 | $0.00 | 0.53% | 0.55% | -1.64% | 0.00 | 0.91 | 0.56 | -0.43% | 0.96% | 0.02 | 0.61 | 54.39% |
| 2/14/17 | 4,962,947 | $24.54 | $0.00 | -0.32% | 0.43% | -0.38% | 0.00 | 0.93 | 0.54 | 0.18% | -0.51% | 0.02 | -0.32 | 74.80% |
| 2/15/17 | 5,599,574 | $24.40 | $0.00 | -0.57% | 0.51% | -0.06% | 0.00 | 0.92 | 0.54 | 0.42% | -0.99% | 0.02 | -0.63 | 52.96% |
| 2/16/17 | 5,162,872 | $24.28 | $0.00 | -0.49% | -0.08% | 0.56% | 0.00 | 0.91 | 0.54 | 0.21% | -0.70% | 0.02 | -0.44 | 65.85% |
| 2/17/17 | 5,122,976 | $24.28 | $0.00 | 0.00% | 0.17% | 0.81% | 0.00 | 0.92 | 0.54 | 0.56% | -0.56% | 0.02 | -0.35 | 72.46% |
| 2/21/17 | 6,846,831 | $24.67 | $0.00 | 1.61% | 0.60% | 0.20% | 0.00 | 0.91 | 0.53 | 0.62% | 0.98% | 0.02 | 0.62 | 53.52% |
| 2/22/17 | 6,431,600 | $24.83 | $0.00 | 0.65% | -0.10% | 0.13% | 0.00 | 0.93 | 0.53 | -0.04% | 0.69% | 0.02 | 0.44 | 66.27% |
| 2/23/17 | 6,597,988 | $24.71 | $0.00 | -0.48% | 0.05% | 0.92% | 0.00 | 0.93 | 0.53 | 0.53% | -1.01% | 0.02 | -0.64 | 52.46% |
| 2/24/17 | 6,056,642 | $24.58 | $0.00 | -0.53% | 0.17% | 0.55% | 0.00 | 0.92 | 0.52 | 0.43% | -0.96% | 0.02 | -0.61 | 54.57% |
| 2/27/17 | 6,722,186 | $24.61 | $0.00 | 0.12% | 0.12% | -1.29% | 0.00 | 0.92 | 0.52 | -0.58% | 0.70% | 0.02 | 0.44 | 65.89% |
| 2/28/17 | 13,031,838 | $24.26 | $0.00 | -1.42% | -0.25% | -0.30% | 0.00 | 0.92 | 0.51 | -0.40% | -1.02% | 0.02 | -0.64 | 52.22% |
| 3/1/17 | 14,735,804 | $24.04 | $0.54 | 1.32% | 1.39% | -0.41% | 0.00 | 0.93 | 0.51 | 1.05% | 0.27% | 0.02 | 0.17 | 86.57% |
| 3/2/17 | 10,003,104 | $23.53 | $0.00 | -2.12% | -0.58% | 0.47% | 0.00 | 0.94 | 0.51 | -0.33% | -1.79% | 0.02 | -1.12 | 26.30% |
| 3/3/17 | 8,419,064 | $23.48 | $0.00 | -0.21% | 0.05% | -0.03% | 0.00 | 0.97 | 0.49 | -0.01% | -0.20% | 0.02 | -0.13 | 89.96% |
| 3/6/17 | 8,175,124 | $23.10 | $0.00 | -1.62% | -0.33% | 0.04% | 0.00 | 1.08 | 0.53 | -0.41% | -1.21% | 0.02 | -0.76 | 44.75% |
| 3/7/17 | 11,620,855 | $22.50 | $0.00 | -2.60% | -0.28% | -0.47% | 0.00 | 1.16 | 0.55 | -0.67% | -1.93% | 0.02 | -1.22 | 22.64% |
| 3/8/17 | 7,310,167 | $22.45 | $0.00 | -0.22% | -0.20% | -0.27% | 0.00 | 1.19 | 0.56 | -0.49% | 0.27% | 0.02 | 0.17 | 86.75% |
| 3/9/17 | 7,984,260 | $22.73 | $0.00 | 1.25% | 0.08% | 0.36% | 0.00 | 1.19 | 0.56 | 0.20% | 1.05% | 0.02 | 0.66 | 51.32% |
| 3/10/17 | 6,382,025 | $23.14 | $0.00 | 1.80% | 0.33% | 0.44% | 0.00 | 1.29 | 0.59 | 0.61% | 1.20% | 0.02 | 0.76 | 44.84% |
| 3/13/17 | 8,358,911 | $23.46 | $0.00 | 1.38% | 0.07% | 0.13% | 0.00 | 1.30 | 0.59 | 0.10% | 1.28% | 0.02 | 0.81 | 41.90% |
