# Exhibit X

Page 1

1          UNITED STATES DISTRICT COURT
2             DISTRICT OF MINNESOTA
3
4
5

   _____
6  IN RE: CENTURYLINK SALES        )
   PRACTICES AND SECURITIES        )
7  LITIGATION                      )
                                   ) MDL NO.
8                                  ) 17-2795 (MJD/KMM)
                                   )
9  THIS DOCUMENT RELATES TO:       )
   CIVIL FILE NO. 18-296 (MJD/KMM) )
10                                 )
   _____)
11
12
13
14
15         REMOTE PROCEEDINGS OF THE
16    VIDEOTAPED EXPERT DEPOSITION OF BRUCE DEAL
17            FRIDAY, APRIL 24, 2020
18
19
20
21 REPORTED BY KIMBERLY EDELEN,
22 CSR. NO. 9042, CRR, RPR.
23
24
25

Page 2

1    REMOTE PROCEEDINGS OF THE VIDEOTAPED EXPERT
2    DEPOSITION OF BRUCE DEAL, TAKEN ON BEHALF OF THE
3    PLAINTIFF AND THE CLASS, AT 9:06 A.M., FRIDAY,
4    APRIL 24, 2020, BEFORE KIMBERLY A. EDELEN, C.S.R.
5    NO. 9042, CRR, RPR.
6
7    REMOTE APPEARANCES OF COUNSEL
8    FOR THE PLAINTIFF AND THE CLASS:
9                 BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
                  BY:  MICHAEL D. BLATCHLEY, ESQ.
10                     ---AND---
                  MICHAEL M. MATHAI, ESQ.
11                1251 AVENUE OF THE AMERICAS
                  NEW YORK, NEW YORK 10020
12                212.554.1400
                  MICHAELB@BLBGLAW.COM
13                MICHAEL.MATHAI@BLBGLAW.COM
14                ---AND---
15                STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
                  BY:  KEIL M. MUELLER, ESQ.
16                209 SW OAK STREET
                  SUITE 500
17                PORTLAND, OREGON 97204
                  503.227.1600
18                KMUELLER@STOLLBERNE.COM
19
20   FOR THE DEFENDANTS CENTURYLINK, INC., GLEN F. POST,
     III, R. STEWART EWING, JR., DAVID D. COLE, KAREN
21   PUCKETT, DEAN J. DOUGLAS AND G. CLAY BAILEY:
22                COOLEY LLP
                  BY:  RYAN BLAIR, ESQ.
23                4401 EASTGATE MALL
                  SAN DIEGO, CALIFORNIA 92121
24                858.550.6047
                  RBLAIR@COOLEY.COM
25    (REMOTE APPEARANCES CONTINUED ON FOLLOWING PAGE)

```
                                            Page 3
 1   REMOTE APPEARANCES OF COUNSEL (CONTINUED)
 2   FOR THE DEFENDANTS CENTURYLINK, INC., GLEN F. POST,
     III, R. STEWART EWING, JR., DAVID D. COLE, KAREN
 3   PUCKETT, DEAN J. DOUGLAS AND G. CLAY BAILEY:
 4                 COOLEY LLP
                   BY:  CHRISTOPHER J. MARTIN, JR., ESQ.
 5                 55 HUDSON YARDS
                   NEW YORK, NEW YORK 10001
 6                 212.479.6484
                   CMARTIN@COOLEY.COM
 7
                   ---AND---
 8
                   COOLEY LLP
 9                 BY:  CAITLIN B. MUNLEY, ESQ.
                   1299 PENNSYLVANIA AVENUE, NW
10                 SUITE 700
                   WASHINGTON, D.C. 20004
11                 202.776.2557
                   CMUNLEY@COOLEY.COM
12
13
14
15   ALSO PRESENT:  TROY JOHNSON, VIDEOGRAPHER
                     MICHAEL HARTZMARK, Ph.D.
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                          I N D E X

2

3   WITNESS                 EXAMINATION                    PAGE

4   BRUCE DEAL

5                           BY MR. BLATCHLEY               7

6

7

8

9

10                       E X H I B I T S

11

12    NO.            PAGE        DESCRIPTION

13   EXHIBIT 30        5         EXPERT REPORT OF BRUCE
                                 DEAL

14

     EXHIBIT 31      200         BLOOMBERG ARTICLE DATED

15                               6-19-2017, BATES NOS.
                                 CTLDEAL00005591 -

16                               CTLDEAL00005592

17

18

19

20

21

22

23

24

25

```
                                        Page 5
 1                FRIDAY, APRIL 24, 2020;
 2                      9:06 A.M.
 3
 4
 5               (Deposition Exhibit 30
 6           was marked for identification.)
 7            THE VIDEOGRAPHER:  Good morning.  We are
 8    going on the record at 9:06 a.m. on April 24th,
 9    2020.
10            This is Media Unit No. 1 in the video
11    recorded deposition of Bruce Deal taken by counsel
12    for plaintiff in the matter -- in re: of the
13    CenturyLink Sales Practices and Securities
14    litigation filed in the United States Federal Court,
15    District of Minnesota.
16            This deposition today is being held via the
17    Veritext Virtual deposition platform.  My name is
18    Troy Johnson.  I'm from the firm Veritext.  I am
19    your videographer.  Our court reporter today is
20    Kimberly Edelen, also from the firm Veritext.
21            I am not related to any party in this
22    action nor am I financially interested in its
23    outcome.
24            Now, Counsel, can you please introduce
25    yourselves and state whom you represent.
```

Page 6

```
1              MR. BLATCHLEY:  Good morning.  This is
2    Michael Blatchley from Bernstein Litowitz Berger &
3    Grossmans on behalf of plaintiffs.
4              MR. MATHAI:  Good morning.  This is
5    Michael Mathai also from Bernstein Litowitz Berger &
6    Grossmann also on behalf of plaintiffs.
7              MR. MUELLER:  Good morning.  This is
8    Keil Mueller with Stoll Stoll Berne Lokting &
9    Shlachter on behalf of plaintiffs.
10             MR. BLAIR:  Good morning.  My name is
11   Ryan Blair with the firm of Cooley LLP on behalf of
12   defendants and the witness.
13             MR. MARTIN:  Chris Martin of Cooley LLP on
14   behalf of the defendants.
15             MS. MUNLEY:  Caitlin Munley with Cooley LLP
16   on behalf of defendants.
17             THE VIDEOGRAPHER:  Okay.  If that was
18   everyone, now can our court reporter please do her
19   read on and swear in the witness.
20             THE REPORTER:  Do the parties stipulate
21   that the court reporter may swear in the witness
22   remotely?
23             MR. BLATCHLEY:  We do for plaintiffs.
24             MR. BLAIR:  We do, defendants as well.
25   \\\
```

Page 7

1                     BRUCE DEAL,

2      having been first duly sworn by the reporter, was

3               examined and testified as follows:

4               THE WITNESS:  I do.

5               THE VIDEOGRAPHER:  Okay.  You may proceed,

6      Counsel.

7

8                        EXAMINATION

9      BY MR. BLATCHLEY:

10         Q    Thank you, everyone.  And thank you,

11     Mr. Deal, for bearing with us on the -- on the

12     technical aspects and making yourself available

13     remotely.  I really do appreciate it.  I know how

14     difficult at times it is for everyone, so thank you

15     for doing this and being here.

16              If I could, can I get you again to state

17     your full name for the record.

18         A    Sure.  It's Bruce Deal, B-r-u-c-e, last

19     name Deal, D-e-a-l.

20         Q    And provide your home address, please.

21         A    Home address is 98 Hawthorne Drive,

22     Atherton, California 94027.

23         Q    So, Mr. Deal, I know you're an experienced

24     deposition witness, but I want to just, again,

25     because we're remote deposition, quickly just go

Page 8

```
 1   over a couple ground rules.
 2           As in every deposition, especially with
 3   kind of the remote aspect here, please let me know
 4   if you don't understand a question and I'll try to
 5   rephrase it.  I'll repeat it or clarify it.
 6           Is that -- is that an okay way to proceed?
 7       A    Yes.  That's fine.
 8       Q    And, of course, if I ask a question and you
 9   answer it, I'm going to, you know, assume that
10   you've understood it.  Is that -- is that fair?
11       A    Yes.  That's fine.
12       Q    And I know you were just sworn in, and
13   although it's a remote deposition, you understand
14   that you're truthfully and fully to answer all
15   questions asked of you on the record unless your
16   counsel tells you -- instructs you not to answer
17   them.
18           Is that -- do you agree with that?
19       A    I do agree with that, yes.
20       Q    And as you sit here today, is there any
21   reason you are not able to testify truthfully?
22       A    No.  This is fine.
23       Q    And, again, given the remote nature of the
24   deposition, you know, we'll try not to speak over
25   each other.  And, again, we're going to need audible
```

Page 9

1    answers for the -- for the court reporter.

2            And then, again, if you need a break, just

3    let us know.  But, again, let's make sure we've got

4    a question and answer fully done before we take any

5    breaks.

6            Is that -- does that sound good?

7        A    Yes.  That's fine.

8        Q    Okay.  And then just two other, you know,

9    points just before we get going.  Given that it's a

10   remote deposition, I know there's a lot of

11   electronic devices and cell phones.  I would just

12   ask that you not communicate with your counsel or

13   with anyone else while we're on the record on any

14   device or anything like that.

15           Is that something you can agree to?

16       A    Yes.  That's totally fine.

17       Q    Okay.  Good.

18           And then as well we discussed earlier

19   that -- I don't know if you did.  Did you print out

20   a hard copy of your report?

21       A    That's correct.  The only thing I have with

22   me, in addition to a blank piece of paper, is a hard

23   copy of my report.

24       Q    Okay.  And we've marked that prior to

25   getting on the -- on the record as Exhibit 30.  And

```
                                              Page 10
 1    I'd just ask you to represent that the document that
 2    you are -- the hard copy document is exactly the one
 3    that is reflected in Exhibit Share as Exhibit 30,
 4    that you have not made any, you know,
 5    previously-recorded notations or differences between
 6    those two documents?
 7        A    Yes.  Obviously -- I'm opening the Exhibit
 8    Share one now.  I haven't gone through every single
 9    page of it but it certainly has every appearance to
10    be my report, and I haven't made any modifications
11    to the report since it was filed.
12        Q    Great.  Okay.  Well, thanks so much for
13    that.
14             So just getting started, you're here
15    testifying today as an expert witness on behalf of
16    the defendant; is that -- is that right?
17        A    Yes.  That's correct.
18        Q    And who are you retained by?
19        A    I was retained by the firm of Cooley.
20        Q    Okay.  And you served as an expert witness
21    in other matters; is that right?
22        A    Many times, yes.
23        Q    How many times?
24        A    Have I been retained as an expert?  Oh,
25    maybe a hundred, something like that.  I mean, a
```

1    lot.  Maybe more.

2        Q    How many times have you been deposed as an

3    expert?

4        A    Probably between 1- and 200 times.

5        Q    And so -- so -- sorry.  Between a hundred

6    and 200 times being deposed as an expert?

7        A    My best approximation, yes.

8        Q    Okay.  And so you're an experienced expert

9    witness; is that accurate?

10       A    I think that's fair to say, yes.

11       Q    Okay.  So turning again to this expert

12   report you submitted in this case, which we've

13   marked as Exhibit 30.

14            Can you please turn to Page 108.

15       A    Okay.

16       Q    And you see your signature there?

17       A    Yes.

18       Q    And that's your signature; is that correct?

19       A    It is, yes.

20            I'm just looking at the exhibit here.  I'm

21   assuming it's the same.  I'm looking at my hard copy

22   one.

23            Do you -- I don't want to make this

24   awkward.  I'm fine just looking at the paper copy

25   and referencing your questions if you're fine with

1    that as opposed to just confirming everything on the

2    electronic copy.

3         Q    Yeah.  I think whatever is easiest for you,

4    Mr. Deal, is the way we should proceed.  And I'll

5    trust that the two documents match -- match each

6    other, and I'm sure we'll find out if that's not the

7    case as we go along.  Is that fair?

8         A    That's fair.  I did just verify that and

9    they both are my signature and they seem to be

10   identical, so that's a good little test.

11        Q    That's great.

12             And you submitted this -- your

13   declaration -- I'm sorry, your expert report in

14   connection with plaintiffs' motion for class

15   certification; is that right?

16        A    Well --

17             MR. BLAIR:  Object to the question.

18             THE WITNESS:  -- my only hesitancy is I'm

19   not the one that submitted the motion for class

20   certification or the response to the motion.  I

21   believe it was served with the response to the

22   motion for class certification, but that was

23   something that counsel provided.

24   BY MR. BLATCHLEY:

25        Q    Defendant's opposition, correct?

```
                                        Page 13
 1      A    I'm sorry.  What was that?
 2      Q    I think we're in agreement, you submitted
 3  it in connection with defendant's opposition to
 4  plaintiffs' motion for class certification?
 5      A    In connection, yes.
 6      Q    Do you have a retention agreement with
 7  Cooley or how did that work?
 8      A    Well, certainly we have a retention.  I
 9  think your question is do I have a written retention
10  agreement, which I don't know the answer to that.
11  We may.  One of my colleagues handles the
12  administrative part of that.
13      Q    Okay.  So it's not personally with you,
14  it's with someone else?
15      A    Well, it would be with Analysis Group, our
16  firm.
17      Q    Perfect.
18           And can you just describe for me your
19  relationship with the Analysis Group.
20      A    Yes.  I'm a managing principal with
21  Analysis Group, which is essentially a partner at
22  the firm.  We're technically a C corporation, so
23  it's not a partnership.  I'm an employee of Analysis
24  Group, but I'm also one of the owners and the
25  managing principal.
```

```
                                          Page 14
 1      Q    Okay.  And so it wasn't just you who worked
 2   on your report; is that right?
 3      A    That's accurate.
 4      Q    Okay.  And there are other individuals who
 5   contributed to the preparation of the report?
 6      A    Yes.
 7      Q    And who are those individuals?
 8      A    So the two -- there's two primary
 9   individuals and then they supervised others as well,
10   so Peter Hess, H-e-s-s, and Nishi Sinha, S-i-n-h-a,
11   I believe.
12      Q    Okay.  And who did they -- you said they
13   supervised other individuals.  Who did they
14   supervise?
15      A    I don't recall off the top of my head the
16   entire list.  I know there's Tom Polly, Xin Gao,
17   Daniel Bennett, Brett Bowersox.  There may be others
18   as well.  I'm just not recalling.
19      Q    Okay.  And I apologize.  So did you oversee
20   the work of Peter Hess and Nishi Sinha?
21      A    I did, yes.
22      Q    And what were their roles specifically if
23   you could describe those for me in connection with
24   this report.
25      A    Certainly.  So in an effort like this
```

Page 15

1   certainly it's very typically like this, it requires
2   a team, it's all done under my direction.  But in
3   terms of the -- many of the analyses, so pulling the
4   data, writing some of the code, developing some of
5   the exhibits and spreadsheets, those sorts of
6   things, the drafting is all done under my direction.
7          I sometimes have them write a summary of
8   their findings and data, and then I convert that
9   into part of my expert report in the text in my
10  expert report.  But essentially implementing the
11  analyses that I want to have done as part of my
12  report.
13     Q    So who did -- who wrote the first draft of
14  the report?
15     A    I did.
16     Q    Okay.  And that first draft, did that
17  include all of the analyses that are contained
18  within it right now?
19          MR. BLAIR:  Object to the form.
20          THE WITNESS:  I don't recall specifically.
21  I certainly don't recall anything that wasn't in the
22  first draft but -- so obviously these things, you
23  know, evolve.  There's a lot of different exhibits
24  and analyses and things like that, so -- but I don't
25  recall anything that wasn't in the first draft.

1    BY MR. BLATCHLEY:

2        Q    And if you look at I guess the document

3    that you have before you, just to confirm for the

4    record, is this the entirety of your report and the

5    exhibits and appendices that, you know, existed at

6    the time you signed the document?

7        A    Yes.  Just to be clear, I think you're

8    referring to the -- I think it's a 399-page PDF, so

9    it's got my report and quite a number of exhibits.

10   And that is the -- the report and the exhibits

11   together do comprise the report, and nothing has

12   changed since the filing of that report.

13            I believe there was some -- included in

14   there is the documents considered, along with the

15   documents considered, and I believe that backup has

16   all been provided to you, so obviously the report

17   itself doesn't literally have copies of everything

18   in it.  That would be thousands of pages, but I

19   think that's all been provided to you as well.  And

20   the documents considered list is part of my report.

21       Q    And the documents considered list, again,

22   just to clarify, includes all of the documents that

23   you relied upon in -- or expressly mentioned

24   elsewhere in your report in producing your opinions

25   in this case?

```
                                            Page 17

 1        A     That's correct.

 2        Q     Okay.  And so the report, this 399-page

 3   document, they contain the complete statement of all

 4   the opinions that you will express concerning class

 5   certification in this case?

 6        A     Yes.  That's correct.

 7        Q     And it contains a complete statement of all

 8   of the bases and reasons for the opinions you will

 9   express in this case in connection with class

10   certification?

11        A     Yes.

12              MR. BLAIR:  Objection.  Form.

13              THE WITNESS:  I think that's right.

14              I'm sorry.  Ryan, were you objecting?  I

15   may have misspoken.

16              MR. BLAIR:  That's fine.  Go ahead.

17              THE WITNESS:  Yes, subject to my statement

18   a moment ago that the backup, which included some of

19   the calculations, things like that, is also

20   obviously the bases for my opinions.  But between

21   the report and the backup, that is the complete

22   bases of my opinions.

23   BY MR. BLATCHLEY:

24        Q     Do you intend to offer any opinions that

25   are not in your report?
```

1     A    As I sit here right now, I'm not aware of

2  anything.  In my experience, to the extent, for

3  instance, there might be a rebuttal report or some

4  other analysis, I could be asked to review those,

5  but as of now I have not and I don't have any plans

6  right now to do anything.

7     Q    Sitting here today, that report contains

8  all of the opinions you intend to offer with the

9  qualification you just mentioned in connection with

10 class certification, right?

11    A    That's accurate.

12    Q    And then are there any, you know, bases or

13 reasons for your opinions other than those set forth

14 in your report?

15         MR. BLAIR:  Object to the form.

16         THE WITNESS:  I think the answer is no

17 other than, you know, on some level that's a very

18 general question and I refer somewhere in the report

19 to my experience and expertise.

20         I've been doing this a long time, so

21 certainly I have a lot of general knowledge that

22 goes into it, but I think I've referenced that in

23 the report, so -- and, again, there's certainly not

24 anything -- any factual information or, you know,

25 spreadsheets, things like that that are a part of my

Page 19

1    opinion that are not included in the report and the

2    backup materials.

3    BY MR. BLATCHLEY:

4        Q    Okay.  And, again, I think that gets to my

5    next question.  All of the analyses that you

6    considered in connection with your opinions on class

7    certification and preparing the report are described

8    in the report itself; is that right?

9        A    Again, I think it would be the same answer

10   in the sense that there's quite a number of exhibits

11   that are in the report that are attachments to the

12   report.  And those, again, are incorporated sort of

13   by reference to my overall opinions.

14            And there's the backup that goes with each

15   of those that's been provided that would provide

16   some of the specific calculations and things like

17   that.  But between the report and the backup, I

18   think that does form the totality of the bases for

19   my opinion.

20       Q    So sitting here today, do you agree with

21   everything that's written in your report?

22       A    I -- I do.

23            I'm showing a frozen screen.  I don't think

24   that matters to me.

25       Q    Yeah.  My screen is frozen, too.  Are you

```
                                                Page 20

  1   okay --
  2        A    I'm fine continuing with a frozen --
  3        Q    Okay.
  4        A    -- screen.  I'm not sure I offer a lot with
  5   my -- my view anyway.
  6        Q    Well, let's keep going.  Hopefully it will
  7   fix itself and then if -- you know, we can revisit
  8   if it doesn't, if that's okay.
  9        A    Yeah.  That's totally fine.  I'm fine.
 10   Again -- anyway, yes, that's totally fine.
 11        Q    Okay.
 12        A    I lost track of your question.  Do you mind
 13   repeating it?
 14        Q    Yeah.  So the question is do the opinions
 15   in the report -- you agree with everything you've
 16   written in your report sitting here today, correct?
 17        A    I do, yes.
 18        Q    They're still your opinions, those that are
 19   expressed in the report?
 20        A    Yes.  That's accurate.
 21        Q    And they haven't been changed or modified
 22   in any way since you signed the report?
 23        A    That -- that's correct.
 24        Q    And you believe everything in the report is
 25   stated accurately; is that right?
```

1      A     With one incredibly minor clarification.  I
2  noticed as I was reviewing it -- I don't even recall
3  off the top of my head exactly what it was.  One of
4  my footnotes I had referenced three things in the
5  text and the footnote referenced one of them.  The
6  other two are part of my documents considered as
7  well, but the footnote didn't actually include the
8  references to the other two.
9            I believe they were analysts reports, so I
10 realize I'm way down in the weeds now but I noticed
11 that in the spirit of your question.  That's the
12 only thing I noticed.
13     Q     No.  That's -- that's very helpful.
14           Do you recall what footnote that is or
15 what --
16     A     I don't.
17     Q     -- what topic it was on?
18     A     I don't.
19           Sorry.  I think now we're coming back up
20 here.  Let me just click on this.  Okay.  I'm back
21 up.
22     Q     Yeah.
23     A     Yeah.  I don't recall off the top of my
24 head.  I can tell you it was -- to the best of my
25 recollection, it was where I was discussing some of

```
                                              Page 22
 1    the analysts reports, the securities analysts
 2    reports and some of the content, and it was a
 3    footnote that in the text I had referenced oh, these
 4    three analysts had said this or said something like
 5    this, and then I looked at the footnote and it only
 6    had one reference in it.
 7            So you could probably find it.  I could
 8    find it.  I don't suspect it's worth looking at
 9    right now, but if that helps it gives a little
10    context for you.
11    Q    No.  Yeah.  That's helpful and it sounds
12    like we should -- do you remember what -- you know,
13    was it concerning your opinions on the corrective
14    disclosures or some other area?
15    A    That's my recollection, is it was the
16    corrective disclosure discussion, which is where I
17    have most of the discussion of securities analyst.
18    So I believe it was --
19    Q    Okay.
20    A    -- in that section, yeah.
21    Q    Okay.  Is it -- I guess if we get to it
22    today, let's just try to flag it.
23    A    Yeah.  If I -- if we're on that page and I
24    see it, I'll try -- if I recall.  It's not an error
25    so much as I just didn't include the specific
```

Page 23

1   references.  I think it's actually pretty clear from
2   the discussion and the docs considered, but I'll try
3   and remember if we get to it.
4       Q    Okay.  And so just to kind of move along,
5   you know, setting that footnote aside, is there
6   anything else in the report that you would change or
7   amend sitting here today?
8       A    No.
9       Q    Okay.  And that's true with respect to the
10  appendices and the exhibits, correct?
11      A    Yes.  That's correct.
12      Q    Do you think you had all of the information
13  you needed to complete your report?
14      A    Yes.
15      Q    Was there anything that you tried to
16  obtain, any material you tried to obtain in
17  completing your report that were not provided to
18  you?
19      A    No.
20      Q    Okay.  So if you -- if you go -- you don't
21  have to go there, but you reference in Paragraph 29
22  of the report that you reviewed documents and other
23  materials provided to you by CenturyLink or obtained
24  from public sources, and those include
25  Dr. Hartzmark's report, CenturyLink's SEC filings,

Page 24

```
 1   analyst reports, news articles, academic research,
 2   legal documents and other -- you know, I guess
 3   Dr. Hartzmark's production.
 4           Is that an accurate statement of the
 5   materials that you relied on in connection with this
 6   report?
 7       A    Yes.  Although I would include that last
 8   sentence as well just to say that Appendix B is
 9   literally the listing of --
10       Q    Right.
11       A    There's several hundred items on that list.
12   So to the extent -- I'm not aware of any topics or
13   categories being left off of that list, but if
14   there's something on Exhibit -- or Appendix B that
15   doesn't fit nicely into one of those categories, it
16   should also be included.
17       Q    So just so I'm clear, how did you go about
18   selecting those -- those materials?
19       A    Well, when you say "those materials," are
20   you referring to --
21           MR. BLAIR:  Objection to form.
22           THE WITNESS:  -- Appendix -- I'm sorry.
23   Yeah.
24           I think that objection made it on the
25   record, but do you want to state it again, Ryan?
```

Page 25

1          MR. BLAIR:  Yeah, it did.  Just object to

2     the form.  Vague.

3          THE WITNESS:  Yeah.

4          I'm assuming you're referencing the

5     totality of Appendix B?

6     BY MR. BLATCHLEY:

7     Q    Sure.  Let's start there.

8     A    All right.  We could start and end there

9     probably.  That's all of the documents.

10         You know, certainly, I think your question

11    was how did I select them or why did I select them;

12    is that right?

13    Q    Yeah.  How did you go about selecting them?

14    A    Yeah.  So it depends on the -- on the type

15    of document and the -- the use of the document, so

16    I'm not -- there's not just a simple answer to that

17    question.

18         I mean, for instance, obviously

19    Dr. Hartzmark's report is the primary report that

20    I'm rebutting and analyzing so, of course, that

21    would be the natural basis for my work.

22         I think, if I'm understanding your

23    question, it's more general to say well, things

24    like, you know, the data sources you cite and those

25    kind of things.

1          So, again, that really depends on the
2    overall framework for the report and the types of
3    analyses that I want to do.  So to give you an
4    example, for the event study, the equity event
5    study, obviously we need equity prices, we need
6    indices for that, we need to identify dates that
7    various events happened, so it's a combination of
8    the complaint, it's a combination of pulling data
9    from data sources, things like that.
10         Other analyses, for instance, that we might
11   be looking at, you know, analysts reactions, for
12   example, so we're saying hey, we want to look at
13   price reaction to this in terms of target prices.
14         We look at our standard sources, IBIS and
15   others to say well, what's being reported in terms
16   of price targets and changes over time.  So, again,
17   it really varies depending on the analyses.
18         I would say, you know, high level,
19   reviewing Dr. Hartzmark's report, developing my --
20   my broad categories of analysis and response, and
21   then developing the specific types of analyses that
22   I want to do, and then figuring out what's the right
23   data that's needed to analyze each of those.
24         So I think that's hopefully responsive to
25   your question.  Again, it's not just a super simple

                                                    Page 27

1    question.

2         Q    Understood.

3              And so you read the Complaint that the

4    plaintiffs filed in this case, correct?

5         A    I have, yes.

6         Q    And you relied on it in completing your

7    analysis and producing your report?

8         A    I did.  Hang on one second, though.  I just

9    want to make sure -- when the Zoom reset, I just

10   want to make sure I've got the Exhibit Share up.  It

11   looks like it is up.

12             I think the -- I know you just asked me

13   this but just so I'm straight, I think Exhibit 1 is

14   the Complaint in the -- in the document, and I have

15   read it and I have referenced it in my report, and

16   I'm certainly relying on it to the extent I cite it.

17   And Dr. Hartzmark himself has cited it to some

18   extent or at least relied on it, focused on it, so I

19   used it in those contexts.

20        Q    And it was an important document in

21   consideration -- in coming up with your opinions in

22   the report, correct?

23             MR. BLAIR:  Object to the form.

24             THE WITNESS:  It was an important document,

25   I think, yes, in the sense that it was important for

Page 28

1    me to understand -- which I go into quite a bit of

2    detail on in my report.  It was important for me to

3    understand exactly what the allegations are,

4    especially with regards to particular dates.

5              So as I refer to in the report there are 52

6    dates where there's a potential market impact that

7    are alleged to be inflationary.  I believe there's

8    55 total days there, but some of them happened after

9    4:00 so it affects fewer than 55 days, so I needed

10   to understand that, what are the dates that are

11   alleged to be inflationary.

12             I needed to understand what categories of

13   harm that are alleged.  There were five categories.

14   I obtained those from the Complaint.

15             I discussed the fact that there's this

16   intermediate period that I understand the

17   plaintiffs, you have identified as being a low or no

18   cramming period in the middle of the class period.

19   I needed to understand that and analyze that.

20             I needed to look at the corrective -- the

21   supposedly corrective disclosures to understand both

22   what days they are and what is alleged to have

23   occurred on those days, so look at the substance of

24   those, which, of course, I discuss at some length in

25   my report.

