```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------
                                 )
     Benjamin Craig, Individually )   File No. 18-cv-0296
4    and on Behalf of All Others  )          (MJD/KMM)
     Similarly Situated, et al,   )
5                                 )
            Plaintiffs,           )   Minneapolis, Minnesota
6                                 )   June 25, 2020
     vs.                          )   2:00 p.m.
7                                 )
     CenturyLink, Inc., et al,    )   DIGITAL AUDIO
8                                 )   RECORDING TRANSCRIPT
            Defendants.           )
9    ------------------------------------------------------

10        BEFORE THE HONORABLE KATE M. MENENDEZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                  (TELEPHONE CONFERENCE)

12   APPEARANCES
      For the Plaintiffs:      BERNSTEIN LITOWITZ BERGER &
13                             GROSSMAN LLP
                               MICHAEL D. BLATCHLEY, ESQ.
14                             MICHAEL M. MATHAI, ESQ.
                               AMANDA BOITANO, ESQ.
15                             1251 Avenue of the Americas
                               Suite 44th Floor
16                             New York, New York 10020

17                             STOLL STOLL BERNE LOKTING &
                               SCHLACHTER P.C.
18                             LYDIA ANDERSON-DANA, ESQ.
                               KEIL M. MUELLER, ESQ.
19                             TIMOTHY SHAWN DeJONG, ESQ.
                               209 S.W. Oak Street
20                             Suite 500
                               Portland, Oregon 94704
21
                               NELSON ZENTNER, ET AL
22                             GEORGE M. SNELLINGS, IV, ESQ.
                               PO Box 14420
23                             Monroe, Louisiana 71207-4420

24

25
```

```
 1      For the Defendants:         COOLEY LLP
                                    PATRICK E. GIBBS, ESQ.
 2                                  3175 Hanover Street
                                    Palo Alto, California 94304
 3
                                    COOLEY LLP
 4                                  RYAN BLAIR, ESQ.
                                    4401 Eastgate Mall
 5                                  San Diego, California 92121

 6                                  COOLEY LLP
                                    CHRISTOPHER LEE MARTIN, JR.,
 7                                  ESQ.
                                    SARAH M. LIGHTDALE, ESQ.
 8                                  55 Hudson Yards
                                    New York, New York 10001
 9
                                    COLLEY LLP
10                                  BRYAN MATTHEW KOCH, ESQ.
                                    500 Boylston Street
11                                  Boston, Massachussetts 02116

12                                  WINTHROP & WEINSTINE
                                    THOMAS H. Boyd, ESQ.
13                                  Suite 3500
                                    225 South Sixth Street
14                                  Minneapolis, Minnesota
                                    55402-4629
15
16      Transcribed By:             CARLA R. BEBAULT, RMR, CRR, FCRR
                                    316 North Robert Street
17                                  Suite 146 U.S. Courthouse
                                    Saint Paul, Minnesota 55101
18

19

20
            Proceedings recorded by digital audio recording;
21      transcript produced by computer.

22

23

24

25
```

1          **P R O C E E D I N G S**

2          **VIA TELEPHONE CONFERENCE BRIDGE**

3

4                  THE COURT:  Okay.  Sorry about that,

5          Mr. Blatchley, but you were going to take the lead on the

6          call and tell me who else is present from your team.

7                  MR. BLATCHLEY:  Judge, I believe we have on the

8          line, and I might be incorrect about that, Keil Mueller from

9          Stoll Berne team.  Michael Mathai from Bernstein Litowitz,

10         and Amanda Boitano from Bernstein Litowitz.  If there's

11         anyone else on the line, I apologize for not introducing

12         them.

13                 THE COURT:  All right.  Anybody else on the line

14         on behalf of the plaintiff team that did not get named?

15                 MR. DeJONG:  Yes, Your Honor.  It's Tim DeJong,

16         and also I believe Lydia Anderson-Dana, from Stoll Berne in

17         Portland.

18                 THE COURT:  Great.  Thank you.  Welcome to both of

19         you.  Anybody else?

20                 MR. SNELLINGS:  Yes, Your Honor.  This is George

21         Snellings from Monroe, Louisiana, and I'm going to

22         participate briefly.  This case got removed to your court.

23         There's some concern it may come back to our court in

24         Louisiana.  That's why I'm participating on the call or just

25         listening in.

```
 1                THE COURT:  Okay.  And are you counsel in
 2     Louisiana or are you the judge in Louisiana?
 3                MR. SNELLINGS:  I'm counsel in Louisiana.  Local
 4     counsel.
 5                THE COURT:  Okay.  Okay.  Thank you.
 6                Anybody else on the line on behalf of the
 7     plaintiffs that didn't get named already?
 8                All right.  Let's pivot to the defendants.  Who is
 9     lead counsel on behalf of the defendants for today's call,
10     and if you could introduce your team.
11                MR. GIBBS:  Thank you, Your Honor.  This is
12     Patrick Gibbs from Cooley.  I expect to take the lead on
13     today's call for the defendants.  Also on the line today
14     from the defendants I expect will be Ryan Blair, Sarah
15     Lightdale, Bryan Koch.  That's Bryan with a Y, K-o-c-h; and
16     Chris Martin, all from Cooley.  I don't know whether any of
17     our counsel from Minneapolis are on the line or not.
18                MR. BOYD:  Your Honor, Thomas Boyd is on the line.
19                THE COURT:  Great.  Welcome, Mr. Boyd.
20                Anyone else that wasn't named?
21                All right.  I'd say we have plenty of lawyers to
22     be getting along with, so let's go ahead and get started.
23     We are here to talk about a discovery dispute that the
24     parties have chosen to raise to me informally, basically
25     related to the defendants' efforts to obtain through
```

1   discovery communications between the plaintiffs' counsel and

2   the Minnesota Attorney General.

