<pre>
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                )
     In re: CenturyLink Sales     )   File No. 17-MD-2795
 4   Practices and Securities     )          (MJD/KMM)
     Litigation                   )
 5                                )   Minneapolis, Minnesota
                                  )   August 17, 2020
 6                                )   9:03 a.m.
                                  )
 7   ------------------------------------------------------------
                                  )
 8   Benjamin Craig, et al.,      )   File No. 18-CV-296
                                  )          (MJD/KMM)
 9            Plaintiffs,         )
                                  )   Minneapolis, Minnesota
10   vs.                          )   August 17, 2020
                                  )   9:03 a.m.
11   CenturyLink, Inc., et al.,   )
                                  )
12            Defendants.         )
                                  )
13   ------------------------------------------------------------

14


15          BEFORE THE HONORABLE KATHERINE M. MENENDEZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
16

17                       (MOTIONS HEARING)

18

19

20

21

22

23

24
         Proceedings reported by court reporter; transcript
25   produced by computer.
</pre>

```
 1      APPEARANCES (All Counsel Appearing Via Zoom)

 2        For the Plaintiffs:      Bernstein, Litowitz, Berger &
                                   Grossmann, LLP
 3                                 MICHAEL D. BLATCHLEY, ESQ.
                                   44th Floor
 4                                 1251 Avenue of the Americas
                                   New York, New York 10020
 5
                                   Bernstein, Litowitz, Berger &
 6                                 Grossmann, LLP
                                   RICHARD D. GLUCK, ESQ.
 7                                 Suite 700
                                   600 West Broadway
 8                                 San Diego, California 92101

 9                                 Lockridge, Grindal & Nauen, PLLP
                                   GREGG M. FISHBEIN, ESQ.
10                                 Suite 2200
                                   100 Washington Avenue South
11                                 Minneapolis, Minnesota 55401

12                                 Stoll, Stoll, Berne, Lokting &
                                   Shlachter, PC
13                                 LYDIA ANDERSON-DANE, ESQ.
                                   Suite 500
14                                 209 Southwest Oak Street
                                   Portland, Oregon 94704
15
          For the Defendants:      Cooley, LLP
16                                 PATRICK E. GIBBS, ESQ.
                                   3175 Hanover Street
17                                 Palo Alto, California 94304

18                                 Cooley, LLP
                                   SARAH M. LIGHTDALE, ESQ.
19                                 55 Hudson Yards
                                   New York, New York 10001
20
                                   Cooley, LLP
21                                 RYAN BLAIR, ESQ.
                                   4401 Eastgate Mall
22                                 San Diego, California 92121

23

24

25
```

1    <u>APPEARANCES</u> (Cont.)

2      For the Defendants:        Cooley, LLP
                                  BRYAN M. KOCH, ESQ.
3                                 500 Boylston Street
                                  Boston, Massachusetts 02116
4
                                  Winthrop & Weinstine, PA
5                                 WILLIAM A. McNAB, ESQ.
                                  THOMAS H. BOYD, ESQ.
6                                 Suite 3500
                                  225 South Sixth Street
7                                 Minneapolis, Minnesota 55402

8      Court Reporter:           LORI A. SIMPSON, RMR-CRR
                                 Suite 146
9                                316 North Robert Street
                                 St. Paul, Minnesota 55101

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2               **IN OPEN COURT**

3               **(VIA ZOOM)**

4          THE COURT:  All right.  I have now magically

5     appeared on your screen, so that's the pandemic version of

6     "All Rise," but you don't have to do that.

7          We are here for a hearing about subpoenas that

8     have been issued to third parties in this case.  Let's go

9     ahead and get appearances on the record.  First counsel who

10    is going to argue on behalf of the plaintiffs, and if you

11    could also indicate who else from your extended team is

12    present on the call to the best of your knowledge.

13         MR. BLATCHLEY:  Hi, Judge.  It's Mike Blatchley

14    from Bernstein Litowitz on behalf of plaintiffs.  I'll be

15    arguing for our side today.  And please don't hold me to

16    this, but I believe from plaintiffs' side you have Rich

17    Gluck from my firm, Lydia Anderson-Dana from the Stoll Berne

18    firm, and Gregg Fishbein from the Lockridge Grindal firm.

19         THE COURT:  Excellent.  Thank you very much.  And

20    we've been trying to take notes as people chimed in, so

21    hopefully we will be able to make a pretty good record of

22    who attended the hearing.  But thank you very much.

23         And how about on behalf of the defendants today?

24         MR. GIBBS:  Good morning, Your Honor.  This is

25    Patrick Gibbs from Cooley.  I'll be arguing for the

1    defendants.  And also on the line from our side today are

2    Ryan Blair, Sarah Lightdale, and Bryan Koch from Cooley, as

3    well as Bill McNab and Tom Boyd from the Winthrop Weinstine

4    firm.

5            THE COURT:  All right.  Okay.  Thank you all very

6    much.

7            If at any time you can't hear me, please let me

8    know.  We have a court reporter.  We are making an official

9    transcript.  No other recordings, either audio or video, are

10   permitted from today's proceeding.  Our court reporter will

11   be making the official record and that will be available, if

12   necessary, down the road.

13           I should also say that if we have any technical

14   difficulties, which are hopefully not going to thwart our

15   efforts, everybody should just sit tight and will receive an

16   e-mail communication from my chambers about how to get back

17   on the hearing.  Hopefully that won't occur, but it just

18   seems best to have a plan in place.  So check your primary

19   e-mails if something happens and our connections collapse

20   and we will make a Plan B right away.

21           Why don't we jump right in.  I have a lot of

22   questions for everyone, but why don't we go ahead and start

23   with the defendants.  Mr. Gibbs, you can go first.  Tell

24   me -- I think I'll give you about 15 minutes, although if

25   you've met me, you know I will soak up a fair amount of that

1    with questions.  But why don't you jump right in.

2            MR. GIBBS:  Thank you, Your Honor.  We have moved

3    for a protective order as to two different subpoenas that

4    the plaintiffs have served, sets of subpoenas, one on a set

5    of debt collection companies that work with CenturyLink and

6    one on a survey management company called Great Place to

7    Work.

8            In order to set the background for that motion,

9    though, I think it's important to keep in mind how much

10   discovery plaintiffs have already received.  And we've had a

11   bit of a recurring theme on this subject on these calls, but

12   I think it's important to keep in mind what they already

13   have for several reasons.

14           So at this point CenturyLink has produced nearly

15   310,000 separate documents.  The total pages exceed

16   2 million pages.  We've spent over 40,000 reviewer hours.

