## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

This Document Relates to:
Civil Action No. 18-296 (MJD/KMM)

MDL No. 17-2795 (MJD/KMM)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
## <u>CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION</u>

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 4

I.     THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ................ 4

       A.     Plaintiffs and Lead Counsel Have Adequately Represented the
              Class ...................................................................................................... 5

       B.     The Settlement Was Reached After Arm's-Length Negotiations
              with the Assistance of An Experienced Mediator ................................. 7

       C.     The Relief that the Settlement Provides for the Class is
              Adequate, Taking into Account the Costs and Risks of Further
              Litigation and All Other Relevant Factors ......................................... 10

       D.     The Settlement Treats Class Members Equitably Relative to
              Each Other ........................................................................................... 28

       E.     Reaction of the Class ............................................................................ 28

II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE ...................... 29

III.   NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE
       23 AND DUE PROCESS ................................................................................. 30

CONCLUSION ......................................................................................................... 31

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..................................................................................... 6

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
  955 F.3d 254 (2d Cir 2020) ......................................................................... 25

*In re BankAmerica Corp. Sec. Litig.*,
  210 F.R.D. 694 (E.D. Mo. 2002) ................................................................ 25

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  2017 WL 2574005 (D. Minn. June 14, 2017)....................................... 24, 31

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  2020 WL 5517483 (D. Minn. Sept 14, 2020) ............................................. 25

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  403 F. Supp. 3d 712 (D. Minn 2019) ............................................. 15, 16, 18

*In re Charter Commc'ns, Inc., Sec. Litig.*,
  2005 WL 4045741 (E.D. Mo. June 30, 2005) ...................................... 23, 29

*DeBoer v. Mellon Mortg. Co.*,
  64 F.3d 1171 (8th Cir. 1995) ...................................................................... 10

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 256132 (N.D. Ga. Mar. 17, 2020)................................................. 8

*George v. Uponor Corp.*,
  2015 WL 5255280 (D. Minn. Sept. 9, 2015) ................................................ 9

*Goldman Sachs Grp. v. Arkansas Tchr. Ret. Sys.*,
  141 S. Ct. 950 (2020) .................................................................................. 25

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ...................................................................... 30

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018)............................................ 27

*Keil v. Lopez*,
  862 F.3d 685 (8th Cir. 2017) .............................................................. 4, 5, 28

*Khoday v. Symantec Corp.*,
    2016 WL 1637039 (D. Minn. Apr. 5, 2016) ................................................................. 8

*In re MGM Mirage Sec. Litig.*,
    708 F. App'x 894 (9th Cir. 2017) .............................................................................. 8

*Murphy v. Precision Castparts Corp.*,
    2020 WL 4040827 (D. Or. July 17, 2020) ................................................................ 17

*Murphy v. Precision Castparts Corp.*,
    2021 WL 2080016 (D. Or. May 24, 2021) ............................................................... 17

*Paxton v. Union Nat'l Bank*,
    688 F.2d 552 (8th Cir. 1982) ................................................................................... 6

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ........................................................................ 4, 25

*Rawa v. Monsanto Co.*,
    2018 WL 2389040 (E.D. Mo. May 25, 2018) .......................................................... 25

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) .......................................................... 22

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2020 WL 4196468 (S.D.N.Y. July 21, 2020) ................................................... 11, 27

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    892 F.3d 968 (8th Cir. 2018) ................................................................................... 5

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
    2012 WL 2512750 (D. Minn. June 29, 2012) ........................................................... 4

*Van Horn v. Trickey*,
    840 F.2d 604 (8th Cir. 1988) ........................................................................... 5, 28

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ............................................................ 9

## OTHER AUTHORITIES

Cornerstone Research, *Securities Class Action Settlements: 2020 Review
    and Analysis* (2021) ................................................................................................ 24

Fed. R. Civ. P. 23(c)(2) ............................................................................................. 30, 31

Fed. R. Civ. P. 23(e)(2) ............................................................................. *passim*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed Class Representatives the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon"), and Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009 ("Vildosola," and collectively with Oregon, "Plaintiffs"), on behalf of themselves and the Court-certified Class, respectfully submit this memorandum of law in support of their motion for final approval of: (1) the proposed settlement resolving all claims in this securities class action (the "Action") for $55 million in cash (the "Settlement"), and (2) the proposed plan of allocation for distribution of the proceeds of the Settlement (the "Plan of Allocation").[1]

## INTRODUCTION

Subject to Court approval, Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment of $55 million, which has been deposited into an escrow account. Plaintiffs respectfully submit that the proposed Settlement is an outstanding result for the Class and satisfies the standards for final approval under Rule 23(e)(2) of the

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated January 29, 2021 (the "Stipulation") (ECF No. 354-1)) or in the Joint Declaration of Michael D. Blatchley and Keil M. Mueller in Support of (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith. Citations to "¶__" in this memorandum refer to paragraphs in the Joint Declaration and citations to "Ex. " refer to exhibits in the Joint Declaration. Also, unless otherwise noted, all references to "ECF No. __" are to the docket in *Craig v. CenturyLink, Inc.,* No. 18-cv-296 (MJD/KMM).

Federal Rules of Civil Procedure.  As discussed below and in the Joint Declaration,[2] the Settlement was reached after extensive arm's-length settlement negotiations between experienced counsel, which included two mediations before retired United States District Court Judge Layn R. Phillips, one of the preeminent mediators for complex securities class action cases.  The Settlement Amount represents a substantial percentage of the likely maximum potential damages and is greater than the total ***combined*** recoveries in private and government actions brought on behalf of consumers nationwide in connection with the sales and billing misconduct alleged in this case.  If approved, the Settlement would be among the top ten securities class action settlements ever in the District of Minnesota.

