# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION**<br><br>This Document Relates to:<br>Civil Action No. 18-296 (MJD/KMM) | **MDL No. 17-2795 (MJD/KMM)** |

## JOINT DECLARATION OF MICHAEL D. BLATCHLEY AND KEIL M. MUELLER IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................... 1

II.   PROSECUTION OF THE ACTION ...................................................... 8

    A.    Background ................................................................................ 8

    B.    Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Operative Complaint, and the Denial of Defendants' Motion to Dismiss .............................. 9

        1.    Initial Proceedings ............................................................ 9

        2.    Oregon Seeks to Organize the Related Cases ................... 9

        3.    Drafting the Complaint .................................................... 12

        4.    Defendants' Motion To Dismiss ..................................... 13

    C.    Discovery ................................................................................ 16

        1.    The Pursuit of Extensive Document Discovery from Defendants and Third Parties ........................................ 18

        2.    Plaintiffs' Review of Defendants' and Third Parties' Documents and Other Materials ..................................... 25

        3.    Defendants' Document Requests to Plaintiffs ................ 29

        4.    Interrogatories ................................................................ 30

        5.    Analysis of Witnesses and Preparation of Deposition Plan ............ 31

    D.    Expert Discovery .................................................................... 32

    E.    Class Certification .................................................................. 34

    F.    Defendants' Rule 23(f) Petition ............................................. 37

III.  MEDIATION AND SETTLEMENT ................................................... 38

IV.   RISKS OF CONTINUED LITIGATION ............................................ 41

    A.    The Risks of Prosecuting Securities Actions In General ............................ 41

B.   The Substantial Risks of Proving Defendants' Liability and Damages in This Case ............................................................... 47

1.   Risks Associated With Proving Falsity and Materiality ................. 48

2.   Risks Associated With Proving Scienter ............................................ 52

3.   Risks Associated With Proving Loss Causation and Damages ....... 56

4.   Risks After Trial ................................................................................... 60

V.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION ........................ 62

VI.   PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE .......................... 63

VII.   PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ................................................................................................. 65

VIII.   THE FEE AND EXPENSE APPLICATION ........................................................ 68

A.   The Fee Application ......................................................................... 69

1.   Lead Plaintiff Oregon and Plaintiff Vildosola Have Authorized and Support the Fee Application ................................... 69

2.   The Time and Labor Devoted to the Action by Plaintiffs' Counsel .................................................................................................. 70

3.   The Experience and Standing of Lead Counsel ............................... 74

4.   The Standing and Caliber of Defendants' Counsel ......................... 77

5.   The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases ............................................ 77

6.   The Reaction of the Class to the Fee Application ............................ 79

B.   The Litigation-Expense Application ........................................... 80

IX.   CONCLUSION ...................................................................................................... 85

MICHAEL D. BLATCHLEY and KEIL M. MUELLER declare as follows:

## I.    INTRODUCTION

1.    We, Michael D. Blatchley of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Keil M. Mueller of Stoll Stoll Berne Lokting & Shlachter PC ("Stoll Berne," and together with Bernstein Litowitz, "Lead Counsel") submit this joint declaration (the "Joint Declaration") in support of the motions described below.[1]  Lead Counsel represents the Court-appointed Lead Plaintiff, the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") and Court-appointed Class Representative Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D ("Vildosola," and together with Oregon, "Plaintiffs"), and is Court-appointed Lead Counsel for the Class.  We are partners in our respective law firms and have personal knowledge of the matters stated in this declaration based on our active supervision of and participation in the prosecution and settlement of the Action.  If called upon as witnesses, we would testify competently thereto.

2.    We respectfully submit this declaration in support of Plaintiffs' motion, under Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the

---

[1] Unless otherwise defined in this declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement dated January 29, 2021 (the "Settlement Stipulation" or "Stipulation"), and previously filed with the Court.  *See* ECF No. 354-1.  Unless otherwise noted, all references to "ECF No. __" are to the docket in *Craig v. CenturyLink, Inc.*, No. 18-cv-296 (MJD/KMM), and all references to "¶__" are to Plaintiffs' Consolidated Securities Class Action Complaint filed on June 25, 2018 (ECF No. 143).

proposed settlement of the Action for $55 million in cash (the "Settlement"), which the Court preliminarily approved by its Order dated March 18, 2021 (the "Preliminary Approval Order"). ECF No. 360.

3.   We also respectfully submit this declaration in support of: (i) Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Class Members (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees in the amount of 25% of the Settlement Fund; payment of Litigation Expenses incurred by Plaintiffs' Counsel's in the amount of $878,413.33; and reimbursement of Oregon's and Mr. Vildosola's reasonable costs and expenses directly related to their representation of the Class (the "Fee and Expense Application").[3]

4.   The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $55 million for the benefit of the Court-certified Class. This Settlement was achieved as a direct result of Plaintiffs' and Lead Counsel's efforts to diligently investigate, vigorously prosecute, and aggressively

---

[2] Plaintiffs' Counsel are: Lead Counsel Bernstein Litowitz and Stoll Berne; Lockridge Grindal Nauen P.L.L.P. ("Lockridge Grindal"), which is liaison counsel for Plaintiffs in the District of Minnesota; Nelson, Zentner, Sartor & Snellings, LLC ("NZS&S"), which served as liaison counsel for Lead Plaintiff while the Action was pending in the United States District Court for the Western District of Louisiana; and Motley Rice LLC ("Motley Rice"), additional counsel for the Class.

[3] In conjunction with this declaration, Plaintiffs and Lead Counsel are also submitting the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

negotiate a settlement of this Action against highly skilled opposing counsel. As discussed in more detail below, Lead Counsel's efforts in the Action, included, among other things:

  i.    Conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, including consulting with experts and reviewing the voluminous public record;[4]

  ii.   Drafting the operative 139-page Consolidated Securities Class Action Complaint (the "Complaint"), which was filed with the Court on June 25, 2018 (ECF No. 143), and which incorporated material from conference call transcripts, press releases, news articles, and other public statements issued by or concerning Defendants; financial analyst research reports concerning the Company and reports and other documents filed publicly by CenturyLink with the U.S. Securities and Exchange Commission ("SEC") and other regulators; CenturyLink's corporate website; interviews with 19 former CenturyLink employees; and other publicly available information;

  iii.  Successfully opposing Defendants' motion to dismiss the Complaint (ECF Nos. 154-161), which consisted of more than 500 pages of briefing and exhibits, by researching and drafting a substantial opposition brief responding to Defendants' arguments, which Plaintiffs filed with the Court on October 12, 2018 (ECF No. 162);

  iv.   Preparing, filing, and arguing Plaintiffs' successful motion for class certification (ECF Nos. 188-93), which included extensive briefing and working with an expert to prepare a report on market efficiency and the availability of class-wide damages methodologies, defending the depositions of Oregon's representatives, Plaintiff Vildosola, and two depositions of Plaintiffs' expert, deposing Defendants' expert, and preparing a reply and sur-sur-reply in support of the class

---

[4] Defendants include CenturyLink, former CEO Glen F. Post, III; former CFO R. Stewart Ewing, Jr.; former Controller David D. Cole; former Global Head of Sales Karen Puckett; former President, Sales and Marketing Dean J. Douglas; and former Treasurer G. Clay Bailey.

certification motion (ECF Nos. 249-54, 270-71), which included a rebuttal expert report;

v.    Successfully opposing Defendants' petition, pursuant to Rule 23(f) of the Federal Rules of Civil Procedure (the "Rule 23(f) Petition"), for leave to appeal the Court's Class Certification Order to the United States Court of Appeals for the Eighth Circuit;

vi.    Consulting with experts regarding loss causation and damages, telecommunications industry practices and economics, and other issues presented by this Action;

vii.    Engaging in significant fact and expert discovery, including producing over 543,000 pages of documents from Oregon and Vildosola, and reviewing and analyzing approximately 2.5 million pages of documents produced by Defendants and third parties;

viii.    Engaging in intensive, arm's-length negotiations with Defendants, including the submission of detailed mediation statements concerning liability and damages, participating in a full-day mediation session before the Hon. Layn R. Phillips (U.S.D.J., Ret.), and months of subsequent negotiations, all of which culminated in a mediator's recommendation to settle the Action for $55 million in cash, which the Parties accepted; and

ix.    Drafting and negotiating the Settlement Stipulation and related settlement documentation.

5.    The proposed Settlement represents an outstanding result for the Class, considering the significant risks in the Action and the amount of the potential recovery. The strength of the recovery is further underscored by the amount recovered in related litigation arising out of the same underlying facts: indeed, the $55 million Settlement is larger than the amount recovered in the companion consumer class action before this Court and the related nationwide Attorney General actions combined. The Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued

litigation, including the risk that the Class could recover substantially less than the Settlement Amount, or nothing at all, after years of additional litigation and delay. As discussed in more detail below, if this case continued to be litigated, there is no guarantee that Lead Plaintiff would have been able to establish Defendants' liability with respect to the fraud alleged in this Action or the damages Lead Plaintiff and the Class suffered.

6.      The close attention paid and oversight provided by Oregon throughout this case supports the reasonableness of the Settlement. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Here, Oregon's representatives were actively involved in overseeing the litigation and settlement negotiations. *See* Declaration of Brian de Haan ("de Haan Declaration" or "de Haan Decl."), attached hereto as Exhibit 2.

7.      The litigation and settlement negotiations were also overseen by Mr. Vildosola, an investor in CenturyLink's 7.60% Senior Notes due September 15, 2039 ("7.60% Notes") who has substantial experience and sophistication in investment and business matters. *See* Declaration of Fernando Alberto Vildosola ("Vildosola Decl."), attached as Exhibit 3.

8.      Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Class. Due to their substantial efforts, Plaintiffs and Lead Counsel are

well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a highly favorable outcome for the Class.

9.    In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Plaintiffs' experienced expert for market efficiency, damages, and loss causation, Michael Hartzmark, Ph.D., developed the Plan of Allocation in consultation with Lead Counsel.  The Plan provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Class Members who submit Claim Forms that are approved for payment by the Court.  Each Claimant's share will be calculated based on their losses attributable to the alleged fraud, similar to what likely would have been awarded at trial if the Action had not settled, continued to trial following a motion for summary judgment and other pretrial motions, and resulted in a verdict favorable to the proposed class.

10.    Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis while incurring significant litigation-related expenses ("Litigation Expenses"), and thus bore substantial risk of an unfavorable result.  For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees for Plaintiffs' Counsel of 25% of the Settlement Fund. The 25% fee request is based on a retainer agreement entered into with Oregon at the outset of the litigation and, as discussed in the Fee Memorandum, is well within the range of fees that courts in this Circuit and elsewhere have awarded in

securities and other complex class actions with comparable recoveries on a percentage basis.  Moreover, the requested fee represents a multiplier of only approximately 0.77 on Plaintiffs' Counsel's total lodestar—meaning that Lead Counsel's efforts will be compensated at *less than* the prevailing rate for such complex work—which is clearly on the lower end of the range of multipliers typically awarded in class actions with significant contingency risks such as this one.  Thus, a lodestar cross-check also supports the reasonableness of the fee.

11.    Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action for their costs and expenses directly related to their representation of the Class, as authorized by the PSLRA.

12.    For all of the reasons discussed in this Joint Declaration and in the accompanying memoranda and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e).  For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

13.    Plaintiffs allege that, from March 1, 2013 through July 12, 2017, inclusive (the "Class Period"), Defendants made materially false and misleading statements concerning the Company's allegedly fraudulent billing practices and its financial condition.  Specifically, Plaintiffs allege that Defendants engaged in the practice of "cramming" customer accounts—adding unauthorized charges and services to customer accounts—but failed to disclose to investors that the Company's billing practices could be called into question (and in fact denying that the Company engaged in cramming). *E.g.*, ¶¶15, 44, 62-65.  Plaintiffs also allege that Defendants misleadingly attributed CenturyLink's revenue growth to its focus on customer needs, its "bundling" marketing strategy, and adherence to CenturyLink's Unifying Principles of fairness, honesty and integrity and its Code of Conduct.  ¶¶3, 40-42, 58-60.

14.    Plaintiffs allege that the prices of publicly traded CenturyLink common stock and 7.60% Notes were artificially inflated as a result of Defendants' allegedly false and misleading statements, and that the price of these securities declined when the truth was revealed in a series of disclosures on June 16, 2017, June 19, 2017, and July 12, 2017.  ¶¶152, 158, 163, 266.

**B.     Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Operative Complaint, and the Denial of Defendants' Motion to Dismiss**

**1.     Initial Proceedings**

15.     Following the first two alleged corrective disclosures, in June 2017, two securities class action complaints were filed against CenturyLink and certain of its officers and executives in the Southern District of New York. *See Thummeti v. CenturyLink, Inc. et al*, No. 1:17-cv-04695-PGG (S.D.N.Y.); *Craig v. CenturyLink, Inc. et al.*, No. 1:17-cv-04740-PGG (S.D.N.Y.).   In August 2017, those two cases were transferred to the Western District of Louisiana—CenturyLink's home district—and another case, *Scott v. CenturyLink, Inc.*, No. 3:17-cv-01033-SMH-JPM (W.D. La.), was filed there.