| 3/14/17 | 5,893,068 | $23.34 | $0.00 | -0.51% | -0.33% | -0.25% | 0.00 | 1.31 | 0.60 | -0.65% | 0.14% | 0.02 | 0.09 | 93.15% |
| 3/15/17 | 10,642,838 | $23.77 | $0.00 | 1.84% | 0.84% | 0.80% | 0.00 | 1.30 | 0.60 | 1.52% | 0.32% | 0.02 | 0.20 | 83.93% |
| 3/16/17 | 10,728,969 | $23.37 | $0.00 | -1.68% | -0.16% | -0.14% | 0.00 | 1.35 | 0.61 | -0.34% | -1.34% | 0.02 | -0.85 | 39.62% |
| 3/17/17 | 24,891,583 | $23.65 | $0.00 | 1.20% | -0.13% | 0.64% | 0.00 | 1.33 | 0.60 | 0.14% | 1.05% | 0.02 | 0.67 | 50.41% |
| 3/20/17 | 8,138,955 | $23.64 | $0.00 | -0.04% | -0.20% | -0.22% | 0.00 | 1.32 | 0.62 | -0.45% | 0.41% | 0.02 | 0.26 | 79.59% |
| 3/21/17 | 7,234,732 | $23.36 | $0.00 | -1.18% | -1.23% | 0.29% | 0.00 | 1.34 | 0.62 | -1.53% | 0.34% | 0.02 | 0.22 | 82.70% |
| 3/22/17 | 12,577,325 | $22.81 | $0.00 | -2.35% | 0.19% | -1.16% | 0.00 | 1.34 | 0.62 | -0.51% | -1.84% | 0.02 | -1.17 | 24.31% |
| 3/23/17 | 6,887,351 | $22.64 | $0.00 | -0.75% | -0.10% | -0.02% | 0.00 | 1.32 | 0.66 | -0.22% | -0.53% | 0.02 | -0.33 | 73.91% |
| 3/24/17 | 5,890,158 | $22.76 | $0.00 | 0.53% | -0.08% | 0.19% | 0.00 | 1.36 | 0.65 | -0.08% | 0.61% | 0.02 | 0.38 | 70.16% |
| 3/27/17 | 9,057,861 | $22.61 | $0.00 | -0.66% | -0.10% | -0.66% | 0.00 | 1.37 | 0.65 | -0.64% | -0.02% | 0.02 | -0.01 | 99.16% |
| 3/28/17 | 7,325,754 | $22.52 | $0.00 | -0.40% | 0.73% | -0.25% | 0.00 | 1.38 | 0.65 | 0.76% | -1.16% | 0.02 | -0.73 | 46.46% |
| 3/29/17 | 8,548,259 | $23.09 | $0.00 | 2.53% | 1.3% | -0.28% | 0.00 | 1.35 | 0.65 | -0.09% | 2.62% | 0.02 | 1.66 | 9.93% |
| 3/30/17 | 7,466,212 | $23.41 | $0.00 | 1.39% | 0.30% | 0.23% | 0.00 | 1.36 | 0.64 | 0.48% | 0.90% | 0.02 | 0.57 | 57.25% |
| 3/31/17 | 7,533,614 | $23.57 | $0.00 | 0.68% | -0.23% | -0.36% | 0.00 | 1.37 | 0.64 | -0.59% | 1.28% | 0.02 | 0.80 | 42.62% |
| 4/3/17 | 6,992,549 | $23.60 | $0.00 | 0.13% | -0.16% | 0.48% | 0.00 | 1.41 | 0.65 | 0.01% | 0.12% | 0.02 | 0.08 | 93.96% |
| 4/4/17 | 12,820,344 | $23.96 | $0.00 | 1.53% | 0.07% | 0.37% | 0.00 | 1.41 | 0.65 | 0.26% | 1.26% | 0.02 | 0.80 | 42.28% |
| 4/5/17 | 12,561,386 | $24.21 | $0.00 | 1.04% | -0.30% | -0.24% | 0.00 | 1.44 | 0.65 | -0.66% | 1.70% | 0.02 | 1.09 | 28.00% |
| 4/6/17 | 7,640,759 | $24.46 | $0.00 | 1.03% | 0.22% | -0.65% | 0.00 | 1.42 | 0.65 | -0.16% | 1.20% | 0.02 | 0.76 | 44.98% |
| 4/7/17 | 9,662,269 | $24.54 | $0.00 | 0.33% | -0.08% | 0.26% | 0.00 | 1.42 | 0.65 | 0.01% | 0.32% | 0.02 | 0.20 | 84.07% |