```
                                            Page 29
 1           So I'd say those are, you know, kind of at
 2    least the primary areas that I rely on for the
 3    Complaint.  There certainly may be other citations
 4    and things like that, but clearly I am directly
 5    relying on the Complaint for those types of things.
 6    BY MR. BLATCHLEY:
 7       Q    So let me just take those kind of in turn.
 8    So you said that --
 9       A    By the way, it doesn't really matter too
10    much, although I'd prefer if I could see you on
11    video and I'm not seeing that right now, I think,
12    unless I'm missing it.  I don't know what's happened
13    on the video here.
14           Let me see if I can -- maybe I can find --
15    there we go.  You were just -- somehow when it reset
16    you scrolled off to the side there but I can see you
17    now, so, okay.
18       Q    Yeah.  I'm able on my end -- I've got you
19    with a green highlight around you, and you're the
20    only person who's popped up.  If you could do the
21    same for me, I think that's --
22       A    I can see you.  It's fine now.  I can see
23    you and Ryan, who are probably the people that are
24    most important to see, the person doing the
25    objection and the person asking the question so I
```

```
                                             Page 30
 1    think we're fine.

 2         Q     Okay.  Great.

 3               So just going through those items that you

 4    mentioned, you said the dates were important.  And I

 5    think you were referencing the dates that the

 6    alleged misstatements and omissions were made; is

 7    that -- is that right?

 8         A     There's really two categories of dates I

 9    would say.  I don't disagree with what you just

10    said.  The 55 days, the 52 equivalent days where

11    there's going to be a market reaction to those,

12    those are what I called the inflationary or the

13    front end days, and I do obtain those from the

14    Complaint.

15         Q     And it was important to make sure that your

16    analysis reflected the allegations concerning those

17    events and those dates in the Complaint; is that

18    right?

19               MR. BLAIR:  Object to the form.

20               THE WITNESS:  Yeah.  I think the answer is

21    yes to that, but let me give a little color on that,

22    if I understand your question.

23               I would say a couple things.  One is

24    certainly identifying what those days were was

25    important, literally like what date it is.
```

Page 31

1                As I say in my report, I then analyzed --
2    many of them are earnings days, not all of them, but
3    many of them are.  So it's important for me to
4    understand the allegations of these broadly, but
5    also to think about the other types of information
6    that was also made public on those days.  And I've
7    done an analysis to look at how many different
8    metrics were discussed on many of those days.
9                You'll probably recall that I also did do
10   at least a -- I would call it a preliminary analysis
11   of the days and trying to map that at least, again,
12   preliminarily and broadly to the allegations, the
13   five categories of allegations.
14               That's not something that plaintiffs had
15   done directly.  I think it's something that would
16   need to be done.  And I was doing it as an attempt
17   to illustrate that there's a complex interaction of
18   the days and the allegations in the report.
19               So that was something that I did but it was
20   important for me to understand the days and the
21   allegations.  And as I just noted, also to
22   understand what other things were identified on
23   those days.
24   BY MR. BLATCHLEY:
25        Q    So let me -- let me just take that.

Page 32

1            So you said first that it was important --
2    the report that you provided, is this -- are you
3    referencing I guess it's Figure 5 or the analysis
4    that was done with respect to, I think what you
5    labeled the 52 inflationary dates or events?
6        A    Do you have a page number on that?  I know
7    my pages are referenced numerically, but -- here we
8    go.  I've got it.  Never mind.
9            Page 41, yeah, it's quite small print,
10   which used to be fine until many years ago when I
11   turned 42, and then the eyes decided they weren't
12   going to be quite as cooperative.
13           But, yes, Figure 5 was that mapping that I
14   had discussed a few minutes ago.
15       Q    And you mentioned that this was just a
16   preliminary analysis; is that right?
17       A    Yeah.  I would call it kind of
18   illustrative.  And my -- so it's not intended to be
19   the final.  I think it's really illustrative of the
20   work that has not been done by Dr. Hartzmark or by
21   plaintiffs that would need to be done.  And really
22   to illustrate the complexity and the interactions of
23   these various things.
24       Q    Got it.
25           Okay.  So, again, what you're doing with

1 that Figure 5 and the surrounding discussion is
2 really suggesting what Dr. Hartzmark should have
3 done; is that right?
4         MR. BLAIR:  Object to the form.
5         THE WITNESS:  I'd say sort of.  I mean, as
6 I say repeatedly, Dr. Hartzmark hasn't done anything
7 on the inflationary dates.  Literally I don't think
8 he's done anything on it.  There's no list of those
9 days, there's no event studies, there's nothing that
10 he's done on those days.
11         So certainly it is my opinion that doing
12 nothing is not -- is not sufficient.  What I've done
13 in my analysis is to show the challenges that would
14 be inherent in doing the types of things that I
15 think would be appropriate to do.  And to
16 demonstrate that you have a damages model that's
17 capable of dealing with these complexities.  So I'm
18 illustrating the complexities and this is a part of
19 that illustration of those complexities.
20 BY MR. BLATCHLEY:
21     Q    Okay.  So just so I understand, your
22 testimony is that Figure 5 is really just an
23 illustration concerning what would need to be done
24 at some point concerning the damages analysis that
25 would have to be conducted in this case?

Page 34

1          MR. BLAIR:  Objection.  Misstates

2     testimony.

3          THE WITNESS:  I'm sorry but I'm trying to

4     think through what you just said if I'm remembering

5     the exact -- the exact question.

6          I think the question in spirit is

7     directionally right.  I don't think it's necessarily

8     precisely right.  It's certainly not the totality of

9     it.  So let me see if I can answer the question in a

10    way that answers your question as well.

11          So my understanding is that at this stage

12    in the proceeding one needs to have a damage

13    methodology that is capable of dealing with the

14    allegations in the case, and potential outcomes of

15    those allegations.

16          In other words, is it capable -- if it

17    turns out that certain things are thrown out, is the

18    damages model capable of dealing with that.  And I

19    spend a lot of time in my report outlining things

20    like the scaling, the parsing, those types of things

21    that would need to be required to do inflationary --

22    an inflationary ribbon.

23          And all of this is really kind of under the

24    heading of the price impact, and so this particular

25    Figure 5 is part of that overall analysis to show

Page 35

1    this is not a simple case where there's a single oh,

2    I allege that we got a great contract, and then

3    later it turns out oh, we didn't get that great

4    contract, and the stock price goes up initially and

5    then goes down later.

6            Even those cases can have some

7    complexities, but they're simpler at least in

8    framing them.

9            Here we've got a very, very complex case

10   from a damages perspective.  You've got 52

11   inflationary days, you've got five categories of

12   inflation, you've got this intermediate period of

13   either no or low cramming, a little unclear what the

14   exact allegations are.

15           And this is part of illustrating the fact

16   that one needs to have a damages model that is

17   capable of dealing with these complexities.  And

18   Dr. Hartzmark has not described a damages model at

19   all that would deal with these things.

20   BY MR. BLATCHLEY:

21       Q    Got it.

22           And so, again, this Figure 5 is really

23   focused on the shortcomings that you believe

24   Dr. Hartzmark -- his report has in coming up with

25   the damages model; is that right?

1       A    Well, it's certainly not right that, you

2   know, Figure 5 represents these shortcomings of

3   Dr. Hartzmark's model.  I mean, Dr. Hartzmark's

4   model is essentially subtraction.

5           He says that an inflationary ribbon could

6   be developed at some point by someone, and then one

7   can look at the day you bought a stock and the day

8   you sold it or the day you held it, and one can do

9   subtraction and figure out the difference.

10          I don't view that as much of a model.

11  That's really just more of a high level concept or

12  even just a mathematical technique of subtraction.

13          This -- what I think -- so having not done

14  anything to describe what a model is, I have given,

15  you know, a fair amount of analysis in my report to

16  illustrate the kinds of things that would -- a model

17  would need to be able to account for, and this is

18  one of those things in there.

19      Q    Okay.  And, again, it's focused on what you

20  believe are the shortcomings of the damages

21  methodology that Dr. Hartzmark provided?

22      A    I -- I think -- I think, yes, I think is

23  the answer to your question.  Again, this and many

24  other things in my report are focused on what I

25  believe to be the shortcomings of Dr. Hartzmark's

Page 37

1    quote/unquote model.

2          But I would take it even a step further to

3    say it's also representative of the challenges that

4    any damages methodology would have on these things.

5          So certainly having not done anything,

6    there's -- by definition it's deficient,

7    Dr. Hartzmark's model.  But I'm also pointing out

8    that -- again, this is not a simple case, and these

9    complexities I think raise real questions, including

10   the -- the price analysis that is a part of this

11   same figure and other parts where I described, I

12   think raise very serious questions about -- I don't

13   know that it can be done, honestly.

14   Q    So you were mentioning that as part of that

15   analysis in Figure 5 it was important to consider

16   the allegations in the Complaint.  Is that -- could

17   you walk me through what you meant by that?

18   A    Sure.  So, again, a part of what I've tried

19   to do in Figure 5 in the middle column is to map --

20   there are five categories of -- what do I call them

21   here? -- alleged mis- -- misstatements.

22         So I pulled these from the Complaint.  I

23   referenced them, the specific citation I believe in

24   the text of the report, so there are five categories

25   of misstatements.

Page 38

```
 1              For example, the customer first strategy,
 2      the -- you know, the business conduct and sales
 3      practices, I was looking at No. 1 and No. 4 just by
 4      way of example.  So those are the categories that
 5      plaintiffs have identified.
 6              The reason that that's important for the
 7      analysis, which I think was your question, is that
 8      one needs to have a damages model that is able to
 9      deal, in my experience, with various outcomes that
10      may happen as the litigation proceeds.
11              So, for instance, there are these five
12      categories.  Well, it may well be found that one or
13      more or several of them ultimately are not part of
14      the final case.  And so one needs to have a damages
15      model that's able to parse those out.
16              So effectively to say if -- for example, if
17      Categories 3, 4 and 5 were found to not be part of
18      the case, how would that change your measure of
19      damage, Dr. Hartzmark's sort of subtraction.
20              Presumably the answer is it would change
21      the inflation ribbon, but in my experience one would
22      need to do more than just say that, to say oh, well,
23      it would change the inflation ribbon.  One needs to
24      describe a methodology of how one would do that.
25      And certainly that's not been done.
```

```
 1      Q    So you spoke about your experience.  Let's
 2   turn to that for a second.  We got a little bit
 3   sidetracked.
 4            So you did undergraduate work at Pacific
 5   Lutheran University?
 6      A    Right.
 7      Q    Then you attended -- is that right?
 8      A    Yes.  That's right.
 9      Q    Then you attended Harvard for -- for a
10   master's in public policy, correct?
11      A    That's correct, yes.
12      Q    And then you did public policy Ph.D.
13   coursework at Harvard; is that right?
14      A    Yes.  That's correct.
15      Q    Okay.  And it says -- so you completed the
16   master's in public policy in 1990, and then you did
17   the coursework for the Ph.D. from '94 to '97; is
18   that right?
19      A    Yes.  I had -- I had completed my Ph.D.
20   exams, my qualifying exams at the end of my
21   master's, and I then worked for several years in
22   between, and then returned to Harvard, completed the
23   additional coursework.  I was working on my
24   dissertation when I started working with Analysis
25   Group.
```

                                              Page 40

1        Q     Okay.  And then so did you pass those

2   exams?

3        A     Yes.

4        Q     Okay.  But you just -- why did you leave

5   without completing your Ph.D.?

6        A     I started working with Analysis Group and

7   initially was part time and then started working

8   full time, and I -- it was a combination of the

9   work, a lot of work.  I had young kids at the time.

10             I also had realized during that period that

11  although I liked teaching and I taught at Harvard

12  while I was there, I actually realized that I was

13  better suited for a consulting environment.

14             So the need for the actual completion of

15  the dissertation, which is essentially required to

16  teach, that wasn't critical for my consulting.

17             I had done consulting before this, and

18  found that the type of consulting that Analysis

19  Group did, which was the type that we're discussing

20  right now, was really an excellent fit.

21             So basically the need for completion and

22  just the time between working full time and the kids

23  and all of that, so I -- I decided that I was not

24  going to complete the dissertation.

25        Q     So while you were at Harvard, I guess that

1   period that we talked about, that time period, what

2   courses did you take in econometrics and/or

3   statistics?

4        A    Econometric, and what was the second part?

5        Q    Statistics.

6        A    Oh, yes.  So I took -- I both took NTAs for

7   statistics classes as part of the master's program

8   in econometric.

9             And then in my Ph.D. coursework I also took

10  additional econometric and additional statistics and

11  was also a teaching fellow for that.

12            So I was a TA for Jim Stock, for instance,

13  who's a Harvard professor in statistics, so...

14       Q    Yeah.  Was that in financial economics --

15  econometric?

16       A    Well, not -- I mean, financial econometrics

17  is sort of a particular application of more

18  generally econometrics --

19       Q    Right.

20       A    -- out there.

21            So when I was -- when I was at Harvard most

22  of the econometrics we were doing, I don't recall

23  that it was specific to securities prices, things

24  like that.  It was more general econometrics.

25       Q    Like public policy issues?

```
                                              Page 42
 1       A    Well, I mean, all sorts of data sets,
 2    analyzing, you know, survey data, things like that.
 3       Q    Yeah.  But not like securities prices or --
 4       A    Not...
 5       Q    You just referenced it wasn't securities
 6    prices, it wasn't...?
 7       A    No, not -- not specifically while I was at
 8    Harvard.  I've done that many times --
 9       Q    Right.
10       A    -- in my professional career.
11       Q    So while at Harvard, did you -- were you
12    taking any courses in finance?
13       A    Yes.
14       Q    Okay.  And what courses were those?
15       A    I took finance and I took some classes over
16    at the Harvard Business School as well.
17       Q    What about accounting?
18       A    I had taken accounting as an undergraduate.
19    I don't recall taking any additional accounting
20    classes in graduate school.
21       Q    And then financial modeling at Harvard?
22       A    I took many classes involving modeling, and
23    many of them involved modeling the economics of
24    various programs.
25       Q    What about like financial modeling for like
```

Page 43

1    public companies?

2        A    I'm not sure what you mean "financial

3    modeling for public companies."  I mean, I -- when I

4    was taking classes at the business school, we

5    certainly would analyze financial statements of

6    companies, things like that, if that's what you're

7    referring to, yes.

8        Q    And then you said you've taken a course in

9    financial statements analysis.

10       A    A specific course in financial statement

11   analysis, again, I took accounting and I've taken --

12   the classes at the business school involved

13   financial statement analysis.

14            And that's basically what I did for several

15   years at Arthur Andersen.  Between finishing my

16   master's and going back to finishing my Ph.D. as

17   well was work with companies and their financial

18   statements and other aspects of their operation.

19       Q    What about time period econometrics?  Do

20   you know what I mean when I say that?

21       A    Yes.  That's something that I did as an

22   undergraduate -- or as a graduate student and again

23   we've done it many times since then.  I've done it

24   many times since then.

25       Q    And what about regression analyses?

1      A     That is the same as econometrics.

2      Q     And what about courses just on valuing

3  publicly-traded companies?

4      A     Again, yes.  It was part of my financial

5  courses, also part of the business school courses,

6  also what I've done for 25 years.

7            I think we lost Zoom again.

8      Q     Yeah.

9      A     Is it?

10     Q     I'm on hold.  Yes.  Are you okay going --

11     A     But I'm fine keeping going.

12     Q     You've -- and when you say, you know,

13 you've done that throughout your career, you're

14 referring to your -- how long have you been at

15 Analysis Group?

16     A     Hang on a second.  Let me -- are you seeing

17 me?  I don't see -- oh, there I am.

18           MR. BLAIR:  Yeah.  You're back, Bruce.

19           THE WITNESS:  Okay.  Yeah.  I hope it's not

20 going to keep doing this every 20 minutes, but we'll

21 see.  It's fine.  I mean, we're having a nice

22 conversation.

23           Sorry.  Do you mind repeating the question.

24 BY MR. BLATCHLEY:

25     Q     Yeah.  Just how long have you been at

Page 45

1    Analysis Group?

2        A    Oh, Analysis Group, 24 years.

3        Q    Okay.  And it's fair to say that since --

4    since your work at Harvard that's where you've been;

5    is that accurate?

6        A    Essentially.  To be precise I was actually

7    at Harvard two different times so I was there -- I

8    graduated with my master's in 1990, then I spent a

9    year working for a consulting group part of Harvard

10   University in Indonesia.  It's called the Harvard

11   Institute for International Development.

12           Then I was in Seattle for several years

13   working with Arthur Andersen, at the time the

14   biggest accounting and consulting firm in the world,

15   working on their -- their financial and strategic

16   consulting group.

17           And then I was back at Harvard working on

18   my Ph.D., and that's when I started working with

19   Analysis Group.  And since then I've only worked

20   with Analysis Group.

21       Q    Okay.  So since your second time at

22   Harvard, you've only been at Analysis Group and

23   that's been for 24 years, correct?

24       A    Correct.

25       Q    And at Analysis Group your job is either as

1   a testifying or consulting expert; is that right?

2       A    Yes.   That's right.

3       Q    And of your clients, am I right to say

4   that, you know, overall they are litigants?

5            MR. BLAIR:  Object to form.

6            THE WITNESS:  It varies.  I would say

7   probably 75 percent, maybe around there, I suspect

8   it's a good estimate, of what I do is being involved

9   in disputes of some sort.

10           About 25 percent is other things that are

11  not directly disputes.  You know, cost effectiveness

12  analysis, we helped run a big Medicaid program in

13  Washington State, I mean, various other economic

14  analyses.

15           But about three quarters of it involves

16  disputes.  They're not always direct litigation.

17  Sometimes investigations, regulatory matters,

18  arbitrations, variations of those things.  But I

19  think it's fair to generally categorize them as

20  disputes.

21  BY MR. BLATCHLEY:

22      Q    So if I turn to your appendix, you've got

23  listed kind of two categories of work that you've

24  done, and one is consulting and another is

25  testifying.

1      A    I mean, I agree with that generally.  I'm

2    not sure exactly what you're referring to, but I

3    agree with the general categories.

4      Q    Yeah.  Can you just describe to me what

5    that difference means?

6      A    Sure.  So testifying is -- is ultimately

7    doing exactly what we're doing right now, where I'm

8    serving as the testifying expert providing reports,

9    deposition testimony, trial testimony, arbitration

10    testimony, things like that.

11          The consulting testimony is either we may

12    initially be hired but ultimately things resolve in

13    a way before I have to provide any actual expert,

14    again, reports, testimony, things like that.

15          Or in some cases also I'm working with

16    typically in academics who may be doing testifying,

17    but I'm helping coordinate and analyze things and

18    run the projects at their direction, and I've done

19    that over my career.

20          I do a little bit of that now.  Mostly now

21    I do testifying myself, but both of those threads of

22    work have been part of my career at Analysis Group.

23      Q    So I just want to make one thing clear, in

24    the consulting cases you didn't provide any

25    testimony, correct?

```
                                          Page 48
 1      A    That's correct.  Not -- I mean, there may
 2  have been testimony provided by the testifying
 3  expert, but I myself did not provide testimony.
 4      Q    You did not provide opinions in those
 5  cases?
 6      A    That's correct.
 7      Q    Okay.  So your Paragraph 27 of your report,
 8  this is again describing your background and your
 9  experience.  And you talk about a number of
10  securities matters that you've worked on, including
11  class action matters for Ernst & Young, AT&T,
12  Oracle, Williams and Alibaba?
13      A    Yes.
14      Q    So were -- and maybe just take a step back
15  and you can answer the broad question first.  How
16  many securities Section 10b class actions have you
17  testified in?
18      A    I think the -- none in terms of actually
19  trial testimony.  I don't recall depositions.  I've
20  provided expert reports in securities cases,
21  including one very recently.  That's what I can
22  recall.
23      Q    What was the recent expert report?
24      A    On Allstate securities class action.
25      Q    And what was the opinion in that report?
```

```
                                        Page 49
```

1       A    So, again, that's an ongoing matter but I

2    filed one report.  There I was looking at the

3    substance of the allegations, so it wasn't the class

4    certification part of it.  It was the subsequent

5    analysis of the substance of the allegations.

6       Q    So and, again, just commenting on the

7    veracity of those allegations or something

8    related --

9       A    Yeah.  I think that's fair to say, yes.

10   The accuracy of the allegations in the Complaint.

11   It's just a complicated statistical analysis of

12   various sorts.

13      Q    And it was related to the claimed damages

14   in that case, wasn't it?

15      A    I mean, everything is related to the

16   claimed damages obviously in some general sense, but

17   I wasn't -- I wasn't specific to a calculation of an

18   inflation ribbon, for instance, or damages, yes,

19   that's correct.

20      Q    Okay.  So you mentioned the Allstate case

21   and there was perhaps one other that you provided

22   deposition testimony; is that right?

23      A    I'm sorry.  I'm just trying to remember.

24   I'm not recalling any specific names as I sit here.

25   I'd have to think about it more, but that's the one

Page 50

```
 1   that comes to mind.
 2        Q    Okay.  So it's correct to say that you've
 3   never testified in a securities class action --
 4   Section 10b securities class action in connection
 5   with a motion for class certification?
 6        A    I think that precise question, the answer
 7   is yes, that's right.  I certainly testified on
 8   class certification many times in class action
 9   matters.  And I've led analyses teams at Analysis
10   Group under the direction of testifying experts on
11   those topics, again, many times, but I have not
12   specifically testified myself prior to this.
13        Q    Yeah.  So I just want to make sure I've got
14   that right.
15             Again, you've never testified in a
16   Section 10b securities class action in connection
17   with class certification?
18        A    I believe that's correct, yes.  I can't
19   recall any other ones.
20        Q    So and you said you've done consulting work
21   in connection with class certification generally,
22   right?
23        A    I have testified in class certification
24   matters many times.
25        Q    And then --
```

1      A    Just not in -- your question was very

2  specific, the Section 10b securities matters.  I

3  view this as a general category of class --

4      Q    Yeah.

5      A    -- certification.  I've done that many

6  times.  But to the specific question of 10b

7  securities matters, no.

8      Q    Okay.  And then just in terms of your

9  consulting work, has any of your consulting work

10  been in connection with a motion for class

11  certification in a Section 10b securities class

12  action?

13      A    Yes.

14      Q    And which were those matters?

15      A    I'm not sure if I can remember all of them,

16  but certainly numerous times.  So one that's not

17  listed here was Clarent, which was one of the few

18  securities class actions to ever actually go to

19  trial.

20          It went to trial in San Francisco and we

21  were involved all the way through on that, including

22  the class certification portion of that.

23          I believe on Alibaba recently, for

24  instance, we were involved in a class certification

25  analysis of that.  I've done several cases for

1    Ernst & Young where they were sued as part of that.

2            So those are a few that I can recall off

3    the top of my head, but I've done it a couple times.

4        Q    So I want to make sure that the question is

5    right and your answer is responding to the question.

6    I'm limiting the question to Section 10b securities

7    class actions work in connection with class

8    certification.

9            Is it your understanding that the Alibaba

10   case alleged claims under Section 10b?

11       A    Well, actually, you know what, I'm sorry.

12   Thank you for that clarification.  I think that's an

13   IPO allegation so it's actually -- whatever the

14   section is under that, I think that's right so I'd

15   have to go back.  But, yeah, that's -- I mean, it's

16   a difference.  I agree.

17           So that was a securities class action but

18   not -- it was involving the allegations around the

19   IPO.  So -- but the other ones I believe, you know,

20   were Section 10b claims.

21       Q    So maybe I'll ask it this way:  So in

22   Appendix -- I guess it's Appendix A, you never --

23   not one of those examples is one in which you've

24   testified as an expert on class certification in a

25   Section 10b securities class action?