3           So first I need to make sure that I understand the

4   sort of parameter of the dispute.  I've got some questions

5   for you, Mr. Gibbs.  Is that a correct assessment of what

6   you believe you are entitled to that has not yet been turned

7   over?

8           MR. GIBBS:  It is with the following caveat, Your

9   Honor.  The request we made actually was broader than that.

10  It requested communications between plaintiffs and a broader

11  array of governmental agencies relating to these matters.

12  The reason this dispute is teed up to Your Honor in this

13  particular form is because plaintiffs' counsel have

14  represented to us that other than communications between

15  plaintiffs' counsel and the Minnesota AG's office, there are

16  no responsive documents to that request.

17          And then although the request is framed as one

18  directed at plaintiffs, it's not actually directed at

19  plaintiffs' counsel, obviously materials in plaintiffs'

20  counsel's possession, custody and control would be in the

21  possession, custody and control of the plaintiffs as well.

22  So that's -- that's the request that has brought us here.

23  The reason it's narrowed to what Your Honor just described

24  is because we've been told that's all that exists that would

25  be responsive.

1           THE COURT:  Okay.  And before I hear more about

2     your thinking about why you think this is discoverable,

3     Mr. Blatchley, let me make sure I understand the table that

4     has been set.  You have, in response to this discovery

5     request, identified communications not between the

6     individual plaintiffs but between their counsel and the

7     Minnesota Attorney General, and those are the only documents

8     that you believe are responsive to Discovery Request 13, but

9     it is your position that they should not be disclosed

10    because they are communications with counsel for the reasons

11    you set forth in your letter.  I'm not looking for a

12    reiteration of the issues from you yet.  I just want to make

13    sure I -- or a reiteration of the rationale.  I just want to

14    make sure I understand what issue we are addressing.

15          MR. BLATCHLEY:  Mike Blatchley.  That's correct.

16    I just wanted to clarify one point which is Mr. Gibbs I

17    think accurately stated the state of affairs, but when Your

18    Honor repeated it, I do want to clarify that we did a robust

19    ESI search for everything in our clients' possession

20    relating to those kinds of -- to that request and we've

21    produced everything that was responsive.  And Mr. Gibbs is

22    right to say that the only dispute before Your Honor and

23    that the only responsive documents that would otherwise

24    exist that we have not produced concern those communications

25    with the Minnesota Attorney General by counsel.

1          THE COURT:  Great.  Okay.  Great.  Thank you for

2     that clarification.  I feel like it's a pretty discrete and

3     focused issue that we can continue to talk about today.

4          So I want to begin with you, Mr. Gibbs.  My -- I

5     have a very difficult time understanding how communications

6     between plaintiffs' counsel and the Minnesota AG are

7     relevant.  I understand how the information that the

8     Minnesota AG gathered in its own investigations might be

9     relevant.  I understand how its conclusions, which has I'm

10    sure been amply communicated to the defendants in a variety

11    of forms and formats, including through a lawsuit, are

12    relevant.  I can't quite wrap my mind around how

13    communications between plaintiffs' counsel and the AG are

14    relevant.  So give me your best pitch.

15         MR. GIBBS:  I'd be happy to, Your Honor.  Thank

16    you.

17         To me, I think the right way to think about this

18    issue is to -- to keep in mind that because of the way the

19    plaintiffs have framed their case, which is to say

20    plaintiffs are alleging that a lawsuit filed by the

21    Minnesota Attorney General's office and the news reporting

22    on the filing of that lawsuit was a corrective disclosure.

23    In other words, the filing of that lawsuit and the

24    publication of the filing of that lawsuit revealed, at least

25    in part, a years' long scheme at CenturyLink to defraud its

1    customers and thereby to defraud its shareholders.

2           We think that's wrong.  We think that the

3    Minnesota Attorney General's lawsuit, the complaint, the

4    publicity around it, included a number of egregiously false

5    statements.  We think that to the extent the Minnesota AG's

6    lawsuit had any impact on CenturyLink's stock price at all,

7    it did so by misleading the market into believing there were

8    some big brewing scandal when there wasn't.

9           And so the activities and statements of the

10   Minnesota Attorney General's office around the

11   investigation, the filing and the publication of that

12   lawsuit, those are all key aspects of the plaintiffs'

13   allegations.  They have injected them into this case.

14          In my view, the right way to think about the

15   Minnesota AG's office and its role in this case is to think

16   about them as a third-party witness.  They are a participant

17   in some of the events that the plaintiffs claim are a part

18   of their securities fraud claim.  And so viewed in that

19   light, I think it's beyond question that communications

20   between counsel for one party and a third-party witness

21   could be relevant to the case.

22          You know, if, for example, I went out and I found

23   one or more of the plaintiffs' confidential witnesses and I

24   interviewed them and had communications with them about the

25   case, and that person came in and recanted their testimony

1    -- their statements, said nothing the plaintiffs have said

2    was true, I don't think there's any question that the

3    plaintiffs would be entitled to come in and ask questions

4    about the nature of my communications with that witness.  I

5    don't think that counsel gets to have secret communications

6    with third-party witnesses and shield them from the other

7    side just because they used counsel to have those

8    communications.

9            So, to me, the short answer is --

10           THE COURT:  Why wouldn't that be work product?

11   That exact example that you gave.  Why isn't that work

12   product?