17   Plaintiffs at this point have already issued 19 other

18   third-party subpoenas.  So these 11 subpoenas to the debt

19   collectors and the survey management company come on top of

20   all of that discovery and, frankly, at some point --

21           THE COURT:  You mentioned --

22       (Simultaneous indiscernible crosstalk)

23           THE COURT:  I'm sorry to interrupt.  But you

24   mentioned 19 other third-party subpoenas.  What are -- what

25   categories of third-party subpoenas are there and has there

1    been any opposition, that you're aware of, either by you or

2    by the various custodians of those third parties?

3              MR. GIBBS:  The categories that I'm aware of, Your

4    Honor, would include the company's outside independent audit

5    firm, KPMG; Ernst & Young, which has performed some

6    outsourced internal audit functions for the company; certain

7    public relations firms that have worked with the company in

8    connection with all of this; and I believe a significant

9    number of call center vendors.

10             So a lot of the company's sales activity takes

11   place by telephone and they performed some of that work by

12   contracting with third-party call center vendors, who do the

13   work for them.

14             And so, for example, we are currently figuring out

15   how to digest and review and deal with thousands and

16   thousands and thousands of call recordings, individual

17   customer call recordings that the plaintiffs have obtained

18   and now that we have from these third-party vendors.

19             So those are the categories.  I'm not aware of

20   anyone having lodged any formal opposition, like a motion

21   for a protective order or anything like that.  There

22   certainly has been some degree of negotiation.  There have

23   been some instances where the third parties have documents

24   that CenturyLink has an attorney-client privilege or work

25   product claim over or some other, you know, privacy or

1    business concerns.  So there have been the usual

2    negotiations, but nobody, to my knowledge, has actually

3    sought a protective order or simply refused to comply with

4    the subpoenas.

5              THE COURT:  Okay.  Thank you.  That's helpful.

6              MR. GIBBS:  So, Your Honor, my only -- well, there

7    are a couple points that I think should be drawn from the

8    size of the discovery record at this point in time.

9              First of all, I think it's important to keep in

10   mind what the plaintiffs are claiming here.  The plaintiffs

11   here are not setting out to prove thousands and thousands of

12   individual customer complaints.  What they're trying to

13   prove here is a securities fraud claim, and the securities

14   fraud claim that they have framed up in their Complaint is

15   one that claims that the company systematically, routinely,

16   at the direction of senior management, billed customers for

17   products and services they did not order.  Plaintiffs have

18   claimed that this business practice was so routinized, so

19   systematic that it amounted to CenturyLink's business plan

20   for a multi-year period.

21             The plaintiffs have hundreds of thousands of

22   documents from the files of the individuals who allegedly

23   oversaw this scheme.  They have hundreds of thousands of

24   pages of documents from the people who reported to them.

25   They have hundreds of thousands of pages of documents from

1    people who report to the people that report to them.  They

2    have an enormous record of documents and internal

3    communications from CenturyLink.

4         And I think point one is if there was anything

5    like the type of scheme that the plaintiffs claim went on

6    here for many, many years and would have affected millions

7    of customers and would have necessarily involved hundreds of

8    people at the company, they would by necessity have ample

9    evidence of that type of scheme from the evidence they have

10   already gathered from the company.

11        And more to the point today, they would also have,

12   if any such thing existed, some evidence, some reason to

13   believe that these 11 subpoena recipients actually have or

14   are likely to have some meaningful evidence relating to this

15   case.  And I think the opposition lays bare that they do

16   not.  There's no indication.  From this enormous discovery

17   record, they've come up with a handful of documents, only

18   one of which --

19        THE COURT:  To interrupt, Mr. Gibbs, I have never

20   really seen an opposition to a subpoena arguing the ultimate

21   merits of the case, which isn't really the position you took

22   in your opening memorandum, but it's pretty much the

23   position you took in the beginning of your reply memorandum,

24   that they should not get this discovery because in your

25   opinion what they have already doesn't prove their case.

1    And I'm not sure that I found any authority for the idea

2    that that's a basis to deny additional discovery.

3              And I'm speaking abstractly here, but it could be

4    were the plaintiffs' claims true, that they need to look to

5    outside sources because the defendants haven't provided

6    discovery that documents their claim.  That doesn't mean

7    their claim has no merit.

8              It feels like what we should focus on here is

9    whether this discovery is redundant of discovery that's

10   already been provided, duplicative of discovery that's

11   already been provided, or whether it's possible that there

12   are things in the possession of these third parties that are

13   relevant for this litigation but have not yet been

14   discovered.  Rather than your argument that because we think

15   we're winning so far, they get no more discovery.

16             MR. GIBBS:  That's fine, Your Honor.  That wasn't

17   the argument I was trying to make right now.  The argument

18   I'm trying to focus on right now goes to, I think, the third

19   of your three points, which is there's nothing in the record

20   before the Court right now that I think supports the

21   inference that these third parties have or are likely to

22   have any meaningful, actually relevant evidence.  There are,

23   I think, other reasons why the state of the record supports

24   some of those other arguments, but this is what I was

25   focusing on right now and so let me get to that.

1          So, you know, as to the debt collectors, the

2    plaintiffs have submitted a handful of documents, some of

3    which touch on the notion of debt collection, none of which

4    suggests that any of these debt collectors are likely to

5    have any information that bears on the ultimate question in

6    this case, even indirectly, even secondarily, tertiarily,

7    about this management-led, top-down scheme to inflate the

8    company's revenue through fraud.

9          They've shown you, you know, two customer-related

10   exchanges, one of which doesn't actually deal with the debt

11   collector's work, both of which show management quickly

12   turning over a customer complaint for resolution and the

13   complaint getting resolved.  None of them suggest the debt

14   collectors are likely to have information that bears on this

15   massive alleged fraud.

16         I know you probably think I am getting into the

17   merits there, but I still think if the documents we have so

18   far don't indicate that the debt collectors had any

19   involvement in the big fraud, I think that's relevant.

20   That's what they're supposed to be looking for here.

21         THE COURT:  What if the debt collectors are

22   hearing from customers we're not going to pay this debt, you

23   know, we told the company that we weren't going to pay this

24   debt because we never requested these services and they were

25   artificially applied to our bill?  How is that not evidence

1    of a scheme to cram?