At the time the agreement to settle was reached, Plaintiffs and Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Stoll Stoll Berne Lokting & Shlachter P.C. ("Stoll Berne") (collectively, "Lead Counsel") had a well-developed understanding of the strengths and weaknesses of the Action.  Before the Settlement was agreed to, Lead Counsel had: (i) conducted an extensive investigation into investors' claims, including through interviews with dozens of former employees of CenturyLink; (ii) drafted a detailed consolidated complaint based on Lead Counsel's investigation; (iii) successfully opposed Defendants' motion to dismiss through extensive briefing and oral argument; (iv) successfully moved for class certification, which required

---

[2] The Joint Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for detailed descriptions of, among other things: the nature of the claims asserted in the Action (¶¶13-14); the history, prosecution, and settlement of the Action (¶¶15-92); the risks and uncertainties of continued litigation of Action (¶¶93-132); and the proposed Plan of Allocation (¶¶141-49).

extensive briefing, preparation of two expert reports addressing market efficiency and damages, defending the depositions of Oregon's representatives and Vildosola, defending two depositions of Plaintiffs' expert, and deposing Defendants' expert; (v) successfully opposed Defendants' Rule 23(f) petition; (vi) engaged in significant fact discovery, including producing over 543,000 pages of documents from Plaintiffs and reviewing and analyzing approximately 2.5 million pages of documents—including over 80 deposition transcripts from related litigation—produced by Defendants and third parties; (vii) briefed and argued numerous discovery motions; (viii) consulted with experts regarding loss causation and damages, telecommunications industry practices, and economics, and other issues presented by the Action; and (ix) participated in extensive arm's-length settlement negotiations, including in mediations under the auspices of Judge Phillips which involved each side's preparation of detailed mediation submissions, as well as critical analysis from the other side and from Judge Phillips and his team.

Plaintiffs and Lead Counsel believe that the Settlement is particularly favorable given the risks of continued litigation. This was not a case with restated financial statements, a parallel SEC investigation, or a governmental inquiry into the alleged misstatements supporting Plaintiffs' claims. To the contrary, the Action presented many significant risks to establishing both liability and damages through continued litigation that could have resulted in no recovery at all for the Class. In addition, if the litigation had continued, Plaintiffs would have to prevail at several additional stages, including summary judgment, trial, and appeals. This process would have taken years and presented risks at

each stage.  The Settlement avoids these risks and provides a substantial and certain benefit rather than the mere possibility of a recovery after additional years of litigation.

In light of these considerations and the other factors discussed below, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court.  Additionally, Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice previously approved by the Court.  The Plan of Allocation, which Lead Counsel developed in consultation with Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Class Members who submit valid claims based on damages they suffered on purchases of CenturyLink securities.

## ARGUMENT

## I.  THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e) requires that a court find a proposed class-action settlement "fair, reasonable, and adequate" before approving it.  Fed. R. Civ. P. 23(e)(2).  The Court's role in reviewing a class settlement is "to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned."  *See Keil v. Lopez*, 862 F.3d 685, 693 (8th Cir. 2017).

The Eighth Circuit has recognized that "[a] strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."  *See Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1148 (8th Cir. 1999).  This policy is "particularly strong in the class action context."  *In re Uponor, Inc.*, *F1807 Plumbing Fittings Prods. Liab. Litig.*, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012).

- 4 -

In reviewing a settlement for final approval, Rule 23(e)(2) provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).   Traditionally, the Eighth Circuit has held that district courts should also consider following four factors in evaluating a class-action settlement:

> (1) the merits of the plaintiff's case [] weighed against the terms of the settlement, (2) the defendant's financial condition, (3) the complexity and expense of further litigation, and (4) the amount of opposition to the settlement.

*In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 978 (8th Cir. 2018); *Keil*, 862 F.3d at 693; *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988) (the "*Van Horn* Factors").

As discussed further below, these factors support approval of the Settlement.

**A.     Plaintiffs and Lead Counsel Have Adequately Represented the Class**

In determining whether to approve a class-action settlement, the court considers whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  Adequacy of representation focuses on two issues: whether "(1) the class representatives have common interests with members of the class,

and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982).

Here, there can be little doubt that Plaintiffs have adequately represented the Class. To start, there is no antagonism or conflict between Plaintiffs and the Class. Plaintiffs and the other Class Members all purchased or otherwise acquired publicly traded CenturyLink common stock and/or 7.60% Notes during the Class Period and were allegedly damaged by the same alleged false and misleading statements about CenturyLink's sales and billing practices and the Company's financial results. If Plaintiffs proved their claims at trial, they would also prove the Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, Plaintiffs and Lead Counsel have more than adequately represented the Class in both their vigorous prosecution of the Action for three-and-a-half years and in the negotiation and achievement of the Settlement. Lead Counsel Bernstein Litowitz and Stoll Berne are highly qualified and experienced in securities litigation, as set forth in their firm resumes (*see* Exs. 5A-3 and 5B-3 to the Joint Declaration), committed extensive resources and skillfully pursued the claims of the Class, and were able to successfully prosecute the litigation against skilled opposing counsel. Indeed, Plaintiffs and Lead Counsel conducted an extensive investigation, overcame Defendants' motion to dismiss, obtained and reviewed substantial discovery including following numerous litigated discovery disputes,

and obtained certification of the class in the face of a vigorous opposition and challenging legal arguments.

Accordingly, as the Court previously found in certifying the Class and appointing Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, Plaintiffs and Lead Counsel have adequately represented the Class.  *See* ECF No. 321 at 48-49.

**B.    The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of An Experienced Mediator**

In weighing approval of a class-action settlement, the Court also considers whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  Here, the Settlement was reached after months of arm's-length negotiations between experienced counsel, an initial mediation process conducted under the auspices of Judge Phillips, and further direct and extensive arm's-length negotiations among counsel—and even then, resolution was only achieved after the parties agreed to a mediator's recommendation from Judge Phillips.