16.     On August 21, 2017, Oregon and several other parties, including KBC Asset Management NV ("KBC"), moved for consolidation of all related securities class actions and appointment as Lead Plaintiff.  *See* ECF Nos. 24-29.  On October 19, 2017, Magistrate Judge Joseph H.L. Perez-Montes of the Western District of Louisiana consolidated the three securities cases, and he appointed Oregon Lead Plaintiff the following day. ECF Nos. 79-80.  KBC immediately appealed, arguing that it had the largest loss and thus should have been appointed Lead Plaintiff instead of Oregon.  *See* ECF No. 87.

**2.     Oregon Seeks to Organize the Related Cases**

17.     While Lead Plaintiff proceedings were going on in the Western District of Louisiana, Defendants identified the securities cases to the JPML in an attempt to get the

consumer cases transferred to the Western District of Louisiana.  *See In re CenturyLink Sales Pracs. & Sec. Litig.*, MDL No. 2795 ("JPML"), ECF No. 27.  However, the JPML noticed the securities cases as potential tag-along cases and issues a conditional transfer order sending them to Minnesota.  *See* JPML ECF Nos. 31, 63.  On October 13, 2017, Defendants filed a notice of opposition to the conditional transfer order.  JPML ECF No. 65.  Within days of being appointed Lead Plaintiff, on October 24, 2017, Oregon appeared before the JPML to oppose Defendants' motion to vacate the conditional transfer order.  JPML ECF No. 73.

18.    Around the same time, an additional securities class action, bringing claims identical to those asserted in the Western District of Louisiana cases on behalf of holders of CenturyLink's 7.60% Notes, was filed in the Southern District of New York.  *See Inter-Marketing Grp. USA, Inc. v. CenturyLink, Inc.*, No. 0:18-cv-00299-MJD-KMM ("*IMG*"), ECF No. 1.  On November 3, 2017, Oregon noticed *IMG* as a potential tag-along to the JPML, which issued a conditional transfer order sending *IMG* to Minnesota on November 6, 2017.  *See* JPML ECF Nos. 78, 80.  Then, on December 12, 2017, Oregon moved to intervene in *IMG* seeking, among other things, to vacate the lead plaintiff deadline purportedly established by the notice issued by the plaintiff in *IMG*, and to require publication of a corrected notice to the class.  *See IMG* ECF Nos. 27-28.  The next day, December 13, 2017, Judge Lewis A. Kaplan of the Southern District of New York transferred *IMG* to the Western District of Louisiana.  *IMG* ECF No. 30.  Before the JPML, Oregon and Defendants briefed Defendants' motion to vacate the conditional transfer order sending *IMG* to Minnesota as well.  *See* JPML ECF Nos. 94, 97-99.

19.     On February 1, 2018, the JPML ordered all four securities cases pending in the Western District of Louisiana to be transferred to this Court.  *See* JPML ECF No. 101. This Court subsequently ordered that all pending motions in the four securities cases be refiled in the District of Minnesota.  *See* ECF No. 107.  And so, on February 27, 2018, KBC renewed its appeal of the order appointing Oregon Lead Plaintiff, Oregon renewed its motions for consolidation of *IMG* and for an order vacating the purported Lead Plaintiff deadline publicized by the plaintiffs in that case, and the *IMG* bondholder plaintiff renewed its motion for appointment as lead plaintiff in what they argued should be a separate, bondholder-specific case.  *See* ECF No. 117; *In re CenturyLink Sales Pracs. & Sec. Litig.*, No. 17-md-2795 (D. Minn.) ("MDL"), ECF Nos. 45-50.[5]

20.     On April 17, 2018, this Court held a contested hearing on the pending motions, and KBC withdrew its appeal.  ECF Nos. 135-36.  Then, on April 20, 2018, this Court ordered *IMG* consolidated with the other federal securities class actions under Oregon's leadership.  *See* ECF No. 137.

21.     Following this Court's consolidation order, Oregon continued to carefully monitor for additional related cases whose prosecution could impact the securities claims Oregon was bringing on behalf of the class.  Throughout the summer of 2018, Oregon noticed four derivative cases as potential tag-alongs to the JPML, and successfully secured their transfer to the District of Minnesota before this Court.  *See* JPML ECF Nos. 176, 178.

---

[5] Certain of these motions were filed only in the MDL docket.

### 3.    Drafting the Complaint

22.    On June 25, 2018, Oregon filed the 139-page Complaint. ECF No. 143. The Complaint alleged claims under Section 10(b) of the Exchange Act against CenturyLink and several of its former executives, including Glen F. Post, III (CEO), R. Stewart Ewing, Jr. (CFO), David D. Cole (Controller), Karen Puckett (Global Head of Sales), and Dean J. Douglas (President, Sales and Marketing), and Section 20(a) claims against Post, Ewing, Cole, Puckett, Douglas, and G. Clay Bailey, CenturyLink's former Treasurer.

23.    Before the Complaint was filed, Lead Counsel conducted a comprehensive factual investigation and detailed analysis of the potential claims that could be asserted on behalf of investors in CenturyLink securities. This investigation included, among other things, a detailed review and analysis of voluminous information relating to CenturyLink, including:

- CenturyLink's SEC filings;

- Transcripts of CenturyLink's investor conference calls, press releases, and publicly available presentations;

- CenturyLink's public filings before various regulators, including the FCC, the FTC, and various state telecommunications regulators; and

- An enormous volume of media, news, and analyst reports relating to CenturyLink and the telecommunications industry.

24.    Lead Counsel also conducted an extensive investigation in which it identified and contacted former CenturyLink employees to develop evidence of the underlying misconduct and the individual Defendants' knowledge and/or recklessness concerning the alleged scheme. Specifically, Lead Counsel and its investigators reached

out to hundreds of individuals, spoke with dozens of former employees, and conducted multiple, lengthy interviews with many of them  The Complaint contained information from 19 such former employees who provided key, behind-the-scenes details concerning CenturyLink's sales and billing practices, the Company's treatment of customers and employees, and senior executives' review of information reflecting cramming and related employment data, all of which served as critically-important facts supporting the Complaint's falsity and scienter allegations.

25.    In addition, Lead Counsel worked with a financial economist on loss causation and damages issues, which was particularly important given that there were three different partial corrective disclosures of the alleged fraud in the case.

### 4.    Defendants' Motion To Dismiss

26.    On August 31, 2018, Defendants filed their 34-page motion to dismiss the Complaint, together with an accompanying declaration attaching 27 exhibits totaling more than 500 pages of material.  ECF Nos. 154-161.[6]  In their Motion, Defendants attacked all parts of the Complaint as inadequate to plead securities fraud.  In particular, Defendants argued that:

- Plaintiffs failed to allege falsity with particularity, including because: (i) there was no estimate of any alleged financial impact of cramming, and no restatement; (ii) the former employees' accounts of misconduct amounted to only a few thousand complaints per month, which could not result in a material impact on revenues, particularly in light of CenturyLink's reimbursement of some

---

[6] Defendants filed their motion to dismiss and supporting papers in the MDL docket on August 31, 2018, and in the *Craig* docket on September 11, 2018.  *See* MDL ECF Nos. 276-283; ECF Nos. 154-161.

persons who complained of billing mistakes; (iii) the Complaint failed to allege specifics concerning an internal audit purportedly showing the scope of overbilling, including details about the audit, the financial amount of overbilling, or whether overbilling was intentional or inadvertent;

- Many of the alleged misstatements, including statements concerning CenturyLink's strategies, policies, and business conduct were non-actionable puffery, opinions, or forward-looking statements;

- The former employees that Plaintiffs relied on to establish falsity and scienter were only low-level employees who would not have known about Defendants' knowledge or states of mind, and in any event their allegations were insufficient because they, among other things, described ordinary activity, sporadic instances or reports of cramming, or mere disagreements with management;

- Plaintiffs' other scienter allegations failed, including because the Complaint only alleged access to information, not Defendants' review of it, and because Defendants implemented processes to monitor and respond to customer complaints;

- The Complaint failed to plead loss causation, including because the alleged corrective disclosures involved only contested allegations or speculation, none of the disclosures stated that alleged fraudulent billing impacted CenturyLink's financials, and none of the alleged corrective disclosures described a management-led scheme deliberately hidden from investors; and

- The Section 20(a) claims should be dismissed for failure to plead an underlying violation and certain Defendants' control.

27.    On October 12, 2018, Plaintiffs filed their opposition to Defendants' motion. ECF Nos. 162-63. In summary, Plaintiffs' opposition argued that:

- The Complaint sufficiently alleged that the Company's financial results were materially misleading, including because of allegations showing the frequency and size of overbilling;

- Defendants' statements concerning CenturyLink's sales practices, its commitment to customer service, and its principles of business

ethics were not non-actionable opinions, puffery, or forward-looking statements;

• The Complaint adequately alleged Defendants' scienter, including through former employee allegations that demonstrated Defendants' review of key information demonstrating the scope and significance of misconduct and its impact on the Company's financial results;

• The Complaint adequately pleaded loss causation, including because the complaints constituting the alleged corrective disclosures in the case revealed facts about Defendants' fraud to the market; and

• The Complaint pleaded Section 20(a) control person claims as to all of the individual Defendants.

28.    On November 9, 2018, Defendants filed a reply in further support of their motion to dismiss, together with a supporting declaration with an addition 40 pages of materials. ECF Nos. 164-65. Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Plaintiffs' opposition brief.

29.    On June 7, 2019, the Court held an approximately two-hour oral argument on Defendants' motion to dismiss. ECF No. 172. Following oral argument, Plaintiffs submitted two supplemental letter briefs highlighting developments in the related Minnesota Attorney General action and recent decisions bearing upon the arguments raised in Defendants' motion to dismiss, and Defendants filed responsive submissions. *See* ECF Nos. 176-79.

30.    On July 30, 2019, the Court issued a thorough, 53-page Memorandum and Order in which it sustained Plaintiffs' allegations in their entirety. ECF No. 180.

31.    Among other things, in the Order, the Court held that Plaintiffs had alleged widespread material sales and billing misconduct with particularity, that Defendants'

-15-

alleged misstatements concerning CenturyLink's sales and billing practices were not non-actionable puffery, opinions, or forward-looking statements, and that the Complaint adequately alleged scienter.  In so holding, the Court specifically credited the accounts provided by several former CenturyLink employees, noting that they had specific experience in several relevant areas of CenturyLink's business such that their allegations were grounded in their personal experience.  The Court also held that the Complaint's loss causation allegations were sufficient, and sustained Section 10(b) claims based on the scienter of non-speaking individual Defendants Section 20(a) claims against all individual Defendants.

32.    On August 13, 2019, Defendants filed their answer to the Complaint.  ECF No. 181.  Defendants' strongly denied all allegations against them, as well as any liability to Plaintiffs and the class, and asserted more than 40 affirmative defenses, including (among other things) that (i) Defendants had not made any material misrepresentations; (ii) even if such material misrepresentations were made, the individual Defendants acted with due diligence and neither knew nor reasonably could have known that the statements were misrepresentations; (iii) Plaintiffs and the class knew the alleged truth notwithstanding any material misrepresentations; and (iv) there was no loss causation or damages.

## C.    Discovery

33.    Immediately following denial of Defendants' motion to dismiss, Lead Counsel set out to vigorously pursue discovery and further factual development of Plaintiffs' claims.

34.     In the weeks following the denial of Defendants' motion to dismiss, the Parties negotiated several matters set forth in their Joint Report Pursuant to Rule 26(f) and L.R. 16.2 (the "Joint Report"), which was filed on August 28, 2019.  ECF No. 183. Among other things, as reflected in the Joint Report, the Parties had significant disputes as to several key issues, including, most significantly, whether documents produced in related actions should be ordered re-produced in this case.  *See id.* at 9-14.  The Parties also had significant disputes about whether the deadlines to be set in the case, including the deadlines for substantial completion of document production, expert discovery, and for briefing class certification.  *See, e.g.*, *id.* at 25-26.  Among other things, Defendants sought an extended briefing schedule for class certification, including because involved extensive expert work and depositions.  *See* MDL ECF No. 463 at 52:6-53:15.

35.     At around the same time, the Parties began negotiating a protocol for the production of electronically-stored information ("ESI") and a protective order.  The Parties had numerous disputes concerning terms of each of these as well.

36.     On October 1, 2019, the Court held an approximately two-hour pretrial conference during which the Parties presented argument on their positions on disputed pretrial matters in the Joint Report.  The Court issued a scheduling and case management order and a protective order on October 16, 2019, and an order concerning the production of ESI on October 21, 2019, each of which reflected significant compromises between Plaintiffs' and Defendants' positions on disputed matters.  *See* MDL ECF Nos. 464-65, 478.

-17-

### 1. The Pursuit of Extensive Document Discovery from Defendants and Third Parties

37.    In parallel with negotiations over the schedule and ESI protocol, the Parties began fact discovery.  On September 4, 2019, Plaintiffs served their first requests for the production of documents on Defendants. Plaintiffs requested that Defendants produce documents concerning, among other things, CenturyLink's customer complaints, employment and human resources records, training materials, financial results from various products, and related litigations and investigations.  After determining that it needed certain documents from prior to the Class Period to effectively litigate the case, Lead Plaintiff sought documents from a time period of more than eight years, extending from January 2011—and in some cases, earlier—through September 2019.