| 4/10/17 | 8,136,814 | $24.87 | $0.00 | 1.34% | 0.07% | -0.36% | 0.00 | 1.42 | 0.65 | -0.16% | 1.51% | 0.02 | 0.95 | 34.25% |
| 4/11/17 | 8,899,935 | $24.90 | $0.00 | 0.12% | -0.13% | 0.16% | 0.00 | 1.42 | 0.64 | -0.11% | 0.23% | 0.02 | 0.14 | 88.51% |
| 4/12/17 | 10,806,222 | $25.14 | $0.00 | 0.96% | -0.37% | 0.81% | 0.00 | 1.39 | 0.64 | -0.03% | 1.00% | 0.02 | 0.63 | 53.05% |
| 4/13/17 | 9,958,699 | $25.12 | $0.00 | -0.08% | -0.68% | -0.20% | 0.00 | 1.37 | 0.65 | -1.09% | 1.01% | 0.02 | 0.64 | 52.30% |
| 4/17/17 | 7,318,113 | $25.30 | $0.00 | 0.72% | 0.86% | -0.32% | 0.00 | 1.35 | 0.67 | 0.93% | -0.21% | 0.02 | -0.13 | 89.43% |
| 4/18/17 | 7,294,946 | $25.06 | $0.00 | -0.95% | -0.29% | 0.47% | 0.00 | 1.36 | 0.75 | -0.09% | -0.86% | 0.02 | -0.55 | 58.47% |
| 4/19/17 | 11,207,568 | $25.29 | $0.00 | 0.92% | -0.16% | -0.10% | 0.00 | 1.37 | 0.75 | -0.35% | 1.27% | 0.02 | 0.81 | 41.86% |
| 4/20/17 | 8,716,160 | $25.49 | $0.00 | 0.79% | 0.76% | -0.17% | 0.00 | 1.38 | 0.76 | 0.40% | 0.39% | 0.02 | 0.25 | 80.18% |
| 4/21/17 | 7,432,209 | $25.32 | $0.00 | -0.67% | -0.30% | -1.35% | 0.00 | 1.39 | 0.75 | -1.50% | 0.83% | 0.02 | 0.53 | 59.69% |
| 4/24/17 | 7,725,596 | $25.45 | $0.00 | 0.51% | 1.09% | -0.77% | 0.00 | 1.48 | 0.55 | 1.05% | -0.53% | 0.01 | -0.41 | 68.45% |
| 4/25/17 | 11,383,317 | $25.93 | $0.00 | 1.89% | 0.61% | -0.72% | 0.00 | 1.44 | 0.55 | 0.35% | 1.53% | 0.01 | 1.17 | 24.27% |
| 4/26/17 | 8,972,261 | $25.87 | $0.00 | -0.23% | -0.05% | 1.29% | 0.00 | 1.47 | 0.54 | 0.51% | -0.74% | 0.01 | -0.57 | 57.26% |
| 4/27/17 | 12,119,332 | $25.79 | $0.00 | -0.31% | 0.07% | -1.34% | 0.00 | 1.33 | 0.49 | -0.64% | 0.33% | 0.01 | 0.27 | 79.04% |
| 4/28/17 | 11,581,185 | $25.67 | $0.00 | -0.47% | -0.19% | -0.92% | 0.00 | 1.28 | 0.46 | -0.71% | 0.25% | 0.01 | 0.20 | 83.82% |
| 5/1/17 | 9,827,091 | $25.38 | $0.00 | -1.13% | 0.17% | -0.88% | 0.00 | 1.19 | 0.48 | -0.21% | -0.92% | 0.01 | -0.80 | 42.35% |
| 5/2/17 | 9,168,370 | $25.95 | $0.00 | 2.25% | 0.12% | -0.16% | 0.00 | 1.19 | 0.49 | 0.06% | 2.19% | 0.01 | 1.91 | 5.88% |
| 5/3/17 | 10,401,430 | $25.42 | $0.00 | -2.04% | -0.11% | -0.65% | 0.00 | 1.30 | 0.49 | -0.44% | -1.60% | 0.01 | -1.39 | 16.84% |
| 5/4/17 | 28,643,399 | $23.74 | $0.00 | -6.61% | 0.06% | -1.05% | 0.00 | 1.27 | 0.49 | -0.45% | -6.16% | 0.01 | -5.43 | 0.00% ** |
| 5/5/17 | 12,349,560 | $23.60 | $0.00 | -0.59% | 0.41% | 1.25% | 0.00 | 1.32 | 0.49 | 1.14% | -1.73% | 0.01 | -1.52 | 13.09% |