```
                                             Page 53
 1      A    I think you've already asked and I've
 2  answered that question.  Yeah, that's right.
 3  I've -- I've testified on class certification many
 4  times and I've been involved in Section 10b class
 5  analyses many times, but I have not testified prior
 6  to this in a 10b securities class action on class
 7  certification issues.
 8      Q    And, again, the consulting matters that you
 9  mentioned, one was not a Section 10b case, the
10  Alibaba case, and you mentioned Clarent.
11           And in that case the class is certified; is
12  that right?
13      A    That's correct, yes.
14      Q    Okay.  And can you name for me any other
15  securities class actions in which you've provided
16  consulting work in connection with a class -- sorry,
17  a motion for class certification?
18           MR. BLAIR:  Objection to the form, asked
19  and answered.
20           You can answer, if you know.
21           THE WITNESS:  Yes.  So I -- I can't recall
22  off the top of my head exactly which ones.  For
23  instance, the other ones are Ernst & Young, I've
24  worked on a number of securities cases for them, the
25  AT&T case, the Oracle case, those were all cases
```

1    where they were 10b security cases and we worked on

2    many aspects of them, to the best of my recollection

3    that included a class, but I don't recall

4    necessarily all the details as I sit here right now.

5    BY MR. BLATCHLEY:

6        Q    So, again, this might be a little inside,

7    but Ernst & Young is an auditor, right?

8        A    Yeah.  They're an auditor.  Well, they're

9    an accounting firm.  They would typically be sued as

10   the auditor in cases, that's right.

11       Q    So it's a third-party auditor firm.  And I

12   assume in the cases that you're discussing there's a

13   corporate defendant, issuer defendant?

14           MR. BLAIR:  Object to the form.

15           THE WITNESS:  If I -- I'm sorry.  Go ahead,

16   Ryan.

17           MR. BLAIR:  That's fine.

18           THE WITNESS:  If I understand your

19   question, there would typically be -- a company

20   would be sued, for instance, and the auditor would

21   be sued as well, if that's your question.

22   BY MR. BLATCHLEY:

23       Q    And so I'm just trying to get at, you know,

24   the consulting work, you're guessing -- you're not

25   guessing.  You're hypothesizing -- again, correct

Page 55

```
 1   me -- say it however you want -- that you've done
 2   work in connection with a class -- consulting work
 3   in connection with securities class actions under
 4   Section 10b -- let me ask it this way:
 5            Do you understand that the cases that you
 6   were working on in those matters for Ernst & Young
 7   alleged Section 10b claims against Ernst & Young?
 8       A    Again --
 9            MR. BLAIR:  Object to form.
10            THE WITNESS:  -- to the best of my
11   recollection I'd have to go back and look and see.
12   I mean, they -- they were certainly being sued as
13   part of the -- as a defendant in a 10b case, so --
14   but I'd have to go back and look at the nuances of
15   that.
16   BY MR. BLATCHLEY:
17       Q    So I'm trying -- because you're saying in
18   those matters, you're doing the work on behalf of
19   Ernst & Young so I assume you're not, you know,
20   doing work on behalf of the defendant issuer,
21   correct?
22       A    On those particular cases, that's right.
23   I've certainly worked on many cases where I have
24   been working on behalf of the -- what you call the
25   defendant issuer.
```

1     Q    And so -- and I guess what I'm trying to

2    say, you're not, you know, in your consulting work

3    in those cases on behalf of Ernst & Young, providing

4    any consulting work with respect to, let's say, you

5    know, a loss causation?

6              MR. BLAIR:  Object --

7              THE WITNESS:  Sorry.  What was the last

8    word?

9    BY MR. BLATCHLEY:

10    Q    I'm caveating it to the class certification

11    motion.  Your work on behalf of  Ernst & Young in

12    providing an analysis as part of your consulting

13    role in the cases we've been discussing, that has

14    not involved, for example, opining on price index?

15              MR. BLAIR:  Object to the form.

16              THE WITNESS:  You know, I -- I don't

17    recall.  I don't know that that's an accurate

18    statement.  I don't recall the details of it, but I

19    know we've worked -- I've definitely worked on

20    numerous class certification and price impact type

21    analyses over many years.  I don't recall all the

22    details of all of the cases.

23    BY MR. BLATCHLEY:

24    Q    So let me just limit it to the past six

25    years of any of your -- has any of your consulting

Page 57

1   work been in connection with a class certification

2   motion in a securities class action Section 10b

3   case?

4       A    I think that's a little hard to answer

5   specifically in the sense that quite a number of

6   times we're asked at the early stages of cases to

7   provide consulting analysis, to look at, you know,

8   price drops, to analyze statistical significance to,

9   you know, kind of do the things that are similar to

10  what I've done here.

11          And fairly often those cases resolve pretty

12  quickly, so I think your specific question was, you

13  know, with regards to a motion, so I don't -- many

14  cases there's no report like I'm providing here, but

15  it is in a class certification stage and the

16  analyses is very similar, so I've done that many

17  times there.

18          So I think -- I can't recall in the last

19  six years -- it may well have been.  I'd have to go

20  back and look at the list and think about it.  We've

21  been over the fact that I haven't been a testifying

22  expert in any of those cases.  I've done it many

23  times in the last six years.  You know, whether

24  those were officially part of reports that were part

25  of motions for opposition to -- or part of the

Page 58

```
 1   summary judgment, I don't recall as I sit here right
 2   now.
 3        Q    Yeah.  And I just wanted to clarify that,
 4   which is it's not summary judgment.  It's the motion
 5   for class certification.  And I think -- I just want
 6   to make sure I've got your testimony right.
 7             That you since -- for the past six years,
 8   can't name any report that you worked on for the
 9   Analysis Group in connection with opposing class
10   certification in a Section 10b case?
11             MR. BLAIR:  Object to the form.
12             THE WITNESS:  I don't recall a specific
13   name as I sit here.  As I said, I've done it many
14   times in the last six years, but I don't recall
15   whether any of those were officially reports that
16   were filed as part of the motion.  I just don't
17   recall.
18   BY MR. BLATCHLEY:
19        Q    Okay.  So, again, going back to that, you
20   have not testified as an expert in opposing class
21   certification in a Section 10b case ever, right?
22        A    That's accurate, yes, in terms of I've
23   never testified.
24        Q    So your opinion in that context has never
25   been accepted by any court?
```

1          MR. BLAIR:  Object to the form.

2          THE WITNESS:  I'm sorry.  It's sort of a

3     tautology.  If I haven't offered an opinion, then

4     certainly it can't be accepted or rejected by a

5     court.  I've never had my opinion rejected by a

6     court, so -- but I'm viewing it as sort of a

7     tautology.

8     BY MR. BLATCHLEY:

9       Q    Okay.  And you've never been a testifying

10    expert, so you've never submitted a report in the

11    context that we've been discussing?

12          MR. BLAIR:  Object to the form.

13          THE WITNESS:  Not that I can recall.

14          MR. BLATCHLEY:  Okay.  Do you guys think

15    it's an okay time to take a quick bathroom break --

16    or a quick break?

17          MR. BLAIR:  I think that makes sense.  How

18    about ten minutes work?

19          MR. BLATCHLEY:  Ten minutes is fine.

20          MR. BLAIR:  Okay.

21          THE WITNESS:  Yeah.

22          THE VIDEOGRAPHER:  I'll do the read off

23    here.

24          MR. BLAIR:  I'll just remind everybody to

25    go on mute and perhaps stop video as well while

```
                                        Page 60
 1   we're on break.
 2          THE VIDEOGRAPHER:  Very good.  We are off
 3   the record at 10:18 a.m.
 4       (Off the record from 10:18 - 10:32 a.m.)
 5          THE VIDEOGRAPHER:  Okay.  So the time is
 6   now 10:32 a.m. and we are back on the record.
 7   BY MR. BLATCHLEY:
 8       Q    Thank you, Mr. Deal.
 9            If I could ask you to turn to Paragraph 25
10   of your report.
11       A    I'd be happy to.  Do you mind if I --
12   during the break I actually -- I was thinking about
13   the line of questioning you were on before.  Do you
14   mind if I add something to that?
15       Q    Yeah.
16       A    So you had asked me about specific cases.
17   So I didn't recall during the questioning but I
18   since recalled during the break that there was a
19   class action City of Pontiac case against Dell where
20   Professor Hubbard from Columbia University was the
21   expert for Dell, and it was exactly addressing class
22   certification issues, very similar, actually, to the
23   report that I've offered in terms of the basic
24   framing and issues.
25            And that was a team that I had led on the
```

```
                                              Page 61

 1   Analysis Group side, so...

 2        Q    And when was that report submitted?

 3        A    Last year, as I recall.  Possibly the year

 4   before, but 2019 or 2020.

 5        Q    What stage of the case is that now?

 6        A    It settled.

 7        Q    Okay.

 8        A    Now I'm happy to turn to Paragraph 25.  I

 9   think that's what you asked before I interrupted.

10        Q    Do you recall in that -- never mind.

11             Paragraph 25, this describes your

12   assignment, right?

13        A    Yes.  That's right.

14        Q    I just wanted to talk about this for a

15   minute, because I wasn't really sure.  When you say

16   here "I have been asked to address a number of

17   economic issues in this report.  I focus first on

18   the economic framework discussed above," which you

19   say is "absent from the Hartzmark report.  I then

20   provide analysis related to his actual opinions,

21   including analysis and critique of his event study

22   methodology for both CenturyLink's equity and its

23   7.60 notes."

24             With my paraphrasing is that an accurate

25   statement of what your assignment was?
```

```
                                          Page 62

  1        A     Yes.

  2        Q     So what does it mean -- what does the

  3   "number of economic issues" here mean?  What does

  4   that mean?  What is that referring to?

  5        A     Yeah.  So I think at the highest level I

  6   think of my report and my assignment as sort of

  7   having two parts to it.

  8             So the second part in some sense is easier

  9   to describe, and that's the last sentence really

 10   which is to say I've been asked to look at the

 11   specific statistical analysis that he's done with

 12   regard to these event studies and abnormal return

 13   calculations, and I've got a section -- or two

 14   sections, one on equity and one on bonds in my

 15   report specific to that.

 16             The general statement, which you just

 17   referred to really -- my assignment is broader there

 18   which is to say to both describe the economic

 19   analyses and the economic framework and damages

 20   framework that I understand to be appropriate and

 21   needed in a case like -- a general case like this,

 22   meaning a securities class action.

 23             And to also then do work to identify

 24   challenges doing that type of work, whether it's

 25   possible or likely to be possible, doing some price
```

Page 63

1   impact analyses on the inflationary work, so it's

2   a -- I mean, it's basically all the things that are

3   in my report, but I characterize them here as a

4   number of economic issues, because they sort of

5   don't fall into just one bucket, largely because

6   Dr. Hartzmark hasn't actually done any of those

7   other things.

8           So it sort of a void that needs to be

9   filled, and I've given quite a bit of analysis to

10  identify issues and challenges and whether it's

11  likely that it can or can't be done accurately.  But

12  it's really the absence of any analysis that I'm

13  filling or partially filling on the front end of my

14  opinions.

15          MR. BLAIR:  I'm hearing -- I'm picking up

16  background noise.

17          THE WITNESS:  I'm getting that as well.

18          MR. BLAIR:  Can everyone other than Mike,

19  Bruce and myself please mute their lines.

20          MR. BLATCHLEY:  Let me try this, guys.

21          MR. BLAIR:  I don't think it was you, Mike.

22  It kind of shows who's making noise.  I think

23  Dr. Hartzmark may need to mute his line.

24          MR. BLATCHLEY:  Is this better now?  Are we

25  okay?

```
                                            Page 64
 1            MR. BLAIR:  Yeah.  Thank you.
 2            THE WITNESS:  Yeah.  I think that is
 3   better.
 4   BY MR. BLATCHLEY:
 5       Q    Just following up on your answer, and I
 6   guess I just want to understand -- make sure I
 7   understand the assignment.  It sounds like the
 8   preliminary assignment -- and tell me where I'm
 9   wrong -- is to criticize what Dr. Hartzmark said in
10   his report and show where he fell short; is that
11   right?
12            MR. BLAIR:  Objection to form.
13            THE WITNESS:  Ryan, did you have a specific
14   objection?  Sorry.  I think I started.
15            MR. BLAIR:  Just to the form, vague.
16            THE WITNESS:  Okay.
17            I mean, I certainly don't disagree with
18   that in the sense that I do -- I do view my report
19   as a rebuttal report.  I think the challenge on
20   this -- and the reason that it's not as simple an
21   answer as you characterize the question is because,
22   again, he really hasn't done any of what I view and
23   I understand to be necessary to do at this stage.
24            So broadly speaking that's sort of a
25   headline critique, but I try to go beyond that, not
```

Page 65

1    just say he didn't do it, but to actually show the
2    kinds of things that would need to be done and the
3    challenges associated with those and whether it is
4    likely it either could be done at all or whether
5    there's any, for example, price impact, those sorts
6    of things.
7              So I've gone beyond just a simple critique,
8    but I agree at a high level it's sort of under a
9    headline of, you know, quote/unquote shortcomings by
10   which I think are your words of Dr. Hartzmark's
11   analysis.
12   BY MR. BLATCHLEY:
13       Q    So were you given the assignment of figure
14   out whether it's possible or likely to be possible,
15   you know, to, like you said, to do a damages model
16   and to show price impact?
17       A    I certainly wasn't asked to develop all the
18   way through a methodology to identify price impact.
19   That's the plaintiffs' burden, as I understand it,
20   in these matters.
21             So I was asked to identify whether -- to
22   discuss whether or not what Dr. Hartzmark has
23   proposed is sufficient.  I believe it's not.  And
24   to -- as I said before, go beyond that to analyze
25   all the things that I've been talking about, which

Page 66

1   I'm sure we'll continue to talk about in the coming

2   time here, about the specifics of those deficiencies

3   and whether or not it's likely that one could put

4   together the type of analyses that I view would be

5   necessary.

6       Q    Again, just because, you know, it says

7   you're to analyze a number of economic issues, and

8   it's a very long report, were you specifically asked

9   to -- for example, you have a section in your report

10  about whether the cramming was material.

11          Were you instructed to go determine whether

12  cramming was material?

13      A    I'm not actually sure what you mean by

14  "whether cramming was material."  I don't think

15  that's a headline on any of my sections.  I mean, I

16  agree that I talk about cramming and the fact that

17  that was something that was known ahead of time.

18  Allegations of cramming in the industry were known.

19          I'm not -- maybe you can point me to a

20  section that specifically talks to that and help me

21  out.

22      Q    Yeah.  I'm sorry if I misspoke.  I was

23  referring to Section I think 4- -- C., Page 49 that

24  says "There is no evidence that the alleged sales

25  practices had a material impact on revenue."

1      A    Oh, okay.  Well, if I understand your

2   general question, counsel did not instruct me

3   "Specifically I want you to" -- "Mr. Deal, to, you

4   know, specifically identify" -- "say these sections

5   and these issues."  It was a broader assignment than

6   that.

7           I view this analysis here to be part of

8   what's important with that broader assignment, but

9   it was a broader assignment that I was given by

10  counsel.  I think that was the spirit of your

11  question but tell me if I'm not answering it.

12     Q    It was.  I mean, I just read that and I

13  was -- you know, it seemed like oh, figure out

14  what's wrong with his report, so I wanted to get

15  clarity on that, and I think you provided it.

16     A    Okay.

17          THE VIDEOGRAPHER:  Let me just break in for

18  a second.  Mr. Deal, I'm kind of losing your face,

19  the bottom part of it.  Can you pull your screen

20  down a little bit, please.

21          Thank you very much.  I appreciate that.

22          Go ahead, Counsel.

23          THE WITNESS:  I don't know if that would be

24  good or bad to lose my face, but that's all right.

25  We'll go with fixing it, so...

Page 68

1    BY MR. BLATCHLEY:

2       Q    Here's what I wanted to do is just to make

3    sure I understood the opinions that you're offering.

4    And there's a number of paragraphs describing a

5    summary of your opinions, but I'd actually ask you

6    to go to Paragraph 7 and just to look at the last

7    sentence of that paragraph.

8       A    Just to be completely clear I think that

9    paragraph is one sentence.  Is that -- I don't see

10   any other periods, so you're really asking me to

11   look at the paragraph, I think.

12      Q    Yeah.  I'm sorry.  I mean, I was really

13   referring "plaintiffs have demonstrated neither that

14   the alleged misrepresentations artificially inflated

15   the price of CenturyLink's securities, nor that the

16   alleged corrective disclosures were actual

17   disclosures as opposed to reflections of uncertainty

18   around allegations, nor have they a model capable of

19   reliably measuring any common inflation in the event

20   that any of the various allegations are found to be

21   true."

22      A    Okay.

23      Q    Can you say that's an accurate summary of

24   the opinions that are included in your report?  And,

25   again, I'll just give you the framework.  I'm trying

```
                                            Page 69
 1   to make sure I've got an accurate representation.
 2   We can go through the summary of your opinions if
 3   you'd prefer to do that.  I just -- this is three
 4   and the summary of opinions is like six paragraphs.
 5        A    Yeah.  Yeah.  No.  I understand what you're
 6   saying.
 7             I think, again, with the sort of little
 8   asterisk that obviously there's a lot behind those
 9   statements, both in terms of additional elaboration
10   in my summary of opinions and obviously the full
11   report itself, but to the spirit of your question
12   I -- I do think -- I think it's probably fair to say
13   that is kind of an elevator speech, if you will,
14   version of the opinions.
15             I think that's fair and that's -- again, at
16   a very high level, it covers the front end
17   inflation, the back end disclosures, the fact that
18   there's no model that's been proposed to be able to
19   deal with what I understand to be a lot of
20   complexities associated with those.  I mean, those
21   are -- I think those are kind of three prongs, if
22   you will, of that.
23             I think that was, Mike, what you were
24   trying to get at; is that right?
25        Q    That's right.  And, again, I'm trying to be
```

Page 70

1    efficient, if, you know --

2        A    Yeah.  Yeah.

3        Q    I know everyone has got stuff to do.

4            So just taking that first one in that last

5    clause that plaintiffs have demonstrated -- I know

6    it's a long sentence that kind of begins elsewhere,

7    but if I'm paraphrasing it accurately let me know.

8    Plaintiffs have not demonstrated that the alleged

9    misrepresentations artificially inflated the price

10   of CenturyLink securities, right?

11       A    Yes.  That's right.

12       Q    The preliminary analysis that you did, and

13   that's reflective in Figure 5 that we had discussed

14   earlier, correct?

15       A    Well, Figure -- I agree that Figure 5 lists

16   52 dates that are potential dates on which one can

17   test whether or not there is any observed abnormal

18   return, and dates in which one can try and map

19   statements to allegations.

20           There are 55 days that are identified

21   there, and that Figure 5 again includes sort of by

22   reference some of the analysis on statistically

23   significant abnormal returns and so forth.  That's

24   part of it, I guess is the short way of saying that.

25       Q    Yeah.  Wouldn't you say that's a key part

```
                                        Page 71
1    of what is supporting your opinion that plaintiffs
2    haven't shown that the misrepresentations
3    artificially inflated the price of the CenturyLink
4    stock -- or securities?
5              MR. BLAIR:  Object to the form.
6              THE WITNESS:  Well, I mean, the heart of it
7    is they haven't even tried.  There's nothing in
8    Dr. Hartzmark's report about what I've kind of
9    broadly categorized as front end inflation here.  So
10   almost by definition there's no demonstration that
11   it was artificially inflated.
12             I've tried to take that a step further and
13   to show the complexities involved in doing that.
14   But I certainly do think there are shortcomings.
15   Again, almost it's tautology.  If you don't do
16   anything and something has to be done, they're
17   clearly shortcomings.
18   BY MR. BLATCHLEY:
19      Q    Figure 5 in the surrounding discussion is
20   part of what you're offering as the analysis
21   demonstrating that that is a very complex analysis
22   to undertake?
23      A    I certainly agree with that statement, that
24   it is complex.  I think that's -- I would go a step
25   further and -- as I do in the report, and say where
```

```
                                            Page 72
 1   I've done analyses that don't just say this is going
 2   to be hard, but, for instance, I run an event study
 3   on each of those 52 days and I find that only four
 4   of them are even positive abnormal returns.
 5           I also look at those disclosures,
 6   especially the disclosures around, you know,
 7   quarterly and annual earnings, and I say there are
 8   dozens of metrics that are being discussed in each
 9   of those days, and so -- you know, again, I do those
10   and more analyses -- I dig deep into those four days
11   where I see positive abnormal returns and I see
12   there's lots of things being disclosed and discussed
13   on those days.
14           So my conclusion is on those that not only
15   is it complex, I agree with that, and one needs to
16   propose a model that could deal with that
17   complexity, which in my view is that has not been
18   proposed, but also that it's going to be very, very
19   hard, if not impossible, to actually show that; to
20   show that there's any price impact given that
21   there's only four positive days, eight negative days
22   in terms of abnormal returns, and 40 days of no
23   impact, plus all the complexities.
24           So it's not just it's going to be hard.  I
25   think it's going to be -- it may well be impossible.
```

1    Q    And so you haven't concluded -- you're
2  obviously just saying it may well be, correct?
3           MR. BLAIR:  Object to form.
4           THE WITNESS:  Can you say -- Mike, did you
5  say it may well be incorrect?
6  BY MR. BLATCHLEY:
7    Q    Be impossible is the language that you
8  used, correct?
9    A    That's correct, yes.
10   Q    You didn't, you know, go out and try and
11 fail and it is impossible?
12   A    I mean, I -- I think that's actually a
13 harder question in some ways in the sense that I
14 certainly did go and -- again, all of the work I've
15 done, to me, it suggests -- I don't see a way to do
16 it.
17          So, again, it's not the plaintiffs'
18 burden -- or excuse me, not the defendant's burden
19 as I understand it.  Dr. Hartzmark hasn't done
20 anything on it.
21          But it's not just "Oh, this is going to be
22 hard" or "I tried one thing and it didn't work."  I
23 don't see how it can be done and I've given a lot of
24 evidence to -- and analysis to support those
25 opinions in my view.

                                                    Page 74

1       Q    As part of that, though, you haven't
2   developed your own model, again, proving the
3   impossibility?
4       A    Again, that's an interesting statement in
5   the sense that I think if you could truly develop a
6   true model that would work, then it wouldn't be
7   impossible.
8            What -- again, I haven't been asked to take
9   it all the way through to there, but I have gone
10  down that path by doing all the analysis I've done,
11  and I don't see a model that in my experience having
12  done damages analyses for decades, you know, in a
13  wide variety of cases, I don't see, given the
14  complexity of this case, how one can do it.
15           I haven't developed a model myself that can
16  do it.  Dr. Hartzmark clearly hasn't.  I think a
17  model would need to be developed and at least be
18  able to describe how it would work at this stage and
19  that work has not been done.
20      Q    I want to make sure what we're referencing
21  again is the preliminary analysis that you set forth
22  in Figure 5, that of course is not the model that
23  would need to be done in this case, right?  That's
24  just your using that as an illustrative of the
25  complexities involved in doing this?

Page 75

1           MR. BLAIR:  Object to the form, misstates
2    testimony.
3           THE WITNESS:  I think that's -- if I'm
4    understanding your question, I think I mostly agree
5    with it in the sense that it's not a model.  I
6    haven't myself quantified, hey, here, let me
7    describe in 18 steps making -- using 18 as a
8    completely made up hypothetical, of course, 18 steps
9    how one would do a model or this is what a model
10   needs -- would look like and quantify, you know, an
11   inflation ribbon or a buildup of inflation.  We're
12   really talking right now I think about the front
13   end, just to be clear, the inflationary side of it
14   there.
15          So I haven't done that, but, again, as I
16   said, I have certainly -- and having done this for a
17   long time, I've said well, what are the kinds of
18   things that one would need to be able to
19   incorporate.
20          So you'd need to be able to incorporate the
21   different categories of misrepresentation, you'd
22   need to incorporate the actual alleged inflationary
23   days.  Here you'd need to be able to incorporate
24   this middle period of supposedly no cramming into
25   it.  You'd look at each of those days and you'd see

```
                                              Page 76
 1   the fact that you don't see any price impact on most
 2   of them -- "price impact" being a positive abnormal
 3   return -- as an initial basis for it.
 4           So I've done enough work on each of those
 5   points to feel comfortable with my opinion that I
 6   don't see how it can be done.  And I do think, given
 7   these complexities, one needs to describe a model if
 8   it can be done, and I -- I haven't done it.  I don't
 9   see how it can be done, and certainly Dr. Hartzmark
10   and the plaintiffs haven't done it.
11   BY MR. BLATCHLEY:
12       Q    Coming back to this, so the -- when you
13   talked about your testifying experience earlier,
14   you've never testified as a damages expert in a
15   securities class action under Section 10b, correct?
16       A    That is correct.
17       Q    And so you've never testified as to a
18   damages model in a securities class section under
19   Section 10b?
20       A    I think that's effectively the same
21   question, right?  I mean, if I haven't testified on
22   that --
23       Q    Oh, no.
24       A    -- I haven't testified on a particular
25   topic, so...
```

Page 77

```
 1      Q    So your point -- so, again, coming back to
 2  have you ever worked on a damages model in a
 3  Section 10b securities class action that, like, for
 4  example, disaggregates company-specific information
 5  from the alleged false statements?
 6      A    Yes.
 7           Was there a pending question?  I didn't
 8  hear.
 9      Q    Sorry.  What matter was that in?
10      A    Oh, I -- I can recall for sure having done
11  it in Williams matter many years ago.
12      Q    Is that the only example that you can think
13  of?
14      A    It's the one that comes to mind.  There may
15  well be others but it's the one that comes to mind.
16      Q    That case you developed a model that was
17  capable of disaggregating company-specific
18  information from the alleged false statements?
19      A    Yes.  I think that's a fair statement.  My
20  recollection of the specifics was -- this is going
21  from memory, so it's been a while, but there were a
22  couple of things announced on a particular day and
23  the stock dropped.  Both of them directionally
24  similar so, as I recall, they would both be things
25  that would be expected to decrease the stock price,
```

1    and the stock price did go down.

2         And the -- it was required to parse or

3    disaggregate the stock drop into the components that

4    were part of the case and the components that were

5    not part of the case, so that's the basic framework.

6    Q    Again, I know it's a long time ago, but do

7    you know just kind of the summary allegations of

8    what that case was about and what was disclosed on

9    the date you were just mentioning?

10   A    I'm afraid that's probably trying to pull a

11   little too deep in the recesses there but it was --

12   again, the high level, as I recall, it was something

13   like -- let me put it more in a hypothetical now,

14   something like revenues missed expectations and we

15   didn't get a contract.

16        So I don't remember that those are the

17   specific facts but some variation of something like

18   that.

19   Q    Do you know how many different factors you

20   were measuring in that particular model?

21   A    My -- again, dredging pretty far back here

22   in the memory cells, my recollection is just a

23   couple, that there were a couple things going on.

24   It's possible there might have been, you know, three

25   or something, but it was not -- it certainly wasn't

```
 1    the significance in terms of the number of metrics
 2    and things that are at issue here on some of these
 3    cases that are being identified.
 4              So, you know, as these things go it was
 5    relatively straightforward.
 6        Q    I don't want to spend too much time on
 7    this.  So Williams Energy Company, is that -- is
 8    that right?  What was the fraud?  What was the
 9    alleged fraud in the case?
10        A    Again, you're probably asking to go deeper
11    than I can recall there.  I honestly just don't
12    remember if it was, you know -- I just don't
13    remember.  Some sort of financial result, to the
14    best of my recollection, but it's been a while.
15        Q    An issue or something about misstating the
16    reasons between financial results?
17        A    You know, I'm sorry.  I just don't
18    remember.
19        Q    In that case, you mentioned that you did a
20    damages analysis that looked to a disclosure on a
21    particular day.  Was this a case involving one
22    disclosure, many disclosures, corrective disclosures
23    is what I'm referring to?
24        A    You know, I'm not trying to be evasive, I
25    just honestly can't -- can't remember.  It's
```

```
                                            Page 80
1    certainly -- to the best of my recollection, it
2    wasn't -- there wasn't a multitude of them.  I don't
3    remember whether it was just one or not, but, again,
4    your question was on the disaggregation and parsing,
5    and I do have a memory of doing that in that matter,
6    but I don't recall a lot of details around it.
7        Q    Returning back -- I'm sorry -- to
8    Paragraph 7 and just kind of the last clause.  You
9    just talked about, you know, your criticism of, you
10   know, front end inflation.
11           The second clause there, and I'll
12   paraphrase, tell me if I'm wrong, you're saying the
13   alleged corrective disclosure -- you're criticizing
14   whether the alleged corrective disclosures in our
15   case, in our Complaint, were actual disclosures as
16   opposed to reflections of uncertainty surrounding
17   allegations.
18           Is that an accurate way of saying what your
19   opinion is there?
20       A    Yeah.  Again, that's sort of, again,
21   somewhat the elevator speech version of them, but I
22   think it's not inaccurate.
23       Q    Yeah.  Sir, if I were doing an elevator
24   speech, it's a long report.
25           What you did there, roughly speaking, and
```

Page 81

1    tell me where I'm wrong, is you examined the

2    corrective disclosures and, you know, stock price

3    declines that followed, and you did an analysis of

4    whether -- the plausibility of plaintiffs'

5    allegation that the corrective disclosures caused

6    the stock prices to decline and whether they were,

7    you know, sufficiently curative to be, I guess,

8    actual corrective disclosures; is that fair?

9        A    I mean, I think semantically you're on the

10   right track there.  I think I would probably -- I

11   would phrase it slightly differently which is to

12   say -- I think in some sense -- as we said before,

13   there's sort of three parts, if you will, to the

14   second part of Paragraph 7.

15           There's the front end part, which we've

16   just been talking about.  There's the corrective

17   disclosures and the event study.  The second and

18   third are slightly intertwined in the sense that

19   there are issues with some of the calculations about

20   the abnormal returns and the drops, but let's set

21   those aside for purposes of your discussions and say

22   there are at least a couple days that have a

23   statistically significant negative return.

24           So this middle clause is really focused on

25   what does that mean and one can imagine -- and I

Page 82

```
 1   discussed this I think in an earlier hypothetical in
 2   my report -- that sometimes you have what I think is
 3   sort of inarguably at least on its face a corrective
 4   disclosure where the company itself might have said
 5   earlier, hey, we got this wonderful contract, and
 6   then stock price goes up, people buy the stock, then
 7   later they say oh, just kidding.  We actually didn't
 8   get that contract.
 9           The company itself makes the statement.
10   It's pretty clearly factual the company has made it,
11   stock price drops.  That's, again, kind of a
12   stylized -- probably idealized from a plaintiffs'
13   perspective class action matter, kind of hard to,
14   again, in that hypothetical to sort of imagine that
15   there's not some problem there.
16           So what I say here is yeah, sure, there's
17   some back end stock price drops.  I disagree
18   somewhat with the event study.  I disagree that
19   these are all the days, although Dr. Hartzmark and I
20   both find, you know, the equity days not to be
21   statistically significant, but I agree that they
22   fell.
23           The big difference in my mind is more of a
24   framing and causal issue, which I think your
25   question was getting to or your kind of phrasing of
```

1    it, which is to say this isn't the company itself

2    saying guess what, we did a whole bunch of cramming

3    and either we have to, you know, restate financials

4    or we're going to have to pay huge money back or

5    some form of that.  These are lawsuits, right.

6            And in my mind that's not the same.  And I

7    don't disagree that the stock price went down and

8    I'll just accept for discussion purposes that it

9    went down related to that news, but if that news is

10   simply the filing of lawsuits and allegations this

11   could be happening -- and, of course, this is an

12   environment of a Wells Fargo heightened concern

13   about issues like cramming and opening accounts and

14   things like that, that's not the same.  That's not

15   actually a company disclosure of information.

16           And I think that's a key issue on these

17   back end disclosures that I think has not been

18   addressed -- well, again, there's no model per se.

19   It's really just a description by Dr. Hartzmark of

20   how to do high level research, but it's certainly

21   not something that's been addressed by Dr. Hartzmark

22   or the plaintiffs how to think about a stock price

23   that's dropping as a result of, again, allegations

24   or lawsuits or things like that.

25           And I think that's sort of the -- that's

```
                                        Page 84
 1    kind of the key issue in some sense on those back
 2    end corrective disclosures.
 3            I realize that was a long answer but
 4    hopefully that gave a little color around your
 5    description.
 6        Q    It was helpful.
 7            So and, again, I hate to go back to the
 8    elevator version, but, again, what you're saying is
 9    that because of the nature of the disclosures, you
10    know, it's really not clear if they caused the stock
11    to decline?
12        A    That's -- I'm being a little -- I'm sort of
13    waffling a little bit on there just thinking about
14    it out loud.
15            I haven't -- put it this way:  I haven't
16    done an analysis to say was there other information
17    on those days that also caused it to -- the stock
18    price to drop.
19            So that may well be an issue and that's
20    sort of a form of what we were discussing before.
21    But I think to the extent -- let's just accept in a
22    more hypothetical sense that that was the only thing
23    that happened and there's no dispute about the fact
24    that the filing of the lawsuit, that did -- you
25    know, following those the stock price dropped.
```

Page 85

1           I think the problem with that from an
2   economic perspective and a damages model perspective
3   is that's not the same as a revelation of an actual
4   truth.  That's -- you know, you can certainly
5   imagine especially in this Wells Fargo environment
6   that that reflects concerns about oh, maybe there is
7   something out there.
8           And I discussed this quite extensively in
9   my report and I looked to equity analysts as to say
10  is this a substantive disclosure that would truly
11  suggest that the discounted value of the future cash
12  flows has meaningfully changed, or is this more
13  likely a signal of potential concern but not
14  something that's an obvious driver of fundamental
15  economic value here.
16          And my conclusion is it's much more of the
17  latter, that it's -- that it's not an allegation
18  that we didn't get the contract.  It's -- there's
19  nothing in it that was new in concept.  Allegations
20  of cramming and billing concerns have been around
21  for a long time.  But in that environment of Wells
22  Fargo it's obviously a concern of oh, maybe there's
23  something here, but -- but it's no more than that.
24      Q    I'll follow up on your statement there.  So
25  you're not suggesting -- you said it's not new in

```
                                          Page 86
 1   concept.  You're not suggesting that the

 2   whistleblower lawsuit that was filed on the

 3   corrective disclosure was known sometime prior to

 4   that date, right?