13           MR. GIBBS:  The communications themselves?

14           THE COURT:  Yeah.  If your part in this is an

15   interview of a third-party witness --

16           MR. GIBBS:  Yes.

17           THE COURT:  -- if that's the analogy on which you

18   want to rely for relevance --

19           MR. GIBBS:  Yes.

20           THE COURT:  -- why doesn't that create serious

21   work product concerns?

22           MR. GIBBS:  Well, two reasons.  First of all, I

23   want to be clear, if I interview a confidential witness or I

24   exchange questions and answers with them by e-mail and I go

25   and write up a memo summarizing my interactions with that

1    witness, my memo is certainly work product.  That doesn't

2    mean my communications with a third party are work product,

3    among other things because I don't have control over that

4    third party, right?  So if I send an e-mail to a third-party

5    witness that lays out my thinking about the case or asks

6    them a series of questions, I put that out to someone who is

7    a stranger to my client and who is a stranger to the case.

8         And, yeah, I know we're going to talk about common

9    interests later, but if you set that aside for a moment,

10    we're just talking about relevance or we're talking about

11    whether something is just inherently work product because it

12    involves counsel, I mean, no, I don't think my

13    communications with a third-party witness are work product

14    any more than I think that the plaintiffs' lawyers'

15    interviews of witnesses, the communications they have with

16    these third-party witnesses, with whom they have no

17    relationship, right?  If counsel for plaintiffs goes and

18    interviews a witness or does it by e-mail, they have no

19    control over whether that person just takes that e-mail and

20    flips it over to me.  In fact it happens sometimes, right?

21         So I don't think a communication with a third

22    party, who is under no obligation to keep anything

23    confidential at all, is work product just because it was

24    conducted by a lawyer as opposed to an investigator.

25         THE COURT:  Well, that's an artificial -- yeah, I

1    mean, that's a little bit of an artificial reason.  It's not

2    just because it was conducted by a lawyer.  It's because it

3    was conducted by a lawyer in preparation for litigation.

4         But, you know, we're going to put that aside.  I

5    know I'm the one who asked you the question.  I was somewhat

6    surprised to hear the path you took analogizing this to a

7    third-party witness, but it's helpful to hear that that is

8    your theory of relevance.

9         Why don't I hear from you, Mr. Blatchley, on

10    behalf of the plaintiff about the relevance question.

11         MR. BLATCHLEY:  Thank you, Judge.  Again, Mike

12    Blatchley for plaintiffs.

13         I think Your Honor kind of said exactly why we

14    think these communications are irrelevant and I think they

15    are laid out in the cases we cited to Your Honor.  Again, I

16    want to just respond to a couple of things that Mr. Gibbs

17    said about the Minnesota Attorney General's role in the

18    case.

19         We did not interject the Minnesota Attorney

20    General into this case.  The Minnesota Attorney General was

21    investigating CenturyLink in the middle of our class period.

22    The internal documents that we have now received from the

23    company show that to be the case.  We've now seen senior

24    executives who were very well aware during the class period,

25    when investors were not, about the questions that they were

1    asking the company about their billing practices.  The

2    Minnesota Attorney General, you know, appeared in this case

3    during the corrective disclosures when they filed the

4    complaint showing that one in five customers were quoted

5    correctly, and the market's reactions to those facts which

6    was, you know, to sell off the shares to CenturyLink and

7    cause a dramatic decline in the price in their stock.

8           And again, just for context about who -- how

9    this -- how the Minnesota Attorney General got interjected

10   here, Judge Davis in the initial conferences in the consumer

11   matter encouraged the plaintiffs' counsel to have

12   communications and to coordinate with the Minnesota Attorney

13   General.  And so, you know, we kind of feel we're being

14   taken advantage of here because we did follow that direction

15   in conducting our investigation and seeking to prove our

16   claims here.

17          But I think fundamentally the reason why there's

18   just absolutely no relevance is that none of the documents

19   or communications that we might have had with the Minnesota

20   Attorney General are going to be in any way relevant to

21   proving any element in this case.  They are not going to be

22   able to be used by either side at summary judgment.  They

23   are not just going to move the needle one inch to say, you

24   know, whether the senior executive of CenturyLink knew that

25   the decisions they made about their billing practices were

1    false and misleading when they -- they are not going to be

2    able to shed any light on whether the corrective disclosures

3    in fact revealed the information to the market and caused

4    the stock prices to decline.

5           They are just not relevant to anything like that.

6    They occurred, you know -- and I don't want to slip up on

7    the time period -- but, you know, months and months if not a

8    year after the events in the lawsuit took place.  And I

9    think as Your Honor rightly noted at the outset, they are

10   just not relevant, you know, before we get to the other work

11   product issues that Mr. Gibbs suggested might exist.

12          THE COURT:  Okay.  Mr. Gibbs, I welcome your

13   thoughts in response to what opposing counsel just shared.

14          MR. GIBBS:  Thank you, Your Honor.  Because I was

15   trying to set up the third-party witness point to lay the

16   groundwork for a relevance argument and we ended up instead

17   in a work product discussion but not before --

18          THE COURT:  That was my fault.

19          MR. GIBBS:  No, no, it's okay.  I took it and ran

20   with it.  So -- but a couple points I'd like to make.  First

21   of all, it's hard for me to imagine how something could

22   simultaneously be work product but not even relevant.  They

23   are two different issues, right?  The fact that it's work

24   product would not make it irrelevant.  In fact, I think if

25   it's work product, how could it not come within the

1    expansive definition of relevance under Rule 26, right?  It

2    must have something to do with the case if it's going to

3    qualify as work product.