2         MR. GIBBS:  I think it is at best, at best

3    tangentially relevant.  It is so far removed.  You know, a

4    single customer saying I don't believe I ordered this

5    product -- and we have dozens and dozens of examples where

6    customers said that and they were wrong.  So a single

7    customer making that claim in a debt collection process is

8    like 50 analytical steps removed from --

9         THE COURT:  What if it's a thousand customers?  We

10   don't know the scope of this discovery because we haven't

11   gotten to what the plaintiffs call kind of the

12   meet-and-confer stage.  What if it's thousands of customers

13   who -- you say a single customer.  I'm speculating wildly in

14   the other direction.  What if it's a lot of customers who

15   consistently say we're not going to pay this debt, we told

16   them we weren't going to pay this debt because we don't owe

17   it?

18        MR. GIBBS:  So there I would say a few things.

19   First of all, the company does business with or interacts

20   with tens of millions of customers and potential customers

21   in any given year.  So it would need to be an enormous

22   number to be even remotely indicative of anything like what

23   the plaintiffs are claiming.

24        But more to the point, that's where I think you

25   get into redundancy.  We have scoured this company.  We have

1    searched through e-mails.  We searched through databases.

2    We have run some of the broadest search terms I've ever seen

3    looking for individual customer complaints to the company.

4         I think there is zero reason to believe that there

5    is some massive set of consumers who complained to the debt

6    collectors that they were charged for services they didn't

7    buy, but who don't show up anywhere in this massive

8    production that we have made looking for any and every

9    individual customer complaint we can find.  I don't think

10   those individual customer complaints prove anything.  I

11   think the plaintiffs should be looking from the top down

12   because that's what their claim is based on.

13        But we haven't objected to a massive amount of

14   individual customer complaint focused discovery aimed at

15   CenturyLink and we have turned that stuff over.  They have

16   thousands of pages, probably hundreds of thousands of pages

17   that touch in some way or another on some kind of customer

18   complaint or another.

19        If that's not enough for them to prove their case

20   or, again, to at least show some meaningful connection, not

21   just speculation that because debt collection might involve

22   people who don't think they owe the money and therefore the

23   communications with the debt collectors might show someone

24   saying they don't owe the money because they claim they

25   didn't order the service, and it might be big enough that it

1    might be somehow tangentially indicative of this supposedly

2    management-led fraud, I don't think that's enough.  At this

3    point it is sheer speculation.  There's no reason to believe

4    there's any evidence there that isn't totally cumulative of

5    evidence they already have from the company.

6         THE COURT:  So your point is that even if it's

7    true that individual -- or one of your points, I don't mean

8    to suggest you have only one point, but your point on this

9    would be that even if it's true that individuals might have

10   complained to the debt collectors, that those individuals

11   would almost for sure have first complained to the

12   defendants before it even went to collections and therefore

13   an echo chamber of additional complaints from the same

14   people doesn't add anything to the litigation?

15         MR. GIBBS:  Yes.

16         THE COURT:  Okay.  Let me talk for a minute about

17   the Great Place to Work survey or the employee satisfaction

18   survey company.  Have you provided discovery related to

19   these -- tell me a little bit first about what you think --

20   tell me a little bit about the relationship that you're

21   aware of between the defendants and this company.  What was

22   the nature of the survey work they were retained to do?

23         MR. GIBBS:  Sure.  The company comes in and -- the

24   survey company comes in and oversees a process of surveying

25   employees to find out what they think about working at the

1    company and then the survey company takes that raw data,

2    which goes straight to the survey company as far as I know,

3    they compile it.  They sometimes issue reports on certain

4    companies that, you know, get very positive feedback from

5    employees.  But they also then take at least some amount of

6    the raw data, the survey responses that they received, and

7    they send it back to the company whose employees were being

8    surveyed, so CenturyLink in this case.

9            And so as I understand the process, Great Places

10   to Work comes in.  They administer a survey that goes out to

11   some selection of CenturyLink employees.  The employees fill

12   out the survey anonymously.  Great Places to Work collects

13   that data.  They review it.  They reach certain conclusions

14   and judgments.  They send at least the raw data back to the

15   company.  That's why those raw responses that plaintiffs

16   submitted in support of their opposition are in the record.

17   They got those from us.

18           And so as to Great Places to Work, I think it's a

19   slightly different issue.  The issue is, first of all, I

20   don't know of any reason to suspect that Great Places to

21   Work has got any relevant information that would not be

22   included in the survey response data, which they already

23   sent back to CenturyLink and we've already produced to the

24   plaintiffs directly.  That's point one.

25           Point two is this information is of marginal

1    relevance at best.  You know, we've pointed out in the reply

2    that the excerpts that plaintiffs have submitted to Your

3    Honor don't actually reflect the full documents that those

4    excerpts are pulled from, and there may be space reasons or

5    whatever for that.

6         But the fact is CenturyLink gets back thousands

7    and thousands of anonymized responses to these very general

8    questions.  Plaintiffs have scoured those thousands and

9    thousands and thousands of survey responses and they have

10   found what I think is reflected in the documents as a

11   handful of stray references to quotas and cramming and the

12   like.  We have no idea who these people are.  As far as I

13   know, there's no way to find out who they are.  There's no

14   way to substantiate those claims.

15        THE COURT:  Let's imagine that these people were

16   consistently saying, yes, there was a scheme from the very

17   top for us to engage in, you know, padding bills and

18   cramming services.  I mean, we can -- even if they are

19   anonymized and even if they're not identified, that's

20   certainly evidence that's material to the conversation.

21        I think the bigger question is is Great Place to

22   Work sitting on information that hasn't been provided

23   already, and I'm having a hard time imagining that Great

24   Place to Work wouldn't have just turned all the information

25   over to defendants because that's what they do.

1          So are you aware of how much information they

2     returned to your clients and how much they may not have

3     returned in the interest of just giving a sampling, or did

4     they give all of their responses?  What's your understanding

5     of what that might be?

6          MR. GIBBS:  As far as I know, they just turned the

7     responses over to us.  That's what appears from the record.

8     I'm not aware of any sort of distinction they draw between

9     here are the responses we're going to give you, but we are

10    going to keep all these other responses.

11         I don't think there's any reason to believe there

12    are individual employee responses that are not included in

13    the data that was provided back to the company and therefore

14    was searched and produced to the plaintiffs.

15         THE COURT:  Okay.  I've got one more set of

16    questions for you and then I think I want to hear from

17    opposing counsel.

18         One of the aspects of the survey subpoena is a

19    question about their response to the state AG -- two state

20    AG investigations, Arizona and Minnesota.  It's Question

21    No. 4 on the Great Place to Work subpoena, if I'm recalling

22    correctly.  Tell me what your thoughts are about that.