Judge Phillips, one of the preeminent mediators for complex litigation, including securities class actions, previously mediated the parallel private consumer action in this matter, and thus was well-positioned to assess the relative strengths and weaknesses of the Parties' positions.  *See* Declaration of Layn R. Phillips (Ex. 1) ("Phillips Decl.") at ¶¶4-5. The Parties participated in a full-day, in-person mediation before Judge Phillips in Corona Del Mar, California on February 4, 2020.  *Id*. ¶6.  Before the mediation, the Parties exchanged and submitted to Judge Phillips detailed mediation statements and supporting exhibits concerning liability, loss causation, and damages.  *Id*. ¶7.  At the mediation

session, the Parties engaged in a full day of vigorous settlement negotiations but were unable to reach any agreement on a resolution of the Action. *Id*. ¶8. Extensive subsequent direct negotiations between counsel over subsequent months were also unsuccessful, until Judge Phillips became involved again and issued a mediator's recommendation that finally produced a compromise. *Id*. ¶9.

The Parties' agreement to resolve the Action for $55 million was based on Judge Phillips mediator's recommendation after these extensive negotiations. *Id*. ¶9; *see Khoday v. Symantec Corp.*, 2016 WL 1637039, at *8 (D. Minn. Apr. 5, 2016) *report and recommendation adopted*, 2016 WL 1626836 (D. Minn. Apr. 22, 2016), *aff'd sub nom. Caligiuri v. Symantec Corp.*, 855 F.3d 860 (8th Cir. 2017) (fact that settlement was "reached through the assistance of an experienced, independent mediator" weighed in favor of approval); *see also In re MGM Mirage Sec. Litig.,* 708 F. App'x 894, 897 (9th Cir. 2017) (unpublished) (calling Judge Phillips a "nationally recognized mediator" and affirming settlement approval in part due to his representations); *In re Equifax Inc. Customer Data Sec. Breach Litig.,* 2020 WL 256132, at *6 (N.D. Ga. Mar. 17, 2020), *aff'd in part, rev'd in part and remanded on other grounds*, 2021 WL 2250845 (11th Cir. June 3, 2021) (noting that Judge Phillips is "a retired federal judge with a wealth of experience in major complex litigation" and crediting his representations about reasonableness of settlement and sound negotiation process).

Plaintiffs and Lead Counsel were well-informed of the strengths and weaknesses of their claims at the time of the settlement negotiations, having (i) conducted an extensive investigation; (ii) performed extensive legal and factual research in preparing the

Complaint, the briefing in opposition to Defendants' motion to dismiss, the briefing in support of the motion for class certification; (iii) worked with industry and other experts; and (iv) reviewed over 2.2 million pages of documents, including transcripts of the deposition testimony of 80 witnesses who were deposed in the related Minnesota Attorney General action and consumer class action. *See* ¶¶22-72. The informed conclusion of Plaintiffs and Lead Counsel that the Settlement is fair and reasonable and in the best interests of the Class further supports the Settlements' approval.

Further, Oregon—an experienced, sophisticated institutional investor that has achieved numerous securities class action recoveries under the PSLRA, and Mr. Vildosola, an experienced investor who suffered a substantial loss on the 7.60% Notes—have endorsed the Settlement. *See* Declaration of Brian de Haan on behalf of Oregon (Ex. 2) ("de Haan Decl.") ¶7; Declaration of Fernando Alberto Vildosola (Ex. 3) ("Vildosola Decl.") ¶5. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007). Indeed, Oregon and the representatives of the Oregon Department of Justice and Oregon State Treasury who oversaw this action exemplify the qualities of the institutional investors Congress sought to empower in enacting the PSLRA to vigorously pursue investors' interests, and they diligently, expertly and faithfully carried out that role in demanding the best possible outcome for the Class here. de Haan Decl. ¶¶2-7.

- 9 -

The judgment of Lead Counsel Bernstein Litowitz and Stoll Berne, two firms with significant experience in securities class-action litigation, is also entitled to "great weight" and supports approval of the settlement. *George v. Uponor Corp.*, 2015 WL 5255280, at *6 (D. Minn. Sept. 9, 2015) ("courts give 'great weight' to and may 'rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement'"); *see also DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1178 (8th Cir. 1995) ("the views of counsel are to be accorded deference").

**C.    The Relief that the Settlement Provides for the Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors**

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court also considers whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C)(i). This factor under Rule 23(e)(2)(C) encompasses at least two of the four traditional *Van Horn* factors: the merits of the plaintiffs' case weighed against the terms of the settlement; and the complexity and expense of further litigation.

As further detailed in the Joint Declaration, continued litigation of the Action presented a number of significant risks that Plaintiffs would be unable to establish liability, loss causation, or damages. ¶¶102-29. Continuing the litigation through trial and appeals would also impose substantial additional costs on the Class and result in extended delays before any recovery could be achieved. ¶¶93, 130-32. The Settlement, which provides a $55 million cash payment for the benefit of the Class, provides certainty and avoids those further costs and delays. The Settlement is also reasonable when considered in relation to

the potential recovery, which was far from certain, that might be obtained if Plaintiffs prevailed at summary judgment, trial, and on any appeals.  ¶¶133-34.

### 1. The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Plaintiffs and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing both liability and damages.