38.    On September 17, 2019, the Parties served their Rule 26 initial disclosures. Due in part to their extensive investigation into the claims alleged in the Complaint, at the very outset of discovery, Plaintiffs were able to identify 84 current and former CenturyLink employees and five CenturyLink advisors and auditors who Plaintiffs believed were likely to have discoverable information concerning the allegations in the Complaint.  By contrast, Defendants did not identify any witnesses beyond the former employees referenced in the Complaint and the named Defendants, thus requiring Plaintiffs to conduct extensive additional discovery to identify relevant individuals and documents.

39.    On October 4, 2019, Defendants served their responses and objections to Plaintiffs' first requests for production. In the months that followed, Lead Counsel

engaged in numerous meet-and-confers and extensive negotiations with Defendants' counsel over the scope and adequacy of Defendants' discovery responses, including relating to search terms to be used, custodians whose documents should be searched, applicable timeframes, and other parameters.

40.     In connection with these and other party discovery negotiations, the Parties had several significant discovery disputes.  At a high level, Plaintiffs sought several categories of documents related to alleged sales and billing misconduct (and its effects) from sources throughout the Company, as well as materials produced in related cases, while Defendants aggressively sought to limit production of documents and materials, arguing (among other things) that discovery should focus on the individual Defendants' documents given the nature of the claims at issue here, and that related cases contained significant amounts of discovery that was irrelevant to this case, rendering improper reproduction of those materials here.  In addition to these overarching differences in position, the Parties contested numerous specific details bearing on the scope of discovery, such as the appropriate sets of custodians and search criteria to apply in identifying potentially relevant documents.

41.     While the Parties were able to ultimately reach agreement on that particular issue, they were forced to bring several others to the Court.  For example, months into discovery, the Parties continued to dispute the appropriate scope of discovery from related attorney general actions against CenturyLink.  After failing to obtain reproduction of documents and materials produced in the related actions from the beginning of the case, Plaintiffs sought more targeted discovery from the related matters during the course

of subsequent negotiations with Defendants.  The Parties were unable to reach agreement on those and certain other open issues.  Accordingly, on February 25, 2020, Plaintiffs filed a motion to compel production of documents and materials CenturyLink produced in response to eight specific document requests in the Minnesota Attorney General action, which Plaintiffs identified by reviewing discovery produced by Defendants, as well as an order requiring Defendants to supplement their interrogatory responses and to add a CenturyLink internal complaint email address as a custodian.  *See* ECF No. 211.  After the Parties briefed the motion, the Court held a telephonic hearing on the motion on April 27, 2020, and issued an order partially granting it on May 4, 2020.  *See* MDL ECF Nos. 686, 694.

42.     In addition to this motion to compel, the Parties addressed numerous other discovery matters in regular status conferences before Magistrate Judge Menendez, who heard argument on discovery disputes and addressed the scope of and responses to document requests, interrogatories, scheduling and other discovery matters in at least eight such hearings or conferences.

43.     Ultimately, after weeks of negotiations, numerous meet-and-confers, and, in certain instances, bringing discovery issues to the Court, Plaintiffs succeeded in obtaining a large volume of documentary evidence from Defendants. In total, Lead Counsel

obtained and analyzed a discovery record consisting of more than 2.2 million pages of documents from Defendants.[7]

44.    As Lead Counsel continued to receive and review documents from Defendants, Lead Counsel identified several third parties who it determined likely had relevant information.  Thus, in addition to seeking discovery from Defendants, Plaintiffs served subpoenas on 30 third parties.  These third parties included CenturyLink's auditors and companies to whom CenturyLink outsourced various aspects of its sales and billing work.  Lead Counsel held dozens of meet and confers with these third parties—many of which were difficult and contentious—before receiving document productions.  During these meet and confers, Lead Counsel negotiated with each third party the scope of the third party's document production, including the applicable date range, search terms, and custodians.  In some cases, Plaintiffs also negotiated with counsel for the various third parties addendums to the Protective Order in case in this case so that Plaintiffs could effectively use the third party documents as exhibits during depositions.

45.    As a result of Plaintiffs' efforts in third party discovery, Plaintiffs obtained more than 233,000 pages of documents from third parties, many of which proved important to Plaintiffs' prosecution of the action, particularly with respect to expert discovery.  For example, documents obtained from CenturyLink's public relations firm

_____

[7] Plaintiffs served a second set of document requests, comprising an additional six document requests, on June 12, 2020.  Defendants served responses and objections to Plaintiffs' second set of document requests on July 13, 2020.  In those responses and objections, Defendants represented that they had already produced materials responsive

helped bolster evidence supporting Plaintiffs' loss causation arguments and supported testimony provided by Plaintiffs' expert concerning the materiality of the disclosures and their impact on the Company's stock price.

46.    The chart below identifies the recipients of the third party subpoenas issued by Plaintiffs, the dates of the subpoenas, and a general description of the role of the subpoenaed entity:

| Subpoenaed Entity | Date | Role in Case |
|---|---|---|
| Ernst & Young LLP | September 26, 2019 | Audit firm |
| KPMG LLP | September 26, 2019 | Audit firm |
| Grant Woods, P.C. | May 11, 2020 | Law firm |
| O'Melveny & Myers LLP | September 26, 2019 | Law firm that advised Special Committee of Board of Directors |
| Alvarez & Marsal Disputes and Investigations, LLC | September 26, 2019 | Expert firm that examined billing practices |
| Great Place to Work Institute, Inc. | June 11, 2020 | Human resources consulting firm |
| Joele Frank | December 19, 2019 | Public relations firm |
| Purple Strategies, Inc. | May 11, 2020 | Public relations firm |
| FINRA | September 26, 2019 November 7, 2019 | Regulator |

to the six additional document requests in connection with their productions in response to Plaintiffs' first set of document requests.

| **Subpoenaed Entity** | **Date** | **Role in Case** |
|---|---|---|
| Alorica, Inc. | May 6, 2020 | Customer service provider and call center operator |
| Communication Solutions, LLC | May 6, 2020 | Customer service provider and call center operator |
| Empereon Marketing LLC | May 6, 2020 | Customer service provider and call center operator |
| Etech Global Services LLC | May 6, 2020 | Customer service provider and call center operator |
| Focus Services LLC | May 6, 2020 | Customer service provider and call center operator |
| KM² Solutions, LLC | May 6, 2020 | Customer service provider and call center operator |
| Qualfon Corporation | September 26, 2019 | Customer service provider and call center operator |
| Teleperformance USA | May 6, 2020 | Customer service provider and call center operator |
| TMOne, LLC | May 6, 2020 | Customer service provider and call center operator |
| TSD Global, Inc. | May 6, 2020 | Customer service provider and call center operator |
| VXI Global Solutions, Inc. | May 6, 2020 | Customer service provider and call center operator |
| AFNI, Inc. | June 11, 2020 | Collection agency |
| Allied Interstate LLC | June 11, 2020 | Collection agency |
| Amalgamated Financial Group | June 11, 2020 | Collection agency |
| Convergent Outsourcing, Inc. | June 11, 2020 | Collection agency |
| EOS-CCA | June 11, 2020 | Collection agency |

| **Subpoenaed Entity** | **Date** | **Role in Case** |
|---|---|---|
| GC Services, LP | June 11, 2020 | Collection agency |
| I.C. Systems, Inc. | June 11, 2020 | Collection agency |
| Robinson, Reagan & Young, PLLC | June 11, 2020 | Collection agency |
| Southwest Credit Systems, L.P. | June 11, 2020 | Collection agency |

47.    In total, Defendants and third parties together produced nearly 578,000 documents, totaling nearly 2.5 million pages, to Plaintiffs.

48.    As Lead Counsel received documents, it reviewed and analyzed those documents through regular team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues, and creating timelines of events and memoranda concerning key themes germane to the case. The magnitude and complexity of the documents was substantial—totaling 2.5 million pages, spanning more than nine years, and including, among other things, emails, complaint documentation, internal finance memoranda, financial statements, audit-related documents, internal analyses of income from various sources, and board materials.

49.    For their part, Defendants aggressively pushed to curtail Plaintiffs' third-party discovery efforts.  On July 16, 2020, Defendants moved for a protective order requiring Plaintiffs to withdraw subpoenas it had issued to CenturyLink debt collectors and a human resources survey company.  *See* ECF Nos. 280-88.  On August 17, 2020, the

Court heard Defendants' motion and, on October 28, 2020, the Court partially granted the motion. ECF No. 345.

### 2. Plaintiffs' Review of Defendants' and Third Parties' Documents and Other Materials

50. As part of its discovery efforts, Lead Counsel assembled a team of staff attorneys that, at various points in the litigation and depending on what Lead Counsel needed to accomplish, ranged in size from three to approximately 20 attorneys. This team included many lawyers who have worked with Lead Counsel for years and have substantial experience on other significant class actions. Their biographies, along with those of all lawyers who worked on this case, are attached hereto in Exhibits 5A, 5B, 5C, 5D, and 5E. As explained below, this team was integral in helping Lead Counsel review and analyze the documentary record, assist expert witnesses, and compile the strongest evidentiary support for Plaintiffs' claims.

51. Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently. Lead Counsel eschewed a "linear" review, whereby Plaintiffs' review team would attempt to review each and every document Defendants and third parties produced. Instead, Plaintiffs constructed a highly focused process by creating searches to identify documents likely to be related to key themes that were relevant to specific claims at issue in the case. Plaintiffs developed their process by closely reviewing notes from their pre-Complaint investigation and numerous other materials, such as materials produced and filed in connection with attorney general investigations of CenturyLink, information provided by Defendants in their interrogatory

responses and during the course of meet-and-confers, and information provided by Plaintiffs' experts. Plaintiffs further continuously updated the search protocols as they discovered more information throughout the course of discovery. Thus, Plaintiffs took significant steps to ensure that their review of materials produced in this litigation was highly focused and efficient, and would not waste time or other resources.

52.    As part of this process, Lead Counsel reviewed, analyzed, and categorized the documents in the case's electronic database. Before beginning, Lead Counsel developed a search protocol, issue "tags," and guidelines for identifying "hot" documents, as well as a written manual with guidelines for the review and "coding" of documents. Using these tools, Lead Counsel tasked its attorneys with reviewing documents, with the documents most likely to be "hot" put into prioritized batches for review. Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document— including whether each document was "hot," "highly relevant," "relevant," or "irrelevant." For important case documents, attorneys documented their substantive analysis of the documents' relevance and import by making notations on the document review system, explaining what portions of the documents were important, how they related to the issues in the case, and why the attorney believed that information to be significant. Attorneys also "tagged" the specific issues that documents related to, such as analyst or investor communications, sales and billing systems, cramming and other unethical behavior, and employee discipline. Given the dynamic, evolving nature of

discovery, Lead Counsel frequently revised and refined its tools, techniques, and "tags" as it developed its understanding of the issues.

53.    Throughout its review, Lead Counsel also analyzed the adequacy and scope of the document productions by Defendants and third parties.  For example, attorneys reviewed privilege redactions and entries in Defendants' privilege logs to assess whether Defendants redacted or withheld potentially non-privileged information.  Lead Counsel also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to document requests.  Where Lead Counsel identified deficiencies in a document production, Lead Counsel challenged Defendants or the producing party to set forth the basis for privilege or otherwise address and correct the deficiency.

54.    In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in weekly meetings with the full litigation team. In advance of these meetings, "hot" documents and documents that raised questions for discussion that had recently been reviewed and analyzed were compiled and circulated to the broader teem.  At the meetings, Lead Counsel discussed those documents, including the reasons they were identified as "hot," attorneys asked questions and discussed similar documents that had been reviewed, and the team generated ideas for research projects and work product following up on open issues. These efforts ensured that the entire litigation team learned of and understood the documentary evidence being developed, provided an opportunity for Lead Counsel to further refine its legal and factual theories, focused the document-review team on

developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently. Lead Counsel also often conducted follow-up research and drafted memoranda concerning topics of interest that arose at these meetings. In total, Lead Counsel's team researched and drafted memoranda concerning literally dozens of discrete issues, including in-depth analyses concerning, among other things, the evolution of the "behavioral coaching" change described in the Complaint, quantification of cramming and billing misconduct, CenturyLink's internal billing and quotation systems, its complaint intake and handling processes, and its human resources and training systems and processes related to sales errors and misconduct.

55.     In addition, Lead Counsel prepared chronologies of events, and maintained a central repository of key documents organized by issue, which it continually updated and refined as the team's knowledge of issues expanded. This step enabled attorneys to quickly and efficiently access critical documents necessary for the preparation for depositions and drafting of evidentiary submissions to the Court.

56.     At the outset of Lead Counsel's document review efforts, Lead Counsel determined that it would be most efficient to utilize in-house litigation support resources at Bernstein Litowitz, which provided a far more cost-effective document review platform and algorithm-based "technology-assisted review" ("TAR") (also known as "predictive coding") than those provided by third-party vendors. The TAR software enabled Lead Counsel to further streamline the review by "learning" the coding of documents as they were reviewed and applying that information to subsequently prioritize further review. While Lead Counsel could not rely on this machine algorithm to

identify all of the necessary documents to prosecute this Action, it did use the algorithm to further streamline its review and to prioritize the review of documents most likely to be relevant to the claims at issue in the case.