 5       A    That's correct.  And I'm surely not saying

 6   that the market somehow knew six months before that

 7   Ms. Heiser was going to file a lawsuit or had a

 8   draft of it or anything like that.  I'm not aware of

 9   anything like that.

10           It's a more general statement that in kind

11   of consumer facing businesses like this, and this

12   being, you know, telecom, Internet, consumer

13   services, all of that, these are very common

14   allegations.  I myself have been involved in cases

15   involving these kind of things, so...

16       Q    In those cases --

17       A    You cut out.  I don't know if your -- I

18   missed the first few words of that.

19       Q    I was saying -- can you hear me?

20       A    I can hear you, yes.

21       Q    Yeah.

22           You weren't a defendant in those cases,

23   were you?

24       A    No.  No.  Fortunately, I don't know if this

25   has been your experience as well, as someone who
```

1    spends their life dealing with disputes all the

2    time, I've actually -- knock wood, I've never

3    actually been a party to one, so, no, no, this is in

4    my expert capacity.  Thanks for clarifying that.

5        Q    Right.  So, again -- but you're not saying

6    that Ms. Heiser's lawsuit, the facts contained in

7    that lawsuit, the other information disclosed on

8    June 16th was publicly known or somehow existed in

9    the market prior to that time?

10       A    Again, I agree with that certainly as to

11   the specifics.  I'm not aware that Ms. Heiser's

12   lawsuit or even any of the subsequent lawsuits that

13   are referenced in the Complaint, that those -- that

14   specific information about those specific lawsuits

15   was known.

16       Q    Got it.

17            And then certainly the same is true of the

18   July 12th corrective disclosure, you're not

19   suggesting that investors were aware of the

20   investigation by the Minnesota attorney general or

21   the, you know, facts set forth in the Complaint that

22   they filed prior to July 12th of 2017?

23            MR. BLAIR:  Objection.  Object to the form.

24            THE WITNESS:  I would certainly agree to

25   the last part of that because, again, I have no

Page 88

1    reason to think that investors knew about the actual

2    filing of the lawsuit.

3              I don't actually know about the first part

4    of your statement, which is was it -- was there

5    knowledge that there was some investigation going

6    on.  I don't know that.  I don't think it really

7    changes your question, as I understand the specific

8    things pointed to is the actual filing of the

9    lawsuit.

10             But I just -- I don't want to imply that I

11   know more than I do know about what was public about

12   that Minnesota situation.

13   BY MR. BLATCHLEY:

14       Q    Yeah.  So I just want to clarify that.

15             So did you look at whether there was any

16   public indication of the Minnesota attorney

17   general's investigation prior to July 12th?

18       A    I don't -- the answer is no in the sense I

19   don't specifically recall any information about it.

20   I think -- I do cite something -- as I recall, I

21   cite something else in Minnesota, I think

22   Senator Klobuchar's, but I think that may be

23   something, you know, different, as I recall.

24             But I'm not aware -- certainly, Mike, I'm

25   not aware of any -- I didn't specifically analyze

Page 89

1    what that lawsuit -- and that's not really my -- my
2    contention isn't that that -- anything specific
3    about that was known.  That's not my -- my view.
4         Q    Okay.  And then certainly if there was
5    anything, it would be in your Appendix B.  And
6    assuming there's nothing in Appendix B concerning a
7    Minnesota investigation prior to July 12th, we're on
8    the same page?
9              MR. BLAIR:  Object to the form.
10             THE WITNESS:  I think I agree with that.
11   I'm not aware of anything in Appendix B that would
12   suggest that it was, but I don't recall or I don't
13   remember specifically looking for that.
14   BY MR. BLATCHLEY:
15        Q    Yeah.  Investors in the public didn't know
16   about a lawsuit before -- the filing of the lawsuit
17   before it was filed.  How about that?
18        A    Were you stating that specific -- I mean, I
19   think I could probably answer it more generally if I
20   understand your question is I'm not -- I'm not
21   contending or I don't have any information to
22   suggest that investors knew about any of the
23   specific lawsuits that are mentioned in the
24   Complaint prior to them hitting the press release
25   times and things like that.

```
                                            Page 90
1           I'm not -- this isn't the sort of oh,
2    that -- that information, specific information was
3    leaked two weeks before or anything like that.  I
4    don't -- I suppose that's possible but that's not
5    what I understand to be the facts.
6       Q    Okay.  And so, again, on -- let's just --
7    June 16th, setting aside June 19th for the moment,
8    and July 12th, of the three dates, the corrective
9    disclosure dates.
10          Are you with me on that?
11      A    So we're talking about the first and the
12   third?
13      Q    Yeah.
14      A    Yeah.
15      Q    And did you agree with Dr. Hartzmark that
16   there was a statistically significant stock price
17   decline on those dates following the corrective
18   disclosures?
19      A    Yes, I think, is the answer to that.  Give
20   me a second.  I just want to get to my table
21   summarizing that.
22          I've got a table -- or a figure here.  My
23   analysis is -- let me see here.  Here we go.
24          Yes.  I'm on Figure 12 just to reference
25   that on Page 85.  So both Dr. Hartzmark and I find
```

Page 91

1    statistically significant negative abnormal returns

2    on June 16th and July 12th.

3        Q    And so, again, your opinion referring back

4    to Paragraph 7, that second clause, what you're

5    really talking about is your opinion about the

6    Wells Fargo environment making it difficult to

7    determine whether those disclosures are actually

8    responsible for the stock price declines as a

9    measure of investor's harm.

10            Is that an accurate way to say it?

11        A    Put it this way:  I certainly agree that

12    the Wells Fargo environment is a factor that has to

13    be considered here.  That it has created a

14    heightened awareness and potential concern about

15    consumer-based companies, so I agree with that.

16            That said, I think the -- there's also a

17    more general concern here about the idea that can

18    the filing of a lawsuit with allegations, is that

19    itself truly a corrective disclosure, you know, or

20    is that simply -- even if we all agree, oh, that

21    moved the stock price, that people were worried that

22    oh, my gosh, a $12 billion lawsuit, what if that's

23    even ten percent likely to be true, you know, the

24    stock could go down.

25            But that's not the same as revealing the

Page 92

1    truth that there actually were underlying problems

2    of the scale that would cause anything like the

3    stock price movement.

4         So I certainly have broad concerns as an

5    economist and as someone who does, you know, damages

6    calculations that the third party allegations of

7    something that cause a price to drop, there's sort

8    of a circularity of oh, well, then that is a

9    corrective disclosure.

10        I mean, at the extreme that would mean any

11   lawsuit that got filed that caused the stock price

12   to drop should be thought of as a corrective

13   disclosure, and kind of assumes to be true, and I

14   said that's not the right framework economically, I

15   think.

16   Q    And, again, what you're saying is you

17   dispute whether it's actually corrective.  Is that a

18   good way of saying it?

19   A    Certainly at eye level I think that is

20   true, that is the filing of a lawsuit with

21   allegations in it, is that -- should that be thought

22   of as a corrective disclosure.  I mean, which I

23   realize is not just an economic question.  As an

24   economist I have views on that, but I do -- in my

25   view it's also a larger question.

Page 93

1        Q    Okay.  So just moving on to kind of the

2    third clause of that -- of that sentence.  You say

3    that there's -- you know, plaintiffs haven't put

4    forward a model capable of reliably -- reliably

5    measuring common inflation.

6             Am I -- am I reading that accurately?

7        A    Yes.  I agree.  Are you talking about the

8    "nor" part of that?

9        Q    Yeah.

10       A    Yes.

11       Q    Okay.  And so --

12       A    I agree that -- let me say basically there

13   is no model per se, so...

14       Q    Yeah.

15       A    Yeah.  You know, in that almost

16   definitionally it's not going to be -- if there's no

17   model it's not capable of doing that.

18       Q    And you haven't put forward in this opinion

19   of yours an alternative damages model, right?

20       A    Well, again, I think we've been talking

21   about this so I'm happy to keep talking about it.

22   But, you know, we talked a lot about the front end

23   of it, that I don't -- as I do my analysis and my

24   experience, I don't see how it can be done.

25             So I don't think -- I haven't put together

Page 94

1  a model but it's not because I just didn't even
2  think about it.  I didn't -- I don't think it can be
3  done.
4        On the back end disclosures that we're
5  talking about here, again, I'm not putting forward a
6  model quote/unquote on the back end disclosures, but
7  that's largely because of the sort of framing
8  concerns about -- that we've just been talking
9  about, that is there even a starting basis to think
10 that these should be thought of as corrective
11 disclosures.
12       Again, I've done the event study.  I see
13 the statistically significant abnormal return.  I
14 don't -- I'm not -- I mean, I'm disputing that in
15 the sense that the specifics of how to do it and
16 there's the days and that, we'll presumably talk
17 about that, but I have a more fundamental problem
18 with that.
19       I haven't put forward a model but largely
20 because I don't see that a model is really
21 appropriate here, certainly not without something
22 tying the -- these allegations in these lawsuits to
23 something more substantive that would really be an
24 underlying economic driver of the value of the price
25 of the CenturyLink stock.

1     Q    You're not contending that -- so when one

2    files a lawsuit, right -- lawyers file lawsuits.  Is

3    that -- do you agree with that?

4     A    I -- I agree with that.  Some of them more

5    than others, but, yes, that is something that

6    lawyers do.

7     Q    And when they file them, the allegations

8    set forth various facts generally?

9     A    I -- I certainly agree that there's lots of

10   statements in Complaints, many of them characterized

11   as facts, yes.

12    Q    And there are Complaints that contain

13   facts?

14    A    Oh, yes.  Sure.  I mean, your Complaint

15   contains facts.

16    Q    Numerous facts?

17    A    That, I don't dispute.  Yes.  It's not a

18   complete house of cards, I agree with that.

19    Q    Right.

20    A    We're setting aside the allegations or

21   whatever, but like you said, the description of

22   CenturyLink and all that, lots of facts in there.

23    Q    Totally, totally fair.

24        And you would also agree with I guess the

25   premise that lawyers are under ethical obligations

Page 96

1   to investigate and, you know, be accurate in

2   alleging facts in Complaints?

3           MR. BLAIR:  Objection.

4           THE WITNESS:  I'm sorry, Ryan.  Did you

5   have an objection?

6           MR. BLAIR:  Yeah.  Object to the form.

7           You can answer.

8           THE WITNESS:  Yeah.  Well, it's probably

9   more a question for the ABA and those.  I mean, that

10  said, I've been doing this a long time, so let's put

11  it this way:  It's certainly my understanding that

12  one can include things you know to not be true, or

13  probably even strongly suspect, although now I'm

14  getting into gray areas in terms of what I actually

15  know on that.

16          As to what level of investigation or belief

17  one has to have?  You know, I'm less familiar with

18  the details of that.  I certainly see many, many,

19  many instances where that turns out not to be true,

20  the allegations in the Complaint, so they're

21  certainly not -- one shouldn't take them for the

22  truth but I don't -- I do agree the high level you

23  can't just -- I think you can't just make stuff

24  up --

25  \\\

```
                                      Page 97
 1   BY MR. BLATCHLEY:
 2       Q    Right.
 3       A    -- about it.  That seems right to me.
 4       Q    Again, setting aside this case, in general
 5   there's certainly a level of -- maybe it's minimal
 6   in your view -- veracity of allegations in a filed
 7   Complaint?
 8            MR. BLAIR:  Object to the form.
 9            THE WITNESS:  You know, I think I probably
10   said as much as I can say.
11   BY MR. BLATCHLEY:
12       Q    Yeah.
13       A    I don't disagree with the proposition
14   they're supposed to be.  You know, again, I've seen
15   lots and lots of cases where it turned out to be,
16   you know, pretty questionable or what the
17   allegations are turned out to be exactly the
18   opposite in some cases.
19            So -- but there's intended to be some form
20   of that.
21       Q    So you had just mentioned -- and maybe it
22   makes sense to turn to this now, you talked about
23   kind of -- you said it a number of times, the
24   economic framework with which to view things in this
25   case.
```

Page 98

1          And if I could just turn your attention to
2     Paragraph 53, I think that's the first time you kind
3     of mention that term.
4          A    Paragraph 5-3?
5          Q    Yeah.
6          A    Yes.
7          Q    So, again, tell me what you mean in that
8     first sentence, what's the economic framework
9     supposed to mean here?
10         A    So, again, at the high level, the task, as
11    I understand it at this stage, is to develop a
12    damages model that is able to deal with all of the
13    allegations and economic facts in the case.
14             So I think, you know, at the highest level
15    the economic framework here, you know, is really a
16    lot -- pretty well focused on the model.  I use the
17    term "economic framework" as opposed to saying
18    "damages model" because I think there are a lot of
19    things that feed into that question of what does a
20    damages model need to take into account.
21             And, again, we've been over many of those
22    already this morning.  I'm happy to talk about them
23    more.  But they're really kind of focused on the
24    core question of how is one going to calculate
25    damages in a case like this and what are the

Page 99

1    economic things that need to be understood.

2            And we talked about the parsing and the

3    scaling and the identification of inflation and the

4    statistically significant price increases or not

5    there, so those are all part of the economic

6    framework in my view.

7            We've just been talking about the

8    corrective disclosures and the economic environment

9    around Wells Fargo and the concerns about that, so

10   that's part of the economic framework that has to be

11   thought about.

12           And then obviously kind of the specific

13   level of a model, as I've said repeatedly in my

14   report and talked about, it needs to be -- have a

15   methodology that can account for various potential

16   outcomes in the case.  In terms of whether some

17   categories are ultimately included or not, I don't

18   think at this stage one has to do the final precise

19   calculations of damages, but it's my understanding

20   that one needs to have a model that is thoughtful

21   and complete and can be described as to is there a

22   way in which one can do these things.

23           And, again, I think that hasn't been done,

24   so it's really the model and the economic issues

25   that feed into that model that I characterize as the

```
                                          Page 100
 1   quote, unquote, economic framework.
 2        Q    Okay.  So thank you for that.
 3             The sentence -- second sentence is
 4   Dr. Hartzmark hasn't provided economic framework,
 5   which is all the stuff you just described, but
 6   rather he assumed the allegations to be true.
 7             So are all those things really just a
 8   dispute about how much weight should be given to the
 9   allegations?
10             MR. BLAIR:  Objection.
11             THE WITNESS:  Sorry, Ryan.  Once again, I
12   talked over you.  Did you have a specific objection,
13   Ryan?  I'm not sure if it got on the record.
14             MR. BLAIR:  No.  Just -- just to the form.
15   You can answer.
16             THE WITNESS:  Okay.
17             MR. BLAIR:  You can.
18             THE WITNESS:  Okay.  Yeah.
19             No, I think is the short answer to your
20   question.  That reference there is really to what I
21   understood from reviewing Dr. Hartzmark's report and
22   his deposition to be his view that none of this --
23   and by "this," I mean all of the discussion we've
24   been having, about, you know, model development,
25   being able to deal with parsing and scaling and the
```

Page 101

1    52 days and the fact that the disclosures are

2    lawsuits and allegations, as opposed to that,

3    he's -- as I understand, he kind of washed his hands

4    of that and just said someone is going to have to

5    develop an inflation ribbon and I'm assuming that

6    everything in the Complaint is true.

7            I don't think that's sufficient.  I don't

8    think that that's what's -- what I understand to be

9    required at this stage.

10   BY MR. BLATCHLEY:

11       Q    So, again, I'm sorry to keep harping on

12   this, you're not saying -- you're not providing an

13   opinion that the Complaint's allegations are not

14   true?

15       A    I think I agree with that in the following

16   sense:  I certainly haven't tried to go through

17   every single allegation and do a complete and

18   thorough analysis of every allegation to show

19   whether the facts are supported or not.

20            But I have certainly done analysis to show

21   the challenges that will be associated with doing --

22   showing that, and the difficulty, if not the

23   impossibility, of ultimately being able to identify

24   those things.

25            So, again, for example, on the upfront

Page 102

1    inflation, talked about all the different things
2    that are associated on some of those days with
3    metrics, and I said they're alleging that this
4    caused inflation, but when you observe in 52 days
5    that only four of them have a positive -- even a
6    positive return, I think it's fair to say that
7    raises real concern about whether or not one could
8    ever show price impact on the front end, and those
9    four days themselves have multiple allegations.
10            So I think I have done analysis that points
11   to the complexity of the analysis or the
12   impossibility, and certainly while not ruling out
13   definitively that there's not a shred of truth in
14   any of the allegations, I think that would be too
15   strong a statement at this point.
16            But I do think what I've done speaks to
17   issues of be it the truth or certainly the economic
18   importance of some of the things in the -- in the
19   Complaint.  So, again, that's probably the best way
20   to characterize that.
21       Q    So just following up with that, was that
22   part of your assignment, was to determine the
23   veracity of the allegations?
24       A    Again, I would say not specifically.
25   Again, I certainly wasn't given the assignment "Hey,

```
                                              Page 103

 1    Mr. Deal, I want you to go through the Complaint

 2    and, you know, list every single thing that's in

 3    there and run with it."  That was not my assignment.

 4            But I think my assignment kind of almost by

 5    definition is going to touch on those types of

 6    issues where I say well, my assignment is to analyze

 7    a damages model, and to think about damages in this

 8    case, which I think it is.

 9            And there's essentially nothing that's been

10    done by Dr. Hartzmark on that front, other than to

11    say someone is going to do an inflation ribbon and

12    I'll do the subtraction later, or someone else will

13    do the subtraction later.

14            Then I think one does need to really do a

15    fairly deep dive, which I've done, into the

16    Complaint to understand well, what days are at

17    issue, what are the alleged categories, to think

18    about all those kinds of issues.

19            That's a slightly different assignment from

20    what you said.  And I agree that my assignment

21    wasn't, you know, test all these things and give a

22    thumbs up or a thumbs down as to the truth of them.

23    But it does certainly touch on them in that way.

24            I'm showing frozen screen.  Are you showing

25    that again as well?
```

1      Q    Yeah.  I am -- I am as well.  Should we

2  continue or...?

3      A    Again, I'm totally -- I'm totally

4  comfortable continuing, if you are.  I feel like our

5  conversation is fine.

6      Q    Okay.  Yeah.  So, again, thank you for that

7  response.  So, again, you're talking about --

8  there's just a thing here I wanted to ask.

9           You say the reasonableness of the

10  assumption of truth about the allegations, and what

11  you were just describing you really -- is it an

12  attack on that assumption?  I mean, I just want

13  to --

14      A    Well -- I didn't mean to interrupt you.

15  Sorry.

16      Q    Sorry.  I wanted to make sure I didn't lose

17  you.

18      A    I'm here.  I should be showing up on -- I

19  just clicked and got -- oh, there we go.

20           All right.  This seems to be a somewhat

21  regular occurrence on this, but that's all right.

22      Q    Sorry.  Let me start over.

23      A    Do you have a little button that you're

24  triggering it based on a response, meaning to turn

25  off the video?

```
                                          Page 105
```

1        MR. BLATCHLEY:  Ryan, are you the

2   controller?

3        THE WITNESS:  Ryan is not -- I have no

4   reason to suspect that anyone is, you know,

5   sabotaging the video here.  Joke.

6        Anyway, I had an answer in my head there,

7   but do you mind repeating your question.

8   BY MR. BLATCHLEY:

9     Q    Yeah.  You say it's important from an

10  economic perspective to evaluate the allegations and

11  identify the reasonableness of an assumption of

12  truths.

13        And, again, this is going back to what you

14  mean by the economic framework.  I think you just

15  answered that what you did to evaluate that

16  assumption is to look at the dates when the false

17  and misleading statements were made and assess them.

18  You're looking at the corrective disclosures and

19  what you refer to as, I guess, fraud.

20        And those things need to be considered

21  before you can precisely come up -- or come up with

22  a damages model.  Is that an accurate way of saying

23  things?

24    A    Sorry.  I got a little distracted by the

25  thing going on and off.  Let me try and respond to

Page 106

1   it and see if I've got the right framework here.

2           I might -- I might answer that question in

3   some sense by pointing to the last sentence on

4   Page 53 there to give a little color around --

5           There.  I think I'm back.  There.  Let me

6   see if I can find you, Mike.  There you are.  All

7   right.

8           So I think there's sort of two aspects to

9   it.  So the one is I don't think -- even if one

10  says -- I'm just assuming everything to be true, I

11  don't think that's sufficient.  And I referenced

12  that, that -- so I -- that is not in my mind -- in

13  my experience, not just my mind, my experience and

14  my understanding of the framework, that isn't enough

15  to say I assume everything is true and say there's

16  an inflation ribbon there.

17          There's a -- I think -- and this is your

18  question, I think, was beyond -- beyond this is that

19  deficient, is that warranted, and I have described,

20  and that's what I do in the next, you know, several

21  pages on this, to say this kind of fundamental idea

22  that, you know, the statements were inflationary and

23  that they contained information that wasn't known

24  and similarly that the -- that the -- or they

25  contained specific information that would cause

1    the -- cause inflation and that the back end

2    disclosures contained information that wasn't known

3    in the market previously, again, I say -- they're

4    not necessarily warranted, not because I say I know

5    for 100-percent certainty there's zero truth to any

6    of the allegations.  I'm not saying that.

7            But even if it were sufficient to assume

8    the facts to be there, I say there's reason to think

9    that either the facts are incorrect or that they

10   missed the complexity of the economic environment

11   and economic factors that need to be taken into

12   account.

13           That may -- I fear that may not be exactly

14   the answer to your question, but tell me if it is.

15       Q    It's not but we'll move on.

16           So, yeah, you describe here, right,

17   essentially whether it's reasonable for

18   Dr. Hartzmark to assume the allegation in

19   Paragraph like 5- -- just following along, 55, 56,

20   and then 57, you conclude at 58, these are -- these

21   are facts that he didn't consider that pertain to

22   this idea that you can't just assume the allegations

23   are true.

24           Is that -- is that fair?

25       A    Yes.  I think that is fair in the sense

Page 108

1    that -- there's two parts of it.  One is are they

2    literally factually true and related to that, do

3    they -- are they consistent with the economic

4    framework that one needs to think about for damages.

5              So I think the way to illustrate that, if

6    you don't mind if I give a little bit of an

7    explanation there, we've been -- we talked a while

8    ago about this -- the back end disclosures for a

9    minute.

10             I think -- again, I'm not disputing that

11   that information was known before.  I don't have any

12   reason to think that's true, so I'm not disputing

13   that there was information about these lawsuits that

14   came out.  I don't think that -- you can assume that

15   to be true.  I don't think that there's really

16   strong evidence that would suggest that's not true,

17   that those lawsuits were filed.

18             But, again, I think that's not quite

19   sufficient.  It doesn't provide the full background

20   of implicit in a securities lawsuit is the idea that

21   this is new information that wasn't known and it's

22   substantively something that would affect the price

23   of the securities as opposed to other kind of

24   factors.

25             And I think in some ways that's -- that's

1    certainly part of my critique.  And in some ways I

2    think at least with regards to the back end

3    complaint, it's probably most of the critique, that

4    this -- the broad concept of cramming and billing

5    issues was well-known out there and we've talked

6    about the fact that these are really allegations.

7            So it's a combination of those things which

8    is why it's kind of characterized as economic

9    framework as opposed to a detailed analysis of each

10   allegation in there.  It's not -- they're related

11   but not the same thing.

12       Q    Okay.  So thank you for that.

13           And, again, these paragraphs that we're

14   talking about, let me just put it this way:  You're

15   saying that there's a lot of information already in

16   the market about these kind of activities, and

17   therefore, you know, the corrective disclosures

18   really can't be corrected because investors

19   effectively know the truth already?

20       A    I mean, that would be the extreme form of

21   the statement.  I don't think I'm making quite --

22   well, I'm not intending to make it quite that

23   extreme.  It's just to say it's not possible for

24   information to have an effect but certainly the idea

25   that -- the broader concept of -- well, put it this

Page 110

1   way:

2          I think -- to think that investors would be

3   assuming that there were not any concerns about

4   CenturyLink's billing practices or cramming or

5   really any other industry participants, I disagree

6   with that.

7          I think there's plenty of information out

8   there and people's individual experience would be

9   sufficient to say there are going -- it's not a

10  surprise.  That's part of the normal course of

11  business.

12         I think the real question is is there

13  something beyond the normal course of business where

14  there's always going to be certain disputes and

15  things like that at some level.

16         And that's where I think you get into these

17  concerns about the Wells Fargo environment and the

18  fact that are these lawsuits which are coming on the

19  heels of Wells Fargo, they're not disclosing -- it's

20  not the first time the investors are aware that

21  these are concerns.

22         These are obviously specific lawsuits that

23  one might be -- I imagine the investors were

24  concerned, you know, could be pointing towards a

25  Wells Fargo, but that's the difference from saying