4         THE COURT:  I'm sure you've done all kinds of work

5    in furtherance of all kinds of litigation that wouldn't

6    satisfy the relevance theory because it doesn't bear fruit,

7    right?  Like, it cannot be that just because a lawyer is

8    chasing down a lead, an angle, a corner, an idea, is

9    co-extensive with the universe of relevance.

10        MR. GIBBS:  I think you and I look at that a

11   little bit differently.  If I go down a path and it doesn't

12   bear fruit and turns up evidence that's inconsistent with my

13   claim, it's relevant.  I may not like it and it may be work

14   product, but that doesn't mean it's not relevant.  So let me

15   give you an example.

16        Plaintiffs in their complaint have repeatedly and

17   loudly parroted a claim that was made by the Minnesota

18   Attorney General about CenturyLink allegedly overbilling

19   millions of customers, which the Minnesota AG purports to

20   have taken from CenturyLink documents.

21        (Audio interruption.)

22        MR. GIBBS:  Somebody is shuffling papers on a

23   microphone quite loud.

24        So plaintiffs' counsel in this case have repeated

25   that accusation by the Minnesota Attorney General's office.

1    For all I know, plaintiffs' counsel and the Minnesota

2    Attorney General's office have discussed that fact, have

3    discussed that document, have discussed whether or not that

4    allegation actually panned out.  If the Minnesota Attorney

5    General, for example, has said, yeah, we thought that but it

6    turned out not to be true.  We dug into it, we found that it

7    was false.  Okay.  Totally hypothetical.

8           And again, we're only talking about relevance, so

9    whether it's work product is a separate discussion.  But

10   those kinds of communications would be deeply relevant to my

11   attempt to show that the Minnesota Attorney General's filing

12   and the allegations that plaintiffs have loudly parroted in

13   this case were not a corrective disclosure.  They didn't

14   reveal the truth.  They were false.

15          And so if they are going to use the Minnesota

16   Attorney General's allegations against CenturyLink to try to

17   prove loss causation in this case, I think it's clearly

18   relevant for me to look into what kinds of communications

19   the Minnesota Attorney General has had about its case, about

20   the factual assertions made in this case.  I think relevance

21   is quite clear.

22          THE COURT:  Mr. Gibbs, have you communicated --

23   have you sought discovery from the Minnesota Attorney

24   General about the truth or falsity of the conclusions in

25   its -- in its investigation?  Because you are articulating a

1    theory of relevance by which you could impeach the

2    conclusions of the Minnesota AG by asking them what they

3    might have said to other people, and you are choosing the

4    other people to be the lawyers for the plaintiffs in this

5    case.  They might have said things to all kinds of other

6    people about what is or isn't true about their

7    investigation, including federal investigators, other

8    agencies.  Have you asked these questions of the Minnesota

9    AG?

10              MR. GIBBS:  I mean --

11              THE COURT:  I can't really imagine that you

12    haven't sought this discovery, right?

13              MR. GIBBS:  Well, if the question is have we

14    served third-party discovery on the Minnesota AG as part of

15    this case, the answer is no, we have not yet done that.  I

16    have, you know, every time I have encountered this issue I

17    have been encouraged by judges to seek discovery from the

18    parties if it's available from the parties and not to bother

19    third parties.  But if the Court thinks this is more

20    appropriately sought from the Minnesota Attorney General's

21    office, I certainly could consider doing that.

22              But I -- I've never heard the availability of

23    information from a third party to be a reason why a party

24    should be excused from producing the same information.

25              THE COURT:  Um-hum.

1          MR. GIBBS:  I have typically operated from the

2     opposite perspective.

3          THE COURT:  Your theory is both over and under

4     inclusive.  In seeking all communications from between

5     plaintiffs' counsel and the Minnesota Attorney General of

6     any sort, you're certain to get things that actually don't

7     either prove or disprove the theory of relevancy you've

8     articulated.  Flipside, you will not get all kinds of

9     information that could prove or disprove your theory of

10     relevance; namely, the lack of veracity of the conclusions

11     that the Minnesota Attorney General announced.  There might

12     be all kinds of smoking gun information about that that has

13     nothing to do with communications between plaintiffs'

14     counsel and the AG, right?

15          MR. GIBBS:  I would say yes, but that test has

16     never been applied to the plaintiffs in this case.  They

17     sought mountains and received mountains of documents from us

18     that do not ultimately bear on the truth or falsity of their

19     allegations, and no one has ever suggested that that makes

20     their request inherently overbroad or not relevant.

21          I mean, there's never a perfect fit between what I

22     ask for and what ends up helping to prove or disprove a case

23     and that's not the standard under Rule 26.  It has to be

24     reasonably calculated to lead to the discovery of admissible

25     evidence, and I think I've articulated reasons why this is

1     calculated to lead to the discovery of admissible evidence.

2              It may not pan out.  Sometimes discovery doesn't

3     pan out.  But I don't think that's a reason why I can't even

4     ask for it.  And I may very well seek discovery from the

5     Minnesota Attorney General's office as well.  But again, the

6     fact that something is available from a third party has

7     never, to my understanding, been a reason to deny discovery

8     from a party if it is reasonably calculated to lead to the

9     discovery of admissible evidence.

10             THE COURT:  So an additional question that I have,

11    it sounds like what you are articulating is relevance or

12    imagined relevance, possible relevance, of communications

13    from the Minnesota AG to the plaintiffs about their

14    investigation, right?  Not communications from the

15    plaintiffs -- from the plaintiffs' counsel to the Minnesota

16    AG, but communications from the Minnesota AG to the

17    plaintiffs' counsel about their investigation.