23         MR. GIBBS:  Well, you know, we've noted in the

24    briefing that that amounts to a form of cloned discovery in

25    our view.  I'm not aware of any particular reason to believe

1    that Great Places to Work has provided any documents to

2    government entities.  As you know, we tried to take some

3    discovery into plaintiffs' interactions with some of these

4    state AGs, but were told it wasn't relevant and so we don't

5    know.  So I don't know why the plaintiffs are asking about

6    this because I'm not aware of any reason to think that Great

7    Places to Work has submitted anything to any government

8    agencies.

9         THE COURT:  Okay.  Thank you.  I'm sure I'll come

10   back to you in a few minutes, but is there any sort of last

11   points you would like to make before I pivot to

12   Mr. Blatchley?

13        MR. GIBBS:  Well, just circling back to the

14   employee point, just as we did with the customer complaint,

15   we have run very, very broad search terms looking for

16   employees complaining internally about precisely these

17   issues.  And so, again, to the extent that those employees

18   were complaining about that, I don't know why Great Places

19   to Work would have information that would not be duplicative

20   of what we've already searched for inside the company.

21        THE COURT:  Does Great Places to Work do any

22   analytical work as well as sort of collecting data?  Do they

23   write summary reports saying here's overall what we found

24   about how your employees feel, here are strengths, here are

25   weaknesses?

 1              MR. GIBBS:  I'm not aware of something that's

 2     created and provided to the company that wouldn't be picked

 3     up by our existing searches.  I know that Great Places to

 4     Work publishes lists in *Fortune* and other magazines.  I'm

 5     not aware of some unpublished analytical work that they are

 6     holding on to that wouldn't have been provided to

 7     CenturyLink.  I'm just not aware of any such thing.

 8              And there, you know, we would no longer even be

 9     talking about feedback directly from CenturyLink employees.

10     We would be talking about conclusions that are drawn by

11     people at Great Places to Work who don't know anything about

12     CenturyLink other than what's in the raw survey responses.

13     So on a scale of relevance, that would strike me as many,

14     many levels removed from the question of what's actually

15     happening at the company.  But I'm not --

16              THE COURT:  Based on those reports --

17              MR. GIBBS:  -- aware of any.

18              THE COURT:  Okay.  I was going to say if those

19     reports exist and if they reference anything about cramming,

20     presumably it's your position you would have turned them

21     over?  I guess those reports would have been provided to the

22     defendants, which, frankly, I can't really imagine Great

23     Places to Work doing internal audits and not providing it to

24     the defendant.  So your point is that if those exist, they

25     would have been turned over?

```
 1              MR. GIBBS:  Yes.  And also, if they were created

 2    but never turned over to the company, I'm not sure what they

 3    even speak to.  It wouldn't speak to what the executives at

 4    CenturyLink know or believe about what's happening at the

 5    company.  If it was turned over to the company, it's been

 6    searched.  It surely would have been picked up by the search

 7    terms we used and the plaintiffs would have it.

 8              THE COURT:  Okay.  Thank you.

 9              All right.  Mr. Blatchley, let's hear from you.

10              MR. BLATCHLEY:  Thank you, Judge.  Can you hear

11    me?

12              THE COURT:  Yeah.

13              MR. BLATCHLEY:  Again, Mike Blatchley from

14    Bernstein Litowitz.  I think probably what I'll do, if it's

15    most efficient, is kind of go through Mr. Gibbs' arguments

16    and I can give you my reaction to those.

17              The first point Mr. Gibbs made, and he has made it

18    repeatedly, is about the amount of discovery that's already

19    been had in party discovery.  I just want to disabuse the

20    Court of the notion that this is somehow extraordinary in

21    this case.  It is not.  Just as -- the subpoenas that

22    plaintiffs served on the collection agencies and the other

23    third party, Great Place to Work, these are routine,

24    run-of-the-mill third-party subpoenas.

25              And the motion that you see from Mr. Gibbs and
```

1    defendants here is seeking to cut off the ordinary

2    meet-and-confer process, which would enable us to, I think,

3    get to actual facts about what your questions to Mr. Gibbs

4    were centered on, to actually talk to the third parties,

5    which we have done successfully with over a dozen other

6    third parties in this case to date, none of which have

7    sought to file a motion for a protective order or anything

8    coming close to that and which have been very cooperative in

9    discovery, as we have tried with every subpoena we've ever

10   issued, to be cooperative and considerate of third parties'

11   circumstances, as we are here.

12           What you have from defendants is to us somewhat of

13   a shocking and very kind of aggressive move to prohibit what

14   on its face, Your Honor, seems to us to be entirely relevant

15   discovery.  We're talking about --

16           THE COURT:  I think one of the concerns is less

17   about -- one of my concerns, I shouldn't try to cabin

18   Mr. Gibbs' concerns to match my own, but one of my concerns

19   is the reality that we are getting to duplicative discovery

20   here, that we are getting to some profound redundancies.

21           Let me use an example.  I don't understand how

22   internal communications, which are contemplated in the

23   collection agency subpoenas, their own internal

24   communications about, quote, billing issues could possibly

25   be relevant.

1          And to the extent that it has any universe of

2     relevance, how is it not overwhelmingly likely to be

3     redundant of the customer complaints that should be

4     voluminous, per your theory, in the hands of the defendants

5     themselves?

6          MR. BLATCHLEY:  Two points, Your Honor.  First, I

7     think that we're talking about an entirely separate

8     universe, and I think the late fee example is one of the

9     examples that we provided in our briefs.

10         We are talking about interactions with CenturyLink

11    customers that the collection agencies uniquely have and

12    that are not shared by the company.  So that's point one.

13    They are a unique set of documents we are confident exist

14    that do not -- have not been shared with CenturyLink.

15         And, second of all, they are just as relevant to

16    our obligation to prove that the defendants' statements were

17    false.  If, Your Honor, as you suggested in your questions

18    to Mr. Gibbs, they show that the collection agencies are

19    getting, you know, loads of consumer debts that they cannot

20    collect because customers are saying that we were improperly

21    charged, the quantification and extent to those improper

22    charges are clearly relevant to our case.

23         Just as our expert is going to look at the

24    internal information that we are able to get from

25    CenturyLink's productions, those experts will also be

1    looking at the evidence from third parties.

2              We have a company that consistently uses third

3    parties to conduct its billing operations and its sales

4    operations.  We had to go out and subpoena multiple call

5    centers that were basically --

6              THE COURT:  I'm going to push back here.  There's

7    a difference between front-end sales operations, which

8    arguably are going to be the front line of the cramming

9    problem, and the collection of unpaid debts, which, as you

10   know, would already go through some significant internal

11   complaint process and trying to get payment before it's

12   kicked to a collection agency.