### (a) Risks To Proving Liability

Plaintiffs recognize that they faced significant challenges in proving that Defendants' statements were materially false and misleading when made.  Neither the SEC nor any other governmental entity brought a formal investigation or asserted a parallel enforcement action concerning the alleged misrepresentations at issue here, and CenturyLink never restated its financial statements.  *See In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *7 (S.D.N.Y. July 21, 2020) (approval warranted in light of "substantial risks to establishing both liability and damages" as there was no "parallel SEC action or a restatement of financial results to support Lead Plaintiff's claims and provide a roadmap for discovery").  To the contrary, Defendants have consistently asserted that their statements to investors about CenturyLink's sales and billing practices were accurate when made, based on information available at the time.  ¶¶105-10.

Here, the alleged false and misleading statements in this case include misstatements and omissions concerning: (i) CenturyLink's business strategies and the reasons for its financial performance; (ii) Defendants' secret attempt to address the Company's

"cramming" crisis; (iii) CenturyLink's purported business integrity and honest sales practices; (iv) CenturyLink's regulatory risks; (v) known trends and uncertainties as set forth in Item 303 of Regulation S-K; and (vi) CenturyLink's financial results, which were allegedly inflated with illicit proceeds.  ¶105  In their motion to dismiss and, to some degree, in their opposition to Plaintiffs' class certification motion, Defendants vigorously argued that none of these statements were false or material to investors.  *See* ¶26.  While Plaintiffs were successful in defeating Defendants' motion to dismiss and obtained certification of the Class, Defendants would likely have repeated their arguments at summary judgment or trial, where the applicable standards would be potentially more challenging for Plaintiffs. *See* ¶105.

For example, Defendants likely would have challenged the materiality of any allegedly concealed cramming misconduct.  Defendants likely would have argued that customer complaints are routine at any telecommunications company, properly accounted for at CenturyLink according to its independent auditor, and that, even assuming any misconduct occurred, its scope was small relative to CenturyLink's size, whether measured by its number of customers, number of employees, or overall revenues—thus rendering it immaterial to the Company's investors.  *See* ¶¶106-09.

Similarly, Defendants likely would have argued that the financial impact of any alleged misconduct was even smaller still—particularly because CenturyLink investigated complaints and routinely reimbursed customers who were overcharged. ¶107. Defendants also were likely to argue that, in at least some instances, billing errors would have resulted in lost revenue for the Company and would have to offset gains from cramming in order to

properly assess the materiality of cramming to CenturyLink's bottom-line financial performance. *Id.*

In support of these arguments, Defendants likely would have argued that internal documents reflected that the Company received a relatively small number of complaints related to cramming, that CenturyLink investigated instances of alleged cramming, and that it routinely reimbursed customers who were overcharged.  ¶108.

Moreover, here, Defendants would have cited the evidence purportedly supporting the findings of the internal investigation into the sales and billing misconduct alleged in this case, which was conducted by a Special Committee of the Company's Board of Directors with the assistance of outside independent law firm O'Melveny & Myers LLP— an investigation whose findings completely exculpate Defendants for the systemic misconduct alleged by Plaintiffs.  Specifically, as reported by CenturyLink, that investigation—which was undertaken in direct response to the allegations of billing misconduct at issue in this case and included review of 9.7 million documents and 32 billion billing records, and interviews with 200 current and former employees—"did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing."  ¶¶119-20.  In fact, the investigation concluded that "Company management did not condone or encouraging cramming" and that "the evidence did not show that cramming was common at the Company."  ¶119.  To the contrary, CenturyLink explained that the investigation concluded that the "Company maintains specific policies and procedures that prohibit and are designed to prevent and deter cramming" and found

that when "instances of cramming were found to have occurred, the Company took reasonable actions to discipline employees." *Id.*

In this light, the fact that CenturyLink settled related consumer and Attorney General cases for relatively modest amounts would have been cited by Defendants as exculpatory, as Defendants would have argued that these settlements were consistent with the Company's own investigatory findings that, while there may have been instances of billing errors, those errors were immaterial, inadvertent, and no way the product of intentional fraud. ¶¶108-09. Defendants also likely would have contrasted the modest Attorney General settlements here to the more than $3 billion in fines and penalties imposed on Wells Fargo, which Plaintiffs have suggested is a comparator for this case. ¶109.

Moreover, Defendants could have persuasively argued that any financial misrepresentations were immaterial for various reasons, including that any amounts CenturyLink obtained by billing errors or misconduct were small, that CenturyLink's billing problems did not generate material revenue for the Company but represented a cost drain in light of the efforts CenturyLink was undertaking to address billing issues, and that CenturyLink reimbursed customers it overbilled. ¶¶107, 120.

While these and other similar arguments were too fact-intensive to be credited at earlier stages of the case, and Plaintiffs believe they would have had strong arguments to make in response, there was a significant risk that the Court or a factfinder could have credited Defendants' arguments at either summary judgment or trial. This could have led to the dismissal of many or all statements from the case, particularly given that several

- 14 -

were sustained at the motion to dismiss stage because the Complaint adequately alleged that Defendants were obtaining material revenues from cramming and other similar misconduct. *See, e.g.*, *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 725 (D. Minn 2019) ("The Complaint adequately alleges that CenturyLink's statements regarding its strategies and policies were false because, in fact, cramming was widespread [and] systemic . . . and . . . Defendants knew CenturyLink's sales were materially dependent on cramming."); *id.* at 726 ("The Complaint adequately alleges that Item 303(a) of Regulation S-K required CenturyLink to disclose that its illegal sales practices were a material driver of its reported revenue[.]"). Had that happened, Plaintiffs' recovery would have been severely reduced, if not eliminated entirely.