### 3.   Defendants' Document Requests to Plaintiffs

57.   Defendants served their first set of document requests to Plaintiffs, comprising 16 document requests, on October 1, 2019.  Plaintiffs responded and objected to those requests on October 31, 2019.  Defendants served their second set of documents requests, comprising a further nine document requests, on February 3, 2020.   In connection with Defendants' document requests, Plaintiffs engaged in extensive meet-and-confers with Defendants to discuss the scope of Plaintiffs' responsive document production.

58.   In response to Defendants' document requests, the Parties had further, significant discovery disputes.  While fighting off a potential motion to compel from Defendants, Lead Counsel worked with Oregon and Vildosola to gather potentially relevant and responsive materials.   Lead Counsel then reviewed those documents carefully, and subsequently produced the relevant, responsive, nonprivileged documents in Plaintiffs' possession.

59.   Plaintiffs made their first production of documents to Defendants on January 3, 2020, their second production on January 29, 2020, their third production on February 24,2020, and their fourth production on February 28, 2020.  In total, Plaintiffs produced over 543,000 pages of documents to Defendants.

### 4.    Interrogatories

60.    On September 4, 2019, Plaintiffs served their first set of interrogatories on Defendants.  Plaintiffs' interrogatories focused on identifying information concerning complaints and investigations related to the underlying allegations of cramming and billing misconduct in the case, including information related to government investigations into such conduct beyond those discussed in the Complaint.  On October 4, 2019, Defendants served their responses and objections to Plaintiffs' first set of interrogatories.

61.    On January 31, 2020, Plaintiffs served their second set of interrogatories on Defendants.  These sought detailed information concerning fees CenturyLink charged customers, including information concerning proceeds from fees, the use of fees as "gap closers" to meet revenue projections, and industry-specific codes associated with those fees, as well as information concerning CenturyLink's termination of employees.  Defendants served responses and objections to Plaintiffs' second set of interrogatories on March 2, 2020.

62.    Plaintiffs served a third set of interrogatories on June 12, 2020, seeking information concerning data contained in one of the documents Defendants had produced.  Defendants served responses and objections to the third set of interrogatories on July 13, 2020.

63.    The Parties met and conferred over the scope of interrogatory responses throughout discovery.  Defendants served amended responses to Plaintiffs first and

second set of interrogatories on May 29, 2020, and further supplemented their response to one of interrogatories contained in Plaintiffs first set of interrogatories on July 10, 2020.

64.    Plaintiffs carefully reviewed Defendants' interrogatory responses to tailor their discovery efforts and shape and inform Plaintiffs' factual and expert analyses.

### 5.    Analysis of Witnesses and Preparation of Deposition Plan

65.    The Parties reached a settlement in principle on the eve of Plaintiffs taking their first fact depositions.  Up to that point, however, Plaintiffs had prepared extensively for depositions in the case. Indeed, Plaintiffs had prepared a full deposition program, including an order of deponents and schedule, had secured dates for certain depositions, and were in the process of negotiating dates for others with Defendants.  Plaintiffs and Defendants had numerous disputes about the deposition program, including concerning the timing of certain depositions and the availability of certain deponents, which they were working to resolve at the time the settlement was reached.

66.    To build an efficient and effective deposition program, Lead Counsel constructed "key players" lists compiled from various sources, including: (i) its investigation in connection with the Complaint; (ii) document searches, including analyses of hot documents; and (iii) corporate-organization charts produced by Defendants. This process involved considerable effort given the volume of Defendants' productions and the expansive nature and time period of the alleged fraud.

67.    Once deponents were identified, effectively preparing for depositions required that Lead Counsel devote substantial time, effort, and resources.

68.     One of Lead Counsel's most significant projects in preparation for the depositions—both in terms of time and effort as well as substantive importance—was the preparation of detailed "deposition kits."  These kits typically consisted of hundreds of documents with an index summary.  The kits also included a detailed memorandum analyzing those documents and the witness's background, likely areas of knowledge, and role in the events at issue in the case.  In addition, as noted above, the attorney team prepared memoranda concerning several key issues in the case, which were used to prepare for the depositions of each witness who was involved with that issue.

69.     Lead Counsel prepared deposition kits for numerous fact witnesses.  Preparing deposition kits required a comprehensive, deep dive into each witness's associated materials, including their: (i) custodial documents, i.e., documents the deponent drafted, received, or maintained in their files; (ii) role in the events at issue, including with respect to information in relevant documents they may not have personally reviewed; (iii) prior relevant testimony or interviews; and (iv) information gleaned from public searches.  The preparation of each kit required the analysis of myriad documents in the particular context of each witness, as well as the exercise of professional judgment in narrowing down which documents to present to that deponent.  As the kits were prepared and refined, the attorneys preparing to take the depositions worked closely with the attorneys tasked with creating the relevant kits.

**D.     Expert Discovery**

70.     Plaintiffs also undertook extensive work with experts in connection with their prosecution of the case.  Lead Counsel worked with its experts closely throughout

each step of expert discovery to analyze the strengths and weaknesses of the case. This process involved careful analysis of the depositions and documents produced by Defendants and third parties, as well as critical and strategic thinking about how best to use the evidence gathered throughout discovery to survive summary judgment and prove Plaintiffs' claims at trial.

71.    Soon after discovery commenced, Plaintiffs retained Michael Starkey, president and founding partner of QSI Consulting, a telecommunications consulting expert with significant experience consulting for large telecommunications companies and other entities including AT&T, Comcast, T-Mobile, and the U.S. Government, as well as serving on three state utility commissions. Mr. Starkey and his team provided Plaintiffs with background information concerning the structures, systems, and processes associated with sales and billing at a large telecommunications company, consulted on discovery issues (including by helping to direct Plaintiffs' review of documents, identifying key sales- and billing-related issues, and analyzing technical documents), and was in the process of putting together an expert report concerning the scope of sales and billing misconduct at CenturyLink at the time the Parties reached an agreement to settle the case in principle.

72.    Plaintiffs also worked closely with Dr. Michael Hartzmark., an economist and experienced testifying expert, to analyze class certification and damages issues, as discussed in more detail below.

**E.    Class Certification**

73.    On January 21, 2020, Plaintiffs filed their motion for class certification and appointment of class representatives and class counsel, requesting that the Court certify a class comprising all persons and entities who purchased or otherwise acquired publicly traded CenturyLink common stock or 7.60% Notes between March 1, 2013 and July 12, 2017, inclusive, and were damaged thereby. ECF Nos. 188-94.    Plaintiffs' motion attached and was supported by the expert report of Dr. Hartzmark, who opined that the markets for CenturyLink common stock and 7.60% Notes were efficient throughout the Class Period, and that damages for investors in CenturyLink common stock and 7.60% Notes could be calculated through a common methodology.  ECF No. 191-3.

74.    In connection with their opposition to Plaintiffs' class certification motion, Defendants deposed two representatives from Oregon, Mr. Vildosola, and Dr. Hartzmark. Lead Counsel (i) reviewed Oregon's and Mr. Vildosola's documents, as well as materials relied on by Dr. Hartzmark in preparing his report and other expert reports he had drafted, (ii) prepared each deponent for their depositions, and (iii) defended the depositions, which occurred in Portland, OR, San Diego, CA, and Palo Alto, CA, asking additional questions where appropriate.

75.    On March 23, 2020, Defendants opposed Plaintiffs' motion for class certification.  ECF Nos. 226-28.  Defendants supported their opposition with the expert report of Mr. Bruce Deal of Analysis Group.  ECF No. 227-1.  Among other things, Defendants argued, based on Mr. Deal's analysis and the Eighth Circuit's decision in *Best Buy*, that they had rebutted the *Basic* presumption of reliance because the alleged

misrepresentations in the case were not reliably associated with increases in the prices of CenturyLink common stock, and that investors were on notice of allegations of billings errors or misconduct during the class period in any event. Defendants also argued that Dr. Hartzmark's analysis failed to adequately show that damages could be calculated on a classwide basis, and that Oregon and Mr. Vildosola were inadequate class representatives. Finally, Defendants argued that if the Court certified a class, it should end on June 16, 2017, when *Bloomberg* published an article identifying the whistleblower lawsuit that triggered the filing of this action, instead of on July 12, 2017—the date of the final corrective disclosure alleged in the Complaint.

76.     Plaintiffs deposed Mr. Deal on April 24, 2020. During the deposition, Lead Counsel obtained significant testimony from Mr. Deal relating to several aspects of his analysis, including securing his admission that price increases would not be expected in connection with misrepresentations like those at issue in this case.

77.     Plaintiffs responded to Defendants' arguments in their reply in further support of their class certification motion, which was filed on May 5, 2020. ECF Nos. 249-54. Among other things, Plaintiffs argued that Defendants had failed to proffer evidence demonstrating an absence of price impact, that damages were clearly capable of being calculated on a classwide basis, that Oregon and Mr. Vildosola were adequate class representatives, and that Defendants' arguments about truncating the class period were incorrect and were, in any event, loss causation arguments that were inappropriate for resolution at the class certification stage. Plaintiffs supported their arguments with a

second expert report of Dr. Hartzmark, which opined on infirmities in Mr. Deal's analysis. ECF No. 251-1.

78. On Friday, May 8, 2020, Defendants filed a motion seeking leave to file a sur-reply in further opposition to Plaintiffs' class certification motion, to reopen the deposition of Dr. Hartzmark, to adjourn the class certification hearing, and seeking an in-person evidentiary hearing on price impact and other issues. *See* ECF Nos. 255-60. The following Monday, May 11, 2020, Plaintiffs filed an opposition to Defendants' motion. ECF Nos. 261-62. Following the submission of these motion papers, the Parties negotiated to determine whether they could reach agreement as to additional class certification depositions and briefing and resolve their dispute without Court assistance. On May 28, 2020, the Parties filed a stipulation whereby Defendants would be permitted to re-depose Dr. Hartzmark and file a sur-reply, and Plaintiffs would be permitted to file a sur-sur-reply and, in the event Mr. Deal submitted a second report, to depose him.

79. Defendants took a second deposition of Dr. Hartzmark on June 5, 2020, and on June 12, 2020, Defendants filed a sur-reply in further opposition to Plaintiffs' class certification motion. ECF No. 267. Defendants reiterated their arguments in their sur-reply that they had successfully rebutted the *Basic* presumption, including because they were only required to meet a burden of production in doing so, and that Plaintiffs' damages model was insufficient under *Comcast*. On June 19, 2020, Plaintiffs filed a sur-sur-reply responding to Defendants' arguments. ECF Nos. 270-71.

80. On July 29, 2020, the Court held a 1.5 hour oral argument on Plaintiffs' class certification motion. ECF No. 297.

81.     On September 14, 2020, the Court issued a decision and order granting in full Plaintiffs' class certification motion.   ECF No. 321.   The Court reviewed the requirements for class certification under Rule 23(a) and 23(b), finding that Plaintiffs had established that all were met. In doing so, the Court rejected Defendants' arguments that there was no price impact for the misrepresentations alleged in the Complaint, that Plaintiffs had failed to establish that they could reliably measure damages, that Oregon and Mr. Vildosola were inadequate class representatives, and that the class period should end after the first alleged corrective disclosure.

### F.     Defendants' Rule 23(f) Petition

82.     Following the Court's decision granting Plaintiffs' motion for class certification, on September 28, 2020, Defendants filed a petition with the Eighth Circuit Court of Appeals seeking permission to appeal the Court's class certification order.   *See State of Oregon v. CenturyLink, Inc., et al*, No. 20-8011 (8th Cir.), Entry ID No. 4961130. Defendants' 23(f) petition substantively reiterated Defendants' arguments from the class certification briefing, contending that the Court had erred in granting class certification on several grounds, including by failing to apply a burden of production standard to Defendants' price impact rebuttal evidence, and by purportedly improperly requiring Defendants to disprove price impact on both the front-end (*i.e.*, at the time misrepresentations were made) and on the back-end (*i.e.*, at the time the truth was allegedly revealed), and therefore ignoring some of Defendants' price impact evidence.

83.     The following day, Defendants moved this Court to stay this case pending resolution of the Rule 23(f) petition and any subsequent appeal.   ECF Nos. 323-28.

Defendants argued that a stay was warranted because their Rule 23(f) petition raised novel and serious legal questions and any efforts in this case could have ended up being wasteful in the event the Eighth Circuit granted the Rule 23(f) petition or decided any subsequent appeal in Defendants' favor.

84.     On October 8, 2020, Plaintiffs filed an opposition to Defendants' Rule 23(f) petition. *See State of Oregon v. CenturyLink, Inc., et al*, No. 20-8011 (8th Cir.), Entry ID No. 4964130.  In their opposition, Plaintiffs argued that the Court's Class Certification Order was correct.  Among other things, Plaintiffs argued that the Court had correctly and repeatedly found that Defendants' price impact evidence failed to meet even a burden of production standard, and that the Court had reached that conclusion after analyzing both the front- and back-end price impact evidence Defendants offered.  On October 13, 2020, Plaintiffs filed a brief in opposition to Defendants' motion for a stay.  *See* ECF Nos. 338-40.[8]

85.     On October 27, 2020, the Eighth Circuit denied Defendants' 23(f) petition. *See State of Oregon v. CenturyLink, Inc., et al*, No. 20-8011 (8th Cir.), Entry ID No. 4970015.