```
                                                  Page 111
 1   that's the truth of the matter.
 2       Q    So let me just focus on something a little
 3   bit more narrow here.  So Paragraph 56 you're
 4   talking -- I guess 56, 57, 58, you're talking about
 5   cramming here.
 6            Can you tell me what you mean by "cramming"
 7   in these examples?
 8       A    In these specific examples?
 9       Q    Yeah.  When you reference cramming here,
10   what do you --
11       A    Yeah.
12       Q    What do you mean by that?  55 you say the
13   issue of cramming, what do you take that term to
14   mean in the context of these paragraphs in this
15   report?
16       A    I mean, the high level I think cramming
17   essentially involves concerns of unauthorized
18   charges in billing, so it's not something the
19   consumer agreed to.
20            That can obviously take some different
21   forms as to whether are there services that I'm
22   being charged for that I didn't think I signed up
23   for, is the price different from what I understood
24   it to be.  So there can be variations but at the
25   highest level it can be consumer unauthorized
```

Page 112

1    charges.

2        Q    So in Paragraph, I guess it's 56, these

3    examples from beginning in 1999, I guess, over 20

4    years ago, through 2014 and 2015 is your last bullet

5    point, is that what you mean using the term

6    "cramming"?  Is that applicable to those examples in

7    that paragraph?

8        A    Yes.  I think so.  I think, again, it's a

9    broader concept.  It can -- I think it can take

10   various forms in my experience.

11           So some of these would be specific to

12   third-party type charges, for example, where I

13   myself had problems with this.  Well, you're

14   probably considerably younger than I am so you may

15   not have had problems, but back when we all had wire

16   lines and landlines, you know, you'd sort of be

17   looking at that and say wait a second.  I didn't --

18   what's this charge from this third party on here,

19   and there were certainly lots of complaints about

20   that.

21           As they opened up -- the wire line

22   companies opened up their platform to third parties

23   to be able to bill as your phone bill as opposed to

24   having to separately charge you for the service.

25   So, you know, that's one form of it, but it's not

Page 113

1    the only form.  There can obviously be things like

2    hey, you charged me for call waiting.  This is back

3    when all these services actually had incremental

4    costs to them.  I'm dating myself a little bit.  And

5    I didn't sign up for that.

6              So, again, it can be third parties.  It

7    could be other services.  It could be variations of

8    those things.  But in some of these examples I think

9    are some of the third parties type things, but the

10   general definition of unauthorized charges is a

11   little broader than that, too.

12       Q    So for my clarification, 56, are there any

13   descriptions there that are not third-party

14   cramming?

15       A    Yes.  I think like the second bullet, for

16   instance, on there talks about phone companies can

17   cram consumers by adding unauthorized charges for

18   telephone services such as call messaging.

19              In my experience, call messaging would be

20   something that the telephone company itself would be

21   providing, so...

22       Q    And that's from the 2000 report?

23       A    Yes.

24       Q    Okay.  Do you understand plaintiffs' case

25   to be about third-party cramming?

Page 114

1      A    I don't believe that's true.

2      Q    You talked about -- let me put that another

3   way.  Is it fair to say that allegations of

4   third-party cramming might not put investors on

5   notice of other types of cramming?

6      A    If I understand your question, it's sort of

7   a form of the fact that there have been concerns

8   about billing and services for years, let's -- in

9   the earlier years they may have been about

10  third-party issues.

11           The question is is that specifically

12  putting consumers on notice that in a world where

13  there's not third-party issues but there nonetheless

14  can be "Hey, I didn't authorize this service" or

15  "You gave me a triple play instead of a double play"

16  or all kinds of variations, certainly at the highest

17  level I think it does put investors on notice that

18  there are concerns in these consumer-facing

19  companies about, you know, unauthorized charges, I

20  think in a broad category they're the same.

21           Are they exactly the same, no, they're not

22  exactly the same, but, again, in my experience and

23  even like we just said, it wasn't only third-party

24  services that were at issue before.

25           And having worked on cases involving these

Page 115

1  kind of issues over many years, I do think -- well,
2  to put it in the extreme, I certainly don't think an
3  investor in CenturyLink would say I'm shocked that
4  there are allegations in the Heiser lawsuit that
5  there was pressure to add services, not from third
6  parties, but from the company itself.
7          I do think that investors would be on
8  notice that there's certainly going to be concerns
9  about unauthorized charges, even if they're not
10 third-party charges, given all the history of these
11 kind of companies.
12         Even if the allegations aren't the same
13 exactly in terms of third party versus other things,
14 but they certainly belong in the same family of
15 concerns about unauthorized charges.
16 Q    Have you done any analysis to determine the
17 actual amount of cramming that was going on at
18 CenturyLink during the class period?
19 A    No is the answer to that.  I do have
20 analysis in my report about levels of complaints
21 which I think speak to those questions, but I have
22 not myself been asked to do an analysis of the
23 incident, the frequency of complaints or of
24 cramming, quote, unquote, unauthorized services.
25         I haven't done any independent analysis of

Page 116

1   that.  But, again, I do have information to speak to

2   those questions in my report.

3       Q    So just, for example, you haven't looked at

4   any internal CenturyLink documents, have you?

5           MR. BLAIR:  Object to the form.

6           THE WITNESS:  Not that I recall or recall

7   citing.  I'd need to look at my Exhibit B or my

8   Appendix B to see if there were any on there, but

9   this is not a -- certainly at a high level this is

10  not an analysis of the kind of internal operations

11  of CenturyLink.  That's not what I was asked to do.

12  BY MR. BLATCHLEY:

13      Q    I want to clarify it because I think it's

14  important.

15          Have you looked at any internal CenturyLink

16  documents dated during the class period?

17          MR. BLAIR:  Same objection.

18          THE WITNESS:  Just give me a moment here.

19          I think the answer is no, to the extent

20  what you're referring to is any nonpublic

21  information.  I certainly have lots of analysis and

22  listings of kind of CenturyLink documents, meaning

23  earnings releases, things like that.

24          But I took your question to be have I had

25  any access to nonpublic data or e-mails, things like

Page 117

1    that.   The answer is no.

2    BY MR. BLATCHLEY:

3         Q    Okay.   That was the question.

4         A    Okay.

5         Q    Thank you for clarifying it was nonpublic

6    information.

7              So you say in Paragraph 58 that, you know,

8    Dr. Hartzmark hasn't shown how the corrective

9    disclosures -- I think that's what you mean -- were,

10   in fact, internally different than concerns in

11   history, the instances you cite in the preceding

12   paragraphs.

13             Is that an accurate way to put it?

14        A    Yes.   I think I say pretty close to those

15   words in the last sentence on Page 34.

16        Q    So beyond listing these examples, right,

17   that you have in Paragraph 56, 57, did you read all

18   these articles in connection with this report?

19        A    Did I personally read every word of every

20   article?   No.

21        Q    Okay.   So what did you do to evaluate the

22   differences between these instances and the

23   corrective disclosures?

24             MR. BLAIR:   Object to the form.

25             THE WITNESS:   I'm not quite sure I

Page 118

1    understand your question.

2    BY MR. BLATCHLEY:

3        Q    Maybe I'm asking it the wrong way.

4            You're saying that Dr. Hartzmark didn't do

5    that.  You yourself didn't do that either; is that

6    right?

7            MR. BLAIR:  Objection.  Misstates

8    testimony.

9            THE WITNESS:  I don't think I'd quite agree

10    with that.  I mean, Dr. Hartzmark hasn't done

11    anything about this, so that's -- I think other

12    than -- well, I don't think he's really done

13    anything with regards to this.  He just sort of says

14    I'm assuming everything in the Complaint is true.

15            I -- I -- I have shown, and we've just been

16    discussing fairly extensively, the fact that there's

17    certainly -- to the extent there's typically a

18    premise in a securities case, that the corrective

19    disclosure information was not known prior to that.

20    I say well, in the larger sense that's not true

21    here, that it certainly is not accurate to say that

22    the disclosures would have been the first

23    opportunity for investors to understand that there

24    are concerns about unauthorized charges.  That's

25    absolutely not true as a premise.

1          And that's not -- again, the Complaint

2    itself doesn't say those words, so I think it's

3    important to understand that that's typically a

4    premise of no public information, then oh, suddenly

5    we discover that you didn't get that big contract,

6    to go back to my hypothetical.

7          So what I'm pointing out is that kind of

8    implied premise isn't there in this case.  That

9    doesn't mean, to the discussion we've been having

10   for a while now, that it's not quite the same as

11   saying the investors knew all the specifics of all

12   the lawsuits.  I don't think that's true.

13         But it calls into question the typical

14   causal link of no public information, then oh, my

15   gosh, they didn't get the contract out there.  I

16   don't -- I don't think that is well -- I don't think

17   that's a justified assumption.

18         So then that leads to the question of -- of

19   which I'm referring to here, of well, what is

20   different, if anything, about these.  Why -- why

21   might one think these are something different from

22   just normal course, right.  You always get some

23   complaints about that, and they've even been sued

24   before, right.

25         And I note in my discussion that the Wells

Fargo type environment, which the Complaint itself clearly hangs its hat on the Wells Fargo type environment here, that that was an additional factor in the environment. There's been nothing that I've seen that suggests that this was a Wells Fargo kind of situation.

I haven't seen anything that Dr. Hartzmark has done or whatever that would say not only were these substance -- were these allegations in a lawsuit that this is Wells Fargo 2, but, in fact, that turned out to be true. They paid a gazillion dollars in fines. You know, there was a huge shake up in the company. I haven't seen anything to suggest that.

And that's where I say what's new about that besides the fact the environment and the heightened awareness. Dr. Hartzmark certainly hasn't done any of that analysis.

MR. BLAIR: Mike, we've been going 90 minutes. Maybe it's a good time for maybe a little longer break than ten, I guess.

MR. BLATCHLEY: Yeah.

MR. BLAIR: On the left coast it would be lunch but I just wanted --

MR. BLATCHLEY: That's totally fine. I

Page 121

```
 1   haven't eaten.  I can do that as well.
 2           THE WITNESS:  Like I said, I can weigh in.
 3   I wouldn't mind getting a bite to eat.  I don't need
 4   a long time, I think, so I'm fine with like a half
 5   hour.
 6           MR. BLATCHLEY:  Ryan, do you want to
 7   just -- do you want to just e-mail and we'll get
 8   together by e-mail, like let's call it 45 minutes?
 9   Is that okay or do you want shorter?
10           MR. BLAIR:  30 or 45 works for us.
11           MR. BLATCHLEY:  Okay.  And I'll e-mail you
12   guys if we're not obviously back together.
13           MR. BLAIR:  Okay.  Why don't we go off the
14   record.
15           THE VIDEOGRAPHER:  Okay.  The --
16           THE WITNESS:  I can offer up the idea if
17   you only have 15 more minutes to go, I'm happy to
18   stay on.  Just a suggestion.
19           MR. BLATCHLEY:  No.  I got a little bit
20   more.  Sorry, guys.
21           THE WITNESS:  Oh, well.  Okay.  A half hour
22   for lunch is fine.
23           THE VIDEOGRAPHER:  So the time is
24   12:00 p.m. Pacific standard time.  We are off the
25   record.
```

Page 122

1          (Lunch recess taken at 12:00 p.m.)

2

3    \\\

4    \\\

5    \\\

6    \\\

7    \\\

8    \\\

9    \\\

10   \\\

11   \\\

12   \\\

13   \\\

14   \\\

15   \\\

16   \\\

17   \\\

18   \\\

19   \\\

20   \\\

21   \\\

22   \\\

23   \\\

24   \\\

25   \\\

```
                                            Page 123

 1                 FRIDAY, APRIL 24, 2020;

 2                      12:55 P.M.

 3

 4

 5                      BRUCE DEAL,

 6     having been previously duly sworn by the reporter,

 7        was examined and testified further as follows:

 8

 9          THE VIDEOGRAPHER:  Okay.  The time is now

10     12:55 p.m. and we are back on the record.

11

12                 EXAMINATION (resumed.)

13     BY MR. BLATCHLEY:

14        Q    Mr. Deal, I'd like to just start by I think

15     clarifying something you had said earlier, making

16     sure I have a correct understanding of what you were

17     saying.

18            So the question I have is is it necessary

19     to have a statistically significant increase in

20     price in order to show price impact?

21        A    That's an -- that's an interesting

22     question.  I think -- my experience is in practice

23     that it's not necessarily a requirement but it's the

24     most common starting point in a situation, like in

25     this case on the up side of inflation, looking for
```

Page 124

1   increases, obviously on the down side of the

2   corrective disclosures.

3           It certainly is a theoretical at least

4   argument that, you know, the inflation or the

5   statement itself might have otherwise inflated or

6   otherwise deflated the stock price, but other

7   factors caused it to go the opposite direction so

8   you don't observe it.

9           That -- I mean, conceptually that can

10  certainly happen.  There's no, you know, kind of

11  theoretical problem with that.

12          I think, again, my experience is as a

13  practical matter that's very, very difficult to show

14  and to identify that, so I wouldn't rule it out as a

15  possibility, but, again, as a practical matter I

16  find that to be typically a starting premise for any

17  price impact analysis.

18      Q    Okay.  So the starting premise is not a

19  requirement; is that right?

20      A    I certainly don't think it's a legal

21  requirement, necessarily, although I think

22  there's -- some of the cases that I'm aware of seem

23  to be suggesting that if you can't show price change

24  in the perspective direction, that itself is -- I'm

25  paraphrasing, strong evidence or whatever on it.

1          But I'm speaking more from a theoretical

2     perspective, you can imagine news that otherwise

3     would if it was the only thing known caused the

4     statistically significant increase or decrease, and

5     if there's a perfectly offsetting other information

6     theory, I think in practice that's very hard to do.

7          Q    So I guess I'm asking a little different

8     question.   Say the example that you just mentioned,

9     the offsetting information, it's certainly

10    possible -- or would you agree that it's possible

11    that you could have a false statement together with,

12    I guess we'll call it confounding information or

13    some other statement that offsets the impact that

14    the statement would otherwise have, would you agree

15    that that's a possibility?

16         A    Yeah.   I think it's at least a theoretical

17    possibility, sure.

18         Q    And in that scenario you wouldn't expect to

19    see a statistically significant increase in stock

20    price?

21         A    Not given the hypothetical you just said,

22    which is a sort of perfectly offsetting news in the

23    opposite direction.   Almost by definition that

24    wouldn't occur.   So the real challenge, of course,

25    is how do you identify the fact that the news that

1    you're focused on would otherwise have caused it.

2         It's a form of the same issue that we've

3    been talking about of parsing out.  It's kind of a

4    in your face form of it in that if there's not even

5    a statistically significant movement in the expected

6    direction, I find again as a practical matter that

7    sets the bar awfully high and I don't see anyway in

8    this case it could be overcome.

9         Q    So here's what I want to go through.  So

10   it's certainly a theoretical possibility, as you

11   just said, that if you have offsetting information

12   you wouldn't expect to see a statistically

13   significant increase in the price even though there

14   would be price impact, correct?

15        A    Yeah.  Before I answer the question, you're

16   a little quiet to me.  I don't know if you are to

17   other people.  I don't know if there's a way to get

18   a little closer to the mike.

19        Q    Let me -- sorry.  Let me -- is this better?

20   Can you hear me?

21        A    Yeah.  I can hear you and that is a

22   little -- a little bit better for me.  Thank you.

23        But I think your question was with the sort

24   of -- you know, is it possible that there's price

25   impact given the presence of offsetting information

1    effectively.    I think it's a -- if I understand the

2    question it's essentially the same question, to say

3    could there be -- if you had a method that you could

4    identify that had this news come out on its own, it

5    would have had a price impact, but, again, it was

6    offset by some other information there, again,

7    theoretically, sure, I think that's possible.

8            And in that case, I don't know the case law

9    so there's a -- there's sort of another branch of it

10   but from a legal standard of what -- and I can't

11   really speak to that, but as an economic proposition

12   it's at least theoretically possible.

13       Q    Got it.

14            Okay.  So, again, let's just maybe take

15   your contract example, right.  You're talking about

16   you falsely announce a contract and that causes the

17   stock to go up.  Say the next quarter you say the

18   contract is doing just fine, right.

19            In that example there's a false statement,

20   right?  You're with me on my hypothetical?

21       A    Yeah.  The premise is that there really

22   never was a contract, as I understand your

23   hypothetical.

24       Q    Right.  Yeah.

25            And, you know, the company reports results

Page 128

1   that are totally in line with expectations.  In that

2   scenario you wouldn't expect to see a statistically

3   significant stock price increase, would you?

4       A    I think what you're describing is sort of

5   what sometimes people refer to as a price

6   maintenance sort of situation, where if there was

7   some initial inflationary and you kind of repeat the

8   same information effectively, we wouldn't

9   necessarily -- it's not new news to the market at

10  that point in time, so we wouldn't expect that news

11  on its own -- to the extent it's essentially just a

12  repetition of previous expectations, I wouldn't

13  expect that to move the price, if that's your

14  question.

15      Q    And so we'll take that.

16           And then the next example is an event,

17  let's say, building on kind of the first

18  hypothetical, you know, the next -- the next

19  quarter, you know, analysts have their estimates,

20  and you have the contract that doesn't exist, but

21  the company also truthfully discloses that its like

22  major manufacturing facility has this huge fire and

23  the stock -- would you expect in that case, this

24  negative information, could have a, you know --

25  could decline -- could cause a stock price decline,

1   even a statistically significant one, and there

2   could still be price impact?

3      A   Let me just repeat that.  So I got the fire

4   part of the hypothetical.  Are you saying on the

5   same day they also disclosed that -- when they

6   disclosed the truth that they never had the

7   contract?

8      Q   No.  They're lying about the contract

9   again.

10      A   Well, I guess -- I think it's sort of back

11   to the same example.  I think what you're describing

12   is a form of the price maintenance, that with the --

13   with the fire it goes down and you expect that to go

14   down, but for that there's not, let's say in a

15   perfect world you're able to figure that out.  Okay.

16   That's the only thing that moved it and it moved it

17   exactly what you would expect and therefore --

18        Again, I think it's price maintenance.  To

19   the extent there's a price impact, again, I think

20   you're sort of stepping over the line a little bit

21   into legal territory a little more than economic

22   territory.

23        I mean, I agree as an economist that had

24   you disclosed that you didn't have a contract, we

25   would expect it to go down.  You repeated the same

Page 130

1   false information so nothing happened.  It wasn't a

2   change in expectations.  Whether that qualifies as

3   quote/unquote price impact is I think essentially

4   kind of a legal question.  But, again, I agree that

5   but with different news the price could move.

6       Q    And, again, I guess just so I'm clear, you

7   agree to the premise that -- I don't want to comment

8   with counsel that you could have a significantly

9   significant decline, say the fire example, you could

10  introduce another false statement on that date, say

11  we got another new contract, when you really didn't,

12  and the overall price decline could be statistically

13  significant in a negative direction, but there could

14  still be price impact based on that false statement.

15          Do you agree with that?

16      A    I think I followed your -- your somewhat

17  increasingly complicated hypothetical, but I think

18  you're stating it as clearly as you can state it so

19  I'll give you credit on that.

20          Again, I think the answer is yes, in that

21  what -- the challenge, of course, is being able to

22  identify and measure that price impact.  But from a

23  conceptual perspective, you know, super bad news

24  that dropped the stock price, combined with a lie

25  that should have increased it by a bit, you know, it

1   may be kind of initially mapped in there by the big
2   drop, but one has to propose a method to actually
3   show how you would parse that apart.
4        I think it's easy to just sort of
5   theoretically say that that's true.  It's very
6   difficult to actually do that.  But I don't
7   disagree, it's conceptually possible.
8        Q    Okay.  And like you just mentioned, it's
9   very -- or you were saying it's difficult to parse
10  those different effects out, and that's not
11  something you attempted to do here in your report,
12  right?
13       A    I certainly didn't attempt to literally do
14  the parsing and quantify that.
15       I did do things related to that as we
16  talked about to identify the confounding information
17  on days I did -- again, I did do the initial event
18  study to identify kind of the starting point of how
19  many days even went up, versus these four it went
20  down, which is eight, versus which no significant
21  change, which is the remainder, so all these things
22  speak to that but I didn't literally do the parsing.
23       Q    Okay.  And just one last point.  I think
24  you're going to agree with it.  I don't think it's
25  controversial.  Suppose in our, again, hypothetical

Page 132

1    example we falsely mask the contract on day one --

2    let me try something else.   Bring us back to our

3    contract example.

4          Say my contractual partner, Company B,

5    announces -- falsely announces that we got a

6    contract and Company A, our company, that we were

7    talking about, their stock inflates in response to

8    that news.  And you have the next quarter

9    Company A -- let me just do this again.

10         Company A affirms the false contract.  You

11   wouldn't expect a statistically significant increase

12   in price in that example, would you?

13   A    I think the answer is I wouldn't expect it,

14   but just to make sure I get your hypothetical, your

15   partner announces it, you don't deny it in quarter

16   one, both -- both stocks go up.

17         The next quarter you again -- you may

18   affirmatively say yeah, I mean, it's a lie but you

19   say yeah, we do have this contract out there.

20   Q    Yeah.

21   A    With the market having already

22   quote/unquote baked into the price --

23   Q    Yeah.

24   A    -- the expectation that you got it, I

25   wouldn't expect to see an incremental change unless

Page 133

1    there was some -- it was a bigger contract --

2         Q      Right.

3         A      -- or something like that, but if it's just

4    literally a repetition of the news, even if they

5    didn't make the original false statement but didn't

6    make the denial of it, the market may well have

7    learned of it that way.

8         Q      Okay.  So let's say in our hypothetical --

9    I'm trying to think.

10            So we have -- we have a contract and we

11   truthfully have the contract and we announce the

12   contract.  And the following in between quarters the

13   contract is broken by our partner and it turns out

14   they're suing us.

15            It's a total disaster and we're filing our

16   annual report the next quarter, and it requires us

17   to disclose literally that fact and we don't say

18   anything, would you expect a material increase in --

19   I'm sorry, a statistically significant increase in

20   price based on that omission?

21            MR. BLAIR:  Object to the form.

22            THE WITNESS:  I -- I think I understand

23   your hypothetical.  I think you meant decrease but I

24   understand the point.

25            It's sort of you have the truth.  This

Page 134

1    contract has fallen apart.  You're positing a legal

2    obligation to tell people that and you don't.  I

3    wouldn't expect at that point -- the market is still

4    operating under the understanding that you do have

5    it until you actually disclose it, so I wouldn't

6    expect it to drop until somehow it's disclosed.

7    BY MR. BLATCHLEY:

8        Q    And in that impact the false -- sorry, the,

9    I guess, the actual admission would have a price

10   impact, it just wouldn't be reflected as a

11   statistically significant increase in price?

12       A    Again, under your hypothetical you would

13   never expect an increase in price.  I think you're

14   talking about the opposite, a decrease in price,

15   right.

16       Q    I was -- I think we might be passing each

17   other.

18            No.  That's the point.  It's not -- I'm

19   talking about the impact from the false statement.

20       A    I thought in your statement it was the

21   market knew we had a contract, the contract falls

22   apart.  When the market learns the truth of that, I

23   expect the stock to drop.

24       Q    Yeah.  Sorry.  Let me clarify.

25            We have the contract.  We truthfully have

Page 135

1  it.  We announce it.  Our stock price has gone up.

2      A    Yeah.

3      Q    During the quarter the contract falls

4  apart.  It's a disaster.  We're required to disclose

5  those facts in the following quarter.  We don't

6  disclose those facts.  Okay.

7      A    Right.

8      Q    Would that failure to disclose, that

9  omission, be expected to cause -- all else equal, be

10 expected to cause a significant increase --

11 statistically significant increase in price?

12     A    I think the answer is no.  I think the way

13 you're phrasing that -- it's sort of if they had

14 done what they were supposed to do, it would have

15 gone down?  It does go down but you're asking do I

16 expect it to go up, no, I don't expect it to go up

17 in that case because it's essentially not changing

18 the mix of information.

19     Q    And you're saying -- again, the premise of

20 a lot of your opinion is that there's a physical be

21 it quantifying or measuring that mix of information.

22          Is that a fair statement?

23     A    I certainly agree with that, that there's a

24 lot of information.  You have alleged 55 days of

25 inflation, 52 of which where they expected to move

1    the stock price five categories and so forth.  On

2    each of -- those days have lots of other information

3    out there, so, you know, a form of your hypothetical

4    is to say do I observe, you know, the first day --

5    the first information going up, and then all the

6    rest of them are simply repetitions of exactly the

7    same information, so I wouldn't expect it.

8            I don't think that's how you pled your

9    case, but conceptually that would be a form of it.

10   But I'm just saying that we don't observe those

11   incremental inflation occurring from those other

12   days.

13       Q    Okay.  And so -- and, again, your -- that

14   Figure 5, 18D I think it was, I think that was the

15   one you were just referencing, what you were doing

16   there is taking from plaintiffs' Complaint what you

17   believe will be the inflationary dates where you

18   would expect that inflation.  Is that -- can I -- is

19   that accurate?

20       A    I am taking --

21            Sorry, Ryan.  Was that an objection?

22            MR. BLAIR:  Yeah.  Objection to form.

23            THE WITNESS:  Okay.  I don't mean to

24   suggest that you should be objecting if you're not.

25            MR. BLAIR:  No.  Don't worry.

Page 137

1          THE WITNESS:  There are times I do join in

2    the objection, though.

3          Anyway, I agree with you that I'm going

4    through the Complaint, I'm identifying the days.  I

5    think to the extent the totality of those days is

6    the inflation out there, I'm saying let's take a

7    first step to analyze do I even observe the stock

8    going up by a statistically significant positive

9    amount?  I see it going down more than up, but

10    mostly not changing.  And then I look at the

11    complexity of the information, so it's certainly

12    complex.

13          And the second part is to say having seen

14    that pattern of only a few positives and more

15    negatives than that, this is a -- in my view with

16    this evidence, this is going to be extremely

17    difficult or I don't really see how it's going to be

18    possible to do it out there.

19          So that's the -- that's the combination of

20    the two things I've done.

21    BY MR. BLATCHLEY:

22    Q    It's really just your criticism of the lack

23    of kind of detailed damages model or -- is that --

24    is that fair?

25    A    I agree that there has not been a detailed

1    damages model, and I agree that I think you're

2    saying that a detailed damages model would need to

3    do that.

4              So, for example, in your hypothetical

5    finding a way to say I see that the stock price

6    actually goes down but yet really this inflation

7    part of it actually would have caused it to go up.

8    That's theoretically possible.  Extremely difficult

9    in my experience and certainly nothing that's been

10   proposed in this case.

11       Q    And, again, just going back, you know,

12   you're saying it's difficult based on plaintiffs'

13   allegations, right?

14       A    Well, I mean, plaintiffs' allegations play

15   into it.  I suspect, though, you could have a

16   different theory with somewhat different

17   allegations, but if the same broad fact pattern

18   holds it would also be extremely difficult.

19             So it's not just this, if I'm following

20   your question.

21             THE VIDEOGRAPHER:  Pardon me.

22             Mr. Deal, could you please pull your screen

23   down slightly because I'm kind of losing you.  There

24   we go.  Thank you very much.

25             THE WITNESS:  You're welcome.

Page 139

1    BY MR. BLATCHLEY:

2         Q    Maybe I'll ask it -- sorry.  Ready to go?

3         A    I'm ready, yeah.

4         Q    Okay.  So let me -- you keep referring to

5    the complexity of the damages model here.  What do

6    you consider complex versus simple?

7         A    Yeah.  That's probably a good question.  I

8    mean, simple would probably be the beginning of our

9    hypothetical that we've been working with for a

10   while of a fact pattern of a clear statement of

11   inflation that causes a statistic -- positive

12   statistically significant increase in stock price.

13        That persists for a while and then a clear

14   single revelation of the truth by the company, let's

15   say, or maybe not even the company but something

16   that is clearly the truth, if the partner says the

17   thing fell apart or the company does but it's not --

18   it doesn't always have to be the company but it's

19   not a dispute, it's not just an allegation, it's not

20   just a lawsuit, it's not whatever.  So I would say

21   that's sort of a stylized simple.  And I've been

22   involved in cases that have somewhat more of that

23   type of pattern in them.

24        I think to the heart of your question, the

25   complex point is when you have multiple inflation

Page 140

1  days, multiple disclosure days, multiple things

2  happening on each day, where the disclosure itself

3  isn't a clear factual revelation but, again, is more

4  of an investigation, allegation of the lawsuit,

5  things like that, and where you don't have

6  intermediate, during the class period, variations in

7  the inflation, and I guess the last one on top is

8  where it kind of is a single allegation.

9        So I would say this case checks every

10  single box in the opposite direction.  To say is

11  this more like Bruce's simple case or is this more

12  like Bruce's complex case, I'd say this one pretty

13  clearly, check, check, check, check, check, this is

14  complex.

15    Q    So where would like Williams fall in?

16    A    Well, as I said, I can't remember all the

17  details of Williams, but what I can remember about

18  it, it -- I don't recall it having this level of

19  complexity or even really close to this level of

20  complexity.

21    Q    So, yeah, describe for me what that means.

22  We talked about how complexity is introduced because

23  there's a number of, you know, pieces of information

24  that are disclosed, or what I mean by disclosed in

25  this context, said made public on false statement

Page 141

1   days, right.

2           Would that -- did you have a similar

3   situation with that in Williams?  Was there -- were

4   there only false statements on -- during the class

5   period, no other information that was not false?

6           MR. BLAIR:  Object to form.

7           THE WITNESS:  Yeah.  We've already

8   discussed the fact that certainly my recollection --

9   well, I should say I honestly don't remember

10  whether -- what I do recall is having to do some

11  parsing, which we talked about.

12          I honestly don't remember whether that was

13  parsing on the inflation side or parsing on the

14  corrective side, but I remember -- as I said, I

15  remember having to say well, if there was a positive

16  increase or a negative, at least two things happened

17  and we have to parse that apart, and we were able to

18  find a method to do it in there.

19          So I would put it not at the very, very

20  simple end because anytime in my experience that you

21  have to do the parsing, it's going to be moving

22  directionally towards complexity.

23          The more things that are announced, the

24  more metrics, the harder that is to do.  So it was

25  moving somewhat in the direction -- you know, I -- I