18             MR. GIBBS:  Well, yes, that's the example I've

19    given.  I also, frankly, have some concerns about

20    communications going the other way.

21             THE COURT:  Help me understand the relevance of

22    communications going the other way.

23             MR. GIBBS:  Sure.  Well, to go back to my

24    third-party witness example, let's say, for example,

25    plaintiffs' counsel is feeding theories and arguments and

1    information to the Minnesota AG's office.  I think that's

2    relevant to the integrity and the nature of the Minnesota

3    AG's investigation and complaints against CenturyLink.  I

4    would certainly use that to impeach witnesses and to make

5    arguments about whether this thing the plaintiffs claim or

6    the corrective disclosure is in fact that, or instead is it

7    something else.

8              THE COURT:  And, Mr. Gibbs, is your -- is your

9    request for communications between plaintiffs' counsel and

10   the Minnesota AG for after the Minnesota AG issued its

11   investigation conclusions for during the Minnesota AG's

12   investigation?  When -- what's the timeframe as it compares

13   to the AG's office investigation?

14             MR. GIBBS:  I'm trying to pull up the request

15   because I don't recall offhand what is the specific time

16   period for the request.  The request is framed as a -- it's

17   all communications and documents reflecting communications,

18   and the time period is from the beginning of the class

19   period to the present.  So it spans before and after.

20             THE COURT:  Okay.  All right.  Mr. Blatchley, what

21   are your thoughts about the arguments that Mr. Gibbs has

22   made?

23             MR. BLATCHLEY:  Your Honor, just very quickly on

24   some of the points about relevance, Mr. Gibbs is not going

25   to be able to prove one way or another about anything that

1    plaintiffs' counsel might have communicated with the

2    Minnesota Attorney General months and months after the fact

3    about what a particular document showed that was, you know,

4    relied on by plaintiffs in the complaint.  What they are

5    going to do is they are going to put that document, if it's

6    at issue at trial, before the jury.  They are going to have

7    someone who actually put that document together testify

8    about what it actually means.  They're not going to be able

9    to call plaintiffs' counsel or the Minnesota Attorney

10   General to say one thing or another that would move the

11   needle one inch on about what that document means or what

12   that allegation is.

13        Now, of course in our case we have now received

14   discovery, and just so we're not mistaken about what that

15   means, you know, we have the Internet cost of coverage fee,

16   which is one of the disputed fees that's at issue in this

17   case.  The internal documents that we have now received from

18   the defendants show that that number was far larger than the

19   document that Mr. Gibbs claims the Minnesota AG incorrectly

20   interpreted.

21        But again, what should be at issue in this case,

22   and I think one of the things we need to note as well in

23   terms of not just the relevance but the proportionality of

24   this discovery being sought here, is that the way to prove

25   the allegations or to, you know, disprove them as Mr. Gibbs

1    would have, is to actually deal with the evidence and the

2    witnesses who have firsthand knowledge of the documents.

3           And again, the proportionality question I think is

4    one that we had addressed at the pretrial conference before

5    Your Honor.  And again, it has to do with the logging

6    protocol.  I think implicit in the ESI protocol is that

7    documents and communications like the ones we're discussing

8    today were going to be of such limited evidentiary value

9    that they didn't even need to be logged in the first place;

10   and I think that, again, just speaks to the very, very kind

11   of far-fetched relevance arguments I think you're hearing

12   from Mr. Gibbs.

13           THE COURT:  Now, let me push back on part of your

14   argument.  Mr. Gibbs suggests that if the Minnesota AG, you

15   know, articulates to anyone, and here he has specifically

16   focused on plaintiffs' counsel as a likely recipient of such

17   admissions, that really their investigation was bunk or they

18   found plenty of evidence that undermined it or they didn't

19   mean it or it was all ill conceived, that that would be

20   relevant to impeach the validity of the Minnesota Attorney

21   General's sort of attack on the defendants.

22           And to my understanding that it's your position

23   not just that the fact of the AG investigation should have

24   been disclosed and wasn't, but that the fact of the conduct

25   described in the AG investigation should have been disclosed

1    but wasn't, and the AG admitting that its investigation was

2    flawed in some way could be impeachment material.  What do

3    you think about that argument?

4         MR. BLATCHLEY:  Again, I think what we are talking

5    about is certainly far-fetched and certainly not

6    proportional.  Um, I mean, Mr. Gibbs can certainly point to,

7    as he has, you know, the settlements that they've paid in

8    this case.  I don't think that there's anything that could

9    have been said between -- and again, without getting into

10   the work product concerns -- between two counsel aligned in

11   proving some of the same misconduct that would properly be

12   put before any trier of fact concerning the validity of the

13   allegations.

14        And again, what we're talking about, what we've

15   been, the Minnesota Attorney General's complaint which was

16   filed in July of 2017, again, doesn't have anything to do

17   with what the Minnesota Attorney General claims counsel

18   might have been discussing ten months later.  So whatever

19   the period of time after that might have been.

20        THE COURT:  Okay.  I will give you the last word,

21   Mr. Gibbs.

22        MR. GIBBS:  Thank you, Your Honor.  I'm frankly a

23   little taken aback to hear Mr. Blatchley talking about

24   proportionality, both because they've given us no

25   information about the volume of these communications.  If

1    the volume is so great that it raises proportionality

2    concerns, I would say that fact in and of itself is of

3    interest and highly relevant.  But frankly, I'm skeptical

4    that the number of communications that we're talking about

5    here could raise any conceivable proportionality concerns in

6    a world where we have produced, you know, nearly a million

7    and a half pages of documents to them.