13             What I don't -- what I can't really relate to is

14   how customers complaining to a collection agency about a

15   bill that they dispute isn't almost guaranteed to be

16   redundant of the same customers complaining to defendants

17   about their cable that they dispute ever having asked for.

18             MR. BLATCHLEY:  Your Honor, I'm not sure I follow

19   the logic in that.  They are going to be unique

20   communications with a collection agency that are not shared

21   by CenturyLink.  I think that that's a reasonable --

22             THE COURT:  Why wouldn't they be shared to

23   CenturyLink?  If CenturyLink is trying to get these

24   collection agencies to collect dud or, you know, false

25   bills, why wouldn't the collection agency have shared that

1    communication to CenturyLink?

2            MR. BLATCHLEY:  Your Honor, from the record that

3    we've seen to date, that doesn't -- it strongly suggests

4    that that is not, in fact, the case.  Obviously the debt

5    collectors are going to have some of those first call

6    conversations.  We know that CenturyLink deleted call

7    recordings after the first 45 days of having them, as we

8    allege in the Complaint, as a business proposition.  So that

9    evidence is not there.  We believe the collection agencies

10   might have obviously different phone calls and different

11   interactions.

12           All of that goes to showing the falsity of

13   defendants' statements.  Again, I think Mr. Gibbs has been

14   focused on the mental state of the defendants, but obviously

15   that is a separate element that we are also required to

16   prove.

17           The fact that the collection agencies -- it's

18   going to be undeniably true that there are going to be

19   separate communications that the debt collection agencies

20   had with the customers.

21           It is also going to be true that these collection

22   agencies, which don't always just work for CenturyLink, but

23   others as well, will have discussions about the quality of

24   the debts that they are receiving from CenturyLink.

25           We also know that they have different processes in

1    place.  Some collection agencies do one step of the

2    collection process.  Some do a later stage, as Your Honor is

3    referencing.  But even the first call kind of issues that

4    you are talking about, those go to collection agencies in

5    many instances.  That's what we've seen in the documents.

6         You're suggesting that the complaints go to

7    CenturyLink first.  We have a document that we submitted to

8    Your Honor that shows that the collection agencies actually

9    called and represented themselves to be CenturyLink to

10   customers.  Now, those interactions from a customer

11   standpoint are going to be like I am talking to CenturyLink.

12   That's --

13        THE COURT:  Let me make sure I understand the

14   timing.  I get my CenturyLink bill.  It has a whole bunch of

15   things I didn't ask for, hypothetically speaking.  I call

16   CenturyLink and say I didn't ask for any of this stuff.

17   You're telling me that that call does not go to CenturyLink,

18   it goes to one of these third parties?

19        MR. BLATCHLEY:  Your Honor, we're still trying to

20   get to the bottom of that, but it appears to be that about

21   10 to 20 percent, at least that's the document that we

22   submitted in the records to Your Honor that's I think

23   Exhibit C, shows that certain initial calls concerning

24   collections were carried out by the third-party collection

25   agencies.  Again --

1          THE COURT:  But that's collections and I'm not

2     really talking about collections here.

3          MR. BLATCHLEY:  Yes.

4          THE COURT:  I'm talking about billing disputes.

5          MR. BLATCHLEY:  I'm sorry, Your Honor.  On

6     Exhibit C they say incoming calls to CenturyLink are routed

7     to the collection agencies, certain of the collection

8     agencies.  That was the one point I wanted to clarify for

9     you.

10          THE COURT:  Okay.

11          MR. BLATCHLEY:  So we think they are undeniably

12     involved in that process on some level and will therefore

13     have kind of unique information about improper charges.

14          And to the extent, Your Honor, that there is a

15     concern about, listen, you should get those documents from

16     the defendants themselves, that is something that's supposed

17     to be worked out and hashed out with the third parties, who

18     can tell us the same thing.  They can tell us we don't have

19     unique documents, everything that we said we forwarded to

20     CenturyLink.  We can have that conversation and deal with it

21     at the appropriate time.

22          It's not -- it doesn't make sense to do that

23     without the actual facts, without -- Your Honor asked

24     Mr. Gibbs a series of questions about what if they have

25     documents showing that there was a significant number of

1    bills that were improperly charged.  We don't know the

2    answers to that, Your Honor, because we haven't had the

3    opportunity to go through the meet-and-confer process, which

4    would enable us to do that.  And we've done it successfully

5    with every other third party in this case so far.  We're not

6    looking to impose burden or get documents that we don't want

7    to review either.

8         Now, Mr. Gibbs, a lot of his argument was centered

9    on the fact that, listen, he thinks the documents show

10   CenturyLink's innocence.  Well, Your Honor, that just goes

11   to show their relevance, right?  If Mr. Gibbs thinks -- his

12   primary argument, as you said, on reply was, look, these

13   documents are only going to show that we are the good guys

14   here.  Listen, we dispute that.  We believe the documents do

15   not remotely show that.  But that only shows their

16   relevance.  And it doesn't speak at all to the fact that

17   they might be outside of the scope of discovery in this

18   case.  It shows the opposite.

19        THE COURT:  I want to talk a little bit about

20   Document Request No. 4 for the ten bill collector subpoenas

21   and that's the questions about the talking points.  It seems

22   like those talking points could only have come from

23   CenturyLink.  They could only have been generated by

24   CenturyLink because only CenturyLink has the knowledge about

25   things like the lawsuit that's being inquired about and the

1       cramming talking points.  Those aren't things that the bill

2       collectors themselves would generate, the *Heiser* lawsuit,

3       the Arizona AG action.

4              How is that not redundant of what you're already

5       going to receive from CenturyLink?  Because presumably

6       you've already sought -- in fact, Mr. Gibbs shows in his

7       submission that they've already provided a great deal of

8       documentation from searching for those exact sorts of terms.

9       So why do we need to ask the bill collectors about that?

10             MR. BLATCHLEY:  Well, Your Honor, the one thing

11      that we've seen in the documents so far is that we see third

12      parties, like the call center vendors, and I believe the

13      same is true of some of the collection agencies, reaching

14      out and asking CenturyLink what they should be doing and

15      what they should be saying.

16             So the internal -- the concerns are not just

17      coming -- the communications and the discovery there is not

18      just CenturyLink here are the talking points, but also what

19      these other kind of third parties are doing in response to

20      these developments and how they're internally discussing how

21      that impacts their business and how it justifies what

22      they've seen for the past couple of years or not.

23             THE COURT:  That seems pretty much a stretch.  I

24      mean, their communications to CenturyLink saying, hey, how

25      should we answer -- how should we talk about the Minnesota

1    AG action, those are going to be captured in documents

2    provided by CenturyLink, right?