Further, Defendants previewed a significant "truth-on-the-market" defense in their class certification papers. Specifically, Defendants' expert argued that allegations of cramming and billing misconduct against telecommunications companies—including CenturyLink itself—were widespread during the Class Period, and thus that investors could not have been misled by Defendants' alleged misrepresentations. *See* ECF No. 227-1 at ¶¶54-55. While Plaintiffs correctly challenged those opinions as too fact-intensive for resolution at class certification, Defendants likely would have raised them again at summary judgment or trial. Plaintiffs believe they would have been able to rebut those arguments, but there was a meaningful risk that the Court or a jury might have accepted them. If that happened, such a finding would have rendered immaterial some or all of Defendants' alleged misrepresentations, thereby reducing or precluding any recovery for the Class.

- 15 -

In addition, Defendants challenged certain of the alleged misrepresentations as non-actionable opinions or forward-looking statements.  *See* ¶26.  The Court rejected those arguments at the pleading stage, including because the Complaint alleged facts suggesting that Defendants knew their statements were false or misleading.  *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 728-29.  However, if Defendants were able to undermine the conclusion with evidence suggesting that cramming and related misconduct was not, in fact, widespread or material at the Company, they might have been able to obtain dismissal of such statements at summary judgment or trial.  *See* ¶111.

Similarly, Defendants argued at the motion-to-dismiss stage that several of the alleged false and misleading statements were mere "puffery"—statements too vague or general to have misled investors.  *See* ¶26.  Although the Court's opinion denying Defendants' motion to dismiss rejected these arguments, it specifically did so "at this stage," *see id.* at 727, and Defendants remained free to press this "puffery" argument at summary judgment or trial.  Defendants likely would have bolstered such arguments with evidence showing that financial analysts following CenturyLink did not mention many of the alleged false and misleading statements in their coverage of the Company.  *See* ¶112. Had the Court or the factfinder credited Defendants' arguments on this score, Plaintiffs would have been precluded from recovering for these statements.

The substantial risk that the Court or a fact finder could later conclude statements upheld as actionable at the motion-to-dismiss stage here following further litigation and fact discovery does not reflect an unrealistic or remote possibility.  For example, in a recent decision involving similar statements challenged by defendants as puffery and forward-

- 16 -

looking, the court at summary judgment—after over five years of litigation, fact and expert discovery, and *Daubert* motion practice—dismissed the case with prejudice after concluding 44 alleged misstatements sustained at the motion-to-dismiss stage were not actionable under the PSLRA. *See Murphy v. Precision Castparts Corp*., 2021 WL 2080016, *1-2 (D. Or. May 24, 2021); *Murphy v. Precision Castparts Corp*., 2020 WL 4040827, *10-11, *15-17 (D. Or. July 17, 2020).

Even if Plaintiffs were able to prove that Defendants' statements were false and misleading, they would still need to prove to a jury that Defendants made the alleged false statements with the intent to mislead investors or with deliberate recklessness. As discussed in the Joint Declaration, the Complaint alleged scienter based on several facts, including Defendants' imposition of quotas (and Defendants' aborted attempt to move away from a quota-focused sales performance system to reduce cramming), numerous statements by former employees who described (among other things) reporting of cramming to CenturyLink senior executives, the importance of CenturyLink's consumer unit, and Defendants' review of data evidencing cramming. *See generally* ¶¶114-20. If, as discussed above, Defendants were successful in establishing that cramming and related misconduct were ***not*** actually widespread at CenturyLink, it would have severely limited the probative force of many of those scienter-related facts. For instance, if Defendants were able to convince the Court or a factfinder that CenturyLink's internal data did not show significant cramming activity, Defendants' review of that data would arguably undermine scienter, rather than support it. *See* ¶115.

- 17 -

Also, because scienter concerns individuals' states of mind, Plaintiffs faced a significant risk that they would not have been able to develop evidence of such culpable intent. This risk was particularly salient for certain key allegations in the Complaint. For example, the Complaint and the Court's motion to dismiss opinion focused significant attention on allegations that, in an attempt to address cramming problems at CenturyLink, the Company shifted to a "behavioral coaching" approach to evaluating sales and customer service employees during the class period, but abandoned that approach when it led to sales declines. *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 733-34. Although the documentary record showed that CenturyLink did attempt to change aspects of its evaluation of sales and customer service employees during the Class Period, Plaintiffs would have had to establish certain further key facts to undermine Defendants' anticipated arguments that the change in performance measurement was undertaken for other legitimate business reasons unrelated to cramming. *See* ¶116.

In addition, Defendants likely would have argued that the imposition of quotas is a commonplace tactic in sales organizations, and that it is in fact intended to maximize shareholder value by incentivizing employees to make sales. *See* ¶117. Further, Defendants would likely have argued that terminations are also commonplace in sales organizations and that, even if executives were aware of them, the terminations here were not so out-of-the-ordinary as to merit suspicion. *See id.* In addition, Defendants likely would have argued that the termination of Heidi Heiser, the whistleblower whose complaint sparked the initial corrective disclosure in this case, did not support scienter, including because Ms. Heiser was terminated for reasons unrelated to the alleged

whistleblowing and voluntarily dismissed her lawsuit alleging wrongful termination. *See id.*

Defendants would also have pointed to significant evidence they would have argued undermined any inference of scienter.  For example, Defendants would likely have argued that, during the Class Period, CenturyLink had explicit rules in place prohibiting cramming, had processes in place to detect cramming, disciplined and terminated employees who engaged in cramming, and refunded customers impacted by billing errors.  *See* ¶118.

Again, in support of these arguments, Defendants would likely point to the internal investigation the Board's Special Committee conducted in connection with the billing misconduct alleged in this case, as well as the evidence purporting to supports its conclusions that the investigation "did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing" and that "[c]ompany management did not condone or encourage cramming, and the evidence did not show that cramming was common at the Company."  Ex. 10.