## III.    MEDIATION AND SETTLEMENT

86.     In late 2019—with fact discovery underway, and class certification briefing on the horizon—the Parties agreed to try to resolve this case through mediation.  In early January 2020, the Parties retained retired United States District Judge Layn Phillips, one

of the nation's preeminent mediators of complex litigation, including securities class actions.  *See* Declaration of Layn R. Phillips (the "Phillips Decl."), attached hereto as Exhibit 1, at ¶¶2-5.  Judge Phillips was particularly well-suited to mediate this action given his prior involvement in mediating the consumer class action settlement.  *See* MDL ECF No. 470.

87.     After retaining Judge Phillips, the Parties scheduled a full-day mediation session in Corona Del Mar, California on February 4, 2020.  *Id.* at ¶6.  Mr. de Haan of the Oregon Department of Justice attended the mediation, while Mr. Vildosola communicated with Lead Counsel and was updated on the progress of the Parties' negotiations during the mediation.

88.     In advance of the mediation session, the Parties exchanged detailed mediation submissions concerning the liability and damages issues in the case.  *Id.* at ¶7.  Through this briefing, and during the first mediation session, it was clear that the disagreements between the Parties were many and complex, and the Parties remained extremely far apart.

89.     Following the Court's order granting Plaintiffs class certification motion and the Eighth Circuit's denial of Defendants' Rule 23(f) petition, and in advance of the beginning of fact depositions, the Parties recognized that there was an opportunity to re-engage about resolving the case.  The Parties engaged in direct negotiations that were productive but, again, unsuccessful.

---

[8]  Plaintiffs filed a corrected brief in opposition Defendants' motion for a stay on October

90.    In October 2020, the Parties renewed settlement discussions.    While the Parties continued to make progress, they were unable to reach resolution on their own. And so, in early November 2020, the Parties returned to mediation with Judge Phillips. At the conclusion of those negotiations, Judge Phillips issued a mediator's recommendation to resolve the case for $55 million in cash.  *Id.* at ¶9.  Per Judge Phillips' deadline, on November 4, 2020, the Parties accepted the recommendation.  The Parties' agreement in principle was memorialized in a term sheet executed on November 19, 2020 (the "Term Sheet").

91.    Following the execution of the Term Sheet, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.  On January 29, 2021, the Parties executed the Stipulation, which embodies the final and binding agreement to settle the Action.  On February 2, 2021, Plaintiffs submitted the Parties' Stipulation to the Court as part of their motion for preliminary approval of the Settlement.  ECF Nos. 351-55.

92.    On March 18, 2021, the Court heard and granted Plaintiffs' motion for preliminary approval of the settlement, approved the proposed procedure for providing notice of the Settlement to potential class members, and set July 20, 2021 as the date for the final approval hearing. ECF No. 360.  The $55 million Settlement Amount was deposited into an escrow account and has been earning interest for the benefit of the Class.

---

15, 2020.  ECF No. 339.

## IV.    RISKS OF CONTINUED LITIGATION

93.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $55 million cash payment.  To Lead Counsel's knowledge, the Settlement represents (if approved) one of the ten largest securities class action settlements in the history of this District, and the single largest securities class action recovery on behalf of investors in a publicly traded company in the District of Minnesota exclusively alleging claims under Sections 10(b) and Section 20(a) of the Exchange Act where there was not a related SEC investigation or criminal U.S. Department of Justice inquiry.  It is also larger than the combined settlements CenturyLink paid to resolve the related consumer class action and attorney general investigation matters, and represents a significant portion of the recoverable damages in the Action as determined by Plaintiffs' damages expert—particularly after considering Defendants' substantial arguments with respect to liability, loss causation and damages. These arguments created a significant risk that, after years of protracted litigation, Plaintiffs and the Settlement Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

### A.    The Risks of Prosecuting Securities Actions In General

94.    In recent years, securities class actions have become riskier and more difficult to prove given changes in the law, including numerous United States Supreme Court decisions. For example, data from Cornerstone Research show that, in each year between 2010 and 2017, approximately half of all securities class actions filed were dismissed, and the percentage of dismissals was as high as 57% in 2013. *See* Cornerstone Research, *Securities Class Action Filings 2019 Year In Review* (2020),

attached hereto as Exhibit 8, at 16. In fact, well-known economic consulting firm NERA found that, in 2020, "both the number of cases settled and the number of cases dismissed reached 10-year record levels—settled cases reaching a record low and dismissed cases reaching a record high," and further that over 77% of the case resolutions in 2020 were in favor of Defendants. *See* Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA Economic Consulting (Jan. 25, 2021), attached hereto as Exhibit 9, at 1, 11-12.

95.    Even when they have survived motions to dismiss, securities class actions can be defeated either at the class certification stage, in connection with *Daubert* motions or at summary judgment. For example, class certification has been denied in several recent securities class actions in connection with the Eighth Circuit's decision in *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775 (8th Cir. 2016) ("*Best Buy*"), which posed significant challenges for Plaintiffs here, as well as the other decisions addressing the "price maintenance" theory of reliance at issue in *Best Buy*. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (citing *Best Buy* and holding that "[a] theory that statements maintained an inflated stock price is not evidence that can refute otherwise overwhelming evidence of no price impact"); *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 2017 WL 2728399, at *4 (D. Minn. June 23, 2017) (denying request to file new motion for class certification following vacatur by Eighth Circuit). Indeed, to Plaintiffs' knowledge, the class certification decision in this case represents the first time a District Court in the Eighth Circuit had explicitly addressed the price maintenance theory following *Best Buy*. And

even beyond *Best Buy*, class certification has been denied in numerous cases in recent years. *See, e.g.*, *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), *reconsideration denied*, 2018 WL 3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied*, *Oklahoma Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F.Supp.3d 193 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *Smyth v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012).

96. Multiple securities class actions also recently have been dismissed at the summary judgment stage. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *6 (D. Or. May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690 (D. Minn. 2009) (granting summary judgment on loss causation grounds after seven years of litigation); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305 (S.D.N.Y. September 13, 2017) (summary judgment granted in 2017 after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*,

2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 113 (D. Mass. 2010), *aff'd sub nom. Mississippi Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010).  And even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions. *See, e.g.*, *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

97.    Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, and have gone to trial, there are still very real risks that there will be no recovery or substantially less recovery for class members.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010. 2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011).  In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. *Id.* at *38. In 2012, the Eleventh Circuit affirmed the district court's ruling,

finding that there was insufficient evidence to support a finding of loss causation. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

98.    There is also the increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended.  The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) ("*Morrison*").  As a result, many cases have been lost after thousands of hours have been invested in briefing and discovery.  For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs finding Vivendi acted recklessly with respect to 57 statements, the district court granted judgment for defendants following a change in the law announced in *Morrison*. 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).  Changes in law at the Circuit level has similarly upended pending cases; for example, in *Murphy v. Precision Castparts Corp.*, the court reconsidered its denial of summary judgment and granted it for defendants based explicitly on an intervening Ninth Circuit decision. 2021 WL 2080016, at *6.

99.    The risk of an intervening change in the law is particularly salient in this case.  On August 21, 2020, defendants in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* filed a petition for a writ of *certiorari* to the Supreme Court,

seeking review of the Second Circuit's decision affirming the district court's grant of class certification. *See* Petition for Writ of Certiorari, *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, (U.S. filed August 21, 2020).[9]  The petition identified the following issues as being presented by the appeal: "Whether a defendant in a securities class action may rebut the presumption of classwide reliance . . . by pointing to the generic nature of the alleged misstatements" and "Whether a defendant seeking to rebut the *Basic* presumption has only a burden of production or also the ultimate burden of persuasion." *Id.* at (I).  That petition was granted on December 11, 2020, and a decision is pending in that appeal.  *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 950 (2020).

100.    Here, Defendants had argued that many of the statements at issue were non-actionable because they were generic (*see In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 727-28 (2019)) and that Defendants bore only a burden of production, rather than a burden of persuasion, in rebutting the *Basic* presumption (*see* ECF No. 226 at 10-11; ECF No. 267 at 2-3). While Plaintiffs have defeated those arguments so far under the present state of the law, there is a significant risk that the Supreme Court's forthcoming decision in *Goldman Sachs* could materially change the applicable law.  For example, the Supreme Court could rule that price maintenance is not a viable theory in connection with price impact, which would likely prevent this case from proceeding as a class action, and moreover, could result in dismissal for the claims

---

[9]  The Petition is available at: https://www.supremecourt.gov/DocketPDF/20/20-222

of individual plaintiffs (like Oregon and Mr. Vildosola) who are unable to demonstrate reliance under a newly articulated standard.

101.    In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation, and the nature and circumstances of this case in particular presented heightened risks of such a dismissal based on an intervening change in law.

### B.    The Substantial Risks of Proving Defendants' Liability and Damages in This Case

102.    While Plaintiffs believe that their claims have merit, they faced substantial risks that Defendants would succeed in eliminating all or part of the case in connection with summary judgment, pre-trial motions, at trial, or on post-trial appeal.

103.    From a "big picture" perspective, such risks were heightened here because this case lacked certain obvious badges of fraud that can provide significant tailwinds for the plaintiffs' discovery efforts and overall case. For example, there was no parallel SEC action against CenturyLink that Plaintiffs could use to support its case or guide its discovery efforts. Further, CenturyLink has not issued any restatement of financial results. This was significant because CenturyLink has settled related consumer and Attorney General cases for relatively modest amounts, and Defendants have argued that any financial misrepresentations were immaterial for various reasons, including that any amounts CenturyLink obtained by billing errors or misconduct were small, CenturyLink may have lost money due to certain instances of billing errors or employee misconduct,

/150881/20200821094223302_Goldman%20Sachs%20cert%20petition%20FINAL.pdf

and CenturyLink reimbursed customers who were overbilled. Moreover, there was no significant insider stock selling.

104. Thus, there was no track record of success or "playbook" for successfully prosecuting securities fraud class claims in this context. In the face of this uncertainty, Plaintiffs and Lead Counsel committed extremely significant resources to this case and achieved success. As set forth in more detail below, Plaintiffs faced substantial challenges to proving liability for their claims, and to proving significant damages. In light of these risks, the significant, immediate benefit of the $55 million Settlement is a particularly strong result for the Class.

### 1. Risks Associated With Proving Falsity and Materiality

105. The alleged false and misleading statements in this case include misstatements and omissions concerning: (i) CenturyLink's business strategies and the reasons for its financial performance; (ii) Defendants' secret attempt to address the Company's cramming crisis; (iii) CenturyLink's purported business integrity and honest sales practices; (iv) CenturyLink's regulatory risks; (v) known trends and uncertainties as set forth in Item 303 of Regulation S-K; and (vi) CenturyLink's financial results, which were allegedly inflated with illicit proceeds generated by cramming. In their motion to dismiss and in their opposition to Plaintiffs' class certification motion, Defendants argued that none of these statements were false nor material to investors. While Plaintiffs prevailed in defeating Defendants' motion to dismiss and obtained certification of the class, Defendants would have remained free to relitigate any of their arguments at

summary judgment or trial, where the applicable standards would likely have been more challenging for Plaintiffs.

106.    To start, Defendants likely would have raised a host of challenges to the materiality of any allegedly concealed misconduct.  Defendants likely would have argued that customer complaints are routine at any telecommunications company, and that, even assuming any misconduct occurred, its scope was small relative to CenturyLink's size, whether measured by its number of customers, number of employees, or overall revenues—thus rendering it immaterial to the Company's investors.  Defendants would have adduced significant evidence in favor of this argument: in connection with the related consumer class action cases, CenturyLink offered testimony and evidence suggesting that cramming was not widespread and, in connection with Board of Directors' investigation (described in more detail below), the Special Committee concluded that "evidence did not show that cramming was common at the Company." Ex. 10.

107.    In a similar vein, Defendants likely would have argued that the financial impact of any alleged misconduct was even smaller still—particularly because CenturyLink investigated complaints and routinely reimbursed customers who were mis-billed, and therefore did not retain those monies as revenues.  Defendants also were likely to argue that, in at least some instances, billing errors would have resulted in losses for the Company, further undermining the notion that cramming was material to CenturyLink's bottom-line financial performance or that Defendants deliberately misled investors.

108.    In support of these contentions, Defendants likely would have pointed to internal documents reflecting that there were very few customer complaints specifically identified as being cramming-related in CenturyLink's internal systems, that CenturyLink investigated instances of alleged cramming, and that it reimbursed certain customers who were overcharged.  They also likely would have pointed to the fact that CenturyLink has settled related cases and government investigations for arguably modest amounts— contrasting them to the hundreds of millions or billions of dollars in liability discussed by the media when consumer class actions were filed in 2017—as further evidence that any alleged misconduct could not have been material to the Company's operations or financial results.

109.    Indeed, Defendants likely would have contrasted the settlements here to those reached in connection with the "fake account" scandal at Wells Fargo, which Plaintiffs employed as a comparison at the pleading stage.  *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 727-28.  Defendants would have argued that the fines and consumer settlements here are miniscule in comparison to the over $3 billion in fines and other sanctions paid to the SEC and federal prosecutors and regulators by Wells Fargo in connection with the "fake accounts" scandal at the bank, citing the difference as strong evidence that any alleged misconduct here was orders of magnitude less material.