```
                                          Page 142
```

1   don't have perfect memory as I said of all the --

2   BY MR. BLATCHLEY:

3       Q    Yeah.

4       A    -- allegations in the case.

5            But, you know, if you say one is Bruce's

6   simple stylized, ten is about as complex as you can

7   get, you know, it maybe was a two or a three or

8   something like that.  I mean, it was not the

9   simplest form but, you know, it was something that

10  one could do on it.

11           I mean, here you've got -- well, I won't go

12  through the long list.  We've been through it many

13  times, but you've got years of allegations and so

14  forth, so...

15      Q    Yeah.  And then, you know, again, we've got

16  three disclosure dates in this case.

17           Do you remember how many disclosure dates

18  there were in Williams?

19      A    I don't, no.

20      Q    Any information that you were parsing, can

21  you give me a ballpark of kind of the pieces of

22  information that you were trying to calculate in

23  that case?

24      A    You know, again, I think I probably plumbed

25  the recesses of the memory cells about as much as I

Page 143

1    can do.  I -- I have some memory of, again, some

2    type of revenue information and something else, but

3    that's -- that's stretching it to some form of that.

4        Q    Do you remember how long like the class

5    period was in Williams?

6        A    No is the answer.  I don't recall it being

7    anything like as long as this one, but I just don't

8    remember.

9        Q    Okay.  And then just so I understand your

10   argument about complexity, are you saying that

11   CenturyLink is a -- you know, you laid out in your

12   Figure 5 that it's an information-rich disclosure

13   date, you have in your Exhibit 6 that there's a lot

14   of different financial metrics that were disclosed

15   on false statement dates or inflation dates I think

16   you called them.

17           Are you suggesting that that is, you know,

18   abnormal in terms of, you know, companies in the

19   telecom industry or more broadly?

20           MR. BLAIR:  Object to the form.

21           THE WITNESS:  That's a good question.

22           I think -- like take the second part of

23   that question first.  On the sort of -- on any given

24   day, disclosure days, earning days, is it unusual

25   for there to be, you know, dozens of different

Page 144

1    metrics disclosed?  Not particularly, I would say.

2          This company does have a lot going on in

3    addition to just financial results.  There were

4    mergers at various points in time.  There were

5    reorganizations of their reporting.  They did cash

6    stock buyback.  So I think they were at the complex

7    end.

8          But it's certainly not unusual as a general

9    proposition for numerous things to be disclosed on

10   earnings disclosure days there.  But even

11   conditional on that in my experience this is even

12   more than usual, but it's not like normally it's

13   just one thing and here it's 40 things.

14          But, you know, you might find -- I'm just

15   making this up a little bit, but, you know, a dozen

16   things normally.  In here we've got somewhat more.

17   BY MR. BLATCHLEY:

18      Q    Again, you said based on your experience

19   this is a lot.  You didn't do any other analysis to

20   kind of compare this particular company with others

21   in terms of, you know, the, I guess, information

22   rich quantification that you did with respect to

23   CenturyLink?

24      A    Not in any statistical sense so I don't

25   have the equivalent on my table showing on each day

1   how many different metrics, so, no, I don't have

2   that.

3           But that's -- this is more based on my

4   broad several decades of experience working on a

5   variety of different types of cases, including

6   securities cases and looking at what's being

7   disclosed on quarters.

8           It's my experience that this is at the more

9   complex end, but I haven't done a statistical

10  analysis.

11     Q    Right.  And so I want to focus, I think

12  what the relevant experience -- obviously you'll

13  disagree with me -- is in the securities class

14  action Section 10b class certification context.

15          So in that context, based on your

16  experience, is this certainly -- again, same

17  question, how is this abnormal and where does it

18  fall along that complexity scale that you were

19  mentioning?

20          MR. BLAIR:  Objection to form.

21          THE WITNESS:  I'm trying to follow your

22  question.  I'll agree with your advanced statement

23  that I would argue that's not the only relevant

24  experience here.

25          But conditional on that, the answer to your

Page 146

1   question is this would fall onto the more complex

2   end of those.  And we just talked about Williams,

3   for example, which is one where there was, you know

4   some parsing involved.  And this one is certainly

5   more complex than what I remember of Williams.  I

6   don't remember all the details of it, but I remember

7   enough to know that this was there.

8            I mean, I would say, you know, the Dell

9   case that we were discussing a little earlier, too,

10  this one is even more complex than that.  There

11  weren't nearly as many, you know, dates involved in

12  that matter.

13           So the answer is it falls at the complex

14  end of 10b-5 class security cases where I've had

15  involvement.

16  BY MR. BLATCHLEY:

17      Q   So, again, you're not holding yourself out

18  as an expert in the complexity of securities class

19  action classification, are you?

20      A   I was answering your question.  Is that --

21  I mean, that's --

22      Q   So, for example -- I'm sorry.  Yeah.  Let

23  me rephrase that.

24           What I'm saying is we started talking about

25  how CenturyLink -- you were saying CenturyLink has

Page 147

1    certain complexities that other companies don't,
2    there was a lot going on at the company, so -- and I
3    was trying to say well, for example, take, you know,
4    Wal-Mart, for example, is there more information
5    disclosed by Wal-Mart on quarterly earnings
6    announcement dates than CenturyLink?  Have you done
7    that analysis with respect to any other
8    publicly-traded company, and if so, you know, has
9    that informed your opinion here?
10        A    And I think this is asked and answered but
11   I'm happy to answer it again.  So I haven't done any
12   specific comparative analysis in this -- in my
13   report other than to sort of just -- I mean, the
14   numbers by themselves make it, I think, quite clear
15   the complexity of this situation.
16             I'm telling you from my broad experience,
17   which I thought was your experience, that this falls
18   as -- my sense is any individual disclosure may be
19   somewhat more complex for CenturyLink than others,
20   because of its sort of -- again, it checks the boxes
21   of a lot of the kinds of things that not every
22   company has disclosed.
23             So, for instance, stock buyback, you know,
24   mergers, you know, the financial results themselves,
25   reorganizations of how they report things, those are

Page 148

1    all -- in my experience, any one of those are some

2    complexities and I see a lot of them in CenturyLink.

3              That said, my opinion isn't just based on

4    oh, if only there were 20 things disclosed instead

5    of 40 things disclosed, this would be a piece of

6    cake.  I think it's hard anyway.

7              And the real complexity, I think, or the

8    additional complexity comes in the shear number of

9    days that you all have identified, the categories,

10   you've identified five categories of things, you've

11   identified this intermediate period that would have

12   to be accounted for, so it's really the cumulative

13   effect of all those things that I think is what

14   really pushes it to the complex end of things.

15   Q    So let me just -- again, I know we're

16   talking about complexity.  If it was on a scale, you

17   think this is a ten.

18   A    I wouldn't say a ten but it's pushing in

19   that direction.

20   Q    Okay.  So I'm overstating.  Good.  Thank

21   you for that clarification.

22             So you're not opining that you need a

23   perfect fact pattern to do a damages analysis?

24   A    I agree with that.  I think that -- and I

25   sometimes do see people sort of making that type of

Page 149

1    a statement, and I disagree with that as someone who

2    quantifies damages.

3         I think one has to do -- you know, you can

4    quantify damages to a reasonable degree of certainty

5    in many situations, even if you don't have perfect

6    clarity on every issue.

7    Q    So, for -- you know, one of the things you

8    keep saying makes this case different is the

9    uncertainty surrounding the disclosures.  That's

10   fair?

11   A    Yes.  In terms of sort of the nature of the

12   disclosures themselves.  It isn't like our contract

13   is done, our plant burned down like we've been

14   talking about.  Lawsuits are fine.

15   Q    Right.  It's the -- one of those are

16   sufficiently curative is basically what you're

17   saying is the problem?

18   A    I mean, when I say this, there's a lot of

19   problems we've been talking about.

20   Q    Right.

21   A    But specific to disclosure dates, I

22   think -- again, the broader environment has its

23   Wells Fargo, you know, FUD, fear, uncertainty,

24   doubt, and -- but focusing on your question, I do

25   think the fact that these are just lawsuits is --

Page 150

1    adds -- that in and of itself is a challenge in this
2    case to which there's nothing in the damages model
3    that would deal with that.
4        Q    So let's talk about the fear, uncertainty
5    and doubt for just a second.
6            Can you tell me where that comes from?
7    What does that mean?
8        A    Well, the first time I heard it was very
9    early in my career in some of the Microsoft
10   litigation where the competitor might try and create
11   a fear, uncertainty and doubt about a competitor's
12   product, for instance.  Our word processor is great.
13   You know, theirs has all kind of problems.  There so
14   you're kind of creating -- the first I heard of this
15   acronym FUD, F-U-D, and -- but it was in this
16   environment of, you know, I'm not sure if they're
17   really going to be able to make their release, this
18   new version, or will it fix the bugs, will it do
19   those kind of things.
20           So it stems from that.  But I think it's
21   appropriate to think about it in this case as well,
22   where Wells Fargo, I think, as they made actual
23   disclosures of fines being paid, things like that, I
24   think it's fair to say it was a significant issue at
25   Wells Fargo.

Page 151

1           And in that environment if one sort of

2    creates an atmosphere to say this might look like

3    that, meaning this situation might look more like a

4    Wells Fargo, that would be using that situation and

5    the uncertainty around it, well, maybe it is, maybe

6    it isn't.  Boys, if it's that, that's going to be

7    bad.

8           It's that environment that -- and I think

9    that's pretty clear in this case, that when I look

10   at the actual press releases, when I look at your

11   Complaint, there's a lot of references to Wells

12   Fargo in there.

13          In my experience that would be, you know,

14   kind of equivalent to where I first saw this decades

15   ago.

16      Q    So let me just follow up on a few points

17   there.  The context in which you saw -- you're

18   referring to Microsoft.  Is that like the Microsoft

19   antitrust matters?  Am I right about that?

20      A    Yes.

21      Q    And just to be clear, that wasn't in the

22   context of loss causation in a securities class

23   action, right?

24      A    I certainly agree with that.  I mean, I

25   don't recall whether there was any securities class

                                                    Page 152

1    action as part of that.  I didn't personally work on

2    any of those if there were.

3            But it's a much broader concept than

4    something that's specific to securities class

5    action, that's for sure.

6        Q    Yeah.  I'm just not familiar with it.

7            So, you know, it's helpful for the

8    explanation.  Again, it's in the antitrust context

9    that you first learned of this term, and in that --

10       A    Well --

11       Q    Yeah.  I'm trying to see what it means in

12   terms of securities practices, because I've never

13   heard the term used in connection with securities

14   practices.

15       A    Yeah.  I mean, to be clear it's not an

16   antitrust specific term by any stretch.

17       Q    It's usually -- yeah.

18       A    It may have come up in those antitrust

19   cases as part of what are the competitive or

20   allegedly anticompetitive practices of Microsoft.

21   But it's a much more general concept of either

22   creating fear, uncertainty and doubt, which was at

23   least the allegation in Microsoft, that they

24   affirmatively created these -- this environment.

25           It would be as if your firm -- and I don't

Page 153

1    recommend you doing this, and I'm not suggesting

2    that you do it, but if you were to say oh, Cooley,

3    those guys aren't going to be around for very long.

4    They got some really terrible attorneys, or I've

5    heard that -- you know, it's that sort of, you know,

6    kind of rumors or fear just kind of creating this

7    environment where then you are able to capitalize on

8    that.

9             I'm not alleging -- I'm not alleging.  I

10    sound like a lawyer.  I'm not suggesting that, you

11    know, you as the plaintiff lawyers or whatever had

12    anything to do with Wells Fargo.  But that's an

13    example of an event that will create an environment

14    of fear, uncertainty and doubt, even if it's not an

15    intentional -- initially an intentional direction at

16    CenturyLink.

17             I do see, based on kind of the equivalency

18    in the tech industry where FUD starts, I do see some

19    equivalency in the way the headlines seem to have

20    come out, the press releases, things like that, an

21    attempt to really tie the allegations in CenturyLink

22    regarding, you know, cramming as we've been

23    describing it, to the Wells Fargo situation.

24             So it has analyses there of this might well

25    be that, or here's a potential $12 billion lawsuit.

                                                Page 154

1   So I do think that there's some real analogies

2   there.  But it's not something that one would

3   necessarily expect to see.  It's not specific to

4   antitrust.  It's not specific to securities class

5   actions.  It's more of a general phenomenon.

6        Q    So -- and again, the Microsoft context is

7   Microsoft was going around creating this

8   environment, and that was an anticompetitive thing

9   that they did wrong in that case?

10       A    I don't remember how those specific

11  allegations got resolved.  I mean, there were lots

12  of things in the Microsoft case, so it was part of

13  the mix of what are the tactics that Microsoft is

14  doing and what of those are legitimate.

15            But I would also say it wasn't only a

16  Microsoft tactic.  It's something that, with all due

17  respect to my brother here in Silicon Valley, it's

18  something that's been done a long, long time in

19  tech.  It's a very common situation.

20            And it's not just limited to tech, too, but

21  if you can create some FUD out there -- and even if

22  you didn't create it, if you can capitalize on it,

23  so, you know, let's say some third law firm failed

24  and it's like okay, well, that creates a whole worry

25  environment, again, if you can kind of capitalize

Page 155

1   that on by suggesting that somehow, you know, Cooley

2   or whoever is more like that, that would be a way of

3   you not creating the FUD environment, but perhaps

4   trying to capitalize on it.

5          Again, this is all completely hypothetical

6   to be clear on the record.

7   Q    Yeah.  I'm just trying to say, because this

8   concept is kind of, you know, a key part of your

9   report and I'm trying to understand it.

10         So you're not saying plaintiffs created

11  this environment, right?  That's not what you're

12  trying to say?

13  A    I agree with that.  The environment was

14  really created by Wells Fargo presumably, you know,

15  whatever -- potentially their actions but certainly

16  we observed with Wells Fargo in my limited

17  experience and my reading of the press reports and

18  things, and I cite a little bit in my report, I

19  mean, they paid very large fines, for example.

20         And I understand that they reported, you

21  know, large layoffs of people.  And, I mean, I think

22  it's fair to say it was a real thing at Wells Fargo

23  there.  So I don't have any reason to think that,

24  you know, lawyers of any sort created that.

25         But it did create a different environment

```
                                             Page 156
 1   before and after that suddenly the question of is

 2   this limited essentially to Wells Fargo or is this

 3   something that's much more widespread and we should

 4   have broader concerns.

 5        Q    So have you -- is there academic research

 6   quantifying this concept that you're taking from

 7   these other context?

 8        A    I'm not sure what even you mean,

 9   quantifying.  You mean describing FUD as a concept

10   and how it can be used in an anticompetitive way?

11        Q    Yeah.  Or measuring it.

12        A    Certainly I -- again, I can't cite as I sit

13   here right now, but I know that there -- well, to

14   the best of my recollection there was and there is,

15   therefore, existing research in -- as I recall in

16   the context of Microsoft and some of these kind of

17   antitrust issues that FUD is something that is

18   explored in the research.

19             I can't cite specific papers and things

20   right now but I have a recollection that it's a

21   topic that's explored.