8              And also I just, you know, in their letter brief

9    and again just now, Mr. Blatchley has repeatedly suggested

10   that he thinks it's unlikely that I'm gonna use any of these

11   documents, these communications, either on summary judgment

12   or at trial.  I disagree with his assessment of that

13   likelihood, but that's never been the test.  There's no part

14   of Rule 26 that asks how likely is it that the party

15   requesting these documents is going to use these documents

16   as evidence at summary judgment or trial.  That's not the

17   test.  And if it were the test, we certainly wouldn't have

18   produced a million and a half pages of documents to the

19   plaintiffs in this case.

20             The test is whether the discovery that I'm

21   requesting is reasonably calculated to lead to admissible

22   evidence.  And so it doesn't have to be that these

23   communications themselves are going to be used in evidence

24   of any particular proceeding.  I'm entitled to investigate

25   my position one step at a time by asking for pieces of

1    evidence and then following the trail where it leads just

2    like Mr. Blatchley is.

3           And that's sort of my last point, which is

4    plaintiffs here on all fronts, proportionality, relevance,

5    all of it, are proposing a -- what would amount to an

6    absolutely egregious double standard, right?  They've asked

7    for millions of pages of documents from us, the vast

8    majority of which are never ever, ever going to see the

9    light of day.  The vast majority of which are completely

10   irrelevant to the truth or falsity of their allegations or

11   our defense, because that's how discovery works.

12          And then we make a request for what -- what could

13   at most be, what, a couple of dozen e-mail exchanges?  Maybe

14   several dozen.  It's not going to be thousands.  It's not

15   gonna be hundreds of thousands.  And all of a sudden they

16   are up in arms and claiming that it's disproportionate to

17   the needs of case and, you know, you don't get it unless you

18   can show definitively that you're going to put it in

19   evidence at trial or summary judgment.  You know, that's not

20   the standard that's being applied to their request and it

21   shouldn't be the standard that's applied to ours.

22          Rule 26 says I'm entitled to get discovery if my

23   discovery is reasonably calculated to lead to the discovery

24   of admissible evidence.  I don't think there's any question

25   that this is reasonably calculated to lead to discovery of

1    admissible evidence.  It may pan out.  It may not.  That's

2    how discovery works, but I get to take discovery, too.

3           THE COURT:  Okay.  I am going to issue a ruling

4    right now.  I'm going to explain the reasoning.  I will

5    follow it up with a brief order.

6           I'm going to deny the request for the information

7    at issue.  I'm not relying on work product or attorney-

8    client privilege.  I think that the issues related to that

9    are very interesting and complicated and if I were going to

10   rely on that I would have asked for supplemental briefing,

11   more formal briefing, because the letter briefs and as

12   augmented by my own research just hints at the complexity of

13   the shared interest doctrine.  Frankly, it's the way the

14   work product doctrine works in this case and I would need

15   more input and assistance from the parties.

16          Instead, I am concluding that the information

17   being sought, and I'm going to be very specific, I'm not

18   finding that everything asked for in that document request

19   was necessarily irrelevant.  But now that we have drilled

20   down to the only category of communications that might

21   exist, namely communications between plaintiffs' counsel and

22   the Minnesota Attorney General during the class period,

23   which postdates when the Minnesota Attorney General was

24   conducting its investigation or issuing its findings, is not

25   relevant to any issues in this case.  And I'm going to

1    explain a few things.

2            First of all, I disagree with Mr. Gibbs'

3    assessment that somehow the plaintiffs are not entitled to

4    invoke questions of proportionality because the defendants

5    have produced millions of pages.  I'll remind everyone that

6    I have denied discovery requests from the plaintiffs as well

7    as from the defendants in this case.  I'm not going to take

8    a global view that whoever provides less paper waives the

9    right to complain about the relevance or even the

10   proportionality of certain requests.

11           Proportionality is an assessment not of the total

12   amount of discovery being exchanged from one side or the

13   other, but the specific burdens related to a particular

14   request as balanced against the likelihood that that request

15   leads to the discovery of relevant and usable evidence.

16           I agree very much with Mr. Gibbs that we can't

17   just talk about discovery as though each page received has

18   to itself be independently admissible and tieable to a

19   particular element that's guaranteed to be at issue in

20   summary judgment or trial.  That is too narrow.

21           But nonetheless, when the theory for relevance

22   here is that the Minnesota Attorney General's conclusions

23   are flawed and wrong and that they misunderstand the billing

24   practices of the defendants, they misapprehend the way the

25   defendants interact with their clients and they falsely

1    concluded that these inappropriate billing practices

2    happened, there are much more direct and directly relevant

3    and useful ways to have that information to prove up that

4    conclusion than asking for plaintiffs' counsel's

5    after-the-fact communications with the AG.

6          One of the reasons that I find that this does

7    raise proportionality concerns is because it also so clearly

8    raises questions of work product and attorney-client

9    privilege.  And to have to log each of these communications,

10   whether they are many or few, and assess the privilege

11   issues related to each of them when the theory of relevance

12   is so remote and tangential I find to be disproportionate to

13   the discovery needs in this case.

14         The defendants I am certain have access to

15   millions of pages, many of which are in their own

16   collections, to undermine and discredit the conclusions --

17   or to try to undermine and discredit, I'm not opining on

18   whether they will succeed or not -- the conclusions of the

19   Minnesota Attorney General.  Asking for after-the-fact

20   communications between the Minnesota AG and plaintiffs'

21   counsel about those things are not even close to a direct

22   way to prove that up.