3            MR. BLATCHLEY:  Your Honor, so the direct

4    communications would be captured in the search that

5    CenturyLink has performed.

6            Your Honor, I do want to say just on this point we

7    have strong disagreements, and I'm sure you will see us

8    before Your Honor again, about the sufficiency and the

9    quality of those searches.  Again, Mr. Gibbs, I think,

10   oversteps tremendously when he says -- when he talks about

11   the robustness and the comprehensiveness of the search that

12   they performed.  That is simply not the case.  I don't want

13   to rehash it here, Your Honor.

14           But we're talking about a very limited number of

15   custodians in a case that is of significant national scope

16   and what we're talking about here is, you know, we had a

17   total of 50 custodians.  They destroyed the files of five of

18   them.  We had 20 of those custodians who are going to be

19   former employees that we ourselves, plaintiffs, had cited in

20   the Complaint.  Seven of them are of the executive

21   defendants.  That leaves a bucket of about, you know, 20 to

22   30 custodians that are unique individuals at a company whose

23   business operations were very large, national in scope.

24           We're talking about all kinds of, you know,

25   different parts of the company, from accounting, to bill

1    collections, to call centers, to marketing.  It is a

2    significant scope of a case.  It requires a significant

3    amount of discovery and the third-party subpoenas that we

4    issued are seeking just routine, ordinary third-party

5    discovery in a case like this.  Now --

6         THE COURT:  Okay.  I want to talk a little bit

7    about how routine and ordinary this third-party discovery

8    is.  Like let's talk about the language in the bill

9    collector subpoena.  You're asking for language -- let me

10   just get to it.  All documents about any master agreement or

11   forward flow agreement or any contract or agreements between

12   them and CenturyLink and all documents describing the work

13   you performed and the results you obtained, that feels

14   wildly broadly disconnected to trying to get at customers

15   complaining about cramming.

16        MR. BLATCHLEY:  So, Your Honor, let me just

17   explain that because I think that might have been unclear.

18   And, again, the process that normally takes place, we issue

19   a subpoena --

20        THE COURT:  I understand your position is that you

21   should be able to ask for the universe and then engage in

22   some sort of negotiation with the third party that gets to

23   what you're actually asking for, but you're still on the

24   face extremely broad.

25        MR. BLATCHLEY:  So, Your Honor -- and we don't

1    mean to be and that's what the meet and confer is for, Your

2    Honor, in every case.  They will say I don't know what

3    you're talking about.  Let's limit it to this.  Can we

4    narrow it to that?  And that process takes place.  It's

5    taken place with all the other third parties in this case so

6    far.  It takes place every day with every subpoena that's

7    issued across the country.

8         Here that request is specifically relevant to the

9    allegations that we have that CenturyLink was

10   misrepresenting to investors the reasons why its revenues

11   were fluctuating with respect to the creditworthiness of

12   their customers.  That is something that the company said,

13   well, the revenue has declined a little bit because we are

14   trying to focus on higher creditworthy customers.  And it

15   also showed that revenues are declining because we have

16   customers who are not paying their bills.

17        And, again, the discovery from the collection

18   agencies is going to show, or not, that those

19   representations were not true because what was, in fact,

20   happening, is our allegation, is that people were being sent

21   to collections and not paying their bills because they were

22   being improperly charged.

23        And, again, the late termination fee, the late

24   fee -- I'm sorry, the termination fee, a fee that's only

25   assessed when you're leaving the company, that is only going

1   to show up in a dispute with the collection agencies in the

2   vast majority of cases because, again, like the documents

3   show, some of those calls are going straight to the

4   collection agencies themselves when you call in to complain

5   about your bills.

6         THE COURT:  But there's no reason -- aside from

7   your 10 to 20 percent of calls answered by a collection

8   agency allegation, there's no reason that -- if I closed out

9   my relationship with CenturyLink and got my final bill and

10  it had some random penalty for closing out my relationship,

11  I would call CenturyLink, right?  I mean, there's no reason

12  that it would automatically get kicked to collections.

13  Let's say it's not overdue.

14        MR. BLATCHLEY:  Your Honor, I think what we're

15  talking about here again, I think your hypothetical is that,

16  it's a hypothetical.  We have an opportunity to have those

17  discussions with the third parties themselves.  I think that

18  what we should be doing is talking about concrete facts

19  about what kind of documents that they have, what is their

20  process, do they have -- how does it work.

21        We don't have some of the basic information that

22  gets to the kind of process question that I think you are

23  asking when you are saying I don't -- I wasn't charged

24  for -- I'm a customer.  I think I'm speaking to CenturyLink.

25  And if that's not the case, I'm talking to a third-party

1   collection agency, then your example doesn't work.

2          If I'm -- again, if I'm getting, you know, hounded

3   by a collection agency for something that I feel I

4   improperly owe, I have to deal with the collection agency

5   first.  Those are going to be unique communications with the

6   collection agency.

7          Your Honor, defendants made a big deal in their

8   motion to dismiss about how plaintiffs had not quantified

9   the impact of this cramming.  That is a centerpiece of their

10  defense in this case.  What they are trying to do with this

11  motion and with all party discovery, in fact, is trying to

12  limit our ability to quantify that misconduct.

13         And to say that it's somehow not relevant is just

14  simply untrue.  We are entitled to that discovery.  It is

15  routine, ordinary discovery.  And to the extent that there

16  are questions about duplication, we are going to talk about

17  that with the third parties and avoid that burden.

18         THE COURT:  Let me ask you about Request No. 2,

19  all documents concerning disputed collections.  So

20  presumably that is all records of all conversations with all

21  people from whom they are trying to collect debts about, oh,

22  my deadbeat uncle opened that account under my Social

23  Security number, right?  All documents --

24         MR. BLATCHLEY:  Your Honor --

25      (Simultaneous indiscernible crosstalk)

1          THE COURT:  That's where you would see the

2     complaints, right, it's Request No. 2?

3          MR. BLATCHLEY:  Yes, Your Honor.  But, Your Honor,

4     again, what we are trying to do is making sure we're asking

5     a question that will get us the answer we want, and to do

6     that you have to go through the meet-and-confer process so

7     that we can --

8          THE COURT:  You keep defending the idea that you

9     can serve a subpoena with very few limits and then tidy it

10    up on the back end, and that might be how things go, but

11    what I'm asked to look at in this motion to quash are the

12    four corners of this subpoena and, read literally, Request

13    No. 2 asks for all documents concerning disputed

14    collections --

15         MR. BLATCHLEY:  Your Honor --

16         THE COURT:  -- and billing issues.  That's like

17    all the documents.