Defendants would have argued that these facts are entirely at odds with any alleged scheme to inflate CenturyLink's financial performance or deceive investors.  *See* ¶120. Defendants likely would have further argued that overbilling customers makes no sense as a hidden scheme to inflate revenues, since customers can and do complain publicly and can prompt regulator investigations, and that the reputational harm in terms of lost current and future customers and the costs of responding to such regulator inquiries would have outweighed any potential revenue gains obtained through cramming.  *See id.*  While Plaintiffs believe they had strong arguments to make and evidence to marshal in response,

if the Court or a jury were to accept Defendants' scienter arguments in whole or in part, the Class's recovery could have been reduced or eliminated.

### (b)   Risks To Proving Loss Causation and Damages

Even if Plaintiffs were able to prove Defendants' material misrepresentations and scienter, they still faced significant risks in proving loss causation and damages.   For example, Defendants would have likely contended at summary judgment and trial that Plaintiffs could not establish a causal connection between the alleged misrepresentations and the losses investors suffered, as required by law.   ¶122.   In support of this contention, Defendants would likely reprise their arguments from class certification that the alleged misrepresentations in the case lacked price impact.   *Id*.   According to Defendants, the alleged misrepresentations were not consistently associated with increases in the prices of CenturyLink common stock and 7.60% Notes during the Class Period, and, therefore, the alleged misrepresentations did not inflate the prices of those securities.   *Id*.   Defendants also argued that the price drop associated with the second alleged corrective disclosure was not statistically significant and the use of a two-day window was inappropriate.   *Id*.

In addition, Defendants would again argue that the alleged corrective disclosures were not corrective as a matter of law because, among other things, they only reported on unproven allegations of a "Wells Fargo-like scheme" at CenturyLink—as opposed to actual facts correcting Defendants' alleged misrepresentations.   *Id*.   While Plaintiffs successfully opposed these arguments at the motion to dismiss and class certification stages, Defendants were free to assert that they rebutted loss causation at summary judgment and trial.   If Defendants were successful in making such arguments, some or all the alleged

misrepresentations might have been removed from the case, thereby reducing or eliminating damages. *See id.*

Defendants would have likely reasserted and further refined arguments raised at class certification that, if accepted by the Court or a jury, could have significantly reduced recoverable damages or eliminated them entirely. For example, Defendants likely would have also argued that damages associated with disclosures of the Minnesota Attorney General lawsuit and consumer class actions would necessarily have to be limited in light of the fact that CenturyLink settled those actions for modest sums—orders of magnitude smaller than the claimed damages alleged by the Minnesota Attorney General and in the consumer actions that were discussed in the Complaint. ¶126.

Defendants would have contended that—unlike the billing misconduct that led to $3 billion in SEC and other government fines and sanctions at Wells Fargo—here, the nationwide consumer action settled for $15.5 million (plus administrative costs), the Attorney General actions settled for similarly modest amounts, and there have been no government investigations or proceedings by *any* federal regulator relating to the alleged underlying misconduct or any securities-law violations related to it. *See* ¶123. Thus, Defendants could have persuasively argued that the declines in CenturyLink's stock price in response to disclosures of the underlying lawsuits here were not compensable but instead reflected "fear, uncertainty, and doubt" about a "Wells Fargo-like" scheme at CenturyLink when, in fact, the facts here are far different than in Wells Fargo. *See id.* In contrast to the modest sums paid by CenturyLink, Wells Fargo paid $3 billion—including a $500 million fine to the SEC for making misstatements to investors—to resolve federal prosecutors'

claims, entered into a deferred prosecution agreement, and clawed back tens of millions of dollars in compensation from its senior executives. *See id.* In this light, Defendants' loss causation arguments about the stock price declines in this case could have intuitive jury appeal.

Further, as Defendants forcefully argued at class certification, Defendants would clearly contend at summary judgment and trial that any class period should end after the first alleged corrective disclosure.  ¶¶125-26.  While the Court correctly recognized that these arguments were inappropriate at the class certification stage, it explicitly noted that such arguments could properly be brought at summary judgment or trial.  ¶125.  If Defendants had succeeded in cutting off the class period at the first alleged corrective disclosure, it would have potentially reduced damages by more than 50%. *Id.*

Moreover, as noted above, Defendants could have argued that there was no loss causation because the fact of consumer complaints was known to the market years before the alleged corrective disclosures, which also would have significantly reduced recoverable damages or eliminated them entirely.  ¶113.  Defendants also could have raised additional arguments beyond those previewed at class certification which, if accepted by the Court or a jury, could have significantly reduced recoverable damages or eliminated them entirely. For example, Defendants could have argued that the fact that this action was itself filed prior to the disclosure of the Minnesota Attorney General's lawsuit undermines any argument that the Class would be able to recover for stock price declines following the disclosure of that action. *See* ¶128; *see also,, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*,

2019 WL 3001084, at *18-19 (S.D.N.Y. July 10, 2019) (limiting class period based on similar argument).

Resolution of disputed issues regarding damages would have boiled down to a "battle of experts," and Defendants would undoubtedly have been able to present a well-qualified expert who would opine that the class's damages were smaller or nonexistent. ¶129.  Because Plaintiffs could not be certain which expert's view would be credited by the jury, this "battle of experts" posed an additional litigation risk.  *See In re Charter Commc'ns, Inc., Sec. Litig.*, 2005 WL 4045741, at *16 (E.D. Mo. June 30, 2005) (securities class action was "subject to a battle of experts").  Plaintiffs recognize that the above risks posed a possibility that the Class would not be able to recover at all or would have recovered a lesser amount if the Action proceeded through summary judgment, trial, and appeals.

### 2.    The Settlement Is Reasonable in Light of the Likely Recoverable Damages

The Settlement is also a favorable result when considered in relation to the amount of damages that could realistically be established at trial.  Indeed, the Settlement here would represent the single largest securities class action recovery on behalf of investors in a publicly traded company in the District of Minnesota that exclusively alleges claims under Section 10(b) and Section 20(a) of the Exchange Act, where there was not a related SEC investigation or criminal U.S. Department of Justice inquiry—a fact that strongly supports the reasonableness of the settlement here.