110.    While these and other similar arguments were too fact-intensive to be credited at earlier stages of the case, and Plaintiffs believe they had significant arguments to make in response, there was a significant risk that the Court or a factfinder could have credited them at either summary judgment or trial.  This could have led to the dismissal

of many or all statements from the case, particularly given that several were sustained at the motion to dismiss stage because the Complaint adequately alleged that Defendants were obtaining material revenues from cramming and other similar misconduct. *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 725 ("The Complaint adequately alleges that CenturyLink's statements regarding its strategies and policies were false because, in fact, cramming was widespread [and] systemic . . . and . . . Defendants knew CenturyLink's sales were materially dependent on cramming."), *id.* at 726 ("The Complaint adequately alleges that Item 303(a) of Regulation S-K required CenturyLink to disclose that its illegal sales practices were a material driver of its reported revenue . . . ."). Had that happened, Plaintiffs' recovery would have been severely reduced, if not eliminated entirely.

111. For example, Defendants challenged certain of the alleged misrepresentations as non-actionable opinions or forward-looking statements. The Court rejected those arguments at the pleading stage, including because the Complaint alleged facts suggesting that Defendants knew their statements were false or misleading. *See, e.g.*, *id.* at 728-29. However, if Defendants were able to undermine the conclusion with evidence suggesting that cramming and related misconduct was not, in fact, widespread or material at the Company, they might have been able to obtain dismissal of such statements at summary judgment or trial.

112. Similarly, Defendants argued at the motion to dismiss stage that several of the alleged false and misleading statements were mere "puffery"—statements too vague or general to have misled investors. Although the Court's motion to dismiss opinion

rejected these arguments, it specifically did so "at this stage," *see CenturyLink*, 403 F. Supp. 3d at 727, and Defendants remained free to press this "puffery" argument at summary judgment or trial. Defendants likely would have bolstered such arguments with evidence showing that financial analysts following CenturyLink did not mention many of the alleged false and misleading statements in their coverage of the Company. Had the Court or the factfinder credited Defendants' arguments, Plaintiffs would have been precluded from pursuing a recovery based on those misstatements.

113.    Further, Defendants previewed a significant "truth-on-the-market" defense in their class certification papers. Specifically, Defendants' expert, Mr. Deal, argued that allegations of cramming and billing misconduct against telecommunications companies—including CenturyLink itself—were widespread during the Class Period, and thus that investors could not have been misled by Defendants' alleged misrepresentations. *See* ECF No. 227-1 at ¶¶54-55. While Plaintiffs correctly challenged those opinions as too fact-intensive for resolution at class certification, Defendants likely would have raised them again at summary judgment or trial. Plaintiffs believe they would have been able to rebut those arguments, but there was a meaningful risk that the Court or a jury might have accepted them. If that happened, it could have rendered immaterial some or all of Defendants' alleged misrepresentations, thereby reducing or precluding any recovery for the class.

### 2.    Risks Associated With Proving Scienter

114.    Even if Plaintiffs had been able to establish falsity and materiality, they would have faced significant case-ending risk in establishing Defendants' scienter. Had

Plaintiffs failed to create triable issues on scienter at summary judgment, or to prevail on establishing scienter at trial, they would likely have faced a severe reduction or outright elimination of any recovery.

115.   As an initial matter, the Complaint alleged scienter based on several facts, including Defendants' imposition of quotas (and aborted attempt to move away from quotas to reduce cramming), the central importance of CenturyLink's consumer unit, the requirement that senior management closely monitor CenturyLink's sales practices under the obligations imposed by the settlement entered into with the Arizona Attorney General in 2016, numerous statements by former employees who described, among other things, personally reporting extensive cramming to CenturyLink senior executives, the termination of whistleblowers, executive resignations, and CenturyLink's denials of wrongdoing. *See generally* 403 F. Supp. 3d at 729-35. If, as discussed above, Defendants had been able to show that cramming and related misconduct was ***not*** actually widespread at CenturyLink, that would have severely limited the probative force of many of these scienter facts.  For example, if Defendants were able to persuade the Court or a factfinder that CenturyLink's internal data did not show significant levels of cramming, Defendants' review of that data would arguably undermine scienter, rather than support it.

116.   Indeed, Defendants would have likely pointed to numerous facts they would argue failed to support—and in some cases undermined—any inference of a culpable state of mind, a risk that was particularly acute for certain key allegations in the Complaint.  For example, the Complaint and the Court's motion to dismiss opinion addressed Plaintiffs' allegations that, in an attempt to address cramming problems at

CenturyLink, the Company shifted to a "behavioral coaching" approach to evaluating sales and customer service employees during the class period, but abandoned that approach when doing so led to sales declines. *See, e.g.*, *id.* at 733-34. Although the documentary record showed support for Plaintiffs' allegations that CenturyLink changed aspects of its evaluation of sales and customer service employees during the class period, Plaintiffs would have had to establish certain further key facts to undermine Defendants' anticipated argument that this change was in fact carried out (and reversed) for other legitimate business purposes unrelated to cramming.

117.   In addition, Defendants likely would have argued that the imposition of quotas is a commonplace tactic in sales organizations, and that it is in fact intended to maximize shareholder value by incentivizing employees to make sales.  Further, they would likely have argued that terminations are commonplace in sales organizations, and that, even if executives were aware of them, the terminations here were not so out-of-the-ordinary as to merit suspicion.  In addition, Defendants likely would have argued that the termination of Ms. Heiser, the whistleblower whose complaint sparked the initial corrective disclosure in this case, does not support scienter, including because Ms. Heiser's lawsuit alleging wrongful termination was voluntarily dismissed.

118.   Defendants would also have pointed out that, during the class period, CenturyLink had explicit rules in place prohibiting cramming, had processes in place to detect cramming and address customer complaints about cramming, disciplined and terminated employees who engaged in cramming, and refunded significant amounts of money to customers who were overbilled.

119.    In support of these arguments, Defendants would likely have pointed to the internal investigation a special committee of the Company's Board of Directors conducted in the wake of the alleged corrective disclosures in this case and the underlying evidence purportedly supporting the investigation's findings.  On August 2, 2017, after Heidi Heiser's whistleblower lawsuit and the Minnesota A.G. complaint were filed, CenturyLink announced that its Board of Directors had appointed a special committee and hired the law firm O'Melveny & Myers LLP to investigate allegations of sales misconduct and other issues implicated by those lawsuits.  Approximately four months later, on December 7, 2017, CenturyLink announced the conclusion of that investigation, which involved analysis of 9.7 million documents and 32 billion billing records, as well as interviews of more than 200 current and former CenturyLink employees.  In the announcement, CenturyLink explained that "[t]he investigation did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing" and that "[c]ompany management did not condone or encourage cramming, and the evidence did not show that cramming was common at the Company."  Ex. 10.  CenturyLink further explained: "The Company maintains specific policies and procedures that prohibit and are designed to prevent and deter cramming. When instances of cramming were found to have occurred, the Company took reasonable actions to discipline employees."  *Id.*

120.    Defendants would have argued that these facts are entirely at odds with any alleged scheme to inflate CenturyLink's financial performance or deceive investors.  Pointing to internal documents assessing customer views of the Company, Defendants

likely would have further argued that overbilling customers makes no sense because customers can and do complain publicly, the costs of responding to regulator investigations is high, and the loss of current and future customer revenues as a result of negative perceptions of CenturyLink's business practices would lead to a decline in revenues that would more than offset any revenue benefit derived from cramming. While Plaintiffs believe they had strong arguments to make and evidence to marshal in response, if the Court or a jury were to accept Defendants' scienter arguments in whole or in part, the Class's recovery could have been reduced or eliminated.

### 3. Risks Associated With Proving Loss Causation and Damages

121. Even if Plaintiffs had successfully established Defendants' material misrepresentations and scienter, they would have faced meaningful challenges in establishing loss causation and damages.

122. Defendants argued aggressively at class certification that the alleged misrepresentations in the case lacked price impact. *See In re CenturyLink*, 337 F.R.D. 193, 209-11 (D. Minn. 2020). Among other things, Defendants argued that the alleged misrepresentations were not consistently associated with price increases, and therefore that the misrepresentations did not inflate CenturyLink's stock price. *See id.* Defendants also argued that the price drop associated with the second alleged corrective disclosure was not statistically significant and that Dr. Hartzmark's use of a two-day window was inappropriate. *See id.* at 211. And Defendants reprised their argument from the motion to dismiss stage that the alleged corrective disclosures were not corrective as a matter of law because, among other things, they only reported on unproven allegations, rather than

facts correcting Defendants' alleged misrepresentations.  *See id.*  While Plaintiffs successfully opposed these arguments on grounds that they were not germane to the class certification inquiry, as the Court noted, Defendants were free to assert that they rebutted loss causation at summary judgment and trial.  If Defendants were successful in making such arguments, some or all of the alleged misrepresentations might have been removed from the case, thereby reducing or eliminating damages.

123.   Defendants were also free to reassert their "FUD" theory—the claim that the stock drops on the corrective disclosure dates here were due to "fear, uncertainty, and doubt" in the market in the wake of the Wells Fargo scandal, rather than actual revelations of fraud—which was a centerpiece of their class certification expert report. *See, e.g.*, ECF No. 227-1 ¶¶15, 23-24, 58, 108.  As noted above, Defendants would have further contrasted the more than $3 billion in fines in the Wells Fargo scandal with the consumer-related settlements here, arguing that the market clearly overreacted to the alleged (and unproven) misconduct at CenturyLink.   While Plaintiffs believe this argument was unlikely to succeed at summary judgment, they also understood it could have presented an intuitive argument that could be persuasive to a jury.

124.   In addition, Defendants argued strenuously that damages raised commonality issues under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  *See CenturyLink*, 337 F.R.D. at 212-13.  Specifically, Defendants argued that:

> [I]t will be difficult and complex to calculate damages because there are many dates with various alleged misrepresentations, there was other information provided by CenturyLink that could have influenced securities' prices, the alleged fraud increased and decreased as the scheme changed over time, the telecommunications industry underwent changes during this

time that influenced the prices of securities, there was general fear based on the Wells Fargo fraud, and the securities' prices changed over time.

*Id.* at 213.  While the Court correctly found that these issues did not implicate issues relevant to class certification, it specifically noted that Defendants were free to make these and other arguments about the accuracy of Plaintiffs' damages model at summary judgment or trial.  *See id.*  Had Defendants succeeded in challenging the accuracy of Plaintiffs' damages model at summary judgment or before the jury, they might have succeeded in severely reducing or even eliminating Plaintiffs' recovery on behalf of the Class.

125.    Defendants also argued strenuously at class certification that any class period should end after the first alleged corrective disclosure, "point[ing] to some evidence to support their claim that the thrust of the alleged fraud was revealed in the June 16 Bloomberg article."  *Id.* at 213-14.  While the Court correctly recognized that these arguments were inappropriate at the class certification stage, it explicitly noted that such arguments could properly be brought at summary judgment or trial.  *See id.* at 214. If Defendants had succeeded in truncating the class period at the first alleged corrective disclosure, it would have potentially reduced damages by more than 50%.

126.    Defendants also could have raised additional arguments beyond those previewed at class certification.  For example, Defendants would have argued that damages associated with the claims would have to be limited in light of the fact that CenturyLink settled the related consumer class action and Attorney General matters for modest sums—orders of magnitude smaller than the nine- to eleven-figure potential

liabilities discussed in the Complaint. *See* ¶158. Specifically, Defendants could have argued both that the modest consumer settlements undermine Plaintiffs' theory that there was widespread and material misconduct occurring at the Company, and also that the stock price was reacting to projections of immense liability exposure for the Company that were later proven to have been overblown. While Lead Plaintiff had strong arguments in response, there was a risk that a jury could find this argument persuasive from an economic perspective, therefore reducing or eliminating any damages.

127. Further, as noted above, Defendants could have argued that there was no loss causation because the fact of consumer complaints was known to the market years before the alleged corrective disclosures. If accepted, this argument would have reduced damages very substantially, or eliminated them entirely.

128. In addition, as to the third alleged corrective disclosure, Defendants could have argued that the fact that the *Craig* and *Thummeti* securities cases were filed prior to the third corrective disclosure undermines the notion that Plaintiffs could establish loss causation with respect to that disclosure—as investors were clearly on notice of billing misconduct by that time. While Plaintiffs had meaningful arguments in response, there was a significant risk that this argument would have at least had significant jury appeal, and therefore that the third alleged disclosure could have been removed from the case— reducing class-wide damages by a significant amount.

129. The Settlement eliminates those risks and provides a substantial and certain recovery for the Class. *See Beaver Co. Empls. Ret. Fund. v. Tile Shop Holdings, Inc.,* 2017 WL 2574005, *3 (D. Minn. June 14, 2017) ("The parties had retained highly

qualified experts whose damages assessments were at considerable variance.  Faced with the uncertainty of a jury trial, there existed the real possibility that the amount of damages the Class would actually recover would be zero or only a fraction of the damages Class Representatives contended."); *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]"); *see also, e.g.*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses.  Under such circumstances, a settlement is generally favored over continued litigation."); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *9 (S.D.N.Y. Nov. 7, 2007) ("[A] very lengthy and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results.  These risks as to liability strongly militate in favor of the Settlement.").