22             I'm not sure what exactly you mean by

23   "quantified."  I mean, I'm not sure how one would

24   exactly quantify it as you're describing.  I mean,

25   it's a measure.
```

Page 157

1        So -- but it certainly -- it is something
2   that, again, to the best of my recollection the
3   researchers and others have -- have analyzed in
4   various contexts.
5        Q    So maybe this is a better question.
6   Outside of the Microsoft experience that you
7   described, have you studied FUD?  Like is that
8   something that you're holding yourself out as an
9   expert on?
10       A    I'm not sure that one ever thinks of
11  studying FUD specifically.  I certainly have had
12  that -- I certainly had the concept of FUD.  I -- I
13  definitely analyzed that in other cases.  Again,
14  it's a pretty common aspect in the technology
15  environment.  I can't necessarily think of the
16  specific cases --
17       Q    Yeah.
18       A    -- where it's come up.  But I'm
19  underscoring the fact that it's not -- I mean, I
20  appreciate the fact maybe it's a new concept in your
21  experience there, but in terms of is this something
22  that, you know, almost anybody in the technology
23  industry, for instance, back in the '90s and since
24  then, if you said oh, you know, look at that FUD,
25  you know, that Cisco is spreading or whatever, I

Page 158

1    mean, they would totally understand what that meant.

2              It's probably pretty hard to actually

3    quantify it per se.  It's a creation of -- by nature

4    it's fear, uncertainty and doubt, kind of a

5    heightened concern about things.

6        Q    So one more thing.  Again, you say the tech

7    industry.  What you're talking about there is,

8    again, the competitive nature of the tech industry,

9    and you're not talking about securities

10   litigation -- it's not applied in a securities

11   litigation against tech companies.  What you were

12   referring to earlier is about the competitive

13   practices of technology companies.

14             Am I right about that?

15             MR. BLAIR:  Objection.  Misstates

16   testimony, form.

17             You can answer.

18             THE WITNESS:  Yeah.  I mean, sort of is the

19   answer to your question I think in the sense that

20   it's true that Microsoft was an antitrust series of

21   matters and it certainly was a specific thing in the

22   Microsoft cases.

23             But to say that it somehow, you know, is

24   limited to an antitrust or that I think would be

25   absolutely wrong.

Page 159

1      Because what it really is underneath it is

2   underlying it is this idea that you're creating an

3   environment of, you know, kind of heightened

4   sensitivity to issues for whatever reason.

5      So that could be because you want your

6   competitor to, you know, lose sales.  It could be

7   because you want your customers to go with you.  It

8   could be because you want -- you know, in this

9   context, I think the analogy would be you're playing

10  on the concerns of investors and the public that

11  this could be another Wells Fargo.  So hoping for a

12  bigger settlement, if you can sort of tie it to this

13  fear, uncertainty and doubt that's associated with

14  Wells Fargo.

15      So it would be a mistake to think of it as

16  a -- again, it's not an antitrust concept.  It's

17  not -- I mean, it could have applicability in

18  antitrust but it's by no means limited to it.  And

19  it's not -- you know, it's not just a securities

20  thing but it certainly has applicability in the

21  securities world, so that's the best I can answer, I

22  think.

23  BY MR. BLATCHLEY:

24      Q   So, you know, you said earlier that you

25  hadn't really studied FUD in your experience.  Have

                                                            Page 160

1    you ever studied or taken any courses about, like,
2    maybe reputational effects of disclosures in
3    securities litigation?
4         A    I haven't taken any courses in reputational
5    effects in securities litigation.  Certainly that's
6    a concept -- it's not limited to securities
7    litigation, but it's a concept that, I think, is
8    inherent in lots of litigation out there, this one
9    included where there's a concern about --
10             I mean, I'm in another case right now where
11   literally that's exactly the core issue is is there
12   some reputational effect that's going to cause
13   lower, you know, customers in the future because of
14   reputational issues or bad customer service and
15   that's going to somehow, you know, get out there and
16   cause us to lose customers.
17             So it's a very common element.  And trying
18   to quantify potential losses associated with that
19   can happen in other kind of cases.
20        Q    Okay.  So you've studied what we're calling
21   reputational effects in the securities context?
22        A    I don't remember specifically in securities
23   context, but, again, it's a much more general
24   concept than that.  I've certainly -- this idea of
25   reputational harm, which is the underlying larger

Page 161

1    concept under the FUD, it's like is my reputation,

2    you know, rightly or wrongly tainted with these

3    kinds of issues.  That's certainly something that I

4    have studied in cases.

5        Q    Okay.  And it's something that's, you know,

6    the subject of academic studies, the reputational

7    harm issue?

8        A    Oh, yeah.  For sure reputational harm is --

9    you know, and broadly speaking reputation and those

10   kinds of, you know, customer perception of

11   companies.  Those are for sure topics that are

12   studied by academics.

13       Q    Studied and, you know, quantifying models

14   that will, you know, measure it?

15       A    I mean, that's too broad a topic to answer

16   simply but I think the answer is yes.  I mean, as an

17   example, there's, you know, analyses of brand value

18   and if somehow -- well, I can give you -- actually,

19   I can give you a specific example of years ago I was

20   involved in a case where there were rumors about a

21   company and, you know, the question was would

22   consumers potentially believe these rumors and would

23   that have potentially an effect on their sales, on

24   their willingness to buy.

25             So, again, there's not an untruth to it but

1   it somehow paints a reputation of the company.

2        Q    So, again, turning back to our disclosure,

3   again, on June 16th, you're saying that the FUD is

4   at some level responsible for the cause of the

5   decline.  Is that -- is that right?

6        A    Close, I think.  I'd say this post Wells

7   Fargo -- and by "post Wells Fargo" I mean after some

8   of at least the initial information about Wells

9   Fargo was coming out, I think it's fair to say that

10  that increased the concern or potential concern by,

11  you know, customers, investors, others, about, you

12  know, kind of issues associated with unauthorized

13  charges or accounts or variations of that.

14            So the environment is -- has this situation

15  in it, this FUD situation in it, and I think that

16  when I view the stock price reaction and I

17  understand the context and I look at the analysts'

18  feedback, it does -- it is consistent to me with the

19  market -- the heightened uncertainty because the

20  market was aware before this of general allegations

21  of cramming as we've talked about.

22            I think it does explain the environment in

23  which we observe stock price decreases as the market

24  would be concerned about that.  Then when I look at

25  the analysts' response to it, I see many of the

Page 163

1    analysts themselves saying this seems like it's a
2    reaction to, you know, concerns about Wells Fargo
3    and uncertainty.  We don't see it -- many of them
4    saying we don't see it as being a big deal
5    necessarily.  I'm obviously paraphrasing.  They
6    don't use those exact terms.  Or as significant, or
7    what would be consistent with the type of decline in
8    stock price.
9            So I view it as why do I see a pretty
10   significant stock price decline, even setting aside
11   other news.  If one just accepts the simple premise
12   that it was associated with that, why would that be.
13   I see the FUD environment out there and to me that's
14   consistent with it.
15           But, again, it's a broader -- it's a
16   broader concern of just the fact that these are
17   lawsuits anyways, so even if it didn't move as much
18   as it did, it could still be a concern.  But I think
19   the FUD helps explain the environment in which one
20   does observe an increase and some significant
21   decreases.
22       Q    Again, it's one of the contributing causes
23   of the decline in the FUD environment?
24       A    I think that's a fair statement, yeah, that
25   I think that the FUD environment is -- it allows one

Page 164

1    to understand what otherwise might not have caused

2    as big a stock price decline, why do we observe as

3    big a stock price decline as we do on those days, so

4    I think that's fair.

5         Q    And your opinion is, you know, the FUD kind

6    of environment didn't cause the stock price decline

7    prior to June 16th, right?

8              MR. BLAIR:  Object to the form.

9              THE WITNESS:  Well, I haven't studied that.

10   I focused on the days that were in your Complaint.

11   I'm not aware of other dates, put it this way,

12   where -- where you could point to it and say, you

13   know, that stock price decline seems to have a

14   similar pattern.  It plays into existing concerns

15   about, you know, cramming and the Wells Fargo type

16   allegations.  I'm not aware of any but I haven't

17   really studied it.

18   BY MR. BLATCHLEY:

19        Q    Maybe I'll ask it differently.  Other than

20   FUD you haven't identified any other confounding

21   information on any of the three disclosure dates

22   that you believe caused the decline?

23        A    If I understand your question, you're

24   saying that the three disclosure dates that you're

25   alleging that I've studied here, the question is

1    what other confounding information is there.

2            I haven't studied that question in detail.

3    I'm not -- I don't -- they're not earning disclosure

4    dates so they don't have the same kinds of issues

5    as, you know, many of the dates on the inflationary

6    side.

7            There may be other things on those days as

8    well, but I haven't studied that in detail.  I'm not

9    aware of a significant number.  I think -- I do

10   see -- especially on the first and the third day,

11   when I look at the intraday information, you know, I

12   do see a connection -- let's take the first day

13   between when this news comes out and the intraday,

14   prices do seem to decline.

15           So I don't dispute that there's a likely

16   connection between those two, and it's not that

17   there was also, oh, our plant blew up that day.  I'm

18   not aware of any of that type of confounding

19   information.

20           I think that was your question, Mike,

21   wasn't it?

22      Q    Yeah.

23           And just speaking of your intraday

24   analyses, you even pulled news articles on those

25   dates.  And, I mean, you can let me know if I'm

Page 166

1    wrong, but I didn't see anything else -- I assumed

2    that the collection of articles included everything

3    about CenturyLink on those dates.  That's my

4    understanding of what was in those exhibits.

5            Do you know what I'm talking about?

6            MR. BLAIR:  Objection to form.

7            THE WITNESS:  I do.  I'm just -- I'm

8    pausing a little bit.

9            I mean, for sure I was looking at -- so why

10   don't you give me just a second.  I can just -- I

11   can just -- if it's worth it.  I mean, tell me if

12   you want me to.

13           What I'm just not remembering is whether or

14   not there was some other information in there or

15   whether I focused -- whether I was focusing on news

16   about the lawsuit or whether I had news of the

17   other.  I just don't remember off the top of my head

18   but I can look if you want me to.

19           MR. BLATCHLEY:  Yeah.  We'll come to that

20   in just a second.

21           THE WITNESS:  Okay.

22           MR. BLATCHLEY:  Does anybody mind --

23           And maybe if you want you can go back and

24   look.

25           Can we take a quick break, like five, ten

Page 167

1  minutes, Ryan?

2          THE WITNESS:  Yeah.  Sure.  We've been

3  going an hour.

4          MR. BLAIR:  Fine.

5          THE WITNESS:  That's fine with me.

6          MR. BLATCHLEY:  Okay.  Thank you.

7          THE VIDEOGRAPHER:  Okay.  So the time is

8  1:55 p.m. and we are off the record.

9       (Off the record from 1:55 - 2:09 p.m.)

10          THE VIDEOGRAPHER:  Okay.  The time is

11  2:09 p.m. and we are back on the record.

12  BY MR. BLATCHLEY:

13     Q   Mr. Deal, I'm correct in stating that you

14  don't criticize Dr. Hartzmark's opinions regarding

15  the efficiency of the market for potential earned

16  stock or the 7.6 percent bonds, right?

17     A   I agree with that.  I don't have any

18  dispute with his conclusion that they both traded in

19  efficient markets.

20     Q   Okay.  And then as part of that analysis,

21  Dr. Hartzmark's analysis and your opinion in your

22  report, you both developed similar event studies.

23  Is that a fair statement?

24     A   Similar in the broad sense, sure.  I mean,

25  there are some -- you know, some differences, but

Page 168

1    broadly speaking I agree with that, yes.

2        Q    And the difference is, as I understand

3    them -- let me know where I'm wrong -- is the choice

4    of index I think is the major one, the days

5    excluded, and the method for calculating residuals;

6    is that right?

7        A    Yes.  There is a very small -- I think it's

8    fair to say super nerdy additional critique that I

9    think is only interesting probably to Dr. Hartzmark

10   and myself about what standard errors one should use

11   in calculating fee statistics.

12             It really makes almost no difference.  I

13   think what I use is a little more theoretically

14   correct, but I suggest we don't spend a ton of time

15   on that.  It's not materially important but I'm

16   happy to talk about it if you want to.

17       Q    No.  I'm happy not to talk about it.

18       A    But I think you've characterized the main

19   ones, and certainly the industry index I think is

20   the most important of those, but the other ones are

21   there as well.

22       Q    And then, again, other than the industry

23   index, we can say you're on the same page with

24   respect to Dr. Hartzmark's model?

25             MR. BLAIR:  Object to the form.

                                    Page 169

1   BY MR. BLATCHLEY:

2        Q    From our prior discussion, you don't have

3   any problem with it besides the three issues we just

4   discussed?

5        A    I don't have any problem with it insofar as

6   it goes in the sense of is it measuring

7   statistically significant abnormal positive or

8   negative returns.  It is -- it is the right model to

9   use with some of the choice differences we talked

10  about, and the fact that he's done an event study.

11  That part is all fine.

12       Q    Okay.  And I'm correct that we discussed

13  this before, of the three alleged corrective

14  disclosures, both you and Dr. Hartzmark, with your

15  respective models, find June 16th and July 12th to

16  be statistically significant; is that correct?

17       A    For the equity, that's correct.

18            Mike, you're a little -- a little quiet

19  again.  I don't know if there's a way to get a

20  little closer.  I'm hearing you but it's just a tiny

21  bit distant.

22       Q    Is this better?  Can you hear me?

23       A    Yeah.  It is a little bit better.  Thank

24  you.

25       Q    Okay.  Yeah.  Of course.

1          So if it helps I can point you to the place

2     in the report that I'm going to be talking about.

3     So I want to talk about June 19th and Paragraph 144

4     I think is where you discuss it.  I should probably

5     go there, too.

6          A    144?

7          Q    Correct.  Page 86.

8          A    Yes.

9          Q    So one of the issues that you have with the

10    way Dr. Hartzmark did things and the way you did

11    them, you state here that you do not believe it is

12    appropriate to use a two-day window to assess the

13    statistical significance; is that right?  Am I

14    understanding that correctly?

15         A    Yes.  I think that -- that certainly is my

16    general opinion.  Essentially always and certainly

17    in this case I don't think a two-day window makes

18    sense when you've got an efficient market.

19         Q    So did you evaluate your model using a

20    two-day window --

21         A    No.

22         Q    -- on the corrective -- you did not.

23              Did anybody at Analysis Group do that

24    before you submitted your report?

25         A    I'm not aware of any, no.

Page 171

1       Q     And I think, again, this is Paragraph 144,
2    you say it's inappropriate to use a two-day window
3    because in an efficient market news responds to
4    information very quickly.
5            Is that -- is that right?
6       A     That is right, yes.
7       Q     And that's your belief here?
8       A     Yes.  I do believe that.  I think that's a
9    very common understanding among economists and
10   financial analysts that efficient markets implies
11   very quick market response news.  I think
12   Dr. Hartzmark would believe that as well.
13      Q     Sorry.  Just to quickly interrupt, I don't
14   know if someone could mute -- could mute their phone
15   who is not one of us three.
16           Okay.  Sorry.  So, again, let me just go
17   back.  What's the basis for your belief beyond the
18   fact that the market is efficient?
19      A     Well, I'm not sure if I understand your
20   question.  I mean, that is sort of gospel part of
21   market efficiency is if you have an efficient
22   market, it should respond very, very quickly.  You
23   know, sometimes seconds, sometimes minutes at the
24   most is what the research would suggest to new news
25   out there, so, I mean, there's tons and tons of

Page 172

1    studies on that topic.

2        Q    And are you aware of any literature or

3    studies assessing multi-day windows?

4        A    I'm -- not off the top of my head.  I'm

5    sure that's something that does get studied, but I

6    think certainly the core premise of efficient

7    markets is rapid price response to news.

8            So just conceptually thinking that -- I

9    mean, to me, frankly, it's weird to hold these two

10   things in the same hand of I've got efficient market

11   and I think I should look at a two-day window.

12   That's just inconsistent to me.

13       Q    So the academic research that you're

14   focused on or that -- you know, that you mentioned,

15   a lot of that is just responses to information on

16   earnings announcements, right?

17       A    I mean, yes.  I know that that's a topic

18   that is studied.  It's certainly not the only topic

19   that's studied, but it's a very frequent one of oh,

20   it turns out the market was expecting you to have

21   $100 million in profits and you had $200 million in

22   profits.  Well, as soon as you announce it, what

23   happens to the stock price.  It isn't like oh, it

24   lollygags around for a couple days and then --

25       Q    Right.

1    A    -- it's like boom.  It's up.

2    Q    And some of the reasons that's the case

3    because -- well, what are some of the reasons why

4    that's the case?  Why earnings announcement dates

5    are particularly studied in the efficient market

6    context?

7    A    Why are they studied?  Well, I think for

8    one those are clearly days where information --

9    important information about the future cash flows of

10   the company is going to be revealed.  They're

11   revealing financial results, you know, other kinds

12   of information, so it's an obvious date to choose.

13   Q    And analysts and investors and market

14   participants are expecting that information will be

15   disclosed on earnings announcement dates?

16   A    They're expecting information to be

17   disclosed.  Obviously they have their own

18   expectations of what that information will be, but,

19   yeah, they're -- they're certainly watching for it,

20   if that's your question.

21   Q    Yeah.  As opposed to every other, you know,

22   trading day in a given time period, the earnings

23   dates will certainly be dates in which there's going

24   to be, for the reasons we just discussed, higher

25   volatility and more likelihood of, you know,

1    abnormal return.  Is that fair to say?

2        A    I suspect that is right.  I don't off the

3    top of my head know the exact literature and

4    citations about --

5            I think we just lost it again here.  I

6    think we're coming back up.  I see you guys again.

7            -- about exactly how much more volatility

8    there is on earnings day than other days, but

9    certainly I don't disagree that they're important

10   days where a lot of information is released and

11   they're oftentimes studied by academics.

12       Q    And typically, again, the higher

13   volatility, more information, you know, they're

14   different than like other days where there's not a

15   similar higher disclosure?

16       A    I mean, they're different in the sense that

17   they -- we're freezing again -- by definition that

18   is when financial information is being disclosed and

19   the market is expecting information.

20           But it is certainly not my opinion that

21   efficient markets mean it responds quickly on

22   earnings days and otherwise, you know, it can take

23   days to respond.  That's not my view.  And I don't

24   think that's the mainstream view of economists

25   either.

Page 175

1       Q    That's helpful.

2            Do you know or are you aware of any

3    academic research showing that the length of time

4    for information to be reflected in a stock price

5    might differ based on the nature of the disclosure?

6       A    Not off the top of my head.  It wouldn't

7    surprise me.  I mean, that seems like exactly the

8    kind of topic that finance guys might study.

9            I'm certainly not aware of any literature

10   that says on nonearning days, it takes two days for

11   information to get incorporated into the price.

12   That could create a huge arbitrage opportunity for

13   hedge funds if that were true.

14      Q    Sorry.  I missed -- hold on.

15           So maybe I'll ask it this way:  So would

16   you agree that -- let me ask it this way:  Are you

17   aware of any literature that says the nature of the

18   dissemination -- and what I mean by that is a

19   company versus a third party -- disclosing the

20   information as having an impact on the amount of

21   time it takes for information to be reflected in the

22   stock price in an efficient market?

23      A    Again, I can't cite specific papers off the

24   top of my head from memory.  I mean, again, that's

25   exactly the kind of thing that finance academic

Page 176

1    loves to study.  I'm sure there is research out

2    there on it.  I just don't have it memorized off the

3    top of my head.

4        Q    And the same goes, you know, for example,

5    the complexity of the information that's disclosed

6    and, you know, how long it takes to process that?

7        A    Same answer, I think.  I don't have -- I

8    don't have papers memorized off the top of my head,

9    but that's the kind of information that -- or the

10   kind of things that academics love to study.

11       Q    Would you agree that those factors could

12   influence the rate of stock price reaction?

13       A    Super modestly, in my experience.

14       Q    But you're not aware of like academic

15   literature saying those factors do not have an

16   impact on the time for response?

17       A    Again, I don't have the papers memorized,

18   but I'm very confident that there's not good

19   financial literature that says it takes two days on

20   nonearnings days for the market to figure out

21   relatively straightforward information, and process

22   it into the stock price.

23            And that's not even what we observe on

24   these days, so I think it's frankly sort of a silly

25   proposition.

1    Q    Okay.  So, again, you're not aware of like

2  a legal precedence saying economists are prohibited

3  from considering two-day or multiple-day windows as

4  somehow being, you know, not appropriate?

5    A    I'm not a lawyer so I don't know about the

6  legal precedent.  I can tell you in my experience

7  having done this for a long time, I mean, with all

8  candor we sort of roll our eyes when we see two-day

9  windows typically because it's just not -- it's

10  something that's very, very hard to reconcile with

11  the facts with efficient market claims.

12    Q    Are you aware of the Analysis Group ever

13  using a two-day window in any context -- I mean,

14  again, securities class action context?

15    A    I -- I don't know.  I don't have a

16  comprehensive knowledge of it.

17    Q    Have you ever examined securities prices

18  using a two-day window in any of the consulting work

19  or testifying work you've done?

20    A    I mean, yes, in the sense that I know that

21  we sometimes see these windows from plaintiffs'

22  counsel and we sometimes analyze those.  I will say

23  I haven't seen it for a while in my experience,

24  so -- but it's certainly something that comes up and

25  we look at various windows sometimes in terms of

Page 178

1    understanding reaction and things like that.

2            So I'm not saying it's never done.  But my

3    own, you know, view, and certainly in this case I

4    think it's pretty easy to see it in the underlying

5    data, is that a two-day window is not appropriate.

6        Q    So let me ask this question.  We're talking

7    about the length of time to respond to information.

8    What if there's like some uncertainty about the

9    information, could that impact the length of time?

10       A    Well --

11           MR. BLAIR:  Object to form.

12           THE WITNESS:  -- I think if -- I'm not sure

13   if I quite understand your question.  It sort of

14   has -- I think it's related to the complexity of it.

15           So, you know, I'm making a simple example

16   here or kind of an extreme example, but, you know,

17   if a giant 400-page report gets dropped on the

18   press -- press release one day and buried in

19   Page 380 of it is sort of, by the way, our plant

20   blew up, you know, that could take a bit for them to

21   process through that and understand it.

22           Or if the news is some form of we're not

23   sure but we may have a problem with a plant, I mean,

24   the market may react initially and it may -- as more

25   information is revealed, it could certainly

Page 179

1    change -- you know, the stock price could change.  I

2    believe markets are evolving in terms of their

3    collective expectation of what the effect will be of

4    something, so that can certainly happen.

5            But I would not expect, just because it's

6    complex information, that there's no reaction to it.

7    It could be some initial reaction and then as

8    more -- you know, if it's information that requires

9    someone to go and check something or whatever, I

10   mean, obviously that can affect the specifics of it

11   as well.

12           But, again, I don't -- I don't see that

13   fact pattern here.  I should say, I see the fact

14   pattern here in the sense that I do think these

15   lawsuits themselves are simply -- there's

16   uncertainty about is there some legitimacy to it so

17   in that sense I do.

18           In terms of the market response to that, I

19   mean, I think you can pretty clearly look at, say,

20   June 16th and see it's not an earnings day but the

21   market reacted quickly to this news.

22   BY MR. BLATCHLEY:

23      Q    Great.

24           Okay.  And the news on the 16th, it comes

25   out at 1:50 in the afternoon, right?

Page 180

1        A    Yeah.  I think that's right.  I know that

2    as I was reviewing the data -- and I'm looking at

3    Exhibit 30A, I think what's interesting to me --

4    it's got an interesting phenomena here which is, you

5    know, you do see a fairly significant reaction.

6            I'm not using "significant" in the

7    statistical sense here, although overall it does

8    move in a statistically significant way from -- from

9    over the course of the day, but it sort of looks

10   like it kind of pauses a little and then falls off

11   the cliff, the mini cliff here.

12           It's my understanding that it first -- it

13   took a little while to hit the Bloomberg press feed,

14   but I think that is all part of the same -- the same

15   point, that Bloomberg, in addition to obviously

16   being the revenue source for the former presidential

17   candidate, is a very widely used financial service.

18           And I'd say in my experience it's the one

19   that most finance guys -- and I'm using "guys"

20   generically there, not in any gender way, that

21   they -- that they follow, so if something hits some

22   other form of a press release, and then, say, half

23   an hour later hits Bloomberg, it may well be that

24   you'd see the most significant movement once it hits

25   Bloomberg.  That's kind of an interesting just sort

Page 181

1    of operational aspect of this.  And I think that's
2    kind of what we observed in this situation.
3              But, again, we're talking about relatively
4    minor differences, short amounts of time.  These are
5    not multi day kind of situations.
6         Q    Got it.
7              And, again, this article did get
8    published or at least, again, roughly speaking,
9    about two hours before the close of market trading
10   on Friday?
11        A    Yeah.  I think that's correct.
12        Q    And so you say also in your report that
13   when an announcement is published after trading
14   hours, you're expecting the impact to be seen the
15   following day; is that right?  That's kind of what
16   is laid out in -- I think we spoke about it earlier
17   today -- Figure 5.
18        A    I agree with that as a concept.  So if the
19   news were to come out at 6:00 p.m. it definitinally
20   can't affect cash prices assuming it's new news.  So
21   one would expect to see that reflected in the
22   opening price effectively of the following day.  I
23   mean, I'm setting aside after-hours trading here.
24        Q    Right.
25              And, again, it would -- the impact that --

Page 182

1  you measure the return on the following day, right,

2  for a post -- again, talking about the trading day

3  for a post market closed disclosure?

4      A    I think I'm following what you're saying.

5  Yes.  So just to play this so I make sure I got the

6  hypothetical right, so first setting aside the

7  weekend for a minute.  If it's a Monday it closes at

8  $10, at 6:00 p.m., you know, bad news comes out and

9  it opens at -- what did I say $10? -- it opens at $8

10  and then no other news comes out during that day so

11  it closes at $8, you're typically measuring the

12  close of the trading day after the news comes out

13  compared to the untainted close prior.

14      Q    And so, for example, the full impact would

15  say is within the two hours that we have left on

16  that Friday the 16th?

17      A    Yes.  That's -- I think the answer is yes

18  to your question, that that's what I'm measuring as

19  the change on the 16th, is the change from the close

20  on the 16th.

21      Q    So you said the information was

22  straightforward, you know, that was, you know,

23  released on the 16th.

24          Why do you say that?  Why do you believe

25  it's straightforward?

Page 183

1        A    I mean straightforward in the sense that,
2    you know, it's the news of a lawsuit being filed.  I
3    don't think that's a hard concept to understand.
4            And obviously there's some details and
5    specifics of the allegations from a former employee
6    and so forth, but you can read the press releases
7    and see what -- how they're characterizing it.
8            Again, as I said, there is uncertainty for
9    sure around the broader questions that we talked
10    about all day about whether this represents truth or
11    fact or allegations.  But the idea that there was a
12    lawsuit filed that had Wells-Fargo-like allegations
13    in it, I don't -- I don't think that is particularly
14    complex information.
15        Q    Right.
16            But like here's an easy one.  Again, there
17    wasn't in that disclosure here's going to be the
18    cash flow impact on the company, right?  That wasn't
19    part of the disclosure?
20        A    I agree with that, yeah.  Certainly.
21        Q    Yeah.  The other company didn't provide
22    guidance, for example, in response to the
23    disclosure?
24        A    That would be a whole new industry, I
25    guess, for people to do if sort of every time a

1    lawsuit was filed the company would provide, oh, we

2    expect this to, you know, cost us a million bucks or

3    zero or whatever, no, they didn't do that.  Not that

4    I'm aware of, I should say.

5        Q    So I want to -- you mentioned your intraday

6    analyses just a minute ago.  And I think I want to

7    take a look at those.

8             I think -- just for a minute.  Hold on.  I

9    think those begin Exhibit 30A.

10       A    Yes.  That's correct.

11       Q    Just so we're on the same page, I want to

12   get to the right paragraph of your report.  It's

13   162, I want to say.

14       A    162 I think is talking about the two-day

15   thing.

16       Q    Yeah.

17       A    Do you want to talk more on that or...?

18       Q    Yeah.  162, 163, you're saying you can't --

19   June 19th cannot plausibly be tied to alleged

20   curative disclosures and we shouldn't use a two-day

21   window, right?  Isn't that what that conclusion is?

22       A    I certainly agree we shouldn't use a

23   two-day window.  I don't find June 19th to be a

24   statistically significant movement day.

25       Q    Right.

```
                                                    Page 185
```

1          And you didn't analyze whether June 16th
2    and 19th would be significant, right?
3        A    I didn't look at a two-day window.  I don't
4    think it's the right thing to do.
5        Q    So one of the things that you say here is
6    that, you know, "There is no reason to believe the
7    market needed additional time to process the
8    information."
9          Am I reading that right?
10       A    Yes.
11       Q    And, again, you're saying although there's
12   uncertainty, this was again -- it wasn't -- what was
13   the example you gave?  Like a 200-page document that
14   people needed to read and translate?
15       A    Yeah.  I agree with that.  It's not -- it's
16   not that kind of information.
17       Q    So and then in Exhibit -- let's just look
18   at 30B.  You've compiled here -- I think it's kind
19   of a poll of the news on that day.
20          Can you just walk me through what this
21   shows?
22       A    Well, I think to be clear on the Page 184
23   of 253 under the Notes and Sources, I describe what
24   it is, which is these are all stories that are
25   relevant to cramming that were identified from, in

Page 186

1    fact, even Bloomberg when I searched for

2    CenturyLink, so it's a subset of stories from that

3    day all of which had CenturyLink in their name.

4              In addition to that, I think there's some

5    analyst reports in there as well.  But specifically

6    as you can see it's focused on stories relevant to

7    cramming.

8    Q    So how did -- yeah.  How did you make that

9    determination that it was relevant to cramming or

10   not?  And maybe you're just saying this is our way

11   of excluding junk, like stuff that's not -- just

12   walk me through what was done in that Footnote 2.

13   A    Sure.  I mean, so first step is obviously

14   the search.  Okay.  Let's look for CenturyLink,

15   let's look for all stories on that day from these

16   sources.  Let's look at the analyst reports as well.

17             Then it's literally a review, so that's

18   part of what the staff under my direction was

19   reviewing each of those to -- obviously there's some

20   professional judgment under my direction as to is

21   this related to cramming or not.

22             But the attempt was -- I wouldn't

23   necessarily call it junk as you characterized it,

24   but, you know, kind of we've been talking all day

25   about confounding information and that, so that's

Page 187

1    why I was saying there may well be other information

2    coming out on those days.  This isn't intended to be

3    a list of everything that came out.  This is

4    intended to be focused on things related to

5    cramming.  Most of which appear to be related to the

6    lawsuit, if not all of them.

7              So that's essentially the process, is

8    identify the superset, you review them, tag the time

9    on those, the ones that are related to cramming,

10   plot them as red dots on Exhibit 38.

11      Q    So can I ask you a question, is the one

12   that you rejected, are those in your Appendix B, I

13   believe it is, or did they not make it into the

14   appendix because -- for whatever reason, because

15   that's the process you went through?

16      A    Yeah.  I certainly described the process.

17   I'd have to look back at the backups to see if all

18   of the news reports were initially input.  I

19   certainly don't remember off the top of my head.

20             But one could certainly replicate it by

21   doing the same searches and just doing the reverse.

22   Just saying whatever I don't list by definition are

23   the things that were not included.  But I just don't

24   recall exactly which is backup.

25      Q    Now, with the caveat that there's some sort

Page 188

1   of relevance determination here that it's not -- I
2   mean, can you give me a little bit more clarity on
3   what that was?  Did it actually include the word
4   "cramming" or was it broader than that?  Because
5   it's --
6       A    It was broader than that.  I mean --
7       Q    Okay.
8       A    I'm sorry.  I didn't mean to -- I think I
9   talked over the top of you.  My apologies for that.
10  Were you done with the question, Mike?
11      Q    I was.
12      A    Yeah.  Yeah.  I think "broader than that"
13  is a fair statement.  I mean, many of them did have,
14  you know, literally those words in there but it
15  wasn't just a mechanical exercise, if that's your
16  question.  It was in my experience mechanical
17  exercises can help, but they're not -- well, rarely
18  sufficient on these things.
19          You can imagine a whole article that would
20  describe the lawsuit that literally never used the
21  word "cramming," but it's pretty clearly related to
22  the lawsuit and the related allegations.  So that's
23  where -- you know, we haven't been told they're
24  replaced by AI yet.
25      Q    So just getting back to -- I mean, this

1    exercise, right, is it part of the support that

2    you've included as why a two-day window is not

3    appropriate, and you use it to support your opinion

4    concerning Dr. Hartzmark's damages methodology?

5    That's fair to say, right?

6        A    I think it's -- yes.  I think that's fair

7    to say.  I mean, he doesn't find the 19th to be

8    statistically significant.  I don't find it either.

9    I find it by even less than he does.  I mean, he

10   only even ties the 19th there by saying it's a

11   two-day window, and I just don't think that's

12   appropriate.

13       Q    So undertaking the analysis and looking

14   at -- I mean, the reason you're doing this is --

15   those two reasons we just described, and you're

16   looking at the stock price reaction in response to

17   new information.  Is that -- that's fair, right?

18   I'm describing that correctly?

19            MR. BLAIR:  Objection to form.

20            THE WITNESS:  Sorry.  Did I interrupt you,

21   Ryan?

22            MR. BLAIR:  Go ahead.  It's on the record.

23            THE WITNESS:  In broad strokes, yes, but

24   I'm not doing kind of a mini event study on each day

25   here but I'm looking at -- I mean, this is very

1   common in securities cases.  As you're saying,

2   well -- I mean, you know, you could imagine a

3   pattern that would say the stock dropped in the

4   morning because they said my plant blew up, and then

5   when this news came out, nothing changed.

6           So you typically want to look at the

7   intraday saying -- as I recall, Dr. Hartzmark

8   himself looked at intraday things as well just to

9   say we expect the information to be confounded in

10  the stock price quickly and, A, is it, and B, is

11  there at least -- you know, can one not dismiss out

12  of hand to put it in a negative that this is the --

13  this is related to it.

14          And I agree, I certainly can't dismiss out

15  of hand that these -- the press releases about the

16  lawsuits do seem to have directionally had some

17  impact on the stock price.  Again, there could be

18  some other confounding things in there but this

19  pattern to me is suggestive that, you know, we can't

20  just -- we can't rule out these.  And it's --

21  anyway...

22  BY MR. BLATCHLEY:

23      Q    So thank you for that.

24          So one of the things I think you already

25  mentioned is that you look at analyst reports, and

Page 191

1  in, you know, assessing whether an analyst report
2  would be helpful to your analysis of the stock price
3  reaction, I assume you'd want to understand the
4  content of those reports; is that right?
5      A    Sure.  I mean, I think that's a very
6  general statement, if I understand it.
7      Q    Right.  It's not just the fact that there's
8  an analyst report, but it's what the analyst report
9  actually says that matters, right?
10     A    Yeah.  I certainly -- I mean, I think -- I
11 agree with that.  It sounds right to me.  I mean,
12 just the fact of an analyst report isn't
13 particularly informative in and of itself.
14     Q    Right.  And so I think we're on the same
15 page.
16          So it's also -- like you do analysis
17 elsewhere about price targets, and you would agree
18 with me that it's appropriate -- again, I'm talking
19 about the content of the analyst's report -- the
20 reasons why an analyst changes their price target is
21 important.
22          Would you agree with that?
23     A    Sure.  And, I mean, I have that discussion
24 in my report itself.  I've analyzed those questions
25 saying well, A, I don't see very many price changes,

1   which itself is informative, but where I do see

2   price changes I dig a little deeper to say okay,

3   well, what are they saying.

4           Is it because they say I see a lawsuit is

5   filed the stock price dropped, I got to believe that

6   lawsuit is almost certainly true, and therefore it's

7   going to affect future cash flows, or what are they

8   saying around that.

9           Are there other things that have caused

10  them to change their price target.  Are they noting

11  a lawsuit, but what are they crediting in terms of

12  the likely underlying substance to it or what's the

13  effect of it.  So absolutely I agree with that and

14  that's what I've done.

15      Q    So -- okay.  And you would also agree, I

16  think, then when you're looking at this kind of --

17  this two-day window context that we're talking

18  about, any statements by the company itself; is that

19  right?

20      A    I'm not entirely sure what you mean, but

21  you confused me with the two-day window thing in

22  there.  You're -- I mean --

23      Q    Yeah.

24      A    -- I agree the company statement could be

25  relevant but I'm not sure what it means by the two

Page 193

1    day.

2        Q    It means when you're assessing what caused

3    the, you know, stock to react on these two days, the

4    16th and the 19th, statements by the company would

5    be something you'd want to consider?

6        A    Sure.

7        Q    Okay.  And so --

8        A    I certainly agree that statements by the

9    company could be relevant, if it's a general

10   question like that.

11       Q    Yeah.  I think it's even a specific one.  I

12   mean, you said analysts and what they said would be

13   important.  I understand that analysts mostly get

14   their information from a company.

15            Would you agree with that?

16       A    No.  I don't think that's true.  I agree

17   analysts often get a lot of information from

18   companies, but at most -- I guess it depends on how

19   you consider -- what you define as "most."

20            Certainly they would get information about

21   financial data that's typically coming from the

22   company, so in that sense it's most.  But it's also

23   very true that analysts -- one of their big claims

24   to adding value is that they're not just parrots

25   receiving what the company told them; otherwise,

Page 194

1    they would presumably not add any value.
2            So they're talking to customers, they're
3    doing other kinds of things frequently, so they get
4    lots of information from the company but it's
5    hopefully in some sense not just the company.
6    Q    And it's hopefully -- I mean, you would
7    agree they're not going to ignore what the company
8    would say, right?
9    A    Not going to what?
10   Q    Ignore what the company might say.
11   A    Well, that's a little harder question to
12   answer because I've certainly seen situations where
13   analysts were quite clear they didn't think that
14   management had any credibility and they were
15   ignoring what management was saying.  I suspect
16   you've been involved in some of those cases as well.
17           But as a general matter, I agree with that.
18   That they -- unless there's sort of some unique
19   circumstance, they typically would, you know, at
20   least see what management is saying.
21   Q    And certainly, again, the company's
22   statement is not irrelevant to assessing a stock
23   price decline in response to the corrective
24   disclosures?
25   A    I certainly don't think it's irrelevant as

1    a concept.  Whether or not it -- you know, if it's a

2    specific matter and a detailed matter, you know, the

3    mix of information all those kind of things, but as

4    a general concept you can't dismiss it out of hand.

5    I agree with that.

6         Q    Do you -- do you believe it's irrelevant

7    here?

8         A    You mean company statement?

9         Q    Yes.

10        A    Again, not -- not out of hand.  Are you --

11   if there's something else specific you're thinking

12   about, I'm happy to look at it or something, but...

13        Q    Okay.  What about in assessing, you know,

14   again, we're talking about this two-day window issue

15   and what's, you know, causing the stock price to

16   decline and, you know, what's appropriate to look

17   at.

18             Would it be relevant to you to consider

19   anything that, say, the investor relations personnel

20   at the company itself were saying about the reasons

21   behind the stock price decline?

22             MR. BLAIR:  Objection to form.

23             THE WITNESS:  I -- I feel like you're

24   dancing around something that you just want to show

25   me.  If you want to just show it to me, I'm happy to

Page 196

1    look at it.  But I'm not -- out of hand you
2    obviously can't dismiss that.  That it's always
3    irrelevant, no, it's not always irrelevant.
4    BY MR. BLATCHLEY:
5        Q    Would it be important to you?
6            MR. BLAIR:  Same objections.
7            THE WITNESS:  Again, it really depends on
8    what's -- what's in it and other things.  It's hard
9    to make such a blanket statement.  It's not
10   irrelevant.
11   BY MR. BLATCHLEY:
12       Q    What about let's say a major investor, like
13   one of the top, you know, investors in the company,
14   let's say they make a statement or, you know,
15   disclose a position of that, would that be something
16   that's important for you to consider?
17       A    Again, you're asking such general
18   questions, I'm not sure, Mike, if one could answer
19   them.  They're not -- I mean, one never sort of just
20   dismisses out of hand that, but, you know, it really
21   depends on what it is.  I mean, just the fact that
22   someone took a big position in a company, I mean,
23   that may or may not be interesting or important.
24       Q    Again, I think what we're talking about is
25   when we're doing this analysis of what's causing the

Page 197

1    stock price to decline, you've been saying that

2    there are some things that you'd want to look at

3    which are the analyst reports, we've agreed on that.

4    You said it's potentially relevant what the company

5    says.

6              Would you want to consider, you know, like

7    a five percent holder makes a statement or discloses

8    a position, would that be something you'd want to --

9    if that happens during the time period we're talking

10   about?

11             MR. BLAIR:  Objection to form.

12             THE WITNESS:  I'm not trying to be evasive

13   or dismissive.  I just -- you can't make sort of

14   just some blanket statement.  And I'm not trying --

15   I'm certainly not doing any kind of a microanalysis

16   of oh, this news story moved it this much, that

17   moved it that much, all of that.  But the broad

18   facts I think are not in dispute here.

19             There were lawsuits filed.  The stock price

20   moved.  It moved quite quickly initially.  It didn't

21   move statistically significantly on the 19th, so I'm

22   not sure -- it's like you're -- anyway, I'm not

23   quite sure where you're going with this and I'm a

24   little confused honestly.

25   \\\

Page 198

1    BY MR. BLATCHLEY:

2        Q    You know what a 13D filing is, right?

3        A    Yes.

4        Q    And it's for, you know, you get

5    five percent of the company, you have to disclose

6    your position and a couple other things.  Is that

7    fair?

8        A    That's -- yes.  That's my understanding.

9        Q    And are you aware of academic literature

10   addressing stock price reactions in connection with

11   13D filings?

12       A    Again, same answer as before, that I'm not

13   going to be able to quote you specific papers, but

14   that's absolutely the kind of things finance guys

15   love to study.

16       Q    And generally there would be a positive

17   impact upon the filing of a 13D according to those

18   studies?

19       A    I'd have to look at the -- I'd have to look

20   at the literature and see.  I mean, I'm not -- I

21   think it kind of depends on who's taking the

22   position and why and those sorts of things, so I'm

23   not sure you can make it a simple statement.

24       Q    That's fair, but it could have an impact on

25   price reaction?

Page 199

1        A    When you say "have an impact on price

2    reaction," I think what you're asking is could the

3    fact that they disclosed hey, you know, Carl Icahn

4    is taking a five percent position in the company, is

5    that the sort of thing that might move the stock

6    price, yeah, I think it could, if that's your

7    question.

8        Q    So let me just turn to, I guess I want to

9    look at 30 -- 31B.  I think it's probably easier

10   this way.

11       A    I'm there.

12       Q    I'm sorry, guys.  I just need a minute.

13       A    I do have the paper copy if you want to

14   just refer to that.

15       Q    So I'm looking at your -- you've got one,

16   two, three, four -- you've got 6/19 Insurance

17   Information Institute Database.  Do you see where I

18   am?

19       A    When you say -- do you want me to be

20   looking at --

21       Q    I'm sorry.  Yeah.  Hopefully I'm on the

22   right thing.  I'm on Exhibit 31B.  Are you with me?

23   I'm sorry.

24       A    Almost.  I'm just getting my -- okay.  All

25   right.  I'm on 31B, yeah.