23         I also agree with Mr. Gibbs that we don't have to

24   have admissible evidence for it to be discoverable, but I do

25   have an incredibly difficult time picturing how

1    communications between the plaintiffs and the -- or the

2    plaintiffs' counsel and the Minnesota AG could ever actually

3    even lead to discoverable evidence, let alone having a

4    difficult time picturing how communications from counsel

5    could be used in an impeachment context.  I understand

6    impeachment is a big tent.  I thought a lot about it back

7    when I was a litigator.  But I don't find that this is

8    likely to lead to evidence even that leads to discoverable

9    evidence, and I find that actually the entire theory of

10   relevance here is much more amply and soundly proven through

11   other methods and methodologies.

12          I don't accept Mr. Gibbs' suggestion that I am

13   somehow out on a limb in crazy land by suggesting that it

14   would be better to get information from a third party than a

15   party to the litigation.  I think that's a little bit of a

16   simplistic comparison in this case.  The third party at

17   issue is also engaged in extensive litigation, or has been,

18   with the defendants.  There's been enormous information

19   shared about the AG's conclusions about what the AG found,

20   what they said, what their investigation led to.

21          This isn't like picking on some third party small

22   business to get copies of their conclusions or the ways they

23   reached them.  I'm not saying I'm not wading into

24   discoverability of those things or not.  The AG is not on

25   the phone, and I'm not trying to say that they have to turn

1    these things over.  But I suspect very strongly that the

2    defendants already have a great deal of information about

3    the AG's conclusions, how it reached them, whether they were

4    flawed, what information they looked at, what the weaknesses

5    are in their conclusions.  In fact, I suspect that's been at

6    the heart of the work that the defendants have been doing in

7    all three aspects of this MDL.

8         So I am simply finding that it is not relevant.

9    That it's removed in time from the actual strength or

10   weakness of the Minnesota AG's conclusions.  That it's

11   several levels removed in direct relevance, and that because

12   it is so fraught with issues of privilege when weighed

13   against a really theoretical remote theory of relevance,

14   that that actually does validly raise proportionality

15   concerns.

16        I don't agree that simply because the defendants

17   have had to produce a great deal of discovery in this case

18   that means that the plaintiffs cannot invoke proportionality

19   concerns.  Proportionality has different facets and

20   different impacts in different ways of thinking about it.

21   And frankly, in a case like this, it is very little surprise

22   that the defendants would be in possession of many more of

23   the documents that are relevant to both sides than the

24   plaintiffs would, but that doesn't become a basis for the

25   defendants to be entitled to discover otherwise not relevant

1    information.

2         So I'm going to deny the request to get

3    communications between plaintiffs' counsel and the Minnesota

4    AG's office from the class period identified, which

5    postdates the Minnesota AG's initial conclusions in this

6    case.  I'm not going to make a decision about whether I

7    would also deny that request on grounds of work product,

8    shared interests, or any other privilege.  I'm basing it

9    solely on the relevance assessment at this time.

10        Does anybody need -- let's start with you,

11   Mr. Blatchley.  Do you need any clarification about my

12   ruling?

13        MR. BLATCHLEY:  No thank you.

14        THE COURT:  Mr. Gibbs, do you need any

15   clarification about the line that -- or the ruling that I've

16   issued?

17        MR. GIBBS:  No, Your Honor.  The ruling is quite

18   clear.

19        THE COURT:  Okay.  The next item that was

20   mentioned in only one of your letters was that there might

21   be another disagreement brewing.  I get the impression that

22   it is embryonic at this point.  Mr. Blatchley, do you want

23   to tell me about that?

24        MR. BLATCHLEY:  We had a lengthy meet and confer

25   on Tuesday of this week and it appears we're at an impasse

1    on two interrogatories that we think we're entitled to

2    information on.  And I guess we wanted to raise that, and we

3    described it briefly in the letter, which is the term "gap

4    closures" which is a term that we've seen being used in

5    company documents, and as well as information we're seeking

6    about the billing systems and how revenue is generated by

7    various fees were reported up into the company's financial

8    results.

9         I just wanted to raise the possibility of an

10   informal conference and scheduling one with Your Honor

11   because we do believe it is an issue that needs or should --

12   we respectfully request that it, you know, receive prompt

13   attention; but we did want to also flag that we think that

14   some additional documentary evidence concerning the items

15   that will be at issue in the request is something that the

16   Court needed to see in order to rule on it, so we wanted to

17   make sure that we were proceeding in the right way in

18   requesting an informal conference on these issues.

19        (Pause in audio.)

20        MR. GIBBS:  Your Honor, this is Patrick Gibbs.  If

21   you're speaking, I can't hear you.

22        THE COURT:  Oh, thank you.  How many times am I

23   going to make the same mistake?  I trust you all have made

24   it once or twice yourself.  I was speaking into mute.  Let

25   me repeat.

1    I was asking you, Mr. Gibbs, what your perspective

2    is on whether there is indeed a kind of ripe disagreement

3    about this and how you think would make the most sense to

4    raise it.

5    MR. GIBBS:  We have had some amount of meet and

6    confer, but I think Your Honor is right.  It is embryonic.

7    We may end up doing another informal discovery conference on

8    it, but lobbing a request for an informal discovery

9    conference into a letter relating to a conference on a

10   different subject is not how I understood the process to

11   work.  So I, frankly, would prefer to go through the normal

12   process of scheduling an informal discovery conference if

13   it's necessary once we have actually completed the meet and

14   confer process on this, because I understood this conference

15   to be about our request for these communications.  You have

16   now ruled on it.  There are ongoing discussions about these

17   other interrogatories.  I don't really know what's the

18   purpose of lobbing it in through a letter on a totally

19   different subject or into today's conversation.