18         MR. BLATCHLEY:  Your Honor, clearly we don't want

19    all the documents.  Clearly the subpoena should be read as I

20    think, Your Honor, Request No. 2 actually reads, to reflect

21    requests about what we call cramming and billing issues.

22         Again, cramming is in this case.  And I'm just

23    trying to explain the reason for the language that you're

24    seeing.  We have a series of problems where customers were

25    misquoted, and we have also -- and that means a different

1    price than they thought they were going to --

2         THE COURT:  I understand the heart of your case.

3    Yeah, I get it.  I understand how your case works.  I

4    understand what you are claiming happened.  I understand the

5    nature of the Complaint.  It is contemplated by cramming and

6    billing issues, or at least by the word "cramming" and

7    perhaps by sales and billing practices.

8         But when we talk about -- I mean, one of my

9    concerns, and I'm not hiding my cards, is that these

10   subpoenas, even if there are key nuggets of relevant

11   information here, are really, really broad.

12        MR. BLATCHLEY:  Your Honor, and again I think the

13   way we address those concerns is through the meet-and-confer

14   process.  You know, I appreciate Your Honor is looking at

15   the subpoena as written.  I promise you that when we get on

16   the phone calls with these third parties, they tell us,

17   listen, I can tell you who the relevant folks are.  Here's

18   what we are willing to do.  Here's how the process actually

19   worked.

20        We haven't had the opportunity to have those

21   conversations to come back to you with actual facts about

22   here is what the actual request comes down to and here's

23   what the response and the potential universe of documents

24   looks like.  We just haven't had that opportunity.

25        THE COURT:  I have two more questions for you on

1    this one and then I have one question for you on the other

2    one, "this one" being the bill collector subpoena, "the

3    other one" being the Great Place to Work subpoena.

4         So tell me both why you are seeking information

5    about a time frame that is broader than the time frame that

6    we have at issue in the lawsuit and tell me why Request

7    No. 4 is remotely relevant and, frankly, not just an effort

8    to kind of backdoor my earlier rulings about cloned

9    discovery.

10        MR. BLATCHLEY:  So, Your Honor, again on the time

11   period, I think we answered that question for Your Honor in

12   the brief.  Again, it's -- it was our anticipation in

13   putting forth the time period that we would negotiate the

14   appropriate time period as to each collection agency.

15   That's what attorneys do when we get on the meet-and-confer

16   phone calls.  As I think we mention in the brief, we would

17   be happy to shorten the time period.

18        On the motion today, we do know that certain of

19   the third-party collection agencies were responsible for

20   certain time periods and they ended their relationships at

21   other time periods.

22        We don't want documents that don't exist and we

23   don't want to create an undue burden by having an overly

24   long time period, but, again, the questions about what the

25   appropriate time period is, we're concerned when we are

1    sending out a subpoena that we are not asking for the right

2    universe, but we will get to a smaller universe, the

3    appropriate universe, in the meet-and-confer process.

4         Your Honor, on Request No. 4, that was actually

5    driven by the answers that we got back from some of the

6    third-party call center subpoena recipients who had been

7    previously subpoenaed by the Minnesota Attorney General.  We

8    got the answer from them that said, and this goes to the

9    burden argument, we don't want to review this.  Will you

10   just take the Attorney General's production?  We've already

11   done this once.  We thought that that was a way to ease the

12   production burden on them.  We thought that that would,

13   again, be a helpful way to streamline it, so we put it as a

14   request in the subpoena.  That's the idea there.

15        Again, it's our intent to not burden third

16   parties.  It's not our intent to burden plaintiffs, which

17   are working, you know, on a basis where we don't want a

18   large universe of documents, we want the right documents to

19   review.

20        THE COURT:  So you're saying that for the

21   third-party bill collectors you would -- instead of

22   everything else, you would accept just what they produced to

23   the AG?

24        MR. BLATCHLEY:  No, Your Honor.  What we said is

25   that has been a category of documents that we have found

1    that other third parties, the call center third parties,

2    gladly provided to us and we've supplemented the discovery

3    on those third parties in some instances where sometimes

4    that's been sufficient.  And so that's what the request was

5    intended to accomplish and again --

6                THE COURT:  Okay.

7                MR. BLATCHLEY:  Again, the idea there, and I don't

8    want Your Honor to get the misimpression, the idea there is

9    to eliminate, reduce, alleviate burden because they've

10   already done the work and not to in any way --

11               THE COURT:  It feels like it eliminates and

12   alleviates burden if you agree that's all you'll ask for,

13   but if that is just one of several things, then it does the

14   exact thing that I expressed concerns about in the first

15   place.

16               MR. BLATCHLEY:  Your Honor, and that's right, but

17   we found that the third parties in many instances were able

18   to say, listen, we've already done this.  We would be happy

19   to have you take this and then we can talk about whatever

20   else you might need.  It's just a way to streamline things.

21               THE COURT:  Let's look at the Great Place to Work

22   subpoena.  So that's what you're referring to with Request

23   No. 4.  What is your reason to think that Great Place to

24   Work has information that they didn't provide to

25   CenturyLink?

1            MR. BLATCHLEY:  Your Honor, again, that's a

2     question we would like Great Place to Work's answer on.  And

3     if the answer is we have nothing, then I don't think -- we

4     don't have much farther to go.

5            The problem is when we -- you know, we served the

6     subpoena and we got a motion from defendants saying we want

7     to shut it down without letting us talk to the third party.

8     Mr. Gibbs, I think your question to him showed that he

9     didn't know the answer as to whether they have unique

10    internal documents.

11           We've found in many cases that I prosecuted, Your

12    Honor, that the third parties themselves have very valuable

13    discussions that go to, you know, in this case it would be

14    the falsity of defendants' representations about their

15    cramming, the culture inside the company.  That --

16           THE COURT:  But presumably --

17    (Simultaneous indiscernible crosstalk)

18           THE COURT:  -- there's no universe in which they

19    wouldn't share that.  Like what possible value do they have

20    sitting on this information?  This information is valuable

21    to the defendants.  The information is arguably valuable to

22    their ratings.  But there's no logical reason they wouldn't

23    have provided it to the defendants, right?  They are not

24    doing secret work on behalf of some other third party.

25           MR. BLATCHLEY:  No, Your Honor, but I think what's

1   missing there is that they have an experience doing this for

2   companies all across the country and to the extent that they

3   have a viewpoint about how CenturyLink has done things, that

4   they want to make sure they -- when they discuss that

5   internally, when they do the summaries, when they put those

6   together, and they have the conversations about how they

7   want to more carefully message what the results of those

8   surveys are to the company, that's certainly valuable

9   information that's relevant to this case.