Lead Counsel's consultation with experts in damages and loss causation issues in securities class actions similarly confirm the reasonableness of the Settlement when compared to the amount of damages Plaintiffs could recover at trial. Even assuming Plaintiffs prevailed on all liability issues, Lead Counsel believes that the maximum total damages Plaintiffs could realistically establish at trial was approximately $315 to $690 million (though, of course, if Defendants succeeded on some or all of their other loss causation and damages arguments, damages would be reduced substantially below this amount). ¶133. Thus, the $55 million Settlement represents approximately 8% to 17% of the realistic maximum recoverable damages for the Class. *Id.*

The level of recovery achieved through the Settlement is significantly greater than the normal recovery amount in comparable securities class action settlements with similar maximum damages—a factor that strongly supports approval. *See* Cornerstone Research, *Securities Class Action Settlements: 2020 Review and Analysis* (2021) (Fig. 5) (Ex. 11) at 6 (from 2011 to 2019, the median settlement recovery in securities fraud class actions with damages estimated between $500 and $999 million was 3.3%, and in 2020 it was 2.6%); *see also, e.g.*, *id.* at 20 (App'x 5) (in securities class actions in the Eighth Circuit from 2011 to 2020, the median settlement recovery was 6.1% of estimated damages); *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2017 WL 2574005, at *3 (D. Minn. June 14, 2017) (holding settlement representing 6.8% to 9.5% of provable damages "strongly" supported approval, noting amount "exceeds the median recovery of estimated damages in similar securities class actions").

3.    **The Costs and Delays of Continued Litigation Support Approval of the Settlement**

The substantial costs and delays that would be required before any recovery could be obtained through litigation also strongly support approval of the Settlement.  If the litigation had continued, Plaintiffs would have had to prevail at several additional stages: summary judgment, trial, and if Plaintiffs had prevailed at trial, on the appeal that likely would have followed.  *See* ¶¶96-97, 101.  This process would have taken years and presented new risks at each stage, including the risk of intervening changes in the law.

Moreover, here, the risk of an intervening change in law having a material impact on Plaintiffs' ability to recover damages in this action was not remote.  For example, the U.S. Supreme Court recently granted certiorari and heard argument to consider the Second Circuit's decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc*., 955 F.3d 254 (2d Cir 2020), which the Court considered in granting class certification and upholding Plaintiffs' allegations of price impact.  *See Goldman Sachs Grp. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 950 (2020); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 2020 WL 5517483, at *10-13 (D. Minn. Sept 14, 2020).  Depending on how the Supreme Court rules, Defendants could seek to decertify the Class or even seek dismissal of Plaintiffs' claims altogether.  *See* ¶¶99-100.

The Settlement avoids these risks and will provide a prompt and certain benefit to the Class, rather than risk a smaller recovery—or none at all—after additional years of litigation and appeals.  *See In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) (finding that "the complexity, expense and duration of litigation weigh in favor

of approving the proposed settlement" because trial of the securities action "would be lengthy, costly and complex," and, "[r]egardless of the outcome at trial, post-judgment appeals were likely").[3]

### 4. All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants in this case are well-established, effective methods that have been widely used in securities class-action litigation. As set forth in the notice approved by the Court at the preliminary approval stage, the proceeds of the Settlement will be distributed to class members who submit eligible Claim Forms with required documentation to the Court-appointed Claims Administrator, Epiq Class Action

---

[3] Defendants' ability to pay an amount greater than the Settlement Amount does not suggest that the Settlement is inadequate. *See Petrovic*, 200 F.3d at 1152 ("While it is undisputed that [defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Rawa v. Monsanto Co.*, 2018 WL 2389040, at *7 (E.D. Mo. May 25, 2018) (this factor was "neutral" where Defendants' financial condition would not prevent it paying a larger amount).

& Claims Solutions, Inc. ("Epiq").   ¶¶135-40.   Epiq will provide claimants with an opportunity to cure any deficiencies in their claims or request review by the Court of a denial of their claim and will mail or wire eligible claimants their pro rata share upon approval of the Court.[4]

Second, the relief provided for the Class is also adequate when the terms of the proposed award of attorney's fees are taken into account.   As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.   Moreover, approval of attorneys' fees is entirely separate from approval of the Settlement in this case, and neither Plaintiffs nor Lead Counsel may terminate the Settlement based on any ruling with respect to attorneys' fees. *See* Stipulation ¶16.

Third, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).   *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).   Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which CenturyLink may terminate the Settlement if the requests for exclusion from the Class reach a specified threshold.   *See* Stipulation ¶37.   "This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the

---

[4] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted.  *See* Stipulation ¶13.

Settlement." *Signet Jewelers Ltd.*, 2020 WL 4196468, at *13; *see also Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement . . . does not weigh against approval" of settlement).

**D.     The Settlement Treats Class Members Equitably Relative to Each Other**

The proposed Settlement treats members of the Class equitably relative to one another. *See* Fed. R. Civ. P. 23(e)(2)(D). As discussed below in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their purchases or acquisitions of CenturyLink common stock and/or 7.60% Notes during the Class Period. ¶¶141-49. Plaintiffs will receive the same level of *pro rata* recovery as all other Class Members.