### 4.    Risks After Trial

130.    Even if Plaintiffs and the Class overcame all the above risks and prevailed at trial, Defendants would have appealed any judgment in Plaintiffs' and the Class's favor.  Such an appeal could have taken years, and could have been successful.  For example, in *Glickenhaus & Co. v. Household Int'l Inc.*, 787 F.3d 408 (7th Cir. 2015), a

securities fraud class action alleging a massive predatory lending scheme, the plaintiffs won a trial verdict. Defendants appealed, challenging loss causation, as well as a jury instruction about who legally "made" a statement for liability purposes. Defendants prevailed, and the Seventh Circuit set aside the judgment that plaintiffs had won.

131. Moreover, even if a judgment in Plaintiffs' favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including Plaintiffs, in an extended series of individual proceedings. That process could have taken multiple additional years, and could have severely reduced any recovery to the Class as Defendants "picked off" class members. For example, in *In re Vivendi Universal SA Securities Litigation*, the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members." 765 F. Supp. 2d 520, 583-584 (S.D.N.Y. 2011). Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

132. Thus, even if Plaintiffs and the Class prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely reduced or even eliminated any recovery—and, at minimum, could have added several years of further delay.

## V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

133.    The $55 million Settlement represents an excellent recovery for the Class. It is also a very favorable result when it is considered in relation to the range of potential recoveries that might be obtained if Plaintiffs prevailed at trial, which was far from certain for the reasons noted above.  Even assuming Plaintiffs prevailed on all liability issues, Lead Counsel believes that the maximum total damages Plaintiffs could realistically establish at trial was approximately $315 to $690 million (though, of course, if Defendants succeeded on some or all of their other loss causation and damages arguments, damages would be reduced substantially below this amount).  However, as discussed above and in Plaintiffs' motion for preliminary approval, achieving that figure would have required Plaintiffs to pitch a "perfect game" at trial by proving that Defendants made numerous material misrepresentations, with scienter, leading to damages spread over three alleged corrective disclosures.  Under such a scenario, the $55 million Settlement represents approximately 8% to 17% of the realistic maximum recoverable damages for the Class, which analysis from Cornerstone Research shows is more than twice the median recovery in cases with similar maximum damages.

134.    For these reasons, Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation.

## VI.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

135.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Notice") and the Proof of Claim and Release Form ("Claim Form") be disseminated to the Class. The Preliminary Approval Order also set a June 29, 2021 deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Class and set a final approval hearing date of July 20, 2020.

136.    In accordance with the Preliminary Approval Order, Lead Counsel instructed Epiq, the Court-approved Claims Administrator, to disseminate copies of the Notice and Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Class Members' rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to exclude themselves from the Class.  The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund and for payment of Litigation Expenses in an amount not to exceed $2,000,000, including reimbursement of the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Class.  To disseminate the Notice, Epiq obtained information from the Company and from banks, brokers, and other

nominees regarding the names and addresses of potential Class Members. *See* Declaration of Owen F. Sullivan Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Sullivan Decl."), attached as Exhibit 4, at ¶¶3-10.

137.    On April 15, 2021, Epiq sent 37,425 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Class Members and nominees by first-class mail. *See* Sullivan Decl. ¶¶4-7. Through June 14, Epiq disseminated 951,921 Notice Packets. *Id.* ¶10.

138.    On April 26, 2021, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in the *Investor's Business Daily* and to be transmitted over the *PR Newswire*. *See id.* ¶11.

139.    Lead Counsel also caused Epiq to establish a dedicated settlement website, www.CenturyLinkSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint. *See id.* ¶16.

140.    As noted above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Class, is June 29, 2021. As of June 14, 2021, 24 requests for exclusion have been received (*see* Sullivan Decl. ¶16) and there are currently no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application. Plaintiffs will file reply papers in support of final approval of the Settlement on July 13,

2021, after the deadline for submitting requests for exclusion and objections has passed, and will address all requests for exclusion and any objections received.

## VII.    PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

141.    In accordance with the Preliminary Approval Order, and as provided in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, (iv) any attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit valid Claim Forms with all required information postmarked no later than August 13, 2021.  As provided in the Notice, the Net Settlement Fund will be distributed among Class Members according to the plan of allocation approved by the Court.

142.    Plaintiffs' damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class Members who suffered losses as a result of the conduct alleged in the Complaint.

143.    The Plan of Allocation is included in the mailed Notice.  *See* Notice, attached as Exhibit A to the Sullivan Decl., at pp. 9-13.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after trial or estimates of the amounts that will be paid to Authorized Claimants under the

Settlement.  Instead, the calculations under the Plan are only a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

144.  In developing the Plan of Allocation in conjunction with Lead Counsel, Plaintiffs' damages expert calculated the estimated amount of alleged artificial inflation in the per share closing prices of CenturyLink common stock and 7.60% Notes that was allegedly proximately caused by Defendants' alleged materially false and misleading statements and omissions.  In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered price changes in CenturyLink common stock and 7.60% Notes in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes that were attributable to market or industry forces and based on assumptions related to the case provided by Lead Counsel.  *See* Notice ¶51.

145.  Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of CenturyLink common stock or 7.60% Notes during the period from March 1, 2013 through and including July 12, 2017 that is listed in the Claim Form and for which adequate documentation is provided.  *Id.* ¶¶54, 56.  The calculation of Recognized Loss Amounts will depend upon several factors, including: (a) when the shares of CenturyLink common stock or 7.60% Notes were purchased or otherwise acquired, and at what price; and (b) whether the CenturyLink common stock shares or 7.60% Notes were sold or held through the end of the Class

Period or the 90-day look-back period under the PSLRA, and if they were sold, when and for what amounts. *Id.* ¶¶54-57. In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price, whichever is less. *Id.* ¶53.

146. Claimants who purchased and sold all their shares of CenturyLink common stock or 7.60% Notes before the first corrective disclosure, or who purchased and sold all their shares between two consecutive dates on which artificial inflation was allegedly removed from the price of CenturyLink common stock or 7.60% Notes (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the securities' prices), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because any loss they suffered would not have been caused by the disclosure of the alleged fraud. *Id.* ¶¶52-53.

147. Under the Plan of Allocation, the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims. Notice ¶¶58, 66-67. Once the Claims Administrator has processed all submitted claims it will make the *pro rata* distributions to eligible Class Members, until additional re-distributions are no longer cost effective. *Id.* ¶69. At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court. *Id.*

148. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on the losses they

suffered on transactions in CenturyLink common stock or 7.60% Notes that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

149. As noted above, through June 14, 2021, 951,921 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Class Members. *See* Sullivan Decl. ¶10. To date, no objections to the proposed Plan of Allocation have been received.

## VIII. THE FEE AND EXPENSE APPLICATION

150. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees in the amount of 25% of the Settlement Fund (the "Fee Application"). Lead Counsel also requests payment for expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $878,413.33, and reimbursement of $40,763.69 to Lead Plaintiff Oregon and $21,375 to Mr. Vildosola for costs and expenses that they incurred directly related to their representation of the Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4) (collectively, the "Expense Application").

151. The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

152.    For the efforts of Plaintiffs' Counsel on behalf of the Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As discussed in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the U.S. Supreme Court and the Eighth Circuit Court of Appeals for cases of this nature.

153.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 25% fee award is well within the range of percentages awarded in securities class actions in this Circuit and elsewhere in comparable settlements, and actually amounts to a *negative* lodestar of approximately 0.77.

### 1.    Lead Plaintiff Oregon and Plaintiff Vildosola Have Authorized and Support the Fee Application

154.    Lead Plaintiff Oregon is a sophisticated institutional investor that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action.  *See* de Haan Decl. ¶8.  Oregon has evaluated the Fee Application and fully supports the fee requested, which is consistent with the fee agreement entered into by

Oregon and Lead Counsel at the outset of the litigation. *Id.* at ¶8. After the agreement to settle the Action was reached, Oregon reviewed the proposed fee and believes it is fair and reasonable in light of the outstanding result obtained for the Class, the quality of the work performed by Plaintiffs' Counsel, and the risks undertaken by counsel. *Id.* at ¶9. Oregon's endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

155.    Named Plaintiff and Class Representative Mr. Vildosola also fully supports the requested fee. Mr. Vildosola is an experienced businessman and is employed in numerous capacities, including as a consultant and advisor for Viga Energy Partners, Axios Group LLC, and Vildosola Consulting, a consulting firm that he owns and operates. *See* Vildosola Decl. ¶9. Based on his active involvement in the prosecution and settlement of this Action, Mr. Vildosola has carefully considered the requested fee and believes that it is fair and reasonable in light of the work Plaintiffs' Counsel performed on behalf of the Class. *Id.* at ¶6.

## 2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel

156.    As defined above, Plaintiffs' Counsel are the Court-appointed Lead Counsel Bernstein Litowitz and Stoll Berne, as well as Motley Rice, additional counsel for the Class, Lockridge Grindal, which is liaison counsel for Plaintiffs in the District of Minnesota, and NZS&S, which served as liaison counsel for Lead Plaintiff while the Action was pending in the United States District Court for the Western District of Louisiana.

157.   As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included, among other things: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly-available information from SEC filings, analyst reports, conference call transcripts, press releases, news articles, CenturyLink's corporate website, and other publicly available sources of information concerning CenturyLink, as well as interviews with former CenturyLink employees and consultations with experts in financial economics and telecommunications; (ii) drafting and filing the detailed amended complaint asserting violations of the Exchange Act against Defendants; (iii) successfully defeating Defendants' motion to dismiss the Complaint through extensive briefing; (iv) obtaining certification of the Class, which involved submitting an expert report on market efficiency and the availability of class-wide damages methodologies, defending the depositions of Plaintiffs' representatives and expert, deposing Defendants' expert, and submitting a rebuttal expert report; (v) defeating Defendants' Rule 23(f) petition before the Eighth Circuit; (vii) undertaking substantial fact and expert discovery efforts, including producing over 543,000 pages of Plaintiffs' documents to Defendants in response to their requests, drafting and serving extensive discovery requests on Defendants and document subpoenas upon numerous third parties, serving interrogatories and litigating discovery disputes, and reviewing and analyzing approximately 2.5 million pages of documents produced by Defendants and third parties; (vii) consulting extensively throughout the litigation with experts regarding loss causation, damages, and telecommunications-industry issues that were central to this Action; (viii) engaging in

extensive, arm's-length settlement negotiations to achieve the Settlement, including an all-day, in person mediation session and several subsequent negotiations; and (ix) drafting and negotiating the Settlement Stipulation and related settlement documentation.

158.    Throughout the litigation, we maintained control of and monitored the work performed by other lawyers at Bernstein Litowitz and Stoll Berne on this case. Specifically, most of the major tasks in the case—drafting sections of each pleading, motion, or discovery request or response, negotiating particular discovery issues with Defendants or third parties—were handled primarily by us with the assistance of the other lawyers on the team.    We personally handled client communications, strategy meetings, and were involved in all aspects of the settlement process.    More junior attorneys and paralegals worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of the Action.

159.    Attached hereto as Exhibits 5A, 5B, 5C, 5D, and 5E, respectively, are our declarations on behalf of Bernstein Litowitz and Stoll Berne, and the declaration of Gregg M. Fishbein on behalf of Lockridge Grindal, the declaration of Gregg Levin on behalf of Motley Rice, and the declaration of George Snelling, IV on behalf of NZS&S, in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations").    Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred (if any), delineated by category.    The Fee and Expense Declarations

indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court. The first page of Exhibit 5 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiffs' Counsel firm, and gives totals for the numbers provided.

160.    As set forth in Exhibit 5, Plaintiffs' Counsel expended a total of 39,043.30 hours in the investigation, prosecution, and resolution of this Action through November 19, 2020. The resulting lodestar is $17,923,589.75. The vast majority of the total lodestar—$16,396,312.75, or approximately 92%—was incurred by Lead Counsel. Lead Counsel has and will continue to invest substantial time and effort in this case after the November 19, 2020 cut-off imposed for their lodestar submissions on this application, including by overseeing the distribution of funds to eligible claimants.

161.    If the Court awards Plaintiffs' Counsel's Litigation Expenses, the requested fee of 25% of the Settlement Fund represents $13,750,000 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 0.77 on Plaintiffs' Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier is well below the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency-fee risk, in this Circuit and elsewhere.

### 3. The Experience and Standing of Lead Counsel

162. As demonstrated by Bernstein Litowitz's firm résumé attached as Exhibit 5A-3 hereto, Bernstein Litowitz is one of the most experienced and skilled law firms in the securities-litigation field, with a long and successful track record representing investors in cases of this kind, and consistently ranked among the top plaintiffs' firms in the country. As reflected in its firm résumé, Bernstein Litowitz served as Lead Counsel in *In re WorldCom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.), in which settlements were obtained for the class totaling in excess of $6 billion. Bernstein Litowitz also secured a resolution of $2.43 billion for the class in *In re Bank of America Corp. Securities, Derivative & ERISA Litigation*, No. 09-md-2058 (S.D.N.Y.), a $1.06 billion recovery for the class in *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, No. 05-cv-1151 (D.N.J.), and a $730 million settlement on behalf of the class in *In re Citigroup Inc. Bond Action Litigation*, No. 08-cv-9522 (S.D.N.Y.).