```
                                              Page 200

 1        Q    And just looking down -- again, let me just
 2   back up one second, did you read all these articles
 3   before they went into the report or was this
 4   something handled by the staff?
 5        A    Primarily the staff, under my direction.
 6        Q    Okay.  So you've got -- you've got these
 7   disclosures June 19th, 2017 at 9:02, the Morgan
 8   Stanley analyst report?
 9        A    Yes.
10        Q    And then after that you've got the
11   June 19th, 2017, 9:40 Denver Business Journal Online
12   news article?
13        A    Yes.
14        Q    So I don't know if I've done this correctly
15   but I just introduced -- or I tried to introduce.
16   Let me know if you get it -- Exhibit 31 which has
17   been marked for the record.
18        A    I do see it.  Congratulations on that.
19        Q    So just looking at that -- yeah.  Sorry.
20        A    Hang on a second.  It's just spinning here.
21   Wait.  There, it's coming up.  Okay.
22                   (Deposition Exhibit 31
23              was marked for identification.)
24   BY MR. BLATCHLEY:
25        Q    So I just want to direct you, the time
```

Page 201

1    stamp or at least the one that we've -- this is the
2    document that you've produced, this is at 9:30 in
3    the morning Eastern time on the 19th.
4        A    Okay.
5        Q    I just didn't -- I didn't see it in your
6    31B or your exhibit on the 19th of 31A.  And let me
7    know if I just missed it, but then I just want to
8    ask you a couple questions about it.
9        A    As I sit here right now I don't see it on
10   the list.
11       Q    So it's fair to say that that article is
12   not in this exhibit either, you know, referenced as
13   part of the -- you know, one, two, three, four,
14   five -- I mean, I assume, and let me know if I'm
15   wrong, the articles listed in 31B, are those
16   referenced in 31A on the chart?
17       A    Yes.  I think that's accurate.
18       Q    Okay.  So this Bloomberg article --
19       A    Sorry.  Just to be clear --
20       Q    Yeah.
21       A    -- there are -- oh, 31A is just the
22   intraday trading on the 19th.  31B includes articles
23   from the 17th and the 18th as well, as well as like
24   before trading opens on the 19th, so there's more
25   listed on 31B than there are red dots on 31A.

1    Q    Yeah.  Yeah.  And so I guess on 31A I just

2    looked at No. 4 on the notes and sources, which I

3    think explains what you're describing, which is one,

4    two, three, four, five are stories or reports

5    released the prior weekend or before market.

6         Is that -- are we on the same page?

7    A    Yes.  I think that's right.

8    Q    Okay.  So, again, going back to the

9    Exhibit -- what did we call it? -- 31, I guess.  So

10   this is an article that -- do you understand that

11   this article is referenced in plaintiffs' Complaint?

12   A    I'd have to double-check but it wouldn't

13   surprise me.

14   Q    You understand that you've referenced this

15   article in your report, in other sections of your

16   report?

17   A    I certainly recognize the 12 billion number

18   in it, so I'm happy to double-check but I'll take

19   your word for it.

20   Q    And this, again, was referenced in the

21   Complaint -- plaintiffs' Complaint as one of the

22   articles in causing -- sorry, in the loss causation

23   truth emerges section?

24   A    Again, I'll take your word for it.

25   Q    Again, I just want to make sure.  You agree

```
                                              Page 203
 1   with me it's important to include when assessing --
 2   again, I think you make a statement in your analysis
 3   using this intraday price chart about the
 4   reasonableness of the Complaint's allegations.
 5           You agree with me that in doing that it
 6   would be appropriate to consider what is alleged in
 7   the Complaint?
 8       A    I'm not quite sure of your question.
 9   Sorry.  Maybe you could rephrase it.
10       Q    Yeah.
11           This is alleged as, you know, a
12   corrective -- or review of corrective information.
13   Your analysis on the intraday price decline does not
14   appear to include it.  And I'm just asking the
15   question why did you think it was appropriate not to
16   consider this article?
17       A    Well, I mean, you just said that I cited it
18   at a place so obviously I have considered it.  Your
19   specific question is why is it not listed on 31B?  I
20   don't know.  I'd have to go back and check on that.
21   But it certainly isn't changing any opinion.
22       Q    Yeah.  No.  I'm just concerned because, you
23   know, you spend a couple paragraphs, 144 you're
24   saying a two-day window is inappropriate, you got
25   147 where you are talking about the model and the
```

Page 204

1    decline on the 19th and why it's not appropriate to
2    consider a two-day window, and your support for that
3    is this exhibit about the intraday trading.
4           And I'm just wondering why we're not
5    talking about the article in the Complaint.
6       A    Well, I think maybe you're misunderstanding
7    what we've been talking about for the last bit.  The
8    support for a two-day window isn't based on how many
9    dots are on these charts or the specific price
10   movement of those.
11          It's based on a much more general
12   proposition that's reinforced by the intraday
13   analysis here, but it's not -- I mean, the
14   fundamental point is Dr. Hartzmark and I agree this
15   is an efficient market for the equity for
16   CenturyLink.
17          There is a statistically significant drop
18   on the 16th.  There is not a statistically
19   significant drop on the 19th.  I look at the
20   intraday news on the 16th and it does seem to be
21   moving in a consistent way with the framing, so I --
22   those all seem fine to me as far as they go to
23   suggest that the 16th one can't rule it out, but the
24   19th -- the idea that the two-day window is
25   somehow -- one would reach a different conclusion if

Page 205

1    one had more dots or fewer dots or something like

2    that, that's not the point.

3        Q    So -- and again, I'm sorry.  I might have

4    given you the wrong paragraph.  164 is I think where

5    I was focused.

6            And, again, you said in these paragraphs

7    preceding 164 talking about the intraday price

8    analysis and how it supports your conclusion that

9    Dr. Hartzmark's blanket assumption that plaintiffs'

10   allegations will be shown to be true is not

11   supported.  And I'm wondering why when we're talking

12   about plaintiffs' allegations you're not including

13   the articles that are clearly alleged in the

14   Complaint.

15           MR. BLAIR:  Object to the form, asked and

16   answered.

17           THE WITNESS:  I think I've answered this as

18   much as I can.  You yourself have noted that I cite

19   this in my report.  I don't dispute that it's in the

20   Complaint.  It seems exactly consistent with, you

21   know, the general thrust of all of these corrective

22   disclosures that have been identified.  It doesn't

23   change anything there.

24           So as to why it's not specifically listed

25   on that chart, I don't know, I'd have to go back and

Page 206

1    look but it doesn't change anything.  The chart is

2    intended to be illustrative of whether there's

3    anything in the intraday that would be inconsistent

4    with, you know, kind of the efficiency of the market

5    and therefore why one needs to think about two-day

6    windows, and I just don't see it.

7    BY MR. BLATCHLEY:

8        Q    Okay.  So in addition to the two-day window

9    you've also assessed -- you have some comments in

10   your analysis of the 7.6 percent bonds, right?

11       A    You're now switching topics, is that right,

12   to the bonds?

13       Q    I just want -- again, would it be

14   appropriate to not include this from your

15   consideration?

16            MR. BLAIR:  Object to form.

17            THE WITNESS:  Yeah.  I mean, we clearly

18   have talked about the fact that I considered it.

19   You've noted that I don't see it on my 31B and I can

20   go back and look and see, but that certainly doesn't

21   mean it hasn't been considered.

22            And as I review it on the screen --

23   although the version I see on the screen seems to be

24   missing a bunch of letters, so it's kind of hard to

25   read a little bit, at least on my screen.  But it

                                                      Page 207

1    seems to be just a recitation of the same things.  I

2    don't know if your version seems to be missing a

3    bunch of letters, too.

4    BY MR. BLATCHLEY:

5        Q    Yeah.  And I apologize for that.  That's

6    the way it was produced to us.  And I wish it was

7    better quality but that's what we have.

8             But, you know, there is here a statement

9    from the company.  You know, it's -- again, it's

10   the -- the article that's, you know, discussed

11   extensively in the Complaint and the party's

12   submissions.

13       A    I mean, that doesn't seem wrong to me, but

14   one only has to glance at 31B to see 12 billion, you

15   know, show up in many, many headlines.  For

16   instance, the fact of the lawsuit was -- if you want

17   to point me to something that you think is unique

18   and new information in here, I'm happy to think

19   about that.  But I just don't see anything that's

20   extremely relevant about this.

21            There's nothing relevant about -- the fact

22   that it's not on my 31B doesn't change anything.

23       Q    So let me just turn back real quick again

24   to -- I'm sorry.  30 -- maybe it's on me.  30A and

25   30B.  And what I wanted to do -- I'll just make the

Page 208

1   simple point and maybe you can agree with me or you

2   won't.  30A has -- this is the intraday impact

3   analysis of June 16th.

4        A    Okay.

5        Q    And the last -- I'm looking at 17, I think

6   it's Page 184 -- I'm sorry, there's a series of

7   articles that are -- the last article with the time

8   stamp on here is 16:44, the Reuters story on

9   Page 183.

10       A    Yes.

11       Q    And then there's these additional articles

12  that we don't have a time stamp for, but they could

13  have been either published during the day or after

14  the close, correct?

15       A    Yeah.  I mean, I suppose -- I'm not sure

16  how one would figure it out.  I suppose in theory

17  they could be published before the day, before the

18  trading day started.  But they're certainly

19  published on that day, that's the way they are

20  dated, but they don't have a time stamp.

21       Q    So and then Exhibit 31A, the one we were

22  just -- I'm sorry.  31B, the one we were just

23  looking at, you know, discussing the disclosures

24  over the -- over the weekend and then on June 19th.

25       A    Okay.

```
                                          Page 209
 1      Q    So and I just wanted to -- you know, if you
 2   could -- I don't know if you have it, but the
 3   Complaint, which was previously marked as Exhibit 1,
 4   I think it's in the folder.  Let me know if I need
 5   to resubmit it.
 6      A    Exhibit 1, the Complaint?
 7      Q    Yeah.
 8      A    All right.  I have it.
 9      Q    Okay.  Paragraph 157.
10      A    It's revealing itself to me very slowly.
11   I'm getting there.
12           MR. BLAIR:  Hey, Mike.
13           MR. BLATCHLEY:  Yeah.
14           MR. BLAIR:  We've been going about an hour.
15   Maybe while he gets there, maybe we take five, ten
16   minutes.
17           MR. BLATCHLEY:  That would be totally fine.
18           THE WITNESS:  I'm there right now.  Do you
19   want to just finish this line of questioning and
20   then we can...
21   BY MR. BLATCHLEY:
22      Q    Yeah.  Well, this will take -- it's very
23   short.  Paragraph 157, it talks about, the second
24   sentence, you know, articles published on June 16th
25   in Ars Technica and CRN.
```

```
                                        Page 210
1          I just wanted to point your, you know,
2     direction to those two articles, and then just get
3     you to confirm that neither of those two articles
4     are mentioned in Exhibits 31A or 30A, the ones that
5     we were just looking at.
6          A    I think you mean 30B.
7          Q    I'm sorry.  Yeah.  30B and 31B.  I'm sorry.
8     Thank you for that.
9          A    I mean, I'll sort of take your word for it
10    in the sense I certainly don't see the source.  But
11    the topic describe the sources that I used, which is
12    the Bloomberg sources, so I don't see Ars Technica
13    or CRN in the source.  Whether or not those sources
14    are looking at other ones is I suppose a different
15    question, but I'll take your word for it they're not
16    listed.
17         Q    So and I'll just -- again, I'll say those
18    are not articles included in your Appendix B; is
19    that right?
20         A    I'm not seeing them.
21         Q    And so you didn't read those articles in
22    coming to your conclusions -- or I'm sorry, your
23    opinions in the report?
24         A    Wrong.  I'd have to look and see if they're
25    in my list of docs considered.  I mean, you quote
```

1    parts of them in here and I certainly relied on the

2    Complaint, but I don't recall specifically -- I'm

3    not sure if you're -- where exactly you're going

4    with these in the sense that no specific article

5    is -- they kind of make or break on any of these

6    sorts of points here.  So I don't see the relevance

7    of the questions, but I don't see them listed on

8    30B, so I think that's technically true, I guess.

9        Q    I'll make it easy.  So it's fair to say you

10   did not consider those articles in your analysis and

11   your accompanying discussion referencing

12   Exhibits 30B and 31B?

13            MR. BLAIR:  Object to the form.

14            THE WITNESS:  I think I've answered that as

15   much as I can.  I don't see them literally on the

16   list there.  So I think that kind of speaks for

17   itself in the sense that they're not there.

18            Whether or not they were in some broader

19   search and then excluded, I don't have any reason to

20   believe that but I don't know.

21            But I didn't -- to the extent they're not

22   on the list, obviously in some sense they're not

23   considered.  But neither is any specific article --

24   I mean, they're considered in their totality and an

25   illustration of the intraday trading, but it's not

```
                                            Page 212
```

1    as though the particular substance of any of them is

2    being analyzed for a particular impact on the stock

3    price.  I think that would miss the point.

4              MR. BLATCHLEY:  Okay.  Should we take our

5    break?

6              MR. BLAIR:  Let's do it.

7              MR. BLATCHLEY:  Okay.

8              THE VIDEOGRAPHER:  The time is 3:12 p.m.

9    and we are off the record.

10          (Off the record from 3:12 - 3:30 p.m.)

11             THE VIDEOGRAPHER:  All right.  The time now

12   is 3:30 p.m.  We are back on the record.

13   BY MR. BLATCHLEY:

14       Q    Mr. Deal, can you hear me?  I'm sorry.

15   Just to -- is this okay?

16       A    I think so.  Can you say something else?

17            No.  Not hearing anything.

18       Q    Can you hear me now?

19       A    Yes.

20       Q    Sorry about that.

21            Mr. Deal, you're aware, and this in your

22   report, that Dr. Hartzmark is proposing an

23   out-of-pocket methodology for calculating classified

24   damages?

25       A    Yes.

Page 213

1      Q    And you're familiar with the out-of-pocket

2   methodology?

3      A    Yes.

4      Q    Are you aware that it is nearly universally

5   used to calculate classified damages in securities

6   fraud cases under Section 10b?

7      A    Yes.  In the large.  My quibble is not with

8   the idea of an out-of-pocket method.  I agree that

9   that is typically how damages are calculated.  It

10  has to do with everything else we've been talking

11  about today.

12          That just to say I'm going to use

13  subtraction and somehow there's going to be

14  inflation ribbon in my view is not sufficient.

15     Q    And, again, you're not proposing to do

16  damages methodology of your own?

17     A    I'm not proposing anything different from

18  out of pocket as a concept, no.

19     Q    And so your criticism here -- and I know

20  there's a lot in your report, but let me try to boil

21  it down if I could.

22          One, you say the price decline in the

23  corrective disclosure dates really can't be used as

24  a measure of inflation because, I think, of two

25  reasons, there's no corrective information and this

1   whole FUD concept that you were talking about.  Is

2   that -- is that fair?

3       A    I mean, that's -- that's part of it.

4   That's not all of it.

5       Q    Just with respect to the corrective

6   disclosures.

7       A    Right.

8       Q    Okay.  And then the second --

9       A    I'm saying that -- do you want me to -- I'm

10  happy to give you the full answer if you want,

11  but...

12      Q    Well, just make sure I haven't, you know,

13  omitted anything you think is important.  You know,

14  I think your other criticism is that that's your

15  Figure 5 analysis, that there's a lot of

16  inflationary misstatements that are hard to

17  quantify, and that's -- again, the term I think you

18  used a lot today was complexity.  Is that -- is that

19  right?

20           MR. BLAIR:  Object to form.

21           THE WITNESS:  I agree that there's a lot of

22  complexity.  I've restated many times Dr. Hartzmark

23  hasn't done anything on the front end to measure

24  inflation.  I agree that there's a lot of complexity

25  there and we've been over that and I incorporate

Page 215

1  that into my answer, everything we've talked about

2  today.

3          Before you leave the corrective

4  disclosures, it's not just the fact that there's FUD

5  out there.  I think that's a contributing factor to

6  why we see the drop we see.  But even if the drop

7  were half as big but still statistically significant

8  and there wasn't any FUD or Wells Fargo, the core

9  problem of -- it's not actually a disclosure of

10  factual information from the company.  It's still a

11  core problem and I see that as being a very

12  important problem in the corrective disclosures.

13  BY MR. BLATCHLEY:

14      Q    The other information wasn't corrective; is

15  that fair?  That's your position?

16      A    I certainly -- yeah.  I think that's right.

17  Certainly on its face it's not corrective.  It's

18  not -- it's allegations in the lawsuit but on its

19  face that alone is not corrective information.

20      Q    So let me take that.  Whether or not the

21  corrective disclosure dates involve disclosure of

22  truly corrective information, actual corrective

23  disclosures I think is the term you used, or were

24  prompted by FUD, that issue is common to all class

25  members, right?

Page 216

1          MR. BLAIR:  Object -- objection to the

2     form.

3          THE WITNESS:  If I understand your

4     question, I think the answer is probably yes in the

5     sense that with the out-of-pocket type measure, you

6     are looking at the price of the security that's

7     faced by all investors.

8          So whether or not there's -- any of those

9     are corrective disclosures or those price drops can

10    be considered to be corrective disclosures, that's a

11    question about the impact on the price specific to

12    the allegations in the lawsuit that will affect all

13    investors.

14         I think that's your core question.  I don't

15    think there's, you know, one group of investors in,

16    you know, California that are going to be

17    differently affected by a group of investors in

18    Pennsylvania.  I'm using those obviously

19    conceptually.  I agree with that.  I think that was

20    your question.

21    BY MR. BLATCHLEY:

22    Q    It was my question.  And, again, just to

23    put it another way, nothing -- none of your

24    criticisms or any analysis -- I'm sorry.

25         None of your criticisms are directed by any

Page 217

```
 1   analysis that's unique to any individual class
 2   member?
 3            MR. BLAIR:  Object to the form.
 4            THE WITNESS:  Again, I think I would agree
 5   with that in concept.  I mean, obviously to the
 6   extent it affects, you know, ribbons, parsing,
 7   scaling, all of those things, any individual will
 8   fall somewhere on there in their ribbon and their
 9   calculation will be unique to their buy day and
10   their sell day or their hold day.  But two people
11   who otherwise have equal information I think are not
12   differently situated in terms of the concerns that
13   I'm raising.
14   BY MR. BLATCHLEY:
15       Q    Got it.
16            And so I think you said in your report and
17   throughout that, you know, I think it's that parsing
18   and scaling issue is really what you're talking
19   about and the complexity and the difficulty in doing
20   that.
21            Is your opinion that that is possible to do
22   in this case?
23            MR. BLAIR:  Object to the form, asked and
24   answered repeatedly.
25            THE WITNESS:  Yeah.  Based on what I've
```

Page 218

1   seen and my analysis, I don't see how it's possible.
2   So I think that's the best answer I can give you.
3   BY MR. BLATCHLEY:
4       Q    So it's your opinion then that if this
5   matter were to proceed to the damages phase,
6   defendants would not be able to offer a reliable
7   expert opinion that calculates classified damages?
8               MR. BLAIR:  Object to the form.
9               THE WITNESS:  Given everything that I've
10  seen and that we've talked about, I don't see how it
11  can be done.
12  BY MR. BLATCHLEY:
13      Q    Okay.  And you're certainly not going to
14  offer that opinion, correct?
15      A    I'm going to offer the opinion that I don't
16  see how it can be done.  I'm not going to offer an
17  opinion -- I'm not going to calculate -- I have no
18  plans to calculate the damages ribbon if that's the
19  question there.  I don't see how that can be done
20  accurately given the complexity of all the
21  allegations.
22              MR. BLATCHLEY:  Okay.  Can you -- can you
23  all give me -- can we go off the record for like two
24  minutes.
25              MR. BLAIR:  Sure.

```
                                              Page 219

 1              THE WITNESS:  Sure.

 2              MR. BLATCHLEY:  Thanks.  Sorry, all.

 3              THE WITNESS:  Do you want to -- should we

 4   mute and all that or we can just stay on?

 5              MR. BLATCHLEY:  Yeah.  We can do that.

 6   I'll just take this off.  Hold on.

 7              THE VIDEOGRAPHER:  Okay.  So I'll just say

 8   we're off the record at 3:39 p.m.

 9          (Off the record from 3:39 - 3:42 p.m.)

10              THE VIDEOGRAPHER:  Okay.  The time is

11   3:42 p.m.  Back on the record.

12              MR. BLATCHLEY:  So, Mr. Deal, again, thank

13   you so much for all your time today and for doing

14   the remote deposition.  That's -- that's all the

15   questions I have for now.

16              THE WITNESS:  Thank you.  I enjoyed it.

17              MR. BLAIR:  Mike, I have no follow up.

18              MR. BLATCHLEY:  Okay.  Great.  Thanks so

19   much, everyone, and I apologize for the delay at the

20   beginning.  We can go off the record, if that's

21   okay.

22              THE VIDEOGRAPHER:  Okay.  This concludes

23   today's testimony given by Bruce Deal.  The time is

24   now 3:42 p.m.  We are off the record.

25   \\\
```

Page 220

1    (Whereupon, at 3:42 p.m., the remote deposition of

2              BRUCE DEAL was concluded.)

3

4                    ---oOo---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                        Page 221

1   STATE OF CALIFORNIA      )
2   COUNTY OF SAN MATEO      )   ss.
3
4
5
6           I, the undersigned, hereby certify under
7   penalty of perjury under the laws of the State of
8   California that the foregoing testimony is true and
9   correct.
10          Executed this _____ day of
11  _____, 20_____, at _____,
12  California.
13
14
                       _____
15
                         BRUCE DEAL
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 222
```

1  STATE OF CALIFORNIA        )

2  COUNTY OF LOS ANGELES      )    ss.

3

4       I, Kimberly A. Edelen, C.S.R. No. 9042, in and

5  for the State of California, do hereby certify:

6       That prior to being examined, the witness named

7  in the foregoing deposition was by me duly sworn to

8  testify the truth, the whole truth and nothing but

9  the truth;

10       That said deposition was taken down by me in

11  shorthand at the time and place therein named, and

12  thereafter reduced to typewriting under my

13  direction, and the same is a true, correct and

14  complete transcript of said proceedings;

15       That if the foregoing pertains to the original

16  transcript of a deposition in a Federal Case, before

17  completion of the proceedings, review of the

18  transcript { } was {X} was not required.

19       I further certify that I am not interested in

20  the event of the action.

21       Witness my hand this 27th day of April,

22  2020.

23

24

            KIMBERLY A. EDELEN, C.S.R. NO. 9042

25

```
                                          Page 223

1                    INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over carefully

4     and make any necessary corrections. You should state

5     the reason in the appropriate space on the errata

6     sheet for any corrections that are made.

7         After doing so, please sign the errata sheet

8     and date it.

9         You are signing same subject to the changes

10    you have noted on the errata sheet, which will be

11    attached to your deposition.

12        It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you. If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Page 224

1                      E R R A T A

2

3

4

5          I wish to make the following changes,

6       for the following reasons:

7

8       PAGE LINE

9       ___  ___  CHANGE:_____

10      REASON:_____

11      ___  ___  CHANGE:_____

12      REASON:_____

13      ___ ___  CHANGE:_____

14      REASON:_____

15      ___ ___  CHANGE: _____

16      REASON:_____

17      ___ ___  CHANGE: _____

18      REASON:_____

19

20      _____   _____
                 BRUCE DEAL                    DATE

21

22      SUBSCRIBED AND SWORN TO BEFORE

23      ME THIS ___DAY OF_____, 20 .

24

        _____     _____
25      NOTARY PUBLIC            COMMISSION EXPIRES