20   THE COURT:  Okay.  Thank you.

21   I share Mr. Gibbs' perspective at this time.  I'm

22   not faulting Mr. Blatchley for just putting it out there as

23   kind of an issue identifier that's going to come down the

24   road, but it feels certainly inappropriate for me to even

25   wade into it speculatively when Mr. Blatchley hasn't

1    addressed it in his -- I'm sorry, when Mr. Gibbs hasn't

2    addressed it in his letter; and it feels like it's a little

3    early for the issue to be crystalized.

4            One of the very helpful things about the

5    conversation we just had related to the communications

6    issue, although I'm sure Mr. Gibbs doesn't agree that it's

7    helpful, but is that it was very well teed up by the

8    parties.  You had communicated about what was being

9    requested.  The other side had communicated about what

10   existed.  You had communicated about why you didn't intend

11   to turn it over, why the other side thought it was

12   discoverable, and then you brought that to me.

13           This feels early and we haven't yet had that kind

14   of meeting of the minds about what the dispute is.  I am

15   widely available throughout the month of July.  Basically

16   I'm going to take a couple days off at the end of next week,

17   but otherwise I am -- I'm really available whenever you

18   decide that you be want to address this.  If you're unable

19   to work it out yourself, I could get you on the calendar

20   with great haste.

21           Alternatively, as you know, things can be brought

22   to me formally as well.  It takes both sides to agree that

23   the informal process is the appropriate one, and if you

24   decide this is more appropriate for a formal motion

25   practice, I'm open to that as well.

1        So, feels early to wade into this, but I am ready

2   and happy to do so when you decide that you need my

3   assistance in whatever form that takes.

4        Mr. Blatchley, anything else at this time?

5        MR. BLATCHLEY:  Thank you for that clarification,

6   Your Honor.  We certainly did not mean to inappropriately

7   interject an issue.  We just thought that the issue was teed

8   up and just wanted to get your guidance on the best way to

9   proceed, so thank you for that.

10        THE COURT:  You're welcome.  Anything else that

11   you think we should talk about while we're together?  Any

12   scheduling matters or anything else that would be helpful or

13   should we save it for another day?

14        MR. BLATCHLEY:  The one thing I would note, we did

15   bring a, you know, a disputed motion over additional

16   discovery related to our class certification motion.  We

17   were able to resolve that before that hearing.  We were

18   scheduled to argue the motion before Your Honor.  That

19   discovery has now been complete and so has the briefing on

20   our class certification motion.  I believe Judge Davis is

21   now aware of that, and I think the parties are ready for a

22   hearing whenever the District Court is.  But I just did want

23   to note that in case that was helpful.

24        THE COURT:  That is helpful.  Thank you for the

25   reminder, and I actually have been meaning to commend you at

1    some point.  I have a handful of cases that have sort of

2    fallen apart in terms of the attorneys' ability to work

3    together civilly to resolve issues or work together civilly

4    at all.  And this case, even though it is very hotly

5    litigated and incredibly important and high stakes to both

6    sides, it has plenty of lawyers in the mix and plenty of

7    issues and a lot of strong disagreements, you continue to

8    work together respectfully and to try to find ways to narrow

9    those disagreements and compromise even if you don't really

10   want to, and your handling of that discovery dispute related

11   to the class issues really demonstrated that and it enabled

12   us to get back on track with the rest of the briefing

13   schedule and that was really appreciated.

14        I'm not saying that when you have disagreements

15   that you can't resolve that that is a failure of

16   professionalism.  I'm not saying that at all.  But I do

17   appreciate the professional tone that you all have managed

18   to hang onto even when you have disagreements that you bring

19   to the Court, and I also appreciate your ongoing efforts to

20   try to compromise even when you don't really want to.

21        So I just wanted to note that.  It's a pleasant

22   contrast to some of my cases I have where, frankly, the

23   parties have a lot less they should be fighting about and

24   yet are fighting about them a lot more and a lot more

25   hostilely.

 1          So with that in mind, I will certainly keep my

 2     eyes open.  I would not be surprised if Judge Davis

 3     relatively soon picks a time to have that hearing.  I know

 4     that he had -- well, you all know better than me -- that

 5     there was a hearing in a related part of this case just

 6     yesterday.  Were any of counsel on this call also involved

 7     in that hearing?

 8          MR. BOYD:  I was a listener, Your Honor.  This is

 9     Tom Boyd.

10          THE COURT:  Okay, Mr. Boyd.  I know Judge Davis

11     has a lot on his plate with the collective sets of cases

12     going forward in this case and I'm sure he'll get that on

13     for a hearing soon.  If you haven't heard from him in a few

14     weeks, counsel can feel free to drop me, my chambers, an

15     e-mail and I'll see what I can learn about whatever their

16     approach to scheduling that matter is going to be.  Okay?

17          Mr. Gibbs, anything else you think we ought to

18     talk about?

19          MR. GIBBS:  No.  Thank you, Your Honor.

20          THE COURT:  Okay.  All right.  Thank you all for

21     your time.  I appreciate it, and everybody take care of

22     yourself and have a good rest of the week.

23          MR. BLATCHLEY:  Thank you, Your Honor.

24          MR. GIBBS:  Thank you.

25          THE COURT:  Bye.

1          (Court adjourned at 2:45 p.m.)

2                          *      *      *

3

4

5          I, Carla R. Bebault, certify that the foregoing is

6    a correct transcript from the digital audio recording of

7    proceedings in the above-entitled matter, transcribed to the

8    best of my skill and ability.

9

10

11          Certified by:   s/Carla R. Bebault
                             Carla Bebault, RMR, CRR, FCRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25