10          THE COURT:  But they provided raw data, right,

11  they provided the raw responses to CenturyLink?

12          MR. BLATCHLEY:  Again, Your Honor, we don't have a

13  very good understanding of what exactly was provided and

14  what was not, and that is what the conversations with the

15  third parties are supposed to get at and they can tell us

16  that; and if they do, then I think we're done there.  But

17  the problem is we haven't had that opportunity to have that

18  routine, everyday meet-and-confer process.  And we have

19  strong reasons to believe --

20          THE COURT:  So can I ask you a question about

21  that?

22          MR. BLATCHLEY:  Yep.

23          THE COURT:  Why haven't you had the routine,

24  everyday meet and confer?  I mean, Mr. Gibbs isn't king and

25  he can't tell them -- can you all hear me?  I just got that

1      little alert that my Internet is wigging.  Can you all still

2      hear me and see me?

3                  MR. GIBBS:  We can hear you, Your Honor.

4                  THE COURT:  Good.  Sorry about that.

5                  Did somehow the defendants stop you from talking

6      to these third parties to identify the volume of documents

7      in the universe?

8                  MR. BLATCHLEY:  Your Honor, I think what happened

9      is that the defendants reached out to the third parties and

10     said that they were filing this motion, that they didn't

11     have to respond to our subpoena.  Because of that motion, I

12     don't want to -- they have had that correspondence and so

13     what the third parties have told us is let's wait and hear

14     what Judge Menendez has to say before we engage in those

15     discussions.

16                 THE COURT:  All of them?

17                 MR. BLATCHLEY:  Your Honor, I believe that so far

18     that is true.  We've had one discussion that is further

19     along about potentially responding, but for the most part,

20     Your Honor, they've served responses and objections.  And,

21     again, it's like the responses and objections we received

22     from every third party in this case and, you know, we wanted

23     to go out and have that process done, but, again, we didn't

24     want to overstep anything that Your Honor might provide.

25                 THE COURT:  So when you say they served responses

1    and objections, what did Great Place to Work say?

2              MR. BLATCHLEY:  Your Honor, I'm not positive on

3    that.  I actually might have to check with one of my

4    colleagues, what they said, but I haven't seen -- again, I

5    haven't had a discussion with them to see what, you know,

6    internal third party -- internal documents they might have

7    that are unique and not provided to CenturyLink.

8              THE COURT:  Okay.  Thank you.  This has been super

9    helpful.

10             Mr. Gibbs, I'll give you the last word, a few

11   minutes, if you would, to respond to Mr. Blatchley's points.

12             MR. GIBBS:  Thank you, Your Honor.  Just briefly.

13             I think we have a fundamental disagreement with

14   plaintiffs about how the third-party subpoena process is

15   supposed to work.  The rules affirmatively require counsel

16   to avoid undue burden on third parties.

17             And this subpoena is not just a document request

18   served by a party.  The subpoena comes under the court's

19   name and lawyers are given the legal ability to use the

20   court's power to compel third parties, who have nothing to

21   do with this case, to produce documents.  That's why they

22   have an affirmative obligation to draft them in a way that

23   is reasonable and that avoids undue burden.

24             And it does not suffice to use the court's power

25   to serve an incredibly broad, facially duplicative subpoena

1    and just say don't worry, Judge, I'm going to be reasonable

2    when we get on the phone.  They have an obligation to be

3    reasonable in the subpoena as drafted and as served on a

4    third party.  They've made no effort to do that here.

5           As to the meet-and-confer process, Your Honor is

6    exactly right.  I don't get to tell these people what to do.

7    If they are inclined to continue meeting and conferring,

8    they are entitled to do that.  But they are also entitled to

9    know that we plan to file a motion for a protective order,

10   which we did in good faith because we believe this was well

11   beyond reasonable discovery.  We believe that enough is

12   enough.

13          If there's a case there to be proven, they should

14   have it by now and so we decided to move for a protective

15   order because it seemed to us that based on the way in which

16   relevance has been discussed so far, these are well beyond

17   that reasonableness line.

18          THE COURT:  Okay.  All right.  Thank you both very

19   much for a really helpful argument.  I'm going to try to get

20   an order out on this as soon as we can.  I really appreciate

21   you answering all of my questions and taking time to talk to

22   me today.

23          And thanks for participating remotely.  I know

24   this is a strange way for us to conduct business, but I

25   actually found it really helpful to see you both instead of

1    just having a phone hearing, which I know we've also done in

2    the past.  So unless I hear an objection, I think for the

3    near future we're going to stick with Zoom over phone

4    hearings for substantive hearings like this.  To the extent

5    the informal process gets invoked, we'll continue to do

6    those by phone.

7            Can we tend to one housekeeping matter before I

8    let you go, and that's this.  We have a telephonic status

9    conference set for next week, if I'm recalling correctly.

10   Let me pull up the date.  I have us on the 25th of August.

11   I am -- I think we should get together and talk.  I suspect

12   there are things to discuss besides just this.  Does anybody

13   disagree?

14           MR. BLATCHLEY:  No, Your Honor.

15           MR. GIBBS:  No, Your Honor.  That's fine with us.

16           THE COURT:  Okay.  If there's anything in

17   particular that you would like to have on the agenda or that

18   you would like to prepare me for in advance, if you could

19   get an e-mail to chambers, cc'ing opposing counsel of

20   course, by 5:00 on Monday.  If it's going to be a big

21   pitched battle, the sooner the better.  But if it's just

22   flagging a issue or two so that I'll know what we'll be

23   discussing, that would be really appreciated.

24           And I recognize that I might not have the right

25   two of you on the hot seats for the conversation about what

1    we might need to talk about next week, so please consult

2    with your colleagues and let them know as well that if they

3    want me to think about anything or if you all want to

4    propose a particular agenda, do that by close of business on

5    Monday, the 24th.

6            Okay.  All right.  Thanks.  I hope everybody is

7    staying healthy and well during all of this uncertainty, and

8    I appreciate your time today.

9            MR. GIBBS:  Thank you, Your Honor.

10           MR. BLATCHLEY:  Thank you, Your Honor.

11           THE COURT:  Okay.  Thank you.

12       (Court adjourned at 10:00 a.m.)

13                        *      *      *

14

15

16       I, Lori A. Simpson, certify that the foregoing is a

17    correct transcript from the record of proceedings in the

18    above-entitled matter.

19

20           Certified by:  *s/ Lori A. Simpson*

21                          Lori A. Simpson, RMR-CRR

22

23

24

25