**E.     Reaction of the Class**

In considering approval of a settlement, the court also may consider "the amount of opposition to the settlement." *See, e.g., Keil*, 862 F.3d at 693; *Van Horn*, 840 F.2d at 607. To date, the reaction of the Class has been positive. Epiq began mailing copies of the Notice and Claim Form (the "Notice Packet") to potential Class Members and nominees on April 15, 2021. *See* Declaration of Owen F. Sullivan (Ex. 4) (the "Sullivan Decl.") ¶¶4-6. As of June 14, 2021, Epiq had mailed a total of 951,921 copies of the Notice Packet. *See id.* ¶10. The Notice set out the essential terms of the Settlement and informed potential Class Members of, among other things, their right to opt out of the Class or object to any aspect of the Settlement, and the procedure for submitting Claim Forms. While the deadline set by the Court for Class Members to exclude themselves or object to the

Settlement has not yet passed, to date, no objections to the Settlement or the Plan of Allocation has been received and only 24 requests for exclusion have been received. ¶140; Sullivan Decl. ¶17.[5]

*     *     *

In sum, all of factors to be considered under Rule 23(e)(2) and Eighth Circuit law support a finding that the Settlement is fair, reasonable, and adequate.

## II.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See Charter Commc'ns*, 2005 WL 4045741, at *10. A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *Id.*

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Plaintiffs' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members who submit valid Claim Forms. In developing the Plan of Allocation, Plaintiffs' expert calculated the amount of estimated artificial inflation in the prices of publicly traded CenturyLink common stock and 7.60% Notes during the Class Period which allegedly was proximately caused by Defendants' alleged false and misleading statements by considering the price changes in these securities in reaction to the alleged corrective disclosures, adjusting for changes attributable to market

---

[5] The deadline for submitting objections and requesting exclusion from the Class is June 29, 2021. As provided in the Preliminary Approval Order, Plaintiffs will file reply papers by July 13, 2021 addressing the requests for exclusion and any objections that may be received.

- 29 -

and industry factors and assumptions related to the case provided by Lead Counsel.  ¶¶141-49.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of publicly traded CenturyLink common stock and 7.60% Notes during the Class Period that is listed in the Claim Form and for which adequate documentation is provided.  Notice ¶¶54, 56.  In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price, whichever is less.  *Id*. ¶53.  Claimants who purchased and sold all their shares of CenturyLink common stock or 7.60% Notes before the first corrective disclosure, or who purchased and sold all their shares or notes between two consecutive dates on which artificial inflation was allegedly removed from the price of CenturyLink common stock or 7.60% Notes (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the securities' prices), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because any loss they suffered would not have been caused by the disclosure of the alleged fraud.  *Id*.  To date, no objections to the proposed Plan of Allocation have been received.  *See* ¶140.

## III.   NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual

notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975).

Epiq began sending copies of the Notice Packet to potential Class Members on April 15, 2021. *See* Sullivan Decl. ¶¶4-6. As of June 14, 2021, Epiq has disseminated over 951,921 copies of the Notice Packet to potential Class Members and nominees. *See id*. ¶10. In addition, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over *PR Newswire* on April 26, 2021. *See id*. ¶11. Copies of the Notice and Claim Form, as well as other relevant documents, including the Complaint, the Stipulation, and the Preliminary Approval Order, were made available on the settlement website maintained by Epiq beginning on April 14, 2021. *See id*. ¶16. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over newswires, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Tile Shop*, 2017 WL 2574005, at *1-2 (approving comparable notice).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: June 15, 2021                    Respectfully submitted,

                                        */s/ Michael D. Blatchley*
                                        John C. Browne, NYS Bar No. 3922747
                                        Michael D. Blatchley, NYS Bar No. 4747424
                                        Michael M. Mathai, NYS Bar No. 5166319
                                        **BERNSTEIN LITOWITZ BERGER &**
                                          **GROSSMANN LLP**
                                        1251 Avenue of the Americas
                                        New York, New York 10020
                                        Telephone: (212) 554-1400
                                        Facsimile: (212) 554-1444
                                        johnb@blbglaw.com
                                        michaelb@blbglaw.com
                                        michael.mathai@blbglaw.com

                                        Keith S. Dubanevich, OSB No. 975200
                                        Timothy S. DeJong, OSB No. 940662
                                        Keil M. Mueller, OSB No. 085535
                                        Lydia Anderson-Dana, OSB No. 166167
                                        Megan K. Houlihan, OSB No. 161273
                                        **STOLL STOLL BERNE LOKTING &**
                                          **SHLACHTER P.C.**
                                        209 SW Oak Street, Suite 500
                                        Portland, OR 97204
                                        Telephone: (503) 227-1600
                                        Facsimile: (503) 227-6840
                                        kdubanevich@stollberne.com
                                        tdejong@stollberne.com
                                        kmueller@stollberne.com
                                        landersondana@stollberne.com
                                        mhoulihan@stollberne.com

                                        *Special Assistant Attorneys General and Counsel*
                                        *for Lead Plaintiff the State of Oregon by and*
                                        *through the Oregon State Treasurer and the*
                                        *Oregon Public Employee Retirement Board, on*
                                        *behalf of the Oregon Public Employee Retirement*
                                        *Fund and Fernando Alberto Vildosola, as trustee*
                                        *for the AUFV Trust U/A/D 02/19/2009, and Lead*
                                        *Counsel for the Class*

                                        - 32 -

Richard A. Lockridge, MN No. 64117
Gregg M. Fishbein, MN No. 202009
Kate M. Baxter-Kauf, MN No. 392037
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4044
Facsimile: (612) 339-0981
ralockridge@locklaw.com
gmfishbein@locklaw.com
kmbaxter-kauf@locklaw.com

*Liaison Counsel for Lead Plaintiff the State of
Oregon by and through the Oregon State
Treasurer and the Oregon Public Employee
Retirement Board, on behalf of the Oregon Public
Employee Retirement Fund and Fernando Alberto
Vildosola, as trustee for the AUFV Trust U/A/D
02/19/2009, and Lead Counsel for the Class*