163. Courts in this District and Circuit have recognized Bernstein Litowitz as adequate and qualified class counsel in securities class actions in certifying Bernstein Litowitz as Class Counsel and approving settlements in securities class actions and shareholder derivative actions the firm has prosecuted. Such examples include *Minneapolis Firefighters' Relief Assoc. v. Medtronic, Inc.*, No. 08-cv-6324(PAM/AJB) (D. Minn.) (recovering $85 million for investors), *In re UnitedHealth Group Inc. Shareholder Derivative Litigation*, No. 06-cv-1216(JMR/FLN) (D. Minn.) (recovering over $920 million), and *Sanchez v. Centene Corp.*, No. 17-cv-806-AG (E.D. Mo.) (recovering $7.5 million).

164.    Courts have also recognized Bernstein Litowitz's advocacy.  For example,

in *In re Clarent Corp. Securities Litigation*, No. 01-cv-3361-CRB (N.D. Cal.), one of the

few securities class actions that have been tried to a jury since the passage of the PSLRA,

the court described Bernstein Litowitz's trial presentation as exhibiting "great civility and

the highest professional ethics."  Transcript of Jury Trial - Vol. 17 at 2611:19-20, *In re*

*Clarent Corp. Sec. Litig.*, Master Case No. C 01-3361 (N.D. Cal. Feb. 17, 2005) (Breyer,

J.).  Another court has noted that Bernstein Litowitz takes its "responsibilities to the court

very seriously" (Transcript of Fairness Hearing at 26:22-23, *In re Openwave Systems Sec.*

*Litig.*, No. 07-cv-1309 (DLC) (S.D.N.Y. Feb. 27, 2009)); and another described its

advocacy as being performed "at every juncture with integrity and competence" (*In re*

*WorldCom, Inc. Sec. Litig.*, 2004 WL 2591402, *17 (S.D.N.Y. Nov. 12, 2004)).[10]

165.    Similarly, as demonstrated by the Stoll Berne firm résumé attached as

Exhibit 5B-3 hereto, Stoll Berne has extensive experience prosecuting securities class

actions, including litigating such cases to trial.  Stoll Berne won an $88 million jury

---

[10] Attached hereto as Exhibit 7 is a copy of an order in an unrelated action where Bernstein Litowitz has been serving as Lead Counsel for Lead Plaintiff SEB Investment Management AB, and Class Counsel for the certified Class.  *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).  As reflected in the order, counsel for an unsuccessful lead plaintiff movant raised questions about Bernstein Litowitz's hiring of a former employee of the Lead Plaintiff.  Following discovery and extensive briefing, the court found that the evidence did not establish a *quid pro quo*, and allowed Bernstein Litowitz to continue as Class Counsel.  *See id.* at *1-2.  The court nevertheless ordered Bernstein Litowitz to bring the order to the attention of any court in which Bernstein Litowitz seeks appointment as class counsel, and also to the decisionmaker for the proposed lead plaintiff who is selecting class counsel.  *See id.* at *2.  Bernstein Litowitz provided the order to Oregon and Mr. Vildosola and discussed its

verdict as co-lead counsel in *In re Melridge, Inc. Securities Litigation*, 87-1426-FR (D. Or. 1988), and has obtained significant settlements as lead or co-lead counsel in a number of other securities class actions, including: *Ciuffitelli v. Deloitte & Touche LLP* (D. Or. 2016) (recovering $234.6 million for investors); *In re Assisted Living Concepts, Inc. Securities Litigation* (D. Or. 1999) (recovering $43.5 million for investors); *In re Louisiana-Pacific Corp. Securities Litigation* (D. Or. 1995) (recovering $65.1 million for investors); *Flecker v. Hollywood Entertainment Corp.* (D. Or. 1995) (recovering $15 million for investors); and *In re Southern Pacific Funding Corp. Securities Litigation* (recovering $19.5 million for investors).

166. Working together, Bernstein Litowitz and Stoll Berne have represented Oregon in several complex securities actions and achieved significant recoveries for investors. *See, e.g.*, *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, No. 12-md-2335 (S.D.N.Y.) (recovering $180 million for investors); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12-cv-3852 (S.D.N.Y.) (recovering $150 million for investors).

167. Stoll Berne also has represented Oregon in individual securities litigation since at least 1999. The firm has extensive familiarity with the staff who manages the Oregon Public Employee Retirement Fund ("OPERF") as well as the outside investment managers, consultants, custodians and related third-parties that have a role in investing and protecting OPERF's funds. This experience benefited Lead Counsel's prosecution of this Action.

---

content and circumstances with them. Both Oregon and Mr. Vildosola have considered

168.    Further, Bernstein Litowitz and Stoll Berne have each taken complex cases like this to trial, and are among the few firms with experience doing so. We believe that this willingness and ability to take cases to trial added valuable leverage during the settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

169.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Cooley LLP, one of the country's most prestigious and experienced defense firms, which vigorously represented its clients. Defendants were also represented by esteemed local counsel from Winthrop & Weinstine, P.A and Blackwell Burke P.A. In the face of this experienced, formidable, and well-financed opposition from top defense firms, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are highly favorable to the Class.

### 5.    The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

170.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

---

the order and reaffirm their endorsement of the settlement and proposed fee request.

171.    From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and have incurred over $878,000 in expenses in prosecuting the Action for the benefit of the Class.

172.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.    Despite the most vigorous and competent efforts, success in contingent-fee litigation like this is never assured.

173.    Further, Lead Counsel undertook the risk of prosecuting this case knowing that, even if a settlement were to be achieved, Lead Counsel might not be compensated for even the fair value of their time.  Indeed, here, the requested fee amounts to a *negative* lodestar (i.e., a lodestar smaller than 1).  In effect, that means that Lead Counsel are receiving a smaller fee on a per-hour basis than the going rate for non-contingency work of similar sophistication in their home markets.

174.     Lead Counsel knows from experience that the commencement and prosecution of a class action do not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

175.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

176.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.  In these circumstances and in consideration of the hard work and the excellent result achieved, I believe that the requested fee is reasonable and should be approved.

### 6.     The Reaction of the Class to the Fee Application

177.     As stated above, through June 14, 2021, more than 950,000 Notice Packets had been mailed to potential Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement

Fund.  *See* Sullivan Decl. ¶10.  In addition, the Court-approved Summary Notice was published in April 26, 2021.  *Id.* ¶11.  To date, no objections to the request for attorneys' fees have been received.  Should any objections be submitted, they will be addressed in Lead Counsel's reply papers to be filed on July 13, 2021, after the deadline for submitting objections has passed.

178.   In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.  Based on the outstanding result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 25% of the Settlement Fund, resulting in a lodestar multiplier of approximately 0.77 is fair and reasonable, and is supported by the fee awards that courts have granted in other comparable cases.

### B.    The Litigation-Expense Application

179.   Lead Counsel also seeks payment from the Settlement Fund of $878,413.33 in litigation expenses that were reasonably incurred by Plaintiffs' Counsel in commencing, litigating, and settling the claims asserted in the Action.

180.   From the outset of the Action, Plaintiffs' Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute

the Action. Consequently, counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

181.    As shown in Exhibit 5 hereto, Plaintiffs' Counsel have incurred a total of $878,413.33 in Litigation Expenses in prosecuting the Action. The expenses are summarized in Exhibit 6, which identifies each category of expense, *e.g.*, expert fees, online research, mediation fees, document management costs, and travel expenses, and, and the amount incurred for each category. These expense items are incurred separately by Plaintiffs' Counsel, and these charges are not duplicated in counsel's hourly rates.

182.    Of the total amount of Plaintiffs' Counsel's expenses, $534,996.41, or approximately 61%, was incurred for the retention of experts. As noted above, Lead Counsel consulted with economics experts during its investigation and the preparation of the amended complaints and Plaintiffs' class certification motion, with economics, damages, and telecommunications-industry experts during discovery, and consulted further with its damages expert during the settlement negotiations with Defendants and the development of the proposed Plan of Allocation.

183.    Another significant expenditure in this Action was for online legal and factual research, which was necessary to (among other things) prepare the amended complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss, brief and obtain class certification and prevail on Defendants' Rule 23(f) petition, and to litigate discovery disputes. The charges for online

research amounted to $197,597.46, or approximately 22% of the total amount of expenses.

184.   The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely passed on to clients billed by the hour.  These expenses include, among others, mediation costs, document management, costs of out-of-town travel, service of process expenses, court reporting, copying costs, and postage and delivery expenses.

185.   All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by Oregon and Mr. Vildosola.  *See* de Haan Decl. ¶10; Vildosola Decl. ¶7.

186.   Additionally, Oregon and Mr. Vildosola seek reimbursement of the reasonable costs and expenses that they incurred directly in connection with their representation of the Class.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum.  As set forth in the de Haan Declaration, attached hereto as Exhibit 2, Oregon seeks reimbursement of $40,763.69 for its time and expenses in connection with the Action, and as set forth in the Vildosola Decl., attached hereto as Exhibit 3, Mr. Vildosola seeks reimbursement of $21,375.00 for his time expended on this litigation.

187.   Among other things, representatives of Oregon and Mr. Vildosola spent a substantial amount of time communicating with Lead Counsel concerning strategy; reviewing and commenting on pleadings and motion papers filed in the Action; gathering and producing documents in response to discovery requests; preparing for their own

depositions and being deposed by Defendants; in the case of Mr. de Haan, preparing for, traveling to, and attending the mediation session in California before Judge Phillips; and evaluating and approving the proposed Settlement.  *See* de Haan Decl. ¶¶11-15; Vildosola Decl. ¶¶8-9.

188.    The Notice informed potential Class Members that Lead Counsel would be seeking payment of Litigation Expenses in an amount not to exceed $2,000,000, which might include an application for the reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Class.  Notice ¶¶5, 72.  The total amount requested, $940,552.02, which includes $878,413.33 for expenses incurred by Plaintiffs' Counsel, $40,763.69 for costs and expenses incurred by Oregon, and $21,375.00 for costs and expenses incurred by Mr. Vildosola, is significantly below the $2,000,000 that Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

189.    The expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be paid in full from the Settlement Fund.

190.    Attached to this declaration are true and correct copies of the following documents previously cited in this declaration:

Exhibit 1:    Declaration of Layn R. Phillips in support of Motion for Final Approval of Class Action Settlement, dated June 14, 2021.

Exhibit 2:      Declaration of Brian de Haan, Senior Assistant Attorney General for the Oregon Department of Justice, on behalf of the State of Oregon, in support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and (II) Lead Counsel's Motion for an Award of Attorney's Fees and Litigation Expenses, dated June 14, 2021.

Exhibit 3:      Declaration of Fernando Alberto Vildosola, as Trustee for The Aufv Trust U/A/D 02/19/2009, in Support of: (A) Plaintiffs' Motion for Final Approval of Class Action Settlement and Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, dated June 14, 2021.

Exhibit 4:      Declaration of Owen F. Sullivan regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date, dated June 15, 2021.

Exhibit 5:      Summary Chart of Plaintiffs' Counsel's Lodestar and Expenses.

Exhibit 5A      Declaration of Michael D. Blatchley in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP, dated June 15, 2021.

Exhibit 5B      Declaration of Keil M. Mueller in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, Filed on Behalf of Stoll Stoll Berne Lokting & Shlachter P.C., dated June 15, 2021.

Exhibit 5C      Declaration of Gregg M. Fishbein in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, Filed on Behalf of Lockridge Grindal Nauen P.L.L.P., dated June 14, 2021.

Exhibit 5D      Declaration of Gregg Levin in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses Filed on Behalf of Motley Rice LLC, dated June 4, 2021.

| Exhibit 5E | Declaration of George Snelling, IV in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, Filed on Behalf of Nelson, Zentner, Sartor & Snellings, LLC, dated June 15, 2021. |
| Exhibit 6: | Breakdown of Plaintiffs' Counsel's Expenses by Category. |
| Exhibit 7: | Order re Conflict Dispute dated April 20, 2021, *SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 (N.D. Cal.). |
| Exhibit 8: | Cornerstone Research Report titled "*Securities Class Action Filings 2019 Year In Review.*" |
| Exhibit 9: | NERA Economic Consulting Report titled "*Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review,*" dated January 25, 2021. |
| Exhibit 10: | Press Release titled "CenturyLink announces conclusion of Special Committee investigation," dated December 7, 2017. |
| Exhibit 11: | Cornerstone Research Report titled "*Securities Class Action Settlements, 2020 Review and Analysis.*" |

## IX.    CONCLUSION

191.    For all the reasons discussed above, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the requests for payment of Plaintiffs' Counsel's expenses in the amount of $878,413.33, $40,763.69 for reimbursement of Oregon's costs and expenses, and $21,375.00 for reimbursement of Mr. Vildosola's costs and expenses, should also be approved.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief, this 15th day of June, 2021.

*Michael D. Blatchley*
_____
Michael D. Blatchley

*Keil M. Mueller*
_____
Keil M. Mueller